UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| ANUCHA BROWNE SANDERS, | 06 Civ. 00589 (GEL) |
| Plaintiff, | AMENDED COMPLAINT |
| - against - | ECF CASE |
| MADISON SQUARE GARDEN, L.P., ISIAH LORD THOMAS III AND JAMES L. DOLAN, | PLAINTIFF DEMANDS A TRIAL BY JURY |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RECEIVED JUL 25 2006 U.S.D.C. S.D.N.Y. CASHIERS

Plaintiff Anucha Browne Sanders ("Browne Sanders" or "plaintiff"), by her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complaining of defendants Madison Square Garden, L.P. ("MSG"), Isiah Lord Thomas III ("Thomas") and James L. Dolan ("Dolan") (collectively, "defendants"), alleges as follows:

### NATURE OF CLAIMS

1.  Browne Sanders is one of the most accomplished and highly-regarded women in professional sports. Based on her hard work and achievements, she became the second highest-ranking official for the New York Knickerbockers ("Knicks") and was responsible for all of the Knicks' business operations. Browne Sanders' career proceeded without impediment until December 2003 when MSG hired Isiah Thomas as President, Basketball Operations. Contrary to Thomas' carefully cultivated public persona, he is capable of abhorrent behavior in private. Soon after his hire, he began to sexually harass Browne Sanders, including calling her "bitch" and "ho" to her face. His hostility toward Browne Sanders went on for months, and he took pains to marginalize Browne Sanders and to prevent her from doing her job.

234650 v2

2.  Once Thomas realized that Browne Sanders was not going to recede in the face of Thomas' gender-based hostility, he took a new approach. He began to make sexual advances to Browne Sanders, repeatedly professing his love for her, making comments about her physical appearance, and suggesting that they go "offsite" together, a thinly veiled solicitation for sex. When Browne Sanders proved unreceptive to Thomas' advances, he continued to undermine her within the organization by, among other things, making derogatory remarks about her to the Knicks players, whose cooperation Browne Sanders needed to perform her marketing duties. The situation deteriorated to the point where Stephon Marbury ("Marbury"), the Knicks' star player, felt free to refer to Browne Sanders as a "black bitch" to other employees of the organization.

3.  Browne Sanders repeatedly complained about Thomas' conduct to her supervisor and others within the organization, but nothing was done to rein in Thomas. Left with no reasonable alternative, Browne Sanders engaged an attorney to press her complaints of harassment and discrimination again. That action finally led MSG to "investigate" Browne Sanders' claims. It also prompted immediate retaliation. As the investigation commenced, Browne Sanders was forced to take an unwanted "vacation," and was not permitted to come to work. Unbelievably, at the conclusion of the investigation, MSG's counsel informed plaintiff's counsel that Browne Sanders' claims were "not supported" <u>and that she was being fired, effective immediately</u>.

4.  Having not the faintest trace of a legitimate reason to dismiss Browne Sanders, who has always been a star performer, MSG has asserted, among other things, that her employment was being terminated because she had poor interactions with senior management, the very people who had either harassed Browne Sanders or who had allowed the harassment to

continue unchecked, and because she would not accept purported organizational changes instituted by Thomas. The reality, of course, is that Browne Sanders was discharged in retaliation for her complaints of discrimination. The retaliatory decision to fire Browne Sanders was made by Dolan, among others. Thomas assisted that decision by falsely and with retaliatory animus stating to MSG that Browne Sanders would not accept his managerial changes. In firing Browne Sanders, defendants flouted the anti-discrimination laws to a degree rarely seen in the contemporary workplace.

5. This diversity proceeding is brought to remedy discrimination on the basis of sex in the terms and conditions of employment and retaliation for opposition to unlawful employment practices, in violation of the New York State Human Rights Law, New York Executive Law § 296 et seq. (the "Executive Law"); and the Administrative Code of the City of New York § 8-107 et seq. (the "Administrative Code"). Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief pursuant to the Executive Law and the Administrative Code.

PARTIES, JURISDICTION AND VENUE

6. Plaintiff is a citizen of New Jersey. Until recently, plaintiff was employed by defendant MSG as a senior executive in the front office of the Knicks, a National Basketball Association ("NBA") franchise owned by MSG.

