UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANUCHA BROWNE SANDERS,

                Plaintiff,

     - against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD
THOMAS III and JAMES L. DOLAN,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

06 Civ. 0589 (GEL) (DF)

ECF CASE

---

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

VLADECK, WALDMAN, ELIAS
   & ENGELHARD, P.C.
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300

Of Counsel:

    Anne C. Vladeck
    Kevin T. Mintzer
    Karen Cacace

244578 v2

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

ARGUMENT ................................................................................................................. 11

I.    UNDER THE GOVERNING LEGAL STANDARDS, PLAINTIFF IS
      ENTITLED TO PARTIAL SUMMARY JUDGMENT AGAINST MSG
      AND DOLAN ..................................................................................................... 11

      A.    Summary Judgment Standards .................................................................. 11

      B.    Legal Standards Governing Plaintiff's Retaliation Claims ...................... 11

II.   PLAINTIFF WAS DISMISSED FOR ENGAGING IN PROTECTED
      ACTIVITY .......................................................................................................... 13

      A.    MSG And Dolan Illegally Fired Plaintiff Because Of Her Settlement
            Position ...................................................................................................... 14

            1.    Plaintiff Participated In Efforts To Settle Her Sexual
                  Harassment Claim ......................................................................... 14

            2.    Participation In Settlement Discussions Is Protected
                  Activity .......................................................................................... 15

      B.    MSG And Dolan Improperly Discharged Plaintiff Because She
            Spoke With Colleagues About Her Claims And Gathered
            Supporting Evidence .................................................................................. 17

            1.    Plaintiff Did Not Tamper With MSG's Internal
                  Investigation .................................................................................. 17

            2.    Plaintiff's Communications With Other MSG Employees
                  About MSG's Sexual Harassment Were Protected Activity ......... 20

      C.    Plaintiff Had A Good Faith, Reasonable Basis For Her Protected
            Activity ...................................................................................................... 22

      D.    Defendants Cannot Demonstrate That Plaintiff Would Have Been
            Fired Even If She Had Not Engaged In Protected Activity ....................... 24

CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

Alexander v. Gardner-Denver Co.,
   415 U.S. 36 (1974)................................................................................17

Cifra v. General Elec. Co.,
   252 F.3d 205 (2d Cir. 2001)..............................................................15, 24

Connell v. Bank of Boston,
   924 F.2d 1169 (1st Cir. 1991)...............................................................15

Cooper-Nicholas v. City of Chester, No. Civ. A. 95-6493,
   1997 WL 799443 (E.D. Pa. Dec. 30, 1997).............................................23

Cruz v. Coach Stores,
   202 F.3d 560 (2d Cir. 2000)..............................................................12, 22

Deravin v. Kerik,
   335 F.3d 195 (2d Cir. 2003)....................................................................12

Feingold v. New York,
   366 F.3d 138 (2d Cir. 2004)....................................................................13

Gordon v. New York City Bd. of Educ.,
   232 F.3d 111 (2d Cir. 2000)....................................................................12

Grant v. Hazlett Strip-Casting Corp.,
   880 F.2d 1564 (2d Cir. 1989)..................................................................20

Gregory v. Daly,
   243 F.3d 687 (2d Cir. 2001)....................................................................12

Haggard v. The Standard Register Co.,
No. Civ. A. 01-2513-CM, 2003 WL 22102133 (D. Kan. Aug. 1, 2003)..................16

Heller v. Champion Int'l Corp.,
   891 F.2d 432 (2d Cir. 1989).............................................................20, 21

Jute v. Hamilton Sundstrand Corp.,
   420 F.3d 166 (2d Cir. 2005).............................................................11, 20

Martin v. General Elec. Co.,
   891 F. Supp. 1052 (E.D. Pa. 1995).........................................................16

Matima v. Celli,
      228 F.3d 68 (2d. Cir. 2000)...............................................................21, 24

Price Waterhouse v. Hopkins,
      490 U.S. 228 (1989)...............................................................................24

Proulx v. Citibank, N.A.,
      659 F. Supp. 972 (S.D.N.Y. 1987) .......................................................12

Raniola v. Bratton,
      243 F.3d 610 (2d Cir. 2001)...................................................................12

Rodal v. Anesthesia Group of Onondaga P.C.,
      369 F.3d 113 (2d Cir. 2004)...................................................................11

Slagle v. County of Clarion,
      435 F.3d 262 (3d Cir. 2006)...................................................................12

Smith v. Berry Co., No. A. 96-1899,
      1997 WL 358123 (E.D. La. June 24, 1997),
      aff'd in relevant part, 165 F.3d 390 (5th Cir. 1990) ............................21

Sprott v. Franco,
      No. 94 Civ. 3818, 1997 WL 79813 (S.D.N.Y. Feb. 25, 1997) ...................15, 16

Sumner v. United States Postal Service,
      899 F.2d 203 (2d Cir. 1990)...................................................................21

Taitt v. Chemical Bank,
      849 F.2d 775 (2d Cir. 1988)...................................................................16

Tomka v. Seiler Corp.,
      66 F.3d 1295 (2d Cir. 1995)...................................................................13

Wise v. Overhead Door Corp.,
      No. 1:04-CV-2972, 2006 WL 648776 (N.D. Ga. March 15, 2006)..................16

## STATUTES

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a) ......................................1, 11, 15

Age Discrimination in Employment Act, 29 U.S.C. § 623(d)................................................15

New York Executive Law § 296 et seq. ...............................................................................1, 11

New York City Administrative Code § 8-107(7) ..................................................................11,13

New York City Administrative Code § 8-130 ........................................................................13

New York City Administrative Code § 8-502 ..........................................................................1

### RULES AND OTHER RESOURCES

Fed. R. Civ. P. 56(c) ..............................................................................................................11

Fed. R. Evid. 408 .........................................................................................................8, 9, 14, 15

E.E.O.C. Compliance Manual, Section 8-II(B)(2)..............................................................12, 21

Plaintiff Anucha Browne Sanders ("Browne Sanders" or "plaintiff") submits this memorandum in support of her motion for partial summary judgment against defendants Madison Square Garden, L.P. ("MSG") and James L. Dolan ("Dolan") (collectively, "defendants") on plaintiff's claims of retaliation arising from Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3(a), New York Executive Law § 296 ("Executive Law") and the New York City Administrative Code § 8-502 ("City Code").

