UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
ANUCHA BROWNE SANDERS,

                                            06 Civ. 0589 (GEL) (DF)

              Plaintiff,

   - against -                        ECF CASE

MADISON SQUARE GARDEN, L.P., ISIAH     AFFIDAVIT OF KEVIN T. MINTZER IN
LORD THOMAS III and JAMES L. DOLAN,    SUPPORT OF PLAINTIFF'S MOTION FOR
                                               PARTIAL SUMMARY JUDGMENT

              Defendants.
------------------------------------x

STATE OF NEW YORK    )
                           ) ss.:
COUNTY OF NEW YORK  )

       KEVIN T. MINTZER, being duly sworn, deposes and says:

       1.     I am a member of the firm Vladeck, Waldman, Elias & Engelhard, P.C., attorneys for plaintiff Anucha Browne Sanders ("plaintiff" or "Browne Sanders) in this action against Madison Square Garden, L.P. "(MSG"), Isiah Lord Thomas ("Thomas") and James L. Dolan ("Dolan"). I submit this affidavit in support of plaintiff's Motion For Partial Summary Judgment.

       2.     Attached hereto as Exhibit 1 are excerpts from the first day of plaintiff's deposition on November 27, 2006 and Browne Sanders Deposition Exhibit 11.

       3.     Attached hereto as Exhibit 2 are excerpts from the deposition of James L. Dolan and Dolan Deposition Exhibits 4 and 16.

244886 v1

4. Attached hereto as Exhibit 3 are excerpts from the deposition of Isiah Lord Thomas and Thomas Deposition Exhibit 4.

5. Attached hereto as Exhibit 4 are excerpts from the deposition of Stephen Mills and Mills Deposition Exhibits 1, 3, 4, 6, 7, 8, 11 and 16.

6. Attached hereto as Exhibit 5 are excerpts from the deposition of Rusty McCormack and McCormack Deposition Exhibit 8.

7. Attached hereto as Exhibit 6 are excerpts from the deposition of Stephon Marbury.

8. Attached hereto as Exhibit 7 are excerpts from the deposition of John Moran and Moran Deposition Exhibits 1,2, 3 and 4.

9. Attached hereto as Exhibit 8 are excerpts from the deposition of Rochelle Noel and Noel Deposition Exhibit 14.

10. Attached hereto as Exhibit 9 are excerpts from the deposition of Karin Buchholz and Buchholz Deposition Exhibit 1.

11. Attached hereto as Exhibit 10 are excerpts from the deposition of Dan Gladstone and Gladstone Deposition Exhibit 7.

12. Attached hereto as Exhibit 11 are excerpts from the deposition of Faye Brown.

13. Attached hereto as Exhibit 12 are excerpts from the deposition of Jeff Nix.

14. Attached hereto as Exhibit 13 are excerpts from the deposition of Robert Levy.

15. Attached hereto as Exhibit 14 are excerpts from the deposition of Peter Olsen and Olsen Deposition Exhibits 2 and 7.

16. Attached hereto as Exhibit 15 is a document produced by MSG reflecting the hiring of plaintiff by MSG in November 2000.

17. Attached hereto as Exhibit 16 is the Declaration of Jonathan Schindel, Esq., dated January 23, 2007.

18. Attached hereto as Exhibit 17 is a document produced by MSG that appears to be notes of John Moran's interview with Gary Winkler.

19. Attached hereto as Exhibit 18 is the Declaration of Marc Schoenfeld, Esq., dated March 2, 2007

20. Attached hereto as Exhibit 19 is an e-mail exchange between counsel for MSG and counsel for Browne Sanders on December 22 and December 23, 2005.

21. Attached hereto as Exhibit 20 is a letter from counsel for MSG to counsel for Browne Sanders dated December 30, 2005 (attached term sheet is omitted).

22. Attached hereto as Exhibit 21 is a letter from plaintiff's counsel to MSG's counsel dated January 20, 2006.

23. Attached hereto as Exhibit 22 is a letter from MSG's counsel dated February 28, 2007, concerning Mills Deposition Exhibit 8.

24. Attached hereto as Exhibit 23 are notes that appear to have been taken by John Moran at the interview of plaintiff by John Moran and Rochelle Noel on January 6, 2006.

25. On December 22, 2005, I participated in a meeting among attorneys for Browne Sanders and attorneys for MSG. At that meeting, Browne Sanders' counsel stated,

among other things, that Browne Sanders had been sexually harassed at MSG and provided MSG's counsel with information concerning Browne Sanders' claims.

