# Exhibit 2

Dockets.Justia.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
06 Civ. 0589 (CGE)

---------------------------------------x

ANUCHA BROWNE-SANDERS,

Plaintiff,

- against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD THOMAS, III, and JAMES DOLAN,

Defendants.

---------------------------------------x

December 11, 2006
10:00 a.m.

VIDEOTAPE DEPOSITION of JAMES DOLAN, taken by the Plaintiff, pursuant to Notice, held at the offices of Vladeck Waldman Elias & Engelhard, P.C, 1501 Broadway, New York, New York, before Debbie Zaromatidis, a Shorthand Reporter and Notary Public of the State of New York.

DOLAN

discussion of providing her with a separation package?

A. Not that I recall.

Q. Or severance?

A. Right. I could have just said that to you, huh?

Q. And are notes or minutes normally taken at these chair meetings?

A. No.

Q. Approximately how long was there a discussion at that meeting of Ms. Browne-Sanders?

A. I -- I couldn't say. I wouldn't, you know -- I didn't time it or --

Q. And do you recall approximately how many times Mr. Ratner suggested to you that Ms. Browne-Sanders should be fired?

A. I think --

MR. GREEN: Objection. Asked and answered. You may answer it again.

A. I can't give you a specific. I know he was of that -- of that opinion and I believe strongly of that opinion from

DOLAN

the July period on.

Q. Did Mr. Ratner tell you that he didn't personally like Ms. Browne-Sanders or her style?

MR. GREEN: Objection to form. You may answer it.

A. I don't recall that he specifically said he didn't like her.

Q. Did he ever describe her to you as arrogant?

THE WITNESS: Counsel --

MR. GREEN: You may answer the question fully except to the extent that those conversations might have been held in the presence of counsel; otherwise, you may answer the question.

A. Okay. I'm -- I don't think -- it is not my job to help you here. The --

(Laughter.)

A. But in the interest of -- the interest of getting through this the -- Mr. Ratner I believe did not think that Ms. Sanders had a strong and cordial

DOLAN

management style. I believe he expressed to me, and I can't tell you specifically when he expressed it to me, but I know that I was aware that he did not like her management style.

Q. Is being tough as a manager a strength or a weakness at The Garden?

MR. GREEN: Objection to form. You may answer, if you can.

A. I think it completely depends on the situation.

Q. Did you find Ms. Browne-Sanders to be arrogant?

A. No, I found her to be aggressive but not arrogant.

Q. And is being aggressive a positive or negative trait at The Garden?

MR. GREEN: Objection to form, but you may answer.

A. I think it is a positive trait.

Q. What other positive traits did you believe that Ms. Browne-Sanders had?

A. I was not her direct boss, so, you know, my opinions of her were formed

DOLAN

from the -- the budget meeting, and really my opinion of her changed pretty dramatically from when you talk about pre that July period to post that July period.

Q. Other than Mr. Mills and Mr. Ratner, did you get input from anyone else on their view of Ms. Browne-Sanders?

MR. GREEN: Objection to form. You may answer.

A. In what period?

Q. Any period.

A. Can you ask the question again?

MS. VLADECK: Can you read it back.

(Record read.)

A. I am sure Mr. McCormack gave me his view.

Q. What was Mr. McCormack's view?

A. Well, Mr. McCormack, the -- would have given me his view. I believe he did give me his view right at the time that Ms. Sanders was let go.

Q. And what did he say to you and what did you say to him?

DOLAN

A. Mr. McCormack said that Ms. Sanders had willfully violated the company's policies and had undermined his investigation of the charges of sexual harassment that he had -- was charged with investigating.

Q. What did he say she had done which was a willful violation of the company policies?

A. That she had attempted to influence her direct reports using her authority.

Q. Anything else?

A. I believe he told me that he -- that she took one of her direct reports here.

Q. What did he say about that?

A. Well, that clearly was against company policy.

Q. What company policy is it against?

A. When you are -- put in a complaint regarding sexual harassment or actually a complaint, any complaint that

DOLAN

needs to be investigated at the company, we have a human resources and employee relations department that are charged with -- with -- with doing that, and that the -- as you would expect when someone makes a complaint there is always obviously two sides to it, and what the company deems necessary is to have the -- its HR, ER person the group investigate that from basically a third party's point of view. It requires both parties to the -- to not discuss the matter any further, not engage in -- obviously in any further discussions between themselves regarding the matter and allow the HR department to conduct an investigation and come to a conclusion.

Q. Is it your belief that the HR department came to a conclusion?

MR. GREEN: Objection to form. You may answer.

A. No, I don't believe that they -- that they had at that point.

Q. No. Do you believe they have at

DOLAN

any point?

MR. GREEN: Same objection as to form. You may answer if you know, Mr. Dolan.

A. Yes, I have come -- that the HR department believes that they came to a conclusion regarding the complaint that was made.

Q. Did the HR department ever make a recommendation based on the conclusion that it came to?

MR. GREEN: You mean to Mr. Dolan himself?

MS. VLADECK: To anyone.

MR. GREEN: Objection to form. If you know, Mr. Dolan, you may answer.

A. Not that I am aware of.

Q. Now, going back to the conversation that you had with Mr. McCormack, you stated that he told you that Ms. Browne-Sanders attempted to influence her direct reports using her authority?

A. Yes.

DOLAN

Q. What did Mr. McCormack say to you about that?

A. That Ms. Sanders had brought in her direct reports, that she attempted to infuse a memory into them of -- of the particular times that the complaint was registered about essentially attempting to coerce her -- her direct reports into corroborating her complaint.

Q. Did he identify any of these direct reports that she attempted to coerce?

A. I don't specifically remember.

Q. Now, you said that he said to you that she brought in her direct reports. Was it your understanding that during the time of the investigation that Ms. Browne-Sanders was at work?

A. Yes.

MR. GREEN: Objection to form. Which investigation are you referring to?

MS. VLADECK: The one that he is referring to that Mr. McCormack said that she was attempting to coerce people.

78

DOLAN

MR. GREEN: I am not sure he identified which --

THE WITNESS: No. No. I am sorry. That is right. You're correct.

**A. I think if you are asking me did she do this during his investigation, the -- -- my understanding of it was that she did this prior to filing the -- filing a complaint.**

**Q. With all due respect, Mr. Dolan, you said that she willfully violated company policies and undermined his investigation of her charges.**

**A. That's right.**

**Q. Is that correct or incorrect?**

**A. Yes, by bringing in people who were -- that the -- by attempting to influence the -- the process.**

**Q. And is it your understanding that Ms. Browne-Sanders was present at work during the time that her charges were being investigated?**

MR. GREEN: Objection to form.

**A. I don't recall.**

79

DOLAN

**Q. Now, you said earlier that it was clearly against company policy what she did. I ask you again what company policy are you referring to?**

MR. GREEN: Objection to form. It has been asked and answered. If the witness wants to add --

MS. VLADECK: It has been asked. I disagree that it has been answered.

**A. I don't think it takes a whole -- a great deal of, you know -- you know, I mean you need to refer to a book about it, that the -- if you have a complaint about how you've been treated at the company, the -- you bring the complaint forward to the company. The -- you don't proceed -- the -- to take the people that you think are going to corroborate or could corroborate your complaint and then attempt to influence them using your position of authority with them.**

**Q. And it is your understanding that to the extent one of**

80

DOLAN

**Ms. Browne-Sanders' direct reports went with her to a lawyer that that direct report went for Ms. Browne-Sanders as opposed to herself?**

**A. Excuse me. I don't understand.**

MS. VLADECK: Could you read it back.

(Record read.)

**A. You are asking about what was the other employee's motivation, and that is exactly what the point was. Is that what was the employee's motivation? Was the employee going for themselves? Was the employee going to support Anucha Browne-Sanders? Was the employee going because they were -- they -- that was their boss and their boss -- they needed to please their boss. The -- in order to stay in good standing. You probably need to answer that more than I do.**

**Q. What company policy is violated by an individual going to a lawyer with respect to complaints about sexual harassment?**

81

DOLAN

MR. GREEN: Objection. Misstates prior testimony. Asked and answered.

**A. That is exactly correct. That is a misstatement. You asked me about bringing her direct report to a lawyer.**

**Q. Why don't we go back to the conversation you had with McCormack and why don't you tell me exactly what Mr. McCormack said with respect to Ms. Browne-Sanders taking one of her direct reports with her to a lawyer.**

MR. GREEN: Objection to form. Asked and answered. You may answer it, Mr. Dolan.

