# Exhibit 5

Dockets.Justia.com

```
                                                           1
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   06 CIV. 0589
 5   ------------------------------------------x
 6   ANUCHA BROWNE-SANDERS,
 7                              Plaintiff,
 8          - against -
 9   MADISON SQUARE GARDEN, L.P., ISIAH LORD
10   THOMAS III, AND JAMES DOLAN,
11                              Defendants.
12   ------------------------------------------x
13                              November 7, 2006
                                10:20  a.m.
14
15          VIDEOTAPE DEPOSITION of RUSTY
16   McCORMACK, taken by the Plaintiff,
17   pursuant to Notice, held at the offices of
18   Vladeck Waldman Elias & Engelhard, P.C.,
19   1501 Broadway, New York, New York, before
20   Debbie Zaromatidis, a Shorthand Reporter
21   and Notary Public of the State of New
22   York.
23
24
25
```

18

McCORMACK
1
2  Q. That was after the -- so after
3  Ms. Browne-Sanders internal complaint you
4  had this discussion with Mr. Ratner?
5  A. No. No. This was after the
6  call I assume from you or whatever
7  attorney to our attorneys.
8  Q. Right. So after -- after
9  Ms. Browne-Sanders' counsel made the
10 complaint on her behalf, you had a
11 discussion with Mr. Ratner about the
12 substance of the complaint?
13 A. Yes.
14 Q. And it was -- who said what in
15 that discussion?
16 A. Well, I -- it was just again a
17 passing conversation, and it -- what it
18 amounted to was the fact that, you know,
19 we had not been -- at least to that stage
20 in the investigation we had no
21 corroboration of the allegations that she
22 -- that were apparently made.
23 Q. Any other discussions that you
24 had with Mr. Ratner on the subject --
25 A. No, I don't remember --

19

McCORMACK
1
2  Q. You have to let me finish the
3  question.
4  A. I am sorry.
5  Q. That's okay.
6     Any other discussion that you
7  had with Mr. Ratner on the subject of
8  Ms. Browne-Sanders?
9  A. No, not that I remember.
10 Q. What about Mr. Dolan, have you
11 ever discussed them -- the lawsuit with
12 Mr. Dolan?
13 A. I never have.
14 Q. Have you ever discussed
15 Ms. Browne-Sanders with Mr. Dolan?
16    MR. GREEN: Objection to form.
17 You may answer.
18 A. No, I have not.
19 Q. Do you ever ride to work with
20 Mr. Dolan?
21 A. Yes, I do.
22 Q. And is it by the same -- same
23 mode of transportation, helicopter?
24 A. Same mode of transportation.
25 Q. Does -- is it the case that Mr.

20

McCORMACK
1
2  Dolan is usually present with you and Mr.
3  Ratner or that you -- you travel with Mr.
4  Dolan on other occasions?
5  A. I -- I have traveled
6  infrequently with Mr. Dolan on other
7  occasions.
8  Q. Usually when you travel with Mr.
9  Dolan, it is with Mr. Ratner as well?
10 A. That's correct.
11 Q. Anyone else present for those
12 helicopter rides?
13 A. Generally not. We have a senior
14 staff meeting every Wednesday afternoon,
15 so both Jim and Hank will come in
16 virtually ever Wednesday, and we fly
17 together in and back.
18 Q. Do they not come in -- do Mr.
19 Dolan and Mr. Ratner not come in every day
20 to -- to Madison Square Garden's offices
21 in Manhattan?
22 A. They do not.
23 Q. About how often do they come in?
24 A. Hank will be here more often
25 than Jim, but, as I said, at least once a

21

McCORMACK
1
2  week. Recently it has been at least a
3  couple of days a week, and sometimes Hank
4  will be here three days a week.
5  Q. Okay. And they also ---Mr. Dolan
6  an Mr. Ratner also have offices on Long
7  Island as well?
8  A. Yes, they do.
9  Q. And those are at Cablevision
10 headquarters?
11 A. Correct. So do I.
12 Q. You have an office at
13 Cablevision's headquarters?
14 A. Yes.
15 Q. How often do you go there?
16 A. Every morning.
17 Q. How often do you come to -- to
18 Madison Square Garden?
19 A. Every day.
20 Q. So is it -- so is it the case
21 that you go to Cablevision in the morning,
22 and then you spend your afternoon at
23 Madison Square Garden?
24 A. No. No. I go in the morning
25 but leave generally at 9:15 to come to the

222

McCORMACK

1
2  A.  Yes.
3  Q.  Okay.
4  A.  The whole project was his.
5  Q.  I think you said earlier in your
6  testimony that Mr. Moran and Ms. Noel
7  updated you about the progress of their
8  investigation as it was ongoing?
9  A.  Yes.
10 Q.  What did they say to you about
11 it?
12 A.  There wasn't a lot done until
13 they completed, but the -- the feedback as
14 the -- as it progressed was that they
15 had -- they were not corroborating the
16 allegations of Anucha.
17 Q.  Did they tell you that they were
18 corroborating any of the allegations of
19 Ms. Browne-Sanders?
20 A.  Well, that there was a -- as I
21 remember, Dan Gladstone, for instance,
22 said, yeah, Stephon did say that to him,
23 and Isiah did say, yes, I put my arms
24 around Anucha and tried to kiss her, but
25 that was it that I remember anyhow.

223

McCORMACK

1
2  Q.  They told you that while the
3  investigations was ongoing?
4  A.  I think so.  I -- or it may
5  come -- come later.  I -- the timing I
6  don't know.  It was either in a report or
7  -- or prior to that.
8  Q.  Did you eventually receive a
9  report reflecting the results of an
10 investigation?
11 A.  Yes, I did.
12 Q.  Did you take any action in
13 connection with that report?
14 A.  I did not.
15 Q.  Did you make any recommendations
16 in connection with that report?
17 A.  I did not.
18 Q.  Did you have discussions with
19 anyone --
20 A.  Immediately.  We did write a
21 report later, a memo later.
22 Q.  Well, my question was: Did you
23 make any recommendations in connection
24 with that -- the report that had been
25 given to you by Mr. Moran and Ms. Noel?

