# Exhibit 7
# Part 1

Dockets.Justia.com

1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    06 Civ. 0589 (CGE)

5    ------------------------------------------x

6    ANUCHA BROWNE-SANDERS,

7                         Plaintiff,

8         - against -

9    MADISON SQUARE GARDEN, L.P., ISIAH LORD

10    THOMAS, III, and JAMES DOLAN,

11                         Defendants.

12    ------------------------------------------x

13                    November 10, 2006

                      10:10  a.m.

14

15         VIDEOTAPE DEPOSITION of JOHN D.

16    MORAN, taken by the Plaintiff, pursuant to

17    Notice, held at the offices of Vladeck

18    Waldman Elias & Engelhard, P.C, 1501

19    Broadway, New York, New York, before

20    Debbie Zaromatidis, a Shorthand Reporter

21    and Notary Public of the State of New

22    York.

23

24

25

70

MORAN

1
2 that there was an issue in her area, and
3 that in fact she had -- by the time she
4 had called me she had already investigated
5 it, which -- which was a problem for me
6 because that is not the process. The
7 process is that if she receives a
8 complaint, she should bring her complaint
9 to me, and I'm to do the investigating,
10 and the reason I say that was a problem
11 was because the individuals she was
12 interviewing were people in her
13 department. They have to work together.
14 They have a personal relationship. It's,
15 you know, in a sense that -- and I don't
16 think it is best that the supervisor
17 interview their own subordinates in terms
18 of that subordinates might not be as
19 forthcoming, and they might not be -- if
20 you are not trained, you may be tipping
21 what you want to say.
22      But at any rate she did do that.
23 She called me up. I immediately went to
24 her office, and she relayed to me what she
25 discovered. She had interviewed actually

71

MORAN

1
2 a couple of people, more than one, and I
3 heard what she had to say, and then I
4 conducted my own investigation.
5    Q.   When you were conducting your
6 own investigation, did you do that
7 investigation with anyone else?
8    A.   A couple of the -- one -- at
9 least one of the interviews that -- there
10 were other people present. Anucha was
11 present, and I believe Karen Buchholz was
12 present, but they weren't -- they
13 weren't -- they weren't conducting the
14 investigation at that point.
15    Q.   Is there a woman by the name of
16 Anne Jackson on your staff?
17    A.   Yes.
18    Q.   Was she involved in the
19 investigation at all?
20    A.   She was involved in a piece of
21 it, yes.
22    Q.   What piece was she involved in?
23    A.   I believe she interviewed one or
24 two of the individuals -- actually on a
25 couple of the interviews she -- that I did

72

MORAN

1
2 she sat in with me, and then I believe she
3 conducted one interview on her own of an
4 employee.
5    Q.   You referred in your earlier
6 answer to Ms. Browne-Sanders having what
7 you say conducted her own investigation
8 about what -- Mr. Gonsalves' conduct?
9    A.   Yes.
10    Q.   And you said that she had you
11 believe interviewed two people?
12    A.   Yes.
13    Q.   Who did she interview?
14    A.   ████████████████████████
15 ████
16    Q.   Both of those individuals
17 reported to Ms. Browne-Sanders indirectly?
18    A.   Indirectly, yes.
19    Q.   Are you aware whether
20 Ms. Browne-Sanders discussed the issue of
21 Mr. Gonsalves' conduct with Steve Mills
22 before calling you about it?
23    A.   It's my understanding that she
24 did call him first, and I believe she sent
25 us both an E mail around that same time,

73

MORAN

1
2 either that day or the next day outlining
3 some of her findings.
4    Q.   Did you talk to Mr. Mills about
5 it -- the allegations against Mr.
6 Gonsalves at all?
7    A.   I'm -- I'm not sure that I did.
8 I'm not sure that I did.
9    Q.   At any point?
10    A.   I don't believe so. I don't
11 recall.
12    Q.   We started this line of
13 questioning because I had asked you
14 whether or not there were any instances in
15 in which you conducted an investigation
16 but didn't speak to the person who was
17 accused of wrongdoing.
18    A.   Yes.
19    Q.   And I take it you didn't speak
20 to Mr. Gonsalves about the allegations
21 against him?
22    A.   No, I didn't.
23    Q.   Why not?
24    A.   There -- there are very few
25 cases, and this was one of them,

19

74

MORAN

1
2  that -- that was very clear cut in my
3  mind.  We had multiple witnesses who
4  corroborated each other's experiences.
5  When he was making very inappropriate
6  comments, others overheard it.  So we have
7  four, five witnesses who -- at periodic
8  different times overheard his again
9  inappropriate comments.  It was very -- in
10  my mind it was very clear cut that he
11  needed to be terminated.
12      Q.    When you say inappropriate
13  comments, what sort of comments are you
14  referring to?
15      A.    Well, one that comes to mind is
16  he said to one of the women, gee, you look
17  nice.  I bet your pussy looks nice, too.
18  He said I hear -- to another one he said I
19  hear you give good head or blow jobs.  I'm
20  not sure which.  To one of the women he
21  sent an E mail, which I had -- she saved
22  it and sent me a text message, and it was
23  Thanksgiving time, and he said -- she said
24  something about happy Thanksgiving he says
25  yes, you know, when can I stick

75

MORAN

1
2  the -- when can I stick it in.  There were
3  others, but those are the ones that come
4  to mind.
5      Q.    With respect to the comments
6  that were made, not the text message, do
7  you recall were there witnesses to those
8  comments being made other than the people
9  who were --
10      A.    It is --
11      Q.    I just have to finish the
12  question.
13      A.    Sorry.
14      Q.    With respect to the comments
15  that you've referred to, were there
16  witnesses to the comments other than the
17  people who they were directed at?
18      A.    I -- I understand the -- I think
19  on two of the occasions, the one that you
20  look nice today I bet your pussy does too,
21  I understand there was a witness.
22      Q.    Who was the witness in that
23  case?
24      A.    I'm not going to retrieve the
25  name, but I believe it was the individual

76

MORAN

1
2  that Anne Jackson interviewed.
3      Q.    When you do a harassment
4  investigation, is it your belief that in
5  order to conclude that a violation of the
6  company's anti harassment -- harassment
7  policies occurred, there has to be
8  corroboration of what the complaining
9  witness has -- has said?
10          MR. GREEN:  Objection to form.
11  You may answer.
12      A.    Yeah.  It would -- it would
13  depend on the circumstances, but it is
14  certainly the key -- a key element on it.
15      Q.    Are there any instances
16  in -- where you have done a harassment
17  investigation and you have credited what a
18  complainant has said even though there
19  wasn't independent corroboration of
20  the -- the allegations?
21          MR. GREEN:  Same objection to
22  form.  You can answer, Mr. Moran.
23      A.    Not that I'm aware of.
24          MR. GREEN:  Kevin, it is 11:30.
25  Good time for a few minutes.

77

MORAN

1
2          THE VIDEOGRAPHER:  We have come
3  to the end of the tape 1.  It is now 11:28
4  a.m.  We are going off the record.  End of
5  tape 1.
6          (Recess taken.)
7          THE VIDEOGRAPHER:  This is the
8  beginning of tape number 2.  We are back
9  on the record at approximately 11:43 a.m.
10          MR. MINTZER:  For the record, I
11  think we should just state that we had a
12  couple of other lawyers join us from when
13  we started.  If you want to note your
14  appearance.
15          MR. GREEN:  Sure.  I will note
16  it for you.  Brian Cesaratto and Teresa
17  Holland of Epstein Becker.
18          MS. VLADECK:  Didn't you forget
19  a name?  Epstein Becker.
20          (Laughter.)
21          MR. GREEN:  I have always done
22  that.
23      Q.    Mr. Moran, in your investigation
24  of Mr. Gonsalves' conduct, did it come to
25  your attention that there was any

20



78

MORAN

2 inappropriate conduct by any other
3 employee of Madison Square Garden?
4         MR. GREEN:   I object to form.
5 You may answer, Mr. Moran.
6     A.   I'm thinking.  Nothing comes to
7 mind.
8     Q.   Did you learn about any
9 inappropriate conduct by Stephon Marbury?
10    A.   Stephon Marbury's name came up.
11 I don't know that I would have necessarily
12 categorize it as inappropriate.
13    Q.   How did Stephon Marbury's name
14 came up -- come up?
15    A.   I'm trying to get the names
16 right.  I believe ████████████████████
17 ████████████ and █████████ is the --
18 one of the names I couldn't -- couldn't
19 recall before -- went to a club in I
20 believe the Bronx.  Not -- no, Westchester
21 it was.  I believe it was ████████████
22 ████████████, and ████ and ████████
23 had been there Before and offered to take
24 her there ████████████, and while they
25 were there they ran into Hassan who was

