Sanders v. Madison Square Garden, L.P. et al Doc. 56 Att. 7

# Exhibit 10

Dockets.Justia.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
06 Civ. 0589 (GEL-XDR)

-----------------------------------------x

ANUCHA BROWNE-SANDERS,

Plaintiff,

- against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD THOMAS III, AND JAMES DOLAN,

Defendants.

-----------------------------------------x

October 30, 2006
10:00 a.m.

VIDEOTAPE DEPOSITION of DAN GLADSTONE, taken by the Plaintiff, pursuant to Notice, held at the offices of Vladeck Waldman Elias & Engelhard, P.C, 1501 Broadway, New York, New York, before Debbie Zaromatidis, a Shorthand Reporter and Notary Public of the State of New York.

night staff. Everybody who has these part time jobs if there is ever a full time posting position they are interested. There are people who have a day time job or full time job that still want to get a position with the Knicks.

Q. It is a coveted position to be able to be with the Knicks on a full-time basis?

A. Sure.

Q. Is that fair to say?

A. It's fair to say.

Q. Who told you about Mr. Gonsalves and Mr. Ward's hiring?

A. Anucha.

Q. And what did she say to you about it?

A. They're -- they're being hired. They'll be under your report on the street team.

Q. Did she say anything else about it?

A. Not so much. That they were -- connected -- related to Stephon

Marbury.

Q. Did she tell you that they were being hired because they were related to Stephon Marbury?

A. That's correct.

Q. Did you have any particular reaction to that?

A. Happy to get extra staff, happy to get some -- some manpower so to speak or just some hands, but I would have liked to have been in the hiring process. I would have liked to be able to hire who would be my direct reports.

Q. Did you express that to Ms. Browne-Sanders?

A. Yes.

Q. And what did he she?

A. That's -- it is what it is. You have to manage the situation. I'm sure you'll do well.

Q. Did she sell you that she had no choice in taking these people on?

A. I don't remember her exact words, but she -- along those lines.

told him that that was inappropriate, right?

A. That's correct.

Q. Did you ever discuss that subject with Stephon Marbury, the fact that you had admonished Mr. -- Mr. Gonsalves?

A. I believe so.

Q. And what was the sum and substance of your conversation with Mr. Marbury; what did he say, and what did you say?

A. There was a phone call that Stephon Marbury called me and was displeased about the salary for his -- his relative. He wasn't happy with the salary or his hours or his parking or just Hassan -- Hassan wasn't happy with his job and what he was doing. So I guess that was Hassan told Stephon. Stephon called me to express that he wasn't pleased with the situation as it was, and in that discussion is where I tried to explain, well, here is -- here is how it is. Here

the -- here's what the job is. Here's what it entails. Here is the salary. Here is the hours. Here is kind of what's acceptable, what's not acceptable.

Q. You explained this to Mr. Marbury?

A. I did.

Q. Do you -- do you talk to Mr. Marbury regularly as part of your job?

A. No.

Q. Can you say approximately how many conversations you have had with him?

A. Maybe four to five.

Q. And he is the Knicks -- one of the Knicks star players, correct?

A. That's correct.

Q. So it's generally a pretty memorable event for you to speak to him, correct, especially --

A. We speak at work. If it's a Knicks appearance, if he is at a Knicks camp, we will discuss the event and the appearance and what to expect of him, and we will do what he does.

GLADSTONE

Q. Had you ever called you --
A. He had not.
Q. -- prior to the telephone that you are just referring to?
A. He had not.
Q. So that was unusual?
A. That was very unusual to get a call.
Q. And did Mr. Marbury say anything else in this telephone call other than what you've already said?
A. He did. He was extremely hostile, and he had many derogatory things to say about Anucha.
Q. How is that Mr. Browne-Sanders came up in the conversation?
A. I explained to Stephon that Anucha is the boss, and she runs our office, and she determines salaries. She sets the structure that's in place, and basically she -- she is in charge.
Q. What did -- what did Mr. Marbury have to say in response to that?
A. I don't know if it was in

response to that or it was just his personal opinion. He just -- he had many negative things to say about Anucha.

Q. What specifically did he say?

A. I can't recall exact specifics, but there were some hostile curse words and not so flattering language.

Q. Do you recall anything specifically that he said?

A. He called her a bitch. He called her -- racial black bitch. I think he used the F word to describe her.

MR. MINTZER: Can you mark this as Exhibit 7.

(Gladstone Exhibit 7 marked for identification.)

MR. SHERWOOD: Can we take a break for a minute?

MR. MINTZER: Can I ask a couple of questions on this, and then we can take a break?

MR. SHERWOOD: I think I would like to take a break for a minute.

MR. MINTZER: If you're

insisting.

MR. SHERWOOD: I am not going to ask him any questions relating to the exhibit.

MR. MINTZER: Okay. I am happy to accomodate that.

MR. SHERWOOD: I appreciate that.

THE VIDEOGRAPHER: The time is 3:06 p.m. We are going off the record.

(Recess taken.)

THE VIDEOGRAPHER: Okay. The time is 3:13 p.m. We are back on the record.

Q. Mr. Gladstone, I have given you a document that's marked -- been marked as Gladstone 7. It is a three-page document. It is Bates stamped MSG 6176 and then the next two Bates stamps are cut off in the copying, but they are 6177 and 6178.

Have you had a chance to review this document?

A. I have.

Q. The -- the E mail on the top of

the first page, 6176, is that an E mail that you sent to Ms. Browne-Sanders on November 28, 2005?

A. That's correct.

Q. And do you remember writing this E mail?

A. I do.

Q. And what were the circumstances of your writing this E mail?

A. Anucha had asked for me to give her as much documentation regarding Hassan Gonsalves, this Stephon phone call, and Vernon Manuel.

