# Exhibit 14

Dockets.Justia.com

1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   06 Civ. 0589 (CGE)

5   ------------------------------------------x

6   ANUCHA BROWNE-SANDERS,

7                          Plaintiff,

8        - against -

9   MADISON SQUARE GARDEN, L.P., ISIAH LORD

10  THOMAS, III, and JAMES DOLAN,

11                         Defendants.

12  ------------------------------------------x

13                    December 13, 2006

                      10:10  a.m.

14

15            VIDEOTAPE DEPOSITION of PETER

16  OLSEN, taken by the Plaintiff, pursuant to

17  Notice, held at the offices of Vladeck

18  Waldman Elias & Engelhard, P.C, 1501

19  Broadway, New York, New York, before

20  Debbie Zaromatidis, a Shorthand Reporter

21  and Notary Public of the State of New

22  York.

23

24

25

78

1                OLSEN
2  project -- well, there was a project for
3  Isiah Thomas, and I know there was at
4  least one other one.  Oh, well -- well
5  there are -- if you -- I don't know if you
6  consider it a project or not.  So, for
7  example, asking me to look into executive
8  education for Anucha Browne-Sanders, I
9  guess that is a project.  I think I am
10 missing one, but I -- that's -- that's all
11 I mean.  It will come to me.
12    Q.   If you think of it later in the
13 deposition, just let me know, and we
14 will -- we will add it.
15    A.   Okay.
16    Q.   What was the project Mr. Mills
17 asked you to do for Mr. Thomas?
18    A.   He -- he wanted me to -- pardon
19 me -- as he termed it help Isiah build his
20 organization.
21    Q.   When did Mr. Mills tell you
22 about that project?
23    A.   I think the first discussion
24 about that was a telephone call that Steve
25 made to me when I was working at home, and

79

1                OLSEN
2  he mentioned that he wanted to help Isiah
3  build his organization.  I -- did -- what
4  was your question?
5    Q.   Yes.  Do you recall when that
6  telephone call took place?
7    A.   Yes, I do remember that.  That
8  was April 1 I think.  I am pretty sure it
9  was April 1.
10    Q.   What did Mr. Mills say during
11 that telephone call?
12    A.   Well, he said a number of
13 things.  I actually wrote them down, and
14 it looks like it that might be the paper
15 that I --
16    Q.   I'll -- I will show you the
17 paper, but I would like just your
18 recollection now of what -- what he said
19 to you.
20    A.   Okay.  Yeah.  He mentioned a
21 number of things that Isiah
22 obviously -- we need to help Isiah build
23 his organization.  He -- I think it
24 is -- again this is a very general answer
25 because I -- I know we had a number of

80

1                OLSEN
2  conversations about it, so what he said
3  exactly on the first I may not get right,
4  but he said that he -- we needed to help
5  him, you know, know what it takes to be
6  successful around here, and I think he
7  was -- he may have used but he certainly
8  was using that frame of reference that I
9  referred to earlier, process, structure,
10 feedback.  How do we do things here?  What
11 does it take to be successful here?  How
12 should he structure his organization?
13 Let's see.  What -- and again feedback
14 meaning what types of reports should he
15 get?  How should he report to Steve, to
16 Jim and Hank, for example.  Those kinds of
17 things.  It was sort of like I took it to
18 mean how do we help him understand "The
19 Cablevision or MSG way."
20    Q.   Anything else that you can
21 recall during that conversation?
22    A.   I listed -- it was sort -- it
23 was a very quick conversation.  He named a
24 few different things that I think I
25 captured, but I don't remember

81

1                OLSEN
2  anything -- that is why I take notes and
3  look at notes.
4    Q.   Do you remember anything that
5  you said to Mr. Mills during that
6  conversation?
7    A.   It was really much more of a
8  one-way conversation because I -- at least
9  I interpreted it as I thought I got an
10 understanding what he was talking about
11 because it's -- again the parlance of MSG
12 and Cablevision is process, structure,
13 feedback.  So it made sense, but I -- I am
14 sure we said -- I don't know if I said it
15 or he said it, but I have to believe
16 I -- one of us said something about we
17 will talk some more but keep it in the
18 back of your mind.  You know, I'll give
19 you some more dates, but think about it
20 some more, and we will get together and
21 talk some more I think.
22        MS. CACACE:  Could you mark
23 this as Olsen 2.
24    A.   Okay.  Yes.
25        (Olsen Exhibit 2 marked for

21

82

```
1              OLSEN
2   identification.)
3        (Document handed to witness.)
4    Q.   Okay.  What has been marked as
5   Olsen Exhibit 2 is two pages from
6   different calendars.  The first one has
7   been identified as MSG 9213, and the
8   second one is MSG 9214.
9        Are those the notes you were
10  referring to when you had the telephone
11  call with Mr. Mills?
12   A.   Yes.
13.  Q.   Could you read -- well, actually
14  starting from the beginning, Deanna Corey,
15  is that what it says?
16   A.   Dianella.
17   Q.   Who is that?
18   A.   Steve Mills' administrative
19  assistant.
20   Q.   Did you have a telephone call
21  with her that day?
22   A.   No.
23   Q.   Do you know what those notes are
24  in reference to?
25   A.   Yes.
```

