UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

ANUCHA BROWNE SANDERS,

                Plaintiff,

- against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD
THOMAS III and JAMES L. DOLAN,

                Defendants.
------------------------------------x

06 Civ. 0589 (GEL) (DF)

ECF CASE

STATEMENT OF MATERIAL FACTS
PURSUANT TO LOCAL CIVIL RULE 56.1

In compliance with Rule 56.1 of the United States District Court for the Southern District of New York, plaintiff Anucha Browne Sanders ("plaintiff" or "Browne Sanders") submits the following list of material facts that entitle her to partial summary judgment on her claims of retaliation for opposition to unlawful employment practices against defendant Madison Square Garden, L.P. ("MSG") and James L. Dolan ("Dolan") (collectively, "defendants").

Browne Sanders' Employment At MSG

    1.    Browne Sanders began her employment with MSG in November 2000 as a Vice President of Marketing for the New York Knickerbockers ("Knicks"), a National Basketball Association ("NBA") franchise owned by MSG. (Affidavit of Kevin T. Mintzer in Support of Plaintiff's Motion For Partial Summary Judgment, dated April 27, 2007 ("Mintzer Aff.") Ex. 15)[1] Browne Sanders was hired by Stephen Mills ("Mills"), who was then the

---

[1] The relevant portions of deposition transcripts are attached to the Mintzer Aff. and are designated by "[deponent's name] Dep. [page numbers]." Excerpts from plaintiff's first day of depositions are attached as Exhibit 1 to the Mintzer Aff. ("Browne Sanders I Dep.") Excerpts from Dolan's deposition are attached as Exhibit 2 to the Mintzer Aff. Excerpts from Isiah Thomas' deposition are attached as Exhibit 3 to the Mintzer Aff. Excerpts from Stephen Mills

Executive Vice President for Franchise Operations for MSG. (Mills Dep. 47-49) As Vice President of Marketing, Browne Sanders reported to Mills. (Id.)

2. On or about January 24, 2002, Mills completed a performance evaluation for Browne Sanders for the calendar year 2001. (Mills Dep. 56 and Mills Dep. Ex. 3) In that evaluation, Mills gave Browne Sanders an overall performance rating of "outstanding," which was the best of four possible ratings. (Mills Dep. Ex. 3)

3. On or about February 25, 2002, MSG awarded Browne Sanders a bonus of $30,500, representing approximately 18% of her 2001 base salary. (Dolan Dep. Ex. 16)

4. On or about March 11, 2002, MSG promoted Browne Sanders to the position of Senior Vice President, Marketing & Business Operations of the New York Knicks. (Mills Dep. 83-85 and Mills Dep Ex. 4) In this new role, plaintiff continued to report to Mills, who at that point had been promoted and held the position of President, MSG Sports Team Operations. (Mills Dep. Exs. 1 and 4)

5. On or about January 24, 2003, Mills completed an executive performance appraisal for Browne Sanders for the calendar year 2002. In that evaluation, Mills gave Browne

---

deposition are attached as Exhibit 4 to the Mintzer Aff. Excerpts from Rusty McCormack's deposition are attached as Exhibit 5 to the Mintzer Aff. Excerpts from Stephon Marbury's deposition are attached as Exhibit 6 to the Mintzer Aff. Excerpts from John Moran's deposition are attached as Exhibit 7 to the Mintzer Aff. Excerpts from Rochelle Noel's deposition are attached as Exhibit 8 to the Mintzer Aff. Excerpts from Karin Buchholz's deposition are attached as Exhibit 9 to the Mintzer Aff. Excerpts from Dan Gladstone's deposition are attached as Exhibit 10 to the Mintzer Aff. Excerpts from Faye Brown's deposition are attached as Exhibit 11 to the Mintzer Aff. Excerpts from Jeff Nix's deposition are attached as Exhibit 12 to the Mintzer Aff. Excerpts from Robert Levy's deposition are attached as Exhibit 13 to the Mintzer Aff. Excerpts from Peter Olsen's deposition are attached as Exhibit 14 to the Mintzer Aff. Deposition exhibits are included, where relevant, following the deponent's transcript and are designated by "[deponent name] Dep. Ex. [number]." Other documents are attached to the Mintzer Aff. and are designated "Mintzer Aff. Ex. [number]."

