# EXHIBIT

# A

Dockets.Justia.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANUCHA BROWNE SANDERS,                            06 Civ. 00589 (GEL)

                    Plaintiff,                   <u>SECOND AMENDED COMPLAINT</u>

      - against -                                  <u>ECF CASE</u>

MADISON SQUARE GARDEN, L.P.,                      PLAINTIFF DEMANDS
ISIAH LORD THOMAS III AND JAMES L. DOLAN,         <u>A TRIAL BY JURY    </u>

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff Anucha Browne Sanders ("Browne Sanders" or "plaintiff"), by her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complaining of defendants Madison Square Garden, L.P. ("MSG"), Isiah Lord Thomas III ("Thomas") and James L. Dolan ("Dolan") (collectively, "defendants"), alleges as follows:

NATURE OF CLAIMS

        1.    Browne Sanders is one of the most accomplished and highly-regarded women in professional sports. Based on her hard work and achievements, she became the second highest-ranking official for the New York Knickerbockers ("Knicks") and was responsible for all of the Knicks' business operations. Browne Sanders' career proceeded without impediment until December 2003 when MSG hired Isiah Thomas as President, Basketball Operations. Contrary to Thomas' carefully cultivated public persona, he is capable of abhorrent behavior in private. Soon after his hire, he began to sexually harass Browne Sanders, including calling her "bitch" and "ho" to her face. His hostility toward Browne Sanders went on for months, and he took pains to marginalize Browne Sanders and to prevent her from doing her job.

2.    Once Thomas realized that Browne Sanders was not going to recede in the face of Thomas' gender-based hostility, he took a new approach. He began to make sexual advances to Browne Sanders, repeatedly professing his love for her, making comments about her physical appearance, and suggesting that they go "offsite" together, a thinly veiled solicitation for sex. When Browne Sanders proved unreceptive to Thomas' advances, he continued to undermine her within the organization by, among other things, making derogatory remarks about her to the Knicks players, whose cooperation Browne Sanders needed to perform her marketing duties. The situation deteriorated to the point where Stephon Marbury ("Marbury"), the Knicks' star player, felt free to refer to Browne Sanders as a "black bitch" to other employees of the organization.

3.    Browne Sanders repeatedly complained about Thomas' conduct to her supervisor and others within the organization, but nothing was done to rein in Thomas. Left with no reasonable alternative, Browne Sanders engaged an attorney to press her complaints of harassment and discrimination again. That action finally led MSG to "investigate" Browne Sanders' claims. It also prompted immediate retaliation. As the investigation commenced, Browne Sanders was forced to take an unwanted "vacation," and was not permitted to come to work. Unbelievably, at the conclusion of the investigation, MSG's counsel informed plaintiff's counsel that Browne Sanders' claims were "not supported" and that she was being fired, effective immediately.

4.    Having not the faintest trace of a legitimate reason to dismiss Browne Sanders, who has always been a star performer, MSG has asserted, among other things, that her employment was being terminated because she had poor interactions with senior management, the very people who had either harassed Browne Sanders or who had allowed the harassment to

continue unchecked, and because she would not accept purported organizational changes instituted by Thomas.    The reality, of course, is that Browne Sanders was discharged in retaliation for her complaints of discrimination. The retaliatory decision to fire Browne Sanders was made by Dolan, among others. Thomas assisted that decision by falsely and with retaliatory animus stating to MSG that Browne Sanders would not accept his managerial changes. In firing Browne Sanders, defendants flouted the anti-discrimination laws to a degree rarely seen in the contemporary workplace.

5.    This proceeding is brought to remedy discrimination on the basis of sex in the terms and conditions of employment and retaliation for opposition to unlawful employment practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Human Rights Law, New York Executive Law § 296 et seq. (the "Executive Law"); and the Administrative Code of the City of New York § 8-107 et seq. (the "Administrative Code").  Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief pursuant to Title VII, the Executive Law and the Administrative Code.

## PARTIES, JURISDICTION AND VENUE

6.    Plaintiff is a citizen of New Jersey.  Until recently, plaintiff was employed by defendant MSG as a senior executive in the front office of the Knicks, a National Basketball Association ("NBA") franchise owned by MSG.

7.    Defendant MSG is a limited partnership organized under the laws of the State of Delaware with headquarters in New York.  On information and belief, MSG is wholly-owned by Rainbow Media Holdings, LLC ("Rainbow Media"), a limited liability company organized under the laws of the State of Delaware with headquarters in New York.  Rainbow Media, in turn, is a

wholly-owned subsidiary of Cablevision Systems Corporation ("Cablevision"), which is incorporated under the laws of the State of Delaware with headquarters in New York.

8.    Defendant Thomas is employed by MSG as the President, Basketball Operations and Head Coach of the Knicks. On information and belief, he is a citizen of the State of New York.

9.    Defendant Dolan is the Chairman of MSG, as well as the President and Chief Executive Officer of Cablevision. On information and belief, he is a citizen of the State of New York. Dolan has a substantial ownership interest in Cablevision and MSG.

10.    Jurisdiction of this Court is proper under 28 U.S.C. § 1332(a)(1), because the plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000. Jurisdiction of this Court is also proper under Title VII, 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. § 1331. The Court additionally has supplemental jurisdiction over the Executive Law and the Administrative Code claims pursuant to 28 U.S.C. § 1367.

11.    As the Southern District of New York is the district where a substantial part of the events giving rise to the claim occurred, venue is proper within this District pursuant to 28 U.S.C. § 1391(a)(2). Pursuant to § 8-502(c) of the City Law, prior to filing the Second Amended Complaint, plaintiff will serve a copy of the Second Amended Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

12.    Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against MSG on or about February 23, 2006, complaining of the acts of sex discrimination and retaliation alleged herein. On or about September 15, 2006, following an investigation which included reviewing documents and interviewing witnesses, the EEOC issued a determination, which found, inter alia, that there was "probable cause to believe that [MSG] violated Title VII of the Civil Rights Act of 1964, as amended, as alleged, by subjecting

[plaintiff] to a sexually hostile environment, failing to address her complaints of sexual harassment, and by retaliating against [plaintiff] for complaints of sexual harassment, leading to [plaintiff's] ultimate departure from [MSG]." On or about September 21, 2006, the EEOC issued plaintiff a notice of right to sue. Plaintiff has complied fully with the administrative prerequisites of Title VII.

## FACTUAL ALLEGATIONS

A.   Browne Sanders' Background and Employment With the Knicks

12.   Browne Sanders received a B.S. from Northwestern University in 1985. While at Northwestern, Browne Sanders was a standout college basketball player. She won a place on both the United States National Basketball Team and the Big Ten All Decade Team, was an NCAA National Scoring Champion, and was also a Women's Sports Foundation Kodak All-American. Following her graduation from Northwestern, Browne Sanders was awarded a two-year fellowship to Florida State University, where she earned a Masters of Science in communications.

13.   After receiving her master's degree, Browne Sanders began a successful business career, working first at Eastman Kodak and later at IBM. While at Kodak, Browne Sanders assisted in coordinating and promoting Kodak's Harlem Week sports program, and while at IBM, she worked on web-based marketing for the Olympic Games. Browne Sanders was ultimately promoted at IBM to the position of Program Manager, World Wide Sports Office – Corporate Marketing, where she was responsible for corporate marketing support programs for IBM's sponsorship of the Olympics.

14.    Browne Sanders began working for MSG in 2000 as the Knicks' Vice President of Marketing. Her first two years of working with the team were marked by success and glowing personnel reviews.

15.    In the spring of 2002, Browne Sanders was promoted to Senior Vice President, Marketing and Business Operations. In that role, Browne Sanders reported to Steve Mills ("Mills"), President and Chief Operating Officer of MSG. She also had a dotted line reporting relationship to the President of Basketball Operations for the Knicks. Soon after Browne Sanders' promotion, she was named to the Sports Business Journal's prestigious "Forty Under Forty" list, which honors the top forty professionals in sports under the age of forty.

16.    As Senior Vice President, Marketing and Business Operations, Browne Sanders was responsible for the day-to-day management of the business side of the Knicks' front office; she served as the team's chief marketing officer; and she acted as the primary liaison between the Knicks and the NBA. Browne Sanders also oversaw all of the Knicks' business activities and revenue streams, including partnerships, ticketing, fan development, field marketing, event presentation, community relations, special events and new media. In addition, Browne Sanders supervised thirty people, and was a mentor to many female employees. Browne Sanders was the only female member of the Knicks' senior management team.

17.    Following her promotion in 2002, Browne Sanders continued to enjoy professional success and received praise for her performance. In her performance reviews for 2002 and 2003 she received an overall rating of "5," the highest ranking on a 1 to 5 scale.

B.    <u>Thomas Begins to Harass and Discriminate Against Browne Sanders</u>

18.    On or about December 22, 2003, Thomas was named President of Basketball Operations for the Knicks.

19.    On or about February 20, 2004, many of the Knicks players went out to celebrate Marbury's birthday and, upon information and belief, stayed out very late. On or about February 21, 2004, the Knicks held a community relations/marketing event that was organized by Browne Sanders and attended by many of the Knicks' players.

