# EXHIBIT
# G

Dockets.Justia.com

# MEMORANDUM

To:     Files

From:   Rusty McCormack

Date:   January 19, 2006

Re:     <u>Knicks Employee Relations Issues</u>

I have reviewed the report of the investigation conducted by Rochelle Noel and John Moran regarding the allegations recently made by Anucha Browne Sanders and her counsel. In light of that report I am making certain recommendations.

<u>Anucha Browne Sanders</u>

As the report indicates, most of Browne Sanders' allegations were not confirmed. However, based on comments Browne Sanders made to Steve Mills and members of her department before making her complaint, it is clear that Browne Sanders has a poor relationship and difficulty interacting with Mills and other members of MSG management. Browne Sanders is unable to function effectively in her position. Moreover, MSG cannot function if its senior management cannot communicate and work together effectively. In light of this, and considering related issues with Browne Sanders' communication skills and overall effectiveness, Browne Sanders should be separated from MSG and offered severance and outplacement services, subject to her execution of an appropriate release.

<u>Isiah Thomas</u>

As indicated above, most of Browne Sanders' allegations against Thomas were not confirmed. Based on the interviews, the investigation made clear that Browne Sanders and Thomas had a number of business disagreements and differences in philosophy and management style. Other employees asserted that Thomas has on occasion used profanity and has raised his voice in the workplace at MSG. He also acknowledged that on one occasion he greeted Browne Sanders with a hug and kiss. In light of the above, I recommend that Thomas undergo one-one-one sessions with a qualified outside expert in order to sensitize him further with regard to the concerns that his conduct could raise in a corporate environment and in light of company policy. This can be dovetailed with our ongoing efforts to work with Thomas to help him manage his organization and deal effectively with other people in the Knicks organization and at MSG. This training should begin in the next 30 days.

1

CONFIDENTIAL

MSG     6363

<u>Steve Mills</u>

The investigation did not establish that Mills contravened the company's anti-harassment policy. In fact, as the report indicates, Mills took appropriate action to respond to the incidents that were called to his attention. Nevertheless, it is my experience that these situations can be used as learning tools to improve effectiveness in the future. I therefore recommend that Mills meet with my counterparts from Corporate and Rainbow, Rob Doodian and Frank Livoti, who have not been involved in this matter, to discuss what lessons, if any, may be learned from the facts described in the report. This meeting should occur in the next 30 days.

2

# EXHIBIT H

```
 1              MILLS
 2  Those are generally the responsibilities.
 3     Q.    Okay.  I think your previous
 4  answer may have touched on this, but why
 5  is it that you hired Ms. Browne-Sanders?
 6     A.    I thought she was -- I thought
 7  she -- she had a skill set and
 8  that -- that would -- that was a good fit
 9  for what I was looking for within the
10  Knicks organization.
11     Q.    And what were you looking for
12  within the Knicks organization at that
13  point?
14     A.    I think -- did I answer that?
15     Q.    Well, I think your answer might
16  have alluded to it.  If there is anything
17  else you want to add to it, that is fine.
18     A.    I think I -- I think I -- I
19  answered that.
20     Q.    Okay.  Were you looking to hire
21  someone to reorganize the Knicks
22  operations at that point?
23     A.    I -- I wanted someone to -- to
24  add some more structure to the marketing
25  department and the activities that took
```

Page 53

```
 1                  MILLS
 2    were -- was hired?
 3              MR. GREEN:   Objection to form.
 4    You may answer, Mr. Mills.
 5        A.    No.
 6        Q.    Ms. Browne-Sanders started as a
 7    vice president of marketing in November of
 8    2000.  Does that sound right to you?
 9        A.    That sounds right.
10        Q.    Okay.  She was in that role
11    until she was promoted to senior vice
12    president of business operations; is that
13    correct?
14        A.    Yes.
15        Q.    And who was responsible for
16    Ms. Browne-Sanders' promotion to that
17    position?
18        A.    I was.
19        Q.    Anyone else?
20        A.    Well, ultimately all promotions
21    have to be signed off
22    through -- through -- through our human
23    resources department, but ultimately I was
24    responsible for the promotion.
25        Q.    Did you consult with anyone
```

1              MILLS

2              MR. GREEN:   You may answer, Mr.

3    Mills, subject to my objection that it has

4    been asked and answered.

5         A.    You know, I -- I may have talked

6    to her about the -- the quality of -- of

7    the Knicks organization, but I know I also

8    specifically had conversations with her

9    and concerns about how she was as long and

10   as a strategic matter structuring the

11   Knicks organization.

12        Q.    Okay.  We will -- we will come

13   back to 2005.  There came a point in 2002

14   in which Ms. Browne-Sanders was promoted I

15   think you've said, correct?

16        A.    Yes.

17        Q.    And what was the position that

18   Ms. Browne-Sanders was promoted to?

19        A.    I believe Anucha was promoted

20   into the -- a position of senior vice

21   president of marketing and business

22   operations at a time when I -- I did

23   a -- I actually restructured both the

24   Knicks and the Rangers to create a

25   comparable position in both -- both

Page 89

1                   MILLS

2       A.      Normally I would involve our

3   finance -- one of our finance people and

4   someone from human resources in the

5   drafting of it.

6       Q.      Does the document that begins on

7   page 1881 accurately describe the position

8   of senior vice president of business

9   operations that Ms. Browne-Sanders held

10  beginning in March of 2002?

11      A.      Yes.

12      Q.      Did the position have any --

13              MR. MINTZER:  Strike that.

14      Q.      Are you familiar with the phrase

15  "dotted line reporting relationship"?

16      A.      Yes.

17      Q.      Did the SVP of business

18  operations position have any dotted line

19  reporting relations?

