UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ANUCHA BROWNE SANDERS,

                         Plaintiff,                  06 Civ. 0589 (GEL)

       - against -                       ECF Case

MADISON SQUARE GARDEN, L.P., ISIAH
LORD THOMAS III, and JAMES L. DOLAN,

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO ISIAH THOMAS' MOTION FOR PARTIAL SUMMARY JUDGMENT

VLADECK, WALDMAN, ELIAS &
   ENGELHARD, P.C.
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300

245174 v2

Dockets.Justia.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................ii

PRELIMINARY STATEMENT .............................................................................................1

STATEMENT OF FACTS .......................................................................................................2

ARGUMENT...............................................................................................................................8

    I.     UNDER THE APPLICABLE LEGAL STANDARDS, THOMAS'
          MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD
          BE DENIED ...........................................................................................8

    II.    THOMAS AIDED AND ABETTED MSG'S RETALIATORY
          DISMISSAL OF BROWNE SANDERS ............................................8

          A.    An Individual Can Aid And Abet Retaliation Even If He
               Is Not A Decisionmaker ...........................................................9

          B.    Thomas Participated In The Retaliatory Dismissal Of Plaintiff
               By Providing MSG With A Pretextual Basis For Her Dismissal .............10

    III.   BROWNE SANDERS IS ENTITLED TO PURSUE HER CLAIM
          FOR REPUTATIONAL DAMAGES AGAINST THOMAS...........................15

          A.    Browne Sanders Is Not Required To Prove Defamation To
               Recover For Harm To Her Professional Reputation ...............................15

          B.    New York's Civil Rights Law Does Not Bar Plaintiff From
               Recovering Reputational Damages ........................................................20

          C.    A Jury Could Find That Thomas Caused Damage To Plaintiff's
               Professional Reputation.........................................................................21

CONCLUSION ..........................................................................................................................23

# TABLE OF AUTHORITIES

## CASES

Brice v. Security Operations Systems, Inc.,
   No. 00 Civ. 2438 (GEL), 2001 WL. 185136 (S.D.N.Y. Feb. 26, 2001) .................9, 10, 13

Caplan v. Winslett,
   637 N.Y.S.2d 967 (1st Dep't 1996) ...............................................................................21

Dunson v. Tri-Maintenance & Contractors, Inc.,
   171 F. Supp. 2d 103 (E.D.N.Y. 2001).......................................................................9, 10

E.E.O.C. v. Ethan Allen, Inc.,
   44 F.3d 116 (2d Cir. 1994) ...........................................................................................15

Feingold v. New York,
   366 F.3d 138 (2d Cir. 2004) ...........................................................................................9

Graham v. Long Island R.R.,
   230 F.3d 34 (2d Cir. 2000) ..............................................................................................8

Hudson v. Goldman Sachs & Co.,
   757 N.Y.S.2d 541 (1st Dep't 2003) ..............................................................................21

Lipin v. National Union Fire Ins. Co. of Pittsburgh, PA.,
   202 F. Supp. 2d 126 (S.D.N.Y. 2002) ..........................................................................21

Long v. Marubeni America Corp.,
   No. 05 Civ. 0639 (GEL), 2006 WL. 547555 (S.D.N.Y. March 6, 2006).....................9, 10

Mack v. Otis Elevator Co.,
   326 F.3d 116 (2d Cir. 2003) ..........................................................................................14

Mahony v. Keyspan Corp.,
   No. 94 CV 554, 2007 WL. 805813 (E.D.N.Y. March 12, 2007) .....................................18

Mandell v. County of Suffolk,
   316 F.3d 368 (2d Cir. 2003) ............................................................................................8

Osorio v. Source Enterprises, Inc.,
   No. 05 Civ. 10029 (JSR), 2007 WL. 683985 (S.D.N.Y. March 2, 2007) .................18, 22

Patterson v. City of Utica,
   370 F.3d 322 (2d Cir. 2004) .....................................................................................19, 20

Reed v. Cedar County,
    No. 05-CV-64-LRR, 2007 WL. 509186 (N.D. Iowa Feb. 12, 2007) ................22

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000) ...........................................................8, 15

Rodal v. Anesthesia Group of Onondaga P.C.,
    369 F.3d 113 (2d Cir. 2004) .....................................................8

Tolbert v. Queens Coll.,
    242 F.3d 58 (2d Cir. 2001) ......................................................8

Williams v. Pharmacia, Inc.,
    137 F.3d 944 (7th Cir. 1998) ...............................................16, 17

## STATUTES

42 U.S.C. § 1981a.........................................................................17

42 U.S.C. § 1983 .........................................................................19

18 U.S.C. § 1514A(c)(1) .................................................................18

Fed. R. Evid. 801(c).....................................................................13

N.Y. Exec. Law. §296(7)...............................................................9, 10

N.Y. Exec. Law § 297(9)..................................................................18

N.Y. Civil Rights Law § 74..........................................................20, 21

N.Y.C. Admin. Code § 8-107.......................................................9, 18, 19

N.Y.C. Local Law No. 85 of 2005 .........................................................19

## OTHER AUTHORITIES

Craig Gurian, A Return To Eyes On The Prize: Litigating Under The Restored New York
    City Human Rights Law, 33 Fordham Urb. L.J. 255, 307-310 (2006) .............19

EEOC Policy Guidance On Damages Provisions
    of 1991 Civil Rights Act...............................................................17

## PRELIMINARY STATEMENT

Plaintiff Anucha Browne Sanders ("Browne Sanders" or "plaintiff") brings this action against defendants Madison Square Garden, L.P. ("MSG"), Isiah Lord Thomas III ("Thomas") and James L. Dolan ("Dolan") to remedy gender discrimination, including sexual harassment, and to remedy retaliation for engaging in protected activities, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the New York State Executive Law § 290 et seq. ("Executive Law"); and the Administrative Code of the City of New York § 8-101 et seq. ("City Code"). Plaintiff submits this Memorandum of Law in opposition to Thomas' motion for partial summary judgment on plaintiff's claim of retaliation and her demand for reputational damages.

