UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANUCHA BROWNE SANDERS,

              Plaintiff,

      - against -

MADISON SQUARE GARDEN, L.P., ISIAH
LORD THOMAS III and JAMES L. DOLAN,

              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

06 Civ. 0589 (GEL)


ECF CASE

DECLARATION OF KEVIN T. MINTZER
IN SUPPORT OF PLAINTIFF'S OPPOSITION
TO ISIAH THOMAS' MOTION FOR
PARTIAL SUMMARY JUDGMENT

      KEVIN T. MINTZER, under penalty of perjury, affirms and states as follows:

      1.     I am a member of the firm Vladeck, Waldman, Elias & Engelhard, P.C.,

attorneys for plaintiff Anucha Browne Sanders ("plaintiff" or "Browne Sanders") in this action

against Madison Square Garden, L.P. ("MSG"), Isiah Lord Thomas III ("Thomas") and James L.

Dolan ("Dolan"). I submit this declaration in opposition to Thomas' motion for partial summary

judgment.

      2.     Attached hereto as Exhibit 1 is a true and correct copy of an e-mail

sequence produced by MSG in this action.

      3.     Attached hereto as Exhibit 2 is a true and correct copy of a letter from

plaintiff's counsel to MSG's counsel, dated January 20, 2006.

      4.     Attached hereto as Exhibit 3 is a true and correct copy of Thomas' initial

employment contract with MSG produced by MSG in this action.

      5.     Attached hereto as Exhibit 4 is a true and correct copy of a press statement

made by Thomas' and MSG's attorneys.

45483 v1

Dockets.Justia.com

6.  Attached hereto as Exhibit 5 is a true and correct copy of plaintiff's charge of discrimination filed with the U.S. Equal Employment Opportunity Commission ("EEOC"), dated February 15, 2006.

7.  Attached hereto as Exhibit 6 is a true and correct copy of MSG's Position Statement, without attachments, submitted to the EEOC, dated April 14, 2006.

8.  Attached hereto as Exhibit 7 is a true and correct copy of a memorandum by EEOC Senior Investigator Patricia M. Araujo concerning her telephone interview with Thomas, dated September 14, 2006.

9.  Attached hereto as Exhibit 8 is a true and correct copy of the Affidavit of Kevin T. Mintzer, without attachments, filed in support of plaintiff's Motion for Partial Summary Judgment, dated April 27, 2007.

10.  Attached hereto as Exhibit 9 is a true and correct copy of Exhibit 7 from the deposition of Dan Gladstone.

11.  Attached hereto as Exhibit 10 is a true and correct copy of excerpts from the first day of plaintiff's deposition on November 27, 2006.

12.  Attached hereto as Exhibit 11 is a true and correct copy of excerpts from the second day of plaintiff's deposition on November 28, 2006.

13.  Attached hereto as Exhibit 12 is a true and correct copy of excerpts from the deposition of Thomas.

14.  Attached hereto as Exhibit 13 is a true and correct copy of excerpts from the deposition of James Dolan and Dolan Deposition Exhibits 4 and 16.

15.  Attached hereto as Exhibit 14 is a true and correct copy of excerpts from the deposition of Stephen Mills and Mills Deposition Exhibits 3, 4, 6, 7, 8 and 11.

16.     Attached hereto as Exhibit 15 is a true and correct copy of excerpts from the deposition of Rusty McCormack.

17.     Attached hereto as Exhibit 16 is a true and correct copy of excerpts from the deposition of John Moran and Moran Deposition Exhibits 10 and 11.

18.     Attached hereto as Exhibit 17 is a true and correct copy of excerpts from the deposition of Rochelle Noel and Noel Deposition Exhibit 2, 13 and 14.

19.     Attached hereto as Exhibit 18 is a true and correct copy of excerpts from the deposition of Hank Ratner.

20.     Attached hereto as Exhibit 19 is a true and correct copy of excerpts from the deposition of Robert Levy.

21.     Attached hereto as Exhibit 20 is a true and correct copy of excerpts from the deposition of Jeff Nix.

22.     Attached hereto as Exhibit 21 is a true and correct copy of excerpts from the deposition of Karin Buchholz.

23.     Attached hereto as Exhibit 22 is a true and correct copy of excerpts from the deposition of Joseph Favorito.

24.     Attached hereto as Exhibit 23 is a true and correct copy of excerpts from the deposition of Faye Brown.

25.     Attached hereto as Exhibit 24 is a true and correct copy of the Declaration of Jonathan Schindel, Esq., dated January 23, 2007.

