# Exhibit 5

Dockets.Justia.com

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | | CHARGE NUMBER |
|---|---|---|
| | FEPA | |
| X | EEOC | 520-2006-00757 |

New York State Division of Human Rights _____ and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)*| HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Ms. Anucha Browne Sanders | |

| STREET ADDRESS | CITY. STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| Madison Square Garden, L.P. | 500+ | (212) 465-6471 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 2 Pennsylvania Plaza, New York, New York  10001 | | New York |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION *(Check appropriate box(es))*

| | | |
|---|---|---|
| ☐ RACE | ☐ COLOR | ☒ SEX | ☐ RELIGION | ☐ AGE |
| ☒ RETALIATION | ☐ NATIONAL ORIGIN | ☐ DISABILITY | ☐ OTHER *(Specify)* | |

DATE DISCRIMINATION TOOK PLACE
EARLIEST *(ADEA/EPA)*        LATEST *(ALL)*

**January 19, 2006**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s))*:

Please see attached.

EEOC-NYDO
2006 FEB 23 AM 11: 24
RECEIVED

MICHELE HOST
NOTARY PUBLIC State of New York
No. 02HO6116876
Qualified in New York County
Commission Expires Oct 12, 2006

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements)    2/15/06 |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| Date 2-15-06    Charging Party *(Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

EEOC FORM 5 (Test 10/94)

234725 v1

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ANUCHA BROWNE SANDERS,

                   Complainant,             Charge No.

      - and -

MADISON SQUARE GARDEN, L.P.,

                   Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

STATE OF NEW YORK    )
                         ) ss.:
COUNTY OF NEW YORK  )

     ANUCHA BROWNE SANDERS, being duly sworn, deposes and says:

    1.     I am the Complainant in this matter, and I submit this Affidavit in support of my Charge of discrimination.  I believe that Madison Square Garden, L.P. ("MSG") discriminated against me because of my sex (female) and retaliated against me when I complained of discriminatory treatment, as set forth in this Affidavit.

    2.     In 2000, I began working for defendant MSG as a senior executive in the front office of the Knicks, a National Basketball Association ("NBA") franchise owned by MSG.  I was promoted to my current position, Senior Vice President, Marketing and Business Operations, in 2002.  Throughout my employment I received excellent performance reviews.

    3.     On or about December 22, 2003, MSG hired Isiah Lord Thomas III ("Thomas") as President of Basketball Operations for the Knicks.  Thomas repeatedly subjected me to sexually harassing treatment.  Thomas repeatedly referred to me in sexist, demeaning, and

234723 v2

profane terms; touched me inappropriately; told me he was "in love" with me; and made sexual advances towards me.

4.    Thomas also undermined my ability to do my job effectively.    Among other things, Thomas told me that he did not want me to talk to his staff or the players; failed to make the players available for marketing purposes; and repeatedly refused to be involved in sales-related activities that were my responsibility.

5.    I was also aware of other inappropriate and gender-related conduct by Thomas and others at MSG in 2004 and 2005.

6.    I repeatedly informed my supervisor, Steve Mills ("Mills"), President and Chief Operating Officer of MSG, of Thomas' conduct, but Mills took no action.  I also complained to a human resources consultant hired by MSG about Thomas' conduct, who also took no action to remedy the discrimination.   To the extent that MSG had a sexual harassment policy, I fully complied with it by reporting Thomas' conduct to Mills and Human Resources.

7.    In November 2005, a member of my staff told me that player Stephon Marbury had made numerous hostile and sexist comments about me to others in the organization.  I told Mills about these comments.

8.    On or about December 22, 2005, my counsel informed MSG's counsel about the harassment and discrimination that I had experienced.

9.    Once I raised my complaints through counsel, MSG purported to undertake an investigation of my claims.  I was not permitted to return to MSG while the investigation was pending.

10.    On January 19, 2006, MSG's counsel informed my counsel that the company had finished its investigation, found my complaints to be "unsupported," and was terminating my employment.

11.    Because I was fired and the situation was urgent, on January 24, 2006, I filed the attached Complaint in the United States District Court for the Southern District of New York, which asserts claims under the New York State Human Rights Law and the Administrative Code of the City of New York.[1]  The details of MSG's discriminatory and retaliatory treatment are described more fully in the Complaint.  I plan to add a Title VII claim to my lawsuit after the EEOC issues a Right to Sue Notice.

ANUCHA BROWNE SANDERS

Sworn to before me this
15 th day of February, 2006

MICHELE HOST
NOTARY PUBLIC State of New York
No. 02HO6115876
Qualified in New York County
Commission Expires Oct. 12, 2008

Notary Public

---

[1]    My Complaint names Isiah Thomas as an individual defendant under City and State law.

**JUDGE LYNCH**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**06 CV 0589**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANUCHA BROWNE SANDERS,

                  Plaintiff,

      - against -

MADISON SQUARE GARDEN, L.P., AND
ISIAH LORD THOMAS III,

                  Defendants.

06 Civ.   (  )

<u>COMPLAINT</u>

<u>ECF CASE</u>

PLAINTIFF DEMANDS
<u>A TRIAL BY JURY</u>

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Anucha Browne Sanders ("Browne Sanders" or "plaintiff"), by her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complaining of defendants Madison Square Garden, L.P. ("MSG"), and Isiah Lord Thomas III ("Thomas") (collectively, "defendants"), alleges as follows:

### NATURE OF CLAIMS

1.    Browne Sanders is one of the most accomplished and highly-regarded women in professional sports. Based on her hard work and achievements, she became the second highest-ranking official for the New York Knickerbockers ("Knicks") and was responsible for all of the Knicks' business operations. Browne Sanders' career proceeded without impediment until December 2003 when MSG hired Isiah Thomas as President, Basketball Operations. Contrary to Thomas' carefully cultivated public persona, he is capable of abhorrent behavior in private. Soon after his hire, he began to sexually harass Browne Sanders, including calling her "bitch" and "ho" to her face. His hostility toward Browne Sanders went on for months, and he took pains to marginalize Browne Sanders and to prevent her from doing her job.

