# Exhibit 8

Dockets.Justia.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANUCHA BROWNE SANDERS,

              Plaintiff,

     - against -

MADISON SQUARE GARDEN, L.P., ISIAH
LORD THOMAS III and JAMES L. DOLAN,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

06 Civ. 0589 (GEL) (DF)

ECF CASE

AFFIDAVIT OF KEVIN T. MINTZER IN
SUPPORT OF PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF NEW YORK )

      KEVIN T. MINTZER, being duly sworn, deposes and says:

      1.     I am a member of the firm Vladeck, Waldman, Elias & Engelhard, P.C., attorneys for plaintiff Anucha Browne Sanders ("plaintiff" or "Browne Sanders) in this action against Madison Square Garden, L.P. "(MSG", Isiah Lord Thomas ("Thomas") and James L. Dolan ("Dolan"). I submit this affidavit in support of plaintiff's Motion For Partial Summary Judgment.

      2.     Attached hereto as Exhibit 1 are excerpts from the first day of plaintiff's deposition on November 27, 2006 and Browne Sanders Deposition Exhibit 11.

      3.     Attached hereto as Exhibit 2 are excerpts from the deposition of James L. Dolan and Dolan Deposition Exhibits 4 and 16.

4.      Attached hereto as Exhibit 3 are excerpts from the deposition of Isiah Lord Thomas and Thomas Deposition Exhibit 4.

5.      Attached hereto as Exhibit 4 are excerpts from the deposition of Stephen Mills and Mills Deposition Exhibits 1, 3, 4, 6, 7, 8, 11 and 16.

6.      Attached hereto as Exhibit 5 are excerpts from the deposition of Rusty McCormack and McCormack Deposition Exhibit 8.

7.      Attached hereto as Exhibit 6 are excerpts from the deposition of Stephon Marbury.

8.      Attached hereto as Exhibit 7 are excerpts from the deposition of John Moran and Moran Deposition Exhibits 1,2, 3 and 4.

9.      Attached hereto as Exhibit 8 are excerpts from the deposition of Rochelle Noel and Noel Deposition Exhibit 14.

10.     Attached hereto as Exhibit 9 are excerpts from the deposition of Karin Buchholz and Buchholz Deposition Exhibit 1.

11.     Attached hereto as Exhibit 10 are excerpts from the deposition of Dan Gladstone and Gladstone Deposition Exhibit 7.

12.     Attached hereto as Exhibit 11 are excerpts from the deposition of Faye Brown.

13.     Attached hereto as Exhibit 12 are excerpts from the deposition of Jeff Nix.

14.     Attached hereto as Exhibit 13 are excerpts from the deposition of Robert Levy.

15.    Attached hereto as Exhibit 14 are excerpts from the deposition of Peter Olsen and Olsen Deposition Exhibits 2 and 7.

16.    Attached hereto as Exhibit 15 is a document produced by MSG reflecting the hiring of plaintiff by MSG in November 2000.

17.    Attached hereto as Exhibit 16 is the Declaration of Jonathan Schindel, Esq., dated January 23, 2007.

18.    Attached hereto as Exhibit 17 is a document produced by MSG that appears to be notes of John Moran's interview with Gary Winkler.

19.    Attached hereto as Exhibit 18 is the Declaration of Marc Schoenfeld, Esq., dated March 2, 2007

20.    Attached hereto as Exhibit 19 is an e-mail exchange between counsel for MSG and counsel for Browne Sanders on December 22 and December 23, 2005.

21.    Attached hereto as Exhibit 20 is a letter from counsel for MSG to counsel for Browne Sanders dated December 30, 2005 (attached term sheet is omitted).

22.    Attached hereto as Exhibit 21 is a letter from plaintiff's counsel to MSG's counsel dated January 20, 2006.

23.    Attached hereto as Exhibit 22 is a letter from MSG's counsel dated February 28, 2007, concerning Mills Deposition Exhibit 8.

24.    Attached hereto as Exhibit 23 are notes that appear to have been taken by John Moran at the interview of plaintiff by John Moran and Rochelle Noel on January 6, 2006.

25.    On December 22, 2005, I participated in a meeting among attorneys for Browne Sanders and attorneys for MSG. At that meeting, Browne Sanders' counsel stated,

among other things, that Browne Sanders had been sexually harassed at MSG and provided MSG's counsel with information concerning Browne Sanders' claims.

26.    Following the meeting, on December 22, 2005, Browne Sanders' counsel and MSG's counsel agreed to, inter alia, "attempt to expedite a negotiated, good faith resolution of Ms. Browne Sanders' claims."  Counsel also agreed that their understanding with respect to settlement discussions was "confidential and deemed in furtherance of settlement pursuant to Fed. R. Evid. 408."  See Exhibit 19 attached hereto.

27.    Pursuant to the parties' understanding of December 22, 2005, on December 27, 2005, Browne Sanders' counsel conveyed a settlement proposal to MSG's counsel in connection with Browne Sanders' sexual harassment claims against MSG.  To the best of my knowledge, prior to this proposal, neither Browne Sanders nor anyone acting on Browne Sanders' behalf had made a monetary settlement or severance proposal to MSG.

28.    On December 30, 2005, MSG's counsel delivered to plaintiff's counsel a letter that included a counter-offer to settle plaintiff's claims.  The letter from MSG's counsel stated that MSG's counter-offer was being made pursuant to Fed. R. Evid. 408.  The letter also stated that "MSG is ready, willing and able to continue as rapidly as possible our good-faith discussions in order to find a mutually acceptable resolution."  See Exhibit 20 attached hereto (term sheet omitted)..

29.    On January 3, 2006, plaintiff's counsel orally conveyed another settlement proposal to MSG's counsel.

30.    On January 19, 2006, MSG's counsel informed me that MSG's investigation of plaintiff's internal complaint had been concluded.  In that same conversation,

MSG's counsel informed me that MSG was going to terminate Browne Sanders' employment, effective immediately. <u>See</u> Exhibit 21 attached hereto.

KEVIN T. MINTZER

Sworn to before me this
27th day of April, 2007.

Notary Public

R. J. OSBORNE
NOTARY PUBLIC, State of New York
No. 02OS6094970
Qualified in Queens County
Commission Expires June 2007

244886 v1

# Exhibit 9

**Unknown**

**EXHIBIT**

| | |
|---|---|
| **From:** | Gladstone, Dan |
| **Sent:** | Monday, November 28, 2005 6:27 PM |
| **To:** | Browne Sanders, Anucha |
| **Cc:** | Buchholz, Karin |
| **Subject:** | Staffing issues - MARBURY |

**Importance:**     High

**Attachments:**     Staffing memo(June 16).doc

Anucha

As per your request, I am submitting some comments made by Stephon Marbury from a phone conversation that happened this summer in June (perhaps June 16th at 9 PM in the evening) when he called me on my cell phone to comment on events that transpired as mentioned below in the attached email as pertaining to his cousin, Knicks staffer Hassan Gonsalves:

- Stephon was upset that he felt his family member, Hassan, was being treated unfairly by Knicks management
- Stephon was not happy with the salary range for his cousin Hassan.
- I explained the timesheets and payroll process, and that Hassan would not be assigned to work more then 35 hours per work nor would he be assigned to work overtime and Hassan's salary was determined by Knicks management.
- I explained that Hassan was not granted a parking spot at 31st street garage and I did not approve him using my access code nor was I aware he was forging my signature to park his vehicle.

- Stephon was upset at these circumstances and expressed extreme displeasure at the Knicks front office staff, particularly mentioning Anucha
- Though time has passed, several comments I can recall Stephon making include:

all referring to Anucha
- "No one likes that black bitch"
- "Fuck that black bitch, she thinks she runs the Knicks, she don't run shit. I sell the tickets around here, not her, I put people in seats, this is my team."
- "We don't like her, she thinks she tells us what to do, she don't tell us shit"
- "Fuck that black bitch, she ain't shit and we'll see what happens this year"

the conversation was more detailed but to the best of my ability those are the only exact phrases I can recall. I did call you that night to give you a head's up that Stephon was angry with the situation and that Stephon had some hostile things to say about members of Knicks management.

sincerely

Dan Gladstone

-----Original Message-----

| | |
|---|---|
| **From:** | Gladstone, Dan |
| **Sent:** | Thursday, June 16, 2005 1:13 PM |
| **To:** | Browne Sanders, Anucha |
| **Cc:** | Buchholz, Karin |
| **Subject:** | Staffing issues |
| **Importance:** | High |

Anucha

As per your request – here are 2 issues that occurred this week that need to be bought to your attention regarding Knicks Field Marketing staffer Hassan Gonsalves:

- **Time Sheets** - over the period of Hassan's employment (hired October 2004) he has had trouble completing his bi-weekly administrative time sheets properly (submitting to me for approval, for me to sign, and then submitting to payroll to process on time so that Hassan would receive a paycheck). I have had to return at least 6 timesheets for

1

**CONFIDENTIAL**

Hassan to re-do and properly submit to me for approval/signature in order to reflect the proper time/hours worked on Knicks events, and as a result often Hassan has not had his timesheet submitted to payroll in order in time to get his check the following week. Recently Hassan again submitted a timesheet reflecting overtime he was not approved to work - I made a change in his hours to reflect what he WAS approved to work and submitted to payroll for him so that he would be paid on time to expedite the process. On this occasion, I submitted the timesheet and send it back to Hassan to correct, because I wanted to get it to payroll in a timely manner so he would be paid the following week.

- **Parking** – it has come to my attention through the managers at Central parking system that Hassan has been using my parking account (#3-6-9) for the 31st street lot to park his own personal vehicle on a frequent basis under my name. I did not approve nor give out my account to Hassan to park his car on my account nor use my code. In fact, I have been extremely clear to Hassan that he is NOT to drive nor EVER be behind the wheel of a MSG vehicle as the result of a background check on his driver's license which resulted in him not being permitted or legal to drive company vehicles, thus it is extremely important that he does not park on the company account as we could be liable for an accident that occurs in the lot or associated with him parking and driving under the Knicks.

Moving forward, I have attached a DRAFT of a memo I wanted to present to both Tasheem Ward & Hassan Gonsalves to meet with them and re-enforce the nature of their employment status with the Knicks...please review and let me know how to proceed.  I can also forward a copy of this memo to HR to approve or comment on...please advise....



Staffing memo(June 16).doc

Thank you.

Dan Gladstone
New York Knicks
Director, Community Relations & Field Marketing
2 Penn Plaza – 14th Floor – New York, NY 10121

w# (212) 465-6411
f# (212) 465-6047

get your Knicks tickets at ny.knicks.com

2

CONFIDENTIAL

# MEMO

TO:    Tasheem Ward
      Hassan Gonsalves

FR:    Dan Gladstone

CC:    Anucha Browne Sanders
      Karin Buchholz

RE:    Employment Guidelines

DT:    6/16/05

---

The following is a memo to outline and summarize the basic parameters of your employment:

You are employed in the New York Knicks Community Relations Department / Field Marketing with an annual salary of $30,300.

Time Sheets:   In order to receive paychecks, you must complete and submit a **bi-weekly administrative time sheet** to Dan Gladstone to review and approve with signature, this timesheet should then be copied (with a copy going to Dan Gladstone) and submitted to the payroll department to be processed.

                You will be responsible to work **thirty five (35) hours per week**, seven (7) hours per day (Monday – Friday) or any combination of hours that equal but does not go above thirty five (35) hours per week. If you are scheduled to work weekend events or 7 days per week, the total scheduling of your hours will never exceed thirty five (35) hours per week.

Scheduling:   You will receive your work schedule – assignment of events that total thirty five (35) hours per week – in a weekly meeting with Dan Gladstone that will be scheduled based on the event calendar.

