# Exhibit 11

Dockets.Justia.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

ANUCHA BROWNE SANDERS,

              Plaintiff,

        -against-             06 CV 0589 (GEL)

MADISON SQUARE GARDEN, L.P.,
ISIAH LORD THOMAS III and JAMES L. DOLAN,

              Defendants.

-----------------------------------------X

VIDEOTAPED DEPOSITION OF ANUCHA BROWNE SANDERS

New York, New York

Tuesday, November 28, 2006

REPORTED BY:

BARBARA R. ZELTMAN

JOB NO.: 10957



**David Feldman**
W o r l d w i d e

From File to Trial.

805 Third Avenue, 8th Floor           600 Anton Boulevard, 11th Floor
New York, NY 10022                Costa Mesa, CA 92626
(800) 642-1099                    (866) DFW-1380

138

1        ANUCHA BROWNE SANDERS
2        A    I didn't view securities and
3    facilities as other divisions of the
4    Garden.
5        Q    What are they?
6        A    These are peers and people
7    that I worked with.
8        Q    Don't you have peers and
9    people you work with in other divisions?
10        MS. VLADECK:  Objection to
11    form.
12        A    Well, they provide a service
13    to the Garden and I wouldn't deem that as
14    other divisions of Madison Square Garden.
15        Q    On the next page, you'll
16    notice the question:  "Did you receive any
17    feedback from Steve Mills about
18    deficiencies in performing management
19    and/or financial aspects of job."
20        And the answer is:  "No.
21    Before Isiah Thomas started working there,
22    Charging Party was always praised to
23    performance used for the last three years.
24    She received five on performance reviews.
25    Charging Party also received bonuses that

139

1        ANUCHA BROWNE SANDERS
2    were based on an algorithm between
3    personal performance rating and company
4    rating, and last year she received a four
5    on performance review."
6        Do you recall giving that
7    answer to that question?
8        MS. VLADECK:  Objection to
9    form.
10        A    Yes.
11        Q    Was that answer a truthful
12    response to that question?
13        A    Yes.
14        Q    The answer begins with the
15    word "no" in response to did you receive
16    any feedback from Steve Mills about
17    deficiencies in performing management
18    and/or financial aspects of your job.
19        Is no a truthful response to
20    that question?
21        A    Yes.
22        MS. VLADECK:  Asked and
23    answered.
24        Q    So would it be your testimony
25    then that Mr. Mills, in all the years you

140

1        ANUCHA BROWNE SANDERS
2    worked for him at Madison Square Garden,
3    never gave you any feedback about
4    deficiencies in performing management
5    and/or financial aspects of your job?
6        A    Yes. That's accurate.  I
7    never received any feedback from Steve
8    with regards to my management --
9    deficiencies in my management or financial
10    aspects of my job.
11        Q    And are you including in that
12    response, for example, the summer 2005
13    budget meeting you attended with
14    Mr. Mills, Mr. Ratner, Mr. McCormack,
15    Mr. Moran and others?
16        MS. VLADECK:  Objection to
17    form.
18        A    Those weren't all the people
19    that were there.  Mr. Moran was not there.
20        Q    Mr. Dolan?
21        A    Mr. Dolan.
22        Q    Are you including that meeting
23    when you say that you received no feedback
24    from Steve Mills about deficiencies of
25    performing financial aspects of your job?

141

1        ANUCHA BROWNE SANDERS
2        A    Yes.
3        Q    And are you including in that
4    answer no to receiving feedback from Steve
5    Mills about deficiencies in performing
6    management aspects of your job, for
7    example, the process by which you
8    empowered your secretary to manage the
9    host and hostess program without
10    consulting the labor relations people with
11    respect to the ushers at Madison Square
12    Garden?
13        MS. VLADECK:  Objection to
14    form.
15        A    That's not accurate.
16        Q    And are you including in this
17    your management of Last Man Standing?
18        A    That's not accurate, either.
19        Q    Are you including in this your
20    decision to paint a mural with departed
21    Knicks players?
22        MS. VLADECK:  Objection to
23    form.
24        A    We didn't paint the mural.
25    And the logistics around that would need

36 (Pages 138 to 141)

142

1    ANUCHA BROWNE SANDERS
2  to be elaborated on before I would say yes
3  or no to that.
4    Q    But now that I have acquainted
5  you with some other issues that may have
6  arisen, is it still your testimony that
7  your answer no is a truthful answer to the
8  question, "Did you receive any feedback
9  from Steve Mills about deficiencies in
10 performing management and/or financial
11 aspects of your job"?
12    MS. VLADECK:  Objection to
13   form.
14    A    The answer is still no.  I
15 didn't receive feedback with regards to
16 deficiencies in my management or financial
17 aspects of my job.
18    Q    Just so there's no
19 misunderstanding using a sometimes complex
20 word like that, what's your understanding
21 of the term "deficiencies" as used in the
22 question to which you responded?
23    MS. VLADECK:  Objection to
24   form.
25    A    That there were areas that

143

1    ANUCHA BROWNE SANDERS
2  were lacking in management of different
3  aspects of my job and that I wasn't
4  performing up to his par in the financial
5  aspects of my job.
6    Q    Would you turn to the next
7  page, please.
8    A    The last question on this page
9  reads:  "Did you ever complain to anyone
10 about sex discrimination or sexual
11 harassment, when, to whom, how, any
12 witnesses?  (Complaints to supervisor,
13 Steve Mills)  If and when you complained,
14 was any action ever taken?
15    Do you recall being asked that
16 question?
17    MS. VLADECK:  Objection to
18   form.
19    A    Yes, I do.
20    Q    Let me now read what is
21 indicated as your response.
22    "Charging Party complained to
23 Peter Olsen, organizational psychologist
24 consultant, hired by HR.  Peter Olsen had
25 previously been an employee of

