# Exhibit 13

Dockets.Justia.com

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    06 Civ. 0589 (CGE)

5    ------------------------------------x

6    ANUCHA BROWNE-SANDERS,

7                        Plaintiff,

8         - against -

9    MADISON SQUARE GARDEN, L.P., ISIAH LORD

10   THOMAS, III, and JAMES DOLAN,

11                        Defendants.

12   ------------------------------------x

13                        December 11, 2006

                          10:00  a.m.

14

15             VIDEOTAPE DEPOSITION of JAMES

16   DOLAN, taken by the Plaintiff, pursuant to

17   Notice, held at the offices of Vladeck

18   Waldman Elias & Engelhard, P.C, 1501

19   Broadway, New York, New York, before

20   Debbie Zaromatidis, a Shorthand Reporter

21   and Notary Public of the State of New

22   York.

23

24

25

18

DOLAN
1            DOLAN
2    Q.  Was Mr. Pollichino promoted to
3  the position of CFO after you were
4  chairman of the Garden?
5    A.  I believe he was.
6    Q.  And do you know what position he
7  had been before that?
8    A.  I believe he was comptroller and
9  had a senior vice president's title I
10 believe.
11   Q.  Did you have a role in his
12 promotion from senior vice president,
13 comptroller to CFO?
14   A.  I believe I did.
15   Q.  And what role did you have?
16   A.  I'm sure I approved his -- his
17 moving up to that position.
18   Q.  Who, if you know, recommended
19 his promotion?
20   A.  Well, I don't believe that his
21 promotion came through as a recommendation
22 as more -- it was much more of a
23 restructuring of the company, and it was
24 decided -- I decided that he could handle
25 the new position that was involved in the

19

1            DOLAN
2  restructuring.
3    Q.  And can you describe what the
4  restructuring was?
5    A.  Yes.  We essentially took the
6  areas of operation of Madison Square
7  Garden that were directly related to
8  revenue generation and had them form their
9  own operational units with their own
10 separate profit and loss reports,
11 responsibilities.  They in turn
12 would -- we then took the rest of the
13 operations facilities, accounting, et
14 cetera, and called them support areas.
15 They were nonprofit, nonrevenue related
16 areas, accounted for each of them
17 separately, had each operation -- each P
18 and L operating unit contract with -- with
19 the different staff support functions and
20 created income statements that reflected
21 what we believe were the true nature in
22 terms of the profitability of each one of
23 those operations.
24   Q.  When did this restructuring
25 occur?

20

1            DOLAN
2    A.  I am not exact -- around 2001.
3    Q.  Did you have any interviews with
4  Isiah Thomas before he joined the Knicks?
5    A.  I did.
6      MR. GREEN:  Objection to form.
7      THE WITNESS:  Excuse me.
8    Q.  How many did you have?
9      MR. GREEN:  You can answer.
10     THE WITNESS:  I can answer?
11     MR. GREEN:  You can answer,
12 yes.
13   A.  At least one.
14   Q.  Did you interview him alone or
15 with someone else present?
16   A.  Both.
17   Q.  Okay.  What -- you interviewed
18 with him once alone and once with somebody
19 else present or --
20   A.  No.  The same --
21   Q.  Same --
22   A.  The same time period.
23   Q.  And who is the other person or
24 who were the other people who interviewed
25 him?

21

1            DOLAN
2    A.  Steve Mills.
3    Q.  Do you recall what you said and
4  what Mr. Thomas said and what Mr. Mills
5  said generally?
6    A.  Generally.
7    Q.  Why don't you tell us what they
8  said and what you said.
9      MR. GREEN:  Objection to form.
10 You may answer.
11   A.  We discussed the -- how Mr.
12 Thomas viewed the team, how he -- he would
13 work inside of our operation, spent
14 significant amount of time discussing how
15 the operation worked, talked about the
16 values of the company, discussed his
17 personal situation in terms of -- of his
18 moving.
19   Q.  Were there any discussions about
20 the staff at The Garden or what his role
21 would be with respect to the staff?
22   A.  I believe that we discussed what
23 his duties and responsibilities would be.
24   Q.  And what were his duties and
25 responsibilities as stated during the

6  (Pages 18 to 21)

22

1              DOLAN
2  interview?
3      A.   Okay.  I cannot give you
4  specifically off -- off of the position
5  description, but the -- within the general
6  context, they were the -- the operation of
7  the basketball team including the hiring,
8  firing of all of its personnel.  When I
9  say the operation of the basketball team,
10  I specifically mean the team itself.  I do
11  not mean the marketing.  I do not mean the
12  -- The Garden on a game day, et cetera,
13  but more the coaches, the assistant
14  coaches, the -- the support personnel
15  around that, the players, the relationship
16  with the league.
17      Q.   Anything else you recall?
18      A.   No, that is about it.
19      Q.   You said that you talked about
20  the values of the company.  What did you
21  discuss concerning the values of the
22  company?
23      A.   Well, we talked about our
24  relationship, how that would work and how
25  his relationship would work with Steve.

23

1              DOLAN
2      Q.   What was said about your
3  relationship with Mr. Thomas?
4      A.   That we would be honest with
5  each other.
6      Q.   Have you been?
7          MR. GREEN:   Objection to form.
8  You may answer.
9      A.   I believe so.
10      Q.   And what did you discuss about
11  his relationship with Mr. Mills?
12      A.   Roughly the same thing, that we
13  were all -- we all remained honest with
14  each other, and we wouldn't have any
15  communication problems.  I am sure we
16  discussed the press market and how tough
17  that would be, and that falls into
18  the -- roughly the same category.
19      Q.   Did you tell Mr. Thomas how his
20  performance would be judged?
21      A.   I am sure I discussed it with
22  him.
23      Q.   And what -- how --
24      A.   What I was looking for.
25      Q.   What were you looking for?

24

1              DOLAN
2      A.   Progress.
3      Q.   Define progress in this context.
4      A.   Well --
5          MR. GREEN:   I object to that
6  question, but you may answer as best you
7  can.
8      A.   I have been asked that question
9  now for quite a while.  So -- and I think,
10  you know, progress is a fairly
11  self-evident term.  The -- although some
12  people like to suggest that
13  it's -- progress is evidenced in the -- in
14  the wins and losses of the team and how
15  those are counted, in my opinion
16  progress is measured by a judgment
17  subjective as it might be about the
18  improvement of the team and the operation,
19  improvement in their performance on the
20  court, but also improvement in how the
21  operation works from scouting
22  through -- through the movement of the
23  team to the -- to the training center,
24  to -- with the trainers, the physician
25  staff, all of the things that are

25

1              DOLAN
2  necessary for the -- for the maintenance
3  of the team.
4      Q.   Have you formed an opinion as to
5  Mr. Thomas' performance?
6          MR. GREEN:   Objection to form.
7  You may answer.
8      A.   I have.  I believe he is doing
9  quite a good job.
10      Q.   Have you had conversations with
11  Mr. Mills concerning whether or not Mr.
12  Mills thinks he is doing a good job?
13      A.   Mr. Mills and I confer regularly
14  about the operation, which includes how
15  well Mr. Thomas is doing in his job.
16      Q.   And has Mr. Mills expressed to
17  you an opinion of how Mr. Thomas is doing
18  in his job?
19          MR. GREEN:   Objection to form.
20  You may answer.
21      A.   We have not had a specific
22  conversation regarding Isiah in some time
23  although I believe that Mr. Mills feels
24  that Mr. Thomas is doing a good job.
25      Q.   Did he say why?

7  (Pages 22 to 25)

42

DOLAN

```
 1
 2  to vendors that --
 3         MS. VLADECK:   Strike that.
 4     Q.   What are the roles with respect
 5  to vendors and relationships of vendors to
 6  employees at The Garden?
 7         MR. GREEN:   Objection to form.
 8  You may answer if you understand the
 9  question.
10     A.   I do understand the question.  I
11  can't quote directly from the -- the
12  employee manual on this, but my -- my
13  understanding of it is that, and you would
14  expect this -- in any corporate
15  environment, that any relation of that
16  kind would be disclosed prior to the
17  awarding of a contract.
18     Q.   Are there any approvals
19  necessary other than just disclosure
20  of -- prior to awarding a contract?
21     A.   I think you would need to get
22  approval.
23     Q.   And do you know whether there is
24  a written approval for Dale Thomas being a
25  vendor at The Garden?
```

43

DOLAN

```
 1
 2     A.   I have no idea if there is a
 3  written approval, but I did approve it.
 4     Q.   And was that also before Mr.
 5  Thomas came to The Garden or was it at
 6  some later point?
 7     A.   I think it was at some later
 8  point.
 9     Q.   Are there any other vendors that
10  have relationships with employees at The
11  Garden that you know of?
12         MR. GREEN:   Objection to form.
13  You may answer if you know.
14     A.   Not that I know of.
15     Q.   And is there anything in writing
16  with respect to approval of Dale Thomas as
17  a vendor?
18         MR. GREEN:   Objection.  Asked
19  and answered.
20     A.   I wouldn't know.
21     Q.   Who would?
22     A.   I would think that either Mr.
23  Mills or Mr. McCormack would know,
24  possibly Mr. Hassett.
25     Q.   What is Mr. Hassett's role with
```

44

DOLAN

```
 1
 2  respect to vendors?
 3     A.   Mr. Hassett runs the facilities
 4  division of -- of Madison Square Garden.
 5  Underneath that there is many
 6  responsibilities that -- going all the way
 7  from securities to ushers, but it also
 8  includes the food service division, which
 9  is the -- the operating of the
10  restaurants, the vending areas, the people
11  who go down into the crowd and actually
12  vend food goods to the -- and the
13  operation of the kitchen, et cetera, all
14  are -- report to a gentleman who then
15  reports to Tim.
16     Q.   And who is that gentleman?
17     A.   I believe that is Chuck
18  Trachley.
19     Q.   Now, are there areas at The
20  Garden that you have more of a day-to-day
21  or regular involvement with than others?
22     A.   I think there are.
23     Q.   And what are those areas?
24         MR. GREEN:   Objection to form.
25  You may answer.
```

45

DOLAN

```
 1
 2     A.   I wouldn't know that I would
 3  call them day to day, but I -- on a
 4  regular basis there is bearly anything I
 5  do day to day.  The -- but on a regular
 6  basis I review how The Garden is doing in
 7  its press relations.  Of course I observe
 8  the performance of the teams.  Most of
 9  though my involvement centers around a
10  weekly meeting versus a day-to-day
11  operation.
12     Q.   And with whom do you have weekly
13  meetings, if anyone?
14     A.   I have two regularly scheduled
15  weekly meetings.
16     Q.   Who are attendees?
17     A.   One is called the office of the
18  chairman meeting, which is Mr. Ratner, Mr.
19  Mills, Mr. Thomas, Mr. Sather, Mr.
20  Pollichino, and myself.
21     Q.   Who is Mr. Sather?
22     A.   Mr. Sather is the president and
23  general manager of the New York Rangers.
24     Q.   And what is the other weekly
25  meeting you have?
```

12 (Pages 42 to 45)

