# Exhibit 15

Dockets.Justia.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
06 CIV. 0589

---------------------------------------x

ANUCHA BROWNE-SANDERS,

Plaintiff,

- against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD THOMAS III, AND JAMES DOLAN,

Defendants.

---------------------------------------x

November 7, 2006
10:20 a.m.

VIDEOTAPE DEPOSITION of RUSTY McCORMACK, taken by the Plaintiff, pursuant to Notice, held at the offices of Vladeck Waldman Elias & Engelhard, P.C., 1501 Broadway, New York, New York, before Debbie Zaromatidis, a Shorthand Reporter and Notary Public of the State of New York.

MCCORMACK

A. Yes.

Q. Okay.

A. The whole project was his.

Q. I think you said earlier in your testimony that Mr. Moran and Ms. Noel updated you about the progress of their investigation as it was ongoing?

A. Yes.

Q. What did they say to you about it?

A. There wasn't a lot done until they completed, but the -- the feedback as the -- as it progressed was that they had -- they were not corroborating the allegations of Anucha.

Q. Did they tell you that they were corroborating any of the allegations of Ms. Browne-Sanders?

A. Well, that there was a -- as I remember, Dan Gladstone, for instance, said, yeah, Stephon did say that to him, and Isiah did say, yes, I put my arms around Anucha and tried to kiss her, but that was it that I remember anyhow.

MCCORMACK

Q. They told you that while the investigations was ongoing?

A. I think so. I -- or it may come -- come later. I -- the timing I don't know. It was either in a report or -- or prior to that.

Q. Did you eventually receive a report reflecting the results of an investigation?

A. Yes, I did.

Q. Did you take any action in connection with that report?

A. I did not.

Q. Did you make any recommendations in connection with that report?

A. I did not.

Q. Did you have discussions with anyone --

A. Immediately. We did write a report later, a memo later.

Q. Well, my question was: Did you make any recommendations in connection with that -- the report that had been given to you by Mr. Moran and Ms. Noel?

MCCORMACK

A. Yes.

Q. What -- what recommendations did you make?

A. I recommended that Isiah be given some sensitivity training, and that Steve meet to do a recap and lessons learned from the -- from the events.

Q. Did you make any other recommendations?

A. No.

Q. Did you recommend that Ms. Browne-Sanders be terminated?

A. No, I don't think it was a recommendation. It was -- it was a statement that -- that based upon her relationships both, you know, within the organization primarily but -- that she should be separated. I didn't say recommend.

Q. Could you clarify for me the distinction that you are making? You said you said in your memo that she should be separated, but you didn't view that as a recommendation?

MCCORMACK

A. It is up -- that is not my -- it is up to management then to decide how they do it. I -- I recommended in the case of -- of Isiah and Steve, but the organization then has to react to the Anucha thing.

Q. Did you make a recommendation that Ms. Browne-Sanders should be separated?

A. No.

Q. Did you have -- did you make a statement in your report that Ms. Browne-Sanders should be separated?

A. I did.

Q. And could you clarify for me in your mind what is the distinction between a statement that she should be separated and a recommendation that she should be separated?

A. There is not a lot, but it is not -- not a recommendation.

Q. Are you --

A. She obviously wasn't fitting in the organization, and by then she had

226

McCORMACK

pretty much decided her fate.

Q. How -- are you able to explain at all what the difference is in your mind between a statement that she should be separated and a recommendation that she should be separated?

A. It is close, but there is a difference. I -- I just didn't use the word recommend.

Q. Is there any particular reason why you didn't use the word recommend?

A. Because that is the way Mark Schoenfeld wrote it.

Q. You did not write it -- you did not write your --

A. That was drafted by Mark Schoenfeld.

Q. When you say that, you are referring to the --

A. That memo.

Q. You've got to let me ask the questions.

A. Sorry.

Q. The -- the memo in which

227

McCORMACK

you -- you just described that you made recommendations with respect to Mr. Thomas and -- and Mr. Mills, that memo was drafted by Mr. Schoenfeld?

A. Correct.

Q. You just signed your name to it?

A. No. I -- we -- I did some minor edits, but for the most part it was written by Mark Schoenfeld. The only thing I did was wordsmithing the memo.

Q. How did you wordsmith it?

A. I don't remember. It was minor edits.

Q. Did you agree with all of the statements that were made in this memorandum that Mr. Schoenfeld drafted?

A. Yes, I did.

Q. Okay. And what was the basis for the conclusion that Mr. Thomas should be given I think you said sensitivity training?

A. Well, he admitted that he had touched her and attempted to kiss her, and so -- our concern was that different

228

McCORMACK

people had different sensibilities, and we just thought for the sake of the organization, et cetera, we -- we would give him some training to sensitize him to that. It would be one-on-one.

Q. Was it -- and then that in your judgment was based solely on the determination that he had hugged Ms. Browne-Sanders and attempted to kiss her? Was it based on any other facts?

A. No, that was -- that was the primary -- because that is all we knew that had really taken place.

Q. Did you know whether or not Mr. Brown -- Mr. Thomas had used profanity in the workplace?

A. The investigation did not corroborate that.

Q. No. That -- it did not corroborate that he used profanity?

A. Correct.

Q. And what was the basis of the recommendation with respect to Steve Mills?

229

McCORMACK

A. With Steve, you know, we thought that -- that if he sits down and -- we thought let him sit down with some HR -- by the way Frank Lavotic and Rob Dotien are both -- Frank is a senior vice president for cable operations in charge of human resources, which is a big chunk of our company. Rob Dotien is a corporate -- he might be SVP now too I think, but I am not really sure. Anyway, they are HR professionals, and we thought let's -- let Steve sit down with somebody who has not been involved with this thing and do sort of a post mortem lessons learned sort of exercise.

Q. Your recommendation was that Mr. Mills should sit down with Mr. Dotien and Mr. Lavotic?

A. Right.

Q. Did you think that there was any lessons that Mr. Mills needed to learn as a result of this investigation?

A. We didn't know. That is why we wanted somebody who had not been involved,

230

MCCORMACK

you know, who -- who was really separate from the organization to take a look at it.

