UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANUCHA BROWNE SANDERS,

                   Plaintiff,

       - against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD
THOMAS III AND JAMES L. DOLAN,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

06 CV 0589 (GEL) (DCF)

ECF CASE

## MEMORANDUM OF LAW IN SUPPORT OF
## MADISON SQUARE GARDEN, L.P. AND JAMES L. DOLAN'S
## <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177-1211

———

212.351.4500

Attorneys for Defendants Madison Square Garden, L.P. and James L. Dolan

Dockets.Justia.com

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 4

    A.   Plaintiff's Hiring, Responsibilities and Public Role ............................................. 4

    B.   Plaintiff's Attempts to Prevent Discovery of Her Tax Returns ............................. 5

    C.   Plaintiff's Tax Returns Reflecting Her Direct Marketing Business ...................... 5

    D.   Plaintiff's November 22, 2006 Amendment of Her 2003 and
        2004 Tax Returns ............................................................................................... 8

    E.   The Testimony of Plaintiff's Accountants ........................................................... 8

    F.   The Agreement and MSG Policies Violated by Plaintiff....................................... 9

    G.   Had MSG Known of Plaintiff's Conduct, MSG Would Have Terminated
        Her Employment Consistent With Its Past Practice ............................................ 11

    H.   MSG'S Public Comments Were Limited To Plaintiff's Litigation ...................... 12

ARGUMENT ............................................................................................................... 12

    I.   STANDARDS FOR SUMMARY JUDGMENT ................................................. 13

    II.   THE AFTER-ACQUIRED EVIDENCE DOCTRINE LIMITS
        PLAINTIFF'S CLAIM FOR BACK PAY AND BARS HER
        CLAIMS FOR REINSTATEMENT AND FRONT PAY .................................... 14

    III.   PLAINTIFF'S PERSONAL TAX FRAUD OR UNDISCLOSED OUTSIDE
        BUSINESS, EACH IN CLEAR VIOLATION OF COMPANY POLICY,
        CONSTITUTE AFTER-ACQUIRED EVIDENCE SUFFICIENT FOR
        MSG TO HAVE TERMINATED HER EMPLOYMENT ................................... 16

        A. Plaintiff's Tax Fraud Would Have Constituted A Legitimate
           Non-Discriminatory Reason to Terminate Her Employment and
           Must Limit Damages, If Any........................................................................ 17

        B. Plaintiff Knowingly Retaining A False Tax Benefit Would Have
           Constituted A Legitimate Non-Discriminatory Reason To Preclude
           Reinstatement and Must Limit Front Pay, If Any......................................... 21

C. Plaintiff's Undisclosed Operation Of An Outside Direct
Marketing Business Would Have Constituted A Legitimate
Non-Discriminatory Reason to Terminate Her Employment
and Must Limit Damages, If Any .................................................................. 23

IV.    PLAINTIFF HAS NO CLAIM UNDER TITLE VII, STATE OR
CITY LAW FOR "REPUTATIONAL DAMAGES" ........................................... 24

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

**PAGE**

Ahing v. Lehman Bros., No. 94 Civ. 9027,
2000 WL 460443 (S.D.N.Y. Apr. 18, 2000)................................................................15

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)................................................13

Badaracco v. C.I.R., 464 U.S. 386 (1984) ..........................................................17, 21

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ..........................................................13

Davis v. Arkansas Dep't of Human Servs., 862 F.2d 173 (8th Cir. 1988)..................16

Gant v. Wallingford Bd. of Educ., 195 F.3d 134 (2d Cir. 1999)................................15

Gordon v. New York City Bd. of Educ., No. 01 Civ. 9265,
2003 WL 169800 (S.D.N.Y. Jan. 23, 2003) ..............................................................13

Greene v. Coach, Inc., 218 F. Supp. 2d 404 (S.D.N.Y. 2002)..............................passim

Levu v. Employment Dep't, 941 P.2d 1056 (Ore. Ct. App. 1997).............................16

Martin v. Unemployment Compensation Bd. of Review,
713 A.2d 753 (Pa. Commw. Ct. 1998) ......................................................................16

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ................13

McKennon v. Nashville Banner Publ'g. Co., 513 U.S. 352 (1995) .......................passim

Medlock v. Ortho Biotech, Inc., 164 F.3d 545 (10th Cir. 1999) ...............................22

Prebula v. Arizona Dep't of Econ. Sec., 138 Ariz. App. 26,
672 P.2d 978 (Ariz. 1983)........................................................................................16

Quinn v. Green Tree Credit Corp., 159 F.3d 759 (2d Cir. 1998) ..............................13

Sellers v. Mineta, 358 F.3d 1058 (8th Cir. 2004) .....................................................22

Sigmon v. Parker Chapin Flattau & Kimpl, 901 F. Supp. 667 (S.D.N.Y. 1995)...........23

Sookdeo-Ruiz v. GCI Group, No. 00 Civ. 3517,
2001 WL 121942 (S.D.N.Y. Feb. 13, 2001), aff'd, No. 01-7290,
2002 WL 355916 (2d Cir. Mar. 5, 2002)...................................................................14

Tomka v. Seiler Corp., 66 F.3d 1295 (2d Cir. 1995) ........................................13

U.S. v. Boulerice, 325 F.3d 75 (1st Cir. 2003) .............................................18

U.S. v. Coppola, 425 F.2d 660 (2d Cir. 1969) .............................................19

U.S. v. Dinnell, 428 F. Supp. 205 (D. Az. 1977), aff'd, 568 F.2d 779 (9th Cir. 1978) ...........23

U.S. v. Magnus, 365 F.2d 1007 (2d Cir. 1966) ...........................................18

U.S. v. Romanow, 509 F.2d 26 (1st Cir. 1975) ...........................................19

Vichare v. AMBAC, Inc., 106 F.3d 457 (2d Cir. 1996) ...................................15

Washington v. Lake County, Ill., 969 F.2d 250 (7th Cir. 1992) ..........................20

## RULES AND STATUTES

42 U.S.C. § 1981a(b)(3) ....................................................................25

42 U.S.C. § 2000e, et seq ..................................................................1

26 U.S.C. § 6501(c) .....................................................................19, 21

26 U.S.C. § 6531 ..........................................................................21

26 U.S.C. § 7201 ..........................................................................19

26 U.S.C. § 7203 ..........................................................................19

26 U.S.C. § 7206 ..........................................................................19

26 U.S.C. § 7207 ..........................................................................19

Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq ..........................14

Fed. R. Civ. P. 56 ......................................................................passim

Fed. R. Evid. 801(d)(2)(A) ...............................................................23

## SECONDARY AUTHORITIES

DR 5-103(b)(1) ............................................................................17

EEOC Compliance Manual § 604:0182 ....................................................17

Plaintiff Anucha Browne Sanders ("Plaintiff") asserts claims for employment discrimination on the basis of sex, sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and under state and local law. Pursuant to Fed. R. Civ. P. 56, Defendants Madison Square Garden, L.P. ("MSG" or "the Company") and James L. Dolan ("Defendants") move for partial summary judgment dismissing Plaintiff's claims for (i) front pay and reinstatement, as well as limiting her claims for back pay, based on the after-acquired evidence of Plaintiff's tax fraud and other misconduct; and (ii) reputational damages because MSG's post-litigation comments on Plaintiff's lawsuit were absolutely privileged and Dolan made no comments whatsoever.

