UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ANUCHA BROWNE SANDERS,

            Plaintiff,          06 Civ. 0589 (GEL)

- against -               ECF CASE

MADISON SQUARE GARDEN, L.P.,    PLAINTIFF'S STATEMENT OF
ISIAH LORD THOMAS III, and JAMES L.  MATERIAL FACTS PURSUANT
DOLAN,                                 TO LOCAL CIVIL RULE 56.1 IN
                                           OPPOSITION TO ISIAH THOMAS'
           Defendants.         MOTION FOR PARTIAL SUMMARY
                                           JUDGMENT

------------------------------x

       Plaintiff Anucha Browne Sanders ("plaintiff" or "Browne Sanders"), pursuant to Local Civil Rule 56.1(c), submits this statement in response to the statement of purportedly undisputed material facts submitted by defendant Isiah Lord Thomas III ("Thomas").[1]

       1.     Admit.

       2.     Admit.

       3.     Admit in part. This description is not a complete description of Browne Sanders' primary responsibilities. Browne Sanders was also a profit and loss ("P & L") manager

---

[1]    Excerpts of the first and second day of plaintiff's deposition are referred to as "Pl. Dep. I __" and Pl. Dep. II __." Excerpts of the depositions of all other witnesses are referred to with the person's name, followed by "Dep. __." Deposition Exhibits are referred to as "Dep. Ex. [name] [exhibit number]." Excerpts of the transcripts and selected deposition exhibits from the deposition of plaintiff, Isiah Thomas, James Dolan, Rusty McCormack, Hank Ratner, John Moran, Rochelle Noel, Joseph Favorito, Dan Gladstone, Jeff Nix, Karin Buchholz, Faye Brown and Robert Levy are attached to the Declaration of Kevin T. Mintzer In Opposition To Isiah Thomas' Motion For Partial Summary Judgment, dated May 25, 2007 ("Mintzer-Thomas Decl."). The documents referred to herein are attached to either the Mintzer-Thomas Decl. or the Declaration of Lucetta V. Franco ("Franco Decl."), which was submitted in support of Thomas' motion for partial summary judgment. Also submitted herewith is the Declaration of Anucha Browne Sanders, dated May 24, 2007 ("Browne Sanders Decl.").

245108 v1

with collaborative responsibilities for the budget. She also had responsibility for the game presentation and alumni relations (i.e. relations with former Knicks players). (Pl. Dep. I 343-44)

4. Deny. The organizational change in which Browne Sanders and other heads of business units became P & L managers took place before 2004. MSG Chairman James Dolan ("Dolan") testified that Browne Sanders' duties changed when she "took on full responsibilities for marketing the Knicks" (Dolan Dep. 52), which took place in 2002. (See ¶ 2, supra; see also Dolan Dep. 19-21, 163-66) Browne Sanders already had P & L responsibilities by the time that Thomas was hired in December 2003. (Thomas Dep. 240-41)

5. Deny. The salary adjustment that Browne Sanders received in April 2005 from approximately $213,000 to $250,000 was not in connection with any increased responsibilities because Browne Sanders' responsibilities had not changed in 2005 or 2004. (See ¶ 4, supra) When Stephen Mills ("Mills") informed Browne Sanders of the raise in 2005, he said that Browne Sanders was receiving it because she was doing a great job. (Browne Sanders Decl. ¶ 11) Furthermore, Mills testified that he did not know why Browne Sanders had received a raise in 2005 (Mills Dep. 349-52), and only after discussing the matter with counsel on a break did he testify that the raise was because of a change in Browne Sanders' grade. (Mills Dep. 418-20) Dolan also testified that he did not know why Browne Sanders received a raise in 2005 even though he had personally approved the raise. (Dolan Dep. 153-55)

6. Admit.

7. Admit that Mills was primarily responsible for plaintiff's hire, promotion and salary. Others were involved, however. For example, Dolan has claimed that he approved plaintiff's promotion to Senior Vice President, Marketing and Business Operations. (Affidavit of

245108 v1

2

James L. Dolan, dated April 26, 2007, at ¶ 2, submitted in support of MSG's motion for partial summary judgment)

