```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   -------------------------------x
     ANUCHA BROWNE-SANDERS,
 5
               Plaintiff,
 6
          vs.                          No. 06 Civ. 0589
 7                                     (GEL)(DF)
     MADISON SQUARE GARDEN, L.P.,
 8   ISIAH LORD THOMAS, III,
     and JAMES DOLAN,
 9
               Defendants.
10   -------------------------------x
11
12
13
14             February 26, 2007
15             10:11 a.m.
16
17        Videotaped deposition of BARRY
18   WATKINS, held at the offices of Vladeck,
19   Waldman, Elias & Engelhard, P.C., 1501
20   Broadway, New York, New York, pursuant to
21   notice, before Cary N. Bigelow, RPR, a
22   Notary Public of the State of New York.
23
24
25
```

```
1                       Watkins
2      they said to the press?
3           A.    I don't think so, no.
4           Q.    Had you discussed it with them, what
5      they were going to say to the press?
6           A.    Yeah, sure.  We discussed that they
7      were going to give the statements out to every
8      media person that called in.
9           Q.    Apart from the statements, were they
10     also giving the reporters information on
11     background that wasn't in the statement?
12          A.    I don't know.  I don't think so.  I
13     think it was basically just sticking to this
14     defensive strategy.
15          Q.    At any point do you know whether Dan
16     Klores Communications, any of the employees of
17     Dan Klores giving information to the media on
18     background that wasn't contained in the official
19     statements?
20          A.    I don't know.
21          Q.    Are you aware, did Madison Square
22     Garden or anyone acting on Madison Square
23     Garden's behalf provide the media with any
24     derogatory information about Miss Browne-Sanders
25     that wasn't part of the official statements
```

1                           Watkins

2    issued by the Garden?

3        A.    No.

4            MR. GREEN:  Objection to form.

5            You may answer.

6        A.    No.  Like I said, we released various
statements in response to Anucha's press
campaign and on background with people that I
had relationships with, I certainly would
explain the statement and, you know, just
reiterate the fact that she was looking for
money here and it was baseless accusations and I
may have said that I saw her with Isiah quite a
bit and saw lots of mutual hugging and things
like that, but as far as anything inflammatory,
no, I don't think I'm aware of anything.

17       Q.    Who did you speak to on background?

18       A.    Excuse me?

19       Q.    Who were the reporters -- you just
mentioned that you spoke to some reporters on
background you had close relationships with; I'm
asking who they are.

23       A.    You asked me a couple of names and I
gave you the answers.  I don't remember exactly,
but the Knick writers that would call in, you

147

Watkins

people from his office?

A. Yes.

Q. Anyone in particular?

A. I don't remember exactly which lawyers were there. I am not sure I knew who everybody who was in the room, but there were lawyers from, I think, from Ron's office, I don't remember, lawyers from the Garden, lawyers from Peter's office or consultants.

Q. Approximately how many people were part of that second meeting that was crafting this statement?

A. Eight, 10, maybe.

(Watkins Exhibit 2, document bearing production No. MSG 6197, marked for identification, as of this date.)

Q. Mr. Watkins, why don't you read this document, which for the record is MSG 6197, which has been marked as Watkins Exhibit 2 for identification.

A. Okay.

Q. Is this an e-mail you received from Mary Pat Clarke?

A. Yes.

```
                                                          148
 1                      Watkins
 2       Q.    It discusses the press coverage of
 3   Anucha Browne-Sanders' lawsuit?
 4       A.    Right.
 5       Q.    Can I ask you to look in the first
 6   paragraph, the third sentence, it says, "During
 7   the day we conducted significant background with
 8   media to refute the allegations, focusing most
 9   specifically on the fact that this is all about
10   money."
11             Do you see that?
12       A.    Uh-huh.
13       Q.    What's the significant background that
14   Miss Clarke was referring to here, if you know?
15       A.    It's exactly what I said earlier, when
16   the sports media would call in and the people we
17   had relationships with, we would do two things,
18   we would give them the numbers to Klores to call
19   to get the official statement and on background
20   we would set the record straight and speak to
21   the fact that it was about money and it was
22   baseless and we would be proven in court that it
23   was right.
24       Q.    I am sorry, that what?
25       A.    I said that we'd be proven in court
```