UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
ANUCHA BROWNE SANDERS,

           Plaintiff,

    - against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD
THOMAS, III, AND JAMES L. DOLAN,

           Defendants.
----------------------------------------X

Case No. 06 Civ. 568 (GEL) (DCF)

**AFFIDAVIT OF STEPHEN MILLS**

STATE OF NEW YORK    )
                          ) ss.
COUNTY OF NEW YORK  )

        STEPHEN MILLS, being duly sworn, deposes and says:

        1.    I am the President and Chief Operating Officer, MSG Sports, for Madison Square Garden, L.P. ("MSG"). I submit this affidavit in support of MSG's and James L. Dolan's motion for partial summary judgment in the above-captioned action filed by Anucha Browne Sanders ("Plaintiff"), a former employee of MSG. I have personal knowledge of the facts set forth herein.

Plaintiff's Employment

        2.    I initially met Plaintiff in 1996 while she worked for IBM, and I was employed at the National Basketball Association. In 2000, after I became employed at MSG, Plaintiff worked on a potential project for MSG and I was impressed with her work performance.

        3.    In or around November 2000, I personally recruited and hired Plaintiff for the position of Vice President, Marketing, for the New York Knickerbockers ("Knicks"), a division of MSG. She was hired on November 20, 2000.

NY:1790703v1

4.  At all times during her employment with MSG, Plaintiff reported directly to me. We interacted on a daily basis as to all aspects of her job performance.

5.  I promoted Plaintiff while at all times believing that she was a person of honesty and integrity worthy of the trust that I personally and MSG, as a company, had placed in her.

6.  I believed that she was complying fully with MSG's policies designed to preserve its corporate image and the trust of individuals and businesses with which MSG did business.

7.  As the chief marketing officer for the Knicks from the time of her hire to her March 2002 promotion, Plaintiff was responsible for all aspects of the Knicks' marketing and media efforts, as well as promoting business sponsorships and fan development. Her duties also included supervising the Knicks' promotion and charitable efforts in the local community, such as the promotion of literacy and poetry programs in the schools. In her position, she had access to highly confidential financial and proprietary business material and, as such, she was in a position of extreme trust.

8.  On or about March 11, 2002, I promoted Plaintiff to Senior Vice President, Marketing and Business Operations, one of the most important and visible senior executive level positions at MSG with day-to-day responsibility over revenue and expenses in the Knicks' marketing and business operations budget, which reached $120 million by the 2005-2006 season. This job included not only her responsibilities as Vice President Marketing, but expanded to include, among other things, profit and loss management of all of the Knicks' sales, marketing and business operations. Plaintiff's position required her to interact with individuals and businesses vital to the Knicks' financial success, including its sponsors, vendors and fans.

Plaintiff regularly attended Knicks' home games and NBA meetings, and negotiated and entered into contracts with major Knicks' vendors and sponsors, such as McDonalds and Foxwoods Casino Hotels. Her increased responsibilities placed her in an even higher level of trust within the organization.

9. Prior to her termination, Plaintiff's poor job performance became increasingly apparent, including but not limited to, her poor management style and performance in defining a strategic direction for the Knicks and in the budget process. I made efforts to accommodate her job performance issues by speaking with Plaintiff and recommending outside professional instruction in areas where she needed improvement. I requested that she be provided further opportunity to correct her job performance, against the recommendation of Hank Ratner, Vice Chairman of MSG, who felt she was not qualified for her position. At the time that I made these efforts, I had no reason to know of Plaintiff's violations of MSG policies and of the trust I had placed in her.

10. In late November 2005, Plaintiff told me she had lost the respect of her peers and subordinates, could not do her job and needed my help finding another job. I agreed to help her make the transition to new employment. She <u>subsequently</u> raised an internal complaint of discrimination through her counsel against Isiah Thomas in late December 2005, and then demanded that MSG pay her $6.5 million.

11. On January 19, 2006, Plaintiff's employment with MSG was terminated for legitimate non-discriminatory reasons, including but not limited to, her poor job performance.

Plaintiff's Tax Returns

12. I understand that Plaintiff has produced in this case her federal and state income tax returns for the years 2001 - 2005.

13. I understand that Plaintiff's tax returns for 2001 - 2004 certify that she was the proprietor of a direct marketing business, and claimed a substantial number of business deductions, including but not limited to, car expenses, taxes and licenses, professional dues, attending conferences, telephone, books and subscriptions, and office expenses.

