Sanders v. Madison Square Garden, L.P. et al

Doc. 87 Att. 1

# EXHIBIT M

Dockets.Justia.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

06 Civ. 0589 (CGE)

-------------------------------------------x

ANUCHA BROWNE-SANDERS,

                     Plaintiff,

      - against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD

THOMAS, III, and JAMES DOLAN,

                   Defendants.

-------------------------------------------x

                December 11, 2006
                10:00  a.m.


        VIDEOTAPE DEPOSITION of JAMES

DOLAN, taken by the Plaintiff, pursuant to

Notice, held at the offices of Vladeck

Waldman Elias & Engelhard, P.C, 1501

Broadway, New York, New York, before

Debbie Zaromatidis, a Shorthand Reporter

and Notary Public of the State of New

York.

1                    DOLAN

2    that I specifically remember was when Mr.

3    Mills reported to us that Ms. -- Ms.

4    Browne was leaving the company.

5        Q.    What did he say and what did

6    anyone else there say?

7        A.    Mr. Mills reported that he had

8    had a meeting with -- with Ms. Browne and

9    that Ms. Browne had informed him that she

10   did not wish to continue on in her

11   position, and I believe that Mr. Ratner

12   was -- I don't know if I could use the

13   right word.  I don't know if I could say

14   he was pleased, but Mr. Ratner thought

15   that that was a good development for the

16   company.

17       Q.    Anybody else say anything else?

18       A.    Mr. Mills reported that he was

19   going to work on an arrangement where Ms.

20   Browne could -- could leave the company.

21   The -- on some sort of graduated basis,

22   continue to perform her duties, look for

23   another position.  I believe Ms. -- that

24   Steve reported that Ms. Browne asked

25   her -- asked him to help in locating

Page 53

```
 1                    DOLAN
 2    responsibilities for the Knicks.
 3         Q.    Do you recall approximately when
 4    that was?
 5         A.    Obviously prior to July.  I
 6    think significantly prior, meaning
 7    somewhere longer than six months prior.
 8         Q.    So would it have been in 2004?
 9         A.    It could have been, but it could
10    have been earlier.  It could have been
11    early 2005.
12         Q.    Now, prior to the November,
13    December time frame when you say that Mr.
14    Mills told you and others that
15    Ms. Browne-Sanders was leaving The Garden,
16    had you heard anyone be critical of
17    Ms. Browne-Sanders?
18              MR. GREEN:    Objection to form.
19    You may answer it.
20         A.    Yes.
21         Q.    Who did you hear who had a
22    criticism of Ms. Browne-Sanders?
23         A.    Well, I had criticism of
24    Ms. Browne-Sanders, and Mr. Ratner had
25    criticism of Ms. Browne-Sanders.
```

Page 54

1                    DOLAN

2       Q.    Let's start with Mr. Ratner.

3   What criticism did Mr. Ratner express to

4   you of Ms. Browne-Sanders?

5       A.    I think Mr. Ratner's criticism

6   centered around the thing that I

7   was -- that I had mentioned before, the

8   inability to perform the duties,

9   responsibilities of the job, that the

10  skill levels were not there.

11      Q.    What skills did

12  Ms. Browne-Sanders not have in your view

13  or in Mr. Ratner's view as he expressed it

14  to you?

15          MR. GREEN:    Objection to form.

16  You may answer.

17      A.    Mr. Ratner specifically felt

18  that Ms. Sanders had problems getting

19  along with other executives in -- in the

20  company.  The -- but I also think that he

21  agreed with me that Ms. -- Ms. Sanders

22  particularly was missing the budgetary

23  skills, the financial skills as well as

24  the branding and marketing management

25  skills that were necessary in order to do

Page 55

1                    DOLAN

2    the job.

3        Q.    And did Mr. Ratner tell you who

4    he believed that she had problems getting

5    along with?

6        A.    I don't recall.

7        Q.    Did anyone tell you that they

8    had problems getting along with

9    Ms. Browne-Sanders?

10       A.    I don't specifically recall.

11       Q.    Did Mr. Ratner tell you how he

12   came to form a belief that

13   Ms. Browne-Sanders had problems getting

14   along with others?

15       A.    I'm sure he did, but I don't

16   specifically remember -- recall the

17   specifics of it.  No.

18       Q.    Did he tell you that he had

19   understood that that was her reputation or

20   words to that effect?

21            MR. GREEN:    Objection to form.

22   You may answer.

23       A.    As I said, I don't specifically

24   recall, you know, how -- what he used as

25   his rationale or backup for forming that

Page 56

1                    DOLAN

2    opinion.

3        Q.    And what were the budget and

4    financial skills that you said both you

5    and Mr. Ratner believed that

6    Ms. Browne-Sanders was lacking?

7        A.    Well, in -- budgeting is a -- it

8    is part of a managerial science.   In

9    essence the -- a budget is a numerical

10   expression of a -- of a plan of action for

11   an upcoming period of time, generally a

12   year in advance sometimes as much as five

13   years in advance.   The -- it requires

14   the -- the person in charge of that

15   operation to first be able to articulate

16   what their plans, their goals, their

17   objectives are for their area of

18   responsibility for that period of time.

