# EXHIBIT

# O

Dockets.Justia.com

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

06 Civ. 0589 (CGE)

------------------------------------------x

ANUCHA BROWNE-SANDERS,

                        Plaintiff,

        - against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD

THOMAS, III, and JAMES DOLAN,

                        Defendants.

------------------------------------------x

                        December 12, 2006
                        10:08  a.m.


        VIDEOTAPE DEPOSITION of STEPHEN

C. MILLS, taken by the Plaintiff, pursuant

to Notice, held at the offices of Vladeck

Waldman Elias & Engelhard, P.C, 1501

Broadway, New York, New York, before

Debbie Zaromatidis, a Shorthand Reporter

and Notary Public of the State of New

York.

Page 123

```
 1              MILLS
 2      A.    Yes.
 3      Q.    And that corresponded with, if
 4  you look at the next page, it appears to
 5  correspond with far exceeding -- far
 6  exceeded expected performance; is that
 7  correct?
 8      A.    Yes.
 9      Q.    And is that how you actually
10  viewed Ms. Browne-Sanders' performance at
11  the time?
12      A.    Yes.
13      Q.    Mr. Mills, did there come a
14  point where Ms. Browne-Sanders was fired
15  from MSG?
16      A.    Yes.
17      Q.    When was that?
18      A.    I -- I don't know the specific
19  dates, but in, you know, January or
20  December -- January of '06.
21      Q.    Why was she fired?
22      A.    Well, first of all, Anucha came
23  to me and -- in late November and
24  expressed to me that she could no
25  longer -- felt that she could do her job
```

Page 124

```
 1                    MILLS
 2    at The Garden.  She had felt that she had
 3    tried do it in a number of ways, both
 4    being aggressive and being passive, but
 5    that she couldn't -- she lost the respect
 6    of her -- her employees.  She lost the
 7    respect of her peers and that she couldn't
 8    function in her job and that she needed my
 9    help to find another job, and I agreed
10    with her, and -- and ultimately we -- she
11    was fired because she really was
12    not -- she was unable to -- to lead the
13    Knicks organization strategically and
14    grasp the concepts of managing the P and L
15    and being the complete -- the strategic
16    leader of the Knicks organization.  She
17    also did not -- was unable to perform in
18     --   in the budget process, and the P and
19    L responsibilities of the Knicks.  She
20    had, you know, disastrous budget meetings
21    during -- during -- during '05.
22              She had demonstrated an
23    inability to work with her peers and
24    manage her relationships across The Garden
25    from our advertising sales group to our
```

Page 125

```
 1              MILLS

 2    facilities operations group to the

 3    relationships within the basketball

 4    operations department.  She -- at that

 5    point in time she became -- she refused to

 6    be accountable for things that were

 7    clearly in any kind -- any kind of

 8    problems that remained she refused to take

 9    accountability for -- for them, and in

10    some instances turned and would blame me

11    for in -- issues that were her

12    responsibility.  So at that point, I

13    clearly lost faith in -- and confidence in

14    her ability to -- to continue in the job,

15    and she, you know -- she at that point,

16    you know, and over -- over -- over time

17    became very resistant to -- to -- to

18    criticism and opportunities to -- to

19    understanding what things needed to be

20    changed in order for us to move forward.

21        Q.    Who decided to fire her?

22        A.    Ultimately it was -- it was Jim

23    Dolan.

24        Q.    Did he consult with you about

25    that?
```

1                    MILLS

2    with Mr. Dolan about each of those

3    reasons?

4        A.    I had conversations with -- with

5    Rusty McCormack about -- about those

6    reasons, and, you know, I had

7    conversations with Jim clearly about those

8    views and clearly some of those reasons.

9        Q.    So at some point you discussed

10    with Mr. Dolan all of your concerns and

11    criticisms about Mr. Browne-Sanders that

12    you articulated in your previous answer?

13            MR. GREEN:    Objection to form.

14    You may answer, Mr. Mills.

15        A.    Yes.

16        Q.    But I take it from your answer

17    that Mr. Dolan had the ultimate

18    determination to -- whether to fire

19    Ms. Browne-Sanders?

20        A.    Absolutely.

21        Q.    And so it's fair to say when I

22    asked you why she was fired you don't know

23    what was in Mr. Dolan's head when he

24    decided to fire her; is that correct?

25        A.    No, I don't know what was

Page 170

```
 1              MILLS
 2   expectations and a dress policy, institute
 3   -- instituting sort of more regular
 4   standards around what things were going on
 5   with the -- with players around practices
 6   and who was in the -- who was in
 7   the -- the -- in the building
 8   as -- as -- as players practiced, more
 9   structure around how we were going to use
10   the players in activities, the timing of
11   how we would use -- would use players in
12   activities to make sure that the players
13   were at the critical points in the season
14   focused on the things that ultimately were
15   going to make us all successful, and that
16   was winning basketball games.
17       Q.    Did you have any discussions
18   with Ms. Browne-Sanders at any point after
19   Mr. Thomas was brought on board about her
20   view of Mr. Thomas' changes?
21       A.    The -- yes.
22       Q.    And tell me what was said in
23   those conversations with -- by you and by
24   her.
25       A.    You know, there were -- there
```

1                    MILLS

2    were -- there were -- one instance in

3    particular where she came to me and she

4    told me that Isiah had -- had, you know,

5    informed her that the players were not

6    going to -- to make, you know, appearances

7    the way that they had made appearances

8    before, and he wanted a -- a more

9    structured -- more structured schedule

10   around it.  You know, we had  --   we had

11   numerous conversations about things like

12   that.

13       Q.    Well, what did you say when she

14   said that to you?

15       A.    I said that, you know, the

16   players are going to make the appearances

17   that -- that we need them to make, and we

18   need to strategically develop a plan

19   to -- to -- to -- to utilize the players,

20   but the players will make the appearances

21   that -- that organizationally we needed

22   them to make.

