UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

ANUCHA BROWNE SANDERS,                          :

                              Plaintiff,        :

                                                :        06 CV 0589 (GEL) (DCF)

        - against -                             :
                                                :        ECF CASE
MADISON  SQUARE  GARDEN,  L.P.,  ISIAH  LORD     :
THOMAS III AND JAMES L. DOLAN,                   :

                              Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF
## MADISON SQUARE GARDEN, L.P. AND JAMES L. DOLAN'S
## OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177-1211

212.351.4500

Attorneys for Defendants Madison Square Garden, L.P. and James L. Dolan

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ........................................................................... 1

DISPUTED AND UNDISPUTED FACTS ......................................................... 2

A.  Plaintiff Becomes Concerned About Her Role and Her Job Security ................... 2

B.  Plaintiff Begins to Demonstrate Serious Performance Deficiencies ...................... 4

C.  Plaintiff Manufactures a Harassment Claim and a "Sexually Hostile Environment" to Exact a Large Severance Before Leaving MSG ......................... 7

    1.  Plaintiff's Own Purported Harassment Claims ............................................. 7

    2.  Plaintiff's Involvement in the "Claims" of Other Employees .................... 8

D.  Plaintiff Retains Counsel and Seeks an Extortionate Severance Payment ............. 9

E.  Dolan's Decision to Terminate Plaintiff ............................................................ 11

ARGUMENT ....................................................................................................... 12

I.  APPLICABLE LEGAL STANDARDS ......................................................... 12

    A.  Standard For Summary Judgment .............................................................. 12

    B.  Liability for Retaliation Under Title VII .................................................. 13

    C.  The Mixed-Motive Doctrine in Retaliation Cases ..................................... 14

II.  THERE ARE GENUINE ISSUES OF FACT AS TO WHETHER PLAINTIFF CAN ESTABLISH DOLAN'S LACK OF RETALIATORY INTENT ............. 14

    A.  Whether There is a Causal Connection Between Dolan's Decision to Terminate Plaintiff and Any Protected Activity is Genuinely Disputed .. 14

    B.  Evidence of Dolan's Good Faith Belief That Plaintiff Was Tampering With An Ongoing Investigation Precludes Summary Judgment .............. 16

    C.  A Fair Reading of Dolan's Testimony Precludes Summary Judgment Under the Mixed-Motive Doctrine ........................................................... 17

i

III.    THERE ARE GENUINE ISSUES OF FACT AS TO WHETHER PLAINTIFF
        CAN ESTABLISH THAT SHE ENGAGED IN PROTECTED ACTIVITY
        REQUIRED FOR A PRIMA FACIE CASE OF RETALIATION .......................19

        A.    Plaintiff's Attempts to Fabricate a Claim and Tamper With MSG's Ability
              to Investigate That Claim Were Not Undisputably Protected Activity .....19

        B.    Plaintiff's Attempts to Extort an Unwarranted Severance Package Were
              Not Undisputably Protected Activity ........................................................20

        C.    Whether Plaintiff Had a Reasonable, Good Faith Belief that She Was
              Subjected to Any Sexual Harassment, A Material Issue, is Genuinely
              Disputed....................................................................................................22

              1.    There is a Material Dispute as to Whether Plaintiff Ever
                    Complained to MSG Before Counsel Was Retained....................23

              2.    There is a Material Dispute as to Whether Plaintiff Raised Her
                    Allegations as a "Smoke Screen" to Avoid the Consequences of
                    Her Poor Performance and to Exact a Large Severance From MSG
                    ....................................................................................................24

CONCLUSION ....................................................................................................................25

## TABLE OF AUTHORITIES

**Page**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).................................................13

Matter of Benjamin, 129 A.D.2d 886 (3d Dept.), appeal denied, 70 N.Y.2d 666
(1987)........................................................................................................................22

Bufford v. Boeing Co., No. 06-3170, 2007 WL 766313 (10th Cir. Mar. 15, 2007) ...................16

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...................................................................12

Cf. Jute v. Hamilton Sundstrand Corp., 420 F.3d 166 (2d Cir. 2005).............................22

Champion v. Artuz, 76 F.3d 483 (2d Cir. 1996) ...............................................................13

Civ. 819, 2000 WL. 297176 (S.D.N.Y. Mar. 21, 2000) ...................................................16

Civ. 8453, 2007 WL. 1001161 (S.D.N.Y. Apr. 3, 2007) ...................................................22

De Los Santos v. City of, N.Y., No. 02 .............................................................................22

Deravin v. Kerik, 335 F.3d 195 (2d Cir. 2003) .................................................................22

Elmore v. North Fork Bancorporation, Inc., 325 F. Supp. 2d 336 (S.D.N.Y. 2004).....................12

Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276 (2d Cir. 1998) .........................23

Glover v. South Carolina Law Enforcement Div., 170 F.3d 411 (4th Cir. 1999) .........................20

Gordon v. New York City Bd. of Educ., 232 F.3d 111 (2d Cir. 2000) ..........................14

Gregory v. Daly, 243 F.3d 687 (2d Cir. 2001) ...................................................................22

Holtz v. Rockefeller & Co., 258 F.3d 62 (2d Cir. 2001)......................................................13

Jackson v. St. Joseph State Hosp., 840 F.2d 1387 (8th Cir. 1988).......................................20, 25

Jowers v. Lakeside Family and Children's Servs., 2005 WL. 3134019 (S.D.N.Y.
Nov. 22, 2005)..........................................................................................................22

Kauffman v. Maxim Healthcare Servs., Inc., 2006 WL. 1983196 (E.D.N.Y. July
13, 2006)...................................................................................................................22

Marks v. Nat'l Commc'ns Ass'n, Inc., 72 F. Supp. 2d 322 (S.D.N.Y. 1999)..................24

Matima v. Celli, 228 F.3d 68 (2d Cir. 2000) ........................................................... 14, 19

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ............... 12, 13

McLean-Nur v. Department of Transp., City of, N.Y., No. 98 ................................. 16

Monteiro v. Poole Silver Co., 615 F.2d 4 (1st Cir. 1980) ....................................... 25

Nugent v. St. Luke's/Roosevelt Hosp. Ctr., No. 05 Civ. 5109, 2007 WL. 1149979
(S.D.N.Y. Apr. 18, 2007) ........................................................................................ 17

Perry v. Barnard, 745 F. Supp. 1394 (S.D. Ind. 1989), aff'd, No. 89-3575, 1990
WL 121481 (7th Cir. Aug. 17, 1990) ...................................................................... 21

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) ............................................... 14

Quinn v. Green Tree Credit Corp., 159 F.3d 759 (2d Cir. 1998) ........................... 12

Reed v. A.W. Lawrence & Co., 95 F.3d 1170 (2d Cir. 1996) ................................. 14

Spadola v. New York City Transit Auth., 242 F. Supp. 2d 284 (S.D.N.Y. 2003) ....... 22

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) ............................. 16

Tomka v. Seiler Corp., 66 F.3d 1295 (2d Cir. 1995) .............................................. 13

Uddin v. City of N.Y., 427 F. Supp. 2d 414 (S.D.N.Y. 2006) ................................ 13

Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d at 241 (2d Cir. 2004) ...... 13

Zerafa v. Montefiore Hosp. Hous. Co., 403 F. Supp. 2d 320 (S.D.N.Y. 2005) ........... 13

## STATUTES

42 U.S.C. § 2000e-3(a) ........................................................................................... 13, 22

42 U.S.C. § 2000e et seq ......................................................................................... 1

Fed. R. Civ. P. 56 .................................................................................................... 12, 13

## PRELIMINARY STATEMENT

Plaintiff Anucha Browne Sanders ("Plaintiff") asserts claims for employment discrimination on the basis of sex, sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and under state and city law. Plaintiff moves for partial summary judgment on her retaliation claims against Madison Square Garden, L.P. ("MSG" or the "Company") and James L. Dolan ("Dolan"). Despite the substantial record evidence demonstrating that Plaintiff was lawfully terminated, Plaintiff seeks partial summary judgment on the ground that "Dolan has left no doubt about his unlawful motivations." (Pl. Br. at 2). Plaintiff has utterly failed to carry her burden on summary judgment for several independent reasons.

