Ronald M. Green  (RG-7766)
Teresa M. Holland (TH-6973)
Barry A. Cozier (BC-7110)
Brian G. Cesaratto (BC-5464)
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York  10177
(212) 351-4500

Amber L. Kagan (AK- 7973)
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178
(212) 309-6000
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| ANUCHA BROWNE SANDERS, | 06 Civ. 0589 (GEL) (DCF) |
| Plaintiff, | ECF CASE |
| - against - | **RULE 56.1 STATEMENT IN SUPPORT OF DEFENDANTS MADISON SQUARE GARDEN, L.P. AND JAMES L. DOLAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| MADISON SQUARE GARDEN, L.P., ISIAH LORD THOMAS III AND JAMES L. DOLAN, | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Defendants Madison Square Garden, L.P. ("MSG") and James L. Dolan, by their

attorneys, Epstein Becker & Green, P.C. and Morgan Lewis & Bockius, L.P., pursuant to Local

Civil Rule 56.1 of the United States District Court, Southern District of New York, hereby

submit the following statement of material facts as to which there is no genuine issue to be tried.

    1.    Plaintiff was hired by MSG in November 2000 as its Vice President,

Marketing.  (Deposition Transcript of Anucha Browne Sanders dated November 27, 2006

("Browne Sanders Tr. I") at 13 (attached as Exhibit ("Exh.") A to Declaration of Brian G.

Cesaratto dated April 27, 2007 ("Cesaratto Dec."))[1]; Affidavit of Stephen Mills dated April 27, 2007 ("Mills Aff."), ¶ 3).

2.      The decision to recruit and hire Plaintiff was made by Stephen Mills ("Mills"), presently President and Chief Operating Officer, MSG Sports, for Madison Square Garden, L.P. ("MSG"), who knew Plaintiff when she worked for IBM on a potential project for MSG. (Browne Sanders Tr. I at 27-28 (Cesaratto Dec., Exh. A); Mills Aff. at ¶¶2-3).

3.      Plaintiff's primary job responsibilities as Vice President of Marketing were to market the Knicks' team brand and oversee the Knicks' community relations activities, including player appearances including those mandated by NBA requirements. (Deposition Transcript of Anucha Browne Sanders dated November 28, 2006 ("Browne Sanders Tr. II") at 246-48; (Cesaratto Dec., Exh. B)). Her duties included supervising the Knicks' promotion and charitable efforts in the local community, such as the promotion of literacy and poetry programs in the schools. (Affidavit of James Dolan ("Dolan Aff.") dated April 26, 2007 at ¶ 3; Mills Aff. ¶ 7).

4.      Plaintiff was the chief marketing officer for the Knicks responsible for all aspects of the Knicks' marketing and media efforts. (Mills Aff. ¶ 7). She was responsible for new media and communications on the Web, Knicks' game presentation and event management, and oversaw partnerships, sponsorship events and subscription, alumni relations, as well as Knicks' fan development. (Browne Sanders Tr. II at 246-247 (Cesaratto Dec., Exh. B)).

5.      Plaintiff had access to highly confidential financial and business proprietary material and, as such, she was in a position of extreme trust. (Mills Aff. ¶ 7).

---

[1] The purpose of the Cesaratto Dec. is to identify pleadings, discovery requests and responses, deposition transcripts and exhibits thereto, and court submissions.

6. On or about March 11, 2002, Plaintiff was promoted by Mills to the position of Senior Vice President, Marketing and Business Operations. (Browne Sanders Tr. II at 266 (Cesaratto Dec., Exh. B); Mills Aff. ¶ 8). James Dolan, the Chairman of MSG, approved Plaintiff's promotion thereby entrusting her with financial and operating responsibility for one of MSG's core businesses – the Knicks. (Dolan Aff. ¶ 2).

7. MSG issued a press release regarding Plaintiff's promotion. (Browne Sanders Dep. Tr. II at 269-270 (Cesaratto Dec. Exhs. B, C). The release stated, among other things, that "the promotion will also make her one of the highest ranking women at any professional team." (Cesaratto Dec., Exh. C). A news article on the promotion reported, "Ms. Sanders is now the third-highest ranking female executive in the National Basketball Association." (Browne Sanders Tr. II at 270 (Cesaratto Dec., Exhs. B, C)). In addition, it stated that Plaintiff was "the highest ranking African-American female in major professional sports." (Id.)

