UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANUCHA BROWNE SANDERS,

               Plaintiff,

    - against -

MADISON SQUARE GARDEN, L.P., ISIAH
LORD THOMAS III, and JAMES L. DOLAN,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

06 Civ. 0589 (GEL)

ECF Case

PLAINTIFF'S STATEMENT OF
MATERIAL FACTS PURSUANT
TO LOCAL CIVIL RULE 56.1 IN
OPPOSITION TO MADISON
SQUARE GARDEN, L.P. AND
JAMES L. DOLAN'S MOTION
FOR PARTIAL SUMMARY
JUDGMENT

     Plaintiff Anucha Browne Sanders ("plaintiff" or "Browne Sanders"), pursuant to Local

Civil Rule 56.1(c), submits this statement in response to the statement of purportedly undisputed

material facts submitted by defendants Madison Square Garden, L.P. ("MSG") and James L.

Dolan ("Dolan") (collectively "defendants").[1]

    1.     Admit.

---

[1]    Excerpts of the first and second day of plaintiff's deposition are referred to as "Pl. Dep. I
__ and Pl. Dep. II __." Excerpts of the depositions of all other witnesses are referred to with the
person's name, followed by "Dep. ___." The complete transcripts of the depositions of ████
████, Brock Weaver, Leon Reimer and excerpts of the transcripts of plaintiff, Ruth Browne,
Vicki Browne Moore, Joseph Favorito, Robert Levy, Roy Sanders, Isiah Thomas, Melinda
Gerrard, Rick Singer, and Barry Watkins are attached to the Declaration of Kevin Mintzer in
Opposition to Madison Square Garden, L.P. and James L. Dolan's Motion for Partial Summary
Judgment and Madison Square Garden, L.P.'s Motion for Leave to Amend Its Answer ("Mintzer-
MSG Decl."). The Affidavit of Leon Reimer, dated May 23, 2007 ("Reimer Aff.") and the
Declaration of Anucha Browne Sanders, dated May 24, 2007 ("Browne Sanders Decl.") are
submitted separately. The documents referred to herein are attached to either the Mintzer-MSG
Decl., the Declaration of Brian G. Cesaratto ("Cesaratto Decl.") or the Affidavit of John Moran
("Moran Aff."). The Cesaratto Decl. and Moran Aff. were submitted in support of Madison
Square Garden, L.P. and James L. Dolan's Motion for Partial Summary Judgment.

245384 v2

2.      Admit that Stephen Mills ("Mills") hired plaintiff. (Pl. Dep. I 27-28)  Plaintiff had met Mills previously when Mills worked at the National Basketball Association League Offices. (Pl. Dep. I 28)

3.      Admit that plaintiff's responsibilities as Vice President of Marketing were to market the Knicks' team brand.  (Pl. Dep. II 246-247)  In addition, plaintiff worked with the head of community relations on player programs and adhering to league community relations requirements.  (Pl. Dep. II 246-247)

4.      Admit.

5.      Admit that plaintiff had access to highly confidential financial and business proprietary material.  However, a jury need not accept Mill's characterization in his affidavit of plaintiff being in a position of "extreme trust."[2]

6.      Admit that in the spring of 2002, plaintiff was promoted to the position of Senior Vice President, Marketing and Business Operations.  (Pl. Dep. II 266)  Deny that Dolan approved plaintiff's promotion.  Dolan testified that he did not have to approve plaintiff's promotion and that Mills informed him that Mills was promoting plaintiff.  (Dolan Dep. 50-51)

7.      Admit.

8.      Admit.

9.      Admit.

---

[2] As this testimony was submitted in the form of an affidavit, plaintiff did not have the opportunity to cross-examine Mills on this issue.  Moreover, under the Supreme Court's decision in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 131, 151 (2000), a jury is entitled to disbelieve testimony of an interested witness.  See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment at 19-21.

10.   Deny.  Browne Sanders was not directly involved in negotiating contracts with major Knicks vendors and sponsors, such as McDonalds and Foxwoods Casino Hotels, and she did not sign any such contracts on behalf of MSG.  (See Browne Sanders Decl. ¶ 8)

11.   Admit that plaintiff's responsibilities required her to interact with individuals and businesses vital to the Knicks' financial success, including its sponsors, vendors and fans. However, a jury need not believe Mills' characterization in his affidavit that plaintiff's "increased responsibilities placed her in an even higher level of trust within the MSG organization." See FN 2.

