Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
ANUCHA BROWNE SANDERS,

                    Plaintiff,

        -against-            06 CV 0589 (GEL)

MADISON SQUARE GARDEN, L.P.,
ISIAH LORD THOMAS III and JAMES L. DOLAN,

                    Defendants.
----------------------------------------X


    VIDEOTAPED DEPOSITION OF ANUCHA BROWNE SANDERS

            New York, New York

        Monday, November 27, 2006




REPORTED BY:

BARBARA R. ZELTMAN

Job Number: 10954

```
1                 ANUCHA BROWNE SANDERS
2    friendly terms with?
3                 MS. VLADECK:  Objection to
4        form.
5        A      Scott Layden, who was the
6    general manager at the time.
7        Q      When was Layden the general
8    manager?
9        A      From 2000 -- well, from when I
10   was there, when I came in 2000, he was
11   there as general manager.  And he left in
12   2003, at the end of 2003.
13       Q      How would you describe,
14   yourself?  Would you say you were good
15   buddies?  By that I don't mean anything
16   other than within the workplace.  There's
17   no thoughts of mine other than to ask
18   questions relating to the workplace.
19       A      We were work associates.  We
20   were also friendly.
21       Q      You liked him?
22       A      Yes.  I respected him.
23       Q      And you liked him?
24                MS. VLADECK:  Objection to
25       form.
```

```
 1              ANUCHA BROWNE SANDERS

 2       A      And I liked him.

 3       Q      And would you believe that it

 4  was reciprocated?

 5       A      Yes.

 6       Q      So there was a good feeling

 7  there between you and the general manager

 8  of the Garden for several years, correct?

 9       A      Yes.

10       Q      In addition to that, there was

11  an assistant general manager by the name

12  of Jeff Nix, was there not?

13       A      Yes.

14       Q      And Jeff also was a buddy of

15  yours, at the workplace?  At the

16  workplace.

17       A      Jeff Nix was and is a friend

18  of mine.

19       Q      And continues to be a good

20  friend, correct?

21       A      Yes.

22       Q      Now, as the vice president of

23  marketing, is it your position that you

24  had a direct reporting relationship to

25  Scott Layden?
```

1                  ANUCHA BROWNE SANDERS

2    did or it didn't; you are saying you just

3    don't remember?

4          A     I don't recall seeing any that

5    had my level and my peers up.

6          Q     Eventually Isiah Thomas came

7    to become general manager of the New York

8    Knicks; is that right?

9          A     Yes.

10          Q     And that was in December of

11    '03, if I'm not mistaken?

12          A     Yes, it was.

13          Q     And did you consider that you

14    had had any input into the firing of

15    Scott Layden?

16                MS. VLADECK:  Objection to

17          form.

18          A     No.

19          Q     Did you consider yourself as

20    having any input into the hiring of

21    Isiah Thomas?

22          A     No.

23          Q     Did you tell anybody --

24    employee of Madison Square Garden that

25    "we" had fired Scott Layden?

49

1                ANUCHA BROWNE SANDERS

2        that right?")

3                MS. VLADECK:  Objection to

4        form.

5        A    No.

6             I'm confused with the

7    question.  Maybe you could restate it.

8        Q    Right.  I thought that --

9    well, let me go back -- let's get off the

10   organizational chart for just a minute.

11            Let's talk about the period of

12   time -- which was several years, was it

13   not?  Three or two and change when Scott

14   Layden was there, right?

15       A    Closer to -- yes.

16       Q    And during that time, you had

17   quite a bit of freedom in terms of your

18   association with Layden, did you not?

19            MS. VLADECK:  Objection to

20       form.

21       A    I wouldn't say it was called

22   freedom.  We had a good working

23   relationship.  There were open lines of

24   communication, yes.

25       Q    That's a better way to put it.

50

1                 ANUCHA BROWNE SANDERS

2    You had open lines of communication?   Yes?

3         A     Yes.

4         Q     And you communicated with him

5    regularly?

6                 MS. VLADECK:  Objection to

7         form.

8         A     Regularly, yes.

9         Q     You practiced with the

10   basketball players?

11        A     Which basketball players?

12        Q     The basketball players that

13   played for the New York Knickerbockers?

14        A     I've never practiced with the

15   basketball players from the team.

16        Q     Then I'm misinformed.

17                If I ask you a question in the

18   form of a statement, if you hear my voice,

19   probably you don't pick it up, is a

20   question.

21                I had an impression -- and if

22   it's a wrong impression -- but you did

23   attend the practices, did you not?

24                MS. VLADECK:  Objection to

25        form.

51

```
 1              ANUCHA BROWNE SANDERS
 2        A    I have attended practices,
 3   yes.
 4        Q    On a regular basis when
 5   Scott Layden was there?
 6        A    I would say once in a while I
 7   came up to the practice facility and
 8   watched the practice.
 9        Q    How often was once in a while?
10   How many years were you there with
11   Mr. Layden?
12             MS. VLADECK:  Asked and
13        answered.
14        A    Which is the question?  How
15   often or --
16        Q    How long were you there with
17   Mr. Layden?
18        A    From November 2000 to December
19   of 2003.
20        Q    Little over a year?
21             MS. VLADECK:  Objection to
22        form.
23        A    No, it was more than a year.
24   It was closer to two years.
25        Q    You said November 2002?
```

                    ANUCHA BROWNE SANDERS

1

2    does it vary?

3         A     They are away 41 games, and

4    they are home 41 games.

5         Q     So of the 41 games they are

6    away during any particular season, during

7    the Layden years, how often during the

8    season would you say you went up and saw

9    them play out of town?

10        A     On a yearly basis, I would say

11   the first year I was there probably none.

12   Second year, maybe three different road

13   trips I went on.

14        Q     And the next year?

15        A     Well, the second season -- let

16   me restate that then.

