Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
ANUCHA BROWNE SANDERS,

                    Plaintiff,

          -against-              06 CV 0589 (GEL)

MADISON SQUARE GARDEN, L.P.,
ISIAH LORD THOMAS III and JAMES L. DOLAN,

                    Defendants.
---------------------------------------X


   VIDEOTAPED DEPOSITION OF ANUCHA BROWNE SANDERS

              New York, New York

           Tuesday, November 28, 2006


REPORTED BY:

BARBARA R. ZELTMAN

JOB NO.: 10957

20

ANUCHA BROWNE SANDERS

1

2    form.

3    A    Not that I can recall.

4    Q    And what are the circumstances

5    of you using profanity in the workplace?

6    A    I was usually in my office and

7    may have been speaking about something

8    with my secretary.

9    Q    So you would say it in the

10    presence of your staff?

11    MS. VLADECK:  Objection to

12    form.

13    A    I would say it in the presence

14    of my secretary.

15    Q    Wasn't she a member of your

16    staff?

17    A    Yes.

18    Q    Did you use profanity on the

19    phone or otherwise in the presence of

20    anyone else other than your secretary?

21    A    I might have said, "This is

22    bullshit" in a meeting.

23    Q    And who might be attending the

24    meeting at which you used profanity?

25    MS. VLADECK:  Objection to

25

```
 1                ANUCHA BROWNE SANDERS
 2    individuals."
 3                Did you consider the
 4    inappropriate use of profanity in the
 5    presence of your staff to be the use of
 6    obscene or vulgar language?
 7                MS. VLADECK:  Objection to
 8         form.
 9         A    I didn't consider it to be
10    obscene language.
11         Q    Do you consider it to be
12    vulgar language?
13         A    I don't consider it vulgar
14    language.
15         Q    But inappropriate?
16         A    Yes.
17         Q    Yesterday you were shown and
18    identified Browne Sanders Exhibit 3 which
19    is Cablevision's harassment prevention
20    policy.
21                Do you recall testifying
22    yesterday that you had seen this policy or
23    one very much like it during your
24    employment at Madison Square Garden?
25                MS. VLADECK:  Objection to
```

26

ANUCHA BROWNE SANDERS

2  form.

3    A    Yeah, this is probably

4  something I saw in a pile of documents. I

5  may have seen it, I guess.

6    Q    When you worked at Madison

7  Square Garden, did you consider its

8  policies concerning harassment prevention

9  important?

10    MS. VLADECK:  Objection to

11  form.

12    A    Yes, I did.

13    Q    So if you saw it in a pile of

14  documents, would you have taken the time

15  to read it?

16    A    If I saw this, it was probably

17  within a pile of documents that I saw the

18  very first day of work, which included my

19  benefits information, everything that they

20  present to you in the first day of work.

21    Q    And on the very first day of

22  work in the year 2000, were you a manager?

23    A    Yes, I was vice president.

24    Q    Did you have responsibilities

25  to ensure that the workplace was free of

27

1              ANUCHA BROWNE SANDERS

2    harassment for those who worked for you?

3          A    Yes, I did.

4          Q    Did you have an obligation to

5    become familiar with the policies that

6    governed their workplace as well as yours?

7          A    Yes.

8          Q    Were you someone they would go

9    with complaints if they thought they were

10   a victim of harassment?

11         A    Yes.

12              MS. VLADECK:  Objection to

13        form.

14         Q    So you knew you had to

15   understand the policies as a manager,

16   didn't you?

17              MS. VLADECK:  Objection to

18        form.

19         A    I had a -- I had a general

20   understanding of the policies.

21              Throughout my employment

22   there, there was one other time where I

23   took some online training.

24         Q    Would you take a look at the

25   page that's now Bates stamped 12853 in

30

                    ANUCHA BROWNE SANDERS

1

2    in or receiving such treatment or conduct,

3    you should contact your local employees

4    relations manager immediately.  The local

5    employee relations manager has primary

6    responsibility for investigating and

7    resolving any complaint of sexual or other

8    harassment, discrimination or other

9    improper or abusive conduct.  If you

10   believe that it is -- it is more

11   appropriate given the particular

12   circumstances, you may contact corporate

13   employee relations to -- you may contact

14   corporate employee relations to report a

15   complaint."

16        Q    You can stop there because

17   that's the second paragraph now.  It's

18   okay.

19        A    What did you ask me?

20        Q    The first paragraph.

21        A    Okay.  I'm sorry.  You didn't

22   stop me.  But I'll keep reading.