7. Defendant MSG is a limited partnership organized under the laws of the State of Delaware with headquarters in New York. On information and belief, MSG is wholly-owned by Rainbow Media Holdings, LLC ("Rainbow Media"), a limited liability company organized under the laws of the State of Delaware with headquarters in New York. Rainbow Media, in turn, is a

wholly-owned subsidiary of Cablevision Systems Corporation ("Cablevision"), which is incorporated under the laws of the State of Delaware with headquarters in New York.

8. Defendant Thomas is employed by MSG as the President, Basketball Operations and Head Coach of the Knicks. On information and belief, he is a citizen of the State of New York.

9. Defendant Dolan is the Chairman of MSG, as well as the President and Chief Executive Officer of Cablevision. On information and belief, he is a citizen of the State of New York. Dolan has a substantial ownership interest in Cablevision and MSG.

10. Jurisdiction of this Court is proper under 28 U.S.C. § 1332(a)(1), because the plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000.

11. As the Southern District of New York is the district where a substantial part of the events giving rise to the claim occurred, venue is proper within this District pursuant to 28 U.S.C. § 1391(a)(2). Pursuant to § 8-502(c) of the City Law, prior to filing the Amended Complaint, plaintiff will serve a copy of the Amended Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

12. Plaintiff has filed a charge of discrimination with the United States Equal Opportunity Employment Commission (the "EEOC"). When plaintiff receives a Right to Sue Notice, she will seek to amend the Complaint to add claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). The facts set forth are those relevant to that claim as well, and therefore, there will be no prejudice to defendants by this procedure.

## FACTUAL ALLEGATIONS

A. <u>Browne Sanders' Background and Employment With the Knicks</u>

12. Browne Sanders received a B.S. from Northwestern University in 1985. While at Northwestern, Browne Sanders was a standout college basketball player. She won a place on both the United States National Basketball Team and the Big Ten All Decade Team, was an NCAA National Scoring Champion, and was also a Women's Sports Foundation Kodak All-American. Following her graduation from Northwestern, Browne Sanders was awarded a two-year fellowship to Florida State University, where she earned a Masters of Science in communications.

13. After receiving her master's degree, Browne Sanders began a successful business career, working first at Eastman Kodak and later at IBM. While at Kodak, Browne Sanders assisted in coordinating and promoting Kodak's Harlem Week sports program, and while at IBM, she worked on web-based marketing for the Olympic Games. Browne Sanders was ultimately promoted at IBM to the position of Program Manager, World Wide Sports Office – Corporate Marketing, where she was responsible for corporate marketing support programs for IBM's sponsorship of the Olympics.

14. Browne Sanders began working for MSG in 2000 as the Knicks' Vice President of Marketing. Her first two years of working with the team were marked by success and glowing personnel reviews.

15. In the spring of 2002, Browne Sanders was promoted to Senior Vice President, Marketing and Business Operations. In that role, Browne Sanders reported to Steve Mills ("Mills"), President and Chief Operating Officer of MSG. She also had a dotted line reporting relationship to the President of Basketball Operations for the Knicks. Soon after Browne

Sanders' promotion, she was named to the Sports Business Journal's prestigious "Forty Under Forty" list, which honors the top forty professionals in sports under the age of forty.

16. As Senior Vice President, Marketing and Business Operations, Browne Sanders was responsible for the day-to-day management of the business side of the Knicks' front office; she served as the team's chief marketing officer; and she acted as the primary liaison between the Knicks and the NBA. Browne Sanders also oversaw all of the Knicks' business activities and revenue streams, including partnerships, ticketing, fan development, field marketing, event presentation, community relations, special events and new media. In addition, Browne Sanders supervised thirty people, and was a mentor to many female employees. Browne Sanders was the only female member of the Knicks' senior management team.

17. Following her promotion in 2002, Browne Sanders continued to enjoy professional success and received praise for her performance. In her performance reviews for 2002 and 2003 she received an overall rating of "5," the highest ranking on a 1 to 5 scale.

B. Thomas Begins to Harass and Discriminate Against Browne Sanders

18. On or about December 22, 2003, Thomas was named President of Basketball Operations for the Knicks.

19. On or about March 8, 2004, the Knicks held a community-relations event, which was organized by Browne Sanders and attended by the Knicks' players. After the event, the players went out to celebrate Marbury's birthday and, upon information and belief, stayed out very late.