## PRELIMINARY STATEMENT

Anucha Browne Sanders believed that she was experiencing sexual harassment at her job. She reported the harassment and became concerned because nothing was done to correct the situation. She engaged counsel to complain to her employer on her behalf. Before that, Browne Sanders spoke to a number of her colleagues about the circumstances of her complaint and requested that several of them document discriminatory incidents that they had relayed to her that she believed to be relevant to her complaint. After Browne Sanders retained counsel, her attorney and MSG's counsel discussed the substance of her complaint and exchanged positions on settlement. MSG also began to investigate Browne Sanders' allegations. Approximately one week after her counsel first contacted MSG, the company prohibited Browne Sanders from coming to MSG's offices. Three weeks later, MSG fired her.

James Dolan, MSG's Chairman, made the decision to fire Browne Sanders. At his deposition, Dolan testified as to the factors that contributed to his decision. Two of the decisive factors, Dolan claims, were: (1) Browne Sanders' interactions with her colleagues about her allegations of bias, interactions Dolan claims were contrary to MSG's policy and amounted to "tampering" with MSG's investigation; and (2) the monetary settlement demand made by

244578 v2

Browne Sanders' counsel, which Dolan thought was "ridiculous." These admissions compel a finding that Browne Sanders was fired for engaging in protected activity. The anti-discrimination laws protect employees who seek to gather evidence and elicit support for a claim of discrimination. They also protect employees who retain counsel and offer to settle a potential discrimination lawsuit. While determining an employer's intent is usually a fact-bound inquiry that is not susceptible to summary adjudication, Dolan has left no doubt about his unlawful motivations. Accordingly, plaintiff is entitled to partial summary judgment on her retaliation claims against MSG and Dolan.

## STATEMENT OF FACTS

### Browne Sanders' Performance History At MSG

Browne Sanders began her employment with MSG in November 2000 as a Vice President of Marketing for the New York Knickerbockers ("Knicks"), a National Basketball Association ("NBA") franchise owned by MSG. (Plaintiff's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1") ¶ 1) Browne Sanders was hired by Stephen Mills ("Mills"), who was then the Executive Vice President for Franchise Operations for MSG. As Vice President of Marketing, Browne Sanders reported to Mills. (Id.)

On or about March 11, 2002, MSG promoted Browne Sanders to the position of Senior Vice President, Marketing & Business Operations of the New York Knicks. (Pl. 56.1 ¶ 4) In this new role, plaintiff continued to report to Mills, who at that point had been promoted and held the position of President, MSG Sports Team Operations. (Id.) Both before and after Browne Sanders' promotion, she received outstanding performance evaluations, as well as significant bonuses and raises. (Pl. 56.1 ¶¶ 2-12)

In or about the early part of 2005, Mills completed a performance appraisal for Browne Sanders for the calendar year 2004. In that document, Mills assigned Browne Sanders an overall performance rating of 4 on a scale of 1 to 5, denoting that plaintiff's overall performance for 2004 "exceeded expected performance." (Pl. 56.1 ¶ 10) In or about February 2005, MSG awarded Browne Sanders a bonus of $76,000, which represented approximately 36% of her 2004 salary. (Pl. 56.1 ¶ 11) On or about April 6, 2005, MSG made an "adjustment" and raised Browne Sanders' annual base salary from approximately $213,000 to $250,000, an increase of over 17%. This raise was retroactive to January 1, 2005. (Pl. 56.1 ¶ 12)

Facts Related To Plaintiff's Sexual Harassment Claim[1]

On or about March 23, 2004, Frank Murphy ("Murphy"), then a Senior Vice President of Basketball Operations, referred to plaintiff as a "bitch" during a conversation that Murphy and plaintiff were having in plaintiff's office. The same day, Browne Sanders called Isiah Thomas ("Thomas"), the Knicks' President of Basketball Operations, to complain about Murphy's unprofessional conduct because Murphy reported to Thomas. During plaintiff's conversation with Thomas, Thomas admits that he may have said, referring to Browne Sanders' complaint about Murphy, "I'll fucking handle it." (Pl. 56.1 ¶¶ 13-14)

In or about October 2004, Thomas asked Petra Pope ("Pope"), who was then the head of the New York Knicks' female dance team, to check on the referees before games. Pope told Browne Sanders that Thomas had asked her on more than one occasion to check in on the referees and make them "happy," which Pope said meant that she was being told to flirt with the

---

[1]    The following is not a complete statement of the evidence supporting plaintiff's sexual harassment claim. Rather, the facts recited are only those as to which there is no dispute.

referees. Pope further told Browne Sanders that she did not want to continue to do what Thomas had asked her to do. (Pl. 56.1 ¶¶ 15-17)

After a Knicks basketball game on or about December 29, 2004, Thomas embraced Browne Sanders, who pulled away from Thomas' embrace. A few minutes later, Browne Sanders told Jeff Nix ("Nix"), who was the Knicks' Assistant General Manager, that Thomas had told her that he was "in love" with Browne Sanders and compared his feelings to the movie "Love and Basketball." (Pl. 56.1 ¶¶ 18-19) The following month, Faye Brown ("Brown"), plaintiff's assistant, told Browne Sanders that she had witnessed Thomas looking at Browne Sanders up and down, while biting his lip and "checking [her] out." (Pl. 56.1 ¶ 20)

On or about May 11, 2005, Browne Sanders had a discussion with Peter Olsen ("Olsen"), an MSG consultant who Mills asked to help Thomas build his organization. (Pl. 56.1 ¶ 21) Olsen's notes of his conversation with Mills reflect that Mills asked Olsen to speak with Thomas about, inter alia, the use of "locker room language" in the workplace. (Pl. 56.1 ¶ 22) During the conversation between plaintiff and Olsen, Browne Sanders told Olsen that Thomas had said to her that Thomas was in love with her. Browne Sanders also said to Olsen that Thomas should be given sexual harassment training. (Pl. 56.1 ¶ 23)