26. Following the meeting, on December 22, 2005, Browne Sanders' counsel and MSG's counsel agreed to, inter alia, "attempt to expedite a negotiated, good faith resolution of Ms. Browne Sanders' claims." Counsel also agreed that their understanding with respect to settlement discussions was "confidential and deemed in furtherance of settlement pursuant to Fed. R. Evid. 408." See Exhibit 19 attached hereto.

27. Pursuant to the parties' understanding of December 22, 2005, on December 27, 2005, Browne Sanders' counsel conveyed a settlement proposal to MSG's counsel in connection with Browne Sanders' sexual harassment claims against MSG. To the best of my knowledge, prior to this proposal, neither Browne Sanders nor anyone acting on Browne Sanders' behalf had made a monetary settlement or severance proposal to MSG.

28. On December 30, 2005, MSG's counsel delivered to plaintiff's counsel a letter that included a counter-offer to settle plaintiff's claims. The letter from MSG's counsel stated that MSG's counter-offer was being made pursuant to Fed. R. Evid. 408. The letter also stated that "MSG is ready, willing and able to continue as rapidly as possible our good-faith discussions in order to find a mutually acceptable resolution." See Exhibit 20 attached hereto (term sheet omitted)..

29. On January 3, 2006, plaintiff's counsel orally conveyed another settlement proposal to MSG's counsel.

30. On January 19, 2006, MSG's counsel informed me that MSG's investigation of plaintiff's internal complaint had been concluded. In that same conversation,

MSG's counsel informed me that MSG was going to terminate Browne Sanders' employment, effective immediately. See Exhibit 21 attached hereto.

_____
KEVIN T. MINTZER

Sworn to before me this
27th day of April, 2007.

_____
Notary Public

R. J. OSBORNE
NOTARY PUBLIC, State of New York
No. 02OS6094970
Qualified in Queens County
Commission Expires June 2007

244886 v1

5

# Exhibit 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
ANUCHA BROWNE SANDERS,


                    Plaintiff,

         -against-                      06 CV 0589 (GEL)

MADISON SQUARE GARDEN, L.P.,
ISIAH LORD THOMAS III and JAMES L. DOLAN,

                    Defendants.
---------------------------------------X
```

VIDEOTAPED DEPOSITION OF ANUCHA BROWNE SANDERS

New York, New York

Monday, November 27, 2006

REPORTED BY:

BARBARA R. ZELTMAN

Job Number: 10954



**David Feldman**
W o r l d w i d e

From File to Trial.

805 Third Avenue, 8th Floor    600 Anton Boulevard, 11th Floor
New York, NY 10022                    Costa Mesa, CA 92626
(800) 642-1099                           (866) DFW-1380

### Page 174

ANUCHA BROWNE SANDERS

2  A  Yes. He would be incorrect.
3  Q  In fact it would not be true,
4  would it?
5  A  It would not be true.
6  Q  Would it surprise you that
7  Steve Mills would tell an untruth?
8  A  I am not a read of his
9  character. If he did, he did. I don't
10 know.
11 Q  You don't have a read of his
12 character?
13 A  Not at this point, I sure
14 don't.
15 Q  At any point, did you?
16 A  I thought I did.
17 Q  You thought he was a great
18 guy, right?
19     MS. VLADECK: Objection to
20 form.
21 A  I thought he was smart and
22 likeable.
23 Q  Not a great guy?
24     MS. VLADECK: Objection to
25 form.

### Page 175

ANUCHA BROWNE SANDERS

2     Do you want to define "great
3 guy"?
4  Q  As you understand it. Never
5 as I understand it.
6     When I ask you a question,
7 it's as you understand it. You know, if
8 you have an understanding of the words
9 "great guy," then you say it. If you
10 don't have an understanding, I'll define
11 it.
12     MS. VLADECK: Objection to
13 form.
14 Q  But I am not asking you
15 supercalifragelisticexpialidocious.
16 I am just saying "great guy,"
17 whatever you think of as a great guy.
18     MS. VLADECK: Objection to
19 form.
20 A  I saw Steve as a professional.
21 Q  Not a great guy?
22     MS. VLADECK: Objection to
23 form.
24 A  I'm answering your question.
25 I saw Steve as a professional.

### Page 176

ANUCHA BROWNE SANDERS

2  Q  Do you understand the words
3 "great guy"?
4  A  I wouldn't describe somebody I
5 worked with as a "great guy" because I
6 don't know them personally enough to
7 define them that way. I think great guy
8 goes well beyond professional.
9  Q  Okay. I can accept that.
10    In November and December of
11 '05, you caused members of your staff, did
12 you not, to reconstruct the Petra Pope
13 incident in a memo?
14    MS. VLADECK: Objection to
15 form.
16 A  You said members of my staff.
17    Could you explain that?
18 Q  You don't know what the words
19 "members of your staff" means?
20    MS. VLADECK: Objection to
21 form.
22 A  The answer to your question is
23 no. It's plural.
24 Q  Plural?
25 A  I asked one member of my

### Page 177

ANUCHA BROWNE SANDERS

2 staff.
3  Q  Oh, oh, oh. I am not trying
4 to fence with you.
5     MS. VLADECK: Then please
6 don't, Peter. Ask a question. And
7 if she says she doesn't understand
8 it, please rephrase it.
9     MR. PARCHER: I am just trying
10 to understand what's going on.
11 A  I just want to be careful that
12 I don't say something that is incorrect.
13 So you said "members," which is plural to
14 me. And I asked one member of my staff.
15 That's singular.
16 Q  It would be helpful if you
17 raised my consciousness to that before I
18 ask you the next question so I can get an
19 misunderstanding.
20 A  Sure.
21 Q  And you're trying not to give
22 me a misunderstanding, right?
23    MS. VLADECK: Objection to
24 form.
25 Q  Who did you ask?