**A. Just what I just said before that he told me that the -- that Ms. Browne-Sanders had taken one of the employees to a lawyer to discuss the -- her charges of being harassed.**

**Q. And did he further say or did you infer from that that it was clearly against company policy?**

MR. GREEN: Objection to form.

DOLAN

Two different questions.

A. Well, I said before, right, that you can't -- the -- you know, once you've -- you've informed the company about a complaint but even before that, I mean you can't -- when you have a complaint, you need to bring it -- you know, you need to complain to the people who are in charge. The -- you can't go about the engineering that the -- an investigation of a complaint -- of a complaint. The -- using your authority and -- you know, as the person -- as the people who are going to be, you know, testifying about it using your authority to influence them, the --

Q. Are you aware that Ms. Browne-Sanders had complained to Mr. Mills about sexual harassment against her?

MR. GREEN: Objection -- objection to form. Misstates the record. The witness may answer, if he knows.

MS. VLADECK: No speaking objection. There is no record to mistate.

DOLAN

MR. GREEN: I think your question is improperly formed.

MS. VLADECK: I think you can say objection to form.

MR. GREEN: Misleading.

MS. VLADECK: Fine.

MR. GREEN: If you know the answer, you may answer, Mr. Dolan. My objection to the question is that it is misleading.

A. Are you asking me if I am aware now or was I aware at some particular time?

Q. Have you ever been aware as to whether or not Ms. Browne-Sanders went to Mr. Mills and complained about sexual harassment?

MR. GREEN: To the extent that the witness may be privy to information he obtained from discussions with counsel, he may not answer this question. If he has any independent information other than that gained from conversations with counsel, he may answer.

DOLAN

A. With that in mind, I think the answer is no.

Q. Were you aware that Ms. Browne-Sanders had complained to Pete Olsen concerning sexual harassment before she went to a lawyer?

MR. GREEN: Same objection.

A. No.

Q. Did you believe that Ms. Browne-Sanders going to a lawyer was a violation of any company policy?

A. No.

Q. Do you believe that two employees together going to a lawyer is a violation of company policy?

MR. GREEN: Objection. Asked and answered. The witness may answer if he understands the question.

A. I think it depends on the situation.

Q. In what circumstances would it not be a violation of policy?

MR. GREEN: Objection. The witness has answered that question now

DOLAN

several times. I object to the form of the question. If he wants to amend a prior answer, he may. I am instructing him not to say what he said twice before.

MS. VLADECK: It is a different question. Maybe if you hear it read back.

A. I think it -- I think I can answer the question. I think it is -- the -- when the employees are going on their own behalf, I think that is fine.

Q. When did Mr. McCormack tell you that Ms. Browne-Sanders had willfully violated company policies and undermined his investigation of her charges?

A. I don't have the specific date. It was on a helicopter ride between our corporate offices in Bethpage and West 30th Street here.

Q. Can you time it as to proximity to when she was actually fired?

A. Same day I think. Within 24 hours.

Q. Prior to that helicopter ride, have you had any other conversations with

86

DOLAN

**Mr. McCormack concerning Ms. Browne-Sanders?**

MR. GREEN: Objection to form. At any time ever?

MS. VLADECK: Yes.

**A. I don't recall.**

**Q. Prior to that helicopter ride, had you had conversations with Mr. McCormack or anyone else with respect to the investigation into her charges?**

MR. GREEN: To the extent that that would require you to reveal conversations you had in the presence of counsel, Mr. Dolan, or at the direction of counsel, you may not answer this question.

MS. VLADECK: This is a yes or no. Can I have the question read back, please.

(Record read.)

MR. GREEN: Because the question contains the substance and subject of the meeting, I instruct the witness not to answer to the extent it would be a meeting at which counsel was

87

DOLAN

present or held at counsel's direction. So you may not answer this question if you had any such meeting or discussion at the -- in the presence of counsel or at the direction of counsel.

**A. Okay. I got the direction. I think that -- that the answer -- I know that the answer is that the only communication I had with Mr. McCormack prior to this in regards to this -- this matter would be to verify that he was in fact investigating the matter.**

**Q. Who made the decision to have Ms. Browne-Sanders' employment be terminated by The Garden?**

**A. I did.**

**Q. Did you make it on your own or was it with others, consultation or something else?**

**A. Well, all decisions at The Garden I make on my own.**

**Q. And what were the reasons or what was the reason you fired Ms. Browne-Sanders?**

88

DOLAN

**A. Because Ms. -- we could not keep going with her in the position that she was in in The Garden. Remember, that what we had agreed to was -- is that Ms. Browne-Sanders was going to continue on with her duties and responsibilities while she looked for another position. The -- that is what she had asked us to do. The -- and we had agreed.**

**Q. The -- as part of that we -- the operation of the -- of the marketing and of the Knicks was part and parcel of that. We needed somebody to make sure Game Day happened. Make sure that -- that the slicks were reviewed, that the -- all of the day-to-day responsibilities that were part of Anucha's job. That the -- after that -- that conversation it was very clear -- clear to me that she could no longer do that job, that we could not have her do that job.**

**Q. I am sorry. When you say after that conversation, what conversation?**

**A. The conversation on the**

89

DOLAN

**helicopter.**

**Q. With Mr. McCormack?**

**A. With Mr. McCormack. I think Mr. Ratner was there, too.**

**Q. And the conversation related to Mr. McCormack suggesting that Ms. Browne-Sanders was undermining the investigation?**

MR. GREEN: Objection to form. You may answer.

**A. That she had had undermined the investigation, yes.**

**Q. Did Mr. Ratner say anything during this conversation?**

**A. I believe Mr. Ratner echoed what he has been saying all along, that -- that Ms. Sanders needed to be let go.**

**Q. What, if anything, about what Mr. McCormack told you was a factor in your decision to fire Ms. Browne-Sanders?**

**A. The -- really the single thing was that -- is that -- whether she was going to be able to continue to do -- to exercise her duties and responsibilities**

90

DOLAN

in that job. That -- the -- you know, that was, you know -- we had to have somebody in the job that they -- and, you know, when it became clear that -- that she was not going to be able to do that, there was no reason to have her continue on as an employee.

Q. Has Ms. Browne-Sanders been replaced?

A. Mr. Mills is doing Mr. -- Ms. Browne-Sanders' job I believe as --

Q. So --

A. Yes.

Q. So you had to have somebody in the job, but it has been 12 months, and you haven't?

MR. GREEN: Objection to form. Argumentative. You may answer, Mr. Dolan.

A. I -- yeah. I think that -- you know, what had -- what ended up happening is that Steve had to do the job. That is not acceptable. It is still not acceptable to be honest that they -- and I

91

DOLAN

certainly don't think that the company should continue on employing somebody for the position if they are not going to do the job that -- so, you know, the fact that Steve had to do it is unacceptable. It is still unacceptable that we don't have a person in the position although we have been interviewing the -- and I believe we are close, but it's -- you can't -- I just don't think that you're -- that is as -- you know, as the CEO I could let the situation exist where we had someone being paid to do the job, who had agreed to do the job, who then put themselves in a position where they could no longer do the job and then continue employing that person. Why would we do that?

Q. Did you tell anyone that you had to fire Ms. Browne-Sanders because she made a settlement demand that you believed was exorbitant?

MR. GREEN: Objection to form.

A. No.

92

DOLAN

MR. GREEN: Do not reveal conversation --

A. I don't believe I did.

MR. GREEN: -- with counsel in responding to this question; otherwise, you may answer fully.

MR. VLADECK: I think he did answer fully.

A. I did.

Q. Did you consult with counsel about the decision to fire Ms. Browne-Sanders?

MR. GREEN: You may answer whether you consulted with counsel.

A. No. In fact, I -- I specifically I think did not consult with counsel.

Q. Why is that?

A. Because I felt that that -- that the overall health of The Garden was at jeopardy here, and that that would -- that would override any opinion on counsel -- counsel might have otherwise that why we should have Ms. Sanders stay in the job.

93

DOLAN

Q. Were you concerned that counsel would tell you not to fire her?

MR. GREEN: Objection.

A. I didn't know what counsel -- that's all speculative.

Q. Were there discussions at or about this time that you were present at with counsel with respect to the potential termination of Ms. Browne-Sanders' employment?

MR. GREEN: Objection. The witness may not respond since the question calls for privileged information.

Q. Were you present at meetings with counsel during this time frame?

MR. GREEN: Objection. The witness is instructed not to answer. The question presupposes a privileged communication.

Q. To whom did you communicate your decision to fire Ms. Browne-Sanders?

A. To Mr. McCormack and Mr. Ratner.

Q. And what, if anything, did you tell them to do?

DOLAN

A. That they needed to let her go.

Q. Did you tell Mr. McCormack to write a memo to make it look like it was his decision?

MR. GREEN: Objection to form.