224

McCORMACK

1
2  A.  Yes.
3  Q.  What -- what recommendations did
4  you make?
5  A.  I recommended that Isiah be
6  given some sensitivity training, and that
7  Steve meet to do a recap and lessons
8  learned from the -- from the events.
9  Q.  Did you make any other
10 recommendations?
11 A.  No.
12 Q.  Did you recommend that
13 Ms. Browne-Sanders be terminated?
14 A.  No, I don't think it was a
15 recommendation.  It was -- it was a
16 statement that -- that based upon her
17 relationships both, you know, within the
18 organization primarily but -- that she
19 should be separated.  I didn't say
20 recommend.
21 Q.  Could you clarify for me the
22 distinction that you are making?  You said
23 you said in your memo that she should be
24 separated, but you didn't view that as a
25 recommendation?

225

McCORMACK

1
2  A.  It is up -- that is not my -- it
3  is up to management then to decide how
4  they do it.  I -- I recommended in the
5  case of -- of Isiah and Steve, but the
6  organization then has to react to the
7  Anucha thing.
8  Q.  Did you make a recommendation
9  that Ms. Browne-Sanders should be
10 separated?
11 A.  No.
12 Q.  Did you have -- did you make a
13 statement in your report that
14 Ms. Browne-Sanders should be separated?
15 A.  I did.
16 Q.  And could you clarify for me in
17 your mind what is the distinction between
18 a statement that she should be separated
19 and a recommendation that she should be
20 separated?
21 A.  There is not a lot, but it is
22 not -- not a recommendation.
23 Q.  Are you --
24 A.  She obviously wasn't fitting in
25 the organization, and by then she had

```
                                                    226
 1             McCORMACK
 2   pretty much decided her fate.
 3      Q.   How -- are you able to explain
 4   at all what the difference is in your mind
 5   between a statement that she should be
 6   separated and a recommendation that she
 7   should be separated?
 8      A.   It is close, but there is a
 9   difference.  I -- I just didn't use the
10   word recommend.
11      Q.   Is there any particular reason
12   why you didn't use the word recommend?
13      A.   Because that is the way Mark
14   Schoenfeld wrote it.
15      Q.   You did not write it -- you did
16   not write your --
17      A.   That was drafted by Mark
18   Schoenfeld.
19      Q.   When you say that, you are
20   referring to the --
21      A.   That memo.
22      Q.   You've got to let me ask the
23   questions.
24      A.   Sorry.
25      Q.   The -- the memo in which
```

```
                                                    227
 1             McCORMACK
 2   you -- you just described that you made
 3   recommendations with respect to Mr. Thomas
 4   and -- and Mr. Mills, that memo was
 5   drafted by Mr. Schoenfeld?
 6      A.   Correct.
 7      Q.   You just signed your name to it?
 8      A.   No.  I -- we -- I did some minor
 9   edits, but for the most part it was
10   written by Mark Schoenfeld.  The only
11   thing I did was wordsmithing the memo.
12      Q.   How did you wordsmith it?
13      A.   I don't remember.  It was minor
14   edits.
15      Q.   Did you agree with all of the
16   statements that were made in this
17   memorandum that Mr. Schoenfeld drafted?
18      A.   Yes, I did.
19      Q.   Okay.  And what was the basis
20   for the conclusion that Mr. Thomas should
21   be given I think you said sensitivity
22   training?
23      A.   Well, he admitted that he had
24   touched her and attempted to kiss her, and
25   so -- our concern was that different
```

```
                                                    228
 1             McCORMACK
 2   people had different sensibilities, and we
 3   just thought for the sake of the
 4   organization, et cetera, we -- we would
 5   give him some training to sensitize him to
 6   that.  It would be one-on-one.
 7      Q.   Was it -- and then that in your
 8   judgment was based solely on the
 9   determination that he had hugged
10   Ms. Browne-Sanders and attempted to kiss
11   her? Was it based on any other facts?
12      A.   No, that was -- that was the
13   primary -- because that is all we knew
14   that had really taken place.
15      Q.   Did you know whether or not Mr.
16   Brown -- Mr. Thomas had used profanity in
17   the workplace?
18      A.   The investigation did not
19   corroborate that.
20      Q.   No.  That -- it did not
21   corroborate that he used profanity?
22      A.   Correct.
23      Q.   And what was the basis of the
24   recommendation with respect to Steve
25   Mills?
```

```
                                                    229
 1             McCORMACK
 2      A.   With Steve, you know, we thought
 3   that -- that if he sits down and -- we
 4   thought let him sit down with some
 5   HR -- by the way Frank Lavotic and Rob
 6   Dotien are both -- Frank is a senior vice
 7   president for cable operations in charge
 8   of human resources, which is a big chunk
 9   of our company.  Rob Dotien is a
10   corporate -- he might be SVP now too I
11   think, but I am not really sure.  Anyway,
12   they are HR professionals, and we thought
13   let's -- let Steve sit down with somebody
14   who has not been involved with this thing
15   and do sort of a post mortem lessons
16   learned sort of exercise.
17      Q.   Your recommendation was that
18   Mr. Mills should sit down with Mr. Dotien
19   and Mr. Lavotic?
20      A.   Right.
21      Q.   Did you think that there was any
22   lessons that Mr. Mills needed to learn as
23   a result of this investigation?
24      A.   We didn't know.  That is why we
25   wanted somebody who had not been involved,
```

Page 230

McCORMACK

1
2  you know, who -- who was really separate
3  from the organization to take a look at
4  it.
5    Q.  Did that meeting happen to your
6  knowledge?
7    A.  I don't think it did.
8    Q.  Do you know why it -- it didn't?
9    A.  No, I don't know that.
10   Q.  Do you know whether --
11   A.  Just -- you know, I think the
12 lawsuit came and -- and we just
13 didn't -- we didn't follow-up on it.
14   Q.  And did Mr. Thomas receive the
15 sensitivity training that you referred to?
16   A.  No.
17   Q.  And do you know why he did not?
18   A.  Because the -- when the lawsuit
19 came that -- that was about as much
20 sensitivity training as he -- he would
21 ever want.
22   Q.  What do you mean by that?
23   A.  Well, he had been accused of
24 some serious things, and he obviously I
25 don't think would -- would do anything,