79

MORAN

2 there at the club, and Stephon Marbury was
3 at the club.  I don't know whether -- I
4 don't know whether Hassan and Stephon were
5 together, but -- but I was told they were
6 at the club.  So Stephon's name came up in
7 that context.
8     Q.   Did you learn anything else
9 about Mr. Marbury's conduct in connection
10 with your investigation?
11    A.   After the -- after the -- well
12 at some point in the evening the three
13 women decided to go home, and they were in
14 the parking lot, and Hassan, as it was
15 relayed to me, said to ████████, you know,
16 I'll -- I can give you a ride home because
17 I guess she -- I believe she lived
18 somewhere -- had an apartment somewhere
19 around ████████ and she agreed to do that
20 and went with him.
21    Q.   With Mr. Gonsalves?
22    A.   With Mr. Gonsalves, yes.
23    Q.   And how did Mr. Marbury get
24 involved in this?
25    A.   And then -- well, they were

80

MORAN

2 going to his car.  Mr. Marbury -- Stephon
3 Marbury was in his vehicle.  I'm not sure
4 what type it was, but he was in his
5 vehicle and asked ████████ to -- to join
6 him in his vehicle.
7     Q.   And what did you learn about
8 what happened in the vehicle?
9     A.   I understand that from -- this
10 is strictly from ████████, that she went
11 into his vehicle.  She indicated that they
12 had sex, and she didn't tell me what that
13 meant, and then she left the vehicle, and
14 Hassan she related drove him -- drove her
15 home.
16    Q.   What was Mr. -- Ms. ████████
17 position at Madison Square Garden at this
18 time?
19    A.   I believe at that point she was
20 ████████████████
21    Q.   Did you inquire at all about
22 whether Ms. ████████ gave consent to have
23 sex with Mr. Marbury?
24    A.   Yes, I did.
25    Q.   What were you told?

81

MORAN

2     A.   I was told -- well, I asked
3 ████████ directly.  Actually when I was
4 interviewing her, Rochelle Noel was with
5 me, and I believe it was Rochelle who
6 asked her directly did you get into the
7 van voluntarily, and she said yes, and did
8 you -- was he -- did he force you to do
9 anything.  She said no, and it was
10 actually asked -- I think I asked her are
11 you saying it was consensual, and she said
12 yes.
13    Q.   Did you have any discussions
14 about that allegation with anyone else
15 other than Ms. ████████?
16    A.   Well, when we interviewed ████
17 ████████ and ████████████████, we asked
18 them to take us through the evening, and
19 the last they remember -- I don't -- I
20 don't believe they are aware of -- of what
21 happened with ████████ and Stephon Marbury
22 because she left with Hassan, and they
23 went home, and they might know because
24 maybe -- when I did the investigation
25 I -- I felt fairly certain that they did

21

82

MORAN

1
2  not know of -- of this consensual sex.
3      Q.    Did they -- did anyone tell you
4  that Ms. ▮▮▮▮ had been drinking alcohol
5  that night?
6      A.    They said that -- that they had
7  had a couple of drinks.  As I recall -- as
8  I recall, someone said they didn't think
9  she was -- I would have to check my notes,
10  but -- well, let me answer your question.
11  I am sorry.  Yes, they had had drinks.
12      Q.    And Ms. ▮▮▮▮ had had alcohol
13  that night?
14      A.    Yes.
15      Q.    Did you have any conversation
16  about that allegation with Karen Buchholz?
17      A.    Karen -- Karen was aware of
18  the -- of the -- ▮▮▮▮ I believe had
19  told both Anucha and Karen what happened.
20  So -- I mean Karen wasn't there.  So
21  we -- we might have had a conversation
22  about it, but I don't know that -- I'm not
23  sure what Karen -- I'm not sure what
24  Karen -- I'm just trying to think.  Well,
25  as I said, Karen was aware of the

83

MORAN

1
2  situation.
3      Q.    Well, do you recall what Karen
4  told you about anything more than what you
5  have said?
6      A.    I'm not sure it was Karen.
7  Someone made the statement because I don't
8  believe she made -- I'm not sure ▮▮▮▮
9  made it to me, but ▮▮▮▮ made a
10  statement to someone that she might not
11  have gotten in the car if it hadn't been
12  Stephon.
13      Q.    So you think that that was
14  Ms. Buchholz who told you that or someone
15  else?
16      A.    I'm not sure who it was.
17      Q.    Did --
18      A.    I think -- I think it was
19  Anucha.  It could have been both actually,
20  but --
21      Q.    Did you discuss -- did you
22  separately interview Ms. Buchholz and
23  Ms. Browne-Sanders in your investigation
24  of the Gonsalves issues?
25      A.    Yes.  Yes.

84

MORAN

1
2      Q.    Did Ms. Buchholz tell you that
3  ▮▮▮▮▮▮ felt like she had to do it with
4  Mr. Marbury?
5          MR. GREEN:  Objection to form.
6  You may answer, Mr. Moran.
7      A.    Yes, I -- I don't know what her
8  exact words were, but it was something to
9  the effect that I recall it was more like
10  if it wasn't Stephon Marbury I probably
11  wouldn't have done it.
12      Q.    Did Ms. Buchholz tell you that
13  Ms. ▮▮▮▮ had said to her that she felt
14  like a prostitute?
15          MR. GREEN:  I am going to
16  object.  I am going to ask also if you are
17  reading from any document would you please
18  give the witness the opportunity to read
19  the document you are reading from.
20  Otherwise, I will instruct him not to
21  answer to the extent your question is
22  coming from a document that you have
23  access to and could share with him on a
24  nonprivileged basis.
25          MR. MINTZER:  If you are going

85

MORAN

1
2  to object and instruct him not to answer,
3  we are going to call the court based on
4  that.  You have no right to instruct him
5  not to answer.  Whether I am or am not
6  reading from a document, I have a right to
7  probe his recollection.  If I want to ask
8  him a question without giving him the
9  document, that is perfectly legitimate.
10  Tell me if we are going to have continual
11  directions not to answer on that basis,
12  then I am afraid we are going to have to
13  call the court.
14          MR. GREEN:  You can call the
15  court any time you like, Kevin.  My
16  objection is to the extent you are reading
17  from a document that is not privileged, in
18  fairness you should not test the witness'
19  memory but give him a chance to see what
20  you are reading from.  If your question is
21  a paraphrase, that is different.
22          MR. MINTZER:  You can object.
23  My only concern is if you are going to
24  direct him not to answer on that basis, we
25  are going to have to call the court.

22



86

1          MORAN
2          MR. GREEN:  Well, let's call
3  the court.
4          THE VIDEOGRAPHER:  We are now
5  going off the record.  The time is 11:53
6  a.m.
7          (Discussion held off the
8  record.)
9          THE VIDEOGRAPHER:  We are going
10 back on the record at approximately 11:57
11 a.m.
12     Q.    What did -- what do you recall
13 Ms. Buchholz telling you about what
14 ▮▮▮▮▮▮ relayed about how she felt
15 about the interaction with Mr. Marbury?
16     MR. GREEN:  Objection to form.
17 You may answer.
18     A.    As I recall, she felt very
19 poorly about herself and was sorry she did
20 it, but -- and again made some statement
21 that if it hadn't -- if it hadn't been
22 Stephon Marbury I don't think I would have
23 done it or something to that effect.
24     Q.    Did you ask Ms. Buchholz --
25     MR. MINTZER:  Well, strike that.

87

1          MORAN
2     Q.    Did Ms. Buchholz tell you
3  anything in words or substance that she
4  didn't feel that Ms. ▮▮▮▮▮▮ was very
5  convincing in her statement that it
6  wasn't -- that the interaction was
7  consensual?
8          MR. GREEN:  Objection to form.
9  You may answer.
10     Q.    Let me try to ask it a little
11 better.
12          Did Ms. Buchholz tell you that
13 in her view Ms. ▮▮▮▮▮▮ was not very
14 convincing in her statement that the
15 interaction between her and Mr. Marbury
16 had been consensual?
17     MR. GREEN:  Objection to form.
18 You may answer.
19     A.    I don't recall that.
20     MR. MINTZER:  Can we mark this
21 as Moran 1.
22     (Moran Exhibit 1 marked for
23 identification.)
24     (Document handed to witness.)
25     MR. MINTZER:  For the record, I

88

1          MORAN
2  have given a -- the witness a four-page
3  document that's Bates stamped MSG 00277
4  through 00280.
5     Q.    Let me know after you have had a
6  chance to review it, Mr. Moran.
7          (Pause.)
8          MR. GREEN:  While the witness
9  is reading that, to avoid some unnecessary
10 paperwork, Kevin.  Any objection to our
11 noting as confidential all accusations of
12 inappropriate conduct with respect to the
13 names and the incidents involved?
14     MR. MINTZER:  Of this matter?
15     MR. GREEN:  How about during
16 this deposition today, all allegations of
17 impropriety made by anyone against anyone
18 marked as confidential.
19     MR. MINTZER:  Including the
20 claims that Ms. Browne-Sanders has made?
21     MR. GREEN:  No, not
22 Browne-Sanders.  We have heard this
23 morning so far alleged other incidents,
24 what is coming up now with respect to
25 Stephon Marbury and Hassan Gonsalves.