Q. Okay. Had you had any conversation with Mr. -- Ms. Browne-Sanders in June about your conversation with Mr. Marbury?

A. I did.

Q. And could you tell me what was said in that conversation back into June?

A. Well, to the best of my ability. She -- I called her after I had got off the phone with Stephon Marbury and told her that I just had a phone call where

referred to her as a black bitch?

A. I believe so. That was pretty clear in my head.

Q. Did Ms. Browne-Sanders have any reaction to that?

A. She was not pleased.

Q. Did she say anything or did she just say I am not pleased?

A. I don't recall the conversation. Just that it was not -- it was not a high point career discussion talking about this -- this kind of language.

Q. Did you have any further conversation with her about Mr. Marbury's call to you at that point in June?

A. No, not that I can recall.

Q. And how did it come to be that in November you were writing an E mail about the substance of the call?

A. That's actually a good question. I -- I was pretty surprised that all this information -- she needed this information. It was -- seemed apparent to me that she was getting as much

information together as she could about an uncomfortable situation. She was not happy with the Vernon Manuel situation. She wanted me to document everything about that, and she wanted me to document pretty much everything that I had experienced or witnessed that seemed out of the ordinary.

Q. And as part of that, she had asked you to document your -- your call with Mr. -- Mr. Marbury in June?

A. I believe so.

Q. And as a result of that direction, that's what you produced as the top E mail in Gladstone 7?

A. That's correct.

Q. There are several items in quotation marks in your E mail under the heading "all referring to Anucha."

Do you have a recollection of Mr. Marbury saying all those things that are in quotations?

A. I do.

Q. The third bullet point refers to a quote that Mr. Marbury said "We don't

like her. She thinks she tells us what to do. She don't tell us shit."

Did you have any understanding about the we Mr. Marbury was referring to in that sentence?

A. I'm not sure.

Q. Did you -- did you ask him?

A. I didn't.

Q. Did you know whether he was referring to the other players?

A. It could have been the players. It could have been his family. I don't know.

Q. Do you know whether he could have been referring to Mr. Thomas?

A. I don't know.

Q. Do you know whether Mr. Marbury and Mr. Thomas have a -- have a close relationship?

A. Apparently so. I read that in the newspaper.

Q. You don't know anything more about that than what you read in the newspaper?

A. That's correct.

Q. Is that fair to say?

A. That's correct.

Q. You -- you wrote in the last paragraph of that E mail "The conversation was more detailed, but to the best of my ability those are the only exact phrases that I can recall." And then you went on to say "I did call you that night to give you a heads up that Stephon was angry with the situation and that Stephon had some hostile things to say about members of Knicks management. "

Do you see that?

A. I do.

Q. You didn't refer to the conversation that you had had with Ms. Browne-Sanders a couple of days after your call with Mr. Marbury?

A. I'm not sure what the question is.

Q. In your E mail you didn't refer -- you testified just a little while ago that you had -- after that night you

had had a couple of days later a conversation with Ms. Browne-Sanders about that subject?

A. That's correct.

Q. And that's not reflected in your E mail, correct?

A. It doesn't -- no.

Q. Any particular reason why that's not reflected in your E mail?

A. It didn't. I don't think it was relevant. I think she asked me the conversation that I had with Stephon.

Q. The phrases in quotations --

A. Yes.

Q. -- is it your testimony that you had previously told Ms. Browne-Sanders the substance of these quotations back in June?

A. I don't remember the exact words, but I remember we -- I told her about the disparaging remarks.

Q. Well, did you just refer to them generally as disparaging remarks or were you more detailed about it?

EXHIBIT
Gladstone 4
10/30/06

## Unknown

**From:** Gladstone, Dan
**Sent:** Monday, November 28, 2005 6:27 PM
**To:** Browne Sanders, Anucha
**Cc:** Buchholz, Karin
**Subject:** Staffing issues - MARBURY

**Importance:** High

**Attachments:** Staffing memo(June 16).doc

Anucha

As per your request, I am submitting some comments made by Stephon Marbury from a phone conversation that happened this summer in June (perhaps June 16th at 9 PM in the evening) when he called me on my cell phone to comment on events that transpired as mentioned below in the attached email as pertaining to his cousin, Knicks staffer Hassan Gonsalves:

- Stephon was upset that he felt his family member, Hassan, was being treated unfairly by Knicks management
- Stephon was not happy with the salary range for his cousin Hassan.
- I explained the timesheets and payroll process, and that Hassan would not be assigned to work more then 35 hours per work nor would he be assigned to work overtime and Hassan's salary was determined by Knicks management.
- I explained that Hassan was not granted a parking spot at 31st street garage and I did not approve him using my access code nor was I aware he was forging my signature to park his vehicle.
- Stephon was upset at these circumstances and expressed extreme displeasure at the Knicks front office staff, particularly mentioning Anucha
- Though time has passed, several comments I can recall Stephon making include:

**all referring to Anucha**

- "No one likes that black bitch"
- "Fuck that black bitch, she thinks she runs the Knicks, she don't run shit. I sell the tickets around here, not her, I put people in seats, this is my team."
- "We don't like her, she thinks she tells us what to do, she don't tell us shit"
- "Fuck that black bitch, she ain't shit and we'll see what happens this year"

the conversation was more detailed but to the best of my ability those are the only exact phrases I can recall. I did call you that night to give you a head's up that Stephon was angry with the situation and that Stephon had some hostile things to say about members of Knicks management.

sincerely

Dan Gladstone

-----Original Message-----
**From:** Gladstone, Dan
**Sent:** Thursday, June 16, 2005 1:13 PM
**To:** Browne Sanders, Anucha
**Cc:** Buchholz, Karin
**Subject:** Staffing issues
**Importance:** High

Anucha

As per your request - here are 2 issues that occurred this week that need to be bought to your attention regarding Knicks Field Marketing staffer Hassan Gonsalves:

- **Time Sheets** - over the period of Hassan's employment (hired October 2004) he has had trouble completing his bi-weekly administrative time sheets properly (submitting to me for approval, for me to sign, and then submitting to payroll to process on time so that Hassan would receive a paycheck). I have had to return at least 6 timesheets for

Hassan to re-do and properly submit to me for approval/signature in order to reflect the proper time/hours worked on Knicks events, and as a result often Hassan has not had his timesheet submitted to payroll in order in time to get his check the following week. Recently Hassan again submitted a **timesheet reflecting overtime he was not approved to work** - I made a change in his hours to reflect what he WAS approved to work and submitted to payroll for him so that he would be paid on time to expedite the process. On this occasion, I submitted the timesheet and send it back to Hassan to correct, because I wanted to get it to payroll in a timely manner so he would be paid the following week.