83

```
1              OLSEN
2    Q.   What are they reference to?
3    A.   This -- Dianella left me either
4   an E mail or voicemail.  I think it was a
5   voicemail after a meeting I had with Steve
6   previously, and we were talking -- that
7   was at -- I think that is what I meant by
8   the skunk works project, like high
9   potentials.  How do we know who our
10  keepers are?  How do we better develop our
11  talent, so forth?  After -- I think it was
12  after -- I am pretty sure it was
13  afterthought.  Steve had -- he said Jarret
14  Merrell is the kind of person we are
15  talking about.  Jarret I think was an
16  intern, seems like a very capable young
17  person.  We should sort of latch on to
18  these folks and make sure we develop them
19  and develop it -- so, you know, I think he
20  said to Dianella ask Pete to go meet with
21  Jarret, Jarret Merrell and talk with him
22  and see -- he'll know then a little better
23  what we are -- what we are talking about.
24  So I don't remember if I had already met
25  with Jarret at that time or I was going to
```

84

```
1              OLSEN
2   but -- but it was -- it was like a to do
3   thing that day.
4    Q.   What was the thing under Jarret
5   Merrell?
6    A.   It says have Vizio because it
7   was -- I think I was as I did often
8   helping a senior -- a senior executive in
9   this case Steve think through our
10  structure, organization charts and
11  options, and it takes a little bit of
12  thought because if you change one thing it
13  means a lot of other things have to
14  change, so they -- they may ask for my
15  help in terms of helping them as a sort of
16  a sounding board, think through org charts
17  of the changes.  I do org charts in Vizio,
18  which is a computer program, and I didn't
19  know if they had Vizio, so it is a
20  question.
21   Q.   Okay.  And this -- the third
22  thing says▓▓▓▓▓▓▓
23   A.   ▓▓▓▓▓▓▓▓▓.  I was -- I think
24  this is what this was, but I had suggested
25  to Steve, you know, that I could be a
```

85

```
1              OLSEN
2   resource on the team side that I had, you
3   know -- I have been -- I have done in a
4   lot of organizational stuff, a lot of team
5   building stuff.  Maybe I could
6   provide -- I could be the same type of
7   resource for the Knicks and Rangers and
8   Liberty maybe as I was to senior
9   management.  Steve had said talk -- you
10  should really talk to -- you know, get in
11  touch with Lisa Callahan, who was team
12  physician for the Knicks and a lot of that
13  sort of thing sort of I -- I take, you
14  know, was steered through Lisa.  So that
15  was a follow-up type thing.
16   Q.   Could -- and could you read your
17  notes into the record under Steve Mills?
18   A.   Um hum.  It says, "Process
19  document regarding employee development
20  draft for discussion purposes Lisa
21  Callahan."  Lisa, two bullet points.
22   Q.   What does the first one refer
23  to?
24   A.   Well, I think it probably refers
25  to -- I put together a process here is how
```

22



86

1           OLSEN
2    we could do employee development as a
3    draft, and I either wanted to work on it
4    that day or it wasn't at a meeting I was
5    at home that day. So I think it was
6    something I wanted to do that day, and
7    ████████ was I had either called
8    █████ and she maybe had called me back or
9    had not called me back, but it was still
10   something that was out there. It wasn't
11   finished, so it was like a reminder to
12   myself.
13       Q.   And then what's under that?
14       A.   Then it says Rusty, and those
15   are all also I think to dos or just
16   thoughts, set up org chart meetings with
17   Brian Lafemina.
18       Q.   Does that have something to do
19   with what you discussed with Mr.
20   McCormack?
21       A.   Yes.
22       Q.   Okay. And could you read down
23   the rest of that list?
24       A.   Yes. It says "don't single out.
25   Never worked as exec."

87

1           OLSEN
2        Q.   What does that refer to?
3        A.   That is -- this -- at that point
4    this is where I was taking notes on the
5    telephone call from Steve.
6        Q.   Okay. So when it says don't
7    single out, what does that refer to?
8        A.   Well, I -- I think what he was
9    saying was he didn't -- this is, you know,
10   a very tip -- sort of a typical request.
11   They wanted me to have me work with
12   somebody, but they don't want them to feel
13   like they are being singled out that they
14   are the only one who gets this for, you
15   know, like -- this kind of treatment or
16   whatever I guess or he also could have
17   meant don't -- well, that's -- I would say
18   that is what he meant.
19       Q.   And was he referring to Mr.
20   Thomas when he said don't single him out?
21       A.   Yes.
22       Q.   He didn't want Mr. Thomas being
23   singled out for needing special help?
24       A.   Correct.
25       Q.   Something like that?