Sanders an overall performance rating of "outstanding," which was the best of four possible ratings. (Mills Dep. Ex. 6)

6. On or about February 14, 2003, Mills completed a performance planning and appraisal document in connection with MSG's Management Performance Incentive Plan ("MPIP"). In that document, Mills assigned Browne Sanders an overall rating of 5 on a scale of 1 to 5 (where 5 is the highest rating), denoting that Browne Sanders had "far exceeded expected performance." (Mills Dep. Ex. 7)

7. On or about April 30, 2003, MSG awarded Browne Sanders a bonus of $58,000, which represented approximately 29% of her 2002 base salary. (Dolan Dep. Ex. 16)

8. In or about early 2004, in connection with evaluating Browne Sanders' performance for the calendar year 2003 for purposes of the MPIP, Mills assigned Browne Sanders an overall rating of 5, which was the highest possible rating. (Mills Dep. Ex. 8; Mintzer Aff. Ex. 22)

9. In or about April 2004, MSG awarded Browne Sanders a bonus of $53,000, which represented approximately 25% of her 2003 salary. (Dolan Dep. Ex. 16)

10. In or about the early part of 2005, Mills completed an MPIP performance appraisal for Browne Sanders for the calendar year 2004. In that document, Mills assigned Browne Sanders an overall performance rating of 4 on a scale of 1 to 5, denoting that plaintiff's overall performance for 2004 "exceeded expected performance." (Mills Dep. Ex. 11)

11. In or about February 2005, MSG awarded Browne Sanders a bonus of $76,000, which represented approximately 36% of her 2004 salary. (Dolan Dep. Ex. 16)

12. On or about April 6, 2005, MSG made an "adjustment" and raised Browne Sanders' annual base salary from approximately $213,000 to $250,000, an increase of over 17%. This raise was made effective as of January 1, 2005. (Dolan Dep. Ex. 4)

Facts Related To Plaintiff's Sexual Harassment Claim[2]

13. In or about March 2004, Frank Murphy ("Murphy"), then a Senior Vice President of Basketball Operations, referred to plaintiff as a "bitch" during a conversation that Murphy and plaintiff were having in plaintiff's office. (Browne Sanders I Dep. 240; Brown Dep. 138-141)

14. In or about March 2004, Browne Sanders called Isiah Thomas ("Thomas") to complain about Murphy's unprofessional conduct because Murphy reported to Thomas. (Thomas Dep. 187-91; Thomas Dep. Ex. 4) During plaintiff's conversation with Thomas, Thomas admits that he may have said, referring to Browne Sanders' complaint about Murphy, "I'll fucking handle it." (Thomas Dep. 192-93)

15. In or about October 2004, Thomas asked Petra Pope ("Pope"), who was then the head of New York Knicks' dance team, to check on the referees before games. (Thomas Dep. 263-64)

16. Pope told Browne Sanders that Thomas had asked her on more than one occasion to check in on the referees and make them "happy," which Pope said meant that she should flirt with the referees. (Browne Sanders I Dep. 293-94)

17. Pope further told Browne Sanders that she did not want to continue to do what Thomas had asked her to do. (Browne Sanders I Dep. 296)

---

[2] The following is not a complete statement of the evidence supporting plaintiff's sexual harassment claim. Rather, the facts recited are only those as to which there is no dispute.