20.    On or about the time of the events described in the preceding paragraph, the Knicks played a game and lost. After the game ended, in the Knicks' locker room, Thomas announced that the players would no longer be required to do any community events. Soon after his announcement, Thomas grabbed Browne Sanders' arm and pulled her into a small room to the side of the team's locker room. He yelled that the team was not going to do "any more f--king events." Browne Sanders calmly told Thomas that the league required the Knicks to do community events, and that he should discuss his concerns with Mills. Thomas continued to scream at Browne Sanders, calling her a "f--king bitch," among other things. He eventually stormed out of the room.

21.    At Browne Sanders' next weekly meeting with Mills, Browne Sanders told Mills about Thomas' post-game outburst, as well as his announcement that the Knicks would no longer be doing community service events. Mills did not respond.

22.    On March 23, 2004, Frank Murphy ("Murphy"), then Senior Vice President of Basketball Operations and Thomas' Chief of Staff, appeared in Browne Sanders' office, stood over her desk, and began screaming at her. Among other things, Murphy told Browne Sanders that she was a "bitch."

23.    After Murphy left her office, Browne Sanders called Thomas and described Murphy's statements. Thomas immediately began to berate her, calling her a "bitch" and a "ho," among other expletives. Thomas demanded to know what Browne Sanders' job responsibilities

were. As they continued to discuss Browne Sanders' job functions, Thomas continued to curse at her and refer to her by sexist and demeaning terms.

24.    The next day, Mills asked Browne Sanders to attend a meeting. When Browne Sanders arrived, Mills and Thomas were already present in Mills' office. During the meeting, Browne Sanders described her roles and responsibilities to Thomas, and Mills corroborated her description. At one point during the meeting, Mills stepped out of his office. Thomas immediately resumed cursing at Browne Sanders. Once Mills returned, Thomas stopped. Thomas instructed Browne Sanders and Mills that he did not want Browne Sanders to talk to his staff or the players. He told Browne Sanders that she should go through Murphy when she needed to contact the team.

25.    After Thomas left the room, Browne Sanders told Mills what had happened when Mills had been absent. Mills neither apologized nor said that he would chastise Thomas. Browne Sanders asked what she should do when Thomas spoke inappropriately to her; Mills said that she was doing what she was supposed to be doing. Browne Sanders asked how she could do her job if she could not speak to Thomas' staff or the Knicks; Mills told her to accommodate Thomas.

26.    Shortly after the meeting, Browne Sanders sent an e-mail message to Murphy, copying Mills and Thomas, telling Murphy that he could not threaten her and swear at her. Mills told her not to send those types of e-mail messages.

27.    Throughout the late spring and summer of 2004, Thomas refused to be involved in sales-related activities that were Browne Sanders' responsibility. Moreover, for almost the entire balance of 2004, Thomas acted in a very hostile manner towards Browne Sanders on nearly every occasion that the two interacted.

28.    On information and belief, Thomas told members of his basketball operations staff that Browne Sanders was a "bitch," and further stated, referring to Browne Sanders, that they did not have to take direction from "that bitch."

C.    <u>Thomas Begins To Make Sexual Advances to Browne Sanders</u>

29.    On or about December 29, 2004, Thomas' behavior toward Browne Sanders significantly changed. Rather than continue to address Browne Sanders in a hostile and abusive manner, Thomas began to approach Browne Sanders with sexual overtures. After the Knicks game on or about December 29, 2004, Thomas stopped Browne Sanders, hugged her tightly, and said that he had determined why he and Browne Sanders "had problems" with one another. Thomas told Browne Sanders that he was "in love" with her, and said that they were "so much alike." Thomas compared his feelings to the movie "Love and Basketball."

30.    Shortly thereafter, Browne Sanders told Mills that Thomas had become even more inappropriate in his interactions with her, and that he should be given sexual harassment training. Mills did not respond.

31.    After December 30, 2004, Thomas regularly told Browne Sanders that he was in love with her or made comments to that effect. On each occasion, Browne Sanders made clear to Thomas that his advances were unwelcome. Examples of Thomas' inappropriate, harassing and unwelcome conduct towards Browne Sanders in 2005 include the following:

(a)    Thomas asked Browne Sanders on more than one occasion if she would meet with him outside of the office or "offsite." Browne Sanders understood these requests as sexual advances, which she refused. Browne Sanders told Mills about Thomas' requests on at least one occasion, and also told Mills that she had refused to meet him offsite because she was uncomfortable with him.

(b)      On or about March 14, 2005, Thomas told Browne Sanders that he was "very attracted" to her and "in love" with her. He pointed to a scar above Browne Sanders' right eye and compared it to a similar scar that he had above his eye. Thomas then repeated that he was in love with her and said, "I know you think I'm inappropriate but I'm in love with you." Browne Sanders said that Thomas was ridiculous and inappropriate and walked away.

(c)      On October 30, 2005, while Browne Sanders was watching the team practice, Thomas told Browne Sanders that if she "stayed close to him" he would make her "a lot of money."

(d)      On or about December 15, 2005, Thomas approached Browne Sanders and hugged her and tried to kiss her. Browne Sanders pulled away and Thomas said, "What, I can't get any love from you today?" Browne Sanders walked away without saying anything.

32.      On May 11, 2005, and June 13, 2005, Browne Sanders met with a human resources management consultant hired by MSG. The consultant told Browne Sanders that Mills had asked him to develop a program for Thomas because he had problems with women. Browne Sanders told the consultant in detail about Thomas' harassing and discriminatory conduct. On information and belief, MSG took no action to remedy the problems that Browne Sanders raised with the consultant.

D.      Other Inappropriate and Sexist Conduct By Thomas

33.      On or about October 14, 2004, before a game, a female employee of the Knicks told Browne Sanders that Thomas had instructed her to flirt with certain men connected to the

game and to make them happy. Browne Sanders had a follow up conversation with the female employee the following day.

34.    On or about October 18, 2004, Browne Sanders met with Mills and told him about her conversations with the female employee. Browne Sanders told Mills that Thomas was putting the organization in a bad position. Browne Sanders also told Mills, among other things, that the female employee could accuse Thomas of sexual harassment.

35.    In a meeting with Thomas in early 2005, Thomas told Browne Sanders that he was pushing to get more Sunday noon games on the schedule. Thomas said that he was working with the concierges of the hotels frequented by the visiting teams to have the concierges direct players to certain nightclubs -- including strip clubs -- that Thomas had established relationships with. Thomas said that his plan was to induce visiting players to go to these clubs on Saturday night, and get them intoxicated so that they would not be prepared to play on Sunday. Browne Sanders was incredulous that Thomas' "basketball strategy" included getting opposing teams drunk at strip clubs.

E.    Defendants Undermine Browne Sanders' Ability to Do Her Job

36.    In the fall of 2004, Mills told Browne Sanders that Dolan said she needed to create new jobs for two of Marbury's cousins, Hassan Gonsalves ("Gonsalves") and Tasheem Ward ("Ward"). After reviewing their resumes and interviewing both men, Browne Sanders recognized that they were completely unqualified. On or about November 10, 2004, Browne Sanders told Mills about the problems with Gonsalves and Ward, but Mills told her that she needed to create jobs for them anyway and that they needed to be on staff by the following Monday, November 15.

37.    This was not the first occasion that Dolan had insisted the she hire someone unqualified. Previously, Dolan had required that Browne Sanders create a position within her team for Vernon Manuel ("Manuel"), who had worked as Dolan's landscaper, dated Dolan's daughter, and was not qualified to work with the Knicks. While employed by MSG, Manuel forged his manager's signature on multiple occasions, stole from the company, and acted in a hostile and aggressive manner with many women on the staff, including Browne Sanders.

38.    On information and belief, the male senior managers within the Knicks organization were not required to hire unqualified individuals such as Gonsalves, Ward and Manual.

39.    Gonsalves was ultimately fired by MSG, at Browne Sanders' urging, because he engaged in repeated and flagrant sexual harassment. His firing did not occur, however, until he had sexually harassed several women on the staff and had on numerous occasions defrauded the company. That conduct would not have occurred if MSG had accepted Browne Sanders' determination that Gonsalves should not have been hired.

40.    In March 2005, Browne Sanders received her most recent performance evaluation from Mills. While the evaluation was still strong, Browne Sanders received a 4 out of 5. The only substantive criticism in the review was that Browne Sanders needed to do a better job "maintaining relationships," which, on information and belief, referred to plaintiff's relationship with Thomas. Browne Sanders had difficulty "maintaining a relationship" with Thomas because he had repeatedly sexually harassed her and verbally berated her, as Mills well knew.

41.    On information and belief, because Browne Sanders rejected Thomas' sexual advances, he continued to undermine her ability to do her job.

42.    For example, in a meeting in early 2005, Mills confirmed to Browne Sanders that the players were not cooperating with her marketing efforts because of Thomas. Indeed, the current marketing campaign promoting the Knicks features cardboard cut-outs of the Knicks players because Thomas has generally refused to make the players available to Browne Sanders' team for marketing purposes. By contrast, the marketing campaign for the New York Rangers, another MSG-owned franchise, utilizes approximately seventeen players in its current marketing campaign.