20              MR. GREEN:  If know, Mr. Mills.

21      A.      I'm not sure.

22      Q.      Did you ever tell

23  Ms. Browne-Sanders that she had a dotted

24  line reporting relationship to anyone?

25      A.      No.

Page 98

1                          MILLS

2      a much more strategic and -- and revenue

3      generation responsibility within -- within

4      the budget.  In '05 we were going into a

5      situation with -- where the Rangers were

6      coming out of a lockout, so they were back

7      in business whereas in the prior season

8      there was no ranger activity.  So I was

9      actually more involved on the Knicks side

10     at that point, but moving into '05 both

11     the Knicks -- the senior vice president of

12     business operations for the Knicks and the

13     senior vice president of business ops for

14     the Rangers had to really take charge of

15     the entire strategic process, the entire

16     budget process from start to finish, and I

17     was less directly involved in the -- in

18     the creation process leading up to the

19     final product.

20         Q.    Was there -- are you familiar

21     with the phrase P and L manager?

22         A.    Yes.

23         Q.    And at some point did the SVP of

24     business operations position for the

25     Knicks become a P and L manager?

```
 1                    MILLS
 2      A.    Yes.
 3      Q.    When was that?
 4      A.    Sometime in -- at some point
 5    in -- in '04.
 6      Q.    Did the job of becoming a P and
 7    L manager coincide with the greater
 8    responsibilities in terms of the budgetary
 9    process that you -- you just were
10    mentioning?
11      A.    Yes.
12      Q.    Did the increased
13    responsibilities of the senior vice
14    president of business operations position
15    that you described, were those ever
16    reflected in a document that you've seen,
17    anything in writing?
18      A.    They -- they were reflected
19    in -- in  --   in conversations that we
20    had.  They were reflected in a -- a salary
21    adjustment as the grade changed -- change
22    in the position took place.
23      Q.    My question was:  Did the
24    description of the increased
25    responsibilities, did that appear in a
```

```
 1                    MILLS
 2   with Mr. Dolan about each of those
 3   reasons?
 4       A.    I had conversations with -- with
 5   Rusty McCormack about -- about those
 6   reasons, and, you know, I had
 7   conversations with Jim clearly about those
 8   views and clearly some of those reasons.
 9       Q.    So at some point you discussed
10   with Mr. Dolan all of your concerns and
11   criticisms about Mr. Browne-Sanders that
12   you articulated in your previous answer?
13            MR. GREEN:    Objection to form.
14   You may answer, Mr. Mills.
15       A.    Yes.
16       Q.    But I take it from your answer
17   that Mr. Dolan had the ultimate
18   determination to -- whether to fire
19   Ms. Browne-Sanders?
20       A.    Absolutely.
21       Q.    And so it's fair to say when I
22   asked you why she was fired you don't know
23   what was in Mr. Dolan's head when he
24   decided to fire her; is that correct?
25       A.    No, I don't know what was
```

```
 1              MILLS
 2       A.    Well, the way -- the way we
 3    budget is that every budget process before
 4    we even start to talk about numbers
 5    we -- we talk about what the brand of the
 6    -- the various entities that we are
 7    working with is, what the key brand
 8    attributes are, what the mission statement
 9    of the -- the team or the organization is,
10    then build up into that what the key
11    objectives, strategies, goals and tactics
12    to support what you define as the -- as
13    the brand of the team and how that
14    ultimately translates into a process that
15    filters down to build their financial
16    model for the team -- for the year.
17       Q.    Did you believe that
18    Ms. Browne-Sanders had any deficiency
19    in -- in branding the team?
20       A.    She -- she clearly had
21    deficiencies in -- in industry -- in
22    defining a strategic direction for -- for
23    the team as we were -- were trying -- as
24    we were trying to move forward, and I
25    think she had -- had issues in terms of
```

1                    MILLS

2    being able to listen to what people were

3    asking of her and listen to how they

4    wanted the branding strategy to be

5    articulated and how they wanted the

6    branding strategy to roll up into this

7    pyramid -- pyramid that we build as part

8    of the branding process, and I think -- I

9    think she had real issues of structurally

10   putting those things together and seeing

11   how they all fit.  Some of them started

12   with  maybe some additional help that she

13   needed in terms of structural process, but

14   some of them started with her inability or

15   unwillingness to really focus and listen,

16   and as she and I tried to have these

17   conversations about why the training was

18   important and what she should try to get

19   out of it initially before she decided to

20   take the training, her tact was more to

21   attack Jim and/or try to articulate that

22   Jim didn't understand really what

23   a -- what branding is or what a real brand

24   statement is or what brand attributes are

25   as opposed to listening to what needed to

```
 1                    MILLS
 2        Q.    You said at one point in your
 3   testimony that you had been informed that
 4   Ms. Browne-Sanders was saying that you
 5   were at fault for something that went
 6   wrong in the budget meeting?
 7        A.    Yes.
 8        Q.    And who were you informed of
 9   that by?
10        A.    John Cudmore, who is the
11   financial -- senior vice president of
12   finance for the teams.  We had, you
13   know -- after -- after one of the budget
14   meetings, John told me that, you know,
15   Steve, you should just know that I had a
16   conversation with Anucha, and she really
17   is accusing you of this -- of Last Man
18   Standing being your responsibility, and I
19   told him I -- my amazement at -- at that,
20   and what I did was we had -- I had a
21   meeting with Anucha and Mike Golub and
22   John Cudmore to talk about what my
23   expectations of them in -- in the budget
24   process, what I expected to happen as
25   we -- as we further moved through the
```

```
 1                    MILLS

 2      A.    With counsel.

 3      Q.    Okay.  Prior to learning that

 4   Ms. Browne-Sanders' lawyers had contacted

 5   The Garden, could you tell me all of the

 6   people who you told that

 7   Ms. Browne-Sanders had told you that she

 8   could no longer perform her duties at The

 9   Garden?

10      A.    The -- the only people I

11   remember having that conversation with

12   were Rusty and -- and Hank.  I can't

13   remember whether or not I -- I had the

14   conversation with Jim.

15      Q.    And did either Mr. McCormack or

16   Mr. Ratner suggest that Ms. Browne-Sanders

17   receive a severance package?

18      A.    What -- what Hank said to me was

19   you should -- you should get together with

20   Rusty and let's figure out some kind

21   of -- let's figure out some kind

22   of -- some kind of package to make sure

23   that this happens.

24      Q.    And by package you understood

25   that he was taking about a severance
```