For many years, Browne Sanders was a highly successful female executive in the world of professional sports. Based on her hard work, skills and experience, she rose to a level that very few women have ever achieved: head of business operations for a National Basketball Association ("NBA") franchise. Browne Sanders' career proceeded without disruption until her employer, MSG, hired Thomas to lead its basketball operations. Soon thereafter, Thomas began to sexually harass Browne Sanders and made it difficult for her to do her job. Because MSG failed to remedy this situation in response to her many internal complaints, and because the problems that she experienced with Thomas and other male employees were getting worse, not better, she retained counsel to complain to MSG on her behalf. This led to almost immediate retaliation. Within a month, Browne Sanders was summarily dismissed.

While Thomas professes to have had no role in Browne Sanders' firing, the evidence shows otherwise. In response to Browne Sanders' complaints about harassment, Thomas provided MSG with a false tale of how Browne Sanders purportedly tried to act as his boss and how she wanted to make decisions within basketball operations. According to

Thomas, he and Browne Sanders "butted heads" because he wanted complete control of the players, something that Browne Sanders could allegedly not abide. Sure enough, after MSG fired Browne Sanders, it originally claimed that her firing was due in large part to her alleged inability to work well with Thomas and to accept his organizational changes. Based on this evidence, a reasonable jury could find that Thomas aided and abetted MSG's retaliatory conduct by intentionally providing MSG with a pretext for Browne Sanders' firing. Furthermore, there is sufficient evidence for a jury to find that as a result of Thomas' conduct, Browne Sanders has suffered substantial damage to her reputation and her ability to earn a living now and in the future. Accordingly, Thomas' motion for partial summary judgment should be denied.

STATEMENT OF FACTS

<u>Browne Sanders' Employment With MSG</u>

Browne Sanders began her employment with MSG in November 2000 as the Vice President of Marketing for the New York Knickerbockers ("Knicks"), an NBA franchise owned by MSG. Browne Sanders was hired by Stephen Mills ("Mills"), who was then the Executive Vice President for Franchise Operations for MSG. As Vice President of Marketing, Browne Sanders reported to Mills. (Plaintiff's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1") ¶ 45).

On or about March 11, 2002, MSG promoted Browne Sanders to the position of Senior Vice President ("SVP"), Marketing & Business Operations of the New York Knicks. In this new role, plaintiff continued to report to Mills, who at that point had been promoted and held the position of President, MSG Sports Team Operations. As SVP of Marketing and Business Operations, Browne Sanders also had a "dotted line" reporting relationship to Scott Layden ("Layden"), who was then the President of Basketball Operations for the Knicks. Browne

Sanders was responsible for keeping Layden informed about the important business developments related to the team.  (Pl. 56.1 ¶ 47)

Both before and after Browne Sanders' promotion to SVP, she received outstanding performance evaluations, as well as significant bonuses and raises.  (Pl. 56.1 ¶¶ 5, 19, 46, 48-51)  Furthermore, during the course of her employment with MSG, she received many professional and personal honors, including being named by the Sports Business Journal as one of the top 40 professionals under 40 years old in the sports field.  (Pl. 56.1 ¶ 52)

Thomas Is Hired By MSG

On or about December 22, 2003, MSG hired Thomas as the President of Basketball Operations for the Knicks.  Before joining the Knicks, Thomas was a hall-of-fame basketball player, an executive and coach.  When Thomas joined MSG, he was given a multi-year contract until July 2007 and became part of MSG's Office of the Chairman, a five member group of MSG's most senior managers led by MSG Chairman James Dolan ("Dolan").  Browne Sanders continued to have the same dotted line reporting relationship to Thomas that she had to Layden.  (Pl. 56.1 ¶ 53)

Beginning in early 2004, Thomas began sexually harassing Browne Sanders by, among other things, referring to her by demeaning and sexist epithets, such as "bitch" and "ho," as well as cursing at her in their private conversations.  Browne Sanders complained to Mills on multiple occasions about Thomas' conduct, and she also told Thomas that he should act like a professional and to treat her with respect.  (Pl. 56.1 ¶ 54)  After Browne Sanders complained about Thomas' behavior, Thomas told Mills that he wanted plaintiff fired.  Thomas also complained about plaintiff's performance to another executive in the organization.  (Pl. 56.1 ¶ 55)

In or about the early part of 2005, Mills completed a performance appraisal for Browne Sanders for the calendar year 2004. In that document, Mills assigned Browne Sanders an overall performance rating of 4 on a scale of 1 to 5, denoting that plaintiff's overall performance for 2004 "exceeded expected performance." Mills also wrote in that review that "Anucha effectively managed through the organizational and philosophical changes when Isiah Thomas was hired." (Pl. 56.1 ¶ 51) In or about February 2005, MSG awarded Browne Sanders a bonus of $76,000. In April 2005, MSG raised Browne Sanders' annual base salary from approximately $213,000 to $250,000, an increase of over 17%. (Pl. 56.1 ¶ 19)

Browne Sanders Complains Of Discrimination Through Counsel

Beginning in late December 2004 and continuing throughout 2005, Thomas' treatment of Browne Sanders changed. Instead of cursing at Browne Sanders and treating her with hostility, Thomas began to profess his love for her, to make sexual advances toward her, and to make comments about her physical appearance such as telling her that she was "beautiful," "attractive" and "easy on the eyes." (Pl. 56.1 ¶ 56) Based on, among other things, Thomas' continual sexual harassment and the inappropriate conduct of Knicks player Stephon Marbury, who had repeatedly referred to Browne Sanders as a "black bitch," (Pl. 56.1 ¶ 57), Browne Sanders retained counsel to complain to MSG on her behalf.