26.     Attached hereto as Exhibit 25 is a true and correct copy of the Declaration of Marc Schoenfeld, Esq., dated March 2, 2007.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 25, 2007 in New York, New York.

_____
KEVIN T. MINTZER

# Exhibit 1

*40 under 40*

**Browne-Sanders, Anucha**

From:        Favorito, Joe
Sent:        Monday, November 04, 2002 1:40 PM
To:          Browne-Sanders, Anucha
Subject:     RE: you're in

you, Joe Dumars and Tony Hawk...what else would you want

-----Original Message-----
From:        Browne-Sanders, Anucha
Sent:        Monday, November 04, 2002 1:39 PM
To:          Favorito, Joe
Subject:     RE: you're in

thanks. This is nice

-----Original Message-----
From:        Favorito, Joe
Sent:        Monday, November 04, 2002 1:10 PM
To:          Browne-Sanders, Anucha
Subject:     you're in

## SBJ Releases Its Annual "40 Under 40" List Of Execs

The SPORTSBUSINESS JOURNAL has released its annual "40 Under 40" list, and Bill King writes, "Is this a list of the most powerful under 40-executives in sports, or the brightest? Yes. Does it reflect those who have achieved the most or promise the most? Yes. There is no scoring system here. No formula. We try to produce a list that represents the best of the industry, taken from a cross section of sports and an array of business disciplines." The '02 winners, which will be honored Friday night at the Waldorf Astoria in N.Y., are presented below *(SBJ, 11/4)*.

SBJ Releases Its Annual "40 Under 40" List Of Execs
The SPORTSBUSINESS JOURNAL has released its annual "40 Under 40" list, and Bill King writes, "Is this a list of the most powerful under 40-executives in sports, or the brightest? Yes. Does it reflect those who have achieved the most or promise the most? Yes. There is no scoring system here. No formula. We try to produce a list that represents the best of the industry, taken from a cross section of sports and an array of business disciplines." The '02 winners, which will be honored Friday night at the Waldorf Astoria in N.Y., are presented below (SBJ, 11/4).

NAME ORGANIZATION POSITION
MARK ABBOTT MLS COO
HANK ADAMS Ignite Sports CEO & Chair
PAUL ARCHEY MLB Senior VP/Int'l Business
SETH BERGER And 1 Founder & CEO
PAUL BROOKS NASCAR VP/Broadcasting
**ANUCHA BROWNE-SANDERS Knicks Senior VP/Marketing & Business Operations**
SCOTT BRUBAKER D'Backs Senior VP/Sales & Marketing
PETER CARLISLE Octagon Dir of Olympic, Action Sports/Athlete Rep Div.
RAY CLARK The Marketing Arm Founder & CEO
BOB CRAMER MasterCard Int'l VP/Global Sponsorships & Event Marketing
MICHAEL CROWLEY A's President
WILLIAM DALY NHL Exec VP & CLO
JOE DUMARS Pistons President/Basketball Ops
TOM FOX Gatorade VP/Sports & Event Marketing
JOHN GALLOWAY Pepsi Dir of Sports Marketing
TONY HAWK Tony Hawk Inc./ Birdhouse Projects President, CEO & Founder

1

MSG 02438

ED HORNE NHL Enterprises President
WAYNE KATZ Proskauer Rose Partner
JONATHAN KRAFT The Kraft Group/Patriots President, COO & Vice Chair
STEVE LAULETTA Miller Brewing Dir of Sports & Event Marketing
MARK LAZARUS Turner Sports President
MARK LEWIS UT Athletic Foundation President & CEO
DAN LOZANO Beverly Hills Sports Council Partner
ELLIOTT MCCABE Bank of America Managing Director
PATRICK MCGEE Octagon VP/Athlete Marketing, Worldwide
TOM MCGOVERN OMD USA Dir of Sports Marketing
ALAN OSTFIELD Palace Sports & Entertainment COO
BEATRIZ PEREZ Coca-Cola N.A. VP/Sports Marketing
JOHN PLEASANTS Ticketmaster President & CEO
GEORGE POSTOLOS Rockets President & CEO
GEORGE PYNE NASCAR Senior VP/Marketing
KRIS RONE Dodgers Exec VP & CMO
JAMEY ROOTES Texans Senior VP, Chief Sales & v
MICHAEL RUBIN GSI Commerce President & CEO
CHRIS RUSSO NFL Senior VP/New Media & Publishing
MARK SHAPIRO ESPN Exec VP/Programming & Production
BRENDA SPOONEMORE NBA Entertainment VP/Interactive Services
MARK STEINBERG IMG Senior VP/Golf, President of Basketball
NEAL TILES Fox Sports Marketing Group Exec VP
HEIDI UEBERROTH NBA Entertainment Exec VP/Global Media Properties & Marketing Partnerships