234650 v1

2.    Once Thomas realized that Browne Sanders was not going to recede in the face of Thomas' gender-based hostility, he took a new approach. He began to make sexual advances to Browne Sanders, repeatedly professing his love for her, making comments about her physical appearance, and suggesting that they go "offsite" together, a thinly veiled solicitation for sex. When Browne Sanders proved unreceptive to Thomas' advances, he continued to undermine her within the organization by, among other things, making derogatory remarks about her to the Knicks players, whose cooperation Browne Sanders needed to perform her marketing duties. The situation deteriorated to the point where Stephon Marbury ("Marbury"), the Knicks' star player, felt free to refer to Browne Sanders as a "black bitch" to other employees of the organization.

3.    Browne Sanders repeatedly complained about Thomas' conduct to her supervisor and others within the organization, but nothing was done to rein in Thomas. Left with no reasonable alternative, Browne Sanders engaged an attorney to press her complaints of harassment and discrimination again. That action finally led MSG to "investigate" Browne Sanders' claims. It also prompted immediate retaliation. As the investigation commenced, Browne Sanders was forced to take an unwanted "vacation," and was not permitted to come to work. Unbelievably, at the conclusion of the investigation, MSG's counsel informed plaintiff's counsel that Browne Sanders' claims were "not supported" <u>and that she was being fired, effective immediately.</u>

4.    Having not the faintest trace of a legitimate reason to dismiss Browne Sanders, who has always been a star performer, MSG has asserted that her employment was being terminated because she had poor interactions with senior management, the very people who had either harassed Browne Sanders or who had allowed the harassment to continue unchecked. The

reality, of course, is that Browne Sanders was discharged in retaliation for her complaints of discrimination. In firing Browne Sanders, MSG flouted the anti-discrimination laws to a degree rarely seen in the contemporary workplace.

5.      This diversity proceeding is brought to remedy discrimination on the basis of sex in the terms and conditions of employment and retaliation for opposition to unlawful employment practices, in violation of the New York State Human Rights Law, New York Executive Law § 296 et seq. (the "Executive Law"); and the Administrative Code of the City of New York § 8-107 et seq. (the "Administrative Code"). Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief pursuant to the Executive Law and the Administrative Code.

<u>PARTIES, JURISDICTION AND VENUE</u>

6.      Plaintiff is a citizen of New Jersey. Until recently, plaintiff was employed by defendant MSG as a senior executive in the front office of the Knicks, a National Basketball Association ("NBA") franchise owned by MSG.

7.      Defendant MSG is a limited partnership organized under the laws of the State of Delaware with headquarters in New York. On information and belief, MSG is wholly-owned by Rainbow Media Holdings, LLC ("Rainbow Media"), a limited liability company organized under the laws of the State of Delaware with headquarters in New York. Rainbow Media, in turn, is a wholly-owned subsidiary of Cablevision Systems Corporation ("Cablevision"), which is incorporated under the laws of the State of Delaware with headquarters in New York.

8.      Defendant Thomas is employed by MSG as the President, Basketball Operations of the Knicks. On information and belief, he is a citizen of the State of New York.

9.     Jurisdiction of this Court is proper under 28 U.S.C. § 1332(a)(1), because the plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000.

10.     As the Southern District of New York is the district where a substantial part of the events giving rise to the claim occurred, venue is proper within this District pursuant to 28 U.S.C. § 1391(a)(2).    Pursuant to § 8-502(c) of the City Law, prior to filing this Complaint, plaintiff served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

11.     Plaintiff will file a charge of discrimination with the United States Equal Opportunity Employment Commission (the "EEOC").    When plaintiff receives a Right to Sue Notice, she will seek to amend the Complaint to add claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII").    The facts set forth are those relevant to that claim as well, and therefore, there will be no prejudice to defendants by this procedure.

## FACTUAL ALLEGATIONS

A.    Browne Sanders' Background and Employment With the Knicks

12.     Browne Sanders received a B.S. from Northwestern University in 1985.    While at Northwestern, Browne Sanders was a standout college basketball player.    She won a place on both the United States National Basketball Team and the Big Ten All Decade Team, was an NCAA National Scoring Champion, and was also a Women's Sports Foundation Kodak All-American.    Following her graduation from Northwestern, Browne Sanders was awarded a two-year fellowship to Florida State University, where she earned a Masters of Science in communications.

234650 v1                                               4

13.     After receiving her master's degree, Browne Sanders began a successful business career, working first at Eastman Kodak and later at IBM.  While at Kodak, Browne Sanders assisted in coordinating and promoting Kodak's Harlem Week sports program, and while at IBM, she worked on web-based marketing for the Olympic Games.  Browne Sanders was ultimately promoted at IBM to the position of Program Manager, World Wide Sports Office – Corporate Marketing, where she was responsible for corporate marketing support programs for IBM's sponsorship of the Olympics.

14.     Browne Sanders began working for MSG in 2000 as the Knicks' Vice President of Marketing.  Her first two years of working with the team were marked by success and glowing personnel reviews.

15.     In the spring of 2002, Browne Sanders was promoted to Senior Vice President, Marketing and Business Operations.  In that role, Browne Sanders reported to Steve Mills ("Mills"), President and Chief Operating Officer of MSG.  She also had a dotted line reporting relationship to the President of Basketball Operations for the Knicks.  Soon after Browne Sanders' promotion, she was named to the Sports Business Journal's prestigious "Forty Under Forty" list, which honors the top forty professionals in sports under the age of forty.