CONFIDENTIAL

# Exhibit 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
ANUCHA BROWNE SANDERS,

                     Plaintiff,

           -against-        06 CV 0589 (GEL)

MADISON SQUARE GARDEN, L.P.,
ISIAH LORD THOMAS III and JAMES L. DOLAN,

                    Defendants.
----------------------------------------X


VIDEOTAPED DEPOSITION OF ANUCHA BROWNE SANDERS

          New York, New York

       Monday, November 27, 2006


REPORTED BY:

BARBARA R. ZELTMAN

Job Number: 10954



**David Feldman**
W o r l d w i d e

From File to Trial.

805 Third Avenue, 8th Floor
New York, NY 10022
(800) 642-1099

600 Anton Boulevard, 11th Floor
Costa Mesa, CA 92626
(866) DFW-1380



34

ANUCHA BROWNE SANDERS

1
2    A    And I liked him.
3    Q    And would you believe that it
4  was reciprocated?
5    A    Yes.
6    Q    So there was a good feeling
7  there between you and the general manager
8  of the Garden for several years, correct?
9    A    Yes.
10    Q    In addition to that, there was
11  an assistant general manager by the name
12  of Jeff Nix, was there not?
13    A    Yes.
14    Q    And Jeff also was a buddy of
15  yours, at the workplace?  At the
16  workplace.
17    A    **Jeff Nix was and is a friend**
18  **of mine.**
19    Q    And continues to be a good
20  friend, correct?
21    A    Yes.
22    Q    Now, as the vice president of
23  marketing, is it your position that you
24  had a direct reporting relationship to
25  Scott Layden?

35

ANUCHA BROWNE SANDERS

1
2         MS. VLADECK:  Objection to
3  form.
4    A    No.
5    Q    Is it your position that you
6  had a dotted line relationship to
7  Scott Layden?
8    A    Yes.
9    Q    Now, I understand that, as a
10  practical matter, you may have interfaced
11  with him quite regularly on work-related
12  matters.
13         But as a part of your
14  responsibility as the vice president of
15  marketing, would you describe what the
16  dotted line relationship was?
17    A    Yes.  **The dotted line**
18  **relationship was really about making sure**
19  **that he was kept abreast of what was going**
20  **on in the business side of the team.  And**
21  **that encompassed just regular meetings**
22  **with him.**
23    Q    When you say "the business
24  side of the team," at the time that Layden
25  was there initially, your responsibilities

36

ANUCHA BROWNE SANDERS

1
2  were for the marketing side, correct?
3    A    Yes.
4    Q    And is that what you mean by
5  the business side, or is there something
6  more that you mean?
7    A    **A large part of the marketing**
8  **side really was the business side.  So**
9  **that it really was marketing, primarily**
10  **marketing, and I would say community**
11  **relations as well.  Part of the**
12  **communications function.**
13    Q    Was there an organizational
14  chart at the Garden at that time that
15  would describe the relationships of the
16  various executives each to each other in a
17  business sense?
18    A    **The ones that I reviewed were**
19  **only focused on my direct reports.**
20    Q    And didn't contain any dotted
21  lines at all concerning anybody?
22         MS. VLADECK:  Objection to
23  form.
24    A    **I can't recall.**
25    Q    So you are not saying that it

37

ANUCHA BROWNE SANDERS

1
2  did or it didn't; you are saying you just
3  don't remember?
4    A    **I don't recall seeing any that**
5  **had my level and my peers up.**
6    Q    Eventually Isiah Thomas came
7  to become general manager of the New York
8  Knicks; is that right?
9    A    Yes.
10    Q    And that was in December of
11  '03, if I'm not mistaken?
12    A    Yes, it was.
13    Q    And did you consider that you
14  had had any input into the firing of
15  Scott Layden?
16         MS. VLADECK:  Objection to
17  form.
18    A    No.
19    Q    Did you consider yourself as
20  having any input into the hiring of
21  Isiah Thomas?
22    A    No.
23    Q    Did you tell anybody --
24  employee of Madison Square Garden that
25  "we" had fired Scott Layden?

10   (Pages 34 to 37)

38

ANUCHA BROWNE SANDERS

1
2    A    I'm sorry. I don't understand
3  your question.
4          MR. PARCHER: Can you repeat
5  the question.
6          (Requested portion of record
7    read: "Q. Did you tell employee of
8    Madison Square Garden that "we" had
9    fired Scott Layden?")
10    A    Who is "we"?
11    Q    I'm asking whether you ever
12  said it.
13          MS. VLADECK: Objection to the
14  form.
15    A    That "we fired Scott Layden,"
16  those words?
17    Q    In substance, yes, but the
18  word "we" is in it.
19    A    I don't understand your
20  question. But no, I don't recall ever
21  saying that to anybody.
22    Q    So you understand the
23  question, but your answer is no, right?
24          MS. VLADECK: Objection to
25  form.

39

ANUCHA BROWNE SANDERS

1
2    A    I don't understand the
3  question as in "we."
4          Am I representing the company
5  in saying "we"?
6    Q    I don't know. I'm asking you
7  whether you ever said words to that
8  effect.
9          Do you understand that? Do
10  you understand my question?
11    A    I don't recall ever saying
12  that.
13    Q    But do you understand my
14  question?
15    A    Sure.
16    Q    And your answer is you don't
17  recall saying that?
18    A    No.
19    Q    How about that "We hired Isiah
20  Thomas"?
21    A    I don't remember if I ever
22  said that.
23    Q    So you may have said that?
24    A    I don't remember.
25    Q    Well, that indicates to me --

40

ANUCHA BROWNE SANDERS

1
2  correct me if I'm wrong -- that you are
3  not precluding the possibility that you
4  did.
5    A    "We hired Isiah Thomas"? I
6  may have said that.
7    Q    Did you consider yourself as
8  having a direct relationship -- I am
9  talking about in the organizational
10  sense -- did you consider yourself as
11  having a direct relationship with
12  Mr. Thomas as part of your job?
13    A    The same dotted line
14  relationship that I had with Scott Layden,
15  yes.
16    Q    Are you familiar with any --
17  I'm calling it charts. I don't know if
18  that's the right description, but I will
19  show it to you in a minute.
20          Are you familiar with any
21  charts that were made at the Garden that
22  indicated what relationship, if any, you
23  had with Mr. Thomas?
24    A    No, I don't.
25    Q    Perhaps I'll show you a few

41

ANUCHA BROWNE SANDERS

1
2  and see if they refresh your recollection.
3  Hold on a minute.
4          MR. PARCHER: I have a series
5    of them. Why don't we just mark
6    them -- if it's okay with you, we've
7    got a series of charts, we'll mark
8    them as one exhibit.
9          MS. VLADECK: That's fine.
10          MR. PARCHER: If we need to
11    make something clearer, we'll make it
12    clearer. Okay?
13          For these purposes, I'll
14    represent to you that we have more
15    charts. Apparently the Garden does
16    lots of charts.
17    Q    Is that true by the way?
18    A    They do org charts.
19    Q    Org charts?
20    A    Organizational charts.
21    Q    I am not a corporate person.
22  So when you say "org charts," I think what
23  is she saying. Then I get it.
24  Organizational charts.
25    A    Organizational charts.

11  (Pages 38 to 41)

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

102

ANUCHA BROWNE SANDERS

1  there, like, more infrequently. I just --
2  I didn't really go up there as often.
3
4      Q    When did those unpleasant
5  meetings take place?
6      A    Throughout 2004.
7      Q    Well, but there must have
8  been --
9          MS. VLADECK: Wait, I'm sorry.
10  I think you interrupted her.
11          Could you read back.
12      A    In 2004 --
13          MS. VLADECK: Wait, wait,
14  wait. She's going to read it back.
15          MR. PARCHER: Off the record.
16          (Discussion off the record.)
17          (Requested portion of record
18  read: "Q. When did those unpleasant
19  meetings take place?
20          "A. Throughout 2004.")
21      A    Throughout 2004 primarily,
22  yes.
23      Q    But it had to be begin
24  somewhere.
25          Where was the first unpleasant

103

ANUCHA BROWNE SANDERS

1
2  incident?
3      A    In January 2004.
4      Q    What was that? Would you
5  describe it for us, please.
6      A    I handed Isiah a card. Card
7  or -- small card that had -- was just an
8  outline of the business at a glance. It
9  was just a small, almost kind of like a
10  cheat sheet. And I handed that to him,
11  and he said, "What the fuck is this?"
12      Q    And you said, if anything?
13      A    I explained to him what it
14  was.
15      Q    But that was unpleasant for
16  you, wasn't it?
17      A    That was unpleasant, yes.
18      Q    And did that give you kind of
19  feeling that maybe you weren't going to
20  get along with Isiah as well as you got
21  along with Scott Layden?
22          MS. VLADECK: Objection to
23  form.
24      A    Not necessarily. It gave me a
25  sense that he -- you know, he wasn't very

104

ANUCHA BROWNE SANDERS

1
2  clear on what the purpose of the card was,
3  and that's how he chose to ask me.
4      Q    So you didn't get a bad -- a
5  feeling as that being a sign as to the
6  fact that you weren't going to have a good
7  relationship? That didn't give you that
8  feeling?
9      A    Not at that particular time.
10      Q    What was the next -- so that
11  didn't stop you from going up to the
12  practice facility, right? That particular
13  incident.
14      A    That didn't happen at the
15  practice facility.
16      Q    I know. But that's how we
17  started asking the question about
18  incidents. You said after some unpleasant
19  incidents you stopped going over there or
20  more or less you stopped going up there as
21  often.
22          MS. VLADECK: Objection to
23  form.
24      Q    You recall that, don't you,
25  testifying to that?

105

ANUCHA BROWNE SANDERS

1
2          MS. VLADECK: Objection to
3  form. You are mischaracterizing.
4  Objection to form.
5          MR. PARCHER: Your witness
6  says she does recall that.
7          MS. VLADECK: That's why we
8  have transcripts.
9          MR. PARCHER: No. That's why
10  we have witnesses. That's why we
11  have witnesses, real live people to
12  answer questions.
13      Q    So when was the next incident
14  that was unpleasant?
15      A    There were a few meetings that
16  I had in his office to discuss player
17  appearances.
18      Q    When was that?
19      A    In end of January, beginning
20  of February time frame of 2004.
21      Q    And did these incidents -- are
22  they separate in your mind, or do they all
23  run on into an event that you would
24  describe for us?
25          MS. VLADECK: Objection to

27  (Pages 102 to 105)

106

ANUCHA BROWNE SANDERS

1    form.
2
3    A    I don't understand that
4    question.
5        Q    You said there was a series of
6    meetings. I could take them one by one,
7    or I could ask you to describe the
8    meetings and the unpleasantries, whichever
9    you are more comfortable with.
10        Tell us what happened, who was
11    present, when it was, where it was, what
12    was said.
13    A    I would try to meet with Isiah
14    once a week, as a calendar meeting,
15    similar to what I was doing with
16    Scott Layden, which was at the direction
17    of Steve Mills.
18        So I met with him at his
19    office, and just to take him through
20    anything that was relevant to the
21    business.
22        And his responses were
23    hostile. He cursed. You know, he would
24    say things like "What the fuck is this,
25    what do you want, what the fuck are you

107

ANUCHA BROWNE SANDERS

1
2    doing here, I can't be bothered with this
3    shit." It was hostile.
4        And it was very apparent that
5    he didn't want to be bothered with it.
6        Q    He didn't want to be bothered
7    with the subject that you were talking to
8    him about?
9        MS. VLADECK: Objection to
10    form.
11    A    With whatever I was discussing
12    with him.
13        Q    Okay. And was anybody
14    present --
15        I gather this was a series of
16    meetings, right?
17    A    End of January/February time
18    frame.
19        Q    And was anybody else present
20    at any of these meetings other than you
21    and Mr. Thomas?
22    A    No, not that I recall. These
23    were meetings in his office. And they
24    were scheduled.
25        Q    And you found it unpleasant?