144

1    ANUCHA BROWNE SANDERS
2  Cablevision's HR Department and was
3  brought back on to do different consulting
4  projects.  Charging Party met Peter Olsen
5  when he was first -- when he first started
6  working for the company and she had a
7  mentoring relationship with him.  Olsen
8  asked Charging Party to have lunch with
9  him to discuss a program he was working on
10 for Isiah Thomas who was having problems
11 with hostility and women.  At this
12 luncheon meeting, Charging Party told
13 Olsen everything that happened between her
14 and Isiah Thomas.  Charging Party also
15 named other people who could provide
16 information.  Charging Party mentioned
17 name of ██████████.
18    In or around June 2005,
19 Charging Party and Olsen had a follow-up
20 meeting about Isiah Thomas.  Peter Olsen
21 mentioned ████████████████
22 to Charging Party because there were a lot
23 of rumors about ████████ and Isiah
24 Thomas.  Charging Party suggested that one
25 of the ways to work with Isiah Thomas

145

1    ANUCHA BROWNE SANDERS
2  would be to work within his circle.
3  Charging Party was also working with Olsen
4  on a team building project/possible new
5  business venture.  Olsen told Charging
6  Party that he tried to meet with Isiah
7  Thomas but Isiah wouldn't meet with him;
8  Charging Party doesn't know if they ever
9  ended up meeting.
10    Karen Buchholz was also aware
11 of what was going on with Charging Party.
12 Charging Party spoke with Michelle Evans,
13 (MSG's lawyer primarily for Radio City)
14 and shared what was going on from a
15 standpoint of a friend.  Lynn Carfora,
16 (employer relations/HR) Charging Party
17 told her that her treatment from Isiah is
18 ridiculous.  Charging Party got the
19 impression that Lynn Carfora didn't want
20 to hear this or get involved in something
21 with such a potential magnitude."
22    Do you recall giving that
23 answer to the question asked?
24    MS. VLADECK:  Objection to
25   form.

37  (Pages 142 to 145)

374

1       ANUCHA BROWNE SANDERS
2    form.
3       A    I thought that I did, yes.
4       Q    Did there come a time in 2005
5    when you told Mr. Mills you thought Isiah
6    Thomas should sign 4,500 letters
7    personally by hand to ticket holders or
8    potential ticket holders?
9            MS. VLADECK:  Objection to
10   form.
11      A    No.
12      Q    What, if anything, did you
13   tell Mr. Mills regarding Mr. Thomas
14   signing letters to subscribers?
15      A    I wrote Steve and e-mail, if I
16   remember correctly, and the e-mail was a
17   suggestion and I was asking for his input
18   before I moved forward with anything.
19      Q    Was your suggestion that
20   Mr. Thomas sign 4,500 letters personally?
21   Was that your suggestion?
22      A    My suggestion was that we
23   consider having Isiah sign letters to
24   season ticket holders, and the point of
25   the e-mail to Steve Mills was to ask for

375

1       ANUCHA BROWNE SANDERS
2    his feedback because in a number of
3    meetings we talked about what other teams
4    are doing across the league.  Of course,
5    we have a large season subscriber base,
6    but we talked about having him sign a
7    subset.  For example, signing -- for
8    example, signing the letters that only
9    went to first-year subscribers or the most
10   tenured subscribers.  So there were a
11   number of options.  And I was sending the
12   note to Steve Mills to get his feedback.
13          (Browne Sanders Exhibit II,
14      MSG-6996, was marked for
15      Identification.)
16      Q    Ms. Browne Sanders, showing
17   you a copy of we've marked as
18   Exhibit BS-II for Identification.
19          There are several e-mails,
20   most recent of which was Sunday May 1,
21   2005, 11:53 in the morning.
22          In the earliest of these
23   e-mails, Ms. Browne Sanders, you write to
24   Steve Mills as follows:  "Hi, Steve, On
25   Monday, Jordan will drop off a drop of the

376

1       ANUCHA BROWNE SANDERS
2    renewal package for your review.  To date
3    I approved the design direction, invoice
4    piece and benefits outline.  You will also
5    receive a copy of the letter that will
6    come from Isiah.  I would like to have
7    Isiah sign each letter.  We have 4,500
8    accounts.  He can do this over a few days.
9    Thoughts?  I don't want to ask until I
10   hear from you."
11          Did you send that to
12   Mr. Mills?
13      A    Yes, I did.
14      Q    Mr. Mills responds, does he
15   not, "I think 4,500 letters to sign is too
16   much.  We never sent originals like that
17   and I question how valuable it really is."
18          Is that his response in part?
19          MS. VLADECK:  Objection to
20      form. The document speaks for
21      itself.
22      A    That's his response, yes.
23      Q    And did you think your boss
24   thought your idea was not a very sensible
25   one to ask Isiah Thomas to sign 4,500