46
DOLAN
1
2    A.   The other weekly meeting is a
3  staff meeting for my direct reports.  It
4  involves the eight members that you have
5  listed earlier.  Sometimes their
6  assistants, depending on whether there is
7  a topic that we need to get to in depth.
8    Q.   How much time do you normally
9  spend in the New York office and how much
10  time do you normally spend in Long Island?
11    A.   It varies.  Anywhere from a day
12  to two days in the New York office to as
13  much as a whole week, the entire week.
14  There has been weeks when I have only gone
15  and used the New York office.  There has
16  been weeks when I have only used the
17  Bethpage office.
18    Q.   So it depends upon the
19  circumstances or what is going on?
20    A.   It does.
21    Q.   Now, during the office of the
22  chair meetings, was there a discussion of
23  Anucha Browne-Sanders?
24    A.   Yes, I believe there was.
25    Q.   When was the first such

47
DOLAN
1
2  discussion that you recall?
3       MR. GREEN:   Let me just
4  admonish the witness to the extent that
5  this would reveal conversations at which
6  counsel was present or held at the
7  direction of counsel he may not answer;
8  otherwise, he may and should answer fully.
9       THE WITNESS:  Thank you.
10    Q.   Got that?
11       THE WITNESS:  I was hoping you
12  were going to admonish me about
13  remembering things, but --
14    (Laughter.)
15    A.   I'm a little concerned of how
16  you want me to answer the question.
17  I -- you know, I will not be able to give
18  you specific dates of specific
19  conversations.  I can give you relative
20  time frames.
21    Q.   Okay.  Why don't we start with
22  that.
23    A.   I believe that -- this is in
24  specifically -- specifically to the office
25  the chairman meetings.  One conversation

48
DOLAN
1
2  that I specifically remember was when Mr.
3  Mills reported to us that Ms. -- Ms.
4  Browne was leaving the company.
5    Q.   What did he say and what did
6  anyone else there say?
7    A.   Mr. Mills reported that he had
8  had a meeting with -- with Ms. Browne and
9  that Ms. Browne had informed him that she
10  did not wish to continue on in her
11  position, and I believe that Mr. Ratner
12  was -- I don't know if I could use the
13  right word.  I don't know if I could say
14  he was pleased, but Mr. Ratner thought
15  that that was a good development for the
16  company.
17    Q.   Anybody else say anything else?
18    A.   Mr. Mills reported that he was
19  going to work on an arrangement where Ms.
20  Browne could -- could leave the company.
21  The -- on some sort of graduated basis,
22  continue to perform her duties, look for
23  another position.  I believe Mr. -- that
24  Steve reported that Ms. Browne asked
25  her -- asked him to help in locating

49
DOLAN
1
2  another position not in the company.
3    Q.   In this conversation, did Mr.
4  Mills report that Ms. Browne-Sanders was
5  concerned about her safety?
6    A.   I don't recall that.
7    Q.   Was there any discussion at this
8  meeting about The Garden providing
9  security for Ms. Browne-Sanders?
10    A.   I don't recall that either.
11    Q.   Did Mr. Mills say why
12  Ms. Browne-Sanders said she was leaving
13  the company?
14       MR. GREEN:  Objection to form,
15  but you may answer.
16    A.   My recollection of it is -- is
17  that it was due to Ms. Sanders not feeling
18  that she could do the job.  Why that was I
19  could -- you know, I would only speculate.
20  She had had a very difficult time in the
21  position, so I don't think that that made
22  it a big surprise to us.
23    Q.   What do you mean by she had a
24  very difficult time in the position?
25    A.   Well, starting from July of that

50

DOLAN

1    year when the company decided to
2    recalendarize the budget process for the
3    sports teams, Ms. Sanders had what I would
4    characterize as great difficulty with that
5    entire process, and I believe the process
6    revealed significant weaknesses in her
7    skill levels that were necessary in order
8    for her to do the job.
9    Q.   Now, understanding that you
10   can't give an exact date, can you give the
11   time frame when Mr. Mills reported to you
12   and others at a meeting that
13   Ms. Browne-Sanders was leaving the
14   company?
15   A.   It was towards the end of the
16   year, November, December.
17   Q.   Now, prior to July had you heard
18   anything positive or negative about
19   Ms. Browne-Sanders' performance from
20   anybody?
21        MR. GREEN:   Objection to form.
22   You may answer.
23   A.   I don't recall one way or
24   another other than that she was promoted.
25

51

DOLAN

1    Q.   And do you recall when she was
2    promoted?
3    A.   I am not sure.
4    Q.   Did you have to approve that
5    promotion?
6    A.   No, I don't believe I did.
7    Q.   Do you know who promoted her?
8    A.   Steve Mills.
9    Q.   Had Mr. Mills at any point
10   talked to you about either his wanting to
11   or having promoted Ms. Browne-Sanders?
12   A.   I am sure he informed me of it,
13   yes.
14   Q.   And did he tell you that he
15   thought she had been doing a good job?
16   A.   I think he did.
17   Q.   Did anyone else at any time
18   prior to your learning that
19   Ms. Browne-Sanders was leaving tell you
20   that they believed Ms. Browne-Sanders had
21   done a good job?
22   A.   Not in the position that she was
23   in prior to her leaving.
24   Q.   At -- at any time has anyone

52

DOLAN

1    else said that Ms. Browne-Sanders was
2    doing a good job?
3        MR. GREEN:   Objection to form.
4    In connection with any prior position --
5        MS. VLADECK:   Other than Mr.
6    Mills.
7        MR. GREEN:   Did the question
8    include any prior position?
9        MS. VLADECK:   Correct.
10   A.   No, I don't -- I don't recall
11   anyone speaking to me about it.  It would
12   only come from Mr. Mills.
13   Q.   Now, is it your testimony that
14   Ms. Browne-Sanders' job changed in July of
15   '05?
16   A.   No, it changed prior to that.
17   Q.   And when did it change?
18   A.   When she took on the full
19   responsibilities of marketing the Knicks.
20   Q.   When was that?
21   A.   I'm going to be a little fuzzy
22   on that one.  It might be -- but we had
23   had personnel changes the -- in -- in the
24   operation, and she was given additional

53

DOLAN

1    responsibilities for the Knicks.
2    Q.   Do you recall approximately when
3    that was?
4    A.   Obviously prior to July.  I
5    think significantly prior, meaning
6    somewhere longer than six months prior.
7    Q.   So would it have been in 2004?
8    A.   It could have been, but it could
9    have been earlier.  It could have been
10   early 2005.
11   Q.   Now, prior to the November,
12   December time frame when you say that Mr.
13   Mills told you and others that Mr.
14   Ms. Browne-Sanders was leaving The Garden,
15   had you heard anyone be critical of
16   Ms. Browne-Sanders?
17        MR. GREEN:   Objection to form.
18   You may answer it.
19   A.   Yes.
20   Q.   Who did you hear who had a
21   criticism of Ms. Browne-Sanders?
22   A.   Well, I had criticism of
23   Ms. Browne-Sanders, and Mr. Ratner had
24   criticism of Ms. Browne-Sanders.

14   (Pages 50 to 53)

66

DOLAN

1           DOLAN
2 wanted to give Ms. Sanders an opportunity
3 to be successful on the job. He did
4 agree -- I don't recall that I had to
5 argue with him about it. He did agree
6 that he would go and work with our staff
7 in putting together a training plan that
8 would be designed to fill the gaps
9 in -- in Ms. Saunders' skill set that she
10 needed in order to do the job.
11     Q.   And can you describe what those
12 gaps were?
13     A.   Essentially what I said before.
14 The -- budgeting, the -- the broader
15 managerial level of marketing particularly
16 having to do with branding. The --
17     Q.   And --
18     A.   I believe there was some
19 discussion at least of -- of general
20 personnel management kind of skills, but I
21 don't know that that -- in my mind at
22 least, that wasn't the primary reason for
23 sending her for training.
24     Q.   And who --
25        MS. VLADECK:   Just one more.

67

DOLAN

1           DOLAN
2     Q.   You said that you asked Mr.
3 Mills to work with somebody. Who did you
4 ask him to work with?
5     A.   With Mr. Olsen.
6        THE VIDEOGRAPHER:   We are now
7 going off the record at approximately
8 11:24 a.m. End of tape one.
9        MS. VLADECK:   Why don't we take
10 ten minutes.
11        (Recess taken.)
12        THE VIDEOGRAPHER:   We are now
13 going on the record at 11:40 a.m.
14     Q.   Just to go back for a moment to
15 the meeting at which Mr. Mills told you
16 and others that Ms. Browne-Sanders was
17 leaving The Garden, who else was at that
18 meeting?
19     A.   I remember Mr. Ratner was at the
20 meeting. I don't remember who else. I
21 would only be conjecturing to say. It was
22 a board -- it was a chairman's meeting, so
23 the only normal people that would have
24 been there would have been the ones I gave
25 you before who attend the meeting, but

68

DOLAN

1           DOLAN
2 that -- there -- the -- there are many
3 times when -- when both Mr. Thomas and Mr.
4 Sather are not there because they are
5 attending to the duties of the team.
6 So --
7     Q.   Do you have any recollection of
8 Mr. Thomas being there?
9     A.   I don't actually.
10     Q.   And what, if anything, did you
11 say?
12     A.   Well, I do remember agreeing
13 that the -- the -- that we could
14 accomodate Ms. Sanders in her request to
15 stay on the -- while she worked for
16 another position.
17     Q.   Was there any discussion of
18 providing her with severance?
19     A.   I don't -- I don't recall.
20     Q.   Is severance normally provided
21 to individuals who quit from The Garden?
22        MR. GREEN:   Objection to form.
23 You may answer.
24        THE WITNESS:   Does that mean I
25 can answer or not?