Q. Did that meeting happen to your knowledge?

A. I don't think it did.

Q. Do you know why it -- it didn't?

A. No, I don't know that.

Q. Do you know whether --

A. Just -- you know, I think the lawsuit came and -- and we just didn't -- we didn't follow-up on it.

Q. And did Mr. Thomas receive the sensitivity training that you referred to?

A. No.

Q. And do you know why he did not?

A. Because the -- when the lawsuit came that -- that was about as much sensitivity training as he -- he would ever want.

Q. What do you mean by that?

A. Well, he had been accused of some serious things, and he obviously I don't think would -- would do anything,

231

MCCORMACK

even the hug and kiss ever again.

MR. MINTZER: Why don't we take a five-minute break.

THE VIDEOGRAPHER: Okay. The time is 3:47 p.m., November 7, 2006. This is the end of tape number 3 of the videotape deposition of Rusty McCormack.

(Recess taken.)

THE VIDEOGRAPHER: Okay. The time is 3:59 p.m., November 7, 2006. This is tape number 4 of the videotape deposition of Rusty McCormack.

BY MR. MINTZER:

Q. Mr. McCormack, before the break you had mentioned a -- a memo that Mr. Schoenfeld had drafted that you signed. Do you recall that?

A. Yes.

Q. And that there was a statement in that memorandum that said that Ms. Browne-Sanders should be separated from MSG, correct?

A. Correct.

Q. Had you had any discussions with

232

MCCORMACK

anyone else at MSG other than Mr. Schoenfeld about that statement?

A. No, I had not.

Q. Had you discussed the possibility of Ms. Browne-Sanders being separated with anyone else at MSG at the time that you signed that memorandum?

A. No.

Q. At any point, did you have any discussion with Steve Mills about separating Ms. Browne-Sanders from MSG?

A. No.

Q. Did you have any conversation with James Dolan about separating Ms. Browne-Sanders from MSG?

A. No, I did not.

Q. And did you have any conversations with Hank Ratner about separating Ms. Browne-Sanders from MSG?

A. No, I did not.

Q. Is it fair to say the only person you spoke to about that was Mr. Schoenfeld?

A. I believe that is correct.

233

MCCORMACK

Q. What is -- what was the substance of your conversation with Mr. Schoenfeld about separating Ms. Browne-Sanders from MSG?

A. Well, we --

MR. GREEN: I instruct the witness not to answer. Privileged communication.

MR. MINTZER: You are taking the position that that is privileged?

MR. GREEN: Yes, I am not taking the position that the letter itself is privileged, but the underlying conversations which would be advice sought or rendered would be privileged.

Q. Are you aware -- were there any drafts of the memorandum that you signed that was authored by Mr. Schoenfeld?

MR. GREEN: Same objection. All communications between Mr. McCormack and Mr. Schoenfeld would be privileged except for the version of the document that is in evidence as to which no privilege has been asserted.

250

McCORMACK

corroborate the allegations.

Q. This report was -- was addressed to you, correct?

A. That's correct.

Q. Why didn't you think it was significant to focus on it?

A. It was done by the two professionals in this area, and it was done for management review at that point.

Q. But based on this report, you made a statement in a -- in a memorandum that said Ms. Browne-Sanders should be fired. Isn't that -- isn't that true?

MR. GREEN: Objection. That's not the prior testimony.

Q. Mr. -- you can answer.

A. No, nothing based on this report was that.

Q. Isn't it --

A. She had -- she had -- she had a lot of troubles by then, and it -- but it was relationship issues. It was communication issues. She had already told Steve Mills that she could no longer

251

McCORMACK

work there and please help her while she works for employment but nothing based upon this.

Q. You only made a statement in a document that Ms. Browne-Sanders should be fired after reviewing this report; isn't that a fact?

MR. GREEN: Objection to form. You may answer, Mr. McCormack.

A. Okay. Yes.

MR. MINTZER: Could you -- could you read the question back. I may have --

A. Yes, but it had nothing do with this report.

Q. There is no question pending. I am going to ask for it to be read back.

(Record read.)

MR. GREEN: I objected to that, and you can answer the question.

Q. Okay. And you can answer the question.

A. I had reviewed the report.

Q. The only time that you made a

252

McCORMACK

statement in a document that -- saying that Ms. Browne-Sanders should be fired was after you had reviewed this report marked McCormack Deposition Exhibit 7, correct?

MR. GREEN: Objection to form.

A. That's correct, but it had nothing to do with the report.

Q. Based on this report, you made recommendations concerning Mr. Thomas and Mr. Mills; is that -- is that true?

A. That is correct.

Q. Didn't you think it was important to read it carefully before you made recommendations concerning these gentlemen?

A. No, I -- I read through it, but -- but again the recommendation was coming from -- from legal also.

Q. Your testimony you just -- just a couple of minutes ago was that you didn't focus on this -- on some of the words used in this report?

A. At the time I didn't focus on it

253

McCORMACK

all that much. I read it, but I didn't know where it was -- where it was headed.

Q. And even though you were going to make recommendations on the -- related to the careers of Mr. Thomas and Mr. Mills based on the report, you didn't focus on what was written in the report. Is that -- is that an accurate statement?

A. No. As I said I read it, but I -- to the minute detail, I did not. That -- John and Rochelle were the two experts in this area, and I -- and I think legal corroborated them on the -- further writing of the memo.

Q. You think legal corroborated with Mr. Moran and Ms. Noel about the writing of McCormack 7?

A. I am sorry. Ask again.

Q. Did legal corroborate with Mr. Moran and Ms. Noel about the writing of McCormack 7?

A. I think so, but you'll have to ask them. I don't -- I'm not sure.

MR. MINTZER: McCormack 8,

254

McCORMACK

please.

(McCormack Exhibit 8 marked for identification.)

(Document handed to witness.)

MR. MINTZER: For the record, McCormack 8 is a two-page document that's Bates stamped MSG 6363 and 6364.

(Pause.)

Q. Have you had a chance to review McCormack 8?

MR. GREEN: Take a moment, if you need it, to read it please, Mr. McCormack.