## PRELIMINARY STATEMENT

Plaintiff was the Senior Vice President, Marketing and Business Operations for the New York Knickerbockers ("Knicks"), with profit and loss responsibility for the Knicks' $120 million marketing and business operations budget. As a highly visible senior-level executive of MSG and the Knicks' chief marketing and business operations officer, Plaintiff was entrusted with significant fiscal and operating responsibility. Plaintiff was the public face of the Knicks in essential areas of marketing, team sponsorship, fan development and community activities, including programs in the schools. In January 2006, Plaintiff's employment was terminated for legitimate non-discriminatory business reasons that included demonstrably poor job performance and attempting to improperly influence an internal investigation that did not concern her personally in order to bolster her own then-undisclosed complaints of alleged harassment. Plaintiff challenged her termination, following a $6.5 million pre-suit "settlement" demand, and now seeks, inter alia, $600,000 in back pay, $9,762,000 in front pay and reputational damages, an unknown amount on account of pension payments and stock options, and reinstatement.

Discovery has revealed that Plaintiff claimed approximately $73,000 in tax deductions from 2001 through 2004 for a "direct marketing" business – which Plaintiff now admits *did not exist* (although her 2001 and 2002 returns still show the existence of that business). Plaintiff either engaged in tax fraud or conducted an outside unauthorized business in contravention of MSG policy. Under established Supreme Court doctrine, the discovery of "employee wrongdoing that would lead to a legitimate discharge" precludes recovery for periods after the discovery of the wrongdoing – even if such discovery comes as a result of the employee's lawsuit. Accordingly, Defendants are entitled to an order sharply limiting the remedies available to Plaintiff because it is beyond genuine dispute that Plaintiff engaged in fraud and misconduct during and after her employment at MSG – conduct that would have provided MSG with yet another reason to terminate Plaintiff's employment had MSG previously known of it.

The undisputed facts are simple. When Plaintiff produced her 2001-2004 income tax returns (after months of resistance) they revealed that Plaintiff claimed to have operated a "direct marketing" business as a "sole proprietorship" – and took tens of thousands of dollars in detailed tax deductions associated with that business. Soon after (but only after) this Court's November 6, 2006 Order requiring production of her returns, Plaintiff amended her 2003 and 2004 returns (two of the four years claiming these deductions). The amended returns now denied the existence of the "direct marketing" business from which she had obtained significant tax benefits, eliminating *all* of the business deductions related to that business. (The amended returns also eliminated almost $20,000 in claimed charitable deductions.) Plaintiff's decision to amend her tax returns to disclaim the existence of a business and related deductions only when faced with court-ordered disclosure of the original returns is further indisputable evidence of serious misconduct that would have given MSG grounds to terminate her had MSG learned of it

at the time.

Alternatively, if the original tax returns are correct (and Plaintiff's amendments and her testimony that the returns were "incorrect" are false), then Plaintiff knowingly conducted a direct marketing business for four years in violation of company policy and her agreement with MSG.

Finally, it is undisputed that Plaintiff never amended her 2001 and 2002 returns – obviously because she believes the statute of limitations for IRS liability for those years has expired – and thus Plaintiff has elected to keep tens of thousands of dollars in tax benefits that she now admits she was not entitled to. In short, despite her post-litigation decision to amend her 2003 and 2004 returns, and despite her contrary testimony that she did not operate a business while employed by MSG, Plaintiff's 2001 and 2002 returns serve as a binding admission that Plaintiff operated an unauthorized business while employed by MSG, thereby violating her agreement.

Under any version of the facts, there can be no dispute that Plaintiff engaged in misconduct that would have resulted in her termination, and the after-acquired evidence doctrine developed by the Supreme Court now requires an order that substantially limits the wages she can recover. Plaintiff simply cannot choose among her conflicting admissions, all made under penalty of perjury, in order to avoid the equitable remedies of a limitation on back pay, front pay and reinstatement. Based on these facts as to which there is no genuine issue, MSG is entitled as a matter of law to partial summary judgment limiting Plaintiff's claim for back pay and barring her claims for front pay and reinstatement.

\* \* \*

Defendants also seek partial summary judgment dismissing Plaintiff's claims against MSG and Dolan for "reputational injury." Since it is undisputed that MSG commented

only as to its belief that Plaintiff's lawsuit lacked merit and was made to seek a "financial windfall," its statements were absolutely privileged under New York law. Indeed, MSG responded, as it was entitled to, to Plaintiff's well-orchestrated publicity surrounding her lawsuit. Since Dolan made no public comments whatsoever, Plaintiff's claims of "reputational injury" as to him must be dismissed as well.

## STATEMENT OF FACTS

Defendants rely on their Rule 56.1 Statement summarized, in part, below.

### A.    Plaintiff's Hiring, Responsibilities and Public Role

MSG hired Plaintiff in November 2000 as Vice President, Marketing. (56.1 ¶1). In May 2002, Plaintiff was promoted to the position of Senior Vice President, Marketing and Business Operations and entrusted with Profit & Loss responsibility for the Knicks' marketing and business operations budget, which reached $120 million by the 2005-06 NBA season. (56.1 ¶6,8). Indeed, Plaintiff testified that "she owned the [Knicks'] revenue streams." (56.1 ¶9). Plaintiff was a highly visible MSG senior executive, regularly attended Knicks home games and NBA meetings, and was named, at MSG's initiative, to the Sports Business Journal's "Forty Under Forty" list. (56.1 ¶12). Among other duties, she was responsible for overseeing ticket sales, the marketing of the Knicks brand, its community relations programs, all Knicks' game presentations, communications on the internet, alumni relations, team sponsorship and fan development, in addition to several other important revenue and expense items. (56.1 ¶3,4). She also negotiated and entered into contracts with major Knicks' vendors and sponsors such as McDonalds and Foxwoods Casino Hotel. (56.1 ¶10). Plaintiff was paid over $1.1 million in compensation in her five years as a Knicks employee, earning over $300,000 in 2005. (56.1 ¶13).