8.   Admit.

9.   Admit in part. Thomas also had an office and a conference room at MSG's offices in Manhattan on the same floor as Browne Sanders. (Pl. Dep. I 213-16)

10.  Admit in part. Thomas also reported to Dolan. (Thomas Dep. 131-32)

11.  Admit.

12.  Admit in part. Thomas worked at the Practice Facility and he traveled. In addition, he also worked at MSG's Penn Plaza offices, where he had an office and a conference room. Thomas also came to the arena for home games. (Pl. Dep. I 213-16)

13.  Admit. However, Browne Sanders had also previously informed MSG that she had been sexually harassed. (Pl. Dep. I 106-08, 245-48, 335-36)

14.  Admit in part, deny in part. Shortly after the December 22, 2005 meeting between plaintiff's counsel and MSG's counsel, MSG began an internal investigation of plaintiff's sexual harassment complaint. (Mintzer-Thomas Decl., Ex. 25, at ¶ 7) MSG's internal investigation was conducted by, among others, Rochelle Noel ("Noel"), an in-house attorney for Cablevision, MSG's parent company, and MSG Vice President of Employee Relations John Moran ("Moran"). (Id.) On or about January 13, 2006, Noel and Moran, among others, finalized the findings of MSG's internal investigation in a document entitled, Summary of Harassment Investigation ("Investigation Summary"). (Noel Dep. Ex. 14) The Investigation Summary does not contain any recommendations. (Id.)

On or about January 19, 2006, Marc Schoenfeld ("Schoenfeld"), then MSG's Acting General Counsel, drafted a memorandum for Rusty McCormack ("McCormack"), MSG's

Senior Vice President of Human Resources, entitled "Knicks Employee Relations Issues." (McCormack Dep. 223-227, 254-56; Franco Decl., Ex. G)  The Knicks Employee Relations Issues memorandum recommended that Thomas receive "one-on-one sessions with a qualified outside expert in order to sensitize him further with regard to the concerns that his conduct could raise in a corporate environment and in light of company policy." The Knicks Employee Relations Issues memorandum further recommended that Mills have meetings with Cablevision's human resources officers to discuss what "lessons, if any, may be learned from the facts described in the [Investigation Summary]."  The Knicks Employee Relations Issues memorandum also states that Browne Sanders should be fired.  Neither Thomas nor Mills ever received the training recommended in the Knicks Employee Relations Issues memorandum. (McCormack Dep. 228-30; Franco Decl., Ex. G)

        15.    Deny.  Thomas was interviewed by Moran and Noel on December 23, 2005 and January 11, 2006.  During those interviews, Thomas provided false and misleading information to MSG investigators and greatly influenced the findings of the investigation. Thomas repeatedly and falsely said that Browne Sanders' harassment complaints were unfounded and falsely suggested that her allegations against him arose from changes that he implemented upon joining the Knicks.  Specifically, Thomas told MSG's investigators: (1) that he and Browne Sanders "butted heads" because Thomas "wanted complete control of players time and responsibilities," which Browne Sanders resisted; (2) that Browne Sanders "wanted to be making decisions in basketball operations," rather than running her own department; and (3) that Browne Sanders had acted as if she were Thomas' boss.  (Moran Dep. 299-300, 310-12 and Moran Dep. Exs. 10 and 11; Noel Dep. 64-67, 94-95, 232-233 and Noel Dep. Exs. 2, 13, 14)

16.     Admit in part, deny in part. Admit that Thomas was an interviewee. However, Thomas raised issues with the MSG investigators about Browne Sanders' purported involvement in basketball operations that the investigators did not ask him about. For example, Thomas volunteered to Moran and Noel that a former Knicks player had allegedly complained to Thomas about Browne Sanders inappropriately getting involved in basketball operations by criticizing a player. (Moran Dep. 315-16; Moran Dep. Ex. 11)

17.     Admit that the Knicks Employee Relations Issues memorandum, drafted by counsel, contains the above-quoted words. The memorandum also states that the "investigation made clear that Browne Sanders and Thomas had a number of business disagreements in philosophy and management style." (Franco Decl., Ex G)