14. I understand that, shortly before being deposed in this case, Plaintiff amended her 2003 and 2004 tax returns, but did not amend her 2001 and 2002 returns, to eliminate all references to her direct marketing business, as well as almost all of her charitable contributions for 2003 and 2004.

15. I have reviewed that portion of Plaintiff's deposition testimony where she states that she ***did not own or operate*** a direct marketing business.

16. It appears from the tax returns filed in 2001, 2002, 2003 and 2004, the amended returns for 2003 and 2004, and her deposition testimony that Plaintiff purposefully provided false information on her tax returns in order to claim and receive a substantial tax benefit. Submitting false tax returns is illegal conduct in violation of MSG policy and is an act of personal dishonesty in violation of the trust that was placed in her.

Legal Compliance/Personal Interests

17. I have reviewed MSG's Confidentiality, Code of Business Conduct and Proprietary Agreement (the "Agreement") signed by Plaintiff when she began employment which states that:

> [d]uring my employment I may not engage in activities or have personal or financial interests that impair, or appear to impair, my independence or judgment or otherwise conflict with my responsibilities to [MSG]. Such activities include, but are not limited to: . . . (g) serving as an officer, director, agent, employee, consultant or provider of or in any other capacity for any for-profit organization.

18. The Agreement is between MSG and each of its employees. The Agreement provides that "any breach of the agreement will result in . . . immediate termination" and "that the company may, in addition, pursue its legal and equitable remedies in the event of a breach or threatened breach."

19. I have reviewed the legal compliance provision in MSG's Code of Business Conduct and Ethics, which provides that each employee is personally responsible for complying "with all applicable laws and regulations" and for "adher[ing] to the standards and restrictions imposed by those laws and regulations."

20. In addition, I have reviewed MSG's Employee Handbook dated April 2003, which provides under a section titled, "How We Conduct Ourselves: Employee Code of Conduct," that illegal activity is prohibited, and that an employee who fails to maintain MSG's conduct standards is subject to disciplinary action up to and including termination.

21. Had I received knowledge during any period of her employment that Plaintiff was engaging in such illegal conduct in violation of MSG's policies, I would have recommended Plaintiff's immediate termination from employment with MSG. Furthermore, this illegal conduct would prevent her from ever again being employed at MSG.

Plaintiff's Direct Marketing Business

22. I have also reviewed the portions of Plaintiff's 2001 - 2004 income tax returns certifying that *she owned and operated* a direct marketing business.

23. I further understand that Plaintiff testified at her deposition in this case that she understood that if she owned or operated a direct marketing business during her employment with MSG such an ownership interest would violate the Agreement.

24. I had no knowledge that Plaintiff was the proprietor of a direct marketing business while she was employed at MSG as stated on her 2001 - 2004 tax returns. She never asked me for or received my approval to conduct her own outside personal business.

25. If Plaintiff owned or operated a direct marketing business during her employment with MSG without MSG's knowledge and consent, as her tax returns certified (and her 2001 - 2002 tax returns continue to certify), such an ownership would violate the Agreement.

26. Had I received knowledge during her employment that Plaintiff owned and operated an undisclosed direct marketing business without even seeking MSG's consent, I would have recommended Plaintiff's immediate termination from employment with MSG. Her violation in this regard would prevent her from ever again being employed by MSG.

Amended Returns

27. I have reviewed that portion of Plaintiff's deposition testimony where she states that her deductions for a direct marketing business were **"incorrect."**

28. It is my further understanding that on November 22, 2006, Plaintiff elected to amend only two of the four years of her false tax returns by eliminating, among other things, deductions for the direct marketing business and almost all of her substantial charitable contributions.

29. Plaintiff, who knew, based on her deposition testimony, that her returns for 2001 and 2002 were "incorrect" and provided her with a tax benefit to which she knew she was not entitled, has chosen to keep the benefit of those false deductions.

30. Plaintiff's conduct demonstrates a lack of personal integrity necessary for me to entrust her with the responsibility for managing the Knicks' business operations.

31. Her lack of integrity and personal honesty would prevent her from ever again being employed by MSG.

Sworn to before me this
27th day of April 2007.

_____
NOTARY PUBLIC

MARC J. SCHOENFELD
NOTARY PUBLIC, State of New York
No. 02SC5083349
Qualified in New York County
Commission Expires August 11, 2009

_____
Stephen Mills