19   It then requires from there the planning,

20   the -- the strategies, tactics, the

21   execution of those, the -- in advance

22   obviously for -- as long as the period of

23   time as the budget is for.   From that,

24   there -- there is then a financial portion

25   of that that is then translated into a

Page 57

```
 1                    DOLAN
 2   budget, a plan, a financial plan
 3   essentially saying we are going to -- we
 4   are going to achieve this goal by using
 5   these strategies and these tactics, and
 6   these tactics will involve the spending of
 7   this money, the using of these resources,
 8   et cetera, the -- and then ultimately
 9   having that result in an overall financial
10   plan for whatever the operation is that
11   you're running.  The -- Ms. Sanders did
12   not understand that basic concept.
13        Q.    Which basic concept?
14        A.    The basic concept is that the
15   budget was a plan -- the basic -- was a
16   reflection of the plan for the upcoming
17   year.
18        Q.    And how do you know that she did
19   not understand that basic concept?
20        A.    Because as I reviewed her
21   submission for a budget, it became clear
22   that she did not understand what she
23   needed to do in order to -- to complete
24   the -- a budget, a financial plan.  She
25   could not answer the questions that the
```

Page 58

1                        DOLAN

2    person who was the author of such a

3    document would need and you would expect

4    would be able to answer.  The --

5        Q.    Do you remember any questions

6    that she was unable to answer?

7        A.    Oh, yes.  Specifically

8    the -- the way we review a budget we start

9    off not with any of the numbers per se,

10   but we start off asking the manager, the P

11   and L manager, to write down for us their

12   goals, strategies, tactics, the -- and in

13   the case of Ms. Browne-Sanders' area we

14   also required a branding statement.  These

15   formed the basis for which you then form

16   the plan for -- for the operating year

17   ahead.  It took us several meetings and a

18   great deal of coaching sometimes to the

19   point where I felt that I was authoring

20   the plan in order to get a sufficient

21   document that you could rely -- that you

22   could then use to formulate the -- a

23   budget off of.

24       Q.    And when was the first of these

25   several meetings that you said that there

Page 59

1                  DOLAN

2    was a great deal of coaching and when did

3    you have a sufficient document?

4           MR. GREEN:    Objection.

5    Multiple, compound question.  You may

6    answer.

7       Q.    What is the time frame --

8       A.    What -- roughly July if -- that

9    is summer.

10      Q.    Now, when were all of the

11   meetings where there were several meetings

12   and a great deal of coaching?

13      A.    In that -- in the summertime,

14   June, July.  I believe it went into

15   August.

16      Q.    Now, prior to the June, July,

17   August time frame, had you seen

18   Ms. Browne-Sanders at budget forecast or

19   strategy meetings?

20      A.    I don't recall.

21      Q.    Prior to the June, July, August

22   time frame, had you formed an opinion of

23   Ms. Browne-Sanders' skill set or skill

24   level?

25           MR. GREEN:    Objection to form.

Page 60

```
 1                  DOLAN
 2   In 2005, Anne?
 3           MS. VLADECK:   Yes.
 4      A.    No, I don't believe I had in
 5   that position.
 6      Q.    When you keep saying in that
 7   position, what position are you referring
 8   to?
 9      A.    Well, I think that Ms. Saunders
10   had a job prior to this, the -- where she
11   was not in charge of the direct marketing
12   the -- of the Knicks, that she was in a
13   position where she was in charge of
14   portions of the execution of -- of that
15   marketing.  The -- and the -- I believe
16   that she did a good job at that time,
17   the -- that was Mr. Mills -- I believe his
18   statements to me in -- his rationale in
19   promoting her into the position that he
20   did promote her into was that she had done
21   a good job in the job she had before.
22   The -- and it was a promotion, and
23   necessarily with a promotion you make a
24   move up the ladder of the company that you
25   are working for, and you take on
```

Page 61

1                    DOLAN

2   additional duties, responsibilities, et

3   cetera, and hopefully you've done a good

4   job and the -- you are ready to do that.

5   It became clear in July that Ms. Sanders

6   was not ready to do that, that it was in

7   my opinion a mistake to -- to promote her

8   to that position, but she was in the --

9   the position.

10       Q.    And to the best of your

11   recollection, when did she become

12   responsible for the areas that you thought

13   she was not ready for?

14       A.    Again, I -- you know, it is

15   prior to that July period.  She had enough

16   experience that she was not considered new

17   at that July meeting and whether that was

18   six months or a year I have -- you know, I

19   can't tell you.

20       Q.    So you formed an impression in

21   the June, July, August 2005 time frame

22   that Ms. Browne-Sanders did not have the

23   skills for the job that she had at that

24   time?

25       A.    Yes.

Page 62

1                  DOLAN

2    · Q.    Prior to that time at any point,

3    did anyone express criticism of her to

4    you?