23       Q.    Had she told you that Mr. Thomas

24   had said to the players that they wouldn't

25   be making any appearances?

```
 1              MILLS
 2      A.    You know, there was an instance,
 3   and I -- and I believe Anucha was the one
 4   that brought it to my attention where
 5   after -- after a really bad loss that
 6   Isiah went into the locker room and told
 7   the players that they weren't making any
 8   more appearances.
 9            As soon as that was brought to
10   my attention I had a conversation with
11   Isiah, and I said to Isiah, you know what,
12   I understand we are trying to make the
13   playoffs, and I -- I understand your point
14   of view on this -- on this particular
15   issue, but you are ending up putting
16   yourself in a bad position because I'm
17   going to tell you that the players  --
18   community -- the appearances be it with
19   MSG network or be it with sponsors or be
20   it with community relations, that the
21   players are going to make the
22   activities -- the appearances that they
23   are committed to making, and, you know, he
24   said -- he said okay.
25      Q.    The source of your information
```

Page 173

```
 1              MILLS
 2   about what Mr. Thomas said in the locker
 3   room I think you said you believe it came
 4   from Ms. Browne-Sanders.  Was that your
 5   testimony?
 6      A.    Yes.
 7      Q.    Do you think you may have spoken
 8   with anyone else about it?
 9      A.    I know Anucha talked to me about
10   it.  I just can't remember if another
11   person mentioned it to me as well.
12      Q.    Was it your belief based on the
13   conversations that you had had with
14   Ms. Browne-Sanders that she was resistant
15   to the changes that Mr. Thomas was
16   instituting?
17      A.    You know, she didn't -- she
18   didn't like the -- the structure that was
19   being placed around the -- the changes and
20   the planning that -- that -- that had to
21   go into, you know, utilization of the
22   players, and those kinds of things.
23      Q.    What -- would you say that she
24   was resistant to the changes?
25      A.    Yes.
```

Page 174

```
 1              MILLS
 2         MR. GREEN:   Objection to the
 3  form.  Asked and answered.  You may answer
 4  again, Mr. Mills.
 5     A.   Yes.
 6     Q.   And do you remember anything
 7  that she said more specifically about it
 8  other than -- other than what you've
 9  already testified to?
10     A.   Well, there -- the -- you know,
11  again there were -- there
12  were -- over -- over the course of time
13  there were -- were -- were many things
14  that I -- you know, I can't remember all
15  of them.
16     Q.   Okay.  Well, specifically on the
17  subject of Ms. Browne-Sanders' view of the
18  changes that Mr. Thomas brought to the
19  organization, other than what you have
20  said -- testified to, is there anything
21  else you recall her saying about it?
22     A.   She wasn't happy with the
23  restrictions that he placed on -- on the
24  access that people had to the training
25  center.
```

```
 1                    MILLS
 2        Q.    What did she say about that?
 3        A.    She said that, you know, Isiah
 4   has limited access to certain parts of the
 5   training center to -- to only -- to only
 6   members of the basketball operations
 7   staff, and that she and her people needed
 8   to have access to the training center
 9   and -- in order to get players to do
10   certain things, and that was a problem for
11   her.
12        Q.    And what did you say?
13        A.    I spoke to Isiah about it, and
14   Isiah said, listen, I -- I don't care if
15   people come into the training center, you
16   know, and -- as long as they're -- as
17   they're professional and don't come in to
18   the team while they are practicing, and
19   they are not intrusive in terms of giving
20   the players room to sort of be to
21   themselves after practice, but to the
22   extent that they need to come in to get
23   things from the players or arrange for the
24   players to do that he is more than willing
25   to come up with a system to allow that to
```

Page 176

```
 1              MILLS
 2   happen.
 3       Q.    Did you convey that to
 4   Ms. Browne-Sanders?
 5       A.    Absolutely.
 6       Q.    And what was her response to
 7   that?
 8       A.    She still was not -- not happy
 9   that there was sort of an unfiltered
10   access to the training center, but Karen
11   Buchholz and the people -- Dan Gladstone
12   and those people who worked with her had
13   no problems interacting with the players
14   and maneuvering around the training center
15   under sort of the rules that Isiah had
16   outlined and accomplishing whatever they
17   needed to get accomplished with the
18   players.
19       Q.    Anything else that you can
20   recall about conversations that you had
21   with Ms. Browne-Sanders about her views of
22   the changes that Mr. Thomas implemented
23   other than what you've already testified
24   to?
25       A.    There are -- there are -- there
```

```
 1                    MILLS
 2    are -- I can't say that I am -- that this
 3    covers all of the conversations about the
 4    changes.
 5         Q.    Well, I  --  I understand that,
 6    but sitting here right now have you
 7    testified fully to your recollection about
 8    your conversations with Ms. Browne-Sanders
 9    about the changes that Mrs.  -- Mr. Thomas
10    had implemented?
11         A.    Well, there were -- there were,
12    you know, again -- again, there were many,
13    many, changes.  There were changes
14    in -- in terms of, you know, what
15    his -- what the basketball operations role
16    was going to be in the process of -- of
17    selling -- selling tickets and
18    incorporated in -- incorporated into
19    season ticket sponsorship activities that
20    included how we would include players
21    into -- into sponsorship activity, and
22    again ways that we would systematically
23    incorporate the basketball operations
24    staff and -- and the team itself
25    into -- into business initiatives, but
```

```
 1                    MILLS
 2    they were going -- they were going
 3    to -- there was a framework that was going
 4    to be around that that was -- that was
 5    different.
 6        Q.   And you had discussions about
 7    that with Ms. Browne-Sanders, her view of
 8    that?
 9        A.   Absolutely.
10        Q.   And what did Ms. Browne-Sanders
11    say?
12        A.   She -- she was not happy with
13    the -- with the changes, but, you know, it
14    -- in my opinion, those were -- those were
15    the ones that I was endorsing in terms of
16    what the -- what the -- what the right
17    structure was going to be and how we
18    should view the organization, so that we
19    could move forward.
20        Q.   You said that to
21    Ms. Browne-Sanders?
22        A.   Yes.
23        Q.   Okay.  Anything else that you
24    recall about conversations that you had
25    with her about her views of the changes
```

Page 179

1                    MILLS

2    that Mr. Thomas has -- had implemented,

3    anything else other than what you

4    can -- what you've already testified to?

5        A.    Well, the -- I'm sure that there

6    is some that I am not -- that I am not

7    thinking of at the moment.

8        Q.    But sitting here right now, we

9    have exhausted your recollection about

10   those discussions with Ms. Browne-Sanders?

11       A.    Yes, there may be some that I

12   had that were referred to --

13       Q.    But not right now, nothing else

14   comes to mind right now?