*First*, Plaintiff materially misstates Dolan's testimony, unfairly portraying and unduly narrowing the combination of reasons for termination he testified to, in order to avoid a trial as to MSG's intent. Plaintiff omits material facts and testimony, and mischaracterizes numerous material facts as "undisputed" where genuine issues requiring trial exist. When the record is read in its proper context, even if Plaintiff could demonstrate that her termination was partly motivated by retaliatory reasons, she cannot establish as a matter of law, as she must at this stage, that Defendants would not have taken the same action in the absence of any such retaliatory motive.

*Second*, there is a genuine issue as to whether Plaintiff had a reasonable, good faith belief that she was subjected to sexual harassment – a necessary element under the law for Plaintiff's activity to be protected. There is a wide array of evidence suggesting that Plaintiff raised her allegations of harassment for pretextual reasons, including her increasing (and well-founded) concerns about her job security based on her repeated performance failures. Such evidence includes, for example, (i) the mounting criticisms of Plaintiff's performance in the

months leading up to her allegations, including her poor performance at budget meetings with senior management and their request that she get additional business training, (ii) Plaintiff's direct statements to her superiors, (iii) the fact that Plaintiff had not once complained to anyone at MSG about any alleged harassment until her job was in jeopardy and she acknowledged to her boss that she needed to leave MSG – and after she had retained counsel, and (iv) the fact that Plaintiff planned and carried out her own "freelance investigation" to develop "evidence" to support a harassment claim well before raising any allegations.

*Finally*, the activity that Plaintiff characterizes as "protected" was not legally protected activity – or at the very least there exist genuine factual issues as to whether Plaintiff was terminated for engaging in protected activity. Rather than "opposing discrimination," the evidence establishes that Plaintiff tampered with evidence and pressured employees for her own purposes and failed to report allegations of discrimination as required by company policy. Moreover, whether or not Plaintiff *in fact* improperly tampered with an investigation, Dolan was told – and reasonably understood – that she had tampered with an investigation, and for that reason alone Plaintiff's argument fails. Similarly, Plaintiff's attempt to extort a $6.5 million "severance" payment – untethered to any rational measure of damages – along with her threat of public embarrassment, on this factual record, cannot constitute protected activity.

## DISPUTED AND UNDISPUTED FACTS[1]

### A.    Plaintiff Becomes Concerned About Her Role and Her Job Security

Prior to Isiah Thomas' appointment as President, Basketball Operations by the Knicks, Plaintiff had an excellent relationship with the Club's then-President and General

---

[1] All of the facts set forth below are supported in the record by depositions or affidavits and go to the issue of whether Plaintiff had a good faith, reasonable belief that she was subjected to discrimination or harassment or whether, as Defendants contend, she raised her claims in an unprotected effort to exact an unwarranted severance package from Defendants to avoid legitimate, non-discriminatory employment actions that would have occurred whether or not she raised her claims. To the extent Plaintiff now disputes any of these facts, that merely indicates that there are genuine issues of material fact precluding the grant of partial summary judgment on this issue.

Manager, Scott Layden, and Layden's Assistant General Manager, Jeff Nix. (56.1(b) ¶81). As a consequence of this relationship, Plaintiff enjoyed perks, exercised influence and assumed responsibilities that were not part of her position. (56.1(b) ¶82). For example, Plaintiff had lunch with Layden as often as three times per month, attended many of the team's practice sessions, and watched many of the team's home games from the broadcast booth with Layden, Nix and their basketball operations staff. (56.1(b) ¶82). Plaintiff had direct access to the Knicks players and frequented the players' lounge adjacent to the locker room. (56.1(b) ¶83).

In late December 2003, the Knicks terminated Layden and Thomas was appointed in his place. (56.1(b) ¶84). Shortly after Thomas assumed his position, he began to make changes in the way the team was managed. (56.1(b) ¶85). Those changes included relieving Nix of his responsibilities as Assistant General Manager, dispersing his duties to other staff members, and offering him a less influential position as Director of Scouting. (56.1(b) ¶86). Thomas also restricted access to the team to only those employees who, in Thomas' view, had an important reason to have such access in performing their duties. (56.1(b) ¶87). Accordingly, Plaintiff no longer had the access, perks and perceived influence that she had become used to. (56.1(b) ¶88).

Over time, and as a result of these changes, Plaintiff's relationship with Thomas became strained. (56.1(b) ¶88). She created conflict over their respective roles and responsibilities and over her access to the team. (56.1(b) ¶¶89-90). This conflict first came to a head in March 2004, when Plaintiff and Thomas attended a meeting with Steve Mills, President and COO of MSG Sports, to whom both reported. (56.1(b) ¶91). Mills explained to Plaintiff and Thomas what their respective roles and responsibilities were and made it clear that while Plaintiff was responsible for the non-basketball business operations of the Knicks, Thomas was solely responsible for basketball operations. (56.1(b) ¶92). Despite this outcome, Plaintiff regularly brought to Mills' attention perceived conflicts between her and Thomas and his staff,

so much so that Mills began to feel like a referee, a role he did not want and for which he did not have time. (56.1(b) ¶93). Mills repeatedly reminded Plaintiff that Thomas was President of the team and had full responsibility for basketball operations, so Plaintiff needed to find a way to work with him and his staff in order to fulfill her responsibilities. (56.1(b) ¶94).

**B.    Plaintiff Begins to Demonstrate Serious Performance Deficiencies**

In early 2004, as part of an overall restructuring, MSG decentralized many of its business operations and gave several senior managers of its business groups – including Plaintiff – significantly more responsibility for the overall financial success performance of their business units. (56.1(b) ¶95). Within MSG, this expanded role was referred to as "P&L Manager." (56.1(b) ¶95). In Plaintiff's case, the role of P&L Manager required her to understand and manage several important aspects of the Knicks' business operations (including food and merchandise sales and operations, and day-of-game facilities costs) for which she had not previously been directly responsible. (56.1(b) ¶96). While Plaintiff had previously managed only the team's marketing and community relations operations, she was now accountable for virtually all of the team's revenues and expenses (with the exception of player-related costs, which remained Thomas' responsibility). (56.1(b) ¶97). Plaintiff's revenue and expense budget of $120 million was one of the largest components of MSG's annual budget. (56.1(b) ¶98).