8. Plaintiff's promotion elevated her to one of the most important and visible senior executive level positions at MSG. (Dolan Aff. ¶ 3; Mills Aff. ¶ 8). Her new job included not only her responsibilities as Vice President, Marketing, but expanded to include, among other things, Profit & Loss responsibility for all of the Knicks' business operations. (Mills Aff. ¶ 8). The Knicks' marketing and business operations budget, for which Browne-Sanders was now responsible, reached $120 million by the 2005-06 NBA season and was one of the largest components of the overall MSG operating budget. (Dolan Aff. at ¶ 3; Mills Aff. ¶8).

9. Plaintiff testified in her deposition that as Senior Vice President, Marketing and Business Operations "she owned the [Knicks'] revenue streams. (Browne Sanders Tr. I at 344 (Cesaratto Dec., Exh. A)).

10.    In her position, Plaintiff negotiated and entered into contracts with major Knicks vendors and sponsors, such as McDonalds and Foxwoods Casino Hotels. (Mills Aff. ¶8).

11.    Plaintiff's responsibilities required her to interact with individuals and businesses vital to the Knicks' financial success, including its sponsors, vendors and fans. (Mills Aff. ¶ 8). Her increased responsibilities placed her in an even higher level of trust within the MSG organization. (Id.)

12.    Plaintiff was a highly visible executive, immersed in MSG's civic and charitable community affairs who regularly attended Knicks home games and NBA meetings, and was named, at MSG's initiative to, the Sports Business Journal's "Forty Under Forty" list. (Deposition transcript of Joseph Favorito, dated February 12, 2007 at 127-130 (Cesaratto Dec., Exh. D); Mills Aff. ¶¶7-8).

13.    Plaintiff's total compensation while employed at the Knicks exceeded $1,100,000.    (Affidavit of John Moran, dated April 26, 2007 ("Moran Aff.") ¶ 11). Plaintiff earned $16,346 for the portion of the year she worked in 2000; $158,158 in 2001; $213,916 in 2002; $255,421 in 2003; $248,897 in 2004; and $307,230 in 2005. (Moran Aff. ¶ 11, Exh. K).

14.    At the time of her hire, on November 21, 2000, Plaintiff signed a copy of MSG's Confidentiality, Code of Business Conduct and Proprietary Property Agreement (the "Agreement"). (Browne Sanders Tr. II at 44-46 (Cesaratto Dec., Exhs. B and E)).

15.    Section 2 of the Agreement states as follows:

During my employment I may not engage in activities or have personal or financial interests that impair, or appear to impair, my independence or judgment or otherwise conflict with my responsibilities to [MSG].  Such activities include, but are not limited to: . . . (g) serving as an officer, director, agent, employee,

> consultant or provider of or in any other capacity for any for-profit
> organization (the "Code").

(Cesaratto Dec., Exh. E).

16.     The Agreement also provides, under a section titled "Remedies" that:

> I understand that any breach of the Agreement may result in my
> immediate termination. I also understand that the company may,
> in addition, pursue its legal and equitable remedies in the event of
> a breach or threatened breach.

(Id.)

17.     Plaintiff also signed on November 21, 2000 MSG's "Employee Code Of

Conduct," acknowledging that "Public trust and confidence are the greatest assets held by

Madison Square Garden." (Browne Sanders Tr. II at 24 (Cesaratto Dec., Exhs. B and F).

18.     Cablevision's Code of Business Conduct and Ethics applicable to MSG

(hereinafter "MSG Code of Ethics"), which Plaintiff received and acknowledged reading on

October 11, 2004, provides at page 3:

> Legal Compliance
>
> It is the Company's policy to comply with all applicable laws,
> rules and regulations. It is the personal responsibility of each
> employee, officer and director to adhere to the standards and
> restrictions imposed by those laws, rules and regulations.

(Moran Aff. ¶ 12, Exhs. H and L).

19.     Plaintiff attended MSG's ethics training on October 12, 2004. (Browne

Sanders Tr. II at 196-197 (Cesaratto Dec., Exh. B); Moran Aff. ¶ 7, Exh. G).