12.   Admit in part.  Plaintiff was named to the Sports Business Journal's "Forty Under Forty" list.  MSG supported plaintiff's inclusion in the list, but the Sports Business Journal made the ultimate decision.  (Favorito Dep. 130)

13.   Admit.

14.   Admit.

15.   Admit that defendants have cited a portion of MSG's Confidentiality, Code of Business Conduct and Proprietary Property Agreement ("Code of Business Conduct") correctly. The Agreement also provides that its terms "shall not be waived or modified except by an instrument in writing signed by myself and an officer of the Company."  (Cesaratto Decl., Ex. E at ¶ 5)

16.   Admit.

17.   Admit.

18.   Admit.

19.   Admit.

20.   Admit that defendants have cited selected portions of the documents correctly.

21.    Admit that defendants have cited a portion of the MSG Employee Handbook correctly.  The sections cited by defendants, however, must apply only to conduct at the workplace because they limit behavior that is legal and appropriate outside of the workplace, such as consuming alcohol and social gathering.  (Moran Aff. ¶ 10, Ex. J, at 18)  The MSG Employee Handbook also prohibits the use of vulgar, obscene or abusive language.  (Moran Aff. ¶ 10, Ex. J, at 29)

22.    Admit that in the deposition testimony cited by defendants, MSG's counsel read to plaintiff a portion of the Code of Business Conduct and plaintiff testified that she understood that portion of the Code of Business Conduct in 2000.  (Pl. Dep. II 45-46)  Plaintiff, however, did not operate a direct marketing business while she worked at MSG.  (Pl. Dep. II 44; Sanders Dep. 291; Browne Dep. 216; Browne-Moore Dep. 229; Nix Dep. 252-53; Gerrard Dep. 73; Singer Dep. 80)

23.    Admit that pursuant to Mills' direction, plaintiff fired an MSG employee who was the ████████████████████ in 2003.  (Pl. Dep. II 240-41)  The employee had offered to work for ████████ to coordinate a project involving the Knicks at the same time she was working full-time for MSG and coordinating the same project on behalf of MSG.  (Pl. Dep. II 240-41)  The employee also said that she had in the past been hired by other companies to coordinate projects with the Knicks while she was working full-time for MSG and her responsibilities included coordinating the projects for MSG.  (Pl. Dep. II 240-41)

24.    Admit.

25.    Admit that plaintiff objected to producing her tax returns on the grounds that the request was "overly broad, unduly invasive of plaintiff's privacy and seeks information that is

neither relevant nor reasonably calculated to lead to the discovery of admissible evidence."
(Cesaratto Decl., Ex. I)

26. Admit that there was an exchange of letters between counsel on July 31, 2006 and August 11, 2006, that, among other things, addressed the production of plaintiff's tax returns. In their July 31, 2006 letter, defendants' counsel requested that plaintiff identify which documents had been withheld in response to MSG's Document Request No. 59, which included a request for plaintiff's tax returns. (Cesaratto Decl., Ex. J) In their August 11, 2006 letter, plaintiff's counsel explained which documents had been produced in response to MSG's Document Request No. 59 and requested that MSG explain why it believed it was entitled to any additional information. (Cesaratto Decl., Ex. K) On November 1, 2006, the parties wrote to the Court regarding several discovery issues. In that letter, defendants' counsel stated that defendants sought plaintiff's tax returns because "plaintiff's financial situation and family income are relevant to the existence of financial stressors, may tend to explain her workplace interactions, or expose the potential motives for filing this action." (Cesaratto Decl., Ex. L at 13) On November 6, 2006, the Court ordered plaintiff to produce her tax returns for the years beginning in 2000. (Cesaratto Decl., Ex. M)

27. Admit.

28. Admit.

29. Admit that plaintiff's 2001-2004 tax returns contain a Schedule C, which indicated that she was the proprietor of a direct marketing business which operated from her home address. Plaintiff, however, did not operate a direct marketing business at any point, including from 2001 through 2004. (Pl. Dep. II 44; Sanders Dep. 291; Browne Dep. 216; Browne-Moore Dep. 229; Nix Dep. 252-53; Gerrard Dep. 73; Singer Dep. 80) The Schedule C

forms were prepared by ████████████, plaintiff's accountant, but ████ does

not remember having any discussions with Browne Sanders regarding a direct marketing

business. (████ Dep. 44-46, 50-51, 64-65, 72) Nor does ████ have any documents

provided to him by plaintiff that reflect a direct marketing business. (████ Dep. 54) In a

questionnaire that Browne Sanders completed for ████, she confirmed that she did not have a

business. (████ Dep. 35; Mintzer-MSG Decl., Ex. 1) ████ testified that he did not

remember if he made up the information contained on the Schedule C forms that he prepared for

plaintiff. (████ Dep. 48) Plaintiff did not know this information was included on her tax

returns because she did not review her tax returns before she signed and filed them. (Pl. Dep. II

43; Reimer Dep. 92)

     30.    Admit in part, deny in part. Deny that plaintiff fixed in each years' return the date

of February 13, 2001 as the date she first used her vehicle for business purposes. See ¶ 29.