17             The first season, probably

18   none.  The second season, maybe one.  The

19   last season, maybe three.

20        Q     And what about after the

21   ballgames, have you ever gone to the

22   Knicks locker room after the games?  In

23   the Layden years, I'm talking about.

24        A     Yeah, I went into the lounge

25   of the players' locker room.

1          ANUCHA BROWNE SANDERS

2          Q      Could you describe that for

3    me, and particularly for the record, what

4    you mean by "the lounge"?

5          A      Yes.  There are multiple

6    entrances into the locker room.  One

7    entrance opens up into a lounge with

8    couches and a television.  And that's the

9    area of the locker room that I was in.

10         Q      And how often would you go to

11   the lounge in the Layden years?  And I

12   understand it can vary.  I understand it's

13   an approximation.  And I am not holding

14   you to the number.  I'm just trying to get

15   a sense.

16         A      I'm trying to understand.

17                How often after the games?

18         Q      After the games.

19         A      I might go in there after each

20   game, either that or I stand outside the

21   door and talk.

22         Q      And what about in the

23   Isiah Thomas years until you left the

24   company?

25         A      There were times that I went

59

```
 1              ANUCHA BROWNE SANDERS
 2   into the locker room.  It was less
 3   frequent.
 4         Q     And how about the practice
 5   facility under Isiah Thomas?
 6         A     Very rarely.
 7         Q     And how about -- well, you
 8   only --
 9         A     Let me clarify that.
10               I went up to the practice
11   facility when we had events that were
12   taking place there and if there was a need
13   to go up there to meet with somebody.
14         Q     I don't mean outside of the
15   times when the team was practicing.
16               When the team was practicing,
17   I believe you said that under Layden you
18   went approximately three times at the
19   most; is that right?
20               MS. VLADECK:  Objection to
21         form.
22         A     Well, then, I should clarify
23   that because, under Layden, I probably sat
24   through three practices or so.
25         Q     That's what I'm saying.
```

```
1                ANUCHA BROWNE SANDERS
2    Three.
3         A     Right.  But there were player
4    events.  The player events also were times
5    that there were teams were practicing.
6    They would usually practice, and then
7    you'd have the player -- the event.  So
8    there could have been more times.
9         Q     Did Isiah Thomas, when he
10   came, change the rules at all about
11   attending -- persons who were not on the
12   team attending practices?
13              MS. VLADECK:  Objection to
14        form.
15        Q     If you know.
16        A     I don't recall him doing
17   something that was official.
18        Q     I suppose there's a lot of
19   ways to get your point across, but did he
20   get the point across that persons who
21   weren't members of the team weren't
22   welcome at the practice facility when the
23   team was practicing?
24        A     He never said anything
25   directly to me.  It never was communicated
```

62

ANUCHA BROWNE SANDERS

1

2      object and say that she answered.

3      A      I did answer your question.

4      Q      What about in terms of

5   traveling with the team to away games?

6   Did that change at all under Isiah Thomas?

7      A      It changed.  It wasn't an

8   official mandate, but it changed.

9      Q      And the same thing, you felt

10  you needed to stay away?

11         MS. VLADECK:  Objection to

12      form.

13      A      I made some choices to travel

14  less with the team.

15      Q      Did you travel at all with the

16  team?

17      A      I recall a road trip.  Maybe a

18  road trip.  I am not sure.  I don't

19  remember.

20      Q      When was that?

21      A      It had to be early on.

22      Q      And after that, you didn't

23  travel with the team at all, correct?

24      A      If I traveled with the team,

25  it wasn't on the team plane, but there

ANUCHA BROWNE SANDERS

1
2    were times where I would meet the team in
3    a city.
4        Q    And what about the lounge of
5    the players' locker room, was your
6    attendance there reduced, too, under
7    Isiah?
8        A    There were times when I went
9    in.  You know, there wasn't -- there were
10   times I went into the locker room, same
11   area.  It didn't necessarily change for
12   me.
13       Q    Well, Isiah came to the
14   team -- correct me if I'm wrong -- I
15   believe it was December of 2003; is that
16   right?
17       A    Yes.
18       Q    Were you sad to see
19   Scott Layden go?
20       A    I was sad for him.
21       Q    Were you glad to see
22   Isiah Thomas coming?
23       A    I was happy for the Garden.
24       Q    How about for yourself, did
25   you see that as a positive in any way?

121

ANUCHA BROWNE SANDERS

1

2    A    On what?

3    Q    Any example that you want.  If

4 something happens that's disturbing to

5 you, you call it to the attention of

6 Steve, not employee relations, and it

7 doesn't clear itself up to your

8 satisfaction.

9         What, if anything, did you do?

10    A    I left it to Steve Mills.

11    Q    Always left it to Steve?

12    A    Yes.

13    Q    So during the course of your

14 employment by the Garden while

15 Isiah Thomas was there, you went to

16 Steve Mills and complained about Isiah on

17 several occasions, did you not?  Without

18 quantifying the number.  We'll get to

19 that.

20    A    Yes.

21    Q    And each time, after you spoke

22 to Steve Mills, was your disturbance or

23 your grievance satisfied, so far as you

24 were concerned?

25         MS. VLADECK:  Objection to

                    ANUCHA BROWNE SANDERS

1

2       form.

3            A      Not necessarily, no.

4            Q      Was it ever satisfied so far

5    as you were concerned?

6            A      No.

7            Q      So, then, in all the two years

8    that -- give or take an hour or two --

9    that you were there while Isiah Thomas was

10   there, none of your complaints about

11   disturbances concerning Isiah were ever

12   satisfied, so far as you were concerned,

13   by Steve Mills; is that right?

14                  MS. VLADECK:  Objection to

15       form.

16           A      I guess I wouldn't

17   characterize it as "satisfied."  I might

18   characterize it differently.