23        Q    You understood then, did you

24   not, when you first read this policy and

25   during the years you were manager charged

98

```
 1              ANUCHA BROWNE SANDERS

 2     continued to address Browne Sanders in a

 3     hostile and abusive manner, Thomas began

 4     to approach Browne Sanders with sexual

 5     overtures.  After the Knicks game on or

 6     about December 29, 2004, Thomas stopped

 7     Browne Sanders, hugged her tightly and

 8     said that he had determined why he and

 9     Browne Sanders 'had problems' with one

10     another.  Thomas told Browne Sanders that

11     he was 'in love' with her and said that

12     they were 'so much alike.'"

13              Thomas compared his feelings

14     to whom he loved and basketball.

15              Ms. Browne Sanders, you say in

16     your Second Amended Complaint that

17     Mr. Thomas said he was in love with you on

18     the 29th of November 2004, and you just

19     said under oath that he said that to you

20     for the first time in March of 2005.

21              Which is it?

22              MS. VLADECK:  Objection to

23         form.  Mischaracterizes the

24         testimony.

25         A    Well, to be very clear with
```

122

ANUCHA BROWNE SANDERS

1

2    A    Yes, from time to time.

3    Q    You went to the Knicks locker

4    room or reception area in their locker

5    room from time to time?

6        MS. VLADECK:  Objection to

7    form.

8    A    Yes, I did.

9    Q    And you went to the practice

10    facility in Westchester County from time

11    to time?

12    A    Yes.

13    Q    After Mr. Thomas came in, did

14    there come a time when it became clear to

15    you Mr. Thomas didn't want you to travel

16    with the team?

17        MS. VLADECK:  Objection to

18    form.  Asked and answered.

19    A    Only -- only my interactions

20    with him where he was calling me a bitch

21    and a ho and a mother fucker, I made some

22    assumptions from those interactions with

23    him.

24    Q    I am not asking for

25    assumptions.  I'm asking if you came to

123

ANUCHA BROWNE SANDERS

1

2  learn that Mr. Thomas did not think you

3  belonged on the bus or on a plane where

4  the team was traveling, you had no

5  business traveling with the team.  Did you

6  come to learn that that was his belief and

7  intention?

8      MS. VLADECK:  Objection to

9      form.

10     A    No, that was never

11  communicated to me.

12     Q    And when you went to the

13  Knicks' locker room or reception area, did

14  there come a time where you learned that

15  Mr. Thomas didn't want you in the locker

16  room or the reception area for the locker

17  room either?

18     A    Never communicated to me.

19     Q    Did you ever go in the locker

20  room itself, by the way?

21     MS. VLADECK:  Asked and

22     answered.

23     A    Not when there were players

24  present.  Never went in the locker room.

25     Q    So when the players were in

136

ANUCHA BROWNE SANDERS

1

2   "Did you receive any feedback from Steve

3   Mills, president and chief operating

4   officer, about interactions with other

5   divisions and/or outside vendors?"

6         The answer is "No."

7         Is no a truthful answer to the

8   question I just read to you?

9     A    Yes.

10         MS. VLADECK:  Objection to

11     form.

12     Q    Did Mr. Mills ever tell you,

13   for example, that security or facilities

14   at the Garden had some questions

15   concerning your performance?

16         MS. VLADECK:  Objection to

17     form.

18     A    Not questions with regards to

19   my performance, no.

20     Q    Was there a time when

21   Mr. Mills acquainted you with the fact

22   that facilities or security was concerned

23   about an open practice event that you were

24   responsible for?

25         MS. VLADECK:  Objection to

137

ANUCHA BROWNE SANDERS

1

2     form.

3        A     Yes.

4        Q     And would it be truthful to

5     say that facilities or security didn't

6     agree with you with respect to some

7     aspects of the open practice?

8              MS. VLADECK:  Objection to

9        form.

10       A     I would say that facilities or

11    security identified that there was

12    miscommunication on the day of the open

13    practice.

14       Q     And their view was, whether

15    you agree with or it or not, that you did

16    not properly advise them of the scope of

17    attendance to anticipate at the open

18    practice which in their view created a

19    security concern; would that be fair?

20             MS. VLADECK:  Objection to

21       form.

22       A     Yes.

23       Q     Would you consider that to be

24    feedback from Mr. Mills about your

25    interaction with facilities or security?

149

                    ANUCHA BROWNE SANDERS

1

2    aware of this and I didn't go to anybody

3    else until I got clearance from my first

4    line manager which was Steve Mills.

5        Q    Any reason -- do you know of

6    any reason why she would have omitted that

7    from your response?

8            MS. VLADECK:  Objection to

9        form.