20. On or about March 9, 2004, the Knicks played a game and lost. After the game ended, in the Knicks' locker room, Thomas announced that the players would no longer be required to do any community events. Soon after his announcement, Thomas grabbed Browne

Sanders' arm and pulled her into a small room to the side of the team's locker room. He yelled that the team was not going to do "any more f--king events." Browne Sanders calmly told Thomas that the league required the Knicks to do community events, and that he should discuss his concerns with Mills. Thomas continued to scream at Browne Sanders, calling her a "f--king bitch," among other things. He eventually stormed out of the room.

21. At Browne Sanders' next weekly meeting with Mills, Browne Sanders told Mills about Thomas' post-game outburst, as well as his announcement that the Knicks would no longer be doing community service events. Mills did not respond.

22. On March 23, 2004, Frank Murphy ("Murphy"), then Senior Vice President of Basketball Operations and Thomas' Chief of Staff, appeared in Browne Sanders' office, stood over her desk, and began screaming at her. Among other things, Murphy told Browne Sanders that she was a "bitch."

23. After Murphy left her office, Browne Sanders called Thomas and described Murphy's statements. Thomas immediately began to berate her, calling her a "bitch" and a "ho," among other expletives. Thomas demanded to know what Browne Sanders' job responsibilities were. As they continued to discuss Browne Sanders' job functions, Thomas continued to curse at her and refer to her by sexist and demeaning terms.

24. The next day, Mills asked Browne Sanders to attend a meeting. When Browne Sanders arrived, Mills and Thomas were already present in Mills' office. During the meeting, Browne Sanders described her roles and responsibilities to Thomas, and Mills corroborated her description. At one point during the meeting, Mills stepped out of his office. Thomas immediately resumed cursing at Browne Sanders. Once Mills returned, Thomas stopped. Thomas instructed Browne Sanders and Mills that he did not want Browne Sanders to talk to his

staff or the players. He told Browne Sanders that she should go through Murphy when she needed to contact the team.

25. After Thomas left the room, Browne Sanders told Mills what had happened when Mills had been absent. Mills neither apologized nor said that he would chastise Thomas. Browne Sanders asked what she should do when Thomas spoke inappropriately to her; Mills said that she was doing what she was supposed to be doing. Browne Sanders asked how she could do her job if she could not speak to Thomas' staff or the Knicks; Mills told her to accommodate Thomas.

26. Shortly after the meeting, Browne Sanders sent an e-mail message to Murphy, copying Mills and Thomas, telling Murphy that he could not threaten her and swear at her. Mills told her not to send those types of e-mail messages.

27. Throughout the late spring and summer of 2004, Thomas refused to be involved in sales-related activities that were Browne Sanders' responsibility. Moreover, for almost the entire balance of 2004, Thomas acted in a very hostile manner towards Browne Sanders on nearly every occasion that the two interacted.

28. On information and belief, Thomas told members of his basketball operations staff that Browne Sanders was a "bitch," and further stated, referring to Browne Sanders, that they did not have to take direction from "that bitch."

C.  Thomas Begins To Make Sexual Advances to Browne Sanders

29. On or about December 29, 2004, Thomas' behavior toward Browne Sanders significantly changed. Rather than continue to address Browne Sanders in a hostile and abusive manner, Thomas began to approach Browne Sanders with sexual overtures. After the Knicks game on or about December 29, 2004, Thomas stopped Browne Sanders, hugged her tightly, and

said that he had determined why he and Browne Sanders "had problems" with one another. Thomas told Browne Sanders that he was "in love" with her, and said that they were "so much alike." Thomas compared his feelings to the movie "Love and Basketball."

30. Shortly thereafter, Browne Sanders told Mills that Thomas had become even more inappropriate in his interactions with her, and that he should be given sexual harassment training. Mills did not respond.

31. After December 30, 2004, Thomas regularly told Browne Sanders that he was in love with her or made comments to that effect. On each occasion, Browne Sanders made clear to Thomas that his advances were unwelcome. Examples of Thomas' inappropriate, harassing and unwelcome conduct towards Browne Sanders in 2005 include the following:

(a) Thomas asked Browne Sanders on more than one occasion if she would meet with him outside of the office or "offsite." Browne Sanders understood these requests as sexual advances, which she refused. Browne Sanders told Mills about Thomas' requests on at least one occasion, and also told Mills that she had refused to meet him offsite because she was uncomfortable with him.