In or about June 2005, Stephon Marbury ("Marbury"), a player on the Knicks, called Dan Gladstone ("Gladstone"), who was one of Browne Sanders' supervisees, to complain about the treatment of Hassan Gonsalves ("Gonsalves"). (Pl. 56.1 ¶ 24) Gonsalves is a cousin of Marbury who, at Marbury's request, was hired by the Knicks to work in the field marketing group under Gladstone's supervision. (Pl. 56.1 ¶ 25) During Marbury's telephone call with Gladstone, Marbury acknowledges that he referred to Browne Sanders as a "bitch" and that, in speaking of Browne Sanders, he said, "fuck her." (Pl. 56.1 ¶ 26) In November 2005, Gladstone

sent Browne Sanders an e-mail in which Gladstone recounted, among other things, that Marbury had said the following in their June 2005 conversation, all referring to Browne Sanders: "No one likes that black bitch"; "fuck that black bitch, she thinks she runs the Knicks, she don't run shit"; "we don't like her, she thinks she tells us what to do, she don't tell us shit"; "fuck that black bitch, she ain't shit and we'll see what happens this year." (Pl. 56.1 ¶ 29) Browne Sanders forwarded this e-mail to Mills, who did not follow up with plaintiff about Marbury's comments. (Id.)

In or about October 30, 2005, at a Knicks practice open to fans, Thomas made comments in Browne Sanders' presence concerning her physical appearance while putting his arm around her. For example, Thomas stated that Browne Sanders was "beautiful" and "easy on the eyes." Thomas also made comments to the effect that it was "distracting to work with someone who was so attractive," and that he was "not getting any love" from Browne Sanders. (Pl. 56.1 ¶¶ 27-28)[2] Approximately one month later, members of her staff told plaintiff that Gonsalves was making inappropriate and graphic comments of a sexual nature to female members of Browne Sanders' staff. For example, a staff member told Browne Sanders that Gonsalves had said, "I want you to fuck me. When are you coming to my apartment." (Pl. 56.1 ¶ 30)

In or about late November 2005, a female member of Browne Sanders' staff disclosed to plaintiff and Karin Buchholz ("Buchholz"), a Vice President who reported to plaintiff, that ██████████ had had sexual relations with Marbury when she was ██████ with MSG earlier in 2005. ████████ told Browne Sanders and Buchholz that this incident

---

[2] Thomas denies making some of these statements at the open practice, but the comments were overheard by two Knicks fans who were attending the open practice, both of whom are third parties who have never even met plaintiff.

occurred in an automobile following an evening at a "gentleman's club." ▆▆▆▆▆▆ further disclosed to Browne Sanders and Buchholz that she had been drinking alcohol on the evening in question, that she was "out of it" when she had sex with Marbury, and that she was very ashamed about the episode. ▆▆▆▆▆ also told Browne Sanders and Buchholz that she had consensual sex with Marbury, but that she did not believe she could say no because of who Marbury is. Furthermore, neither Buchholz nor Browne Sanders believed that ▆▆▆▆▆ was convincing in stating that the encounter was consensual. ▆▆▆▆▆ also told Buchholz and Browne Sanders that, following the incident in the automobile, Marbury sent her a text message stating, "I want some more of that," but ▆▆▆▆ did not respond. (Pl. 56.1 ¶¶ 32-35)

In or about late November 2005, John Moran ("Moran"), MSG's Vice President of Employee Relations, became aware of the alleged conduct of Gonsalves and Marbury discussed above as a result of conversations with Browne Sanders, Buchholz and members of Browne Sanders' staff. (Pl. 56.1 ¶ 36) Browne Sanders had discussed these issues with Mills as well. (Pl. 56.1 ¶ 31) Following an investigation by Moran in or about late November 2005, Gonsalves was fired for violating MSG's sexual harassment policy. (Pl. 56.1 ¶ 37) However, neither Moran nor anyone else at MSG questioned Marbury about his allegedly referring to Browne Sanders as, among other names, a "black bitch" or his conduct with respect to ▆▆▆▆▆ who worked on Browne Sanders' staff. Indeed, Marbury was not interviewed during this investigation at all. (Pl. 56.1 ¶ 38)

On or about December 14, 2005, at a Knicks basketball game, Thomas approached Browne Sanders from the side, placed his arm on her shoulder and attempted to kiss her on the cheek. When Browne Sanders pulled away and would not allow him to kiss her, Thomas said, "No love today?" The following day, Browne Sanders sent an e-mail to Mills concerning her

interaction with Thomas on the previous day.  Mills did not respond to Browne Sanders concerning this e-mail. (Pl. 56.1 ¶¶ 39-40)

Browne Sanders' Discussions With Members Of Her Staff And Colleagues

At various times in 2004 and 2005, Browne Sanders spoke with other MSG employees about, among other things, interactions and difficulties that she had with Thomas and Marbury.  Among the MSG employees that Browne Sanders spoke to concerning these matters were Buchholz, Nix and Brown. (Pl. 56.1 ¶ 41)  According to Buchholz, in or about November and December 2005, Browne Sanders initiated discussions with her in which Browne Sanders attempted to refresh Buchholz's recollection concerning matters that she had discussed with Browne Sanders in the past, including, among other subjects, plaintiff's interactions with Thomas and Marbury and their inappropriate conduct towards her. (Pl. 56.1 ¶ 42)

According to Buchholz, on or about November 28, 2005, Browne Sanders requested that Buchholz send her an e-mail documenting incidents she had previously discussed with plaintiff related to Marbury's stated feelings toward Browne Sanders.  Buchholz further testified that all statements in her e-mail of November 28, 2005 were true. (Pl. 56.1 ¶ 43)  Also on or about November 28, 2005, Browne Sanders requested that Gladstone send her an e-mail reflecting the conversation that he had in June 2005 with Marbury. (Pl. 56.1 ¶ 44)  Approximately two weeks later, Browne Sanders requested that Gary Winkler ("Winkler"), the Vice President of Event Presentation, send her an e-mail documenting his conversations with Pope concerning Pope's being asked to check on the referees. (Pl. 56.1 ¶ 45)

Plaintiff's Counsel's Contacts With MSG

On or about December 2, 2005 and December 4, 2005, Browne Sanders and Buchholz jointly met with counsel. According to Buchholz, Browne Sanders requested that