```
                                           178
                ANUCHA BROWNE SANDERS
 1
 2      A     His name is Gary Winkler.
 3      Q     Why did you ask Gary Winkler
 4   in November of '05 to reconstruct an event
 5   that had happened over a year earlier?
 6          MS. VLADECK: Objection to
 7       form.
 8      A    I wanted to make sure I had a
 9   record of it, as I was demanding that
10   Steve deal with things.
11      Q     Didn't you have some desire to
12   make sure that you had a record of this
13   arm-pulling/screaming incident so that
14   Steve could deal with things in November
15   of '05?
16          MS. VLADECK: Objection to
17       form.
18      A    Not necessarily, no. Either
19   it was something that happened to me that
20   I recalled.
21      Q     Was it important to you, as
22   you did with Winkler and Petra Pope, to go
23   around to the different people that might
24   have been in the corridor that night and
25   say: "Did you see Isiah pulling me"? That
```

```
                                           179
                ANUCHA BROWNE SANDERS
 1
 2   wasn't important to you?
 3          MS. VLADECK: Objection to
 4       form. Asked and answered.
 5      A    You mentioned Petra Pope. She
 6   was gone from the business before.
 7      Q     I am not talking about
 8   Petra Pope
 9          MS. VLADECK: Then don't
10       mention her.
11      A    You mentioned her.
12      Q     I know, but now I'm talking
13   about the arm grabbing incident.
14      A    You referenced Petra Pope --
15          MS. VLADECK: Objection to
16       form.
17      Q     Do you understand my question?
18      A    No, I don't. Maybe you should
19   ask it again.
20      Q     Are you instructing me to ask
21   it again?
22      A    Yeah, I didn't understand it.
23          MS. VLADECK: Normally, in the
24       beginning when we say if you don't
25       understand a question, ask me to
```

```
                                           180
                ANUCHA BROWNE SANDERS
 1
 2   rephrase or repeat it. And so she's
 3   asking you to rephrase it.
 4      Q     If you don't understand the
 5   question I'm asking you, always, always,
 6   always ask me to repeat it. I will be
 7   very happy to do it. And if that isn't
 8   the look on my face, I would still be very
 9   happy to do it. I don't want you to
10   ask -- answer a question that you don't
11   understand. Not that I have seen you do
12   that, but I don't want you to.
13      I'm trying to find out whether
14   at any time you checked around to find out
15   whether you had any witnesses other than
16   yourself to the incident that you are
17   describing happened outside of the
18   players' lounge and then inside the bike
19   room, that we've been talking about.
20          MS. VLADECK: Objection to
21       form. Asked and answered three
22       times.
23      A    No.
24      Q     Did you ever try to get a
25   witness, to check anybody to see if they
```