A. No. I'm taking the responsibility for it now.

Q. Were you aware that there were documents suggesting that it was Mr. McCormack's recommendation to fire Ms. Browne-Sanders?

MR. GREEN: Objection to form.

A. No.

Q. Why don't I get to it. You are making me go out of order here.

A. Sorry. If that means we get to skip to the end, that would be okay.

Q. Unfortunately we go back.

(Dolan Exhibit 1 marked for identification.)

(Document handed to witness.)

MS. VLADECK: For the record, what has been identified and marked as Dolan Exhibit 1 is a memo to files from

DOLAN

Rusty McCormack dated January 19, 2006, and it's Bates numbers MSG's 6363 and 6364.

(Pause.)

A. Okay.

Q. Have you had a chance to review Dolan Exhibit 1?

A. Yes.

Q. Have you ever seen that before today?

A. No.

Q. If you look at the part under the heading Anucha Browne-Sanders --

A. Yes.

Q. -- it says "As the record indicates most of the Browne-Sanders' allegations were not confirmed."

Do you see that?

A. I do see that.

Q. Do you know which, if any, of her allegations were confirmed?

MR. GREEN: Objection to form.

A. No, I don't.

Q. It says later "It is clear that

DOLAN

Browne-Sanders has a poor relationship and difficulty interacting with Mills and other members of MSG management."

A. I see that.

Q. What, if any, understanding did you have with respect to Ms. Browne-Sanders' relationship with Mr. Mills?

A. Other than that Mr. Mills was Ms. Browne's supervisor, I think they may have known each other in -- from the NBA, but other than that I am not aware of any other.

Q. Had anybody at any time suggested to you that Ms. Browne-Sanders and Mr. Mills had a poor relationship?

MR. GREEN: Objection to form.

A. I don't recall.

Q. Now, if you see with respect to Isiah Thomas it says, "This training should begin in the next 30 days" at the very end of the paragraph.

A. I see that.

Q. Do you know whether or not Mr.

DOLAN

Thomas received training as a result of the sexual harassment investigation?

A. I do not know.

Q. And then if you look at the next page, it -- there is a paragraph with respect to Mr. Mills.

A. Yes.

Q. And it says, "Mills took appropriate action to respond to the incidents that were called to his attention."

Do you see that?

A. I do.

Q. Do you know what action Mr. Mills took to incidents that were called to his attention?

A. I think I need you to be more specific about that.

Q. Were you aware of any action Mr. Mills took in response to any incidents that Ms. Browne-Sanders had called to his attention?

MR. GREEN: I admonish the witness to only respond to the extent he

118

DOLAN

Programming. I hope that is enough. I can name them, but it is going to take a while.

Q. Approximately how many individuals would you say would be included in your senior management?

A. Oh, forty, not all direct reports but as part of the management team.

Q. And do they have a particular title like vice president and above or are they varying titles or something else?

A. It would be varying titles. It would depend on the -- you know, primarily though I would characterize it as those people who are involved in setting the strategy of the company.

Q. And when you decide to use Mr. Olsen for a project, how do you do that? Do you hire him for a particular project; do you ask somebody else to or something else?

A. No, I think he has an arrangement because I've never had a

119

DOLAN

discussion with him about the -- I guess I don't recall having a discussion with him about what his fees, et cetera, were.

Q. When you then decide you want to use him for a management conference, do you do anything differently than you would had he been an employee?

A. I guess I am not really sure about what you would expect would be -- would be different. I mean the -- he is doing a project for me. The -- I guess the only real difference would be from the point of view of -- that, you know, his availability to me, but I've always found him to be available if not immediately within a reasonable amount of time enough for me to get my project done.

Q. Do you know whether he has a particular background or expertise?

A. I believe he does. I am -- I cannot give you the specifics of it, but I believe he does have specific background in these areas. He certainly is talented

120

DOLAN

in them, but I don't recall specifically what his background is.

Q. Did you know what, if any, role he had with respect to Ms. Browne-Sanders' sexual harassment complaints?

MR. GREEN: Objection to form. You may answer unless you acquired the information from counsel or at meetings at which counsel were present.

A. Other than what I learned from counsel, I have had had -- I have no knowledge that there was any discussions or any connection.

Q. Other than through counsel, did you ever hear that there were --

A. You know what, I need to amend that. I am sorry. The -- she was -- he was, and I remember recommending his -- his involvement in her -- the training that we wanted to see her get from the -- resulting from the July meetings.

Q. Did you hear from anyone other than counsel that anyone was critical of

121

DOLAN

Mr. Olsen's handling of Ms. Browne-Sanders' sexual harassment complaint?

MR. GREEN: Again, other than through counsel.

A. No. I had no -- I did not, no. No.

Q. Now, with reference to the training that you said you asked him to work with Ms. Browne-Sanders on --

A. No, I asked him to work with Mr. Mills on it.

Q. Do you know whether Ms. Browne-Sanders ever got that training?

A. I believe she did.

Q. And do you know when she got the training?

A. No.

Q. What interactions did you have with Ms. Browne-Sanders between the summer of '05 and the day you decided to fire her?

MR. GREEN: Objection to form. You may answer.

122

DOLAN

A. Are you asking me post the -- the budgetary process?

Q. Correct.

A. Right. I don't recall any.

Q. Did anyone at any point come to you with complaints about Vernon Manuel?

A. Yes.

Q. Who came to you about Vernon Manuel?

A. Steve Mills.

Q. And what did Mr. Mills say to you?

A. Mr. Manuel had problems with anger in the workplace, had problems being respectful of his -- the individuals he directly reported to, threatened to -- used my name and threatened to come to me to solve his issues with his -- his personnel issues.

Q. When did Mr. Mills come to you on that?

A. You know, I couldn't -- I couldn't say. I don't -- I know when Mr. Manuel -- you know, I am not even sure

123

DOLAN

what the dates that he was employed are specifically. It has been a while since he has been here.

Q. Now, Mr. Manuel was connected to you in -- in what way?

A. The -- he was at the time dating my step daughter.

Q. And when he was fired from The Garden, was he still dating your step daughter?

A. I think he was.

Q. Other than Mr. Mills, did anybody else come to you with problems about Vernon Manuel?

A. No.

Q. What did you say to Mr. Mills when he came to you with the problems?

A. That he needed to treat Mr. Manuel as a -- as he would any other employee.

Q. Did Mr. Mills ever tell you that Mr. Manuel had been forging his supervisor's signature on parking vouchers?

124

DOLAN

A. He did.

Q. And what did you say in response to that?

A. That he had to be disciplined for it.

Q. Did you say what the discipline should be?

A. No, I let Mr. Mills decide that. That discipline could have included firing. Oops.

Q. It sounds like lunch was more than a salad.

Did you give Mr. Manuel a car?

A. No, I let him use a car.

Q. And you let him use a car that was yours or that was the companies or something else?

A. No, it was mine.

Q. Do you know whether Mr. Manuel would fail to show up to work or come late?

A. Yes. I had heard that report on him.

Q. Did anyone come to you and

125

DOLAN

specifically request permission to fire him?

MR. GREEN: Objection. Asked and answered. You may answer it again, Mr. Dolan.

A. Yes.

Q. Who did?

A. Mr. Mills.

Q. Do you know whether Mr. McCormack was aware of the issues concerning Mr. Manuel?

A. No, I don't know.

Q. Do you know whether Mr. Ratner was aware of the issues concerning Mr. Manuel?

MR. GREEN: Objection to form.

A. I don't know.

MR. GREEN: That is okay.

Q. Did you ever tell anyone to take Mr. Manuel on as a project?

MR. GREEN: Objection to form. You may answer.

A. Mr. Mills and I discussed how Mr. Manuel was doing. The -- he was my

174

DOLAN

further waiver.

MR. GREEN: Fair enough.

MS. VLADECK: But I will argue potentially that we are entitled just by the initial comment to the entire conversation.

MR. GREEN: You are free to make the argument, and I will allow the witness to answer then with respect to the question who was it who told him that Anucha Browne-Sanders had demanded 6 million dollars.

MS. VLADECK: Okay.

MR. GREEN: He may respond.

**A. That was a lot discussion for the answer you are about to get.**

**Q. And what is the answer I am about to get?**

**A. I don't recall.**

**(Laughter.)**

**Q. Let -- let me ask you a question that is more recent.**

**I asked you specifically about the -- the amount of money this morning,**

175

**DOLAN**

**and you rejected as a reason for deciding to fire Ms. Browne-Sanders that a settlement demand or a demand was exorbitant.**

MR. GREEN: I must -- I must correct you.