Page 231

McCORMACK

1
2  even the hug and kiss ever again.
3        MR. MINTZER:  Why don't we take
4  a five-minute break.
5        THE VIDEOGRAPHER:  Okay.  The
6  time is 3:47 p.m., November 7, 2006.  This
7  is the end of tape number 3 of the
8  videotape deposition of Rusty McCormack.
9        (Recess taken.)
10       THE VIDEOGRAPHER:  Okay.  The
11 time is 3:59 p.m., November 7, 2006.  This
12 is tape number 4 of the videotape
13 deposition of Rusty McCormack.
14 BY MR. MINTZER:
15   Q.  Mr. McCormack, before the break
16 you had mentioned a -- a memo that Mr.
17 Schoenfeld had drafted that you signed.
18 Do you recall that?
19   A.  Yes.
20   Q.  And that there was a statement
21 in that memorandum that said that
22 Ms. Browne-Sanders should be separated
23 from MSG, correct?
24   A.  Correct.
25   Q.  Had you had any discussions with

Page 232

McCORMACK

1
2  anyone else at MSG other than Mr.
3  Schoenfeld about that statement?
4    A.  No, I had not.
5    Q.  Had you discussed the
6  possibility of Ms. Browne-Sanders being
7  separated with anyone else at MSG at the
8  time that you signed that memorandum?
9    A.  No.
10   Q.  At any point, did you have any
11 discussion with Steve Mills about
12 separating Ms. Browne-Sanders from MSG?
13   A.  No.
14   Q.  Did you have any conversation
15 with James Dolan about separating
16 Ms. Browne-Sanders from MSG?
17   A.  No, I did not.
18   Q.  And did you have any
19 conversations with Hank Ratner about
20 separating Ms. Browne-Sanders from MSG?
21   A.  No, I did not.
22   Q.  Is it fair to say the only
23 person you spoke to about that was Mr.
24 Schoenfeld?
25   A.  I believe that is correct.

Page 233

McCORMACK

1
2    Q.  What is -- what was the
3  substance of your conversation with Mr.
4  Schoenfeld about separating
5  Ms. Browne-Sanders from MSG?
6    A.  Well, we --
7        MR. GREEN:  I instruct the
8  witness not to answer.  Privileged
9  communication.
10       MR. MINTZER:  You are taking
11 the position that that is privileged?
12       MR. GREEN:  Yes, I am not
13 taking the position that the letter itself
14 is privileged, but the underlying
15 conversations which would be advice sought
16 or rendered would be privileged.
17   Q.  Are you aware -- were there any
18 drafts of the memorandum that you signed
19 that was authored by Mr. Schoenfeld?
20       MR. GREEN:  Same objection.
21 All communications between Mr. McCormack
22 and Mr. Schoenfeld would be privileged
23 except for the version of the document
24 that is in evidence as to which no
25 privilege has been asserted.

```
                                          254
 1            McCORMACK
 2   please.
 3        (McCormack Exhibit 8 marked for
 4   identification.)
 5        (Document handed to witness.)
 6        MR. MINTZER: For the record,
 7   McCormack 8 is a two-page document that's
 8   Bates stamped MSG 6363 and 6364.
 9        (Pause.)
10    Q.   Have you had a chance to review
11   McCormack 8?
12        MR. GREEN: Take a moment, if
13   you need it, to read it please, Mr.
14   McCormack.
15        (Pause.)
16    A.   Okay.
17    Q.   Is this the memorandum that you
18   referred to earlier in your testimony that
19   was drafted by Mr. Schoenfeld --
20    A.   Correct.
21    Q.   -- that you signed?
22    A.   That's correct. Yes.
23    Q.   Okay. The top line says that
24   it's to files. Do you see that?
25    A.   Yes.
```

```
                                          255
 1            McCORMACK
 2    Q.   What does that refer to?
 3    A.   It's a memorandum -- a
 4   memorandum to file, which -- which then
 5   goes into the employee relations files.
 6    Q.   Was this a memorandum that was
 7   intended to be read by any particular
 8   person?
 9    A.   Not necessarily. It was really
10   written because at that point we -- we
11   assumed we probably were going to be sued.
12   So this was just to be on the record.
13    Q.   So this was a document that was
14   created in contemplation of litigation?
15    A.   That's correct.
16    Q.   In the document, you made
17   certain recommendations, as you said
18   before, concerning Isiah Thomas and Mr.
19   Mills, right?
20    A.   Um hum.
21    Q.   Yes?
22    A.   Yes. Yes.
23    Q.   Who were you directing those
24   recommendations to?
25    A.   In the case of Isiah,
```

```
                                          256
 1            McCORMACK
 2   it's -- obviously that's Steve Mills'
 3   decision as to whether he would do that or
 4   not.
 5    Q.   And what about with respect to
 6   Mr. Mills?
 7    A.   That would be Jim Dolan's
 8   decision.
 9    Q.   Okay. And so did you
10   contemplate that both Steve Mills and Mr.
11   Dolan were going to read this memorandum?
12    A.   I don't remember contemplating
13   it at the time.
14    Q.   Well, did you intend it, this
15   memorandum, to be read by Mr. Mills and
16   Mr. Dolan?
17    A.   No, not necessarily. It was
18   up -- you know, I really was pretty much
19   taking directions from the legal
20   department.
21    Q.   And the statements that you made
22   concerning Ms. Browne-Sanders, did you
23   intend them to be read by anyone?
24    A.   Not necessarily.
25    Q.   I think you -- you testified
```

```
                                          257
 1            McCORMACK
 2   before that you had had no discussion with
 3   anyone other than Mr. Schoenfeld about the
 4   statements you've made concerning
 5   Ms. Browne-Sanders in this memo?
 6    A.   I'm sure I discussed it with
 7   John Moran at the time.
 8    Q.   You discussed the content --
 9    A.   Yes.
10    Q.   -- of the paragraph relating to
11   Ms. Browne-Sanders --
12    A.   Well, these --
13    Q.   Hold on. Hold on.
14    A.   I'm sorry.
15    Q.   Let me finish my question, sir.
16        You discussed the content of the
17   paragraph related to Ms. Browne-Sanders
18   with Mr. Moran?
19    A.   That's correct.
20    Q.   When did you do that?
21    A.   Well, I showed him the
22   memorandum.
23    Q.   You showed him this entire
24   memorandum?
25    A.   Yes, I did.
```