89

1          MORAN
2     MR. MINTZER:  Why don't we say
3  I -- I don't think we -- I don't have an
4  objection to at this stage treating them
5  as confidential.  If we upon looking at
6  the transcript think otherwise, we'll
7  notify you.
8          MR. GREEN:  Okay.
9     A.    I'm finished reading it.
10     Q.    Okay.  Can you tell me what
11 these notes are, do you know?
12     A.    It looks like it was a phone
13 conversation on November 29 of '05 that I
14 had with Karen Buchholz.
15     Q.    These are your notes, right?
16     A.    These are my notes.
17     Q.    And these are notes that you
18 took in connection with your investigation
19 of Mr. Gonsalves' alleged misconduct?
20     A.    Yes.
21     Q.    Having reviewed the notes, does
22 it refresh your recollection that
23 Ms. Buchholz had told you that Ms. ▮▮▮▮▮▮
24 was not convincing in her statement that
25 she did not say no to Mr. Marbury?

23



90

1                    MORAN
2        MR. GREEN:  Objection to form.
3  You may answer.
4      A.    Correct.  She -- my -- my notes
5  reflect that she said Karen -- Karen felt
6  that -- her opinion was that ██████ was
7  not real convincing.
8      Q.    And Ms. ████ also told you
9  that that Mrs. --
10       MR. MINTZER:  Strike that.
11      Q.    Ms. Buchholz also told you that
12  Ms. ██████ had said to her that she felt
13  like she had to do it?
14        MR. GREEN:  Objection to form.
15  You may answer, Mr. Moran.
16      A.    Yes, she said that -- she
17  related to me that ██████ said to her
18  that she felt like she had to do it, which
19  I'm not sure it is totally consistent with
20  what ██████ told me when I interviewed
21  her.
22      Q.    Just to take a step back, when
23  you take notes of conversations such as
24  this do you make an attempt to write down
25  everything that you regard as relevant to

91

1                    MORAN
2  the investigation?
3      A.    Yes, I try to.
4      Q.    Okay.  And I take it that
5  you're -- you're not trying to take down a
6  verbatim transcript of what someone has
7  said to you?
8      A.    I -- I try to -- it's -- during
9  a conversation I don't -- you know, I
10  don't take shorthand, and as you can see I
11  am sort of -- I am writing -- I am trying
12  to write down as much as I can.  If -- if
13  time allows, I try to write it down.
14      Q.    Okay.  Do you ever go back after
15  a conversation is done and supplement your
16  notes or do you generally simply rely on
17  the notes as you take them during your
18  conversation?
19      A.    I -- I might do that on
20  occasion.  Typically it would be something
21  in the margin, so I could tell the
22  difference, try to make sure I could tell
23  the difference.
24      Q.    So with respect to Moran 1, do
25  you see any notation you think you might

92

1                    MORAN
2  have had made after the conversation you
3  had with Ms. Buchholz?
4      A.    Probably on 00278.
5      Q.    Um hum.
6      A.    Where it says "get date,"
7  that -- that mostly likely afterwards
8  because I have a blank to the right.
9      Q.    Um hum.
10      A.    I think -- 00280, if you go to
11  the fifth line from the bottom,
12  it's -- there are three stars there.  It
13  says "when/time frame."  It would seem to
14  be after the situation with Stephon.  That
15  might have been afterwards.  I'm not sure.
16  And perhaps the -- perhaps the sentence
17  after that.  I'm not -- I'm not sure.
18      Q.    Other than those notationss, do
19  you think you took the notes during your
20  conversation with Ms. Buchholz?
21      A.    Yes.
22      Q.    Did you find out what
23  Ms. ████████ was?
24      A.    I did, but I'm not going to
25  remember it.

93

1                    MORAN
2      Q.    Do you recall approximately how
3  old she was at this time?
4      A.    No.
5      Q.    Can I ask you to take a look at
6  page 278.  Okay.
7      Q.    The last line on the page says,
8  "██████ said she was pretty out of it."
9      A.    Um hum.
10      Q.    What does that refer to?
11      A.    Again, that is -- talking with
12  Karen, that was a -- as much as possible a
13  quote from -- from Karen saying that
14  ██████ said she was pretty out of it.
15      Q.    Did you understand that to mean
16  that Ms. Buchholz had said that Ms.██████
17  had told her that she had consumed alcohol
18  that evening?
19        MR. GREEN:  Objection to form.
20  You may answer it.
21      A.    I didn't ask specifics, but when
22  she said it I -- when she said I thought,
23  you know, that she might have had a couple
24  of drinks, but I didn't ask -- I didn't
25  ask about the alcohol at that time.

24



94

```
              MORAN
1
2     Q.   Did you ask Ms.          when you
3  spoke to her whether she had had alcohol?
4     A.   I'm not sure.  I don't recall.
5     Q.   Did you learn in the
6  investigation that Mr. Marbury had sent
7  any text messages to Ms.          following
8  their encounter in the vehicle?
9     A.   Right.  I don't recall whether I
10 learned that from Karen's discussions with
11          or my own, but I recall a
12 follow-up text from Stephon to her.  I'm
13 not -- again, I'm not sure whether -- I'm
14 not sure whether          told me this
15 directly or I'm getting it from Karen, but
16 something to the effect of, you know, when
17 can I get -- when can I get some more of
18 that.
19    Q.   Did you make any further
20 inquiries about those text messages after
21 you learned of it?
22    A.   Yes.  She --
23    Q.   Excuse me?
24    A.   She said I'm not sure in what
25 context, but she said they stopped.
```

95

```
              MORAN
1
2     Q.   Who did, Ms.          ?
3     A.   Yes.  Yes.
4     Q.   When did she say that they
5  stopped?
6     A.   I'm not sure of the exact time
7  frame.  My sense was it was a month or so
8  that -- I don't think there were that many
9  of them, but I know she said they stopped.
10    Q.   And was it your understanding
11 that there was more than one text message
12 sent?
13    A.   I'm not really sure.  I would
14 have to review my notes.
15    Q.   Did any of what you learned in
16 connection with the allegations that were
17 made about what happened with Ms.
18 and Mr. Marbury cause you concern about
19 whether Mr. Marbury had violated the
20 company's harassment or nondiscrimination
21 policies?
22         MR. GREEN:   Objection to form.
23 You may answer.
24    A.   Well, it was certainly something
25 I considered and looked at.  It was -- it
```

96

```
              MORAN
1
2  was off premises.  It was after work.  It
3  was something that she said was
4  consensual, so I did not -- I did not feel
5  that it was something that violated the
6  company's policies.
7     Q.   And is the same true for the
8  text messages that were sent?
9     A.   The text messages were -- were
10 again between two individuals.
11 They -- there was no reporting
12 relationship.  I viewed it as
13 outside -- outside of the workplace.
14    Q.   Mr. Marbury is the -- one of the
15 star basketball players of the team;
16 correct?
17    A.   That's correct.
18    Q.   And Ms.          , as you said, at
19 this time was an
20    A.   Yes.
21    Q.   Did you consider that there was
22 any power imbalance in that pairing?
23         MR. GREEN:   Objection to form.
24 You may answer, Mr. Moran.
25    A.   I'm not sure what you mean
```

97

```
              MORAN
1
2  by --
3     Q.   Well, did you consider that
4  Ms.          may have been in a position
5  where she felt that she had to go along
6  with what Mr. Marbury wanted?
7         MR. GREEN:   Objection to form.
8  You may answer.
9     A.   Well, I did consider that, and
10 that is why I asked her and Rochelle Noel
11 who was with me asked her was she forced.
12 Was there any -- anything physical.  She
13 said no and -- and told me it was
14 consensual.
15    Q.   Okay.  And did you have any
16 concern that notwithstanding her statement
17 that it was consensual, that she may have
18 felt as though she had to consent because
19 of who Mr. Marbury is?
20         MR. GREEN:   Objection to form.
21 You may answer, Mr. Moran.
22    A.   I -- I -- I took her at her
23 word.
24    Q.   With respect to the text
25 messages, was it your belief that because
```

25

212-267-6868                                              516-608-2400

98

MORAN

2 those text messages were not sent on the
3 premises of Madison Square Garden that it
4 was not a violation of the company's
5 anti-harassment policy?
6         MR. GREEN:   Objection to form.
7 You may answer, Mr. Moran.
8     A.   I'm not sure -- the definitive
9 point for me wouldn't be whether it
10 was -- if one of their -- one or both
11 might have been on or one was on or off.
12 It was employees -- employees have a right
13 to have relationships even though they
14 work for The Garden.  We don't prohibit
15 that as long as it is not a direct
16 reporting relationship, and if they are
17 text messaging each other, that is -- I
18 wouldn't consider that a violation.
19     Q.   Well, I mean a text message that
20 says in substance, you know, when can I
21 get more of that, do you consider that to
22 be appropriate under all circumstances
23 unless it is not from a supervisor to
24 their subordinate?
25         MR. GREEN:   Objection to form.