- **Parking** - it has come to my attention through the managers at Central parking system that Hassan has been using my parking account (#3-6-9) for the 31st street lot to park his own personal vehicle on a frequent basis under my name. I did not approve nor give out my account to Hassan to park his car on my account nor use my code. In fact, I have been extremely clear to Hassan that he is NOT to drive nor EVER be behind the wheel of a MSG vehicle as the result of a background check on his driver's license which resulted in him not being permitted or legal to drive company vehicles, thus it is extremely important that he does not park on the company account as we could be liable for an accident that occurs in the lot or associated with him parking and driving under the Knicks.

Moving forward, I have attached a **DRAFT** of a memo I wanted to present to both Tasheem Ward & Hassan Gonsalves to meet with them and re-enforce the nature of their employment status with the Knicks...please review and let me know how to proceed. I can also forward a copy of this memo to HR to approve or comment on...please advise....

Staffing memo(June 16).doc

Thank you.

Dan Gladstone
New York Knicks
Director, Community Relations & Field Marketing
2 Penn Plaza - 14th Floor - New York, NY 10121

w# (212) 465-6411
f# (212) 465-6047

get your Knicks tickets at ny.knicks.com

CONFIDENTIAL

# MEMO

**TO:** **Tasheem Ward**
**Hassan Gonsalves**

**FR:** **Dan Gladstone**

**CC:** **Anucha Browne Sanders**
**Karin Buchholz**

**RE:** **Employment Guidelines**

**DT:** 6/16/05

---

The following is a memo to outline and summarize the basic parameters of your employment:

You are employed in the New York Knicks Community Relations Department / Field Marketing with an annual salary of $30,300.

Time Sheets: In order to receive paychecks, you must complete and submit a **bi-weekly administrative time** sheet to Dan Gladstone to review and approve with signature, this timesheet should then be copied (with a copy going to Dan Gladstone) and submitted to the payroll department to be processed.

You will be responsible to work **thirty five (35) hours per week**, seven (7) hours per day (Monday – Friday) or any combination of hours that equal but does not go above thirty five (35) hours per week. If you are scheduled to work weekend events or 7 days per week, the total scheduling of your hours will never exceed thirty five (35) hours per week.

Scheduling: You will receive your work schedule – assignment of events that total thirty five (35) hours per week – in a weekly meeting with Dan Gladstone that will be scheduled based on the event calendar.

# Exhibit 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
ANUCHA BROWNE SANDERS,

Plaintiff,

-against- 06 CV 0589 (GEL)

MADISON SQUARE GARDEN, L.P., ISIAH LORD THOMAS, III and JAMES L. DOLAN,

Defendants.
---------------------------------------X

VIDEOTAPED DEPOSITION OF FAYE BROWN

New York, New York

Wednesday, February 14, 2007

REPORTED BY:

BARBARA R. ZELTMAN

JOB NO. 11799

David Feldman
Worldwide

From File to Trial.

805 Third Avenue, 8th Floor
New York, NY 10022
(800) 642-1099

600 Anton Boulevard, 11th Floor
Costa Mesa, CA 92626
(866) DFW-1380

110

FAYE BROWN

**Q Was that person someone who worked at the Garden?**

MR. MINTZER: Objection to form.

A I don't remember.

**Q And your testimony is that no kids were playing in the game?**

A No.

**Q What was Mr. Thomas wearing?**

A What?

**Q What was Mr. Thomas wearing?**

A I don't remember. I don't recall right now.

**Q You don't recall what he was wearing?**

MR. HERNSTADT: Asked and answered.

A No.

**Q Do you recall what the person who you believed may have been Jordan Schlachter was wearing?**

A Yeah, I think he -- I believe -- I don't want to speculate.

**Q What about the fourth person,**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

111

FAYE BROWN

**do you recall what the fourth person was wearing?**

A No, I don't.

**Q Did you watch the entire game of -- you know what Horse is, right, play basketball?**

A Yes.

**Q Did you watch the entire game of Horse from the start to the end?**

A Yes.

**Q And what do you recall happened in terms of the game?**

MR. MINTZER: Objection to form.

A It was fun.

**Q Who shot first?**

A I think Jordan did.

**Q And who followed Jordan?**

A Anucha.

**Q And who followed Anucha?**

A No, I think it was Jordan, the person whoever, Anucha and Isiah. That's how it was.

**Q And you said at what point --**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

112

FAYE BROWN

**Well, who went out of the game first?**

A Jordan, I think.

**Q He shot after Mr. Thomas?**

A Yes.

**Q And who went out second?**

A I don't remember.

**Q Who won the game?**

A I think Mr. Thomas. Isiah.

**Q Do you remember who Mr. Thomas beat to win the game?**

A I think it's the person -- sorry.

Can you ask that again?

**Q Who did Mr. Thomas beat to win the Horse game?**

A I think it was between, like, Anucha and that other player. I don't remember who the other player is, though.

**Q So you don't recall whether Mr. Thomas beat Anucha or whether Mr. Thomas beat the other player?**

MR. MINTZER: Objection to form.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

113

FAYE BROWN

A Overall, he won the game.

**Q And you don't recall who the last person was who he won the game over; is that right?**

MR. MINTZER: Objection to form.

A I don't want to speculate.

MR. CESARATTO: Why don't we change the tape.