88

1           OLSEN
2        A.   Yes, something like that.
3        Q.   "Never worked as exec."
4        A.   Yes.
5        Q.   That is referring to Mr. Thomas
6    has never been an executive before?
7        A.   Well, that is interpretation or
8    my notes based on what he said yes. I
9    can't say that Steve said those exact
10   words, yes, but I don't think he said
11   those exact words.
12       Q.   Okay. What is the next one
13   under that?
14       A.   I think it says basketball.
15       Q.   Referring to Mr. Thomas having
16   basketball experience?
17       A.   Yes.
18       Q.   And the next line?
19       A.   "What means to be an exec."
20       Q.   What does that refer to?
21       A.   That means now he is talking
22   about sort of the gist of this service or
23   consulting assignment project, help Isiah
24   understand what it means to be an
25   executive.

89

1           OLSEN
2        Q.   And what is the --
3        A.   Here.
4        Q.   I am sorry. What was the --
5        A.   Here.
6        Q.   At The Garden?
7        A.   Right.
8        Q.   What is the next line under
9    that?
10       A.   Doesn't -- D -- I think that
11   means DK, which means he doesn't know all
12   the ground rules or if you will the -- the
13   subtleties or whatever of MSG/Cablevision.
14   I think that is --
15       Q.   And then there is something with
16   a star?
17       A.   "Locker room language."
18       Q.   What does that refer to?
19       A.   Well, as I think -- as he talked
20   about what he -- what he meant, he said,
21   you know, for example, he's got to know
22   that he can't use locker room language I
23   think he said in the offices or around
24   here or something like that.
25       Q.   Did he give you any specifics of

23

106

OLSEN

2 a card sort, which is a -- it is a
3 technique that organizational people like
4 myself use. And what we do is go through
5 cards and people prioritize what do you
6 think is most important and next most
7 important at least and so on, so forth.
8 So it starts with a broad deck
9 of cards, and you have a number of
10 different elements, you know, each one
11 having its own like element, and then the
12 participant sorts through them. So this
13 is the most important, and this is -- it
14 is nice to have, but it is not critical,
15 and this is really not relevant, so forth.
16 So it is a way to sort of take this and
17 zero it down. So I talked to him about
18 that approach, and some things I had to
19 build around it I guess or was thinking of
20 building around it.
21 Q. Okay. When -- you said before
22 you -- came up with this program you
23 had some conversations and did some
24 reality testing ideas.
25 A. Um hum.

107

OLSEN

2 Q. Do you recall that you just said
3 that? What -- who did you have
4 conversations with and what were the
5 reality test -- what was the reality
6 testing that you did?
7 A. Well, when I say reality
8 testing, people that I, you know, knew and
9 felt comfortable with whom I could sort of
10 show them like a card sort, Rusty I think
11 -- I am sure I showed Rusty an early draft
12 or the original idea or maybe the cards
13 that are the Lominger cards just as a
14 process. Here is a technique. I showed
15 them to Anucha at lunch on May 11. I
16 think it was May 11. Who else did I show
17 them to? I -- I may have shown them to
18 somebody like Mark Piazza, who I talked to
19 fairly often, and who else? Fran Hurley
20 who is head of training. I think -- I
21 know she saw some iteration of it. It
22 went through several iterations as it sort
23 of evolved just in terms of feedback and
24 what do you think of this. Those people,
25 maybe others.

108

OLSEN

2 Q. Did -- did Mr. Mills ever tell
3 you why he wanted your help to work with
4 Mr. Thomas?
5 MR. GREEN: Objection. Asked
6 and answered. You may answer again, Mr.
7 Olsen.
8 A. Well, it was these reasons here
9 that I mentioned that I think that --
10 Q. Did he say whether he tried to
11 work with Mr. Thomas previously?
12 A. No, he didn't say.
13 Q. Did he say anything to the
14 effect that he didn't want to hurt his
15 relationship with Mr. Thomas?
16 A. He didn't say that.
17 Q. When -- when you showed
18 the -- this card sort to Mr. McCormack,
19 what did he think of it?
20 A. It --
21 MR. GREEN: Objection to form.
22 You may answer.
23 A. He thought it was a good idea
24 and a good technique. I don't know that
25 he had ever seen something like that.