244280 v2

4

18. After a Knicks basketball game on or about December 29, 2004, Thomas embraced Browne Sanders, who pulled away from Thomas' embrace. (Nix Dep. 140-44)

19. A few minutes later, Browne Sanders told Jeff Nix ("Nix"), who was the Knicks' Assistant General Manager, that Thomas had told her that he was "in love" with Browne Sanders and compared his feelings to the movie "Love and Basketball." (Nix Dep. 145-46)

20. In or about January 2005, Browne Sanders was told by Faye Brown ("Brown"), her assistant, that Brown had witnessed Thomas looking at Browne Sanders up and down, while biting his lip and "checking [her] out." (Brown Dep. 112-19, 179-81)

21. On or about May 11, 2005, Browne Sanders had a discussion with Peter Olsen ("Olsen"), an MSG consultant who had been asked by Mills to help Thomas build his organization. (Olsen Dep. 78-79; 109-117)

22. Olsen's notes of his conversation with Mills reflect topic areas that Mills wanted Olsen to discuss with Thomas, including making Thomas aware that he should not use "locker room language." (Olsen Dep. 82, 89, 265; Olsen Dep. Ex. 2)

23. During Browne Sanders' May 11, 2005 conversation with Olsen, Browne Sanders told Olsen that Thomas had said to her that Thomas was in love with her. Browne Sanders also said to Olsen that Thomas should be given sexual harassment training. (Olsen Dep. 117, 262 Olsen Dep. Ex. 7)

24. In or about June 2005, Stephon Marbury ("Marbury"), a player on the Knicks, called Dan Gladstone ("Gladstone"), who was one of Browne Sanders' supervisees, to complain about the treatment of Hassan Gonsalves ("Gonsalves"). (Marbury Dep. 14-16; Gladstone Dep. 207-212; Gladstone Dep. Ex. 7)

25.  Gonsalves is a cousin of Marbury who, at Marbury's request, was hired by the Knicks to work in the field marketing group under Gladstone's supervision. (Marbury Dep. 34; Gladstone Dep. 173-74)

26.  During Marbury's telephone call with Gladstone, Marbury acknowledges that he referred to Browne Sanders as a "bitch" and that, in speaking of Browne Sanders, he said "fuck her." (Marbury Dep. 28-32)

27.  In or about October 30, 2005, at an open practice for the Knicks, Thomas made comments concerning Browne Sanders' physical appearance while having his arm around her. (Mintzer Aff. Ex. 16, Declaration of Jonathan Schindel, Esq. ¶ 9; Levy Dep. 21-22, 51-52)

28.  For example, at the open practice, Thomas stated that Browne Sanders was "beautiful" and "easy on the eyes." Thomas also made comments to the effect that it was "distracting to work with someone who was so attractive," and that he was "not getting any love" from Browne Sanders.[3] (Mintzer Aff. Ex. 16, Declaration of Jonathan Schindel, Esq. ¶ 9; Levy Dep. 21-22)

29.  On November 28, 2005, Gladstone sent Browne Sanders an e-mail in which Gladstone recounted, among other things, that Marbury had said the following in their June 2005 conversation, all referring to Browne Sanders: "No one likes that black bitch"; "fuck that black bitch, she thinks she runs the Knicks, she don't run shit"; "we don't like her, she thinks she tells us what to do, she don't tell us shit"; "fuck that black bitch, she ain't shit and we'll see what happens this year." (Gladstone Dep. Ex. 7; Gladstone Dep. 216) The following day,

---

[3]  Thomas denied making some of these statements at the open practice, but the comments were overheard by two Knicks fans who were attending the open practice, both of whom are third parties who have never even met plaintiff.

Browne Sanders forwarded this e-mail to Mills, who never followed up with Browne Sanders about Marbury's comments (Mills Dep. 315-16; Moran Dep. Ex. 2)

30. In or about late November 2005, plaintiff was informed by members of her staff that Gonsalves was making inappropriate comments of a sexual nature to female members of Browne Sanders' staff. Among the comments that Browne Sanders was told Gonsalves made to female members of her staff were the following:

- "I want you to fuck me. When are you coming to my apartment."
- "I want you to suck my dick."
- "I talked to Stephon and he said to tell you to stop playing."
- "When can I stick it in?"
- "I hear you give good head."
- "You look good, you look good, I bet that pussy is good too."