43.    On information and belief, Thomas has made negative comments about Browne Sanders to Marbury. On or about November 28, 2005, Browne Sanders was told by a member of her staff that Marbury had made numerous hostile and sexist comments about her to others in the organization. Among the things that Marbury has said concerning Browne Sanders are the following:

(a)    "No one likes that black bitch"

(b)    "F--k that black bitch, she thinks she runs the Knicks, she don't run shit"

(c)    "F--k that black bitch, she ain't shit and we'll see what happens this year"

44.    On or about November 29, 2005, Browne Sanders met with Mills. Browne Sanders told Mills about Marbury's statements, and also said that she regarded the comments as personally threatening. Mills said that that Marbury's hostility was based on things that Thomas was saying to Marbury about Browne Sanders. Browne Sanders said that she had enough of Thomas' harassment.

45.    Shortly after their meeting, Mills called Browne Sanders and said, in substance, that if Browne Sanders persisted in raising harassment claims, she should be prepared for Thomas to spread a damaging and false rumor about Browne Sanders. In response, Browne

Sanders asked whether she should retain an employment lawyer; Mills said that she should not do so.

F.     Browne Sanders Retains Counsel and Is Subject to Retaliation

46.     After her meeting and subsequent telephone call with Mills, and in light of Thomas' continuing harassment and Marbury's comments, Browne Sanders determined that she needed to engage an attorney to protect herself against further harassment and discrimination.

47.     On or about December 22, 2005, Browne Sanders' counsel informed MSG's counsel about the harassment and discrimination that Browne Sanders had experienced. This was not the first time that MSG learned the information that Browne Sanders' counsel had conveyed. Browne Sanders had previously told Mills, her direct supervisor, about much of the harassment that she was subjected to during various meeting in 2004 and 2005. In addition, Browne Sanders had described Thomas' harassing and discriminatory conduct to the human resources consultant hired by MSG.

48.     Once Browne Sanders raised her complaints through counsel, MSG purported to undertake an investigation of Browne Sanders' claims. Browne Sanders fully cooperated with MSG's investigation.

49.     Soon after Browne Sanders raised her complaints through counsel, MSG prohibited her from coming to her office or to Madison Square Garden. Browne Sanders protested, both directly and through counsel, that MSG's decision to force her out of work was retaliatory. Nevertheless, Browne Sanders was not permitted to return to work while the investigation was pending. On information and belief, the individuals Browne Sanders had accused of harassment, including Thomas, were permitted to continue to work throughout MSG's investigation.

50.    On January 19, 2006, counsel for MSG called counsel for Browne Sanders and said that MSG had completed its investigation of Browne Sanders' discrimination and harassment complaint. MSG's attorney said that the result of the investigation was that Browne Sanders' complaint was "not supported." Furthermore, MSG's counsel said that MSG had decided to "separate" Browne Sanders from MSG, effective immediately. MSG's attorney told Browne Sanders' attorney that he should advise Browne Sanders of her dismissal.

51.    According to MSG's attorney, MSG had decided to fire Browne Sanders because she was unable to function effectively in her position, she had poor interactions with MSG's senior management, and the organization could not function effectively if she remained employed there.

52.    MSG's asserted reasons for firing Browne Sanders are transparently pretextual. Prior to her dismissal, Browne Sanders had never been warned that any aspect of her performance was lacking. In fact, as discussed above, her performance evaluations had been uniformly very strong. Moreover, the allegedly "poor interactions" that she had with MSG's senior management were directly related to the harassment and discrimination that Browne Sanders suffered. MSG fired Browne Sanders to retaliate against her for raising claims of sexual harassment and gender discrimination, and to send a message to other employees that similar complaints will not be tolerated. MSG fired Browne Sanders with full knowledge that it is illegal to punish an employee for complaining of harassment and discrimination.

53.    The retaliatory decision to fire plaintiff because she opposed defendants' unlawful employment practices was made by Dolan, among others. Thomas intentionally aided and abetted the decision to fire plaintiff because she opposed and refused to submit to the illegal conduct described herein. Specifically, on information and belief, because plaintiff opposed and

refused to submit to the illegal conduct described herein, Thomas falsely, without basis, and with retaliatory animus, stated to MSG's senior management that plaintiff would not accept changes in the organization that Thomas had purportedly implemented. Although MSG knew Thomas' statements to be false or otherwise incorrect, MSG has used Thomas' statements concerning Browne Sanders as a pretext to justify Browne Sanders' retaliatory dismissal.

## FIRST CAUSE OF ACTION

### Sex Discrimination Under The Executive Law Against MSG and Thomas

54.    Plaintiff repeats and realleges paragraphs 1-53 as if fully set forth herein.

55.    By the acts and practices described above, including but not limited to creating a hostile work environment for plaintiff because of her sex and ignoring plaintiff's complaints of discrimination, MSG and Thomas discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of the Executive Law.

56.    Defendant Thomas is liable under the Executive Law as an aider and abettor of the discrimination against plaintiff.

57.    Defendant MSG is liable as plaintiff's "employer" pursuant to the Executive Law.

58.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of MSG's and Thomas' discriminatory acts.

## SECOND CAUSE OF ACTION

### Sex Discrimination Under the Administrative Code Against MSG and Thomas

59.    Plaintiff repeats and realleges paragraphs 1-58 as if fully set forth herein.

60.    By the acts and practices described above, including but not limited to creating a hostile work environment for plaintiff because of her sex and ignoring plaintiff's complaints of

discrimination, MSG and Thomas discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of the Administrative Code.

61.    Defendant Thomas is liable under the Administrative Code as an aider and abettor of the discrimination against plaintiff.

62.    Defendant MSG is liable as plaintiff's "employer" pursuant to the Administrative Code.

63.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of MSG and Thomas' discriminatory acts.

64.    MSG and Thomas acted intentionally and with malice and/or reckless indifference to plaintiff's statutory rights.

<u>THIRD CAUSE OF ACTION</u>

<u>Retaliation Under the Executive Law Against All Defendants</u>

65.    Plaintiff repeats and realleges paragraphs 1-64 as if fully set forth herein.

66.    By the acts and practices described above, including but not limited to forcing plaintiff to stop working and terminating plaintiff's employment, defendants retaliated against plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of the Executive Law.

67.    Defendant MSG is liable as plaintiff's "employer" pursuant to the Executive Law.

68.    Defendant Thomas is liable under the Executive Law as an aider and abettor of the retaliation against plaintiff.

69.    Defendant Dolan is liable under the Executive Law as plaintiff's "employer" and is also liable under the Executive Law as an aider and abettor of the retaliation against plaintiff.

70.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of defendants' retaliatory acts.

## FOURTH CAUSE OF ACTION

### Retaliation Under the Administrative Code Against All Defendants

71.    Plaintiff repeats and realleges paragraphs 1-70 as if fully set forth herein.

72.    By the acts and practices described above, including but not limited to forcing plaintiff to stop working and terminating plaintiff's employment, defendants retaliated against plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of the Administrative Code.

73.    Defendant MSG is liable as plaintiff's "employer" pursuant to the Administrative Code.

74.    Defendant Thomas is liable under the Administrative Code as an aider and abettor of the retaliation against plaintiff.

75.    Defendant Dolan is liable under the Administrative Code as plaintiff's "employer" and is also liable under the Administrative Code as an aider and abettor of the retaliation against plaintiff.

76.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of defendants' retaliatory acts.

77.    Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's statutory rights.

## FIFTH CAUSE OF ACTION

### Sex Discrimination Under Title VII Against MSG

78.    Plaintiff repeats and realleges paragraphs 1-77 as if fully set forth herein.

79.    By the acts and practices described above, including but not limited to creating a hostile work environment for plaintiff because of her sex and ignoring plaintiff's complaints of discrimination, MSG discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of Title VII.

80.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of MSG's discriminatory acts.

81.    MSG acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

## SIXTH CAUSE OF ACTION

### Retaliation Under Title VII Against MSG

82.    Plaintiff repeats and realleges paragraphs 1-81 as if fully set forth herein.

83.    By the acts and practices described above, including but not limited to forcing plaintiff to stop working and terminating plaintiff's employment, MSG retaliated against plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of Title VII.

84.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of defendants' retaliatory acts.

85.    MSG acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter an award:

(a)    declaring the acts and practices complained of herein are in violation of Title VII, the Executive Law and the Administrative Code;

(b)    enjoining and permanently restraining these violations of the Title VII, the Executive Law and the Administrative Code;

(c)    directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d)    directing defendants to place plaintiff in the position she would be in but for defendants' discriminatory and retaliatory treatment of her, and to make her whole for reputational damage and all earnings she would have received but for defendants' discriminatory and retaliatory treatment, including, but not limited to, wages, bonuses, equity interests, pension and other lost benefits;

(e)    directing defendants to reinstate plaintiff;

(f)    directing defendants to pay plaintiff punitive damages as provided by Title VII and the Administrative Code;

(g)    awarding plaintiff such interest as is allowed by law;

(h)    awarding plaintiff her reasonable attorneys' fees and costs; and

(i)    granting such other and further relief as the Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a

trial by jury in this action.


Dated: New York, New York
      November 10, 2006

                VLADECK, WALDMAN, ELIAS
                  & ENGELHARD, P.C.