# EXHIBIT
# I

JEFFREY NIX

1

2    A    I think she was outstanding.

3    Q    So regardless of what the facts

4    are of any of the occurrences that form

5    the basis of her lawsuit, your opinion of

6    her hasn't changed?

7    A    I think she was excellent at what

8    she did.

9    Q    And you continued to believe that

10    she would be an excellent and competent

11    employee for any company?

12    A    Any company.

13    Q    Going back to the summer of 2005,

14    did there ever come a time when she told

15    you that she had been at a meeting at

16    which Jim Dolan and Hank Ratner, at least,

17    were in attendance where she had been

18    criticized for her budgeting abilities?

19        MR. MINTZER:  Objection to form.

20    A    She told me she had some hostile

21    budget meetings.

22    Q    When did she first tell you about

23    hostile budget meetings?

24    A    It was after whenever they had

25    the budget meetings.  I don't recall the

246

1                    JEFFREY NIX

2    have been something to the effect, "Hey,

3    if I can help you in any way try to find

4    another source of employment, please let

5    me know."

6        Q    What, if anything, have you done

7    to help her find employment?

8        A    I've sent her resume out to some

9    friends of mine.

10       Q    And who did send her resume to?

11            Scott Paddock, Gatorade.

12            Joe Mature, University of

13   Minnesota.

14       Q    Let me ask you to go a little

15   slower.  These are names I haven't heard

16   before.

17            Scott Paddock?

18       A    Scott Paddock.

19       Q    P-A-D-D-O-C-K?

20       A    Yes.

21       Q    At Gatorade?

22       A    He's at Gatorade.

23       Q    Okay.

24            The next one?

25       A    I sent it to Joe Mature,

247

1                    JEFFREY NIX

2   M-A-T-U-R-E.  He is the athletic director

3   at the University of Minnesota.

4          Boo Corigan.

5      Q    B-O-O?

6      A    B-O-O.

7      Q    C-O-R-I-G-A-N?

8      A    Yes.

9      Q    And where is he or she?

10     A    He's at the University of Notre

11  Dame.

12     Q    Okay.

13     A    Tim Andree who is -- he's in

14  advertising for a marketing firm here in

15  the City.

16     Q    I'm going to stop you for a

17  moment.

18          T-I-A?

19     A    Tim.  Tim.

20     Q    Tim.  I'm sorry.  Tim Mondre?

21  M-O-N --

22     A    Andree, A-N-D-R-E-E.

23          He's at a marketing company in

24  the City.  I can't think of the name of

25  it.

248

JEFFREY NIX

1

2     Q    Oh, you can't think --

3     A    I can't think of the name of it,

4  no.

5     Q    Okay.

6          Anyone else?

7     A    There could have been.  I can't

8  remember right now.

9     Q    And did you send any kind of a

10  cover letter with her resume?

11    A    Not a cover letter.  Probably I

12  got in just a note, "Hey, just, you know,

13  take a look at this and see what you

14  think, and if anything develops or opens

15  up please, give her some consideration."

16    Q    Did any of them contact you

17  telling you that they had openings?

18    A    Yeah, I talked to them and they

19  said there's really nothing available.

20    Q    When you say you talked to them,

21  are you --

22    A    Scott Paddock talked to me and

23  said, "Hey, you know, I'll keep an eye

24  out.  We don't have anything available.  I

25  don't see anything right now."

249

JEFFREY NIX

1

2 Joe Mature just said, "Hey,

3 thanks."  There was no response from that,

4 other than that.

5 Boo Corrigan is similar to Scott

6 Paddock.  Keep it on file, if something

7 happens.

8 And then Tim Andree said, "Hey,

9 thanks for Anucha's resume.  Right now it

10 would be a tough hire because it's

11 volatile.  It's a volatile situation."

12 Q And have you had any

13 conversations with any of these people

14 since then?

15 A Yeah, they are friends of mine.

16 Q Okay.

17 So you are saying you talk to

18 these people on a -- on a periodic basis?

19 A Yeah, I talk to them.

20 Q Have any ever them indicated

21 there are any job openings for which

22 Anucha Browne Sanders might be eligible?

23 A Nothing yet.  That's the

24 impression I have.

25 Q And what has Anucha

# EXHIBIT J

61

H. RATNER

1

2    meetings or some other type of, you

3    know, strategy meeting.  That would be

4    the lion's share of the interactions.

5        Q.    Do you have any estimate of

6    how many budget meetings that you were

7    at that Ms. Browne-Sanders was at?

8        A.    Budget meetings.  Let's see.

9    You know, a few.  I'm guessing now

10   which maybe I shouldn't do, but, you

11   know.

12           MS. VLADECK:  It's not

13       hitting you, it's okay?

14           MR. GREEN:  It's okay.

15       A.    Five, six, you know,

16   something like that.  I could be off by

17   two in either direction, you know,

18   maybe.