On December 22, 2005, counsel for Browne Sanders met with counsel for MSG. At that meeting, Browne Sanders' attorneys stated, among other things, that Browne Sanders had been subjected to sexual harassment at MSG and provided MSG's counsel with information concerning Browne Sanders' claims. (Pl. 56.1 ¶ 58) Shortly after the December 22, 2005 meeting between plaintiff's counsel and MSG's counsel, MSG began an internal investigation of plaintiff's sexual harassment complaint. MSG's internal investigation was conducted by, among

others, Rochelle Noel ("Noel"), an in-house attorney for Cablevision, MSG's parent company, and MSG Vice President of Employee Relations John Moran ("Moran"). (Pl. 56.1 ¶ 59)

Moran and Noel interviewed plaintiff on January 6, 2006, at which time Browne Sanders provided substantial detail about her sexual harassment complaint. (Pl. 56.1 ¶ 60) Moran and Noel also interviewed Thomas on December 23, 2005 and January 11, 2006, during which Thomas falsely denied most of Browne Sanders' allegations. In those interviews Thomas also volunteered numerous criticisms about Browne Sanders' performance. Among other things, Thomas falsely stated that he and Browne Sanders "butted heads" because Thomas "wanted complete control of players time and responsibilities," which Browne Sanders resisted; that Browne Sanders "wanted to be making decisions in basketball operations," rather than running her own department; and that Browne Sanders had acted as if she were Thomas' boss. (Pl. 56.1 ¶¶ 15, 61)

<u>MSG Concludes Its Investigation Of Browne Sanders' Harassment Complaint And She Is Fired</u>

On or about January 13, 2006, Noel and Moran finalized the findings of MSG's internal investigation in a document entitled, Summary of Harassment Investigation ("Investigation Summary"). (Pl. 56.1 ¶ 14) Approximately six days later, on January 19, 2006, Marc Schoenfeld ("Schoenfeld"), then MSG's Acting General Counsel, drafted a memorandum for Rusty McCormack ("McCormack"), MSG's Senior Vice President of Human Resources, entitled "Knicks Employee Relations Issues." (<u>Id.</u>) The memorandum purports to make recommendations in light of the Investigation Summary, including a recommendation that Browne Sanders should be fired. The memorandum also reiterated Thomas' false charge that Thomas and Browne Sanders had a "number of business disagreements and differences in philosophy and management style." (Pl. 56.1 ¶¶ 15, 17, 41, 61) On the same date of the

memorandum, January 19, 2006, MSG's counsel informed plaintiff's counsel that MSG was terminating Browne Sanders' employment, effective immediately. (Pl. 56.1 ¶ 18)

On January 24, 2006, plaintiff filed this action. That same day, lawyers for Thomas and MSG made statements to the press on behalf of their respective clients. MSG claimed that plaintiff's claim was "fabricated and outrageous" and that Browne Sanders was "fired because of an inability to fulfill her professional responsibilities." Thomas' lawyers stated that plaintiff's claims were "a blatant attempt by Anucha Browne Sanders to get a large sum of money from Madison Square Garden by taking advantage of the celebrity status of our client." Plaintiff responded to these smears in a statement that she read at a press conference on January 25, 2006. That same day, Thomas held a press conference in which he falsely denied plaintiff's claims and asserted that Browne Sanders was trying to use him as a "pawn" for her "financial gain." Two days later, Thomas held another press conference, in which he again falsely denied Browne Sanders' claims. (Pl. 56.1 ¶ 62)

In February 2006, Browne Sanders filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against MSG based on the same events described in her original Complaint, including her claims that she was sexually harassed and that she was fired for engaging in protected activity. In April 2006, MSG submitted a Position Statement to the EEOC concerning Browne Sanders' charge. In its Position Statement, MSG represented that Browne Sanders "refused to accept and adapt to changes in procedure after Isiah Thomas joined the Knicks in December 2003 as President, Basketball Operations." According to MSG, Browne Sanders was fired, at least in part, because she refused "to adapt to the changes instituted by Thomas." (Pl. 56.1 ¶ 64)

On or about July 14, 2006, plaintiff amended her Complaint in this action and added a claim against Thomas for aiding and abetting MSG's retaliatory decision to fire her. Thereafter, MSG changed its position about why Browne Sanders was discharged. At his deposition in December 2005, Dolan claimed that he made the decision to fire Browne Sanders from MSG, and he did so on his own, without consulting anyone else. (Pl. 56.1 ¶¶ 37, 67) Dolan's stated reasons for firing Browne Sanders are now, among other things, that Browne Sanders purportedly requested six million dollars in severance and that she allegedly violated MSG's policies by tampering with the internal investigation of her sexual harassment complaint. (Pl. 56.1 ¶ 67) In fact, Browne Sanders never made a "severance demand" to MSG. Rather, her counsel and MSG's counsel attempted to settle her claims of sexual harassment. Furthermore, Browne Sanders did nothing to "tamper" with MSG's investigation; she simply sought to gather evidence in support of her claims, as was her right under the anti-discrimination laws. (Pl. 56.1 ¶ 68)

Following Browne Sanders' unlawful dismissal and the negative public comments that defendants made about her, her career prospects and earning capacity have been damaged. Although Browne Sanders has applied for jobs with hundreds of potential employers in a wide variety of businesses, she is presently working as an independent contractor for a non-profit organization. Her annual compensation is less than half of what she had earned at MSG. (Pl. 56.1 ¶ 69) Moreover, Browne Sanders has repeatedly been asked about the circumstances of her dismissal from MSG by prospective employers and executive recruiters, some of whom have specifically referenced her dismissal from MSG in the context of discussing potential jobs that she ultimately was not offered. (Id.)