Comment On This Story

2

MSG 02439

Exhibit 2

VLADECK, WALDMAN, ELIAS & ENGELHARD, P.C.

COUNSELORS AT LAW

1501 BROADWAY

NEW YORK, N.Y. 10036

TEL 212/403-7300

FAX 212/221-3172

KEVIN T. MINTZER



WRITER'S DIRECT DIAL

403-7348

January 20, 2006

BY FACSIMILE
Christopher P. Reynolds, Esq.
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178-0060

       Re:    Anucha Browne Sanders and Madison Square Garden

Dear Mr. Reynolds:

       I am writing to confirm our telephone conversation of yesterday.

       You said that your client, Madison Square Garden ("MSG"), had completed its investigation of Ms. Browne Sanders' gender discrimination and sexual harassment complaint. You said that the result of the investigation was that Ms. Browne Sanders' complaint was not supported, and that her account had been contradicted by individuals interviewed during the investigation. You then said that MSG had decided to separate Ms. Browne Sanders from MSG, effective immediately, that I should advise Ms. Browne Sanders of her dismissal, and that a representative of MSG would be contacting her regarding certain administrative matters. You further said, in substance, that MSG had decided to fire Ms. Browne Sanders because she was unable to function effectively in her position, that she had poor interactions with MSG's senior management, and that the organization could not function effectively if she remained employed.

       Please advise me immediately, no later than 4 p.m. today, if you believe that I have in any way inaccurately described our conversation.

       Very truly yours,

Kevin T. Mintzer

234609 v1

# Exhibit 3

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT made as of the 22nd day of December, 2003, by and between Mr. Isiah Thomas (the "Executive") and MADISON SQUARE GARDEN, L.P. (the "Company").

The Company and Executive agree as follows:

1.    EMPLOYMENT.

1.1.    For the period December 22, 2003 through July 31, 2007 (the "Term"), the Company shall retain the Executive as President, Basketball Operations of the New York Knickerbockers Basketball Club (the "Club"), or in such other comparable senior executive position as the Company may designate, performing such executive duties and services as may be assigned to him from time to time by the Company's Chairman and/or President, Sports Team Operations. The Executive shall direct, supervise and manage the basketball operations of the Club with such duties, functions and responsibilities as generally are incident to that position in the NBA.

1.2.    Either the Executive or the Company may terminate this Agreement effective as of July 31, 2005.  In order to exercise his right of termination, Executive must notify the Company of his intent to do so on or before July 1, 2005.  In order to exercise its right of termination, the Company must notify the executive of its intent to do so on or before July 15, 2005.  In the event the Company exercises its right of termination under this paragraph, its sole obligation to the Executive shall be to pay him ⋯ ⋯payable in equal bi-weekly installments during the period August 1, 2005 through July 31, 2006.

1.3.    During the Term of this Agreement, the Executive shall devote substantially all of his business time, attention, skills and energies (reasonable vacation time and absence for sickness or similar disability excepted) to the business affairs of the Club. Executive shall perform his services hereunder in a diligent, competent and skillful manner, to the best of his abilities.

1.4.    The Executive shall participate in those promotional activities of the Company or the Club reasonably assigned to him by the Company's Chairman and/or President, Sports Team Operations.

1.5.    The Executive shall be entitled to such vacation, leaves for illness, temporary disability and similar programs as other similarly situated senior executives of the Company.

1

CONFIDENTIAL

MSG 09094

1.6.    The Executive shall relocate his primary residence to the New York metropolitan area promptly following the effective date of this Agreement.

2.    COMPENSATION.

2.1.    (a)  The Company shall reimburse the Executive all of his reasonable, out-of-pocket relocation-related expenses pursuant to the Company's executive relocation policy.

(b)  The Company shall provide the Executive with an appropriate corporate apartment in an area of Westchester County convenient to the Club's Training Center for the period from the date hereof through July 31, 2004.