16.     As Senior Vice President, Marketing and Business Operations, Browne Sanders was responsible for the day-to-day management of the business side of the Knicks' front office; she served as the team's chief marketing officer; and she acted as the primary liaison between the Knicks and the NBA.  Browne Sanders also oversaw all of the Knicks' business activities and revenue streams, including partnerships, ticketing, fan development, field marketing, event presentation, community relations, special events and new media.  In addition, Browne Sanders

supervised thirty people, and was a mentor to many female employees. Browne Sanders was the only female member of the Knicks' senior management team.

17.    Following her promotion in 2002, Browne Sanders continued to enjoy professional success and received praise for her performance. In her performance reviews for 2002 and 2003 she received an overall rating of "5," the highest ranking on a 1 to 5 scale.

B.    Thomas Begins to Harass and Discriminate Against Browne Sanders

18.    On or about December 22, 2003, Thomas was named President of Basketball Operations for the Knicks.

19.    On March 9, 2004, the Knicks held a community-relations event, which was organized by Browne Sanders and attended by the Knicks' players. After the event, the players went out to celebrate Marbury's birthday and, upon information and belief, stayed out very late.

20.    March 10, 2004, was a game night, and the Knicks lost. After the game ended, in the Knicks' locker room, Thomas announced that the players would no longer be required to do any community events. Soon after his announcement, Thomas grabbed Browne Sanders' arm and pulled her into a small room to the side of the team's locker room. He yelled that the team was not going to do "any more f--king events." Browne Sanders calmly told Thomas that the league required the Knicks to do community events, and that he should discuss his concerns with Mills. Thomas continued to scream at Browne Sanders, calling her a "f--king bitch," among other things. He eventually stormed out of the room.

21.    At Browne Sanders' next weekly meeting with Mills, Browne Sanders told Mills about Thomas' post-game outburst, as well as his announcement that the Knicks would no longer be doing community service events. Mills did not respond.

234650 v1                                6

22.     On March 23, 2004, Frank Murphy ("Murphy"), then Senior Vice President of Basketball Operations and Thomas' Chief of Staff, appeared in Browne Sanders' office, stood over her desk, and began screaming at her. Among other things, Murphy told Browne Sanders that she was a "bitch."

23.     After Murphy left her office, Browne Sanders called Thomas and described Murphy's statements. Thomas immediately began to berate her, calling her a "bitch" and a "ho," among other expletives. Thomas demanded to know what Browne Sanders' job responsibilities were. As they continued to discuss Browne Sanders' job functions, Thomas continued to curse at her and refer to her by sexist and demeaning terms.

24.     The next day, Mills asked Browne Sanders to attend a meeting. When Browne Sanders arrived, Mills and Thomas were already present in Mills' office. During the meeting, Browne Sanders described her roles and responsibilities to Thomas, and Mills corroborated her description. At one point during the meeting, Mills stepped out of his office. Thomas immediately resumed cursing at Browne Sanders. Once Mills returned, Thomas stopped. Thomas instructed Browne Sanders and Mills that he did not want Browne Sanders to talk to his staff or the players. He told Browne Sanders that she should go through Murphy when she needed to contact the team.

25.     After Thomas left the room, Browne Sanders told Mills what had happened when Mills had been absent. Mills neither apologized nor said that he would chastise Thomas. Browne Sanders asked what she should do when Thomas spoke inappropriately to her; Mills said that she was doing what she was supposed to be doing. Browne Sanders asked how she could do her job if she could not speak to Thomas' staff or the Knicks; Mills told her to accommodate Thomas.

26.     Shortly after the meeting, Browne Sanders sent an e-mail message to Murphy, copying Mills and Thomas, telling Murphy that he could not threaten her and swear at her. Mills told her not to send those types of e-mail messages.

27.     Throughout the late spring and summer of 2004, Thomas refused to be involved in sales-related activities that were Browne Sanders' responsibility. Moreover, for almost the entire balance of 2004, Thomas acted in a very hostile manner towards Browne Sanders on nearly every occasion that the two interacted.

28.     On information and belief, Thomas told members of his basketball operations staff that Browne Sanders was a "bitch," and further stated, referring to Browne Sanders, that they did not have to take direction from "that bitch."

C.     <u>Thomas Begins To Make Sexual Advances to Browne Sanders</u>

29.     On or about December 30, 2004, Thomas' behavior toward Browne Sanders significantly changed. Rather than continue to address Browne Sanders in a hostile and abusive manner, Thomas began to approach Browne Sanders with sexual overtures. After the Knicks game on December 30, 2004, Thomas stopped Browne Sanders, hugged her tightly, and said that he had determined why he and Browne Sanders "had problems" with one another. Thomas told Browne Sanders that he was "in love" with her, and said that they were "so much alike." Thomas compared his feelings to the movie "Love and Basketball."

30.     Shortly thereafter, Browne Sanders told Mills that Thomas had become even more inappropriate in his interactions with her, and that he should be given sexual harassment training. Mills did not respond.

31.     After December 30, 2004, Thomas regularly told Browne Sanders that he was in love with her or made comments to that effect. On each occasion, Browne Sanders made clear to

Thomas that his advances were unwelcome.  Examples of Thomas' inappropriate, harassing and unwelcome conduct towards Browne Sanders in 2005 include the following:

(a)    Thomas asked Browne Sanders on more than one occasion if she would meet with him outside of the office or "offsite."  Browne Sanders understood these requests as sexual advances, which she refused.  Browne Sanders told Mills about Thomas' requests on at least one occasion, and also told Mills that she had refused to meet him offsite because she was uncomfortable with him.

(b)    On or about March 14, 2005, Thomas told Browne Sanders that he was "very attracted" to her and "in love" with her.  He pointed to a scar above Browne Sanders' right eye and compared it to a similar scar that he had above his eye.  Thomas then repeated that he was in love with her and said, "I know you think I'm inappropriate but I'm in love with you."  Browne Sanders said that Thomas was ridiculous and inappropriate and walked away.