108

ANUCHA BROWNE SANDERS

1
2    A    Yes.
3        Q    You found it degrading?
4    A    I found it unprofessional.
5        Q    Was it disturbing to you?
6    A    Yes.
7        Q    Made you angry?
8    A    I wouldn't call it angry.
9        Q    Sad?
10    A    It was disturbing.
11        Q    Disturbing.
12        Did you report it to
13    Steve Mills?
14    A    Yes.
15        Q    On one or more than one
16    occasion? And we're talking now in this
17    January/February period.
18    A    I told Steve in early
19    February -- actually, I told him -- it was
20    probably toward the end of January, early
21    February. I don't remember the exact
22    timing, but it was right in that period.
23        Q    In other words, right at the
24    beginning, when it happened you went and
25    told Steve Mills; is that what you are

109

ANUCHA BROWNE SANDERS

1
2    testifying to?
3    A    Not after each meeting.
4        Q    You let it go once or twice?
5    A    Yeah, I let it go once or
6    twice, yeah.
7        Q    And then you went to see
8    Steve, right?
9    A    Yes.
10        Q    You didn't make a memo?
11    A    Not at that time. I don't
12    remember making a memo.
13        Q    You didn't send an e-mail?
14    A    No, I don't recall sending an
15    e-mail.
16        Q    You didn't go to HR?
17    A    No, I didn't.
18        Q    What's John Moran's job at HR?
19        MS. VLADECK: Objection to
20    form.
21        Q    If you know?
22    A    He's the vice president of
23    human resources.
24        Q    And is he -- if you know, is
25    he also the person -- bear with me. I'll

28  (Pages 106 to 109)

170

ANUCHA BROWNE SANDERS

1
2    Q    Sorry?
3    A    **I said he pulled me into the**
4    **room.**
5    Q    Okay. And he opened the door?
6    A    **Yes.**
7    Q    And inside the room, did he
8    close the door?
9    A    **Yes, he did.**
10    Q    Bang it or shut it softly or
11    how did he close it?
12    MS. VLADECK: Objection to
13    form.
14    A    **He just closed the door.**
15    Q    Let go of your arm?
16    A    **Yes.**
17    Q    Now, in this Complaint -- I'm
18    reading it to you -- you say, "He yelled
19    that the team was not going to do anymore
20    F-ing events. Browne Sanders calmly told
21    Thomas that we require the Knicks to do
22    community events and that he
23    should discuss his concerns with Mills.
24    Thomas continued to scream at
25    Browne Sanders calling her a F-ing bitch,

171

ANUCHA BROWNE SANDERS

1
2    among other things. He eventually stormed
3    out of the room."
4    Is that accurate?
5    A    **Yes.**
6    Q    So the man was screaming at
7    you?
8    A    **Yes.**
9    Q    Did you ever find out whether
10    or not somebody screams at you in a bike
11    room, a screaming voice could be heard
12    outside the bike room?
13    A    **It didn't occur to me. It was**
14    **still crowded in the arena.**
15    Q    Would it surprise you if I
16    told you that I went there and I checked
17    it out and it can be heard clear as a
18    bell?
19    MS. VLADECK: Objection to
20    form.
21    Q    Would that surprise you?
22    A    **No, it wouldn't.**
23    Q    But you still say that the man
24    was screaming at you?
25    A    **Yes.**

172

ANUCHA BROWNE SANDERS

1
2    Q    Spewing curses?
3    A    **Spewing curses.**
4    Q    Now, do you have any witnesses
5    that heard that?
6    A    **I don't know. I didn't ask**
7    **anybody if they heard it.**
8    Q    Well, at some point you made a
9    decision that you were going to leave the
10    Garden, correct?
11    A    Yes.
12    MS. VLADECK: Objection to
13    form.
14    Q    And at or around that time --
15    A    Wait. I'm sorry.
16    **Explain "leave the Garden."**
17    Q    Resign.
18    A    **No.**
19    Q    You were never going to
20    resign?
21    A    **No.**
22    Q    You didn't go up to
23    Steve Mills in November of '05 and tell
24    him that you wanted to leave for whatever
25    your reasons?

173

ANUCHA BROWNE SANDERS

1
2    We'll get into it, if the
3    clock doesn't tick.
4    A    **No.**
5    Q    I may have to go make an
6    application.
7    MS. VLADECK: Objection to
8    form.
9    Q    What?
10    A    **Could you ask the question**
11    **again?**
12    **(Requested portion of record**
13    **read: "Q. You didn't go up to**
14    **Steve Mills in November of '05 and**
15    **tell him that you wanted to leave for**
16    **whatever your reasons?")**
17    A    **No, I did not.**
18    Q    Never?
19    A    **No.**
20    Q    And if Mills, your friend said
21    that, he would be inaccurate?
22    MS. VLADECK: Objection to
23    form.
24    Q    If Mills said that, it would
25    be inaccurate?

**44  (Pages 170 to 173)**

174

ANUCHA BROWNE SANDERS

1
2    A    Yes.  He would be incorrect.
3    Q    In fact it would not be true,
4  would it?
5    A    It would not be true.
6    Q    Would it surprise you that
7  Steve Mills would tell an untruth?
8    A    I am not a read of his
9  character.  If he did, he did.  I don't
10  know.
11    Q    You don't have a read of his
12  character?
13    A    Not at this point, I sure
14  don't.
15    Q    At any point, did you?
16    A    I thought I did.
17    Q    You thought he was a great
18  guy, right?
19    MS. VLADECK:  Objection to
20  form.
21    A    I thought he was smart and
22  likeable.
23    Q    Not a great guy?
24    MS. VLADECK:  Objection to
25  form.

175

ANUCHA BROWNE SANDERS

1
2  Do you want to define "great
3  guy"?
4    Q    As you understand it.  Never
5  as I understand it.
6    When I ask you a question,
7  it's as you understand it.  You know, if
8  you have an understanding of the words
9  "great guy," then you say it.  If you
10  don't have an understanding, I'll define
11  it.
12    MS. VLADECK:  Objection to
13  form.
14    Q    But I am not asking you
15  supercalifragelisticexpialidocious.
16    I am just saying "great guy,"
17  whatever you think of as a great guy.
18    MS. VLADECK:  Objection to
19  form.
20    A    I saw Steve as a professional.
21    Q    Not a great guy?
22    MS. VLADECK:  Objection to
23  form.
24    A    I'm answering your question.
25  I saw Steve as a professional.

176

ANUCHA BROWNE SANDERS

1
2    Q    Do you understand the words
3  "great guy"?
4    A    I wouldn't describe somebody I
5  worked with as a "great guy" because I
6  don't know them personally enough to
7  define them that way.  I think great guy
8  goes well beyond professional.
9    Q    Okay.  I can accept that.
10    In November and December of
11  '05, you caused members of your staff, did
12  you not, to reconstruct the Petra Pope
13  incident in a memo?
14    MS. VLADECK:  Objection to
15  form.
16    A    You said members of my staff.
17    Could you explain that?
18    Q    You don't know what the words
19  "members of your staff" means?
20    MS. VLADECK:  Objection to
21  form.
22    A    The answer to your question is
23  no.  It's plural.
24    Q    Plural?
25    A    I asked one member of my

177

ANUCHA BROWNE SANDERS

1
2  staff.
3    Q    Oh, oh, oh.  I am not trying
4  to fence with you.
5    MS. VLADECK:  Then please
6  don't, Peter.  Ask a question.  And
7  if she says she doesn't understand
8  it, please rephrase it.
9    MR. PARCHER:  I am just trying
10  to understand what's going on.
11    A    I just want to be careful that
12  I don't say something that is incorrect.
13  So you said "members," which is plural to
14  me.  And I asked one member of my staff.
15  That's singular.
16    Q    It would be helpful if you
17  raised my consciousness to that before I
18  ask you the next question so I can get an
19  understanding.
20    A    Sure.
21    Q    And you're trying not to give
22  me a misunderstanding, right?
23    MS. VLADECK:  Objection to
24  form.
25    Q    Who did you ask?

45  (Pages 174 to 177)

210

ANUCHA BROWNE SANDERS

1
2 to hear me. It's ridiculous."
3        Did you say anything like that
4 to Steve?
5    A    I told Steve. I told Steve
6 what transpired in those meetings.
7    Q    Each time?
8    A    Not after each one. But I
9 told him. As they started to become more
10 regular, I certainly told him.
11    Q    I'm just referring to these
12 three now -- these three meetings.
13        Did you tell him after each
14 meeting?
15    A    No, not after each meeting.
16    Q    After how many meetings did
17 you tell him?
18    A    I would say after two, maybe
19 three.
20    Q    So after all of those three;
21 is that you are what saying?
22    A    No. I said that the first
23 time when I gave him the cheat sheet and
24 he said that to me.
25    Q    I am not on the cheat sheet.

211

ANUCHA BROWNE SANDERS

1
2    A    Okay. But that's all part of
3 the series of meetings that I'm referring
4 to because we're in January, early
5 February.
6    Q    Okay.
7        So it was only once that you
8 went to Mills, or more than once?
9        MS. VLADECK: Objection to
10    form.
11    A    It was more than once.
12    Q    And each time he sat there
13 quietly? Didn't respond?
14        MS. VLADECK: Objection to
15    form. Asked and answered.
16    Mischaracterizes the record.
17    A    Yes.
18    Q    Yes. Okay.
19        Now, after the arm-pulling
20 incident, what was the next incident
21 between you and Isiah, if any, that was
22 disturbing to you?
23    A    March.
24    Q    When in March was that?
25    A    We continued to have

212

ANUCHA BROWNE SANDERS

1
2 conversations. I don't -- I didn't -- I
3 can't pinpoint the actual meetings, but
4 when I could update him, if he was in the
5 office, I tried to. Even if it was in
6 passing in the conference room, I would
7 try and update him.
8        But the meeting that I can
9 pinpoint is -- took place on March 23rd.
10 It was conversation over the phone.
11    Q    Had he cursed at you or cursed
12 in your presence between the meetings you
13 described in January/February and the
14 March incident that -- what I'm about to
15 ask you about?
16    A    Yes.
17    Q    Could you tell us on each
18 occasion when and where, who was present
19 and what was said?
20    A    Steve asked me to have
21 meetings with him to discuss player
22 appearances. There were a number of
23 issues with player appearances, and he
24 asked me to meet with him. And so I did.
25    Q    "He," Isiah? Or "he," Steve?

213

ANUCHA BROWNE SANDERS

1
2    A    Steve asked me to meet with
3 Isiah.
4        And on those occasions I met
5 with him and he was very unhappy with the
6 frequency of the player appearances and,
7 you know, made it clear that he wasn't
8 happy with it.
9    Q    Well, did he make that clear
10 in the three meetings that you described
11 before when he was using profanity?
12    A    Those three meetings were more
13 update meetings. And these following
14 meetings were end of February/early March,
15 and they were -- I was directed by Steve
16 to meet with him on player appearances.
17    Q    So how often did you go in to
18 see him in late February, early March on
19 player appearances?
20        MS. VLADECK: What year?
21    Q    We're talking about '04?
22    A    Early '04, yes.
23    Q    Yeah.
24    A    I wouldn't say that they're
25 scheduled meetings. So there were maybe

54  (Pages 210 to 213)

214

ANUCHA BROWNE SANDERS

1
2 two, three.
3    Q    And where would these meetings
4 take place?
5    A    Either in his office or the
6 conference room.
7    Q    At Madison Square Garden?
8    A    Yes.
9    Q    Was Isiah in that office area
10 very frequently while he worked at the
11 Garden when you were there?
12    MS. VLADECK: Objection to
13 form.
14    Q    You could use your definition
15 of frequently. You don't need to use
16 mine.
17    A    He was there -- typically, on
18 a game day he was there, or if there was
19 an office of the chairman meeting, he was
20 there. It wasn't as -- in comparison to
21 Scott, it wasn't as frequent, but he was
22 there.
23    Q    Approximately once a week?
24    A    No. More than once a week.
25    Q    Approximately twice a week?