377

1       ANUCHA BROWNE SANDERS
2    letters?
3          MS. VLADECK:  Objection to
4      form.
5      A    Did I think it was a sensible
6    request --
7      Q    Do you believe your boss
8    thought that your idea was not a very
9    sensible one?
10         MS. VLADECK:  Objection to
11     form.
12     A    I don't think that he
13   perceived it as not sensible.
14     Q    You thought he credited that
15   as something responsible of the senior
16   vice president of the organization to have
17   president and general manager of the
18   Knicks sign 4,500 letters over two days?
19         MS. VLADECK:  Objection to
20     form.  Misstates the evidence.
21     A    Steve and I talked about a lot
22   of things that would be responsive to a
23   season subscriber base that spent
24   $65 million at Madison Square Garden every
25   season.  We talked about a number of

95  (Pages 374 to 377)

378

1       ANUCHA BROWNE SANDERS
2  **communication opportunities with our**
3  **season subscriber group.**
4       Q    Do you recall a budget meeting
5  in the summer of 2005 at which in the
6  presence of your boss, Mr. Mills, you were
7  unable to explain the difference between
8  operating expense and capital expenditure
9  when asked by Mr. Dolan?
10      MS. VLADECK:  Objection to
11      form. Asked and answered.
12      A    **I was never asked in a meeting**
13 **to explain the difference between a**
14 **capital budget and an operating budget.**
15      Q    Was it clear to you at that
16 meeting that you did not know the
17 difference?
18      MS. VLADECK:  Objection to
19      form.
20      A    **I was very clear in that**
21 **meeting between capital and operating**
22 **budget.**
23      Q    Was it clear to you?
24      MS. VLADECK:  Asked and
25      answered.  Objection to form.

379

1       ANUCHA BROWNE SANDERS
2       Q    Do you understand my question?
3       A    **I didn't understand the**
4  **difference between what you are asking.**
5       Q    At that meeting in the
6  presentation you were making to Mr. Dolan,
7  was it clear to you that you did not know
8  the difference between an operating
9  expense and a capital expenditure?
10      MS. VLADECK:  Objection to
11      form. Asked and answered.
12      A    **In that meeting, I did know**
13 **the difference between a capital and an**
14 **operating budget.**
15      Q    Were you upset with Mr. Mills
16 for not coming to your aid during that
17 meeting when you were pressed by Mr. Dolan
18 for some answers to questions?
19      MS. VLADECK:  Objection to
20      form.
21      A    **Coming to my aid, I thought**
22 **that he would have input in that meeting**
23 **with regards to that program.**
24      Q    Was it apparent to you at that
25 meeting that Mr. Dolan was unhappy with

380

1       ANUCHA BROWNE SANDERS
2  your presentation?
3       A    **Not as a whole, no.**
4       Q    After that meeting, were you
5  asked to take some remedial education on
6  financial terms from managers?
7       MS. VLADECK:  Objection to
8       form.
9       A    **No, I was not.**
10      Q    Did you take some training
11 after the meeting at the request of
12 Mr. Dolan?
13      MS. VLADECK:  Objection to
14      form.
15      A    **I took a marketing class at**
16 **the request of Steve Mills.**
17      Q    Were you asked to take any
18 courses that might help you learn more
19 about the financial aspects of business,
20 including the difference between operating
21 expenses and capital expenditures?
22      A    **No.**
23      Q    At that budget meeting, were
24 you criticized by Mr. Dolan or Mr. Ratner
25 for any expenditures you had authorized

381

1       ANUCHA BROWNE SANDERS
2  which were in their view improper?
3       A    **I wouldn't characterize it as**
4  **criticism.**
5       Q    What did they say and how
6  would you characterize it?
7       MS. VLADECK:  Objection to
8       form.
9       A    **They wanted feedback from**
10 **Steve and myself on how the capital**
11 **request that was being submitted was**
12 **approved without Jim signing off on it. I**
13 **think that was his concern.**
14      (Browne Sanders Exhibit JJ,
15      MSG-12642 through 12645, was marked
16      for Identification.)
17      Q    Ms. Browne Sanders, I show you
18 a copy what's been marked for
19 Identification as BS-JJ.  It is an e-mail
20 transmitting a copy of your resume, Sunday
21 June 5, 2005, at 12:19 in the afternoon,
22 to Jay Nixer.
23      Is that Mr. Nix?
24      A    **Yes, it is.**
25      Q    Were you sending Mr. Nix, your

96 (Pages 378 to 381)

# Exhibit 12

```
 1

 2    UNITED STATES DISTRICT COURT

 3    SOUTHERN DISTRICT OF NEW YORK

 4    06 Civ. 0589 (CGE)

 5    ------------------------------------------x

 6    ANUCHA BROWNE-SANDERS,

 7                          Plaintiff,

 8          - against -

 9    MADISON SQUARE GARDEN, L.P., ISIAH LORD

10    THOMAS, III, and JAMES DOLAN,

11                          Defendants.

12    ------------------------------------------x

13                          December 8, 2006

                            12:24 p.m.

14

15          VIDEOTAPE DEPOSITION of ISIAH

16    LORD THOMAS, III, taken by the Plaintiff,

17    pursuant to Notice, held at the offices of

18    Vladeck Waldman Elias & Engelhard, P.C,

19    1501 Broadway, New York, New York, before

20    Debbie Zaromatidis, a Shorthand Reporter

21    and Notary Public of the State of New

22    York.

23

24

25
```

78

1                   THOMAS
2        MR. SHERWOOD:   I would --
3        MS. EISENBERG:   Excuse me.
4        MR. SMITH:   But I will do --
5        MS. EISENBERG:   I listened to
6    your criticism, and I will of course be
7    respectful of that.
8        MR. SMITH:   Okay.
9        MS. EISENBERG:   However, having
10   said that, there is a legal definition as
11   you know and I know for full time.  Having
12   said that, you've heard my objection.
13   Please continue.
14       MR. SMITH:   That is fine.
15   Q.   What is your understanding of
16   full time?
17   A.   I guess when you are working for
18   somebody and you are working nine to five
19   and doing it five, six days a week.
20   Q.   Okay.
21   A.   So I guess my shoe shine
22   job -- shoot that was full time to me.
23        (Laughter.)
24       MR. SMITH:  So I think he
25   understood my question.  Okay.