69

DOLAN

1           DOLAN
2        MR. GREEN:   You can answer.
3 You can answer it, yes.
4     A.   Okay. Not normally that -- that
5 isn't, you know, something that you would
6 expect that the -- I mean it depends upon
7 the situation. In this situation, I don't
8 think it would be normal to provide
9 severance because what we were doing is
10 saying that you could stay on while you
11 found another position. If someone moves
12 from The Garden to another company, you
13 wouldn't -- you know, I don't think there
14 has ever been a case or at least none that
15 I am aware of where we would provide
16 severance to someone who is moving to
17 another company. Now -- and the -- so I
18 mean the plan was that they were going to
19 find another -- she was going to find
20 another job at another company, and that
21 she had asked Steve to help her find
22 another position some place else, and I
23 think Steve had agreed that he would.
24     Q.   Just so it is clear then, as you
25 recall sitting here today, there was no

18   (Pages 66 to 69)

70

DOLAN

1 DOLAN
2 discussion of providing her with a
3 separation package?
4      A.   Not that I recall.
5      Q.   Or severance?
6      A.   Right.   I could have just said
7 that to you, huh?
8      Q.   And are notes or minutes
9 normally taken at these chair meetings?
10     A.   No.
11     Q.   Approximately how long was there
12 a discussion at that meeting of
13 Ms. Browne-Sanders?
14     A.   I -- I couldn't say.   I
15 wouldn't, you know -- I didn't time it
16 or --
17     Q.   And do you recall approximately
18 how many times Mr. Ratner suggested to you
19 that Ms. Browne-Sanders should be fired?
20     A.   I think --
21          MR. GREEN:   Objection.   Asked
22 and answered.   You may answer it again.
23     A.   I can't give you a specific.   I
24 know he was of that -- of that opinion and
25 I believe strongly of that opinion from

71

1 the July period on.
2      Q.   Did Mr. Ratner tell you that he
3 didn't personally like Ms. Browne-Sanders
4 or her style?
5          MR. GREEN:   Objection to form.
6 You may answer it.
7      A.   I don't recall that he
8 specifically said he didn't like her.
9      Q.   Did he ever describe her to you
10 as arrogant?
11         THE WITNESS:   Counsel --
12         MR. GREEN:   You may answer the
13 question fully except to the extent that
14 those conversations might have been held
15 in the presence of counsel; otherwise, you
16 may answer the question.
17     A.   Okay.   I'm -- I don't
18 think -- it is not my job to help you
19 here.   The --
20         (Laughter.)
21     A.   But in the interest of -- the
22 interest of getting through this
23 the -- Mr. Ratner I believe did not think
24 that Ms. Sanders had a strong and cordial

72

1 DOLAN
2 management style.   I believe he expressed
3 to me, and I can't tell you specifically
4 when he expressed it to me, but I know
5 that I was aware that he did not like her
6 management style.
7      Q.   Is being tough as a manager a
8 strength or a weakness at The Garden?
9          MR. GREEN:   Objection to form.
10 You may answer, if you can.
11     A.   I think it completely depends on
12 the situation.
13     Q.   Did you find Ms. Browne-Sanders
14 to be arrogant?
15     A.   No, I found her to be aggressive
16 but not arrogant.
17     Q.   And is being aggressive a
18 positive or negative trait at The Garden?
19         MR. GREEN:   Objection to form,
20 but you may answer.
21     A.   I think it is a positive trait.
22     Q.   What other positive traits did
23 you believe that Ms. Browne-Sanders had?
24     A.   I was not her direct boss, so,
25 you know, my opinions of her were formed

73

1 DOLAN
2 from the -- the budget meeting, and really
3 my opinion of her changed pretty
4 dramatically from when you talk about pre
5 that July period to post that July period.
6      Q.   Other than Mr. Mills and Mr.
7 Ratner, did you get input from anyone else
8 on their view of Ms. Browne-Sanders?
9          MR. GREEN:   Objection to form.
10 You may answer.
11     A.   In what period?
12     Q.   Any period.
13     A.   Can you ask the question again?
14         MS. VLADECK:   Can you read it
15 back.
16         (Record read.)
17     A.   I am sure Mr. McCormack gave me
18 his view.
19     Q.   What was Mr. McCormack's view?
20     A.   Well, Mr. McCormack,
21 the -- would have given me his view.   I
22 believe he did give me his view right at
23 the time that Ms. Sanders was let go.
24     Q.   And what did he say to you and
25 what did you say to him?

19 (Pages 70 to 73)

74

DOLAN

2  A.  Mr. McCormack said that
3  Ms. Sanders had willfully violated the
4  company's policies and had undermined his
5  investigation of the charges of sexual
6  harassment that he had -- was charged with
7  investigating.
8      Q.  What did he say she had done
9  which was a willful violation of the
10 company policies?
11     A.  That she had attempted to
12 influence her direct reports using her
13 authority.
14     Q.  Anything else?
15     A.  I believe he told me that
16 he -- that she took one of her direct
17 reports here.
18     Q.  What did he say about that?
19     A.  Well, that clearly was against
20 company policy.
21     Q.  What company policy is it
22 against?
23     A.  When you are -- put in a
24 complaint regarding sexual harassment or
25 actually a complaint, any complaint that

75

DOLAN

2  needs to be investigated at the company,
3  we have a human resources and employee
4  relations department that are charged
5  with -- with -- with doing that, and that
6  the -- as you would expect when someone
7  makes a complaint there is always
8  obviously two sides to it, and what the
9  company deems necessary is to have
10 the -- its HR, ER person the group
11 investigate that from basically a third
12 party's point of view.  It requires both
13 parties to the -- to not discuss the
14 matter any further, not engage
15 in -- obviously in any further discussions
16 between themselves regarding the matter
17 and allow the HR department to conduct an
18 investigation and come to a conclusion.
19     Q.  Is it your belief that the HR
20 department came to a conclusion?
21        MR. GREEN:  Objection to form.
22 You may answer.
23     A.  No, I don't believe that
24 they -- that they had at that point.
25     Q.  No.  Do you believe they have at

76

DOLAN

2  any point?
3        MR. GREEN:  Same objection as
4  to form.  You may answer if you know, Mr.
5  Dolan.
6      A.  Yes, I have come -- that the HR
7  department believes that they came to a
8  conclusion regarding the complaint that
9  was made.
10     Q.  Did the HR department ever make
11 a recommendation based on the conclusion
12 that it came to?
13        MR. GREEN:  You mean to Mr.
14 Dolan himself?
15        MS. VLADECK:  To anyone.
16        MR. GREEN:  Objection to form.
17 If you know, Mr. Dolan, you may answer.
18     A.  Not that I am aware of.
19     Q.  Now, going back to the
20 conversation that you had with Mr.
21 McCormack, you stated that he told you
22 that Ms. Browne-Sanders attempted to
23 influence her direct reports using her
24 authority?
25     A.  Yes.

77

DOLAN

2      Q.  What did Mr. McCormack say to
3  you about that?
4      A.  That Ms. Sanders had brought in
5  her direct reports, that she attempted to
6  infuse a memory into them of -- of the
7  particular times that the complaint was
8  registered about essentially attempting to
9  coerce her -- her direct reports into
10 corroborating her complaint.
11     Q.  Did he identify any of these
12 direct reports that she attempted to
13 coerce?
14     A.  I don't specifically remember.
15     Q.  Now, you said that he said to
16 you that she brought in her direct
17 reports.  Was it your understanding that
18 during the time of the investigation that
19 Ms. Browne-Sanders was at work?
20     A.  Yes.
21        MR. GREEN:  Objection to form.
22 Which investigation are you referring to?
23        MS. VLADECK:  The one that he
24 is referring to that Mr. McCormack said
25 that she was attempting to coerce people.

20  (Pages 74 to 77)

78

DOLAN

1
2  MR. GREEN:  I am not sure he
3  identified which --
4  THE WITNESS:  No. No. I am
5  sorry. That is right. You're correct.
6  A.  I think if you are asking me did
7  she do this during his investigation,
8  the -- -- my understanding of it was that
9  she did this prior to filing the -- filing
10  a complaint.
11  Q.  With all due respect, Mr. Dolan,
12  you said that she willfully violated
13  company policies and undermined his
14  investigation of her charges.
15  A.  That's right.
16  Q.  Is that correct or incorrect?
17  A.  Yes, by bringing in people who
18  were -- that the -- by attempting to
19  influence the -- the process.
20  Q.  And is it your understanding
21  that Ms. Browne-Sanders was present at
22  work during the time that her charges were
23  being investigated?
24  MR. GREEN:  Objection to form.
25  A.  I don't recall.

79

DOLAN

1
2  Q.  Now, you said earlier that it
3  was clearly against company policy what
4  she did. I ask you again what company
5  policy are you referring to?
6  MR. GREEN:  Objection to form.
7  It has been asked and answered. If the
8  witness wants to add --
9  MS. VLADECK:  It has been asked.
10  I disagree that it has been answered.
11  A.  I don't think it takes a
12  whole -- a great deal of, you know -- you
13  know, I mean you need to refer to a book
14  about it, that the -- if you have a
15  complaint about how you've been treated at
16  the company, the -- you bring the
17  complaint forward to the company. The --
18  you don't proceed -- the -- to take the
19  people that you think are going to
20  corroborate or could corroborate your
21  complaint and then attempt to influence
22  them using your position of authority with
23  them.
24  Q.  And it is your understanding
25  that to the extent one of

80

DOLAN

1
2  Ms. Browne-Sanders' direct reports went
3  with her to a lawyer that that direct
4  report went for Ms. Browne-Sanders as
5  opposed to herself?
6  A.  Excuse me. I don't understand.
7  MS. VLADECK:  Could you read it
8  back.
9  (Record read.)
10  A.  You are asking about what was
11  the other employee's motivation, and that
12  is exactly what the point was. Is that
13  what was the employee's motivation? Was
14  the employee going for themselves? Was
15  the employee going to support Anucha
16  Browne-Sanders? Was the employee going
17  because they were -- they -- that was
18  their boss and their boss -- they needed
19  to please their boss. The -- in order to
20  stay in good standing. You probably need
21  to answer that more than I do.
22  Q.  What company policy is violated
23  by an individual going to a lawyer with
24  respect to complaints about sexual
25  harassment?

81

DOLAN

1
2  MR. GREEN:  Objection.
3  Misstates prior testimony. Asked and
4  answered.
5  A.  That is exactly correct. That
6  is a misstatement. You asked me about
7  bringing her direct report to a lawyer.
8  Q.  Why don't we go back to the
9  conversation you had with McCormack and
10  why don't you tell me exactly what Mr.
11  McCormack said with respect to
12  Ms. Browne-Sanders taking one of her
13  direct reports with her to a lawyer.
14  MR. GREEN:  Objection to form.
15  Asked and answered. You may answer it,
16  Mr. Dolan.
17  A.  Just what I just said before
18  that he told me that the -- that
19  Ms. Browne-Sanders had taken one of the
20  employees to a lawyer to discuss
21  the -- her charges of being harassed.
22  Q.  And did he further say or did
23  you infer from that that it was clearly
24  against company policy?
25  MR. GREEN:  Objection to form.

21  (Pages 78 to 81)

82

DOLAN
2 Two different questions.
3      A.   Well, I said before, right, that
4 you can't -- the -- you know, once
5 you've -- you've informed the company
6 about a complaint but even before that, I
7 mean you can't -- when you have a
8 complaint, you need to bring it -- you
9 know, you need to complain to the people
10 who are in charge.  The -- you can't go
11 about the engineering that the -- an
12 investigation of a complaint -- of a
13 complaint.  The -- using your authority
14 and -- you know, as the person -- as the
15 people who are going to be, you know,
16 testifying about it using your authority
17 to influence them, the --
18      Q.   Are you aware that
19 Ms. Browne-Sanders had complained to Mr.
20 Mills about sexual harassment against her?
21      MR. GREEN:   Objection --
22 objection to form.  Misstates the record.
23 The witness may answer, if he knows.
24      MS. VLADECK:   No speaking
25 objection.  There is no record to mistate.

83

DOLAN
2      MR. GREEN:   I think your
3 question is improperly formed.
4      MS. VLADECK:   I think you can
5 say objection to form.
6      MR. GREEN:   Misleading.
7      MS. VLADECK:   Fine.
8      MR. GREEN:   If you know the
9 answer, you may answer, Mr. Dolan.  My
10 objection to the question is that it is
11 misleading.
12      A.   Are you asking me if I am aware
13 now or was I aware at some particular
14 time?
15      Q.   Have you ever been aware as to
16 whether or not Ms. Browne-Sanders went to
17 Mr. Mills and complained about sexual
18 harassment?
19      MR. GREEN:   To the extent that
20 the witness may be privy to information he
21 obtained from discussions with counsel, he
22 may not answer this question.  If he has
23 any independent information other than
24 that gained from conversations with
25 counsel, he may answer.