(Pause.)

A. Okay.

Q. Is this the memorandum that you referred to earlier in your testimony that was drafted by Mr. Schoenfeld --

A. Correct.

Q. -- that you signed?

A. That's correct. Yes.

Q. Okay. The top line says that it's to files. Do you see that?

A. Yes.

255

McCORMACK

Q. What does that refer to?

A. It's a memorandum -- a memorandum to file, which -- which then goes into the employee relations files.

Q. Was this a memorandum that was intended to be read by any particular person?

A. Not necessarily. It was really written because at that point we -- we assumed we probably were going to be sued. So this was just to be on the record.

Q. So this was a document that was created in contemplation of litigation?

A. That's correct.

Q. In the document, you made certain recommendations, as you said before, concerning Isiah Thomas and Mr. Mills, right?

A. Um hum.

Q. Yes?

A. Yes. Yes.

Q. Who were you directing those recommendations to?

A. In the case of Isiah,

256

McCORMACK

it's -- obviously that's Steve Mills' decision as to whether he would do that or not.

Q. And what about with respect to Mr. Mills?

A. That would be Jim Dolan's decision.

Q. Okay. And so did you contemplate that both Steve Mills and Mr. Dolan were going to read this memorandum?

A. I don't remember contemplating it at the time.

Q. Well, did you intend it, this memorandum, to be read by Mr. Mills and Mr. Dolan?

A. No, not necessarily. It was up -- you know, I really was pretty much taking directions from the legal department.

Q. And the statements that you made concerning Ms. Browne-Sanders, did you intend them to be read by anyone?

A. Not necessarily.

Q. I think you -- you testified

257

McCORMACK

before that you had had no discussion with anyone other than Mr. Schoenfeld about the statements you've made concerning Ms. Browne-Sanders in this memo?

A. I'm sure I discussed it with John Moran at the time.

Q. You discussed the content --

A. Yes.

Q. -- of the paragraph relating to Ms. Browne-Sanders --

A. Well, these --

Q. Hold on. Hold on.

A. I'm sorry.

Q. Let me finish my question, sir.

You discussed the content of the paragraph related to Ms. Browne-Sanders with Mr. Moran?

A. That's correct.

Q. When did you do that?

A. Well, I showed him the memorandum.

Q. You showed him this entire memorandum?

A. Yes, I did.

McCORMACK

Q. When did you do that?
A. I showed to him -- actually I might have showed it to him before I signed it. I can't remember.
Q. So sometime shortly -- either shortly before you signed it or shortly after you signed it?
A. Yes.
Q. The memorandum is dated January 19, 2006. Do you see that?
A. Um hum. Yes.
Q. You've already said that you didn't draft it. Mr. Schoenfeld drafted it. When did you first see a draft of this?
A. Maybe a couple of days prior to that at most.
Q. You wrote in the first paragraph that you have reviewed the report of the investigation conducted by Rochelle Noel and John Moran regarding the allegations recently made by Anucha Browne-Sanders and her counsel. "In light of that report, I am making certain recommendations."

McCORMACK

What did you mean by that sentence, "in light of that report I am making certain recommendations"?
A. Well, we -- we -- based upon again the -- the difficulty that Anucha was having, the interpersonal problems that she was having, her expressed desire to leave the company, and all of the things that we have discussed today in terms of things like the open practice fiasco where somebody could have been hurt, in view of things that I personally was involved with, you know, we -- we -- I did not disagree that she should probably leave the company or should leave the company. She just had poor relationships, and she had already lost the confidence of the -- certainly the vice chairman of the company with the budget fiasco.
With Isiah we said, again we need to sensitize him. We should -- you know, different people have different sensitivities. Is he aware of that? He hasn't worked in a large public company,

McCORMACK

and you -- believe me having been a private company for some time and may be going to be private again, but it -- the -- particularly today with the SEC and regulations, that he wouldn't -- he probably wouldn't know that, so we wanted to sensitize him, so that he could -- he would -- and with Steve, as I said, we -- we recommended that he meet with two people who had not been involved with this issue and -- but who are professionals and do follow-up.
Q. When you say though "in light of the report," what did the report have to do with the recommendations that you were making --
A. They --
Q. -- with respect to Ms. Browne-Sanders?
A. They -- it did not have anything do with it.
Q. So where you wrote "in light of that report I am making certain recommendations," you didn't really mean

McCORMACK

that with respect to the recommendations for Ms. Browne-Sanders?
A. No, the -- again, Mark Schoenfeld wrote this, but -- but we -- the -- the action taken with Anucha was done by Jim Dolan.
Q. How do you know that?
A. Okay. So -- well, that's the word I got.
Q. The word you got from whom?
A. That I'm not sure. I don't know whether it was Steve. I don't know whether it was -- I don't remember that exactly.
Q. Someone had decided --
A. But Jim Dolan decided to -- that he was going to fire Anucha.
Q. Someone -- someone told you that that Jim Dolan said that Ms. Browne-Sanders was going to be separated?
A. That's correct.
Q. Great. And then you had heard that before you made this -- you signed

262

McCORMACK

your name to this document, McCormack 8?

A. Yes.

Q. So it's fair to say that you learned about Mr. Dolan's decision, and then you and Mr. Schoenfeld drafted a memorandum that would conform to Mr. Dolan's decision?

MR. GREEN: Objection to form.

Q. Is that accurate?

A. We -- yeah, we did write this -- we did write this with that, yes, but the decision was him. You have speak to Jim.

Q. Did you hear about Ms. Browne-Sanders' supposed desire to leave the company from anyone other than Steve Mills?

A. No, I don't believe so.

Q. No, you didn't hear about it from anyone other than Steve Mills?

A. That's correct. Steve came to me to discuss the possibility of her continued employment while she looked for work.

263

McCORMACK

Q. And -- and when did that happen?

A. It was after she came to him, which was in late November I think.

Q. Your -- your memorandum says in the second line "However, based on comments Browne-Sanders made to Steve Mills and members of her department before making the -- her complaint, it is clear that Browne-Sanders has a poor relationship and difficulty interacting with Mills and other members of MSG management."