**B.     Plaintiff's Attempts to Prevent Discovery of Her Tax Returns**

In April 2006, MSG sought copies of Plaintiff's tax returns for the period of her employment. (56.1 ¶25). Plaintiff objected in June 2006 that the tax returns "were neither relevant nor reasonably calculated to lead to the discovery of admissible evidence." Id. (Although unknown to the Court or Defendants at the time, it is now undisputed that Plaintiff was fully aware when she interposed this objection that her return for 2004 reflected her operation of a direct marketing business which she admitted would be a violation of MSG policy.) (56.1 ¶¶44,35). Plaintiff had discussed her business deductions in April 2006 with her Indiana-based accountant, Brock Weaver, CPA ("Mr. Weaver"). (56.1 ¶45). Despite this knowledge, Plaintiff testified that she only learned in November 2006 that the information reflected in her tax returns was "incorrect."[1] (56.1 ¶32). Plaintiff and her husband both testified that she never operated a direct marketing business as she claimed on her returns. (56.1 ¶¶33,34).

Following Plaintiff's refusal to produce her tax returns voluntarily, on November 6, 2006 this Court ordered Plaintiff to produce copies of her tax returns for tax years beginning in 2000. (56.1 ¶26). Subsequently, on November 21, 2006 (three business days before her deposition), Plaintiff produced her 2001-2005 federal and state tax returns. (56.1 ¶27). On November 24, 2006 – one business day before her deposition – Plaintiff produced amended federal and state tax returns for 2003 and 2004 (dated November 22, 2006). Id.

**C.     Plaintiff's Tax Returns Reflecting Her Direct Marketing Business**

Plaintiff, who signed and filed her returns for 2001, 2002, 2003 and 2004, indicated on each year's Schedule C ("Profit or Loss From Business (Sole Proprietorship)") that she was the proprietor of a direct marketing business that she operated from her home address in

---

[1] At the time of Plaintiff's deposition, Defendants had just received Plaintiff's tax returns and had not yet had the opportunity to subpoena Mr. Weaver for deposition. Mr. Weaver's April 2006 conversation with Plaintiff about her business deductions did not come to light until after Plaintiff's deposition.

Short Hills, New Jersey. (56.1 ¶29). A portion of the 2001 Schedule C, which is identical to those filed for the other years, is set forth below.

Without declaring any gross or net income derived from the business in any of the subject tax years, Plaintiff listed expenses under Schedule C, reflecting a total of $73,000 of losses associated with that business. (56.1 ¶30). The itemized expenses, set forth in detail below, include car expenses, taxes and licenses, professional dues, attending conferences, telephone, books and subscriptions, office supplies and office expenses. Plaintiff even fixed in each year's return the exact date she first placed her vehicle in service for business purposes. (56.1 ¶30).

43 When did you place your vehicle in service for business purposes? (month, day, year) ▸ 02/13/2001 ___ .

## 1.    Plaintiff's 2004 Deductions

Plaintiff's 2004 Schedule C reflects deductions totaling $20,429.00, as follows: (a) $6,669.00 for car and truck expenses; (b) $209.00 for depreciation expenses; (c) $450.00 for legal and professional expenses; (d) $809.00 for office expenses; (e) $2,887.00 for supplies; (f) $792.00 for travel, meals and entertainment expenses; and (g) $8,613.00 for other expenses. (56.1 ¶29). A portion of the 2004 Schedule C is set forth below:

- 6 -

44  Of the total number of miles you drove your vehicle during 2004, enter the number of miles you used your vehicle for
    a Business _ _ _ _ _ _ 17,791   b Commuting _ _ _ _ _ _ _ _ _   c Other _ _ _ _ _ 6,374

45  Do you (or your spouse) have another vehicle available for personal use? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   [ ] Yes  [x] No

46  Was your vehicle available for personal use during off duty hours? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   [x] Yes  [ ] No

47a Do you have evidence to support your deduction? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   [x] Yes  [ ] No

  b If "Yes," is the evidence written? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   [ ] Yes  [x] No

| Part V | Other Expenses. List below business expenses not included on lines 8-26 or line 30 | | |
|---|---|---|---|
| TELEPHONE | | | 1,297. |
| BOOKS, SUBSCRIPTIONS | | | 1,091. |
| INTERNET | | | 277. |
| POSTAGE | | | 336. |
| PARKING & TOLLS | | | 184. |
| PROFESSIONAL DUES | | | 1,747. |
| CONFERENCES | | | 3,681. |
| | | | |
| | | | |
| 48  Total other expenses. Enter here and on page 1, line 27 . . . . . . . . . . . . . . . . . . . . . . . . | 48 | | 8,613. |

Schedule C (Form 1040) 2004

## 2.    Plaintiff's 2003 Deductions

Plaintiff's 2003 Schedule C reflects deductions totaling $20,633.00, as follows: (a) $5,970 for car and truck expenses; (b) $419.00 for depreciation expenses; (c) $450.00 for legal and professional expenses; (d) $784.00 for office expenses; (e) $2,487.00 for supplies; (f) $2,160.00 for taxes and licenses; and (g) $8,363.00 for other expenses. Id.

## 3.    Plaintiff's 2002 Deductions

Plaintiff's 2002 Schedule C reflects deductions totaling $20,324.00, as follows: (a) $624.00 for advertising expenses; (b) $7,126.00 for car and truck expenses; (c) $419.00 for depreciation expenses; (d) $450.00 for legal and professional expenses; (e) $759.00 for office expenses; (f) $3,045.00 for supplies; and (g) $7,901.00 for other expenses. Id.

4.    **Plaintiff's 2001 Deductions**

Plaintiff's 2001 Schedule C reflects deductions totaling $13,326.00, as follows: (a) $480.00 for advertising expenses; (b) $6,160.00 in car and truck expenses; (c) $698.00 in depreciation expenses; (d) $275.00 for office expenses; and (e) $5,713.00 for other expenses. Id.

D.    **Plaintiff's November 22, 2006 Amendment of Her 2003 and 2004 Tax Returns**

After the Court directed Plaintiff to produce her tax returns, Plaintiff's counsel in this action paid a $4,000 retainer to a New York City based accountant, Leon Reimer, CPA ("Mr. Reimer"), to provide Plaintiff advice regarding her returns and to prepare amended tax returns for 2003 and 2004. (56.1 ¶36). The amended returns completely eliminated all references to her direct marketing business for those two years. (56.1 ¶37). As a result, approximately $20,000 of business deductions was removed from her tax return for each of these two years. Id. Additional changes made by Plaintiff for the 2003 and 2004 years included, inter alia, the virtual elimination of her charitable contributions, from $9,100 to $100 in 2003, and from $10,220 to $940 in 2004. (56.1 ¶38). As a result of all the amendments, Plaintiff incurred a back tax liability for 2003 and 2004 of approximately $38,000. (56.1 ¶39).[2]

E.    **The Testimony of Plaintiff's Accountants**

Mr. Weaver, Plaintiff's Indiana-based accountant who prepared her 2005 tax return, asked Plaintiff in April 2006 about the business deductions on her 2004 income tax return. (56.1 ¶44). Plaintiff told him that she had no direct marketing business at any time but that she had provided business expenses to her prior accountant, ███████████ CPA ("Mr. ███████ who prepared her 2001-2004 tax returns. Id. Mr. Weaver's April 2006 inquiry of Plaintiff concerning these business deductions is reflected in his notes. (56.1 ¶45).