18.     Admit in part, deny in part. Although McCormack signed the Knicks Employee Relations Issues memorandum, the document was actually written by Schoenfeld. According to McCormack, Schoenfeld drafted the memorandum in order to create a "record" for anticipated litigation. Furthermore, the memorandum was created <u>after</u> McCormack had already learned that Dolan had decided to fire Browne Sanders. (Franco Decl., Ex. G; McCormack Dep. 254-55, 260-62) Indeed, Browne Sanders was fired on the same date that the memorandum was finalized, January 19, 2006. (Mintzer-Thomas Decl., Ex. 2)

19.     Deny. In or about the first quarter of 2005, Browne Sanders received a performance appraisal from Mills. (Mills Dep. 46) In that appraisal, Browne Sanders received an overall performance rating of 4 on a scale of 1 to 5, denoting that plaintiff's overall performance "exceeded expected performance." (Mills Dep. Ex. 11) In or about February 2005, MSG awarded Browne Sanders a bonus of $76,000, which represented approximately 36% of her 2004 salary. (Dolan Dep. Ex. 16) On or about April 6, 2005, MSG raised Browne Sanders'

annual base salary from approximately $213,000 to $250,000, an increase of over 17%. Dolan approved this raise which, according to Mills, Browne Sanders received because she was doing a great job. (Dolan Dep. Ex. 4; Browne Sanders Dec. ¶ 11) Browne Sanders was never told that she did not have the skills to do her job, that her performance was deficient or that her job was in jeopardy. (Mills Dep. 375; Pl. Dep. I 345-48; Browne Sanders Decl. ¶ 5) Likewise, there was no document created before Browne Sanders' counsel complained of sexual harassment on her behalf that reflects that Dolan or anyone else at MSG had determined that Browne Sanders did not have the skills to do her job. A reasonable jury could reject Dolan's self-serving testimony that he had decided that she did not have the skills to perform her job within a few months of Browne Sanders receiving a large bonus, a significant raise and an excellent performance review.

20.  Deny. Browne Sanders' performance at the budget meetings was not unacceptable, and she was never told by anyone that she showed a "lack of understanding of the budgeting process." (Pl. Dep. I 345-48; Pl. Dep. II 139-41, 378-79) As discussed above (see ¶ 19, supra), a jury could conclude that Dolan's purported criticism of Browne Sanders' performance is not genuine and that it is a pretext to justify Browne Sanders' retaliatory dismissal.

21.  Deny. Browne Sanders was not criticized for her presentation of the budget, and she understood the concepts of capital and operating expense at all times. (See response to ¶¶ 19-20, supra)

22.  Deny. Hank Ratner ("Ratner") admits that he never expressed any criticism of Browne Sanders to her directly. (Ratner Dep. 181-83) Ratner claims that he developed a low opinion of Browne Sanders' performance in November or December 2004 (Ratner Dep. 87), even though Browne Sanders received an excellent performance review

several months later in or about March 2005. (Mills Dep. Ex. 11) Furthermore, there is not a single document reflecting that Ratner believed that Browne Sanders had any performance deficiencies, let alone that she should be dismissed. Accordingly, a jury would be entitled to reject Dolan's testimony, relied on by Thomas, that Ratner had recommended Browne Sanders' dismissal in or about the summer of 2005. (See response to ¶¶ 19-21, supra)

23. Admit that Browne Sanders and Ratner interacted at budget, forecast and strategy meetings in 2004 and 2005.

24. Deny. Ratner never told Browne Sanders that he believed that there was any deficiency in her job knowledge, temperament or any other aspect of her performance. (Ratner Dep. 181-83) Moreover, MSG has not produced a single document reflecting that Ratner held such a view or that he expressed it to anyone. A jury could reject Ratner's self-serving testimony that he was critical of Browne Sanders' performance. (See also response to ¶¶ 19 and 22, supra)

25. Deny. (See response to ¶ 24, supra)

26. Deny. In the final performance review that Browne Sanders received at MSG in or about March 2005, she was specifically praised for her work as a P & L manager and, in the category of her "job knowledge," she was rated as "exceeded expected performance." (Mills Dep. Ex. 11; see also response to ¶¶ 22-24, supra)