5            MR. GREEN:   Objection.  Asked

6    and answered.  You may answer again.

7        A.    Yes, I think we did.  I said

8    before no, not that I recall.

9        Q.    You said that Mr. Ratner had

10   expressed criticism to you of

11   Ms. Browne-Sanders?

12       A.    Yes.

13       Q.    On how many occasions did he

14   express criticism?

15       A.    More than once and not every

16   day.

17       Q.    Can you approximate how many

18   times?

19            MR. GREEN:   Do you have a time

20   frame, Anne? It may be helpful to the

21   witness.

22            MS. VLADECK:   I think he said

23   that it never happened before the

24   summertime frame.

25       A.    I don't recall it happening

Page 64

1                    DOLAN

2    of the opinion that Ms. Sanders should be

3    fired essentially from the time that we

4    had those July budget meetings through to

5    when she ultimately was fired.

6        Q.    When he first raised with you

7    his belief that she should be fired, what

8    did you say?

9        A.    Well, I know that I did not

10   agree that she should be fired.

11       Q.    What did you say?

12       A.    That we gave her the position,

13   the -- I agree she is not skilled

14   for -- but let's give her an opportunity

15   to build those skills.  If she doesn't

16   take the opportunity to build the skills,

17   then that is another thing, and we will

18   have to have a replacement.

19       Q.    Did you at any point tell Mr.

20   Mills to tell Ms. Browne-Sanders that you

21   believed that she was not skilled and that

22   she had to build her skills?

23             MR. GREEN:   Objection to form.

24   Could you have the question read back to

25   us, please.

Page 65

```
 1                    DOLAN
 2           MR. VLADECK:   Sure.
 3           THE WITNESS:  No, I heard it.
 4           MR. GREEN:    Okay.
 5       A.    What I told Mr. Mills is
 6   that -- not that I told him to tell her
 7   that -- because -- that -- what I told Mr.
 8   Mills was that I believed she didn't have
 9   the skills, the -- and that rather than
10   letting her go because she couldn't do the
11   job, that we needed to provide her with
12   training and attempt to get her up to the
13   level that she needed to be in terms of
14   her skill level, so that she could do the
15   job.  It was my feeling that the -- when
16   you do that for an employee that you get
17   back a very good employee assuming they
18   are willing to rely apply themselves and
19   learn the position.  The -- and it was my
20   hope that that was what was -- would
21   happen with Ms. Browne-Sanders.
22       Q.    What, if anything, did Mr. Mills
23   tell you when you discussed your belief
24   that Ms. Browne-Sanders wasn't performing?
25       A.    The -- I believe Mr. Mills
```

Page 66

                        DOLAN

 1

 2    wanted to give Ms. Sanders an opportunity

 3    to be successful on the job.  He did

 4    agree -- I don't recall that I had to

 5    argue with him about it.  He did agree

 6    that he would go and work with our staff

 7    in putting together a training plan that

 8    would be designed to fill the gaps

 9    in -- in Ms. Saunders' skill set that she

10    needed in order to do the job.

11         Q.    And can you describe what those

12    gaps were?

13         A.    Essentially what I said before.

14    The -- budgeting, the -- the broader

15    managerial level of marketing particularly

16    having to do with branding.  The --

17         Q.    And --

18         A.    I believe there was some

19    discussion at least of -- of general

20    personnel management kind of skills, but I

21    don't know that that -- in my mind at

22    least, that wasn't the primary reason for

23    sending her for training.

24         Q.    And who --

25              MS. VLADECK:   Just one more.

```
 1                    DOLAN
 2   from the -- the budget meeting, and really
 3   my opinion of her changed pretty
 4   dramatically from when you talk about pre
 5   that July period to post that July period.
 6       Q.    Other than Mr. Mills and Mr.
 7   Ratner, did you get input from anyone else
 8   on their view of Ms. Browne-Sanders?
 9            MR. GREEN:   Objection to form.
10   You may answer.
11       A.    In what period?
12       Q.    Any period.
13       A.    Can you ask the question again?
14            MS. VLADECK:   Can you read it
15   back.
16            (Record read.)
17       A.    I am sure Mr. McCormack gave me
18   his view.
19       Q.    What was Mr. McCormack's view?
20       A.    Well, Mr. McCormack,
21   the -- would have given me his view.  I
22   believe he did give me his view right at
23   the time that Ms. Sanders was let go.
24       Q.    And what did he say to you and
25   what did you say to him?
```

Page 74

DOLAN

1

2      A.     Mr. McCormack said that

3   Ms. Sanders had willfully violated the

4   company's policies and had undermined his

5   investigation of the charges of sexual

6   harassment that he had -- was charged with

7   investigating.

8      Q.     What did he say she had done

9   which was a willful violation of the

10  company policies?

11     A.     That she had attempted to

12  influence her direct reports using her

13  authority.

14     Q.     Anything else?

15     A.     I believe he told me that

16  he -- that she took one of her direct

17  reports here.