15       A.    There -- there might be some,

16   but I can't think -- think of any right at

17   this moment.

18            MR. MINTZER:    Okay.  I think

19   the tape is ending.  It is probably a good

20   time for a lunch break.

21            THE VIDEOGRAPHER:    Okay.  We

22   are off the record.  The time is 1:06.

23   This is the end of tape 2.

24            (Luncheon recess:  1:06 p.m.)

25

Page 180

```
 1                  MILLS
 2      A F T E R N O O N   S E S S I O N
 3                2:09 p.m.
 4           THE VIDEOGRAPHER:   We are back
 5    on the record.  The time is 2:09.  This is
 6    the beginning of tape 3.
 7    S T E P H E N   M I L L S, resumed.
 8    CONTINUED EXAMINATION
 9    BY MR. MILLS:
10       Q.    Mr. Mills, did at any time in
11    2004 Ms. Browne-Sanders make you aware of
12    any concerns this she had had about Mr.
13    Thomas' conduct towards her?
14       A.    No.
15       Q.    Did at any point
16    Mr. -- Ms. Browne-Sanders tell you that
17    Mr. Thomas was hostile towards her --
18       A.    No.
19       Q.    -- in 2004?
20       A.    No.
21       Q.    Did at any point
22    Ms. Browne-Sanders tell you in 2004 that
23    Mr. Thomas had used inappropriate language
24    with her?
25       A.    No.
```

Page 181

1           MILLS

2      Q.    Did at any point in 2004

3   Ms. Browne-Sanders tell you that Mr.

4   Thomas had used profanity while speaking

5   with her?

6      A.    No.

7      Q.    Did you become aware at any

8   point that Mr. Thomas had used profanity

9   in speaking with Ms. Browne-Sanders?

10          MR. GREEN:    Objection to form,

11   and to the extent the witness has acquired

12   any such information only through counsel

13   and in the presence of counsel he is

14   instructed not to respond further.

15   Otherwise, he may answer.

16      A.    I can't respond further.

17      Q.    Did Ms. Browne-Sanders ever

18   raise any issues to you about Frank

19   Murphy's conduct towards her in 2004?

20      A.    No.

21      Q.    Did you -- did you ever have a

22   conversation with her about any

23   interactions that she had had with Frank

24   Murphy?

25      A.    Not that I can -- no.

Page 194

```
 1               MILLS
 2    Your responsibilities are the basketball
 3    operations of the team.  You don't have a
 4    responsibility in -- in the business
 5    operations of the team.  You don't have a
 6    say over, you know, what the game
 7    presentation is.  You're managing
 8    the -- the infrastructure of the
 9    basketball organization, the scheduling of
10    the basketball games, and Anucha is
11    responsible for the day-to-day business
12    operations.  He said well, you know, I
13    thought that I had -- there was -- I had
14    more input in different places, but if
15    that's the way it is, that's the way it
16    is, and I'm -- I'm willing to move forward
17    and accept that that's the way it is.
18        Q.    Did Ms. Browne-Sanders say
19    anything in the meeting?
20        A.    She wanted to know how we are
21    going -- what was going to be the
22    structure in terms of moving forward, how
23    the two organizations were going to
24    function and operate, you know, together
25    and -- and Isiah designated -- he said
```

```
 1              MILLS
 2   well I don't -- I don't want to be the
 3   person that has to funnel every player
 4   request through and every time, you know,
 5   for a business initiative a player needs
 6   to go to a school or if a player needs to
 7   go on an ad sales call or if a player
 8   needs to appear in a television commercial
 9   I don't -- I am not going to be the person
10   that each one of those individual requests
11   come across my desk and that -- and that I
12   am going to designate someone, the group,
13   and it is going to be Frank Murphy as the
14   person that is going to be my liaison with
15   the business operations group.
16        Q.    Was anything else said in the
17   meeting that you recall?
18        A.    I mean we -- we -- we probably
19   discussed, you know, other issues in -- in
20   the meeting, but those were
21   clearly -- that was -- that was the focal
22   point of the meeting of deciding -- that
23   was the initial intent of the meeting was
24   to, you know, establish everyone's
25   responsibilities as -- in terms of how
```

Page 196

```
 1                    MILLS

 2    they would interact and in -- you know, to

 3    really make sure that Isiah understood

 4    what Anucha's role was because clearly

 5    based on her request to me he didn't, and

 6    so I wanted to make sure we clarified

 7    that.

 8        Q.    And did it appear to you in the

 9    meeting based on Mr. Thomas'

10    conduct -- comments that he did have some

11    misunderstanding about what

12    Ms. Browne-Sanders' role was?

13        A.    I thought that -- I did sense

14    that he thought he had more of a say in

15    certain things as related to, you know,

16    that presentation and things like that,

17    but, you know, I was very clear about

18    that, and -- and at the end of the day he

19    understood what his role was, and Anucha

20    understood there was no change.  She

21    understood what her role -- she -- the

22    role she thought she had was

23    reestablished.

24        Q.    Did you have to step out of the

25    meeting at any point to take a phone call?
```

```
 1                    MILLS
 2       A.    Yes, I did.
 3       Q.    And who -- who was the phone
 4    call from?
 5       A.    I -- I don't remember.
 6       Q.    Did you have any discussions
 7    with Ms. Browne-Sanders after the meeting?
 8       A.    Yes.  In fact I asked her to
 9    stay -- after the meeting was over I asked
10    her to stay behind to -- to talk to me.
11       Q.    And what would -- what did you
12    two discuss at that point?
13       A.    I said to her that, you know, we
14    started out this meeting with you having
15    concerns about Isiah sort of overreaching
16    into your areas, and in my opinion we
17    clarified everything to your
18    understanding, and I thought in
19    the -- over the course of the meeting you
20    were overly aggressive in dealing with
21    him, that -- you know, I have to say that
22    you -- that it seemed like everything you
23    wanted coming out of this -- that you
24    wanted going into the meeting you got, but
25    I thought you were pretty -- pretty
```

1                    MILLS

2    aggressive over the course of the meeting

3    and -- and never at any point just said

4    okay.  I am glad this is the way -- this

5    is the way it worked out.