While Plaintiff performed satisfactorily in her marketing and community relations capacity – as reflected in her early performance reviews by Mills – she struggled with understanding and managing her significantly expanded role as P&L Manager. (56.1(b) ¶99). These struggles became openly apparent in 2005, when Plaintiff was involved in a series of "disastrous" budget meetings with MSG's most senior management team, including Dolan, MSG's Chairman; Hank Ratner, MSG's Vice Chairman; and Mills. (56.1(b) ¶100). These meetings highlighted Plaintiff's deficiencies in the minds of Dolan, Ratner and Mills. (56.1(b)

¶100). From their perception, Plaintiff could not capably answer questions concerning core aspects of the team's business activities and did not grasp what they believed were basic business and financial principles and important company approval procedures. (56.1(b) ¶101). The problems were so severe from Dolan's perspective that he had a conversation with Mills and Ratner about Plaintiff's performance immediately after the meeting. (56.1(b) ¶102). Dolan afforded Plaintiff the opportunity for financial training over the objection of Ratner, who held the view that Plaintiff did not have the necessary capabilities to perform in her expanded role. (56.1(b) ¶¶103, 105). Mills also shared with Dolan his own similar concerns about Plaintiff's performance. (56.1(b) ¶67). Mills discussed with Dolan the gaps in Plaintiff's skills in budgeting, financial management, branding the Knicks and general personnel management. (56.1(b) ¶104). Mills' concerns included that Plaintiff was unable to lead the Knicks strategically and grasp the concept of being the P&L Manager, and had demonstrated an inability to work constructively with her peers and manage her relationships across MSG. (56.1(b) ¶67). Nevertheless, at that point, Dolan decided to give Plaintiff an opportunity to gain additional skills training in an attempt to salvage her performance and instructed Mills to identify some business courses she could attend. (56.1(b) ¶105).

Despite this opportunity, Plaintiff's job performance did not improve. (56.1(b) ¶105). To the contrary, after the "disastrous" budget meetings, Plaintiff made a number of other serious mistakes that came to Mills' attention. (56.1(b) ¶¶106-120). For example, in October 2005, Plaintiff organized a free "open practice" for the Knicks that resulted in a dangerous security situation, due to Plaintiff's decision to advertise the event and encourage thousands of fans to arrive at the Garden without tickets. (56.1(b) ¶106). From the perspective of Timothy Hassett, MSG's Executive Vice President of Facilities, this situation resulted from Plaintiff's direct disregard of his staff's request – which they believed she agreed to – not to advertise the

event to people without tickets. (56.1(b) ¶107). Plaintiff not only went ahead and advertised the

event against their express request, but made matters worse by failing to inform his staff that she

had done so. (56.1(b) ¶108). As a result, MSG's security staff was unexpectedly faced with a

dangerously large crowd of patrons who had no tickets and were being told they could not enter

the facility. (56.1(b) ¶109). In order to avoid the potential for injuries, the facilities staff had no

choice but to admit these patrons without even the most basic security check. (56.1(b) ¶110).

The incident was called to Mills' attention in an angry email from Hassett:

> I am baffled at why the Knicks' staff would, for all apparent
> indications, blatantly disregard the input of the Facilities staff and
> unilaterally, without notice, take action contrary to our advice. I
> thought the concept behind the P&L Manager structure was one of
> discussion, collaboration and ultimate agreement on a given course
> of action for any particular event. Certainly Anucha and Gary
> [Winkler, Plaintiff's subordinate] have the right to disagree with
> our suggestions, as we have the right to disagree with theirs, but
> they have an obligation to articulate that position to those
> responsible for running the building and managing the crowd
> control at our events so we could at least have had an opportunity
> to react accordingly -- in which case we may have stood a chance
> of being prepared for the type of situation that ultimately occurred.

(56.1(b) ¶111). Mills was understandably concerned by Plaintiff's conduct which he only

learned of from someone other than Plaintiff. (56.1(b) ¶¶112-113). Moreover, there was now

evident friction between Plaintiff and the executives responsible for MSG's facilities operations.

(56.1(b) ¶114). Mills openly criticized Plaintiff for the way she handled the event. (56.1(b)

¶105).

There were a number of other serious performance issues that caused Mills to

question Plaintiff's ability to perform her job.[2] Mills repeatedly communicated his concerns to

---

[2] Later in October 2005, for example, Plaintiff retained a number of untrained "customer service representatives" to
work the Knicks' opening game without even consulting the facilities group. (56.1(b) ¶116-117). Moreover, MSG
has unionized employees who were responsible for some of the duties that Plaintiff had assigned these
"representatives" to perform. (56.1(b) ¶118). This incident was brought to the attention of Rusty McCormack,
MSG's Senior Vice President of Human Resources and Organization Development, who testified about how much it

Plaintiff throughout 2005, both in emails and in conversations. (56.1(b) ¶121). The situation became so untenable that in one conversation, Plaintiff asked Mills if they were ever going to have another meeting where she was going to leave feeling good about herself. (56.1(b) ¶122).

Finally, in November 2005, after all of the incidents outlined above and in the footnote below had occurred, Plaintiff met with Mills. She told him she knew she had had lost his respect and that of her peers and subordinates; that she felt she could no longer perform her job for the Knicks; and that she needed his help to find another job while she still had a job. (56.1(b) ¶123). Mills agreed to help her and reported the conversation to Ratner and McCormack, who later advised Dolan. (56.1(b) ¶124).

## C.    Plaintiff Manufactures a Harassment Claim and a "Sexually Hostile Environment" to Exact a Large Severance Before Leaving MSG

In the face of these mounting performance issues, Plaintiff launched a series of sua sponte "investigations" in November 2005 into purported claims of harassment, by her and others, in disregard of MSG's policies and without advising anyone in management or HR.

### 1.    Plaintiff's Own Purported Harassment Claims

Immediately prior to the Thanksgiving holiday, Plaintiff instructed one of her subordinates, Dan Gladstone, Director of Fan Development, to prepare a memo concerning comments Knicks player Stephon Marbury had allegedly made about Plaintiff. (56.1(b) ¶125). Significantly, the comments were allegedly made more than five months earlier and although

---

concerned him. (56.1(b) ¶120). In addition, Plaintiff asked Thomas to hand sign each of 4,500 letters requesting renewal of season ticket subscriptions, prompting Mills to respond critically, "I think 4500 letters to sign is too much. We have never sent originals like that and I question how valuable it really is." Plaintiff then admits, "I figured you wouldn't agree with Isiah signing the letters." (56.1(b) ¶121). Mills' October 4, 2005 email to Plaintiff, regarding her decision to mount a large mural in the arena before the start of the new season containing players who were already traded, states, "I think it is crazy to have a mural go up today with 2 players that are no longer on the team. We should take this down." . . . "I can not imagine what past direction or position would suggest that we should put something up that is clearly an out of date image . . . I am somewhat surprised that the conclusion you come to is that we should leave it up. Given that this is part of every team you should give some thought as how you would like to deal with it. When the Knicks marketing function reported to me I budgeted a provision to make necessary changes when trades were made." (56.1(b) ¶121).