20.     MSG's Employee Handout to accompany the Company's October 12,

2004 business ethics training provides:

> Remember: Doing the right thing:
> • protects personal and company integrity
> • builds and protects our reputation
> • ultimately protects jobs.

It further provides that employees should ask themselves, "Will my action violate any laws or policies of the company?" and "Could my action negatively impact me, others or the company?" (Moran Aff. ¶ 9, Exh. I). MSG's Statement of Company Values provides that "Cablevision is a business founded upon basic principles of honesty, integrity and a sincere commitment to our employees and our customers." (Moran Aff. ¶13, Ex. M).

21.    The MSG Employee Handbook dated April 2003 (the "Handbook") provides, under a section entitled "How We Conduct Ourselves: Employee Code of Conduct":

> An employee who fails to maintain these conduct standards by violating any of the company's work rules and/or the Employee Code of Conduct, is subject to disciplinary action up to and including termination.
>
> Listed below are examples of the rules and regulations you will be expected to follow. . . .
>
> Illegal activities are prohibited including being in the possession of or using controlled substances including alcohol.

(Moran Aff. ¶ 10, Exh. J) (emphasis in original).

22.    At her deposition, Plaintiff testified that she understood the import of the Agreement to mean that she was not permitted to engage in any business that she might have owned or controlled while she was an executive of MSG. (Browne Sanders Tr. II at 45-46 (Cesaratto Dec., Exh. B)).

23.    Plaintiff admitted that she terminated one of the employees she supervised for attempting to engage in outside business activity while working at MSG. (Browne Sanders Tr. II at 240-241 (Cesaratto Dec., Exh. B)).

24.    Plaintiff testified that when she was hired, she received a copy of the Handbook and read parts of it at that time.  (Browne Sanders Tr. II at 193 (Cesaratto Dec., Exh. B)).

25.    MSG sought copies of Plaintiff's tax returns by document request dated April 11, 2006.  (Cesaratto Dec., Exh. H).  On June 20, 2006, Plaintiff objected that Plaintiff's tax returns "were neither relevant nor reasonably calculated to lead to the discovery of admissible evidence."  (Cesaratto Dec., Exh. I).

26.    Following an exchange of letters between counsel on July 31, 2006 and August 11, 2006 that failed to result in Plaintiff voluntarily producing her tax returns, the parties submitted the issue to the Court.  (Cesaratto Dec., Exhs. J, K and L).  On November 6, 2006, the Court ordered Plaintiff to produce copies of her tax returns for tax years beginning in 2000.  (Cesaratto Dec., Exh. M).

27.    On November 21, 2006, Plaintiff produced her federal and New York and New Jersey state tax returns for 2000-2005 and, on November 24, 2006 produced <u>amended</u> federal and state tax returns for 2003 and 2004.  (Cesaratto Dec. Exhs. N and O).  The amended returns were dated November 22, 2006.  (<u>Id.</u>)

28.    Plaintiff was deposed on November 27 and 28, 2006.  (Cesaratto Dec. Exhs. A and B).

29.    Plaintiff's 2001, 2002, 2003 and 2004 federal tax returns indicated on each year's Schedule C (which is titled, "Profit or Loss From Business (Sole Proprietorship)") that she was the proprietor of a direct marketing business which she operated from her home address.  (Cesaratto Dec. Exhs. P(PL4302); Q(PL4321); R(PL4353); S(PL4388)).  These deductions were

carried over onto her New York and New Jersey tax returns as well on each of those years. (Cesaratto Dec., Exhs. T-V).

30.    The tax deductible expenses, totaling $73,000, associated with Plaintiff's "direct marketing business" are itemized on the Schedule C's attached to the original returns. (See Cesaratto Dec., Exh. P(PL4302); Q(PL4321); R(PL4353); S(PL4388)).  They include car expenses, taxes and licenses, professional dues, attending conferences, telephone, books and subscriptions, office supplies and office expenses.  (Id.)  Plaintiff fixed in each years' return the date of February 13, 2001 as the date she first used her vehicle for business purposes.  (See Cesaratto Dec., Exhs. P, Q, R, S).