Plaintiff was not aware that any business deductions were taken on her 2001-2004 tax returns or

that her returns declared that she was the sole proprietor of a direct marketing business. (Pl. Dep.

II 43; Reimer Dep. 24, 28, 99-100)

     31.    Admit that plaintiff signed the tax returns. Plaintiff, however, did not know her

tax returns contained erroneous information because she did not review her tax returns before she

signed and filed them. (Pl. Dep. II 43; Reimer Dep. 92)

     32.    Admit.

     33.    Admit.

     34.    Admit.

     35.    Admit that in the deposition testimony cited by defendants, plaintiff testified that

she understood that if she violated MSG's Code of Business Conduct she could be terminated.

(Pl. Dep. II 45-46)  Plaintiff, however, did not operate a direct marketing business at any point, including from 2001 through 2004.  (Pl. Dep. II 44; Sanders Dep. 291; Browne Dep. 216; Browne-Moore Dep. 229; Nix Dep. 252-53; Gerrard Dep. 73; Singer Dep. 80)

36.    Admit in part.    As an accommodation to Leon Reimer ("Reimer"), plaintiff's counsel advanced Reimer the initial retainer that Reimer charged plaintiff to review her 2000-2005 tax returns.  Plaintiff reimbursed counsel for the retainer amount and made all subsequent payments directly to Reimer.  (Reimer Aff. ¶ 20; Mintzer-MSG Decl. ¶ 2)  Based on his review of plaintiff's tax returns and his conversations with plaintiff, Reimer advised plaintiff to amend her 2003 and 2004 returns.  (Reimer Dep. 24-25, 48-54; Reimer Aff. ¶19)

37.    Admit.

38.    Admit.  Plaintiff amended her 2003 and 2004 tax returns based on Reimer's advice.  (Reimer Dep. 25, 48-49)

39.    Admit.

40.    Admit.

41.    Admit that based on Reimer's advice, plaintiff amended only her 2003 and 2004 tax returns.  (Reimer Dep. 67-68)

42.    Deny.  See ¶ 36.

43.    Admit.

44.    Admit in part, deny in part.  Admit that Brock Weaver ("Weaver"), asked plaintiff about the business deductions on her 2004 tax return and that plaintiff told Weaver that she had no direct marketing business at any time.  Deny that plaintiff told Weaver that she provided business expenses to ███████.  When Weaver asked Browne Sanders about the business expenses, she responded, "What business expenses, what do you mean by a business? . . . I don't

have a business." (Weaver Dep. 34)  According to Weaver, Browne Sanders seemed not to

know that the business expenses existed.  Browne Sanders told Weaver, "I don't know where the

preparer got those expenses from."  (Weaver Dep. 35-36)  Plaintiff told Weaver that she never

had a direct marketing business. (Weaver Dep. 107)  In addition, the evidence establishes that

plaintiff did not provide any information to ████ about business expenses.  See ¶¶ 69-81, 95-

96.

     45.     Admit.

     46.     Admit it part, deny in part.  Admit that ████ prepared plaintiff's tax returns for

2001-2004.  Deny that plaintiff provided ████ with the erroneous information contained on

her 2001-2004 returns.  ████ does not remember having any discussions with Browne

Sanders regarding a direct marketing business.  (████ Dep. 44-46, 50-51, 64-65, 72)  Nor

does ████ have any documents provided to him by plaintiff that reflect a direct marketing

business.  (████ Dep. 54)  In a questionnaire which Browne Sanders completed for ████,

she confirmed that she did not have a business.  (████ Dep. 35)  The questionnaire, entitled

Individual Tax Organizer (1040), appears to be for the 2001 tax year and asks the taxpayer to

check "yes" or "no" to several questions. (Mintzer-MSG Decl., Ex. 1)  One of the questions is,

"Did you start a business?"  Plaintiff checked "NO" in response to that question.  (Id. (BH0013))

The questionnaire also includes a worksheet for taxpayers to list all of their business expenses.

(Id. (BH0018-19))  Browne Sanders did not list any business expenses on the worksheet.  (Id.)

The questionnaire was produced by ████ in response to defendants' subpoena for his file

concerning plaintiff.  Browne Sanders had not maintained a copy of the questionnaire.