19           Q      How would you characterize it?

20           A      There was one occurrence where

21   Steve called a meeting and we met in his

22   office as a result of what I communicated

23   to him.

24           Q      Was that in -- an incident in

25   March of '04?

123

1                    ANUCHA BROWNE SANDERS

2          A     Yes.

3          Q     Other than that, what's the

4     answer to my question?  I could repeat it

5     for you if you want me to.

6                MS. VLADECK:  Why don't you

7           rephrase it.

8                MR. PARCHER:  Say again.

9                MS. VLADECK:  Why don't you

10          rephrase it since she had trouble

11          with the words you used.

12                MR. PARCHER:  I'll ask the

13          question, and then I'll rephrase it.

14          I'm not in sync with what you are

15          asking me to do.

16          Q     You understand what I'm

17     asking?

18          A     I said "satisfied," I wouldn't

19     call -- I wouldn't use the word satisfied.

20          Q     What word would you use?

21     Properly resolve?  Help me.  Tell me.

22          A     The fact that he might have

23     taken some action, I guess.  The fact that

24     he took some action doesn't necessarily

25     mean that the event was satisfied.

131

1              ANUCHA BROWNE SANDERS

2     into a room in that same area and began to

3     yell at me and say that we weren't doing

4     anymore "fucking events."  He said, "You

5     don't run this team.  I run this team."

6     He called me a "fucking bitch."  He was

7     spewing curses.

8          Q     Spewing curses?

9          A     Spewing curses.

10               And I told him that these

11    events were either League mandated or we

12    were under contractural obligations to

13    sponsors and, if he had problems, he

14    should really talk to Steve about it.

15         Q     I have -- I don't know if it's

16    to scale or anything like that.  But I

17    have a drawing of what I think is the part

18    of the Garden that you were referring to.

19    And I am not claiming to you -- and more

20    particularly to your lawyer because I

21    don't want to face the objection to form

22    if I can avoid it -- that it's to scale or

23    that it's perfect.

24               But I will represent to you

25    that it's, I think, reasonably accurate,

170

```
                   ANUCHA BROWNE SANDERS
 1

 2        Q      Sorry?

 3        A      I said he pulled me into the

 4   room.

 5        Q      Okay.  And he opened the door?

 6        A      Yes.

 7        Q      And inside the room, did he

 8   close the door?

 9        A      Yes, he did.

10        Q      Bang it or shut it softly or

11   how did he close it?

12               MS. VLADECK:  Objection to

13        form.

14        A      He just closed the door.

15        Q      Let go of your arm?

16        A      Yes.

17        Q      Now, in this Complaint -- I'm

18   reading it to you -- you say, "He yelled

19   that the team was not going to do anymore

20   F-ing events.  Browne Sanders calmly told

21   Thomas that we require the Knicks to do

22   community events and that he

23   should discuss his concerns with Mills.

24   Thomas continued to scream at

25   Browne Sanders calling her a F-ing bitch,
```

1                  ANUCHA BROWNE SANDERS

2        A      His name is Gary Winkler.

3        Q      Why did you ask Gary Winkler

4    in November of '05 to reconstruct an event

5    that had happened over a year earlier?

6               MS. VLADECK:  Objection to

7         form.

8        A      I wanted to make sure I had a

9    record of it, as I was demanding that

10   Steve deal with things.

11       Q      Didn't you have some desire to

12   make sure that you had a record of this

13   arm-pulling/screaming incident so that

14   Steve could deal with things in November

15   of '05?

16              MS. VLADECK:  Objection to

17        form.

18       A      Not necessarily, no.  Either

19   it was something that happened to me that

20   I recalled.

21       Q      Was it important to you, as

22   you did with Winkler and Petra Pope, to go

23   around to the different people that might

24   have been in the corridor that night and

25   say, "Did you see Isiah pulling me"?  That

200

ANUCHA BROWNE SANDERS

1

2      Q      Probably or definitely?

3      A      On more than one occasion.

4      Q      Probably or definitely?

5             MS. VLADECK:  Objection to

6      form.

7      A      I'm answering your question.

8  You asked me if I used profanity in the

9  workplace and you asked me if I used it on

10 more than one occasion.  And I have said I

11 have used profanity in the workplace on

12 more than one occasion.

13     Q      How many times would you say

14 you used it, approximately, in all the

15 years you were there at the Garden?

16     A      I don't know.  I didn't keep

17 count.  It wasn't a lot.

18     Q      I don't know what you mean, to

19 quote your lawyer, as "a lot"?

20            MS. VLADECK:  Objection to

21     form.  Is there a question?

22     Q      Whatever you mean by that,

23 give it an approximate number.

24            MS. VLADECK:  Objection to

25     form.

201

ANUCHA BROWNE SANDERS

1

2     A     It's tough to quantify it.  I

3     would say little less than ten times.

4     Q     So in the -- how many years

5     were you at the Garden?  Approximately

6     five?

7     A     Approximately five, little

8     over five before I was fired.

9     Q     In the approximate little over

10    five, you've used profanity in the

11    workplace probably less than ten times?

12    A     Yes.

13    Q     Okay.  Just asking.  Get the

14    record clear.

15          Any other profanity incidents

16    that you recall involving Isiah?

17          MS. VLADECK:  Objection to

18       form.

19          And other people?

20    Q     And other people.  Same

21    question as before.

22    A     There were times where he used

23    profanity in our staff meetings.

24    Q     When?

25    A     A few that he went to.

218

1                    ANUCHA BROWNE SANDERS

2        form.

3            A    It varied.  There was some

4    meetings where he just used profanity.

5    There were others where he was directing

6    it at me and he called me a "fucking

7    bitch."

8            Q    On one or more than one

9    occasion in those five or six meetings?