10       A    No.  But it was a three-hour

11   meeting.  I mean, these five or eight

12   pages could probably go on for a long

13   time.  I don't know what she was taking

14   notes down of and what she wasn't.

15       Q    Did you have a good

16   professional relationship with John Moran

17   when you worked at the Garden?

18           MS. VLADECK:  Objection to

19       form.

20       A    I did.  I think I did, yes.

21       Q    Did you have lunch with him

22   from time to time?

23       A    No, I don't think we ever went

24   out to lunch.

25       Q    Did you see him most work

187

1                ANUCHA BROWNE SANDERS

2      A      August of 1989.

3      Q      To your current husband?

4      A      Yes.

5             (Browne Sanders Exhibit K,

6        MSG-12856 through 12858, was marked

7        for Identification.)

8             MS. VLADECK:  This is K,

9      right?

10             MR. GREEN:  This is K.

11      Q      We've marked this as

12   Exhibit BS-K for Identification.  It's a

13   three-page document entitled Cablevision's

14   Policies, Harassment Prevention Policy.

15   Third page says "Revised March 2004."

16      A      Now, is this the one I looked

17   at this morning?

18      Q      I honestly don't know.  This

19   one says "Revised March 2004," so I ask

20   you if you recall receiving a copy of this

21   policy after its revision in March 2004.

22      A      It looks exactly like the one

23   I saw this morning.  That's why I asked

24   you the question.

25             You are asking me if I have

188

ANUCHA BROWNE SANDERS

1

2  seen it?  I may have seen this.

3      Q      Okay.

4          Would you look at the second

5  page, please, under Complaint Procedure,

6  Important notice to all employees.

7          MS. VLADECK:  Where are you?

8          MR. GREEN:  Second page.

9      Q      Referring to the policies set

10  forth on Page 1, it says, "Employees who

11  have experienced conduct they believe is

12  contrary to this policy have an obligation

13  to take advantage of this complaint

14  procedure.  If you believe you have been

15  or are being discriminated against,

16  harassed or otherwise treated improperly,

17  or believe some other employee is engaging

18  in or receiving such treatment or conduct,

19  you should contact your local employee

20  relations manager immediately.  The local

21  employee relations manager has the primary

22  responsibility for investigating and

23  resolving any complaint of sexual or other

24  harassment, discrimination or other

25  improper or abusive conduct."

189

```
 1           ANUCHA BROWNE SANDERS
 2           Do you know what that means?
 3           MS. VLADECK:  Objection to
 4       form.
 5       A     Yes.  In the next paragraph,
 6   it says, "If you believe it is more
 7   appropriate, given the particular
 8   circumstances, you may contact Corporate
 9   Employee Relations to report your
10   complaint.  You may also feel free to
11   contact the following persons directly:
12   Robert Doodian, vice president employee
13   relations and staffing, at phone number
14   for Corporate Rainbow and Light Path.  Sue
15   Crickmore, vice president employee
16   relations policy and operations, at
17   telephone number for cable and
18   communications.  And John Moran, vice
19   president employee and labor relations at
20   telephone number for MSG, Radio City Music
21   Hall and Hartford Civic Center."
22           Do you understand what all
23   that means?
24           MS. VLADECK:  Objection to
25       form.
```

261

ANUCHA BROWNE SANDERS

1

2    being cursed out and seeing the hostility

3    that he engaged in when I was having a

4    direct conversation with him to then

5    engage him again in front of Steve.

6         My perspective was that Steve

7    would manage the situation.  Steve my was

8    direct manager and that's who I went to to

9    complain countless times.

10        Q    When Scott Layden was at the

11   Garden, did you attend the draft with him

12   in the draft war room?

13        A    I was part of a very large

14   team that was in the draft room.

15        Q    Did you have the same access

16   when Mr. Thomas came in?

17        A    I'm trying to think of the

18   first year he was there.

19        They moved -- they moved the

20   rooms around so it was much smaller

21   quarters.  I think I was in the draft

22   room.  I don't think that I was in the

23   same position or same placement around the

24   table that I was when Scott was there.

25        Q    Was that because you had a

262

ANUCHA BROWNE SANDERS

1

2  different relationship with Mr. Thomas

3  than you had with Scott Layden?

4          MS. VLADECK:  Objection to

5      form.

6      A    I wouldn't say it was because

7  we had a different relationship.  I think

8  Isiah had a different philosophy and what

9  his needs were on draft night.

10     Q    And what did you understand

11  that different philosophy to be?

12     A    That he wanted only certain

13  people in that immediate vicinity of him

14  as he made decisions on draft-eligible

15  players.

16     Q    And you were not among those

17  he selected to be around him?