(b) On or about March 14, 2005, Thomas told Browne Sanders that he was "very attracted" to her and "in love" with her. He pointed to a scar above Browne Sanders' right eye and compared it to a similar scar that he had above his eye. Thomas then repeated that he was in love with her and said, "I know you think I'm inappropriate but I'm in love with you." Browne Sanders said that Thomas was ridiculous and inappropriate and walked away.

(c)    On October 30, 2005, while Browne Sanders was watching the team practice, Thomas told Browne Sanders that if she "stayed close to him" he would make her "a lot of money."

(d)    On or about December 15, 2005, Thomas approached Browne Sanders and hugged her and tried to kiss her. Browne Sanders pulled away and Thomas said, "What, I can't get any love from you today?" Browne Sanders walked away without saying anything.

32.    On May 11, 2005, and June 13, 2005, Browne Sanders met with a human resources management consultant hired by MSG. The consultant told Browne Sanders that Mills had asked him to develop a program for Thomas because he had problems with women. Browne Sanders told the consultant in detail about Thomas' harassing and discriminatory conduct. On information and belief, MSG took no action to remedy the problems that Browne Sanders raised with the consultant.

D.    Other Inappropriate and Sexist Conduct By Thomas

33.    On or about October 14, 2004, before a game, a female employee of the Knicks told Browne Sanders that Thomas had instructed her to flirt with certain men connected to the game and to make them happy. Browne Sanders had a follow up conversation with the female employee the following day.

34.    On or about October 18, 2004, Browne Sanders met with Mills and told him about her conversations with the female employee. Browne Sanders told Mills that Thomas was putting the organization in a bad position. Browne Sanders also told Mills, among other things, that the female employee could accuse Thomas of sexual harassment.

35. In a meeting with Thomas in early 2005, Thomas told Browne Sanders that he was pushing to get more Sunday noon games on the schedule. Thomas said that he was working with the concierges of the hotels frequented by the visiting teams to have the concierges direct players to certain nightclubs -- including strip clubs -- that Thomas had established relationships with. Thomas said that his plan was to induce visiting players to go to these clubs on Saturday night, and get them intoxicated so that they would not be prepared to play on Sunday. Browne Sanders was incredulous that Thomas' "basketball strategy" included getting opposing teams drunk at strip clubs.

E.   Defendants Undermine Browne Sanders' Ability to Do Her Job

36. In the fall of 2004, Mills told Browne Sanders that Dolan said she needed to create new jobs for two of Marbury's cousins, Hassan Gonsalves ("Gonsalves") and Tasheem Ward ("Ward"). After reviewing their resumes and interviewing both men, Browne Sanders recognized that they were completely unqualified. On or about November 10, 2004, Browne Sanders told Mills about the problems with Gonsalves and Ward, but Mills told her that she needed to create jobs for them anyway and that they needed to be on staff by the following Monday, November 15.

37. This was not the first occasion that Dolan had insisted the she hire someone unqualified. Previously, Dolan had required that Browne Sanders create a position within her team for Vernon Manuel ("Manuel"), who had worked as Dolan's landscaper, dated Dolan's daughter, and was not qualified to work with the Knicks. While employed by MSG, Manuel forged his manager's signature on multiple occasions, stole from the company, and acted in a hostile and aggressive manner with many women on the staff, including Browne Sanders.

38. On information and belief, the male senior managers within the Knicks organization were not required to hire unqualified individuals such as Gonsalves, Ward and Manual.

39. Gonsalves was ultimately fired by MSG, at Browne Sanders' urging, because he engaged in repeated and flagrant sexual harassment. His firing did not occur, however, until he had sexually harassed several women on the staff and had on numerous occasions defrauded the company. That conduct would not have occurred if MSG had accepted Browne Sanders' determination that Gonsalves should not have been hired.

40. In March 2005, Browne Sanders received her most recent performance evaluation from Mills. While the evaluation was still strong, Browne Sanders received a 4 out of 5. The only substantive criticism in the review was that Browne Sanders needed to do a better job "maintaining relationships," which, on information and belief, referred to plaintiff's relationship with Thomas. Browne Sanders had difficulty "maintaining a relationship" with Thomas because he had repeatedly sexually harassed her and verbally berated her, as Mills well knew.

41. On information and belief, because Browne Sanders rejected Thomas' sexual advances, he continued to undermine her ability to do her job.