Buchholz accompany her to meet with counsel and Buchholz felt that she was required to go. (Pl. 56.1 ¶ 47)[3]  On December 22, 2005, counsel for Browne Sanders met with counsel for MSG. At that meeting, Browne Sanders' attorneys stated, among other things, that Browne Sanders had been subjected to sexual harassment at MSG and provided MSG's counsel with information concerning Browne Sanders' claims.  (Pl. 56.1 ¶ 48)  Later that day, counsel for the parties agreed to, inter alia, "attempt to expedite a negotiated, good faith resolution of Ms. Browne Sanders' claims."  Counsel also agreed that settlement discussions would be "confidential and deemed in furtherance of settlement pursuant to Fed. R. Evid. 408." (Pl. 56.1 ¶ 49)

Shortly after the December 22, 2005 meeting between plaintiff's counsel and MSG's counsel, MSG began an internal investigation of plaintiff's sexual harassment complaint. MSG's internal investigation was conducted by, among others, Rochelle Noel ("Noel"), an in-house attorney for Cablevision, MSG's parent company, and Moran. (Pl. 56.1 ¶ 50)  Moran and Noel interviewed plaintiff on January 6, 2006, at which time Browne Sanders provided substantial detail about her sexual harassment complaint, including her claims that Thomas had repeatedly referred to her by sexist terms such as "bitch," and that he had repeatedly said that he was "in love" with her and made sexual overtures to her. (Pl. 56.1 ¶ 51)

Pursuant to the parties' understanding of December 22, 2005, on December 27, 2005, Browne Sanders' counsel conveyed a settlement proposal to MSG's counsel in connection with Browne Sanders' sexual harassment claims against MSG.  Prior to the proposal of December 27, 2005, neither Browne Sanders nor anyone acting on Browne Sanders' behalf had

---

[3]     Buchholz did not disclose to anyone at MSG that she had accompanied Browne Sanders to meet with counsel until after Browne Sanders was dismissed and had filed suit against MSG. (Pl. 56.1 ¶ 66)

made a monetary settlement or severance proposal to MSG.  Several days later, MSG's counsel delivered to plaintiff's counsel a letter that included a counter-offer to settle plaintiff's claims. The letter from MSG's counsel stated that MSG's counter-offer was being made pursuant to Fed. R. Evid. 408.  The letter also stated that "MSG is ready, willing and able to continue as rapidly as possible our good-faith discussions in order to find a mutually acceptable resolution."    On January 3, 2006, plaintiff's counsel orally conveyed another settlement proposal to MSG's counsel.  (Pl. 56.1 ¶¶ 52-55)

On or about January 13, 2006, Noel and Moran finalized the findings of MSG's internal investigation in a document entitled Summary of Harassment Investigation ("Investigation Summary").  (Pl. 56.1 ¶ 56)  Approximately six days later, on January 19, 2006, Marc Schoenfeld ("Schoenfeld"), then MSG's Acting General Counsel, drafted a memorandum for Rusty McCormack ("McCormack"), MSG's Senior Vice President of Human Resources, entitled "Knicks Employee Relations Issues."    The memorandum purports to make recommendations in light of the Investigation Summary.    Among the purported recommendations in the memorandum is that Browne Sanders should be fired.[4]  (Pl. 56.1 ¶¶ 59-60, 63)  On the same date of the memorandum, MSG's counsel informed plaintiff's counsel that MSG's investigation of plaintiff's internal complaint had been concluded.    In that same

---

[4]    The memorandum also recommended that Thomas receive "one-on-one sessions with a qualified expert in order to sensitize him further with regard to the concerns that his conduct could raise in a corporate environment and in light of company policy."  The memorandum further recommended that Mills have meetings with Cablevision's human resources officers to discuss what "lessons, if any, may be learned from the facts described in the [Investigation Summary]."    Neither Thomas or Mills ever received the training recommended in the memorandum.  (Pl. 56.1 ¶¶ 60-64)

conversation, MSG's counsel informed plaintiff's counsel that MSG was terminating Browne

Sanders' employment, effective immediately.  (Pl. 56.1 ¶ 65)

Dolan's Reasons For Terminating Plaintiff's Employment

Dolan made the decision to fire Browne Sanders from MSG, and he did so on his

own, without consulting anyone else.  (Pl. 56.1 ¶ 67)  Dolan's stated reasons for firing Browne

Sanders are: (1)  that Mills had told Dolan in late 2005 that Browne Sanders had advised Mills

that she no longer wanted to work at MSG, but that she wanted to continue her employment there

while she looked for a new job; (2) that Dolan believed that Browne Sanders had performed

poorly at budget meetings in July and August of 2005; (3) that Browne Sanders requested $6

million in severance; and (4) that Browne Sanders willfully violated MSG's policies by

tampering with the investigation of her internal sexual harassment complaint. (Pl. 56.1 ¶ 68)

According to Dolan, during a helicopter ride between Bethpage, Long Island and

Manhattan, McCormack told him that Browne Sanders had interfered with the investigation by

coercing her direct reports into corroborating her complaint.  (Pl. 56.1 ¶ 70)  Dolan claims that

Browne Sanders "could have continued on doing her job if she had not tampered with -- with

those people, the -- but the combination of all of those things together -- and finally the

tampering as being the last straw in that really led us to -- led me to the conclusion that her

employment at the company was over with."  (Pl. 56.1 ¶ 78)  According to Dolan, Browne

Sanders was fired because "she [was] utilizing her position that she is -- she [was] off through

the company attempting to garner support for a complaint that the -- about sexual harassment."

(Pl. 56.1 ¶ 79)

ARGUMENT

I.    UNDER THE GOVERNING LEGAL STANDARDS, PLAINTIFF IS ENTITLED
      TO PARTIAL SUMMARY JUDGMENT AGAINST MSG AND DOLAN

Plaintiff is entitled to partial summary judgment on her retaliation claims against MSG and Dolan because, based on the applicable legal standards and the facts as alleged by defendants, a jury would be compelled to find that MSG and Dolan dismissed Browne Sanders because she engaged in protected activity.

A.    Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A court determining whether a genuine issue of material fact exists must "constru[e] the evidence in the light most favorable to the non-moving party." See Rodal v. Anesthesia Group of Onondaga P.C., 369 F.3d 113, 118 (2d Cir. 2004).