```
                                           181
                ANUCHA BROWNE SANDERS
 1
 2   could help you, either because they saw
 3   the arm pull or because they heard the
 4   screaming and the cursing?
 5          MS. VLADECK: Objection to
 6       form. Asked and answered.
 7      A    No.
 8      Q     When that incident occurred,
 9   did you go to Steve Mills?
10          MS. VLADECK: Objection to
11       form.
12      Q     What incident?
13      A    Which incident are you
14   referring to?
15      Q     The arm pull/screaming.
16      A    Yes, I told Steve Mills after
17   that weekend.
18      Q     Were you disturbed when you
19   went to see him?
20      A    I told him that I was
21   disturbed by it.
22      Q     You wouldn't make something
23   up? You were disturbed, right?
24          MS. VLADECK: Objection to
25       form.
```

**Page 238**

ANUCHA BROWNE SANDERS

   A   It was the first time he called me a ho. It wasn't the first time he called me a bitch.

   Q   So it was the ho that drove you over the top? Or had you told Mills that you can't take him calling you a bitch earlier on?

   MS. VLADECK: Objection to form.

   A   I had conversations with Steve as these were happening, and I told him that "the language is inappropriate. He's got to do something about this."

   Q   So it was getting worse. You were telling Mills when you saw him, and yet the situation was getting worse, wouldn't you say?

   MS. VLADECK: Objection to form.

   A   I would say the situation wasn't getting better.

   Q   Well, the man went from bitch to ho, which is a thing which you said was most upsetting to you -- not that the

**Page 239**

ANUCHA BROWNE SANDERS

other wasn't upsetting.

   So it was getting worse, no?

   MS. VLADECK: Objection to form.

   A   All the profanity that was directed at me was bad.

   Q   But it was getting worse, or was it the same all the time?

   A   In this particular conversation, he was seething. He was spewing curses and seething over the phone.

   Q   So it was getting worse?

   A   So this one was particularly bad. Worse than the others.

   Q   Thank you.

   Now, you called that meeting -- for that meeting?

   A   Yeah.

   Q   Okay. Now, what had prompted you to call Isiah --

   This is March 23rd, is it not?

   A   Yes.

   Q   What prompted you to call

**Page 240**

ANUCHA BROWNE SANDERS

Isiah that day?

   A   Frank Murphy came in my office, and we were -- I think it was to discuss player appearances, something around player appearances. And he started yelling at me. He said, "I don't like the way I've been treated here for two years, and now you are going to pay." And he said this standing over my desk as I was sitting at my desk. And he said, "If you want a relationship with Isiah, you are going to have to go through me." And he called me a "fucking bitch." I told him to get out of my office. And then I got on the phone with Isiah.

   Q   Now, you say -- what did you say it had something to do with?

   A   I think it was player appearances. It was player -- it certainly was player appearances, something around player availability.

   Q   Excuse me just a second. When I turn my back it's because --

   Let me ask you something while

**Page 241**

ANUCHA BROWNE SANDERS

we're waiting for Lisa to pull a document for me.

   Did it ever occur to you that you could have avoided meetings alone with Thomas if he was saying unpleasant things to you?

   MS. VLADECK: Objection to form.

   A   I wasn't seeking him out.

   Q   That's not what I'm asking you, in all candor.

   Did it ever occur to you, cross your mind, that since every time you saw this guy he was using profanity and/or cursing at you, and you said he wasn't doing it in front of other people, that you could avoid meeting with him alone?

   MS. VLADECK: Objection to form.

   A   Yes, it did occur to me.

   Q   Did you ever take it up with Steve Mills?

   A   I think we decided later on that he would basically be -- that Steve

61 (Pages 238 to 241)

|     | 290 |     | 292 |
| --- | --- | --- | --- |
| | ANUCHA BROWNE SANDERS | | ANUCHA BROWNE SANDERS |

**Page 290**

1  ANUCHA BROWNE SANDERS
2      MR. PARCHER: Right, Anne?
3      MS. VLADECK: Very good.
4      MR. PARCHER: One on 03666 is
5  where it starts.
6      You don't have to worry about
7  that. I'm just reading the pages
8  off.
9  Q  And I'm going to call your
10 attention to something on 03667 and then
11 ask you a question from later on.
12     MS. VLADECK: Just for the
13 record this is a plaintiff production
14 as opposed to MSG.
15     MR. PARCHER: Whatever you
16 say.
17 Q  You see there you are writing
18 down the Petra Pope -- so-called Petra
19 Pope incident?
20     Do you see that?
21     MS. VLADECK: What page are
22 you on?
23     MR. PARCHER: It ends with 67.
24 Second page.
25 Q  Do you see that there?

**Page 291**

1  ANUCHA BROWNE SANDERS
2  A  Yes.
3      Which page are you referring
4  to? The first one?
5  Q  No, the second page.
6  Plaintiff's 06367.
7      Do you see on the top right
8  you referred to the Petra Pope incident?
9  A  Yes.
10 Q  Now, moving along on these
11 pages, we'll go to the 15, so on and so
12 forth -- and finally you end up on the
13 19th of October on the very last page,
14 03672.
15     You got the last page? No,