MS. VLADECK: Wait.

MR. GREEN: That wasn't his testimony.

MS. VLADECK: Let me have Mr. Dolan leave the room.

MR. GREEN: Fair enough.

THE WITNESS: I am going to leave the room now. Hey, guys this is not boding well for a 4:30 departure. I just assume answer this question.

MS. VLADECK: No. No, not, Ron -- not while he is here.

MR. GREEN: Fine. Step out just for a moment. Just outside the door.

THE WITNESS: Sure. Are you coming with me?

MR. GREEN: I want to argue this point.

176

DOLAN

THE WITNESS: You know I give you 30 seconds at which point if you don't have this resolved, I am coming in and answering the question. Don't take that as your advantage now.

(Witness leaves the room.)

THE VIDEOGRAPHER: We are going off the record at 3:12.

MS. VLADECK: No, not off the record.

MR. GREEN: On the record.

THE VIDEOGRAPHER: I am sorry. We are not off the record at 3:12.

MR. MINTZER: You are recording a blue screen.

MS. VLADECK: You were about to say something that I said was a speaking objection.

MR. GREEN: You are mischaracterizing his testimony. I don't believe he said he considered it. I believe you asked him if he told anyone about that. I don't think you asked him if he considered it. It is a fair

177

DOLAN

question, but I don't think it has been asked.

MS. VLADECK: Okay. I'm not sure that is correct, but I think it is easily remedied.

MR. GREEN: He can answer fully.

(Witness returns to the room.)

MR. GREEN: Thirty seconds. Just made it.

MR. MINTZER: Done.

**Q. See, we take your deadline seriously.**

**A. What is the scoop Betty Boops? Am I answering or not answering?**

MR. GREEN: Well, I asked her to rephrase the question.

THE WITNESS: Fabulous.

MR. GREEN: She may rephrase the question or not.

**Q. Let me go back a little. Did you hear about a 6 million dollar request for severance from counsel?**

**A. I don't recall --**

178

DOLAN

MR. GREEN: You may answer.

A. -- who I heard the 6 million dollar request from.

Q. In what context did you hear the request?

A. That is what I don't recall.

Q. And did you hear the request on the day you decided to fire her?

A. I'm not sure.

Q. Did you tell anyone that a factor in your decision to fire Ms. Browne-Sanders was that she had made a request for 6 million in severance?

A. I think I did.

Q. Who did you tell?

A. I think at that same discussion at the helicopter I pointed out that she is already had -- had essentially -- I was told she wasn't staying. She -- she resigned and asked for the extended stay period. The -- that she had tampered with an investigation that -- that was begun on her behalf, the -- and then had asked for 6 million dollars in severance.

179

DOLAN

Q. Now, when you said you think you said it in the same conversation, was that with Mr. McCormack and Mr. Ratner?

A. Right.

Q. Is there a reason you didn't tell me that this morning when you were asked a direct question as to whether or not you told Mr. Ratner or Mr. McCormack that a request for severance was a factor in your decision to fire her?

A. No, I don't think you asked me about a request for severance. You asked me about a settlement. Settlement is a bit different than a request for severance.

Q. Is that the way you've been parsing my questions if there was --

A. I don't mean to be cute with you, but the --

Q. Well --

A. The -- it first came in a request for severance. That then came in a threat, right, that if the -- that if the -- if I didn't get the money, right,

180

DOLAN

I'm going to go, right, the -- and file this case that we are talking about right now and make a big stink about it.

Q. Who told you that there was a threat that if it wasn't paid we are going to file this case and make a big stink about it?

A. I think it was Mr. Mills. I'm not sure whether it was him. Whoever was relating to Anucha at that time, I think it was still Mr. Mills.

MS. VLADECK: Do you have word search? Could you search for the word exorbitant.

(The record was read back as follows:

"Question: Did you tell anyone that you had to fire Ms. Browne-Sanders because she made a settlement demand that you lebieved was exorbitant?

"Mr. Green: Objection to form.

"Answer: No."

Q. You never told anyone that --

A. What --

181

DOLAN

MR. GREEN: Objection to form.

Q. -- about a settlement demand?

A. Correct. That they -- -- I don't recall. I'm not -- you know, at this point I am a little confused because at one point she is asking for -- she is asking for 6 million dollars. Later on I believe she asked -- she let us know that she got -- that if she doesn't get the 6 million dollars she is going to then -- that she attempted to essentially extort the 6 million dollars from the company.

Q. Did you have a discussion on this subject at lunch with your counsel?

MR. GREEN: I'm going to object and instruct the witness not to answer to conversations with counsel.

Q. Well, did you have any discussion during the lunch break with your counsel to refresh your recollection concerning this 6 million dollar demand?

MR. GREEN: Same objection. To the extent counsel posed any questions or

182

DOLAN

provided any answers to questions or any discussions about this case, those would be privileged communications.

MS. VLADECK: Could you mark that for a ruling.

Q. So just so it is clear and make me clear that this is all there is or if there is something else, the three reasons that you decided to fire Ms. Browne-Sanders on the date you did were the events from July, the budget meeting?

A. Right.

Q. The date you fired her?

A. Right.

Q. You said that she was tampering with the investigation or what words did you use?

MR. GREEN: Objection to form.

A. Excuse me?

MR. GREEN: I just objected to form.

A. Yes, because I think it is in there. Now, I am really being asked to

183

DOLAN

recall what I said, the exact words.

Q. Then why don't --

A. I mean it is simple. That she used her position to influence her direct reports --

Q. And that was having --

A. -- to corroborate her complaint.

Q. And that was having a -- another MSG employee go to a lawyer with her?

MR. GREEN: Objection.

A. No.

Q. Was there -- excuse me. Was there something else?

A. It was reported to me that she did it with more than one person.

Q. What else did she do?

A. That there were other people that she had attempted to influence, to corroborate her complaint.

Q. What did she do to attempt to influence them to corroborate her complaint.

A. I don't recall the specifics, what was reported to me.

184

DOLAN

Q. This was the reason you fired her; is that correct?

A. Sure.

Q. What is the best recollection you have as to what you believed that she did with respect to the investigation?

MR. GREEN: Objection. It is asked and answered. The witness can -- answer the question if he wants to supplement what he said.

A. Again, used her influence with direct reports to influence their answers, their -- their responses to an inquiry to an investigation that was being made on her behalf.

Q. And then the third thing was you're understanding that she asked for 6 million in severance?

A. She asked for 6 million dollars, right?

MR. GREEN: Just note my objection that your question presupposed that there were three.

Q. Were there any other factors? I

185

DOLAN

am trying to get the universe of factors.

MR. GREEN: I thought the witness had testified more fully to a number of things.

MS. VLADECK: That is a speaking objection.

Q. To the extent that there are other factors, what are they?

A. And all the factors leading up to from July up until that point. I mean that is a quite a long list, you know.

Q. That was your first factor. What were all the events from July until the date you fired her?

A. The -- again, I stated earlier the -- you know, the inability to do her job.

Q. And how was that reflected between July and January?

A. That's in -- that is inability -- inability to budget, inability to brand. It is --

Q. And --

A. The -- and then the -- you know,

186

DOLAN

my essentially taking the opinion of Mr. Ratner that she had not improved, that he believed that she was -- should be terminated.

Q. Are you done with all the events leading from July to January?

A. Yes, I think so.

Q. What made you believe that from July to January she had an inability to budget or brand?

A. Because of the July meeting, the skills and the work product that she produced was not -- low, not acceptable. It showed a lack of understanding of budgeting. It showed a lack of understanding of branding. She was unable to come up with a branding statement for the New York Knicks. She had to be given one. That the -- and her -- in her budget she was unable to explain her budget and when she -- and when she did explain her budget, her explanations, the -- showed a lack of understanding of how budgets are -- are put together and differences

187

DOLAN

between things such as operating expenses and capital expenses, and she actually in the middle of the budgetary process revealed that she had misclassified some 80,000 dollar or a hundred thousand dollars worth of expenses from operating into -- from capital into operating.

Q. Was this all reflected during the summer budget meetings or is this something that happened between July and January?

A. This was all -- the budget meetings went through July and August.

Q. Okay. My question is after the budget meetings over the summer --

A. Yes.

Q. What did you observe with respect to Ms. Browne-Sanders' inability to budget and/or brand from those budget meetings until January of '06?

A. Nothing other than that -- that I did not receive a report that she had gotten any better, and there was no reason to think that she went through the -- the

188

DOLAN

training, but I did not get a positive report. I didn't get any report essentially on it.