Page 258

McCORMACK
Q. When did you do that?
A. I showed to him -- actually I might have showed it to him before I signed it. I can't remember.
Q. So sometime shortly -- either shortly before you signed it or shortly after you signed it?
A. Yes.
Q. The memorandum is dated January 19, 2006. Do you see that?
A. Um hum. Yes.
Q. You've already said that you didn't draft it. Mr. Schoenfeld drafted it. When did you first see a draft of this?
A. Maybe a couple of days prior to that at most.
Q. You wrote in the first paragraph that you have reviewed the report of the investigation conducted by Rochelle Noel and John Moran regarding the allegations recently made by Anucha Browne-Sanders and her counsel. "In light of that report, I am making certain recommendations."

Page 259

McCORMACK
What did you mean by that sentence, "in light of that report I am making certain recommendations"?
A. Well, we -- we -- based upon again the -- the difficulty that Anucha was having, the interpersonal problems that she was having, her expressed desire to leave the company, and all of the things that we have discussed today in terms of things like the open practice fiasco where somebody could have been hurt, in view of things that I personally was involved with, you know, we -- we -- I did not disagree that she should probably leave the company or should leave the company. She just had poor relationships, and she had already lost the confidence of the -- certainly the vice chairman of the company with the budget fiasco.
    With Isiah we said, again we need to sensitize him. We should -- you know, different people have different sensitivities. Is he aware of that? He hasn't worked in a large public company,

Page 260

McCORMACK
and you -- believe me having been a private company for some time and may be going to be private again, but it -- the -- particularly today with the SEC and regulations, that he wouldn't -- he probably wouldn't know that, so we wanted to sensitize him, so that he could -- he would -- and with Steve, as I said, we -- we recommended that he meet with two people who had not been involved with this issue and -- but who are professionals and do follow-up.
Q. When you say though "in light of the report," what did the report have to do with the recommendations that you were making --
A. They --
Q. -- with respect to Ms. Browne-Sanders?
A. They -- it did not have anything do with it.
Q. So where you wrote "in light of that report I am making certain recommendations," you didn't really mean

Page 261

McCORMACK
that with respect to the recommendations for Ms. Browne-Sanders?
A. No, the -- again, Mark Schoenfeld wrote this, but -- but we -- the -- the action taken with Anucha was done by Jim Dolan.
Q. How do you know that?
A. Okay. So -- well, that's the word I got.
Q. The word you got from whom?
A. That I'm not sure. I don't know whether it was Steve. I don't know whether it was -- I don't remember that exactly.
Q. Someone had decided --
A. But Jim Dolan decided to -- that he was going to fire Anucha.
Q. Someone -- someone told you that that Jim Dolan said that Ms. Browne-Sanders was going to be separated?
A. That's correct.
Q. Great. And then you had heard that before you made this -- you signed

66

Page 262

```
 1              McCORMACK
 2   your name to this document, McCormack 8?
 3     A.  Yes.
 4     Q.  So it's fair to say that you
 5   learned about Mr. Dolan's decision, and
 6   then you and Mr. Schoenfeld drafted a
 7   memorandum that would conform to Mr.
 8   Dolan's decision?
 9          MR. GREEN:  Objection to form.
10     Q.  Is that accurate?
11     A.  We -- yeah, we did write
12   this -- we did write this with that, yes,
13   but the decision was him.  You have speak
14   to Jim.
15     Q.  Did you hear about
16   Ms. Browne-Sanders' supposed desire to
17   leave the company from anyone other than
18   Steve Mills?
19     A.  No, I don't believe so.
20     Q.  No, you didn't hear about it
21   from anyone other than Steve Mills?
22     A.  That's correct.  Steve came to
23   me to discuss the possibility of her
24   continued employment while she looked for
25   work.
```

Page 263

```
 1              McCORMACK
 2     Q.  And -- and when did that happen?
 3     A.  It was after she came to him,
 4   which was in late November I think.
 5     Q.  Your -- your memorandum says in
 6   the second line "However, based on
 7   comments Browne-Sanders made to Steve
 8   Mills and members of her department before
 9   making the -- her complaint, it is clear
10   that Browne-Sanders has a poor
11   relationship and difficulty interacting
12   with Mills and other members of MSG
13   management."
14          Do you see that sentence?
15     A.  Yes.
16     Q.  What were the comments that
17   Ms. Browne-Sanders had made to other
18   members of her department that was the
19   basis of that statement?
20     A.  She -- I had heard that
21   she -- she made some statements to other
22   members.  I don't know exactly who that
23   was, but I -- I -- that's what I
24   understood.  That was -- that was the talk
25   around in the -- in the -- that
```

Page 264

```
 1              McCORMACK
 2   specifically, and Steve Mills of course
 3   was the fact that she wanted to leave the
 4   company.
 5     Q.  Right.  But the statements that
 6   were supposedly made to members of her
 7   department, those were not statements you
 8   heard firsthand?
 9     A.  I can't remember who exactly it
10   was, but I may -- I may have been told.  I
11   can't remember.
12     Q.  You may have been told.  You may
13   not have been told.  Is that a fair -- is
14   that accurate?
15     A.  Well, I probably was told
16   because that was the scuttlebutt in the
17   company is she was having -- she was
18   having conversation, and -- and the fact
19   that she was unhappy and probably was
20   going to leave the company.
21     Q.  So that part of your -- your
22   statement with respect to
23   Ms. Browne-Sanders' future at the company
24   was based on scuttlebutt?
25     A.  Yes.
```