99

MORAN

2 Asked and answered.  You may answer again,
3 Mr. Moran.
4     A.   I -- I don't get into value
5 judgements as to what people are saying to
6 one another when they're not, you
7 know -- when they are conducting their own
8 private business.
9     Q.   So you considered what went on
10 between Mr. Marbury and Ms. ███████ their
11 own private business?
12     A.   Yes, I did.
13     Q.   Did you make any inquiries of
14 Mr. Marbury about what had transpired?
15     A.   No, I didn't.
16     Q.   Did you make any effort to
17 communicate to Mr. Marbury that he -- he
18 needed to be cognizant of the company's
19 anti-harassment policy?
20         MR. GREEN:   Objection to form.
21 You may answer, Mr. Moran.
22     A.   No, I didn't.
23     Q.   Is there any reason why you
24 didn't explore any of these issues with
25 Mr. Marbury?

100

MORAN

2         MR. GREEN:   Objection to form.
3 Asked and answered.  You may answer again,
4 Mr. Moran.
5     A.   I felt it was outside -- outside
6 of the company's -- outside of the
7 company's viewing.  It was something that
8 he was doing on his own personal time.
9     Q.   In the course of your
10 investigation into Mr. Gonsalves' conduct,
11 did you learn of any other inappropriate
12 conduct by Mr. Marbury other than with
13 respect to Ms. ███████?
14         MR. GREEN:   Objection to form.
15 Misstates prior testimony as to Mr.
16 Marbury.  You may answer, Mr. Moran.
17     A.   I am sorry.  Would you -- would
18 you repeat --
19     Q.   Other than Mr. Marbury's conduct
20 with respect to Mr. -- Ms. ███████, did you
21 learn of any inappropriate conduct by
22 Ms. Marbury -- Mr. Marbury in connection
23 with your investigation of Ms. -- Mr.
24 Gonsalves' alleged misconduct?
25         MR. GREEN:   Objection to form.

101

MORAN

2 You may answer.
3     A.   Nothing -- nothing comes to mind
4 at the moment.
5     Q.   Did you learn that in the course
6 of that investigation that Mr. Marbury had
7 made inappropriate comments about
8 Ms. Browne-Sanders?
9     A.   I -- I did learn that Mr.
10 Marbury called a gentleman named Dan
11 Gladstone and made comments -- according
12 to Mr. Gladstone he said that Stephon
13 called him, and they -- made comments
14 towards Anucha.
15     Q.   How did you learn that?
16     A.   From Mr. -- from Mr. Gladstone.
17     Q.   Were you speaking with Mr.
18 Gladstone in the context of your
19 investigation of Mr. Gonsalves?
20     A.   I believe so, yes.
21     Q.   Mr. Gladstone relayed to you
22 what the comments were that Mr. Marbury
23 made about Ms. Browne-Sanders?
24     A.   Yeah.  Just the -- back up.  I
25 think the context came not so much

26

MORAN                                                    102

1     MORAN
2 in -- in the investigation of Mr.
3 Gonsalves, but -- and I'm not clear on the
4 context, but Anucha had asked him to put
5 in writing a conversation that took place
6 maybe a year earlier, and I'm not sure
7 that it -- I'm not sure that it had any
8 relationship at all to the investigation.
9 It was something that -- for whatever
10 reasons I'm not sure, but Anucha said to
11 him she -- we -- we had a conversation.
12 You told me about a year ago, what --
13 whatever the time frame was, that Stephon
14 had called you and made remarks about me.
15 Can you now put that in writing for me,
16 and he did I guess.  He -- I know he did,
17 and I don't -- I don't think it had
18 anything to do with the Gonsalves
19 investigation.  I mean it might have come
20 up during that time frame, but it wasn't
21 directly related to my investigation.
22     Q.    Does Mr. Gonsalves have any
23 relation to Mr. Marbury?
24     A.    He is referred to as his cousin,
25 but I don't know that to be accurate.

MORAN                                                    103

1     MORAN
2     Q.    Who told you that they were
3 cousins?
4     A.    I -- it is sort of folklore
5 around.
6     Q.    Do you have a basis to doubt
7 that they are cousins?
8     A.    Someone had told me after
9 the -- after all of this that they weren't
10 in fact cousins, but to this day I don't
11 know.
12     Q.    In the context of interviewing
13 Mr. Gladstone concerning Mr. Gonsalves'
14 conduct, did Mr. Gladstone make you aware
15 of Mr. Marbury's comments towards
16 Ms. Browne-Sanders?
17     A.    He did.  He -- again I am not
18 sure in what context.  I'm not sure -- I'm
19 not sure why it came up because it didn't
20 seem to be relevant to investigating
21 Gonsalves' -- we are investigating what
22 Gonsalves did -- said, did or whatever to
23 these individuals.  That -- it did come
24 up, but I don't -- I don't recall why.  It
25 seemed extraneous to me.

MORAN                                                    104

1     MORAN
2     Q.    What did Mr. Gladstone tell you
3 that Mr. Marbury had said?
4         MR. GREEN:    Objection to form.
5 You may answer.
6     A.    I'm not going to be able to
7 quote it correctly, but he said that he
8 was -- called Anucha names, you know, that
9 she's not running this place, and he -- he
10 might have used the term bitch, ho.  I
11 don't know.  It was that type of language.
12 He was very upset.
13     Q.    Mr. Gladstone was upset?
14     A.    No, Mr. Marbury was upset
15 with -- when he was -- he was making these
16 comments towards Anucha.  I'm not sure
17 why.
18     Q.    Did you ever see an E mail in
19 which these comments were reflected?
20     A.    Yes, I did.
21     Q.    And did you see that E mail at
22 around the time you were investigating Mr.
23 Gonsalves' conduct?
24     A.    Yes, I did.
25     Q.    When you saw that E mail, were

MORAN                                                    105

1     MORAN
2 you concerned that Mr. Marbury's comments
3 were contrary to the company's
4 anti-harassment policy?
5         MR. GREEN:    Objection to form.
6 You may answer.
7     A.    Well, the comments -- the
8 comments concerned me, and, you know, in
9 terms of the policy, you know, everything
10 is -- needs to be looked at in context,
11 and I wasn't sure what the context was,
12 but the -- but the words concerned me.
13     Q.    Well, did you make any effort to
14 find out what the context was?
15     A.    It is my -- my understanding of
16 what the context was -- well, the call was
17 like -- the call we are talking about
18 didn't take place in November when -- when
19 the E mail was asked for.  The call took
20 place -- I don't know -- six months or a
21 year earlier, and my understanding was
22 that Gon -- Hassan Gonsalves had been
23 forging the signature of a supervisor for
24 parking tickets, and it came to our
25 attention.  Not my attention, it came to

27

106

MORAN

1 the department's attention, and so he was
2 reprimanded for that and told he would
3 have to repay the money and told he
4 couldn't park in that parking lot any
5 more, and I think that, if I have this
6 correct, that is when Stephon called Dan
7 Gladstone and said, you know, why are you
8 picking on, you know, Hassan, you know.
9 This is, you know -- I think he said this
10 is Anucha trying to -- she doesn't like me
11 or something like that and then said
12 whatever he said.
13     Q.     Did you have any personal
14 knowledge of the issues related to Mr.
15 Gonsalves forging his --
16     A.     No.
17     Q.     -- manager's signature?
18     A.     No, that was actually the first
19 I had heard about it.
20     Q.     You hadn't been involved in
21 investigating that?
22     A.     No.
23     Q.     So to be clear, your
24 understanding of the context was that Mr.