THE VIDEOGRAPHER: Time is 12:46. Going off the record. This marks the end of Tape 1.

(A brief recess was taken.)

THE VIDEOGRAPHER: Time is 12:48. Back on the record.

This marks the beginning of Tape 2.

**Q What did you observe Mr. Thomas do that you believe was inappropriate?**

A The way he looked at Anucha.

**Q And how did he look at Anucha that you believed was inappropriate?**

A Well, he was, like, looking at

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

29 (Pages 110 to 113)



114

FAYE BROWN

her from the back.

**Q And when he was looking at her from the back, where was she?**

A She was shooting.

**Q She was shooting from where on the court?**

A Baseline. Side shot.

**Q She was shooting from the baseline on one of the sides of the basket?**

A Yes.

**Q And was that on the side where you were standing, or were you standing on the opposite side?**

A I was standing, like, right by the basket.

**Q So you were standing underneath the backboard?**

A What did you say?

**Q Were you standing underneath the backboard when Mr. Thomas, you say, was looking at her from behind while she was shooting?**

A Yes. Uh-huh.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

115

FAYE BROWN

**Q You were underneath the backboard?**

A Right.

**Q Ms. Browne Sanders was shooting along the baseline on one of the sides of the court?**

A Right.

**Q And then Mr. Thomas was standing behind her?**

A Right.

**Q Was he next in line to shoot?**

A If she made it.

**Q If she made it.**

**And how far behind Ms. Browne Sanders was Mr. Thomas standing while she was shooting?**

A She was shooting probably, like, where Ed is right now to the table.

**Q So about six, seven feet?**

MR. HERNSTADT: It's more like four or five feet.

MR. CESARATTO: I don't think so, actually. I think this table is four feet wide.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

116

FAYE BROWN

**Q Was it greater than the width of this table?**

A Approximately, like, around there.

**Q And how far out along the baseline was Ms. Browne Sanders shooting the shot?**

A Well, it was a side shot.

**Q Was she outside -- was she out near the three point line, or was she in closer than that?**

A She was a little in closer than that.

**Q Was anyone else standing behind her other than Mr. Thomas?**

A No. That I can recall, no.

**Q Where were the other players?**

A They were, like, watching, like, on the -- well, yeah, they were just watching --

You want to know exactly where?

**Q Where on the court were they?**

A I think another person was getting the rebound. So someone was,

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

117

FAYE BROWN

like, near the other side of the baseline area.

**Q And what specifically did you observe Mr. Thomas do that you felt was inappropriate?**

A Well, he looked at her up and down like -- and he was flirting.

**Q Well, he was behind her?**

A Right.

**Q So she couldn't see him while she was shooting?**

A Right.

**Q So she's shooting the basket, he's behind her?**

A Right.

**Q So how was he flirting with her if she can't see him?**

A Well, I saw him.

**Q You saw him.**

**But how is it he was flirting with her if she could not see him?**

**Was there something else that he did that caused you to believe he was flirting with her?**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

30 (Pages 114 to 117)

118

FAYE BROWN

MR. MINTZER: Objection to form.

MR. HERNSTADT: Objection to form and compound.

A So you want to know the question --

**Q Did he say anything to her while he was looking her up and down?**

A No.

**Q So other than him looking her up and down, that's your basis to say that he was flirting; is that correct?**

A No. He was looking at her like flirting. I mean it was like he was eyeing her up and down and he was like --

**Q As he's watching her shoot?**

A Yes.

**Q And did she make the shot?**

A Yes, she did.

**Q Other than her looking her up and down, did he take any -- did you observe him do anything else that caused you to believe he was flirting with her?**

MR. HERNSTADT: And other

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

119

FAYE BROWN

than the facial expression that indicated.

**Q What facial expression?**

A Like, he bit his lip a little bit. He bit his lip and he looked her up and down. And that's like -- I can tell if someone is, like, checking someone out. That's what that was to me.

**Q And did she make the shot?**

A Yes.

MR. MINTZER: Asked and answered.

MR. HERNSTADT: Asked and answered.

**Q And did he shoot next?**

A Yes.

**Q Did he move up to the spot where she shot?**

A Yes.

**Q And did he make the shot?**

A Yes.

**Q And did anybody say anything when she made the shot?**

A Well, yeah, it was competitive.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

120

FAYE BROWN

So everyone was like "yeah, all right, oh, oh." Comments like that.

**Q Did he say that?**

A Did he say?

**Q Did he say, "Oh, oh, I'm in trouble, I need to make this shot" or anything like that?**

MR. HERNSTADT: Objection.

MR. MINTZER: Objection.

MR. HERNSTADT: I think you have to first establish if he said anything.

A It was, like, a smile.

**Q So he smiled when she made the shot?**

A Yes.

**Q Did he say anything?**

A I mean, you saw his lips moving, but, like, I don't know.

**Q So you saw his lips moving, but you didn't hear him saying anything?**

A Right. I didn't hear him say anything.

**Q Had you ever watched -- well,**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

121

FAYE BROWN

**how long after that did the game go on for?**

A Probably, like, ten to fifteen minutes, I think. Ten minutes.

**Q Prior to that time, had you ever watched Isiah Thomas play basketball?**

A Like?

**Q When he played for the NBA?**

A Yes.

**Q Had you ever watched him play basketball since he was at Madison Square Garden -- since he got hired at Madison Square Garden?**

A I don't think so. No, I don't recall, no.

**Q And when he took the shot that Anucha had just made, was he still biting his lip?**

A Un-un. No.

**Q Do you know whether or not he bites his lip when he plays basketball?**

A I am not sure, no.

**Q Is it possible that he bites**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

31 (Pages 118 to 121)

138

FAYE BROWN

yell at me. Frank, do not yell at me. Do not stand over me." That's what she kept on saying.

**Q What F word did you hear?**

A F-U-C-K.

**Q And what B word did you hear?**

A B-I-T-C-H.

**Q When you heard these words, was the door to Ms. Sanders' office open or closed?**

A It was open.