109

OLSEN

2 So I think he -- he was positive for --
3 toward it. I don't think it was a long
4 discussion, but I know it is -- oh, this
5 is interesting.
6 Q. When -- what was the context in
7 which you showed the cards to
8 Ms. Browne-Sanders?
9 A. It was at lunch on May 11.
10 Q. And what did you tell
11 Ms. Browne-Sanders about your -- about the
12 project you had -- Mr. Mills had asked you
13 to work on with Mr. Thomas?
14 A. Well, you're -- I -- are you
15 asking me the context of the lunch or
16 the --
17 Q. What -- what did you tell
18 Ms. -- well, did you say to
19 Ms. Browne-Sanders before the lunch
20 any -- anything about the project Mr.
21 Mills asked you to work on with Mr.
22 Thomas?
23 A. I don't think so. It was only a
24 week later, and I don't think I
25 saw -- well, the -- the meeting with Steve

28



110

```
1              OLSEN
2   was on the seventh, so I don't think I
3   said anything to Anucha before that.  No.
4       Q.   Did you ask Ms. Browne-Sanders
5   to lunch for the purpose of discussing Mr.
6   Mills project with her?
7           MR. GREEN:   Objection to form.
8   You may answer.
9       A.   Say that question again.
10      Q.   Did you ask Ms. Browne-Sanders
11  to have lunch with you on May 11, so you
12  could run by some ideas concerning the
13  project Mr. Mills asked you to work on
14  with Mr. Thomas?
15      A.   I don't think I asked her to
16  lunch.  We had periodically and -- you
17  know, for -- for the past few years, we
18  had lunch, casual lunch, usually set up in
19  passing.  We should get lunch.  We've got
20  to catch up.  Yep, let's catch up.  This
21  was one of those occasions, so it
22  wasn't -- the intention of the lunch
23  wasn't -- wasn't, you know -- I don't
24  remember setting it up.  I don't know who
25  set it up.  I may have or she may have,
```

111

```
1              OLSEN
2   but it was -- wasn't set up with -- with
3   an intention of sharing the project, but
4   the lunch I took as an opportunity to take
5   my cards with me to, you know, again ask
6   Anucha to be a sounding board and give me
7   some feedback on it.
8       Q.   So what did you say to
9   Ms. Browne-Sanders before you showed her
10  the card sort about the project Mr. Mills
11  had asked you to work on with Mr. Thomas?
12          MR. GREEN:   Objection to form.
13  Asked and answered.  You may answer again,
14  Mr. Olsen.
15      A.   I am sorry to ask you.  If you
16  could say that again, please.
17      Q.   Sure.
18          MS. CACACE:   Could you read
19  that back.
20          (Record read.)
21      A.   I don't remember the exact
22  words, but I'm sure I introduced it
23  somehow, and it was something to the
24  effect of Steve has asked me to do a
25  project with Isiah, maybe with the team,
```

112

```
1              OLSEN
2   you know.  It may even cascade and become
3   sort of a Knicks program, and I was
4   thinking about an approach.  Here
5   is -- could you look at this with me and
6   tell me what you think.  This -- something
7   like that.  I can't say those are the
8   exact words, but it was --
9       Q.   Did you tell Ms. Browne-Sanders
10  any of the specifics that Mr. Mills had
11  told to you about the reasons he wanted
12  you to help Mr. Thomas?
13      A.   Not that I recall.
14      Q.   What did Ms. Browne-Sanders say
15  to you when you told her you were -- Mr.
16  Mills had asked you to do a project with
17  Mr. Thomas?
18      A.   She said quite a bit actually.
19  She had a lot to say about -- that
20  was -- and these are not the words, but it
21  is -- it was sort of well let me tell you
22  about Mr. Thomas and the Knicks and all
23  that sort of stuff.
24      Q.   And what did she say to the best
25  of your recollection?
```

113

```
1              OLSEN
2       A.   Well, she -- she prefaced that
3   by saying very clearly that you have to
4   promise you won't say anything about this
5   to anybody, which I -- I said I don't know
6   if I even said anything because I think
7   she leaned forward and, you know, said
8   with great emphasis I mean it.  You can't
9   say anything about this to anybody else,
10  and we were at a booth.  So I guess I do
11  remember the -- the leaning forward part
12  and the -- the emphasis on her -- desire
13  to emphasize confidentiality is clear to
14  this day in my mind.
15      Q.   Okay.  And then what else did
16  she say?
17      A.   Well, then she launched into a,
18  for lack of a better word, a diatribe I
19  guess about the -- about Mr. Thomas, about
20  the Knicks.  You are asking my specific
21  recollections of that?
22      Q.   I am --
23      A.   Words said or --
24      Q.   To the best of your
25  recollection -- recollection what did she
```

29

114

OLSEN

1  tell you?
2    A.    She said that they are a bunch
3  of -- I won't have the word right here
4  because I took notes after the fact, but
5  she said that they are basically a bunch
6  of thugs, that they -- if -- if
7  something -- you know, it's -- I'm
8  thinking -- this probably was my word --
9  like almost incestuous.  If you're not
10  part of this -- she said -- first she
11  described the relationship that Mr. Thomas
12  had with Stephon Marbury that it was very,
13  very close, and she questioned whether or
14  not that was for the good of the team.
15  You know, that their back
16  yards -- they -- they live next to each
17  other.  Their back yards abut, that they
18  talk on the phone until 2 in the morning,
19  and that they -- if other players don't go
20  along with, you know, the way that they
21  see the world, they're excluded I guess
22  and that may be my word, but it's like
23  either you're in or you're out.  The word
24  thug was used several times.  She -- and