(Browne Sanders I Dep. Ex. 11)

31. Browne Sanders informed Mills about these comments on or about November 28, 2005. (Browne Sanders I Dep. Ex. 11)

32. In or about late November 2005, a ████████████ disclosed to plaintiff and Karin Buchholz ("Buchholz"), a Vice President who reported to plaintiff, that she had had sexual relations with Marbury when she was ████████ in April 2005. ████████ told Browne Sanders and Buchholz that this incident occurred in an automobile following an evening at a "gentleman's club." (Buchholz Dep. 56-59, 82-87; Moran Dep. 78-84, 86-100, 141-47, Moran Dep. Exs. 1 and 3)[4]

---

[4] The name of the intern has been redacted from the deposition transcripts and related exhibits.

33.  ▓▓▓▓ further disclosed to Browne Sanders and Buchholz that she had been drinking alcohol on the evening in question, that she was "out of it" when she had sex with Marbury, and that she was very ashamed about the episode. (Buchholz Dep. 56-59, 82-87; Moran Dep. 78-84, 86-100, 141-47, Moran Dep. Exs. 1 and 3)

34.  ▓▓▓▓ also told Browne Sanders and Buchholz that she had consensual sex with Marbury, but neither Buchholz nor Browne Sanders believed that ▓▓▓▓ was convincing in making this statement. ▓▓▓▓ also told Buchholz and Browne Sanders that she did not feel that she could say no to Marbury because of who he is. (Buchholz Dep. 56-59, 82-87; Moran Dep. 78-84, 86-100, 141-47, Moran Dep. Exs. 1 and 3)

35.  ▓▓▓▓ also told Buchholz and Browne Sanders that, following the incident in the automobile, Marbury sent her a text message stating "I want some more of that," but ▓▓▓▓ did not respond. (Buchholz Dep. 56-59, 82-87; Moran Dep. 78-84, 86-100, 141-47, Moran Dep. Exs. 1 and 3)

36.  In or about late November 2005, John Moran ("Moran"), MSG's Vice President of Employee Relations, became aware of the information set forth above concerning the alleged conduct of Gonsalves and Marbury as a result of conversations with Browne Sanders, Buchholz and ▓▓▓▓ (Moran Dep. 73-75; 77-115; 129-32; 141-47; Moran Dep. Exs. 1, 2 and 3)

37.  Following an investigation by Moran in or about late November 2005, Gonsalves was fired for violating MSG's sexual harassment policy. (Moran Dep. 73-74)

38.  Neither Moran nor anyone else at MSG questioned Marbury about his allegedly referring to Browne Sanders as, among other things, a "black bitch" or his conduct with

respect to the ████████ who worked on Browne Sanders' staff. Indeed, Marbury was not interviewed during the investigation at all. (Moran Dep. 99, 115; Marbury Dep. 47, 92)

39. On or about December 14, 2005, at a Knicks basketball game, Thomas approached Browne Sanders from the side, placed his arm on her shoulder and attempted to kiss her on the cheek. When Browne Sanders pulled away and would not allow him to kiss her, Thomas said, "No love today?" (Thomas Dep. 258-59)

40. On or about December 15, 2005, Browne Sanders sent an e-mail to Mills concerning her interaction with Thomas on the previous day. Mills did not respond to Browne Sanders concerning this e-mail. (Mills Dep. 397-99; Mills Ex. 16)

Browne Sanders' Discussions With Members Of Her Staff And Colleagues

41. At various times in 2004 and 2005, Browne Sanders spoke with other MSG employees about, among other things, interactions and difficulties that she had with Thomas and Marbury. Among the MSG employees that Browne Sanders spoke to concerning these matters were Buchholz, Nix and Brown. (Buchholz Dep. 124-33; Brown Dep. 151-59, 161-73, 179-82; Nix Dep. 76-81, 91-95, 140-48, 166-67, 281-82)