By: _Anne Vladeck_

           Anne C. Vladeck (AV 4857)
           Kevin T. Mintzer (KM 4741)
           Karen Cacace (KC 3184)
           Attorneys for Plaintiff
           1501 Broadway, Suite 800
           New York, New York 10036
           (212) 403-7300

# EXHIBIT B

L. Peter Parcher (LPP 8096)
O. Peter Sherwood (OPS 3076)
Lisa Horwitz (LH 8168)
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, New York 10036
(212) 790-4500

  – and –

Sue Ellen Eisenberg (SE 4713) – *pro hac vice*
Lucetta V. Franco – *pro hac vice*
Eisenberg & Bogas, P.C.
33 Bloomfield Hills Parkway, Suite 145
Bloomfield Hills, Michigan  48304-2945

*Attorneys for Isiah Thomas*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANUCHA BROWNE SANDERS, | Civil Case No. 06 Civ. 0589 |
| Plaintiff, | ECF CASE |
| -against- | |
| MADISON SQUARE GARDEN, L.P. AND ISIAH LORD THOMAS III, | |
| Defendants. | |

DEFENDANT ISIAH THOMAS' ANSWER TO THE SECOND AMENDED COMPLAINT
OF PLAINTIFF ANUCHA BROWNE SANDERS

  Defendant Isiah Thomas by and through his counsel, in answer to the Second Amended

Complaint, states:

  Anucha Browne Sanders, a disgruntled former employee of Madison Square Garden

("MSG"), has, upon information and belief, initiated this Second Amended Complaint in order

to, among other things, harm Thomas whom she blames for her professional difficulties and

secure an unwarranted sum of money from Thomas and MSG.  Many of the allegations are

without any factual support, and those that have some semblance of accuracy have been distorted. Thomas treated plaintiff in a professional manner and, in good faith, exercised his best judgment as President of Basketball Operations concerning the appropriate business relationship and day to day contact between Basketball Operations and Business Operations – where plaintiff was a Senior Vice President. Upon information and belief, plaintiff's inability to accept the changes that occurred under Thomas' leadership fueled her antipathy towards Thomas and are reflected by this meritless lawsuit.

Thomas denies that he sexually harassed plaintiff, retaliated against plaintiff or otherwise violated New York State Human Rights Law, New York Executive Law § 296 et seq. or the Administrative Code of the City of New York § 8-107 et seq. and answers the Second Amended Complaint as set forth below.

## NATURE OF THE CLAIMS

1.      Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations of the first three sentences of paragraph 1 of the Second Amended Complaint and denies the remaining allegations of paragraph 1.

2.      Thomas denies the allegations of the first three sentences of paragraph 2 of the Second Amended Complaint and denies knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of paragraph 2.

3.      Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 of the Second Amended Complaint.

4.      Thomas denies the allegations of the fourth sentence of paragraph 4 of the Second Amended Complaint and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 4.

5.      The allegations of paragraph 5 of the Second Amended Complaint are allegations of law to which no response is required.  Thomas states that plaintiff is not entitled to any relief under Title VII, the Executive Law or the Administrative Code.

## PARTIES, JURISDICTION AND VENUE

6.      Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 of the Second Amended Complaint except admits the allegations of the second sentence of paragraph 6.

7.      Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 of the Second Amended Complaint.

8.      Thomas admits the allegations of paragraph 8 of the Second Amended Complaint.

9.      Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Second Amended Complaint.

10.     The allegations of paragraph 10 of the Second Amended Complaint are allegations of law to which no response is required.

11.     The first sentence of paragraph 11 of the Second Amended Complaint contains allegations of law to which no response is required.  Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph

12.     Thomas admits that Plaintiff filed a charge of discrimination against MSG with the Equal Employment Opportunity Commission ("EEOC") and that the EEOC issued a determination of probable cause, but denies the remaining allegations.  On information and belief, Thomas admits that the EEOC issued Plaintiff a notice of right to sue.

## FACTUAL ALLEGATIONS

12.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in plaintiff's second paragraph 12 of the Second Amended Complaint.

-3-

13.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Second Amended Complaint.

14.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Second Amended Complaint.

15.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second and fourth sentences of paragraph 15 of the Second Amended Complaint and denies the remaining allegations of paragraph 15.

16.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Second Amended Complaint.

17.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Second Amended Complaint.

18.     Thomas admits the allegations of paragraph 18 of the Second Amended Complaint.

19.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Second Amended Complaint except admits that, on or about February 21, 2004, he attended a community relations/marketing event, organized by plaintiff and attended by Knicks' players and staff.

20.     Thomas denies the allegations of paragraph 20 of the Second Amended Complaint except admits that, on or about the time of the events described in the preceding paragraph, the Knicks lost a basketball game.

21.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Second Amended Complaint.

22.    Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 of the Second Amended Complaint.

23.    Thomas denies the allegations of paragraph 23 of the Second Amended Complaint.

24.    Thomas denies the allegations of paragraph 24 of the Second Amended Complaint except admits that, in or about March 2004, he attended a meeting with plaintiff and Steve Mills, in which plaintiff's and Thomas' respective roles and responsibilities in the organization were discussed.

25.    Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 of the Second Amended Complaint.

26.    Thomas denies the allegations of paragraph 26 of the Second Amended Complaint except admits that, on or about the time specified in the Second Amended Complaint, plaintiff sent an email to Frank Murphy.  That email speaks for itself.

27.    Thomas denies the allegations of paragraph 27 of the Second Amended Complaint.

28.    Thomas denies the allegations of paragraph 28 of the Second Amended Complaint.

29.    Thomas denies the allegations of paragraph 29 of the Second Amended Complaint.

30.    Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 of the Second Amended Complaint.

31.     Thomas denies the allegations of paragraph 31 of the Second Amended Complaint except admits that on or about December 15, 2005, Thomas greeted plaintiff by placing his hand on her shoulder and attempting to kiss her on the cheek.

32.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32 of the Second Amended Complaint.

33.     Thomas denies instructing any female employee in such a manner and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 33 of the Second Amended Complaint.

34.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 of the Second Amended Complaint.

35.     Thomas denies the allegations of paragraph 35 of the Second Amended Complaint.

36.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36 of the Second Amended Complaint.

37.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37 of the Second Amended Complaint.

38.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 of the Second Amended Complaint.

39.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 of the Second Amended Complaint.

40.     Thomas denies the allegations of the last sentence of paragraph 40 of the Second Amended Complaint and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 40.

41.     Thomas denies the allegations of paragraph 41 of the Second Amended Complaint.

42.     Thomas denies the allegations of paragraph 42 of the Second Amended Complaint except admits that the New York Rangers utilize its players in its marketing campaigns.

43.     Thomas denies the allegations of the first sentence of paragraph 43 of the Second Amended Complaint and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 43.

44.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44 of the Second Amended Complaint.

45.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45 of the Second Amended Complaint.

46.     Thomas denies the allegations of the second clause of the first sentence of paragraph 46 of the Second Amended Complaint and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 46.

47.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47 of the Second Amended Complaint.

48.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48 of the Second Amended Complaint.

49.     Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 49 of the Second Amended Complaint except admits that he worked during the relevant time period.

50.    Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 50 of the Second Amended Complaint.

51.    Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 51 of the Second Amended Complaint.

52.    Thomas denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32 of the Second Amended Complaint.

53.    Thomas denies the allegations of paragraph 53 of the Second Amended Complaint.

## FIRST CAUSE OF ACTION

54.    In answer to paragraph 54 of the Second Amended Complaint, Thomas repeats and re-alleges paragraphs 1-53 of this Answer as if fully set forth herein.

55.    Thomas denies the allegations of paragraph 55 of the Second Amended Complaint with respect to himself and, upon information and belief, denies them with respect to MSG.

56.    Thomas denies the allegations of paragraph 56 of the Second Amended Complaint.

57.    Upon information and belief, Thomas denies the allegations of paragraph 57 of the Second Amended Complaint with respect to MSG, and to the extent the allegations contain conclusions of law, they require no response.

58.    Thomas denies the allegations of paragraph 58 of the Second Amended Complaint with respect to himself and, upon information and belief, denies them with respect to MSG.

## SECOND CAUSE OF ACTION

59.    In answer to paragraph 59 of the Second Amended Complaint, Thomas repeats and re-alleges 1-58 of this Answer as if fully set forth herein.

60.    Thomas denies the allegations of paragraph 60 of the Second Amended Complaint with respect to himself, and upon information and belief, denies them with respect to MSG.

61.    Thomas denies the allegations of paragraph 61 of the Second Amended Complaint.

62.    Upon information and belief, Thomas denies the allegations of paragraph 62 of the Second Amended Complaint with respect to MSG and, to the extent the allegations contain conclusions of law, they require no response.

63.    Thomas denies the allegations of paragraph 63 of the Second Amended Complaint with respect to himself and, upon information and belief, denies them with respect to MSG.

64.    Thomas denies the allegations of paragraph 64 of the Second Amended Complaint with respect to himself, and upon information and belief, denies them with respect to MSG.

## THIRD CAUSE OF ACTION

65.    In answer to paragraph 65 of the Second Amended Complaint, Thomas repeats and re-alleges paragraphs 1-64 of the Answer as if fully set forth herein.

66.    To the extent the allegations of paragraph 66 of the Second Amended Complaint relate solely to MSG and James L. Dolan ("Dolan"), they require no response by Thomas. To the extent they relate to Thomas, Thomas denies the allegations.

67.     The allegations of paragraph 67 of the Second Amended Complaint relate solely to MSG and therefore require no response by Thomas, and to the extent the allegations contain conclusions of law, they require no response.