19       Q.    And what about forecast

20   meetings?

21       A.    You know, maybe a few more

22   than that.

23       Q.    So a few more than five or

24   six, off by two potentially, either

25   way?

62

H. RATNER

1

2      A.    Give or take.  You know,

3   it's -- that's the kind of ballpark, I

4   mean, you have the first quarter

5   forecast, the second quarter forecast,

6   your third quarter forecast might be

7   budget meetings so it might not be a

8   separate meeting.  Those often get

9   combined.  You know.  And then I can't

10  quite figure out, you know, exactly the

11  time period of when it would occur.  So

12  I'm trying to just do some general

13  calculations figuring.  Those are sort

14  of the ball parks.

15      Q.    And what about the strategy

16  meetings?

17      A.    Well, we usually have a

18  strategy meeting preceding a budget

19  meeting in order to determine how the

20  budget should be done because we view

21  budgets as numerical expressions of the

22  strategy, so.  And then sometimes you

23  have a strategy meeting and, you know,

24  there's -- there's not agreement on the

25  strategy that was presented as the

63

1          H. RATNER

2   appropriate strategy, and then you have

3   the strategy meeting over again.  So

4   that's why I can't really recall

5   exactly how many we might have had,

6   just because there's a one year

7   strategy, you know.  One year budget

8   doesn't mean that you only had one

9   strategy meeting because you might have

10  gone back.  So I don't specifically

11  recall exactly how many, but, you know,

12  a few again.

13      Q.    Do the strategy meetings

14  determine how a budget is going to be

15  done in a particular year?

16      A.    Well, you know, we sit down

17  and we'll try to understand basically

18  the goal of the business, and the

19  strategy and the overlying tactics.

20  And to go and prepare numbers before

21  that, you might be preparing numbers on

22  something that there isn't management

23  buy in on.  So we have the strategy

24  meeting up front.  And then once we

25  agree on that strategy, the business

64

H. RATNER

1    end is to go off to express that

2    strategy in numbers and come up with

3    their budget for the year.

4        Q.    And the strategies change

5    year to year or may change year to

6    year?

7        A.    Yeah, they may change midyear

8    as well.  But, you know, we look, we

9    try to do a bottoms up look, you know,

10   take a fresh and not be a prisoner to

11   what you may have thought was

12   appropriate the year before.

13       Q.    And who would be present at

14   the strategy meetings, generally?

15       A.    Relating to what business?

16       Q.    The Knicks.

17       A.    It would be Jim, myself,

18   Steve, and it would be then the people

19   in Steve's staff that Steve would then

20   bring.

21       Q.    And who did he bring?

22           MR. GREEN:  Objection to

23   form.  You may answer if you

24   recall.

65

H. RATNER

1  A.    Well, Anucha when she was

2  with the company, John Cudmore, the

3  head of finance for the team's

4  division.  You know, I don't have

5  specific recollection of who else, you

6  know.  Potentially there could have

7  been ad salespeople, there could have

8  been facilities people.  You know, I

9  don't remember.

10 Q.    Were the same participants

11 present at the strategy meetings as

12 were at the forecast and budget

13 meetings?

14 A.    Sometimes they may have been,

15 they may not have been.

16 Q.    And what would be the

17 determinative as to who was at which

18 meeting?

19 A.    Well, the strategy meeting

20 would be more of a strategy and less of

21 a numbers meeting.  So you might not

22 have people who were, you know, more

23 involved in the numbers than involved

24 in actually the strategies, too, or

66

H. RATNER

1    what to do going forward, so.

2    Q.    And what was Mr. Cudmore's

3    title at the time that he would attend

4    these meetings?

5    A.    I don't know.

6    Q.    What was Ms. Browne-Sanders'

7    title at the time she would attend

8    these meetings?

9    A.    I'm not sure.

10   Q.    What was your understanding

11   of Mr. Cudmore's role at the meetings?

12   A.    John's the finance guy.  He

13   works with the businesses.  He takes

14   their direction as to what business

15   initiatives they want and he helps them

16   put that into a, you know, financial

17   format.

18   Q.    And what was your

19   understanding of Ms. Browne-Sanders'

20   role at these meetings?

21   A.    She was the head of marketing

22   and, I think, business operations.

23   Q.    And what was your

24   understanding that her role as a

1          H. RATNER

2    participant in these meetings was to

3    be?

4          MR. GREEN:  Objection to

5       form.  You may answer.

6       A.    Okay.  Strategy, budget,

7    forecast, which one?

8       Q.    All.

9       A.    All of them.  Well, the

10   strategy meeting, you know, you'd

11   really have to speak more to Steve

12   about that as to how Steve Mills split

13   and determined, you know,

14   responsibilities with Anucha.  So I

15   can't really get underneath that.

16      Q.    Okay.

17      A.    But what they needed to do

18   with -- the business unit needed to do

19   is come in with a, you know, a

20   strategic plan.  So for the strategy

21   meeting, her role would have been what

22   Steve asked her to do.  You know, what

23   I would have been looking for, what I

24   look for is the strategy to be

25   presented that has logic and makes

1          H. RATNER

2    sense and, you know, comes up with a

3    path of growth for the business.

4              After we get out of the

5    strategy meeting, you go to the budget

6    meeting, you know, likewise, you know,

7    it's Steve and whatever

8    responsibilities he's given to Anucha.

9    But Anucha's job was to be the P&L

10   manager for the Knicks's business unit,

11   and as such, she was responsible for

12   the budgeting.  And likewise, when we

13   had forecast meetings, you're

14   reforecasting with the knowledge that

15   you now have given the time that's

16   passed and you have your quarterly

17   results and you're taking a comparison

18   budget and you're updating on what you

19   think is going to happen for the year

20   and you're comparing it against the

21   budget.  So, you know, my thinking

22   would be she probably would be leading

23   that effort and pulling it all together

24   on behalf of the Knicks organization.