<u>ARGUMENT</u>

I.  UNDER THE APPLICABLE LEGAL STANDARDS, THOMAS' MOTION
    FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED

Summary judgment is inappropriate because Thomas has not established the

absence of material factual issues. See <u>Rodal v. Anesthesia Group of Onondaga P.C.</u>, 369 F.3d

113, 118 (2d Cir. 2004). A court determining whether a genuine issue of material fact exists

must "constru[e] the evidence in the light most favorable to the non-moving party." <u>Id.</u> On a

motion for summary judgment, a court must credit all evidence favorable to the non-movant and

may not credit the movant's evidence unless it comes from disinterested witnesses and is

uncontradicted and unimpeached. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151

(2000); <u>Tolbert v. Queens Coll.</u>, 242 F.3d 58, 70 (2d Cir. 2001). In "discrimination cases where

state of mind is at issue," summary judgment is granted "sparingly because 'careful scrutiny of

the factual allegations may reveal circumstantial evidence to support the required inference of

discrimination.'" <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 377 (2d Cir. 2003) (quoting

<u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000)).

II.  THOMAS AIDED AND ABETTED MSG'S RETALIATORY
     DISMISSAL OF BROWNE SANDERS

Thomas is not entitled to summary judgment because there are, at a minimum,

material factual disputes concerning whether he aided and abetted MSG's retaliatory dismissal of

plaintiff. Thomas' motion is predicated on an erroneous understanding of the standards

governing aiding and abetting liability under the Executive Law and the City Code. Under the

correct legal standards, an individual who assists an employer in carrying out a retaliatory

dismissal by providing a pretextual justification for that dismissal can be liable as an aider and

abettor. (<u>See</u> Section II(A), <u>infra</u>) Moreover, there is substantial evidence to support plaintiff's

claim that Thomas intentionally assisted MSG's efforts to retaliate by falsely claiming that

Browne Sanders had resisted his organizational changes and wanted to manage basketball operations as well as her own department. (See Section II(B), infra)

   A.     An Individual Can Aid And Abet Retaliation Even If He Is Not A Decisionmaker

              Under both the Executive Law and the City Code, it is unlawful for "any person" to "retaliate or discriminate" against anyone who has opposed a discriminatory practice. N.Y. Exec. Law. §296(7); N.Y.C. Admin. Code § 8-107(7). In addition, both statutes provide that it is unlawful for "any person" to "aid [or] abet" a discriminatory employment practice. N.Y. Exec. Law. §296(6); N.Y.C. Admin. Code § 8-107(6). An individual who "actually participates" in an unlawful employment action can be liable as an aider and abettor. See Feingold v. New York, 366 F.3d 138, 157-58 (2d Cir. 2004). Contrary to Thomas' argument (see Memorandum of Law of Defendant Isiah Thomas In Support Of His Motion For Partial Summary Judgment ("Thomas Br.") 12), the "actual participation" standard does not require a showing that the accused aider and abettor had the authority to engage in an unlawful employment practice. See Dunson v. Tri-Maintenance & Contractors, Inc., 171 F. Supp. 2d 103, 114 (E.D.N.Y. 2001). Rather, in the context of a claim of a retaliatory dismissal, an individual can aid and abet the unlawful retaliatory practice "if, acting with the retaliatory animus required for liability, he intentionally aided another who did have such authority to engage in illegal conduct." Long v. Marubeni America Corp., No. 05 Civ. 0639 (GEL), 2006 WL 547555, at *4 (S.D.N.Y. March 6, 2006).

              Thus, a defendant who provides the pretextual basis for a plaintiff's dismissal  and who is motivated by retaliatory animus can be liable for aiding and abetting retaliation. See Long, 2006 WL 547555, at *4; Dunson, 171 F. Supp. 2d at 115-16; Brice v. Security Operations Systems, Inc., No. 00 Civ. 2438 (GEL), 2001 WL 185136, at *7 (S.D.N.Y. Feb. 26, 2001). For example, in Long, this Court held that the plaintiffs stated a viable claim of retaliatory aiding and abetting against a retired executive who had no involvement in the adverse actions taken by the

employer against plaintiffs other than that he falsely disavowed -- after his retirement -- severance agreements he allegedly made with plaintiffs on the employer's behalf. See Long, 2006 WL 547555, at *3-5. As this Court recognized, although the retired executive did not have the authority to take adverse actions against the plaintiffs, he was still potentially liable for aiding and abetting because he falsely misrepresented the plaintiffs' contractual rights because they had complained of discrimination. Id. at *5.

Similarly, in Dunson, the plaintiff alleged that two private investigators aided and abetted his employer in firing him for retaliatory reasons by conducting an investigation designed to find a reason to justify his retaliatory dismissal. Dunson, 171 F. Supp. 2d at 113-16. After stating that Executive Law § 296(6) and City Code § 8-107(6) do not require that a defendant have authority over a plaintiff's employment in order for liability to attach, the court rejected the private investigators' motion for summary judgment. Summary judgment was denied because there was a factual dispute over whether the investigators aided the plaintiff's employer in creating a pretext for plaintiff's firing. Dunson, 171 F. Supp. 2d at 115-16; see Brice, 2001 WL 185136, at *7 ("had [defendant] intentionally provided [plaintiff's employer] with a pretext, it would be guilty of aiding and abetting").

B.    Thomas Participated In The Retaliatory Dismissal Of Plaintiff
By Providing MSG With A Pretextual Basis For Her Dismissal

Thomas' contention that there is no factual basis for plaintiff's aiding and abetting claim (Thomas Br. 11) is without merit. As in Long and Dunson, Thomas participated in MSG's retaliatory dismissal of plaintiff by providing the company with a pretextual justification to fire her.