2.2.    (a)  The Company shall pay to the Executive a signing bonus in the amount of ⸱            ; payable in equal installments of .            ! on each of January 15, 2004 and February 15, 2004.  This amount is subject to forfeiture on a pro-rata basis in the event Employee resigns or is terminated for Cause during the term of this Agreement.

(b)  The Company shall pay to the Executive the salaries provided for in Exhibit A hereto.  Such salary shall be remitted to the Executive in accordance with the regular payroll practices of the Company.

2.3.    The Company shall remit to the Executive the bonuses described below.  Such bonuses, if any, shall be payable within 30 days following the conclusion of the relevant NBA playoffs, provided the Executive actually renders services to the Company throughout the applicable regular season and playoffs.  Said bonuses shall be calculated as follows:

(a)    If the Club participates in the playoffs, :
            , Dollars; and

(b)    If the Club participates in the second round of the playoffs, an additional
Dollars; and

(c)    If the Club participates in the third round of the playoffs, an additional I
Dollars; and

(d)    If the Club participates in the final round of the playoffs, an additional ⸱
Dollars; and

(e)    If the Club wins the final round of the playoffs, an additional ⸱            Dollars.

2

CONFIDENTIAL

MSG 09095

3.    BENEFITS.    During the Term of this Agreement, the Executive shall be included, to the extent eligible, in all group health, dental, group life, pension, disability, 401(k) savings, accidental death and dismemberment insurance benefit plans and other similar plans, which are made available generally to other similarly situated senior executives of the Company.

4.    EXPENSES.    The Company shall reimburse the Executive during the Term of this Agreement for all appropriately documented expenses reasonably and actually incurred by him in the performance of his duties for the Company.

5.    REPRESENTATIONS AND WARRANTIES.    The Executive represents, warrants and agrees that:

5.1.    The Executive has extraordinary and unique skills and ability with regard to the sport of professional basketball, that his exclusive services rendered to the Company and the Club cannot be replaced, or the loss thereof adequately compensated in money damages, and that any breach by the Executive of this Agreement will cause irreparable injury to the Company.  Therefore, it is agreed that in the event the Executive in any manner materially breaches or allegedly materially breaches this Agreement, the Company, in addition to any other remedies that may be available to it, shall have the right to obtain, from any court having jurisdiction, such equitable relief as may be appropriate, including without limitation a decree enjoining the Executive from any further such breach of this Agreement.

5.2.    The Executive has the full right, title and authority to enter into this Agreement, and perform his duties and obligations hereunder.

5.3.    The Executive has not granted, nor will he grant, any right, do any act or enter into any agreement or understanding whatsoever, which may or will prevent, impair or hinder the Executive's full performance of his obligations hereunder.

5.4.    The Executive shall not do any act, fail to do any act or make any statement whatsoever which will, in a material way, impair, impugn, denigrate, disparage or reflect negatively upon the name, reputation or business interests of the Club, the Company, Cablevision or any of their respective officers, directors, employees or affiliated entities.

6.    COVENANTS.

6.1.    Executive shall not, at any time during the Term hereof, participate in the writing or scripting (including, without limitation, any "as told to" publications) of any book, periodical, periodical story, movie, play or other written or theatrical work, except ordinary media interviews and the like done in the course of his employment, which

3

MSG 09096

relates to Executive's services to the Club and the Company, without the prior written consent of the Company.

6.2.    The Executive acknowledges that due to his position in the Company and his knowledge of the Company's confidential and proprietary information, his employment or affiliation with certain entities would be detrimental to the Company. The Executive agrees that during the Term, without the prior written consent of the Company, he will not represent, become employed by, consult to, advise in any manner or have any material financial interest in any business in competition with: the Company's current or future sports, entertainment, theatrical or cable television programming business in the United States; or Cablevision's current or future cable television, programming, telephone, advertising, movie, theatrical, PCS, DBS, on-line service, Internet service or other business in the telecommunications marketplace in the States of New York, New Jersey, Connecticut, Massachusetts or Ohio.  Ownership of not more than 1% of the outstanding stock of any publicly traded entity shall not be a violation of this provision.

6.3.    The Executive shall maintain in strictest confidence all confidential or proprietary information concerning the Club, the Company or Cablevision or their businesses or organizations which is not (independently of disclosure by the Executive) public knowledge or general knowledge of the trade.  Following any termination or expiration of the Executive's employment hereunder, the Executive shall not, except as required by compulsion of legal process, use or make any such information available for any purpose other than with the written approval of the Company.