(c)    On October 30, 2005, while Browne Sanders was watching the team practice, Thomas told Browne Sanders that if she "stayed close to him" he would make her "a lot of money."

(d)    On or about December 15, 2005, Thomas approached Browne Sanders and hugged her and tried to kiss her.  Browne Sanders pulled away and Thomas said, "What, I can't get any love from you today?"  Browne Sanders walked away without saying anything.

32.    On May 11, 2005, and June 13, 2005, Browne Sanders met with a human resources management consultant hired by MSG.  The consultant told Browne Sanders that Mills had asked him to develop a program for Thomas because he had problems with women.  Browne

Sanders told the consultant in detail about Thomas' harassing and discriminatory conduct. On information and belief, MSG took no action to remedy the problems that Browne Sanders raised with the consultant.

D.     **Other Inappropriate and Sexist Conduct By Thomas**

33.     On or about October 14, 2004, before a game, a female employee of the Knicks told Browne Sanders that Thomas had instructed her to flirt with certain men connected to the game and to make them happy. Browne Sanders had a follow up conversation with the female employee the following day.

34.     On or about October 18, 2004, Browne Sanders met with Mills and told him about her conversations with the female employee. Browne Sanders told Mills that Thomas was putting the organization in a bad position. Browne Sanders also told Mills, among other things, that the female employee could accuse Thomas of sexual harassment.

35.     In a meeting with Thomas in early 2005, Thomas told Browne Sanders that he was pushing to get more Sunday noon games on the schedule. Thomas said that he was working with the concierges of the hotels frequented by the visiting teams to have the concierges direct players to certain nightclubs -- including strip clubs -- that Thomas had established relationships with. Thomas said that his plan was to induce visiting players to go to these clubs on Saturday night, and get them intoxicated so that they would not be prepared to play on Sunday. Browne Sanders was incredulous that Thomas' "basketball strategy" included getting opposing teams drunk at strip clubs.

E.     **Defendants Undermine Browne Sanders' Ability to Do Her Job**

36.     In the fall of 2004, Mills told Browne Sanders that James Dolan ("Dolan"), Chairman of MSG as well as the Chief Executive Officer of Cablevision, said she needed to

create new jobs for two of Marbury's cousins, Hassan Gonsalves ("Gonsalves") and Tasheem Ward ("Ward"). After reviewing their resumes and interviewing both men, Browne Sanders recognized that they were completely unqualified. On or about November 10, 2004, Browne Sanders told Mills about the problems with Gonsalves and Ward, but Mills told her that she needed to create jobs for them anyway and that they needed to be on staff by the following Monday, November 15.

37.    This was not the first occasion that Dolan had insisted the she hire someone unqualified. Previously, Dolan had required that Browne Sanders create a position within her team for Vernon Manuel ("Manuel"), who had worked as Dolan's landscaper, dated Dolan's daughter, and was not qualified to work with the Knicks. While employed by MSG, Manuel forged his manager's signature on multiple occasions, stole from the company, and acted in a hostile and aggressive manner with many women on the staff, including Browne Sanders.

38.    On information and belief, the male senior managers within the Knicks organization were not required to hire unqualified individuals such as Gonsalves, Ward and Manual.

39.    Gonsalves was ultimately fired by MSG, at Browne Sanders' urging, because he engaged in repeated and flagrant sexual harassment. His firing did not occur, however, until he had sexually harassed several women on the staff and had on numerous occasions defrauded the company. That conduct would not have occurred if MSG had accepted Browne Sanders' determination that Gonsalves should not have been hired.

40.    In March 2005, Browne Sanders received her most recent performance evaluation from Mills. While the evaluation was still strong, for the first time Browne Sanders received a 4 out of 5. The only substantive criticism in the review was that Browne Sanders needed to do a

better job "maintaining relationships," which, on information and belief, referred to plaintiff's relationship with Thomas. Browne Sanders had difficulty "maintaining a relationship" with Thomas because he had repeatedly sexually harassed her and verbally berated her, as Mills well knew.

41.    On information and belief, because Browne Sanders rejected Thomas' sexual advances, he continued to undermine her ability to do her job.

42.    For example, in a meeting in early 2005, Mills confirmed to Browne Sanders that the players were not cooperating with her marketing efforts because of Thomas. Indeed, the current marketing campaign promoting the Knicks features cardboard cut-outs of the Knicks players because Thomas has generally refused to make the players available to Browne Sanders' team for marketing purposes. By contrast, the marketing campaign for the New York Rangers, another MSG-owned franchise, utilizes approximately seventeen players in its current marketing campaign.

43.    On information and belief, Thomas has made negative comments about Browne Sanders to Marbury. On or about November 28, 2005, Browne Sanders was told by a member of her staff that Marbury had made numerous hostile and sexist comments about her to others in the organization. Among the things that Marbury has said concerning Browne Sanders are the following:

(a)    "No one likes that black bitch"

(b)    "F--k that black bitch, she thinks she runs the Knicks, she don't run shit"

(c)    "F--k that black bitch, she ain't shit and we'll see what happens this year"

44.    On or about November 29, 2005, Browne Sanders met with Mills. Browne Sanders told Mills about Marbury's statements, and also said that she regarded the comments as

personally threatening. Mills said that that Marbury's hostility was based on things that Thomas was saying to Marbury about Browne Sanders. Browne Sanders said that she had enough of Thomas' harassment. .

45.    Shortly after their meeting, Mills called Browne Sanders and said, in substance, that if Browne Sanders persisted in raising harassment claims, she should be prepared for Thomas to spread a damaging and false rumor about Browne Sanders. In response, Browne Sanders asked whether she should retain an employment lawyer; Mills said that she should not do so.

F.    Browne Sanders Retains Counsel and Is Subject to Retaliation

46.    After her meeting and subsequent telephone call with Mills, and in light of Thomas' continuing harassment and Marbury's comments, Browne Sanders determined that she needed to engage an attorney to protect herself against further harassment and discrimination.