215

ANUCHA BROWNE SANDERS

1
2    A    It could have been three times
3 a week, but it wasn't a full day. He
4 would come in, maybe be there for an hour
5 and leave. He would come in and be there
6 for three hours and leave. So it varied.
7    Q    So all in all, in a typical
8 week, how long would you say Isiah spent
9 at the Garden offices?
10    MS. VLADECK: Objection to
11 form.
12    A    I don't know. I didn't keep
13 track of the hours that he was in the
14 office.
15    Q    I'm asking for an
16 approximation.
17    A    The only -- I can't give you
18 an approximation because I only dealt with
19 Isiah when I needed to. So I can't tell
20 you how long he was in the office.
21    Q    Would you see him when he
22 walked into the offices?
23    His office was near you,
24 wasn't it?
25    MS. VLADECK: Objection to

216

ANUCHA BROWNE SANDERS

1
2 form.
3    A    His office was on the other
4 side, but he typically went down the
5 corridor. He didn't pass my office to get
6 to his. So he could have been there, he
7 might not have been there. I wasn't
8 keeping track.
9    Q    So approximately twice, you
10 went in there to report to him in late
11 February, early March what happened?
12    A    You said approximately twice?
13    Q    That's what you said, I
14 thought.
15    A    We were talking about meetings
16 in February and I mentioned three. And
17 then you asked me -- I told you about the
18 player appearance meetings that Steve
19 directed me to have with him. And I met
20 with him approximately two times on that,
21 maybe three.
22    Q    He cursed at you then?
23    A    Yes, he did.
24    Q    What did he say?
25    A    It was to the effect of "what

217

ANUCHA BROWNE SANDERS

1
2 the fuck is this." It was -- he continued
3 to ask me "what the fuck is this." "This
4 is -- you know, I'm trying to get this
5 fucking team ready to play. What are all
6 these fucking events?"
7    Q    So the cursing wasn't
8 directed -- you used this distinction
9 before, didn't you?
10    The cursing wasn't directed at
11 you, the person, but just the
12 circumstance; is that a fair --
13    MS. VLADECK: Objection to
14 form.
15    A    Depended on the meeting.
16    Q    Well, it -- excuse me.
17    In the arm grab incident, he
18 took you to the bike room and he cursed at
19 you, correct?
20    A    Yes, he did.
21    Q    In these other meetings that
22 you are describing now, approximately five
23 or six of them, was he cursing at you, or
24 was he using profanity?
25    MS. VLADECK: Objection to

55  (Pages 214 to 217)

218

```
1           ANUCHA BROWNE SANDERS
2      form.
3         A    It varied.  There was some
4   meetings where he just used profanity.
5   There were others where he was directing
6   it at me and he called me a "fucking
7   bitch."
8         Q    On one or more than one
9   occasion in those five or six meetings?
10        A    I would say on more than one
11  occasion.  In those five or six meetings,
12  it was probably three times.  But when he
13  started this cursing, he was spewing
14  curses.  So it was a mixture of he was
15  referring to the situation and then he was
16  referring to me.
17        Q    Did you go back to Mills and
18  report to him and tell him what was going
19  on?
20        A    Yes.
21        Q    At the weekly meetings, or
22  right after it happened?
23           MS. VLADECK:  Objection to
24      form.
25        A    It depended on the event.
```

219

```
1           ANUCHA BROWNE SANDERS
2   There were times I went to him right
3   after.  And as I said earlier, I was
4   trying not to be in his office complaining
5   all the time.
6         Q    Leaving that aside, what you
7   were trying not to do, I'm getting an
8   impression that five or six times you went
9   into this man's office and he was cursing
10  at you all the time and making it very
11  unpleasant and uncomfortable and miserable
12  for you, right?
13           MS. VLADECK:  Objection to
14      form.
15        A    It wasn't always in his
16  office.  Sometimes it was in the
17  conference room.  But yes, that's
18  accurate.
19        Q    But that's accurate, right?
20           And very, very different than
21  the way it was under Scott Layden, right?
22        A    It was different, yes.
23        Q    Where you were very
24  comfortable in having these interactions
25  with the general manager under Layden,
```

220

```
1           ANUCHA BROWNE SANDERS
2   weren't you?
3           MS. VLADECK:  Objection to
4      form.
5         A    I was comfortable with Scott,
6   yes.
7         Q    Now, did you go into Mills at
8   any time -- this is in the February, March
9   period -- and say -- not in exact words
10  but in concept -- "This is impossible, I
11  can't talk to the man.  Every time I talk
12  to the man he's cursing at me"?
13        A    I made Steve very much aware
14  of it, and I did complain.  I said, "This
15  is not a comfortable environment.  He
16  can't just curse me out."  And I made it
17  very clear to him, especially the evening
18  of March 23rd, that this -- it could not
19  continue like this.  This is absolutely
20  outrageous.
21        Q    Before March 23, had you made
22  it clear to him that it could not
23  continue, that it was outrageous?
24        A    Yes, I did.
25        Q    So March 23rd was just a
```

221

```
1           ANUCHA BROWNE SANDERS
2   culmination of that period; it wasn't the
3   first time you made it clear, right?
4         A    I think after he called me a
5   "fucking bitch" and "ho," it made it very
6   clear to me that Steve had to step in.
7         Q    Was that the March 23rd
8   incident or the incidents before?
9         A    The "fucking bitch" or the
10  "ho."
11           MS. VLADECK:  Objection to
12      form.
13        Q    It isn't so much of the words.
14  I am not minimizing the words.
15           But it isn't so much the
16  words, as to cursing at you as
17  distinguished from using profanity.
18           You make that distinction,
19  right?
20           MS. VLADECK:  Objection to
21      form.
22        A    I'm sorry.  I didn't
23  understand.
24        Q    Well, when the man says "what
25  the fuck am I doing here" or words to that
```

222

ANUCHA BROWNE SANDERS

1    effect, or some of the things you said, he
2    said at the advertising meeting, "don't
3    waste my fucking time" -- he's not cursing
4    at anybody, he is using profanity, you
5    understand that, right?
6        A    Yes.
7        Q    And I believe you testified
8    that in the five or six meetings you
9    described -- we're not in the March 23rd,
10   24th meeting yet -- but up until that
11   time, sometimes he used profanity and
12   sometimes he was spewing curses at you,
13   correct?
14       A    Yes.
15       Q    And you told that to Steve on
16   more than one occasion?
17       A    Yes.
18       Q    That it was impossible and
19   it's got to stop?
20       A    I didn't say it wasn't
21   possible.
22       MS. VLADECK:  Objection to
23   form.
24       Q    What did you say?

223

ANUCHA BROWNE SANDERS

1        A    That's not what I said.
2        Q    What did you say?
3        A    I said this is unprofessional
4    and it needs -- we need to settle this and
5    figure out how we can work together.
6        Q    Did it ever get settled?
7    Because I got the impression from your
8    Complaint that this continued throughout
9    the entire year of '04?
10       MS. VLADECK:  Objection to
11   form.
12       A    My interactions with him were
13   less frequent, but it continued.
14       Q    Was there ever a time that you
15   were with that man having an interaction
16   in the year '04, that he didn't curse at
17   you and use profanities?
18       A    Very rarely.  And only in
19   public.
20       Q    But if it was the two of you
21   privately, he always cursed at you and
22   used profanities?
23       A    Yes.
24       Q    And how many times in '04,

224

ANUCHA BROWNE SANDERS

1    counting the five or six that you've told
2    us about, how many times did you have
3    these private interactions with him in the
4    year '04?
5        A    I think I just described about
6    eight, right?  About eight.
7        Q    I'm not getting the eight.
8    Maybe I'm missing something.
9        A    There were a few meetings to
10   discuss player appearances.  I want to say
11   three.
12       Q    Three.
13       A    There were about
14   three-some-odd meetings -- yeah, about
15   three meetings prior to that that were
16   just update meetings.
17       Q    This was all in
18   January/February?
19       A    Yes.  January/February, early
20   March.
21            There was the meeting in
22   January -- that's seven -- where I handed
23   him the cheat sheet.
24       Q    The cheat sheet, that's seven.

225

ANUCHA BROWNE SANDERS

1        A    And then after the -- and then
2    in March 23rd, that discussion that we
3    had.  So that's eight.
4            And then after that point, I
5    met with him less frequently, but those --
6    and most of those meetings took place in
7    the conference room as opposed to his
8    office, most of them.  But, yes, we would
9    sit down and we would discuss things, and
10   he would continue to use profanity with
11   me.
12       Q    How many times,
13   approximately -- I understand that you
14   don't have the exact number -- would you
15   say, after the March discussions that you
16   had, that you met with Isiah in the
17   conference room, or anyplace where it was
18   just the two of you, to discuss whatever,
19   where he cursed at you and used profanity
20   in the year '04?
21       A    I would say several.
22       Q    Well, let's do this.
23       A    What several --
24       Q    I'm asking you to put a number

226

ANUCHA BROWNE SANDERS

1 on it. And I'm understanding, by the
2 way --
3
4     A    Seven.
5     Q    -- it's not the exact number.
6     A    I would say seven or eight.
7 About seven or eight.
8     Q    And this was -- so this would
9 be, like, every month? You got about nine
10 months left between March -- about eight
11 months left after March.
12     A    Yeah, could have been more.
13 That's why it's hard to pinpoint, but --
14 yeah.
15     Q    Do you remember any specifics
16 of those meetings, starting with the first
17 and continuing to the last, all in '04?
18     A    Yes. Are you talking about
19 the 23rd incident or the 24th incident?
20     Q    Skipping that for the moment,
21 I promise you I'm going to question you
22 about that. I have no doubt about that.
23          Talking about the other seven
24 or eight that occurred after that.
25     A    Yeah, I mean, there were

227

ANUCHA BROWNE SANDERS

1
2 meetings where we discussed -- there was a
3 meeting where we discussed the draft and
4 some logistics around the draft, and he
5 was hostile.
6     Q    When was that?
7     A    In the May time frame.
8     Q    What did he say to you, and
9 what did you say to him?
10     A    It was a discussion about -- I
11 think it was a discussion about how we
12 could possibly use him during the draft.
13 And he was -- I don't remember his exact
14 words. I just remember the hostility and
15 the cursing.
16     Q    What did he say? Did he curse
17 at you, or use profanity?
18          MS. VLADECK: Objection to
19     form.
20     A    He cursed at me.
21     Q    What did he say?
22     A    Very regularly, "fucking
23 bitch."
24     Q    Anything else?
25     A    That's what stands out.