79

1                   THOMAS
2        MS. EISENBERG:   Okay.
3    Q.   Now, outside of your job as
4    being a shoe shine boy, what other full
5    time positions have you held?
6    A.   Do you -- now, is a part-time
7    summer job, is that a full-time job where
8    you are working like in the summers?
9    Q.   Outside of part-time summer jobs
10   --
11   A.   Okay.
12   Q.   -- other employment -- what
13   other full-time employment have you had?
14   A.   Then that would -- outside of
15   being a professional athlete --
16   Q.   Okay.  List --
17   A.   -- with the Detroit Pistons?
18   Q.   Okay.  When were you a
19   professional athlete with the Detroit
20   Pistons?
21   A.   I was drafted in 1981 I believe.
22   Q.   And how long were you a
23   professional athlete with the Detroit
24   Pistons?
25   A.   For thirteen years.

80

1                   THOMAS
2    Q.   And what were your
3    responsibilities as a professional athlete
4    with the Detroit Pistons?
5    A.   Basically to play basketball.
6    Q.   Any other responsibilities?
7    A.   No.
8    Q.   When you were a professional
9    basket -- basketball player with the
10   Detroit Pistons -- Pistons, did you have
11   any obligations to do any community
12   events?
13   A.   I think you were required to
14   do -- I'm not sure how many requirements
15   they had in the contract -- in your
16   contract that had -- you had to perform.
17   Q.   So you had to perform some
18   community events as -- as being a
19   professional athlete for the Detroit
20   Pistons?
21   A.   Yeah.  But I'm not sure to the
22   exact number at that time of my contract.
23   Q.   Would you say -- would it be
24   fair to say that as a professional athlete
25   for the Detroit Pistons that you were a

81

1                   THOMAS
2    very fierce competitor?
3    A.   I think that would be accurate.
4    On the floor.
5    Q.   On the basketball floor?
6    A.   Yes.
7    Q.   And when you were a professional
8    athlete with the Detroit Pistons, was
9    there -- did the Detroit pistons have any
10   rules or regulations with you -- with you
11   regarding dating any employees of the
12   Detroit Pistons?
13       MR. GREEN:   Objection to form.
14       MS. EISENBERG:   Objection as to
15   form.
16   A.   That I don't know.
17   Q.   When you were a player with the
18   Detroit Pistons, was there policies
19   regarding sexual harassment?
20       MR. GREEN:   Objection.
21   Q.   At the workplace.
22       MS. EISENBERG:   I am sorry.  I
23   didn't hear the last part.
24       MR. SMITH:   At the workplace.
25   Sorry.

21  (Pages 78 to 81)

86

1    THOMAS
2    between L.A. and Boston -- L.A., Boston,
3    and Philly, then we weren't necessarily --
4    at that time as we were coming up, we
5    weren't thought of as in the same light as
6    Boston or L.A. because they had tradition
7    behind them with Russell and Chamberlain
8    and Kareem, and we were just new kids on
9    the block, and when I mean the block, the
10   NBA just trying to carve some turf and
11   carve out a name and make an organization
12   and basically do what Boston and L.A. were
13   doing, and, you know, when we say crashing
14   the party, you know, Boston and L.A.
15   wanted an exclusive club, and they liked
16   every year that they went to the finals
17   and played in the finals, and we wanted to
18   go as opposed to Boston going.
19      Q.   Was there any mention that
20   the --
21        MR. SMITH:   Withdrawn.
22      Q.   During your time as a basket
23   player -- basketball player with the
24   Detroit Pistons, was Detroit known to
25   be --

87

1    THOMAS
2        MR. SMITH:   Withdrawn.
3      Q.   Was the Detroit basketball team
4    known to be a very aggressive, hard
5    playing team?
6        MR. GREEN:   Objection to form.
7      A.   We were known as a mentally
8    tough team, and the aggressiveness, you
9    know, was also labeled with the city that
10   was considered tough and aggressive, hard
11   working people who rolled up their
12   sleeves, went to work and worked in the
13   factory manufacturing at that time it was
14   General Motors, Chrysler, Ford.  So the
15   identity of the team in terms of tough,
16   gritty, aggressive really came from a
17   Detroit community that identified with
18   a -- with a work force that our team kind
19   of adopted that attitude.
20      Q.   Okay.  Were you -- when you were
21   a player of the Detroit Pistons, was your
22   team ever accused of being a very dirty
23   physically playing team?
24        MS. EISENBERG:   Objection.
25        MR. GREEN:   Objection to form.

88

1    THOMAS
2        MS. EISENBERG:   Form, yes.
3      A.   Not only our team but when other
4    teams were trying to rise, that's, you
5    know, the -- the champion always has --
6    you know, in basketball is -- it is called
7    a labeling theory, which I learned in
8    sociology that also applies to basketball
9    in that the negative labels that are
10   always attached to a defensive minded
11   team, a team that really concentrates and
12   plays defense as opposed to offense, the
13   offense gets the pretty labels, like, you
14   know, free flowing, you know, jump high,
15   the nice things, and when you're
16   defensive-minded things you -- you more or
17   less get the negative labels that come
18   along with defensive-minded teams, and
19   most defensive-minded teams, whether it be
20   football, baseball, hockey, the label that
21   is attached to defense is always a
22   negative label, and the label that is
23   attached to offense is more or less a
24   positive label, and we were a
25   defensive-minded team.