84

DOLAN
2      A.   With that in mind, I think the
3 answer is no.
4      Q.   Were you aware that
5 Ms. Browne-Sanders had complained to Pete
6 Olsen concerning sexual harassment before
7 she went to a lawyer?
8      MR. GREEN:   Same objection.
9      A.   No.
10      Q.   Did you believe that
11 Ms. Browne-Sanders going to a lawyer was a
12 violation of any company policy?
13      A.   No.
14      Q.   Do you believe that two
15 employees together going to a lawyer is a
16 violation of company policy?
17      MR. GREEN:   Objection.  Asked
18 and answered.  The witness may answer if
19 he understands the question.
20      A.   I think it depends on the
21 situation.
22      Q.   In what circumstances would it
23 not be a violation of policy?
24      MR. GREEN:   Objection.  The
25 witness has answered that question now

85

DOLAN
2 several times.  I object to the form of
3 the question.  If he wants to amend a
4 prior answer, he may.  I am instructing
5 him not to say what he said twice before.
6      MS. VLADECK:   It is a different
7 question.  Maybe if you hear it read back.
8      A.   I think it -- I think I can
9 answer the question.  I think it
10 is -- the -- when the employees are going
11 on their own behalf, I think that is fine.
12      Q.   When did Mr. McCormack tell you
13 that Ms. Browne-Sanders had willfully
14 violated company policies and undermined
15 his investigation of her charges?
16      A.   I don't have the specific date.
17 It was on a helicopter ride between our
18 corporate offices in Bethpage and West
19 30th Street here.
20      Q.   Can you time it as to proximity
21 to when she was actually fired?
22      A.   Same day I think.  Within 24
23 hours.
24      Q.   Prior to that helicopter ride,
25 have you had any other conversations with

22  (Pages 82 to 85)

86

DOLAN

1          DOLAN
2 Mr. McCormack concerning
3 Ms. Browne-Sanders?
4     MR. GREEN:  Objection to form.
5 At any time ever?
6     MS. VLADECK:  Yes.
7   A.  I don't recall.
8   Q.  Prior to that helicopter ride,
9 had you had conversations with Mr.
10 McCormack or anyone else with respect to
11 the investigation into her charges?
12     MR. GREEN:  To the extent that
13 that would require you to reveal
14 conversations you had in the presence of
15 counsel, Mr. Dolan, or at the direction of
16 counsel, you may not answer this question.
17     MS. VLADECK:  This is a yes or
18 no. Can I have the question read back,
19 please.
20     (Record read.)
21     MR. GREEN:  Because the
22 question contains the substance and
23 subject of the meeting, I instruct the
24 witness not to answer to the extent it
25 would be a meeting at which counsel was

87

1          DOLAN
2 present or held at counsel's direction.
3 So you may not answer this question if you
4 had any such meeting or discussion at
5 the -- in the presence of counsel or at
6 the direction of counsel.
7   A.  Okay. I got the direction. I
8 think that -- that the answer -- I know
9 that the answer is that the only
10 communication I had with Mr. McCormack
11 prior to this in regards to this -- this
12 matter would be to verify that he was in
13 fact investigating the matter.
14   Q.  Who made the decision to have
15 Ms. Browne-Sanders' employment be
16 terminated by The Garden?
17   A.  I did.
18   Q.  Did you make it on your own or
19 was it with others, consultation or
20 something else?
21   A.  Well, all decisions at The
22 Garden I make on my own.
23   Q.  And what were the reasons or
24 what was the reason you fired
25 Ms. Browne-Sanders?

88

1          DOLAN
2   A.  Because Ms. -- we could not keep
3 going with her in the position that she
4 was in in The Garden. Remember, that what
5 we had agreed to was -- is that
6 Ms. Browne-Sanders was going to continue
7 on with her duties and responsibilities
8 while she looked for another position.
9 The -- that is what she had asked us to
10 do. The -- and we had agreed.
11   Q.  The -- as part of that we -- the
12 operation of the -- of the marketing and
13 of the Knicks was part and parcel of that.
14 We needed somebody to make sure Game Day
15 happened. Make sure that -- that the
16 slicks were reviewed, that the -- all of
17 the day-to-day responsibilities that were
18 part of Anucha's job. That the -- after
19 that -- that conversation it was very
20 clear -- clear to me that she could no
21 longer do that job, that we could not have
22 her do that job.
23   Q.  I am sorry. When you say after
24 that conversation, what conversation?
25   A.  The conversation on the

89

1          DOLAN
2 helicopter.
3   Q.  With Mr. McCormack?
4   A.  With Mr. McCormack. I think Mr.
5 Ratner was there, too.
6   Q.  And the conversation related to
7 Mr. McCormack suggesting that
8 Ms. Browne-Sanders was undermining the
9 investigation?
10     MR. GREEN:  Objection to form.
11 You may answer.
12   A.  That she had had undermined the
13 investigation, yes.
14   Q.  Did Mr. Ratner say anything
15 during this conversation?
16   A.  I believe Mr. Ratner echoed what
17 he has been saying all along, that -- that
18 Ms. Sanders needed to be let go.
19   Q.  What, if anything, about what
20 Mr. McCormack told you was a factor in
21 your decision to fire Ms. Browne-Sanders?
22   A.  The -- really the single thing
23 was that -- is that -- whether she was
24 going to be able to continue to do -- to
25 exercise her duties and responsibilities

23  (Pages 86 to 89)

90

```
 1            DOLAN
 2  in that job.  That -- the -- you know,
 3  that was, you know -- we had to have
 4  somebody in the job that they -- and, you
 5  know, when it became clear that -- that
 6  she was not going to be able to do that,
 7  there was no reason to have her continue
 8  on as an employee.
 9      Q.   Has Ms. Browne-Sanders been
10  replaced?
11      A.   Mr. Mills is doing
12  Mr. -- Ms. Browne-Sanders' job I believe
13  as --
14      Q.   So --
15      A.   Yes.
16      Q.   So you had to have somebody in
17  the job, but it has been 12 months, and
18  you haven't?
19         MR. GREEN:  Objection to form.
20  Argumentative.  You may answer, Mr. Dolan.
21      A.   I -- yeah.  I think that -- you
22  know, what had -- what ended up happening
23  is that Steve had to do the job.  That is
24  not acceptable.  It is still not
25  acceptable to be honest that they -- and I
```

91

```
 1            DOLAN
 2  certainly don't think that the company
 3  should continue on employing somebody for
 4  the position if they are not going to do
 5  the job that -- so, you know, the fact
 6  that Steve had to do it is unacceptable.
 7  It is still unacceptable that we don't
 8  have a person in the position although we
 9  have been interviewing the -- and I
10  believe we are close, but it's -- you
11  can't -- I just don't think that
12  you're -- that is as -- you know, as the
13  CEO I could let the situation exist where
14  we had someone being paid to do the job,
15  who had agreed to do the job, who then put
16  themselves in a position where they could
17  no longer do the job and then continue
18  employing that person.  Why would we do
19  that?
20      Q.   Did you tell anyone that you had
21  to fire Ms. Browne-Sanders because she
22  made a settlement demand that you believed
23  was exorbitant?
24         MR. GREEN:  Objection to form.
25      A.   No.
```

92

```
 1            DOLAN
 2         MR. GREEN:  Do not reveal
 3  conversation --
 4      A.   I don't believe I did.
 5         MR. GREEN:  -- with counsel in
 6  responding to this question; otherwise,
 7  you may answer fully.
 8         MR. VLADECK:  I think he did
 9  answer fully.
10      A.   I did.
11      Q.   Did you consult with counsel
12  about the decision to fire
13  Ms. Browne-Sanders?
14         MR. GREEN:  You may answer
15  whether you consulted with counsel.
16      A.   No.  In fact, I -- I
17  specifically I think did not consult with
18  counsel.
19      Q.   Why is that?
20      A.   Because I felt that that -- that
21  the overall health of The Garden was at
22  jeopardy here, and that that would -- that
23  would override any opinion on counsel --
24  counsel might have otherwise that why we
25  should have Ms. Sanders stay in the job.
```

93

```
 1            DOLAN
 2      Q.   Were you concerned that counsel
 3  would tell you not to fire her?
 4         MR. GREEN:  Objection.
 5      A.   I didn't know what
 6  counsel -- that's all speculative.
 7      Q.   Were there discussions at or
 8  about this time that you were present at
 9  with counsel with respect to the potential
10  termination of Ms. Browne-Sanders'
11  employment?
12         MR. GREEN:  Objection.  The
13  witness may not respond since the question
14  calls for privileged information.
15      Q.   Were you present at meetings
16  with counsel during this time frame?
17         MR. GREEN:  Objection.  The
18  witness is instructed not to answer.  The
19  question presupposes a privileged
20  communication.
21      Q.   To whom did you communicate your
22  decision to fire Ms. Browne-Sanders?
23      A.   To Mr. McCormack and Mr. Ratner.
24      Q.   And what, if anything, did you
25  tell them to do?
```

94

DOLAN

1    A.    That they needed to let her go.
2    Q.    Did you tell Mr. McCormack to
3 write a memo to make it look like it was
4 his decision?
5        MR. GREEN:    Objection to form.
6    A.    No. I'm taking the
7 responsibility for it now.
8    Q.    Were you aware that there were
9 documents suggesting that it was Mr.
10 McCormack's recommendation to fire Ms.
11 Browne-Sanders?
12        MR. GREEN:    Objection to form.
13    A.    No.
14    Q.    Why don't I get to it. You are
15 making me go out of order here.
16    A.    Sorry. If that means we get to
17 skip to the end, that would be okay.
18    Q.    Unfortunately we go back.
19        (Dolan Exhibit 1 marked for
20 identification.)
21        (Document handed to witness.)
22        MS. VLADECK:    For the record,
23 what has been identified and marked as
24 Dolan Exhibit 1 is a memo to files from

95

DOLAN

1 Rusty McCormack dated January 19, 2006,
2 and it's Bates numbers MSG's 6363 and
3 6364.
4        (Pause.)
5    A.    Okay.
6    Q.    Have you had a chance to review
7 Dolan Exhibit 1?
8    A.    Yes.
9    Q.    Have you ever seen that before
10 today?
11    A.    No.
12    Q.    If you look at the part under
13 the heading Anucha Browne-Sanders --
14    A.    Yes.
15    Q.    -- it says "As the record
16 indicates most of the Browne-Sanders'
17 allegations were not confirmed."
18        Do you see that?
19    A.    I do see that.
20    Q.    Do you know which, if any, of
21 her allegations were confirmed?
22        MR. GREEN:    Objection to form.
23    A.    No, I don't.
24    Q.    It says later "It is clear that

96

DOLAN

1 Browne-Sanders has a poor relationship and
2 difficulty interacting with Mills and
3 other members of MSG management."
4    A.    I see that.
5    Q.    What, if any, understanding did
6 you have with respect to
7 Ms. Browne-Sanders' relationship with Mr.
8 Mills?
9    A.    Other than that Mr. Mills was
10 Ms. Browne's supervisor, I think they may
11 have known each other in -- from the NBA,
12 but other than that I am not aware of any
13 other.
14    Q.    Had anybody at any time
15 suggested to you that Ms. Browne-Sanders
16 and Mr. Mills had a poor relationship?
17        MR. GREEN:    Objection to form.
18    A.    I don't recall.
19    Q.    Now, if you see with respect to
20 Isiah Thomas it says, "This training
21 should begin in the next 30 days" at the
22 very end of the paragraph.
23    A.    I see that.
24    Q.    Do you know whether or not Mr.