Do you see that sentence?

A. Yes.

Q. What were the comments that Ms. Browne-Sanders had made to other members of her department that was the basis of that statement?

A. She -- I had heard that she -- she made some statements to other members. I don't know exactly who that was, but I -- I -- that's what I understood. That was -- that was the talk around in the -- in the -- that

264

McCORMACK

specifically, and Steve Mills of course was the fact that she wanted to leave the company.

Q. Right. But the statements that were supposedly made to members of her department, those were not statements you heard firsthand?

A. I can't remember who exactly it was, but I may -- I may have been told. I can't remember.

Q. You may have been told. You may not have been told. Is that a fair -- is that accurate?

A. Well, I probably was told because that was the scuttlebutt in the company is she was having -- she was having conversation, and -- and the fact that she was unhappy and probably was going to leave the company.

Q. So that part of your -- your statement with respect to Ms. Browne-Sanders' future at the company was based on scuttlebutt?

A. Yes.

265

McCORMACK

MR. GREEN: Objection to form.

Q. Who are the other members of MSG management that are referred to in that sentence?

A. Well, I mentioned to you I am one of them and Fran Hurley, my vice president of training and development, is another one. Tim Hassett, Joe DeCoco, who was in charge of security. Of course, Hank Ratner, who is -- you know with budget issues and the fact that -- that he had said that she was probably over her head, and there were other people. Specifically I don't know. I can't name them all, but I -- I had heard again talk around the company that Anucha was just over her head.

Q. Did you -- did you personally have any difficulty interacting with Ms. Browne-Sanders?

A. No, I didn't, but I didn't -- I didn't have to.

Q. Okay.

A. I didn't have a real business

# Exhibit 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
06 Civ. 0589 (CGE)

----------------------------------------x

ANUCHA BROWNE-SANDERS,

Plaintiff,

- against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD THOMAS, III, and JAMES DOLAN,

Defendants.

----------------------------------------x

November 10, 2006
10:10 a.m.

VIDEOTAPE DEPOSITION of JOHN D. MORAN, taken by the Plaintiff, pursuant to Notice, held at the offices of Vladeck Waldman Elias & Engelhard, P.C, 1501 Broadway, New York, New York, before Debbie Zaromatidis, a Shorthand Reporter and Notary Public of the State of New York.

MORAN

now four or five times, and the witness has answered.

MR. MINTZER: No, I'm asking about what he has written here because there seems to be some confusion.

MR. GREEN: That's --

Q. I am asking him -- Mr. Moran, Mr. Thomas did say according to your note that he would have done something if she said that Mr. Murphy was inappropriate?

MR. GREEN: Objection to form. I will instruct him not to answer further. He already answered the question.

MR. MINTZER: Could you mark it for a ruling.

Q. Can I ask you to look at the last page, 13204?

A. Yes.

Q. Could you read from the top, please?

A. "Do you understand Anucha could feel her position was being usurped? No, Jeff Nix and Anucha had close relationship and Jeff ran everything, and Anucha was

MORAN

his right hand. I kept Jeff as assistant GM. I asked Steve what her duties were. I think she liked being in basketball ops" -- "op and making decisions rather than running her own department. I wanted changes but not out of dislike."

You want me to keep reading?

Q. No.

A. Okay.

Q. Had you asked Mr. Thomas anything about Jeff Nix?

A. No, I don't believe we did.

Q. Do you know what the basis was for Mr. Thomas' statement that Mr. Nix and Ms. Browne-Sanders had a close relationship?

A. Well, I -- I think he is -- he is trying to -- he is drawing the -- the picture that Jeff Nix and Anucha had a close working relationship, and he allowed her to do a lot of things in basketball -- outside of her -- her defined responsibilities into the basketball ops world. When -- when Isiah came in, he

MORAN

was saying, hey, this is basketball ops. This was marketing and let's not intermix.

Q. My -- my question, Mr. Moran, was did Mr. Thomas say what the basis of his knowledge was about Mr. -- Mr. Nix's relationship with Ms. Browne-Sanders?

A. No.

(Moran Exhibit 11 marked for identification.)

(Document handed to witness.)

A. I should start reading it?

Q. Yes.

(Pause.)

A. Okay.

Q. Can I ask you to look at 13187, please.

A. Yes.

Q. The third paragraph on that page.

A. Okay.

Q. Can you read that?

A. "If players committed to it. We did it. I don't think there was a time we didn't work or tried to accomodate. If

MORAN

not, we gave a rational reason."

Q. Do you recall what Mr. Thomas said in that -- in that connection?

A. I think it was in conjunction with making players available. So we -- he is saying, you know -- you know, I am not sure there wasn't a time they didn't do it, but if they didn't, they had a good reason for it. They tried to accomodate, but if they weren't able to they gave a rationale -- a rational reason.

Q. Could I ask you to look at the bottom of the page, please.

A. "Don't recall Steve coming to me about player availability."

Q. Did Mr. Thomas say that Mr. Mills had never raised the issue of player availability with him?

MR. GREEN: Objection to form.

A. Well, we followed that up. I think it answers in here. We told him, well, did he ever come to you with concerns, and -- and then he said well, yeah, you -- he said you and Anucha need



306

MORAN

You may answer, Mr. Moran.

A. He didn't elaborate over what period of time it was, but that's certainly possible.

Q. Well, I -- he didn't -- he didn't expressly say that, but that was your understanding that he was referring to the entire period that they worked together?

MR. GREEN: Objection to form, but you may answer.

A. I really don't know.

Q. Could you read the paragraph right below that please, the four or five times?

A. "She tried to set up weekly meeting. I told her that I won't be meeting with you. Whatever you need we will deliver, and [redacted] will work with you. We will fulfill our obligations." And that was -- I believe that was the -- you know, I shouldn't speculate. I'm not sure what that was.

Q. Can I ask you to look at the

307

MORAN

next page, 13189?

A. Yes.

Q. Could you read the top paragraph?

A. A lot of people -- I'm not sure what that word is.

Q. Complain.

MS. HORWITZ: Comment.