---

[2] Plaintiff executed a stipulation that the original and amended income tax returns referred to above, and produced by her in discovery, were actually filed with the IRS and state taxing authorities. (Rule 56.1 ¶43).

Plaintiff was the only person Mr. ████ talked to regarding the preparation of her 2001 and 2003 returns. (56.1 ¶46). Plaintiff was the only person who supplied information to assist Mr. ████ in the preparation of her returns and was the only person who furnished him with the information on Schedule C.[3] Id. Mr. ████ testified that he would not have signed Plaintiff's tax returns if they were fraudulent, and that all of the information contained on the returns was based on information that Plaintiff provided to him. (56.1 ¶47).

Mr. Reimer, who met with Plaintiff for the first time after this Court ordered the returns produced, prepared Plaintiff's 2003 and 2004 amended federal and state tax returns. (56.1 ¶41). Mr. Reimer advised Plaintiff (at a meeting also attended by her litigation counsel) that the IRS has a three-year civil statute of limitations for amending or correcting tax returns, and recommended that she only amend her false 2003 and 2004 returns. (56.1 ¶40). Mr. Reimer invoiced Plaintiff for his services, but his fee was paid in full by Plaintiff's counsel. (56.1 ¶42). Plaintiff followed her accountant's advice and elected to amend only her 2003 and 2004 returns, even though her 2001 and 2002 returns were also admittedly "incorrect." (56.1 ¶41,32).

**F.    The Agreement and MSG Policies Violated by Plaintiff**

1.    Under MSG's Confidentiality, Code of Business Conduct and Proprietary Agreement (the "Agreement"), which Plaintiff signed at the time of her hiring on November 21, 2000, Plaintiff agreed:

> During my employment I may not engage in activities or have personal or financial interests that impair, or appear to impair, my independence or judgment or otherwise conflict with my responsibilities to [MSG]. Such activities include, but are not limited to: . . . (g) serving as an officer, director, agent, employee, consultant or provider of or in any other capacity for any for-profit organization.

(56.1 ¶15).

---

[3] Mr. ████ could not recall whether the same was true for tax years 2002 and 2004.

2.    Cablevision's **Code of Business Conduct and Ethics**, applicable to MSG (hereinafter "MSG Code of Ethics"), which Plaintiff received and acknowledged reading on October 11, 2004 , provides as follows:

> Legal Compliance
>
> It is the Company's policy to comply with all applicable laws, rules and regulations.  It is the personal responsibility of each employee, officer and director to adhere to the standards and restrictions imposed by those laws, rules and regulations.

(56.1 ¶18).

MSG's handout from the ethics training session attended by Plaintiff on October 12, 2004 clearly expresses MSG's policy:

> Remember: Doing the right thing:
> • protects personal and company integrity
> • builds and protects our reputation
> • ultimately protects jobs.

(56.1 ¶20).  It further provides that employees should ask themselves, "Will my action violate any laws or policies of the company?" and "Could my action negatively impact me, others or the company?" Id.

3.    The **MSG Employee Handbook** dated April 2003 (the "Employee Handbook") provides, under a section entitled "How We Conduct Ourselves: Employee Code of Conduct":

> **An employee who fails to maintain these conduct standards by violating any of the company's work rules and/or the Employee Code of Conduct, is subject to disciplinary action up to and including termination.**
>
> Listed below are examples of the rules and regulations you will be expected to follow:
>
> [...]

- 10 -

> • Illegal activities are prohibited including being in the possession of or using controlled substances including alcohol.]

(56.1 ¶21 (emphasis in original)).

4.     Plaintiff signed MSG's **Employee Code Of Conduct**, acknowledging, <u>inter alia</u>, that "Public trust and confidence are the greatest assets held by Madison Square Garden." (56.1 ¶17). MSG's **Statement of Company Values** similarly reinforces that "Cablevision is a business founded upon basic principles of honesty, integrity and a sincere commitment to our employees and our customers." (56.1 ¶ 20).

> **G.     Had MSG Known of Plaintiff's Conduct, MSG Would Have Terminated Her Employment Consistent With Its Past Practice**

MSG has consistently terminated employees who have engaged in fraudulent, dishonest or unlawful conduct. (56.1 ¶52). These rules apply to every employee of MSG, even lower-level employees not entrusted with the high-level responsibilities and duties with which Plaintiff was entrusted. <u>Id.</u> As set forth in detail in the affidavit of John Moran, Vice President of Employee and Labor Relations, MSG has terminated or disciplined employees for falsifying an employee application, for bank fraud, and for falsification of company records to commit insurance fraud. <u>Id.</u>

The Agreement, under "Remedies," specifically states that "any breach of the agreement will result in . . . immediate termination" and "that the company may, in addition, pursue its legal and equitable remedies in the event of a breach or threatened breach." (56.1 ¶16). At her deposition, Plaintiff testified as follows:

> Q.     If in fact you were the proprietor of a direct marketing business in 2004 while you were Senior Vice President of Madison Square Garden, wouldn't that represent the violation of the policies prohibiting conflict of interest of which you are familiar?

> A.     It would, and this is incorrect information.

- 11 -

(56.1 ¶32). Indeed, Plaintiff testified that she herself terminated one of the employees she supervised for attempting to engage in outside business activity while working at MSG. (56.1 ¶23).

There can be no dispute that MSG would have terminated Plaintiff's employment, as demonstrated by the affidavits of James Dolan, the Chairman of MSG, and Stephen Mills, the President and COO of MSG Sports, because, separate and apart from breaches of her Agreement, MSG policy and values, her conduct was inherently inconsistent with the personal and corporate trust they had placed in her to run the Knicks' business operations, after hiring her, training her and then promoting her to one of MSG's most important executive positions with direct impact on its finances and public image. (56.1 ¶¶14-21).