27. Deny. None of the views purportedly held by Ratner concerning plaintiff's performance were ever conveyed to Browne Sanders. Furthermore, in Browne Sanders' most recent performance review, Browne Sanders was rated "exceeds expected performance" in the categories of "job knowledge" and "develops relationships." In the category of "manages and develops people," Browne Sanders was rated "far exceeds expected performance." (Mills Dep. Ex. 11; see also response to ¶¶ 22-26, supra)

28.     Deny. (See response to ¶¶ 22-27, supra)

29.     Deny. Browne Sanders never told Mills that she wanted to leave MSG. (Pl. Dep. I 172-74) Accordingly, a jury could find that Mills did not tell Ratner that Browne Sanders wanted to leave.

30.     Deny. Mills never expressed any criticism of Browne Sanders' strategic planning skills, her "listening skills" or her "branding" skills over the course of many years of completing Browne Sanders' performance reviews. (Mills Dep Exs. 6, 8, 11)

31.     Deny. Browne Sanders did not "attack" Dolan for not understanding the concept of branding or any other "concepts." (Browne Sanders Decl. ¶ 6)

32.     Deny. Browne Sanders did not blame Mills for her own errors. (Browne Sanders Decl. ¶ 7)

33.     Deny. Browne Sanders never told Mills that she could no longer do her job. (Pl. Dep. I 172-74) Therefore, a jury could find that Mills did not make any such statements to McCormack and Ratner.

34.     Deny. McCormack did not have any discussions with Ratner, Mills or Dolan about Browne Sanders separating from MSG. (McCormack Dep. 232) According to Dolan, there was no discussion of providing Browne Sanders with severance. (Dolan Dep. 68-69) Furthermore, there are no documents reflecting Ratner ever told Mills or McCormack to work on a severance package for Browne Sanders, or that anyone from MSG prepared a severance package for Browne Sanders. (Mills Dep. 285-86)

35.     Deny. Browne Sanders never told Mills that she did not wish to continue working for the company. (Pl. Dep. I 172-74) Therefore, a jury could find that Mills did not make any such statements to Dolan. Furthermore, there are no documents reflecting that Mills or

anyone else ever worked on a separation "arrangement" for Browne Sanders. (Mills Dep. 285-86)

36.  Deny. Neither MSG or Dolan has ever identified any company policy that Browne Sanders purportedly violated by discussing her complaints of harassment with her direct reports or colleagues. Furthermore, Browne Sanders' communications with her colleagues concerning her complaints of sexual harassment constitute protected activity under the anti-discrimination laws. See Memorandum of Law In Support of Plaintiff's Motion For Partial Summary Judgment, dated April 27, 2007, previously submitted to the Court.

37.  Admit that Dolan made the decision to terminate Browne Sanders' employment with MSG.

38.  Admit in part, deny in part. Admit that Dolan claims to have considered Browne Sanders' work performance, her alleged tampering with the investigation of her sexual harassment complaint, and her demand for a severance payment in reaching his decision. Deny that Browne Sanders' work performance was actually a motivating factor in the decision to fire Browne Sanders. Browne Sanders' work performance was consistently rated as excellent throughout her employment at MSG. (Mills Dep. Exs. 6, 8, 11; ¶¶ 48-51, infra) Dolan had no interactions with plaintiff from the summer 2005 budget meetings through and including the day in January 2006 that he decided to fire her. (Dolan Dep. 121-22) Furthermore, there is no evidence that Browne Sanders "tampered" with MSG's investigation of her harassment complaint or that she ever made a "demand for a severance payment."