18     Q.     What did he say about that?

19     A.     Well, that clearly was against

20  company policy.

21     Q.     What company policy is it

22  against?

23     A.     When you are -- put in a

24  complaint regarding sexual harassment or

25  actually a complaint, any complaint that

1                    DOLAN

2    needs to be investigated at the company,

3    we have a human resources and employee

4    relations department that are charged

5    with -- with -- with doing that, and that

6    the -- as you would expect when someone

7    makes a complaint there is always

8    obviously two sides to it, and what the

9    company deems necessary is to have

10   the -- its HR, ER person the group

11   investigate that from basically a third

12   party's point of view.  It requires both

13   parties to the -- to not discuss the

14   matter any further, not engage

15   in -- obviously in any further discussions

16   between themselves regarding the matter

17   and allow the HR department to conduct an

18   investigation and come to a conclusion.

19        Q.    Is it your belief that the HR

20   department came to a conclusion?

21             MR. GREEN:    Objection to form.

22   You may answer.

23        A.    No, I don't believe that

24   they -- that they had at that point.

25        Q.    No.  Do you believe they have at

Page 76

1                    DOLAN

2    any point?

3            MR. GREEN:    Same objection as

4    to form.  You may answer if you know, Mr.

5    Dolan.

6        A.    Yes, I have come -- that the HR

7    department believes that they came to a

8    conclusion regarding the complaint that

9    was made.

10       Q.    Did the HR department ever make

11   a recommendation based on the conclusion

12   that it came to?

13           MR. GREEN:    You mean to Mr.

14   Dolan himself?

15           MS. VLADECK:    To anyone.

16           MR. GREEN:    Objection to form.

17   If you know, Mr. Dolan, you may answer.

18       A.    Not that I am aware of.

19       Q.    Now, going back to the

20   conversation that you had with Mr.

21   McCormack, you stated that he told you

22   that Ms. Browne-Sanders attempted to

23   influence her direct reports using her

24   authority?

25       A.    Yes.

Page 77

1                    DOLAN

2      Q.    What did Mr. McCormack say to

3  you about that?

4      A.    That Ms. Sanders had brought in

5  her direct reports, that she attempted to

6  infuse a memory into them of -- of the

7  particular times that the complaint was

8  registered about essentially attempting to

9  coerce her -- her direct reports into

10  corroborating her complaint.

11     Q.    Did he identify any of these

12  direct reports that she attempted to

13  coerce?

14     A.    I don't specifically remember.

15     Q.    Now, you said that he said to

16  you that she brought in her direct

17  reports.  Was it your understanding that

18  during the time of the investigation that

19  Ms. Browne-Sanders was at work?

20     A.    Yes.

21          MR. GREEN:   Objection to form.

22  Which investigation are you referring to?

23          MS. VLADECK:   The one that he

24  is referring to that Mr. McCormack said

25  that she was attempting to coerce people.

Page 84

1                    DOLAN

2       A.     With that in mind, I think the

3    answer is no.

4       Q.     Were you aware that

5    Ms. Browne-Sanders had complained to Pete

6    Olsen concerning sexual harassment before

7    she went to a lawyer?

8            MR. GREEN:    Same objection.

9       A.     No.

10      Q.     Did you believe that

11   Ms. Browne-Sanders going to a lawyer was a

12   violation of any company policy?

13      A.     No.

14      Q.     Do you believe that two

15   employees together going to a lawyer is a

16   violation of company policy?

17           MR. GREEN:    Objection.  Asked

18   and answered.  The witness may answer if

19   he understands the question.

20      A.     I think it depends on the

21   situation.

22      Q.     In what circumstances would it

23   not be a violation of policy?

24           MR. GREEN:    Objection.  The

25   witness has answered that question now

Page 85

1                    DOLAN

2    several times.  I object to the form of

3    the question.  If he wants to amend a

4    prior answer, he may.  I am instructing

5    him not to say what he said twice before.

6              MS. VLADECK:    It is a different

7    question.  Maybe if you hear it read back.

8        A.    I think it -- I think I can

9    answer the question.  I think it

10   is -- the -- when the employees are going

11   on their own behalf, I think that is fine.

12       Q.    When did Mr. McCormack tell you

13   that Ms. Browne-Sanders had willfully

14   violated company policies and undermined

15   his investigation of her charges?

16       A.    I don't have the specific date.

17   It was on a helicopter ride between our

18   corporate offices in Bethpage and West

19   30th Street here.

20       Q.    Can you time it as to proximity

21   to when she was actually fired?

22       A.    Same day I think.  Within 24

23   hours.