6         Q.    What did Mr. --

7    Ms. Browne-Sanders say to that?

8         A.    She, you know, said it was just

9    important for her that Isiah understands

10   that, you know, he has his role, and she

11   has her role, that she felt very strongly

12   about it, and I just reiterated that I

13   thought she was overly aggressive in

14   how -- in how she responded to a situation

15   that I thought worked out the way she

16   wanted it to work out.

17        Q.    What did she say in the meeting

18   with you, her and Mr. Thomas that you

19   found to be overly aggressive?

20        A.    She was very, very forceful, and

21   I just want to make sure you understand

22   that I am responsible for X.  I want to

23   make sure you understand that I am

24   responsible for Y.  I want to make sure

25   you understand that I am responsible for

```
 1                    MILLS
 2    the on court experience, that tone in --
 3    as we sort of discussed the issues that
 4    were gray in Isiah's mind before he walked
 5    in the door.
 6        Q.   Did it seem that
 7    Ms. Browne-Sanders was agitated?
 8        A.   Yeah.  I said she -- she -- it
 9    seemed like she was clearly upset in
10    calling for the meeting because I -- there
11    was a misunderstanding, and she was
12    concerned that maybe her job
13    responsibilities had changed.  So that was
14    clearly important for her to come into
15    this meeting and have it reaffirmed, the
16    scope of her job and to affirm the scope
17    of Isiah's job.
18        Q.   At any point did Mr. Thomas
19    complain to you about Ms. Browne-Sanders?
20            MR. GREEN:   Objection to form.
21    Any time frame?
22            MR. MINTZER:   Any time.  Was
23    that -- was that the only basis of the
24    objection.
25            MR. GREEN:   Yes.
```

```
 1                    MILLS

 2      Q.    So we clarified that.  At any

 3   point.

 4      A.    He -- he complained that, you

 5   know -- that there -- there were times

 6   when it appeared that he was being, you

 7   know -- that there were certain things

 8   that he didn't want to be involved in that

 9   Anucha was -- was outlining or requesting

10   that he be involved in.  He made it clear

11   to me that he did not want to be a person

12   who was out selling season tickets.  He

13   didn't want to be a guy who in -- sending

14   letters to season ticket holders asking

15   them to please renew their tickets

16   sincerely Isiah Thomas.  He -- and it

17   seemed that Anucha wanted to include him

18   in things like that -- that -- that

19   troubled him.  He said -- he was always

20   clear I want to do whatever I can do to

21   support the organization, but I don't -- I

22   don't want to be in the business of -- of

23   selling tickets, and he told me that, you

24   know, that's something Willis Reid has

25   shared with him in -- when he came in and
```

```
 1                    MILLS
 2   was working with Anucha and -- and Scott
 3   Laden.  He said that if you're not careful
 4   in the organization they will turn you
 5   into a pitch man to sell tickets, and you
 6   have to find a way to stay focused on
 7   basketball and -- and so that was -- that
 8   was a complaint of his.  He said he would
 9   be more than happy to make sure that
10   whenever we needed him to tell -- to
11   communicate to people about what was going
12   on with the team, how we're building the
13   team, what our expectations about the team
14   were, he would be more than happy to
15   participate in that and use that to
16   support our -- our business, but he didn't
17   want to be in the business of sort of
18   being a salesperson.
19        Q.    Mr. Thomas' comment about Willis
20   Reid, would -- and correct me if I am
21   wrong, I want to make sure I understand
22   this right.  Was he saying that
23   Ms. Browne-Sanders had made according to
24   Mr. Reid Mr. Reid into a -- you know, a
25   salesperson or a pitch man?
```

Page 204

```
 1                    MILLS
 2       Q.    Okay.  We will -- that --
 3       A.    Okay.  Then can you repeat the
 4    question?
 5       Q.    The clarification that you made
 6    and then my question is other than that,
 7    did Mr. Thomas ever express any other
 8    views about Ms. Browne-Sanders' job
 9    performance or her role in the
10    organization or anything along those
11    lines?
12       A.    He didn't have -- he didn't have
13    any say in her job performance so -- and
14    her role in the organization was defined
15    by me, not by him.  So he -- you know,
16    we -- there may have been some other
17    comments or discussions that we had, but
18    I -- I can't remember -- remember them at
19    the time.
20       Q.    Okay.  Did he ever tell you that
21    he thought that Ms. Browne-Sanders should
22    be replaced in her role?
23       A.    No.
24       Q.    Did he ever tell you that
25    Ms. Browne-Sanders should be fired?
```

```
 1                    MILLS
 2       A.    No, nor would I have -- again,
 3    it wasn't -- he wasn't in a place to make
 4    a decision on whether or not she should be
 5    replaced nor whether she should be fired
 6    so, but he didn't have those conversations
 7    with me.
 8       Q.    As president of basketball
 9    operations he was -- he could have if he
10    wanted to offered an opinion about that,
11    correct?
12       A.    He could offer an opinion about
13    many things, but he is not in the position
14    to -- to control those things.
15       Q.    How was, if you know,
16    Ms. Browne-Sanders' relationship with
17    Scott Laden?
18       A.    It -- they had a very good
19    relationship.
20       Q.    And how do you know that?
21       A.    I had conversations with Scott
22    about -- I had meetings with Scott and
23    Anucha, conversation with Anucha regarding
24    her involvement in the basketball
25    operations role.  They had -- they had a
```

```
 1                    MILLS
 2    and when they're used and how they are
 3    integrated, and so there was a
 4    change -- there was change versus -- there
 5    was a change both organizationally.  There
 6    was a change both from a philosophical
 7    standpoint between Scott and Isiah, and
 8    she managed to get done what in my opinion
 9    were the things that I was judging her on
10    in terms of what was important to get done
11    with the basketball team and the players.
12    She was able to get those done given that
13    there had been a philosophical and
14    organizational shift with Isiah Thomas.
15    Q.    So she still managed to be
16    effective in her job and duties that she
17    had to perform even in light of the
18    philosophical changes that Mr. Thomas had
19    instituted; is that correct?
20    A.    As it related to involving --
21    this was -- this was specifically focused
22    on -- on integrating players into
23    marketing and business initiatives.
24    Q.    Were there some philosophical
25    changes that Mr. Thomas implemented that
```