Gladstone had told Plaintiff of their tone and import at that time, Plaintiff had never requested that they be documented until November 2005, when her own performance issues were coming to a head. (56.1(b) ¶126). Gladstone was surprised by Plaintiff's request and urgent instruction that he prepare the memo over the Thanksgiving weekend. (56.1(b) ¶127).

At around the same time, Plaintiff instructed another subordinate, Gary Winkler, Vice President of Event Presentation, to document an incident that purportedly occurred over a year earlier. (56.1(b) ¶128). That incident, the facts of which are disputed, pertained to alleged inappropriate behavior by Thomas toward another employee requesting that she check in on the referees before games. (56.1(b) ¶129). Plaintiff also instructed Karin Buchholz, Vice President of Community Relations and Fan Development, to prepare her own memo concerning Marbury's purported animosity toward Plaintiff. (56.1(b) ¶130). Buchholz was "uncomfortable" and felt "pressured to document the instances" because Plaintiff was her supervisor. (56.1(b) ¶131). Moreover, according to Buchholz, Plaintiff actually told Buchholz what the memo should say. (56.1(b) ¶132). Plaintiff's instructions to prepare these memos were made just days before she retained an attorney in early December 2005. (56.1(b) ¶133).

### 2. Plaintiff's Involvement in the "Claims" of Other Employees

At the same time Plaintiff was requiring her subordinates to document events that purportedly occurred months in the past, she was conducting another "investigation" into issues allegedly raised by lower-level staff employees. (56.1(b) ¶134). Specifically, Plaintiff launched what became a wide-ranging "investigation" into allegations of inappropriate comments made to female employees by Hassan Gonsalves, a Field Marketing Assistant and Stephon Marbury's cousin. (56.1(b) ¶135). Plaintiff began and pursued her own "investigation" into Gonsalves' conduct (and ultimately Marbury's conduct) without informing Mills or anyone in MSG's Employee Relations/Human Resources ("HR") department. (56.1(b) ¶136). Plaintiff's decision

- 8 -

to conduct interviews by herself, without notifying or involving HR, was in direct contravention of clearly defined MSG policy. (56.1(b) ¶137). MSG's Harassment Prevention policy provides:

> Employees who have experienced conduct they believe is contrary to this policy have an obligation to take advantage of this complaint procedure. If you believe you have been or are being discriminated against, harassed or otherwise treated improperly, or believe some other employee is engaging in or receiving such treatment or conduct, you should contact your local Employee Relations Manager immediately. The local Employee Relations Manager has the primary responsibility for investigating and resolving any complaint of sexual or other harassment, discrimination or other improper or abusive conduct.

(56.1(b) ¶137).

While Plaintiff was conducting these interviews, Plaintiff instructed Buchholz and Gladstone to prepare memos concerning alleged performance deficiencies of Vernon Manuel, another employee on her staff who was then dating Dolan's stepdaughter. (56.1(b) ¶139).

After Thanksgiving weekend, when she had completed her "investigations" into Gonsalves and Manuel (and, in the process, obtained information that Marbury had engaged in consensual sex with an ████████, Plaintiff informed Mills for the first time of her "investigations" and the "results" thereof. (56.1(b) ¶140). Mills was understandably concerned about Plaintiff's conduct and referred the entire matter to HR for a proper investigation. (56.1(b) ¶141). Although Plaintiff may have believed that no action would be taken against Gonsalves or Manuel given their relationships with Marbury and Dolan, respectively, she was plainly mistaken. MSG HR staff immediately investigated these matters and at the conclusion of the investigation, MSG terminated the employment of both Gonsalves and Manuel. (56.1(b) ¶142).

### D.    Plaintiff Retains Counsel and Seeks an Extortionate Severance Payment

On December 2, 2005, days after she completed her "investigations" into Gonsalves, Manuel and Marbury, Plaintiff retained counsel. (56.1(b) ¶143). On December 15, 2005, Plaintiff sent Mills an email in which she asserted that, at the Knicks game the previous

- 9 -

evening, the fact that Thomas had tried to hug her, and the way he spoke to her, made her uncomfortable. (56.1(b) ¶144). This was the first time Plaintiff ever complained at MSG about any allegedly inappropriate action or conduct by Thomas. (56.1(b) ¶¶143, 145).[3] Plaintiff was familiar with MSG policies pertaining to discrimination and harassment and had a good relationship with HR's Vice President who investigated those types of allegations. (56.1(b) ¶138). On December 21, 2005, Plaintiff's counsel contacted MSG's legal department and asserted that Plaintiff had a "knock down" sexual harassment suit against MSG. (56.1(b) ¶146). In a meeting on December 22, 2005 between Plaintiff's counsel and MSG's counsel, before MSG had the opportunity to investigate Plaintiff's claims, Plaintiff's counsel indicated that unless Plaintiff's monetary demand was met, she was going to file a lawsuit likely to result in substantial publicity. (56.1(b) ¶147). Plaintiff's counsel specifically referred to the public embarrassment to the Knicks and Thomas that would result from the press coverage of the suit. (56.1(b) ¶148). Plaintiff's counsel reminded MSG's counsel that Plaintiff's "investigation" had revealed that Marbury, the Knicks' star player, had sexual relations with ███████████ even though this allegation had – and has – absolutely no bearing on Plaintiff's allegations about Thomas. (56.1(b) ¶149). Plaintiff's counsel went on to say that Plaintiff wanted "money, lots of money" if MSG were to avoid such a lawsuit. (56.1(b) ¶150). Only days later, while MSG's internal investigation into Plaintiff's claims was underway, Plaintiff's counsel made a "settlement demand" of $6.5 million. (56.1(b) ¶151). At the time, Plaintiff was still employed by MSG. (56.1(b) ¶152). As MSG's counsel pointed out in a letter dated December 30, 2005, Plaintiff's "settlement" demand had no rational basis. (56.1(b) ¶153). In response to a

---

[3] Plaintiff claims that she had previously complained of sexual harassment to both Mills and Peter Olsen, an outside consultant on organization behavior, but both Mills and Olsen dispute this material fact. (56.1(b) ¶145).

settlement proposal from MSG, Plaintiff's next "settlement" demand was reduced to $5,950,000, representing over 22 years' front pay.[4]  (56.1(b) ¶154).

**E.     Dolan's Decision to Terminate Plaintiff**

When asked why he made the decision to terminate Plaintiff, Dolan testified that "[w]e had come to the conclusion that her working at the company was no longer tenable due to the fact first that – leading up until that point and all the way from July up until that point we had had problems." (56.1b ¶155).  Dolan identified as a factor his own considered opinion of her "inability to do her job" that included her "inability to budget" and "inability to brand" and lack of understanding of both. (56.1(b) ¶156).  Dolan also identified as a factor his acceptance of Ratner's longstanding view that her performance had not improved and would never improve enough, and that she should be terminated. (56.1(b) ¶156).  Dolan further considered Plaintiff's admission to Mills that she could no longer perform her job and her request that MSG keep her on while she looked for another position. (56.1(b) ¶159).