31.    Plaintiff signed each of the tax returns in question, certifying that, as the taxpayer, each return was "true, correct and complete."  (Browne Sanders Tr. at 38, 41, 43, 44 (Cesaratto Dec., Exhs. P(PL4300); Q(PL4319); R(PL4350); S(PL4385); T(PL4306, 4313); U(PL4329, 4340); V(PL4366, 4375).

32.    Plaintiff maintained at her November 28, 2006 deposition that the information reflected in Schedule C of her 2002, 2003 and 2004 federal tax returns was "incorrect."  (Browne Sanders Tr. II at 40-43 (Cesaratto Dec., Exh. B)).  She testified that she had learned that her tax returns for those years were "incorrect" in the three weeks prior to her deposition.  (Id.)

33.    Plaintiff testified that she never operated a direct marketing business of which she was the sole proprietor.  (Browne Sanders Tr. II at 43-44 (Cesaratto Dec., Exh. B)).

34.    Plaintiff's husband testified that Plaintiff had never operated a direct marketing business of any kind from their home.  (Deposition Transcript of Roy Sanders, dated December 14, 2006 at 291 (Cesaratto Dec., Exh. Y)).

35.     Plaintiff acknowledged that if she was the proprietor of a direct marketing business in 2004 while she was employed as a senior vice president of MSG that such a proprietorship represented a violation of the Code for which termination could be appropriate. (Browne Sanders Tr. II at 45-46 (Cesaratto Dec., Exh. B)).

36.     Following the Court's November 6, 2006 order, Plaintiff's counsel paid a $4,000 retainer to Leon Reimer, CPA ("Mr. Reimer") a New York City based accountant, to have prepared on Plaintiff's behalf amended federal and state tax returns for 2003 and 2004 and to provide Plaintiff advice regarding amending her returns (Deposition Transcript of Leon Reimer, dated January 22, 2007 ("Reimer Tr.") at 66-67, 82-84 (Cesaratto Dec., Exh. Z)).

37.     The amended returns for 2003 and 2004 completely eliminated all references to her direct marketing business for those two years. (Cesaratto Dec., Exhs. Z, W and X, JJ). As a result, approximately $20,000 of business deductions were removed from her tax return for each of these two years. (Reimer Tr. at 36-37, 49-50 (Cesaratto Dec., Exhs. W, X, Z)).

38.     Additional changes made by Plaintiff for the 2003 and 2004 years included a change of her filing status to Married Filing Separately; virtually eliminated her charitable contributions from $9,100 to $100 in 2003, and from $10,220 to $940 in 2004; and eliminated the claimed personal exemptions for three children and herself, and a tax credit for child care expenses paid to day care providers. (Compare Cesaratto Dec., Exh. R and S to Exh. W and X).

39.     As a result of all the amendments, Plaintiff incurred a back tax liability of approximately $38,000. (Cesaratto Dec., Exhs. W(PL4418) and X(PL4441)).

40.     Mr. Reimer advised Plaintiff at their November 2006 meeting attended by Plaintiff's litigation counsel here, that the IRS has a three-year civil statute of limitations for

amending or correcting tax returns and thus, recommended that she only amend her 2003 and 2004 returns. (Reimer Tr. at 67-68; and 56-57 (Cesaratto Dec., Exh. Z)).

41.    Following Mr. Reimer's advice, Plaintiff amended only her 2003 and 2004 tax returns, but did not amend her 2001 and 2002 returns, claiming approximately $33,000 in losses. (Reimer Tr. at 67 (Cesaratto Dec., Exhs. W, X, Z)).

42.    Mr. Reimer furnished an invoice to Plaintiff for his services for preparation of the returns, but was in fact paid in full by Plaintiff's counsel. (Reimer Tr. at 82-83 (Cesaratto Dec., Exh. Z)).

43.    Plaintiff filed all of the original and amended income tax returns referred to above, and produced by her in discovery, with the IRS and state taxing authorities. (Stipulation of Plaintiff dated April 4, 2007 (Cesaratto Dec., Exh. AA)).