     In addition, ████ testified that he did not remember if he made up the information

contained on the Schedule C forms that he prepared for plaintiff.  (████ Dep. 48)  He also did

not remember if in general he included information on tax returns that was not based on information that he received from his clients. (████ Dep. 179) While ████ testified that he did not speak to anyone other than plaintiff about her 2001 return (████ Dep. 47-48), he then testified that he did not recall if he made up the information on plaintiff's Schedule C for 2001 (████ Dep. 48). When questioned specifically on the tax returns he prepared for 2003, ████ testified that he did not remember if the tax returns were prepared based on information provided to him by his clients. (████ Dep. 194) He also testified that with regard to plaintiff's 2003 tax return, he did not remember if he completed it based on information provided by plaintiff. (████ Dep. 198)

47.    Deny. See ¶ 46. ████ testified that he did not remember if he made up the information contained on the Schedule C forms that he prepared for plaintiff. (████ Dep. 48) In addition, when questioned about the specific entries on plaintiff's 2002 tax form, ████ testified that he did not know who provided the information included on the Schedule C (████ Dep. 64); he did not remember if he made any entries on the Schedule C form that were based on information that he did not receive from plaintiff (████ Dep. 185-88); and he did not remember if he added additional information to plaintiff's 2002 Schedule C that was not provided to him by plaintiff. (████ Dep. 191)

48.    Deny. Plaintiff did not engage in tax fraud. See ¶¶ 69-81, 86, 95-96. Even if plaintiff had intentionally filed false taxes (which she did not), there is no credible evidence that defendants would have fired her. A jury need not believe the testimony of Mills or Dolan. See FN 2. In addition, defendants have not offered evidence of any employee that they have fired because of the employee's personal taxes. None of the comparators proffered by defendants engaged in conduct similar to the conduct allegedly engaged in by plaintiff. See ¶¶ 104-08.

Moreover, there is substantial evidence that defendants do not fire employees who engage in illegal conduct or violate company policies. See. ¶¶ 98-103.

49.    Deny.    There is no evidence that plaintiff did anything improper in following Reimer's advice to amend only her 2003 and 2004 tax returns. Even if plaintiff's amending only her 2003 and 2004 tax returns was improper, there is no credible evidence that such conduct would violate any MSG policy or that MSG would have fired her for such conduct. A jury need not believe the testimony of Mills or Dolan. See FN 2. In addition, defendants have not offered evidence of any employee that they have fired because of an employee's personal taxes. None of the comparators proffered by defendants engaged in conduct similar to the conduct allegedly engaged in by plaintiff. See ¶¶ 104-08. Moreover, there is substantial evidence that defendants do not fire employees who engage in illegal conduct or violate company policies. See ¶¶ 98-103.

50.    Admit.    Plaintiff did not operate a direct marketing business at any point, including from 2001 through 2004.  (Pl. Dep. II 44; Sanders Dep. 291; Browne Dep. 216; Browne-Moore Dep. 229; Nix Dep. 252-53; Gerrard Dep. 73; Singer Dep. 80)

51.    Deny.    There is substantial evidence that defendants do not fire employees who violate MSG policies. See ¶¶ 98-103. In addition, a jury need not believe the testimony of Mills or Dolan. See FN 2.

52.    Admit that MSG has provided documents which purport to show it revoked a job offer to an employee after it determined that she had misrepresented her qualifications. See ¶ 106. Admit that MSG has provided documents which purport to show it fired an employee after she was arrested for conspiracy to commit bank fraud. (Moran Aff. ¶ 5, Ex. A) Admit that MSG has provided documents which purport to show it fired an employee who was arrested for felony assault and harassment and pled guilty to the violation of harassment. (Moran Aff. ¶ 5, Ex. B)

Admit that MSG has provided documents which purport to show it placed an employee on investigative layoff after she was arrested for driving under the influence and impersonating an officer, but reinstated the employee following a dismissal of the charges on speedy trial grounds. (Moran Aff. ¶ 5, Ex. C)  Admit that MSG has provided documents which purport to show it fired an employee who was working for a competitor of MSG while being paid by MSG.  See ¶ 104. Admit that MSG has provided documents which purport to show it fired an employee who submitted applications through MSG for medical insurance for a women that he falsely claimed was his wife, costing MSG over $70,000 in insurance premiums. See ¶ 105.[3]

53.    Admit.

54.    Admit.

55.    Admit.

56.    Admit.

57.    Deny.  Aside from the official statements made by MSG and its counsel, other MSG employees spoke with reporters and their statements were reported in the press.  (Watkins Dep. 44-47, 56-57, 148-52, 178-84; Favorito Dep. 59-67)

58.    Admit in part.  The same day that plaintiff filed her lawsuit, lawyers for MSG made statements to the press on behalf of their client.  MSG claimed that plaintiff's claim was "fabricated and outrageous" and that Browne Sanders was "fired because of an inability to fulfill her professional responsibilities."  (Rule 56.1 Statement in Support of Defendants Madison Square Garden and James L. Dolan's Motion for Partial Summary Judgment "MSG 56.1," at ¶

---

[3] Defendants produced all of the documents related to the proposed comparators on February 27, 2007, the last day of discovery, precluding plaintiff from conducting any follow-up discovery on these issues.  Thus, if the Court finds any of the comparators proposed by defendants to be relevant, plaintiff requests that discovery be reopened to allow her to gather evidence concerning those comparators and other employees who engaged in similar conduct but were not fired.