10           A    I would say on more than one

11   occasion.  In those five or six meetings,

12   it was probably three times.  But when he

13   started this cursing, he was spewing

14   curses.  So it was a mixture of he was

15   referring to the situation and then he was

16   referring to me.

17           Q    Did you go back to Mills and

18   report to him and tell him what was going

19   on?

20           A    Yes.

21           Q    At the weekly meetings, or

22   right after it happened?

23               MS. VLADECK:  Objection to

24       form.

25           A    It depended on the event.

219

ANUCHA BROWNE SANDERS

1

2    There were times I went to him right

3    after.  And as I said earlier, I was

4    trying not to be in his office complaining

5    all the time.

6         Q    Leaving that aside, what you

7    were trying not to do, I'm getting an

8    impression that five or six times you went

9    into this man's office and he was cursing

10   at you all the time and making it very

11   unpleasant and uncomfortable and miserable

12   for you, right?

13              MS. VLADECK:  Objection to

14        form.

15        A    It wasn't always in his

16   office.  Sometimes it was in the

17   conference room.  But yes, that's

18   accurate.

19        Q    But that's accurate, right?

20              And very, very different than

21   the way it was under Scott Layden, right?

22        A    It was different, yes.

23        Q    Where you were very

24   comfortable in having these interactions

25   with the general manager under Layden,

220

ANUCHA BROWNE SANDERS

1

2    weren't you?

3                MS. VLADECK:  Objection to

4        form.

5        A    I was comfortable with Scott,

6    yes.

7        Q    Now, did you go into Mills at

8    any time -- this is in the February, March

9    period -- and say -- not in exact words

10   but in concept -- "This is impossible, I

11   can't talk to the man.  Every time I talk

12   to the man he's cursing at me"?

13       A    I made Steve very much aware

14   of it, and I did complain.  I said, "This

15   is not a comfortable environment.  He

16   can't just curse me out."  And I made it

17   very clear to him, especially the evening

18   of March 23rd, that this -- it could not

19   continue like this.  This is absolutely

20   outrageous.

21       Q    Before March 23, had you made

22   it clear to him that it could not

23   continue, that it was outrageous?

24       A    Yes, I did.

25       Q    So March 3rd was just a

221

ANUCHA BROWNE SANDERS

1

2  culmination of that period; it wasn't the

3  first time you made it clear, right?

4      A    I think after he called me a

5  "fucking bitch" and "ho," it made it very

6  clear to me that Steve had to step in.

7      Q    Was that the March 23rd

8  incident or the incidents before?

9      A    The "fucking bitch" or the

10 "ho."

11         MS. VLADECK:  Objection to

12     form.

13     Q    It isn't so much of the words.

14 I am not minimizing the words.

15         But it isn't so much the

16 words, as to cursing at you as

17 distinguished from using profanity.

18         You make that distinction,

19 right?

20         MS. VLADECK:  Objection to

21     form.

22     A    I'm sorry.  I didn't

23 understand.

24     Q    Well, when the man says "what

25 the fuck am I doing here" or words to that

277

1                  ANUCHA BROWNE SANDERS

2    the policy relating to harassment and

3    discrimination and things like that?

4              MS. VLADECK:   Objection to

5         form.

6         A    I became familiar through some

7    of their -- they had some training.

8         Q    And did you take the training?

9         A    I took one of the trainings,

10   yes.

11        Q    On one or more than one

12   occasion?

13        A    The one I recall was the one I

14   took, I think, in the fall -- summer/fall

15   time frame of 2005, was the one that I

16   recall.

17        Q    You only recall one?

18        A    Sitting through sexual

19   harassment training.   There was one that

20   was an online course that I took.

21        Q    But in the years of 2000,

22   2001, 2002, 2003, 2004, you don't recall

23   ever attending any type of meeting or

24   conference or anything where --

25        A    There were meetings.

276

ANUCHA BROWNE SANDERS

1

2    answered.   Objection to form.

3       A     No, there was nothing that

4    prevented me from writing things down.

5       Q     And Steve Mills, when he told

6    you not to -- these are my words.  I'm

7    forgetting words you used -- you know,

8    take it elsewhere other than him, when he

9    told you not to do that, he wasn't

10   directing you not to write things in your

11   diary, was he?

12          MS. VLADECK:  Objection to

13      form.  Asked and answered.

14      A     I didn't interpret that.

15      Q     Right.  Now, were you

16   familiar --

17          What's funny about that?

18      A     Are you okay?

19      Q     You sincerely want to know the

20   answer to that?  I'm okay.  Thank you for

21   asking.  I appreciate it.  That was very

22   kind of you.

23          When you got to the Garden,

24   and throughout the years that you were

25   there, did you become at all familiar with

298

```
 1              ANUCHA BROWNE SANDERS
 2       paragraph.
 3          Q      She said it was clear that
 4    Isiah Thomas wanted her to flirt with the
 5    officials on a regular basis.
 6              That's what she said to you?
 7          A    Yes.
 8          Q    Now, if she were to testify
 9    that she didn't say any such --
10              Was there a witness to that,
11    by the way?
12          A    To her telling me this?
13          Q    Yes.
14          A    At the time, no.  But
15    Gary Winkler also confirmed it because she
16    had told Gary.
17          Q    Let's take a look at Gary
18    Winkler's e-mail to you.
19              You asked him to write, did
20    you not, on or about sometime in
21    December 15th of '05?
22              MS. VLADECK:  Objection to
23       form.
24          A    Yes.
25          Q    Now, by December 13th of '05,
```

299

ANUCHA BROWNE SANDERS

1

2    you had a lawyer, did you not?

3        A    By December 13th?

4        Q    Yes.

5        A    I think so.

6        Q    Who is Robert Levy?

7            MS. VLADECK:  I am going to

8        direct her not to answer to the

9        extent she only knows through

10       counsel.

11           (Directive to witness.)