18     A    No.

19     Q    Would you say that when you

20  were working at the Garden along with

21  Mr. Nix, the two of you had a good

22  friendship?

23          MS. VLADECK:  Asked and

24      answered six times.

25     A    Yes.

```
 1              ANUCHA BROWNE SANDERS
 2   assembling for the open practice.
 3              Is that consistent with your
 4   recollection of the crowd that appeared
 5   that day?
 6              MS. VLADECK:  Objection to
 7        form.
 8        A    For the open practice, yes,
 9   there was a large crowd.
10              (Browne Sanders Exhibit FF,
11         MSG-6902 through 6904, was marked
12         for Identification.)
13        Q    Ms. Browne Sanders, I show you
14   a copy of what we've marked for
15   Identification as Exhibit FF, a series of
16   e-mails the most recent of which is
17   November 1, 2005.
18              When did you first become
19   aware that Steven Collins had written to
20   Tim Hassett critical of your
21   decision-making with the open practice?
22              MS. VLADECK:  Objection to
23        form.
24        A    Let me just read it.
25        Q    Sure.
```

352

```
 1              ANUCHA BROWNE SANDERS

 2   investigation of Stephon Marbury, Hassan

 3   Gonsalves, Vernon Manuel, bring all that

 4   to the attention of Mr. Mills at about the

 5   same time?  That's just a coincidence?

 6              MS. VLADECK:  Objection to

 7        form.  Asked and answered.  We went

 8        through this yesterday at length.

 9        A    The investigation of Hassan

10   Gonsalves was based on sexual harassment

11   complaints that came it my attention and I

12   brought to Steve Mills.

13              At that point, Steve said --

14   and it's document because we went through

15   that today or yesterday -- to have Dan and

16   Karen document the performance issues

17   related to those two employees over the

18   course of their employment.  That was the

19   point that I said to Dan and Karen, "Steve

20   wants you to document the performance

21   issues."

22        Q    Did Mr. Mills ask you to

23   document the conversation that Stephon

24   Marbury had with Dan Gladstone?

25              MS. VLADECK:  Objection to
```

353

ANUCHA BROWNE SANDERS

1

2      form asked and answered.

3          A     No, he didn't.

4          Q     Did Mr. Mills tell you to send

5      a copy of Mr. Gladstone's memo to your

6      friend Jeff Nix?

7               MS. VLADECK:   Objection to

8          form.

9          A     No, he didn't.

10         Q     Why would you send something

11     as sensitive as the memorandum attributing

12     certain comments to Mr. Marbury to your

13     friend Mr. Nix who had no involvement in

14     that entire process?

15              MS. VLADECK:   Objection to

16         form.   Mischaracterizes the evidence.

17         A     I saw Jeff as a senior person

18     in the Knicks organization and I sent it

19     to him.   I was very concerned after he

20     wrote about what Stephon said about me.   I

21     was threatened and I felt that my safety

22     was in jeopardy.   I didn't find any

23     problem sending a note where a member of

24     the Knicks basketball team is referring to

25     me as a black bitch and telling me that

355

ANUCHA BROWNE SANDERS

1
2      6:36 p.m.  Going off the record.
3           MS. VLADECK:  How much time do
4      we have left?
5                (A brief recess was
6        taken.)
7           THE VIDEOGRAPHER:  Time is
8      6:54 p.m.  Back on the record.
9           (Browne Sanders Exhibit GG,
10       MSG-249, was marked for
11       Identification.)
12     Q     Ms. Browne Sanders, I show you
13   a copy of what we've marked for
14   Identification as Exhibit BS-GG.
15          It's e-mail from you to
16   Mr. Mills, subject:  Haasan Gonsalves,
17   sent on Monday, November 28, 2005 at
18   12:31 in the afternoon.
19          It begins with, "Steve, need
20   to address some issues that I discussed
21   with you regarding Haasan.  It was brought
22   to my attention he has made a number of
23   inappropriate comments to women on the
24   staff."  And it continues.
25          Is this, Ms. Browne Sanders,

356

ANUCHA BROWNE SANDERS

1

2    the communication to Mr. Mills that

3    brought about the conversation in which he

4    told you to get an investigation underway

5    and document what occurred?

6              MS. VLADECK:  Objection to

7         form.

8         A    This is not the note that

9    prompted it.  The conversation that I had

10   with him prompted it.

11        Q    When was the conversation?

12        A    It may have been earlier that

13   day or it might have been on Friday.

14        Q    So either Friday the 25th or

15   earlier on Monday the 28th of November,

16   2005, you had a conversation with

17   Mr. Mills that you assert lead to his

18   telling you to look into the matter more

19   fully?