42. For example, in a meeting in early 2005, Mills confirmed to Browne Sanders that the players were not cooperating with her marketing efforts because of Thomas. Indeed, the current marketing campaign promoting the Knicks features cardboard cut-outs of the Knicks players because Thomas has generally refused to make the players available to Browne Sanders' team for marketing purposes. By contrast, the marketing campaign for the New York Rangers, another MSG-owned franchise, utilizes approximately seventeen players in its current marketing campaign.

43. On information and belief, Thomas has made negative comments about Browne Sanders to Marbury. On or about November 28, 2005, Browne Sanders was told by a member of her staff that Marbury had made numerous hostile and sexist comments about her to others in the organization. Among the things that Marbury has said concerning Browne Sanders are the following:

(a) "No one likes that black bitch"

(b) "F--k that black bitch, she thinks she runs the Knicks, she don't run shit"

(c) "F--k that black bitch, she ain't shit and we'll see what happens this year"

44. On or about November 29, 2005, Browne Sanders met with Mills. Browne Sanders told Mills about Marbury's statements, and also said that she regarded the comments as personally threatening. Mills said that that Marbury's hostility was based on things that Thomas was saying to Marbury about Browne Sanders. Browne Sanders said that she had enough of Thomas' harassment.

45. Shortly after their meeting, Mills called Browne Sanders and said, in substance, that if Browne Sanders persisted in raising harassment claims, she should be prepared for Thomas to spread a damaging and false rumor about Browne Sanders. In response, Browne Sanders asked whether she should retain an employment lawyer; Mills said that she should not do so.

F. Browne Sanders Retains Counsel and Is Subject to Retaliation

46. After her meeting and subsequent telephone call with Mills, and in light of Thomas' continuing harassment and Marbury's comments, Browne Sanders determined that she needed to engage an attorney to protect herself against further harassment and discrimination.

234650 v2

13

47. On or about December 22, 2005, Browne Sanders' counsel informed MSG's counsel about the harassment and discrimination that Browne Sanders had experienced. This was not the first time that MSG learned the information that Browne Sanders' counsel had conveyed. Browne Sanders had previously told Mills, her direct supervisor, about much of the harassment that she was subjected to during various meeting in 2004 and 2005. In addition, Browne Sanders had described Thomas' harassing and discriminatory conduct to the human resources consultant hired by MSG.

48. Once Browne Sanders raised her complaints through counsel, MSG purported to undertake an investigation of Browne Sanders' claims. Browne Sanders fully cooperated with MSG's investigation.

49. Soon after Browne Sanders raised her complaints through counsel, MSG prohibited her from coming to her office or to Madison Square Garden. Browne Sanders protested, both directly and through counsel, that MSG's decision to force her out of work was retaliatory. Nevertheless, Browne Sanders was not permitted to return to work while the investigation was pending. On information and belief, the individuals Browne Sanders had accused of harassment, including Thomas, were permitted to continue to work throughout MSG's investigation.

50. On January 19, 2006, counsel for MSG called counsel for Browne Sanders and said that MSG had completed its investigation of Browne Sanders' discrimination and harassment complaint. MSG's attorney said that the result of the investigation was that Browne Sanders' complaint was "not supported." Furthermore, MSG's counsel said that MSG had decided to "separate" Browne Sanders from MSG, effective immediately. MSG's attorney told Browne Sanders' attorney that he should advise Browne Sanders of her dismissal.

51. According to MSG's attorney, MSG had decided to fire Browne Sanders because she was unable to function effectively in her position, she had poor interactions with MSG's senior management, and the organization could not function effectively if she remained employed there.

52. MSG's asserted reasons for firing Browne Sanders are transparently pretextual. Prior to her dismissal, Browne Sanders had never been warned that any aspect of her performance was lacking. In fact, as discussed above, her performance evaluations had been uniformly very strong. Moreover, the allegedly "poor interactions" that she had with MSG's senior management were directly related to the harassment and discrimination that Browne Sanders suffered. MSG fired Browne Sanders to retaliate against her for raising claims of sexual harassment and gender discrimination, and to send a message to other employees that similar complaints will not be tolerated. MSG fired Browne Sanders with full knowledge that it is illegal to punish an employee for complaining of harassment and discrimination.