B.    Legal Standards Governing Plaintiff's Retaliation Claims

Section 704(a) of Title VII makes it unlawful to retaliate against an employee, "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).[5] This provision includes separate protections for employees who oppose discrimination proscribed by Title VII (the "opposition clause") as well as for those who participate in Title VII proceedings or investigations (the "participation clause"). See Jute v. Hamilton Sundstrand Corp., 420 F.3d

---

[5]    The Executive Law and the City Code contain similar provisions. See N.Y. Exec. Law § 296(1)(e); N.Y.C. Admin. Code § 8-107(7).

166, 173 (2d Cir. 2005); <u>Deravin v. Kerik</u>, 335 F.3d 195, 203 n.6 (2d Cir. 2003). To establish

that an activity is protected under the opposition clause, a plaintiff need not prove the merit of

her underlying discrimination complaint, but need establish only that she was acting under a

good faith, reasonable belief that a violation existed. <u>See, e.g.</u>, <u>Gregory v. Daly</u>, 243 F.3d 687,

700-01 (2d Cir. 2001).

   In contrast, conduct that falls under the participation clause is protected even if

the employee's allegations are invalid and unreasonable. <u>See</u> <u>Slagle v. County of Clarion</u>, 435

F.3d 262, 268 (3d Cir. 2006) (once plaintiff files a facially valid complaint, plaintiff is afforded

broad protection of participation clause "'regardless of whether the allegations in the original

charge were valid or reasonable.'") (quoting E.E.O.C. Compliance Manual, Section 8-II;

additional citations omitted); <u>Proulx v. Citibank, N.A.</u>, 659 F. Supp. 972, 978 (S.D.N.Y. 1987)

(participation clause protects even false and malicious claims).

   Under either the opposition or participation clause, to prevail on a claim of

retaliatory dismissal, a plaintiff need not demonstrate that a retaliatory motive was the sole cause

for terminating her employment. <u>See</u> <u>Raniola v. Bratton</u>, 243 F.3d 610, 625 (2d Cir. 2001);

<u>Gordon v. New York City Bd. of Educ.</u>, 232 F.3d 111, 117-18 (2d Cir. 2000). Rather, a plaintiff

prevails "merely by showing that retaliation was one of a number of motivating factors" in the

dismissal. <u>Id.</u> at 118.

   The same standards apply to plaintiff's retaliation claims under the Executive Law

and the Administrative Code. <u>See</u> <u>Cruz v. Coach Stores</u>, 202 F.3d 560, 565 n. 1 (2d Cir. 2000)

("[C]onsideration of claims brought under the state and city human rights laws parallels the

analysis used in Title VII claims." (citations omitted)).[6]  Furthermore, in contrast to Title VII,

which does not provide for individual liability, under the Executive Law and the Administrative

Code, a supervisor such as Dolan who "actually participates" in an unlawful employment

decision is individually liable as an "employer" and for aiding and abetting an unlawful

employment action.  See Feingold v. New York, 366 F.3d 138, 157-59 (2d Cir. 2004) (citing

Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995)); N.Y. Exec. Law §296(6); N.Y.C.

Admin. Code § 8-107(1)(a) & (6).

II.    PLAINTIFF WAS DISMISSED FOR ENGAGING IN PROTECTED ACTIVITY

Plaintiff is entitled to partial summary judgment because the evidence establishes

that Dolan's decision to fire plaintiff was motivated by her protected activity.  First, Dolan has

admitted that part of the reason he fired Browne Sanders was her counsel's pre-litigation

proposal to settle Browne Sanders' legal claims against MSG.  The law provides, however, that

an employee cannot be punished for participating in efforts to settle claims of discrimination and

harassment. (See Section II(A), infra)  Second, while Dolan claims that he fired plaintiff because

she allegedly tampered with MSG's internal harassment investigation, there is simply no

evidence that plaintiff did any such thing.  Rather, plaintiff spoke with her colleagues about her

complaints of harassment and sought to gather evidence in support of her potential claims.  Such

activities are protected by the anti-retaliation laws.  (See Section II(B), infra)  Finally, both the

prevailing legal standards and the undisputed evidence preclude defendants from prevailing on

---

[6]    However, the City Code was amended in 2005 to reemphasize that: "The provisions of
this title shall be construed liberally for the accomplishment of the uniquely broad and remedial
purposes thereof, regardless of whether federal or New York State civil and human rights laws,
including those laws with provisions comparably-worded to provisions of this title, have been so
construed." N.Y.C. Admin Code § 8-130.

any argument that plaintiff did not have a reasonable, good faith basis to complain about sexual harassment (see Section II(C), infra) or that she would have been fired even if she had not engaged in protected activity. (See Section II(D), infra)

A.    MSG And Dolan Illegally Fired Plaintiff Because Of Her Settlement Position

Plaintiff should prevail on her claims of retaliation based on Dolan's testimony that part of his motivation for firing plaintiff is that she made a separation proposal that he believed was "ridiculous." (Pl. 56.1 ¶ 68)

1.    Plaintiff Participated In Efforts To Settle Her Sexual Harassment Claim

Although Dolan acknowledged that he was "a little confused" about the relevant facts, Dolan claimed that Browne Sanders initially made a demand for $6 million in severance and later said that, if she was not paid, she was going to "file this case . . . and make a big stink about it," which Dolan considered an attempt to "extort" MSG. (Pl. 56.1 ¶ 80) The undisputed evidence, however, is that neither plaintiff nor anyone acting on plaintiff's behalf made any monetary demand prior to the settlement discussions conducted between plaintiff's counsel and MSG's counsel concerning plaintiff's claims of sexual harassment and gender discrimination. On December 22, 2005, plaintiff's counsel and MSG's counsel agreed to "attempt to expedite a negotiated, good faith resolution of Ms. Browne Sanders' claims." Counsel also agreed that settlement discussions would be "confidential and deemed in furtherance of settlement pursuant to Fed. R. Evid. 408." Pursuant to that understanding, on December 27, 2005, Browne Sanders' counsel conveyed a settlement proposal to MSG's attorneys in connection with Browne Sanders' potential legal claims against MSG. (Pl. 56.1 ¶¶ 48-49, 52-53)

On December 30, 2005, MSG's counsel delivered to plaintiff's counsel a letter that contained a counter-proposal to settle plaintiff's claims. The letter explicitly stated that MSG's

counter-offer was being made pursuant to Fed. R. Evid. 408 and did not contain any assertion

that plaintiff's settlement proposal was extortionate.  To the contrary, MSG's letter stated that the

company "is ready, willing and able to continue as rapidly as possible our good-faith discussions

in order to find a mutually acceptable resolution."  On January 3, 2006, plaintiff's counsel orally

conveyed another settlement proposal to MSG's counsel.  Following that date, no further

proposals were exchanged by the parties.  Thus, the only monetary proposals made by plaintiff to

MSG were through her counsel.  Furthermore, as repeatedly acknowledged by MSG's counsel,

those proposals were made in the course of "good faith" discussions conducted pursuant to Fed.