16 not that one. The one past that. You see
17 on October 19, 2004 --
18     MS. VLADECK: I'm sorry. Did
19 you say October 19 -- oh, the last
20 page of this exhibit.
21     MR. PARCHER: Is October 19,
22 2004. Starts on the 14the or maybe a
23 little before.
24     MS. VLADECK: Got it.
25 Q  We're down to the third item

**Page 292**

1  ANUCHA BROWNE SANDERS
2  on the top left there. "Spoke to
3  G Winter -- G Winkler.
4      That's Gary Winkler, right?
5  A  Uh-huh.
6  Q  "About importance of following
7  procedures and reporting anything
8  inappropriate."
9  A  Yes.
10 Q  Do you see that?
11     Now, that was around the Petra
12 Pope incident.
13     Do you recall a conversation
14 with Gary Winkler being about reporting
15 Petra Pope properly?
16     MS. VLADECK: Objection to
17 form.
18 A  Yes.
19 Q  And why was it important to
20 follow procedures when reporting anything
21 inappropriate?
22 A  The procedure I explained to
23 him was to bring it to my attention, and
24 that's what I told him.
25 Q  The procedure of the Garden is

**Page 293**

1  ANUCHA BROWNE SANDERS
2  for him to bring it to your attention if
3  he sees anything inappropriate?
4      MS. VLADECK: Objection to
5  form.
6  A  When I met with him and Petra,
7  that's what I told him. If they are aware
8  of anything inappropriate, please bring it
9  to my attention. And that's what I'm
10 referencing there.
11 Q  So the procedures that you
12 were referring to, "the following
13 procedures," you weren't referring to the
14 procedures set forth by Madison Square
15 Garden when something inappropriate
16 occurred, were you?
17     MS. VLADECK: Objection to
18 form.
19 A  I wasn't referring to --
20 what -- I was referring to what I deemed
21 as the procedure, which was to bring it to
22 your manager's attention.
23 Q  And nothing about the Garden's
24 procedures, whatever they may have been?
25     MS. VLADECK: Objection to

294

ANUCHA BROWNE SANDERS

1  ANUCHA BROWNE SANDERS
2  form.
3    A    That wasn't discussed.
4    Q    Were you aware of what the
5  Garden procedures were in reporting
6  anything inappropriate?
7        MS. VLADECK: Objection to
8  form.
9    A    I understood the procedures
10 as -- I understood the procedure as -- I
11 understood the procedure was to bring it
12 to your manager's attention. And that's
13 what I was explaining to both Petra and
14 Gary.
15   Q    Now, did Petra actually tell
16 you that Isiah told her to go and flirt
17 with the referees?
18   A    Yes. What she told me was
19 that Isiah asked her to go into the
20 locker -- go into the referees' locker
21 rooms and make them, quote, "happy." And
22 I asked her to tell me what that meant.
23 And she said, "Well, it meant he wanted me
24 to flirt with the referees."
25   Q    Now, I'm looking at your

295

1  ANUCHA BROWNE SANDERS
2  diary. I don't want to do a whole
3  cross-examination here and have nothing to
4  do ask you at the trial, if we go to
5  trial.
6        But here it says, "before the
7  New York Knicks versus Nets game in
8  Wilkes Barre, Petra Pope told me that
9  Isiah Thomas had her, quote, 'serve,' end
10 quote, the officials last year."
11       You didn't mean last year, did
12 you? You must have meant last night?
13   A    No.
14   Q    Last year?
15   A    I meant the season prior to,
16 what she told me was that Isiah -- this
17 was not the first time that Isiah asked
18 her to do that. So referred to last
19 season and also referred to that game at
20 Wilkes Barre.
21   Q    This is a note of
22 October 2004.
23       Isiah wasn't at the Garden in
24 2003, was he?
25       MS. VLADECK: Objection to

296

1  ANUCHA BROWNE SANDERS
2  form.
3    A    He came in December of 2003,
4  and it was during the season that he came.
5    Q    So the '03/'04 season is when
6  it occurred?
7    A    It occurred during the '03/'04
8  season --
9    Q    When?
10   A    Can I finish? It occurred
11 during the '03/'04 season, and what she
12 was telling me in October -- I think it
13 was October 14th, what she was telling me
14 was, at the Wilkes Barre game when we were
15 playing -- I think we played the Nets that
16 day -- she said to me, "This is what he
17 has asked. This is not the first time he
18 has asked me to do it. He's asked me to
19 do it last season too."
20       But she was telling me he
21 asked her to do it at that game, and she
22 didn't want to do it anymore.
23   Q    Did she specifically say to
24 you that he was asking her to flirt?
25   A    I asked her what that meant,

297

1  ANUCHA BROWNE SANDERS
2  and she said, "He wants me to flirt with
3  the officials."
4    Q    And you thought it was
5  important enough that she told you this
6  information to write it in your diary, did
7  you not?
8        MS. VLADECK: Objection to
9  form.
10   A    I wrote it down.
11   Q    Well, is that because you
12 thought it was important?
13       MS. VLADECK: Objection to
14 form. Asked and answered.
15   A    It was important. I thought
16 it was important.
17   Q    Is there a reason you didn't
18 write down in your diary that she said
19 that she interpreted his request as asking
20 her to flirt with the referees?
21       MS. VLADECK: Objection to
22 form and mischaracterizes.
23       It says, "IT wanted her to
24 flirt."
25       If you read farther on in that