Q. Did you ask for a report at any time between the summer budget meetings and the day you decided to fire her?

A. I don't recall. I don't -- I don't recall if I did or if I didn't.

Q. Now, you said that you also relied on the opinion of Mr. Ratner that she should be terminated.

When did Mr. Ratner express his opinion that she should be terminated?

A. Consistently from July through her termination date.

Q. And you rejected his opinion from July, August, September, October, November and December; is that correct?

MR. GREEN: Objection to form. Misstates prior testimony.

Q. Is that correct?

MR. GREEN: You may answer.

A. I think it -- rejected would be strong, but essentially we didn't act upon

189

DOLAN

what his -- what his opinion -- we tried to give Anucha a chance, but you have to remember that the -- you are asking me about the day she was fired. The -- we went through this whole process with her. Then she comes back to us, and she tells us that she is not going to work here any more. The -- that the -- it is unclear what the reason is why she doesn't -- why she can't work here any more, but I assume that the -- that it had something to do with her experience over the last six months. The -- so now we are already looking for -- we already have to rejigger the -- the department, et cetera, but she is -- she is going to stay as long as we help her find another position, but she is essentially out. She has no future at the company by her own hand, and then the -- comes in the report that she wants $600,000 worth -- excuse me -- 6 million dollars worth of severance that the -- and that -- that the -- she's been tampering with an investigation into a complaint

190

DOLAN

that she's made, and the last part is the -- is the part that is most difficult to deal with because as ridiculous as the 6 million dollar request was that the -- she could have continued on doing her job if she had not tampered with -- with those people, the -- but the combination of all of those things together -- and finally the tampering as being the last straw in that really led us to -- led me to the conclusion that her employment at the company was over with.

Q. Now, you started by saying that you believed she started this whole process. What whole process are you referring to?

A. I'm not sure --

MS. VLADECK: Could you read it back.

(Record read.)

Q. What did you mean by the whole process?

A. What I meant by the whole process is -- we went through the whole

191

DOLAN

budgeting process with her. We discovered these deficiencies that the -- that -- you know, that -- in her skill set. We went through and paid for the -- and offered her training the -- and paid for her training to up those skills. I mean that was at our expense that the -- -- and, you know, after we are done sending her school, right -- that -- to get better at this, right, the -- she walks into the office and says essentially I'm quitting. The -- I can't work here any more. The -- the -- and you need to -- what I -- what I need you to do is to keep me on, and I'll do my job, which was fair, and help me find another job. That the -- you know, at that point, you know, I have to tell you that as -- as the CEO of the company having then, you know, offered her the -- the ability, right, to essentially come out of what was a pretty bad review but which is what came up out of in terms of how her performance was in that budgetary process, offering her the

192

DOLAN

ability for help, training to get her skill levels up, the company was going to stick with her, that the -- the -- and she took the training, and then she came back and basically said I quit. The -- then she asks for 6 million dollars, that the -- and then we find out that she -- that she is utilizing her position that she is -- she is off through the company attempting to garner support for a complaint that the -- about sexual harassment. The -- at what point does -- does an employee become no longer effective at a company as -- in her position. She was no longer effective. The -- the -- and the -- at that point, you know, I decided that the company had to -- had to just cut it off, and that was when -- when she was fired.

Q. Now, you say that you heard from Mr. Mills that Mrs. Anucha Browne-Sanders just walked into the office and said I'm quitting?

MR. GREEN: Objection.

193

DOLAN

Misstates prior testimony. You may answer.

A. I think that is what I said, but, you know -- look --

Q. That is a yes or no.

A. I'm taking -- you don't get to do that with me.

Q. Yes, I do.

A. Well, I'm still going to answer the way I want to answer. I'm characterizing what her conversation was with Mr. Mills.

Q. Did you hear from anyone that what Ms. Browne-Sanders said as a result of the sexual harassment was I can't take this any more?

MR. GREEN: Objection to form. Can I have that question read back, please.

(Record read.)

A. No.

Q. Now, who did you talk to about Ms. Browne-Sanders from January 13 to January 19, whether or not they were

194

DOLAN

lawyers? What is the universe of people you spoke to about her?

MR. GREEN: Just a moment. Just be sure that the witness understands that he may not reveal the substance of any conversation --

MS. VLADECK: Just asking for names.

MR. GREEN: -- any conversations held with counsel, with counsel present or at the direction of counsel, but you may reveal the names of persons you spoke with if you can recall those names.

A. I have --

Q. Let me throw out --

A. You're specifically asking me about three days now almost.

Q. Did you speak to Marc Schoenfeld?

A. I have no idea.

Q. Did you speak to Chris Reynolds?

A. I have no idea. I have no idea. I have no idea -- I have no idea on

195

DOLAN

those three dates. What is the specific -- is there something you can help me with with the three dates?

Q. Why don't we do this. Would you look at the first exhibit? It is "File Rusty McCormack." I think it is Exhibit 1.

(Document handed to witness.)

Q. The -- what exhibit is that?

MR. GREEN: It is 1.

Q. Now, the date on which Ms. Browne-Sanders was fired was January 19, 2006, which is the same date as this, and I will represent to you and I will show you that the investigation into sexual harassment was completed on January 13.

MR. GREEN: You don't have to accept anything. I am instructing the witness he need not accept as true any date that you put in your question. That was his question to me.

Q. Do you have any recollection of a different date?

196

DOLAN

A. I --

MR. GREEN: Objection to form.

A. I don't know which date it was.

Q. Is there anything that would refresh your recollection?

A. I don't know. I -- you know, I mean -- other than hearing somebody else's testimony, I guess, and that is not really very helpful. I mean I --

Q. Now, are you -- are you aware that Mr. McCormack believed that the document that you have before you, Dolan Exhibit 1, was prepared after you made the decision to fire Ms. Browne-Sanders?

MR. GREEN: Objection to form. If the witness knows what Mr. McCormack knew or thought he knew.

A. I -- you know, I am unaware of this document essentially until today. I mean I am seeing it for the first time today. I didn't know Mr. McCormack wrote a document such as this.

Q. Well, he didn't write it. Mr. Schoenfeld did, but -- did you tell Mr.

197

DOLAN

McCormack the three reasons or the three factors for Ms. Browne-Sanders' termination that you just told us here today?

MR. GREEN: I am going to object to your characterizing the factors as any specific number, but the witness may answer.

A. I believe I did.

Q. And did you tell Mr. Ratner?

A. Yes.

Q. And you told both of them that Ms. Browne-Sanders using her position to influence the investigation was a factor in the termination?

A. Yes.

Q. Is one factor more heavily weighted than any of the others?

MR. GREEN: Objection to form.

A. I -- you -- it -- I would have to say that that the July -- the July through -- this period here was significant. The -- however the -- using her position to influence employees in the

198

DOLAN

investigation was particularly -- showed a lack of -- of ability for us to trust her. I don't think we could trust her after she did that. The -- you know, the -- if she couldn't let the company operate and follow the rules of the company and she was going to establish her own rules, which is essentially what she did, that the -- it -- I mean at that point the -- I think she really made her -- her employment untenable because you just had no idea what she would do. The -- I mean the -- she clearly didn't respect the process and the lines of authority, so how could she stay?

Q. You have characterized what she did as violation of policy as being wrong, as all sorts of things.

A. Yeah.

Q. What did she do that in your view was so bad that it deserved immediate termination?

MR. GREEN: Objection. Misstates prior testimony. It has been

199

DOLAN

asked and answered on several --

MS. VLADECK: Ron, objection to form. That is it. This is a different question.

MR. GREEN: Well --

MS. VLADECK: This is --

MR. GREEN: It sounds like the same question the witness has answered several times.

MR. VLADECK: Okay. That is fine.

MR. GREEN: I want the witness to know that I object because this question has been asked and answered. He is not instructed not to answer, but he can rely on his prior testimony unless he wants to augment it.

A. She specifically used her authority, used her position of authority to influence individuals who worked underneath her to testify that the -- and back her up on claims of sexual harassment.

Q. And what is your understanding

200

DOLAN

that she actually did in order to influence people or have them back her up?