Page 265

```
 1              McCORMACK
 2          MR. GREEN:  Objection to form.
 3     Q.  Who are the other members of MSG
 4   management that are referred to in that
 5   sentence?
 6     A.  Well, I mentioned to you I am
 7   one of them and Fran Hurley, my vice
 8   president of training and development, is
 9   another one.  Tim Hassett, Joe DeCoco, who
10   was in charge of security.  Of course,
11   Hank Ratner, who is -- you know with
12   budget issues and the fact that -- that he
13   had said that she was probably over her
14   head, and there were other people.
15   Specifically I don't know.  I can't name
16   them all, but I -- I had heard again talk
17   around the company that Anucha was just
18   over her head.
19     Q.  Did you -- did you personally
20   have any difficulty interacting with
21   Ms. Browne-Sanders?
22     A.  No, I didn't, but I didn't -- I
23   didn't have to.
24     Q.  Okay.
25     A.  I didn't have a real business
```

<u>MEMORANDUM</u>

To: Files

From: Rusty McCormack

Date: January 19, 2006

Re: <u>Knicks Employee Relations Issues</u>

I have reviewed the report of the investigation conducted by Rochelle Noel and John Moran regarding the allegations recently made by Anucha Browne Sanders and her counsel. In light of that report I am making certain recommendations.

<u>Anucha Browne Sanders</u>

As the report indicates, most of Browne Sanders' allegations were not confirmed. However, based on comments Browne Sanders made to Steve Mills and members of her department before making her complaint, it is clear that Browne Sanders has a poor relationship and difficulty interacting with Mills and other members of MSG management. Browne Sanders is unable to function effectively in her position. Moreover, MSG cannot function if its senior management cannot communicate and work together effectively. In light of this, and considering related issues with Browne Sanders' communication skills and overall effectiveness, Browne Sanders should be separated from MSG and offered severance and outplacement services, subject to her execution of an appropriate release.

<u>Isiah Thomas</u>

As indicated above, most of Browne Sanders' allegations against Thomas were not confirmed. Based on the interviews, the investigation made clear that Browne Sanders and Thomas had a number of business disagreements and differences in philosophy and management style. Other employees asserted that Thomas has on occasion used profanity and has raised his voice in the workplace at MSG. He also acknowledged that on one occasion he greeted Browne Sanders with a hug and kiss. In light of the above, I recommend that Thomas undergo one-one-one sessions with a qualified outside expert in order to sensitize him further with regard to the concerns that his conduct could raise in a corporate environment and in light of company policy. This can be dovetailed with our ongoing efforts to work with Thomas to help him manage his organization and deal effectively with other people in the Knicks organization and at MSG. This training should begin in the next 30 days.

1



<u>Steve Mills</u>

The investigation did not establish that Mills contravened the company's anti-harassment policy. In fact, as the report indicates, Mills took appropriate action to respond to the incidents that were called to his attention. Nevertheless, it is my experience that these situations can be used as learning tools to improve effectiveness in the future. I therefore recommend that Mills meet with my counterparts from Corporate and Rainbow, Rob Doodian and Frank Livoti, who have not been involved in this matter, to discuss what lessons, if any, may be learned from the facts described in the report. This meeting should occur in the next 30 days.

CONFIDENTIAL                                                          MSG    6364

# Exhibit 6

```
                                                          1
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
06 Civ. 0589 (CGE)
-----------------------------------x
ANUCHA BROWNE-SANDERS,

            Plaintiff,


       - against -



MADISON SQUARE GARDEN, L.P., ISIAH LORD
THOMAS, III, and JAMES DOLAN,
            Defendants.
-----------------------------------x
            January 8, 2007
            11:01 a.m.


       Videotaped Deposition of STEPHON
MARBURY, taken by Plaintiff, pursuant to
Notice, held at the offices of Vladeck
Waldman Elias & Engelhard, P.C., 1501
Broadway, New York, New York, before Todd
DeSimone, a Registered Professional
Reporter and Notary Public of the State of
New York.
```

## Page 14

MARBURY

Q. Knick?
A. The middle of the season of 2003.
Q. What caused you in the summer of 2005 to refer to Anucha Browne-Sanders as a bitch to Dan Gladstone?
A. I was having a conversation with Dan Gladstone about my cousin, Hassan, about him not getting his overtime pay, and Dan had told me that I had to take it up with Anucha.
   But I was talking to Dan about what had happened with why he wasn't getting paid his overtime pay, and Dan basically was saying that it wasn't his call. Then I asked him how did his time sheets -- how did his time sheets get changed when he never changed it.
Q. And what did he say in response?
A. I don't recall.
Q. So you were talking to Dan Gladstone about your cousin, Hassan, regarding him not getting overtime?

## Page 15

MARBURY

A. Uh-huh.
Q. Is that correct?
A. Yes.
Q. And he said that there was nothing he could do?
A. Basically, yes.
Q. So how did Ms. Sanders' name come up in this discussion, Ms. Browne-Sanders' name?
A. Because he was saying that I had to speak to Anucha about it and I was asking him, and then he was saying that she changed his schedule, his work schedule, or something like that.
Q. And so how during that conversation did you refer to -- how did you use the term "bitch" when referring to Anucha Browne-Sanders come up?
   MR. SHERWOOD: Objection as to form.
A. I just called her a bitch. It wasn't no specific way or certain way that it came up in the conversation. That's just how it came up.