107

MORAN

1 Marbury made the comments to Mr. Gladstone
2 about Ms. Browne-Sanders because he was
3 upset that Mr. Gonsalves had been
4 reprimanded for forging his manager's
5 signature?
6     A.     Well, I think he was upset
7 because he had lost his parking
8 privileges.
9     Q.     His cousin had lost his
10 parking --
11     A.     I am sorry. Yes. His cousin
12 had lost his parking privileges.
13     Q.     And his cousin had lost his
14 parking privileges because he was forging
15 his manager's signature?
16     A.     That's correct.
17     Q.     So understanding that context,
18 were you concerned that Mr. Marbury's
19 comments were a violation of the company's
20 anti-harassment policy?
21         MR. GREEN:   Same objection as
22 to form. You may answer.
23     A.     Well, they weren't
24 directed -- they weren't directed to

108

MORAN

1 Anucha, and she didn't, you know -- she
2 didn't hear them. So that is -- as we
3 look at all the factors, that is certainly
4 a factor that we have to consider, you
5 know. If someone uses a curse word in a
6 conversation and it might be directed to
7 someone but it is not directed towards
8 them, I have to take that into -- that is
9 a factor I take into consideration.
10     Q.     But you understood that
11 Ms. Browne-Sanders learned of these
12 comments, correct?
13     A.     Yes, she -- she did. She asked
14 him to -- as I stated, she asked him to
15 put them in an E mail.
16     Q.     Is it your understanding that is
17 how she learned of them, when Mr.
18 Gladstone put them in an E mail?
19     A.     I think when it happened he had
20 made some comments to her, but -- Stephon
21 called and said some not nice things about
22 you, but at that time to my understanding
23 he did not elaborate what they were. Fast
24 forward to, you know, the -- a year later

109

MORAN

1 whenever it was, she said; you know, do
2 you remember that conversation you told me
3 about. I now want you to tell me in
4 detail in an E mail just what was said.
5     Q.     And that understanding, does
6 that come from Mr. Gladstone or some other
7 source?
8     A.     I'm sorry. I -- I'm -- would
9 you repeat that?
10     Q.     You just said you had an
11 understanding about how a sequence of
12 events transpired.
13     A.     That came from -- yes, that came
14 from Mr. Gladstone.
15     Q.     Mr. Gladstone you understood was
16 one of the members of Ms. Browne-Sanders'
17 team?
18     A.     Yes.
19     Q.     And Mr. Gladstone reported to
20 Ms. Browne-Sanders indirectly?
21     A.     Yes.
22     Q.     So you had understood that she
23 learned from one of the people she
24 supervised that the star player or one of

28

110

MORAN

1
2 the star players for the Knicks had been
3 referring to her in derogatory terms,
4 correct?
5    A.   Correct.
6    Q.   And you understood that those
7 derogatory terms were in at least in part
8 gender based?
9        MR. GREEN:   Objection to form.
10 You may answer, Mr. Moran.
11    A.   I'm not sure what you mean.
12 Which words would have --
13    Q.   Well, you testified that your
14 recollection was Mr. Gladstone had said to
15 you something about
16 being -- Ms. Browne-Sanders being called a
17 ho and a bitch?
18    A.   Um hum.
19    Q.   You would agree with me that
20 those are gender-based terms?
21        MR. GREEN:   Objection to form.
22 You may answer, Mr. Moran, if that is your
23 recollection.
24    A.   Yeah.  I do remember those
25 words, and it is -- one could certainly

111

MORAN

1
2 argue those are gender based, yes.
3    Q.   Could one -- in your view, is
4 there an interpretation of those words
5 that are not gender based?
6    A.   I have heard -- I have heard
7 guys call other guys ho, bitch.  So
8 it's -- I don't know that that is -- it is
9 always --
10    Q.   Mr. Moran --
11    A.   It seems to be terms that people
12 use interchangebly with men and women.
13    Q.   Mr. Moran, when a woman is
14 referred to as a bitch or a ho, do you
15 have any doubt in your mind that that is a
16 gender-based insult?
17        MR. GREEN:   Objection to form.
18 You may answer Mr. Moran.
19    A.   I -- I don't know.  I don't
20 know.
21    Q.   Okay.  I think you said in one
22 of your earlier answers that you had some
23 concern about the comments --
24    A.   Um hum.
25    Q.   Is that fair to say?

112

MORAN

1
2    A.   That is fair to say, yes.
3    Q.   Is it your testimony that you
4 had some concern about whether they were
5 contrary to the company's anti-harassment
6 policy?
7    A.   Yes.
8        MR. GREEN:   Objection to form.
9 Just give me a chance to object.
10       THE WITNESS:  I am sorry.
11       MR. GREEN:   You may answer.
12    Q.   What did you do in -- in
13 response to those concerns?
14    A.   I -- I didn't do anything.  I
15 didn't do anything directly.  The comments
16 were -- were conveyed to -- to -- other
17 managers were wear of those comments.
18    Q.   What other managers were aware
19 of those comments?
20    A.   Steve Mills would have been made
21 aware of the comments.
22    Q.   How do you know that?
23    A.   Because we were -- well, that
24 is -- I don't know that I do know that.  I
25 just have a recollection of talking to him

113

MORAN

1
2 about it.
3    Q.   Did you talk to
4 Ms. Browne-Sanders about those comments at
5 or around the time that Mr. Gonsalves was
6 being investigated?
7    A.   Well, she talked to me about it.
8 She -- she is the one that brought it to
9 my attention.
10    Q.   What did she say?
11    A.   She wanted me to see -- she sent
12 me the E mail I believe and wanted me to
13 look at it.
14    Q.   Was -- was she upset about it?
15    A.   You know, it was more in the
16 context, look -- it was more in the
17 context look at this.  This is what he
18 thinks of me or something like that.  I
19 didn't get the -- she -- I didn't get the
20 impression she was upset about it.  It
21 was -- she just wanted me to see it.
22    Q.   Did she tell you that she was
23 scared of Mr. Marbury?
24       MR. GREEN:   Objection to form.
25 You may answer, Mr. Moran.

29

114

MORAN

2  A.  Not at that time.
3  Q.  Did Ms. Browne-Sanders say
4  anything else to you about these comments
5  at the time of the Hassan Gonsalves
6  investigation?
7  A.  I don't recall.  I think that
8  was it.
9  Q.  I just want to go back to your
10  answer a couple of questions ago.  I think
11  you said that in response to learning of
12  these comments by Mr. Marbury, that you
13  didn't do anything because you believed
14  that other management were aware of these
15  comments?
16  MR. GREEN:  Objection.
17  Misstates testimony.
18  A.  Yeah.  I am not --
19  MR. GREEN:  You may answer.
20  A.  I'm not sure that is what I
21  said, but I know in -- I'm not sure what I
22  said actually.
23  Q.  Let's -- let's start over again.
24  A.  Okay.
25  Q.  What did you do, if anything, in

115

MORAN

2  response to learning of these comments?
3  A.  It -- at that point I didn't do
4  anything.  I just continued the -- the
5  investigation of -- of Hassan because at
6  the same time there was another situation
7  I had to deal with in -- in -- in that
8  department, so I -- I didn't do anything.
9  Q.  When you say there was another
10  situation you had to deal with, what are
11  you referring to?
12  A.  There was another employee who I
13  had to investigate whether he should be
14  terminated.
15  Q.  Who was that?
16  A.  That was Vernon -- Vernon
17  Manuel.
18  Q.  Are you saying that you didn't
19  take any action in response to the
20  comments you learned were made by Mr.
21  Marbury because you had to investigate Mr.
22  Manuel's situation?
23  A.  Basically when -- I, you
24  know -- it slipped my mind, and I didn't
25  go back and do anything about it.

116

MORAN

2  Q.  What were you investigating with
3  respect to Mr. Manuel?
4  A.  Karen Buchholz or actually I
5  think Anucha brought it to my attention,
6  but I -- they were having a problem with
7  this employee, and so I interviewed Karen,
8  and she said this employee had
9  been -- been very hostile to them.  His
10  work performance was poor.  He had major
11  attendance problems.  He had also been
12  involved in forging -- I don't know if he
13  was forging -- I think he was forging his
14  supervisor's signature on parking
15  vouchers.  So we already had that
16  situation with him, and she said she felt
17  intimidated by him.  He was -- could be
18  very -- could be hostile to her, and so
19  I -- I spoke to her about that, and I
20  spoke to Anucha about that, and I -- I
21  interviewed Dan Gladstone about that
22  because Dan Gladstone I believe was
23  her -- was his direct supervisor.
24  Dan reiterated that he had major
25  performance problems.  He had significant

117

MORAN

2  absentee problems.  He was insubordinate.
3  He often refused assignments plus the
4  hostility aspects of it, and we talked
5  about the best way to deal with him
6  should -- is this something to be
7  corrected.  We -- in lieu of the fact that
8  he had already forged the signatures on
9  the parking tickets, the fact that he was
10  rejecting assignments, he had severe
11  absentee problems, and -- et cetera, as
12  they were related, we decided to terminate
13  him.
14  Q.  Had you been aware that
15  Mr. Manuel had forged his manager's
16  signature prior to this -- this time?
17  A.  No, I hadn't.
18  Q.  Okay.  And -- and by the way,
19  this is -- your looking into Mr. Manuel's
20  conduct, this is late November of 2005
21  approximately?
22  A.  Right.  I think it was the same
23  week that we were dealing with Hassan.
24  Q.  In your experience as a human
25  resources professional, is forging a

30



126

MORAN

2  that clear and that definitive, you know,
3  where a resource were available. They
4  know we are available to help. You know,
5  as long as, you know -- as long as we are
6  involved in the termination, then -- then
7  I think that would satisfy the policy or
8  the practice. Not the policy.
9      Q.   Did you make a recommendation to
10  anyone that Mr. Manuel should be
11  dismissed?
12     A.   I don't know that I made a
13  recommendation. I -- well, at -- let me
14  think about that. Actually I believe I
15  did. I told -- told Rusty McCormack that
16  we were going to terminate -- we wanted to
17  terminate him.
18     Q.   What did Mr. McCormack say?
19     A.   He said -- he said fine. I gave
20  him the facts, and he -- he concurred that
21  that was appropriate.
22     Q.   Do you know whether Mr.
23  McCormack spoke with anyone before
24  agreeing with your recommendation to
25  dismiss Mr. Manuel?