**Q And did you hear those words as you walked by, or while you were sitting at your secretary's station?**

A When I walked by.

**Q When you walked by, where did you go to?**

A I kind of stayed right out at the hallway.

**Q And so did you listen in on the conversation?**

A No.

**Q Well, why did you stop in the hallway?**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

139

FAYE BROWN

A Because I wanted to find out what was going on because I saw him walking kind of upset. So I wanted to find out, like, okay. And I kind of stayed around to make sure, and I just passed and I went in the hallway and then I just came back.

**Q When you came back, was Mr. Murphy still in Ms. Sanders' office?**

A Yes.

**Q How long after they came back did their conversation continue?**

A Probably like a set down and then like probably two to three minutes after.

**Q So how long was the entire -- withdrawn.**

**Did you see Mr. Murphy leave Ms. Sanders' office?**

A Yes.

**Q And how long was the entire conversation from start to finish?**

A Oh, gosh. Like five to seven minutes.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

140

FAYE BROWN

**Q And other than hearing the words "fuck" and "bitch," did you hear any other part of the conversation?**

A No, it was like you --

MR. HERNSTADT: Other than what she's already testified?

MR. CESARATTO: Well, I think she's only testified that she heard "fuck" and "bitch."

**Q Is that right?**

A Yes. So far.

MR. HERNSTADT: Let's go back because I think she also testified about what Ms. Sanders said.

MR. CESARATTO: Oh, okay. That's right.

**Q Other than that, other than Mr. Murphy saying "fuck" and "bitch" and Ms. Sanders saying words to the effect, "don't yell at me, don't stand over me," did you hear any other parts of the conversation?**

A "You."

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

141

FAYE BROWN

**Q Who was saying "you"?**

A Mr. Murphy.

**Q Do you know the subject matter -- did you overhear the subject matter that they were discussing?**

A I didn't. Those words were -- I think because they were used, like, loud and aggressively, that's why it kind of popped out to me. But in terms of the dialog, I am not too sure of the subject.

**Q Did Ms. Sanders raise her voice?**

A No. She kept it, "Frank, do not talk to me like that. Move away from my desk. Frank, do not stand over me." Like, she was just very professional.

**Q Did you speak with Ms. Browne Sanders after her conversation with Mr. Murphy ended?**

A No.

**Q You never asked her whether she was all right?**

MR. MINTZER: Objection to form.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

36 (Pages 138 to 141)

150

FAYE BROWN

**Q Did you on occasion observe Mr. Murphy to joke with Ms. Browne Sanders?**

MR. MINTZER: Objection to form.

A On those occasions?

**Q On any occasion, did you observe Mr. Murphy to joke with Ms. Browne Sanders?**

A Yes.

MR. MINTZER: Objection to form.

**Q And would you observe how she would respond to those jokes?**

A Well, Mr. Murphy always had, like, a joke to tell or a story. So you would just kind of just listen. But yeah, would listen.

**Q Would she laugh? On occasion, would she laugh?**

MR. MINTZER: Objection to form.

**Q On occasion, did she laugh?**

MR. MINTZER: Objection to

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

151

FAYE BROWN

form.

A On occasion, yeah.

**Q Did Ms. Browne Sanders tell you that Mr. Thomas had used profanity when he spoke with her?**

A Did she tell me this?

**Q Yes.**

A Yes.

**Q And when was the first time that she told you that Mr. Thomas had used profanity with her?**

A I believe it was probably, like, the second meeting that they had together, the bi-monthly one.

**Q And where did Ms. Browne Sanders tell you this?**

A In the office.

**Q In her office?**

A Yes.

**Q And what did she say to you and what did you say to her in this conversation?**

A She just told me basically that he was -- he cursed at her and it just

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

152

FAYE BROWN

wasn't professional.

**Q And what did you say?**

A And she was shocked.

**Q And what did you say, if anything?**

A I was like, "Really? Man."

**Q And did she tell you the curse words that he used?**

A In that particular time or throughout?

**Q Asking you only about the first conversation.**

A The first conversation, F-U-C-K.

**Q Any other words that you would regard as curse words that she told you Isiah Thomas used in this conversation?**

A In that initial conversation?

**Q Yes.**

A No.

**Q Did she tell you anything else about the conversation that she and Mr. Thomas had where he used the word "fuck"?**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

153

FAYE BROWN

MR. HERNSTADT: Can you read that back, please.

(Requested portion of record read: "Q. Did she tell you anything else about the conversation that she and Mr. Thomas had where he used the word "fuck"?")

(End of read-back.)

MR. HERNSTADT: Any conversation, or the one she's been testifying about?

**Q Just so we're clear, we are only on that initial conversation.**

**So in that initial conversation where she said to you he used the word "fuck," did she tell you anything further about that conversation that she had with Mr. Thomas?**

A Yes. Yeah.

**Q What else did she say to you?**

A Basically what he told her.

**Q And what is it that she told you that he told her?**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

39 (Pages 150 to 153)

154

FAYE BROWN

A That he was, like, "who the F are you and what is your F'ing position here?"

**Q And did she say how she responded, if at all to Mr. Thomas?**

A Well, in terms of yeah, she told him that if -- basically, if he needs to find about what she does, like in detail, then she would probably have -- probably needs to go to Steve Mills to clarify.

**Q And this is all things that she told you in that initial conversation?**

A Yes.

**Q And did you understand --**

A Because she was taken back a little bit, so ...

**Q Did you come to have an understanding that basketball operations and business operations, that there was some question about their respective roles?**

MR. MINTZER: Objection to form.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

155

FAYE BROWN

MR. HERNSTADT: Objection to form.

A Their positions? Their job description?

**Q Strike that question.**

**Did you come to an understanding that Mr. Thomas had a question about what Ms. Browne Sanders' role was at Madison Square Garden, in terms of what she did for her job?**

MR. MINTZER: Objection to form.