115

OLSEN

1  then she gave me, you know -- she -- I
2  guess she was -- it was a -- she was
3  dumping her bucket I guess is the way I
4  would say it about -- she was illustrating
5  what she meant with some other examples,
6  like the Stephon Marbury and Anucha
7  talking on the phone until 2 in the
8  morning.
9    Q.    Stephon Marbury and Anucha --
10    A.    I'm sorry.  Isiah Thomas.
11    Q.    What else did she tell you about
12  Mr. Thomas?
13    A.    She said that it is rule by
14  fear.  I remember that.  She said -- she
15  mentioned player -- a couple -- I remember
16  her mentioning I think it was Kurt Thomas,
17  who was a Knicks player at the time, that
18  he was -- you know, he wasn't one who was
19  going to go along with this, and that -- I
20  think she said that he said I am not an
21  ass kisser.  I'm not going to play their
22  game or something like that, and what she
23  was implying was I think if you don't play
24  along you don't play the game.  You know,

116

OLSEN

1  you're going to sit on the bench, and
2  that's in my words right there, but -- she
3  mentioned -- she said it would be a
4  media -- media field day if the papers
5  ever got a hold of it.
6    Q.    If the papers ever got a hold of
7  what?
8    A.    Well, she -- well, she -- again
9  not necessarily in this order, but she
10  said -- she mentioned Petra Pope.  She
11  said Petra Pope I think was -- was Magic
12  Johnson's girlfriend, and Isiah knew Petra
13  Pope from that relationship, and that
14  Isiah had asked Petra Pope to go into the
15  referees' locker room before a game and
16  alluded to have make them feel comfortable
17  or see if there is anything they need or
18  something like that.  She said that Isiah
19  had been seen leaving a hotel with
20  this -- ▮▮▮▮▮▮▮▮▮  What else?
21  I am forgetting things here for sure.  I
22  guess that's -- I don't remember
23  anything -- but it was -- that -- that was
24  it.

117

OLSEN

1    Q.    Did -- did Mrs. Browne-Sanders
2  say anything to you about her relationship
3  with Mr. Thomas?
4    A.    Oh.  She said that he said
5  something about -- that he mentioned the
6  word love, and I don't know how he
7  characterized it, that I love you.  I'm in
8  love with you or something to that effect,
9  and that they should go off site to plan
10  for a day.  To which she quickly added and
11  with emphasis, I told him no way.  And
12  when she actually -- now, it is sort of
13  coming back to me, but she said
14  when -- that he said something about I
15  love you or whatever it was that she sort
16  of like -- it's -- because of my training
17  as a psychologist, it is the way she said
18  it I think that -- she said it in a manner
19  that was sort of like she sloughed it off,
20  like what is -- she may have even said
21  what is that supposed to mean.  And that I
22  think -- I can't remember anything else
23  about the relationship between the two of
24  them, but those two things were mentioned.

30

262

OLSEN

1  
2  Q.  Could you look back at Olsen
3  Exhibit 7 please, which is your
4  typewritten notes.
5  A.  Yes.
6  Q.  At the top of page 9149, that
7  first paragraph.
8  A.  Right.
9  Q.  The second sentence says, "Went
10  to Steve Mills rather than human resources
11  on harassment.  IT said he was in love
12  with her" with the in love in quotes.  Is
13  that what you wrote?
14  A.  That's what I wrote.
15  Q.  That is not vague, is it?
16  A.  Well --
17  MR. GREEN:  Objection to form.
18  It is argumentative.  You may answer, Mr.
19  Olsen.
20  A.  That wasn't -- well, it wasn't
21  necessarily meant to convey that it -- it
22  was a quote.  It was like, you know, how
23  sometimes you put in quotes something that
24  is -- something that's -- I don't know
25  could stand out in some way maybe or a

263

OLSEN

1  
2  phrase that could convey different things
3  maybe or whatever.
4  Q.  Did you ever suggest to
5  Ms. Browne-Sanders that she should go to
6  HR concerning Mr. Thomas' behavior?
7  A.  I asked her or even suggested
8  that she go to Steve.  She told me she had
9  been to Steve rather than HR.  So no, I
10  didn't suggest that she go to HR.
11  Q.  Did you tell Mr. McCormack that
12  Ms. Browne-Sanders had made it clear to
13  you that she had told Mr. Mills about Mr.
14  Thomas' behavior?
15  A.  Did I make it clear to Mr.
16  McCormack?
17  Q.  Yes.
18  MR. GREEN:  Objection to form.
19  The document speaks for itself, but you
20  may answer.
21  A.  Say again.  Sorry.
22  Q.  You can answer the question.
23  A.  No, I am -- asking.
24  Q.  Asking me to repeat.
25  A.  Yes.