42. According to Buchholz, in or about November and December 2005, Browne Sanders initiated discussions with her in which Browne Sanders attempted to refresh Buchholz's recollection concerning matters that she had discussed with Browne Sanders in the past, including, among other subjects, her interactions and difficulties with Thomas and Marbury and their inappropriate conduct toward her. (Buchholz Dep. 124-133, 169-75)

43. According to Buchholz, on or about November 28, 2005, Browne Sanders requested that Buchholz send her an e-mail documenting incidents related to Marbury's stated

feelings toward Browne Sanders. Buchholz claimed that she was "uncomfortable"[5] with Browne Sanders' request that she document issues related to Marbury in an e-mail, but Buchholz further testified that all statements in her e-mail of November 28, 2005 were true, as was everything that Buchholz told MSG's internal investigators. (Buchholz Dep. 124-33, 179-85; Buchholz Dep. Ex. 1)

44. On or about November 28, 2005, Browne Sanders requested that Gladstone send her an e-mail reflecting the conversation that he had in June 2005 with Marbury. (Gladstone Dep. 215-16) According to Gladstone, all of the statements in the e-mail that are attributed to Marbury are accurate. (Gladstone Dep. 217-19)

45. On or about December 13, 2005, Browne Sanders requested that Gary Winkler ("Winkler"), the Vice President of Event Presentation, send her an e-mail documenting his conversations with Pope from 2004 concerning Pope being asked to check on the referees. (Browne Sanders I at 176-78) Winkler confirmed to MSG that the substance of this is e-mail is accurate. (Mintzer Aff. Ex. 17)

46. Browne Sanders requested members of her staff to memorialize certain incidents that she reasonably believed to be related to her complaint of sexual harassment, including Marbury's referring to her as a "black bitch," because plaintiff was going to use the documentation to insist that her manager deal with her sexual harassment complaints. (Browne Sanders I Dep. 333-34)

---

[5] Buchholz was not "uncomfortable" in requesting plaintiff to document a proposed raise that Buchholz was supposed to receive because she thought it was important to have a written record of the raise. (Buchholz Dep. 258-60)

Plaintiff's Counsel's Contacts With MSG

47. On or about December 2, 2005 and December 4, 2005, Browne Sanders and Buchholz jointly met with counsel. According to Buchholz, Browne Sanders requested that Buchholz accompany her to meet with counsel and Buchholz felt that she was required to go. (Buchholz Dep. 196-98)

48. On December 22, 2005, counsel for Browne Sanders met with counsel for MSG. (Mintzer Aff. ¶ 25; Mintzer Aff. Ex. 18) At that meeting, Browne Sanders' counsel stated, among other things, that Browne Sanders had been sexually harassed at MSG and provided MSG's counsel with information concerning Browne Sanders' claims. (Mintzer Aff. ¶ 25)

49. On December 22, 2005, plaintiff's counsel and MSG's counsel agreed to, inter alia, "attempt to expedite a negotiated, good faith resolution of Ms. Browne Sanders' claims." (Mintzer Aff. ¶ 26 and Ex. 19) Counsel also agreed that settlement discussions would be "confidential and deemed in furtherance of settlement pursuant to Fed. R. Evid. 408." (Id.)

50. Shortly after the December 22, 2005 meeting between plaintiff's counsel and MSG's counsel, MSG began an internal investigation of plaintiff's complaint. (Mintzer Aff. Ex. 18) MSG's internal investigation was conducted by, among others, Rochelle Noel ("Noel"), an in-house attorney for Cablevision, MSG's parent company, and Moran. (Id.)