68.     Thomas denies the allegations of paragraph 68 of the Second Amended Complaint.

69.     The allegations of paragraph 69 of the Second Amended Complaint relate solely to Dolan and therefore require no response by Thomas, and to the extent the allegations contain conclusions of law, they require no response.

70.     To the extent the allegations of paragraph 70 of the Second Amended Complaint relate solely to MSG and Dolan, they require no response by Thomas.  To the extent they relate to Thomas, Thomas denies the allegations.

### FOURTH CAUSE OF ACTION

71.     In answer to paragraph 71 of the Second Amended Complaint, Thomas repeats and re-alleges paragraphs 1-70 of this Answer as if fully set forth herein.

72.     To the extent the allegations of paragraph 72 of the Second Amended Complaint relate solely to MSG and Dolan, they require no response by Thomas.  To the extent they relate to Thomas, Thomas denies the allegations.

73.     The allegations of paragraph 73 of the Second Amended Complaint relate solely to MSG and therefore require no response by Thomas, and to the extent the allegations contain conclusions of law, they require no response.

74.     Thomas denies the allegations of paragraph 74 of the Second Amended Complaint.

75.    The allegations of paragraph 75 of the Second Amended Complaint relate solely to Dolan and therefore require no response by Thomas, and to the extent the allegations contain conclusions of law, they require no response.

76.    To the extent the allegations of paragraph 76 of the Second Amended Complaint relate solely to MSG and Dolan, they require no response by Thomas.  To the extent they relate to Thomas, Thomas denies the allegations. .

77.    To the extent the allegations of paragraph 77 of the Second Amended Complaint relate solely to MSG and Dolan, they require no response by Thomas.  To the extent they relate to Thomas, Thomas denies the allegations.

<u>FIFTH CAUSE OF ACTION</u>

78.    In answer to paragraph 78 of the Second Amended Complaint, Thomas repeats and re-alleges paragraphs 1-77 of this Answer as if fully set forth herein.

79.    The allegations of paragraph 79 of the Second Amended Complaint relate solely to MSG and require no response by Thomas.

80.    The allegations of paragraph 80 of the Second Amended Complaint relate solely to MSG and require no response by Thomas.

81.    The allegations of paragraph 81 of the Second Amended Complaint relate solely to MSG and require no response by Thomas.

<u>SIXTH CAUSE OF ACTION</u>

82.    In answer to paragraph 82 of the Second Amended Complaint, Thomas repeats and re-alleges paragraphs 1-81 of this Answer as if fully set forth herein.

83.    The allegations of paragraph 83 of the Second Amended Complaint relate solely to MSG and require no response by Thomas.

84.    The allegations of paragraph 84 of the Second Amended Complaint relate solely

to MSG and require no response by Thomas.

85.    The allegations of paragraph 85 of the Second Amended Complaint relate solely to MSG and require no response by Thomas.

## AFFIRMATIVE DEFENSES

86.    The Second Amended Complaint, or portions thereof, fails to state a claim upon which relief can be granted.

87.    Thomas acted lawfully and in good faith without any intent to harass, discriminate or retaliate against plaintiff.

88.    Thomas treated plaintiff in a fair, non-harassing manner, without reference to any protected basis.

89.    Plaintiff has failed to mitigate her damages.

90.    Plaintiff has failed to state a claim for recovery of any damages, including punitive damages.

91.    Plaintiff has failed to exhaust her administrative remedies.

92.    Some or all of plaintiff's claims are barred by the applicable statute of limitations.

93.    All or some of plaintiff's claims are barred in that plaintiff, by reason of her own conduct and actions, has waived any right to assert the claims set forth in her Second Amended Complaint.

94.    Plaintiff's claims are frivolous and groundless and known to plaintiff to be frivolous and groundless and without foundation in fact or law. Furthermore, this suit is being pursued in bad faith for vexatious reasons for the purpose of harassing defendants.

WHEREFORE, Thomas respectfully requests judgment herein as follows:

1. Dismissing the Second Amended Complaint with prejudice;

2. Awarding to Thomas attorneys' fees, costs, and disbursements for this action;

3. For such other and further relief as to this Court seems just and proper.

Dated: New York, New York.
      December 1, 2006

TO:

Judith P. Vladeck (JV 2908)
Kevin T. Mintzer (KM 4741)
Vladeck, Waldman, Elias & Engelhard, P.C.
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300

*Attorneys for Plaintiff*

Ronald M. Green (RG-7766)
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York 10177-1211
(212) 351-4500

     – and –

Christopher P. Reynolds (CR-8338)
Amber L. Kagan (AK-7973)
Morgan Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178
(212) 309-6000

*Attorneys for Defendant Madison Square
Garden, L.P.*

MANATT, PHELPS & PHILLIPS, LLP

BY:  s/ L. Peter Parcher
    L. Peter Parcher (LPP 8096)
    O. Peter Sherwood (OPS 3076)
    Lisa Horwitz (LH 8168)
7 Times Square
New York, NY 10036
(212) 790-4500

     – and –

Sue Ellen Eisenberg (SE 4713) – *pro hac vice*
Lucetta V. Franco – *pro hac vice*
Eisenberg & Bogas, P.C.
33 Bloomfield Hills Parkway, Suite 145
Bloomfield Hills, Michigan 48304-2945

*Attorneys for Defendant Isiah Thomas*

80378168.1

-13-

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ANUCHA BROWNE SANDERS,

     Plaintiff,

   - against -

MADISON SQUARE GARDEN, L.P., ISIAH
LORD THOMAS III, and JAMES L. DOLAN,

     Defendants.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

06 Civ. 0589 (GEL)

PLAINTIFF'S RESPONSE TO
DEFENDANTS MADISON SQUARE
GARDEN, L.P., and JAMES L.
DOLAN'S SECOND SET OF
INTERROGATORIES AND REQUEST
FOR DOCUMENTS

To:  Theresa M. Holland, Esq.
   Epstein, Becker & Green, P.C.
   250 Park Avenue
   New York, New York 10177
   Attorneys for Madison Square Garden

    **PLEASE TAKE NOTICE** that, pursuant to Rules 26, 33 and 34 of the Federal

Rules of Civil Procedure, and Civil Rules 26.2, 26.3 and 33.3 of the Local Rules of the United

States District Court for the Southern District of New York, Plaintiff Anucha Browne Sanders

("plaintiff") hereby responds to the Second Set of Interrogatories and Request for Documents of

Defendants Madison Square Garden, L.P. and James L. Dolan (collectively "defendants").

## GENERAL OBJECTIONS

   1.  Plaintiff responds to the interrogatories and request for documents subject to

the accompanying objections, without waiving and expressly reserving all such objections. Plaintiff

also submits these responses subject to, without intending to waive, and expressly reserving: (a) any

objections as to relevancy, materiality, privilege, and admissibility in the above-captioned litigation,

or any other action, of any information provided in response to the requests; and (b) the right to

object to other discovery procedures involving or relating to the subject matter of the documents produced in response to the requests.

2.    If plaintiff locates any additional responsive documents becomes aware of additional information responsive to the interrogatories, she reserves the right to produce the documents or information and to assert additional objections.

3.    Plaintiff objects to the interrogatories and request for documents to the extent they seek communications protected by the attorney-client privilege or documents protected by the work product doctrine, including, but not limited to, communications between plaintiff and her counsel or documents that report, reflect, summarize or relate specifically to such communications, and documents prepared in anticipation of litigation by or on behalf of plaintiff or her counsel. Plaintiff does not intend to waive any such objections by the production of any of the foregoing documents.

4.    Plaintiff objects to the requests to the extent they purport to impose discovery obligations exceeding those imposed by the Federal Rules of Civil Procedure and the local rules of this Court.

5.    Plaintiff objects to each and every of document requests to the extent that such document request is overly broad, ambiguous, vague, unclear, unduly invasive of privacy, and not relevant or material to, or reasonably calculated to lead to, the discovery of evidence admissible in this litigation.

6.    Plaintiff objects to each and every Document Request, and to "Definition and Instruction" number 4, to the extent defendants seek the production of documents not in the possession, custody or control of plaintiff.

# RESPONSES TO INTERROGATORIES

Interrogatory No. 1

Identify all persons whom Plaintiff believes has knowledge or information concerning the reputational injuries claimed in this lawsuit, and/or the reputational damages sought in this lawsuit and, for each such person, specify the date of Plaintiff's most recent communication with him or her.

Response to Interrogatory No. 1:

Plaintiff objects to Interrogatory No. 1 on the grounds that it is vague, ambiguous, and purports to impose discovery obligations exceeding those imposed by Local Civil Rule 33.3(a) of the Southern District of New York. Subject to the foregoing and the general objections, plaintiff states that anyone who has read or viewed media accounts of this case containing statements about plaintiff by defendants or defendants' representatives, employees, agents or attorneys may have knowledge of plaintiff's reputational injuries. Furthermore, plaintiff specifically identifies the following persons as individuals who may have knowledge or information concerning the reputational injuries claimed in this lawsuit, and/or the reputational damages sought in this lawsuit:

    Bob Beaudine
    Eastman & Beaudine
    7201 Bishop Road, Suite 220
    Plano, Texas 75024
    (972) 312-1012

    Buffy Fillipel
    TeamWork Consulting, Inc.
    22550 McCauley Road
    Shaker Heights, OH 44122
    (216) 360-1790

    Kathy Mangan
    Baker Parker and Associates, Inc.
    Five Concourse Parkway, Suite 2440
    Atlanta, GA 30328
    (770) 804-1996

240722 v1

3

Jeff Nix

Interrogatory No. 2

Identify all persons with whom Plaintiff, or anyone acting on her behalf, has had any communications about the reputational injuries claimed in this lawsuit, and/or the reputational damages sought in this lawsuit and, for each such person, specify the date of Plaintiff's most recent communication with him or her.