25        Q.    Before you go to

69

1              H. RATNER

2  Ms. Browne-Sanders' role at forecast

3  meetings, what was your understanding

4  of how long Ms. Browne-Sanders had been

5  the P&L manager?

6          MR. GREEN:  As of when?

7      Q.    As of when?  As of what date

8  she became --

9          MR. GREEN:  I don't mean to

10      confuse you.  I object to the form.

11          MS. VLADECK:  That's already

12      done.

13          MR. GREEN:  I don't know

14      whether the question was asking the

15      witness to answer as of a certain

16      .date.

17          MS. VLADECK:  Okay.  I can

18      rephrase it.

19      Q.    Was it your understanding

20  that Ms. Browne-Sanders was P&L manager

21  from the date she was hired, or did she

22  become the P&L manager at some time

23  during her tenure?

24      A.    She was not the date she was

25  hired.  She became sometime during her

70

H. RATNER

1
2   tenure.

3       Q.    And do you know when during

4   her tenure she became P&L manager?

5       A.    No.

6       Q.    Did she attend the strategy,

7   budget or forecast meetings prior to

8   becoming a P&L manager?

9       A.    I don't know.  Her

10  involvement at the Garden preceded my

11  involvement with the Garden.

12      Q.    Was she present at the

13  meetings, strategy, forecast and

14  budget, from the day you became

15  involved at the Garden?

16      A.    Well, it wasn't necessarily

17  from the day I became involved.  I

18  think my first real involvement in the

19  Garden budget process was probably for

20  calendar year 2005, the 2005 budget

21  which was -- .

22      Q.    Was that in 2004?

23      A.    It would have been the end of

24  '04.  And that, I think, is my first

25  involvement in a budget cycle at the

71

H. RATNER

1  Garden and really my, you know, first

2  involvement with a lot of the stuff at

3  the Garden as opposed to where I had

4  been previously.

5      Q.    And from that time, was

6  Ms. Browne-Sanders, to your knowledge,

7  P&L manager?

8      A.    I think it might have been

9  right around there, but again, I

10  don't know.  I'm not a hundred percent

11  sure.

12     Q.    And what was

13  Ms. Browne-Sanders' role at forecast

14  meetings?

15     A.    Her role was to present the

16  forecast.

17     Q.    Now, at each of these

18  meetings where Ms. Browne-Sanders was

19  present, was Mr. Mills present?

20     A.    Again, no specific

21  recollection, but I think he would have

22  been.

23     Q.    And was Mr. Cudmore present?

24     A.    Again, no specific

1                   H. RATNER

2      Q.     Somewhere between 10 and 20,

3  or 15?

4      A.     Ten and 15 maybe.  Again, I'm

5  being clear with you.  I am sort of

6  guessing on that number.

7      Q.     Did you form an impression as

8  to her performance?

9      A.     I did.

10      Q.     And what was your impression?

11      A.     Underwhelming.

12      Q.     What do you mean by that?

13      A.     I didn't think she had the

14  goods or temperament to do the job that

15  we needed done.

16      Q.     And when did you form that

17  impression?

18      A.     You know, I can't

19  particularly pinpoint exactly when it

20  occurred, when I first started having

21  concerns, but it was clear to me that

22  she didn't have a grasp of what it was

23  going to take to get her job done, that

24  she didn't have a grasp for the

25  financial aspects of her position, and

83

H. RATNER

1  specific recollection of the strategy

2  meetings other than I don't think they

3  went well in that when we tried to be

4  open minded and discuss thinking more

5  broadly about the opportunity of the

6  Knicks and the running of the Knicks,

7  you know, my recollection is it's sort

8  of was met with resistance.  It was met

9  with a lot of this is the way we do it.

10  And where I was coming from, it's

11  really about start over again and let's

12  figure out if we were starting, you

13  know, this franchise today, what do you

14  do today, what are the strategies

15  today, what are the business

16  opportunities today, and don't lock

17  yourself into the past.

18          And again, without specific

19  recollection, there wasn't a lot of

20  open minded behavior taking place.  It

21  was very, very defensive and sort of it

22  makes very difficult to run a business

23  and move forward if everybody is not

24  open minded to change, because that's

84

H. RATNER

1  the one constant we're always going to

2

3  have in the world, change.

4        You know, we then moved on

5  and we got to the budgets and, you

6  know, Anucha's command for the business

7  of the Knicks just wasn't acceptable to

8  me, you know, as the person sitting in

9  the center.  You know, she needed to be

10  responsible for the business aspects of

11  what was taking place.  So for

12  instance, you know, how many ushers

13  were going to be at the event.  How

14  many security guards were going to be

15  at the event.  How many food service

16  workers are going to be at the event.

17        Now, in our structure, those

18  groups reporting to a facilities group.

19  Because facilities is our in-house

20  expert on ushers and security and food

21  service.  But the premise of our

22  organization is that that facilities

23  group works for the P&L manager.  In

24  almost like a, if you went to a third

25  party vendor, you hired the third party

H. RATNER

1

2  vendor and the third party vendor works

3  for you and performs certain services

4  for you.  But that doesn't mean you

5  don't have responsibility for it.  You

6  do, because you have to work out with

7  them what's the prudent level of

8  ushers, security, food and beverage

9  workers, etcetera.  And those were the

10  type conversations that were very

11  frustrating because those were the kind

12  of conversations which were well,

13  that's sort of facilities, that's not

14  me.  And that was just dead wrong, as

15  we tried to explain, you know, over and

16  over again.