Although Browne Sanders reported to Mills, she also had a dotted line reporting relationship to Thomas, which meant that she was required to keep him abreast of the activities

on the business-side of the organization. (Pl. 56.1 ¶¶ 47, 53)  After Browne Sanders told Thomas to stop harassing her, Thomas complained to Mills about Browne Sanders and told Mills that he wanted her fired. (Pl. 56.1 ¶ 55)  Furthermore, during Thomas' interviews with the MSG investigators who were investigating plaintiff's sexual harassment complaint, Thomas repeatedly and falsely said that Browne Sanders' harassment complaints were unfounded and falsely suggested that her allegations against him arose from changes that he implemented upon joining the Knicks. (Pl. 56.1 ¶¶ 15, 41, 61)  Specifically, Thomas told MSG's investigators: (1) that he and Browne Sanders "butted heads" because Thomas "wanted complete control of players' time and responsibilities," which Browne Sanders presumably resented; (2) that Browne Sanders "wanted to be making decisions in basketball operations," rather than running her own department; and (3) that Browne Sanders had acted as if she were Thomas' boss. (Pl. 56.1 ¶ 15) Within a month of Thomas making these complaints, MSG fired Browne Sanders.

Ignoring these facts, Thomas wrongly contends that there is no evidence that he told MSG that Browne Sanders was resistant to his managerial changes. (Thomas Br. 11) Thomas also ignores that his false assertions to MSG are echoed in his Answer to plaintiff's Second Amended Complaint.  Thomas' Answer specifically alleges that "plaintiff's inability to accept the changes that occurred under Thomas' leadership fueled her antipathy toward Thomas and are reflected by this meritless lawsuit." (Pl. 56.1 ¶ 63)  Likewise, Thomas falsely stated to the representative of the EEOC who was investigating Browne Sanders' charge of discrimination that Browne Sanders "did not like" the organizational changes that Thomas had implemented within basketball operations. (Pl. 56.1 ¶ 65)

A jury could further find that MSG seized upon the false information provided by Thomas in order to justify its retaliatory dismissal of plaintiff.  Although Dolan now

acknowledges that Browne Sanders' settlement position and her interactions with her colleagues about her sexual harassment claims were the decisive factors in her firing, that was not MSG's original position in this matter.[1]  (Pl. 56.1 ¶ 67)  MSG initially claimed that Browne Sanders was fired because she did not work well with MSG's senior management, including Thomas, and because she refused to accept Thomas' managerial changes.  MSG began to formulate this pretext on or about January 19, 2006, the day Browne Sanders was fired, when Schoenfeld prepared the Knicks Employee Relations Issues memorandum for McCormack to sign. (Pl. 56.1 ¶¶ 14, 18)  That memorandum, which McCormack acknowledged was written in order to create a "record" for anticipated litigation, purported to make recommendations "in light of" the investigation of Browne Sanders' sexual harassment complaint, including a recommendation that "Browne Sanders should be separated from MSG."  (Pl. 56.1 ¶ 18)  The memorandum also reiterated Thomas' false charge that Thomas and Browne Sanders had a "number of business disagreements and differences in philosophy and management style." (Pl. 56.1 ¶ 17)

MSG's use of Thomas' false complaints about Browne Sanders continued when MSG submitted its Position Statement to the EEOC in response to Browne Sanders' charge of discrimination. (Pl. 56.1 ¶ 64)  MSG's Position Statement makes clear that MSG used Thomas'

---

[1]    As set forth more fully in Plaintiff's Memorandum of Law in Support of Plaintiff's Motion For Partial Summary Judgment ("Plaintiff's Memorandum"), separately submitted to the Court, Dolan testified that he made the decision to fire Browne Sanders on his own, and that two of the determinative factors in his decision were that: (1) Browne Sanders spoke with her colleagues about her allegations of sexual harassment, interactions that Dolan erroneously claims were contrary to MSG's policy and amounted to "tampering" with MSG's sexual harassment investigation; and (2) the monetary settlement demand made by Browne Sanders' counsel. For the reasons stated in Plaintiff's Memorandum, Dolan's testimony and related evidence compel a finding that Browne Sanders was fired by MSG and Dolan for engaging in protected activity. Contrary to Thomas' argument (Thomas Br. 13), the fact that Dolan claims to have made the decision to fire Browne Sanders on his own does not absolve Thomas of aiding and abetting liability for plaintiff's dismissal because, as discussed above, Thomas intentionally assisted MSG in firing plaintiff by supplying a false basis for her dismissal.

complaints to justify plaintiff's firing.    In its Position Statement, MSG represented the following

to the EEOC:

- "This matter . . . resolves around an employee with numerous professional shortcomings, particularly her inability or unwillingness to interact in a collegial or professional manner with other members of MSG's management <u>and to accept and adapt to changes in procedure after Isiah Thomas joined the Knicks</u> in December 2003 as President, Basketball Operations."

- "<u>Browne Sanders openly resented [Thomas'] philosophical and operational changes</u>, which caused a clear tension between her, Thomas and other members of the Knicks organization."

- "Browne Sanders' inability to work with other MSG executives, including Thomas, <u>and to adapt to the changes instituted by Thomas</u>, combined with other significant professional conflicts and her repeated failures to effectively perform the management and financial aspects of her job, led to her termination in January 2006."

- "<u>Browne Sanders' demonstrated inability or unwillingness to accept the changes Thomas implemented and her failure to get along with Thomas</u>, and other senior employees engendered significant concerns about her ability to perform her key management role."