6.4.    During the Term of this Agreement, the Executive may not engage in any commercial activity or endorsements without the prior written approval of the Company.

6.5.    The Executive agrees that he will not, during the twelve-month period following the termination of his employment, or in contemplation of termination of his employment, induce, entice or solicit any employee of the Company to leave his or her employment with the Company.

7.    DEATH OR DISABILITY.  The Company may terminate this Agreement prior to the expiration of the Term if the Executive is unable to perform his duties hereunder for any reason as a result of the Executive's disability or incapacity for a continuous period of more than three consecutive months, or for shorter non-consecutive periods aggregating more than three months during any twelve month period of the Term of this Agreement, in each case without further obligation to the Executive other than to pay the compensation and reimbursement amounts provided for herein pro-rated to the date of such termination.  Any payments received by the Executive pursuant to the Company's standard employee disability insurance policy or any other any policy of disability insurance which may be maintained by the Company on his behalf, shall be

4

CONFIDENTIAL

MSG 09097

credited against the Company's obligations to the Executive as set forth in this Agreement.

8.    DISCHARGE.

8.1.    (a)    The Company shall have the right to terminate the employment of the Executive for Cause. If the Company exercises such right, its obligations under this Agreement to make any further payments to the Executive shall thereupon cease and terminate, it being understood that upon termination pursuant to this Section 8.1, the Club shall pay to the Executive any compensation amounts which are attributable to the period prior to, but which are unpaid as of the date of, such termination. As used herein, the term "Cause" shall be limited to (i) action by the Executive which constitutes a material breach of the terms hereof, (ii) the Executive's gross neglect or refusal to perform the duties assigned to him hereunder, or (iii) the Executive being convicted of a felony or pleading nolo contendere with respect to a felony charge.

(b)    The Company may not terminate Executive's employment for Cause pursuant to clause (i) or (ii) above unless (i) the Company has notified the Executive of the Company's basis for declaring that Executive has committed a material breach of this Agreement, or has grossly neglected or refused to perform his duties hereunder; (ii) the Company has afforded the Executive a period of at least three (3) business days to effect a cure of such breach, neglect or refusal; and (iii) the Executive has failed to so cure such breach, neglect or refusal. It is understood and agreed that the preceding sentence shall not apply to a termination based on the Executive's violation of Section 5.4 of this Agreement.

8.2.    In the event the Company shall terminate the employment of the Executive for any reason other than for Cause at any time during the Term of this Agreement, the Company shall, as its sole obligation hereunder, subject to the Executive's execution of the Company's standard release and termination agreement, pay to the Executive the regular base salary at the times and in the amounts specified in Section 2 and Exhibit A hereto through the conclusion of the Term, provided, however, that if such termination occurs on or prior to July 15, 2005, the Company's obligation shall be limited to payment of (i) the regular base salary at the times and in the amounts specified in Section 2 and Exhibit A hereto through July 31, 2005, plus (ii) an amount equal to rs·            ) for the period August 1, 2005 through July 31, 2006.

8.3.    Nothing contained herein will be construed to prevent the Executive from seeking or obtaining other employment in the event the employment of the Executive is terminated by the Club for reasons other than Cause, subject at all times to the Company's prior approval thereof. In the event the Executive obtains any other employment in or related to the field of professional or amateur basketball, the Company's obligations to make further payments to the Executive shall thereupon be reduced by the sum (or sums) which is (or are) (i) paid to Executive in respect of the regular base salary

5

CONFIDENTIAL

MSG 09098

of such other employment and (ii) attributable to the period of time then remaining during the Term (regardless of when actually paid).

8.4.    In the event of the termination of Executive's employment for reasons other than Cause, Executive hereby represents, warrants and agrees that if he obtains any other basketball-related employment, his financial remuneration in connection therewith and as contemplated above shall be negotiated in good faith and as the result of arms-length bargaining.