47.    On or about December 22, 2005, Browne Sanders' counsel informed MSG's counsel about the harassment and discrimination that Browne Sanders had experienced. This was not the first time that MSG learned the information that Browne Sanders' counsel had conveyed. Browne Sanders had previously told Mills, her direct supervisor, about much of the harassment that she was subjected to during various meeting in 2004 and 2005. In addition, Browne Sanders had described Thomas' harassing and discriminatory conduct to the human resources consultant hired by MSG.

48.    Once Browne Sanders raised her complaints through counsel, MSG purported to undertake an investigation of Browne Sanders' claims. Browne Sanders fully cooperated with MSG's investigation.

49.     Soon after Browne Sanders raised her complaints through counsel, MSG prohibited her from coming to her office or to Madison Square Garden. Browne Sanders protested, both directly and through counsel, that MSG's decision to force her out of work was retaliatory. Nevertheless, Browne Sanders was not permitted to return to work while the investigation was pending. On information and belief, the individuals Browne Sanders had accused of harassment, including Thomas, were permitted to continue to work throughout MSG's investigation.

50.     On January 19, 2006, counsel for MSG called counsel for Browne Sanders and said that MSG had completed its investigation of Browne Sanders' discrimination and harassment complaint. MSG's attorney said that the result of the investigation was that Browne Sanders' complaint was "not supported." Furthermore, MSG's counsel said that MSG had decided to "separate" Browne Sanders from MSG, effective immediately. MSG's attorney told Browne Sanders' attorney that he should advise Browne Sanders of her dismissal.

51.     According to MSG's attorney, MSG had decided to fire Browne Sanders because she was unable to function effectively in her position, she had poor interactions with MSG's senior management, and the organization could not function effectively if she remained employed there.

52.     MSG's asserted reasons for firing Browne Sanders are transparently pretextual. Prior to her dismissal, Browne Sanders had never been warned that any aspect of her performance was lacking. In fact, as discussed above, her performance evaluations had been uniformly very strong. Moreover, the allegedly "poor interactions" that she had with MSG's senior management were directly related to the harassment and discrimination that Browne Sanders suffered. MSG fired Browne Sanders to retaliate against her for raising claims of sexual

harassment and gender discrimination, and to send a message to other employees that similar complaints will not be tolerated. MSG fired Browne Sanders with full knowledge that it is illegal to punish an employee for complaining of harassment and discrimination.

## FIRST CAUSE OF ACTION

### Sex Discrimination Under The Executive Law Against All Defendants

53.     Plaintiff repeats and realleges paragraphs 1-52 as if fully set forth herein.

54.     By the acts and practices described above, including but not limited to creating a hostile work environment for plaintiff because of her sex and ignoring plaintiff's complaints of discrimination, defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of the Executive Law.

55.     Defendant Thomas is liable under the Executive Law as an aider and abettor of the discrimination against plaintiff.

56.     Defendant MSG is liable as plaintiff's "employer" pursuant to the Executive Law.

57.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

## SECOND CAUSE OF ACTION

### Sex Discrimination Under the Administrative Code Against all Defendants

58.     Plaintiff repeats and realleges paragraphs 1-57 as if fully set forth herein.

59.     By the acts and practices described above, including but not limited to creating a hostile work environment for plaintiff because of her sex and ignoring plaintiff's complaints of discrimination, defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of the Administrative Code.

234650 v1                                                                15

60.    Defendant Thomas is liable under the Administrative Code as an aider and abettor of the discrimination against plaintiff.

61.    Defendant MSG is liable as plaintiff's "employer" pursuant to the Administrative Code.

62.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' discriminatory acts.

63.    Defendants acted intentionally and with malice and/or reckless indifference to plaintiff's statutory rights.

### THIRD CAUSE OF ACTION

#### Retaliation Under the Executive Law Against MSG

64.    Plaintiff repeats and realleges paragraphs 1-63 as if fully set forth herein.

65.    By the acts and practices described above, including but not limited to forcing plaintiff to stop working and terminating plaintiff's employment, defendant MSG retaliated against plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of the Executive Law.

66.    Defendant MSG is liable as plaintiff's "employer" pursuant to the Executive Law.

67.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' retaliatory acts.

### FOURTH CAUSE OF ACTION

#### Retaliation Under the Administrative Code Against MSG

68.    Plaintiff repeats and realleges paragraphs 1-67 as if fully set forth herein.

234650 v1

16

69.     By the acts and practices described above, including but not limited to forcing plaintiff to stop working and terminating plaintiff's employment, defendant MSG retaliated against plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of the Administrative Code.

70.     Defendant MSG is liable as plaintiff's "employer" pursuant to the Administrative Code.

71.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages and damages for mental anguish and humiliation as a result of defendants' retaliatory acts.

72.     Defendant MSG acted intentionally and with malice and/or reckless indifference to plaintiff's statutory rights.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiff respectfully requests that this Court enter an award:

(a)     declaring the acts and practices complained of herein are in violation of the Executive Law and the Administrative Code;

(b)     enjoining and permanently restraining these violations of the Executive Law and the Administrative Code;

(c)     directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d)     directing defendants to place plaintiff in the position she would be in but for defendants' discriminatory and retaliatory treatment of her, and to make her whole for all earnings she would have received but for defendants' discriminatory and retaliatory treatment, including, but not limited to, wages, bonuses, equity interests, pension and other lost benefits;

234650 v1

17

(e)    directing defendants to reinstate plaintiff;

(f)    directing defendants to pay plaintiff punitive damages as provided by the Administrative Code;

(g)    directing defendants to pay an additional amount to compensate plaintiff for the emotional distress defendants' unlawful conduct has caused plaintiff;

(h)    awarding plaintiff such interest as is allowed by law;

(i)    awarding plaintiff her reasonable attorneys' fees and costs; and

(j)    granting such other and further relief as the Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated:  New York, New York
        January 24, 2006

                        VLADECK, WALDMAN, ELIAS
                        & ENGELHARD, P.C.