228

ANUCHA BROWNE SANDERS

1
2     Q    And so he would do that how
3 often in '04? And again, I'll keep
4 telling you, if you say 10, it turns out
5 you want to say 11 in the courthouse, I'm
6 not going to say, "Ha, ha, you only said
7 10." I understand you are giving your
8 best approximation.
9     A    Say seven, eight times over
10 the course of the rest of the year.
11     Q    So for a total of how many in
12 the 12-month period, January '04 to
13 December 31, '04?
14          MS. VLADECK: Objection to
15     form.
16     A    About twenty.
17     Q    Twenty times?
18     A    Yes.
19     Q    Now, each time that he did it,
20 did you go in and tell Steve Mills?
21     A    No, I didn't.
22     Q    Did there come a time when you
23 stopped telling Steve Mills?
24     A    No. I consistently told him.
25 But I wasn't running to his office every

229

ANUCHA BROWNE SANDERS

1
2 other -- every single time I had an
3 interaction with Isiah.
4     Q    And each time, it was
5 disturbing to you, wasn't it?
6          MS. VLADECK: Objection to
7     form.
8     A    Yes, it was.
9     Q    Each time was upsetting to
10 you?
11     A    Depends what he called me.
12 "Fucking ho," "fucking bitch" was very
13 upsetting.
14     Q    And did you tell that to Mills
15 each time? "This is really upsetting to
16 me"?
17          MS. VLADECK: Objection to
18     form. Asked and answered.
19     A    Yes.
20     Q    And it didn't stop, did it,
21 for the whole year?
22     A    No, it didn't.
23     Q    Now, at any time during that
24 year, did it ever run through your mind,
25 this business of just telling Mills what's

58   (Pages 226 to 229)

242

ANUCHA BROWNE SANDERS

1
2  would be more of a conduit between me and
3  Isiah, as opposed to me having direct
4  meetings with him.
5      Q    When did Steve decide that?
6      A    After he started professing
7  his love for me.
8      Q    So throughout '04 -- let's
9  change my question around. Maybe make it
10 a narrower question if I can.
11         Throughout the year '04, did
12 it ever occur to you that you could avoid
13 meeting alone with Isiah Thomas, given
14 what he was doing every time you got in a
15 meeting alone with him?
16         MS. VLADECK: Objection to
17 form.
18     A    No. I was focused on trying
19 to work through and do my job.
20     Q    So it never crossed your mind
21 that maybe when you had a meeting with
22 Isiah Thomas, you could bring somebody
23 with you as part of the meeting?
24     A    No, not at my level. I didn't
25 feel like it was appropriate to bring

243

ANUCHA BROWNE SANDERS

1
2  somebody along to meet with Isiah just to
3  be able to meet with him.
4      Q    Well, after a period of time,
5  weren't you just sort of knowing that you
6  were going to be cursed at every time you
7  walked in there to talk to him about
8  something that you thought you were
9  supposed to be talking to him about?
10     A    Well, my expectation was that
11 Steve was going to be working with him.
12 That wasn't happening. And I continued to
13 meet with him so I could get my job done.
14     Q    So I'm asking you: Did it
15 occur to you during '04 at any time to
16 avoid meeting with him alone so you didn't
17 get this cursing at you?
18         MS. VLADECK: Objection to
19 form. Asked and answered.
20     A    Not necessarily. I just was
21 more focused on trying to get my job done.
22     Q    Did you ever say to Mills,
23 "Hey, you got to have somebody in there
24 when I'm talking to him. I can't talk to
25 this man alone"?

244

ANUCHA BROWNE SANDERS

1
2      A    No.
3      Q    You never said that to him?
4      A    No.
5      Q    Did you ever say to Mills in
6  '04, "We've got to bring human resources
7  into this. You are not getting the
8  situation cleared up"?
9      A    No.
10         MS. VLADECK: Objection to
11 form.
12     Q    Did it ever occur to you to
13 say that to him?
14     A    Not to Steve.
15     Q    Not to Steve?
16     A    No.
17     Q    Did you say it to anybody in
18 the company, "I got to get HR involved in
19 it" during the year '04?
20     A    No.
21     Q    Is there a reason you didn't?
22         MS. VLADECK: Asked and
23 answered.
24     A    Steve was my direct manager.
25     Q    But he wasn't getting the job

245

ANUCHA BROWNE SANDERS

1
2  done.
3          Did you tell that to Steve?
4          MS. VLADECK: Objection to
5  form. Asked and answered.
6      A    Steve was getting -- I was
7  focused on getting my job done, and my
8  expectations was that Steve would deal
9  with it. And I think he did get
10 Pete Olsen involved at one point.
11     Q    In the course of the year
12 2004, you described a number of incidents,
13 and then you recounted for me a number of
14 incidents, all told around 20 -- don't
15 hold me to the number, could be a little
16 less, could be a little more, I don't care
17 about the number -- but around 20, where
18 you would walk into Isiah's -- and just
19 about every time you got in there, whether
20 it was the conference room or his office,
21 as long as it was the two of you, he was
22 cursing at you and using profanity and
23 making it miserable, right?
24         MS. VLADECK: Objection to
25 form.

62   (Pages 242 to 245)

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

246

1      ANUCHA BROWNE SANDERS
2    A    Yes.
3    Q    And you originally told Mills,
4  that he was quiet, I believe you
5  testified, and you thought to yourself
6  he's probably going to take speak to Isiah
7  directly and straighten this out.
8        Do you remember telling me
9  that this morning?
10      MS. VLADECK: Objection to
11    form.
12    A    Yes.
13    Q    And at some point, happens one
14  time, happens two times, happens three
15  times, happens four times, it happens five
16  times and so on, does it cross your mind
17  that Steve Mills is not getting the job
18  done, he is not getting Isiah to stop?
19        Does that ever cross your
20  mind?
21    A    Yes.
22    Q    Do you say it to Mills?
23    A    No.
24    Q    Now, you and Mills -- and I am
25  not making this larger than life.

247

1      ANUCHA BROWNE SANDERS
2  But you've acknowledged that
3  you and Mills were friends or friendly in
4  a business sense?
5        MS. VLADECK: Objection to
6    form.
7    Q    Correct?
8        MS. VLADECK: Asked and
9  answered. Mischaracterizes the
10  testimony.
11    A    Yes.
12    Q    Were you afraid to say to
13  Mills, "What in the world is going on
14  here? This guy keeps cursing at me.
15  Enough."
16        Did it ever occur to you to
17  say that?
18    A    I had those conversations with
19  Steve.
20    Q    What do you say --
21      MS. VLADECK: Let her finish.
22    A    I had the conversations with
23  Steve. We were also at a point -- the
24  team was losing horribly, there was a lot
25  of pressure on Steve. And so I would

248

1      ANUCHA BROWNE SANDERS
2  continue to raise these issues in the
3  hopes that he would deal with it.
4    Q    What was the basis of your
5  hopes after the first, second, third,
6  fourth, fifth, sixth, seventh, eighth and
7  so on time? What was the basis of your
8  hope that he would deal with it? "He,"
9  Steve.
10      MS. VLADECK: Objection to
11    form. Argumentative.
12    A    That I had respect for him and
13  that I reported to him and that I had to
14  trust that he was going to get something
15  done.
16    Q    So for the entire year of
17  2004, the situation continued as bad, if
18  not worse, and yet you never said to Steve
19  "Enough is enough, we've got to straighten
20  this out right now"?
21      MS. VLADECK: Objection to
22  form. Objection to form.
23    A    I did say that to Steve.
24    Q    And did you straighten it out?
25        How did you straighten it out?

249

1      ANUCHA BROWNE SANDERS
2      MS. VLADECK: Objection to
3    form.
4    A    I said to Steve, "We have to
5  have a meeting." And we did have a
6  meeting.
7    Q    That was in March?
8    A    Yes.
9    Q    After March, between March and
10  December, how did you straighten it out?
11  How did you have a meeting?
12      MS. VLADECK: Objection to
13    form.
14    A    I just continued to bring to
15  his attention what was going on.
16    Q    How often did this man call
17  you, in '04, a bitch or fucking bitch and
18  a ho?
19      MS. VLADECK: Objection to
20    form.
21    A    Are you asking me to quantify
22  the bitch, the ho or the fucking bitch,
23  fucking ho? Because many of the
24  interactions, he was spewing curses.
25    Q    Well, best you can.

63  (Pages 246 to 249)

334

ANUCHA BROWNE SANDERS

1
2     A    Yes.
3     Q    And yet you saw the necessity
4  of doing it again over a year later?
5          MS. VLADECK:  Objection to
6  form.
7     A    Of documenting it, yes.
8     Q    Why did you see the necessity
9  of documenting it in December of '05?
10    A    I thought it was important.
11    Q    Why?
12    A    I think it's important to
13 document things.
14    Q    Why wasn't it important
15 earlier to document these things?
16    A    There were a number of things
17 going on right around that time, including
18 a threat -- I think was at the time -- by
19 Steve Mills.  My insistence to Steve that
20 he deal with the sexual harassment.
21    Q    This was the first time that
22 you insisted to Mills?  In November of
23 '05 was the first time you insisted that
24 he deal with sexual harassment?
25    A    It wasn't the first time, no.

335

ANUCHA BROWNE SANDERS

1
2     Q    When was the first time?
3     A    I think -- I want to say
4  January of 2005.
5     Q    And before that?
6     A    The verbal harassment on a
7  regular basis.
8     Q    So between January of '05 and
9  December of '05, you saw no need to insist
10 that Steve deal with the sexual harassment
11 business?
12         MS. VLADECK:  Objection to
13 form.  Mischaracterizes the
14 testimony.
15    A    No.  That's not what you asked
16 me.
17    Q    Well, I don't understand.  Can
18 you explain that to me?
19    A    Are you asking me?
20    Q    Yes.
21    A    To explain -- you didn't ask
22 me that question when I answered you
23 before.
24    Q    So explain it to me now.
25    A    Well, you asked me was that

336

ANUCHA BROWNE SANDERS

1
2  the first time you insisted that I asked
3  Steve to deal with the sexual harassment.
4  And I said I insisted that he deal with
5  the verbal harassment in 2004.  And after
6  he started professing his love to me at
7  the end of 2004 and into 2005, I was very
8  persistent with Steve in dealing with that
9  as well.
10    Q    Now, we'll go back to --
11 between October of '04 and December of
12 '04, are there any incidents that
13 occurred --
14    A    Say that again.
15    Q    Between October of '04, Petra
16 Pope, and December of '04, that's the
17 incident at Gate 1 -- I don't think you
18 need your recollection refreshed -- but
19 the incident where he tells you he's in
20 love with you for the first time.
21         Do you know what I'm referring
22 to?
23         MS. VLADECK:  Objection to
24 form.  Mischaracterizes the
25 testimony.

337

ANUCHA BROWNE SANDERS

1
2     A    In December.
3     Q    Do you know what I'm referring
4  to?  I'll show you the document.
5     A    I'm aware of it.
6     Q    Between that period of October
7  of '04 and December '04, were there any
8  incidents that occurred between you and
9  Isiah that were disturbing to you that you
10 haven't told us about?
11    A    October of '04.  Not that I
12 can remember right now.
13    Q    Okay.  So before we do
14 December '04, let's go back to the
15 infamous March '04 period of time.
16         And where we left off quite a
17 while ago, Murphy had come in to your
18 office, he was vulgar towards you, it was
19 something to do with player relations, it
20 had nothing to do with Leonard Lewin and
21 you had called for a meeting between you,
22 Steve Mills and Isiah, right?
23         MS. VLADECK:  Objection to
24 form.
25    A    Yes.  In March.