89

1    THOMAS
2      Q.   And because you were a
3    defensive-minded team, sometimes you
4    were -- the team was given negative
5    labels?
6        MR. GREEN:   Objection to form.
7        MS. EISENBERG:   Objection as to
8    form again.
9      A.   I would -- I would say the
10   majority of the time, yes.
11      Q.   After being an NBA basketball
12   player, did you held -- hold any other
13   positions, full-time positions?
14      A.   After being -- after I retired,
15   I became a part owner, president of
16   basketball operations for the Toronto
17   Raptors.
18      Q.   And what was your duties as
19   president of the Toronto Raptors?
20      A.   We were -- we were granted an
21   expansion franchise in '94, and basically
22   you had a blank sheet of paper, and as one
23   of the -- the owners and president of
24   basketball operations you basically had to
25   come up with a staff, office personnel,

23  (Pages 86 to 89)

90

THOMAS

1
2  arenas, places to play, balls. I mean
3  everything from, you know, finding the
4  ganitor to finding the vice president.
5  You know, those first couple of months you
6  were involved in it.
7      Q.   Okay. And what period were you
8  the president of the Raptors?
9      A.   That would be from '94 to '97 I
10 believe. '97, '98.
11     Q.   And when you were president of
12 the raptors, did --
13     A.   Basketball operations.
14     Q.   -- basketball operations,
15 president of the basketball operations for
16 the Raptors --
17     A.   Yes.
18     Q.   -- did the raptors have a sexual
19 harassment policy?
20     A.   Yes.
21     Q.   And did you receive any training
22 regarding EEO matters as president of
23 basketball operations for the Toronto
24 Raptors?
25         MR. GREEN:   Objection to form.

91

THOMAS

1
2      A.   We -- we operated in Canada, and
3  so I'm -- I'm not sure if the E -- who,
4  who was EO --
5      Q.   EO -- okay. Let me -- did you
6  receive any training regarding handling of
7  sexual harassment claims when you were
8  president of operations for the Toronto
9  Raptors?
10         MR. GREEN:   Objection to form.
11     A.   From the NBA mandate and also
12 from the way Canadian business operated
13 also.
14     Q.   When you were president of the
15 Toronto Raptors, was there any policy
16 regarding players fraternizing with
17 employees of the raptors?
18         MR. GREEN:   Objection to form.
19         MS. EISENBERG:   Objection as to
20 form.
21         MR. GREEN:   Misstates prior
22 testimony.
23     A.   One more time.
24         MR. SMITH:   Read it back.
25         (Record read.)

92

THOMAS

1
2         MR. SMITH:   Let me rephrase it.
3      Q.   When you were president of
4  basketball operations for the Toronto
5  Raptors, was there any policy regarding
6  players fraternizing with employees of the
7  raptors?
8      A.   I don't think we had a policy
9  like that.
10     Q.   When you were president of
11 basketball operations for the Raptors, did
12 the Raptors ever have any cheerleaders or
13 dancers?
14     A.   Yes.
15     Q.   Were they -- did the Raptors
16 have dancers or cheerleaders?
17     A.   They were -- they would call
18 themselves a dance team.
19     Q.   Okay.
20     A.   I think they were called a dance
21 pack.
22     Q.   Were players when you were
23 president of basketball operations for the
24 Toronto Raptors allowed to date the
25 dancers for the team?

93

THOMAS

1
2         MR. GREEN:   Objection to form.
3      A.   If -- if they -- they were
4  single and they chose to.
5      Q.   While you were president of the
6  basketball operations for the Toronto
7  Raptors, did you ever have any --
8         MR. SMITH:   Sorry. Withdrawn.
9      Q.   When you were president of
10 basketball operations for the Toronto
11 Raptors, were you ever accused of sexual
12 harassment?
13     A.   No.
14         MR. GREEN:   Objection as to
15 form.
16         MS. EISENBERG:   Objection as to
17 form.
18     Q.   And when you were president of
19 basketball operations for the Toronto
20 Raptors, did you ever have sex with any of
21 your employees?
22         MR. GREEN:   Objection to form.
23     A.   No.
24     Q.   Just to make -- I want to make
25 clear. When you were president of

24  (Pages 90 to 93)

98

1              THOMAS
2  Camby.
3        I was reluctant to trade those
4  players. I said we were a young team, and
5  we would build and grow, and one day they
6  were going to be good, and if I trade
7  those players, it would damage my
8  reputation, and so I didn't buy the team,
9  and I thus resigned.
10       MR. SMITH:  Can you do me a
11  favor and read back that answer.
12     A.   Sorry it was such a long answer.
13        (Record read.)
14     Q.   When you were president of
15  basketball operations for the Toronto
16  Raptors, did you have an employment
17  contract?
18     A.   Yes.
19     Q.   And how long was the contract
20  for?
21     A.   I believe it was five years I
22  would say.
23     Q.   Now, you said that your
24  relationship after --
25        MR. SMITH:  Withdrawn.