97

DOLAN

1 Thomas received training as a result of
2 the sexual harassment investigation?
3    A.    I do not know.
4    Q.    And then if you look at the next
5 page, it -- there is a paragraph with
6 respect to Mr. Mills.
7    A.    Yes.
8    Q.    And it says, "Mills took
9 appropriate action to respond to the
10 incidents that were called to his
11 attention."
12        Do you see that?
13    A.    I do.
14    Q.    Do you know what action Mr.
15 Mills took to incidents that were called
16 to his attention?
17    A.    I think I need you to be more
18 specific about that.
19    Q.    Were you aware of any action Mr.
20 Mills took in response to any incidents
21 that Ms. Browne-Sanders had called to his
22 attention?
23        MR. GREEN:    I admonish the
24 witness to only respond to the extent he

118

DOLAN

1    Programming.  I hope that is enough.  I
2    can name them, but it is going to take a
3    while.
4        Q.   Approximately how many
5    individuals would you say would be
6    included in your senior management?
7        A.   Oh, forty, not all direct
8    reports but as part of the management
9    team.
10       Q.   And do they have a particular
11   title like vice president and above or are
12   they varying titles or something else?
13       A.   It would be varying titles.  It
14   would depend on the -- you know, primarily
15   though I would characterize it as those
16   people who are involved in setting the
17   strategy of the company.
18       Q.   And when you decide to use Mr.
19   Olsen for a project, how do you do that?
20   Do you hire him for a particular project;
21   do you ask somebody else to or something
22   else?
23       A.   No, I think he has an
24   arrangement because I've never had a

119

DOLAN

1    discussion with him about the -- I guess I
2    don't recall having a discussion with him
3    about what his fees, et cetera, were.
4        Q.   When you then decide you want to
5    use him for a management conference, do
6    you do anything differently than you would
7    had he been an employee?
8        A.   I guess I am not really sure
9    about what you would expect would
10   be -- would be different.  I mean
11   the -- he is doing a project for me.
12   The -- I guess the only real difference
13   would be from the point of view
14   of -- that, you know, his availability to
15   me, but I've always found him to be
16   available if not immediately within a
17   reasonable amount of time enough for me to
18   get my project done.
19       Q.   Do you know whether he has a
20   particular background or expertise?
21       A.   I believe he does.  I am -- I
22   cannot give you the specifics of it, but I
23   believe he does have specific background
24   in these areas.  He certainly is talented

120

DOLAN

1    in them, but I don't recall specifically
2    what his background is.
3        Q.   Did you know what, if any, role
4    he had with respect to Ms. Browne-Sanders'
5    sexual harassment complaints?
6            MR. GREEN:   Objection to form.
7    You may answer unless you acquired the
8    information from counsel or at meetings at
9    which counsel were present.
10       A.   Other than what I learned from
11   counsel, I have had had -- I have no
12   knowledge that there was any discussions
13   or any connection.
14       Q.   Other than through counsel, did
15   you ever hear that there were --
16       A.   You know what, I need to amend
17   that.  I am sorry.  The -- she was -- he
18   was, and I remember recommending
19   his -- his involvement in her -- the
20   training that we wanted to see her get
21   from the -- resulting from the July
22   meetings.
23       Q.   Did you hear from anyone other
24   than counsel that anyone was critical of

121

DOLAN

1    Mr. Olsen's handling of
2    Ms. Browne-Sanders' sexual harassment
3    complaint?
4            MR. GREEN:   Again, other than
5    through counsel.
6        A.   No.  I had no -- I did not, no.
7    No.
8        Q.   Now, with reference to the
9    training that you said you asked him to
10   work with Ms. Browne-Sanders on --
11       A.   No, I asked him to work with Mr.
12   Mills on it.
13       Q.   Do you know whether
14   Ms. Browne-Sanders ever got that training?
15       A.   I believe she did.
16       Q.   And do you know when she got the
17   training?
18       A.   No.
19       Q.   What interactions did you have
20   with Ms. Browne-Sanders between the summer
21   of '05 and the day you decided to fire
22   her?
23            MR. GREEN:   Objection to form.
24   You may answer.

31  (Pages 118 to 121)

122

DOLAN

1
2    A.   Are you asking me post
3  the -- the budgetary process?
4    Q.   Correct.
5    A.   Right.  I don't recall any.
6    Q.   Did anyone at any point come to
7  you with complaints about Vernon Manuel?
8    A.   Yes.
9    Q.   Who came to you about Vernon
10 Manuel?
11   A.   Steve Mills.
12   Q.   And what did Mr. Mills say to
13 you?
14   A.   Mr. Manuel had problems with
15 anger in the workplace, had problems being
16 respectful of his -- the individuals he
17 directly reported to, threatened
18 to -- used my name and threatened to come
19 to me to solve his issues with his -- his
20 personnel issues.
21   Q.   When did Mr. Mills come to you
22 on that?
23   A.   You know, I couldn't -- I
24 couldn't say.  I don't -- I know when Mr.
25 Manuel -- you know, I am not even sure

123

DOLAN

1
2  what the dates that he was employed are
3  specifically.  It has been a while since
4  he has been here.
5    Q.   Now, Mr. Manuel was connected to
6  you in -- in what way?
7    A.   The -- he was at the time dating
8  my step daughter.
9    Q.   And when he was fired from The
10 Garden, was he still dating your step
11 daughter?
12   A.   I think he was.
13   Q.   Other than Mr. Mills, did
14 anybody else come to you with problems
15 about Vernon Manuel?
16   A.   No.
17   Q.   What did you say to Mr. Mills
18 when he came to you with the problems?
19   A.   That he needed to treat Mr.
20 Manuel as a -- as he would any other
21 employee.
22   Q.   Did Mr. Mills ever tell you that
23 Mr. Manuel had been forging his
24 supervisor's signature on parking
25 vouchers?

124

DOLAN

1
2    A.   He did.
3    Q.   And what did you say in response
4  to that?
5    A.   That he had to be disciplined
6  for it.
7    Q.   Did you say what the discipline
8  should be?
9    A.   No, I let Mr. Mills decide that.
10 That discipline could have included
11 firing.  Oops.
12   Q.   It sounds like lunch was more
13 than a salad.
14        Did you give Mr. Manuel a car?
15   A.   No, I let him use a car.
16   Q.   And you let him use a car that
17 was yours or that was the companies or
18 something else?
19   A.   No, it was mine.
20   Q.   Do you know whether Mr. Manuel
21 would fail to show up to work or come
22 late?
23   A.   Yes.  I had heard that report on
24 him.
25   Q.   Did anyone come to you and

125

DOLAN

1
2  specifically request permission to fire
3  him?
4        MR. GREEN:  Objection.  Asked
5  and answered.  You may answer it again,
6  Mr. Dolan.
7    A.   Yes.
8    Q.   Who did?
9    A.   Mr. Mills.
10   Q.   Do you know whether Mr.
11 McCormack was aware of the issues
12 concerning Mr. Manuel?
13   A.   No, I don't know.
14   Q.   Do you know whether Mr. Ratner
15 was aware of the issues concerning Mr.
16 Manuel?
17        MR. GREEN:  Objection to form.
18   A.   I don't know.
19        MR. GREEN:  That is okay.
20   Q.   Did you ever tell anyone to take
21 Mr. Manuel on as a project?
22        MR. GREEN:  Objection to form.
23 You may answer.
24   A.   Mr. Mills and I discussed how
25 Mr. Manuel was doing.  The -- he was my

---

150

DOLAN

1 the -- from one end of a conference hall
2 to another without being able to actually
3 walk them across. It was a challenge of
4 ingenuity, et cetera, but it was much more
5 a challenge of being able to predict how
6 many you could get across from point A to
7 point B, and the closer that you were to
8 getting to the actual prediction number,
9 the -- the better you did. If you went
10 way over, the -- you were -- you only
11 received 5 percent of the value of what
12 you transferred. The -- if you went way
13 under, right, the -- you were -- it was
14 subtracted. The differential was
15 subtracted.
16     Q.   Were there people in teams
17 during this?
18     A.   They were.
19     Q.   And were there prizes for the
20 team that had the most revenues and then
21 the team that came closest revenue to
22 forecast?
23     A.   I think something like that,
24 yeah.

---

151

DOLAN

1     Q.   And did Ms. Browne-Sanders come
2 in number one in terms of revenues?
3     A.   I have no idea. I don't
4 remember who won.
5     Q.   Did she come in second in terms
6 of revenues to forecast?
7     A.   I still don't remember who won.
8     Q.   Do you remember who lost?
9     A.   No. What I remember is
10 that -- is that we -- we firmly sustained
11 the concepts of budgeting in there and
12 that later on in October we were able to
13 when we actually reviewed budgets
14 reference back that experience and say,
15 you know, you over counted your chips.
16 You under counted your chips, et cetera,
17 and everybody knew what we were talking
18 about.
19     Q.   Did -- you said earlier that
20 you would on occasion -- -- you had said
21 earlier at some point that you spot
22 checked performance reviews?
23     A.   Yes.
24     Q.   Did you ever spot check

---

152

DOLAN

1 Ms. Browne-Sanders' performance reviews?
2     A.   I don't think so. I don't
3 recall.
4     Q.   What role, if any, do you have
5 in creating organization charts at Madison
6 Square Garden?
7     A.   I review them. I generally
8 approve of them if they are at a high
9 enough level.
10     Q.   And is there a reason --
11     MS. VLADECK:   Strike that.
12     Q.   Do the organization charts at
13 The Garden only refer to those individuals
14 with whom there is a direct reporting
15 relationship?
16     MR. GREEN:   Objection to form.
17 They speak for themselves. The witness
18 can answer if he can recall.
19     A.   I couldn't -- I couldn't tell
20 you for sure one way or another.
21     Q.   Okay.
22     MS. VLADECK:   Is this 4?
23     MR. GREEN:   4.
24     (Dolan Exhibit 4 marked for

---

153

DOLAN

1 identification.)
2     (Document handed to witness.)
3     Q.   What you have before you as
4 Dolan Exhibit 4 is a one-page document MSG
5 00333. Is this a salary adjustment form
6 or a form reflecting a salary change
7 adjustment?
8     A.   I've got to be sure if I want to
9 answer yes.
10     Q.   Just to make it easier, up here
11 there is a little box that says
12 adjustment.
13     MR. GREEN:   She is referring to
14 that.
15     A.   Yes, I know I see that, and I
16 see it down there. Yeah. I mean --
17     Q.   Is --
18     A.   Go ahead.
19     Q.   Is this your signature where it
20 says Rusty McCormack and then
21 underneath --
22     A.   Yes.
23     Q.   -- is that your signature?
24     A.   That is my signature.