A. Yeah. I think it is comment to me. "A lot of people commented to me they have problems with [redacted] One reason he is not here."

Q. Did he say what the -- what the problems that people had with [redacted] were?

A. No, he didn't.

Q. Can I --

A. At that point [redacted] was gone, so --

Q. Can I direct your attention to the middle of the page. It says "see [redacted] as" -- do you see that?

A. Um hum.

Q. Could you read that sentence?

A. "See [redacted] as a liability. No,

308

MORAN

I love [redacted] Hurt me when he had to go."

Q. Had you or Ms. Noel asked whether --

A. Yes, I --

Q. He is -- let me just finish the question.

Had you and Ms. Noel asked whether Mr. Thomas had seen Mr. [redacted] as a liability?

A. Yes, I believe so.

Q. And Mr. Thomas said he did not?

A. Correct.

Q. Do you know the circumstances of Mr. [redacted] separation?

A. Actually I don't.

Q. Were you -- you weren't involved with that?

A. No.

Q. Do you know whether it was voluntary or involuntary?

A. I know he took a retirement, but I think it was involuntary.

Q. And what's the basis for your belief?

309

MORAN

MR. GREEN: Objection to form.

A. He received a severance.

Q. Because he received a severance you think it was involuntary?

MR. GREEN: Objection to form.

A. Yes.

Q. Can I ask you to read the bottom paragraph on 13189?

A. "Ever hear from Steve that [redacted] was abusing" -- "abusive or hostile -- hostile. No, just you know how [redacted] is. I never saw [redacted] be abusive or hostile in my presence. Could" -- something -- "could be dismissive or short or make you feel he didn't get it if he didn't agree with you." I think that was all -- all being said by Isiah.

Q. Did -- when Mr. Thomas said "no, just you know how [redacted]s," did you know what he was talking about?

A. No, I really didn't.

Q. Did you ask him what he meant by that?

A. No, I didn't. He actually

310

MORAN

said -- he went on and said, you know, he could be dismissive or short or make you feel you didn't get it. That was sort of -- I think he was elaborating there.

Q. Could you look at the page 13191?

A. Yes.

Q. Could you start reading from the top, please.

A. "March 22, 2004. Prior to 3/23 meeting with Steve said what the fuck." Excuse me. "If do you these things, what am I here for. I wasn't clear as to what she did. She was acting as if she was my boss. I wanted clarification. Hired as president at basketball op. Where I came from that included everything. I asked her what she did. Getting people into building, ushers, security, profits and loss, referees, players, getting to be" something "other talent." On -- "getting to be on air talent. On court production. All that goes around the game she does. I replied what am I here for? If you do all

311

MORAN

of that, what do I do" -- "what do I did? I said what did I do? What did I do. You may" --

Q. Okay.

A. "You may -- she replied you make trades, and he said we need to -- to meet with Steve to clarify what I am here for."

Q. Okay. That's fine.

A. All right.

Q. Did -- Mr. Thomas was saying that Ms. Browne-Sanders told him that she was responsible for -- for on court basketball matters?

A. "Ask her what she did. Getting people into building, ushers, security, profit and loss, referees." And I am sorry the question was?

Q. Players. My question was --

A. Players, getting players. Oh, "players getting to be with on air talent." Meaning setting up interviews I think and promotions.

Q. And then what -- I am sorry, and then something on court?

312

MORAN

A. "On court production" meaning stuff that takes place at the half time or time outs.

Q. So was -- was Mr. Thomas saying that Ms. Browne-Sanders had told him that she was responsible for basketball matters?

MR. GREEN: Objection to form. You may answer, Mr. Moran.

A. Well, I don't -- I wouldn't categorize it as basketball matters but those things that -- that he ticked off, yes.

Q. Did he say that he called his wife?

A. Yeah. "Called wife. I have a problem here. Explained to her what was going on. Called Steve and said we had to meet."

Q. So Mr. Thomas told you that after his conversation with Ms. Browne-Sanders he called his wife?

A. Right. Correct.

Q. And then he called Ms. -- Mr.

313

MORAN

Mills?

A. Right.

Q. Can I ask you to look at 13193?

A. Okay.

Q. Beginning with "recounted Stephon's."

A. Okay.

Q. Could you read that, please?

A. Read that. "Recounted Stephon's first name an incident over getting into green room. I told her that it was a big mistake since we have no policy. Should let go. She took a hard stance and that set her off on a bad relationship with him." Then Rochelle outlined what Anucha's position on that was, and Isiah said -- on the above. So Rochelle outlined what Anucha said to us. He said "Well she came to me. I said for right now let's go with it. I don't know who is important to him. He does recall saying earlier about only family, but on that night I made it -- I made a game -- on that night I made a game call. I made a

314

MORAN

game call and told her to adjust to it also. Big deal about him coming back home. Bend until we know who was family, friends, et cetera."

Q. The -- when you are reading this near the top, there is a reference to green room. Do you see that?

A. Recount -- yes. I am sorry. Yes.

Q. What is the green room?

A. The green room is where players' family can hang out and have some privacy. It is a private room.

Q. Okay. Does this refresh your recollection -- I think you testified earlier in the deposition that you believe that this issue with the credentialing had to do with seating one of Mr. Marbury's family members?

A. Yeah. I -- I thought it was seating. It could have been seating in the green room. I am not sure.

Q. Did Mr. Thomas say there was any issue about seating?

315

MORAN

A. I -- I didn't hear it, no.

Q. Can I you ask to you look at the next page 13194.

A. Okay.

Q. Could you read the top of the page?

A. Other player -- other players complained. Just guys over -- just guys overweight. Also Sweetney not playing hard or having" -- or having -- or having heart -- or having -- I think it is heart. He -- he did -- "he did speak to her about this" -- "he didn't speak to her about this or to Steve. Happened on someone else's watch. Jeff and Anucha did the heavy lifting under Scott."