## H.    MSG'S Public Comments Were Limited To Plaintiff's Litigation

MSG commented publicly on Plaintiff's lawsuit when it was filed. (56.1 ¶¶53-56). Indeed, Plaintiff had publicly announced her Complaint, called a press conference and made public statements about her lawsuit so it was only appropriate that MSG respond in kind. (56.1 ¶). MSG's comments were limited to its opinion that Plaintiff's allegations were meritless and emphasized MSG's policy against harassment as it related to the lawsuit. (56.1 ¶¶53-55). MSG also commented that it disagreed with the EEOC's determination of probable cause. (56.1 ¶56). Plaintiff subsequently amended her lawsuit to eliminate any claim for mental anguish, substituting "reputational injury." (56.1 ¶59).

## ARGUMENT

Under the after-acquired evidence doctrine, Plaintiff's remedies are barred for those periods after which MSG would have terminated her employment for her misconduct and violation of MSG policies. Accordingly, Plaintiff's entitlement to back pay is limited to the period before November 21, 2006, the date on which Defendants learned of her misconduct

through the production of her tax returns or, alternatively, before June 2006, when Plaintiff should have first produced them without asserting baseless relevance objections that delayed their production until after this Court's November 6, 2006 order. Any entitlement that she may have to front pay and/or reinstatement is barred. For the reasons set forth herein, Defendants' motion should be granted.[4]

I.    **STANDARDS FOR SUMMARY JUDGMENT**

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); accord Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is material only if "it 'might affect the outcome of the suit under the governing law,' [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Gordon v. New York City Bd. of Educ., No. 01 Civ. 9265, 2003 WL 169800, at *3 (S.D.N.Y. Jan. 23, 2003) (citation omitted).

The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), and the Court must view the record in the light most favorable to the non-movant by resolving all ambiguities and drawing all reasonable inferences in favor of that party, Matsushita, 475 U.S. at 587-88; see also Tomka v. Seiler Corp., 66 F.3d 1295, 1304 (2d Cir. 1995). The movant may rely on deposition

---

[4] As set forth in Defendants' accompanying motion for leave to amend its answer to assert a counterclaim based on its discovery of the after-acquired evidence, Defendants seek disgorgement of Plaintiff's salary and compensation,

testimony and admissions on file to show that there is no issue as to any material fact. Fed. R. Civ. P. 56(c). The opposing party "must enumerate 'specific facts and circumstances supported by deposition, affidavits based on personal knowledge and admissions,' and cannot rely on conclusory allegations or denials." Sookdeo-Ruiz v. GCI Group, No. 00 Civ. 3517, 2001 WL 121942, at *2 (S.D.N.Y. Feb. 13, 2001), aff'd, No. 01-7290, 2002 WL 355916 (2d Cir. Mar. 5, 2002) (citation omitted).

## II. THE AFTER-ACQUIRED EVIDENCE DOCTRINE LIMITS PLAINTIFF'S CLAIM FOR BACK PAY AND BARS HER CLAIMS FOR REINSTATEMENT AND FRONT PAY

In McKennon v. Nashville Banner Publ'g. Co., 513 U.S. 352, 362-63 (1995), the Supreme Court discussed the availability of after-acquired evidence of an employee's wrongdoing as a defense to a discrimination claim. The Court rejected the use of after-acquired evidence as a complete bar to recovery for discrimination cases, but held that an employee's unclean hands has an effect on the specific remedy available and could limit relief.

The Court held that back pay in an action under the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. should be limited to the date of the employer's discovery of the information that would have resulted in a decision to terminate the employee. 513 U.S. at 362:

> Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit. The beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered. In determining the appropriate order for relief, the court can consider taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party.

subject to proof at trial, from February 13, 2001, the date in 2001 she first conducted her unauthorized business or, alternatively, on or about April 11, 2002, the date she filed her 2001 returns and committed tax fraud.

Once such a showing is made, "as a general rule . . . , neither reinstatement nor front pay is an appropriate remedy [because it] would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event upon lawful grounds." Id.

In Vichare v. AMBAC, Inc., 106 F.3d 457, 468 (2d Cir. 1996), the Second Circuit applied the Supreme Court's reasoning in McKennon to a Title VII case.  In 2000, this Court articulated the definition of after-acquired evidence as "evidence of employee misconduct, such as criminal behavior, employer rule infractions, malpractice and the like, committed during the course of employment, of which the employer *became aware* only *after* the employee's termination."  Ahing v. Lehman Bros., No. 94 Civ. 9027, 2000 WL 460443, at *11 (S.D.N.Y. Apr. 18, 2000) (citing Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 147 & n. 17 (2d Cir. 1999)).

More recently, this Court held, consistent with McKennon, that evidence that the employee would have been terminated for lawful reasons will make certain remedies, such as reinstatement and front pay, unavailable.  Greene v. Coach, Inc., 218 F. Supp. 2d 404, 412 (S.D.N.Y. 2002) (Buchwald, J.).  In addition, the Greene court held that summary judgment is an appropriate vehicle for resolving the issue of after-acquired evidence where material facts are not in dispute.  Id. at 413.  Specifically, the Court held that "there exists no per se rule that requires the issue of after-acquired evidence to be submitted to the jury where material facts are not in dispute.  In fact, to create such a rule would be contrary to the directive of Rule 56." Id., (citing Fed. R. Civ. P. 56(d)).

### III. PLAINTIFF'S PERSONAL TAX FRAUD OR UNDISCLOSED OUTSIDE BUSINESS, EACH IN CLEAR VIOLATION OF COMPANY POLICY, CONSTITUTE AFTER-ACQUIRED EVIDENCE SUFFICIENT FOR MSG TO HAVE TERMINATED HER EMPLOYMENT

The after-acquired evidence doctrine is not limited to workplace misconduct. Indeed, the Equal Employment Opportunity Commission has acknowledged that all relevant criteria may be used to ascertain whether the employer's after-acquired evidence defense is justifiable. EEOC Compliance Manual § 604:0182. That evidence includes whether "1) the misconduct is criminal in nature (e.g., embezzlement, fraud, assault, or theft); 2) the employee's behavior compromised the integrity of the employer's business (divulgence of trade secrets, security, or confidential information); or 3) the nature of the employee's misconduct was such that the adverse action appears reasonable and justifiable." Id.