39.  Admit that Dolan made the decision to fire Browne Sanders on his own. However, MSG and Dolan were assisted in their retaliatory decision to fire Browne Sanders by Thomas, who provided MSG with a pretextual basis for her dismissal by falsely claiming, inter

alia, that Browne Sanders wanted to run basketball operations instead of her own department and that Browne Sanders had acted as if she was his boss. (See ¶ 15, supra)

40. Admit that Dolan did not ask Mills whether Mills agreed with the decision to fire Browne Sanders.

41. Admit in part, deny in part. Admit that Thomas did not have the authority to terminate Browne Sanders' employment on his own. After Browne Sanders told Thomas to stop harassing her, however, Thomas complained to Mills about Browne Sanders and told Mills that he wanted her fired. (Pl. Dep. I 453-54) Furthermore, Thomas provided his "opinion" about Browne Sanders during his interviews with Moran and Noel, among other occasions. (See ¶ 15, supra)

42. Admit in part, deny in part. Admit that the filing of Browne Sanders' complaint in this action on January 24, 2006 triggered a number of news reports. However, Browne Sanders did not have a press conference until after Thomas' counsel and MSG's counsel made false and derogatory statements concerning Browne Sanders to the press. (See ¶ 62, infra)

43. Admit.

44. Admit.[2]

Plaintiff, pursuant to Local Civil Rule 56.1(b), submits this statement of additional material issues of fact that present genuine issues to be tried in this action against Thomas.

45. Browne Sanders began her employment with MSG in November 2000 as the Vice President of Marketing for the Knicks. Browne Sanders was hired by Mills, who was

---

[2] Thomas' 56.1 Statement contains two consecutive paragraphs that are numbered "43."

then the Executive Vice President for Franchise Operations for MSG. (Mills Dep. 47-49) As Vice President of Marketing, Browne Sanders reported to Mills. (Mills Dep. 47-49)

46. On or about January 24, 2002, Mills completed a performance evaluation for Browne Sanders for the calendar year 2001. (Mills Dep. 56 and Mills Dep. Ex. 3) In that evaluation, Mills gave Browne Sanders an overall performance rating of "outstanding," which was the best of four possible ratings. (Mills Dep. Ex. 3)

47. On or about March 11, 2002, MSG promoted Browne Sanders to the position of Senior Vice President ("SVP"), Marketing & Business Operations of the New York Knicks. In this new role, plaintiff continued to report to Mills, who at that point had been promoted and held the position of President, MSG Sports Team Operations. (Mills Dep. 83-85 and Mills Dep. Ex. 4) As SVP of Marketing and Business Operations, Browne Sanders also had a so-called dotted line reporting relationship to Scott Layden ("Layden"), who was then the President of Basketball Operations for the Knicks. Browne Sanders was responsible for keeping Layden informed about the important business developments related to the team. (Pl. Dep. I 35-40, 460-61)

48. On or about January 24, 2003, Mills completed an executive performance appraisal for Browne Sanders for the calendar year 2002. In that evaluation, Mills gave Browne Sanders an overall performance rating of "outstanding," which was the best of four possible ratings. (Mills Dep. Ex. 6)

49. On or about February 14, 2003, Mills completed a performance planning and appraisal document in connection with MSG's Management Performance Incentive Plan ("MPIP"). In that document, Mills assigned Browne Sanders an overall rating of 5 on a scale of

1 to 5 (where 5 is the highest rating), denoting that Browne Sanders had "far exceeded expected performance." (Mills Dep. Ex. 7)

50. In or about early 2004, in connection with evaluating Browne Sanders' performance for the calendar year 2003 for purposes of the MPIP, Mills assigned Browne Sanders an overall rating of 5, which was the highest possible rating. (Mills Dep. Ex. 8)

51. In or about the first quarter of 2005, Mills completed a performance appraisal for Browne Sanders for the calendar year 2004. (Mills Dep. 46) In that document, Mills assigned Browne Sanders an overall performance rating of 4 on a scale of 1 to 5, denoting that plaintiff's overall performance for 2004 "exceeded expected performance." Mills also wrote in that review that "Anucha effectively managed through the organizational and philosophical changes when Isiah Thomas was hired. She has managed to derive upon key player involvement in team business and marketing initiatives with less player availability. " (Mills Dep. Ex. 11)

52. During the course of Browne Sanders' employment with MSG, she received many professional and personal honors, including being named by the Sports Business Journal as one of the top 40 professionals under 40 years old in the sports field. (Mintzer-Thomas Decl., Ex. 1; Browne Sanders Decl. ¶ 2)