24       Q.    Prior to that helicopter ride,

25   have you had any other conversations with

Page 86

```
 1                    DOLAN
 2   Mr. McCormack concerning
 3   Ms. Browne-Sanders?
 4            MR. GREEN:   Objection to form.
 5   At any time ever?
 6            MS. VLADECK:   Yes.
 7       A.   I don't recall.
 8       Q.   Prior to that helicopter ride,
 9   had you had conversations with Mr.
10   McCormack or anyone else with respect to
11   the investigation into her charges?
12            MR. GREEN:   To the extent that
13   that would require you to reveal
14   conversations you had in the presence of
15   counsel, Mr. Dolan, or at the direction of
16   counsel, you may not answer this question.
17            MS. VLADECK:   This is a yes or
18   no.  Can I have the question read back,
19   please.
20            (Record read.)
21            MR. GREEN:   Because the
22   question contains the substance and
23   subject of the meeting, I instruct the
24   witness not to answer to the extent it
25   would be a meeting at which counsel was
```

Page 87

                        DOLAN

1

2    present or held at counsel's direction.

3    So you may not answer this question if you

4    had any such meeting or discussion at

5    the -- in the presence of counsel or at

6    the direction of counsel.

7        A.    Okay.  I got the direction.  I

8    think that -- that the answer -- I know

9    that the answer is that the only

10   communication I had with Mr. McCormack

11   prior to this in regards to this -- this

12   matter would be to verify that he was in

13   fact investigating the matter.

14       Q.    Who made the decision to have

15   Ms. Browne-Sanders' employment be

16   terminated by The Garden?

17       A.    I did.

18       Q.    Did you make it on your own or

19   was it with others, consultation or

20   something else?

21       A.    Well, all decisions at The

22   Garden I make on my own.

23       Q.    And what were the reasons or

24   what was the reason you fired

25   Ms. Browne-Sanders?

Page 95

```
 1              DOLAN
 2   Rusty McCormack dated January 19, 2006,
 3   and it's Bates numbers MSG's 6363 and
 4   6364.
 5          (Pause.)
 6   A.    Okay.
 7   Q.    Have you had a chance to review
 8   Dolan Exhibit 1?
 9   A.    Yes.
10   Q.    Have you ever seen that before
11   today?
12   A.    No.
13   Q.    If you look at the part under
14   the heading Anucha Browne-Sanders --
15   A.    Yes.
16   Q.    -- it says "As the record
17   indicates most of the Browne-Sanders'
18   allegations were not confirmed."
19          Do you see that?
20   A.    I do see that.
21   Q.    Do you know which, if any, of
22   her allegations were confirmed?
23          MR. GREEN:   Objection to form.
24   A.    No, I don't.
25   Q.    It says later "It is clear that
```

Page 108

1                    DOLAN

2    investigation.

3              Were you aware as to who was

4    actually conducting the investigation for

5    The Garden?

6        A.    No.

7        Q.    Did you have any conversations

8    with John Moran concerning the

9    investigation?

10       A.    No.

11       Q.    Did you have any conversations

12   with Rochelle Noel concerning the

13   investigation?

14       A.    No.

15       Q.    Did you have any conversations

16   with Marc Schoenfeld concerning the

17   investigation?

18       A.    He is an attorney, but no.

19              MR. GREEN:  You gave your

20   answer.  You can answer.

21       Q.    Did you discuss with anyone the

22   possibility of turning the Play by Play

23   Restaurant into the Play Boy Club?

24       A.    No.

25       Q.    Have you ever heard of that idea

Page 116

1                    DOLAN

2       Q.    What was your understanding of

3   Anucha Browne-Sanders' claims of sexual

4   harassment?

5            MR. GREEN:    To the extent, Mr.

6   Dolan, you acquired any understanding from

7   counsel or at meetings in which counsel

8   were present, you may not answer.  If you

9   learned it some other way, then you may.

10      A.    My attorney is directing me not

11  to answer due to the privilege.

12      Q.    Did you ever read any documents

13  that set forth either the complaints or

14  the investigation itself?

15      A.    Nothing other than the

16  newspaper.

17      Q.    Did you have conversations with

18  anyone other than counsel concerning the

19  substance of the complaints that

20  Ms. Browne-Sanders had against The Garden?

21            MR. GREEN:    Other than with

22  counsel?

23            MS. VLADECK:    Correct.

24      A.    I don't recall.

25      Q.    Now, going back for a minute to

Page 171

```
 1                    DOLAN
 2      A.    I don't recall.
 3      Q.    Again, it would not be -- a
 4  normal thing for Mr. Mills to talk to me
 5  about the complaints for his -- his
 6  employer.  I mean he is responsible for
 7  her.  So why complain to me?  The -- in
 8  fact, I would probably ask him that
 9  question.  Why are you complaining to me?
10  She reports to you.
11      Q.    Before you made the decision to
12  fire Ms. Browne-Sanders, did you ask Mr.
13  Mills whether he agreed or disagreed with
14  that decision?
15      A.    No.
16      Q.    And do you recall why you made
17  the decision to fire her on the day that
18  you made the decision?
19      A.    Yes.
20      Q.    And what was that?
21      A.    We had come to the conclusion
22  that her working at the company was no
23  longer tenable due to the fact first
24  that -- that leading up until that point
25  and all the way from July up until that
```