Page 228

```
 1                    MILLS
 2   Ms. Browne-Sanders did not effectively
 3   manage through?
 4       A.    You know, the -- the things were
 5   effectively managed through.  The -- at
 6   the end of the day the things that needed
 7   to be -- that I viewed as being important,
 8   not necessarily what Anucha viewed as
 9   being important, but ultimately as her
10   boss and the one that's making the
11   decisions on how she is being judged the
12   things that I thought were important and
13   the things that I was going to judge her
14   on were being done.
15       Q.    You -- you also wrote that she
16   has managed to derive upon key player
17   involvement in team business and marketing
18   initiatives with less player availability.
19            What were you referring to
20   there?
21       A.    This was a -- in this year, we
22   we were -- you know, or -- you know, this
23   covers the -- this covers -- this covers
24   the '04 year, and if you talk about the
25   '04 year, you're talking about the end of
```

1              MILLS

2    the '03, '04 season, and we did have a

3    situation at the end of the '03, '04

4    season where we as a team were making a

5    playoff push, and Isiah had said to me,

6    listen, you know, we are -- we -- I want

7    these guys focused on -- on making the

8    playoffs, and I really want to do less

9    things.  I don't want any -- I don't want

10   these guys distracted trying to -- to make

11   the playoffs, and we are going to do two

12   or three -- fewer things so -- so in that

13   period of time, a short period of time in

14   through '04 calendar year there would have

15   been fewer player appearances.

16       Q.    When was the playoff push?

17       A.    It would have been in the -- it

18   it would have been in the spring.

19       Q.    So between March and April?

20       A.    Or it could have started as

21   early as February, but it is somewhere in

22   the -- you know, I can't remember looking

23   at the schedule when we were -- at that

24   point when we were trying to make a -- to

25   make a push.

1                    MILLS

2        Q.    When did Mr. Thomas tell you

3   that, that he wanted to have the players

4   really focused on basketball and not do

5   other things?

6        A.    I can't remember the specifics

7   of when -- when he said it.

8        Q.    Do you think it was at some

9   point in the February, March time frame?

10       A.    I really can't remember

11  when -- when the conversation was.

12       Q.    Is it your testimony that the

13  reduced player availability or the less

14  player availability as you wrote only

15  corresponded to the time frame of that

16  playoff push?

17       A.    Well, you know, it depends on

18  how -- you know, how you view player

19  availability and how you view player

20  appearances.  I don't -- I have -- I just

21  -- personally, as I judge the people

22  that -- that work for me both Anucha and

23  the people that she would judge underneath

24  her, I don't -- don't view them in an

25  absolute number of player -- player

```
 1                    MILLS

 2   appearances.  So if you ask me during

 3   this -- during this period of time did the

 4   Knicks make five more player appearances

 5   than they did in another period of time, I

 6   really couldn't answer it because I -- I

 7   didn't look at the player appearances in

 8   any sort of absolute number.  I looked at

 9   them in the effectiveness of what we are

10   doing.

11       Q.    Mr. Mills, I am just using your

12   words and what you are talking about here.

13   That is all these questions are related

14   to.

15            So my question is that when you

16   refer to less player availability, is it

17   your testimony that that only related to

18   the time period corresponding with the

19   playoff push in the spring of 2004?

20       A.    I'm telling you that that is

21   what I was referring to.

22       Q.    Right.  That is what I -- that

23   is what I wanted to be clear for the

24   record.

25       A.    Okay.
```

```
 1                    MILLS
 2    Ms. Browne-Sanders about Mr. Thomas'
 3    hesitancy at being involved in business
 4    front office operation matters?
 5              MR. GREEN:  Objection to form.
 6    You may answer, Mr. Mills.
 7         A.   I -- I had conversations
 8    with -- with Anucha regarding again
 9    giving -- given that we were moving into a
10    more difficult period of time with -- with
11    the Knicks that I -- that there were
12    things that I needed a comprehensive
13    strategy as to how she was going -- how
14    she was going to incorporate Isiah and the
15    basketball operations staff of the team
16    into -- into business initiatives.
17         Q.   Did you ever have occasion to
18    tell Ms. Browne-Sanders that you didn't
19    want to continue to be the intermediary
20    between her and Ms. -- Mr. Thomas?
21         A.   Yes.
22         Q.   And tell me the circumstances of
23    that.
24         A.   That she was -- she would
25    complain that there were certain things
```

```
 1                    MILLS
 2   that she wanted to get done or there would
 3   be a session that was scheduled and then
 4   ultimately cancelled, and I -- I explained
 5   to her that -- that, you know, at -- at
 6   some point I was not going to continue to
 7   be the person making the decisions or
 8   ultimately having to -- to make sure all
 9   of these things were executed upon, and
10   she needed to develop a strategy for
11   either herself or the people underneath
12   her to find a way to -- to get the
13   initiatives with the basketball team done,
14   and that that wasn't an efficient use of
15   my time to be the person ultimately making
16   all those decisions.
17        Q.    Well, Ms. Browne-Sanders had
18   been asking you to be an intermediary and
19   to talk to Mr. Thomas about doing the
20   things that related to the business
21   activities of the team that
22   Ms. Browne-Sanders thought needed to be
23   down.  Isn't that true?
24             MR. GREEN:    Objection to form.
25   You may answer, Mr. Mills.
```

1                    MILLS

2      with Hank about that, and I had already

3      known that Hank was not a fan of Anucha's,

4      and I had the conversation with him.  He

5      said you should get to Rusty, so that we

6      can figure out a way -- how to accomodate

7      this and accomodate her, and so I had a

8      conversation with Rusty.

9          Q.    And what was your conversation

10     with Mr. McCormack; what did you say and

11     what did he say?

12         A.    I said that Anucha came to me

13     and said she couldn't do this,

14     couldn't -- couldn't do this any more.

15     She -- I recounted that she had lost the

16     confidence of the people that -- that

17     worked for her and that she wanted -- she

18     couldn't do it, and I agreed, and that she

19     needed to -- to have a job while she went

20     out and -- and looked for another job, and

21     I spoke to Hank, and I -- and -- you know,

22     we should start working on a -- a plan.