Dolan also identified Plaintiff's multi-million dollar demand, her failure to follow MSG's HR policies by tampering with investigations and abusing her position to improperly influence her direct reports in furtherance of her own agenda. (56.1(b) ¶157).  Dolan testified that he believed, based on what he had been told by McCormack and Ratner, two of his trusted advisors, that Plaintiff "used her influence with direct reports to influence their answers, their [sic] -- their responses to an inquiry to an investigation that was made on her behalf." (56.1(b) ¶158).  As Chairman of MSG, of course, Dolan relies on information conveyed to him by his direct reports, including Mills, Ratner and McCormack. He had been told she had "tampered with an investigation" and "essentially attempt[ed] to coerce her direct reports into corroborating

---

[4] Plaintiff's multi-million dollar demands could not be supported by any "unlawful termination," since she had not been terminated.  And they could not have been for emotional distress damages, as she has asserted no such claims in this action. (56.1(b) ¶152).

her complaint," knowing that she was going to make a complaint, in violation of Company policy. (56.1(b) ¶158).

Dolan testified that it was the "combination of all those things together" that led him to terminate Plaintiff. (56.1(b) ¶160). When asked which factor was weighted more heavily in his decision, Dolan said Plaintiff's performance issues since July were "significant," as was her misuse of her position to influence her employees, stating that the Company could not trust her after that. (56.1(b) ¶161).

## ARGUMENT

Plaintiff is not entitled to partial summary judgment under Fed. R. Civ. P. 56 because she cannot show by record evidence that there is no genuine issue as to any material fact and that she is entitled to judgment as a matter of law. Plaintiff's motion fails both prongs of Rule 56(c). Plaintiff mischaracterizes as undisputed numerous controverted facts, states facts in the light most favorable to her, states "facts" that have no support in the record and omits material facts. She also misstates and narrows Dolan's testimony as to the reasons for termination. Plaintiff's summary judgment motion lacks appropriate factual support and for that reason alone should be denied. See Local Rule 56.1; Elmore v. North Fork Bancorporation, Inc., 325 F. Supp. 2d 336, 337 (S.D.N.Y. 2004).

## I.     APPLICABLE LEGAL STANDARDS

### A.     Standard For Summary Judgment

Summary judgment is appropriate only where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); accord Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), and the

Court must view the record in the light most favorable to the non-movant by resolving all ambiguities and drawing all reasonable inferences in favor of that party. Matsushita, 475 U.S. at 587-88; see also Tomka v. Seiler Corp., 66 F.3d 1295, 1304 (2d Cir. 1995). The Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Court may not, however, rely solely on the moving party's Rule 56.1 Statement; it also must be satisfied that the moving party's assertions are supported by the record. See Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d at 241, 244 (2d Cir. 2004); see also Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001); Zerafa v. Montefiore Hosp. Hous. Co., 403 F. Supp. 2d 320, 329 n.12 (S.D.N.Y. 2005). Summary judgment may be granted only where the Court is satisfied that the truly undisputed material facts, as supported by the record, "'show that the moving party is entitled to a judgment as a matter of law.'" Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996) (quoting Fed. R. Civ. P. 56(c)). Local Rule 56.1(d) requires that the statement be based on admissible evidence.

**B.    Liability for Retaliation Under Title VII**

Section 704(a), which sets forth Title VII's non-retaliation provision, states that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) defendants were aware of the protected activity; (3) she was subjected to an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. Uddin v. City of N.Y., 427 F. Supp. 2d 414, 426

- 13 -

(S.D.N.Y. 2006) (citing Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996));

Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000).  Because there are

numerous genuine issues in dispute going to whether Plaintiff can establish a prima facie case

and MSG's intent, summary judgment is inappropriate.

      **C.**      **The Mixed-Motive Doctrine in Retaliation Cases**

      Even if Plaintiff could satisfy her prima facie burden and demonstrate that

protected activity was a substantial factor in the termination decision (which Defendants

demonstrate *infra* that she cannot), Defendants can defeat her claim by proving that there were

legitimate, non-retaliatory reasons for her termination.  In Price Waterhouse v. Hopkins, 490

U.S. 228, 258 (1989), the Supreme Court established a "mixed-motive" framework:  even if an

employee demonstrates an unlawful employment practice by showing that discrimination played

a "motivating part," or was a "substantial factor" in the employment decision, the employer will

avoid liability if it proves that it would have made the same employment decision in the absence

of the unlawful motive.  Id. at 244-45.  This standard is applicable here and serves to preclude

summary judgment on this particularly fact-intensive, intent-governed issue.[5]

**II.**      **THERE ARE GENUINE ISSUES OF FACT AS TO WHETHER PLAINTIFF CAN
ESTABLISH DOLAN'S LACK OF RETALIATORY INTENT**

      **A.**      **Whether There is a Causal Connection Between Dolan's Decision to
Terminate Plaintiff and Any Protected Activity is Genuinely Disputed**

      Plaintiff cites only part of Dolan's testimony concerning his reasons for

terminating her employment, and then claims that those reasons were based on her allegedly

protected activity.  This claim is factually unsupported.

      For example, in paragraph 68 of her 56.1 Statement, Plaintiff omits Dolan's

testimony that the stated reason she was terminated was, in part, because she lacked the

---

[5] See Matima v. Celli, 228 F.3d 68, 81 (2d Cir. 2000) ("[A] mixed motive finding acts as a complete bar to a retaliation claim, precluding any and all relief").

necessary skills related to budgeting, branding and general personnel management. (Dolan Tr. at 64-66, 185-186). Plaintiff mischaracterizes Dolan's concern about Plaintiff's performance issues as limited to the July and August budget meetings, when Dolan testified that from July 2005 leading up to her termination, "we had problems." (Dolan Tr. at 171, 185) ("and all the factors leading up to from July up until that point. I mean that is a quite long list, you know"). Plaintiff fails to mention that Dolan identified as a factor the opinion of Ratner, MSG's Vice Chairman (who had personally observed her performance) that over the time period since July Plaintiff had not improved and lacked the ability to perform her job as the P&L manager. (Dolan Tr. at 54-55, 70-71, 73, 89, 186). Plaintiff fails to mention that Mills and Dolan had discussed Mills' concerns regarding Plaintiff's inability to lead the Knicks strategically and grasp the concept of being the P&L manager. (Dolan Tr. at 64-66, 73; Mills Tr. at 125-27). Plaintiff fails to note the testimony that Mills also expressed his concerns to Dolan regarding Plaintiff's inability to work with her peers and manage her relationships across MSG from the advertising sales group to the facilities group to the basketball operations department. (Mills Tr. at 123-27). Finally, Plaintiff omits Dolan's testimony that he considered Plaintiff's stated intention to leave her job because she could no longer do her job at MSG having lost the respect of her employees and peers. (Dolan Tr. at 49, 190-191; Mills Tr. at 48-50; 123-27).

Dolan's testimony makes clear that he decided to terminate Plaintiff's employment for a number of reasons, including what he believed were her serious performance deficiencies; Ratner's and Mills' expressed judgments that she was unable to perform her increased responsibilities; and her own decision, as she expressed to Mills, that she needed to leave MSG. (56.1(b) ¶¶67-68, 78, 100-105). All of these reasons are indisputably legitimate business reasons and were not based on any protected activity.