44.    Brock Weaver, CPA ("Mr. Weaver"), Plaintiff's Indiana-based accountant, who prepared Plaintiff's 2005 tax return, asked Plaintiff in April 2006 about the business deductions on her 2004 income tax return. (Deposition Transcript of Brock Weaver dated December 21, 2006 ("Weaver Tr.") at 32-34) (Cesaratto Dec., Exh. BB)). Plaintiff told Mr. Weaver that she had no direct marketing business at any time but had provided business expenses to her prior accountant, ███████████ CPA, who prepared her returns for tax years 2001 through 2004. (Weaver Tr. at 107-109 (Cesaratto Dec., Exh. Z)).

45.    Mr. Weaver's notes reflect his April 2006 inquiry of Plaintiff concerning the business deductions he reviewed on her 2004 income tax return. (Weaver Tr. at 32-34 (Cesaratto Dec., Exhs. BB, II)).

46.    ██████████ CPA ("Mr. ████████ prepared Plaintiff's 2001, 2002, 2003 and 2004 tax returns. Deposition Transcript of ██████████ dated January 23, 2007

▇▇▇ Tr.") at 59, 63, 69, and 76 (Cesaratto Dec., Exh. CC). Plaintiff was the only person Mr. ▇▇▇ spoke to regarding the preparation of her tax returns for tax years 2001 and 2003, and was the only person who supplied him with information to assist him in the preparation of her returns for those two years. ▇▇▇ Tr. at 43; 46-48; 70-73; and 176-177 (Cesaratto Dec., Exh. CC)).[2]

47.    Mr. ▇▇▇ would not have signed Plaintiff's tax returns if they were fraudulent, and all of the information contained on the returns was based on information that the Plaintiff provided to him. (Id. at 176-177).

48.    MSG would have terminated Plaintiff's employment upon learning of her tax fraud had she been employed. (Dolan Aff. ¶ 5; Mills Aff. ¶ 19). Plaintiff's tax fraud was in violation of MSG policy prohibiting illegal activity and her Agreement, as well as of the trust that had been placed in her as an MSG executive. (Dolan Aff. ¶ 5; Mills Aff. ¶¶ 17-21).

49.    Plaintiff's election in November 2006 to retain her admittedly false tax benefit for 2001 and 2002 demonstrates a lack of personal integrity and honesty that would prevent her from ever again being employed by MSG. (Dolan Aff. ¶ 7; Mills Aff. ¶ 31). Plaintiff's election to retain her false tax benefit would be in violation of MSG policy. (Id.)

50.    MSG had no knowledge that Browne Sanders was the proprietor of a direct marketing business while she was employed at MSG as stated on her 2001-2004 tax returns. (Mills Aff. ¶24). Plaintiff never asked Mills for, or received his approval, to conduct her own outside personal business. (Id.)

51.    MSG would have terminated Plaintiff's employment upon learning that she owned a direct marketing business as her tax returns certified (and her 2001-2002 tax returns

_____
[2] Mr. ▇▇▇ could not recall whether the same was true for tax years 2002 and 2004. ▇▇▇ Tr. at 73, 77).

continue to certify) in violation of her Agreement. (Dolan Aff. ¶ 6; Mills Aff. ¶ 26). Her lack of

integrity and personal honesty would prevent her from ever again being employed by MSG.

(Mills Aff. ¶31).

      52.    MSG has terminated or disciplined employees, at significantly lower level

positions than that held by Plaintiff, for the following fraudulent, dishonest or unlawful conduct

in breach of MSG policy and/or their signed agreements, identical to those signed by Plaintiff:

- falsification of employment applications;
- bank fraud;
- an arrest for felony assault and subsequent guilty plea to the violation of harassment;
- arrest for driving under the influence and impersonating an officer;
- double-booking work (i.e., working for a competing company while on MSG time); and
- insurance fraud.

(Affidavit of John Moran, dated April 26, 2007 ("Moran Aff.") ¶¶ 2 and 6; Exhs. A-G).

      53.    On January 25, 2006, following the filing of this action, Stephen Mills

made the following statement to the press:

> I am appalled by Anucha Browne Sanders' outrageous allegations.
> At no time whatsoever did I tell her that any MSG employee was
> out to harm her or would harm her. I was stunned to learn that
> while she was still employed at MSG, she demanded $6.5 million
> to leave quietly. Her was that [sic] only threat I was privy to.

(Deposition Transcript of Barry Watkins dated February 26, 2007 ("Watkins Tr.") at 147-148

(Cesaratto Dec. Exh. DD)).