54)  Plaintiff responded to these smears in a statement that she read at a press conference on January 25, 2006.  (Pl. Dep. I 463-64)

59.    Admit in part.  In her Amended Complaint, plaintiff removed her claim for mental anguish.  (Cesaratto Decl., Ex. FF)  Separately, in her Second Amended Complaint, plaintiff added a claim for reputational damages.  (Cesaratto Decl., Ex. GG)

60.    Deny.  Plaintiff's claim for reputational damages stems from her allegation that her professional reputation has been negatively affected by the harassment she experienced at MSG, her resulting complaints of discrimination and her unlawful dismissal for complaining about defendants' discriminatory practices.  (Pl. Dep. I 481-82) As a result, plaintiff's ability to earn income now and in the future has been dramatically reduced.  (Browne Sanders Decl. ¶ 3) While a jury could find that the public statements that defendants and their counsel have made about plaintiff after she filed this suit have compounded plaintiff's reputational injury, the underlying cause of plaintiff's reputational damage is the discriminatory and retaliatory conduct that resulted in plaintiff's dismissal.

61.    Admit.

Plaintiff, pursuant to Local Civil Rule 56.1(b), submits this statement of material issues of fact that present genuine issues to be tried in this action against defendants.

Damage To Plaintiff's Reputation

62.    Plaintiff was terminated from her employment at MSG on January 19, 2006. (Mintzer-MSG Decl., Ex. 2)

63.    On January 24, 2006, plaintiff filed this action.  That same day, lawyers for MSG made statements to the press on behalf of their client.  MSG claimed that plaintiff's claim was "fabricated and outrageous" and that Browne Sanders was "fired because of an inability to fulfill

her professional responsibilities." (MSG 56.1 ¶ 54)  Dolan acknowledged that he approved MSG's press strategy in response to Browne Sanders' lawsuit. (Dolan Dep. 224-25)

64.    Plaintiff responded to the statements made by MSG's lawyers in a statement that she read at a press conference on January 25, 2006. (Pl. Dep. I 463-64)

65.    Following Browne Sanders' unlawful dismissal and the negative public comments that have been made about her by defendants, her career prospects and earning capacity have been damaged. (Pl. Dep. I 465-67; Browne Sanders Decl. ¶ 3)

66.    Although Browne Sanders applied for jobs with hundreds of potential employers in a wide variety of businesses, she is presently working as an independent contractor for a non-profit organization.  Her annual compensation is less than half of what she had earned at MSG. (Browne Sanders Decl. ¶ 3)

67.    Browne Sanders has repeatedly been asked about the circumstances of her dismissal from MSG by prospective employers and executive recruiters, some of whom have specifically referenced the circumstances of he dismissal in the context of discussing potential jobs that she ultimately was not offered. (Pl. Dep. I 467; Browne Sanders Decl. ¶4)

Plaintiff's 2001-2004 Tax Returns

68.    Prior to 2000, plaintiff's tax returns were prepared by ARB Associates. (Mintzer-MSG Decl., Ex. 3)

69.    In 2001, plaintiff hired a new accountant, ██████ (██████ Dep. 25) ██████ prepared plaintiff's tax returns for the years 2001 through 2004. (Cesaratto Decl., Exs. P-S)

70.    Plaintiff did not operate a direct marketing business at any point, including from 2001 through 2004. (Pl. Dep. II 44; Sanders Dep. 291; Browne Dep. 216; Browne-Moore Dep. 229; Nix Dep. 252-53; Gerrard Dep. 73; Singer Dep. 80)

71.     In a questionnaire which Browne Sanders completed for███████ she confirmed that she did not have a business. (██████Dep. 35) The questionnaire, entitled Individual Tax Organizer (1040), appears to be for the 2001 tax year and asks the taxpayer to check "yes" or "no" to several questions. (Mintzer-MSG Decl., Ex. 1) One of the questions is, "Did you start a business?"    Plaintiff checked "NO" in response to that question.    (Id. (BH0013))    The questionnaire also includes a worksheet for taxpayers to list all of their business expenses. (Id. (BH0018-19)) Browne Sanders did not list any business expenses on the worksheet. (Id.) The questionnaire was produced by ████████ in response to defendants' subpoena for his file concerning plaintiff. Browne Sanders had not maintained a copy of the questionnaire.