12           MR. PARCHER:  I have far too

13       much respect for you to say what on

14       earth are you talking about.  So I'm

15       just going to say -- I'll try to

16       figure out what you mean.  But you,

17       obviously, by the look on your face,

18       are on pretty solid ground here.  So

19       I'll proceed cautiously.  I'll see if

20       I can't get to the real truth here.

21       Q    Did you ever speak to

22   Robert Levy?

23       A    No, I didn't.

24       Q    Never in your lifetime?

25       A    I don't recall Robert Levy.

308

1                    ANUCHA BROWNE SANDERS

2    to figure it out.

3          Q      And you looked it up for the

4    first time, found out what was going on

5    with you, on October 29, 2005, right?

6                    MS. VLADECK:   Objection to

7          form.

8          A      That was the first time I

9    looked it up, yes.

10         Q      And it was in November, was it

11   not, around Thanksgiving time that you

12   caused people in your office that worked

13   under you to write up -- to investigate or

14   write up a report about these two young

15   men, Gonsalves and Vernon Manuel, right?

16                   MS. VLADECK:   Objection to

17         form.

18         A      At Steve's direction, yes.

19         Q      At Steve's direction?

20         A      Yes.

21         Q      Had something happened to

22   precipitate that?

23                   MS. VLADECK:   Objection to

24         form.

25         A      I think something did happen.

312

```
 1              ANUCHA BROWNE SANDERS

 2        answer?  Never mind.  I'll go at it a

 3        different way.

 4        Q       In November, you got a series

 5   of reports and conducted an investigation

 6   that culminated in your asking someone at

 7   the Garden to let go of two people, right?

 8              MS. VLADECK:  Objection to

 9        form.

10        A       Yes.

11        Q       And who were those two people?

12        A       Vernon Manuel and

13   Hassan Gonsalves.

14        Q       And who is the third person's

15   whose name you mentioned before?

16        A       Tasheem Ward.

17        Q       You didn't ask for him to be

18   fired?

19        A       No, I don't recall asking

20   about him.

21        Q       So just referring to the two

22   young men that you asked to be fired, they

23   had been troublesome for you since way

24   back in '04, had they not?

25        A       Yes.
```

313

ANUCHA BROWNE SANDERS

1

2   Q    And there were all kinds of

3   incidents -- without characterizing and

4   serializing and showing you documents --

5   that occurred, relating to them, in '04 as

6   well as in '05, right?

7   A    In '03, '04 and in '05.

8   Q    What were some of those

9   incidents, if you can tell us, to the best

10  of your recollection.

11  A    Vernon had consistently had

12  hostile confrontations with people in the

13  office, including myself.  He was

14  disrespectful.  He, on occasion, did not

15  show up for events, didn't show up to the

16  office.  Was very argumentative.  Had a

17  lot of demands and was insubordinate to

18  his manager, to managers above him.  So

19  that was an ongoing problem with Vernon.

20  Q    And what about the other

21  fellow?  Gonsalves.

22  A    Hassan was -- I guess I would

23  characterize him as someone who really

24  didn't perform in his job function.  And

25  he was also sexually harassing women on

314

ANUCHA BROWNE SANDERS

1

2  the staff.

3          Vernon was verbally hostile to

4  women on the staff.

5      Q      Did they also -- phony

6  invoices?

7      A      Yes, I think Vernon forged his

8  manager's signature 20 or 30 times, and

9  Hassan forged his manager's signature over

10  80 times.

11      Q      They did something

12  inappropriate about parking spots?

13          MS. VLADECK:   Objection to

14      form.

15      A      That's the same thing.

16      Q      Wasn't anything to do with

17  expense vouchers or anything like that?

18      A      That's what I was referring

19  to.

20      Q      Only parking?

21      A      Expense -- well, the parking

22  expense.  The parking expense that you

23  sign off on it.

24      Q      But nothing beyond parking?

25      A      In terms of signing things?

317

```
 1              ANUCHA BROWNE SANDERS
 2   around Thanksgiving time?
 3              MS. VLADECK:  Objection to
 4        form.
 5        A     Why did what have to be done
 6   around Thanksgiving time?
 7        Q     Doing this investigation and
 8   writing up the careful reports that you
 9   got written up?
10              MS. VLADECK:  Objection to
11        form.
12        A     "Careful reports."  I guess I
13   need to know what you are referring to.
14              MR. PARCHER:  Okay.  Let's
15        pull them.
16        Q     Did you go to any other lawyer
17   before going to Ms. Vladeck to consult
18   about these issues that you sued on?
19              MS. VLADECK:  Yes or no.  You
20        can just answer yes or no.
21        A     No.  I didn't see anybody
22   else.
23        Q     And Ms. Vladeck was
24   recommended to you by Karen Buchholz?
25        A     Yes.
```

318

ANUCHA BROWNE SANDERS

1

2     Q    And she was recommended by

3 Karen Buchholz at the same time that you

4 were conducting these investigations,

5 right?

6     MS. VLADECK:  Objection to

7    form.

8     A    I think at the very end of

9 them.  It was as a result -- it was at the

10 end of the investigations.

11     Q    Did you ask Karen to recommend

12 a lawyer to you?

13     A    Karen volunteered that

14 information to me.

15     Q    You brought Karen to Anne as

16 well, didn't you?

17     MS. VLADECK:  Objection to

18    form.

19    A    Karen asked to come with me.

20    Q    She made a request?

21    A    She wanted to come with me.

22    Q    You didn't pressure her?

23    A    No, I didn't.

24    Q    Did you tell her that she had

25 been sexually harassed, too?

344

ANUCHA BROWNE SANDERS

1

2   responsibility for parts of the P&L.

3        Q     But the ultimate

4   responsibility for P&L and the budgeting

5   at the Garden, as related to the Knicks,

6   was yours, correct?