20             MS. VLADECK:  Objection to

21        form.

22        A    Yes.

23        Q    So prior to the conversation

24   of Friday the 25th or Monday the 28th,

25   you had not yet received instruction to

357

                    ANUCHA BROWNE SANDERS

1
2    look into the matter of Mr. Gonsalves more

3    fully?

4                    MS. VLADECK:  Objection to

5        form.

6        A    Sorry?  Prior to --

7        Q    Prior to Friday 25th or

8    Monday the 28th.

9        A    I don't know the exact timing,

10   but it was based on conversation that I

11   had with Steve Mills.  I don't know the

12   exact date of that conversation --

13       Q    But your best recollection is

14   it was earlier --

15                   MS. VLADECK:  Sorry, Ron.

16       A    -- but it was around this

17   particular time.

18       Q    Meaning the day of the memo,

19   Monday the 28th or the preceding Friday,

20   as best you can recall?

21       A    It was within this time

22   frame -- within the week.

23       Q    Your memo to Mr. Mills begins,

24   "Need to address some issues that I

25   discussed with you regarding Hassan."

# CABLEVISION'S POLICIES

## Harassment Prevention Policy

OUR COMPANY HAS a zero tolerance policy against harassment, discrimination or other improper conduct on the basis of sex, race, color, age, national origin, citizenship, marital or domestic partner status, veteran status, sexual orientation or preference, religion or religious creed, ancestry, physical or mental disability or handicap or any other characteristic protected by law. This conduct is prohibited in the workplace. Cablevision requires that managerial and supervisory employees be diligent in addressing and preventing such conduct.

We require that everyone refrain from conduct that is, or could be considered, harassing or discriminating. Consequently, this policy against sexual and other harassment, discrimination and other abusive conduct applies to conduct by our employees toward their co-workers as well as conduct by or toward our customers, consultants, suppliers or visitors.

Prohibited practices include the following:

(1) abusing the dignity of an employee, co-worker, consultant, supplier, customer or visitor through unwelcome, insulting, degrading or otherwise offensive remarks or conduct;

(2) engaging in conduct or making remarks that are unwelcome, insulting, degrading to otherwise offensive to or about an employee, co-worker, consultant, supplier, customer or visitor;

(3) unreasonably interfering with an employee's work performance or creating an intimidating, hostile, humiliating or otherwise offensive work environment by, for example, engaging in:

- offensive or unwelcome sexual flirtations, advances, or propositions;

- verbal or non-verbal abuse of a sexual, racial or ethnic nature or based on another characteristic protected by law;

- vulgar comments or gestures about an individual's body or physical or mental attributes;

- the use of sexually, racially, ethnically or otherwise degrading words or gestures to describe an individual or an individual's group;

- the display, in our workplace, of sexually suggestive or offensive objects or pictures; or

CONFIDENTIAL

MSG 12856

- the distribution of sexually explicit or otherwise abusive or offensive e-mail, voice mail or other communications which show hostility or aversion toward an individual or group because of certain personal characteristics protected by law.

(4) retaliating against an employee for complaining about harassing or discriminatory behavior, or for furnishing information or participating in any manner in any investigation of such behavior; and

(5) requiring submission by customers, visitors, consultants or suppliers to any of the foregoing behaviors as a condition of doing business with Cablevision.

We want all employees to know they can work in security and dignity and need not endure unwelcome, degrading, unprofessional, abusive or exploitative treatment or conduct. Submission to unwelcome conduct or any form of harassment and/or discrimination is not and never will be a term or condition of your employment with Cablevision.

Cablevision considers harassment, discrimination and abusive conduct to be serious misconduct. They are also unacceptable in the workplace. Any employee found to have harassed, discriminated against, or been abusive or insulting toward another employee or to a customer, consultant, supplier, visitor or other person covered by this policy will be subject to corrective action, up to and including dismissal.

<u>COMPLAINT PROCEDURE</u>

<u>IMPORTANT NOTICE TO ALL EMPLOYEES:</u>

Employees who have experienced conduct they believe is contrary to this policy have an obligation to take advantage of this complaint procedure. If you believe you have been or are being discriminated against, harassed or otherwise treated improperly, or believe some other employee is engaging in or receiving such treatment or conduct, you should contact your local Employee Relations Manager immediately. The local Employee Relations Manager has the primary responsibility for investigating and resolving any complaint of sexual or other harassment, discrimination or other improper or abusive conduct.