53. The retaliatory decision to fire plaintiff because she opposed defendants' unlawful employment practices was made by Dolan, among others. Thomas intentionally aided and abetted the decision to fire plaintiff because she opposed and refused to submit to the illegal conduct described herein. Specifically, on information and belief, because plaintiff opposed and refused to submit to the illegal conduct described herein, Thomas falsely, without basis, and with retaliatory animus, stated to MSG's senior management that plaintiff would not accept changes in the organization that Thomas had purportedly implemented. Although MSG knew Thomas' statements to be false or otherwise incorrect, MSG has used Thomas' statements concerning Browne Sanders as a pretext to justify Browne Sanders' retaliatory dismissal.

## FIRST CAUSE OF ACTION

### Sex Discrimination Under The Executive Law Against MSG and Thomas

54. Plaintiff repeats and realleges paragraphs 1-53 as if fully set forth herein.

55. By the acts and practices described above, including but not limited to creating a hostile work environment for plaintiff because of her sex and ignoring plaintiff's complaints of discrimination, MSG and Thomas discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of the Executive Law.

56. Defendant Thomas is liable under the Executive Law as an aider and abettor of the discrimination against plaintiff.

57. Defendant MSG is liable as plaintiff's "employer" pursuant to the Executive Law.

58. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of MSG's and Thomas' discriminatory acts.

## SECOND CAUSE OF ACTION

### Sex Discrimination Under the Administrative Code Against MSG and Thomas

59. Plaintiff repeats and realleges paragraphs 1-58 as if fully set forth herein.

60. By the acts and practices described above, including but not limited to creating a hostile work environment for plaintiff because of her sex and ignoring plaintiff's complaints of discrimination, MSG and Thomas discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of the Administrative Code.

61. Defendant Thomas is liable under the Administrative Code as an aider and abettor of the discrimination against plaintiff.

62. Defendant MSG is liable as plaintiff's "employer" pursuant to the Administrative Code.

63.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of MSG and Thomas' discriminatory acts.

64.     MSG and Thomas acted intentionally and with malice and/or reckless indifference to plaintiff's statutory rights.

## THIRD CAUSE OF ACTION

### Retaliation Under the Executive Law Against All Defendants

65.     Plaintiff repeats and realleges paragraphs 1-64 as if fully set forth herein.

66.     By the acts and practices described above, including but not limited to forcing plaintiff to stop working and terminating plaintiff's employment, defendants retaliated against plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of the Executive Law.

67.     Defendant MSG is liable as plaintiff's "employer" pursuant to the Executive Law.

68.     Defendant Thomas is liable under the Executive Law as an aider and abettor of the retaliation against plaintiff.

69.     Defendant Dolan is liable under the Executive Law as plaintiff's "employer" and is also liable under the Executive Law as an aider and abettor of the retaliation against plaintiff.

70.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of defendants' retaliatory acts.

## FOURTH CAUSE OF ACTION

### Retaliation Under the Administrative Code Against All Defendants

71.     Plaintiff repeats and realleges paragraphs 1-70 as if fully set forth herein.

72. By the acts and practices described above, including but not limited to forcing plaintiff to stop working and terminating plaintiff's employment, defendants retaliated against plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of the Administrative Code.

73. Defendant MSG is liable as plaintiff's "employer" pursuant to the Administrative Code.

74. Defendant Thomas is liable under the Administrative Code as an aider and abettor of the retaliation against plaintiff.

75. Defendant Dolan is liable under the Administrative Code as plaintiff's "employer" and is also liable under the Administrative Code as an aider and abettor of the retaliation against plaintiff.

76. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of defendants' retaliatory acts.

77. Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's statutory rights.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter an award:

(a) declaring the acts and practices complained of herein are in violation of the Executive Law and the Administrative Code;

(b) enjoining and permanently restraining these violations of the Executive Law and the Administrative Code;

(c) directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendants to place plaintiff in the position she would be in but for defendants' discriminatory and retaliatory treatment of her, and to make her whole for reputational damage and all earnings she would have received but for defendants' discriminatory and retaliatory treatment, including, but not limited to, wages, bonuses, equity interests, pension and other lost benefits;

(e) directing defendants to reinstate plaintiff;

(f) directing defendants to pay plaintiff punitive damages as provided by the Administrative Code;

(g) awarding plaintiff such interest as is allowed by law;

(h) awarding plaintiff her reasonable attorneys' fees and costs; and

(i) granting such other and further relief as the Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
July 14, 2006

                VLADECK, WALDMAN, ELIAS
                   & ENGELHARD, P.C.

By: _____
Anne C. Vladeck (AV 4857)
Kevin T. Mintzer (KM 4741)
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300