R. Evid. 408 for the purpose of attempting to settle Browne Sanders' potential claims of sexual

harassment and gender discrimination.  (Pl. 56.1 ¶¶ 54-55)

      2.    <u>Participation In Settlement Discussions Is Protected Activity</u>

        Plaintiff's participation in efforts to resolve her potential Title VII claims is

protected activity under Tile VII's anti-retaliation provision.  42 U.S.C. § 2000e-3(a).  By having

her counsel advise MSG about her sexual harassment and gender discrimination claims and

make the company aware that she may pursue those claims, plaintiff "opposed" discrimination

and "participated" in a Title VII proceeding.  <u>See</u> <u>Cifra v. General Elec. Co.</u>, 252 F.3d 205, 217

(2d Cir. 2001) (hiring an attorney to pursue claim of gender discrimination protected activity);

<u>Connell v. Bank of Boston</u>, 924 F.2d 1169, 1179 (1st Cir. 1991) ("It is self-evident that by

retaining an attorney plaintiff had engaged in an activity protected under [the Age Discrimination

in Employment Act]."[7]); <u>Sprott v. Franco</u>, No. 94 Civ. 3818, 1997 WL 79813, at *13 (S.D.N.Y.

---

[7]    The anti-retaliation clause of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(d), is substantially similar to the corresponding Title VII provision,  42 U.S.C. § 2000e-3(a).

Feb. 25, 1997) ("Plaintiff also engaged in protected activity when she retained an attorney and had her attorney notify defendants that she intended to file a lawsuit in federal court if they did not agree to settle her existing retaliation claim."); Martin v. General Elec. Co., 891 F. Supp. 1052, 1060 (E.D. Pa. 1995) (plaintiff engaged in protected activity of opposing discrimination "when he sought legal advice and had his attorney notify [the employer] that he intended to seek redress for a possible age discrimination claim").

In addition, Browne Sanders engaged in protected activity when, as the parties had agreed, her counsel participated in settlement discussions concerning her potential claims and made proposals to settle those claims. See Sprott, 1997 WL 79813, at *13 ("[B]y participating in settlement negotiations, plaintiff engaged in lawful efforts to secure her rights under Title VII. Thus, these attempts to broker a settlement also constituted protected activity.") (citations omitted); accord Wise v. Overhead Door Corp., No. 1:04-CV-2972, 2006 WL 648776, at *6 (N.D. Ga. March 15, 2006) (settlement of EEOC charge is protected activity); Haggard v. The Standard Register Co., No. Civ. A. 01-2513-CM, 2003 WL 22102133, at *13 (D. Kan. Aug. 1, 2003) (portion of e-mail containing settlement proposal for plaintiff's age discrimination "undoubtedly . . . protected speech"); cf. Taitt v. Chemical Bank, 849 F.2d 775, 777-78 (2d Cir. 1988) (plaintiff engaged in protected activity by filing objections to proposed settlement of a Title VII class action). These decisions comport with the statute's express language, which, as discussed, protects employees who oppose discrimination as well as those who participate "in any manner" in a Title VII proceeding or investigation.

A determination that plaintiff's participation in settlement discussions was protected activity is also consistent with Title VII's statutory goals. Title VII was drafted in a manner to encourage parties to resolve disputes on a voluntary basis and without resort to

litigation. See, e.g., Alexander v. Gardner-Denver Co., 415 U.S. 36, 44 (1974).  To allow an employer to take adverse action against an employee who attempts to resolve a Title VII claim through informal means because the employer considers the employee's proposal "ridiculous" or "extortionate" would inhibit settlement discussions and foster additional litigation.  If such a rule was adopted, an employee with potential Title VII claims would face the possibility of dismissal or other adverse action if, as often happens during settlement discussions, an employer's appraisal of the value of a claim markedly differs from the employee's appraisal.  Thus, a plaintiff's participation in settlement discussions prior to filing suit is deemed protected activity in order to further the statutory objective of resolving Title VII disputes without litigation.

      B.      **MSG And Dolan Improperly Discharged Plaintiff Because She Spoke With Colleagues About Her Claims And Gathered Supporting Evidence**

Plaintiff is also entitled to partial summary judgment against MSG and Dolan based on Dolan's testimony that he dismissed plaintiff because she "tampered" with MSG's investigation of her sexual harassment complaint and violated MSG's policies.  The undisputed evidence is that plaintiff spoke with other employees about her complaints and, in a few instances, asked members of her staff to document events they had previously shared with her that plaintiff believed were relevant to her claims.  This conduct did not violate any MSG policy and, in any event, is protected activity under the anti-retaliation laws.

      1.      Plaintiff Did Not Tamper With MSG's Internal Investigation

Dolan testified that plaintiff tampered with the investigation by using her authority to influence members of her staff to corroborate her sexual harassment complaint.[8]

---

[8]     When asked to describe his understanding of what Browne Sanders actually did to influence her staff, Dolan responded, in relevant part:

Dolan claimed that McCormack, MSG's SVP of Human Resources, was his sole source of knowledge about plaintiff's purported "tampering" and that no one personally told Dolan that Browne Sanders had attempted to influence them. (Pl. 56.1 ¶¶ 72-73) McCormack, however, testified that he had never discussed Browne Sanders with Dolan. (Pl. 56.1 ¶ 74) Moreover, the testimony of Browne Sanders' colleagues and staff members does not support defendants' tampering allegations.