```
                                    330
 1        ANUCHA BROWNE SANDERS
 2        MR. PARCHER:  I accept that.
 3   I thought I did.  I'm quite sure --
 4   if I didn't show it to you.  I didn't
 5   show it to you.
 6   Q    I will show it to you.
 7        In addition to these reports
 8   on Manuel and Gonsalves, you obtained
 9   something at or about that time from
10   Dan Gladstone referring to a Marbury
11   incident that had taken place in June or
12   July of '05.
13        Do you recall that?
14        And you had him report to you
15   on that as well?
16   A    Yes.
17        MS. VLADECK:  Objection to
18   form.
19   Q    Do you?
20   A    Yes.
21   Q    And in addition to that -- I
22   think we did discuss this, I might have
23   showed it to you -- you had Gary Winkler
24   give you a reporting in December '05 on
25   the so-called Petra Pope, incident for
```

```
                                    331
 1        ANUCHA BROWNE SANDERS
 2   lack of a better way of putting it.
 3        Do you recall that?
 4   A    Yes.
 5   Q    And were these reports
 6   prepared by you, at that time, to in
 7   any way aid you in this case?
 8   A    No.
 9   Q    It had nothing to do with
10   thoughts on your part that you were going
11   to either get a highly lucrative severance
12   from the Garden or else sue them?
13        MS. VLADECK:  Objection to
14   form.
15   A    Not at all.
16   Q    Never crossed your mind at the
17   time?
18        MS. VLADECK:  Objection to
19   form.
20   A    No.
21   Q    So that in November of '05 --
22   was there a time in November or December
23   of '05 when you walked into Steve Mills'
24   office and told him that you didn't want
25   to work at the Garden anymore?
```

```
                                    332
 1        ANUCHA BROWNE SANDERS
 2        MS. VLADECK:  Asked and
 3   answered.  Objection to form.
 4   A    No.
 5   Q    That you discussed your not
 6   working there anymore?
 7   A    No.
 8   Q    The subject of your not
 9   working there anymore never came up until
10   after your counsel met with the people at
11   the Garden?
12        MS. VLADECK:  Objection to
13   form.
14   A    No.  We didn't discuss that.
15   Steve and I did not discuss me leaving the
16   company.
17   Q    So that the necessity, in your
18   mind, of revisiting, with Gary Winkler,
19   Petra Pope was what?
20        MS. VLADECK:  Asked and
21   answered.  Objection to form.
22   A    I asked him to document it.
23   Q    Why did you ask him, in
24   December, to document is something
25   happened way back in October of the year
```