A. She --

Q. What are -- what are the events that you believe --

A. I believe she had discussions that -- that she brought -- that -- that she had people in her office. I mean it was reported to me that she had been tampering with the investigation that -- that form. I mean the -- the -- you know, her responsibility at that point was to leave the investigation up to the people who she made the complaint to. The -- actually I don't think she had made the complaint at that point. That the -- I am a little fuzzy on whether -- whether it was right there before or after, but she clearly knew she was going to make a complaint that the -- and then she brought people in who reported to her. That the -- and proceeded to discuss the merits of her complaint. The -- and attempt to persuade

201

DOLAN

the people underneath her that her complaint had merit and that they -- and attempt to get them to back her up on her complaints. That the -- the -- now even -- even if -- if those people had heard anything, right, that would back her up, at that point she rendered the company useless in its ability to investigate because at what point -- how do you know when we are asking those people whether they are responding to our specific questions or whether they are responding to the fact that their boss, right, told them that they need to answer this way, that they -- there was no -- she essentially rendered the company incapable of deciding the -- you know, deciding the merits of those people's testimony. The -- the -- I don't think that that is a difficult concept to understand, that the -- the -- you know, the -- you can't be the victim, the judge, and the jury and the prosecutor all at once. You're not allowed to do that. And the -- and that

202

DOLAN

**is what she was attempting to do. The -- she so wanted to -- apparently to have this complaint be verified by the people underneath her, that -- that she -- you know, she violated the company policy, and she rendered herself at that point the -- the -- unemployable by the company. The -- because the -- we had no way of knowing whether she was going to continue to do that or not continue to do that, and so how could I then have her continue to run that operation. We couldn't. The -- that is why she was let go.**

**Q. And everything you learned about her attempt to influence the investigation in your words you learned from Mr. McCormack; is that correct?**

**A. From Mr. McCormack, that's right.**

**Q. Was there any other source of information for that belief?**

**A. Not for that decision, no.**

**Q. And did Mr. McCormack tell you**

203

DOLAN

**what investigation was occurring that he he believed she was attempting to influence?**

MR. GREEN: Objection to form. If you can recall, Mr. Dolan.

**A. It was a harassment investigation based on complaints from Anucha. I knew that.**

**Q. So it was your understanding that it was an investigation into her own complaints of sexual harassment?**

**A. Right.**

MR. GREEN: Objection to form.

**Q. And that during that investigation she brought people into her office?**

MR. GREEN: Objection to form.

**Q. Is that correct?**

MR. GREEN: Objection to form. It misstates a portion of the prior testimony.

MR. VLADECK: Please Mr. -- objection to form is fine. I think that there has been enough coaching.

204

DOLAN

MR. GREEN: No, don't -- this camera is rolling.

MS. VLADECK: Mr. Dolan, do you mind leaving the room?

MR. GREEN: You stay right here.

MS. VLADECK: Excuse me.

MR. GREEN: If you want to end this deposition, you can end it. If you want to end it right now. Do not attempt to insult me in the presence of my client. Do not falsely accuse of me coaching in the presence of my client and do not mislead my client. That is inconsistent with his prior testimony, and you know it. He is not here to be duped or tricked by you asking questions to which he responded.

MS. VLADECK: Mr. Green, I think any observer will see the difference between prelunch and post lunch testimony.

MR. GREEN: Are you referring to Ms. Anucha Browne-Saunders?

MS. VLADECK: No, I am

205

DOLAN

referring to Mr. Dolan, and I am referring --

MR. GREEN: Are you referring to Anucha Browne-Sanders, of others giving her information during her deposition?

MS. VLADECK: I don't have any clue what you are talking about, but you are perfectly capable of saying whatever you want which you did at her deposition.

Could I have the question read back and could I have the answer without speaking objections?

(Record read.)

**A. That is a question?**

**Q. Did you believe that during the investigation into her complaints of sexual harassment she brought people, subordinates into her office to discuss the charges?**

**A. I believe that she used her position -- I'm sorry, but you know what, whether it occurred in her office or not is just -- is just merely that the -- an expression. I have no idea where it**

DOLAN

(Record read.)

MR. GREEN: Objection. Asked and answered. Mr. Dolan, you may answer again if you wish.

**A. Again, it was reported to me by either Mr. Mills, by one of the attorneys that the -- by Mr. McCormack.**

**Q. Did you ever hear Ms. Browne-Sanders say that she wanted 6 million dollars?**

**A. No.**

**Q. Did you ever hear anyone say that Ms. Browne-Sanders attempted to influence them?**

MR. GREEN: Objection to form. You may answer, Mr. Dolan.

**A. No.**

**Q. Have you seen any document that reflects any person saying that Ms. Browne-Sanders tried to influence them?**

MR. GREEN: Objection. I instruct the witness he may not respond to the extent it would reveal a document he

DOLAN

was shown by counsel.

**A. I haven't seen any documents.**

**Q. Okay.**

MR. GREEN: That is your answer.

**Q. I am going to show you --**

MS. VLADECK: Why don't we mark this. What are we up to 9.

(Dolan Exhibit 9 marked for identification.)

(Document handed to witness.)

**Q. What you have before you as Dolan Exhibit 9 is to Rusty McCormack from Rochelle Noel and John Moran dated January 13, 2006, and it is "Re summary of harassment investigation", MSG 03918 through 03929.**

**Have you ever seen this before?**

**A. No.**

**Q. Was it your understanding that any of the attempts to influence the investigation would have occurred prior to January 13, 2006?**

MR. GREEN: Objection to form.

DOLAN

You may answer, Mr. Dolan.

**A. I can't testify to the dates.**

**Q. When Mr. McCormack told you that these things had happened, did he tell you when they happened?**

**A. I don't recall.**

**Q. Did anyone discuss with you the fact that Ms. Browne-Sanders was not permitted at the workplace during the investigation into her complaints?**

MR. GREEN: Objection. Objection to form.

**A. I don't recall.**

**Q. Were you even aware that she wasn't at the workplace during the investigation into her complaints?**

MR. GREEN: Objection to form. You may answer, Mr. Dolan.

**A. I don't -- I --**

MR. GREEN: You may answer.

**A. You know, it is getting really difficult, guys. I mean can't you figure out another way to do that.**

**The -- the question again,**

**DOLAN**

**please.**

MS. VLADECK: Could you read it back.

(Record read.)

**A. I have no knowledge of it.**

**Q. Now, if you look at what has been marked as MSG 03922 through 03923, it says "Browne-Sanders alleges that she told Mills that she -- she had received a complaint from Petra Pope that Thomas asked Pope to go into the referees' locker room and make sure they are happy."**

**Under the witness statements it says "Mills acknowledges that Browne-Sanders informed him of this, and that he spoke with Thomas about it and directed him not to do it again. Thomas states that he did not ask Pope to go into the referees' locker room."**

**Did Mr. Mills ever tell you about this complaint?**

**A. No.**

**Q. And are you aware that Mr. Thomas has testified that he did in fact**



MADISON SQUARE GARDEN
The World's Most Famous Arena

EMPLOYEE PROFILE

| | | |
|---|---|---|
| __ SALARY CHANGE<br>PROMOTION ☐<br>ADJUSTMENT ☑<br>MERIT ☐<br>__ TRANSFER | __ TERM/LAYOFF<br>__ PERSONAL INFORMATION CHANGE<br>__ LEAVE OF ABSENCE | __ RETURN FROM LEAVE<br>__ TITLE CHANGE<br>__ OTHER |

| EFFECTIVE DATE | EMPLOYEE ID |
|---|---|
| 03/31/05 | 519032 |

| LAST NAME | FIRST NAME | MIDDLE INITIAL | STREET ADDRESS |
|---|---|---|---|
| Browne-Sanders | Anuoha | | |

| APT# | CITY | STATE | ZIP | HOME TELEPHONE |
|---|---|---|---|---|
| | | | | |

| DEPT CODE | DEPARTMENT NAME | EMP STATUS | ACTION REASON | EMP ACTION DESCR |
|---|---|---|---|---|
| 212080 | MSG Business Ops NY Knicks | A | DPC | Department Change |

| FLSA STATUS | | EMPLOYEE CLASS | | WORK STATUS | | | COMMENTS |
|---|---|---|---|---|---|---|---|
| EXEMPT ☐<br>NON-EXEMPT ☐ | E | ADMIN ☐<br>CASUAL ☐<br>SEASONAL ☐<br>TEMPORARY ☐<br>UNION REG ☐ | A | TEMP ☐<br>REGULAR ☐ | R | FULL TIME ☐ F<br>PART TIME ☐ | |

| LOCAL# | JOB CODE | CHG REASON | JOB TITLE | PERF CODE | PAY GROUP | SALARY GRADE | ANNUAL SALARY | NDC |
|---|---|---|---|---|---|---|---|---|
| ADM | SVP17 | | SVP Marketing & Business Ops | | BW1 | 27 | 212,992 | 1A |

| BASE SALARY | AMOUNT OF INCREASE | % INCREASE | SAL CHG REASON | SALARY EFF DATE | LAST REVIEW DATE | NEXT REVIEW DATE |
|---|---|---|---|---|---|---|
| 212992 | 0.00 | 0.00 | Adjustment | 1/1/05 | 03/01/2004 | 03/01/2005 |

| SUPERVISOR | BENEFIT PROGRAM | EFFECTIVE DATE | HIRE DATE | SENIORITY DATE | TERM DATE |
|---|---|---|---|---|---|
| Mills, Stephen C | ADM | 11/20/2000 | 11/20/2000 | 11/20/2000 | |

$250,000 Budgeted at $250K effective 1/1/05 [signature]

| DEPARTMENT (SUPERVISOR) | DATE | HUMAN RESOURCES | | DATE |
|---|---|---|---|---|
| DIVISION HEAD [signature] | DATE | PRESIDENT & CEO [signature] | 4/6/05 ENTERED | DATE |

APR 08 2005
H.R.M.S.