## Page 16

MARBURY

Q. So you were having a conversation with Mr. Gladstone regarding your cousin Hassan getting overtime and, during the conversation it just came up, you just referred to Ms. Sanders as a bitch?
A. Yes.
Q. Do you know why you called her a bitch during this conversation?
A. That's how I felt.
Q. Why did you feel during that conversation in the summer of 2005 that Anucha Browne-Sanders was a bitch?
   MR. GREEN: Objection. Asked and answered. You may answer again.
A. I don't know why I felt that way. That's just how I felt at that time.
Q. Now, you said that, if I'm correct, that conversation with Dan Gladstone is the only time you've referred to Anucha Browne-Sanders as a bitch?
A. Yup, from what I recall.
Q. Did you ever feel outside of that time in the summer of 2005 that

## Page 17

MARBURY

Anucha Browne-Sanders was a bitch?
   MR. GREEN: Objection to form. He is not going to answer that question.
Q. Let's go back.
   You said you felt that Ms. Browne-Sanders was a bitch because you asked for some passes for your family; is that correct?
A. Yes, and her disposition.
Q. When did you ask for the passes for your family?
A. When I first got there.
Q. So that would be sometime in, when, 2003-2004?
A. I don't remember.
Q. When you first got to the New York Knicks?
A. Yes.
Q. So sometime when you first got to the New York Knicks when you had this conversation with Anucha Browne-Sanders, you felt that she was a bitch, and then in the summer of 2005 again you felt that she was a bitch; is that correct?

```
                                           26
 1              MARBURY
 2      Q.    Now, you said that you had
 3   conversation with Mr. Gladstone about your
 4   cousin in the summer of 2005; is that
 5   correct?
 6      A.    Yes.
 7      Q.    After reading this document,
 8   would it have been around June of 2005?
 9      A.    Yes.
10      Q.    Now, this document says that
11   you called Mr. Gladstone. Do you recall
12   calling him?
13      A.    Yes.
14      Q.    So this conversation you had
15   with Mr. Gladstone was over the phone?
16      A.    Yes.
17      Q.    Do you recall calling him at
18   night in June around 9 p.m.?
19      A.    Yes.
20      Q.    During your conversation with
21   Mr. Gladstone, did you express that you
22   were upset regarding the compensation of
23   your cousin?
24      A.    Yes.
25      Q.    And during your conversation
```

```
                                           27
 1              MARBURY
 2   with Mr. Gladstone, did you ever say that
 3   you believed that your cousin was being
 4   treated unfairly?
 5      A.    I think that was stated.
 6      Q.    Do you recall Mr. Gladstone
 7   having any conversations with -- any
 8   discussions with you during that
 9   conversation regarding your cousin only
10   working 35 hours?
11      A.    I don't know. The only thing
12   that I do know is that Hassan was telling
13   me that he did overtime hours and that he
14   had signed one of his slips and checking
15   in saying that he had signed in, and then
16   his name was crossed out or something
17   where it wasn't his initials or it wasn't
18   his signature as far as his time slip was
19   concerned.
20      Q.    Do you know what job Hassan had
21   with the Knicks?
22      A.    Community Relations.
23      Q.    Now, during your conversation
24   with Mr. Gladstone, was there any
25   discussions regarding Hassan's use of the
```

```
                                           28
 1              MARBURY
 2   parking garage?
 3      A.    I don't remember about that. I
 4   know I was looking at that. I don't
 5   remember that.
 6      Q.    Now, when you called
 7   Mr. Gladstone, were you upset at the time?
 8      A.    I probably was more wondering,
 9   you know, why was his hours being switched
10   around, and I thought that that wasn't
11   right if he was working overtime hours and
12   he was doing what he was supposed to be
13   doing, you know, why wasn't he being
14   compensated for that.
15      Q.    Now, in this e-mail,
16   Mr. Gladstone says that you referred to
17   Ms. Anucha Browne-Sanders using several
18   phrases. I want to go over those phrases
19   with you. Okay?
20      A.    Fine.
21      Q.    "He says no one likes that
22   black bitch." Do you recall saying that
23   to Mr. Gladstone?
24      A.    I didn't call her a black
25   bitch. I called her a bitch. And I
```

```
                                           29
 1              MARBURY
 2   didn't say "no one," referring to -- I was
 3   talking about myself. I said I don't like
 4   that -- I don't like her basically.
 5      Q.    "I don't like her"? What was
 6   the phrase that came out using the term
 7   "bitch" to refer to her?
 8      A.    I just called her a bitch. I
 9   was like "She's a bitch." Like I don't
10   know how I phrased it, but I know I didn't
11   call her a black bitch. That's not how I
12   would call her a bitch. Like "that black
13   bitch," that's not even in my lingo.
14      Q.    But you do recall just calling
15   her a bitch?
16      A.    Yeah.
17      Q.    So the next phrase, where it
18   says "Fuck that black bitch. She thinks
19   she runs the Knicks. She doesn't run
20   shit. I sell the tickets around here, not
21   her. I put people in the seats. This is
22   my team."
23            Do you recall having any --
24   saying that to Mr. Gladstone?
25      A.    I said that -- what I said to
```

Page 30

```
 1              MARBURY
 2  him was she acts like she runs the Knicks.
 3  She don't run the Knicks.  From the way
 4  how she walks around here telling people
 5  what to do and demanding people to do
 6  certain things as opposed to asking people
 7  to do things.  She didn't do that.  Like
 8  that's not her job.
 9      Q.   Did you say anything about that
10  you put people in the seats?
11      A.   Yes, I did say that.
12      Q.   You did say that?
13      A.   Yes.
14      Q.   And that you sell the tickets
15  around here?
16      A.   When I got here, when I first
17  came to New York, it was a sold-out crowd.
18  My name was on the marquee and they have
19  my name plastered all over New York
20  basically.  So yeah, I did sell seats.
21      Q.   But did you tell Mr. Gladstone
22  that --
23      A.   Yeah, I did.
24      Q.   And did you say "this is my
25  team"?
```

Page 31

```
 1              MARBURY
 2      A.   I probably did say that.
 3      Q.   The next statement he says you
 4  said, "We don't like her.  She thinks she
 5  tells us what to do.  She doesn't tell us
 6  shit."
 7           Did you say that to
 8  Mr. Gladstone?
 9      A.   No, I didn't say we don't like
10  her.  I said I don't like her.
11      Q.   And did you say "she tells us
12  what to do"?
13      A.   She thinks she can tell people
14  what to do.
15      Q.   "She don't tell us shit," did
16  you say that?
17      A.   Yeah.
18      Q.   The last sentence, it says
19  "Fuck that black bitch.  She ain't shit.
20  We'll see what happens this year."
21           Did you say that?
22      A.   I didn't call her a black
23  bitch, and I did say "fuck her."
24      Q.   You said "fuck her"?
25      A.   Uh-huh.
```