127

MORAN

2      A.   Not that I am aware of.
3      Q.   What about with respect to Mr.
4  Hassan, did you make a recommendation that
5  Mr. Hassan be dismissed?
6      A.   Yes.
7      Q.   To whom did you make that
8  recommendation?
9      A.   Well, again, you know -- well
10  Anucha already wanted him dismissed, so
11  that wasn't -- that wasn't an issue. I --
12  again I would have told Mr. McCormack and
13  someone at -- I don't know whether it was
14  me. Someone informed Steve Mills. I
15  don't recall who, and he -- he also
16  concurred.
17     Q.   You didn't speak to Mr. Mills
18  directly about Mr. Hassan -- Mr.
19  Gonsalves' situation?
20     A.   I'm not really sure.
21     Q.   Did you speak to Mr. Mills
22  directly about Mr. Manuel's situation?
23     A.   Again, I'm not -- I'm not sure.
24         MR. MINTZER:   This might be a
25  convenient point to take lunch.

128

MORAN

2         MR. GREEN:   Okay.
3         THE VIDEOGRAPHER:   We are now
4  going off the record at approximately
5  12:45 p.m.
6         (Luncheon recess:  12:45 p.m.)

129

MORAN

2  A F T E R N O O N  S E S S I O N.
3             1:51 p.m.
4         THE VIDEOGRAPHER:   We are now
5  going back on the record at approximately
6  1:51 p.m.
7         MR. MINTZER:   Can you mark this
8  as 2.
9         (Moran Exhibit 2 marked for
10  identification.)
11         (Document handed to witness.)
12         MR. MINTZER:   For the record, I
13  have given the witness a document that we
14  marked as -- marked as Moran 2 for
15  identification. It is a multi-page
16  document Bates stamped MSG 318 through
17  323.
18         (Pause.)
19  J O H N  D.  M O R A N, resumed.
20  CONTINUED EXAMINATION
21  BY MR. MINTZER:
22     Q.   Mr. Moran, why don't you just
23  let me know after you have had a chance to
24  look through it?
25     A.   Okay.

33

130

```
1              MORAN
2       (Pause.)
3    A.   Okay.
4    Q.   Mr. Moran, I just ask you to
5  look at the first page, page 318, the
6  first page.  Is this -- it is a little
7  hard to make out with the copy, but it
8  appears to say "file folder," and it has
9  Dan Gladstone written on the right-hand
10 side.
11      Do you see that?
12   A.   Yes.
13   Q.   Is this your file of your
14 interview with Dan Gladstone in connection
15 with the investigation of Hassan
16 Gonsalves?
17   A.   Yes.
18   Q.   And as part of your file, you
19 have the E mail that Mr. Gladstone sent to
20 Ms. Browne-Sanders that reflects the
21 comments made to Mr. Gladstone by Stephon
22 Marbury.
23      Do you see that?
24   A.   Yes, I do.
25   Q.   And the E mail was forwarded by
```

131

```
1              MORAN
2  Ms. Browne-Sanders to Steve Mills.
3       Do you see that at the top?
4    A.   Yes.
5    Q.   Do you know how this -- you came
6  in possession of this E mail?
7    A.   No, I am -- I'm not sure.
8    Q.   Did Mr. Mills give you a hard
9  copy of this E mail?
10   A.   No.  I am pretty certain he
11 didn't give it to me.
12   Q.   Do you have any idea of how
13 you -- how you got this?
14   A.   I -- I thought I
15 received -- actually received my own copy.
16 I mean it is clearly not here, but I --
17   Q.   Okay.
18   A.   I thought I got my own E mail.
19   Q.   Okay.  Can I ask you just to
20 look at the second page of the notes.
21   A.   Of my notes.
22   Q.   Yeah.  Of your notes, your
23 handwritten notes, 322.
24   A.   Yes.
25   Q.   Could I ask you to read the
```

132

```
1              MORAN
2  paragraph beginning with -- it is about I
3  guess two-thirds of the way down where it
4  says "Based".
5       Do you see that?
6    A.   Yes.  "Based upon Hassan being
7  reprimanded Steven M. called Dan to
8  complain about Hassan's mistreatment.
9  Said it was BS and a personal attack on my
10 cousin.  He was enraged for not getting
11 special treatment and used racial and
12 gender terms to refer to Anucha, black
13 bitch, et cetera.  Not her team.  I run
14 things, et cetera."
15   Q.   Okay.  In reading it you said it
16 is Steven M.  Does that mean --
17   A.   I am sorry.  Stephon.
18   Q.   Stephon M?
19   A.   Stephon.
20   Q.   Okay.  And are these accurate
21 notes of what Dan Gladstone told you?
22   A.   Yes, I would say so.
23   Q.   Can I ask you to look at the
24 next page, MSG 323.
25   A.   Yes.
```

133

```
1              MORAN
2    Q.   You -- you wrote Dan Gladstone's
3  name in what appears to be a series of
4  questions?
5    A.   Um hum.
6    Q.   Do you remember the context
7  in -- that you wrote these -- these
8  questions?
9    A.   Let me just look at them again.
10   Q.   Um hum.
11      (Pause.)
12   A.   Well, I -- I think I was trying
13 to determine when -- when the first
14 conversation was.  He is relating
15 conversations -- he is now relating the
16 conversation that took place back in June
17 I guess.  So I was trying to figure
18 out -- I was trying to figure out since it
19 was, you know, six months ago when it
20 happened because I am not sure I had that
21 E mail then and what the -- what the
22 context of the whole thing was, and I
23 remember Dan -- I don't have it in my
24 notes, but I remember at some point it all
25 sort of fit together for me that, you
```

34

138

MORAN

2 Karen a similar scenario, and maybe Karen
3 related back to me, but --
4    Q.    So you might have heard this
5 second hand from Ms. Buchholz?
6    A.    Well, I think the initial -- I
7 believe I heard it from Anucha, but then I
8 might have heard it back through Karen.
9    Q.    And they both told you that this
10 was an issue of seating Ms. -- some member
11 of Mr. Marbury's family at the game?
12    A.    That's correct.
13    Q.    It wasn't to your recollection
14 an issue about whether a member of the
15 family could go back into the locker room
16 area?
17    A.    That part I didn't -- I don't
18 recall that part.
19    Q.    So is it your understanding that
20 one of Mr. Marbury's family members
21 weren't -- wasn't permitted to attend the
22 game?
23    A.    You know, I am not clear on
24 that.  That is my recollection, but that
25 they actually couldn't attend the game but

140

MORAN

2 Thomas had set down that day or the day
3 before?
4    A.    Yes.  So I -- that is my
5 understanding.  It is that -- I would have
6 hoped that or -- that she would have gone
7 to Isiah just to double-check, since it
8 was his first game, and it was such an
9 emotional evening, but she didn't,
10 but -- and yes, that is what happened.
11    Q.    When you say you would have
12 hoped --
13    A.    Yeah.
14    Q.    -- you would have hoped when you
15 learned of this from Ms. Browne-Sanders?
16    A.    Well, I -- I would have liked to
17 have heard that night before she told
18 him -- before they got into a
19 confrontation just to go back to Isiah and
20 say, hey, Isiah I know what you said, and
21 he's got some family members here.  This
22 is a big night for him.  Can we make an
23 exception, and it seems like Isiah would
24 have, but at that point it was too late.
25    Q.    Okay.

139

MORAN

2 -- I don't know.  It seems so severe to
3 me.  I just don't know whether that
4 happened or not, but that is my
5 understanding.  Yeah.
6    Q.    I think you used the word
7 credentialing.  What does what mean?
8    A.    Well, I guess there are certain
9 seats reserved for family, you know,
10 celebrities, et cetera, and if you don't
11 have, you know, the right passes,
12 credentials that you can't get in that
13 area.  And so he wanted them to be in this
14 certain area, which I take it were the
15 better seats, and she said no.
16    Q.    And do you know was she applying
17 a policy that Mr. Thomas had established?
18    A.    Yes.  That there -- that -- I
19 think that day or somewhere before the
20 game they talked about who would be
21 credentialed and who wouldn't.  Yes,
22 that's correct.
23    Q.    Okay.  To your understanding,
24 Ms. Browne-Sanders was applying the policy
25 to Mr. Marbury's family member that Mr.