MR. HERNSTADT: Objection to form.

A Well, it seemed like he wasn't clear.

**Q He wasn't clear in terms of what her job duties were?**

A All of her job duties, right.

**Q And how did you come to have that understanding?**

A Because, yeah, that's what she communicated, you know. That she oversaw all of the business operations, and it

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

156

FAYE BROWN

was just like, like, he said to her like -- this is what she said to me. He said, "I'm the F'ing president, so I don't understand, you know, where do you come in," like, that kind of attitude.

**Q And when she told you that Isiah Thomas said, "I'm the F'ing president, I don't understand what you do," is this still in this initial conversation we were speaking about?**

A Yes.

**Q But did you ever speak with Ms. Browne Sanders about Mr. Thomas wanting to keep basketball operations separate from business operations?**

MR. MINTZER: Objection to form.

MR. CESARATTO: Could you read it back.

(Requested portion of record read: "Q. But did you ever speak with Ms. Browne Sanders about Mr. Thomas wanting to keep basketball operations separate from business

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

157

FAYE BROWN

operations?")

(End of read-back.)

A No, I didn't talk to her about that.

**Q Have you told us everything that Ms. Browne Sanders said to you in this initial conversation?**

A I think there was more, but I don't remember at this time.

**Q Did Ms. Browne Sanders -- strike that question.**

**Did there come another time where Ms. Browne Sanders told you that Mr. Thomas had used profanity with her?**

A Yes.

**Q And when was the next time that she told you this?**

A I believe it was the following meeting.

**Q And where did she tell you this?**

A In her office.

**Q And what did she say to you and what did you say to her during this**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

40 (Pages 154 to 157)

158

FAYE BROWN

**conversation?**

A What did she say to me? I think it got worse because she said something like he said -- something about "F'ing B-I-T-C-H," because she said she was going to go to Steve because it seems like he's not working with her, like, in terms of, I guess, being -- in terms of methods of management or something. I don't know. Like, he wasn't being very cooperative. And that's it. Yeah.

**Q And what did you say to her, if anything, in this second conversation?**

A Well, I was still, like, shocked, like, "What? Nah. You serious? No. That's unacceptable. No, you have to say something to your supervisor, Steve, someone, because it's just not a part of Madison Square Garden policy."

**Q What, if anything, did Ms. Browne Sanders say after you said that she should tell Steve or her supervisor that it's not part of Madison Square Garden policy?**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

159

FAYE BROWN

MR. MINTZER: Objection to form.

A Say that again.

**Q After you said that, what did Ms. Browne Sanders say, if anything?**

A She was just shocked the fact that he was, you know, Isiah Thomas and she was just shocked in the kind of behavior, threw her off a little bit. And say, okay, this is what I'm dealing with, this is what's going on, and how is the best way to deal with this.

**Q And these are all things she's saying to you in this conversation?**

A Yeah, like, how do I -- you know. I understand there's a policy, but you know, you want to give people the benefit of the doubt. But you know, it was out of hand. And actually, she was crying at that point.

**Q She was crying when she spoke to you?**

A Yeah.

**Q Was anyone else other than you**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

160

FAYE BROWN

**and her in this conversation?**

A At the time, it was just me and her.

**Q Did anybody else come into the conversation?**

A In that conversation?

**Q This is we're talking about the second conversation.**

A Okay. No, no.

**Q Did you tell anybody at any point about this second conversation you had with Ms. Browne Sanders?**

A Telling anyone what?

**Q Tell anyone at work.**

A No.

**Q Did you tell Michelle Quendo?**

A Michelle Quendo?

**Q Yes.**

A No.

**Q Did you tell Raquel Burnette?**

A No.

**Q Did you tell any of your friends at work about this?**

A No.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

161

FAYE BROWN

**Q What about the first conversation, did you tell any of your friends at work about that conversation with Ms. Browne Sanders?**

A No, not that I can remember.

**Q So it's your testimony that you kept these two conversations just between yourself and Ms. Browne Sanders?**

A It was confidential, yeah. Yes.

I think she was a little shocked because it was disrespectful. I think that's why she was crying because it was disrespectful.

**Q Did there come any point in time after the second conversation where you and she again discussed Mr. Thomas using profanity with her?**

A In the second conversation?

**Q After the second conversation.**

A Yes.

**Q And when was the next time the two of you discussed Mr. Thomas' profanity?**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

41 (Pages 158 to 161)

162

FAYE BROWN

A I am not sure. I think probably, like, the following month or something.

**Q And where did that conversation take place?**

A In her office.

**Q And what did she say to you during that conversation?**

A That he was using profanity, using the F word.

**Q Did Ms. Browne Sanders say he used any profanity other than the word "fuck"?**

A In this other meeting? No.

**Q We are talking about the third conversation the two of you had now?**

A Right. No.

**Q What did she tell you, if anything, other than the fact -- other than the Mr. Thomas using the word "fuck"?**

A Nothing. She just said that she's being professional about the situation. She understands that, you

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

163

FAYE BROWN

know, in terms of relationship building was very important, you know, to her. So she was just trying to work with it, but it just got out of hand.

**Q So is that words that she used, "get out of hand"?**

A No. I'm using it.

**Q I'm asking you what you remember her saying to you.**

A Okay.

**Q So what do you remember her saying to you in this third conversation?**

A That she's trying to work. She's trying to put it aside and be professional and get their job done, you know.

**Q Was anyone else other than the two of you present in this third conversation?**

A I think Karen Buchholz was in a meeting with us. I don't know if it's this one. But I know she was in with us at some point.

**Q So you believe that Karen**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

164

FAYE BROWN

**Buchholz was present during a conversation with Ms. Browne Sanders where Mr. Thomas -- where Ms. Browne Sanders said Mr. Thomas had used profanity?**

A Yes.

**Q But you are not sure it was this third conversation or not?**

A Right, right.