264

OLSEN

1  
2  Q.  I am sorry.  Did you tell Mr.
3  McCormack that Ms. Browne-Sanders had made
4  it clear to you that she had told Mr.
5  Mills about Mr. Thomas' behavior?
6  MR. GREEN:  Same objection.
7  You may answer.
8  A.  Well, it is right here.  I mean
9  I don't remember talking about it, but
10  it's --
11  Q.  You didn't have a conversation
12  with Mr. McCormack about that particular
13  matter, whether Ms. Browne-Sanders had
14  told Mr. Mills?
15  A.  Not that I recall.
16  Q.  Did you tell Mr. McCormack that
17  Mr. Mills had asked you to meet with Mr.
18  Thomas in part because of locker room
19  language that Mr. Thomas had used?
20  MR. GREEN:  Objection to form.
21  Misstates prior testimony.  You may
22  answer, Mr. Olsen.
23  A.  Yes, that would be
24  uncharacterize -- your unfair
25  characterization of what I -- as I sort of

265

OLSEN

1  
2  indicated, I tried to keep Rusty informed
3  of what I am doing.  I -- I am pretty sure
4  I told him that Steve had asked me to do
5  this project, help Isiah build his
6  organization.  I may have mentioned some
7  of the things that he mentioned, but it
8  certainly wasn't characterized as that
9  because of that particular situation.
10  Q.  Mr. Mills specifically asked you
11  to deal with Mr. Thomas' language; isn't
12  that correct?
13  MR. GREEN:  Objection to form.
14  Misstates prior testimony.  You may
15  answer, Mr. Olsen.
16  A.  Not really.
17  Q.  Not really but he asked you to
18  meet with Mr. Thomas in part becasue of
19  locker room language?
20  A.  That was the original
21  conversation, and he mentioned it as -- as
22  one of a number of ways to describe -- he
23  didn't -- okay.  That is it.
24  Q.  Did you ever tell Mr. Thomas not
25  to use locker room language in the office?

67

01
Friday
April 2005

When we try to pick out anything by itself, we find it hitched to everything in the universe.
—John Muir

**Daily Notes**

Ricardo Garcia — re: Jared Maxwell
① have visio ?
② "Lisa Callahan

Steve Mills

Rusty

© FranklinCovey. All Rights Reserved. • FranklinCovey.com • Compass-Classic

---

01
Friday
April 2005

M T W T F S
3 4 5 6 7 8 9
10 11 12 13 14 15 16
17 18 19 20 21 22 23
24 25 26 27 28 29 30

✓ Completed    X Deleted    → In Process
→ Forwarded    ○ Delegated

**Prioritized Daily Task List**

↓ ABC

**Appointment Schedule**

8
9
10
11
12
1
2
3
4
5
6
7
8

**Daily Tracker**
Track expenses, e-mail, voice mail, or other information.

• FranklinCovey. All Rights Reserved. • FranklinCovey.com • Compass-Classic

CONFIDENTIAL        MSG    09213

# April 2005

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | | | Conf. call re... Mills... | 2 |
| 3 | 4 | 5 | 6 | 7 Email ethics class... tools/Mills re... KP ... back, building... Email reskls assessivas... training | 8 | 9 |
| 10 | 11 11:00 F. Hurley re. MSG Sports Talent Mgt. | 12 | 13 J. Merrell on statistical analyses of team performance | 14 | 15 R. McCormack re. research/benchmark ethics training | 16 |
| 17 | 18 Email to R. McCormack re. team psych roles | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 1:00 C. Forma, R. McCormack, HR staff Conf. call re. sales / business ethics | 27 | 28 | 29 S. Mills (rescheduled) | 30 |

CONFIDENTIAL          MSG   09214

## Olsen, Pete

| | |
|---|---|
| From: | Olsen, Pete |
| Sent: | Tuesday, December 27, 2005 3:45 PM |
| To: | McCormack, Rusty |
| Subject: | May 11 meeting notes |



Summary of
mments from Anuck

Rusty,
Per your request...
Pete

1



Summary of comments from Anucha Browne Sanders
Meeting on 5-11-05

[On the Knicks] its all about rule by fear. Behind the engaging smile Isiah Thomas is a thug. [Will] turn on you in a second. Doesn't trust anybody. Adversarial nature, doesn't see that has to be different in managing people. Street rules apply, profanity- degrades, undermines people if [he] thinks they're not on his side. A ticking time bomb- [would be] a media field day if anything goes public, doesn't get the importance of ethics and standards in a public company (v. an independent team like Dallas).