51. Moran and Noel interviewed Browne Sanders as part of MSG's investigation on January 6, 2006. During the interview, Browne Sanders provided substantial detail about her sexual harassment complaint, including her claims that Thomas had repeatedly referred to her by sexist terms such as "bitch," and that he had repeatedly said that he was "in love" with her and made sexual overtures to her. (Mintzer Aff. Ex. 23)

52. Pursuant to the parties' understanding of December 22, 2005, on December 27, 2005, Browne Sanders' counsel conveyed a settlement proposal to MSG's counsel in connection with Browne Sanders' sexual harassment claims against MSG. (Mintzer Aff. ¶ 27)

53. Prior to the proposal of December 27, 2005, neither Browne Sanders nor anyone acting on Browne Sanders' behalf had made a monetary settlement or severance proposal to MSG. (Mintzer Aff. ¶ 27)

54. On December 30, 2005, MSG's counsel delivered to plaintiff's counsel a letter that included a counter-offer to settle plaintiff's claims. (Mintzer Aff. ¶ 28; Mintzer Aff. Ex. 20) The letter from MSG's counsel stated that MSG's counter-offer was being made pursuant to Fed. R. Evid. 408. The letter also stated that "MSG is ready, willing and able to continue as rapidly as possible our good-faith discussions in order to find a mutually acceptable resolution." (Id.)

55. On January 3, 2006, plaintiff's counsel orally conveyed another settlement proposal to MSG's counsel. (Mintzer Aff. ¶ 29)

56. On or about January 13, 2006, Noel and Moran finalized the findings of MSG's internal investigation in a document entitled Summary of Harassment Investigation ("Investigation Summary"). (Noel Dep. Ex. 14)

57. For the period between January 3, 2006 through January 19, 2006, MSG refused to allow Browne Sanders to return to work at MSG's offices. (Moran Dep. 201-06 & Moran Dep. Ex. 4)

58. For the period of December 24, 2005 through January 2, 2006, plaintiff's counsel and MSG's counsel agreed that plaintiff would be on paid vacation status. (Mintzer Aff. Exs. 19 & 20)

59. On or about January 19, 2006, Marc Schoenfeld ("Schoenfeld"), then MSG's Acting General Counsel, drafted a memorandum for Rusty McCormack ("McCormack"), MSG's Senior Vice President of Human Resources, entitled "Knicks Employee Relations Issues." (McCormack Dep. 223-227, 254-56 & McCormack Dep. Ex. 8)

60. The Knicks Employee Relations Issues memorandum purports to make recommendations "in light of th[e] [Investigation Summary]." (McCormack Dep. Ex. 8)

61. The Knicks Employee Relations Issues memorandum recommended that Thomas receive "one-on-one sessions with a qualified outside expert in order to sensitize him further with regard to the concerns that his conduct could raise in a corporate environment and in light of company policy." (McCormack Dep. Ex. 8)

62. The Knicks Employee Relations Issues memorandum further recommended that Mills have meetings with Cablevision's human resources officers to discuss what "lessons, if any, may be learned from the facts described in the [Investigation Summary]." (McCormack Dep. Ex. 8)

63. The Knicks Employee Relations Issues memorandum also states that Browne Sanders should be fired. (McCormack Dep. Ex. 8)

64. Neither Thomas nor Mills ever received the training recommended in the Knicks Employee Relations Issues memorandum. (McCormack Dep. 228-30)

65. On January 19, 2006, MSG's counsel informed plaintiff's counsel that MSG's investigation of plaintiff's internal complaint had been concluded. In that same conversation, MSG's counsel informed plaintiff's counsel that MSG was going to terminate Browne Sanders' employment, effective immediately. (Mintzer Aff. ¶ 30; Mintzer Aff. Ex. 21)

66. Buchholz did not disclose to anyone at MSG that she had accompanied Browne Sanders to meet with counsel until after Browne Sanders was dismissed and had filed suit against MSG. (Buchholz Dep. 65-66)

Dolan's Reasons For Terminating Plaintiff's Employment

67. Dolan made the decision to dismiss Browne Sanders from MSG, and he did so on his own, without consulting anyone else. (Dolan Dep. 87)