Response to Interrogatory No. 2:

Plaintiff objects to Interrogatory No. 2 on the grounds that it is vague, ambiguous, and purports to impose discovery obligations exceeding those imposed by Local Civil Rule 33.3(a) of the Southern District of New York. Plaintiff also objects to the extent the interrogatory seeks information concerning any expert witness that plaintiff may call at trial concerning the plaintiff's reputational injuries and damages. Plaintiff will identify any such expert in accordance with the Court's orders in this action. Subject to the foregoing and the general objections, plaintiff identifies the following persons with whom she has had communications concerning the reputational injuries claimed in this lawsuit, and/or the reputational damages sought in this lawsuit:

> Bob Beaudine
> Buffy Fillipel
> Kathy Mangan
> Jeff Nix

Interrogatory No. 3

Identify all communications, documents and other physical evidence, or information of a similar nature, likely to be relevant to the claim of reputational injury being asserted or reputational damages being sought in this action and where such documents are located.

Response to Interrogatory No. 3:

Plaintiff objects to Interrogatory No. 3 on the grounds that it is vague and ambiguous. Subject to the foregoing and the general objections, plaintiff identifies the following

documents as documents that are likely to be relevant to the claim of reputational injury being asserted or reputational damages being sought in this action: Document Nos. 4139-4176.

<u>Interrogatory No. 4</u>

.                    Identify the method used to compute the reputational damages being sought by Plaintiff in this lawsuit and compute the amount of reputational damages being sought by Plaintiff.

<u>Response to Interrogatory No. 4:</u>

Plaintiff objects to this request on the grounds that it requires plaintiff to compute her reputational damages before fact discovery has been completed on this matter and before any deadline set by the Court to complete expert discovery.

## RESPONSES TO DOCUMENT REQUESTS

Document Request No. 5

Produce all documents concerning or supporting any witnesses to the reputational injuries being claimed in this lawsuit.

**Response to Document Request No. 5**

Plaintiff objects to this request on the grounds that it is vague, ambiguous, overly broad, seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is protected by the attorney-client privilege and work product doctrine. Subject to the foregoing and the general objections, plaintiff produces Document Nos. 4139-4176 as responsive to this request. In addition, plaintiff responds that she will provide information concerning any expert she retains related to her claim for reputational damages in accordance with the discovery schedule.

Document Request No. 6

Produce all communications, documents and other physical evidence, or information of a similar nature concerning the claim of reputational injury being asserted or reputational damages being sought in this action.

**Response to Document Request No. 6**

Plaintiff objects to this request on the grounds that it is vague, ambiguous, overly broad, seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is protected by the attorney-client privilege and work product doctrine. Subject to the foregoing and the general objections, plaintiff produces Document Nos. 4139-4176 as responsive to this request.

<u>Document Request No. 7</u>

Produce all documents concerning or supporting the computation of reputational damages claimed to have been suffered by Plaintiff that are being sought in this action.

<u>**Response to Document Request No. 7**</u>

Plaintiff objects to this request on the grounds that it is vague, ambiguous, overly broad, seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is protected by the attorney-client privilege and work product doctrine. Subject to the foregoing and the general objections, plaintiff produces Document Nos. 4139-4176 as responsive to this request.

Dated: New York, New York

October 18, 2006

VLADECK, WALDMAN, ELIAS
& ENGELHARD, P.C.

By:

Anne C. Vladeck (AV 4857)
Kevin T. Mintzer (KM 4741)
Karen Cacace (KC 3184)
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300

# EXHIBIT D

52

1          ANUCHA BROWNE SANDERS

2              MS. VLADECK:  No.  November

3      2000.

4      A      November of 2000 --

5      Q      November 2000 to --

6      A      To December of 2003.

7      Q      Okay.  During that term, how

8  often would you say you attended a

9  basketball practices?  And I am not asking

10 you to give me a computerized answer, just

11 your best assessment.

12     A      Just occasionally.  It was out

13 of my way to get up to the training

14 facility.  So just occasionally.

15     Q      I just don't know what

16 "occasionally" means.

17              Could you be a little more

18 specific than "occasionally"?

19     A      Maybe three times during the

20 season.

21     Q      Three times each season you

22 get up there?

23     A      Yeah.

24              MS. VLADECK:  Objection to

25      form.

1          ANUCHA BROWNE SANDERS

2    into the locker room.  It was less

3    frequent.

4         Q     And how about the practice

5    facility under Isiah Thomas?

6         A     Very rarely.

7         Q     And how about -- well, you

8    only --

9         A     Let me clarify that.

10              I went up to the practice

11   facility when we had events that were

12   taking place there and if there was a need

13   to go up there to meet with somebody.

14        Q     I don't mean outside of the

15   times when the team was practicing.

16              When the team was practicing,

17   I believe you said that under Layden you

18   went approximately three times at the

19   most; is that right?

20              MS. VLADECK:  Objection to

21        fQrm.

22        A     Well, then, I should clarify

23   that because, under Layden, I probably sat

24   through three practices or so.

25        Q     That's what I'm saying.

343

ANUCHA BROWNE SANDERS

1

2    to Isiah.

3        Q      What did he say they were?

4        A      Exactly what I said.  I was

5    P&L manager responsible for the business

6    operations, the business side of the team,

7    the revenue streams, marketing, new media,

8    Web, game presentation, community

9    relations, alumni relations.  We went

10   through fan development and all the rest

11   of my responsibilities.  And he confirmed

12   that that was my role.

13       Q      How about budgets, was that

14   your responsibility?

15       A    Yeah.  It was a collaborative

16   responsibility, yes.

17       Q      Collaborative with who?

18            MS. VLADECK:  Objection to

19       form.

20       A      Well, as P&L manager, there

21   were parts of the P&L that I was

22   responsible for that were directly

23   influenced by my peers.  So there were

24   other people in the senior vice president

25   role that influenced and also had direct

344

1          ANUCHA BROWNE SANDERS

2    responsibility for parts of the P&L.

3         Q     But the ultimate

4    responsibility for P&L and the budgeting

5    at the Garden, as related to the Knicks,

6    was yours, correct?

7              MS. VLADECK:  Objection to

8         form.

9         A     I would consider myself a P&L

10   manager, and in that role, I had people

11   providing me information.

12              The ultimate ownership of the

13   P&L --

14        Q     Sorry.  I was rude, but I did

15   not mean to be rude.  Would you mind

16   saying it again.

17        A     In my role, I was the P&L

18   manager.  So I owned the revenue streams.

19   The budget process was a collaborative

20   process, and it involved myself, it

21   involved Mark Piazza who oversaw P&L for a

22   number of different entities, as well as

23   Brian LaFemina who oversaw suites and

24   tickets and some of the ticket sales

25   responsibilities.

345

ANUCHA BROWNE SANDERS

1

2      Q      Whatever your responsibilities

3  were concerning the budget, do you feel

4  you were competent to do that?

5      A      Yes.

6      Q      And you didn't have any

7  particular difficulty in doing that?

8      A      No.  I think -- I didn't

9  feel -- it was a difficult -- and it was a

10  laborious process, but I didn't have

11  difficulty.

12      Q      Nobody criticized you for the

13  way you presented the budget?

14           MS. VLADECK:  Objection to

15      form.

16      A      Criticize?  No.  It wasn't

17  criticism on how I presented the budget.

18      Q      Nobody recommended that you

19  take a course so you can learn how to do

20  it?

21      A      No.  That wasn't -- no.

22      Q      That never happened?

23      A      No one criticized how I

24  presented the budget and recommended that

25  I take a class because of that, no.

463

ANUCHA BROWNE SANDERS

1

2     A     I think he contributed to the

3  decision to fire me.

4     Q     And that's how he damaged you?

5           Any other way?

6     A     I think that he damaged me,

7  along with Madison Square Garden, in the

8  spreading damaging rumors about me.

9     Q     What damaging rumors did he

10  spread about you?

11     A     Things that were in the press.

12     Q     He spread rumors about you in

13  the press?

14     A     Yes.

15     Q     What did he say in the press

16  that was a rumor?

17     A     I don't remember what his

18  exact quotes were.  He had a press

19  conference.

20     Q     You had a press conference,

21  didn't you?

22     A     Yes, I did.

23     Q     You had a press conference at

24  the time you filed the Complaint, didn't

25  you?

465

ANUCHA BROWNE SANDERS

1

2      Q     You can't say specifically

3  what they were.

4            But anything else?

5      A     He's damaged my reputation.

6      Q     In any other way other than by

7  the ways you just described?

8      A     I think he's affected my

9  ability to get other employment.

10     Q     Have you tried to get other

11  employment since you left the Garden?

12     A     Yes, I have.

13     Q     With whom have you tried?

14     A     Quite a number of people.

15     Q     If I leave a space, will you

16  tell me who those people were?