17       The same thing with

18  sponsorship sales and ad sales.  We

19  have a centralized group that sells

20  sponsorship sales and ad sales, and

21  that group works for, you know, the

22  individual entity.  It's like an ad

23  sales rep.  So they work for the

24  individual entity, whether it's the

25  Knicks, whether it's the Rangers.  It's

1                    H. RATNER

2    the same thing, you know, for other

3    parts of the company as well.  But they

4    have to please the business person

5    who's running the business unit as

6    opposed to the business person

7    abdicating those responsibilities and

8    basically well, that's ad sales or

9    that's facilities.

10            And we had a very difficult

11    time with Anucha in taking

12    responsibility for those numbers.  And,

13    again, those numbers aren't numbers

14    that just are presented to you.  The

15    job of the P&L manager is to go and

16    dive into those numbers and to

17    understand why we're doing what we're

18    doing and get behind the numbers and be

19    satisfied that those are the right

20    numbers, whether they be expense or

21    revenue.

22            And you know, I really felt

23    that there was that disconnect that,

24    you know, she wasn't getting it, she

25    wasn't necessarily capable of getting

87

H. RATNER

1

2 it.  She didn't have, I think, the real

3 financial skills needed, and she was

4 very territorial.  She didn't cooperate

5 well with others, so these

6 interdependencies made it difficult.

7           So the concerns I started

8 having from limited contact in '04

9 became magnified by the budget process

10 for the '05 fiscal year.

11      Q.    And when was the budget

12 meeting at which you say that it became

13 magnified or the budget process, what

14 time period was that?

15      A.    You know, I'm not sure.  I

16 mean, I was guessing which I guess I

17 shouldn't be doing, it would be the

18 November, December.  You know,

19 sometimes budgets fall over and they

20 don't get done and you use something

21 for purposes of, you know, doing your

22 consolidated look for the year, but you

23 may continue the process beyond.  I

24 don't really remember in this instance

25 what happened or what the timing was.

93

H. RATNER

Q.    Season, summer, winter,
spring or fall?

A.    You've covered the options.
You know, I'm still not sure.  It was
forecast meetings that then related to
the 2005 budget that we had somewhere
during the year.

Q.    So was that in calendar year
'04 or calendar year '05?

A.    '05.

Q.    You have no recollection of
when in '05?

A.    No, I don't.

Q.    And who did you have
conversations about Ms. Browne-Sanders
with at that time?

A.    Well, at that point, still
Steve Mills and then Jim Dolan as well.

Q.    Are Mr. Dolan, Mr. Pollichino
and Mr. Mills the universe of
individuals about whom you discussed
Ms. Browne-Sanders' performance?

A.    The universe I remember
discussing.

H. RATNER

1
2    maybe you're having your forecast

3    meeting then probably in May.  But

4    that's a guess.  That would be the

5    first quarter forecast.  You'd have the

6    second quarter forecast less than three

7    months after that.  So that probably

8    gets you sometime during the summer.

9        Q.    So your educated guess is

10   that you had conversations with

11   Mr. Mills and Mr. Dolan about your

12   belief that Ms. Browne-Sanders should

13   be fired either in the summer of '05 or

14   May of '05?

15       A.    If that's when those meetings

16   occurred, yeah.  It was right around

17   one of those meetings.  It was right

18   around -- yeah.  You know, again, I'm

19   not sure which one.

20       Q.    Is it fair to say you

21   wouldn't have a forecast meeting past

22   September of '05?

23       A.    You know, it's possible, but

24   sometimes we combine the forecast

25   meeting with the budget meeting because

H. RATNER

1  know, different points in time.  You

2  know, the first point in time is Steve

3  advising us that Anucha said she no

4  longer could do her job and she wanted

5  to leave.  I embraced that and said,

6  "Good.  Figure out with the HR

7  department what would be an appropriate

8  severance and let part ways," as he

9  knew that that was my long-standing

10 opinion.

11        And, you know, after that

12 point in time, while we were trying to

13 at least figure out what would be an

14 appropriate separation package, having

15 what I considered accepting her

16 resignation, then the thing became

17 legal in nature and pretty much all

18 conversations from that point, you

19 know, included lawyers.

20     Q.    Now, you said there were

21 different points in time and that

22 Mr. Mills had reported to you that

23 Ms. Browne-Sanders came to him and said

24 she could no longer do her job and

# EXHIBIT K

**Sr. Vice President, Business Operations**
**New York Knicks**

# OPERATIONAL POSITION
# DESCRIPTION

## OVERVIEW OF ROLE

**Primary Responsibility:**

Overseeing all non-player related departments such as Marketing, New Media, Franchise Operations, Administration and Community Relations. This position directly impacts the strategic direction of the NY Knicks.

**Reports to:**

President, Sports Team Operations

**Manages:**

Director, Marketing Partnerships (6 direct reports)
Director, Community Relations (3 direct reports)
Director, Franchise Operations (2 direct reports)
Director, Entertainment Marketing (2 direct reports)
Director, Event Presentation (2 direct reports)
Director, New Media

**Key Non-Reporting Relationships:**

3

MSG 01881

CONFIDENTIAL

| Key contact | Description/Purpose |
| --- | --- |
| 1. President & General Manager | Support on-court activities. |
| 2. VP & Controller | Ensure budget and finance compliance. |
| 3. SVP, Legal | Provide information and advise regarding legal matters, potential marketing campaigns and intellectual property rights issues. |
| 4. VP, Public Relations | Support all PR initiatives for the team. |
| 5. SVP, Marketing | Advise and provide marketing expertise. |
| 6. SVP, Human Resources & Administration | Advise on HR requirements (Staffing, Employee Relations, HRMS and Policy Procedures). |
| 7. SVP, Consumer Sales | Establish direction and policies for season ticket and individual ticket sales and servicing. |

## OPERATIONAL ACTIVITIES OF THIS POSITION

1.    Marketing – Provides strategic marketing and brand development direction in order to drive ticket sales, demand for season tickets, franchise enhancement and promotions.