(Pl. 56.1 ¶ 15, 17, 41, 64) (emphasis added)[2]

A jury could find that MSG's attempt to justify plaintiff's firing based on her

purported resistance to Thomas' "operational changes" was a pretext for retaliation.   Contrary to

the cover story that both Thomas and MSG have asserted, a jury could find that Browne Sanders

did <u>not</u> object to the managerial changes that Thomas instituted concerning the functioning of the

---

[2]    MSG's position statement is not hearsay as to Thomas because plaintiff does not seek to introduce the document for the truth of the statements contained therein.  <u>See</u> Fed. R. Evid. 801(c).  Rather, the Position Statement is offered against Thomas for the limited purpose of demonstrating that MSG sought to use Thomas' complaints about Browne Sanders as a pretext to justify plaintiff's retaliatory dismissal.  <u>Cf.</u> <u>Brice</u>, 2001 WL 185136, at *7 (EEOC position statement of one co-defendant not admissible against second co-defendant for truth of statements contained therein, especially because portions of the position statement at issue were disavowed as erroneous by attorney who submitted it).

basketball operations department. Nor did Browne Sanders seek to have a greater role in basketball operations. (Pl. 56.1 ¶ 66) In fact, Browne Sanders had responded very well to the changes that Thomas had implemented. In the final performance review that Browne Sanders received before her dismissal, a review in which her overall rating was "exceeded expected performance," Mills noted that one of Browne Sanders' top three accomplishments during the review period was "effectively manag[ing] through the organizational and philosophical changes when Isiah Thomas was hired. She has managed to derive upon key player involvement in team business and marketing initiatives with less player availability." (Pl. 56.1 ¶ 51)

Finally, contrary to Thomas' assertion (Thomas Br. at 13), a jury could find that Thomas and MSG shared the same retaliatory intent in falsely asserting that Browne Sanders resisted Thomas' organizational changes and sought greater influence over basketball operations. Thomas concedes MSG's retaliatory motive for purposes of this motion. (Thomas Br. 11 n.5) A jury could determine that Thomas shared MSG's retaliatory intent because Browne Sanders had opposed his discriminatory practices. Thomas was motivated to criticize plaintiff falsely because she had accused him of sexual harassment, a potentially devastating charge that Thomas knew to be true. Furthermore, given Thomas' status as President of Basketball Operations for the Knicks, a member of MSG's Office of the Chairman, and a former NBA hall of fame player the Knicks had signed to a multi-year contract (Pl. 56.1 ¶ 53), a jury could find that Thomas knew that his false complaints about Browne Sanders would carry great influence within the organization. <u>Cf.</u> <u>Mack v. Otis Elevator Co.</u>, 326 F.3d 116, 126 (2d Cir. 2003) (employee can be considered a supervisor when authority given by employer enabled or materially augmented ability of employee to create a hostile work environment).

Thomas' retaliatory intent is further evidenced by his dissembling about his role in plaintiff's dismissal. <u>See</u> <u>Reeves</u>, 530 U.S. at 147; <u>E.E.O.C. v. Ethan Allen, Inc.</u>, 44 F.3d 116, 120 (2d Cir. 1994). Although Thomas has falsely claimed that he never complained to anyone about plaintiff's job performance and never recommended that Browne Sanders be fired (Thomas Br. 2), a jury could find that Thomas in fact did complain about Browne Sanders' performance to executives in the organization and that he specifically urged Mills to fire plaintiff. (Pl. 56.1 ¶ 55) A jury could further find that Thomas has dissembled about those complaints in order to conceal his involvement in Browne Sanders' firing.

Accordingly, because there are material factual disputes over whether Thomas aided and abetted MSG's retaliatory dismissal of plaintiff, Thomas' motion for summary judgment on plaintiff's claims of retaliation against him must be denied.

III.   BROWNE SANDERS IS ENTITLED TO PURSUE HER CLAIM
       FOR REPUTATIONAL DAMAGES AGAINST THOMAS

Thomas' motion for summary judgment on plaintiff's claim for reputational damages is also without merit. Contrary to Thomas' argument, victims of discrimination and retaliation such as Browne Sanders are entitled to recover damages for injury to reputation without establishing an independent claim of defamation. (<u>See</u> Section III(A), <u>infra</u>) Likewise, Thomas is mistaken in asserting that Browne Sanders' claim for reputational damages is precluded by Section 74 of the New York Civil Rights Law. (<u>See</u> Section III(B), <u>infra</u>) Finally, a reasonable jury could find that Thomas caused plaintiff's reputational injury by his unlawful conduct. (<u>See</u> Section III(C), <u>infra</u>)

A.   Browne Sanders Is Not Required To Prove Defamation
     To Recover For Harm To Her Professional Reputation

Thomas wrongly contends that Browne Sanders is required to establish the elements of a defamation claim in order to recover damages for injury to her reputation.

(Thomas Br. 14-16)  Thomas incorrectly characterizes plaintiff's claim for reputational damages as arising from the public statements defendants made about plaintiff and this lawsuit.  Plaintiff's professional reputation has been negatively effected by Thomas' harassment, plaintiff's resulting complaints of discrimination and her unlawful dismissal for complaining about the defendants' discriminatory practices.  As a result, plaintiff's ability to earn income now and in the future has been dramatically reduced.  (See Section III(C), infra)  While a jury could find that the public statements that Thomas, MSG and their counsel have made about plaintiff after she filed this suit have compounded plaintiff's reputational injury, the underlying cause of plaintiff's reputational damage is the discriminatory and retaliatory conduct that resulted in plaintiff's dismissal. Accordingly, plaintiff has not pled, and is not required to prove, the elements of a defamation claim.