9.    NOTICES. All notices or communications to either party hereunder shall be in writing and shall be deemed given when personally delivered, when mailed by certified mail, return receipt requested, postage prepaid, addressed as follows:

| If to the Company: | Madison Square Garden, L.P.<br>Two Pennsylvania Plaza<br>New York, New York 10121<br>Attention: President, Sports Team Operations |
| --- | --- |
| With a copy to: | Madison Square Garden, L.P.<br>Two Pennsylvania Plaza<br>New York, New York 10121<br>Attention: General Counsel |
| If to the Executive: | Mr. Isiah Thomas<br>c/o Lonnie Cooper<br>Career Sports Management, Inc.<br>200 Galleria Parkway<br>Suite 2060<br>Atlanta, Georgia 30339 |

10.    RESIGNATION. If the Executive terminates his own employment during the Term, other than in accordance with Section 1.2 hereof, he shall be deemed to be in material breach of this Agreement. In such event, Club's obligations under this Agreement to make any further payments or provide any further benefits to the Executive shall immediately cease and terminate. The Executive acknowledges and agrees that his obligations under the Agreement, including, without limitation, those set forth in Sections 5 and 6 hereof, and the Company's rights in connection with such obligations, shall remain in full force and effect for the duration of the Term. Notwithstanding the foregoing, following such a termination as described in this Section 10, the Executive shall not be required pursuant to Section 6.4 to seek the Company's prior approval for any commercial activity or endorsements that are not basketball-related.

11.    MISCELLANEOUS.

6

CONFIDENTIAL

MSG 09099

11.1.    If any provisions of this Agreement shall be declared to be invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall not affect the remaining provisions hereof which shall remain in full force and effect.

11.2.    This Agreement shall be binding upon and inure to the benefit of the heirs and representatives of the Executive and the assigns and successors of the Company. Neither this Agreement nor any rights hereunder shall be assignable by the Executive and any such attempted assignment shall be void. This Agreement shall be assignable by the Company to another entity controlled by the Company or in respect of which the Company or any affiliate holds a substantial interest, or in connection with any transfer of all or substantially all of the Company's business or any transfer of a portion of the Company's business in respect of which the Executive has responsibility.

11.3.    The Executive agrees to execute, upon request, such standard confidentiality, conflict of interest and proprietary information agreements as similarly situated Company executives are, from time to time, required to execute.

11.4.    This Agreement represents the entire agreement of the parties and shall supersede any and all other contracts, arrangements or understandings between the Company and the Executive. Notwithstanding the foregoing, the Executive shall be bound and governed by the Constitution and By-Laws, rules, regulations, resolutions and agreements of the National Basketball Association, as they may be modified or amended from time to time. This Agreement shall be construed, interpreted and governed in accordance with the internal law of the State of New York.

11.5.    The Company may not be considered in breach of this Agreement unless the Company fails to cure any alleged default in its obligations within five (5) business days following the Company's receipt of written notification of such alleged default from the Executive.

11.6.    The effectiveness of this Agreement is expressly conditioned on the Executive submitting to and passing a standard physical examination (including a drug test) within five (5) calendar days of the date of this Agreement.

7

CONFIDENTIAL

MSG 09100

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed and the Executive has hereunto set his hand, as of the day and year first written.

MADISON SQUARE GARDEN, L.P.

By:    <u>MSG EDEN CORPORATION</u>
its general partner

By:    _____

_____
Isiah Thomas

8

CONFIDENTIAL

MSG 09101

## EXHIBIT A

Period                                                    Salary

December 22, 2003 – July 31, 2004

August 1, 2004 –July 31, 2005

August 1, 2005 –July 31, 2006

August 1, 2006 –July 31, 2007

9

CONFIDENTIAL

MSG 09102

Exhibit 4

11/09/2006  17:53    212-661-9989                    EBG                                    PAGE  04/10



## Ron Green statement on behalf of Madison Square Garden:

"These fabricated and outrageous charges come from an individual whom MSG fired because of an inability to fulfill professional responsibilities, and who now is seeking a financial windfall. We have a zero tolerance policy for a hostile work environment and have always been proud of how our employees are treated, as evidenced by the fact that we have consistently taken appropriate action when employees have engaged in inappropriate behavior. We will fight these outrageous charges and defend our employees from baseless allegations intended to embarrass and harm them."

## Sue Ellen Eisenberg/Peter Parcher statement on behalf of Isiah Thomas:

"This lawsuit is a blatant and cynical attempt by Anucha Browne-Sanders to get a large sum of money from Madison Square Garden, taking advantage of the celebrity status of our client, who had no day-to-day interaction with her. However, while she was still employed, she demanded from the Garden as a condition of her departure the sum of $6 million that is more than 20 times her salary."



'IDENTIAL                                                              MSG 30868