                By:     _____
                        Judith P. Vladeck (JV 2908)
                        Kevin T. Mintzer (KM 4741)
                        Michele Host (MH 2557)
                        Attorneys for Plaintiff
                        1501 Broadway, Suite 800
                        New York, New York 10036
                        (212) 403-7300

234650 v1                          18

# Exhibit 6

# EPSTEIN BECKER & GREEN, P.C.

ATTORNEYS AT LAW
250 PARK AVENUE
NEW YORK, NEW YORK 10177-1211
212.351.4500
FAX: 212.661.0989
EBGLAW.COM

RONALD M. GREEN
TEL: 212.351.4647
FAX: 212.661.0989
RGREEN@EBGLAW.COM

April 14, 2006



**VIA FACSIMILE**

Ms. Rosemarie Wilkes
U.S. Equal Employment Opportunity Commission
New York District Office
33 Whitehall Street, 5th Floor
New York, New York 10004

> Re: Anucha Browne Sanders v. Madison Square Garden, L.P.
> Charge No. 520-2006-00717

Dear Ms. Wilkes:

Madison Square Garden, L.P. ("MSG"), by its attorneys Epstein Becker & Green, P.C. and Morgan, Lewis & Bockius LLP, submits this Statement of Position in response to the charge brought by Anucha Browne Sanders (the "Charge"). A copy of the Charge is annexed as Exhibit A.[1] MSG requests that all facts set forth herein remain confidential. Given the paucity of specifics in the Charge and the Complaint annexed thereto, MSG reserves the right to provide additional information as developments may warrant.

---

[1] On January 24, 2006, Browne Sanders commenced an action in the United States District Court, Southern District of New York, against MSG and Isiah Thomas (the "Complaint") based on diversity of citizenship and asserting claims under the New York State Human Rights Law and the New York City Human Rights Law (the "federal court action"). In paragraph 11 of the Complaint, Browne Sanders states that when she "receives a Right to Sue Notice, she will seek to amend the Complaint to add claims under Title VII of the Civil Rights Act of 1964," an intention she repeats in her Charge. A copy of the Complaint was attached to her Charge. Annexed as Exhibit B is a copy of MSG's Answer to the Complaint. Annexed as Exhibit C is a copy of Isiah Thomas' Answer to the Complaint. For purposes of this position statement, MSG adopts and incorporates herein its own Answer and Isiah Thomas' Answer.

ATLANTA • CHICAGO • DALLAS • HOUSTON • LOS ANGELES • MIAMI
NEWARK • NEW YORK • SAN FRANCISCO • STAMFORD • WASHINGTON, D.C.

EPSTEIN BECKER GREEN WICKLIFF & HALL, P.C. IN TEXAS ONLY

Ms. Rosemarie Wilkes
April 14, 2006
Page 2


## I.    Introduction

In November 2000, Browne Sanders became the Vice President of Marketing for the New York Knickerbockers (the "Knicks"). She was promoted to Senior Vice President of Marketing and Business Operations for the Knicks in February 2002 and held that position until her employment was terminated in January 2006. Browne Sanders brings this Charge alleging that she was subjected to a hostile work environment from at least March 2004 until she reported it through her counsel in late December 2005. Browne Sanders further claims that her termination was in retaliation for making this complaint. Her claims are without merit.

This matter is not about discrimination or retaliation, but instead revolves around an employee with numerous professional shortcomings, particularly her inability or unwillingness to interact in a collegial and professional manner with other members of MSG's management and to accept and adapt to changes in procedures after Isiah Thomas joined the Knicks in December 2003 as President, Basketball Operations. Before Thomas became the President of Basketball Operations, Browne Sanders had involved herself in basketball operations. For instance, prior to Thomas joining the Knicks, Browne Sanders had enjoyed virtually unfettered access to the team, its players and its training facility and even traveled with the team. This all changed when Thomas was hired. At that time, the Knicks were experiencing their third straight disappointing season. Thomas' primary responsibility and objective was to rebuild the Knicks back into a winning franchise. Thomas determined that to accomplish this the players had to be more focused on basketball, and, in keeping with this goal, he imposed limitations on Browne Sanders' and other employees' access to the players and to certain team-only areas of the practice facility and implemented procedures requiring that such access be arranged in advance through members of his staff.

Browne Sanders openly resented these philosophical and operational changes, which caused a clear tension between her, Thomas and other members of the Knicks organization. The relationship between Browne Sanders and Thomas deteriorated to the point where Stephen Mills, the President and Chief Operating Officer of MSG Sports and Browne Sanders' supervisor, had to act as an intermediary. This included holding a meeting in which it was clarified that Thomas would focus on basketball operations and Browne Sanders would focus on marketing and business operations. In addition, Mills made other attempts to get Browne Sanders to work with Thomas and his staff in a professional and effective manner.

Moreover, Browne Sanders' professional and personality conflicts were not limited to those involving Thomas. They extended to relationships with executives in other divisions of Madison Square Garden and to outside vendors. In sum, Browne Sanders' inability to work with other MSG executives, including Thomas, and to adapt to the changes instituted by Thomas, combined with other significant professional conflicts and her repeated failures to effectively perform the management and financial aspects of her job, led to her termination in January 2006.