85  (Pages 334 to 337)

342

ANUCHA BROWNE SANDERS

1
2 accommodate him. Give him what he wants.
3 Accommodate him."
4        And at that point I was
5 really -- the end of the meeting and I
6 left.
7        Q    So were you unhappy with the
8 result of the meeting?
9        MS. VLADECK:  Objection to
10    form.
11        A    I was unhappy with some of the
12 results, and happy about some of them.
13        Q    And what specifically were you
14 unhappy about?
15        A    Well, the night before when he
16 was calling me a bitch and a ho and asking
17 me what the fuck I was responsible for,
18 and I was explaining to him and he said,
19 "I don't like this setup. What am I here
20 to do, just trade fucking players?"
21        And I said -- I asked him -- I
22 said, "You really need to talk to Steve
23 about it." So I was happy and encouraged
24 with the meeting when he had me
25 clarify what my roles and responsibilities

343

ANUCHA BROWNE SANDERS

1
2 to Isiah.
3        Q    What did he say they were?
4        A    Exactly what I said. I was
5 P&L manager responsible for the business
6 operations, the business side of the team,
7 the revenue streams, marketing, new media,
8 Web, game presentation, community
9 relations, alumni relations. We went
10 through fan development and all the rest
11 of my responsibilities. And he confirmed
12 that that was my role.
13        Q    How about budgets, was that
14 your responsibility?
15        A    Yeah. It was a collaborative
16 responsibility, yes.
17        Q    Collaborative with who?
18        MS. VLADECK:  Objection to
19    form.
20        A    Well, as P&L manager, there
21 were parts of the P&L that I was
22 responsible for that were directly
23 influenced by my peers. So there were
24 other people in the senior vice president
25 role that influenced and also had direct

344

ANUCHA BROWNE SANDERS

1
2 responsibility for parts of the P&L.
3        Q    But the ultimate
4 responsibility for P&L and the budgeting
5 at the Garden, as related to the Knicks,
6 was yours, correct?
7        MS. VLADECK:  Objection to
8    form.
9        A    I would consider myself a P&L
10 manager, and in that role, I had people
11 providing me information.
12        The ultimate ownership of the
13 P&L --
14        Q    Sorry. I was rude, but I did
15 not mean to be rude. Would you mind
16 saying it again.
17        A    In my role, I was the P&L
18 manager. So I owned the revenue streams.
19 The budget process was a collaborative
20 process, and it involved myself, it
21 involved Mark Piazza who oversaw P&L for a
22 number of different entities, as well as
23 Brian LaFemina who oversaw suites and
24 tickets and some of the ticket sales
25 responsibilities.

345

ANUCHA BROWNE SANDERS

1
2        Q    Whatever your responsibilities
3 were concerning the budget, do you feel
4 you were competent to do that?
5        A    Yes.
6        Q    And you didn't have any
7 particular difficulty in doing that?
8        A    No. I think -- I didn't
9 feel -- it was a difficult -- and it was a
10 laborious process, but I didn't have
11 difficulty.
12        Q    Nobody criticized you for the
13 way you presented the budget?
14        MS. VLADECK:  Objection to
15    form.
16        A    Criticize? No. It wasn't
17 criticism on how I presented the budget.
18        Q    Nobody recommended that you
19 take a course so you can learn how to do
20 it?
21        A    No. That wasn't -- no.
22        Q    That never happened?
23        A    No one criticized how I
24 presented the budget and recommended that
25 I take a class because of that, no.

87  (Pages  342  to  345)

346

ANUCHA BROWNE SANDERS

1
2  Q   So as far as you were
3  concerned, at no time in the year 2005
4  were you ever at a meeting where there was
5  a negative reaction to the way you were
6  presenting whatever you were presenting
7  relating to budgeting?
8        MS. VLADECK:  Objection to
9  form.
10     A   No, that's not what occurred.
11     Q   What occurred?  Do you know of
12  some incident?
13     A   Yeah.  There was a discussion
14  with regards to a capital request.
15     Q   When was that?
16     A   I think July of 2005.
17     Q   And who was present, and where
18  was it?
19     A   It was a larger budget
20  meeting.  And it involved members of the
21  senior management staff, and it was in
22  Jim Dolan's conference room.
23     Q   And what happened?
24     A   There was a question about a
25  capital expenditure and --

347

ANUCHA BROWNE SANDERS

1
2  Q   Did you know what that was?
3  A   Yes, I did.
4        MS. VLADECK:  Please,
5  Mr. Parcher, when somebody says
6  "and," that means there's more
7  coming.
8  Q   Please continue.
9  A   There was a question about
10  capital expenditure, and there was a
11  concern that a capital purchase had been
12  made without it first being approved by
13  Mr. Dolan.
14  Q   And then what happened?
15  A   Then what happened when?
16  Q   Was there any fuss about it or
17  any --
18  A   There was discussion about it.
19  We talked about how that might have
20  happened.
21        There was confusion -- there
22  was confusion with everybody in the
23  meeting.  They didn't -- because this
24  capital request had been signed off on, on
25  how it did not go through some normal

348

ANUCHA BROWNE SANDERS

1
2  channels.
3  Q   You didn't get a feeling at
4  any time at that meeting that you were
5  losing the respect, professional respect,
6  of the persons in that room?
7  A   No, not at all.
8        MS. VLADECK:  Peter, when you
9  get to a convenient place, I need
10  just a two-minute break.
11        MR. PARCHER:  We can do it
12  now.
13        MS. VLADECK:  That's fine.  If
14  you are in the middle of a line --
15  take a break?
16        THE VIDEOGRAPHER:  Time is
17  4:33 p.m.  Going off the record.
18        (A brief recess was
19  taken.)
20        THE VIDEOGRAPHER:  Time is
21  4:50 p.m.  We're back on the record.
22  Q   In the approximate
23  two-some-odd years that you worked at the
24  Garden during Isiah Thomas's time, did you
25  ever hug Isiah Thomas?

349

ANUCHA BROWNE SANDERS

1
2  A   There may have been a greeting
3  where he hugged me.
4  Q   Did you ever hug Isiah Thomas?
5  A   I hugged him back, yes.
6  Q   Hugged him back?  When was
7  that?
8  A   There was a greeting where we
9  were in front of season subscribers.  It
10  was a season subscriber forum, and I
11  introduced him.
12  Q   When was that?  Approximate
13  time.
14  A   Spring of 2005.
15  Q   Ever a time where you gave
16  him -- and I don't mean anything untoward
17  by this -- where you gave him a kiss or
18  kiss on the cheek something like that,
19  just by way of friendly greeting or
20  something?
21  A   No, I never kissed him on the
22  cheek.
23  Q   Never gave him a kiss of any
24  kind?
25  A   No.

88  (Pages 346 to 349)

394

ANUCHA BROWNE SANDERS

1  
2  A    I don't know why.
3  Q    Okay. Now, if I were to read
4  any of the redacted portions of your
5  diary, would that shed any light on that
6  question of why you didn't?
7      MS. VLADECK: Objection to
8  form.
9  Q    You know, your lawyers crossed
10  out quite a few things in your diary.
11      MS. VLADECK: Excuse me. We
12  went to court over this. This is an
13  improper question to ask her. I'm
14  directing her to answer.
15      (Directive to witness.)
16      MR. PARCHER: You won't let
17  her answer whether any redacted
18  portion of her diary would shed light
19  on why she didn't ask or tell
20  Steve Mills --
21      MS. VLADECK: You can ask her
22  whether any part of the diary,
23  redacted or unredacted. Given your
24  question, I'm directing her not to
25  answer.

395

ANUCHA BROWNE SANDERS

1  
2      MR. PARCHER: So it doesn't
3  matter what I say, you can't answer
4  that question.
5      MS. VLADECK: That's not what
6  I said.
7      MR. PARCHER: I'm not
8  understanding.
9      MS. VLADECK: Fine. Move on.
10      MR. PARCHER: I need to
11  understand -- I might be asking --
12      MS. VLADECK: I am saying that
13  you didn't ask her -- asking really
14  essentially what has been redacted --
15      MR. PARCHER: Oh, I get it.
16  Q    Leave out the word "redacted."
17  Redacted or unredacted or any other dacted
18  you can think of, you know.
19      MS. VLADECK: Objection to
20  form.
21  Q    I'm asking you whether there
22  is anyplace in your diary that sheds light
23  on why you didn't tell Steve Mills, "Are
24  you talking to this man"?
25      MS. VLADECK: Objection to

396

ANUCHA BROWNE SANDERS

1  
2  form.
3  Q    Is there any part of this
4  diary which would shed light on why you
5  didn't say to Steve Mills, "You are not
6  taking care of it. This stuff is still
7  going on"?
8      MS. VLADECK: Objection to
9  form.
10      And also -- I am going to
11  direct her not to answer. I think
12  that's a question that's improper. I
13  also think it may call for privileged
14  information. And I am not --
15      (Directive to witness.)
16      MR. PARCHER: Well, I don't
17  want any privileged information. I
18  actually do. I just said I don't
19  want it. But I am not going to get
20  it. But I am not asking for it.
21  Anyway you are telling her not to
22  answer the question?
23      MS. VLADECK: Correct.
24      MR. PARCHER: We'll get a
25  ruling.

397

ANUCHA BROWNE SANDERS

1  
2  (Marked for a ruling.)
3      MS. VLADECK: We have lots of
4  rulings to get. One more won't make
5  a difference.
6      MR. PARCHER: Sometimes these
7  do make a difference. You get a
8  little insight into a person. You
9  know what I mean? Don't be so sure
10  it won't make a difference.
11  Q    So now we're up to -- anything
12  else between December 29 and March 14,
13  other than this so-called off-site
14  planning -- excuse me -- off-site private
15  meeting that we've been talking about?
16  A    Not that I can remember, no.
17  Q    So now we're into March 14.
18      You made an entry into your
19  diary on March 14. Are you familiar with
20  that?
21  A    Yes.
22  Q    And were you referring to a
23  game that happened -- when?
24      Where did this incident
25  happen? Let's start with that. The

100  (Pages 394 to 397)

398

ANUCHA BROWNE SANDERS

1  March 14 incident.
2     A    **In Gate 1 at a Knicks game.**
3     Q    Same thing as December 29, not
4  the same facts, but the same location?
5     A    **Not in the same exact**
6  **location, no.**
7     Q    What was the difference?
8     A    **The one on March 29, he hugged**
9  **me and walked me into Gate 1 and the**
10 **locker room corridor. And that's when and**
11 **where he said that he was in love with me.**
12    Q    I must not have made my
13 question clear.
14          I am asking you about the
15 specific location. The 29th of December
16 and 14th of March, am I correct in saying
17 it was the same location, more or less, at
18 Gate 1?
19    A    **I would say more or less, yes.**
20    Q    Was it after a game?
21    A    **The March 14 incident took**
22 **place during a game.**
23    Q    During the game?
24    A    **During the game, yes.**

399

ANUCHA BROWNE SANDERS

1     Q    At Gate 1?
2     A    **At Gate 1.**
3     Q    So the world was there to see,
4  if they wanted to?
5     A    **To see?**
6     Q    To see. If anybody looked
7  over at Gate 1, can see what was going on?
8     A    **Yes, they could see me and**
9  **Isiah standing next to each other.**
10    Q    And at this time, he also
11 tells you that he's in love with you?
12    A    **Yes.**
13    Q    And — but this time he says
14 to you, "I know you think I'm
15 inappropriate," right?
16    A    **Yes.**
17    Q    And this all starts by
18 referring to the scar that he has, and
19 frankly, I can't notice it from this
20 distance.
21          But apparently you have a
22 scar, too, over one of your eyes?
23    A    **He started by saying he**
24 **noticed a scar over my eyebrow, yes.**

400

ANUCHA BROWNE SANDERS

1     Q    I guess it's just from this
2  distance, but I don't see it.
3          Do you have a scar over one of
4  your eyebrows?
5     A    **Yes.**
6     Q    Same place as he has his scar?
7     A    **I don't know if it's the same**
8  **place.**
9     Q    So this is the man that's been
10 cursing at you all of '04, correct?
11    A    **'04, yes. Until the end of**
12 **'04, yes.**
13          MS. VLADECK: Objection to
14    form.
15    Q    Now he tells you that he
16 notices everything about you, he notices a
17 scar over your eyebrow, he's got the same
18 one, from fighting, he says, right?
19          MS. VLADECK: Objection to
20    form.
21    A    **Yes.**
22    Q    And then he puts his arm
23 around you?
24    A    **No. I don't recall him**

401

ANUCHA BROWNE SANDERS

1  **putting his arm around me at that point.**
2     Q    So there's no physical
3  contact?
4     A    **No.**
5     Q    And he tells you — what —
6  he's in love with you?
7     A    **He said, "I think you are**
8  **beautiful and I am in love with you."**
9     Q    And didn't he say, "I know you
10 think I'm inappropriate"?
11    A    **"I know you think I'm**
12 **inappropriate," yes. That's exactly what**
13 **he said.**
14    Q    Did you relate that incident
15 to Pete Olsen on May 11 of 2005?
16    A    **I don't remember.**
17    Q    Well, would you take a look at
18 May 11.
19    A    **These notes?**
20    Q    Yeah. Well, I'm saying yes
21 without looking too closely.
22          Is that the Pete Olsen notes
23 that I showed you before, Exhibit 14?
24 6816 up at the top.