99

1              THOMAS
2     Q.   You said that after you offered
3  to buy the team, your relationship with
4  Alan Slaten soured; is that correct?
5     A.   Yes.
6     Q.   What do you -- what do you mean
7  that your relationship soured? How did it
8  sour?
9     A.   We -- he owned 80 percent, and
10  he asked if I would -- if I wanted to buy
11  more of the team, and basically buying
12  more of the team without majority control
13  only bought you 30 percent of the cost,
14  and I wasn't interested in
15  buying -- buying more debt without having
16  a majority say, and seeing what he had
17  just done to his partner I was reluctant
18  to be a minority partner with him. So
19  when he asked if I wanted more and I said
20  no, and then he said he wanted to sell all
21  of his 80, I told him I was interested in
22  putting together a group to buy all of the
23  80 as opposed to continuing to be a
24  minority at X number. I was comfortable
25  at 10, but I wasn't comfortable with

100

1              THOMAS
2  buying more cost.
3     Q.   Okay. You said that you just
4  saw what he had done with his prior --
5     A.   That would be John Bateau, who
6  owned 40 percent of the team, Alan owing
7  the other 40, and he had a shotgun
8  provision, and he just basically wacked
9  one of his partners.
10     Q.   Okay.
11     A.   And I wasn't necessarily
12  interested in becoming -- in becoming the
13  next one by taking on more cost and he
14  being the majority partner.
15     Q.   Now, you said that you -- he
16  wanted you to trade some players, Tracy
17  McGrady, Damian Staudemire; is that
18  correct?
19     A.   Marcus Camby.
20     Q.   Marcus --
21     A.   Who was eventually traded here
22  to New York for Charles Oakley.
23     Q.   And you said that you didn't
24  want to damage your reputation. What did
25  you mean by that?

101

1              THOMAS
2     A.   I was -- that was my first job
3  as a general manager, and we were -- we
4  had a very solid foundation, had three
5  good drafts, also had acquired Doug
6  Christie, so we had a very nice
7  foundation, and we were getting ready to
8  draft Vince Carter, who they eventually
9  drafted. And when you unwind all that and
10  you start trading players around, the
11  other 27 teams at that time I think, you
12  know, they -- people you are trading to
13  would -- probably wouldn't think you were
14  that smart. So you lose credibility.
15     Q.   Okay. Now, after you
16  were -- after you resigned from basketball
17  operations -- as president of basketball
18  operations for the Toronto Raptors, what
19  did you do next?
20     A.   I worked for Dick Ebersol at
21  NBC.
22     Q.   And what did you do for Dick
23  Ebersol at NBC?
24     A.   I was a game analyst.
25     Q.   And what was your duties as a

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868                                    516-608-2400

102
1          THOMAS
2  game analyst for NBC?
3     A.   Doug Collins and I would
4  basically critique the game, give our
5  evaluations of what was going on in the
6  game and try to bring the viewer closer to
7  the game and tell the story of the game
8  and the players.
9     Q.   And how long were you a game
10  analyst for NBC?
11    A.   I believe two years.
12    Q.   While you were a game analyst at
13  NBC, do you know whether or not NBC had a
14  sexual harassment policy?
15    A.   No, I don't know that.
16    Q.   Did you receive any equal
17  employment opportunity training as a game
18  analyst at NBC?
19       MS. EISENBERG:   Objection as to
20  form.
21    A.   What does that mean equal
22  opportunity --
23    Q.   Let me rephrase that.
24       Did you receive --
25    A.   Whatever you said.

103
1          THOMAS
2     Q.   No problem.
3       Did you receive any training
4  regarding discrimination issues at the
5  workplace?
6     A.   No, we were subcontractors.
7     Q.   Okay.  Subcontractors for whom?
8     A.   For NBC.  Meaning we showed up,
9  Saturday, Sunday, did the game and left,
10  and I believe that's -- I don't know.  I
11  believe that is how we were.  So we -- no,
12  I didn't receive any training.
13    Q.   You -- you were not an employee
14  of NBC?
15    A.   I was an -- technically I was an
16  employee of NBC.
17    Q.   Okay.  And why did you leave
18  NBC?
19    A.   I got offered a job to coach the
20  Indiana Pacers.
21    Q.   Okay.  Let me just go back.
22       What years were you a game
23  analyst -- analyst for NBC?
24    A.   I want to say '97 to 2000.
25    Q.   And when did you start coaching

104
1          THOMAS
2  for the Indiana Pacers?
3     A.   I believe it was 2000, 2001 I
4  believe.
5     Q.   And when did you -- what was
6  your responsibilities as coach for the
7  Indiana Pacers?
8     A.   Coach the team, put together a
9  game plan, practice plans, implement game
10  and practice plans, try to win a
11  basketball game, and also develop the
12  players.  We had a very young team.
13    Q.   When you were coach for the
14  Indiana Pacers -- I am sorry.  What period
15  of time were you coach for the Indiana
16  Pacers?
17    A.   What period of time did I say I
18  was coach for the Indiana Pacers?
19       (Record read.)
20    A.   Yes, I think that is when I
21  started.
22    Q.   And how long were you coach for
23  the Indiana Pacers?
24    A.   Two years.  No, I'm sorry.
25  Three years.  Three years.