---

39  (Pages 150 to 153)

**DOLAN** — Page 154

1        DOLAN
2    Q.   And then over in the corner is
3 that Steve Mills' signature?
4    A.   I believe it is.
5    Q.   And am I correct that the salary
6 went from $212,992 to 250,000?
7    A.   I am just a little confused by
8 it.
9    Q.   Okay.
10   A.   Because --
11   Q.   And then it was retroactive --
12      MR. GREEN:   The witness I think
13 was not finished with his answer.
14   Q.   Oh, I am sorry.
15   A.   Oh, I see why it is there.  It
16 is effective 1/1/5.  The only thing if you
17 notice the 250 is in the same box as
18 effective date as 11/2000, but it is --
19   Q.   And then it also budgeted
20 250,000 effective 1/1/05?
21   A.   Right.
22   Q.   Which meant that it was
23 retroactive to January?
24   A.   Effective date 19 -- 605, Rusty.
25 It looks like it, yeah.

**DOLAN** — Page 155

1        DOLAN
2    Q.   And do you know why she received
3 this adjustment, why Ms. Browne-Sanders
4 received this adjustment in April -- in
5 April of 2005?
6      MR. GREEN:   I will object.
7 Just to admonish the witness to testify
8 fully to the extent he has knowledge but
9 not to speculate.
10   A.   I am sorry.  What was the
11 question?
12      MS. VLADECK:  Could you read it
13 back.
14    (Record read.)
15   A.   It's not clear from this piece
16 of paper why -- why she received the
17 adjustment.
18   Q.   And as you sit here today, do
19 you have any independent recollection --
20   A.   I would --
21   Q.   -- or understanding as to why
22 she received this adjustment at this time?
23   A.   It would be conjecture on my
24 part.
25   Q.   Did there come a time when you

**DOLAN** — Page 156

1        DOLAN
2 requested that Mr. Mills and/or
3 Ms. Browne-Sanders keep you informed on
4 the interview process for Petra Pope's
5 replacement?
6    A.   I don't recall.
7      MS. VLADECK:   Okay.  Is this
8 5?.
9      MS. FRANCO:   Yes.
10    (Dolan Exhibit 5 marked for
11 identification.)
12    (Document handed to witness.)
13      MS. VLADECK:   What has been
14 marked as Dolan Exhibit 5 is a memo to Jim
15 Dolan from Anucha Browne-Sanders slash
16 Gary Winkler re Dan team's reorganization
17 dated May 5, 2005, and it is MSG 00703 and
18 704.
19    (Pause.)
20   Q.   Do you recall receiving this
21 memo?
22   A.   No.
23   Q.   Who is Gary Winkler?
24   A.   I'm not absolutely sure.
25   Q.   Did you have meetings with

**DOLAN** — Page 157

1        DOLAN
2 Ms. Browne-Sanders and Mr. Mills and/or
3 others concerning the direction of the
4 dancers?
5    A.   I don't recall.
6    Q.   Did you ever request that you
7 approve photographs of the dancers?
8    A.   No.
9    Q.   Did you ever request that you
10 approve the outfits that the dancers were
11 to wear?
12   A.   I believe I objected to some of
13 the outfits the dancers wore.
14   Q.   And what was your objection to
15 the outfits?
16   A.   That they were too revealing.
17   Q.   And to whom did you make that
18 objection?
19   A.   To Steve Mills.
20   Q.   When did you make that
21 objection?
22   A.   I can't be -- I don't know.
23 After having seen the outfits I would
24 assume.
25   Q.   Did you ever say that you wanted

162

DOLAN

1    promotion?
2    A.    Yes, I did.  You know what, I
3    need to make something clear that you just
4    asked me.  Thank you.  You asked me did
5    this refresh my
6    recollection -- recollection of when she
7    received this promotion.  Actually,
8    this -- this does not reflect when she
9    received the promotion that I was talking
10   about.  This reflects a -- an earlier
11   promotion.
12   Q.    What is your understanding of
13   any promotion subsequent to March of 2002?
14   A.    Is the promotion that she
15   received I think reflected by the document
16   that you showed me earlier that
17   the -- which showed the move in the salary
18   range, right; the adjustment piece, right;
19   where she was then the -- given the P and
20   L responsibilities, right, the -- for the
21   basketball operations, et cetera.
22   Q.    Let me show you another
23   document.  Maybe it will further refresh
24   your recollection.

163

DOLAN

1    A.    Okay.
2    Q.    Or differently refresh your
3    recollection.
4    MS. VLADECK:    This is 8.
5    (Dolan Exhibit 8 marked for
6    identification.)
7    (Document handed to witness.)
8    Q.    What is being marked as Dolan
9    Exhibit 8 is a Cablevision MPIP
10   performance appraisal and and --
11   A.    Yes, I think --
12   Q.    It is MSG 04596 through 04599,
13   and it is our understanding that this was
14   prepared in '05 for the prior year's
15   performance.
16   Have you ever seen this document
17   before?
18   A.    No, I don't recall seeing it.
19   Q.    Now, would the document that is
20   an '05 review be for the prior year's
21   performance?
22   A.    It should be, although
23   this -- it -- it doesn't necessarily have
24   to be.  I mean it could be for any part of

164

DOLAN

1    the prior year.
2    Q.    Okay.  Now, the form itself was
3    revised in 1/1/05.
4    A.    Yes, I saw that.
5    Q.    Okay.  I am going to ask you
6    some questions.  If you look at MSG 04598.
7    A.    Um hum.
8    Q.    Where it says, "Anucha embraced
9    the role of P and L manager.  During this
10   period, she challenged her staff and all
11   service provided to drive revenues and
12   control expenses."
13   Do you see that?
14   A.    I do.
15   Q.    Does that refresh your
16   recollection that Ms. Browne-Sanders had
17   been P and L manager before April of '05?
18   A.    Well, I think the -- the point
19   is you showed me a document from all the
20   way back to 2002, right, and I -- I was
21   just -- it is not possible that she had
22   that position of P and L manager in 2002.
23   Q.    Do you recall when she attained
24   that position?

165

DOLAN

1    A.    No, but we didn't have the
2    position in 2002.  I know that.
3    Q.    When was the position created?
4    A.    When we went through the
5    reorganization, the -- which I testified
6    to earlier.
7    Q.    And I think you testified that
8    that occurred in approximately 2001.
9    A.    Oh, well, it -- it is
10   still -- we didn't -- because we had the
11   budget meeting in 2000 -- remember in
12   2005, the meeting in Los Vegas where we
13   were teaching P and L managers how to deal
14   with the new system.  So I mean that
15   the -- I mean it was an ongoing project,
16   but that the -- you know, I am -- I am
17   pretty sure that that job didn't exist,
18   you know, the P and L manager the way I
19   described it until we went through all
20   that -- that process, the -- and I mean
21   that process was a long process.  I mean
22   the -- I should know.  I went
23   through -- it was a couple of year
24   process.  It started off with McKenzie &

42   (Pages 162 to 165)

166

DOLAN
1    DOLAN
2    Company the -- when I first took the
3    office, and we went through a whole
4    iteration with them, and then we went
5    through a whole iteration ourselves. So
6    that the -- and finally it was Mr.
7    Pollichino who came up with the final
8    structure, right, that we ended up
9    settling on for the reorganization, and
10   that was -- that couldn't have been any
11   sooner than 2002, 2003.
12   The -- the -- and -- so I mean she got
13   this position, right, that you mentioned
14   in -- in the notice here, right, on March
15   11, 2002. The -- it doesn't -- it doesn't
16   seem like it fits, but, you know, I
17   mean --
18       Q.   And just -- you were referring
19   to Dolan 7?
20       A.   Yes.
21       Q.   Just focusing for a minute on
22   Dolan --
23       A.   I mean.
24       Q.   8, I am sorry.
25       A.   The rest of it -- never mind.

167

1    DOLAN
2        Q.   Go ahead. I didn't mean to cut
3    you off.
4        A.   Well, I just think that -- you
5    know, I'm probably not the best person to
6    ask this question. Probably the best
7    people to ask is, you know, the people
8    that she directly reported to and did this
9    with. It just doesn't seem -- it doesn't
10   fit my recollection of the time frame of
11   the reorganization and reprocessing of the
12   company.
13       Q.   If you look at 04599, on the top
14   of the page it says, "Anucha delivered
15   11.5 percent ticket price increase and
16   completed the first stage of rescaling the
17   arena for Knicks games."
18       A.   Yes.
19       Q.   Do you know whether that was
20   correct or not?
21       A.   I don't know for sure, but I
22   assume it would be.
23       Q.   Assuming that this was created
24   by Mr. Mills some time in the first
25   quarter of 2005, would that be correct as

168

1    DOLAN
2    far as when the review period would
3    normally be?
4        MR. GREEN:   Objection to form.
5    You may answer if you can.
6        A.   That is conjecture. I mean, you
7    know, because already you've got -- you've
8    got the other document that suggested
9    April I think in it. Doesn't it? The --
10       Q.   I can't testify. I just -- my
11   understanding of the prior testimony is
12   that the adjustments are separate and
13   apart from the review process.
14       Do you know whether there is a
15   general time period for reviews at The
16   Garden?
17       A.   Generally there are -- the
18   reviews are done, you know, at the end of
19   the year, beginning of the year, but
20   the -- they don't have to be done that
21   way, and I -- you know, if -- if -- you
22   know, I would suggest that that probably
23   this document goes along with the other
24   one which is the adjustment document.
25   They look like they are very -- you know,

169

1    DOLAN
2    this one says revised 1/1. I mean
3    the -- the other one says that it is to be
4    effective 1/1. I -- I would -- you know,
5    it is only conjecture on my part, but I
6    would bet they were done at the same time.
7        Q.   Just for the record, do you know
8    whether this entire performance appraisal
9    form was revised on 1/1 or do you believe
10   that this was the individual
11   performance --
12       A.   That is a good question. You
13   know, I -- I don't know, but I -- you know
14   what, I don't know. You're right. It
15   could be the form.
16       MR. GREEN:   Let me note the
17   obvious but not necessarily to Mr. Dolan.
18   Mr. Mills will be deposed tomorrow. It
19   might be better to ask --
20       MS. VLADECK:   I understand, but
21   since I have Mr. Dolan here unless Mr.
22   Dolan wants to come back.
23       A.   No, Mr. Dolan doesn't want to
24   come back.
25       A.   The -- you know, I -- the

43 (Pages 166 to 169)

174

DOLAN

1  further waiver.
2  
3      MR. GREEN:  Fair enough.
4      MS. VLADECK:  But I will argue
5  potentially that we are entitled just by
6  the initial comment to the entire
7  conversation.
8      MR. GREEN:  You are free to
9  make the argument, and I will allow the
10  witness to answer then with respect to
11  the question who was it who told him that
12  Anucha Browne-Sanders had demanded 6
13  million dollars.
14      MS. VLADECK:  Okay.
15      MR. GREEN:  He may respond.
16      A.  That was a lot discussion for
17  the answer you are about to get.
18      Q.  And what is the answer I am
19  about to get?
20      A.  I don't recall.
21      (Laughter.)
22      Q.  Let -- let me ask you a question
23  that is more recent.
24      I asked you specifically about
25  the -- the amount of money this morning,

175

DOLAN

1  
2  and you rejected as a reason for deciding
3  to fire Ms. Browne-Sanders that a
4  settlement demand or a demand was
5  exorbitant.
6      MR. GREEN:  I must -- I must
7  correct you.
8      MS. VLADECK:  Wait.
9      MR. GREEN:  That wasn't his
10  testimony.
11      MS. VLADECK:  Let me have Mr.
12  Dolan leave the room.
13      MR. GREEN:  Fair enough.
14      THE WITNESS:  I am going to
15  leave the room now.  Hey, guys this is not
16  boding well for a 4:30 departure.  I just
17  assume answer this question.
18      MS. VLADECK:  No.  No, not, Ron
19  -- not while he is here.
20      MR. GREEN:  Fine.  Step out
21  just for a moment.  Just outside the door.
22      THE WITNESS:  Sure.  Are you
23  coming with me?
24      MR. GREEN:  I want to argue
25  this point.