Q. Do you know what the reference in the beginning paragraph "other players complaining had do with"?

A. Yeah. This was a problem. The -- when he says heavy lifting under Scott, he -- Isiah replaced Scott, and the other players -- she supposedly went to Sweetney one night and said to him you are

316

MORAN

overweight, and he -- I guess he was offended by that and something about you are not playing hard or have -- have heart. And the way I understand it he was quite offended, and he was like she is not in basketball ops. Why is she telling me to lose weight, et cetera.

Q. Was that an issue you raised with Mr. Thomas or did he raise it in this interview?

A. I -- I believe he did.

Q. So he raised the issue that he had heard prior to his arrival at MSG that Ms. Browne-Sanders had made comments to a player named Sweetney?

A. Right. Georgetown I believe.

Q. Did he say -- did Mr. Thomas say what the basis of his knowledge about this was?

A. No, he didn't.

Q. Did he say whether Ms. Browne-Sanders had made similar comments to a player by the name of Weatherspoon?

317

MORAN

A. He -- he didn't hear. I -- I've heard something about that, but he didn't hear about it. No.

Q. Had you heard about this issue with Sweetney before?

A. I had, but I -- I don't know where I heard it from.

Q. You had heard that Ms. -- Ms. Browne-Sanders had said something to Mr. Sweetney?

A. Yes.

Q. Do you recall what?

A. Something similar, but I don't recall who I heard it from. I -- actually it might have been Frank Murphy, but I don't know.

Q. And did you hear that Ms. Browne-Sanders had said something to Clarence Weatherspoon?

A. I'm not sure.

Q. In the middle of that page, Mr. Thomas, did he say I am so disappointed that he took shit for -- is that hiring?

A. Yes.

ISIAH

ISIAH – DOES ANUCHA HAVE A REPORTING RELATIONSHIP TO YOU?
– REVIEW ORG. CHARTS
– REVIEW 3/23/04 MEETING WITH STACE
– REVIEW WHAT HE HAS TOLD THE TEAM ABOUT ANUCHA'S ROLE
– OCT 4 / PETRA / REFEREES
[ DEC 30, 04 / I AM IN LOVE WITH YOU
– 3/14/05

REVIEW FRANK MURPHY

6:30 ISIAH

3/23/2004 / COMPLAINED ABOUT FRANK MURPHY – DIDN'T HEAR BITCH PART
– WHEN I GOT HERE THOSE 2 WERE AT ODDS
– THEY COMPLAINED ABOUT EACH OTHER
– IT SOUNDS FAMILIAR THAT PART WITHOUT BITCH
– ANUCHA & JEFF NIX WERE INVOLVED
– SHE AND I BUTTED HEADS / I WANTED COMPLETE CONTROL OF PLAYERS TIME & RESPONSIBILITIES

FRANK WOULD GET LOUD BUT NOT PROFANITY OR DISRESPECTFUL

CONFIDENTIAL

SHE THOUGHT I WAS BEING PERSONAL WITH HER - PERSONALLY ~~HER~~ DOING THIS BECAUSE I DIDN'T LIKE HER WAS THE IMPRESSION SHE LEFT

[illegible] LOSING STREAK & COMMITMENT TO SPONSORS COULD BE HONORED BY OTHER PLAYERS

MAKE A SCHEDULE SO I WILL KNOW TIMES & DATES

SHE COMPLAIN TO [illegible] ABOUT FRANK CALLING HER NAMES - [illegible]

"WHATEVER [illegible] WANTS, LETS DELIVER IT OR FIND SOMETHING ELSE WE CAN DO ?

3/23/04 ASKED ABOUT ISIAH CALLING HER NAMES - NO, I DID NOT DO THAT, NEVER TREATED ANYONE IN THAT MANNER. I GOT SPOKEN BUT WOULDN'T DO THAT

3/23/04 MET WITH STEVE TO CLARIFY ROLES — HE RECALLS THE MEETING. SHE WAS INVOLVED IN BASKETBALL OPERATIONS WHEN HE ARRIVED. WE NEED PLAYERS ENERGY & TIME ON THE CT, MORE THAN IN THE COMMUN BUT WILL MAKE SURE PLAYERS HONOR THERE COMMITMENTS

STEVE LEFT MEETING TO TAKE A CALL
DOESN'T RECALL THIS
DON'T RECALL BEING A HOSTILE MEETING
THOUGHT A GOOD MEETING
POSITIVE DIDN'T TURN INTO A CRAZED PERSON IF HE LEFT ROOM

LATE 2003 OR EARLY 2004 — TOLD PLAYERS TO FOCUS ON BASKETBALL & NOT COMMUN RELATIONS — TO SOME DEGREE, BUT WE STILL FULFILLED OUR COMMITMENTS. AFTER ROAD TRIP WE CAN'T HAVE APPEARANCE
FRANK AND ANUCHA PUT SCHEDULES TOGETHER

ALSO SCHEDULE FOR ISIAH
KNICKS BOWL SCHEDULED PRIOR TO A GAME
HAD PROBLEM WITH THAT

AT END OF SEASON WE PUT A
SCHEDULE TOGETHER & HAVE NOT HAD THE
SAME ISSUES

- I HAVE VERY LITTLE CONVERSATION OR
INTERACTION WITH ANUCHA
- MOST IS WITH FRANK & THIS BY
CHOICE SINCE FRANK WAS AT ARENA
& I WAS MOSTLY AT PRACTICE

* - NON EXISTENT / NEVER A RELATIONSHIP /
- NO QUESTION OF CATEGORIZING RELATIONSHIP

- CUT OUTS SINCE PLAYERS NOT AVAILABLE
NOT INVOLVED IN THAT DECISION ABOUT
THE CAMPAIGN
- ASKED IF SHOULD USE BOZELL PLAYERS OR
PAUL HOUSTON

CONFIDENTIAL

- Comm to do THAT People could Ethone her Directors - No
- my only comm was A. we have to work together, whatever obligations we have, we fulfill & act in a professional manner
- Hired someone to make sure players got there on time & acted in a prof. manner
- After N. years after I got here

June/2005 / Recognition for phone wise / Agree to participate, then told Steve I don't think I should
- Be on phone selling tickets
- Ran risk of being made fun of