Title VII permits termination for any non-discriminatory reason, including reasons arising from an employee's off-duty misconduct. On facts very similar to this case, the Eighth Circuit upheld as legitimate and non-discriminatory an employer's decision to terminate an employee based upon the employee's false tax filings related to an outside business. Davis v. Arkansas Dep't of Human Servs., 862 F.2d 173, 175 (8th Cir. 1988). In Davis, the employee falsified IRS filings to represent the payment of wages when none had in fact been paid. The Eighth Circuit found that the Company's reliance on evidence uncovered in its pre-termination investigation of the employee's fraud was sufficient to demonstrate a legitimate non-discriminatory reason for its termination decision.[5]

---

[5] Similarly, courts have held that an employee's personal misconduct outside of the workplace justifies a refusal to award unemployment benefits where the employer demonstrated that the employee could no longer be trusted to perform her job responsibilities. Martin v. Unemployment Compensation Bd. of Review, 713 A.2d 753 (Pa. Commw. Ct. 1998) (produce clerk terminated for engaging in theft unrelated to her work denied benefits since employer stated it could no longer trust her); Levu v. Employment Dep't, 941 P.2d 1056, 1059 (Ore. Ct. App. 1997) (hotel auditor terminated for shoplifting denied benefits since claimant's actions created an "atmosphere of suspicion and distrust"); Prebula v. Arizona Dep't of Econ. Sec., 138 Ariz. App. 26, 672 P.2d 978 (Ariz. 1983) (manager's secretary who embezzled over $24,000 from a fraternal organization tarnished his character such that he

**A.    Plaintiff's Tax Fraud Would Have Constituted A Legitimate Non-Discriminatory Reason to Terminate Her Employment and Must Limit Damages, If Any**

Here, there is no dispute that Plaintiff represented on her tax returns filed by her for the years 2001, 2002, 2003 and 2004 (years in which she was employed at MSG) that she was the proprietor of a direct marketing business. (56.1 ¶29). These same returns also reflect Plaintiff's liberal abuse of the business deductions available under Schedule C through specific itemized deductions, down to the exact mileage she drove her car for business each year. (56.1 ¶30). There is also no dispute that Plaintiff filed amended tax returns to be prepared for the years 2003 and 2004 and that the amended returns no longer claimed that she was engaged in a direct marketing business and eliminated all of her business deductions as well as almost $20,000 in charitable contributions. (56.1 ¶37).

On these facts, it cannot be disputed that Plaintiff knowingly filed false tax returns, notwithstanding the subsequently filed amendments. See Badaracco v. C.I.R., 464 U.S. 386, 395 (1984) ("[i]t is established that a taxpayer who submits a fraudulent return does not purge the fraud by subsequent voluntary disclosure; the fraud was committed, and the offense completed, when the original return was prepared and filed") (citations omitted).[6]   Plaintiff filed her 2001 - 2004 tax returns, certifying each of them, under penalty of perjury, as "true, correct and complete." Later, at her deposition, Plaintiff claimed that her returns were "incorrect" and, based on Mr. Weaver's testimony, lied about the date she first learned about the errors. It strains

was unsuitable to continue in his employer's business since his conduct might adversely affect the reputation, public trust or confidence upon which his employer's business is dependent).

[6] Litigation counsel's payment to the accountant subsequent to this Court's November 6, 2006 order directing that Plaintiff produce her tax returns was an advance to Plaintiff as part of the "expenses of litigation." See DR 5-103(B)(1) ("A lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses.") Accordingly, Mr. Reimer's preparation of amended returns in this case represents nothing more than Plaintiff's futile litigation strategy to remediate her earlier fraud, inconsistent with Supreme Court precedent.

credulity that Plaintiff, an educated professional with a masters degree in science, marketing and communications failed to read her tax returns for four consecutive years. Indeed, of the 145 total pages of original tax returns produced by Plaintiff, 28 pages contain reference to her false business deductions – including the <u>very first page of every one of the federal returns for the four-year period as follows</u>:

2001 Business income or loss

12   Business income or (loss). Attach Schedule C or C-EZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |      -13,326.

2002 Business income or loss

12   Business income or (loss). Attach Schedule C or C-EZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |      -20,324.
13   Capital gain or (loss). All Sch D if reqd, if not reqd, ck here . . . . . . . . . . . . . . . . . . . ▶ ☐

2003 Business income or loss

12   Business income or (loss). Attach Schedule C or C-EZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |      -20,633.
13a  Capital gain or (loss). All Sch D if reqd, if not reqd, ck here . . . . . . . . . . . . . . . . . . . ☐

2004 Business income or loss

12   Business income or (loss). Attach Schedule C or C-EZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 |      -20,479.
13   Capital gain or (loss). All Sch D if reqd, if not reqd, ck here . . . . . . . . . . . . . . . . . . . ▶ ☐

An additional 8 pages claim tens of thousands of dollars in charitable deductions she later withdrew. Plaintiff now denies having operated a direct marketing business while employed by MSG (a fact confirmed by her husband). Mr. ███████ however, would not have prepared a fraudulent tax return (56.1 ¶47) (nor would he have any reason to do so since he, unlike Plaintiff, did not stand to gain financially), and Plaintiff provided all the information reflected on the returns. (56.1 ¶46-47). Plaintiff told Mr. Weaver in April 2006 that she provided the Schedule C information to Mr. ██████ (56.1 ¶44). As the undisputed facts establish, Plaintiff falsified her tax returns for all four years. See <u>U.S. v. Boulerice</u>, 325 F.3d 75, 80-81 (1st Cir. 2003) ("'[a] jury may permissibly infer that a taxpayer read his return and knew its contents from the bare fact that he signed it'" (citation omitted)); <u>U.S. v. Magnus</u>, 365 F.2d 1007 (2d Cir. 1966) (a

- 18 -

taxpayer's consistent substantial underpayment of taxes by itself supports a finding of willfulness); U.S. v. Romanow, 509 F.2d 26, 27 (1st Cir. 1975) (holding that "'jury could conclude from nothing more than the presence of [defendant's] uncontested signature...'" that the violation was willful).[7]

Plaintiff's filing of false tax returns was a direct violation of her signed Agreement to not "engage in activities or have personal or financial interests that impair, or appear to impair, [her] independence or judgment or otherwise conflict with [her] responsibilities to [MSG]." MSG's well-articulated policy here, acknowledged by Plaintiff when she was first hired, clearly spells out that employees found to have engaged in inappropriate personal or financial interests are subject to termination of employment. MSG's policy, as stated in its Employee Handbook, prohibits illegal activity and, as stated in its Code of Ethics, requires employees to comply with all applicable rules and regulations. Illegal conduct is harmful to MSG's public image and reflects poorly on the organization as a whole. MSG instructs employees literally to "do the right thing" in order to protect personal and Company integrity, and to avoid any adverse impact on MSG's business. Indeed, MSG's policy expressly states, "Public trust and confidence are the greatest assets held by Madison Square Garden" and that its "business [is] founded upon basic principles of honesty, integrity and a sincere commitment to our employees and our customers." Given Plaintiff's high-level, fiduciary position as Senior

---

[7] Plaintiff's conduct violated various sections of the tax code and subjects her to penalties and assessment. See, e.g., 26 U.S.C. § 6501(c) ("In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time."); § 7201 (providing for felony violation for any person who willfully attempts in any manner to evade or defeat any tax); § 7203 (providing for misdemeanor violation for any person required to pay any tax who willfully fails to pay such tax at the time or times required by law or regulations); § 7206 (providing for felony violation for any person who willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that is made under the penalties or perjury, and which he does not believe to be true and correct as to every material matter); § 7207 (providing for misdemeanor violation for any person who willfully delivers or discloses to the Secretary any list, return, account, statement, or other document, known by him to be fraudulent or to be false as to any material matter); U.S. v. Coppola, 425 F.2d 660 (2d Cir. 1969) (the elements of a felony tax violation under 26 U.S.C. § 7201 are willfulness, a tax deficiency, and an affirmative act constituting an evasion of a tax, such as the filing of a fraudulent tax return).