53. On or about December 22, 2003, MSG hired Thomas as the President of Basketball Operations for the Knicks. Before joining the Knicks, Thomas was a hall-of-fame basketball player, an executive, a television basketball analyst and coach. (Thomas Dep. 79-80, 89-90, 101-02, 103-04) When Thomas joined MSG, he was given a multi-year contract until July 2007 (Mintzer-Thomas Decl., Ex. 3) and became part of MSG's Office of the Chairman, a six member group of MSG's most senior managers led by MSG Chairman Dolan. (Dolan Dep.

45-46) Browne Sanders continued to have the same dotted line reporting relationship to Thomas that she had to Layden. (Pl. Dep. I 40)

54.  Beginning in early 2004, Thomas began sexually harassing Browne Sanders by, among other things, referring to her by demeaning and sexist epithets, such as "bitch" and "ho," as well as cursing at her in their private conversations. (Pl. Dep. I 220-26) Browne Sanders complained to Mills on multiple occasions about Thomas' conduct, and she also told Thomas that he should act like a professional and treat her with respect. (Id.; Browne Sanders Decl. ¶ 9)

55.  After Browne Sanders complained about Thomas' behavior, Thomas told Mills that he wanted Browne Sanders fired. Thomas also complained about Browne Sanders' performance to Joseph Favortio, then the Knicks Vice President for Public Relations. (Pl. Dep. I 452-55; Mills Dep. 199-201; Favorito Dep. 86-88)

56.  Beginning in late December 2004 and continuing throughout 2005, Thomas' treatment of Browne Sanders changed. Instead of cursing at Browne Sanders and treating her with hostility, Thomas began to profess his love for her, to make sexual advances toward her, and to make comments about her physical appearance such as telling her that she was "beautiful," "attractive" and "easy on the eyes." (Pl. Dep. I 335-36, 397-401, 426-27; Levy Dep. 20-23)

57.  On or about November 28, 2005, plaintiff had learned from a member of her staff that Knicks player Stephon Marbury had repeatedly referred to her as a "black bitch." (Mintzer-Thomas Decl., Ex. 9)

58.  On December 22, 2005, counsel for Browne Sanders met with counsel for MSG. (Mintzer-Thomas Decl., Ex. 8, at ¶ 25) At that meeting, Browne Sanders' attorneys stated,

among other things, that Browne Sanders had been subjected to sexual harassment at MSG and provided MSG's counsel with information concerning Browne Sanders' claims. (Id.)

59. Shortly after the December 22, 2005 meeting between plaintiff's counsel and MSG's counsel, MSG began an internal investigation of plaintiff's sexual harassment complaint. MSG's internal investigation was conducted by, among others, Noel and Moran. (Mintzer-Thomas Decl., Ex. 25, at ¶ 7)

60. Moran and Noel interviewed plaintiff on January 6, 2006, at which time Browne Sanders provided substantial detail about her sexual harassment complaint. (Noel Dep. Ex. 14)

61. Moran and Noel also interviewed Thomas on December 23, 2005 and January 11, 2006, during which Thomas falsely denied most of Browne Sanders' allegations. (Moran Dep. Exs. 10 and 11 and Noel Dep. Exs. 2, 13, 14) In those interviews Thomas also volunteered numerous criticisms about Browne Sanders as set forth above. (See ¶ 15, supra)

62. On January 24, 2006, plaintiff filed this action. That same day, lawyers for Thomas and MSG made statements to the press on behalf of their respective clients. MSG claimed that plaintiff's claim was "fabricated and outrageous" and that Browne Sanders was "fired because of an inability to fulfill her professional responsibilities." (Rule 56.1 Statement in Support of Defendants Madison Square Garden, L.P. and James L. Dolan's Motion for Partial Summary Judgment ("MSG 56.1 Statement"), dated April 27, 2007, at ¶ 54) Thomas' lawyers stated that plaintiff's claims were "a blatant attempt by Anucha Browne Sanders to get a large sum of money from Madison Square Garden by taking advantage of the celebrity status of our client." (Mintzer-Thomas Decl., Ex. 4) Plaintiff responded to these smears in a statement that she read at a press conference on January 25, 2006. That same day, Thomas held a press