Page 178

```
1                    DOLAN
2          MR. GREEN:   You may answer.
3      A.    -- who I heard the 6 million
4   dollar request from.
5      Q.    In what context did you hear the
6   request?
7      A.    That is what I don't recall.
8      Q.    And did you hear the request on
9   the day you decided to fire her?
10     A.    I'm not sure.
11     Q.    Did you tell anyone that a
12  factor in your decision to fire
13  Ms. Browne-Sanders was that she had made a
14  request for 6 million in severance?
15     A.    I think I did.
16     Q.    Who did you tell?
17     A.    I think at that same discussion
18  at the helicopter I pointed out that she
19  is already had -- had essentially -- I was
20  told she wasn't staying.  She -- she
21  resigned and asked for the extended stay
22  period.  The -- that she had tampered with
23  an investigation that -- that was begun on
24  her behalf, the -- and then had asked for
25  6 million dollars in severance.
```

Page 179

1                    DOLAN

2       Q.    Now, when you said you think you

3    said it in the same conversation, was that

4    with Mr. McCormack and Mr. Ratner?

5       A.    Right.

6       Q.    Is there a reason you didn't

7    tell me that this morning when you were

8    asked a direct question as to whether or

9    not you told Mr. Ratner or Mr. McCormack

10   that a request for severance was a factor

11   in your decision to fire her?

12      A.    No, I don't think you asked me

13   about a request for severance.  You asked

14   me about a settlement.  Settlement is a

15   bit different than a request for

16   severance.

17      Q.    Is that the way you've been

18   parsing my questions if there was --

19      A.    I don't mean to be cute with

20   you, but the --

21      Q.    Well --

22      A.    The -- it first came in a

23   request for severance.  That then came in

24   a threat, right, that if the -- that if

25   the -- if I didn't get the money, right,

1                    DOLAN

2    am trying to get the universe of factors.

3              MR. GREEN:    I thought the

4    witness had testified more fully to a

5    number of things.

6              MS. VLADECK:    That is a

7    speaking objection.

8        Q.    To the extent that there are

9    other factors, what are they?

10       A.    And all the factors leading up

11   to from July up until that point.  I mean

12   that is a quite a long list, you know.

13       Q.    That was your first factor.

14   What were all the events from July until

15   the date you fired her?

16       A.    The -- again, I stated earlier

17   the -- you know, the inability to do her

18   job.

19       Q.    And how was that reflected

20   between July and January?

21       A.    That's in -- that is

22   inability -- inability to budget,

23   inability to brand.  It is --

24       Q.    And --

25       A.    The -- and then the -- you know,

Page 186

1                      DOLAN

2     my essentially taking the opinion of Mr.

3     Ratner that she had not improved, that he

4     believed that she was -- should be

5     terminated.

6          Q.    Are you done with all the events

7     leading from July to January?

8          A.    Yes, I think so.

9          Q.    What made you believe that from

10    July to January she had an inability to

11    budget or brand?

12         A.    Because of the July meeting, the

13    skills and the work product that she

14    produced was not -- low, not acceptable.

15    It showed a lack of understanding of

16    budgeting.  It showed a lack of

17    understanding of branding.  She was unable

18    to come up with a branding statement for

19    the New York Knicks.  She had to be given

20    one.  That the -- and her -- in her budget

21    she was unable to explain her budget and

22    when she -- and when she did explain her

23    budget, her explanations, the -- showed a

24    lack of understanding of how budgets

25    are -- are put together and differences

VERITEXT/NEW YORK REPORTING COMPANY

1                    DOLAN

2    budgeting process with her.  We discovered

3    these deficiencies that the -- that -- you

4    know, that -- in her skill set.  We went

5    through and paid for the -- and offered

6    her training the -- and paid for her

7    training to up those skills.  I mean that

8    was at our expense that the -- -- and, you

9    know, after we are done sending her

10   school, right -- that -- to get better at

11   this, right, the -- she walks into the

12   office and says essentially I'm quitting.

13   The -- I can't work here any more.

14   The -- the -- and you need to -- what

15   I -- what I need you to do is to keep me

16   on, and I'll do my job, which was fair,

17   and help me find another job.  That

18   the -- you know, at that point, you know,

19   I have to tell you that as -- as the CEO

20   of the company having then, you know,

21   offered her the -- the ability, right, to

22   essentially come out of what was a pretty

23   bad review but which is what came up out

24   of in terms of how her performance was in

25   that budgetary process, offering her the

Page 192

1                    DOLAN

2    ability for help, training to get her

3    skill levels up, the company was going to

4    stick with her, that the -- the -- and she

5    took the training, and then she came back

6    and basically said I quit.  The -- then

7    she asks for 6 million dollars, that

8    the -- and then we find out that

9    she -- that she is utilizing her position

10   that she is -- she is off through the

11   company attempting to garner support for a

12   complaint that the -- about sexual

13   harassment.  The -- at what point

14   does -- does an employee become no longer

15   effective at a company as -- in her

16   position.  She was no longer effective.

17   The -- the -- and the -- at that point,

18   you know, I decided that the company had

19   to -- had to just cut it off, and that was

20   when -- when she was fired.