23         Q.    Right.  I think I understood

24     that, but I was asking you about your

25     conversation with -- were you just

Page 284

```
 1                      MILLS
 2   testifying now as to your conversation
 3   with Mr. McCormack?
 4       A.    Yes.
 5       Q.    Okay.  In your -- in your
 6   conversation with Mr. McCormack, you told
 7   him about the conversation you had with
 8   Ms. Browne-Sanders.  You recounted for him
 9   that you had the conversation with Mr.
10   Ratner, correct?
11       A.    Yes.
12       Q.    Okay.  And then did Mr.
13   McCormack say anything in this
14   conversation?
15       A.    He said okay I'll -- I'll work
16   on it.
17       Q.    Did he tell you what he was
18   going to work on?
19       A.    We didn't talk about what the
20   specifics of what he was going to work on.
21       Q.    Did you have an understanding of
22   what -- what he was going to work on?
23       A.    I told him that I wanted some
24   kind of transition plan and some kind
25   of -- that we had to develop some kind of
```

```
 1                    MILLS

 2   package for her that would put her in a

 3   position to -- to move on.

 4       Q.    When did you have this

 5   discussion with Mr. McCormack?

 6       A.    It was -- it was sometime

 7   in -- sometime in -- in late November.

 8       Q.    Did Mr. McCormack ever follow-up

 9   with you about what kind of transition

10   plan he was putting together?

11       A.    No, I think it was -- you know,

12   there was -- it was soon after that that

13   we -- we were contacted by -- by Anucha's

14   attorneys.

15       Q.    When you say soon after, do you

16   know how long after?

17       A.    I really -- I really don't.

18       Q.    Was it several weeks?

19       A.    I really can't remember.

20       Q.    Okay.  But whatever that time

21   period was, you never got any follow-up

22   from Mr. McCormack about what he was doing

23   to implement the transition plan?

24       A.    No.

25       Q.    Did you ever see any document
```

Page 300

```
 1                    MILLS
 2   or who told me that.
 3        Q.    The conversation in which
 4   Ms. Browne-Sanders supposedly said to you
 5   that she couldn't do her job any more,
 6   where did that take place?
 7        A.    It took place in my office.
 8        Q.    And was anyone else present?
 9        A.    No.
10        Q.    Was the door closed?
11        A.    I believe the door was closed.
12        Q.    Do you recall what day of the
13   week it was?
14        A.    No.
15        Q.    Can you tell me everything that
16   you recall being said in that
17   conversation?
18        A.    I -- I recall her walking into
19   my office saying that we have, you know,
20   an explosive situation,
21   that -- regarding -- regarding the Knicks.
22   I can't -- you know, I've lost the
23   confidence of our staff.  I can't do this.
24   I can't do this any more.  I can't do this
25   job any more.  I've tried every way I can.
```

1                   MILLS

2    I have tried to be passive.  I have tried

3    to be aggressive, but I can't do this, and

4    I need your help.  I need to be able

5    to -- to have this job while I go find

6    another one, and I need your help, and I

7    said I understand, and then -- that

8    I -- that I would do what I could to help

9    her.

10       Q.    Was anything else said in the

11   conversation?

12       A.    That's -- that's the -- that's

13   what I can remember.

14       Q.    Did Ms. Browne-Sanders express

15   any concerns about her security or her

16   safety during that conversation?

17       A.    No, not that I can remember.  No

18   -- you know, no, she didn't talk to me

19   about security or safety at that point.

20       Q.    This conversation, was this at

21   or around the time that Ms. Browne-Sanders

22   had made you aware that Hassan Gonsalves

23   had been sexually harassing members of her

24   staff?

25       A.    It was sometime -- sometime I

1                    MILLS

2    you about Mr. Thomas' conduct at any other

3    time during her employment at MSG?

4         A.    Not that I can -- not at that I

5    can recall.

6         Q.    Did Ms. Browne-Sanders ever tell

7    that Mr. Thomas needed sexual harassment

8    training?

9         A.    No.

10        Q.    Did she ever tell you that he

11   had said that he loved her?

12        A.    No.

13        Q.    Did she ever tell you that

14   they -- that Mr. Thomas had suggested that

15   the two of them meet off site for any

16   reason?

17        A.    No.

18             (Mills Exhibit 16 marked for

19   identification.)

20             (Document handed to witness.)

21        Q.    I have given you a document that

22   -- that has been marked for identification

23   as Mills Exhibit 16, Bates stamp PL 00286.

24             Have you had a chance to look at

25   it, Mr. Mills?

Page 398

```
 1                   MILLS
 2              (Pause.)
 3      A.    Yes.
 4      Q.    Does this refresh your
 5  recollection about the timing of when
 6  Ms. Browne-Sanders sent you this E mail?
 7      A.    Yes.
 8      Q.    And you recall getting it on or
 9  about December 15?
10      A.    Yes.
11      Q.    This is the E mail that you were
12  referring to before when you said you
13  received an E mail about -- of concerns
14  from Ms. Browne-Sanders about Mr. Thomas
15  hugging her?
16      A.    Yes.
17      Q.    And so the record is clear you
18  never responded to Ms. Browne-Sanders, to
19  this E mail?
20      A.    The -- what I did with
21  this -- in -- what I did when I received
22  this E mail was speak to Mr. -- Mr. -- Mr.
23  Thomas and tell him that he shouldn't do
24  this.
25      Q.    Right.  Okay.  That is quite
```

# EXHIBIT P

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

06 Civ. 0589 (CGE)

----------------------------------------x

ANUCHA BROWNE-SANDERS,

                         Plaintiff,

         - against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD

THOMAS, III, and JAMES DOLAN,

                         Defendants.

----------------------------------------x

                         December 13, 2006
                         10:10  a.m.