**B.      Evidence of Dolan's Good Faith Belief That Plaintiff Was Tampering With An Ongoing Investigation Precludes Summary Judgment**

Irrespective of whether Plaintiff's freelance "evidence gathering" actually amounted to improper "tampering" (as opposed to some sort of protected activity), the evidence establishes – or at the very least supports an inference – that Dolan *reasonably believed* that her conduct was improper when he made the decision to terminate her.  Dolan was told by his direct report, Rusty McCormack, Senior Vice President of Human Resources and Organization Development, that Plaintiff had "tampered with an investigation," "used her influence with [her] direct reports to influence their answers" and "attempt[ed] to coerce her direct reports into corroborating her complaint . . . in violation of MSG policy." (Dolan Tr. at 77, 184).  Plaintiff argues that, in fact, Dolan was mistaken as Plaintiff merely spoke with employees about her complaints, and, in a few instances, asked staff members to document events with which they were purportedly familiar (Pl. Br. at 17).  As Dolan testified, it was his decision to fire Plaintiff based upon the information made available to him. (Dolan Tr. at 73).  Dolan acted to preserve the integrity of his company and its policies and did not want to retain a senior-level officer he believed was "tampering" with employees and strong-arming subordinates in violation of MSG policies. (Dolan Tr. at 198).  In analyzing the issue of pretext, the Court must "look at the facts as they appear to the person making the decision to [take the employment action]." Bufford v. Boeing Co., No. 06-3170, 2007 WL 766313, at *3 (10th Cir. Mar. 15, 2007) (citation omitted).  "It is not for the Court to scrutinize the personnel decisions of an employer, who need only prove that the motives for its choices were non-discriminatory."  McLean-Nur v. Department of Transp., City of N.Y., No. 98 Civ. 819, 2000 WL 297176, at *6 (S.D.N.Y. Mar. 21, 2000) (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 259 (1981)).

In any event, contrary to Plaintiff's position, her conduct in attempting to extort a severance package and to fabricate claims (while interfering with MSG's own internal investigations) – which is, at a minimum, disputed by the parties – is not protected activity. Accordingly, Dolan's decision to rely, in part, on those actions, cannot violate the law. At a minimum, the facts supporting Dolan's decision are so much in dispute that it would be inappropriate to grant summary judgment based on this record without allowing the jury to make credibility determinations and find facts. See, Nugent v. St. Luke's/Roosevelt Hosp. Ctr., No. 05 Civ. 5109, 2007 WL 1149979, at *8 (S.D.N.Y. Apr. 18, 2007) (summary judgment is generally inappropriate where the defendant's state of mind is at issue).

C.    **A Fair Reading of Dolan's Testimony Precludes Summary Judgment Under the Mixed-Motive Doctrine**

Under the mixed-motive standard applicable to retaliation cases, Defendants are entitled to prove that MSG would have terminated Plaintiff even in the absence of Plaintiff's allegedly protected activity. By selectively quoting from and mischaracterizing Dolan's testimony, however, Plaintiff improperly seeks to have this issue taken from the jury and have this Court rule, as a matter of law, that under no set of facts could Defendants prove that Plaintiff would have been terminated even in the absence of the alleged retaliatory motive.

Plaintiff's brief and 56.1 Statement are rife with such selective quotes and mischaracterization. Plaintiff argues that because Dolan testified that Plaintiff's "tampering" was the "last straw [] that led me to the conclusion that her employment at the Company was over with," (Pl. Br. at 24), she has established that there is no genuine issue as to whether Plaintiff would have been terminated for other, indisputably unprotected, reasons. Plaintiff, however, artificially parses Dolan's testimony. In one long answer that Plaintiff merely excepts, Dolan refers to the entire sequence of events that gave rise to MSG's decision, including giving

- 17 -

Plaintiff additional training and a chance to improve, Plaintiff's admission that she needed to leave (which Dolan understood was in reference to her recent poor job performance), MSG's agreeing that Plaintiff could stay on while MSG helped to find her another job (but she was "out . . . by her own hand"), followed by her demand for $6.5 million of severance pay, and, "finally," the "last straw" being the tampering, which Dolan testified was just as "ridiculous" as the $6 million demand. (56.1(b) ¶78).

Plaintiff's talismanic citation of an excerpt about "tampering" being the "final straw" does not preclude the existence of a genuine factual issue as to whether MSG would have terminated her even absent the "tampering" — a question Dolan was never asked at his deposition.  In fact, when he was asked what factor weighed more heavily out of the "combination" of factors he identified, he testified Plaintiff's poor job performance since July was "significant" and that the "tampering" particularly showed that she could no longer be trusted. (56.1(b) ¶68).

Similarly, Dolan's statement that she "could have continued on doing her job if she had not tampered with those people" is not "determinative" as Plaintiff argues. (Pl. Br. at 24).  Dolan made clear that Plaintiff's "tampering" made her unqualified to continue in her job because he could no longer trust her. (Dolan Tr. at 197-198).  His testimony does not, however, establish the absence of a genuine dispute over whether she would have been terminated for the numerous unprotected reasons, including her poor job performance, that he identified as having rendered her unable to continue in her position.

Based on a fair reading of the record, taking the evidence as a whole and in the light most favorable to Defendants, even if Plaintiff did engage in protected activity (which, at a minimum, is genuinely in dispute), Defendants have presented more than enough evidence that

- 18 -

they would have taken the same action and terminated Plaintiff in the absence of the alleged impermissible motivating factors to defeat summary judgment.

## III.   THERE ARE GENUINE ISSUES OF FACT AS TO WHETHER PLAINTIFF CAN ESTABLISH THAT SHE ENGAGED IN PROTECTED ACTIVITY REQUIRED FOR A PRIMA FACIE CASE OF RETALIATION

### A.   Plaintiff's Attempts to Fabricate a Claim and Tamper With MSG's Ability to Investigate That Claim Were Not Undisputably Protected Activity

An employer does not violate Title VII's prohibition on retaliation when it takes an adverse employment action against an employee in order to preserve an environment that is governed by rules, subject to chains of command, free of commotion, and conducive to the work of the enterprise. Matima, 228 F.3d at 79. Conduct that disrupts the workplace is a legitimate reason for firing an employee. Id. Therefore, while Title VII and state and city laws protect those employees who protest alleged discrimination by "making complaints to management, writing critical letters to customers, ... and expressing support of co-workers who have filed formal charges," not all forms of workplace protest are protected by Title VII's prohibition on retaliation. Id. at 78, (quoting Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)) (internal citation omitted). In fact, the way in which an employee pursues a complaint can be so disruptive or insubordinate that it strips away Title VII's protection against retaliation. Id.

Since Plaintiff points to "evidence gathering" that occurred prior to her bringing a lawsuit, filing her charge with the EEOC or lodging an internal complaint of discrimination, Plaintiff bears the burden here of establishing that her activity was protected. See Matima, 228 F.3d at 79-80 (noting that other circuits have held that disruptive behavior prevents plaintiff from satisfying a prima facie case). There are significant material disputed issues of fact showing that Plaintiff cannot meet her evidentiary burden that she was terminated for protected activity.