      54.    MSG made the following statement through outside litigation counsel

following the filing of the action:

> These fabricated and outrageous charges come from an individual
> whom MSG fired because of an inability to fulfill professional
> responsibilities, and who now is seeking a financial windfall. We
> have a zero tolerance policy for a hostile work environment and
> have always been proud of how our employees are treated, as

> evidenced by the fact that we have consistently taken appropriate
> action when employees have engaged in inappropriate behavior.
> We will fight these outrageous charges and defend our employees
> from baseless allegations intended to embarrass and harm them.

(Watkins Tr. at 143-145 (Cesaratto Dec., Exh. DD)).

55.    MSG also made the following overall statement following the filing of the

action:

> Madison Square Garden has a comprehensive anti-harassment
> policy that includes provisions for employees to raise concerns and
> prohibits retaliation for making complaints. We vigorously and
> immediately investigate any and all claims that are brought to our
> attention and take appropriate action against any employee found
> to have violated our strict policy, including termination, if
> warranted. We have a zero tolerance for a hostile work
> environment and have always been proud of how our employees
> are treated.

(Watkins Tr. at 157-158 (Cesaratto Dec., Exh. DD)).

56.    Following the EEOC determination of probable cause issued regarding

Plaintiff's charge of discrimination, MSG made the following statement:

> When we present facts in court we will expose this charge for what
> it is – a false and financially-motivated fabrication brought by a
> disgruntled former employee. We obviously disagree with the
> EEOC's determination, though it is not an uncommon outcome for
> this type of preliminary administrative review. MSG's workforce,
> almost half of which is female, has and continues to enjoy a fair
> and professional work environment protected by stringent,
> comprehensive sexual harassment policies.

(Watkins Tr. at 174-176 (Cesaratto Dec., Exh. DD)).

57.    Apart from official statements to the press regarding Plaintiff's

allegations, no other statements were made to the press. (Watkins Tr. at 44-45 (Cesaratto Dec.,

Exh. DD)).

58.    Plaintiff filed her initial Complaint on January 24, 2006, (and publicly

announcing the filing at that time) which sought relief "for mental anguish and humiliation as a

result of defendant's discriminatory acts." (Complaint at ¶¶ 57, 63, 67, 71 (Cesaratto Dec., Exh. EE) and Browne Sanders Tr. at 463-464 (Cesaratto Dec., Exh. A)). Following her lawsuit, Plaintiff called a press conference and gave interviews regarding her lawsuit as reported in the press. (Cesaratto Dec., Exh. G).

59.    Plaintiff later amended her Complaint, twice, first to add claims against Dolan under the State and City law, and then to add a Title VII claim as to MSG. (Amended Complaint dated July 25, 2006 at ¶¶ 69, 75 (Cesaratto Dec., Exh. FF); Second Amended Complaint dated November 10, 2006 at ¶¶ 69, 75 (Cesaratto Dec., Exh. GG)). Plaintiff also removed her claim for "mental anguish" and instead added a claim as to Defendants "to make her whole for reputational damage." (Amended Complaint, Prayer for Relief at ¶d (Cesaratto Dec., Exh. FF); Second Amended Complaint, Prayer for Relief at ¶d (Cesaratto Dec., Exh. GG)).

60.    Plaintiff's claim for reputational damage stems from MSG's press statements, following the lawsuit, regarding its reasons for Plaintiff's termination. (Browne Sanders Tr. I at 481-482 (Cesaratto Dec., Exh. A)).

61.    Plaintiff seeks to recover, inter alia, $600,000 in back pay, $9,762,000 in front pay and reputation damages through age 65, an unknown amount on account of pension payments and stock options, and reinstatement. (Plaintiff's Supplemental Disclosures Pursuant

to Fed. R. Civ. P. 26, dated March 19, 2007 (Cesaratto Dec., Exh. HH)).

Dated: New York, New York
     April 27, 2007

                            EPSTEIN BECKER & GREEN, P.C.

                            By:   s/Ronald M. Green
                                    Ronald M. Green, Esq. (RG-4177)
                            250 Park Avenue
                            New York, New York  10177-1211
                            (212) 351-4500
                            Attorneys for Defendants