72.     ██████, however, included a Schedule C on each tax return that he prepared for plaintiff. (Cesaratto Decl., Exs. P-S) The Schedule C claimed business expenses for a direct marketing business. (Cesaratto Decl., Exs. P-S)

73.     ██████ does not remember having any discussions with Browne Sanders regarding a direct marketing business. (██████ Dep. 44-46, 50-51, 64-65, 72) Nor does ██████ have any documents provided to him by plaintiff that reflect a direct marketing business. (██████Dep. 54)

74.     When questioned on the specific entries on plaintiff's 2002 tax form, ███████ testified that he did not know who provided the information included on the Schedule C (██████Dep. 64); he did not remember if he made up any entries on the Schedule C form that were based on information that he did not receive from plaintiff (██████ Dep. 185-88); and he did not remember if he added additional information to plaintiff's 2002 Schedule C that was not provided to him by plaintiff (██████Dep. 191). In response to questions by Thomas' lawyer, ██████testified as follows:

Q: In the calendar year 2003 when you were preparing the tax return for 2002 for Anucha Browne Sanders, would you have made any entries on Schedule C of that return that were not based on information given to you by Anucha Browne Sanders?

A. I do not recall.

 Dep. 185-88)

75.     When questioned specifically on the tax returns he prepared for 2003, ▨▨▨ testified that he did not remember if the tax returns were prepared based on information provided to him by his clients.  (▨▨▨ Dep. 194)  He also testified that with regard to plaintiff's 2003 tax return, he did not remember if he completed it based on information provided by plaintiff. (▨▨▨ Dep. 198)

76.     ▨▨▨ testified that he did not remember if he made up the information contained on the Schedule C forms that he prepared for plaintiff.  (▨▨▨ Dep. 48)  During questioning by MSG's and Dolan's counsel, testified as follows:

Q: None of the information contained in Schedule C was made up by you?

A: I don't recall.

▨▨▨ Dep. 48)

77.     ▨▨▨ also did not remember if in general he included information on tax returns that was not based on information that he received from his clients.  ▨▨▨ Dep. 179) For example, ▨▨▨ gave the following testimony:

Q: My question to you, sir, is that regardless of the tax year, you would not include information in the return that was not based on information that you received from the individual would you?

A: I don't recall.

▨▨▨ Dep. 179)

78.    ████████ is an alcoholic. (████████ Dep. 119)  He began receiving treatment from High Focus, a rehabilitation company, in November 2006.  (████████ Dep. 119-120) ████████ is also receiving treatment from Alcoholics Anonymous.  (████████ Dep. 119)

79.    ████████ testified that he was in denial for many years about his alcoholism, and that he started receiving treatment for his alcoholism because his accounting partner, ████████ told him that he needed to seek help in 2006.  (████████ Dep. 122)

80.    ████████ did not know if his alcoholism affected the preparation of plaintiff's tax returns.  (████████ Dep. 188-91)  ████████ testified that his memory was impaired due to his alcoholism, which had caused his brain to be "partially fried."  (████████ Dep. 119)

81.    Browne Sanders did not review the tax returns that ████████ prepared for her prior to signing them.  (Pl. Dep. II 43)  Accordingly, plaintiff did not know that the tax returns contained erroneous information when she filed them.  (Pl. Dep. II 43)

<u>Plaintiff's 2005 Tax Returns</u>

82.    Plaintiff filed this lawsuit in January 2006.  Plaintiff chose to have Weaver, an out-of-town accountant, prepare her 2005 tax returns.  (Weaver Dep. 83-84)

83.    Plaintiff spoke to Weaver in April 2006 concerning the preparation of her 2005 taxes.  (Weaver Dep. 85)  In order to complete plaintiff's 2005 tax returns, Weaver reviewed her 2004 tax returns.  (Weaver Dep. 33-34)

84.    Because it was so close to the filing deadline of April 15, Weaver was under a lot of pressure to go through all the issues he needed to discuss with Browne Sanders in order to complete her return.  (Weaver Dep. 85)

85.    Weaver asked Browne Sanders about taking a deduction related to her trip to aid the victims of the tsunami in Thailand. (Weaver Dep. 86-87)  Browne Sanders told Weaver about the relief work she had done and the expenses she had incurred. (Weaver Dep. 86-87)

86.    After reviewing her 2004 tax returns, Weaver also questioned Browne Sanders about the business expenses listed on the Schedule C.  (Weaver Dep. 34)  Browne Sanders responded to Weaver, "What business expenses, what do you mean by a business? . . . I don't have a business." (Weaver Dep. 34)  According to Weaver, Browne Sanders seemed not to know that the business expenses existed. Browne Sanders told Weaver, "I don't know where the preparer got those expenses from." (Weaver Dep. 35-36)  Plaintiff told Weaver that she never had a direct marketing business. (Weaver Dep. 107)  Weaver also testified as follows:

> Q: So she told you that she had no idea how this schedule would
> have ever ended up on her return?
>
> A. Yes.