7             MS. VLADECK:  Objection to

8        form.

9        A     I would consider myself a P&L

10  manager, and in that role, I had people

11  providing me information.

12            The ultimate ownership of the

13  P&L --

14       Q     Sorry.  I was rude, but I did

15  not mean to be rude.  Would you mind

16  saying it again.

17       A     In my role, I was the P&L

18  manager.  So I owned the revenue streams.

19  The budget process was a collaborative

20  process, and it involved myself, it

21  involved Mark Piazza who oversaw P&L for a

22  number of different entities, as well as

23  Brian LaFemina who oversaw suites and

24  tickets and some of the ticket sales

25  responsibilities.

1              ANUCHA BROWNE SANDERS

2    with him.  He said he wanted to spend some

3    time with me privately.

4          Q      What was the first one?

5          A      That was the first one.

6          Q      You said something before

7    off-site.

8          A      No, that was it.

9              MR. PARCHER:  Could you read

10         it back.

11             (Requested portion of record

12         read:  "A.  One was Isiah asked me

13         what I thought of his staff.  He also

14         asked me in that same meeting if I

15         would go off-site with him.  He said

16         he wanted to spend some time with me

17         privately.")

18         Q      So where did this meeting take

19   place?

20         A      That meeting took place in his

21   office.

22         Q      At the Garden?

23         A      At the Garden.

24         Q      Anybody else present?

25         A      No.  Not in that meeting, no.

369

ANUCHA BROWNE SANDERS

1

2      Q      Any witnesses?

3      A      No, not that I know of.

4      Q      Any e-mails or other writings

5   on your part?

6      A      About this request to go

7   off-site?

8      Q      Well, about that meeting that

9   you say you had in his office between

10   December and March?

11      A      I told Steve about that

12   meeting.

13      Q      Okay.  But Steve wasn't a

14   witness.  Steve is a witness to what you

15   said.

16            But there was no witness to

17   whatever the conversation was; am I

18   correct?

19      A      Not that I know of.  I don't

20   think there were.

21      Q      It's not in your diary?

22      A      I don't think so.

23      Q      What were you doing in a man's

24   office by yourself?

25      A      Did you ask me what I was

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

370

ANUCHA BROWNE SANDERS

2    doing in a man's office?

3        Q     In that man's office.

4        A     You did say "a man's office."

5        Q     I didn't say it, and if I did

6    say it, I didn't mean it.  I mean what I

7    say.

8             And what I'm saying to you is

9    in that man's office.  I don't see any

10   problem with you going into a man's

11   office, unless you see a problem with it.

12   I don't see a problem with it.

13           I am talking about Isiah

14   Thomas, the man you are accusing of having

15   cursed at you, right, unremittently for

16   approximately a year, without stop, and

17   then, came up to you bizarrely, put his

18   arm around you and told you that he loved

19   you.

20           I'm asking you what you were

21   doing in that man's office by yourself?

22           MS. VLADECK:   Object to form.

23       Argumentative.

24           Do you have a question without

25       a preamble?

371

ANUCHA BROWNE SANDERS

1

2          MR. PARCHER:  That's my

3     question.

4          MS. VLADECK:  Object to form.

5          And I think it's improper.

6     A     To answer your question and

7     just to clarify.

8          I didn't say that he loved me.

9     He said he was in love with me.

10    Q     In love with you.

11    A     Yes.

12    Q     Did you believe him?

13         MS. VLADECK:  Asked and

14    answered.

15    A     Didn't know what to think.

16    Didn't know what to think.

17    Q     There's a chance that he meant

18    it, in your mind?

19    A     He could have.  I am not

20    psychoanalyst.  I am not trying to read

21    what he's thinking.

22    Q     Have you been to a

23    psychoanalyst?

24         MS. VLADECK:  I direct her not

25    answer.

372

ANUCHA BROWNE SANDERS

(Directive to witness.)

MR. PARCHER:  On what grounds?

MS. VLADECK:  It has no

relevance to this case.

MR. PARCHER:  I think it does.

You directed her not to

answer?

MS. VLADECK:  Correct.

A    I was still responsible for

moving forward the business and keeping

him updated.  There was a reason why I was

in his office.  I don't recall why I was

in his office the day he asked me to go

off-site with him.

Q    I thought the whole idea was,

starting back in March of '04, that you

were to go through Murphy.

Wasn't that the whole point of

the Mills/Thomas meeting in March of '04?

MS. VLADECK:  Objection to

form.  Mischaracterizes the

testimony.

A    The meeting that I had with

him in Steve's office, he directed me not

373

ANUCHA BROWNE SANDERS

1

2    to speak to his staff, his basketball

3    operations staff, and players, and he said

4    if I had any request to go through Frank

5    Murphy?  He didn't direct me not to speak

6    to him.

7         Q     I see.

8               So you comfortably went into

9    his office sometime when?  When did this

10   meeting take place?

11              MS. VLADECK:  Objection to

12        form.  Mischaracterizes the

13        testimony.

14        A     Can you please ask that again?

15        Q     When did the meeting take

16   place that we're talking about now?

17        A     In early 2005.

18        Q     That would be January, when

19   you say "early"?  January or February?

20        A     It was January/February, yes.

21        Q     Is there a reason why you

22   didn't write it down in your diary?

23        A     Some things I wrote down, and

24   some things I didn't.

25        Q     That's the only reason you

374

```
 1                ANUCHA BROWNE SANDERS
 2   could give me, right?
 3        A    Yes.
 4        Q    And he's asking you what he
 5   thinks of his staff?
 6             MS. VLADECK:   Objection to
 7        form.
 8        A    He is asking me what I think
 9   of his staff.
10        Q    Correct.
11        A    That was something he asked
12   me, yes.
13        Q    And in the context of that
14   conversation, he says, "I would like to
15   meet you off-site to plan"?
16        A    He wants to go off-site with
17   me.  He wants to spend private time with
18   me.
19        Q    He wants to spend private time
20   with you?
21        A    Yes.
22        Q    Did he say the words "to
23   plan"?
24        A    No, he didn't.
25        Q    He didn't use the words "to
```

399

ANUCHA BROWNE SANDERS

1

2    Q    At Gate 1?

3    A    At Gate 1.

4    Q    So the world was there to see,

5 if they wanted to?