If you believe it is more appropriate given the particular circumstances, you may contact Corporate Employee Relations to report your complaint. Please also feel free to contact the following persons directly: Robert Doodian, Vice President, Employee Relations & Staffing at (516) 803-3140 for Corporate, Rainbow and Lightpath, Sue Crickmore, Vice President, Employee Relations Policy & Operations at (516) 803-4061 for Cable & Communications and John Morán, Vice President, Employee & Labor Relations at (212) 465-6775 for MSG, Radio City Music Hall and Hartford Civic Center.

If you have not received a satisfactory response within five (5) business days after reporting any incident, which you perceive to be harassment, discrimination or abusive conduct, please immediately contact any member of our CEO's staff who will ensure that an investigation is immediately conducted.

CONFIDENTIAL

MSG 12857

All complaints will be fully and promptly investigated and, where necessary, appropriate corrective action or other steps will be taken. Such action may include counseling, informal or formal reprimands, written or verbal warnings, suspension, reduction in pay, reduction in duties, transfers, and other formal sanctions, up to and including termination of employment.

All actions taken to investigate and resolve such complaints will be conducted in confidence to the greatest extent possible. There will be no retaliation for raising or pursuing such complaints. When we have completed our investigation, we will inform the person filing the complaint of the completion of the matter.

## RETALIATION IS PROHIBITED

Cablevision will not in any way retaliate, nor permit any Cablevision personnel to retaliate, against anyone who makes a complaint or report of harassment or discrimination, or participates in the investigation of such a complaint or report. Conduct of this nature is a serious violation of this policy and will itself be subject to any individual who engages in such conduct.

Revised: March 2004

CONFIDENTIAL

MSG 12858

REDACTED

From:        Mills, Steve
Sent:        Tuesday, October 04, 2005 8:22 PM
To:
Subject:     Re: Mural

We can try to talk tomorrow but I can not imagine what past direction or position would suggest that we should put something up that is clearly an out of date image. I don't know when it was installed which is really not the issue. I am some what surprised that the conclusion you come to is that we should leave it up. Given that this is part of every team you should give some thought as how you would like to deal with it. When the knicks marketing function reported to me I budgeted a provision to make necessary changes when trades were made.

-----Original Message-----
From: Browne Sanders, Anucha <Anucha.BrowneSanders@thegarden.com>
To: Mills, Steve <Steve.Mills@thegarden.com>
Sent: Tue Oct 04 19:31:02 2005
Subject: Re: Mural

Steve

I received your message at 10 pm last night. Had I spoken to you earlier in the day when this trade was going down I could have made plans.  I did call you earlier in the day yesterday. It is also not consistent with what our direction has been in the past. We have kept team shots up when players were traded. So there hasn't been a clear policy.

Last week you asked me to add houston, isiah said take him out, then you said add him after you spoke to Barry. No one said anything about Sweetney and tim.

Since it costs about 13k each time we change out the mural, we should all be on the same page.

Between last night at 10pm and this morning there wasn't much that could be done. I'm also not sure how we should handle this moving forward given the frequency of player movement. I would like clear direction from you not from 4 different sources.

-----Original Message-----
From: Mills, Steve <Steve.Mills@thegarden.com>
To: Browne Sanders, Anucha <Anucha.BrowneSanders@thegarden.com>.
Sent: Tue Oct 04 17:55:21 2005
Subject: RE: Mural

i think it is crazy to have a mural go up today with 2 players that are no longer on the team. we should take it down.

-----Original Message-----
From: Browne Sanders, Anucha
Sent: Tuesday, October 04, 2005 4:43 PM
To: Mills, Steve
Subject: Mural

Are we changing the mural every time we do a trade? Do you want this replaced? Hate to start the season with old players. Let me know your position as I should add budget. Given the pattern over the last two seasons.  I just spoke to barry. Thx

1



CONFIDENTIAL



CONFIDENTIAL

MSG 12408

REDACTED

| | |
|---|---|
| **From:** | Browne Sanders, Anucha |
| **Sent:** | Tuesday, November 01, 2005 7:28 AM |
| **To:** | Piazza, Mark |
| **Subject:** | Fw: NYK's Open Practice |
| | |
| **Importance:** | High |
| **Sensitivity:** | Confidential |
| | |
| **Attachments:** | DSC01891.JPG |


DSC01891.JPG
(725 KB)

    Pizza
I'm really surprised at the tone of Tim's note to Steve because it indicates an assumption of distrust and no relationship. We should discuss. maybe I need to be more involved. We should reestablish the bimonthly meetings or have steve collins attend the thursday meetings. We spoke about this in detail on thursday. Not sure if you followed up with them.

I have some real problems with the assumption of blatant disregard for their advice. Call me this morning. I wanted to speak to them yesterday before they sent a note like this.