According to Buchholz, in or about November and December 2005, Browne Sanders initiated discussions with her in which Browne Sanders attempted to refresh Buchholz's memory concerning matters that she had discussed with Browne Sanders in the past, including, among other subjects, the inappropriate behavior of Thomas and Marbury. (Pl. 56.1 ¶ 42) On or about November 28, 2005, Browne Sanders requested that Buchholz send her an e-mail documenting incidents in which Marbury expressed unwillingness to cooperate with plaintiff's marketing efforts. (Pl. 56.1 ¶ 43) Buchholz did not testify that Browne Sanders had ever instructed her to recall something that Buchholz, in fact, did not remember. Nor did Buchholz

---

I believe she had discussions that -- that she brought -- that -- that she had people in her office. I mean it was reported to me that she had been tampering with the investigation . . . I mean the -- the -- you know, her responsibility at that point was to leave the investigation up to the people who she made the complaint to. The -- actually I don't think she had made the complaint at that point. That the -- I am a little fuzzy on whether -- whether it was right there before or after, but she clearly knew she was going to make a complaint that the -- and then she brought people in who reported to her. That the -- and proceeded to discuss the merits of her complaint. The -- and attempt to persuade the people underneath her that her complaint had merit and that they -- and attempt to get them to back her up on her complaints. . . . [S]he violated the company policy, and she rendered herself at that point the -- the -- unemployable by the company. . . . [T]hat is why she was let go. (Pl. 56.1 ¶ 77)

state that Browne Sanders had ever suggested that she should tell MSG's investigators anything other than her truthful recollection of events.  Buchholz did state that she was "uncomfortable"[9] with Browne Sanders' request that she document issues related to Marbury in an e-mail, but she confirmed at her deposition that the substance of that e-mail was true, as was everything that Buchholz told MSG's internal investigators.  (Pl. 56.1 ¶ 43)[10]

On or about November 28, 2005, Browne Sanders requested that Gladstone send her an e-mail reflecting the conversation that he had in June 2005 with Marbury.  Gladstone testified that the substance of this e-mail was accurate, and he did not testify that Browne Sanders had ever suggested what he should say to MSG's investigators.  (Pl. 56.1 ¶ 44) Similarly, on or about December 13, 2005, Browne Sanders requested that Winkler send her an e-mail documenting his conversations with Pope concerning Pope being asked to check on the referees, and Winkler did so.  (Pl. 56.1 ¶ 45)  Again, there is no evidence that Browne Sanders ever told Winkler what he should say to the investigators.

In sum, there is no evidence that plaintiff stated to her staff members or anyone else that they should tell the investigators anything other than the truth, or that plaintiff exerted undue influence on anyone to falsely corroborate her complaint.

---

[9]     This discomfort appears belated and one-sided.  Buchholz asked plaintiff to "document" a proposed raise that Buchholz was supposed to receive because she thought it was important to have a written record of the raise. (Pl. 56.1 ¶ 43)

[10]     Buchholz also testified that plaintiff had requested that Buchholz accompany her to consult with counsel even though Buchholz had told plaintiff that she was uncomfortable in doing so.  (Pl. 56.1 ¶ 47)  Even assuming the truth of this assertion (which plaintiff denies), these facts could not have anything to do with Browne Sanders' dismissal because the undisputed evidence is that Buchholz did not inform anyone at MSG that she went with plaintiff to meet with counsel until after plaintiff had filed suit, by which time plaintiff had already been fired. (Pl. 56.1 ¶ 66)

2.    Plaintiff's Communications With Other MSG Employees About
MSG's Sexual Harassment Were Protected Activity

Browne Sanders' communications with her staff regarding the facts of her complaint against MSG, including her requests that they document certain events related to her complaint, constitute participation protected from retaliation. The Second Circuit has long held that the "exceptionally broad" language of the participation clause, Jute, 420 F.3d at 174, protects the ability of an employee to gather evidence in support of a pending or contemplated charge of employment discrimination.

In Heller v. Champion Int'l Corp., 891 F.2d 432, 436 (2d Cir. 1989), the Court held that the plaintiff engaged in protected activity when he surreptitiously tape recorded his supervisors for the purpose of obtaining evidence for a potential age discrimination claim. Similarly, in Grant v. Hazlett Strip-Casting Corp., 880 F.2d 1564, 1569-70 (2d Cir. 1989), the Second Circuit found the plaintiff's activities protected when he drafted a memorandum containing evidence of age discrimination, asked the company's president to approve the memorandum without revealing its true purpose, and then used the signed memorandum in a later lawsuit against the company.

Here, Browne Sanders asked Buchholz if she recalled conversations that they had over the previous two years. She also requested members of her staff to memorialize certain incidents that she reasonably believed to be related to her complaint of sexual harassment, including Marbury's referring to her as a "black bitch," because plaintiff was going to use the documentation to insist that her manager deal with her sexual harassment complaints. (Pl. 56.1 ¶ 46) These actions fall squarely within the evidence gathering protections of the participation clause, as recognized in Heller and Grant. Indeed, Dolan admits that his objection to plaintiff's

conduct was that she was "off through the company attempting to garner support for a complaint . . . about sexual harassment." (Pl. 56.1 ¶ 79)

Plaintiff's conduct in speaking with her staff and colleagues about her potential claims is also protected by the opposition clause. See Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990) (opposition clause protects against wide range of informal protests of discriminatory practices); E.E.O.C. Compliance Manual, Section 8-II(B)(2) ("A complaint or protest about alleged employment discrimination to a manager . . . co-worker . . . or anyone else constitutes opposition."). Furthermore, contrary to Dolan's testimony, plaintiff's activities did not violate any documented policy of MSG concerning the investigation of harassment complaints. MSG has failed to produce any document stating that an employee who has made or intends to make an internal complaint of harassment must refrain from speaking with anyone about the substance of her complaint or gathering evidence in support of her complaint. Even if MSG had such a policy, it would be contrary to the guarantees of the Title VII anti-retaliation provision and thus unenforceable. See Smith v. Berry Co., No. A. 96-1899, 1997 WL 358123, at *10 (E.D. La. June 24, 1997) (employee's surreptitious tape recording of her supervisor and co-workers was protected activity even though employer's written policy prohibited such tapings), aff'd in relevant part, 165 F.3d 390 (5th Cir. 1990).