```
                                    333
 1        ANUCHA BROWNE SANDERS
 2   before?
 3   A    Because I wanted that
 4   documented because it was part of -- I
 5   expected that it would be denied.
 6   Q    Denied by whom?
 7   A    Isiah.
 8   Q    Did you expect -- but you had
 9   Petra, though, didn't you?
10   A    No.  Petra left the company.
11   Q    But she was a person who had
12   told you what had happened, that he had
13   improperly made her uncomfortable, asked
14   her to go flirt with referees, didn't she?
15        MS. VLADECK:  Objection to
16   form.
17   A    I'm sorry.  I am not
18   understanding.
19        At that time?
20   Q    Petra Pope herself, back
21   when -- in October of the year before, had
22   herself told you what happened?
23   A    Yes.
24   Q    And you had reported it to
25   Mills at that time, right?
```

**Page 334**

ANUCHA BROWNE SANDERS

2  A  Yes.
3  Q  And yet you saw the necessity
4  of doing it again over a year later?
5      MS. VLADECK: Objection to
6  form.
7  A  Of documenting it, yes.
8  Q  Why did you see the necessity
9  of documenting it in December of '05?
10 A  I thought it was important.
11 Q  Why?
12 A  I think it's important to
13 document things.
14 Q  Why wasn't it important
15 earlier to document these things?
16 A  There were a number of things
17 going on right around that time, including
18 a threat -- I think was at the time -- by
19 Steve Mills. My insistence to Steve that
20 he deal with the sexual harassment.
21 Q  This was the first time that
22 you insisted to Mills? In November of
23 '05 was the first time you insisted that
24 he deal with sexual harassment?
25 A  It wasn't the first time, no.

**Page 335**

ANUCHA BROWNE SANDERS

2  Q  When was the first time?
3  A  I think -- I want to say
4  January of 2005.
5  Q  And before that?
6  A  The verbal harassment on a
7  regular basis.
8  Q  So between January of '05 and
9  December of '05, you saw no need to insist
10 that Steve deal with the sexual harassment
11 business?
12     MS. VLADECK: Objection to
13 form. Mischaracterizes the
14 testimony.
15 A  No. That's not what you asked
16 me.
17 Q  Well, I don't understand. Can
18 you explain that to me?
19 A  Are you asking me?
20 Q  Yes.
21 A  To explain -- you didn't ask
22 me that question when I answered you
23 before.
24 Q  So explain it to me now.
25 A  Well, you asked me was that

**Page 336**

ANUCHA BROWNE SANDERS

2  the first time you insisted that I asked
3  Steve to deal with the sexual harassment.
4  And I said I insisted that he deal with
5  the verbal harassment in 2004. And after
6  he started professing his love to me at
7  the end of 2004 and into 2005, I was very
8  persistent with Steve in dealing with that
9  as well.
10 Q  Now, we'll go back to --
11 between October of '04 and December of
12 '04, are there any incidents that
13 occurred --
14 A  Say that again.
15 Q  Between October of '04, Petra
16 Pope, and December of '04, that's the
17 incident at Gate 1 -- I don't think you
18 need your recollection refreshed -- but
19 the incident where he tells you he's in
20 love with you for the first time.
21     Do you know what I'm referring
22 to?
23     MS. VLADECK: Objection to
24 form. Mischaracterizes the
25 testimony.

**Page 337**

ANUCHA BROWNE SANDERS

2  A  In December.
3  Q  Do you know what I'm referring
4  to? I'll show you the document.
5  A  I'm aware of it.
6  Q  Between that period of October
7  of '04 and December '04, were there any
8  incidents that occurred between you and
9  Isiah that were disturbing to you that you
10 haven't told us about?
11 A  October of '04. Not that I
12 can remember right now.
13 Q  Okay. So before we do
14 December '04, let's go back to the
15 infamous March '04 period of time.
16     And where we left off quite a
17 while ago, Murphy had come in to your
18 office, he was vulgar towards you, it was
19 something to do with player relations, it
20 had nothing to do with Leonard Lewin and
21 you had called for a meeting between you,
22 Steve Mills and Isiah, right?
23     MS. VLADECK: Objection to
24 form.
25 A  Yes. In March.

From: Browne Sanders, Anucha
Sent: Monday, November 28, 2005 1:02 PM
To: Mills, Steve
Subject: RE: Hassan Gonsalves

Hi Steve,
I just met with ████████ to ask her specifically what her experience has been with Hassan Gansalves. ████ said that she has become very uncomfortable with Hassan. Here are some of the comments that were said to her by Hassan:
"I want you to fuck me. When are you coming to my apartment"
"I want you to suck my dick"
"I talked to Stephon and he said to tell you to stop playing"
This past weekend Hassan sent ████ a text message which said "When can I stick it in"

I would like to terminate Hassan today. He will be here this afternoon at 5:00 pm.

-----Original Message-----
From: Browne Sanders, Anucha
Sent: Monday, November 28, 2005 12:31 PM
To: Mills, Steve
Subject: Hassan Gonsalves

Steve
Need to address some issues that I discussed with you regarding Hassan. It was brought to my attention that he has made a number of inappropriate comments to women on the staff.

To ████████ Sat in her office cube and said "I hear you give good head"
Hunter brought this to my attention this morning as ████ told him last week. A number of other things have been said to ████. This one was specifically brought to Hunter's attention last week.

To ████████: "You look good, you look good, I bet that pussy is good too"
████████ brought this to Karin Buchholz's attention and Karin relayed it to me this morning. ████ said that if it were anyone else, she would have said something sooner but since it was Stephon's cousin, she didn't feel that she could say anything.

████████ has told me that he put his hands on her waist and her leg and she told him to keep his hands off of her.

████████████████████████████ brought to my attention that Hassan routinely rolls down the windows of the Groove Truck and give "cat calls" to women on the street.

Other members of the staff (Dan Gladstone, Courtney Carter) have said that Hassan routinely says that he can do anything he wants and that if he doesn't like something all he needs to do is call Isiah or Steve and he gets whatever he wants.

Steve, I have a meeting with you this afternoon. Let's discuss how we should proceed.

Thank You

Anucha Browne Sanders
Senior Vice President
Marketing and Business Operations
New York Knicks
212-465-6432

**REDACTED**



1

MSG 00250

CONFIDENTIAL