MSG 00333

CONFIDENTIAL

EXHIBIT
Dolan 4
12/11/06

February 25, 2002

Anucha Browne-Sanders
Madison Square Garden

Dear Anucha,

On behalf of our company, we are pleased to present you with your Management Performance Incentive Plan bonus award for 2001. As you know, it was a particularly challenging year for Cablevision, and we want to express our gratitude for your commitment and efforts toward moving the Company forward. Your hard work and dedication resulted in an individual performance rating of 1.390, division performance of 61.33% and the total company's performance of 80.39%. These ratings led to a bonus of $30,500, representing 17.94% of your 2001 earnings.

We want to thank you for all that you have done for the company. We are proud of our accomplishments, and we look forward to working with you to reach new heights in 2002.

Sincerely yours,

James L. Dolan
President & CEO

Steve Mills
President, Sports Team Operations

Scott Layden
President & General Manager
New York Knicks

JLD/SM/SL:il

April 30, 2003

Anucha Browne-Sanders
Madison Square Garden

Dear Anucha,

On behalf of our company, we are pleased to present you with your Management Performance Incentive Plan bonus award for 2002. As you know, the economy and market conditions continued to pose serious challenges for our Company, and we want to express again our gratitude for your commitment and efforts toward moving the Company forward. Your hard work and dedication resulted in an individual performance rating of 1.450, division performance of 100.00% and the total company's performance of 91.73%. These ratings led to a bonus of $58,000, representing 29.44% of your 2002 earnings.

We want to thank you for all that you have done for the company. We are proud of our accomplishments, and we look forward to working with you to reach new heights in 2003.

Sincerely yours,

James L. Dolan
President & CEO

Seth Abraham
President, Madison Square Garden/
Radio City Entertainment

JLD/SA:kc

April 1, 2004

Anucha Browne-Sanders
Madison Square Garden, L. P.

Dear Anucha,

On behalf of our company, we are delighted to present you with your Management Performance Incentive Plan bonus award for 2003. As you know, our Company faced many challenges in the past year, and our success in meeting these challenges was directly linked to your performance. Your hard work and dedication resulted in a unit performance of 75.0%, which led to a bonus of $53,000, representing 25.1% of your 2003 earnings.

We want to thank you for all that you have done for the company. We are proud of our accomplishments, and we look forward to working with you to reach new heights in 2004.

Sincerely yours,

| | | |
|---|---|---|
| James L. Dolan<br>President & CEO | Hank Ratner<br>Vice Chairman | Steve Mills<br>President, Sports Team Operations |

February 18, 2005

Anucha Browne-Sanders
Madison Square Garden, L.P.

Dear Anucha,

On behalf of our company, we are delighted to present you with your Management Performance Incentive Plan bonus award for 2004. As you may know, our Company had a terrific year. Almost all of our business units exceeded their plans and budgets. You responded exceptionally well in meeting all challenges and opportunities that confronted us this year, and we want both to congratulate and thank you for your splendid efforts and the results they produced. Your hard work and dedication resulted in a unit performance of 120.6%, which led to a bonus of $76,000, representing 35.9% of your 2004 earnings.

Again, we want to thank you for all that you have done for the company. We are proud of our accomplishments, and we look forward to working with you in our continuing efforts to sustain our record of excellent performance.

Sincerely yours,

James L. Dolan
President & CEO

Hank Ratner
Vice Chairman

Steve Mills
President, Sports Teams Operations

# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
06 Civ. 0589 (CGE)

---------------------------------------x

ANUCHA BROWNE-SANDERS,

Plaintiff,

- against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD THOMAS, III, and JAMES DOLAN,

Defendants.

---------------------------------------x

December 8, 2006
12:24 p.m.

VIDEOTAPE DEPOSITION of ISIAH LORD THOMAS, III, taken by the Plaintiff, pursuant to Notice, held at the offices of Vladeck Waldman Elias & Engelhard, P.C, 1501 Broadway, New York, New York, before Debbie Zaromatidis, a Shorthand Reporter and Notary Public of the State of New York.

186

THOMAS

being very charismatic with his style because it was definitely -- it was definitely unique, and he was the only one that could really pull it off and don't ask me to describe it because I -- I can't. It's finish -- if you ever meet him, you just would have to see it. It is just one of those guys whose got his own style.

Q. You saved me a question then.

A. I got it -- I can't -- it's different, but he was very effective.

Did you see this can? Give love.

(Laughter.)

A. Come on.

(Laughter.)

Q. Did you ever become aware of an incident between Mr. Murphy and Ms. Anucha Browne-Sanders?

MR. GREEN: Objection to form.

A. One more time.

MR. SMITH: Could you read that back.

(Record read.)

187

THOMAS

MS. EISENBERG: Before you answer that, could you be a little more specific by what you mean by "incident"?

MR. SMITH: Sure. I will do that.

MS. EISENBERG: Thank you.

Q. Did Anucha Browne-Sanders ever complain to you about Frank Murphy?

A. Yeah, she -- she made it -- yes. She -- she did.

Q. Okay. Did you ever become aware of an incident where Mrs. --

MR. SMITH: Withdrawn.

Q. Did Anucha Browne-Sanders ever complain to you that Frank Murphy came into her office and stood over her and acted unprofessional?

A. Yes, she did.

Q. Okay. And how did you become aware of this?

A. We were -- she phoned me I believe, and I said to her over the phone -- I think I said words to the effect that, you know, I can't believe

188

THOMAS

Frank would act that way, but if he did I definitely will -- will talk to him about it and make sure that he doesn't act that way, and she, you know, said that he was basically unprofessional and, you know, was -- was loud and -- and I told her that I would resolve the problem if there was one. I spoke to Frank, and he had a different take on the story than Anucha had just said -- had just told me, and his response was that, you know, they -- he -- he didn't raise his voice at her, and he didn't call her names, and I said to him well - something to the effect, well, whatever the problem is I expect you to resolve it.

Q. Okay. Mr. Murphy said that he didn't raise his voice at her and didn't call her names.

Did Ms. Browne-Sanders say to you that Mr. Murphy had called her names?

A. No, she did not.

Q. Then why did Mr. Murphy -- what was the conversation -- when you say he

189

THOMAS

didn't raise his voice or call her names, what names did he say he didn't call her?

MR. GREEN: Objection to form.

MS. EISENBERG: Objection form.

A. I -- say it one more time.

Q. Okay. Let me go back. You said Mr. Murphy -- you said you spoke to Mr. Murphy?

A. Yeah.

Q. Okay. And you said Mr. Murphy had a different take. Am I correct?

A. Yeah.

Q. Okay. You said that Mr. Murphy said he didn't raise his voice at Ms. Sanders; is that correct?

A. Yes.

Q. And that he didn't call her names. Did he refer to what names he did not call her?

A. No, I -- I don't -- I think what just happened to me is that in hearing the names that you are referring to -- that you were referring to and that -- that Anucha has alleged people have said about

190

THOMAS

her, me being one, I probably interjected that in a place where it shouldn't have been interjected because I am -- I don't think Mr. Murphy used names. I think this is me in a deposition and everything else hearing this. I probably put that in just for the sake of putting it in and forgive me if I misspoke.

Q. Okay. So I just want to be clear.

What did Mr. Murphy -- when you said you spoke to him, what did -- what do you recall Mr. Murphy saying to you regarding the incident?

A. That he didn't -- that he didn't treat her rudely or didn't raise his voice, and I -- I think I said whatever the issue is or was I expect for you to resolve it.

Q. Okay. Now, did -- when Ms. Sanders phoned you, did she say that Mr. Murphy raised his voice?

A. She did say that he raised his voice, but she did not say that he called

191

THOMAS

her names. She did not say that.