Page 32

```
 1              MARBURY
 2      Q.   Did you say "fuck that bitch"?
 3      A.   No.
 4      Q.   You just said "fuck her"?
 5      A.   Uh-huh.  I said "fuck her."
 6      Q.   Did you say "she ain't shit"
 7  and "we'll see what happens this year"?
 8      A.   No.
 9      Q.   Why did you say "fuck her"?
10      A.   Because that's how I felt.
11      Q.   Why did you feel that way?
12      A.   I don't know why I felt that
13  way at that time.  But that's how I felt.
14      Q.   For the period of time when you
15  first started with the New York Knicks up
16  until June of 2005, how many conversations
17  did you have with Anucha Browne-Sanders?
18      A.   After she said that -- after
19  she came up to me -- or two.  She spoke
20  with me the first time when she told me
21  about the passes and then the second time
22  when she asked me was I okay.  After that
23  I never spoke to her again.
24      Q.   You never spoke to her again?
25      A.   No, there wasn't no need.
```

Page 33

```
 1              MARBURY
 2  Every time I see her, I walked past her.
 3  It was like two ships in the night
 4  passing.
 5      Q.   So after the conversation about
 6  the passes, and then, if I'm correct, that
 7  same day or night, she said "Are you
 8  okay?"
 9      A.   No.  It was the next day.
10      Q.   It was the next day, okay.
11      A.   After that, we haven't had --
12  we never spoke.
13      Q.   So you had two conversations,
14  one about the passes and then the next day
15  she says "Are you all right," and you
16  haven't had any other conversations?
17      A.   And I never said anything else
18  to her.  I never had a conversation with
19  her.
20      Q.   But you felt during your
21  conversation with Mr. Gladstone that, one,
22  she was a bitch, and, two -- I'm sorry,
23  you referred to her as a bitch and you
24  said "fuck her"; is that correct?
25           MR. GREEN:  Objection to form.
```

```
                                        34
 1              MARBURY
 2  You may answer, Stephon.
 3      A.    Yes.
 4      Q.    Do you know how Mr. Hassan --
 5  what is your cousin's last name?
 6      A.    Gonsalves.
 7      Q.    How he was hired?
 8      A.    By Mr. Dolan.
 9      Q.    Did you ask Mr. Dolan to hire
10  your cousin?
11      A.    Yes.
12      Q.    Did you ask Mr. Dolan to hire
13  any other of your family members?
14      A.    Tasheem Ward.
15      Q.    Do you know if Anucha
16  Browne-Sanders interviewed your cousin?
17      A.    No.
18      Q.    Do you know if Anucha
19  Browne-Sanders interviewed Hassan
20  Gonsalves?
21      A.    No.
22      Q.    Do you know if Anucha
23  Browne-Sanders interviewed Tasheem Ward?
24      A.    No.
25      Q.    Do you know if your cousins
```

```
                                        35
 1              MARBURY
 2  worked in her department?
 3      A.    If she was running Community
 4  Relations, that's what I thought that they
 5  were doing.
 6      Q.    Now, I want to refer you to, on
 7  Marbury 1, on the first page it says "time
 8  sheets." Did you have any conversations
 9  with Mr. Gladstone regarding your cousin's
10  inability to fill out time sheets?
11      A.    Not that I recall.
12      Q.    Do you recall having any
13  conversations with your cousin, Hassan,
14  regarding his time sheets?
15      A.    How to fill them out or about
16  his time sheet? The only conversation I
17  had about was he told me about that he put
18  in for his overtime.
19      Q.    I want to go to the next page
20  of Marbury 1 regarding the parking. Did
21  you have any conversations with
22  Mr. Gladstone regarding Hassan using his
23  parking account?
24      A.    I don't recall.
25      Q.    Did you have any conversations
```

```
                                        36
 1              MARBURY
 2  with Hassan regarding his use of
 3  Gladstone's parking account?
 4      A.    I don't recall.
 5      Q.    Do you know who Karin Buchholz
 6  is?
 7      A.    Uh-huh.
 8      Q.    You have to say --
 9      A.    Yes.
10      Q.    Okay, thank you. And who is
11  Karin Buchholz?
12      A.    She works for the Knicks.
13      Q.    Do you know what she does for
14  the Knicks?
15      A.    I don't know people's job
16  descriptions. I mean, I use community
17  relationship for basically everything
18  because that's what they normally do.
19      Q.    Do you know who Chris Bernard
20  is?
21      A.    Yes.
22      Q.    Who is Chris Bernard?
23      A.    He works for the Knicks.
24      Q.    And do you know what area or
25  what does he do for the Knicks?
```

```
                                        37
 1              MARBURY
 2      A.    Player relationship.
 3            (Marbury Exhibit 2 marked for
 4  identification.)
 5            (Witness perusing document.)
 6      Q.    Have you had time to review
 7  what has been marked as Marbury Exhibit 2,
 8  which is a one-page document, it is an
 9  e-mail from Karin Buchholz dated November
10  28th, 2005 and it is Bates stamped MSG
11  05361?
12      A.    Yes.
13      Q.    Did Mr. Bernard ever ask you to
14  sign some jerseys?
15      A.    Yes.
16      Q.    In the e-mail, he says that you
17  did not want to help out Ms. Anucha
18  Browne-Sanders?
19            MR. SHERWOOD: Objection.
20            MR. GREEN: Objection.
21  Misstates what the e-mail says.
22            MR. SMITH: I'll withdraw that.
23      Q.    Did you ever say to Mr. Bernard
24  that you didn't want to help out Anucha
25  Browne-Sanders?
```

```
                                          46
 1              MARBURY
 2       Did you ever say that to Jamie
 3  Matthews?
 4       A.    I didn't have to say it. They
 5  already knew that from the way how I
 6  basically looked when they said something
 7  about her.
 8       Q.    How did you look when they said
 9  something about her?
10       A.    Like that look like down with
11  that face, like no expression.
12       Q.    So you believe it was very
13  clear that people knew that you did not
14  like Anucha Browne-Sanders?
15       A.    Yes.
16       Q.    And it wasn't like you were
17  looking to hide that you didn't like
18  Anucha Browne-Sanders?
19       A.    Not at all.
20       Q.    Did anybody from the Knicks
21  ever talk to you about referring to Anucha
22  Browne-Sanders as a bitch?
23       A.    No.
24       Q.    Were you ever disciplined for
25  referring to Anucha Browne-Sanders as a
```

```
                                          47