141

MORAN

2    THE VIDEOGRAPHER:  Counsel, you
3 have five minutes.
4    MR. MINTZER:  Why don't we --
5    THE VIDEOGRAPHER:  Do you it
6 now?
7    MR. MINTZER:  Why don't you
8 change the tape now.
9    THE VIDEOGRAPHER:  We are now
10 going off the record at approximately 2:08
11 p.m.
12    (Discussion held off the
13 record.)
14    (Moran Exhibit 3 marked for
15 identification.)
16    (Document handed to witness.)
17    THE VIDEOGRAPHER:  Now going
18 back on the record at approximately 2:09
19 p.m.  This is videotape number 3.
20    Q.    Mr. Moran, I have given you a
21 document that has been marked for
22 identification as Moran 3.  It's MSG 300
23 through 307.
24    MR. MINTZER:  I'll -- also I'd
25 ask counsel, page 306, the notes seem to

36

142

MORAN

1  MORAN
2  be cut off on the bottom, so I would ask
3  if we could be provided with a better copy
4  of that.
5      MR. GREEN:  Okay.
6      Q.  Mr. Moran, you know, you are
7  obviously welcome to look at the whole
8  thing.  I am going to ask you to focus on
9  some material on page 306 and 307.
10     A.  Let me just look at it, so I get
11  the context of it.
12     Q.  That's fine.
13         (Pause.)
14     A.  Okay.
15     Q.  Does -- Moran 3, is this
16  your -- your file reflecting your notes of
17  conversations with ████████████ in
18  connection with the Hassan Gonsalves
19  investigation?
20     A.  Yes.
21     Q.  Could I ask you to take a look
22  at page 306, please.  About the middle of
23  the page, if you could read for me
24  starting with "had to work."  Do you see
25  that?

143

MORAN

1  MORAN
2     A.  Yes.  "Had to work at 7:15.
3  Hassan said I will take you.  Walking to
4  Hassan truck Stephon was there.  Where are
5  you going?  Why don't you come in?  Had sex
6  with him.  After got out of SUV, Hassan
7  took me home.  Mid to late April I told
8  him I was seeing someone."  You want me to
9  keep going?
10     Q.  Yes, please.
11     A.  "Stephon text a couple of times.
12  When can I get that again?"
13     Q.  And the notes appear to be cut
14  off, right?
15     A.  Yeah.  It says --
16     Q.  Okay.  That's fine.
17     A.  Yeah.
18     Q.  When -- do you recall what
19  Ms.████████was telling you that she said
20  had to work at 7:15, what that was
21  referring to?
22     A.  I think she meant she had -- I'm
23  not sure where because I'm not -- I don't
24  know if she had another job or not, but I
25  took that as a 7 a.m. in the morning she

144

MORAN

1  MORAN
2  had to get to work, but I don't know that
3  for certain.
4      Q.  And where it said towards the
5  end of that -- that paragraph mid to late
6  April I told him I was seeing someone, do
7  you know what that refers to?
8      A.  Yeah.  She was -- she was -- she
9  was trying to -- she had this relationship
10  with Hassan, and she was trying to end it.
11  So her way of -- her way of politely
12  ending it is telling him I am seeing
13  somebody else.
14     Q.  Okay.  Okay.  And can I ask you
15  to take a look at page 307.
16     A.  Yes.
17     Q.  It looks like on the fourth
18  paragraph down you wrote a series of
19  questions.
20     A.  Yes.
21     Q.  And these were questions related
22  to Mr. Marbury sending Ms.████████ text
23  messages?
24     A.  Yes.
25     Q.  Did you get answers to those

145

MORAN

1  MORAN
2  questions?
3      A.  Well, sort of.  The Steven text
4  she said that -- before she said here a
5  couple of times -- I guess that answers
6  the second question also -- last time.
7  I'm not sure -- I'm not sure I got that.
8  Then she says when did you see him last?
9  She -- the only time she was him was at
10  the time with the SUV, and then she said
11  yes, it was consensual, and he didn't
12  force -- he didn't force
13  him -- himself -- he didn't force himself
14  on you was the question, and she says no.
15  I never said no.
16     Q.  Do you know why you were writing
17  these questions about did he text you from
18  that question after Ms.████████ had
19  previously told you in the conversation
20  that he had?
21     A.  You know, I'm not really sure
22  why I wrote them.
23     Q.  Was Ms. Noel present for this
24  conversation?
25     A.  I am pretty certain she

37

212-267-6868

516-608-2400

146

```
1                MORAN
2  was -- that she was at all the interviews,
3  yes.
4      Q.    Okay.  You -- if you can go over
5  to page 302.
6      A.    Yes.
7      Q.    You --
8      A.    Oh, wait a minute.  No.  No.
9      Q.    Yeah.
10     A.    Let me back up.  It is
11 not -- no, I don't think she was there.  I
12 am sorry.
13     Q.    Okay.  Who -- who were the
14 attendees of this conversation?
15     A.    On page 302?
16     Q.    Yes.
17     A.    Anucha was there, Karen
18 and -- and ████████ of course because that
19 is who we are talking to.
20     Q.    Okay.  And then page -- does
21 page 304 reflect notes of another
22 conversation with Ms. ████████?
23     A.    Pages 0 -- 302 and 303 go
24 together.
25     Q.    Right.
```

147

```
1                MORAN
2      A.    Yes, 304 is a separate
3  conversation.
4      Q.    Okay.
5      A.    And -- and that one was probably
6  just with me.
7      Q.    Just you and Ms. ████████?
8      A.    Yes.
9      Q.    Do you know where you had that
10 conversation?
11     A.    It probably would have been in
12 my office.  It doesn't say it was on the
13 phone, but it was probably in my office.
14     Q.    That was a follow-up to the
15 first conversation you had?
16     A.    Yes.
17     Q.    Did you personally work with
18 Ms. Browne-Sanders on any -- any matters
19 at Madison Square Garden?
20     A.    I -- I don't know that we
21 actually worked on any assignments.  She
22 held a weekly staff meeting, which I
23 attended.  I didn't attend every week, but
24 I tried to get there when I got there.
25 So, you know, I might go two weeks in a
```

148

```
1                MORAN
2  row, and then I am might not go for two
3  weeks, but I probably maybe attended two
4  out of four for -- for, you know, an
5  extended period.
6      Q.    So if there were four held in a
7  month, you approximately went to two of
8  them?
9      A.    Yes.
10     Q.    And for what period of time was
11 that?
12     A.    I think -- I'd say up until the
13 time she left.  I'm not sure when I
14 started but approximately over a year and
15 a half to two years maybe.
16     Q.    About how many people attended
17 these meetings?
18     A.    They were pretty -- it was a
19 fairly large room.  I would say
20 15 -- maybe 15.
21     Q.    And these were members of the
22 basketball --
23         MR. MINTZER:  Strike that.
24     Q.    These were members of the
25 business operations staff for the Knicks?
```

149

```
1                MORAN
2      A.    Right.  Some of those -- some of
3  those were her direct reports, but there
4  were -- there were -- there were people
5  there who didn't report to her.  Frank
6  Murphy came and folks like that.
7      Q.    Anyone outside of business
8  operations other than Mr. Murphy attend on
9  a regular basis?
10     A.    Usually the attorney assigned to
11 Anucha was there.
12     Q.    Who was that?
13     A.    Ron Dershowitz.  The gentleman
14 in charge of suite sales of suite
15 sales --
16     Q.    Who was that?
17     A.    -- was there.  Give me a second
18 to get his name.
19     Q.    Um hum.
20     A.    Brian Lafemina.  Joel Fischer,
21 who was senior VP of sports -- sports
22 operations.  He -- he didn't have the
23 Knicks or Rangers but other sports like
24 college and boxing.  I mentioned -- well
25 Frank Murphy was sort of part of that
```

38

198

MORAN

1
2     Q.    Okay.  And from that point on
3  she continued to come to work, correct?
4     A.   I believe so, yes.
5     Q.    You didn't at any point after
6  she raised those concerns to you before
7  her lawyers got in touch with The Garden
8  tell her that she couldn't come to work
9  because of security concerns, correct?
10     A.   Correct.
11     Q.    And then after she made a
12  complaint through her lawyers, you say you
13  sent a letter to her and said that she
14  couldn't come to work because of security
15  concerns?
16          MR. GREEN:   Objection to form.
17  You may answer, Mr. Moran.
18     A.    Yeah.  I -- well, during
19  the -- when we were in this room and she
20  was making her allegations, I recall -- I
21  recall that she again reiterated her
22  concerns for her security very similar to
23  the same concerns she reiterated on
24  November 29.  It was a month later.  So it
25  was based on those discussions

199

MORAN

1
2  that -- and -- you would have to help me
3  with the time frames, but it was based
4  upon those renewed concerns about her
5  security that -- that we issued that
6  letter is my understanding.
7     Q.    Mr. Moran, so your recollection
8  is that -- that you interviewed
9  Ms. Browne-Sanders, and then you sent her
10  a letter saying that -- that she couldn't
11  come back to work because of security
12  concerns?
13          MR. GREEN:   Objection to form.
14     A.   I -- I really don't recall the
15  timing and the -- I know there were -- I
16  am sure you probably have them.  There
17  were letters that went back and forth, and
18  then finally she -- well, I don't know.  I
19  am confused on the timing at this point.
20     Q.    Mr. Moran, my -- you are -- what
21  I am -- let me ask a few question.
22          You -- you just testified that
23  you instructed Ms. Browne-Sanders not to
24  come to work because of security concerns
25  based on statements that she made in an