**Q And what, if anything, did you say to her after she told you this in this third conversation?**

A I was just, like, "no way," like, you know, "wow," you know. I don't know, I guess my whole thing was, you know, you give someone the benefit of the doubt, but if it's something that -- and she basically said, "I've told him do not talk to me like that, it's just not appropriate." So she told him, and he just continued. So what do you do. That was my question. What do you do when someone is not really listening.

**Q And did you suggest she do**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

165

FAYE BROWN

**anything?**

A I said, "What do you think?" And I kind of gave the question back to her, "What do you think you should do?"

**Q And what did she say?**

A She went to Steve Mills.

**Q So at some point she told you she went to Steve Mills?**

A Yes.

MR. MINTZER: Objection to form.

**Q And what did she tell you about going to Steve Mills?**

A She went to Steve Mills and explained to him what happened.

**Q I'm asking you now, I'm asking you what she told you.**

**So to the best of your memory, what do you remember she telling you about her going to Steve Mills about Isiah Thomas?**

A She told me everything that I told you.

**Q And what was that?**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

42 (Pages 162 to 165)



166

FAYE BROWN

**What it that she told you?**

A About him cursing at her, F-U-C-K, the B-I-T-C-H, you know, "what is this, I'm the president, what's going on?" And basically she approached him with that and said, you know, probably in terms of clarifying what each job description is, because it seems like in terms of if we're going to work together, you know, it has to be things that are communicated and made clear so that there can be some kind of unit.

**Q Did she tell you that she told Mr. Mills that Isiah Thomas used the word "fuck"?**

**Did she tell you that?**

A Yes, yes.

**Q Did she tell you that she told Mr. Mills that Isiah Thomas used the word "bitch"?**

MR. MINTZER: Asked and answered.

You can answer it again.

A Sorry.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

167

FAYE BROWN

**Q Did she tell you, did Ms. Browne Sanders tell you that she told Steve Mills that Isiah Thomas had called her a "bitch"?**

A Yes. And profanity. She used that word too, "profanity."

**Q Did she tell you what, if anything, Steve Mills said after she told him this?**

MR. HERNSTADT: What Steve Mills said to --

**Q What Steve Mills said to Ms. Browne Sanders.**

A Well, he listened to what she said. And then, I think, a couple days later, he started the -- the meeting that Anucha had with Isiah, Steve kind of oversaw that. So now it was just, like, okay, let's meet altogether, Steve, Isiah Thomas and Anucha, and let's try to talk.

**Q Did Ms. Browne Sanders tell you about that meeting with Mr. Thomas, Mr. Mills and herself?**

A Yes, she did.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

168

FAYE BROWN

**Q And when did she tell you that? When did she tell you about that meeting?**

A The same day.

**Q Same day of the meeting?**

A Yes.

**Q And when was that?**

A I am not sure. I am not sure about the time. Let me think.

I'm wondering if it's, like, in the summertime. I am not sure.

MR. HERNSTADT: Again, he is not asking you to speculate.

THE WITNESS: Okay. All right.

**Q And what did Ms. Browne Sanders tell you was said in that meeting?**

A Basically that Steve kind of explained what her role was and explained what his role was, and kind of just saying, you know, we want to come to, like, a common place, common ground. And then she told me he had to take a call, so he left where they were meeting. And that's when he started, like, cursing at

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

169

FAYE BROWN

her again.

**Q Did she say what words he used?**

A F word.

MR. HERNSTADT: Can we be clear who the "he" is here?

THE WITNESS: Isiah.

**Q It's Isiah Thomas you are saying she told you that Isiah Thomas started cursing at her?**

A Right.

**Q Not Steve Mills?**

A Right.

**Q And what words did she say Isiah Thomas used?**

A The F word.

**Q The word "fuck"?**

A Yes.

**Q Did she tell you anything else about this meeting?**

A Yes. She said that, I think when Steve came back, she said that she stated that, you know, she's played on the courtyard, like. Like, she's played street ball. So she's not the type of

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

43 (Pages 166 to 169)

170

FAYE BROWN

person to just cry if something goes wrong, but she will not tolerate this disrespect and this basic -- like a playground. Because she said when Steve left, it was all of a sudden he just started again. So it was, like, what was going on. Inappropriate.

**Q Did she tell you what, if anything, Steve Mills said after she said, you know, she's not going to tolerate this disrespect, she's played street ball?**

A Right. And from that ball -- What did you say?

**Q What did Mr. Mills say, if anything, after that, according to Ms. Sanders?**

A Basically he just kept the meeting, like, him, Isiah and Anucha. It wasn't no longer Isiah and Anucha anymore. It was he was going to be there to moderate and he was going to be, like, the common ground that they could both meet and talk and try to work it out or

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

171

FAYE BROWN

something, work out some kind of ...

**Q And Ms. Browne Sanders told you all of this?**

A Yes.

**Q You weren't at that meeting, correct?**

A No.

**Q I believe you've told me about, I guess, four or five different conversations where Ms. Browne Sanders has told you that Mr. Thomas used profanity with her?**

A Yes.

**Q Are there any other conversations that you've had with Ms. Browne Sanders where she's told you that Mr. Thomas used profanity?**

A I think it was probably once or twice after that, and that's when -- okay. Yeah.

**Q There were one or two more conversations after that.**

**What did Ms. Browne Sanders say in those conversations?**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

172

FAYE BROWN

**Let's start with the first one you remember.**

A I don't remember. I don't remember that off the top of my head.

**Q You don't remember what she said?**

A Oh, yes, I remember she saying she was telling him -- no, this is after the Steve meeting, after the Steve meeting. They really didn't have meetings alone together after that.

**Q So after you and she spoke about the Steve meeting, were there any other conversations that you had with Ms. Browne Sanders where she told you that Mr. Thomas had used profanity with her?**

MR. MINTZER: Asked and answered.

The question had been asked and answered, but you could answer it again.

A I don't remember right now.