Dynamic extends thru the team- close (almost incestuous) with Steph Marbury, [their] backyards abut, [IT] talks with SM 'till 2AM- but [this]shouldn't be his role as a Pres / GM- what does this do to the coaches relationship with that player? SM colludes- tension and friction with those who don't go along (P. Hardaway, K. Thomas). SM doesn't communicate with them let alone motivate them- [it is a] gang (posse) mentality, [everybody is either] in or out, nothing in between. KT says "I'm not an ass kisser", SM tries to cut out those he feels don't respect his 'leadership'. SM doesn't really care about the team and others don't trust him- [thet know that] anything they say [to SM] will go to IT with a spin on it.

Everybody tries to curry IT's favor. Overall dynamic is that individuals try to take advantage of the dysfunction to further their own agenda, e.g. Frank Murphy will listen to something but then go to IT with that info as his 'confidante' of sorts. Individual agendas [prevail] over team agenda. Everybody is SCARED. FM wants to survive another year or so. He doesn't really have any hidden expertise- [we] could handle it if he left- even the NBA has support on salary cap management (his claim to fame). Nobody is really honest; IT has his posse (M. Aguirre, B. Suhr, and George Glymph. His admin, Raquel Brunette, is IT's cousin [she tells people] "no appointments during All My Children.

Enlist B. Suhr? IT may trust him some, same for Steve Mills, but Steve needs to be more direct, BS could maybe give IT direct feedback [there is a] question re. his trustworthiness too- still may be worth the risk.

IT too close to the team. He HOVERS- always at practice facility or in the aisle on game nights. IT says "we need better players" so he is apt to change out the roster leading to further instability.

[■■■■■■■■ was] seen leaving the same hotel with IT several times. The Knicks feared sexual harassment lawsuit if / when she was let go. Players never trusted or talked to her (she used to ask Jamie Matthews how the players were doing).

IT is all ego, narcissistic? 'Little king' quote. All the players have a lot of money, women, etc. and are used to getting whatever they want from an early age.

CONFIDENTIAL    MSG    09148

[Anucha says she has been] very direct with IT, e.g. "nobody tells you the truth". Went to Steve Mills rather than Human Resources on harassment (IT said [he was] "in love" with her), and wanted to go off site for a day to plan. Anucha said "no way".

The team is seriously fractured, low confidence, doesn't care, all [of them] got their millions.

Seems this should infuriate IT. If not, why? Or, it does, and he takes it out in unproductive ways?

Anucha [would] like to get with Steve and me but NOT say we talked. Proposes going to Steve [and say] what are you going to do about this? Maybe to ▮▮▮▮ ▮▮▮▮▮▮▮ too at some point

IT's style similar to Jim Dolan's [in that he gets] no real honest feedback, [has] tirades, threats.

Need some form of role negotiation [?] Steve is nice, Herb Williams is too nice, as was Cheney and Wilkens, and players need an ass kicker.

Does IT side with players when [there is] player-management conflict?

Steve is conflict / confrontation avoidant. Rehearse and video coach him too?

Can draw on IT's ego and desire to win championship, i.e. redeem self from questions about the Raptors, CBA, Pacers

IT is calculated and cunning. Knows exactly what he's doing.

IT [said] to Petra Pope Belton (pre-game) "make sure the refs are comfortable" What's that mean? Nobody supposed to be in the room with the refs pre-game. What would the media say if heard the Knicks were trying to influence the refs? PPB was Magic Johnson's girlfriend when IT was dating his current wife so they know each other well.

Role conflict between Anucha and IT. IT doesn't believe in much player-fan interaction to increase sales. Believes players should concentrate on BBall only.

IT an instigator with an explosive temper. With Detroit, Laimbeer was the enforcer, [would] clean up what IT started.

Doesn't see the cultural cues (corporate culture) so he doesn't differentiate street / ghetto norms from corporate ones? Anucha suggests sexual harassment training. Is training the answer? Culture is 'blame frame' and no responsibility.

CONFIDENTIAL        MSG    09149

# Exhibit 15



# News Release

New York Knickerbockers
Public Relations
Two Pennsylvania Plaza
New York, NY 10121-0091
Tel (212) 465-6471
Fax (212) 465-6498

FOR IMMEDIATE RELEASE

CONTACT:    Joe Favorito
(212) 465-6442

## ANUCHA BROWNE SANDERS PROMOTED
## TO SENIOR VICE PRESIDENT, MARKETING & BUSINESS OPERATIONS

**NEW YORK, May 13, 2002** -- The New York Knickerbockers today announced the promotion of Anucha Browne Sanders to the newly-created position of Senior Vice President, Marketing and Business Operations. Browne Sanders had held the position of Vice President of Marketing since joining the team on Nov. 20, 2000 and will assume her new role immediately.

"Anucha has done an outstanding job in a very short time with the Knicks and is one of the rising stars in the field," said Madison Square Garden President, Sports Team Operations Steve Mills. "This new position will allow her to more effectively set the strategy in leveraging the Knicks' brand."