68. Dolan's stated reasons for firing Browne Sanders are: (1) that Mills had told Dolan in late 2005 that Browne Sanders had stated to Mills that she no longer wanted to work at MSG, but that she wanted to continue to work at MSG while looking for a new job; (2) that Dolan believed that Browne Sanders had performed poorly at budget meetings in July and August of 2005; (3) that Browne Sanders requested $6 million in severance, a proposal that Dolan believed was "ridiculous"; and (4) that Browne Sanders willfully violated MSG's policies by tampering with the investigation of her internal sexual harassment complaint. (Dolan Dep. 73-94, 177-192)

69. Dolan had no interactions with plaintiff from the summer 2005 budget meetings through and including the day in January 2006 that he decided to fire her. (Dolan Dep. 121-22)

70. During a helicopter ride between Bethpage, Long Island and Manhattan, McCormack told Dolan that Browne Sanders had interfered with the investigation by coercing her direct reports into corroborating her complaint and by having one of her direct reports accompany her to consult with counsel about her claims of harassment. (Dolan Dep. 74, 76-77, 81)

71. Dolan testified that, in the same helicopter ride, he told McCormack and Hank Ratner ("Ratner"), MSG's Vice Chairman, that he had decided to fire plaintiff because: (1) Browne Sanders had already said that she was not staying with the company; (2) she had tampered with an investigation that was begun on her behalf; and, (3) she had asked for 6 million dollars in severance. (Dolan Dep. 178)

72. All of the information that Dolan received concerning plaintiff's alleged "tampering" with MSG's investigation came from McCormack. (Dolan Dep. 201-202)

73. No one personally told Dolan that Browne Sanders had attempted to influence their statement to MSG's investigators. (Dolan Dep. 210)

74. McCormack testified that he has never discussed Browne Sanders with Dolan. (McCormack Dep. 19)

75. Dolan never saw the Knicks Employee Relations Issues memorandum. (Dolan Dep. 195-96)

76. McCormack signed the Knicks Employee Relations Issues memorandum after Dolan decided to fire Browne Sanders. (McCormack Dep. 261-62)

77. When asked to describe his understanding of what Browne Sanders actually did to influence her staff, Dolan responded, in relevant part:

> I believe she had discussions that -- that she brought -- that -- that she had people in her office. I mean it was reported to me that she had been tampering with the investigation . . . I mean the -- the -- you know, her responsibility at that point was to leave the investigation up to the people who she made the complaint to. The -- actually I don't think she had made the complaint at that point. That the -- I am a little fuzzy on whether -- whether it was right there before or after, but she clearly knew she was going to make a complaint that the -- and then she brought people in who reported to her. That the -- and proceeded to discuss the merits of her complaint. The -- and attempt to persuade the people underneath

her that her complaint had merit and that they -- and attempt to get them to back her up on her complaints. . . . [S]he violated the company policy, and she rendered herself at that point the -- the -- unemployable by the company. . . . [T]hat is why she was let go. (Dolan Dep. 200-02)

78. Dolan testified that Browne Sanders "could have continued on doing her job if she had not tampered with -- with those people, the -- but the combination of all of those things together -- and finally the tampering as being the last straw in that really led us to -- led me to the conclusion that her employment at the company was over with." (Dolan Dep. 190)

79. Dolan testified that Browne Sanders was fired because "she [was] utilizing her position that she is -- she [was] off through the company attempting to garner support for a complaint that the -- about sexual harassment." (Dolan Dep. 192)

80. Although Dolan acknowledged that he was "a little confused" about the relevant facts (Dolan Dep. 181), Dolan claimed that Browne Sanders initially made a demand for $6 million in severance and later said that, if she was not paid, she was going to "file this case . . . and make a big stink about it" (Dolan Dep. 179-80), which Dolan considered an attempt to "extort" MSG. (Dolan Dep. 181)

Dated: New York, New York
April 27, 2007

VLADECK, WALDMAN, ELIAS
& ENGELHARD, P.C.

By: _____
Anne C. Vladeck (AV 4857)
Kevin T. Mintzer (KM 4741)
Karen Cacace (KC 3184)
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300