17     A     Georgetown University,

18  Gatorade, Verizon Wireless, TENNIS

19  Magazine.

20     Q     What magazine?

21     A     TENNIS.

22     Q     Tents?

23           MS. VLADECK:   TENNIS.

24           MR. PARCHER:   TENNIS Magazine.

25     A     TENNIS Magazine.

466

ANUCHA BROWNE SANDERS

1

2     Q    Are you a tennis player?

3        Sorry.  I withdraw that

4 question.  I've only got a few more

5 minutes.

6     A    Northwestern University.

7 Rutgers University.

8     Q    Only because of the pressure

9 of time, if you have more, you can fill it

10 in at the time you see your depo.  You'll

11 have a chance to put in more after you

12 reflect on it.

13        But are you saying that these

14 are companies or institutions that you

15 applied a job for, they turned you down

16 because your reputation has been damaged;

17 is that your position?

18       MS. VLADECK:  Objection to

19     form?

20     A    Yes, I would agree.  Yes.

21     Q    Did anybody say that to you?

22 At any of the institutions or companies

23 that you applied to, up to this moment in

24 time, has anybody said to you something

25 about your reputation has been damaged and

467

ANUCHA BROWNE SANDERS

1

2    therefore they are not hiring you?

3         MS. VLADECK:   Objection to

4      form.

5         A     No.   Not that I can recall,

6    no.

7         Q     So what's the basis of your

8    saying that it's because your reputation

9    was damaged?

10        A     I interpret a lot of the

11   rejection and certain places I've applied

12   for jobs is not wanting to be associated

13   with somebody involved in something of

14   this magnitude.

15        Q     Has anybody told you that?

16        A     Not in those direct words.

17        Q     Did they tell it to you

18   indirectly?

19        A     I've had executive recruiters

20   reference the case and the difficulty --

21   or the importance of being able to present

22   to their clients, who were firms that are

23   hiring, risk assessment, media assessment

24   of all their clients that they are

25   presenting.

# EXHIBIT
# E

```
 1              THOMAS
 2      A.    Yes.
 3      Q.    Okay.
 4      A.    There was a -- the competitor
 5   was the NBA.  The NBA developmental league
 6   ended up becoming the competitor of the
 7   CBA, and in order to stay in the CBA -- I
 8   mean to stay in the NBA I had to resign
 9   all managerial duties and say that I was
10   going to sell the CBA because the NBA
11   deemed it a conflict of interest.
12      Q.    Okay.
13      A.    You want to take that case?
14      Q.    If you pay me like you pay these
15   lawyers, absolutely.
16            (Laughter.)
17      Q.    Your -- what was your next
18   position after being coach of the Indiana
19   Pacers?
20      A.    I became president of the New
21   York Knicks basketball operations.
22      Q.    And when did you become
23   president of the New York Knicks
24   basketball -- basketball operations?
25      A.    That would be December of 2003 I
```

1                    THOMAS

2            (Record read.)

3       A.    No, I never said that.

4       Q.    Did you ever say -- did you ever

5    complain to anyone regarding Anucha's

6    ability to do -- to perform her duties.

7       A.    No.

8       Q.    Did you ever ask that her -- any

9    of Ms. Anucha Browne-Sanders'

10   responsibilities be cut?

11      A.    No.

12      Q.    Did you ever ask that any of her

13   responsibilities be changed?

14      A.    No.

15      Q.    Did you ever tell anyone at MSG

16   senior management that plaintiff would not

17   accept the changes that you wanted to

18   implement?

19      A.    No.

20      Q.    Okay.  Mr. Thomas, the statement

21   upon information and belief, what

22   is -- what is your basis that you make

23   this upon information and belief, that

24   plaintiff's inability to accept the

25   changes that occurrednd under Thomas'

# EXHIBIT F

1                          DOLAN

2    Mr. Pollichino's work performance to you?

3        A.    I don't recall recently his

4    doing that, but Mr. Ratner is the vice

5    chair and is my number two at the company

6    and is involved essentially with

7    everything that I am involved with and

8    assists me sometimes quite significantly

9    with all -- all of my areas of

10   responsibility.

11       Q.    Do you know Frank Murphy?

12       A.    I know Frank Murphy, yes.

13       Q.    Did you have any role in the

14   hiring of Frank Murphy?

15       A.    No.

16       Q.    What was your understanding of

17   his position when he was employed at The

18   Garden?

19            MR. GREEN:  Objection to form.

20   You may answer.

21       A.    I believe Mr. Murphy was a

22   financial analyst for the basketball

23   operations.

24       Q.    Did you ever have any

25   interaction with him?

```
 1                    DOLAN

 2    that I specifically remember was when Mr.

 3    Mills reported to us that Ms. -- Ms.

 4    Browne was leaving the company.

 5         Q.    What did he say and what did

 6    anyone else there say?

 7         A.    Mr. Mills reported that he had

 8    had a meeting with -- with Ms. Browne and

 9    that Ms. Browne had informed him that she

10    did not wish to continue on in her

11    position, and I believe that Mr. Ratner

12    was -- I don't know if I could use the

13    right word.  I don't know if I could say

14    he was pleased, but Mr. Ratner thought

15    that that was a good development for the

16    company.

17         Q.    Anybody else say anything else?

18         A.    Mr. Mills reported that he was

19    going to work on an arrangement where Ms.

20    Browne could -- could leave the company.

21    The -- on some sort of graduated basis,

22    continue to perform her duties, look for

23    another position.  I believe Ms. -- that

24    Steve reported that Ms. Browne asked

25    her -- asked him to help in locating
```

Page 49

1                           DOLAN

2    another position not in the company.

3         Q.    In this conversation, did Mr.

4    Mills report that Ms. Browne-Sanders was

5    concerned about her safety?

6         A.    I don't recall that.

7         Q.    Was there any discussion at this

8    meeting about The Garden providing

9    security for Ms. Browne-Sanders?

10        A.    I don't recall that either.

11        Q.    Did Mr. Mills say why

12   Ms. Browne-Sanders said she was leaving

13   the company?

14              MR. GREEN:    Objection to form,

15   but you may answer.

16        A.    My recollection of it is -- is

17   that it was due to Ms. Sanders not feeling

18   that she could do the job.  Why that was I

19   could -- you know, I would only speculate.

20   She had had a very difficult time in the

21   position, so I don't think that that made

22   it a big surprise to us.

23        Q.    What do you mean by she had a

24   very difficult time in the position?

25        A.    Well, starting from July of that

Page 60

```
 1                DOLAN
 2   In 2005, Anne?
 3             MS. VLADECK:    Yes.
 4        A.    No, I don't believe I had in
 5   that position.
 6        Q.    When you keep saying in that
 7   position, what position are you referring
 8   to?
 9        A.    Well, I think that Ms. Saunders
10   had a job prior to this, the -- where she
11   was not in charge of the direct marketing
12   the  -- of the Knicks, that she was in a
13   position where she was in charge of
14   portions of the execution of -- of that
15   marketing.  The -- and the -- I believe
16   that she did a good job at that time,
17   the -- that was Mr. Mills -- I believe his
18   statements to me in -- his rationale in
19   promoting her into the position that he
20   did promote her into was that she had done
21   a good job in the job she had before.
22   The -- and it was a promotion, and
23   necessarily with a promotion you make a
24   move up the ladder of the company that you
25   are working for, and you take on
```

Page 61

1              DOLAN

2    additional duties, responsibilities, et

3    cetera, and hopefully you've done a good

4    job and the -- you are ready to do that.

5    It became clear in July that Ms. Sanders

6    was not ready to do that, that it was in

7    my opinion a mistake to -- to promote her

8    to that position, but she was in the --

9    the position.

10        Q.    And to the best of your

11   recollection, when did she become

12   responsible for the areas that you thought

13   she was not ready for?

14        A.    Again, I -- you know, it is

15   prior to that July period.  She had enough

16   experience that she was not considered new

17   at that July meeting and whether that was

18   six months or a year I have -- you know, I

19   can't tell you.

20        Q.    So you formed an impression in

21   the June, July, August 2005 time frame

22   that Ms. Browne-Sanders did not have the

23   skills for the job that she had at that

24   time?

25        A.    Yes.

Page 71

1                    DOLAN

2    the July period on.

3         Q.    Did Mr. Ratner tell you that he

4    didn't personally like Ms. Browne-Sanders

5    or her style?

6              MR. GREEN:    Objection to form.

7    You may answer it.

8         A.    I don't recall that he

9    specifically said he didn't like her.

10        Q.    Did he ever describe her to you

11   as arrogant?

12             THE WITNESS:   Counsel --

13             MR. GREEN:    You may answer the

14   question fully except to the extent that

15   those conversations might have been held

16   in the presence of counsel; otherwise, you

17   may answer the question.

18        A.    Okay.  I'm -- I don't

19   think -- it is not my job to help you

20   here.  The --

21             (Laughter.)

22        A.    But in the interest of -- the

23   interest of getting through this

24   the -- Mr. Ratner I believe did not think

25   that Ms. Sanders had a strong and cordial

1                    DOLAN

2    management style.  I believe he expressed

3    to me, and I can't tell you specifically

4    when he expressed it to me, but I know

5    that I was aware that he did not like her

6    management style.