2.    Community Relations – Involves players and coaches as an organization in community outreach initiatives including participation in Cheering for Children, community events, visiting schools, hospitals, clinics and making a difference in the community.

4

MSG 01882

CONFIDENTIAL

3.    Administration – Plans, prepares and conducts weekly staff meetings. Interfaces with MSG Facilities to coordinate game operations and team scheduling, and with MSG Networks and other Garden administrative areas.

4.    Finance – Oversees budget process and strategic performance of the NY Knicks, including budget meetings and quarterly reviews. Takes steps to achieve operating results.

5.    League Relations – Interacts with the NBA across all team related functions including marketing, licensing and game operations.

6.    Public Relations – Develops long-term strategy and programs in media relations, press events, announcements and coordinates with outside groups, celebrities and interested parties.

## QUANTITATIVE SCOPE

| Measure | Approximate Value |
|---|---|
| 1. Team Operating Revenue | 141,000,000 |
| 2. Division OPBIDA | 23,991,000 |
| 3. Team Operating Expenses | 112,710,000 |
| 4. Regular Seasonal Games | 82 |
| 5. Seating Capacity | 19,763 |
| 6. Capital Expenditures | 289,000 |

## KEY MEASURES OF SUCCESS

1.   Financial metric(s):

   a. Develop marketing programs, and sales strategies to maximize NY Knicks revenues in New York and outside markets that achieve goals of maximizing brand and profits.

5

MSG 01883

# CONFIDENTIAL

    b. Develop marketing programs and sales strategies to maximize all NY Knicks events at Madison Square Garden.

2. Operating metric(s):

    a. Play a key role in identification and development of new strategic incentives to ensure long-term growth.

    b. Build and manage top-flight full service Marketing Department to support all corporate incentives.

    c. Develop effective and breakthrough marketing tools, advertising materials and promotional programs to support sales.

## POSITION'S ORGANIZATION

Number of employees reporting *directly* to this position     6
Number of employees reporting *indirectly* to this position     30

## QUALIFICATIONS

1. Management Skills

    a) High-energy, creative and innovative executive with strong written and verbal communication skills.

    b) Executive leadership qualities that will permit him/her to contribute significantly to the overall strategic direction of the company and to the resolution of key operating issues.

    c) Enthusiasm and energy to inspire and motivate others.

    d) Creative leader who can establish immediate credibility by virtue of the strength of his/her character and personality as well as his/her record of accomplishment in the marketplace.

    e) Ability to understand difficult organizational problems and to formulate and implement appropriate solutions.

1. Technical/Functional Competencies

6

CONFIDENTIAL

MSG 01884

a) Understanding of NBA league requirements and employment laws as they relate to the union-management relationship and the interpretation of collective bargaining agreements.

b) Knowledge of strategic planning and budgeting processes.

c) Project management skills.

1. Key Experiences/Achievements

a) A highly successful track record in the sports industry, preferably 10 years of sports experience, preferably in basketball of increasingly higher level management roles.

b) Experience in marketing with the understanding of building, advertising, public relations, team services and front office administrations.

c) A minimum of 10 years management experience.

d) Network of contacts in the business, experience in evolving work environments and leading large, creative teams..

7

CONFIDENTIAL

# EXHIBIT L

VLADECK, WALDMAN, ELIAS & ENGELHARD, P.C.

COUNSELORS AT LAW

1501 BROADWAY

NEW YORK, N.Y. 10036

TEL 212/403-7300

FAX 212/221-3172

KEVIN T. MINTZER



WRITER'S DIRECT DIAL

403-7348

March 19, 2007

**BY FEDERAL EXPRESS**
Teresa M. Holland, Esq.
Epstein, Becker & Green, P.C.
250 Park Avenue
New York, New York  10177

Re:    Anucha Browne Sanders v. MSG, Isiah Thomas and
       James L. Dolan No. 06 CV 0589

Dear Teresa:

Enclosed are: (1) Plaintiff's Supplemental Disclosures Pursuant to Fed. R. Civ. P.26, which update plaintiff's damages calculations; (2) additional documents concerning plaintiff's job search bearing bates numbers Pl. 04482 through Pl. 05268.

We expect to provide a limited number of additional documents concerning plaintiff's job search within the coming days.

Sincerely,

Kevin T. Mintzer

KTM:slr
Enclosures

cc:    Lisa Horwitz, Esq. (with enclosures – by federal express)

244101 v1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ANUCHA BROWNE SANDERS,

                     Plaintiff,

      - against -

MADISON SQUARE GARDEN, L.P.,
ISIAH LORD THOMAS III, AND
JAMES L. DOLAN,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

06 Civ. 0589 (GEL)

PLAINTIFF'S SUPPLEMENTAL
DISCLOSURES PURSUANT TO
FED. R. CIV. P. 26

ECF CASE

Plaintiff Anucha Browne Sanders ("plaintiff" or "Browne Sanders"), by her attorneys Vladeck, Waldman, Elias & Engelhard, P.C., hereby provides the following information to defendants Madison Square Garden, L.P. ( "MSG"), Isiah Lord Thomas III ("Thomas"), and James L. Dolan ("Dolan") (collectively, "defendants"):

Fed R. Civ. P. 26(a)(1)(C):    Plaintiff cannot fully calculate her damages at this time.  However, based on the information that she currently possesses, plaintiff calculates her damages as follows: $602,568 in back pay to compensate plaintiff, through October 1, 2007, for wages, bonuses, and 401(k) contributions that plaintiff would have received had she not been discriminated against and retaliated against by defendants, less work-related compensation that plaintiff expects to earn in mitigation of her damages through October 1, 2007.  Plaintiff also seeks an Order that MSG convey to her all stock options previously granted to her that did not vest as a result of her unlawful termination from MSG, as well as to supplement her pension in the amounts that she would have received if she had remained employed at MSG.  In addition,

plaintiff seeks compensation for the penalties and taxes that she will incur (amounts presently unknown) as a result of withdrawing money from her retirement accounts since her unlawful termination from MSG.