The entitlement of plaintiffs to recover damages for injury to reputation caused by discrimination, independent of any claim for defamation, is well established.  The leading case on this subject is Williams v. Pharmacia, Inc., 137 F.3d 944 (7th Cir. 1998).  In Williams, a jury found that the plaintiff had been denied a promotion because she was female and then fired because she had pursued a grievance challenging the differential in pay between male and female employees.  Although there was no evidence that defendant had made any post-termination statements about plaintiff's firing, and the plaintiff did not assert any claim of defamation, the jury awarded plaintiff $250,000 in lost future earnings as a result of damage to plaintiff's reputation.

The Seventh Circuit affirmed that award because it "compensate[d] [the plaintiff] for a lifetime of diminished earnings resulting from the reputational harms she suffered as a result of [defendant's] discrimination." Id. at 953. The court in Williams also affirmed a separate

award of front pay to plaintiff, and explained the difference between the front pay and the lost future earnings awards as follows: "Whereas front pay compensates the plaintiff for the lost earnings from her old job for as long as she may have been expected to hold it, a lost future earnings award compensates the plaintiff for the diminution in expected earnings in all of her future jobs for as long as the reputational or other injury may be expected to affect her prospects." Id. at 954. In other words, an award of reputational damages is appropriate in cases in which discrimination has damaged the plaintiff's reputation and future career prospects, regardless of whether the plaintiff is reinstated to the employer that discriminated against her or is awarded front pay in lieu of reinstatement.

The plaintiff's claims in Williams were brought under Title VII, which, as amended by the Civil Rights Act of 1991, authorizes compensatory damages for a plaintiff's "future pecuniary losses, emotional pain . . . and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). The Seventh Circuit agreed with the district court that "injury to professional standing" and "injury to character and reputation" are both "other nonpecuniary losses" compensable under that section. See Williams, 137 F.3d at 952 (citing EEOC Policy Guidance On Damages Provisions of 1991 Civil Rights Act, 8 FEPM 405:7091, 7095 (also available at http://www.eeoc.gov/policy/docs/damages.html)).

While plaintiff's claims against Thomas arise under the Executive Law and the City Code, there is no basis to conclude that damages for reputational harm are less available under those statutes than under Title VII. To the contrary, unlike Title VII, which specifically limits the categories of damages that a plaintiff may pursue and imposes certain caps on damages, see 42 U.S.C. § 1981a, the remedial provisions of the Executive Law and the City Code are broad, uncapped and, with sole exception of the unavailability of punitive damages

under the Executive Law, do not limit the types of damages available to a prevailing plaintiff. See N.Y. Executive Law § 297(9) (person aggrieved by discriminatory practice can pursue cause of action "for damages, including, in cases of housing discrimination only, punitive damages, and such other remedies as may be appropriate"); N.Y.C. Admin. Code § 8-502(a) (person aggrieved by discriminatory practice can pursue cause of action "for damages, including punitive damages, and for injunctive relief and such other remedies as may be appropriate"). Indeed, in a recent retaliation case brought under the Executive Law and the City Code, another court in this District upheld a jury award of four million dollars in compensatory damages for emotional distress and "harm to reputation." See Osorio v. Source Enterprises, Inc., No. 05 Civ. 10029 (JSR), 2007 WL 683985, at *1-2, 5 (S.D.N.Y. March 2, 2007);[3] cf. Mahony v. Keyspan Corp., No. 94 CV 554, 2007 WL 805813, at *7 (E.D.N.Y. March 12, 2007) (denying employer's motion for summary judgment on plaintiff's demand for reputational damages under the Sarbanes-Oxley Act based on language in that statute, 18 U.S.C. § 1514A(c)(1), providing that a prevailing plaintiff is "entitled to all relief necessary to make the employee whole").

Furthermore, any claim that the City Code provides for more limited remedies than Title VII must fail in light of the recent amendments to that statute. In 2005, the City Code was amended to reemphasize that it should be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws . . . have been so construed." N.Y.C. Admin. Code § 8-130

---

[3]    Unlike the plaintiff in Osorio, Browne Sanders has not pursued a claim for emotional distress damages. That has no bearing, however, on her entitlement to damages for injury to her reputation arising from defendants' discriminatory and retaliatory conduct. Furthermore, while the plaintiff in Osorio did prevail on a defamation claim against one of the individual defendants, the court's opinion is clear that the jury awarded (and the court upheld) an additional $3.5 million in damages on that defamation claim, separate and distinct from the four million dollars in reputational and emotional distress damages that the plaintiff was awarded on her Executive Law and City Code retaliation claims. Osario, 2007 WL 683985, at *1.

(emphasis added). The Local Civil Rights Restoration Act of 2005 further provides that federal and state anti-discrimination laws are "a floor below which the City's Human Rights Law cannot fall, rather than a ceiling above which the local law cannot rise." N.Y.C. Local Law No. 85 of 2005 (Oct. 3, 2005), available at http://www.nyc.gov/html/cchr/html/ammend04.html; see generally Craig Gurian, A Return To Eyes On The Prize: Litigating Under The Restored New York City Human Rights Law, 33 Fordham Urb. L.J. 255, 307-310 (2006) (discussing broad remedial goals of the City Code).

Contrary to Thomas' argument (Thomas Br. 15), Patterson v. City of Utica, 370 F.3d 322 (2d Cir. 2004), does not require plaintiff to plead the elements of defamation in order to recover for damage to reputation caused by discrimination. In observing that "loss of reputation alone" is appropriately vindicated by a "state law defamation action," the Court was not making a pronouncement about the recovery of reputational damages in discrimination cases, but was instead discussing the plaintiff's "stigma plus" claim under 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment. Patterson, 370 F.3d at 329-30. The Court was re-stating the principle that in order to prevail on a "stigma plus" claim, a government employee must demonstrate a deprivation of a more "tangible interest" than simply reputation. Id. at 329-30 (citations omitted). This analysis has no bearing on plaintiff's claim that she suffered reputational damages as a consequence of defendants' discriminatory and retaliatory conduct in violation of the anti-discrimination laws.