NY:1056035v1

Ms. Rosemarie Wilkes
April 14, 2006
Page 3

## II.    MSG Has A Comprehensive Anti-Harassment Policy, Which Browne Sanders Failed to Utilize

MSG has a "zero tolerance" harassment prevention policy (the "Policy") that prohibits sexual harassment and discrimination. A copy of MSG's policy is annexed as Exhibit D. On the first day of employment, each employee, including Browne Sanders, is asked to acknowledge having received a copy of MSG's Policy, that he/she understands MSG's Policy, and that he/she accepts the Policy and complaint procedure. (A copy of the Anti-Harassment Acknowledgement Form signed by Browne Sanders is annexed as Exhibit E.) Copies of the Anti-Harassment Policies are also available on MSG's employee intranet website. The Policy provides a comprehensive complaint procedure, which states that any employee who believes he or she has been discriminated against or harassed should contact his or her "local Employee Relations Manager" who is responsible for investigating the complaint. The Policy lists other individuals who may be contacted in the event that it is not appropriate to contact the "local Employee Relations Manager."

As the Policy indicates, Browne Sanders' "local Employee Relations Manager" was John Moran, MSG's Vice President, Employee and Labor Relations. It is undisputed that Browne Sanders never contacted Mr. Moran to complain from the time the alleged harassment began, in March 2004, through her departure in January 2006, even though she met with him often during this period to discuss human resources issues concerning other employees. Moreover, any complaints that were made to Mills related to operational issues and in no way related to any sexual harassment or gender discrimination. In fact, MSG's Employee Relations department was never put on notice of Browne Sanders' allegations, learning of them only when Browne Sanders' counsel finally contacted MSG's counsel in December 2005.[2]

## III.    MSG Investigated Browne Sanders' Complaints and Determined that Her Claims Were Without Merit. They Are Also Legally Insufficient.

As soon as it had notice of Browne Sanders' allegations of harassment in late December 2005, MSG immediately investigated her complaints. In addition to interviewing Browne Sanders, Thomas, and nine other MSG employees, some more than once, MSG also reviewed pertinent documents, including emails. Browne Sanders was less than cooperative throughout

---

[2] While Browne Sanders expressed her opinions concerning Thomas, the Knicks and MSG in general to an outside psychologist engaged on a consulting basis by MSG to work on organizational development, she did not state that she was being sexually harassed. Moreover, Browne Sanders demanded this individual keep her comments about Thomas strictly confidential. As Browne Sanders was well aware, the consultant was not in the Employee Relations department and was not an employee of MSG. Her conversations with this outside psychologist do not fall within MSG's comprehensive complaint procedure. Browne Sanders' failure to avail herself of MSG's complaint procedure is a *per se* defense to her claims of sexual harassment. *See, e.g., Fierro v. Saks Fifth Ave.*, 13 F. Supp. 2d 481, 491-92 (S.D.N.Y. 1998) ("Title VII plaintiffs must at least make a reasonable effort to seek redress for any perceived harassment through the employer before initiating a lawsuit in federal court.").

Ms. Rosemarie Wilkes
April 14, 2006
Page 4

this process. In fact, she refused to make herself available to be interviewed until January 6, 2006, and even then did so only after being told that her lack of cooperation was hindering the investigation. MSG concluded its investigation in mid-January and determined that the evidence did not support Browne Sanders' allegations of sexual harassment or gender discrimination and that witnesses she identified actually contradicted her allegations in important respects. Thomas consistently denied engaging in the conduct attributed to him and the investigation did not reveal any credible evidence that he engaged in such conduct.

Even assuming the truth of the allegations for the purposes of argument, Browne Sanders' hostile work environment claim fails as a matter of law. Her claim is based on a handful of incidents in which individuals allegedly referred to her as a "bitch" and used profanity. She also alleges that on several occasions, Thomas told her he loved her, and, on one occasion, attempted to kiss her.[3] These incidents, which are alleged to have occurred only sporadically over a twenty-two month period, fall far short of the "severe" and/or "pervasive" level necessary to sustain a hostile work environment claim. *Harris v. Forklift System, Inc.*, 510 U.S. 17, 21 (1993). Indeed, courts regularly find behavior that is much more severe and pervasive to be insufficient to support a claim of hostile work environment. *See, e.g., Spina v. Our Lady of Mercy Med. Ctr.*, No. 97 Civ. 4661 (RCC), 2003 WL 22434143 (S.D.N.Y. Oct. 23, 2003) (dismissing claim where plaintiff alleged her supervisor told her that her hair and eyes were beautiful and that he liked the way she looked in tight pants, called her a "bitch" on two occasions, leered at her and once pointed his finger in her face); *Schiano v. Quality Payroll Sys.*, No. 03 Civ. 492 (DRH) (ETB), 2005 WL 1638167, *4 (E.D.N.Y. July 12, 2005) (finding no hostile work environment where over a period of five or six months, plaintiff's supervisor placed his hand on plaintiff's upper thigh more than once, pulled her skirt up two or three inches, asked plaintiff if he could accompany her to her hotel room following a holiday party, approached her from behind and placed his hands on her back, neck and shoulders, and had at least one conversation on topics of "how hot" [she] was" and "the type of underwear she wore"); *Stepheny v. Brooklyn Hebrew Sch. For Special Children*, 356 F. Supp. 2d 248 (E.D.N.Y. 2005) (finding that fact plaintiff had been called a "white bitch" five times over a five-month period and was told to "watch [her]self, I know where you live" was not sufficiently severe or pervasive to constitute a hostile work environment).[4]

---

[3] Browne Sanders neglects to mention that Thomas merely attempted to give Browne Sanders a peck on the cheek in greeting, and that this incident took place during a Knicks game in front of fans and other employees. This type of greeting was not unusual or uncommon among the players and other MSG employees. Indeed, the kiss on the cheek is replacing the handshake as a standard greeting in the corporate environment. *See* Elizabeth Olson, Better Not Miss The Buss, N.Y. Times, April 6, 2006 at G1 (copy annexed as Exhibit F).

[4] *Accord Harrington v. County of Fulton*, 153 F. Supp. 2d 164 (N.D.N.Y. 2001) (dismissing plaintiff's hostile work environment claims where plaintiff was called a "bitch" on more than one occasion, taunted, continually stared at and the recipient of numerous unwelcome sexual advances); *Khan v. Abercrombie & Fitch*, 35 F. Supp. 2d 272 (E.D.N.Y. 1999) (dismissing plaintiff's claims of hostile work environment because a colleague's reference to plaintiff as "black bitch" in one instance did not give rise to a claim for hostile work environment).