101  (Pages 398 to 401)

402

```
1          ANUCHA BROWNE SANDERS
2          Are you looking at the top
3   of -- I can't tell, honestly, whether it's
4   15 or 16, but at the top of that page it
5   begins "Anucha says she's been very direct
6   with IT."
7          You see that there?
8      A    Yes.
9      Q    What incident were you
10  relating to Olsen at that point?
11         MS. VLADECK:  Asked and
12     answered.  Objection to form.
13     Q    Was that the March 14
14  incident?
15     A    No.
16     Q    What is it?
17     A    There were a couple of things.
18         MS. VLADECK:  Objection to
19     form.
20     A    There are a couple things that
21  are referenced in this paragraph.
22     Q    Yes?
23     A    Yes.
24     Q    What are they?
25     A    It says, "Anucha says she's
```

403

```
1          ANUCHA BROWNE SANDERS
2   been direct with IT," and it says, "Nobody
3   tells you the truth."
4          That wasn't the same time, and
5   it also references him asking me to go
6   off-site.  I don't see any reference to
7   him saying -- mentioning the scar above my
8   head.
9      Q    What incident are you
10  referring to there?
11         MS. VLADECK:  She's not
12     referring to anything.  These are not
13     her notes.
14     Q    These notes are inaccurate?
15  You didn't report this information, as set
16  forth in that paragraph, to Pete Olsen?
17         MS. VLADECK:  Objection to
18     form.
19         MR. PARCHER:  If you have a
20     speaking objection one more time,
21     we'll go outside and --
22         MS. VLADECK:  We can have the
23     witness leave right now.  I have no
24     problem with that.
25         MR. PARCHER:  I have a problem
```

404

```
1          ANUCHA BROWNE SANDERS
2   with that.
3          MS. VLADECK:  I have no
4      problem with having the witness here.
5      I have a problem --
6          MR. PARCHER:  I have a problem
7      with you doing it, and you've done it
8      twice today --
9          MS. VLADECK:  Why don't we
10     have Ms. Browne Sanders leave the
11     room, and I will tell you exactly
12     what the problem is.
13         MR. PARCHER:  Let's continue.
14         MS. VLADECK:  It's your
15     choice.
16         MR. PARCHER:  You can tell me
17     all you want.  You are just coaching
18     your witness.
19         MS. VLADECK:  I'm asking her
20     to leave the room.  I'm not sure --
21         MR. PARCHER:  It's too late.
22     The horse got out of the barn.  Now
23     you are saying we'll close the barn
24     door.
25     A    I'm sorry.  What was your
```

405

```
1          ANUCHA BROWNE SANDERS
2   question?
3          MR. PARCHER:  I don't remember
4      it anymore.
5          Could you read back my last
6      question?
7          (Requested portion of record
8      read:  "Q.  These notes are
9      inaccurate?  You didn't report this
10     information, as set forth in that
11     paragraph, to Pete Olsen?")
12         MS. VLADECK:  Object to form.
13     A    If you are asking me if the
14  notes are inaccurate, I interpret these
15  notes as being a culmination of some of
16  the things that I've said to him.  I don't
17  think that he's referring to just one
18  meeting in this first paragraph.
19     Q    Did you tell him about more
20  than one incident?
21     A    Yes.
22     Q    What incidents did you tell
23  him about?
24     A    I told him about a number of
25  the incidents that took place in 2004.
```

102  (Pages 402 to 405)

422

ANUCHA BROWNE SANDERS
1
2  incidents, not cursing incidents.
3       So far you told us about
4  December 29, right?
5       A    Yes.
6       Q    And you told us about the
7  off-site in January/February, whenever it
8  took place, right?
9            MS. VLADECK:  Objection to the
10  form.
11      A    Yes.
12      Q    Now you are telling us about
13  March 14, correct?
14           MS. VLADECK:  Objection to
15  form.
16      A    I'm telling you about
17  March 14.
18      Q    Right.  Right.
19           Are there any incidents that
20  were disturbing to you about Isiah between
21  March 14, 2005, and your meeting with
22  Olsen on May 11, 2005?
23      A    Between March 14 and May 11?
24      Q    Yes.  I say May 11 because
25  that's the date I believe you were in the

423

ANUCHA BROWNE SANDERS
1
2  meeting with Pete Olsen.
3       A    I don't remember right now.
4       Q    If you don't remember, then
5  there's only three incidents to talk
6  about, correct?
7            MS. VLADECK:  Objection to
8  form.
9       A    I said I don't remember right
10  now.
11           You are asking me between
12  March 14 and the meeting -- you said there
13  were only three to talk about between
14  March 14 and the meeting?
15      Q    December 29 --
16      A    You said March 14 and the
17  meeting.
18      Q    That's correct.
19  January/February, off-site, and now
20  March 14.  Those are the three.
21           Were there any others?
22      A    So you mean between December
23  and May 11.
24      Q    Okay.  I thought you already
25  answered between December and March.  But

424

ANUCHA BROWNE SANDERS
1
2  okay.
3       A    Those are the three that I can
4  remember right now, yes.
5       Q    I'm putting the question to
6  you.
7            Did you tell Mr. Olsen about
8  the March 14 incident that you wrote down
9  in your diary?
10           MS. VLADECK:  Objection to
11  form.  Asked and answered.
12      A    I don't remember if I told
13  him.
14      Q    So you may not have?
15      A    I think the substance of our
16  conversation was that he repeatedly says
17  he's in love with me.  I don't recall
18  saying, on this date this happened, on
19  this date this happened.  I told him a
20  series of interactions.  I said --
21      Q    You said repeatedly to him
22  that he repeatedly told you he loved you?
23      A    Yes.
24      Q    Three times is repeatedly.
25           MS. VLADECK:  Objection to

425

ANUCHA BROWNE SANDERS
1
2  form.
3       A    I told him that he repeatedly
4  said he was in love with me.
5       Q    In a meeting in January or
6  February, the so-called off-site planning
7  meeting, he didn't tell you he was in love
8  with you at that meeting, did he?
9            MS. VLADECK:  Objection to
10  form.
11      A    Yes, he did.
12      Q    He did?
13      A    Yes.
14      Q    You didn't tell us that
15  before, did you?
16      A    You didn't ask me.
17      Q    I thought you had --
18           Is there anything else about
19  that meeting that you didn't tell us
20  about?
21           MS. VLADECK:  Objection to
22  form.
23      A    That was it.  He also did as
24  well in that meeting, yes.
25      Q    The man said, "I'm in love

107  (Pages 422 to 425)

426

ANUCHA BROWNE SANDERS

1
2  with you, I want to go off-site with you
3  privately"?
4      A    It was a conversation. I was
5  in his office for more than a split
6  second. He did say he was in love with me
7  in that conversation.
8      Q    And you told me I didn't ask
9  you about it?
10     MS. VLADECK:  I'm sorry,
11  Mr. Parcher. You keep cutting her
12  off, and she's mid word.
13     Q    Go ahead.
14     A    And he also asked me to go
15  off-site with him.
16     Q    No question that he told you
17  he was in love with you?
18     A    There's no question.
19     Q    That's the second time he told
20  you, right? The first time was
21  December 29?
22     A    He may have said it at other
23  times. I'm just trying to remember them.
24     Q    Right now you don't remember
25  them?

427

ANUCHA BROWNE SANDERS

1
2      A    Right this second, I don't
3  remember.
4      Q    And now, between March 14 and
5  May 11, were there any other either
6  touching incidents or I love you
7  incidents?
8      MS. VLADECK:  Objection to
9  form.
10     A    There were times and instances
11  where he said he loved me, but I don't
12  have the times and the dates that he said
13  this. But it was consistent.
14     Q    Consistent.
15     How many times did he tell you
16  he loved you between March 14 and May 11?
17     MS. VLADECK:  Objection to
18  form. Asked and answered.
19     A    I didn't count.
20     Q    More than five?
21     A    It could have been more than
22  five.
23     Q    More than ten?
24     A    No, it wasn't more than ten.
25     Q    Any witness to a single one of

428

ANUCHA BROWNE SANDERS

1
2  these times?
3      A    That he said he was in love
4  with me?
5      Q    Yes.
6      A    No, not that I am aware of.
7      Q    Every time he told it to you,
8  did you tell Mills?
9      A    In combination I told Mills.
10     Q    Anytime other than the three
11  instances, the 29th -- the two instances,
12  the 29th and the 14th, that you wrote it
13  in your diary?
14     MS. VLADECK:  Objection to
15  form.
16     A    Are you asking me if I wrote
17  it in my diary other than those two times?
18     Q    Yes.
19     A    I don't know. I don't think
20  so. I don't know.
21     Q    And if I asked you the reasons
22  you would give me the same reason,
23  sometimes you did and sometimes you
24  didn't?
25     A    Yes.

429

ANUCHA BROWNE SANDERS

1
2      Q    Was this very upsetting to
3  you, the guy was a general manager of the
4  New York Knicks walking around telling you
5  privately he was in love with you? Was it
6  upsetting to you?
7      A    Yes.
8      Q    Did you go to Steve Mills and
9  tell him to "tell him to cut it out"?
10     MS. VLADECK:  Objection to
11  form.
12     A    Yes, but not in those words.
13     Q    What were the words?
14     A    I told Steve Mills to deal
15  with it. I said, "It's ridiculous."
16     THE VIDEOGRAPHER:  The time is
17  6:07 p.m. This ends Tape Number 3 of
18  the videotaped deposition of
19  Browne Sanders.
20     (A brief recess was
21  taken.)
22     THE VIDEOGRAPHER:  The time is
23  6:07 p.m. This is Tape Number 4 of
24  the videotaped deposition of
25  Browne Sanders.