105
1          THOMAS
2     Q.   Three years.
3       And in your three years as coach
4  of the Indiana Pacers did the Pacers have
5  a sexual harassment policy?
6     A.   Yes.
7     Q.   Okay.  Did you receive any
8  training regarding the Pacers' sexual
9  harassment policy?
10    A.   Yes.
11    Q.   Could you describe what -- what
12  training you received regarding the
13  Indiana Pacers sexual harassment policy?
14    A.   Not -- not word for word, but
15  basically be -- be considerate and treat
16  people with -- with human decency and
17  respect.
18    Q.   When you were coach of the
19  Indiana Pacers, did the Pacers ever have
20  any dancers or cheerleaders?
21    A.   Yes.
22    Q.   Was there any policy regarding
23  players dating dancers or cheerleaders of
24  the Indiana Pacers?
25       MS. EISENBERG:   Objection as to

130

THOMAS

1    THOMAS
2    A.  Yes.
3    Q.  Okay.
4    A.  There was a -- the competitor
5    was the NBA.  The NBA developmental league
6    ended up becoming the competitor of the
7    CBA, and in order to stay in the CBA -- I
8    mean to stay in the NBA I had to resign
9    all managerial duties and say that I was
10   going to sell the CBA because the NBA
11   deemed it a conflict of interest.
12   Q.  Okay.
13   A.  You want to take that case?
14   Q.  If you pay me like you pay these
15   lawyers, absolutely.
16       (Laughter.)
17   Q.  Your -- what was your next
18   position after being coach of the Indiana
19   Pacers?
20   A.  I became president of the New
21   York Knicks basketball operations.
22   Q.  And when did you become
23   president of the New York Knicks
24   basketball -- basketball operations?
25   A.  That would be December of 2003 I

131

1    THOMAS
2    believe.
3    Q.  And what were your duties as
4    president of New York Knicks basketball
5    operations?
6    A.  Handle coaches, players,
7    scouting, trainers, medical and also the
8    practice facility or the training
9    facility.
10   Q.  And when you first became
11   president of the New York Knicks
12   basketball operations, who did you report
13   to?
14   A.  Steve and Jim.
15   Q.  Steve and who?
16   A.  Steve Mills and Jim Dolan.
17   Q.  And is -- who is your direct
18   supervisor?
19   A.  Steve.
20   Q.  As president -- Steve Mills?
21   A.  Yeah.
22   Q.  At any time when you became
23   president of the New York Knicks
24   basketball operations, did you directly
25   report to Jim Dolan?

132

1    THOMAS
2    A.  He wasn't -- well, yeah,
3    he -- yes, you report to him about what is
4    going on.
5    Q.  Okay.  Was -- when you were
6    president -- at any time when you were
7    president of the New York Knicks
8    basketball operations, was Jim Dolan your
9    direct supervisor?
10   A.  I think Jim Dolan is everybody's
11   direct supervisor.  He is the owner.
12   Q.  Okay.  As president of New York
13   Knicks basketball operations, do you
14   supervise employees?
15   A.  Yes.
16   Q.  Okay.  And which employees do
17   you supervise as president of the New York
18   Knicks basketball operations?
19   A.  As president, you supervise
20   your -- your scouting department.  You
21   supervise the coaching staff, who
22   supervises the players, and you supervise
23   training, equipment manager.
24   Q.  Do you have an employment
25   contract as president of the New York

133

1    THOMAS
2    Knicks basketball operations?
3    A.  Yes.
4        MR. SMITH:  Can you have this
5    marked?
6    A.  Are you done with this?
7    Q.  Yes, we are done with that for
8    now.
9    A.  Do you want it or shall I --
10   Q.  Just leave it there.
11       (Thomas Exhibit 2 marked for
12   identification.)
13       (Document handed to witness.)
14   Q.  Mr. Thomas, the court reporter
15   has handed you a document that has Bates
16   stamp number MSG 0904 that goes through
17   consecutively to MSG 0902 --
18       MR. MINTZER:  102.
19   Q.  -- 102, sorry.  Thank you.
20   A.  One more time.
21   Q.  The court reporter has handed
22   you a document that is -- that has been
23   identified with Bates stamp number MSG
24   09094 consecutively to 09102.
25       MS. EISENBERG:  He doesn't

238

1       THOMAS
2   February I'm going to take you at your
3   word for it. So okay.
4       Q.   You do remember --
5       A.   I do remember a Poland Springs
6   event, but I -- if it is not February and
7   it is March, let's agree.
8       Q.   Whatever it is. Let's have that
9   understanding.
10      A.   Okay. All right.
11      Q.   Do you recall shortly within one
12  or two days having a discussion with
13  Anucha Browne-Sanders regarding the
14  availability of players to do community
15  events?
16          MR. GREEN:   Objection to form.
17      A.   Again, when I got here in
18  December I took a look at our schedule,
19  player events, what the players were
20  required to do, and I -- I was pretty much
21  in -- in Steve's ear about making sure
22  that we get this tight for next year, and
23  whatever responsibilities and obligations
24  that we had, you know, let's try to make
25  sure that we fulfill those obligations

239

1       THOMAS
2   because to me February, March, April,
3   particularly February, March, that is
4   where you are making your playoff run.
5   That is where you are making your push,
6   and they called it in the NBA the dog days
7   of February, you know, late January,
8   February. I mean those are like the dog
9   days. It is an 82-game schedule. You are
10  traveling all around. So, you know, those
11  are the -- you win those games purely on
12  energy, not necessarily talent and skill.
13  It is -- that is why they call it a
14  marathon. It is like the last team
15  standing, and those are kind of like the
16  dog days, and in that period of time we
17  had a lot of player appearances scheduled,
18  and I was saying to Steve and probably
19  Anucha also that, you know, this is the
20  wrong time to be scheduling those things,
21  and next year let's do a better job of
22  planning, so we won't run into this
23  problem next year.
24      Q.   Okay. Do you recall having a
25  conversation in -- in around February or