176

DOLAN

1  
2      THE WITNESS:  You know I give
3  you 30 seconds at which point if you don't
4  have this resolved, I am coming in and
5  answering the question.  Don't take that
6  as your advantage now.
7      (Witness leaves the room.)
8      THE VIDEOGRAPHER:  We are going
9  off the record at 3:12.
10      MS. VLADECK:  No, not off the
11  record.
12      MR. GREEN:  On the record.
13      THE VIDEOGRAPHER:  I am sorry.
14  We are not off the record at 3:12.
15      MR. MINTZER:  You are recording
16  a blue screen.
17      MS. VLADECK:  You were about to
18  say something that I said was a speaking
19  objection.
20      MR. GREEN:  You are
21  mischaracterizing his testimony.  I don't
22  believe he said he considered it.  I
23  believe you asked him if he told anyone
24  about that.  I don't think you asked him
25  if he considered it.  It is a fair

177

DOLAN

1  
2  question, but I don't think it has been
3  asked.
4      MS. VLADECK:  Okay.  I'm not
5  sure that is correct, but I think it is
6  easily remedied.
7      MR. GREEN:  He can answer
8  fully.
9      (Witness returns to the room.)
10      MR. GREEN:  Thirty seconds.
11  Just made it.
12      MR. MINTZER:  Done.
13      Q.  See, we take your deadline
14  seriously.
15      A.  What is the scoop Betty Boops?
16  Am I answering or not answering?
17      MR. GREEN:  Well, I asked her
18  to rephrase the question.
19      THE WITNESS:  Fabulous.
20      MR. GREEN:  She may rephrase the
21  question or not.
22      Q.  Let me go back a little.  Did
23  you hear about a 6 million dollar request
24  for severance from counsel?
25      A.  I don't recall --

45  (Pages 174 to 177)

178

DOLAN
1
2    MR. GREEN:  You may answer.
3    A.  -- who I heard the 6 million
4  dollar request from.
5    Q.  In what context did you hear the
6  request?
7    A.  That is what I don't recall.
8    Q.  And did you hear the request on
9  the day you decided to fire her?
10    A.  I'm not sure.
11    Q.  Did you tell anyone that a
12  factor in your decision to fire
13  Ms. Browne-Sanders was that she had made a
14  request for 6 million in severance?
15    A.  I think I did.
16    Q.  Who did you tell?
17    A.  I think at that same discussion
18  at the helicopter I pointed out that she
19  is already had -- had essentially -- I was
20  told she wasn't staying.  She -- she
21  resigned and asked for the extended stay
22  period.  The -- that she had tampered with
23  an investigation that -- that was begun on
24  her behalf, the -- and then had asked for
25  6 million dollars in severance.

179

DOLAN
1
2    Q.  Now, when you said you think you
3  said it in the same conversation, was that
4  with Mr. McCormack and Mr. Ratner?
5    A.  Right.
6    Q.  Is there a reason you didn't
7  tell me that this morning when you were
8  asked a direct question as to whether or
9  not you told Mr. Ratner or Mr. McCormack
10  that a request for severance was a factor
11  in your decision to fire her?
12    A.  No, I don't think you asked me
13  about a request for severance.  You asked
14  me about a settlement.  Settlement is a
15  bit different than a request for
16  severance.
17    Q.  Is that the way you've been
18  parsing my questions if there was --
19    A.  I don't mean to be cute with
20  you, but the --
21    Q.  Well --
22    A.  The -- it first came in a
23  request for severance.  That then came in
24  a threat, right, that if the -- that if
25  the -- if I didn't get the money, right,

180

DOLAN
1
2  I'm going to go, right, the -- and file
3  this case that we are talking about right
4  now and make a big stink about it.
5    Q.  Who told you that there was a
6  threat that if it wasn't paid we are going
7  to file this case and make a big stink
8  about it?
9    A.  I think it was Mr. Mills.  I'm
10  not sure whether it was him.  Whoever was
11  relating to Anucha at that time, I think
12  it was still Mr. Mills.
13    MS. VLADECK:  Do you have word
14  search?  Could you search for the word
15  exorbitant.
16    (The record was read back as
17  follows:
18    "Question:  Did you tell anyone
19  that you had to fire Ms. Browne-Sanders
20  because she made a settlement demand that
21  you lebieved was exorbitant?
22    "Mr. Green:  Objection to form.
23    "Answer:  No.")
24    Q.  You never told anyone that --
25    A.  What --

181

DOLAN
1
2    MR. GREEN:  Objection to form.
3    Q.  -- about a settlement demand?
4    A.  Correct.  That they -- -- I
5  don't recall.  I'm not -- you know, at
6  this point I am a little confused because
7  at one point she is asking for -- she is
8  asking for 6 million dollars.  Later on I
9  believe she asked -- she let us know that
10  she got -- that if she doesn't get the 6
11  million dollars she is going to
12  then -- that she attempted to essentially
13  extort the 6 million dollars from the
14  company.
15    Q.  Did you have a discussion on
16  this subject at lunch with your counsel?
17    MR. GREEN:  I'm going to object
18  and instruct the witness not to answer to
19  conversations with counsel.
20    Q.  Well, did you have any
21  discussion during the lunch break with
22  your counsel to refresh your recollection
23  concerning this 6 million dollar demand?
24    MR. GREEN:  Same objection.  To
25  the extent counsel posed any questions or

46 (Pages 178 to 181)

182

DOLAN

1    provided any answers to questions or any
2    discussions about this case, those would
3    be privileged communications.
4            MS. VLADECK:   Could you mark
5    that for a ruling.
6       Q.    So just so it is clear and make
7    me clear that this is all there is or if
8    there is something else, the three reasons
9    that you decided to fire
10   Ms. Browne-Sanders on the date you did
11   were the events from July, the budget
12   meeting?
13      A.    Right.
14      Q.    The date you fired her?
15      A.    Right.
16      Q.    You said that she was tampering
17   with the investigation or what words did
18   you use?
19          MR. GREEN:   Objection to form.
20      A.    Excuse me?
21          MR. GREEN:   I just objected to
22   form.
23      A.    Yes, because I think it is in
24   there.  Now, I am really being asked to

183

DOLAN

1    recall what I said, the exact words.
2       Q.    Then why don't --
3       A.    I mean it is simple.  That she
4    used her position to influence her direct
5    reports --
6       Q.    And that was having --
7       A.    -- to corroborate her complaint.
8       Q.    And that was having a -- another
9    MSG employee go to a lawyer with her?
10          MR. GREEN:   Objection.
11      A.    No.
12      Q.    Was there -- excuse me.  Was
13   there something else?
14      A.    It was reported to me that she
15   did it with more than one person.
16      Q.    What else did she do?
17      A.    That there were other people
18   that she had attempted to influence, to
19   corroborate her complaint.
20      Q.    What did she do to attempt to
21   influence them to corroborate her
22   complaint.
23      A.    I don't recall the specifics,
24   what was reported to me.

184

DOLAN

1       Q.    This was the reason you fired
2    her; is that correct?
3       A.    Sure.
4       Q.    What is the best recollection
5    you have as to what you believed that she
6    did with respect to the investigation?
7          MR. GREEN:   Objection.  It is
8    asked and answered.  The witness
9    can -- answer the question if he wants to
10   supplement what he said.
11      A.    Again, used her influence with
12   direct reports to influence their answers,
13   their -- their responses to an inquiry to
14   an investigation that was being made on
15   her behalf.
16      Q.    And then the third thing was
17   you're understanding that she asked for 6
18   million in severance?
19      A.    She asked for 6 million dollars,
20   right?
21          MR. GREEN:   Just note my
22   objection that your question presupposed
23   that there were three.
24      Q.    Were there any other factors?  I

185

DOLAN

1    am trying to get the universe of factors.
2          MR. GREEN:   I thought the
3    witness had testified more fully to a
4    number of things.
5          MS. VLADECK:   That is a
6    speaking objection.
7       Q.    To the extent that there are
8    other factors, what are they?
9       A.    And all the factors leading up
10   to from July up until that point.  I mean
11   that is a quite a long list, you know.
12      Q.    That was your first factor.
13   What were all the events from July until
14   the date you fired her?
15      A.    The -- again, I stated earlier
16   the -- you know, the inability to do her
17   job.
18      Q.    And how was that reflected
19   between July and January?
20      A.    That's in -- that is
21   inability -- inability to budget,
22   inability to brand.  It is --
23      Q.    And --
24      A.    The -- and then the -- you know,

47  (Pages 182 to 185)

186

DOLAN

2 my essentially taking the opinion of Mr.
3 Ratner that she had not improved, that he
4 believed that she was -- should be
5 terminated.
6     Q.    Are you done with all the events
7 leading from July to January?
8     A.    Yes, I think so.
9     Q.    What made you believe that from
10 July to January you had an inability to
11 budget or brand?
12     A.    Because of the July meeting, the
13 skills and the work product that she
14 produced was not -- low, not acceptable.
15 It showed a lack of understanding of
16 budgeting.  It showed a lack of
17 understanding of branding.  She was unable
18 to come up with a branding statement for
19 the New York Knicks.  She had to be given
20 one.  That the -- and her -- in her budget
21 she was unable to explain her budget and
22 when she -- and when she did explain her
23 budget, her explanations, the -- showed a
24 lack of understanding of how budgets
25 are -- are put together and differences