- AD sales meeting / You're wasting my valuable time / No
- I said it to her?
- Went to AD sales meeting / gave a presentation
- Not saying I'm a saint & don't swear, but not in a way to mistreat someone
- If said in context of play
- Not [illegible] [illegible] this

CONFIDENTIAL

Retba Pope - Flirt with?
Rees / No
/ ~~Scott~~
/ If so, didn't work

- Told to whole Hen, etc. - No

/ Dec. 14 / Grace Hub / "I can't get any love?"
/ Standing in tunnel
/ Her back was to me
/ Grabbed by shoulder
/ 1st time hasty or mean to me and she pulled away & gave me evil look
/ Embarrassing to me with ushers there /
/ Asked if ok but not "I can't get any love"
/ 1st time ~~uncomfortable~~ uncomfortable & 1st time attention distance
/ Had hugged before / No problems
& all usher could tell the that

I'm Positive Nothing Happened on my end to cause this

Dec 30, 04 Game of Horse – I love you, you're Beautiful like the movie — Doesn't ring a bell for me
Laughed
/ Did play Horse at Xmas party & seven others

3/14/2005 / Scar over Eye, Etc
I love you
/ I said I love you whatcha?
Laughed & said no
/ Didn't know she had a scar

Do you hate her – no
I don't hate anyone

Ever told you, you were making it difficult to do job + she received all she needed to do job

Off site meeting / never asked for these
When she wanted to meet I had Frank meet with her / I had no interaction

With Him

Why would she say these things

I come out of blue
They never happened
I I don't take seriously, But I do because it is a serious matter

~~From~~ she never complained about Frank (abuse/touch) - she only said - embarrassing & a goat
I can't get anything done with him

If she would have said Frank was inappropriate I would have done something
I have had complaints about Frank with others about getting angry, and I sat him down & talked to him

DO YOU UNDERSTAND THAT ANUCHA COULD FEEL HER POSITION WAS BEING USURPED?

NO, JEFF AND ANUCHA HAD CLOSE RELATIONSHIP & JEFF RAN EVERYTHING & ANUCHA WAS HIS RIGHT HAND

- I KEPT JEFF AS ASS'T GM
- I ASKED STEVE WHAT HER DUTIES WERE
- I THINK SHE LIKED BEING IN BASKETBALL OP & MAKING DECISIONS RATHER THAN RUNNING HER OWN DEPT
- I WANTED CHANGES BUT NOT OUT OF DISLIKE

DID YOU SET TONE THAT BASKETBALL IS EVERYTHING & ~~FORGET~~ FORGET ALL ELSE

- WE ARE A BASKETBALL BUSINESS 1ST
- NOT A COMMUNICATIONS BUSINESS

ISIAH

ONFIDENTIAL

MSG 13184

2ND INTERVIEW
ESTART
11am
1/11/06

1

ROCHELLE

FACT SHEET/ MID JAN
2004/ MARCH 10/ PULLED INTO ROOM
MARCH 22/ DISCUSSING DUTIES
OCT. 30/ STAY CLOSE TO ME

INTERVIEW

HAS STEPHON SAID ANYTHING ABOUT ANUCHA
WHAT DID HE SAY WHEN YOU TOLD HIM
HASSAN WAS BEING TERMED?

FACT SHEET SHORTLY AFTER YOU ARRIVED?
recall looking - AF gave me info I
PROB VIEWED IT AS HELPFUL, I'm
sure I appreciated it
- NO SPECIAL RECOLLECTION
- NOT OFFENDED AT ALL

MARCH 10/ 2004/ I remember the game
/ RIGHT IN MIDDLE OF PLAYOFF PUSH
AND Knicks HEAVY HAUSSED WITH PLAYERS
/ LOSING LIKE THIS IS UNACCEPTABLE
/ FLL FORWARD WE WILL MAKE SURE
THESE EVENTS OR SOMETHING MISTAKES
DON'T TAKE PLACE - WILL TRY TO CUT
DOWN ANY ACTIVITIES YOU HAVE

MET WITH FRANK AFTERWARDS &
SPEAK TO ANUCHA ABOUT NEXT [illegible]

CONFIDENTIAL

2

AND LET PLAYERS IN BALANCE & GO OVER [illegible]

LOOK LIKE DOING SOMETHING IN MARCH AND APRIL AND THEY NEEDED THEIR ENERGY

DON'T BELIEVE SINCE I HAVE BEEN HERE WE HAVE PLAYERS BLOW OFF AN APPEARANCE — HAS SHE SAID THERE WAS?

TOLD HER WE CAN'T HAVE PLAYERS WITH THE MOST MINUTES GO TO EVERY EVENT & DRAIN ENERGY

OH SAME WHAT YOU PULLED HER INTO A ROOM THAT NEVER HAPPENED / IF WOULD HAVE TAKEN PLACE SOMEONE WOULD HAVE SEEN OR HEARD OR SEEN

Some time later — SHORTLY THEREAFTER I ISIAH SHE STOPPED ME / I SAID I WILL MAKE SURE PLAYERS ARE WHERE THEY ARE SUPPOSED TO BE AND ACT PROPERLY NEXT YEAR WE NEED SENSITIVITY TO PLAYERS & ENERGY LEVEL

3

When I got here, it was not happy times
Footloose / it was communications / basketball
ops and all interconnected

Guys needed focused energy

If players committed to it, we did it /
I don't think there was a time we
didn't or tried to accommodate / if not,
we have a rationale reason

I didn't get sense from her that I
was interfering & in response to
a question

Went out of way to accommodate the
things they wanted

Did she ever complain about players' availability? Hm
"I never heard that"

If a problem she always went to Steve,
I assumed Steve we were working
with her

Don't recall Steve comment
to me about player
availability

CONFIDENTIAL

4

Did he come to you with concerns
n

Steve - She (Anucha) needs to work together
Isiah - said I'm doing everything you want me to do and more

I told him Frank & she met once a week
- maybe issue is she wants to meet with me instead of Frank
- Frank was in daily & I can't commit since in field dealing with players &
Dolan / chief of staff - Frank always

I may have met with Anucha maybe 4 or 5 times

She tried to set up weekly meeting? I told her then I won't be meeting with you. Whatever you need, we will deliver & Frank will work with you. We will fulfill our obligations

I don't interact with Anucha, she would have never complained to Steve

I

A lot of people coming over to me, they had problems w/ the [redacted], one reason he is not here

What kind of complaints
- [illegible] ways / loud / [illegible]
- most people found a way to forgive & overlook
- got to point you couldn't keep forgiving & overlooking

See [redacted] as a liability — No, [redacted] hurt me when he had to go

Feel need to try improve relationship between [redacted] & [illegible] — No personality conflict, but work what needed but never was getting done

Fu response if did you try to improve relationship?