Vice President, Marketing and Business Operations for the Knicks, where she was entrusted with profit-and-loss responsibility for over $120 million in revenue and expenses per year and the marketing of the Knicks' brand, had MSG learned that Plaintiff had filed fraudulent tax returns, MSG would have terminated her.   MSG required Plaintiff, like other similarly-situated executives, to have unquestioned financial integrity.

Plaintiff's fraudulent representations on her tax returns for four consecutive years, fall squarely within the scope of misconduct that would have resulted in her termination.  See Affidavits of Steven Mills and James Dolan dated April 26-27, 2007; see Greene, 218 F. Supp. 2d at 412 (employer's affidavits in support of summary judgment demonstrated that its after-acquired evidence would have led to plaintiff's termination); see also Washington v. Lake County, Ill., 969 F.2d 250, 256-7 (7th Cir. 1992) (no genuine issue of material fact existed where employer's affidavits demonstrated that plaintiff would have been terminated for concealing his criminal conviction).   Employees of significantly lower rank than Plaintiff, and who earned considerably less than her, were terminated for violating MSG policy by engaging in, for example, bank fraud or falsification of personnel records to commit insurance fraud.  See Affidavit of John Moran dated April 26, 2007. For example, one employee was terminated for an arrest that led to a non-criminal harassment violation, and another was suspended after being arrested for driving under the influence and criminal impersonation – significantly less serious unlawful conduct than that Plaintiff engaged in.  Id.  Those employees, many of whom signed the same Agreement as Plaintiff, were terminated for their breaches of MSG policy, as Plaintiff would have been for her breaches if MSG had learned of them while she was employed.  (56.1 ¶52).   Even without the Agreement, the Handbook, and the MSG Code of Ethics , as the affidavits of Dolan and Mills make clear, Plaintiff would have been terminated for her breach of the enormous personal and corporate trust that was placed in her by MSG.

- 20 -

Under these circumstances, summary judgment is appropriate to dismiss Plaintiff's claims for reinstatement and front pay. See Greene, 218 F. Supp. 2d at 413-14. Furthermore, in the event that the trial jury were to find that Plaintiff was unlawfully terminated on or about January 19, 2006, as she alleges in this lawsuit, then her claim for back pay damages should be limited to the date of her termination until November 21, 2006, the date Defendants discovered that she had violated MSG policy.

**B.    Plaintiff Knowingly Retaining A False Tax Benefit Would Have Constituted A Legitimate Non-Discriminatory Reason To Preclude Reinstatement and Must Limit Front Pay, If Any**

Notably, Plaintiff did not amend her 2001 and 2002 tax returns, which remain governed by Plaintiff's certification, under penalty of perjury, that they are "true, correct and complete." By her own admission at her deposition that she never operated a direct marketing business, Plaintiff continues to this very day to knowingly retain tens of thousands of dollars worth of tax benefits to which she is not entitled. Moreover, she elected as recently as November 2006 to continue to retain this improper benefit after obtaining advice from another accountant that the IRS would not pursue her false tax benefit for these earlier years given his view of the applicable statute of limitations. (56.1 ¶41). Following his advice, Plaintiff has decided to retain over $33,000 in wrongfully obtained tax benefits. (56.1 ¶41). Her claims for reinstatement and front pay must be barred on this basis alone.[8]

Plaintiff's decision to continue her prior misconduct indicates such egregious personal dishonesty that her judgment cannot be trusted, and thereby precludes her reinstatement

---

[8] The IRS may well reject the opinion of her accountant that Plaintiff's liability is limited to civil remedies occurring within the last three years. See Badaracco, 464 U.S. at 394 ("once a fraudulent return has been filed, the case remains one 'of a false or fraudulent return' regardless of the taxpayer's later revised conduct, for purposes of criminal prosecution and civil fraud liability under § 6653(b)" (providing for a 50% penalty) and under § 6501(c)(1). The IRS can criminally prosecute within 6 years, and there is no statute of limitations to recover back taxes as the result of fraud intended, as here, to evade taxes. See 26 U.S.C. §§ 6501(c)(1)(2); 6531; Badaracco, 464 U.S. at 386

and the associated remedy of front pay, especially considering her critical role as the face of the

Knicks' organization in its relations with sponsors, fans, schools, and civic and charitable

organizations. See McKennon, 513 U.S. at 361 ("In determining appropriate remedial action, the

employee's wrongdoing becomes relevant not to punish the employee, or out of concern 'for the

relative moral worth of the parties,' . . . but to take due account of the lawful prerogatives of the

employer in the usual course of its business and the corresponding equities that it has arising

from the employee's wrongdoing.") (citation omitted).

The after-acquired evidence doctrine set forth in McKennon should also apply to

Plaintiff's post-termination election to continue her misconduct. The Eighth Circuit has held that

"an employee's post-termination conduct can, in some circumstances, limit an employee's

remedies for wrongful discharge." Sellers v. Mineta, 358 F.3d 1058, 1064 (8th Cir. 2004)

(plaintiff's processing of fraudulent loan application while employed in her new job at a bank

may properly bar front pay and reinstatement as an air traffic controller with the FAA under

McKennon). In Sellers, the Eighth Circuit reasoned that "[t]he McKennon Court used sweeping

language, instructing lower courts to treat each case on a case by case basis considering all the

'factual permutations and the equitable considerations they raise.'" Id. at 1063 (citing

McKennon, 513 U.S. at 361) (opining that it would be inequitable for a plaintiff to avail herself

of the disfavored and exceptional remedy of front pay where her own misconduct precludes the

favored and more traditional remedy of reinstatement); see also Medlock v. Ortho Biotech, Inc.,

164 F.3d 545, 555 (10th Cir. 1999) (stating that it could "not foreclose the possibility that in

appropriate circumstances the logic of McKennon may permit certain limitations on relief based

on post-termination conduct") (citation omitted). While a court in this District has apparently

articulated a contrary bright line rule, stating that misconduct following the employment

(taxpayers who file false or fraudulent return later followed by amended non-fraudulent returns remain subject to

relationship is not within the <u>McKennon</u> rule for application of the after-acquired evidence doctrine, the Second Circuit has not ruled on the issue. <u>See</u> <u>Sigmon v. Parker Chapin Flattau &</u> <u>Kimpl</u>, 901 F. Supp. 667 (S.D.N.Y. 1995). The reasoning of the Eighth and Tenth Circuits is persuasive and should be applied given the factual circumstances here (Plaintiff's post-termination misconduct is so egregious that she could never again be trusted in her position which requires her to deal directly with MSG's fan base, sponsors and vendors).