conference in which he falsely denied plaintiff's claims and asserted that Browne Sanders was trying to use him as a "pawn" for her "financial gain." (Rule 56.1 Statement of Isiah Thomas ("Thomas 56.1 Statement"), dated May 4, 2007, at ¶ 43, submitted in support of Thomas' motion for partial summary judgment) Two days later, Thomas held another press conference, in which he again falsely denied Browne Sanders' claims. (Thomas 56.1 Statement ¶ 44)

63. Thomas' Answer to plaintiff's Complaint specifically alleges that "plaintiff's inability to accept the changes that occurred under Thomas' leadership fueled her antipathy toward Thomas and are reflected by this meritless lawsuit." (Franco Decl., Ex. B at 2)

64. In February 2006, Browne Sanders filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against MSG based on the same events described in her original Complaint, including her claims that she was sexually harassed and that she was fired for engaging in protected activity. (Mintzer-Thomas Decl., Ex. 5) In April 2006, MSG submitted a Position Statement to the EEOC concerning Browne Sanders' charge. In its Position Statement, MSG represented that Browne Sanders "refused to accept and adapt to changes in procedure after Isiah Thomas joined the Knicks in December 2003 as President, Basketball Operations." According to MSG, Browne Sanders was fired, at least in part, because she refused "to adapt to the changes instituted by Thomas." (Mintzer-Thomas Decl., Ex. 6)

65. Thomas falsely stated to the representative of the EEOC who was investigating Browne Sanders' charge of discrimination that Browne Sanders "did not like" the organizational changes that Thomas had implemented within basketball operations. (Mintzer-Thomas Decl., Ex. 7)

66. Browne Sanders did not object to the managerial changes that Thomas instituted concerning the functioning of the basketball operations department. Nor did Browne Sanders seek to have a greater role in basketball operations. Browne Sanders and Mills did discuss Browne Sanders' concerns that Thomas was not making the basketball operations staff, including the players and himself, available for business operations activities. (Browne Sanders Decl. ¶ 10)

67. At Dolan's deposition in December 2006, Dolan claimed that he made the decision to fire Browne Sanders from MSG, and he did so on his own, without consulting anyone else. (Dolan Dep. 87) Dolan's stated reasons for firing Browne Sanders are now, among other things, that Browne Sanders purportedly requested six million dollars in severance and that she allegedly violated MSG's policies by tampering with the internal investigation of her sexual harassment complaint. (Dolan Dep. 73-94, 177-192)

68. In fact, Browne Sanders never made a "severance demand" to MSG. Rather, her counsel and MSG's counsel attempted to settle her claims of sexual harassment. (Mintzer-Thomas Decl., Ex. 8, at ¶¶ 25-29) Furthermore, Browne Sanders did nothing to "tamper" with MSG's investigation. Rather, at various times in 2004 and 2005, Browne Sanders spoke with other MSG employees about, among other things, interactions and difficulties that she had with Thomas and Marbury. (Buchholz Dep. 124-33; Brown Dep. 151-59, 161-73, 179-82; Nix Dep. 76-81, 91-95, 140-48, 166-67, 281-82)

69. Although Browne Sanders has applied for jobs with hundreds of potential employers in a wide variety of businesses, she is presently working as an independent contractor for a non-profit organization. Her annual compensation is less than half of what she had earned at MSG. Moreover, Browne Sanders has repeatedly been asked about the circumstances of her

dismissal from MSG by prospective employers and executive recruiters, some of whom have specifically referred to her dismissal from MSG in discussing potential jobs that she ultimately was not offered. (Browne Sanders Decl. ¶¶ 3-4)


Dated:     New York, New York
           May 25, 2007

By: _____
Anne C. Vladeck (AV 4857)
Kevin T. Mintzer (KM 4741)
Karen Cacace (KC 3184)
VLADECK, WALDMAN, ELIAS &
  ENGELHARD, P.C.
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300

245108 v1                                17