21       Q.    Now, you say that you heard from

22   Mr. Mills that Mrs.  Anucha Browne-Sanders

23   just walked into the office and said I'm

24   quitting?

25             MR. GREEN:    Objection.

Page 196

1                    DOLAN

2      A.    I --

3            MR. GREEN:    Objection to form.

4      A.    I don't know which date it was.

5      Q.    Is there anything that would

6   refresh your recollection?

7      A.    I don't know.  I -- you know, I

8   mean -- other than hearing somebody else's

9   testimony, I guess, and that is not really

10  very helpful.  I mean I --

11     Q.    Now, are you -- are you aware

12  that Mr. McCormack believed that the

13  document that you have before you, Dolan

14  Exhibit 1, was prepared after you made the

15  decision to fire Ms. Browne-Sanders?

16           MR. GREEN:    Objection to form.

17  If the witness knows what Mr. McCormack

18  knew or thought he knew.

19     A.    I -- you know, I am unaware of

20  this document essentially until today.  I

21  mean I am seeing it for the first time

22  today.  I didn't know Mr. McCormack wrote

23  a document such as this.

24     Q.    Well, he didn't write it.  Mr.

25  Schoenfeld did, but -- did you tell Mr.

1              DOLAN

2    McCormack the three reasons or the three

3    factors for Ms. Browne-Sanders'

4    termination that you just told us here

5    today?

6              MR. GREEN:    I am going to

7    object to your characterizing the factors

8    as any specific number, but the witness

9    may answer.

10       A.    I believe I did.

11       Q.    And did you tell Mr. Ratner?

12       A.    Yes.

13       Q.    And you told both of them that

14   Ms. Browne-Sanders using her position to

15   influence the investigation was a factor

16   in the termination?

17       A.    Yes.

18       Q.    Is one factor more heavily

19   weighted than any of the others?

20             MR. GREEN:    Objection to form.

21       A.    I -- you -- it -- I would have

22   to say that that the July -- the July

23   through -- this period here was

24   significant.  The -- however the -- using

25   her position to influence employees in the

Page 198

1                    DOLAN

2    investigation was particularly -- showed a

3    lack of -- of ability for us to trust her.

4    I don't think we could trust her after she

5    did that.  The -- you know, the -- if she

6    couldn't let the company operate and

7    follow the rules of the company and she

8    was going to establish her own rules,

9    which is essentially what she did, that

10   the -- it -- I mean at that point the -- I

11   think she really made her -- her

12   employment untenable because you just had

13   no idea what she would do.  The -- I mean

14   the -- she clearly didn't respect the

15   process and the lines of authority, so how

16   could she stay?

17        Q.    You have characterized what she

18   did as violation of policy as being wrong,

19   as all sorts of things.

20        A.    Yeah.

21        Q.    What did she do that in your

22   view was so bad that it deserved immediate

23   termination?

24             MR. GREEN:   Objection.

25   Misstates prior testimony.  It has been

Page 218

```
 1                    DOLAN
 2    "Browne-Sanders should be separated from
 3    MSG and offered severance and outplacement
 4    services subject to her execution of an
 5    appropriate release."
 6            Do you see that?
 7       A.    I do.
 8       Q.    And is it your testimony that
 9    Mr. McCormack told you what
10    Ms. Browne-Sanders had done in connection
11    with the investigation prior to this time?
12       A.    I told you I couldn't -- I
13    couldn't testify to the exact time and
14    now -- so I can't give you whether between
15    this one or the other one and when this
16    was written versus the other thing.  I
17    just don't have the -- the chronology down
18    to that, you know -- down to that level.
19       Q.    Well, let me ask you this.  You
20    decided to fire Ms. Browne-Sanders?
21       A.    Yes.
22       Q.    Did you fire her?
23            MR. GREEN:   Objection.
24       A.    Well, I -- what constitutes
25    being fired?
```

# EXHIBIT N

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

06 Civ. 0589 (CGE)

-----------------------------------------x

ANUCHA BROWNE-SANDERS,

                        Plaintiff,

        - against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD

THOMAS, III, and JAMES DOLAN,

                        Defendants.

-----------------------------------------x

                        November 10, 2006
                        10:10  a.m.


        VIDEOTAPE DEPOSITION of JOHN D.

MORAN, taken by the Plaintiff, pursuant to

Notice, held at the offices of Vladeck

Waldman Elias & Engelhard, P.C, 1501

Broadway, New York, New York, before

Debbie Zaromatidis, a Shorthand Reporter

and Notary Public of the State of New

York.

```
 1                    MORAN

 2          MR. GREEN:    Objection.

 3    Objection to form.   Misstates prior

 4    testimony.

 5       A.    Yeah.   I -- I -- yes, I think I

 6    did, but I'm -- I'm not really -- I'm not

 7    sure of the timing.   I mean I know she got

 8    new responsibilities.   I am not -- I'm not

 9    sure about the timing.   I know that she

10    got an increase over and above these four

11    to five range.   I don't know the timing of

12    it, but I know she did get it.

13       Q.    What additional responsibilities

14    is it your understanding that she

15    undertook to -- in connection with this

16    increased salary?

17       A.    I'm not sure.

18       Q.    And when did you learn of this?

19       A.    Of her increased

20    responsibilities?

21       Q.    Yeah.

22       A.    I'm sorry.   I'm not sure.

23       Q.    You became aware at some point

24    that Ms. Browne-Sanders had made a

25    complaint of sexual harassment?
```

Page 175

1                    MORAN

2      A.    Yes.

3      Q.    How did you become aware of

4    that?