         VIDEOTAPE DEPOSITION of PETER

OLSEN, taken by the Plaintiff, pursuant to

Notice, held at the offices of Vladeck

Waldman Elias & Engelhard, P.C, 1501

Broadway, New York, New York, before

Debbie Zaromatidis, a Shorthand Reporter

and Notary Public of the State of New

York.

```
 1              OLSEN

 2       Q.    Did she tell you that she

 3   thought Mr. Thomas was harassing her?

 4       A.    No.

 5       Q.    Did she tell you that she

 6   thought Mr. Thomas needed sexual

 7   harassment training -- training?

 8       A.    Well, she -- it is in the notes

 9   I think because I think I asked her

10   something about sexual harassment

11   training, and she -- and she -- I don't

12   think she -- I know I wrote something

13   about her emphasis on it, but I

14   don't -- that would be read out of context

15   to say that she -- she didn't emphasize

16   it.  She did pick up on it or mention it

17   -- something about sexual harassment

18   training, but it wasn't about her.  It was

19   more broadly stated because she had

20   mentioned about Petra Pope and about, you

21   know,            and somewhere in there

22   was ceded            but nothing

23   specific about        It --

24       Q.    Did you mention sexual

25   harassment training or did
```

1              OLSEN

2   Ms. Browne-Sanders?

3      A.    I think I asked because it, you

4   know, if -- if she was alluding to -- I

5   can't say this for sure, but I -- I think

6   I -- because -- a natural question would

7   be, well, if what you're saying is true, I

8   -- I think I know that the -- you know,

9   all employees receive sexual harassment

10  training.  Don't they get it? Haven't they

11  had it, something to that effect, and I

12  think she somehow reiterated that maybe in

13  terms of the -- they need it.  It would be

14  helpful.  She didn't answer it because I

15  think I asked it more like a question.

16  Don't they get, for example, sexual

17  harassment training.

18     Q.    So from what Ms. Browne-Sanders

19  was telling you, it seemed to you that --

20          MS. CACACE:  Strike that.

21     Q.    Did Ms. Browne-Sanders tell you

22  that she had told Mr. Mills about Mr.

23  Thomas telling her he loved her and wanted

24  to go off site with her?

25          MR. GREEN:  Objection to form.

# EXHIBIT Q

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
06 Civ. 0589 (CGE)
- - - - - - - - - - - - - - - - - - -x
ANUCHA BROWNE-SANDERS,

                Plaintiff,

     -against-

MADISON SQUARE GARDEN, L.P., ISIAH
LORD THOMAS, III and JAMES DOLAN,

                Defendants.

- - - - - - - - - - - - - - - - - - -x

                1501 Broadway
                New York, New York

                November 30, 2006
                10:10 a.m.


      DEPOSITION of MADISON SQUARE

GARDEN by HANK RATNER, one of the

Defendants in the above-entitled

action, held at the above time and

place, taken before Barbara P.

Goldsmith, a Shorthand Reporter and

Notary Public of the State of New York,

pursuant to the Federal Rules of Civil

Procedure, and stipulations between

Counsel.

Page 247

1                    H. RATNER

2   conversations with concerning the

3   Garden providing or potentially

4   providing security for

5   Ms. Browne-Sanders?

6       A.    Steve Mills.

7       Q.    And to the extent you can,

8   tell us the whole conversation you had

9   with Mr. Mills about that.

10      A.    There really wasn't much more

11  to it than that.  It was if she had

12  security concerns, we should look to

13  address those concerns.  And then, you

14  know, it was left in Steve's hands.

15      Q.    And you said, I think,

16  earlier that this is the same

17  conversation you had with Mr. Mills

18  where he came to you to say that she

19  wanted to leave?

20      A.    Yes.

21      Q.    So Steve told you that

22  Ms. Browne-Sanders said she could no

23  longer do her job, she wanted to leave,

24  and you embraced that and said good and

25  then said let's figure out an

1              H. RATNER

2    appropriate severance package; is that

3    correct?

4         A.    Along those lines, yes.

5         Q.    And then he said, oh, and by

6    the way, there are threats against her

7    or she's concerned about her safety or

8    something else?

9              MR. GREEN:   Objection to

10       form.

11        A.    I don't think he said oh, by

12   the way, but it was, you know, it was

13   part of the conversation that we had.

14        Q.    Did you ask him from where

15   the threats were coming?

16        A.    I didn't know of any threats.

17   I just know that she stated that she

18   had some concerns and my understanding,

19   whether expressed or implied, was that

20   it related to those two investigations

21   that had occurred.

22        Q.    And was there anything else

23   in that conversation you had with

24   Mr. Mills that you recall that you said

25   or he said?

1                H. RATNER

2      A.    I can't recall if we

3   discussed it.  It was just the trying

4   to work with her to see what would best

5   work for her exiting to transition to

6   something else and whether that meant,

7   you know, staying with the company for

8   a period of time or whether it meant

9   figuring out a severance amount at that

10  point in time.  But that was part of

11  the discussion and that was for Steve

12  to go and work out and figure out.

13     Q.    And did you tell Mr. Mills to

14  contact a particular security company,

15  did you ask him to call security at the

16  Garden, or something else?

17     A.    No, neither.  I didn't make

18  suggestions along those lines.

19     Q.    Did Mr. Mills give you the

20  impression that he believed the threats

21  were serious?

22          MR. GREEN:  Objection to

23      form.

24     A.    Yeah, I don't recall, but,

25  you know, vaguely, no, I don't think

# EXHIBIT R

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

06 CIV. 0589

------------------------------------------x

ANUCHA BROWNE-SANDERS,

                          Plaintiff,

        - against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD

THOMAS III, AND JAMES DOLAN,

                          Defendants.

------------------------------------------x

                          November 7, 2006
                          10:20  a.m.


        VIDEOTAPE DEPOSITION of RUSTY

McCORMACK, taken by the Plaintiff,

pursuant to Notice, held at the offices of

Vladeck Waldman Elias & Engelhard, P.C.,

1501 Broadway, New York, New York, before

Debbie Zaromatidis, a Shorthand Reporter

and Notary Public of the State of New

York.

Page 261

1                  McCORMACK

2    that with respect to the recommendations

3    for Ms. Browne-Sanders?

4        A.    No, the -- again, Mark

5    Schoenfeld wrote this, but -- but

6    we -- the -- the action taken with Anucha

7    was done by Jim Dolan.

8        Q.    How do you know that?

9        A.    Okay.  So -- well, that's the

10   word I got.

11       Q.    The word you got from whom?

12       A.    That I'm not sure.  I don't know

13   whether it was Steve.  I don't know

14   whether it was -- I don't remember that

15   exactly.

16       Q.    Someone had decided --

17       A.    But Jim Dolan decided to -- that

18   he was going to fire Anucha.

19       Q.    Someone -- someone told you that

20   that Jim Dolan said that

21   Ms. Browne-Sanders was going to be

22   separated?