Plaintiff disrupted the workplace by requiring her employees to make written statements, in violation of MSG policy that HR conduct sexual harassment investigations. Indeed, under MSG's policy, Plaintiff had an obligation to immediately report her complaint to MSG HR so that it could conduct an investigation, as set forth in the MSG policy described and quoted at page 9, *supra*. Plaintiff abused her supervisory authority by ordering her reluctant subordinates to document numerous alleged events on Company and personal time and to forgo their regular job duties in order to do so. (56.1(b) ¶¶125-142). Plaintiff's instruction to Buchholz, Gladstone and Winkler to prepare multiple documents was unprotected tampering designed to deny MSG's future access to the unchilled and uncoached testimony of her subordinates. See Glover v. South Carolina Law Enforcement Div., 170 F.3d 411, 414 (4th Cir. 1999) (section 704(a)'s protections ensure that investigators will have access to the "unchilled testimony" of witnesses); Jackson v. St. Joseph State Hosp., 840 F.2d 1387, 1390 (8th Cir. 1988) (plaintiff's request that fellow employee provide a revised statement plaintiff had prepared arguing that the employee's memory was incorrect was not protected). Plaintiff even directed Buchholz what to say in her email about Marbury after HR commenced its investigation, causing Buchholz to feel pressured into doing something she did not want to do. (56.1(b) ¶¶131-132).

**B.    Plaintiff's Attempts to Extort an Unwarranted Severance Package Were Not Undisputably Protected Activity**

Extortion and threats are not protected activity. Plaintiff's demands of $6.5 and $5.95 million can only be viewed as an extortionate attempt to secure undeserved money from MSG for a questionable claim. Plaintiff was seeking what amounted to *22 years* of compensation for discrimination that she only complained to MSG about after she retained counsel – and after advising Mills of her intention to resign and while concerns about her own performance and job security were building. At the time Plaintiff made her demand, she had not

- 20 -

been terminated, and she is not even alleging emotional distress damages in this case. There was simply no rational basis for her exorbitant demand. In addition, Plaintiff's threats to go public with a lawsuit should MSG not agree to the demand demonstrated that Plaintiff was attempting to teach MSG a "lesson" upon threat of public embarrassment. (56.1(b) ¶¶147-150).

       At a minimum, these circumstances raise a significant question of fact as to whether Plaintiff's "participation" in her counsel's $6.5 and $5.95 million demands at that stage was protected activity. Otherwise, any employee facing likely termination for performance-related reasons could make an astronomical demand of the employer, couple it with an alleged discrimination claim, and thereby insulate herself from company discipline out of fear that such discipline would amount to per se retaliation.

       The amount of a settlement demand in a civil rights action can be viewed as extortionate when made in connection with a threat against an opposing party. See Perry v. Barnard, 745 F. Supp. 1394, 1407 (S.D. Ind. 1989) ("The amounts of [plaintiff's] settlement demands and the way that [plaintiff] phrases them make them out to be only slightly veiled extortion demands."), aff'd, No. 89-3575, 1990 WL 121481 (7th Cir. Aug. 17, 1990). The court in Perry went on that such a demand led it "to conclude that the suit, whether [plaintiff] believed it was based on a valid legal theory or not, was nothing more than a device to enable him to harass, cajole, intimidate and extort the defendants into giving [plaintiff] undeserved sums of money or to bring undeserved shame on those involved in the underlying state disputes and on anyone who would not help him do so." Id.

       Plaintiff was still employed at the time the demand was made and had suffered no cognizable damages. Her counsel's demand was disproportionate to any injury and therefore it is implausible for Plaintiff to argue that such a demand should amount to protected activity. Plaintiff's demand was not to compensate her for damages resulting from discrimination but was

designed as a punitive measure, meant to punish MSG if Plaintiff's demand was not met, i.e. to

teach MSG a "lesson," as her counsel indicated. (56.1(b) ¶150-151). Title VII's drafters did not

intend such misuse of its retaliation provision solely for monetary gain. See Spadola v. New

York City Transit Auth., 242 F. Supp. 2d 284, 292 (S.D.N.Y. 2003) ("Congress could not have

contemplated a contrary scheme as a legitimate purpose of Title VII retaliation claims: to arm

employees with a tactical coercive weapon that may be turned against the employer as a means

for the asserted victims to advance their own retaliatory motives and strategies, and thereby

extract employment concessions on account of minor social lapses or harmless infractions in the

workplace, or even to escape appropriate disciplinary measures."). Plaintiff's demand, coupled

with the threat to expose activity not prohibited under Title VII, i.e., consensual sex, should

result in the denial of Plaintiff's motion. See 42 U.S.C. § 2000e-3(a) (requiring opposition to an

"unlawful employment practice"). Seeking to embarrass the Knicks by making public a

consensual sexual affair is outside any protections afforded under Title VII. See, e.g., De Los

Santos v. City of N.Y., No. 02 Civ. 8453, 2007 WL 1001161, at *10 (S.D.N.Y. Apr. 3, 2007).[6]

### C.   Whether Plaintiff Had a Reasonable, Good Faith Belief that She Was Subjected to Any Sexual Harassment, A Material Issue, is Genuinely Disputed

To establish that her activity is protected under the opposition clause, Plaintiff

must demonstrate that she was acting under a good faith, reasonable belief that her legal rights

had been violated.[7]  See, e.g., Gregory v. Daly, 243 F.3d 687, 700-701 (2d Cir. 2001) (law

---

[6] Counsel's demand was so excessive, that when coupled with their threat to publicly embarrass MSG employees through the disclosure of private facts having nothing whatsoever to do with Plaintiff's purported claims, was patently improper. See DR 7-102 (prohibiting a lawyer from taking action that would serve merely to harass or maliciously injure another and from knowingly advancing a claim that is unwarranted); Matter of Benjamin, 129 A.D. 2d 886 (3d Dept.), appeal denied, 70 N.Y.2d 666 (1987) (attorney disciplined for seeking punitive damages in an amount grossly disproportionate to the amount of recoverable compensatory damages).

[7] Plaintiff's pre-complaint activities are properly analyzed under the opposition clause, not the participation clause, as she argues (Pl. Br. at 11-12, 22). See 42 U.S.C. § 2000e-3(a). Plaintiff undertook her "investigations," and directed her employees to document purported events, in November 2005, before her counsel ever conveyed her

protects employees who file discrimination charges, and make informal protests to management, only if employee has "'a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'") (citation omitted). Whether Plaintiff's stated belief that she was sexually harassed was reasonable is determined by the totality of the circumstances. See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).[8]

### 1.    There is a Material Dispute as to Whether Plaintiff Ever Complained to MSG Before Counsel Was Retained

There is a significant dispute as to whether Plaintiff <u>ever</u> complained of harassment prior to involving counsel. While Plaintiff claims that she complained repeatedly to Mills, and also to Peter Olsen (an outside consultant on organizational behavior), about Thomas' purported harassment, both Mills and Olsen deny ever receiving such a complaint. (56.1(b) ¶145). It is undisputed that Plaintiff <u>never</u> complained to MSG's HR personnel about any purported harassment, as she was required to do under MSG's well-established policies, of

---

complaint and before she filed this action and her EEOC charge. Plaintiff offers no legal support for her statement that her purported "evidence gathering" is properly analyzed under the participation clause (Pl. Br. at 22); none of the cases cited by Plaintiff addresses pre-complaint activities. Cf. Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 175 (2d Cir. 2005)(employee participated in protected activity when named as a witness in a co-worker's Title VII lawsuit); Gregory, 243 F.3d at 700-01 (employee engaged in protected activity of making complaints to her immediate supervisor and harasser and filing lawsuit); see Deravin v. Kerik, 335 F.3d 195, 203-04 (2d Cir. 2003) (complainant can establish protected activity by participating in a Title VII proceeding).