(Weaver Dep. 107-08)

87.    Weaver also told Browne Sanders that it appeared that she had not been using the correct filing status. (Weaver Dep. 39)  He told her that if she was married and had lived with her husband for the last six months of the year, she could not file as head of household. (Weaver Dep. 39)  He told her that she could either file as "married filing separately" or "married filing jointly." (Weaver Dep. 40)

88.    Weaver prepared two tax returns for plaintiff for 2005: one with the filing status of "married filing separately" and one with the filing status of "married filing jointly." (Weaver Dep. 54-57, 64-66, 103, 110)

89.    Plaintiff filed the tax return with the filing status of "married filing separately." (Mintzer-MSG Decl., Ex. 4; Cesaratto Decl., Ex. AA)

90.     Weaver incorrectly recorded that Browne Sanders filed the return with the status of "married filing jointly." (Weaver Dep. 49-51, 64-66)

Plaintiff's 2003-2004 Amended Tax Returns

91.     In November 2006, after this Court ordered plaintiff to produce her tax returns for the years 2000 through 2005, Browne Sanders reviewed her 2000 through 2005 tax returns and realized that her tax returns for 2001 through 2004 had listed a number of erroneous deductions concerning a direct marketing business. (Pl. Dep. II 43)

92.     After she realized that her tax returns had been filed incorrectly, plaintiff hired Reimer to review her tax returns. Reimer has specialized for the past thirty-three years in tax planning and forensic accounting. His expertise includes analyzing financial and tax records of individuals and entities to detect irregularities in reporting, filing and payment matters. (Reimer Aff. ¶3) Reimer charged plaintiff a $4,000 retainer. (Reimer Dep. 82-83) This amount was advanced to Reimer by plaintiff's counsel as an accommodation to Reimer. Plaintiff reimbursed counsel for this payment and has paid Reimer directly for all subsequent charges not covered by the original retainer. (Reimer Aff. ¶ 20; Mintzer-MSG Decl. ¶ 2)

93.     Reimer met with Browne Sanders in November 2006 and reviewed her 2000-2005 tax returns. (Reimer Dep. 20)

94.     Reimer told Browne Sanders that her 2000 and 2005 tax returns appeared to be prepared properly. (Reimer Dep. 21-22, 66)

95.     Reimer questioned Browne Sanders about the Schedule C forms that had been included in her 2001 through 2004 tax returns. (Reimer Dep. 24, 31-32) Reimer asked plaintiff if she had been in a trade or business. (Reimer Dep. 24) Browne Sanders replied that she had not been a trade or business and that she had been an employee. (Reimer Dep. 24, 63-64)

Reimer asked plaintiff why a Schedule C had been filed. (Reimer Dep. 24) Browne Sanders informed Reimer that she did not know what a Schedule C was or why it was filed. (Reimer Dep. 24) Browne Sanders also told Reimer that she never discussed the Schedule C expenses with ███████, she had not supplied him with the amounts that were recorded, and she did not know how the amounts were determined. (Reimer Dep. 24, 28, 99-100) Browne Sanders told Reimer that she had not reviewed the tax returns after they were prepared. (Reimer Dep. 92)

96.    Reimer took notes during his initial meeting with plaintiff. (Reimer Dep. 60) One of his notes was a question, "made up expenses by new accountant?" (Reimer Dep. 64) Reimer wrote that note because Browne Sanders had not provided ███████ with information concerning the expenses listed on the Schedule C forms and Reimer questioned whether ███████ had made up the expenses. (Reimer Dep. 64-65)

97.    Reimer advised Browne Sanders that she should amend her 2003 and 2004 tax returns because they reflected a loss from a trade or business when she was not in a trade or business. (Reimer Dep. 24-25) Reimer advised Browne Sanders not to amend her 2001 or 2002 tax returns because the three-year civil statute of limitations that applied to amendments had already expired for those returns. (Reimer Dep. 67-68; Reimer Aff. 19) Plaintiff's amended 2003 and 2004 returns do not include a Schedule C or any deductions for business expenses. (Cesaratto Decl., Exs. W-X)

MSG's Policies Do Not Mandate Firing All Employees
Who Engage In Illegal Behavior Or Who Violate A Policy

98.    Neither Cablevision, MSG's parent company, nor MSG fire all senior level employees that engage in illegal conduct. For example, Dolan has an admitted history of illegal drug use during his employment with Cablevision, describing his mid-thirties as "a festival. It was not a festival of love, it was a festival of self-abuse. Like any other alcoholic and chemically

dependent person, every binge, every event, is a little more than the one before." (Mintzer-MSG Decl., Ex. 5, at 5) Such conduct is a violation of MSG policies, which apply to Dolan, yet he is currently the Chairman of MSG and Chief Executive Officer of Cablevision. (Dolan Dep. 257-58; Dolan Aff. ¶ 1)