6    A    To see?

7    Q    To see.  If anybody looked

8 over at Gate 1, can see what was going on?

9    A    Yes, they could see me and

10 Isiah standing next to each other.

11    Q    And at this time, he also

12 tells you that he's in love with you?

13    A    Yes.

14    Q    And -- but this time he says

15 to you, "I know you think I'm

16 inappropriate," right?

17    A    Yes.

18    Q    And this all starts by

19 referring to the scar that he has, and

20 frankly, I can't notice it from this

21 distance.

22         But apparently you have a

23 scar, too, over one of your eyes?

24    A    He started by saying he

25 noticed a scar over my eyebrow, yes.

# CABLEVISION'S POLICIES

## Harassment Prevention Policy

OUR COMPANY HAS a zero tolerance policy against harassment, discrimination or other improper conduct on the basis of sex, race, color, age, national origin, citizenship, marital or domestic partner status, veteran status, sexual orientation or preference, religion or religious creed, ancestry, physical or mental disability or handicap or any other characteristic protected by law. This conduct is prohibited in the workplace.

Cablevision requires that managerial and supervisory employees be diligent in addressing and preventing such conduct. Any managerial or supervisory employee who receives a complaint about, becomes aware of, or observes conduct that is or could be considered harassing, discriminatory, improper, inappropriate, or in violation of this policy, is required to promptly report such complaint or conduct to Employee Relations.

We require that everyone refrain from conduct that is, or could be considered, harassing or discriminating. Consequently, this policy against sexual and other harassment, discrimination and other abusive conduct applies to conduct by our employees toward their co-workers as well as conduct by or toward our customers, consultants, suppliers or visitors.

Prohibited practices include the following:

(1)  abusing the dignity of an employee, co-worker, consultant, supplier, customer or visitor through unwelcome, insulting, degrading or otherwise offensive remarks or conduct;

(2)  engaging in conduct or making remarks that are unwelcome, insulting, degrading to otherwise offensive to or about an employee, co-worker, consultant, supplier, customer or visitor;

(3)  unreasonably interfering with an employee's work performance or creating an intimidating, hostile, humiliating or otherwise offensive work environment by, for example, engaging in:

- offensive or unwelcome sexual flirtations, advances, or propositions;

- verbal or non-verbal abuse of a sexual, racial or ethnic nature or based on another characteristic protected by law;

- vulgar comments or gestures about an individual's body or physical or mental attributes;



CONFIDENTIAL

MSG 12852

- the use of sexually, racially, ethnically or otherwise degrading words or gestures to describe an individual or an individual's group;

- the display, in our workplace, of sexually suggestive or offensive objects or pictures; or

- the distribution of sexually explicit or otherwise abusive or offensive e-mail, voice mail or other communications which show hostility or aversion toward an individual or group because of certain personal characteristics protected by law.

(4) retaliating against an employee for complaining about harassing or discriminatory behavior, or for furnishing information or participating in any manner in any investigation of such behavior; and

(5) requiring submission by customers, visitors, consultants or suppliers to any of the foregoing behaviors as a condition of doing business with Cablevision.

We want all employees to know they can work in security and dignity and need not endure unwelcome, degrading, unprofessional, abusive or exploitative treatment or conduct. Submission to unwelcome conduct or any form of harassment and/or discrimination is not and never will be a term or condition of your employment with Cablevision.

Cablevision considers harassment, discrimination and abusive conduct to be serious misconduct. They are also unacceptable in the workplace. Any employee found to have harassed, discriminated against, or been abusive or insulting toward another employee or to a customer, consultant, supplier, visitor or other person covered by this policy will be subject to corrective action, up to and including suspension and/or termination of employment.

## COMPLAINT PROCEDURE

### IMPORTANT NOTICE TO ALL EMPLOYEES:

Employees who have experienced conduct they believe is contrary to this policy have an obligation to take advantage of this complaint procedure. If you believe you have been or are being discriminated against, harassed or otherwise treated improperly, or believe some other employee is engaging in or receiving such treatment or conduct, you should contact your local Employee Relations Manager immediately. The local Employee Relations Manager has the primary responsibility for investigating and resolving any complaint of sexual or other harassment, discrimination or other improper or abusive conduct.

If you believe it is more appropriate given the particular circumstances, you may contact Corporate Employee Relations to report your complaint. Please also feel free to contact the following persons directly: Robert Doodian, Vice President, Employee Relations & Staffing at (516) 803-3140 for Corporate, Rainbow and Lightpath, Sue Crickmore, Vice President, Employee Relations Policy & Operations at (516) 803-4061 for Cable & Communications and

CONFIDENTIAL

MSG 12853

John Moran, Vice President, Employee & Labor Relations at (212) 465-6775 for MSG, Radio City Music Hall and Hartford Civic Center.

If you have not received a satisfactory response within five (5) business days after reporting any incident, which you perceive to be harassment, discrimination or abusive conduct, please immediately contact any member of our CEO's staff who will ensure that an investigation is immediately conducted.

All complaints will be fully and promptly investigated and, where necessary, appropriate corrective action or other steps will be taken. Such action may include counseling, informal or formal reprimands, written or verbal warnings, suspension, reduction in pay, reduction in duties, transfers, and other formal sanctions, up to and including termination of employment.