Right now I just need to understand exactly what was communicated to them.


-----Original Message-----
From: Mills, Steve <Steve.Mills@thegarden.com>
To: Browne Sanders, Anucha <Anucha.BrowneSanders@thegarden.com>
Sent: Tue Nov 01 00:23:29 2005
Subject: Fw: NYK's Open Practice

FYI
Obviously this is turning into a real issue especially if we had to let people into the bldg without being randomly wanded. This was a big issue at the last board of gov mtg and until this email I had no idea that this had occurred.   Let's figure this one out.

-----Original Message-----
From: Hassett, Timothy <Timothy.Hassett@thegarden.com>
To: Mills, Steve <Steve.Mills@thegarden.com>
Sent: Tue Nov 01 00:01:22 2005
Subject: FW: NYK's Open Practice

Steve,

I received from Steve Collins the report below of the discussions leading up to the Knicks open practice on Sunday, and the events that subsequently occurred.  I am baffled at why the Knicks staff would, from all apparent indications, blatantly disregard the input of the Facilities staff and unilaterally, without notice, take actions contrary to our advice.  I thought the concept behind the P&L Manager structure was one of discussion, collaboration and ultimate agreement on a given course of action for any particular event. I believe Jim refers to this as "dynamic tension."  Certainly Anucha and Gary have the right to disagree with our suggestions, as we have the right to disagree with theirs, but they have an obligation to articulate that position to those responsible for running the building and managing the crowd control at our events so we could at least have had an opportunity to react accordingly -- in which case we may have stood a chance of being prepared for the type of situation that ultimately occurred.  Perhaps the matter might even have had a chance to make its way to you and I so we could have had the chance to agree on a course of action before there was a problem.  The last time I looked.

1

CONFIDENTIAL

EXHIBIT

MSG 6902

Facilities is held responsible for safety, security, crowd control and general building operations during events -- Anucha and Gary chose to disregard our input entirely and pursued a course of action that we strongly advised against and never agreed upon, thereby leading directly to a very dangerous situation and putting the safety of our guests and our employees at risk. In my opinion, their behavior was reprehensible and has severely compromised the level of trust among our respective staffs.

Finally, under some circumstances, one might be tempted to suggest that perhaps the description below could be a bit exaggerated or sensationalized, but I do not believe this for a single second. I have worked with Steve Collins for many years of my professional career in this business, and I have seen him respond to and react to some of the most challenging circumstances building management and crowd control have to offer. If anything, I would suggest he probably understated his description, if that is even possible in this case.

I will have Loretta call your office to schedule some time to discuss this matter in person.

Tim

-----Original Message-----
From:      Collins, Stephen
Sent: Sunday, October 30, 2005 1:25 PM
To:      Hassett, Timothy
Subject:      NYK's Open Practice

During initial meetings and conversations with Anucha and Gary, the Knicks indicated that they would be distributing approximately 13,500 "GA" tickets as well as 4,000 "reserved tickets" in the loge. The reserved tickets in the loge were going to be used by Season Subscribers and entitled them to a specific seat. The rest of the house was completely GA .t obviously ticketed. The Knicks made several requests to print more GA tickets (beyond capacity) which were denied by both myself and Kirk Randazzo.

Subsequent to this conversation the Knicks requested that Facilities maintain a drop line for individuals who showed up w/o tickets. We agreed to this provided that it would NOT be advertised and that we did not exceed capacity. Contrary to that agreement the following occurred today prior to the event.

At approximately 8am we had people lining up in the breezeways all claiming that they had heard on the radio that the Knicks were "giving away free tickets" at the box office. Gary Winkler confirmed that the NYK's indeed had run game announcements, radio advertisements, and had placed language on the Marquee to this effect completely contrary to what was discussed (see email from me to Gary).

By 10am the situation had deteriorated into an angry mob of approximately 3,000 people (a significant number of children) of which 90% did not have tickets. As individuals who were involved in the event were allowed to enter, the crowd would surge and became angry and aggressive. The situation continued to deteriorate as we were not prepared to open until 11:30am and had no other choice but to allow the crowd to stand and continue to cue in the breezeways. At approximately 10:45am I made the decision to allow all guests into the building with or without tickets to prevent a riot situation and risk injury to children waiting with parents. We both believed that it was unreasonable to think we could print 3000 - 4000 tickets and operate a pick-up operation at the BO windows. In addition last years attendance was approximately 8,000 and we did not believe we would have a capacity issue although we did monitor turnstile count. We announced to the crowd that everyone one would be admitted which was met with applause and seemed to calm to crowd. At approx 11:15am we began to let the crowd enter the building to alleviate the pushing and shoving and prevent the front of the line from being crushed. On several occasions we eded bullhorns to control the crowd with Kirk and myself pleading with the people to remain calm and refrain from any pushing and shoving.