Finally, MSG cannot plausibly argue that plaintiff's protected activity was unreasonably disruptive. There is no evidence that any of plaintiff's oppositional conduct interfered with MSG's business or caused a disturbance in the workplace. See Heller, 891 F.2d at 436 (rejecting employer's argument that plaintiff's surreptitious taping was unprotected conduct because it was "disruptive" and "disorderly"); cf. Matima v. Celli, 228 F.3d 68, 81 (2d. Cir. 2000) (upholding jury finding that plaintiff would have been fired even had he not engaged

in protected activity where plaintiff "repeatedly confronted and antagonized his supervisors in inappropriate contexts in a way that was designed to force the company's hand or make it pay a price in reduced productivity, focus and morale"); Cruz v. Coach Stores, Inc., 202 F.3d at 566 (Title VII "does not constitute a license for employees to engage in physical violence in order to protest discrimination").   To the contrary, plaintiff continued to perform her duties at MSG until the company refused to permit her to come to work following her counsel's bias complaints to MSG on her behalf.

C.     Plaintiff Had A Good Faith, Reasonable Basis For Her Protected Activity

Defendants cannot stave off summary judgment by asserting that plaintiff did not have a good faith and reasonable basis to oppose MSG's discriminatory practices.  Because plaintiff's conduct in reporting sexual harassment to MSG, gathering evidence in support of her claim and discussing settlement through her counsel is covered under the participation clause of Title VII, plaintiff need not demonstrate a reasonable and good faith basis for her conduct in order to be protected from reprisals. (See pp. 11-12, supra)

Furthermore, even if plaintiff's conduct is analyzed solely under the opposition clause, the undisputed facts compel a finding that plaintiff had a reasonable, good faith basis to oppose sexual harassment at MSG.  As of December 2005, when plaintiff's counsel contacted MSG and the parties agreed to engage in settlement discussions, the following undisputed events, among others, had occurred:

- Plaintiff was told by Gladstone that Marbury had said, referring to her, "No one likes that black bitch," "Fuck that black bitch, she thinks she runs the Knicks, she don't run shit," and "fuck that black bitch, she ain't shit and we'll see what happens this year."

- In November 2005, a female member of plaintiff's staff told Browne Sanders that, while she was ████████, she had intercourse with Marbury under circumstances where she felt that she could not say no. ██████████ also stated that Marbury had followed up the sexual encounter with inappropriate text messages.

- In November 2005, several of plaintiff's staff members reported that Gonsalves had made explicit and unwelcome sexual comments and propositions.

- In December 2005, Thomas attempted to hug and kiss Browne Sanders on the cheek and, when rebuffed by Browne Sanders, responded: "No love today?"

- In October 2005, while at a Knicks event, Thomas put his arm around plaintiff and commented on her appearance.

- In early 2005, Thomas embraced Browne Sanders and she pulled away from him.

- Browne Sanders was told by her assistant in December 2004 that she had witnessed Thomas looking Browne Sanders up and down while licking his lips and "checking [her] out."

- In May 2005, Browne Sanders stated to Olsen that Thomas has said that he was "in love" with her; Browne Sanders also told Olsen that Thomas needed sexual harassment training.

- Thomas used profanity in speaking with plaintiff at various times throughout his employment.

(Pl. 56.1 ¶¶ 13-40)

Based on these undisputed facts, a reasonable jury would be compelled to find that Browne Sanders had a good faith, reasonable belief that she was opposing unlawful employment practices at MSG. See, e.g., Cooper-Nicholas v. City of Chester, No. Civ. A. 95-

6493, 1997 WL 799443, at *6 (E.D. Pa. Dec. 30, 1997) (finding "as a matter of law" that plaintiff acted under a good faith, reasonable belief in complaining about a co-employee who made various sexual comments to other employees).

> D.    **Defendants Cannot Demonstrate That Plaintiff Would Have Been**
>       **Fired Even If She Had Not Engaged In Protected Activity**

Defendants cannot prevail by proving that plaintiff would have been fired even if she had not engaged in protected activity. See Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989); Matima, 228 F.3d at 79. While Dolan claimed that part of his motivation for firing plaintiff in January 2006 was her alleged poor performance at budget meetings six months earlier and her supposed statement to Mills that she did not want to continue working at MSG, Dolan admitted that he had no interactions with plaintiff from the summer 2005 meetings through and including the day in January 2006 that he decided to fire her.  (Pl. 56.1 ¶ 69)  Dolan also acknowledged that the determinative factor in plaintiff's dismissal was plaintiff's protected activity.  Indeed, he specifically stated that plaintiff "could have continued on doing her job" if she had not spoken with her staff members about her complaint, which Dolan erroneously described as "tampering" and which, Dolan claimed, was the "last straw [] that . . . led me to the conclusion that her employment at the company was over with."  (Pl. 56.1 ¶ 78)

The determinative nature of plaintiff's protected activity is further corroborated by the extraordinarily suggestive timing of plaintiff's dismissal. See Cifra v. General Elec. Co., 252 F.3d at 217 (timing of plaintiff's dismissal 20 days after employer learned that she had retained counsel highly probative of employer's retaliatory motive).  Browne Sanders was fired less than one month after her counsel raised her Title VII complaints with MSG, a mere six days after MSG had concluded its investigation of plaintiff's internal complaint, and on the same day that

McCormack signed a memorandum in which he stated that Browne Sanders should be dismissed "in light of" the results of MSG's internal investigation.

Accordingly, based on the evidence, a jury would have to conclude that plaintiff would not have been fired in January 2006 but for her participation in protected activity.

<u>CONCLUSION</u>

Based on the foregoing, plaintiff's motion for partial summary judgment against defendants MSG and Dolan on her claims of retaliation should be granted.

Dated:      New York, New York
            April 27, 2007

                                        Respectfully submitted,

                                        VLADECK, WALDMAN, ELIAS
                                         & ENGELHARD, P.C.

            By:     _____
                    Anne C. Vladeck (AV 4857)
                    Kevin T. Mintzer (KM 4741)
                    Karen Cacace (KC 3184)
                    Attorneys for Plaintiff
                    1501 Broadway, Suite 800
                    New York, New York  10036
                    (212) 403-7300

244578 v2                                   25