```
From:           Browne Sanders, Anucha
Sent:           Monday, November 28, 2005 2:49 PM
To:             Moran , John VP ER MSG
Subject:        FW: Hassan Gonsalves
```

**REDACTED**

```
-----Original Message-----
From:      Browne Sanders, Anucha
Sent:      Monday, November 28, 2005 1:02 PM
To:        Mills, Steve
Subject:   RE: Hassan Gonsalves
```

Hi Steve,
I just met with ▮▮▮▮▮▮▮ to ask her specifically what her experience has been with Hassan Gansalves. ▮▮▮ said that she has become very uncomfortable with Hassan. Here are some of the comments that were said to her by Hassan:
"I want you to fuck me. When are you coming to my apartment"
"I want you to suck my dick"
"I talked to Stephon and he said to tell you to stop playing"
This past weekend Hassan sent ▮▮▮ a text message which said "When can I stick it in"

I would like to terminate Hassan today. He will be here this afternoon at 5:00 pm.

```
-----Original Message-----
From:      Browne Sanders, Anucha
Sent:      Monday, November 28, 2005 12:31 PM
To:        Mills, Steve
Subject:   Hassan Gonsalves
```

Steve
Need to address some issues that I discussed with you regarding Hassan. It was brought to my attention that he has made a number of inappropriate comments to women on the staff.

To ▮▮▮▮▮▮▮ Sat in her office cube and said "I hear you give good head"
Hunter brought this to my attention this morning as ▮▮▮ told him last week. A number of other things have been said to ▮▮▮. This one was specifically brought to Hunter's attention last week.

To ▮▮▮▮▮▮▮: "You look good, you look good, I bet that pussy is good too"
▮▮▮▮▮▮ brought this to Karin Buchholz's attention and Karin relayed it to me this morning. ▮▮▮ said that if it were anyone else, she would have said something sooner but since it was Stephon's cousin, she didn't feel that she could say anything.

▮▮▮▮▮▮▮ has told me that he put his hands on her waist and her leg and she told him to keep his hands off of her.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ brought to my attention that Hassan routinely rolls down the windows of the Groove Truck and give "cat calls" to women on the street.

Other members of the staff (Dan Gladstone, Courtney Carter) have said that Hassan routinely says that he can do anything he wants and that if he doesn't like something all he needs to do is call Isiah or Steve and he gets whatever he wants.

Steve, I have a meeting with you this afternoon. Let's discuss how we should proceed.

Thank You

Anucha Browne Sanders

1

**MSG 00251**

CONFIDENTIAL

Senior Vice President-
Marketing and Business Operations
New York Knicks
212-465-6432

2

CONFIDENTIAL

MSG 00252