Q. Okay. Did he say that she -- he treated -- that Mr. Murphy treated her rudely?

A. To the effect and unprofessional and was very loud.

Q. Okay. During your conversation with Ms. Sanders, did you -- did you say anything else to her?

A. I don't believe I did, but I am sure I had to say something more than just those three lines. I am sure we had more conversation than that, but I -- I don't remember exactly what it was.

Q. During your conversation with Ms. Sanders, did you ask her what -- what was her function, what was her job responsibilities?

A. During this conversation?

Q. Yes, during this conversation.

A. No, I asked her that I think the second or third week on the job.

Q. During -- I want to still focus on during this conversation with Frank

192

THOMAS

Murphy. At any time during that conversation did you ever curse at Ms. Saunders?

A. I -- I have never cursed at Ms. Sanders, no.

Q. Okay. You're saying you've never cursed at her?

A. I have never cursed at Ms. Sanders.

Q. Okay.

A. Now, have I ever swore or sweared or used curse words around her, I probably have. But have I cursed at her, no, I have not.

Q. Okay. All right. During this conversation on the phone with Ms. Saunders, did you at any time use the word bitch?

A. No.

Q. Did you at any time use the word fuck?

A. That -- that -- that could have come out but not necessarily at her. I -- you know, I -- I could have said I'll

193

THOMAS

F'ing handle it or I'll -- I could -- I could have sworn but never at her, and by the way I -- when she -- when that phone call was made, I wasn't upset with her for calling me and informing me. I -- my job was to handle it, and I -- I wasn't -- I wasn't mad or anything that she phoned and told me this.

Q. Okay. And during that conversation over the phone, did you ever refer to be Ms. Sanders as a ho?

A. Please. No. Come on.

Q. Okay. Now, when you first started at -- as president of basketball operations for the New York Knicks, did you ever inform anyone that you wanted the players not to do any community activities?

A. No, just the opposite.

Q. Did you ever tell anyone that you wanted the players to limit the community activities?

A. No, I wanted -- I wanted structure to the activities, and I

258

THOMAS

hello, and she kind of pushed back and -- and I remember I -- I said no love today, and she was very kind of cold, and, you know, there were ushers and other people around at gate one, and it was kind a little awkward moment, and I -- I thought to myself, well, that's -- that was strange. That was kind of weird. I left it at that.

Q. When you -- the time that you came to hug her, when she pushed away -- I am sorry.

MR. SMITH: Withdrawn.

Q. The times that you would hug Ms. Anucha Browne-Sanders, did you hug her in -- in front -- in front of her, in front, back, side?

A. No, we would always see each other coming towards each other, and you shake, hug, how are you doing.

Q. Okay.

A. Is that --

Q. On the day that she backed away, was it -- did you come in front of her or

259

THOMAS

from behind her?

A. I believe I actually -- I believe it was on the side. I believe -- I think I walked up, and I put my -- this is her here. I think I put my left hand on her. I guess it would be her right shoulder, and I leaned in and I said, hey -- hey, Nuch, how you doing, and I went to give her a kiss on the cheek, and, you know, that is when I got that reaction.

Q. Did at any time you ever tell Mrs. Anucha Saunders that I know why we have -- why there is friction between us?

MR. GREEN: Objection to form.

A. No.

Q. Did you ever say to Mrs. Anucha Sanders that you believed that you and her were similar or alike?

A. I don't believe so. No.

Q. Okay. Did you ever say our relationship is like Love And Basketball?

A. No.

Q. Have you ever seen the movie of

260

THOMAS

Love And Basketball?

A. No, I have not seen the movie.

Q. Did you ever in your meetings --

MR. SMITH: Withdrawn.

Q. In your -- have you ever -- did you ever in your encounters with Anucha Browne-Sanders ever ask her to go off site?

A. No.

Q. Did you ever have a hotel suite at the Mandarin Hotel?

A. Have I ever had one?

Q. Yes.

A. Yes, I have.

Q. Was there ever a period of time when you were president of basketball operations for the New York Knicks that you held a suite at the Mandarin Hotel for more than a week?

A. That I held the suite for more --

Q. That you had a suite at the Mandarin Hotel for more than a week.

261

THOMAS

A. Like a week straight?

Q. Yes.

A. I -- no, I don't think I have ever had a suite at the Mandarin for a week straight.

Q. When is the longest period of time you've ever had a suite at the Mandarin Hotel?

MS. EISENBERG: Objection to form. You are talking about Mandarin hotel in New York.

Q. When you have said you have stayed at the Mandarin hotel, what Mandarin hotel have you stayed at?

A. The one here in New York.

Q. Okay. In the Mandarin Hotel in New York, what is the longest period of time you've ever stayed there?

A. A night.

Q. Have you ever requested Ms. Anucha Browne-Sanders to come to the Mandarin -- to the Mandarin Hotel with you?

A. No.

THOMAS

Q. Do you know who [redacted] is?

A. Yes, I do.

Q. And who is she?

A. She was -- when I was hired She -- she was here, and she was [redacted]

Q. Let me ask you. Outside of Anucha Browne-Sanders, has anyone in the Knicks ever accused you of sexually harassing an employee?

MR. GREEN: Objection to form.

A. No.

Q. Okay. Have you ever had sex with any employee of the New York Knicks?

MR. GREEN: Objection to form.

A. No.

Q. Do you know who Petra Pope is?

A. Yes, I do.

Q. And who is she?

A. Actually she works for the New Jersey Nets right now.

Q. And at some time did she work

THOMAS

for the New York Knicks?

A. Yes, she did. She was a -- I think she was the head of the dance team and probably had some other responsibilities that I didn't -- that I don't know about.

Q. Did you ever request Petra Pope to go visit or check on the refs, NBA refs, referees?

A. Yes, I did.

Q. And why did you ask Petra Pope to go check on the referees?

A. Because when I first got here, the -- again, one of the things that we wanted to clean up was front of the house, and the officiating, you know, I -- I thought the way we were treating the officials, you know, was poor. They -- we didn't give them food. We didn't give them a proper changing room, and I didn't think that we treated them well, and I wanted to treat the officials a little better, and their -- their changing room also didn't have the amenities for a

THOMAS

female when she came because there are female officials. So I wanted to make sure that our female -- when a female official came to The Garden that she had a proper changing place, and that Dan's team changed the way they -- their locker room was right next to the officials locker room, and I wanted -- we start catering food and putting food in the officials locker room. So I asked Petra since her -- her locker room is right next door to the officials locker room, could she check and make sure that if the officials needed anything while there because it would -- because our locker room is at the end. Sometimes they need to be taped. Sometimes they have hamstring problems. So if there was any miscommunication, since she was right there, if she could check and see that they were properly taken care of and felt that we as host we were doing whatever we could possibly do for them.

Q. Did Mr. Steve Mills ever speak

THOMAS

to you about you requesting Petra Pope to check on the refs?

A. Yes, he did, and he -- and I told him that he definitely had to -- had been misinformed, and I relayed the same story that, you know, I just relayed to you, and I believe since then Petra has confirmed that with -- with Steve in terms of, you know, what that was all about. It wasn't I think -- it was characterized as something other than what it was.

Q. What did Steve tell you that it was characterized as?

A. You can't be asking Petra to go by the officials room and, you know, (indicating) take care of them, you know, and I said that's -- that's not what it was about.

MS. EISENBERG: I would like the record to reflect that Mr. Thomas is putting quotation marks around what, take care of?

MS. FRANCO: Take care of them.

MS. EISENBERG: Take care of

**Murphy, Francis**

**From:** Murphy, Francis
**Sent:** Wednesday, March 24, 2004 11:00 AM
**To:** Mills, Steve; Thomas, Isiah
**Cc:** Browne-Sanders, Anucha
**Subject:** FW: Office Incident

this was just forwarded to me. my reputation and character stands for itself. I am available at any time to discuss this further.

F

-----Original Message-----
**From:** Browne-Sanders, Anucha
**Sent:** Wednesday, March 24, 2004 10:40 AM
**To:** Murphy, Francis
**Subject:** Office Incident

Frank,
After your unprofessional outburst in my office yesterday in which you stood over my desk and threatened me, I feel it's necessary to let you know that I've communicated this to Steve. I was completely shocked and disturbed by your behavior and I'm writing this note to inform you that in the future, you'll need to act in a professional manner when dealing with me or any other members of the organization.

Thank You
Anucha Browne Sanders

*Get your Knicks tickets at www.nyknicks.com and watch Stephon Marbury and the Knicks in action!*