 1              MARBURY
 2  bitch?
 3       A.    The conversation was between
 4  two men. So I didn't think that when I
 5  was talking to Dan Gladstone that that was
 6  going to be repeated to anyone else.
 7            MR. SMITH: Could you read back
 8  the question.
 9            (The record was read.)
10       A.    I just answered, I don't see no
11  reason for me -- like I said, it was two
12  men speaking. We were talking. And no
13  one ever really said -- nobody said
14  anything to me about me calling her a
15  bitch.
16       Q.    So were you ever disciplined
17  for calling her a bitch?
18       A.    Nobody said anything to me
19  about me calling her a bitch. So I didn't
20  get a spanking for that.
21       Q.    Under the collective bargaining
22  agreement with the players and the NBA,
23  are you required to perform community
24  events?
25       A.    Yes.
```

```
                                          48
 1              MARBURY
 2       Q.    Do you know how many events you
 3  are required to do?
 4       A.    More than I normally do.
 5       Q.    So you do less than what is
 6  required?
 7       A.    No, I do more.
 8       Q.    And do you know how many you
 9  are required to do?
10       A.    I think 10 or 12.
11       Q.    With your contract with the New
12  York Knicks, is there a morals clause?
13            MR. GREEN: Objection to form.
14  You may answer if you understand the
15  question.
16       A.    I don't understand.
17       Q.    Is there any clause in your
18  contract that deals with your conduct
19  acting as a professional with regards to
20  the New York Knicks?
21       A.    Yes.
22       Q.    Under your contract, are you
23  supposed to hold yourself out as a
24  professional?
25       A.    Yes.
```

```
                                          49
 1              MARBURY
 2       Q.    And under your contract can you
 3  be disciplined for not holding yourself
 4  out as a professional?
 5       A.    Yes.
 6       Q.    In your contract, is there any
 7  discussion about what they require you to
 8  do to act as being a professional?
 9            MR. GREEN: Objection to form.
10  You may answer, Stephon.
11       A.    Yes.
12       Q.    And what is required?
13       A.    There is a whole list of
14  things. I don't know all of them off the
15  top of my head.
16       Q.    Can you name any of them that
17  you can recall?
18            MR. GREEN: Same objection.
19  You can testify, Stephon. If you can
20  recall them, you can mention them.
21       A.    I choose not, because I don't
22  know all of them.
23       Q.    I'm only asking you what you
24  recall.
25       A.    Make sure when you are in the
```

```
                                                    90
 1              MARBURY
 2      A.      No. I never had any
 3   conversations with anyone.
 4      Q.      Did anyone at The Garden ever
 5   talk to you about your relationship with
 6   ████████████?
 7           MR. GREEN: Objection to form.
 8   You can answer, Stephon.
 9      A.      No.
10      Q.      Did you ever have any
11   conversations with Isiah Thomas regarding
12   your relationship with ████████████?
13      A.      He just told me to be careful
14   with everything -- anything and everything
15   that I'm doing.
16      Q.      When did this conversation
17   occur?
18      A.      I don't remember.
19      Q.      Was it during the season, after
20   the season?
21      A.      This was during the season.
22      Q.      Do you recall how ████████
23   ████ name came about?
24           MR. SHERWOOD: Objection.
25      A.      No.
```

```
                                                    91
 1              MARBURY
 2           MR. SHERWOOD: This misstates
 3   prior testimony.
 4           MR. SMITH: I'll rephrase.
 5      Q.      You said he said be careful
 6   with everything and anything that you were
 7   doing. Did he ever refer to ██████
 8   ██ in that conversation?
 9      A.      No.
10      Q.      Then why did you take it that
11   he was referring to ████████████ during
12   that conversation?
13           MR. SHERWOOD: Objection.
14   There is no indication that he took it
15   that way.
16           MR. SMITH: I asked him did he
17   ever have a conversation with Isiah Thomas
18   about ████████████.
19           THE WITNESS: And I said no.
20           MR. SMITH: Go back. Let's go
21   back.
22           (The record was read.)
23      Q.      Now, you are saying during that
24   conversation that --
25      A.      The conversation wasn't about
```

```
                                                    92
 1              MARBURY
 2   ████.
 3      Q.      What was the conversation
 4   about?
 5      A.      It was about everything that
 6   was going on in my life, everything that
 7   was going on in basketball.
 8      Q.      Did Mr. Isiah Thomas ever ask
 9   you about ████████████ specifically?
10      A.      No, he never asked me about
11   ████████████.
12      Q.      Did anyone from The Garden ever
13   ask you about ████████████?
14      A.      No.
15      Q.      Outside of Dan Gladstone, did
16   anyone from The Garden ever talk to you
17   about Hassan while he was employed at The
18   Garden?
19      A.      When you say talked to me about
20   Hassan, what do you mean?
21      Q.      Did anyone talk to you about
22   Hassan's work?
23      A.      No.
24      Q.      Did anyone talk to you about
25   the allegations made about Hassan?
```

```
                                                    93
 1              MARBURY
 2      A.      I told you no already.
 3      Q.      Prior to him being terminated?
 4      A.      Exactly.
 5      Q.      Now, you said that you had
 6   conversation when you first got to the
 7   Knicks with Anucha Browne-Sanders
 8   regarding the passes. Do you recall who
 9   did you ask for passes for from Anucha
10   Browne-Sanders?
11      A.      There was so much going on that
12   day. It could have been a numerous amount
13   of people.
14      Q.      Was this your first -- was this
15   during the first time you were --
16      A.      Yes, the first --
17      Q.      You've got to let me finish.
18           Was this your first game at The
19   Garden as a New York Knick?
20      A.      Yes.
21      Q.      Do you recall who you were
22   asking for passes for?
23      A.      At that time I was just trying
24   to -- I was just trying to make sure that
25   everybody was straight. I was
```