200

MORAN

1
2  interview that you had with her.
3          MR. GREEN:   Objection to form.
4  Mischaracterizes prior testimony.
5     Q.    Okay.  Is that accurate?
6          MR. GREEN:   Same objection.
7     A.    I -- I believe so, but I would
8  have to review the letters on the timing.
9     Q.    Is there any other reason other
10  than the statements that she made in the
11  interview that you would -- that you know
12  of why you would have told her not to come
13  to work because of security concerns?
14          MR. GREEN:   Objection.  Asked
15  and answered.  You may answer it again,
16  Mr. Moran.
17     A.    Well, I was under the impression
18  that when she and I talked she
19  didn't -- she didn't -- she didn't object
20  that when -- when I said it is my
21  understanding the attorneys had an
22  agreement that you weren't
23  coming -- because I guess there were some
24  discussions going on between counsel that
25  until the -- until that was resolved and

201

MORAN

1
2  the investigation was resolved, that she
3  wasn't going to come back to work, and we
4  had that conversation, and she
5  didn't -- she didn't -- she didn't tell me
6  that was wrong.
7     Q.    You think you had that
8  conversation with her after her interview,
9  your interview with her?
10     A.    It might have been before.  I am
11  not sure at this point.  I am not sure.
12          MR. MINTZER:   Can I ask you to
13  mark this as 4.
14          (Moran Exhibit 4 marked for
15  identification.)
16          (Document handed to witness.)
17          MR. GREEN:   Take your time to
18  read it.
19          THE WITNESS:   Okay.
20          MR. MINTZER:   For the record,
21  Moran Exhibit 4 for identification is a
22  one-page document Bates stamped MSG 4230.
23          (Pause.)
24     A.    Okay.
25     Q.    Reading this letter, does it

51

202

MORAN
2  refresh your recollection that you
3  instructed Ms. Browne-Sanders that she
4  should not come to the office before you
5  had your interview with her?
6      A.   Yes, it does.
7      Q.   Okay.
8      A.   Yes.
9      Q.   And -- first of all, is this a
10 letter that you signed?
11     A.   Yes.
12     Q.   And did you write this letter?
13     A.   No.
14     Q.   Did Mr. Schoenfeld write this
15 letter?
16     A.   I'm not sure who wrote the
17 letter.
18     Q.   How did it come to your -- your
19 attention?
20     A.   It would have been through one
21 of our counsel.
22     Q.   So one of your counsel presented
23 you this letter and asked you to sign it?
24         MR. GREEN:  Objection to form.
25     A.   Well, they -- they asked me to

203

MORAN
2  read it, and -- and then it -- was it
3  consistent with my understanding, and I
4  wanted to make sure I understood it, and,
5  yeah, I mean I signed it.
6      Q.   Okay.  Did you make any changes
7  to it before you signed it?
8      A.   I don't believe so.
9      Q.   The -- in the third paragraph
10 where the letter refers to what
11 we "-- what you have expressed as your
12 concerns about your personal physical
13 safety" --
14     A.   Um hum.
15     Q.   -- what were you referring to
16 there?
17     A.   I am sorry.  Where is it?
18     Q.   In the third paragraph.  You
19 refer to "including particularly what you
20 have expressed as your concerns about your
21 personal physical safety," do you see
22 that?  It is in the third and fourth line
23 in the third paragraph.
24     A.   Um hum.
25         (Pause.)

204

MORAN
2      A.   Well, again she was -- I don't
3  know.  She was making -- she was making
4  statements, and I don't know how often,
5  but she had been -- I know at least on
6  that one occasion about her security and
7  that she was afraid of -- well, concerned
8  about her security.
9      Q.   The statement to you that she
10 made that was approximately a month before
11 you sent this letter, right?
12     A.   Yes.
13     Q.   And she came to work for several
14 weeks after she first made that statement
15 to you, correct?
16     A.   That's correct.
17     Q.   And so your instruction to her
18 not to come to work because of concerns
19 about her personal safety only was made
20 after you were aware that her counsel had
21 complained about discrimination and
22 harassment?
23         MR. GREEN:  Objection to form.
24 You may answer, Mr. Moran.
25     A.   I'm sorry.  Do that again for

205

MORAN
2  me?
3      Q.   Your instruction to
4  Ms. Browne-Sanders not to come to the
5  office out of concerns for her personal
6  safety --
7      A.   Um hum.
8      Q.   -- you only made --
9         MR. MINTZER:  Strike that.
10     Q.   You only gave Ms. Brown-Sanders
11 the instruction not to come to work after
12 her counsel complained about
13 discrimination on her behalf?
14         MR. GREEN:  Objection.
15     Q.   Is that true?
16         MR. GREEN:  Objection to form.
17 You may answer, Mr. Moran.
18     A.   Well, it might have been after,
19 but I don't -- I didn't see any connection
20 at the time.
21     Q.   Whose decision was it for
22 Ms. Browne-Sanders not to come back into
23 the office?
24     A.   I -- I don't know.
25     Q.   Who informed you of that?

52

206

```
1              MORAN
2     A.   Well, I was asked if -- I was
3  asked if I was aware that she had
4  made -- had been concerned about her
5  safety, and I said I had, and I don't
6  recall which counsel I was -- that would
7  have asked me these questions at this
8  point.
9     Q.   My question was who informed you
10 of the decision to tell Ms. Browne-Sanders
11 that she couldn't come to work while the
12 investigation was pending?
13    A.   I believe it was Mark
14 Schoenfeld.
15    Q.   In this letter you had also
16 asked that Ms. Browne-Sanders reconsider
17 what you understood to be her decision not
18 to be interviewed?
19    A.   Yes.
20    Q.   Did you receive a response to
21 that request?
22    A.   Yes, I did.
23    Q.   And what was the -- what was the
24 response?
25    A.   It was -- I believe it was a
```

207

```
1              MORAN
2  letter from Anucha saying that she would
3  give me a call and would -- would set up a
4  date or something like that.
5     Q.   So Ms. Browne-Saders expressed
6  her willingness to be interviewed?
7     A.   That's correct.
8          THE VIDEOGRAPHER:   Counsel,
9  there are four minutes left on this tape.
10         MR. MINTZER:   You want to
11 change it.
12         THE VIDEOGRAPHER:   Okay. Now
13 going off the record at approximately 3:37
14 p.m., the end of tape 3.
15         (Recess taken.)
16         (Moran Exhibit 5 marked for
17 identification.)
18         THE VIDEOGRAPHER:   This is the
19 beginning of tape number 4.  We are going
20 back on the record at approximately 3:47
21 p.m.
22         MR. MINTZER:   For the record, I
23 have given the witness an exhibit that has
24 been marked for identification as Moran 6,
25 MSG 4228 to 29.  5, Exhibit 5.  I am
```

208

```
1              MORAN
2  sorry.
3     Q.   Let me know after you have had a
4  chance to look at it.
5          (Pause.)
6     A.   Okay.
7     Q.   Do you recognize this document,
8  Mr. Moran?
9     A.   Yes, I do.
10    Q.   This was the letter that
11 Ms. Browne-Sanders sent to you in response
12 to your letter that you signed Moran 4?
13    A.   Yes.
14    Q.   And among other things
15 Ms. Browne-Sanders expressed her
16 willingness to be interviewed in this
17 letter?
18    A.   Yes.
19    Q.   Does this letter also refresh
20 your recollection that Ms. Browne-Sanders
21 complained of being retaliated against?
22 I'll call your attention to the third
23 paragraph in the first sentence.
24    A.   I am sorry.  The third sentence,
25 you want me to read it.
```

209

```
1              MORAN
2     Q.   I am sorry.  The third
3  paragraph.
4     A.   Yes.  There is -- I see
5  retaliation.
6     Q.   Did you -- at the time that you
7  got this letter, did you understand that
8  Ms. Browne-Sanders was expressing a
9  concern about retaliation?
10    A.   Yes.  Yes.
11    Q.   What, if anything, did you do in
12 response to Ms. Browne-Sanders concern?
13    A.   Well, if I have my timing right,
14 we were -- we were still -- we were doing
15 our investigation.  It was still going
16 forward, so --
17    Q.   The issue Ms. Browne-Sanders was
18 raising was the failure to allow her
19 to --
20         MR. MINTZER:  Strike that.
21    Q.   Ms. Browne-Sanders was raising
22 the issue about whether she could come
23 back to the office, correct?
24    A.   Yes.
25    Q.   And she was saying that the
```

53

212-267-6868

516-608-2400