**Q Did Ms. Browne Sanders ever**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

173

FAYE BROWN

**tell you that she was documenting Mr. Thomas' use of profanity with her?**

MR. HERNSTADT: Objection to form.

MR. MINTZER: Objection to form.

A Well, she has a book that she puts all her information on. So in terms of documenting, I am not sure what you mean.

MR. HERNSTADT: Could you read back the question, please.

(Requested portion of record read: "Q. Did Ms. Browne Sanders ever tell you that she was documenting Mr. Thomas' use of profanity with her?")

(End of read-back.)

A Yes.

**Q And what did she tell you about -- strike that question.**

**Did she tell you where she was documenting his use of profanity?**

MR. HERNSTADT: Objection to

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

44 (Pages 170 to 173)

178

FAYE BROWN

**write into her journal?**

MR. HERNSTADT: Objection to form.

MR. MINTZER: Objection to form.

A Schedules, telephone numbers. Her thoughts. What she thought about a situation. Her conversations with people. What stood out to her in that day. Good pointers, tips that she needs to remember.

**Q And did she ever tell you why she wrote these things in her journal?**

A Well, it's important. It was -- it's ever since I knew her and worked for her, she wrote everything down in her journal. Because she wants to make sure she doesn't forget anything. That she's organized.

**Q Did you ever see any e-mails where Mr. Thomas' use of profanity was mentioned?**

A No, I didn't see any e-mails -- no, I don't recall. I don't remember

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

179

FAYE BROWN

right now.

**Q Did Ms. Sanders ever tell you that Mr. Thomas had used the word "love" in speaking with her?**

A Yes.

**Q When was the first time she told you that?**

A In January.

**Q January of what year?**

A 2005.

**Q Why do you remember it was in January 2005?**

A Because it was closer to the Christmas party.

**Q You are talking about Christmas party where you observed Ms. Sanders and Mr. Thomas play Horse?**

A Right.

**Q And where did she tell you -- where did you have this conversation with Ms. Browne Sanders where she said Mr. Thomas had used the word "love"?**

A I think in her office.

**Q In her office?**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

180

FAYE BROWN

A Yes.

**Q And what did she say to you in this conversation?**

A She said that he said to her that, "Oh, now I know why there's tension between us" and "it's like love and basketball," you know, "I'm in love with you. That's what it is."

**Q Did she say anything else?**

A She was, like, "First he's cursing and now he's in love." Like "What's going on?" Like that. She was like, "This is just inappropriate, period."

**Q Was she laughing it off with you?**

A What?

**Q Was she laughing it off?**

MR. MINTZER: Objection to form.

A Laughing it off?

**Q Yeah.**

A No.

**Q Was she laughing about it?**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

181

FAYE BROWN

A No. I'm laughing.

**Q Was she laughing about it at the time she told you?**

A No.

**Q What, if anything, did you say to her?**

A And then I told her about the situation in December. That's when I told her because it was like a confirmation that, whoa, okay, it's probably true, because it was true.

**Q And what did you tell her you saw?**

A I told her I saw him flirting or just looking at her up and down, like, "I want you," you know, kind of flirting. You know when somebody is flirting at you, looking at her body.

**Q And what did she say?**

A And she was just like "What? See? What is going on? This is outrageous."

**Q Did she tell you what her response to Mr. Thomas was when he said**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

46 (Pages 178 to 181)

182

FAYE BROWN

**"I'm in love with you. This is like love and basketball"?**

MR. MINTZER: Objection to form.

You can answer.

A She just said, "You need to stop doing this. You need to just" -- she brought it back to a professional level.

**Q Did she tell you that she told Steve Mills about it?**

A Yes.

**Q When did she tell you that she told Steve Mills?**

A This was after my meeting, my conversation in January.

**Q So you had this conversation in January where she tells you about this comment about love and basketball?**

A Right.

**Q And then you have a subsequent conversation with Ms. Browne Sanders where she says she told Steve Mills about Mr. Thomas?**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

183

FAYE BROWN

MR. HERNSTADT: Objection to form.

A Yeah. In terms of policy and procedure, it's something that she has to do. She has to tell her supervisor about the situation, even though, you know, he has a lot on his plate, there's lot going on in the Garden, people are trying to do their jobs. But this is something that has to be addressed because, you know, if it's not, that's not the Garden policy.

**Q But my question is: Did she tell you that she actually spoke to Steve Mills about the love and basketball conversation?**

A Yes.

MR. MINTZER: Asked and answered.

A She did.

**Q And what did she say about that?**

MR. HERNSTADT: Objection. Go ahead.

**Q What did she say about her**

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

184

FAYE BROWN

**conversation with Mr. Mills?**

A She just explained to him what happened.

**Q And what did she tell you she explained to Mr. Mills?**

A What I told you about, about the love and basketball and that he said "he's in love with me" and that's why he understands the root why there's tension between them.

**Q So Ms. Browne Sanders told you that she told Mr. Mills what exactly what Mr. Thomas said to her?**

A Right. And I believe she sent an e-mail to him.

**Q And why do you believe that?**

A Because she did.

**Q And when you say "e-mail to him," you mean e-mail to whom?**

A To Steve Mills.

**Q Did you see this e-mail?**

A Yes.

**Q When did you see it?**

A Before she sent it.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

185

FAYE BROWN

**Q How did you come to see it?**

A Well, she just asked me in terms of, you know, she didn't want to seem -- she didn't want to add any pressure to him because she respected Steve a lot. So she didn't want to add, like, "Oh, gosh what do you want now," like that kind of attitude. She wanted to present it to him where she didn't want to be overbearing. She wanted to do it in the best professional way. So she just asked me to document and read, does this sound like -- how does this sound.

**Q And where did you read it?**

A I read it in her office.

**Q On her computer monitor?**

A Yes.

**Q Was she present while you read it?**

A Yes.

**Q And what did it say?**

A Oh, I don't remember all of it now, but just basically, "Steve, I would like to have a meeting with you

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212)705-8585

47 (Pages 182 to 185)