"It is both an honor and a pleasure to accept this promotion," Browne Sanders said. "The potential of developing the Knicks brand is just beginning to be realized, and I am looking forward to working with our entire team to have us realize that potential."

In her new role, the Brooklyn, N.Y. native will be responsible for the day-to-day management of the business side of the Knicks front office and serve as the team's chief marketing officer. Her responsibilities will be overseeing all of the club's business agendas, including: partnerships, fan development, field marketing, event presentation, community relations, special events and new media. She will work closely with MSG's other sports properties - the New York Rangers and New York Liberty - in finding new and innovative ways to integrate the three very distinct and highly successful brands, and be the primary liaison between the team and the NBA.

Prior to joining the Knicks, Browne Sanders spent 11 years with IBM Corporation, serving in a number of roles, most recently as a Program Manager in IBM's Worldwide Sports Office. In that capacity, she was responsible for a number of IBM's marketing efforts during the Olympic Games (Atlanta 1996, Nagano 1998 and Sydney 2000), including corporate sponsorship efforts that allowed IBM to leverage their investment as a Worldwide Olympic sponsor.

The Northwestern University graduate is also no stranger to success on the hardwood. She was a three-time All Big Ten selection and two-time Big Ten Player of the Year for the Wildcats, finishing her career as the all-time leading scorer in Big Ten women's basketball history, as well as the school's all-time leader in points (2,307) and rebounds (951). Anucha was a two-time Wade Trophy nominee, 1985 Kodak All-American and in her senior season of 1984-85, and led the nation in scoring (a school record 31.5 ppg). She was also selected to play on the U.S. National Team that toured Europe and Asia following her graduation.

Browne Sanders, 38, holds a Bachelors of Science in Communications from Northwestern, and a Masters degree in Marketing communications from Florida State University. Anucha resides with her husband Roy and their three children in New Jersey.

The NBA's New York Knickerbockers basketball team, in its 56th year of operation, is part of Madison Square Garden, L.P.. Cablevision Systems Corporation owns a controlling interest in MSG L.P., which also include the New York Rangers (NHL), the New York Liberty (WNBA), the Hartford Wolf Pack (American Hockey League), the MSG Network, Fox Sports Net and the Madison Square Garden arena complex, located in the heart of the New York metropolitan area.

*###*

NBA World Champions: 1970, 1973 • Eastern Conference Champions: 1951, 1952, 1953, 1970, 1972, 1973, 1994, 1999 • Atlantic Division Champions: 1971, 1989, 1993, 1994

## MADISON SQUARE GARDEN

MSG 02495

# Exhibit 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANUCHA BROWNE SANDERS,

Plaintiff,

-against-

MADISON SQUARE GARDEN, L.P.,
ISIAH LORD THOMAS III AND JAMES L.
DOLAN,

Defendants.

Civil Case No. 06 Civ. 0589 (GEL)

ECF CASE

**DECLARATION OF
JONATHAN SCHINDEL, ESQ.**

JONATHAN SCHINDEL, ESQ., pursuant to 28 U.S.C. § 1746, declares:

1.      I have personal knowledge of the facts set forth in this Declaration.

2.      I am a season ticket holder of the New York Knicks and make this Declaration in order to state what I observed and heard during an open practice held by the Knicks on October 30, 2005.

3.      I attended the open practice with my wife and two children. A friend of mine, with whom I share season tickets, Robert Levy, also attended the practice.

4.      At the practice, Knicks coach Larry Brown had the team do some drills and scrimmage with each other. The event lasted about an hour and a half.

5.      During the event, I sat with my family next to the area where players enter the arena.

6.      While seated, I saw Isiah Thomas standing about a foot from my seat along with two other people. One of those people was a short, overweight, older gray-haired gentlemen. I am not sure who he was although he did look familiar to me. The other person was a woman who I later learned from press reports was Anucha Browne Sanders.

7.     I observed that the three of them stood very close together talking and watching the practice.   To the best of my recollection, they were together for approximately half the practice.

8.     On several occasions during the practice, someone new would approach Thomas and speak with him.  Sometimes he would introduce the person to Ms. Browne Sanders.

9.     During the introductions of Ms. Browne Sanders, he occasionally would place his hand on her arm and comment on her in various ways including comments like "She's so attractive," "She's so beautiful," "I can't concentrate on my work when she's around," and "She's easy on the eyes."

10.     As Thomas made these introductions, he appeared to be playing the role of the host of the event and Ms. Browne Sanders did not appear to object.  She was smiling during the introductions.  She stood by his side and she did not appear to me to be offended or upset.  I did not notice her moving away from him or trying to otherwise physically separate herself from him.

11.     Months later, when I read about the lawsuit in the newspaper, I recognized Ms. Browne Sanders from her picture in the paper as the woman that I had seen with Thomas during the open practice.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 23, 2007.

_____
Jonathan Schindel

_____
Witness