7         Q.    Is being tough as a manager a

8    strength or a weakness at The Garden?

9              MR. GREEN:    Objection to form.

10   You may answer, if you can.

11        A.    I think it completely depends on

12   the situation.

13        Q.    Did you find Ms. Browne-Sanders

14   to be arrogant?

15        A.    No, I found her to be aggressive

16   but not arrogant.

17        Q.    And is being aggressive a

18   positive or negative trait at The Garden?

19              MR. GREEN:    Objection to form,

20   but you may answer.

21        A.    I think it is a positive trait.

22        Q.    What other positive traits did

23   you believe that Ms. Browne-Sanders had?

24        A.    I was not her direct boss, so,

25   you know, my opinions of her were formed

Page 73

```
 1                    DOLAN
 2   from the -- the budget meeting, and really
 3   my opinion of her changed pretty
 4   dramatically from when you talk about pre
 5   that July period to post that July period.
 6        Q.    Other than Mr. Mills and Mr.
 7   Ratner, did you get input from anyone else
 8   on their view of Ms. Browne-Sanders?
 9            MR. GREEN:   Objection to form.
10   You may answer.
11        A.   In what period?
12        Q.   Any period.
13        A.   Can you ask the question again?
14            MS. VLADECK:  Can you read it
15   back.
16            (Record read.)
17        A.   I am sure Mr. McCormack gave me
18   his view.
19        Q.   What was Mr. McCormack's view?
20        A.   Well, Mr. McCormack,
21   the -- would have given me his view.  I
22   believe he did give me his view right at
23   the time that Ms. Sanders was let go.
24        Q.   And what did he say to you and
25   what did you say to him?
```

Page 74

1                    DOLAN

2      A.    Mr. McCormack said that

3  Ms. Sanders had willfully violated the

4  company's policies and had undermined his

5  investigation of the charges of sexual

6  harassment that he had -- was charged with

7  investigating.

8      Q.    What did he say she had done

9  which was a willful violation of the

10  company policies?

11      A.    That she had attempted to

12  influence her direct reports using her

13  authority.

14      Q.    Anything else?

15      A.    I believe he told me that

16  he -- that she took one of her direct

17  reports here.

18      Q.    What did he say about that?

19      A.    Well, that clearly was against

20  company policy.

21      Q.    What company policy is it

22  against?

23      A.    When you are -- put in a

24  complaint regarding sexual harassment or

25  actually a complaint, any complaint that

Page 85

1                    DOLAN

2    several times.  I object to the form of

3    the question.  If he wants to amend a

4    prior answer, he may.  I am instructing

5    him not to say what he said twice before.

6              MS. VLADECK:   It is a different

7    question.  Maybe if you hear it read back.

8         A.    I think it -- I think I can

9    answer the question.  I think it

10   is -- the -- when the employees are going

11   on their own behalf, I think that is fine.

12        Q.    When did Mr. McCormack tell you

13   that Ms. Browne-Sanders had willfully

14   violated company policies and undermined

15   his investigation of her charges?

16        A.    I don't have the specific date.

17   It was on a helicopter ride between our

18   corporate offices in Bethpage and West

19   30th Street here.

20        Q.    Can you time it as to proximity

21   to when she was actually fired?

22        A.    Same day I think.  Within 24

23   hours.

24        Q.    Prior to that helicopter ride,

25   have you had any other conversations with

1                    DOLAN

2    present or held at counsel's direction.

3    So you may not answer this question if you

4    had any such meeting or discussion at

5    the -- in the presence of counsel or at

6    the direction of counsel.

7        A.    Okay.   I got the direction.   I

8    think that -- that the answer -- I know

9    that the answer is that the only

10   communication I had with Mr. McCormack

11   prior to this in regards to this -- this

12   matter would be to verify that he was in

13   fact investigating the matter.

14       Q.    Who made the decision to have

15   Ms. Browne-Sanders' employment be

16   terminated by The Garden?

17       A.    I did.

18       Q.    Did you make it on your own or

19   was it with others, consultation or

20   something else?

21       A.    Well, all decisions at The

22   Garden I make on my own.

23       Q.    And what were the reasons or

24   what was the reason you fired

25   Ms. Browne-Sanders?

Page 168

1                    DOLAN

2    far as when the review period would

3    normally be?

4              MR. GREEN:    Objection to form.

5    You may answer if you can.

6        A.    That is conjecture.  I mean, you

7    know, because already you've got -- you've

8    got the other document that suggested

9    April I think in it.  Doesn't it? The --

10       Q.    I can't testify.  I just -- my

11   understanding of the prior testimony is

12   that the adjustments are separate and

13   apart from the review process.

14             Do you know whether there is a

15   general time period for reviews at The

16   Garden?

17       A.    Generally there are -- the

18   reviews are done, you know, at the end of

19   the year, beginning of the year, but

20   the -- they don't have to be done that

21   way, and I -- you know, if -- if -- you

22   know, I would suggest that that probably

23   this document goes along with the other

24   one which is the adjustment document.

25   They look like they are very -- you know,

1                    DOLAN

2        A.    I don't recall.

3        Q.    Again, it would not be -- a

4    normal thing for Mr. Mills to talk to me

5    about the complaints for his -- his

6    employer.  I mean he is responsible for

7    her.  So why complain to me?  The -- in

8    fact, I would probably ask him that

9    question.  Why are you complaining to me?

10   She reports to you.

11       Q.    Before you made the decision to

12   fire Ms. Browne-Sanders, did you ask Mr.

13   Mills whether he agreed or disagreed with

14   that decision?

15       A.    No.

16       Q.    And do you recall why you made

17   the decision to fire her on the day that

18   you made the decision?

19       A.    Yes.

20       Q.    And what was that?

21       A.    We had come to the conclusion

22   that her working at the company was no

23   longer tenable due to the fact first

24   that -- that leading up until that point

25   and all the way from July up until that

Page 186

1                          DOLAN

2    my essentially taking the opinion of Mr.

3    Ratner that she had not improved, that he

4    believed that she was -- should be

5    terminated.

6        Q.    Are you done with all the events

7    leading from July to January?

8        A.    Yes, I think so.

9        Q.    What made you believe that from

10   July to January she had an inability to

11   budget or brand?

12       A.    Because of the July meeting, the

13   skills and the work product that she

14   produced was not -- low, not acceptable.

15   It showed a lack of understanding of

16   budgeting.  It showed a lack of

17   understanding of branding.  She was unable

18   to come up with a branding statement for

19   the New York Knicks.  She had to be given

20   one.  That the -- and her -- in her budget

21   she was unable to explain her budget and

22   when she -- and when she did explain her

23   budget, her explanations, the -- showed a

24   lack of understanding of how budgets

25   are -- are put together and differences

1            DOLAN

2    training, but I did not get a positive

3    report.  I didn't get any report

4    essentially on it.

5        Q.    Did you ask for a report at any

6    time between the summer budget meetings

7    and the day you decided to fire her?

8        A.    I don't recall.  I don't -- I

9    don't recall if I did or if I didn't.

10        Q.    Now, you said that you also

11    relied on the opinion of Mr. Ratner that

12    she should be terminated.

13            When did Mr. Ratner express his

14    opinion that she should be terminated?

15        A.    Consistently from July through

16    her termination date.

17        Q.    And you rejected his opinion

18    from July, August, September, October,

19    November and December; is that correct?

20            MR. GREEN:    Objection to form.

21    Misstates prior testimony.

22        Q.    Is that correct?

23            MR. GREEN:    You may answer.

24        A.    I think it -- rejected would be

25    strong, but essentially we didn't act upon

Page 189

```
 1                    DOLAN
 2   what his -- what his opinion -- we tried
 3   to give Anucha a chance, but you have to
 4   remember that the -- you are asking me
 5   about the day she was fired.  The -- we
 6   went through this whole process with her.
 7   Then she comes back to us, and she tells
 8   us that she is not going to work here any
 9   more.  The -- that the -- it is unclear
10   what the reason is why she doesn't -- why
11   she can't work here any more, but I assume
12   that the -- that it had something to do
13   with her experience over the last six
14   months.  The -- so now we are already
15   looking for -- we already have to rejigger
16   the -- the department, et cetera, but she
17   is -- she is going to stay as long as we
18   help her find another position, but she is
19   essentially out.  She has no future at the
20   company by her own hand, and then
21   the -- comes in the report that she wants
22   $600,000 worth -- excuse me -- 6 million
23   dollars worth of severance that the -- and
24   that -- that the -- she's been tampering
25   with an investigation into a complaint
```

```
 1                    DOLAN
 2    that she's made, and the last part is
 3    the -- is the part that is most difficult
 4    to deal with because as ridiculous as the
 5    6 million dollar request was that
 6    the -- she could have continued on doing
 7    her job if she had not tampered
 8    with -- with those people, the -- but the
 9    combination of all of those things
10    together -- and finally the tampering as
11    being the last straw in that really led us
12    to -- led me to the conclusion that her
13    employment at the company was over with.
14        Q.    Now, you started by saying that
15    you believed she started this whole
16    process.  What whole process are you
17    referring to?
18        A.    I'm not sure --
19              MS. VLADECK:  Could you read it
20    back.
21              (Record read.)
22        Q.    What did you mean by the whole
23    process?
24        A.    What I meant by the whole
25    process is -- we went through the whole
```