To the extent that plaintiff is not reinstated to her former position at MSG, plaintiff will also seek an award of front pay and/or reputational damages to compensate plaintiff, from October 1, 2007 through age 65 (January 5, 2028), for expected lost wages, bonuses, and 401(k) contributions, less any work-related compensation that plaintiff expects to earn in mitigation of her damages, in the amount of $9,762,406. (See attached chart detailing the calculations for back pay and front pay)  If plaintiff is not reinstated to her former position at MSG, plaintiff will also seek an Order requiring MSG to make pension payments to her in the amounts that she would have been entitled to receive had her employment not been unlawfully terminated by MSG and had she continued to work at MSG until age 65.

Plaintiff additionally seeks punitive damages from defendants in amounts to be determined by the jury.  Plaintiff also seeks attorneys' fees and the costs of this action from defendants in an amount to be determined by the Court.  In addition, plaintiff seeks from defendants an award of pre-judgment interest, as well as damages to compensate plaintiff for any adverse tax consequences.

Plaintiff reserves the right to supplement these disclosures as and if additional information becomes available.  Plaintiff provides these disclosures without waiving any objections that might apply including, but not limited to, objections relating to privilege, confidentiality, materiality, relevancy or burden.

Dated: New York, New York
      March 19, 2007

                         VLADECK, WALDMAN, ELIAS &
                         ENGELHARD, P.C.

By: _____
             Anne C. Vladeck  (AV 4857)
             Kevin T. Mintzer (KM 4741)
             Karen Cacace (KC 3184)
             Attorneys for Plaintiff
             1501 Broadway, Suite 800
             New York, New York  10036
             (212) 403-7300

Attachment to Plaintiff's Supplemental Disclosures Pursuant to Fed. R. Civ. P. 26

| Years | Plaintiff's MSG Salary with 5% Increases | Plaintiff's MSG Bonus 25% of Salary | Plaintiff's 401K ER Contr. 3% of Gross Salary[1] | Plaintiff's MSG Total Compensation | Plaintiff's Job Mitigation with 3% Increases | Difference |
|---|---|---|---|---|---|---|
| 2005 | 0 | 62,500 | 0 | 62,500 | 0 | 62,500 |
| 2006 | 262,500 | 65,625 | 7,750 | 335,875 | 0 | 335,875 |
| 2007 | 275,625 | 68,906 | 8,000 | 352,531 | 107,499[2] | 245,032 |
| 2008 | 289,406 | 72,351 | 8,000 | 369,757 | 115,000[3] | 254,757 |
| 2009 | 303,876 | 75,969 | 8,000 | 387,845 | 118,450 | 269,395 |
| 2010 | 319,070 | 79,761 | 8,000 | 406,831 | 122,003 | 284,827 |
| 2011 | 335,023 | 83,755 | 8,000 | 426,778 | 125,663 | 301,114 |
| 2012 | 351,177 | 87,794 | 8,000 | 446,971 | 129,432 | 317,538 |
| 2013 | 369,363 | 92,340 | 8,000 | 469,703 | 133,314 | 336,388 |
| 2014 | 387,832 | 96,958 | 8,000 | 492,790 | 137,313 | 355,476 |
| 2015 | 407,223 | 101,805 | 8,000 | 517,028 | 141,432 | 375,595 |
| 2016 | 427,584 | 106,896 | 8,000 | 542,480 | 145,674 | 396,805 |
| 2017 | 448,964 | 112,241 | 8,000 | 569,205 | 150,004 | 414,160 |
| 2018 | 471,412 | 117,853 | 8,000 | 597,265 | 154,504 | 442,760 |
| 2019 | 494,984 | 123,746 | 8,000 | 626,730 | 159,139 | 467,590 |
| 2020 | 519,731 | 129,932 | 8,000 | 657,663 | 163,913 | 493,817 |
| 2021 | 545,719 | 136,429 | 8,000 | 690,148 | 168,830 | 521,318 |
| 2022 | 573,005 | 143,251 | 8,000 | 724,256 | 173,895 | 550,360 |
| 2023 | 601,655 | 150,413 | 8,000 | 760,068 | 179,111 | 580,956 |
| 2024 | 631,738 | 157,934 | 8,000 | 797,672 | 184,484 | 613,187 |
| 2025 | 663,325 | 165,831 | 8,000 | 837,156 | 190,018 | 647,137 |
| 2026 | 696,491 | 174,831 | 8,000 | 879,322 | 195,718 | 683,603 |
| 2027 | 731,315 | 182,828 | 8,000 | 922,143 | 201,589 | 720,553 |
| 2028 | 767,881 | 191,970 | 8,000 | 967,851 | 207,636 | 760,214 |
| | $10,874,899 | $2,718,821 | $175,875 | $13,769,595 | $3,404,621 | $10,364,974 |

---

[1]  The employer contribution is calculated based on the statutory limit of an employee's contribution of $15,500 for 2007 and $16,000 for 2008 and beyond.

[2]  10/12 x $129,000 per year as consultant.

[3]  $115,000 per year as employee.

244033 v1