Indeed, to the extent relevant at all, Patterson supports plaintiff's claim for reputational damages against defendants because the Court recognized that reputational harm, when combined with a more tangible harm such as the loss of employment, can form the basis of

a "stigma plus" claim. Id. Here, of course, Browne Sanders has not only sued based on comments that damaged her reputation; she was fired from her job.

Thomas fails to cite any authority for his claim that a plaintiff alleging reputational injury from discriminatory and retaliatory practices must plead the elements of a defamation claim. The remaining cases that he cites (Thomas Br. 16) are inapposite, as they all set forth the unremarkable and irrelevant proposition that an inadequately pled defamation claim cannot be repackaged under the heading of an intentional infliction of emotional distress or similar claim. These cases do not discuss reputational damages in the context of a discrimination claim, let alone hold that a victim of discrimination who suffers reputational damage must prove the elements of a defamation claim.

B.   New York's Civil Rights Law Does Not Bar
     Plaintiff From Recovering Reputational Damages

Equally without merit is Thomas' claim that Section 74 of the New York Civil Rights Law ("Section 74"), which bars suits based on the "publication of a fair and true report of any judicial proceeding," prevents plaintiff from recovering reputational damages. As discussed above, Browne Sanders has not brought suit based on any public statement that Thomas or his attorneys have made. Rather, her claim for reputational damages arises from Thomas' role in sexually harassing her and assisting in her dismissal when she opposed his conduct. Plaintiff may introduce Thomas' statements from his multiple press conferences -- including his false denials of plaintiff's claims and his assertion that plaintiff was using him as a "pawn" for her "financial gain" (Pl. 56.1 ¶ 62) -- because such statements compounded the injury to her reputation from defendants' unlawful conduct. Plaintiff has not asserted an independent claim based on those statements. Nothing in Section 74 or in any of the cases cited by Thomas (Thomas Br. 16-17) states or suggests that the statute imposes any limitation on the scope of

evidence of reputational injury that a plaintiff may present in a discrimination or retaliation case.[4] As such, Section 74 has no relevance to this case.

### C. A Jury Could Find That Thomas Caused Damage To Plaintiff's Professional Reputation

Finally, to the extent that Thomas maintains that there is no evidence to support an award of reputational damages against him, he cannot establish an absence of material facts in dispute. Before Browne Sanders was harassed by Thomas and others and unlawfully fired for opposing defendants' discriminatory practices, she was the Senior Vice President of Business Operations for one of only thirty NBA franchises. Her base salary at the time of her dismissal was $250,000 and she had most recently received a bonus of $76,000. Moreover, Browne Sanders was the recipient of several professional awards and, as a jury could find, possessed an excellent reputation in the sports business community. (Pl. 56.1 ¶¶ 19, 52)

Following Browne Sanders' unlawful dismissal and the negative public comments that have been made about her by defendants, including Thomas, her career prospects and earning capacity have been drastically diminished. Despite engaging in a comprehensive search in which she has applied for jobs with hundreds of potential employers in a wide variety of businesses, she is presently working as an independent contractor for a non-profit organization and her annual compensation is less than half of what she had earned at MSG. (Pl. 56.1 ¶ 69) Moreover, Browne Sanders has repeatedly been asked about the circumstances of her dismissal

---

[4]      Indeed, none of the cases cited by Thomas involve claims of discrimination and related reputational injury. See Lipin v. National Union Fire Ins. Co. of Pittsburgh, PA., 202 F. Supp. 2d 126 (S.D.N.Y. 2002) (dismissing libel claim against attorneys based on statement contained in a memorandum of law filed in court); Hudson v. Goldman Sachs & Co., 757 N.Y.S.2d 541 (1st Dep't 2003) (dismissing libel claim based on public statements by defendant's employees that accurately reflected defendant's position in underlying litigation); Caplan v. Winslett, 637 N.Y.S.2d 967 (1st Dep't 1996) (dismissing slander complaint against attorney based on statement made to opposing counsel in a discussion about a pending case).

from MSG by prospective employers and executive recruiters, some of whom have specifically referenced her firing from MSG in the context of discussing potential jobs that she ultimately was not offered. (Id.)

This evidence is more than sufficient for a jury to find that plaintiff has experienced enormous reputational harm and lost future earnings as a result of Thomas' unlawful conduct. See Osorio, 2007 WL 683985, at *5 (affirming substantial award of damages based on plaintiff's description of reputational harm); Reed v. Cedar County, No. 05-CV-64-LRR, 2007 WL 509186, at *7 (N.D. Iowa Feb. 12, 2007) (in sexual harassment and retaliation case, permitting plaintiff and potentially other witnesses to testify in support of plaintiff's claim for reputational damages). While Thomas claims that no reputational harm could have been caused by his behind-closed-doors sexual harassment (Thomas Br. 18), this ignores the fact that MSG dismissed plaintiff, with Thomas' assistance, as a consequence of her complaints about Thomas' illegal conduct. Accordingly, Thomas' motion for summary judgment on plaintiff's claim of reputational damages should be denied.

## CONCLUSION

Based on the foregoing, Thomas' motion for partial summary judgment should be denied in its entirety.

Dated:      New York, New York
             May 25, 2007

Respectfully submitted,

VLADECK, WALDMAN, ELIAS
& ENGELHARD, P.C.

By: _____
Anne C. Vladeck (AV 4857)
Kevin T. Mintzer (KM 4741)
Karen Cacace (KC 3184)
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York  10036
(212) 403-7300

245174 v2

23