Ms. Rosemarie Wilkes
April 14, 2006
Page 5

## IV.   Browne Sanders Was Terminated for Legitimate, Non-Retaliatory Business Reasons.

Browne Sanders' retaliation claim also has no merit because the termination of her employment was based upon legitimate business reasons. *See Cifra v. General Electric Co.*, 252 F.3d 205, 218 (2d Cir. 2001). Although her performance was generally rated as good, Browne Sanders was repeatedly advised, in her performance reviews and otherwise throughout her tenure, that she had to modify her management style to get the most out of her peers and her subordinates. She never accepted this constructive criticism and resisted MSG's efforts to assist her in improving her ability to interact with other senior level employees. These problems were exacerbated when Thomas joined the Knicks and removed her from basketball operations and limited her access to the players and the practice facility as described in Section I above.

Browne Sanders' demonstrated inability or unwillingness to accept the changes Thomas implemented and her failure to get along with Thomas, and other senior employees engendered significant concerns about her ability to perform in her key management role. Moreover, it became increasingly apparent during 2005 that Browne Sanders had failed to master the business and financial aspects of her position, showed a marked reluctance and inability to take direction, engaged in repeated conflicts with executives in other MSG departments, failed to effectively communicate with other senior MSG personnel, refused to change course or compromise when necessary, and lacked the interpersonal skills to perform her job effectively. A number of these problems were called to her attention well before she raised any claim of discrimination or harassment.[5] In short, MSG had numerous, legitimate, non-retaliatory reasons for terminating Browne Sanders' employment.

## V.   Conclusion

The Charge should be dismissed in its entirety and a finding of no probable cause should be issued because there is no evidence to support Browne Sanders' claims of a sexually harassing hostile work environment and gender discrimination, and because MSG terminated her employment for legitimate, non-retaliatory reasons.

Very truly yours,

Ronald M. Green

Enclosures

---

[5] In early-2005, Browne Sanders, believing that her job status was at-risk, started looking for other employment.

Exhibit 7

Anucha Browne Sanders v. Madison Square Garden
EEOC Charge No.: 520-2006-00717
Interviews with Employees/Witnesses

1

# U.S. Equal Employment Opportunity Commission
# New York District Office

## *MEMORANDUM*

**DATE:**      September 14, 2006

**TO:**        Case File / witnesses' Interviews

**FROM:**      Patricia M. Araujo, Senior Investigator

**RE:**        Anucha Browne Sanders v. Madison Square Garden
               EEOC Charge No.: 520-2006-00717

**SUBJECT: Interviews with Employees/Witnesses**

---

**Interview Isiah Thomas, via telephone (Attorneys for Respondent and Mr. Thomas were present).** Mr. Thomas was in Washington D.C. According to Thomas, he started working on December 2003 as the President of Basketball Operations. According to Thomas, the players and Frank Murphy, the coaches such as Larry Brown and his assistants, and his scouts, would report to him, and he would report to Steve Mills and Jim Dolan simultaneously. When asked if Charging Party reported to him, he stated that she reported to Mr. Mills. According to Thomas, when he started working, he started to immediately implement new changes. The first thing he did was to close access to practices to only the coaches and players, and locker rooms were also restricted to only the players and coaches and medical team. That was, in his opinion, needed so the players can concentrate and play. The Charging Party was to deal only with marketing and community relations. Thomas stated that he prepared and compared schedules for the next season with Charging Party. According to Thomas, some of the players had previously complained to him about how Charging Party was not giving them enough notice to when scheduled them to community appearances. According to Thomas, Charging Party did not like the changes because now she was not able to schedule the players freely as she did before. According to Thomas, after he started to implement the changes, Charging Party complained to Mills about not having access to the players, and she asked him to be on the plane with the players and to bring people to the plane while going from one game to another. According to Thomas, he, Charging Party and Frank Murphy would meet on a weekly basis and when needed, to go over schedules. According to Thomas, Charging Party never complained to him about harassment and/or hostile work environment. Thomas stated that he did his part to give her the schedules in advance. Thomas stated that he was not her boss and that he never was told by

Anucha Browne Sanders v. Madison Square Garden
EEOC Charge No.: 520-2006-00717
**Interviews with Employees/Witnesses**

2

Charging Party that she was so unhappy. Thomas stated that the first time he ever heard about her complaining against him was when the lawsuit was filed. According to Thomas, Moran contacted him regarding Charging Party's complaint, but never told him about her complaining against him about sexual harassment. When asked how he was contacted, he stated that his assistant, Raquelle Brunentte told him about in December 2005. Thomas stated that he met with Moran and a female attorney and that he doesn't remember the name of the female attorney, that she also works at MSG, and that they met at MSG. According to Thomas, they asked him some questions about his swearing and use of profanities. Thomas stated that the next thing he was told was that he has been sued by her, and that Moran was the one who told him. Thomas stated several times during the interview that he never sexually harassed her or anybody, that if he said "I love you", he would say, "I love basketball," and "I love you man", and that if he ever kissed her as she alleged on the cheek, it would not be in a sexual nature, it was just like him kissing any other man or woman on the cheek. It was something like embracing players, greeting each other, hugging, with both men and women, not sexual in nature. I may have said, "I love you more to man than woman" as an expression, or "no love today, I can't get some love today?" as an expression only. He insisted that she (Charging Party) never told him anything about sexual harassment and the first time that he heard about it was when she filed the suit. Thomas stated that he never harassed her or anybody else and he needs to defend himself.

When asked if he ever met with Mr. Mills and CP regarding allegations of harassment and unwelcome behavior of a sexual nature, Mr. Thomas denied it. He states again that was completely surprised about the suit.