108  (Pages 426 to 429)

450

ANUCHA BROWNE SANDERS

1
2    A    Yes.
3    Q    Did you learn something,
4    between the time you filed the Complaint
5    and the time you amended your Complaint,
6    to sue him for aiding and abetting in
7    retaliation? That you didn't learn
8    through counsel.
9        MS. VLADECK: To the extent
10    that you learned anything with
11    respect to the aiding and abetting or
12    facts supporting that through
13    counsel, I direct you not to answer.
14        If you know anything not
15    through counsel, you may answer.
16        (Directive to witness.)
17    Q    I'm waiting for the answer.
18        MS. VLADECK: Do you know
19    anything other than through counsel?
20    A    No.
21    Q    You have no information, from
22    any person at the Garden or elsewhere,
23    that substantiates your allegation upon
24    information and belief that Isiah Thomas
25    aided and abetted in retaliating against

451

ANUCHA BROWNE SANDERS

1
2    you?
3        MS. VLADECK: Two things. I,
4    one, object to the form, and second,
5    to the extent that you understand
6    aiding and abetting and the facts
7    supporting that through counsel, I
8    direct you not to answer.
9        (Directive to witness.)
10    Q    What's the basis for your
11    allegation? What is the basis for your
12    allegation that my client aided and
13    abetted and retaliated against you?
14        MS. VLADECK: I direct her not
15    to answer to the extent her only
16    understanding of aiding and abetting
17    is through counsel.
18        (Directive to witness.)
19    Q    What is the source of your
20    information or grounds of your belief that
21    he aided and abetted and retaliated
22    against you?
23        MS. VLADECK: Same direction.
24        (Directive to witness.)
25    Q    When you are quiet, I gather

452

ANUCHA BROWNE SANDERS

1
2    that what you're really saying is "I all
3    know is through my lawyer, so I can't
4    answer that."
5        Is that in effect what you are
6    saying by being quiet?
7    A    My attorney is not asking me
8    to answer that question.
9    Q    Unless you know something that
10    wasn't told to you by your lawyers. She
11    is saying you can't tell me if it was told
12    to you by her or Kevin or whomever.
13        But do you have any
14    information at all that would lead you to
15    be able to say that Isiah Thomas had a
16    hand in your being fired?
17        MS. VLADECK: That's a
18    different question.
19    A    Yes.
20    Q    Tell me about it.
21    A    There were a number of things
22    that Stephon Marbury said about me. Steve
23    mentioned in a number of meetings that
24    Isiah did not like me, and that was the
25    root of hostility between Stephon and

453

ANUCHA BROWNE SANDERS

1
2    myself. And that Steve had mentioned in
3    one of his meetings that Isiah asked for
4    me to be fired.
5    Q    Steve told you that?
6    A    Yes.
7    Q    Was it just you and Steve
8    present when he told you that?
9    A    Yes.
10    Q    Did you write that down
11    anywhere?
12    A    No.
13    Q    Did you tell anybody that?
14    A    Yes, I told somebody. I told
15    somebody that.
16    Q    Who did you tell?
17    A    I remember telling my sisters.
18    Q    When did you tell your
19    sisters? When did this happen?
20    A    This was in 2004, the spring.
21    Q    In 2004?
22    A    Yes.
23    Q    He asked for you to be fired?
24    A    He asked Steve Mills to fire
25    me.

114   (Pages 450 to 453)

454

ANUCHA BROWNE SANDERS

1
2    Q    And you told both your
3    sisters, or all three of your sisters?
4    A    I told my two sisters, Ruthie
5    and Vickie.
6    Q    And anything more?  Anything
7    more that's the basis for your response?
8    A    Yeah.  Steve mentioned a
9    number of times that Isiah doesn't want me
10   around.
11   Q    Doesn't want you to what?
12   A    Doesn't want me around.
13        Steve mentioned that he wanted
14   me fired.  There was --
15   Q    That's in '04?
16   A    That was in 04, yes.
17   Q    And that he didn't want you
18   around was that in '04 or was it '04 and
19   '05?
20   A    The discussions I had with
21   Steve with regards to him wanting me fired
22   were in spring of -- it was in March and
23   April of 2004.
24   Q    And how about that he doesn't
25   want you around, when did that take place?

455

ANUCHA BROWNE SANDERS

1
2    A    We had had discussions about
3    Isiah and more hostile conversations with
4    regards to Isiah, and he mentioned that in
5    those meetings.  Steve did.
6    Q    When?  Time frame.
7    A    I would say spring and summer
8    of 2004.
9    Q    So anytime in 2005, did he
10   tell you that he doesn't want you around?
11        MS. VLADECK:  Objection to
12   form.
13   A    In 2005 there were -- my basis
14   for what -- the question you asked,
15   references things that were told to me
16   through other people at the Garden.
17   Q    Tell me who those people were
18   and what they told you and when.
19   A    Dan Gladstone.
20   Q    Dan Gladstone.  What did he
21   say to you and when?
22   A    Dan Gladstone told me that
23   Stephon made a number of comments,
24   derogatory comments toward me, called me a
25   "black bitch."

456

ANUCHA BROWNE SANDERS

1
2    Q    That Isiah did that?
3    A    That Stephon, I said.
4    Q    I am asking about Isiah.
5        MS. VLADECK:  Please let her
6    finish her answer.
7        MR. PARCHER:  It's not
8    responsive.  I'm asking about
9    Isiah Thomas.
10   A    When I finish, I'll tell you.
11   It's all part of --
12        Stephon called me a black
13   bitch, said, "We don't take direction from
14   a black bitch.  She thinks she runs the
15   team.  She doesn't run shit.  I put the
16   people in their seats."  And then said,
17   "We'll see what's going to happen to her
18   this year."
19        And I told that to Steve.  And
20   Steve said, "That all comes from Isiah.
21   All of that comes from Isiah."
22        So that confirmed to me that a
23   lot of the root of these issues came
24   directly from Isiah.
25   Q    So why didn't you sue him in

457

ANUCHA BROWNE SANDERS

1
2    the first place for aiding and abetting?
3    You had that information before the
4    Complaint was filed.
5        MS. VLADECK:  To the extent
6    that it calls for attorney/client
7    communication, I direct you not to
8    answer.
9        (Directive to witness.)
10   Q    Are you making the allegation
11   about aiding and abetting on the advice of
12   counsel?  Is that your position?
13        MS. VLADECK:  I direct you not
14   to answer.
15        (Directive to witness.)
16        MR. PARCHER:  How could you
17   direct her not to answer that?  You
18   answer it.
19        Is she making that allegation
20   based on your advice?
21        MS. VLADECK:  You can ask her
22   the underlying facts, which you
23   started to do, but then cut her off
24   mid answer.
25   Q    Are there any underlying facts

458

ANUCHA BROWNE SANDERS

1
2  that you haven't told me about that lead,
3  in your mind, to the allegation that
4  Isiah Thomas aided and abetted in the
5  Garden retaliating against you?
6        MS. VLADECK:  Objection to
7  form.
8        A    The fact that he was extremely
9  verbally hostile.
10      Q    In '04?
11      A    In '04 --
12      Q    Not '05, though, right?
13            MS. VLADECK:  If you are going
14  to ask the question, let her answer.
15            MR. PARCHER:  I'm asking it my
16  way.  You make your objection.
17      Q    Not in '05, correct?
18      A    The fact he was extremely
19  hostile to me in 2004, and his profession
20  of love for me throughout -- end of 2004
21  into 2005, his repeated passes or -- his
22  repeated passes, I would say, and my
23  insistence that he was being
24  unprofessional and certainly didn't
25  acknowledge it.

459

ANUCHA BROWNE SANDERS

1
2        Q    Anything else?  Tell you what,
3  because of time, we'll leave a blank for
4  you, and if there's anything else, you can
5  put it in there when you see the
6  deposition before you sign it.  Okay?
7            So you are saying all of that,
8  and anything else you can remember, is the
9  basis for your allegation on information
10 and belief that Isiah Thomas aided and
11 abetted Madison Square Garden in
12 retaliating against you; is that your
13 position?
14            MS. VLADECK:  Objection to
15 form.
16      A    Yes.  That's most of it, yes.
17      Q    What am I missing?
18      A    Well, you said if I remember
19 anything.
20      Q    You could put it in.  Sure.
21 You could always do that.
22            Then somebody gets to say, why
23 didn't you say it then.  But you can
24 handle that.
25            I'll ask you the same question

460

ANUCHA BROWNE SANDERS

1
2  without using the words is it under the
3  advice of counsel.
4        Without using the words
5  "aiding and abetting," have you given us
6  the whole basis for your saying that
7  Isiah Thomas participated in the
8  retaliation against you by firing you,
9  getting you fired?
10            MS. VLADECK:  Objection to
11 form.
12      A    The fact that I had a dotted
13 line reporting structure to him and --
14      Q    He was your supervisor?
15            MS. VLADECK:  Would you please
16 let her finish an answer.
17            MR. PARCHER:  I thought I did.
18      Q    He was your supervisor?
19      A    I had a dotted line reporting
20 relationship to Isiah.
21      Q    You say so.  Do you have any
22 organizational chart that says so?
23            MS. VLADECK:  Asked and
24 answered three times.
25      A    I don't.

461

ANUCHA BROWNE SANDERS

1
2        Steve told me that I had a
3  dotted line reporting relationship to him,
4  as I did with Scott.
5        Q    Anything else?
6        A    That's what I can recall now.
7        Q    You are not saying that
8  Isiah Thomas was responsible for reviewing
9  your job performance, are you?
10      A    I don't know that he was
11 responsible for reviewing my job
12 performance.
13      Q    You are not saying that
14 Isiah Thomas was responsible for
15 evaluating you at the end of any given
16 period of time, are you?
17            MS. VLADECK:  Objection to
18 form.
19      A    I think Steve gave me a job
20 performance.
21      Q    You are not saying that
22 Isiah Thomas's job was to direct how you
23 did your job, was it?
24      A    Direct, no.  Influence, yes.
25      Q    And he influenced your job by

116  (Pages 458 to 461)

462

1          ANUCHA BROWNE SANDERS
2    telling you he wanted you to go through
3    Murphy when you talked to the players,
4    right?
5          MS. VLADECK:  Objection to
6    form.
7      A    He influenced my job in many
8    ways.
9      Q    Okay.  Let me ask you this:
10   You say that Isiah Thomas damaged you.
11         How did he damage you?
12     A    He contributed to my getting
13   fired.
14     Q    Contributed to the
15   retaliation, is that what you mean?
16         MS. VLADECK:  Objection to
17   form.
18     Q    Is that what you mean?
19         MS. VLADECK:  Objection to
20   form.
21         MR. PARCHER:  I heard you.
22     Q    Is that what you mean?
23     A    Could you repeat the question.
24     Q    Is that what you mean, that he
25   contributed to your retaliation?

463

1          ANUCHA BROWNE SANDERS
2      A    I think he contributed to the
3    decision to fire me.
4      Q    And that's how he damaged you?
5          Any other way?
6      A    I think that he damaged me,
7    along with Madison Square Garden, in the
8    spreading damaging rumors about me.
9      Q    What damaging rumors did he
10   spread about you?
11     A    Things that were in the press.
12     Q    He spread rumors about you in
13   the press?
14     A    Yes.
15     Q    What did he say in the press
16   that was a rumor?
17     A    I don't remember what his
18   exact quotes were.  He had a press
19   conference.
20     Q    You had a press conference,
21   didn't you?
22     A    Yes, I did.
23     Q    You had a press conference at
24   the time you filed the Complaint, didn't
25   you?

464

1          ANUCHA BROWNE SANDERS
2          MS. VLADECK:  Objection to
3    form.
4      A    Yes, I did.
5      Q    And if you know, hasn't your
6    lawyer spoken to the press a whole bunch
7    of times since that time?
8          MS. VLADECK:  Objection to
9    form.
10         To the extent you only know
11   from counsel, I direct you not
12   answer.
13         (Directive to witness.)
14     Q    You read it in the
15   paper, didn't you, Kevin Mintzer said this
16   and Kevin Mintzer said that?
17         MS. VLADECK:  Objection to
18   form.
19         MR. PARCHER:  Are you saying
20   you didn't do it?
21         MR. MINTZER:  I said not so
22   much.
23     Q    He said things about you in
24   the press?
25     A    Yes.

465

1          ANUCHA BROWNE SANDERS
2      Q    You can't say specifically
3    what they were.
4          But anything else?
5      A    He's damaged my reputation.
6      Q    In any other way other than by
7    the ways you just described?
8      A    I think he's affected my
9    ability to get other employment.
10     Q    Have you tried to get other
11   employment since you left the Garden?
12     A    Yes, I have.
13     Q    With whom have you tried?
14     A    Quite a number of people.
15     Q    If I leave a space, will you
16   tell me who those people were?
17     A    Georgetown University,
18   Gatorade, Verizon Wireless, TENNIS
19   Magazine.
20     Q    What magazine?
21     A    TENNIS.
22     Q    Tents?
23         MS. VLADECK:  TENNIS.
24         MR. PARCHER:  TENNIS Magazine.
25     A    TENNIS Magazine.

117  (Pages 462 to 465)