240

1       THOMAS
2   March of 2004 with Anucha Browne-Sanders
3   regarding what her responsibilities were
4   to the New York Knicks?
5       A.   I think that conversation may
6   have occurred before February.
7       Q.   Okay.
8       A.   But --
9       Q.   That is fine.
10      A.   Let's say -- let's say it -- I
11  know the conversation -- I don't
12  know -- but I think it occurred before
13  February.
14      Q.   Okay. Do you -- you do recall
15  having a conversation with Anucha
16  Browne-Sanders regarding her
17  responsibilities to the New York Knicks?
18      A.   Not -- not me telling her
19  responsibilities, but her basically
20  telling me what mine was, but yeah, I
21  remember that conversation.
22      Q.   Okay. Could you tell me what
23  you remember about that conversation?
24      A.   She wanted -- she wanted me to
25  let her know when I was going to make a

241

1       THOMAS
2   trade and why I was going to make a trade,
3   and she needed to be informed before we
4   made a trade, and I -- I said well
5   that -- that is not going to happen,
6   and -- and in that meeting she informed me
7   that, you know, what her role and
8   responsibility was with the -- with the
9   team, and she said that she was
10  responsible for all profit and loss,
11  marketing and anything to do ( indicating)
12  with player transactions needed to go
13  through her. And my response to that
14  then, and I said then -- and I was
15  probably sarcastic about it but meant what
16  I said, and I said well then why the fuck
17  am I here, and I said I think you and I
18  need to have a meeting with Steve to
19  clarify our roles so I get some clarity on
20  what it is that you are doing and what it
21  is that I am doing.
22      Q.   And what did she say when you
23  responded that way?
24      A.   She said okay. She would set up
25  the meeting.

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868                                          516-608-2400

242

1          THOMAS
2     Q.   And did you have a meeting with
3  Steve Mills and Mrs. Anucha
4  Browne-Sanders regarding her job
5  responsibilities or your job
6  responsibilities?
7     A.   Yes, we did.
8     Q.   Okay.  Could
9  you -- where -- where did that meeting
10  take place?
11     A.   In Steve's office.
12     Q.   Do you -- do you recall
13  approximately when that occurred?
14     A.   I -- I can't recall like te date
15  and --
16     Q.   Was it in 2004?
17     A.   Yeah, because I got here in
18  December, so it was definitely, yeah,
19  2004.
20     Q.   And was it very -- was the
21  meeting very shortly after you had your
22  conversation with -- with Anucha
23  Browne-Sanders when you were -- when you
24  asked what I am -- what -- then why am
25  I -- then why I am fucking here?

244

1          THOMAS
2  obligations or responsibilities that we
3  have that need to be fulfilled from
4  basketball operations, player requests,
5  everything else, let's make sure that we
6  get them done.  And by the way, when a
7  player shows up, let's make sure that he
8  shows up with, you know, the right
9  attitude and -- and do what he needs to
10  do.
11     Q.   Okay.  During that meeting with
12  you, Steve Mills and Anucha
13  Browne-Sanders, did -- did Steve -- did
14  Mr. Mills confirm to you the roles of
15  Ms. Browne-Sanders that she was in charge
16  of all profit and loss, marketing and
17  players transactions?
18     A.   Steve said that she was -- she
19  was in charge of marketing, and then he
20  went on to -- I think he kind of talked
21  about the inherent conflict between
22  basketball and marketing, and that it
23  always kind of exists, and, you know, and
24  he had said, you know -- you know,
25  if -- and he said to me if -- if Anucha

243

1          THOMAS
2     A.   No, that ain't what I said.  Why
3  the fuck am I here.
4     Q.   Yes.  Did that meeting occur
5  shortly after that?
6     A.   Yes, it did.
7     Q.   Within a few days, a week, a
8  month?
9     A.   I would say roughly a few days.
10     Q.   A few days.  And what was
11  discussed at that meeting?
12     A.   Roles and responsibilities, and,
13  you know, Steve outlined the things that
14  he wanted from me, and he outlined the
15  things that he wanted from Anucha, and I
16  assured him and Anucha in a meeting that
17  that I would make sure that I put someone
18  in place so if there was ever a time that
19  I wasn't available because a lot of my
20  time was spent out at the practice
21  facility and traveling and scouting and
22  getting players and trying to make trades,
23  and in a weekly management meeting I
24  assigned Frank to that meeting, and I
25  assigned -- and I told Frank whatever

245

1          THOMAS
2  needs players to show up to -- to execute
3  and be at community relations or whatever
4  it is that they need to be at, you know,
5  your job is to make sure that the players
6  are there, and if there is an event that
7  is scheduled, the players are going to be
8  there, and I said I didn't have a problem
9  with that.
10     Q.   Okay.  During that meeting, did
11  Steve Mills ever step -- step out the
12  room?
13     A.   I don't -- I don't remember if
14  Steve step out or not.  I don't -- I
15  remember the meeting.  I don't remember if
16  he stepped out or not.
17     Q.   During that meeting did you ever
18  curse at Anucha Browne-Sanders?
19     A.   I never cursed at Anucha.  Now,
20  do I swear?  Have I cursed?  Yeah, but
21  have I ever cursed at Anucha?  No, I -- I
22  don't curse at anyone.
23         MS. EISENBERG:  Mr. Thomas, it
24  is getting a little bit late.  I want to
25  make sure you are just responding to the

62  (Pages 242 to 245)