187

DOLAN

2 between things such as operating expenses
3 and capital expenses, and she actually in
4 the middle of the budgetary process
5 revealed that she had misclassified some
6 80,000 dollar or a hundred thousand
7 dollars worth of expenses from operating
8 into -- from capital into operating.
9     Q.    Was this all reflected during
10 the summer budget meetings or is this
11 something that happened between July and
12 January?
13     A.    This was all -- the budget
14 meetings went through July and August.
15     Q.    Okay.  My question is after the
16 budget meetings over the summer --
17     A.    Yes.
18     Q.    What did you observe with
19 respect to Ms. Browne-Sanders' inability
20 to budget and/or brand from those budget
21 meetings until January of '06?
22     A.    Nothing other than that -- that
23 I did not receive a report that she had
24 gotten any better, and there was no reason
25 to think that she went through the -- the

188

DOLAN

2 training, but I did not get a positive
3 report.  I didn't get any report
4 essentially on it.
5     Q.    Did you ask for a report at any
6 time between the summer budget meetings
7 and the day you decided to fire her?
8     A.    I don't recall.  I don't -- I
9 don't recall if I did or if I didn't.
10     Q.    Now, you said that you also
11 relied on the opinion of Mr. Ratner that
12 she should be terminated.
13         When did Mr. Ratner express his
14 opinion that she should be terminated?
15     A.    Consistently from July through
16 her termination date.
17     Q.    And you rejected his opinion
18 from July, August, September, October,
19 November and December; is that correct?
20         MR. GREEN:   Objection to form.
21 Misstates prior testimony.
22     Q.    Is that correct?
23         MR. GREEN:   You may answer.
24     A.    I think it -- rejected would be
25 strong, but essentially we didn't act upon

189

DOLAN

2 what his -- what his opinion -- we tried
3 to give Anucha a chance, but you have to
4 remember that the -- you are asking me
5 about the day she was fired.  The -- we
6 went through this whole process with her.
7 Then she comes back to us, and she tells
8 us that she is not going to work here any
9 more.  The -- that the -- it is unclear
10 what the reason is why she doesn't -- why
11 she can't work here any more, but I assume
12 that the -- that it had something to do
13 with her experience over the last six
14 months.  The -- so now we are already
15 looking for -- we already have to rejigger
16 the -- the department, et cetera, but she
17 is -- she is going to stay as long as we
18 help her find another position, but she is
19 essentially out.  She has no future at the
20 company by her own hand, and then
21 the -- comes in the report that she wants
22 $600,000 worth -- excuse me -- 6 million
23 dollars worth of severance that the -- and
24 that -- that the -- she's been tampering
25 with an investigation into a complaint

48   (Pages 186 to 189)

190

DOLAN

1
2 that she's made, and the last part is
3 the -- is the part that is most difficult
4 to deal with because as ridiculous as the
5 6 million dollar request was that
6 the -- she could have continued on doing
7 her job if she had not tampered
8 with -- with those people, the -- but the
9 combination of all of those things
10 together -- and finally the tampering as
11 being the last straw in that really led us
12 to -- led me to the conclusion that her
13 employment at the company was over with.
14    Q.   Now, you started by saying that
15 you believed she started this whole
16 process. What whole process are you
17 referring to?
18    A.   I'm not sure --
19       MS. VLADECK:  Could you read it
20 back.
21       (Record read.)
22    Q.   What did you mean by the whole
23 process?
24    A.   What I meant by the whole
25 process is -- we went through the whole

191

DOLAN

1
2 budgeting process with her. We discovered
3 these deficiencies that the -- that -- you
4 know, that -- in her skill set. We went
5 through and paid for the -- and offered
6 her training the -- and paid for her
7 training to up those skills. I mean that
8 was at our expense that the -- -- and, you
9 know, after we are done sending her
10 school, right -- that -- to get better at
11 this, right, the -- she walks into the
12 office and says essentially I'm quitting.
13 The -- I can't work here any more.
14 The -- the -- and you need to -- what
15 I -- what I need you to do is to keep me
16 on, and I'll do my job, which was fair,
17 and help me find another job. That
18 the -- you know, at that point, you know,
19 I have to tell you that as -- as the CEO
20 of the company having then, you know,
21 offered her the -- the ability, right, to
22 essentially come out of what was a pretty
23 bad review but which is what came up out
24 of in terms of how her performance was in
25 that budgetary process, offering her the

192

DOLAN

1
2 ability for help, training to get her
3 skill levels up, the company was going to
4 stick with her, that the -- the -- and she
5 took the training, and then she came back
6 and basically said I quit. The -- then
7 she asks for 6 million dollars, that
8 the -- and then we find out that
9 she -- that she is utilizing her position
10 that she is -- she is off through the
11 company attempting to garner support for a
12 complaint that the -- about sexual
13 harassment. The -- at what point
14 does -- does an employee become no longer
15 effective at a company as -- in her
16 position. She was no longer effective.
17 The -- the -- and the -- at that point,
18 you know, I decided that the company had
19 to -- had to just cut it off, and that was
20 when -- when she was fired.
21    Q.   Now, you say that you heard from
22 Mr. Mills that Mrs. Anucha Browne-Sanders
23 just walked into the office and said I'm
24 quitting?
25       MR. GREEN:  Objection.

193

DOLAN

1
2 Misstates prior testimony. You may
3 answer.
4    A.   I think that is what I said,
5 but, you know -- look --
6    Q.   That is a yes or no.
7    A.   I'm taking -- you don't get to
8 do that with me.
9    Q.   Yes, I do.
10    A.   Well, I'm still going to answer
11 the way I want to answer. I'm
12 characterizing what her conversation was
13 with Mr. Mills.
14    Q.   Did you hear from anyone that
15 what Ms. Browne-Sanders said as a result
16 of the sexual harassment was I can't take
17 this any more?
18       MR. GREEN:  Objection to form.
19 Can I have that question read back,
20 please.
21       (Record read.)
22    A.   No.
23    Q.   Now, who did you talk to about
24 Ms. Browne-Sanders from January 13 to
25 January 19, whether or not they were

49  (Pages 190 to 193)

**MADISON SQUARE GARDEN**
The World's Most Famous Arena

**EMPLOYEE PROFILE**

| | |
|---|---|
| SALARY CHANGE | TERM/LAYOFF |
| PROMOTION ☐ | PERSONAL INFORMATION CHANGE |
| ADJUSTMENT ☐ | TITLE CHANGE |
| MERIT ☐ | LEAVE OF ABSENCE |
| TRANSFER ☐ | RETURN FROM LEAVE |
| | OTHER |

EFFECTIVE DATE 03/31/05   EMPLOYEE ID 519032

LAST NAME: Browne-Sanders   FIRST NAME: Anucha   MIDDLE INITIAL

APT#   CITY   STATE   ZIP   HOME TELEPHONE

DEPT CODE 212080   DEPARTMENT NAME MSG Business Ops NY Knicks   EMP ACTION DESCR Department Change

FLSA STATUS EXEMPT ☐   EMPLOYEE CLASS   WORK STATUS   DPC Department Change

NON-EXEMPT ☐ E   ADMIN / CASUAL / SEASONAL / TEMPORARY ☐   TEMP ☐ / REGULAR ☐ R   FULL TIME F / PART TIME   COMMENTS

LOCAL#   JOB CODE ADM SVP17   UNION LOCAL   SVP Marketing & Business Ops   PERF CODE BW1   PAY GROUP 27   SALARY GRADE 212,992   ADC 1A

BASE SALARY 212992   AMOUNT OF INCREASE 0.00   % INCREASE 0.00   Adjustment   BENEFIT PROGRAM ADM   EFFECTIVE DATE 11/20/2000   HIRE DATE 11/20/2000   REHIRE DATE 11/20/2000

250,000   1/1/05   SALARY REV DATE 03/01/2004   LAST REVIEW DATE 03/01/2005

DEPARTMENT (SUPERVISOR)   DATE   SUPERVISOR: Mills,Stephen C   DATE   HUMAN RESOURCES   4/6/05   APR 08 2005   ENTERED   DATE

DIVISION HEAD   DATE   H.R.M.S.

**MSG 00333**

**CONFIDENTIAL**

February 25, 2002

Anucha Browne-Sanders
Madison Square Garden

Dear Anucha,

On behalf of our company, we are pleased to present you with your Management Performance Incentive Plan bonus award for 2001. As you know, it was a particularly challenging year for Cablevision, and we want to express our gratitude for your commitment and efforts toward moving the Company forward. Your hard work and dedication resulted in an individual performance rating of 1.390, division performance of 61.33% and the total company's performance of 80.39%. These ratings led to a bonus of $30,500, representing 17.94% of your 2001 earnings.

We want to thank you for all that you have done for the company. We are proud of our accomplishments, and we look forward to working with you to reach new heights in 2002.

Sincerely yours,

James L. Dolan
President & CEO

Steve Mills
President, Sports Team Operations

Scott Layden
President & General Manager
New York Knicks

JLD/SM/SL:tl



April 30, 2003

Anucha Browne-Sanders
Madison Square Garden

Dear Anucha,

On behalf of our company, we are pleased to present you with your Management Performance
Incentive Plan bonus award for 2002. As you know, the economy and market conditions
continued to pose serious challenges for our Company, and we want to express again our
gratitude for your commitment and efforts toward moving the Company forward. Your hard
work and dedication resulted in an individual performance rating of 1.450, division performance
of 100.00% and the total company's performance of 91.73%. These ratings led to a bonus of
$58,000, representing 29.44% of your 2002 earnings.

We want to thank you for all that you have done for the company. We are proud of our
accomplishments, and we look forward to working with you to reach new heights in 2003.

Sincerely yours,

James L. Dolan
President & CEO

Seth Abraham
President, Madison Square Garden/
Radio City Entertainment

JLD/SA:kc

**CONFIDENTIAL**

MSG    30001

April 1, 2004

Anucha Browne-Sanders
Madison Square Garden, L. P.

Dear Anucha,

On behalf of our company, we are delighted to present you with your Management Performance Incentive Plan bonus award for 2003. As you know, our Company faced many challenges in the past year, and our success in meeting these challenges was directly linked to your performance. Your hard work and dedication resulted in a unit performance of 75.0%, which led to a bonus of $53,000, representing 25.1% of your 2003 earnings.

We want to thank you for all that you have done for the company. We are proud of our accomplishments, and we look forward to working with you to reach new heights in 2004.

Sincerely yours,

James L. Dolan
President & CEO

Hank Ratner
Vice Chairman

Steve Mills
President, Sports Team Operations

CONFIDENTIAL

MSG    30002

February 18, 2005

Anucha Browne-Sanders
Madison Square Garden, L.P.

Dear Anucha,

On behalf of our company, we are delighted to present you with your Management Performance Incentive Plan bonus award for 2004. As you may know, our Company had a terrific year. Almost all of our business units exceeded their plans and budgets. You responded exceptionally well in meeting all challenges and opportunities that confronted us this year, and we want both to congratulate and thank you for your splendid efforts and the results they produced. Your hard work and dedication resulted in a unit performance of 120.6%, which led to a bonus of $76,000, representing 35.9% of your 2004 earnings.

Again, we want to thank you for all that you have done for the company. We are proud of our accomplishments, and we look forward to working with you in our continuing efforts to sustain our record of excellent performance.

Sincerely yours,


James L. Dolan
President & CEO

Hank Ratner
Vice Chairman

Steve Mills
President, Sports Teams Operations


CONFIDENTIAL                                      MSG    30003