Ever hear from Steve that [redacted] was abusive or hostile? No, just you know how [redacted] is. Never saw [redacted] be abusive or hostile in my presence / could be obnoxious in situation

6

make you feel he didn't get it if he didn't [illegible] with you

- I don't think I [illegible] heard [redacted] swear
- However, heard him refer to [illegible] in those terms - bitch / whore
- Heard call someone dumb

- [redacted] not here because of a lot of this stuff - we all have bosses

1st got job [illegible] told me [illegible] should be my right hand & I should keep him

saw he was pretty solid but as to mechanics he wasn't what I was used to having

- I was assuming - she felt he should be ass't gm or gm if I was to be President
- Didn't talk to [illegible] about his abilities
- Demoted & made dir of [illegible]
- [illegible] was unhappy - I don't know

2

March 23 2004 / Prior to 3/23 meeting with Steve - said what the fuck

If you do these things, what am I here for. I wasn't clear as to what she did

- She was acting as if she was my boss. I wanted clarification / [illegible] as pres of basketball and where I came from that I [illegible]

I asked her what she did: [illegible] people into building, [illegible], season / profits, [illegible], players [illegible] to be with [illegible] talent, [illegible] production. All that goes around the game, she does

I replied "What am I here for" if you do all that, what do I do!" You make [illegible] trades

We need to meet with Steve to clarify what I'm here for

Called wife / I have a problem here - explained to her what was going on

Called Steve & said we need to meet

[illegible] [illegible] (margin note)

8

2007
OCT. 30 / STAY CLOSE TO ME & MAKE A LOT OF MONEY

[illegible] — DOES IT SOUND LIKE I'M TALKING TO HER? DON'T REMEMBER SAYING THAT

REVIEWED YOU [illegible] [illegible] [illegible] / OFF SITES, ETC

I WOULD NEVER MEET WITH HER
" " " TAKE A MEETING WITH HER
CAN SO [illegible] I DIDN'T
JUST GOT LUCKY, NOT BEING SMART NOT TAKING A MEETING

FEELS YOU SET TONE, COMMON [illegible] TO OTHERS, SHE WASN'T IMPORTANT & DIDN'T NEED TO BE RESPECTED

I HAD NO DEALINGS WITH HER
ANY GAIN OR LOSS, SHE DID ON HER OWN

WHEN I GOT HERE I [illegible] [illegible] BIKES / [illegible]

[REDACTED] / I HAVE A PROBLEM WITH ONE PERSON HERE / ON A ROAD TRIP IN PORTLAND / I WAS ON THE BIKE & SHE SAID YOUR PROBLEM IS YOU NEED TO LOSE WEIGHT & IF YOU DO YOU CAN [illegible] [illegible] US.

9

Several other Players Complained

I told them that you can't play a [illegible] person they didn't have to do what she said

- Recounted Stephon's 1st night & [illegible] going into break room
- I told her that was a big mistake since we have no policy
- Should let go / she took a hard stance & that set her off on a bad relationship with him

Rochelle outlined Anucha's position on the above

Isiah - She came to me, I said for right now lets go with it, I don't know who is important to him

He [illegible] - He was speaking Italian about one's family but on that which I made a [illegible] and I told her to not [illegible] do it also
- Big deal about him coming Back Home
- Bad until we knew who was family, friends, etc

CONFIDENTIAL

6

- OTHER PLAYERS COMPLAINED? JUST GUYS
- [illegible] / ALSO SWEENEY / [illegible]
- HARD ON [illegible]
- HE DIDN'T SPEAK TO HER ABOUT THIS OR TO STEVE
- HAPPENED ON SOMEONE ELSE'S WATCH
- JEFF [illegible] DID HEAVY LIFTING UNDER SCOTT

ASKED ABOUT [illegible] & [illegible] & [illegible]

ASKED IF NEED A LAWYER

- I AM SO DISAPPOINTED
- TOOK SHIT FOR [illegible] [redacted]

HOW THAT I UNDERSTAND, IT IS SICKENING

- I WAS ALWAYS [illegible] BUT I STOOD MY GROUND
- EVERYTHING SHE EVER WANTED SHE GOT
- FRANK PROMPTLY SO GO TO [illegible]
- HE DIDN'T BRING TO ME
- NEVER SAID GO FOR [illegible], ALWAYS HAD A REASON

CONFIDENTIAL

10

- OTHER PLAYERS COMPLAINED? JUST GUYS
  OUTWEIGHT / ALSO SWEENEY / HOT PLAYER
  HARD ON HAVING HERMS
- HE DIDN'T SPEAK TO HER ABOUT THIS OR
  TO STEVE
- HAPPENED ON SOMEONE ELSE'S WATCH
- JEFF & ANUCHA DID HEAVY LIFTING WHEN SPORT

ASKED ABOUT SEPHAD & HASSAN & [illegible]

ASKED IF NEED A LAWYER

- I AM SO DISAPPOINTED
- TOOK SHIT FOR ANUCHA DR. CALLAHAN

NOW THAT I UNDERSTAND, IT IS SICKENING

- I WAS ALWAYS [illegible] BUT I STOOD MY GROUND
- EVERYTHING SHE EVER WANTED SHE GOT
- FRANK PROMOTED. SO HE TO SOME TOOK THAT
  HE DIDN'T BRING TO ME
- HE SAID HE FOR [illegible], ALWAYS
  HAD A REASON

11

I WANT TO FIGHT
THIS IS WRONG

CONFIDENTIAL

MSG 13195