C.   **Plaintiff's Undisclosed Operation Of An Outside Direct Marketing Business Would Have Constituted A Legitimate Non-Discriminatory Reason to Terminate Her Employment and Must Limit Damages, If Any**

Despite Plaintiff's amendments and contrary deposition testimony, Plaintiff's original 2001 - 2004 returns are competent and undisputed evidence that she operated a marketing consulting business during those years. <u>See</u> Fed. R. Evid. 801(d)(2)(A) (a statement is not hearsay if the statement is offered against a party and is the party's own statement); <u>U.S. v.</u> <u>Dinnell</u>, 428 F.Supp. 205, 208 (D. Az. 1977), <u>aff'd</u>, 568 F.2d 779 (9th Cir. 1978) ("Statements made in an income tax return constitute admissions."). Since those returns indicate that she is the sole proprietor of the business, she violated the Agreement, which prohibits employees from "engag[ing] in activities or have personal or financial interest that impair, or appear to impair, [their] independence or judgment or otherwise conflict with their responsibilities to MSG" . . . , without MSG's prior consent, including "<u>serving as an officer, director, agent, employee,</u> <u>consultant or provider of or in any other capacity for any for-profit organization.</u>" (56.1 ¶15 (emphasis added)). Plaintiff is well-acquainted with this policy as she terminated the employment of one of her subordinates for seeking outside employment that arguably conflicted with her MSG position. (56.1 ¶23). MSG also terminated an employee who double-booked

_____

IRS enforcement action at any time).

assignments with two different networks that resulted in the employee being paid for work that he did not perform. (56.1 ¶52).

Under these circumstances, summary judgment is appropriate to dismiss Plaintiff's claims for reinstatement and front pay, and to limit her claim for back pay to June 2006, the date Plaintiff submitted her unsupported objections to MSG's April 2006 request that Plaintiff produce her tax returns. See McKennon, 513 U.S. at 362 ("[i]n determining the appropriate order for relief, the court can consider taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party.") Alternatively, this Court should limit Plaintiff's claim to back pay to November 21, 2006, the date Defendants actually received Plaintiff's tax returns and discovered that she was the proprietor of a direct marketing business. See Greene, 218 F. Supp. 2d at 413-14.

## IV. PLAINTIFF HAS NO CLAIM UNDER TITLE VII, STATE OR CITY LAW FOR "REPUTATIONAL DAMAGES"

In her initial Complaint against MSG, Plaintiff sought relief under the New York State Human Rights Law and the New York City Administrative Code "for mental anguish and humiliation as a result of defendant's discriminatory acts." (56.1 ¶58). Plaintiff later amended her Complaint, twice, first to add a claim against Dolan under State and City law, and then to add a Title VII claim as to MSG. (56.1 ¶59). Plaintiff also removed in her first Amended Complaint her claim for "mental anguish" and instead added a claim "to make her whole for reputational damage." Id. Plaintiff seeks over $9 million in such damages. (56.1 ¶61). Plaintiff has no cognizable claim, as a matter of law or undisputed fact, that her reputation has been damaged as a result of any post-litigation statements made by MSG. For the reasons set forth herein, and in "Point III" of the memorandum of law submitted by Defendant Isiah Thomas, in which Defendants join, Plaintiff's claim for "reputational injury" must be dismissed.

It is undisputed that Plaintiff's claim for "reputational damage" arises solely from

statements MSG and its attorneys made in the media, which are absolutely privileged under New York law since their comments were limited to Plaintiff's lawsuit and her claims. (56.1 ¶60). When asked about the basis for her claim for damage to her reputation at her deposition, Plaintiff responded that she was damaged as a result of the press coverage of her case, even though she was orchestrating her own public relations campaign. Id. (citing Browne Sanders Tr. at 481:5-482:-4). ("I think [the lawsuit] has left questions for people, given the Garden's statement on the reasons I was fired."). Furthermore, any claim for "reputational injury" against Dolan should be dismissed on the independent and undisputed basis that he made no statements whatsoever to the media regarding Plaintiff's lawsuit. (56.1 ¶57).

Similarly, while Title VII authorizes compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses," it does not permit recovery for alleged injury stemming from press statements commenting on a publicly filed lawsuit. See 42 U.S.C. § 1981a(b)(3).

## CONCLUSION

For all the foregoing reasons, this Court should grant Defendants partial summary judgment (i) limiting Plaintiff's claim for back pay prior to June 2006, or alternatively, to November 21, 2006, and bar her claims for front pay and reinstatement with prejudice (ii) dismissing Plaintiff's claims for "reputational damage" and grant Defendants such other relief as the Court deems appropriate.

Dated: New York, New York
    April 27, 2007

                                EPSTEIN BECKER & GREEN, P.C.

                                By:    s/Ronald M. Green
                                       Ronald M. Green  (RG-7766)

Teresa M. Holland (TH-6973)
Barry A. Cozier (BC-7110)
Brian G. Cesaratto (BC-5464)
Darryll A. Buford (DB-0546)
250 Park Avenue
New York, New York  10177-1211
(212) 351-4500

MORGAN, LEWIS & BOCKIUS LLP

Amber L. Kagan (AK- 7973)
101 Park Avenue
New York, New York 10178
(212) 309-6000

*Attorneys for Defendant Madison Square Garden, L.P. and James L. Dolan*

To:     Anne Vladeck, Esq.
        Kevin Mintzer, Esq.
        Vladeck, Waldman, Elias &
        Engelhard, P.C.
        1501 Broadway, Suite 800
        New York, New York 10036
        (212) 403-7300
        *Attorneys for Plaintiff*

        Sue Ellen Eisenberg (SE-4713) –
        *admitted pro hac vice*
        Lucetta Franco (LF-7638) –
        *admitted pro hac vice*
        Eisenberg & Bogas, P.C.
        33 Bloomfield Hills Parkway, Suite 145
        Bloomfield Hills, Michigan  48304-2945

            -and-

        Laurie Berke-Weiss (LB-3445)
        Louis Pechman (LP-6395)
        Berke-Weiss & Pechman LLP
        488 Madison Avenue
        New York, New York 10022
        (212) 538-9500
        *Attorneys for Defendant Isiah Lord
        Thomas III*

- 26 -