5      A.    Mark Schoenfeld asked me

6    to -- he called and asked me with some

7    others to -- he was out of the office, and

8    I think they had just met with plaintiff's

9    counsel, perhaps you, and he wanted to

10   inform us as to what Anucha's allegations

11   were.

12     Q.    Who was present for that

13   conversation? You said Mr. Schoenfeld was

14   calling from out of the office?

15     A.    Yes.

16     Q.    And were you with other people

17   in the office?

18     A.    Yes.

19     Q.    Who -- who was there?

20     A.    I was there, Steve Mills I

21   believe was there.  I think Barry Watkins.

22   I don't know whether Rusty was there or

23   not.

24     Q.    Did you have any conversations

25   with Mr. Mills or Mr. Watkins after the

```
 1                    MORAN
 2   call with Mr. Schoenfeld?
 3       A.    Not that I recall.  I think I
 4   just got up and left and went back to my
 5   office.
 6       Q.    Did Mr. Schoenfeld give you any
 7   direction to investigate the matter?
 8       A.    Yes, he did.
 9       Q.    What did he say about that?
10       A.    Well, he said that -- that when
11   he got back -- I'm not sure if it was that
12   day or whenever he came back -- that we
13   should meet because he wanted me to -- to
14   conduct an investigation, and I -- I
15   think -- I think -- I'm not sure, but I
16   think Rochelle Noel might have been on the
17   conference call in a different location,
18   and so he just said we need to talk.  We
19   need to do -- you know, it looks like we
20   should do an immediate investigation.
21       Q.    Mr. Schoenfeld described what
22   the allegations were as he understood it
23   to everyone who was participating in the
24   call?
25       A.    Yes.
```

Page 194

1              MORAN

2    while I am here in Orlando, and I said

3    well, you know, you should -- I am just

4    going under what I was told that you

5    shouldn't come back until the

6    investigation is complete.  So she said,

7    well, what am I going to tell my people,

8    and I said, well, I don't know.  So she

9    started, well, maybe I will tell them that

10   I am going to extend my vacation for

11   another week, and I said, well, it wasn't

12   for me to -- I said okay, if that is what

13   you want to do, and I think that is what

14   she did.  I think she sent an E mail to

15   them saying I am extending my vacation

16   another week.

17       Q.    Did you ever communicate to

18   Ms. Browne-Sanders that she couldn't come

19   to the office because of security

20   concerns?

21       A.    There is a letter that was

22   written to her that made reference to that

23   I recall, that she -- she had expressed

24   security concerns to us and to me.  In

25   fact, we offered -- we offered if -- we

1                    MORAN

2    said if you feel that way, we offered to

3    give her a security, and in fact when she

4    was going to the games -- this was during

5    the period -- this was around the period

6    when Hassan was being terminated, and she

7    made some -- she made some comments to me

8    about concern for her safety.  I -- we

9    were in her office, and she was very upset

10   and was making statements about Stephon

11   and Isiah and said she was concerned about

12   her security.  And I sell, well, if you

13   are really concerned about security we --

14   maybe we could do something about that.

15   So we had Joe Dean, who was

16   internal -- one the internal security

17   people, we called him and arranged for --

18   she said I have to walk to my car by

19   myself.  So we arranged for her to be

20   escorted to her car.  We had security

21   around where she  --   where she was

22   sitting because she seemed -- she seemed

23   nervous about Hassan.  So they

24   gave -- they gave Hassan's picture to the

25   security people, and they said don't let

1              MORAN

2   this guy in the area, and so she was going

3   on about that.

4          The reason I remember it so

5   vividly is -- it's always bothered me --

6   is that she was quite upset and agitated,

7   and she was saying, you know, Stephon

8   doesn't like me, and, you know, I

9   didn't -- I didn't credential him way back

10  when, and -- and she was saying things

11  about Isiah doesn't like me, and I always

12  find that curious that, you know, here I

13  am ER.  I work with her on all these

14  things, sexual harassment things, and she

15  never once said to me and by the way Isiah

16  Thomas is sexually harassing me.  I mean

17  she had all these other -- she had -- was

18  throwing out all these other things.  I

19  just -- I never -- I've never been able to

20  understand it.  I find it disturbing

21  because why wouldn't she make -- make

22  those allegations to me at the time.

23          MR. MINTZER:    Could you read

24  back my question.

25          (Record read.)