23       A.    That's correct.

24       Q.    Great.  And then you had heard

25   that before you made this -- you signed

Page 262

```
 1              McCORMACK
 2    your name to this document, McCormack 8?
 3        A.    Yes.
 4        Q.    So it's fair to say that you
 5    learned about Mr. Dolan's decision, and
 6    then you and Mr. Schoenfeld drafted a
 7    memorandum that would conform to Mr.
 8    Dolan's decision?
 9              MR. GREEN:    Objection to form.
10        Q.    Is that accurate?
11        A.    We -- yeah, we did write
12    this -- we did write this with that, yes,
13    but the decision was him.  You have speak
14    to Jim.
15        Q.    Did you hear about
16    Ms. Browne-Sanders' supposed desire to
17    leave the company from anyone other than
18    Steve Mills?
19        A.    No, I don't believe so.
20        Q.    No, you didn't hear about it
21    from anyone other than Steve Mills?
22        A.    That's correct.  Steve came to
23    me to discuss the possibility of her
24    continued employment while she looked for
25    work.
```

# EXHIBIT S

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
ANUCHA BROWNE SANDERS,


                    Plaintiff,

          -against-              06 CV 0589 (GEL)

MADISON SQUARE GARDEN, L.P.,
ISIAH LORD THOMAS III and JAMES L. DOLAN,

                    Defendants.
----------------------------------------X




   VIDEOTAPED DEPOSITION OF ANUCHA BROWNE SANDERS

              New York, New York

            Monday, November 27, 2006




REPORTED BY:

BARBARA R. ZELTMAN

Job Number: 10954

452

ANUCHA BROWNE SANDERS

1

2    that what you're really saying is "I all

3    know is through my lawyer, so I can't

4    answer that."

5              Is that in effect what you are

6    saying by being quiet?

7         A    My attorney is not asking me

8    to answer that question.

9         Q    Unless you know something that

10   wasn't told to you by your lawyers.  She

11   is saying you can't tell me if it was told

12   to you by her or Kevin or whomever.

13             But do you have any

14   information at all that would lead you to

15   be able to say that Isiah Thomas had a

16   hand in your being fired?

17             MS. VLADECK:   That's a

18        different question.

19        A    Yes.

20        Q    Tell me about it.

21        A    There were a number of things

22   that Stephon Marbury said about me.  Steve

23   mentioned in a number of meetings that

24   Isiah did not like me, and that was the

25   root of hostility between Stephon and

453

                    ANUCHA BROWNE SANDERS

1

2    myself.  And that Steve had mentioned in

3    one of his meetings that Isiah asked for

4    me to be fired.

5         Q    Steve told you that?

6         A    Yes.

7         Q    Was it just you and Steve

8    present when he told you that?

9         A    Yes.

10        Q    Did you write that down

11   anywhere?

12        A    No.

13        Q    Did you tell anybody that?

14        A    Yes, I told somebody.  I told

15   somebody that.

16        Q    Who did you tell?

17        A    I remember telling my sisters.

18        Q    When did you tell your

19   sisters?  When did this happen?

20        A    This was in 2004, the spring.

21        Q    In 2004?

22        A    Yes.

23        Q    He asked for you to be fired?

24        A    He asked Steve Mills to fire

25   me.

454

ANUCHA BROWNE SANDERS

1

2    Q      And you told both your

3    sisters, or all three of your sisters?

4    A      I told my two sisters, Ruthie

5    and Vickie.

6    Q      And anything more?  Anything

7    more that's the basis for your response?

8    A      Yeah.  Steve mentioned a

9    number of times that Isiah doesn't want me

10   around.

11   Q      Doesn't want you to what?

12   A      Doesn't want me around.

13          Steve mentioned that he wanted

14   me fired.  There was --

15   Q      That's in '04?

16   A      That was in 04, yes.

17   Q      And that he didn't want you

18   around was that in '04 or was it '04 and

19   '05?

20   A      The discussions I had with

21   Steve with regards to him wanting me fired

22   were in spring of -- it was in March and

23   April of 2004.

24   Q      And how about that he doesn't

25   want you around, when did that take place?

455

ANUCHA BROWNE SANDERS

1
2     A     We had had discussions about

3  Isiah and more hostile conversations with

4  regards to Isiah, and he mentioned that in

5  those meetings.  Steve did.

6     Q     When?  Time frame.

7     A     I would say spring and summer

8  of 2004.

9     Q     So anytime in 2005, did he

10 tell you that he doesn't want you around?

11          MS. VLADECK:  Objection to

12     form.

13     A     In 2005 there were -- my basis

14 for what -- the question you asked,

15 references things that were told to me

16 through other people at the Garden.

17     Q     Tell me who those people were

18 and what they told you and when.

19     A     Dan Gladstone.

20     Q     Dan Gladstone.  What did he

21 say to you and when?

22     A     Dan Gladstone told me that

23 Stephon made a number of comments,

24 derogatory comments toward me, called me a

25 "black bitch."

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
ANUCHA BROWNE SANDERS,

               Plaintiff,

         -against-          06 CV 0589 (GEL)

MADISON SQUARE GARDEN, L.P.,
ISIAH LORD THOMAS III and JAMES L. DOLAN,

              Defendants.
---------------------------------------X


  VIDEOTAPED DEPOSITION OF ANUCHA BROWNE SANDERS

          New York, New York

        Tuesday, November 28, 2006


REPORTED BY:

BARBARA R. ZELTMAN

JOB NO.: 10957

119

ANUCHA BROWNE SANDERS

1

2          Tape 2 of the videotaped deposition

3      of Browne Sanders.

4          Q      Ms. Browne Sanders, before we

5      examine the next document, you testified

6      yesterday, did you not, that as of the

7      spring of 2004 and specifically March of

8      2004 you thought there was the possibility

9      you might lose your job, correct?

10              MS. VLADECK:  Objection to

11          form.

12          A      I didn't testify that I

13      thought I might lose my job.

14          Q      Didn't you testify that

15      Mr. Mills told you that Isiah Thomas

16      wanted you fired?

17          A      That's what I testified.

18          Q      So you did testify --

19          A      I testified that Isiah asked

20      Steve to fire me.  And Steve said to

21      him -- that I said he told Isiah, "I don't

22      tell you who to hire and fire.  Don't tell

23      me who to hire and fire.'"

24              So in that, it confirmed to me

25      that I was very safe and secure in my job.