Similarly, Plaintiff's so-called "settlement" demands, and the internal complaint raised through her counsel, are also properly analyzed as alleged "oppositional" activity, not, as she claims, "participatory" activity (Pl. Br. at 11-12, 22), as they preceded both this action and her EEOC filing. See Jowers v. Lakeside Family and Children's Servs., 2005 WL 3134019, at *5 (S.D.N.Y. Nov. 22, 2005) (where plaintiff alleged that his employer retaliated against him because of a series of internal complaints he made about the disrespectful actions of his co-worker, plaintiff's alleged protected activity must be analyzed under the opposition clause rather than the participation clause). The Jowers court observed that "[d]espite the expansive language of § 2000e-3(a)'s participation clause, the Second Circuit has categorized such complaints as possible protected activity under the narrower opposition clause." Id. (citations and internal quotations omitted); see also, Kauffman v. Maxim Healthcare Servs., Inc., 2006 WL 1983196, at *5 (E.D.N.Y. July 13, 2006) (Plaintiff's internal complaints would fall under Title VII's opposition clause). This Court should reject Plaintiff's patently obvious attempt to bootstrap Plaintiff's activities into the more expansive protections of the participation clause without legal or factual support.

[8] Because there is a significant dispute as to whether the harassing conduct Plaintiff complained of ever occurred (see 56.1(b) ¶¶18, 19, 20, 27, 28, 129, 144, 162), there is clearly a dispute as to whether Plaintiff can establish that she believed reasonably, and in good faith, that she was subjected to any harassment by Thomas. See Galdieri-Ambrosini, 136 F.3d at 292. To the contrary, there is substantial record evidence to suggest that Plaintiff fabricated her allegations in order to exact a huge severance package from MSG – facts that are, obviously, also in dispute.

- 23 -

which she was aware. (56.1(b) ¶137). If Plaintiff did fail to make any complaint, that failure alone places directly in dispute the issue of whether she ever had a good-faith belief that she was ever subject to any harassment. See Marks v. Nat'l Commc'ns Ass'n, Inc., 72 F. Supp. 2d 322, 336 (S.D.N.Y. 1999) (holding that employee's failure to make specific complaint of discrimination demonstrated lack of a good faith reasonable belief). Indeed, in Marks, as here, Plaintiff "never realized" she had a complaint of discrimination until she met with counsel. Id.

> ## 2. There is a Material Dispute as to Whether Plaintiff Raised Her Allegations as a "Smoke Screen" to Avoid the Consequences of Her Poor Performance and to Exact a Large Severance From MSG

The record evidence suggests – and at a minimum supports an inference when viewed in the light most favorable to Defendants – that Plaintiff justifiably had increasing concerns about her performance, beginning when her close supporters were terminated or left management and Thomas took over, and reaching a crescendo in the months before she retained counsel and raised her complaints, when it became obvious that Mills, Ratner and Dolan were increasingly critical. Indeed, according to Mills, after a series of serious missteps and difficult discussions with him, Plaintiff asked him whether there would ever be a meeting that she would leave feeling good about herself. (56.1(b) ¶122). She followed that conversation by telling him in late November or early December 2005 that she knew she had lost the respect of her peers and subordinates and needed to leave the Knicks, and asked him to help her find a job while she still had a job. (56.1(b) ¶123). Those conversations – following on the heels of her "disastrous" budget meetings, mandatory training, and errors in connection with the open practice, the customer service representatives, and other mistakes that Mills called to her attention – are evidence that she was concerned for her job at the time she retained counsel and finally made her allegations. For all these reasons, there is a genuine dispute over whether she made those allegations because she had a reasonable, good faith belief that she had suffered harassment, or

as part of an effort to avoid the inevitable consequences of her poor performance.[9]

Similarly, the record evidence also strongly suggests – and at a minimum supports an inference when viewed in the light most favorable to Defendants – that Plaintiff began a scheme to create evidence to support a harassment claim that she did not otherwise believe existed in an effort to create leverage for an unwarranted severance demand upon her departure. Around the same time she was having the conversations with Mills referred to above, Plaintiff was directing reluctant subordinates to create memos concerning events that allegedly occurred five months to over a year earlier, and conducting her own "investigations" into employees with what she believed were close ties to Dolan and Marbury. As detailed above, these "investigations" were begun and continued without the involvement or knowledge of MSG's HR professionals. Significantly, Plaintiff engaged in all of this conduct within days of contacting counsel. After Plaintiff created this "record," her counsel demanded a $6.5 million "settlement" while threatening MSG with public disclosure and bad press if her demands were not met.

If these facts, and Defendants' arguments as to Plaintiff's motivations, are credited by a jury, a reasonable inference could be made that Plaintiff never had a good faith, reasonable belief that she was harassed.

## CONCLUSION

For all the foregoing reasons, this Court should deny Plaintiff's motion for partial summary judgment because genuine issues of material fact remain as to whether Defendants' decision to terminate Plaintiff was in retaliation for Plaintiff's engaging in protected activity.

Dated: New York, New York
May 25, 2007

EPSTEIN BECKER & GREEN, P.C.
s/Ronald M. Green
By:    Ronald M. Green (RG-7766)

---

[9] See, e.g., Monteiro v. Poole Silver Co., 615 F.2d 4 (1st Cir. 1980) (court said that plaintiff's accusations likely were raised as a smoke screen challenge to employer's legitimate criticism of plaintiff's performance); Jackson, 840 F.2d at 1391 ("Title VII protection for retaliation for filing a complaint does not clothe the complainant with immunity for past and present inadequacies [and] unsatisfactory performance").

Teresa M. Holland (TH-6973)
Barry A. Cozier (BC-7110)
Brian G. Cesaratto (BC-5464)
250 Park Avenue
New York, New York  10177-1211
(212) 351-4500

MORGAN, LEWIS & BOCKIUS LLP

Amber L. Kagan (AK- 7973)
101 Park Avenue
New York, New York 10178
(212) 309-6000

*Attorneys for Defendant Madison Square Garden, L.P. and James L. Dolan*

To:    Anne Vladeck, Esq.
       Kevin Mintzer, Esq.
       Vladeck, Waldman, Elias &
       Engelhard, P.C.
       1501 Broadway, Suite 800
       New York, New York 10036
       (212) 403-7300
       *Attorneys for Plaintiff*

       Sue Ellen Eisenberg (SE-4713) –
       *admitted pro hac vice*
       Lucetta Franco (LF-7638) –
       *admitted pro hac vice*
       Eisenberg & Bogas, P.C.
       33 Bloomfield Hills Parkway, Suite 145
       Bloomfield Hills, Michigan  48304-2945

              -and-

       Laurie Berke-Weiss (LB-3445)
       Louis Pechman (LP-6395)
       Berke-Weiss & Pechman LLP
       488 Madison Avenue
       New York, New York 10022
       (212) 538-9500
       *Attorneys for Defendant Isiah Lord Thomas III*

- 26 -