99.    In addition, there is substantial evidence that Thomas lied during his deposition in this case. For example, Thomas testified that he never referred to plaintiff as attractive or "easy on the eyes." (Thomas Dep. 214) Robert Levy ("Levy"), a third party with no connection to plaintiff or any interest in this case, has, however, testified that during a Knicks open practice he witnessed Thomas, plaintiff and a third person talking and that he heard Thomas say that Browne Sanders was attractive and easy on the eyes. (Levy Dep. 22) In addition, Jonathan Schindel ("Schindel"), another third party with no connection to this case, has submitted a declaration stating that at the same open practice he also heard Thomas refer to Browne Sanders as beautiful, attractive, and easy on the eyes. (Schindel Decl. ¶ 9) Despite this evidence, Thomas remains the President, Basketball Operations for MSG and the Head Coach of the Knicks, and it has been widely reported that his contract his been renewed.

100.    Thomas has also been involved in an outside business while employed by MSG. Thomas is one of the owners of Dale & Thomas Popcorn. (Thomas Dep. 18-19) In addition, Thomas has been involved in promotional activities related to Dale & Thomas Popcorn and has used the services of an MSG employee in connection with his Dale & Thomas work. (Favorito Dep. 46-47)

101.    Thomas has not received a written waiver from MSG to engage in any outside business, although he and Dolan claim that Thomas was given permission orally to be an investor in Dale & Thomas. (Thomas Dep. 162; Dolan Dep. 41)

102.   Dale & Thomas Popcorn is also a vendor at MSG, and Thomas has not received a written waiver for this as required by MSG policy.  (Thomas Dep.  162-63; Cesaratto Decl., Ex. E)

103.   In addition, Thomas hired a family member, his niece, as his assistant, without receiving a written waiver as required by MSG policy.  (Thomas Dep. 301-03; Cesaratto Decl., Ex. E)

**Defendants Have Not Produced Any Evidence Of Any
Employee Whom They Have Fired That Engaged In
Conduct Similar To The Conduct Allegedly Engaged In By Plaintiff**

104.   Defendants have not identified any MSG employee who is similarly situated to plaintiff and was fired by MSG.  Two of the comparators proposed by MSG are ▮▮▮▮▮▮ ▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, who MSG fired after they engaged in improper work-related conduct.  (Moran Aff. ¶ 5)  MSG fired ▮▮▮▮ after he double-worked as a cameraman for MSG and ABC-TV in July 2003.  (Moran Aff. ¶ 5)  ▮▮▮▮ worked for ABC-TV during the time he was scheduled to work for Madison Square Garden Network.  (Moran Aff., Ex. D)  As a result, he was not at his scheduled position for MSG and was paid by both companies.  (Moran Aff., Ex. D)  This was ▮▮▮▮ third act of misconduct.  (Moran Aff., Ex. D)

105.   MSG fired ▮▮▮▮▮▮ after it became aware that he had submitted applications through MSG for medical insurance for a woman that he claimed was his wife, when he was not married.  (Moran Aff., Ex. F)  ▮▮▮▮▮▮ misrepresentation had cost MSG over $70,000 in insurance premiums.  (Moran Aff., Ex. F)

106.   MSG also offers as a comparator ▮▮▮▮▮▮▮▮▮▮  MSG revoked an offer of employment to ▮▮▮▮ after it determined that she had misrepresented her

qualifications. (Moran Aff. ¶5) ████████ stated on her resume that she was a college graduate, but this was not true. (Moran Aff., Ex. E)

107. MSG proposes three other comparators, ████████████████████ ███████████████, and ██████████████████, who MSG fired after they were arrested. (Moran Aff. ¶ 5) ████████ was reinstated after the case against her was dismissed on speedy trial grounds. (Moran Aff. ¶ 5)

108. Each of the comparators proposed by defendants are outside of the Knicks organization, and defendants have previously argued, and this Court has held, that plaintiff could not obtain discovery about allegations of discrimination and retaliation at MSG outside of the Knicks organization that do not involve Mills or Dolan. (Court's November 6, 2006 Order)

Dated: New York, New York
       May 25, 2007

By:    _X. 7. M. _____
       Anne C. Vladeck (AV 4857)
       Kevin T. Mintzer (KM 4741)
       Karen Cacace (KC 3184)
       VLADECK, WALDMAN, ELIAS &
         ENGELHARD, P.C.
       1501 Broadway, Suite 800
       New York, New York  10036
       (212) 403-7300

245384 v2                                22