All actions taken to investigate and resolve such complaints will be conducted in confidence to the greatest extent possible. There will be no retaliation for raising or pursuing such complaints. When we have completed our investigation, we will inform the person filing the complaint of the completion of the matter.

## RETALIATION IS PROHIBITED

Cablevision will not in any way retaliate, nor permit any Cablevision personnel to retaliate, against anyone who makes a complaint or report of harassment or discrimination, or participates in the investigation of such a complaint or report. Conduct of this nature is a serious violation of this policy and will itself result in disciplinary action against any individual who engages in such conduct.

Revised: October 2004

CONFIDENTIAL

MSG 12854

RECEIPT OF CABLEVISION'S HARASSMENT PREVENTION POLICY

Having received and read through Cablevision's policy prohibiting sexual and other harassment and discrimination, I fully understand my obligation to comply with this policy. I understand that I will be subject to corrective action up to and including termination of my relationship with the Company if I do not comply with this policy.

Employee Name

_____
(please print)

Employee Signature

_____          Date: _____

CONFIDENTIAL

MSG 12855

From:           Browne Sanders, Anucha
Sent:           Monday, November 28, 2005 1:02 PM
To:             Mills, Steve
Subject:        RE: Hassan Gonsalves

Hi Steve,
I just met with ██████ to ask her specifically what her experience has been with Hassan Gansalves. ████ said that she has become very uncomfortable with Hassan. Here are some of the comments that were said to her by Hassan:
"I want you to fuck me. When are you coming to my apartment"
"I want you to suck my dick"
"I talked to Stephon and he said to tell you to stop playing"
This past weekend Hassan sent ████ a text message which said "When can I stick it in"

I would like to terminate Hassan today. He will be here this afternoon at 5:00 pm.


----Original Message----
From:       Browne Sanders, Anucha
Sent:       Monday, November 28, 2005 12:31 PM
To:         Mills, Steve
Subject:    Hassan Gonsalves

Steve
Need to address some issues that I discussed with you regarding Hassan. It was brought to my attention that he has made a number of inappropriate comments to women on the staff.

To ████ "Sat in her office cube and said "I hear you give good head"
Hunter brought this to my attention this morning as ████ told him last week. A number of other things have been said to ████. This one was specifically brought to Hunter's attention last week.

To ████ "You look good, you look good, I bet that pussy is good too"
████ brought this to Karin Buchholz's attention and Karin relayed it to me this morning. ████ said that if it were anyone else, she would have said something sooner but since it was Stephon's cousin, she didn't feel that she could say anything.

████ has told me that he put his hands on her waist and her leg and she told him to keep his hands off of her.

A member of the ████ brought to my attention that Hassan routinely rolls down the windows of the Groove Truck and give "cat calls" to women on the street.

Other members of the staff (Dan Gladstone, Courtney Carter) have said that Hassan routinely says that he can do anything he wants and that if he doesn't like something all he needs to do is call Isiah or Steve and he gets whatever he wants.

Steve, I have a meeting with you this afternoon. Let's discuss how we should proceed.

Thank You

Anucha Browne Sanders
Senior Vice President
Marketing and Business Operations
New York Knicks
212-465-6432

REDACTED



i

CONFIDENTIAL

MSG 00250

From:       Browne Sanders, Anucha
Sent:       Monday, November 28, 2005 2:49 PM
To:         Moran , John VP ER MSG
Subject:    FW: Hassan Gonsalves

REDACTED

-----Original Message-----
From:       Browne Sanders, Anucha
Sent:       Monday, November 28, 2005 1:02 PM
To:         Mills, Steve
Subject:    RE: Hassan Gonsalves

Hi Steve,
I just met with ▮▮▮▮▮▮ to ask her specifically what her experience has been with Hassan Gansalves ▮▮▮▮▮ said
that she has become very uncomfortable with Hassan. Here are some of the comments that were said to her by Hassan:
"I want you to fuck me. When are you coming to my apartment"
"I want you to suck my dick"
"I talked to Stephon and he said to tell you to stop playing"
This past weekend Hassan sent ▮▮▮▮ a text message which said "When can I stick it in"

I would like to terminate Hassan today. He will be here this afternoon at 5:00 pm.

-----Original Message-----
From:       Browne Sanders, Anucha
Sent:       Monday, November 28, 2005 12:31 PM
To:         Mills, Steve
Subject:    Hassan Gonsalves

Steve
Need to address some issues that I discussed with you regarding Hassan. It was brought to my attention that he has
made a number of inappropriate comments to women on the staff.

To ▮▮▮▮▮▮ sat in her office cube and said "I hear you give good head"
Hunter brought this to my attention this morning as ▮▮▮▮ told him last week. A number of other things have been said
to ▮▮▮▮ this one was specifically brought to Hunter's attention last week.

To ▮▮▮▮▮▮ You look good, you look good, I bet that pussy is good too"
▮▮▮▮ brought this to Karin Buchholz's attention and Karin relayed it to me this morning. ▮▮▮▮▮ said that if it were
anyone else, she would have said something sooner but since it was Stephon's cousin, she didn't feel that she could
say anything.

▮▮▮▮▮▮ has told me that he put his hands on her waist and her leg and she told him to keep his hands off
of her.

A member of the ▮▮▮▮▮▮ brought to my attention  that Hassan routinely rolls down the
windows of the Groove Truck and give "cat calls" to women on the street.

Other members of the staff (Dan Gladstone, Courtney Carter), have said that Hassan routinely says that he can do
anything he wants and that if he doesn't like something all he needs to do is call Isiah or Steve and he gets whatever
he wants.

Steve, I have a meeting with you this afternoon. Let's discuss how we should proceed.

Thank You

Anucha Browne Sanders

MSG 00251

CONFIDENTIAL

Senior Vice President
Marketing and Business Operations
New York Knicks
212-465-6432

2

MSG 00252

CONFIDENTIAL