Due to the nature of the crowd, dangerous crowing conditions in the breezeways we COULD NOT PERFORM any searches.

This was an extremely dangerous situation. At a minimum we are extremely lucky that this situation did not require the NYPD Riot Squad (it would have if we had tried to deny

2

CONFIDENTIAL

admission to non-ticket holders) and unfortunately this could have easily manifested
itself into a stampede which would have undoubtedly injured numerous people.

Obviously our concerns are always, first and foremost, the safety of our guest.  Whoever
decided to advertise "free or available" tickets jeopardized the safety of our guests, our
staff and ultimately the players since we were unable to search anyone.

See attached  picture.

3

CONFIDENTIAL

MSG 6904

Moran , John VP ER MSG
_____

From:            Browne Sanders, Anucha
Sent:            Monday, November 28, 2005 12:31 PM
To:              Mills, Steve
Subject:         Hassan Gonsalves

Steve
Need to address some issues that I discussed with you regarding Hassan. It was brought to my attention that he has made a number of inappropriate comments to women on the staff.

To ▮▮▮▮▮ Sat in her office cube and said "I hear you give good head"
Hunter brought this to my attention this morning as ▮▮ told him last week. A number of other things have been said to This one was specifically brought to Hunter's attention last week.

To ▮▮▮▮ "You look good, you look good, I bet that pussy is good too"
▮ brought this to Karin Buchholz's attention and Karin relayed it to me this morning ▮▮▮▮▮ said that if it were anyone else, she would have said something sooner but since it was Stephon's cousin, she didn't feel that she could say anything.

▮▮▮▮▮ has told me that he put his hands on her waist and her leg and she told him to keep his hands off of her.

A member of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ brought to my attention that Hassan routinely rolls down the windows of the Groove Truck and give "cat calls" to women on the street.

Other members of the staff (Dan Gladstone, Courtney Carter) have said that Hassan routinely says that he can do anything he wants and that if he doesn't like something all he needs to do is call Isiah or Steve and he gets whatever he wants.

Steve, I have a meeting with you this afternoon. Let's discuss how we should proceed.

Thank You

Anucha Browne Sanders
Senior Vice President
Marketing and Business Operations
New York Knicks
212-465-6432



1

CONFIDENTIAL

MSG 00249

REDACTED

| | |
|---|---|
| **From:** | Browne Sanders, Anucha |
| **Sent:** | Sunday, May 01, 2005 11:53 AM |
| **To:** | Mills, Steve |
| **Subject:** | Re: Renewal Package |

That's the plan. I figured you wouldn't agree with isiah signing the letters. I'll have a communications plan to you this eek. Then we can meet with isiah.

Thank you
Anucha Browne Sanders
GO KNICKS !!!

-----Original Message-----
From: Mills, Steve <Steve.Mills@thegarden.com>
To: Browne Sanders, Anucha <Anucha.BrowneSanders@thegarden.com>
Sent: Sat Apr 30 15:24:42 2005
Subject: Re: Renewal Package

I think 4500 letters to sign is too much we have never sent originals like that and I question how valuable it really is.
I thought we talked about a meeting with me you and Isiah outlining where we are and what we need to do. This would include a series of communications throughout the renewal process. I also want to see the plan segmented by how at risk a group is. For instance should people in their first year in the corner 300s get a letter thanking them from Jamal as an example. I want to make sure we think through a very comprehensive strategy.
-------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Browne Sanders, Anucha <Anucha.BrowneSanders@thegarden.com>
To: Mills, Steve <Steve.Mills@thegarden.com>
Sent: Sat Apr 30 11:41:16 2005
Subject: Renewal Package

Hi Steve
On Monday Jordan will drop off a draft of the renewal package for your review. To date I've approved the design direction, invoice piece and benefits outline. You will also receive a copy of the letter that will come from Isiah. I would like to have isiah sign each letter. We have 4500 accounts. He can do this over a few days. Thoughts? I don't want to ask until I hear from you.

Lastly, we are developing a schedule of exactly what we would need isiah to involved in and when. Per our last conversation, I'll plan on presenting to him the state of the business and work with him on what makes the most sense for him to be involved in. The letter however, I think is key. I'll have you review it before I give it to him and Frank.

I'm out until Wednesday but I'll be available by phone.

Thanks !!!!
Thank you
Anucha Browne Sanders
GO KNICKS !!!



1

CONFIDENTIAL

MSG 6996