Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

06 Civ. 0589 (CGE)

------------------------------------------x

ANUCHA BROWNE-SANDERS,

                            Plaintiff,

        - against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD

THOMAS, III, and JAMES DOLAN,

                            Defendants.

------------------------------------------x

                    December 12, 2006
                    10:08  a.m.


          VIDEOTAPE DEPOSITION of STEPHEN

C. MILLS, taken by the Plaintiff, pursuant

to Notice, held at the offices of Vladeck

Waldman Elias & Engelhard, P.C, 1501

Broadway, New York, New York, before

Debbie Zaromatidis, a Shorthand Reporter

and Notary Public of the State of New

York.

Dockets.Justia.com

48

1              MILLS

2    had spoken to a lot of candidates, and I

3    met Anucha I believe in '96.  I believe it

4    was at the -- at the Olympics in -- in

5    Atlanta and had -- you know, was impressed

6    with her at that point.  She had come in

7    and met with us with -- doing some work

8    with IBM while I was -- while -- IBM was a

9    sponsor of the Garden, and she had -- had

10   come and worked on some projects, and then

11   I looked at all the candidates to

12   fill -- fill the position as vice

13   president of marketing.  She was someone

14   that ultimately I decided -- I thought was

15   the right person for the job.

16       Q.    Did you interview her?

17       A.    Yes.

18       Q.    And what did the two of you

19   discuss in the interview, if you recall?

20       A.    Discussed my -- my goals with

21   the Knicks, discussed her experiences at

22   IBM and Kodak, what she was looking for in

23   her next career, what we were looking for

24   or what I particularly was looking for in

25   terms of the role that -- that was open in

49

MILLS

1   the Knicks.

2   the Knicks.

3       Q.    And particularly with respect to

4   Ms. Browne-Sanders' experience at IBM and

5   Kodak, what was said on that? What did you

6   say and what did she say?

7       A.    It -- I don't remember the

8   specifics of what she said. I -- you

9   know, I looked at the marketing background

10  as -- at IBM and the structure of IBM as

11  something that I thought was -- would be

12  good for what I was looking for in the

13  Knicks, at some point better sales

14  experience, and Kodak I thought would be

15  good as we were moving into a sales mode

16  within -- within the Knicks.

17      Q.    What were the duties of the

18  position of vice president of marketing

19  that you were considering

20  Ms. Browne-Sanders for?

21      A.    Really to oversee the day-to-day

22  operations of the marketing staff, oversee

23  the community relations, oversee the

24  interaction between the Knicks staff and

25  the other departments within The Garden.

50

1              MILLS

2    Those are generally the responsibilities.

3        Q.    Okay.  I think your previous

4    answer may have touched on this, but why

5    is it that you hired Ms. Browne-Sanders?

6        A.    I thought she was -- I thought

7    she -- she had a skill set and

8    that -- that would -- that was a good fit

9    for what I was looking for within the

10   Knicks organization.

11       Q.    And what were you looking for

12   within the Knicks organization at that

13   point?

14       A.    I think -- did I answer that?

15       Q.    Well, I think your answer might

16   have alluded to it.  If there is anything

17   else you want to add to it, that is fine.

18       A.    I think I -- I think I -- I

19   answered that.

20       Q.    Okay.  Were you looking to hire

21   someone to reorganize the Knicks

22   operations at that point?

23       A.    I -- I wanted someone to -- to

24   add some more structure to the marketing

25   department and the activities that took

71

MILLS

1   been to -- would have been sort of -- this

2   would have been during my early tenure

3   with the Knicks though.

4

5       Q.    Was Mr. Browne-Sanders receptive

6   to your feedback about her management

7   style?

8       A.     Initially she was.  At the -- at

9   the end -- at the end of her tenure during

10  -- during '05 actually she was actually,

11  you know -- she would sometimes be

12  receptive, but she was very combative in

13  other occasions, in many occasions about

14  giving her feedback that I thought was

15  appropriate in terms of her ability to

16  function at The Garden and function within

17  her job.

18      Q.    My question at this time point

19  was just focused on your feedback about

20  her management style.  Was she receptive

21  to that feedback?

22      A.     Sometimes she was receptive to

23  the feedback, but there were many times

24  when she wasn't receptive to the feedback

25  and in fact combative about the feedback.

72

1                    MILLS

2        Q.    Okay.  Was that in 2005 that she

3    was combative about the feedback?

4        A.    Yes.

5        Q.    And did -- you gave her feedback

6    about her management style in 2005?

7        A.    Yes.

8        Q.    And what was the feedback that

9    you gave her about her management style in

10   2005?

11       A.    It was consistent with

12   the -- with the feedback that I've given

13   her, you know, throughout her time at The

14   Garden that she needs -- needs to find a

15   way to get the most out of her -- out of

16   her people and as we moved into -- into

17   2005 became broader than just management

18   style but management structure.

19       Q.    And what -- what do you mean by

20   "management structure"?

21       A.    You know, how she

22   organized -- how she organized her -- her

23   employees, how she organized her employees

24   around strategies and strategically where

25   she wanted to take the organization and

73

MILLS

1
2  have a management focus and a management
3  plan that -- that as opposed to -- to
4  solve issues with one off replacements to
5  step back and have some -- some structure
6  and some strategic process as to
7  how -- how things should get accomplished.
8      Q.    In 2005, did you ever tell Mrs.
9  Browne-Sanders that you thought that she
10  really puts together a first class
11  organization?
12      A.    I may have said that to her.
13      Q.    Yes.   And how is that consistent
14  with your testimony now that you think
15  that her -- the structure of the
16  organization that she was putting together
17  had -- had deficiencies?
18          MR. GREEN:    Objection to form.
19  You may answer.
20      A.    There were many times in 2005
21  where -- where as -- as employees departed
22  I was very clear with Anucha and
23  disappointed in -- in some of the things
24  that Anucha was doing in terms of her
25  structure, and I made it very clear to her

74

MILLS

1

2 that I felt that in response to people

3 leaving the organization there were many

4 times that rather than take a step back

5 and strategically looking at what she was

6 trying to get accomplished in leading the

7 group and what she -- the goals that she

8 had for the group and say let me look back

9 and decide how I think this organization

10 should be structured, that she responded

11 in a very sort of one off approach to

12 structuring people and putting people in

13 positions to get through today's issue as

14 opposed to a longer term strategic view.

15     Q.    But you do have some

16 recollection of telling her during that

17 same time period in 2005 that she had put

18 together a first class organization.  Is

19 that -- is that fair to say?

20         MR. GREEN:   Objection.  Asked

21 and answered, but the witness may answer

22 again.

23     A.    I felt there were many aspects

24 of the Knick organization that were very

25 good and that -- and that were -- that

75

MILLS

1
2   were good, but I did have a problem with

3   Anucha in terms of the strategic

4   development of her organization.  I was

5   clear with Anucha about that.

6           MR. MINTZER:    Could you read

7   back my question, please.

8           (Record read.)

9       Q.    Could you answer that question?

10          MR. GREEN:    My objection as

11  being asked and answered remains.  You may

12  answer fully, if you can, Mr. Mills.

13      A.    I think I answered.

14      Q.    Was it a yes or no?

15          MR. GREEN:    Objection to form.

16  You may answer more fully, if you can, Mr.

17  Mills.

18      A.    I think there may have been

19  times when I told her I was happy

20  with -- with parts of the organization and

21  some things that were going on with the

22  organization but that I always had an

23  issue about strategically where the

24  organization was going and how she was

25  responding to issues that were happening

76

MILLS

1     within the team.

3          Q.     So your testimony -- your

4     recollection is that you told her that you

5     were happy with certain parts of her

6     organization.  Is that -- is that

7     accurate?

8          A.     I --

9               MR. GREEN:    Objection to form.

10    You may answer, Mr. Mills.

11         A.     I can't remember whether

12    I -- whether I focused on a particular

13    part.  I'm telling you what I -- my views

14    were in 2005 about the Knicks as an

15    organization.

16         Q.     Well, I'm not asking for your

17    views.  I'm asking what you communicated

18    to Mr. Browne-Sanders, Mr. Mills, and I am

19    trying -- you testified to certain

20    conversations you had with

21    Ms. Browne-Sanders, and I am trying get

22    your best recollection.

23               Is it the case that you told her

24    in 2005 that she had put together a first

25    class organization?

96

MILLS

1

2    whether he had ever been the subject of a

3    complaint of harassment or a complaint of

4    discrimination, so he may now answer that

5    question fully.

6        A.    No, I haven't been.

7        Q.    Okay.  And that's -- just to be

8    clear, my question had been I believe

9    whether or not you had ever been alleged

10   to have engaged in any kind of

11   discriminatory or harassing conduct by

12   anyone who worked for you.  The answer is

13   no?

14       A.    Yes.

15       Q.    The -- Ms. Browne-Sanders'

16   position as SVP of business operations,

17   did the job have any budgetary

18   responsibilities?

19       A.    Yes.

20       Q.    And what were they?

21       A.    They are responsibilities of

22   managing budgets in the departments

23   that -- that the job was -- was

24   responsible for, managing the expense side

25   and -- and, you know, in limited places

97

1                          MILLS

2    revenue but mostly

3    management -- management on the expense

4    side.

5         Q.    Between 2004 and -- 2002 and

6    2004, did Ms. Browne-Sanders have any

7    responsibility for creating a budget for

8    the Knicks organization?

9         A.    She was -- she was involved in

10   the budgeting process.  I was more -- more

11   active in my position at that time and

12   very active in -- in that -- in that

13   process of the budget -- of overall

14   budget -- budget preparation for both the

15   Knicks and Rangers, but she was

16   clear -- was clearly involved in the

17   budget process.

18        Q.    Was there a difference between

19   your activeness in the budget process

20   between 2004 and 2005?

21        A.    Yes.

22        Q.    And could you describe that?

23        A.    In -- in 2005 the -- both the

24   job in -- of the senior vice president of

25   business ops for the Knicks had to take on

98

MILLS

1  
2   a much more strategic and -- and revenue

3   generation responsibility within -- within

4   the budget.  In '05 we were going into a

5   situation with -- where the Rangers were

6   coming out of a lockout, so they were back

7   in business whereas in the prior season

8   there was no ranger activity.  So I was

9   actually more involved on the Knicks side

10  at that point, but moving into '05 both

11  the Knicks -- the senior vice president of

12  business operations for the Knicks and the

13  senior vice president of business ops for

14  the Rangers had to really take charge of

15  the entire strategic process, the entire

16  budget process from start to finish, and I

17  was less directly involved in the -- in

18  the creation process leading up to the

19  final product.

20       Q.    Was there -- are you familiar

21  with the phrase P and L manager?

22       A.    Yes.

23       Q.    And at some point did the SVP of

24  business operations position for the

25  Knicks become a P and L manager?

99

MILLS

A.    Yes.

Q.    When was that?

A.    Sometime in -- at some point
in -- in '04.

Q.    Did the job of becoming a P and
L manager coincide with the greater
responsibilities in terms of the budgetary
process that you -- you just were
mentioning?

A.    Yes.

Q.    Did the increased
responsibilities of the senior vice
president of business operations position
that you described, were those ever
reflected in a document that you've seen,
anything in writing?

A.    They -- they were reflected
in -- in --  in conversations that we
had.  They were reflected in a -- a salary
adjustment as the grade changed -- change
in the position took place.

Q.    My question was:  Did the
description of the increased
responsibilities, did that appear in a

100

                    MILLS

1

2   document that you were familiar with?

3       A.    I -- I don't believe there

4   was ever a new operational position

5   described.

6       Q.    Okay.  So to your knowledge, you

7   are not aware of Ms. Browne-Sanders being

8   given a new job description and saying

9   these are now your new responsibilities or

10  anything like that?

11          MR. GREEN:   Objection to form.

12  You may answer.

13      A.    Ms. Browne-Sanders was -- it was

14  very clear to Ms. Browne-Sanders what her

15  new responsibilities were.   It was very

16  clear to her the process and the

17  responsibilities she had as the -- as the

18  P and L manager and -- and the

19  responsibilities she had as -- as part of

20  this -- this position as the P and L

21  manager.

22      Q.    So my question was just whether

23  or not she had ever been given a document

24  that had described her new

25  responsibilities?

101

MILLS

1

2       A.    Well, she was given documents

3   that -- there were -- as we planned for

4   the budget process and as we planned for

5   how we were going to strategically design

6   where the team was going, she was given

7   timelines, she was given outlines.  She

8   was given information as to what the

9   expectations of -- of her and -- around

10  the expectations of the organization, so

11  it is very -- there is no doubt in my mind

12  that she understood and embraced

13  the -- the responsibilities of the P and L

14  manager.

15      Q.    Sir, if you can try to focus on

16  my question.  I am not asking you what she

17  understood or what she embraced.  I am

18  asking you did you ever give her a

19  document that described her increased job

20  responsibilities?

21          MR. GREEN:   Objection.  Asked

22  and answered.  You may answer again, Mr.

23  Mills.

24          MR. SHERWOOD:   You are asking

25  if there is a new job description.  Is

102

MILLS

1

2    that what you are asking, Kevin?

3           MR. MINTZER:  I think my

4    question stands.  If you want to have it

5    read back.

6           (Record read.)

7       Q.    Could you answer that question?

8           MR. GREEN:   My objection --

9    asked and answered.  You may answer again,

10   Mr. Mills.

11      A.    I think I've already -- I think

12   I have already answered this.

13      Q.    You said that were documents

14   created that bore on the budget process

15   and things that had to do with her new

16   responsibilities.  I am asking you did you

17   give her a document at any point that

18   reflected -- that stated what her new job

19   responsibilities were.  It is a yes or no

20   question, sir.

21          MR. GREEN:   Same objection.

22   You may answer.

23      A.    There was not a new operational

24   position description done, but it was made

25   clear to Ms. Browne-Sanders what her new

103

MILLS

1  responsibilities were.

2      Q.    After the point that

3  Ms. Browne-Sanders became head of business

4  operations for the Knicks, did you come to

5  have an opinion about her performance in

6  that job?

7      A.    At what point in time are you

8  referring to?

9      Q.    After she -- she got the job in

10  2002.

11      A.    I thought --

12      Q.    The promotion.  After she got

13  the promotion, did you come to have an

14  opinion about -- I think you've testified

15  about her performance in the VP of

16  marketing job.  Now, I am asking you about

17  the -- her performance in the SVP

18  position.

19          MR. GREEN:  I object to the

20  absence of time frame, Kevin.

21          MR. MINTZER:  I gave the witness

22  one.

23      Q.    After she was promoted in 2002,

24  did you come to have an opinion about her

123

MILLS

1

2     A.     Yes.

3     Q.     And that corresponded with, if

4  you look at the next page, it appears to

5  correspond with far exceeding -- far

6  exceeded expected performance; is that

7  correct?

8     A.     Yes.

9     Q.     And is that how you actually

10  viewed Ms. Browne-Sanders' performance at

11  the time?

12     A.     Yes.

13     Q.     Mr. Mills, did there come a

14  point where Ms. Browne-Sanders was fired

15  from MSG?

16     A.     Yes.

17     Q.     When was that?

18     A.     I -- I don't know the specific

19  dates, but in, you know, January or

20  December -- January of '06.

21     Q.     Why was she fired?

22     A.     Well, first of all, Anucha came

23  to me and -- in late November and

24  expressed to me that she could no

25  longer -- felt that she could do her job

124

MILLS

1
2   at The Garden.  She had felt that she had
3   tried do it in a number of ways, both
4   being aggressive and being passive, but
5   that she couldn't -- she lost the respect
6   of her -- her employees.  She lost the
7   respect of her peers and that she couldn't
8   function in her job and that she needed my
9   help to find another job, and I agreed
10  with her, and -- and ultimately we -- she
11  was fired because she really was
12  not -- she was unable to -- to lead the
13  Knicks organization strategically and
14  grasp the concepts of managing the P and L
15  and being the complete -- the strategic
16  leader of the Knicks organization.  She
17  also did not -- was unable to perform in
18  --  in the budget process, and the P and
19  L responsibilities of the Knicks.  She
20  had, you know, disastrous budget meetings
21  during -- during -- during '05.
22           She had demonstrated an
23  inability to work with her peers and
24  manage her relationships across The Garden
25  from our advertising sales group to our

125

1              MILLS

2    facilities operations group to the

3    relationships within the basketball

4    operations department.  She -- at that

5    point in time she became -- she refused to

6    be accountable for things that were

7    clearly in any kind -- any kind of

8    problems that remained she refused to take

9    accountability for -- for them, and in

10   some instances turned and would blame me

11   for in -- issues that were her

12   responsibility.  So at that point, I

13   clearly lost faith in -- and confidence in

14   her ability to -- to continue in the job,

15   and she, you know -- she at that point,

16   you know, and over -- over -- over time

17   became very resistant to -- to -- to

18   criticism and opportunities to -- to

19   understanding what things needed to be

20   changed in order for us to move forward.

21        Q.    Who decided to fire her?

22        A.    Ultimately it was -- it was Jim

23   Dolan.

24        Q.    Did he consult with you about

25   that?

126

MILLS

1

2      A.     He -- he knew my concerns

3  about -- about what was going on with

4  Anucha, but ultimately he made the

5  decision to fire her.

6      Q.     How did he know your concerns

7  about what was going on with

8  Ms. Browne-Sanders?

9      A.     I -- actually, you know,

10  many -- I shared with him my opinions

11  about, A, her, you know -- you know, how

12  she -- how she was performing in some of

13  the budget meetings.  I understood his

14  concerns as to -- you know, he and Hank

15  Ratner's concerns in terms of how

16  she -- how she performed in some of the

17  meetings and some of the challenges that

18  she was having, but

19  ultimately -- ultimately it was his

20  decision.

21      Q.     But you -- when I asked you

22  originally why she was fired, you

23  proceeded to give me a whole list of

24  reasons why she was fired and did -- my

25  question is:  Did you have discussions

127

MILLS

1

2  with Mr. Dolan about each of those

3  reasons?

4      A.    I had conversations with -- with

5  Rusty McCormack about -- about those

6  reasons, and, you know, I had

7  conversations with Jim clearly about those

8  views and clearly some of those reasons.

9      Q.    So at some point you discussed

10 with Mr. Dolan all of your concerns and

11 criticisms about Mr. Browne-Sanders that

12 you articulated in your previous answer?

13          MR. GREEN:   Objection to form.

14 You may answer, Mr. Mills.

15     A.    Yes.

16     Q.    But I take it from your answer

17 that Mr. Dolan had the ultimate

18 determination to -- whether to fire

19 Ms. Browne-Sanders?

20     A.    Absolutely.

21     Q.    And so it's fair to say when I

22 asked you why she was fired you don't know

23 what was in Mr. Dolan's head when he

24 decided to fire her; is that correct?

25     A.    No, I don't know what was

168

MILLS

1    than we had been operating under with

2    Scott Laden in charge where he was -- he

3    was charged and he was focused on putting

4    the players in positions that they could

5    focus on basketball and concentrate on

6    winning basketball games.

7        Q.    You say -- you are comparing it

8    to Mr. Laden.  Mr. Laden had been the

9    previous GM of the Knicks?

10       A.    Yes.

11       Q.    And what -- how was it

12   different, Mr. Thomas' approach versus Mr.

13   Laden's approach, if you could describe

14   it?

15       A.    Mr. -- Scott's approach was a

16   much more laid back approach with not as

17   many -- just a much more laid back

18   approach to -- to -- to managing the team

19   and managing the organization underneath

20   than Isiah.  Isiah was more intense about

21   how he -- how he wanted to manage his

22   team.  He was more focused in terms of

23   specifically making sure that the

24   basketball players and the basketball team

25

169

MILLS

1    was focused on doing what they had to do,

2    but in -- and what was -- what we needed

3    to do for the business but also for -- to

4    be focused on -- on -- on winning

5    basketball games.

6        Q.    Did Mr. Thomas believe that the

7    players were not sufficiently focused

8    on -- on basketball when he came in?

9            MR. GREEN:    Objection to form.

10   You may answer.

11       A.    I don't know that he -- he felt

12   they were -- they were not sufficiently

13   focused on basketball, but we clearly had

14   an environment that wasn't as -- as

15   focused organizationally on winning

16   basketball games as it needed to be if you

17   were going to be successful.

18       Q.    And how -- what was your

19   understanding of how he went about

20   instituting more of a focus

21   organizationally?

22       A.      More structure around

23   the -- more structure around the players

24   over time instituting things like an

MILLS

expectations and a dress policy, institute -- instituting sort of more regular standards around what things were going on with the -- with players around practices and who was in the -- who was in the -- the -- in the building as -- as -- as players practiced, more structure around how we were going to use the players in activities, the timing of how we would use -- would use players in activities to make sure that the players were at the critical points in the season focused on the things that ultimately were going to make us all successful, and that was winning basketball games.

Q. Did you have any discussions with Ms. Browne-Sanders at any point after Mr. Thomas was brought on board about her view of Mr. Thomas' changes?

A. The -- yes.

Q. And tell me what was said in those conversations with -- by you and by her.

A. You know, there were -- there

171

MILLS

1  were -- there were -- one instance in

2  particular where she came to me and she

3  told me that Isiah had -- had, you know,

4  informed her that the players were not

5  going to -- to make, you know, appearances

6  the way that they had made appearances

7  before, and he wanted a -- a more

8  structured -- more structured schedule

9  around it. You know, we had  --  we had

10  numerous conversations about things like

11  that.

12      Q.    Well, what did you say when she

13  said that to you?

14      A.    I said that, you know, the

15  players are going to make the appearances

16  that -- that we need them to make, and we

17  need to strategically develop a plan

18  to -- to -- to -- to utilize the players,

19  but the players will make the appearances

20  that -- that organizationally we needed

21  them to make.

22      Q.    Had she told you that Mr. Thomas

23  had said to the players that they wouldn't

24  be making any appearances?

174

MILLS

1

2          MR. GREEN:   Objection to the

3    form.   Asked and answered.   You may answer

4    again, Mr. Mills.

5          A.    Yes.

6          Q.    And do you remember anything

7    that she said more specifically about it

8    other than -- other than what you've

9    already testified to?

10         A.    Well, there -- the -- you know,

11   again there were -- there

12   were -- over -- over the course of time

13   there were -- were -- were many things

14   that I -- you know, I can't remember all

15   of them.

16         Q.    Okay.   Well, specifically on the

17   subject of Ms. Browne-Sanders' view of the

18   changes that Mr. Thomas brought to the

19   organization, other than what you have

20   said -- testified to, is there anything

21   else you recall her saying about it?

22         A.    She wasn't happy with the

23   restrictions that he placed on -- on the

24   access that people had to the training

25   center.

175

1           MILLS

2       Q.    What did she say about that?

3       A.    She said that, you know, Isiah

4   has limited access to certain parts of the

5   training center to -- to only -- to only

6   members of the basketball operations

7   staff, and that she and her people needed

8   to have access to the training center

9   and -- in order to get players to do

10  certain things, and that was a problem for

11  her.

12      Q.    And what did you say?

13      A.    I spoke to Isiah about it, and

14  Isiah said, listen, I -- I don't care if

15  people come into the training center, you

16  know, and -- as long as they're -- as

17  they're professional and don't come in to

18  the team while they are practicing, and

19  they are not intrusive in terms of giving

20  the players room to sort of be to

21  themselves after practice, but to the

22  extent that they need to come in to get

23  things from the players or arrange for the

24  players to do that he is more than willing

25  to come up with a system to allow that to

176

MILLS

1 happen.

2

3     Q.     Did you convey that to

4 Ms. Browne-Sanders?

5     A.     Absolutely.

6     Q.     And what was her response to

7 that?

8     A.     She still was not -- not happy

9 that there was sort of an unfiltered

10 access to the training center, but Karen

11 Buchholz and the people -- Dan Gladstone

12 and those people who worked with her had

13 no problems interacting with the players

14 and maneuvering around the training center

15 under sort of the rules that Isiah had

16 outlined and accomplishing whatever they

17 needed to get accomplished with the

18 players.

19     Q.     Anything else that you can

20 recall about conversations that you had

21 with Ms. Browne-Sanders about her views of

22 the changes that Mr. Thomas implemented

23 other than what you've already testified

24 to?

25     A.     There are -- there are -- there

177

MILLS

 1
 2   are -- I can't say that I am -- that this
 3   covers all of the conversations about the
 4   changes.
 5       Q.    Well, I  --  I understand that,
 6   but sitting here right now have you
 7   testified fully to your recollection about
 8   your conversations with Ms. Browne-Sanders
 9   about the changes that Mrs.  -- Mr. Thomas
10   had implemented?
11       A.    Well, there were -- there were,
12   you know, again -- again, there were many,
13   many, changes.  There were changes
14   in -- in terms of, you know, what
15   his -- what the basketball operations role
16   was going to be in the process of -- of
17   selling -- selling tickets and
18   incorporated in -- incorporated into
19   season ticket sponsorship activities that
20   included how we would include players
21   into -- into sponsorship activity, and
22   again ways that we would systematically
23   incorporate the basketball operations
24   staff and -- and the team itself
25   into -- into business initiatives, but

178

MILLS

1
2    they were going -- they were going

3    to -- there was a framework that was going

4    to be around that that was -- that was

5    different.

6        Q.    And you had discussions about

7    that with Ms. Browne-Sanders, her view of

8    that?

9        A.    Absolutely.

10        Q.    And what did Ms. Browne-Sanders

11    say?

12        A.    She -- she was not happy with

13    the -- with the changes, but, you know, it

14    -- in my opinion, those were -- those were

15    the ones that I was endorsing in terms of

16    what the -- what the -- what the right

17    structure was going to be and how we

18    should view the organization, so that we

19    could move forward.

20        Q.    You said that to

21    Ms. Browne-Sanders?

22        A.    Yes.

23        Q.    Okay.  Anything else that you

24    recall about conversations that you had

25    with her about her views of the changes

183

MILLS

Q.    Okay.  But did you have
conversations with Ms. Browne-Sanders
about the issues that she had raised in
the E mail?

A.    Not specifically about those
issues.

Q.    Did you generally have any
discussion with her about Frank Murphy?

A.    Subsequent to that -- to
the -- to the E mail being -- Frank
sending the E mail to me, I had a meeting
with -- with Anucha and Isiah Thomas where
we talked about the roles and
responsibilities in the organization and
at the conclusion or during that meeting
we came to a -- you know, an -- an
understanding of how Frank and Anucha were
going to interact with each other moving
forward and what Frank's role was going to
be in interaction with Anucha.

Q.    Okay.  Aside from that
conversation, which I want to talk to you
about, that was among you, Mr. Thomas and
Ms. Browne-Sanders, did you have any other

189

MILLS

1

2   surprised to learn of it for the first

3   time in this E mail?

4        A.    Yes.

5        Q.    But you did not have -- you

6   don't recall having any conversations with

7   Ms. Browne-Sanders in which you said in

8   substance why have you told Frank that you

9   told me about this?

10        A.    No.

11             MR. GREEN:    Objection to form.

12   You can answer.

13        A.    No.   The conversation -- the

14   conversation we had was again -- something

15   was elevated in terms of the -- the roles

16   and responsibilities which Anucha

17   did -- did raise with me between she and

18   Isiah, and we had a meeting, and we talked

19   about how Frank and Anucha were going to

20   be able to interact with each other and

21   that became the issue that same day that

22   we -- that we became focused on it and

23   that we dealt with it.

24        Q.    Okay.   When you read in the E

25   mail that Mrs. Browne-Sanders was saying

190

MILLS

1
2    that Mr. Murphy had threatened her, did
3    you do anything to inquire about what the
4    nature of that threat was supposed to have
5    been?
6         A.    I talked to -- to Anucha and
7    Isiah in the meeting about how I wanted
8    the two of their departments to work
9    together -- work together, and we talked
10   about them -- that Frank being the -- the
11   liaison between the two of them and that,
12   you know, that their interactions with
13   each other were always going to have to be
14   professional and respectful.
15        Q.    Right.  I understand that, but
16   did you say to Ms. Browne-Sanders at any
17   point what do you mean he threatened you
18   or make any inquiry about what she was
19   referring to there?
20        A.    No, I didn't.  I focused in --
21   in the same meeting we had the next day we
22   focused on how the two of them were going
23   to work together and was she satisfied
24   with the -- with the structure and the
25   interaction -- the methods of interaction

191

MILLS

1
2    that we had had created for the two of
3    them, and this happened -- the two things
4    happened almost simultaneously.  So we
5    never got to discuss this particular
6    instance.

7        Q.    Do you think you received this E
8    mail before you had the meeting with Mr.
9    Thomas and Ms. Browne-Sanders?

10       A.    I can't -- I can't remember if I
11   received -- received it -- if I received
12   it before or right after.  I just
13   can't -- I can't remember.

14       Q.    Somewhere around the time of the
15   meeting?

16       A.    Yes.

17       Q.    And what -- you've touched on
18   it, but I'd like to get your full
19   recollection of what was discussed in the
20   meeting among you, Ms. Browne-Sanders and
21   Mr. Thomas.  I guess first though why
22   don't you tell me how it did it come to be
23   that you were meeting with the two of
24   them?

25       A.    Anucha called me and said that,

192

MILLS

1  
2  you know, she had a discussion with Isiah,

3  and, you know, it is clear that there is

4  some misunderstanding about her roles and

5  her -- his role and her roles, and he

6  clearly thinks that he is involved with

7  more than basketball, and unless there is

8  something that I told him is part of his

9  job that I haven't shared with her she

10  didn't understand what was going on and

11  really would like to have a meeting either

12  way for me to clarify everyone's roles and

13  responsibilities and how we were going to

14  move forward.

15     Q.    And did you say anything in that

16  conversation?

17     A.    I said -- I said, you know, that

18  Isiah is responsible for basketball.  He

19  has no business responsibilities in the

20  organization, and if for some reason you

21  should -- you know, you should -- I

22  assured her that I had -- had not -- you

23  know, there were no expansion of Isiah's

24  responsibilities, and that if there was

25  some -- some misunderstanding between the

MILLS                                    193

two of them I thought it would be very

good for us to get together and clear it

up.

    Q.    Okay.  And did you then have the

meeting with the three of them?

    A.    Yes, I did.

    Q.    The three of you.

        Did Ms. Browne-Sanders say

anything else in that telephone

conversation other than what

you've -- you've said?

    A.    Not that I can -- no.

    Q.    Now, if you can tell me

what -- what was discussed in the meeting

among you, Ms. Browne-Sanders and Mr.

Thomas?

    A.    Well, we discussed the -- the

roles and responsibilities and Anucha

mentioned that, you know, Isiah had -- had

informed her that he -- that his roles, he

thought that his role incorporated more

than just managing the basketball

operations of the team, and I said to him

in that meeting you're -- you're wrong.

194

MILLS

1
2  Your responsibilities are the basketball

3  operations of the team.  You don't have a

4  responsibility in -- in the business

5  operations of the team.  You don't have a

6  say over, you know, what the game

7  presentation is.  You're managing

8  the -- the infrastructure of the

9  basketball organization, the scheduling of

10  the basketball games, and Anucha is

11  responsible for the day-to-day business

12  operations.  He said well, you know, I

13  thought that I had -- there was -- I had

14  more input in different places, but if

15  that's the way it is, that's the way it

16  is, and I'm -- I'm willing to move forward

17  and accept that that's the way it is.

18      Q.    Did Ms. Browne-Sanders say

19  anything in the meeting?

20      A.    She wanted to know how we are

21  going -- what was going to be the

22  structure in terms of moving forward, how

23  the two organizations were going to

24  function and operate, you know, together

25  and -- and Isiah designated -- he said

195

MILLS

1
2  well I don't -- I don't want to be the
3  person that has to funnel every player
4  request through and every time, you know,
5  for a business initiative a player needs
6  to go to a school or if a player needs to
7  go on an ad sales call or if a player
8  needs to appear in a television commercial
9  I don't -- I am not going to be the person
10 that each one of those individual requests
11 come across my desk and that -- and that I
12 am going to designate someone, the group,
13 and it is going to be Frank Murphy as the
14 person that is going to be my liaison with
15 the business operations group.
16     Q.    Was anything else said in the
17 meeting that you recall?
18     A.    I mean we -- we -- we probably
19 discussed, you know, other issues in -- in
20 the meeting, but those were
21 clearly -- that was -- that was the focal
22 point of the meeting of deciding -- that
23 was the initial intent of the meeting was
24 to, you know, establish everyone's
25 responsibilities as -- in terms of how

196

MILLS

1    they would interact and in -- you know, to

2    really make sure that Isiah understood

3    what Anucha's role was because clearly

4    based on her request to me he didn't, and

5    so I wanted to make sure we clarified

6    that.

7        Q.    And did it appear to you in the

8    meeting based on Mr. Thomas'

9    conduct -- comments that he did have some

10   misunderstanding about what

11   Ms. Browne-Sanders' role was?

12       A.    I thought that -- I did sense

13   that he thought he had more of a say in

14   certain things as related to, you know,

15   that presentation and things like that,

16   but, you know, I was very clear about

17   that, and -- and at the end of the day he

18   understood what his role was, and Anucha

19   understood there was no change.  She

20   understood what her role -- she -- the

21   role she thought she had was

22   reestablished.

23       Q.    Did you have to step out of the

24   meeting at any point to take a phone call?

197

MILLS

1

2    A.    Yes, I did.

3    Q.    And who -- who was the phone

4  call from?

5    A.    I -- I don't remember.

6    Q.    Did you have any discussions

7  with Ms. Browne-Sanders after the meeting?

8    A.    Yes.  In fact I asked her to

9  stay -- after the meeting was over I asked

10  her to stay behind to -- to talk to me.

11    Q.    And what would -- what did you

12  two discuss at that point?

13    A.    I said to her that, you know, we

14  started out this meeting with you having

15  concerns about Isiah sort of overreaching

16  into your areas, and in my opinion we

17  clarified everything to your

18  understanding, and I thought in

19  the -- over the course of the meeting you

20  were overly aggressive in dealing with

21  him, that -- you know, I have to say that

22  you -- that it seemed like everything you

23  wanted coming out of this -- that you

24  wanted going into the meeting you got, but

25  I thought you were pretty -- pretty

198

MILLS

2  aggressive over the course of the meeting

3  and -- and never at any point just said

4  okay.   I am glad this is the way -- this

5  is the way it worked out.

6       Q.    What did Mr. --

7  Ms. Browne-Sanders say to that?

8       A.    She, you know, said it was just

9  important for her that Isiah understands

10 that, you know, he has his role, and she

11 has her role, that she felt very strongly

12 about it, and I just reiterated that I

13 thought she was overly aggressive in

14 how -- in how she responded to a situation

15 that I thought worked out the way she

16 wanted it to work out.

17      Q.    What did she say in the meeting

18 with you, her and Mr. Thomas that you

19 found to be overly aggressive?

20      A.    She was very, very forceful, and

21 I just want to make sure you understand

22 that I am responsible for X.   I want to

23 make sure you understand that I am

24 responsible for Y.   I want to make sure

25 you understand that I am responsible for

199

MILLS

1   the on court experience, that tone in --

2   as we sort of discussed the issues that

3   were gray in Isiah's mind before he walked

4   in the door.

5       Q.    Did it seem that

6   Ms. Browne-Sanders was agitated?

7       A.    Yeah.  I said she -- she -- it

8   seemed like she was clearly upset in

9   calling for the meeting because I -- there

10  was a misunderstanding, and she was

11  concerned that maybe her job

12  responsibilities had changed.  So that was

13  clearly important for her to come into

14  this meeting and have it reaffirmed, the

15  scope of her job and to affirm the scope

16  of Isiah's job.

17      Q.    At any point did Mr. Thomas

18  complain to you about Ms. Browne-Sanders?

19          MR. GREEN:   Objection to form.

20  Any time frame?

21          MR. MINTZER:  Any time.  Was

22  that -- was that the only basis of the

23  objection.

24          MR. GREEN:   Yes.

200

MILLS

1

2      Q.      So we clarified that.  At any

3    point.

4      A.      He -- he complained that, you

5    know -- that there -- there were times

6    when it appeared that he was being, you

7    know -- that there were certain things

8    that he didn't want to be involved in that

9    Anucha was -- was outlining or requesting

10   that he be involved in.  He made it clear

11   to me that he did not want to be a person

12   who was out selling season tickets.  He

13   didn't want to be a guy who in -- sending

14   letters to season ticket holders asking

15   them to please renew their tickets

16   sincerely Isiah Thomas.  He -- and it

17   seemed that Anucha wanted to include him

18   in things like that -- that -- that

19   troubled him.  He said -- he was always

20   clear I want to do whatever I can do to

21   support the organization, but I don't -- I

22   don't want to be in the business of -- of

23   selling tickets, and he told me that, you

24   know, that's something Willis Reid has

25   shared with him in -- when he came in and

201

                    MILLS

1
2   was working with Anucha and -- and Scott
3   Laden.  He said that if you're not careful
4   in the organization they will turn you
5   into a pitch man to sell tickets, and you
6   have to find a way to stay focused on
7   basketball and -- and so that was -- that
8   was a complaint of his.  He said he would
9   be more than happy to make sure that
10  whenever we needed him to tell -- to
11  communicate to people about what was going
12  on with the team, how we're building the
13  team, what our expectations about the team
14  were, he would be more than happy to
15  participate in that and use that to
16  support our -- our business, but he didn't
17  want to be in the business of sort of
18  being a salesperson.
19      Q.    Mr. Thomas' comment about Willis
20  Reid, would -- and correct me if I am
21  wrong, I want to make sure I understand
22  this right.  Was he saying that
23  Ms. Browne-Sanders had made according to
24  Mr. Reid Mr. Reid into a -- you know, a
25  salesperson or a pitch man?

207

MILLS

1

2    Q.    Did Ms. Browne-Sanders ever

3    express any complaint to you in, you know,

4    words or substance that she didn't like

5    being excluded from the basketball

6    operations role that she had had under Mr.

7    Laden?

8    A.    She didn't like the idea that

9    she wasn't more involved in -- in the

10   scheduling, and she was -- you know, the

11   preseason scheduling, the scheduling

12   of -- of games. She -- she didn't like

13   that she was -- that she wasn't

14   involved -- more involved in it, but, you

15   know, I explained that that is a thing

16   that -- you know, it is really a

17   basketball operations function.

18          When I worked for the Knicks,

19   Scott wasn't particularly interested in

20   doing -- doing that, so I -- I performed

21   that function when I took on a different

22   role. Anucha performed some of those same

23   responsibilities for Scott, but it really,

24   you know, is more logically and more

25   naturally a function of the basketball

208

MILLS

1

2    operations group, and it is something that

3    she was involved in and I think enjoyed

4    doing.  So she wasn't excited about not

5    being involved in it, but that was the way

6    it was.

7        Q.    Had you had scheduling

8    responsibilities when you were on -- in

9    your previous position with -- for -- for

10   just the Knicks organization?

11       A.    I worked in conjunction with

12   Scott on the scheduling, but I was a lead

13   person on it.

14       Q.    I am sorry.  The last --

15       A.    I was a lead person.

16       Q.    A lead.  Was Ms. Browne-Sanders

17   to your knowledge ever a lead person on

18   it?

19       A.    She was -- she was actively

20   involved in the -- in the scheduling.

21       Q.    The scheduling related in some

22   part to when, you know, player appearances

23   and community events could take place,

24   correct?

25       A.    No, I'm talking about game

246

MILLS

1

2    Ms. Browne-Sanders about Mr. Thomas'

3    hesitancy at being involved in business

4    front office operation matters?

5            MR. GREEN:    Objection to form.

6    You may answer, Mr. Mills.

7        A.    I -- I had conversations

8    with -- with Anucha regarding again

9    giving -- given that we were moving into a

10   more difficult period of time with -- with

11   the Knicks that I -- that there were

12   things that I needed a comprehensive

13   strategy as to how she was going -- how

14   she was going to incorporate Isiah and the

15   basketball operations staff of the team

16   into -- into business initiatives.

17       Q.    Did you ever have occasion to

18   tell Ms. Browne-Sanders that you didn't

19   want to continue to be the intermediary

20   between her and Ms. -- Mr. Thomas?

21       A.    Yes.

22       Q.    And tell me the circumstances of

23   that.

24       A.    That she was -- she would

25   complain that there were certain things

247

MILLS

1
2    that she wanted to get done or there would

3    be a session that was scheduled and then

4    ultimately cancelled, and I -- I explained

5    to her that -- that, you know, at -- at

6    some point I was not going to continue to

7    be the person making the decisions or

8    ultimately having to -- to make sure all

9    of these things were executed upon, and

10   she needed to develop a strategy for

11   either herself or the people underneath

12   her to find a way to -- to get the

13   initiatives with the basketball team done,

14   and that that wasn't an efficient use of

15   my time to be the person ultimately making

16   all those decisions.

17       Q.    Well, Ms. Browne-Sanders had

18   been asking you to be an intermediary and

19   to talk to Mr. Thomas about doing the

20   things that related to the business

21   activities of the team that

22   Ms. Browne-Sanders thought needed to be

23   down.  Isn't that true?

24       MR. GREEN:   Objection to form.

25   You may answer, Mr. Mills.

248

MILLS

1

2      A.      You know I -- what -- what I

3   asked Anucha to do was to develop a

4   comprehensive strategy that incorporated

5   what things needed to be done in order to

6   move business forward, and so I wanted her

7   to develop those -- those kinds of things

8   to determine how we were going to use

9   Isiah and the -- the coaching staff and

10  the Knicks team.  For instance, you know,

11  there were some things that Anucha came

12  forward with that, you know, I think -- I

13  don't know whether she presented them to

14  Isiah or not -- but in my view were

15  inefficient uses of his team time.  I

16  wanted her to come up with things that

17  were appropriate for the business

18  objectives of the team and also of

19  valuable use of his team time and the

20  players and the basketball organization's

21  time.

22      Q.      Ms. Browne-Sanders made you

23  aware that she was having difficulty

24  getting Mr. Thomas to confirm his

25  availability for -- for events; isn't that

274

MILLS

1
2  of regular updates and feedback
3  opportunities.  So that he could have
4  as -- have his hand more in the sense of
5  what was going on or just have in the
6  sense -- on the sense of what was
7  happening with his business.
8      Q.    Did anything come up in this
9  meeting about Mr. Thomas' use of locker
10  room language?
11     A.    No.
12     Q.    Did you ever have a discussion
13  with anyone about Mr. Thomas using locker
14  room language?
15           MR. GREEN:    Objection to form.
16     A.    No.
17     Q.    Did Ms. -- did ██████████ ever
18  tell you that she didn't want to report to
19  Frank Murphy?
20     A.    No.
21     Q.    Did ██████████ ever express
22  any concerns to you about Frank Murphy?
23     A.    No.
24     Q.    Did you become aware from any
25  source other than counsel that Ms. -- that

283

MILLS

1
2  with Hank about that, and I had already
3  known that Hank was not a fan of Anucha's,
4  and I had the conversation with him.  He
5  said you should get to Rusty, so that we
6  can figure out a way -- how to accomodate
7  this and accomodate her, and so I had a
8  conversation with Rusty.
9      Q.    And what was your conversation
10  with Mr. McCormack; what did you say and
11  what did he say?
12      A.    I said that Anucha came to me
13  and said she couldn't do this,
14  couldn't -- couldn't do this any more.
15  She -- I recounted that she had lost the
16  confidence of the people that -- that
17  worked for her and that she wanted -- she
18  couldn't do it, and I agreed, and that she
19  needed to -- to have a job while she went
20  out and -- and looked for another job, and
21  I spoke to Hank, and I -- and -- you know,
22  we should start working on a -- a plan.
23      Q.    Right.  I think I understood
24  that, but I was asking you about your
25  conversation with -- were you just

284

MILLS

1

2   testifying now as to your conversation

3   with Mr. McCormack?

4        A.    Yes.

5        Q.    Okay.  In your -- in your

6   conversation with Mr. McCormack, you told

7   him about the conversation you had with

8   Ms. Browne-Sanders.  You recounted for him

9   that you had the conversation with Mr.

10  Ratner, correct?

11       A.    Yes.

12       Q.    Okay.  And then did Mr.

13  McCormack say anything in this

14  conversation?

15       A.    He said okay I'll -- I'll work

16  on it.

17       Q.    Did he tell you what he was

18  going to work on?

19       A.    We didn't talk about what the

20  specifics of what he was going to work on.

21       Q.    Did you have an understanding of

22  what -- what he was going to work on?

23       A.    I told him that I wanted some

24  kind of transition plan and some kind

25  of -- that we had to develop some kind of

285

MILLS

1

2  package for her that would put her in a

3  position to -- to move on.

4      Q.    When did you have this

5  discussion with Mr. McCormack?

6      A.    It was -- it was sometime

7  in -- sometime in -- in late November.

8      Q.    Did Mr. McCormack ever follow-up

9  with you about what kind of transition

10  plan he was putting together?

11      A.    No, I think it was -- you know,

12  there was -- it was soon after that that

13  we -- we were contacted by -- by Anucha's

14  attorneys.

15      Q.    When you say soon after, do you

16  know how long after?

17      A.    I really -- I really don't.

18      Q.    Was it several weeks?

19      A.    I really can't remember.

20      Q.    Okay.  But whatever that time

21  period was, you never got any follow-up

22  from Mr. McCormack about what he was doing

23  to implement the transition plan?

24      A.    No.

25      Q.    Did you ever see any document

298

1        MILLS

2           MR. GREEN:   Well, I'm not going

3   to object to your placing him in that

4   room.  I just don't want him to slip into

5   a conversation that reveals a privileged

6   communication.  So I'm not going to object

7   to your asking him where he was or how he

8   came to learn, who was present at the

9   time.  That was perfectly fine.

10           Could you tell me what the

11  question was that we started on this.

12           (Record read.)

13           THE VIDEOGRAPHER:   We are back

14  on the record.  The time is 4:18.

15      Q.   Do you recall being in a room

16  with John Moran in which the subject of

17  Ms. Browne-Sanders having retained an

18  attorney was discussed?

19      A.   I -- I don't remember being in a

20  room with him discussing that or that

21  being discussed.

22      Q.   Do you recall Mr. Moran telling

23  you that he was going to proceed with an

24  investigation?

25      A.   I -- I remember, you know, that

299

MILLS

1

2  we were -- that we are going -- that we

3  were going to investigate

4  what -- what -- what the circumstances

5  behind the -- the -- the Hassan Gonsalves

6  incident, and John Moran was

7  going -- there was an investigation taking

8  place as part of that.

9      Q.    Yeah.  Do you remember Mr. Moran

10  ever telling you that he was going to

11  investigate the -- the allegations made by

12  Ms. Browne-Sanders about the -- the

13  treatment that she had claimed to

14  experience?

15      A.    I can't remember whether

16  we -- we sat in a room, and he informed me

17  that.

18      Q.    Okay.  So -- and to be clear, is

19  it your testimony that you don't recall

20  how you learned that Ms. Browne-Sanders

21  retained a lawyer?

22      A.    Yes.

23      Q.    Yes, you don't recall?

24      A.    I do -- at this point in time

25  I -- I don't remember when I was -- when

300

MILLS

1

2    or who told me that.

3         Q.    The conversation in which

4    Ms. Browne-Sanders supposedly said to you

5    that she couldn't do her job any more,

6    where did that take place?

7         A.    It took place in my office.

8         Q.    And was anyone else present?

9         A.    No.

10        Q.    Was the door closed?

11        A.    I believe the door was closed.

12        Q.    Do you recall what day of the

13   week it was?

14        A.    No.

15        Q.    Can you tell me everything that

16   you recall being said in that

17   conversation?

18        A.    I -- I recall her walking into

19   my office saying that we have, you know,

20   an explosive situation,

21   that -- regarding -- regarding the Knicks.

22   I can't -- you know, I've lost the

23   confidence of our staff.  I can't do this.

24   I can't do this any more.  I can't do this

25   job any more.  I've tried every way I can.

301

MILLS

1

2  I have tried to be passive. I have tried

3  to be aggressive, but I can't do this, and

4  I need your help. I need to be able

5  to -- to have this job while I go find

6  another one, and I need your help, and I

7  said I understand, and then -- that

8  I -- that I would do what I could to help

9  her.

10      Q.    Was anything else said in the

11  conversation?

12      A.    That's -- that's the -- that's

13  what I can remember.

14      Q.    Did Ms. Browne-Sanders express

15  any concerns about her security or her

16  safety during that conversation?

17      A.    No, not that I can remember. No

18  -- you know, no, she didn't talk to me

19  about security or safety at that point.

20      Q.    This conversation, was this at

21  or around the time that Ms. Browne-Sanders

22  had made you aware that Hassan Gonsalves

23  had been sexually harassing members of her

24  staff?

25      A.    It was sometime -- sometime I

303

MILLS

1

2  the day she had lost the confidence or was

3  going to have a very difficult time

4  working with Dan, and Dan was going to

5  have a very difficult time working with

6  her, and I -- you know, there were many,

7  many shortcomings, and there were many,

8  many issues that had come up around

9  Anucha's ability to manage

10  through -- through the Knicks's

11  organization and through other

12  organizations, and when there are

13  instances like the open practice issue

14  comes up, and I call a meeting, and I am

15  -- I have people from her organization

16  come, people from the facilities

17  organization come, and it is clear that I

18  have some real questions and real concerns

19  about how an incident -- an incident like

20  that comes to fruition and really

21  challenging her and challenging what

22  really happened in situations like that,

23  the people in her -- that she invited to

24  the meeting they saw what -- what my view

25  of what was going on in the Knicks

304

MILLS

1    organization at that point,

2            MR. MINTZER:  Could you read

3    back my question if you --

4        Q.    You were done?

5        A.    Yes.

6            (Record read.)

7        Q.    And then I said did you ask, and

8    the answer to that is you didn't ask?

9        A.    No.  I assume she -- she was

10   referring -- I assume she was referring to

11   multiple -- multiple people.

12       Q.    And in your -- in your answer

13   you referred to an E mail from Gladstone.

14   What E mail are you -- are you talking

15   about?

16       A.    The -- I received a -- a copy of

17   an E mail from -- from Anucha regarding

18   comments that -- that Stephon Marbury made

19   to Dan Gladstone at some point in

20   the -- in the summer.

21       Q.    And so you received that E mail

22   before the conversation with

23   Ms. Browne-Sanders in which she told you

24   supposedly that she couldn't do her job

25

305

MILLS

1

2   any more?

3        A.    I believe I did.

4        Q.    All right.  And you could tell

5   by the E mail that Mr. Gladstone had sent

6   to Ms. Browne-Sanders that she forwarded

7   to you that Mr. -- Mr. Gladstone wouldn't

8   be able to continue to work for

9   Ms. Browne-Sanders any more?

10            MR. GREEN:  Objection to form.

11   You may answer, Mr. Mills.

12        A.    I absolutely looked at

13   when -- there was an -- there was an

14   instance of sexual -- you know, a sexual

15   harassment claim against Hassan by a

16   number of female employees that I agreed

17   immediately when Anucha brought to my

18   attention that we needed to act on it, and

19   we needed to fire Hassan, but at the same

20   time to start bringing in E mails about

21   conversations that have -- that have

22   absolutely nothing to do with that

23   particular claim regarding comments that a

24   player made to an employee, it clearly

25   impacts, you know, I think the ability

306

1                          MILLS

2     of -- of that -- that employee to feel

3     like he can -- he can move -- move forward

4     working with a supervisor that asked him

5     to put stuff -- put things like that in

6     writing that had nothing to do with a

7     claim that -- that we had -- that was

8     raised and we dealt with.

9          Q.     What was the relationship

10    between Mr. Marbury and Mr. Hassan

11    Gonsalves, if you know?

12         A.      They were -- they were

13    either -- I don't know if they

14    were -- grew up together, if they were

15    cousins or friends.  It -- but

16    they -- there was -- there was definitely

17    a relationship and -- and Hassan was

18    someone that Stephon had -- had

19    brought -- had requested that we hire.

20         Q.     Mr. Gladstone had told Ms.

21    Browne-Sanders and she relayed to you that

22    Mr. Marbury was upset that Mr. Gonsalves

23    had been disciplined when he forged his

24    manager's signature; is that -- is that

25    correct?

317

MILLS

Q.    And what, if anything, did you
do to address the fact that Mr. Marbury
had made those comments or allegedly made
those comments?

A.    Well, I -- I knew it -- you
know, at some point as we got through the
investigation we would find out if he
actually said them and -- and decide
what -- what conversation we should have
with him and what we couldn't go back to
him about.

Q.    Including the investigation you
are referring -- the investigation you are
referring to is the Hassan Gonsalves
investigation?

A.    Yes.

Q.    And did anyone get back to you
with the results of that investigation as
to whether Marbury had in fact made those
comments?

A.    No one got back to me on
comments regarding Stephon.

Q.    Did you ever ask anyone, hey,
whatever happened -- are you we doing

318

MILLS

1

2  anything about Marbury's comments and what

3  he said about Anucha?

4      A.    I think things were in -- were

5  happening so quickly, so I did not get

6  back to anyone, and I -- you know, that

7  was one that was in the hands of our human

8  resources department, and they would

9  initiate the investigations that were

10  appropriate in looking into those

11  comments.

12      Q.    What do you mean that things

13  were happening so quickly?  What was

14  happening so quickly?

15      A.    We -- we -- we -- we

16  terminated -- we terminated Hassan very

17  quickly I think, right before that

18  we -- we -- we terminated Vernon Manuel,

19  and we -- we were in a situation where

20  Anucha had come to me and said that

21  she -- that she couldn't perform in this

22  job, and I was focused on that, and then

23  subsequently after that we were -- we were

24  informed that -- we were contacted

25  by -- by our lawyers.

342

MILLS

Q.    Did you do anything to help
Ms. Browne-Sanders find a job outside of
Madison Square Garden?

A.    No.  By the time this -- all of
this happened so quickly, the conversation
that she had with me telling me she
couldn't -- she couldn't do this any more
to the time that this was -- we were
contacted by the law firm, and this was
in -- you know, being handled by our
lawyers, it was a matter of, you know, a
week or two weeks.  I don't -- it was a
short period of time, so there was no
opportunity.  What I did do was that
Anucha was scheduled to go to -- to NBA
league meetings.  I believe they were in
Florida, and it -- I thought it was
important that she be able to attend those
meetings even though she had told me that
she could no longer do this job and
was -- and wanted to be able -- we had to
find a way for her to leave.  I thought in
order to preserve her position within the
NBA that it -- that it was important to

343

MILLS

1

2    allow her to go attend those meetings and

3    represent the Knicks, so that as we went

4    through a process of finding something

5    else or her finding something else that

6    there -- that we tried everything we could

7    to make it as seamless as possible to the

8    external world.

9        Q.    When Ms. Browne-Sanders had her

10   counsel contact MSG, did she return to

11   Madison Square Garden's offices at any

12   point after that?

13       A.    Yeah.  I -- I can't remember if

14   she did or not.

15       Q.    Did you ever have discussions

16   with anyone about whether

17   Ms. Browne-Sanders would be in the office

18   while her complaint was being

19   investigated?

20          MR. GREEN:    Let me object and

21   advise the witness he may not respond to

22   the extent such discussions, if they were

23   held, were held with counsel or with

24   counsel present; otherwise, he may

25   respond.

355

MILLS

1
2  sold her out in the meeting, and it was my
3  responsibility to step up and answer the
4  questions as it related to Last Man
5  Standing.
6          So Anucha and I had -- had a
7  meeting to discuss that issue, and
8  I -- you know, I informed her that we had
9  a very big disconnect, and that if there
10 was any way that she thought that she was
11 not responsible for that event and for
12 the -- the financial management of that
13 event that I didn't know where she got
14 that opinion from, but I wanted to -- to
15 straighten it out.  There was no -- that
16 event was her responsibility, and she is
17 responsible for managing the expenses of
18 it, and, you know, these were the kinds of
19 discussions that were -- Anucha and I were
20 having throughout 2005 to the extent that,
21 you know, there was at least on one
22 occasion where she left my office and
23 she -- she looked at me and said am I ever
24 going to leave your office and feel good
25 about myself.

356

1          MILLS

2          So there were a series of -- of

3      incidents that took place throughout 2005

4      that were really problematic for my

5      relationship with Anucha and her -- her --

6      you know, her performance in -- in the job

7      in 2005.

8          MR. MINTZER:   Could you read

9      back my question.

10         (Record read.)

11     Q.    I know that you had some things

12     that you wanted to say.  Now could you

13     answer my question?

14         MR. GREEN:   Objection.  There

15     is no reason to be sarcastic, Kevin.

16         MR. MINTZER:   It is not

17     because we are going to be here longer --

18         MR. GREEN:   You are going to be

19     hear as long as you want to keep him up to

20     the maximum amount of time.

21         MR. MINTZER:   That is fine, but

22     if the question wasn't --

23         MS. LYNCH:   I believe it has

24     been asked and answered.  I think he

25     answered at the beginning.

366

MILLS

1
2   not -- were not managed well?

3       A.     I would have to --

4             MR. GREEN:     Objection to form.

5   You may answer, Mr. Mills.

6       A.     I would have to look at the -- I

7   would have to look at the overall P & L of

8   the team and to go through the specifics

9   of it.

10      Q.     The largest expense as I think

11  you referred to earlier in your testimony

12  is the Knicks players salary and luxury

13  tax paid on players' salary; is that

14  right?

15      A.     That is the large -- that is the

16  largest expense in the team portfolio.

17      Q.     You said that you had some

18  conversations with Mr. Dolan, Mr. Ratner

19  about providing training to

20  Ms. Browne-Sanders?

21      A.     Yes.

22      Q.     And could you tell me what was

23  said in those conversations?

24      A.     We -- we had a strategies and

25  tactics and goal planning meeting, and

367

1          MILLS

2  there were some -- and there -- it was a

3  meeting where Anucha wasn't able to -- to

4  satisfactorily answer some of the

5  questions that Jim and -- and Hank had.

6  Jim made a decision that we should move --

7  we shouldn't move forward with the meeting

8  any longer and left the room and went into

9  his office, went -- he went in with Hank,

10  and then, you know, some minutes later

11  they asked me to come into the office

12  and -- and Hank said that -- in that -- in

13  there that, you know, Anucha isn't

14  grasping what we are trying to get done.

15  She is not receptive.  She is not

16  listening.  She is -- she is not grasping

17  what we are trying to do, and I -- you

18  know, I don't think she -- she can make it

19  here.  Jim said, well, she is -- she

20  is -- this is a -- a big job, and we

21  shouldn't just make a judgment like that.

22  She has been successful here up until this

23  point through prior  --   prior years and

24  rather than -- than terminate someone we

25  should find some courses and see if we can

368

MILLS

1
2  give her some training and, he asked me
3  what my thoughts were, and I said well I
4  would like to -- I'm not sure whether she
5  is going -- whether she is going to grasp
6  everything, but I would like to try and
7  see if we can -- we can get training
8  to -- to help her in this area.  Jim asked
9  me to speak with -- to get together with
10 Pete Olsen and have Pete design -- find
11 some courses that she could take and send
12 it around the -- the budget process and
13 marketing as -- as it interacts and
14 intersects with the budget process, and
15 that is what we did.
16     Q.    What were the subjects that Mr.
17 Dolan said that she needed training on?
18     A.    This was -- this was around
19 the -- the process, budget process and
20 marketing as it -- as it related to
21 supporting a budget -- supporting the
22 budget process and building -- building a
23 strategy and a brand for the budget.
24     Q.    When you say building a brand
25 for the budget, what does that refer to?

389

MILLS

1
2    else?

3        A.    There might be things that
4    I'm -- that I'm not thinking of right now.

5        Q.    Right.  But nothing else for the
6    moment comes to mind?

7        A.    You know, there -- there may be
8    other things that I'm -- that I'm not
9    thinking about, but this is it right at
10   this moment in time.

11       Q.    Did Mrs. Browne-Sanders ever
12   communicate to you that Isiah Thomas had
13   acted inappropriate to her?

14       A.    No.  Other than there -- there
15   was an E mail I did receive -- received
16   from her, you know, at -- and I am trying
17   to think of the exact date.  I remember it
18   was in -- sometime late in November there
19   was an E mail she sent to me saying that
20   Isiah had -- I can't remember the
21   specifics of the E mail, but that Isiah
22   had given her a hug and, you know,
23   in -- in gate one, and, you know, I -- I
24   don't want him to -- doing these kinds of
25   things.  Maybe he did it in front -- in

390

MILLS

1
2  front of Jerome Williams.  I do -- I do
3  remember that, and -- and when I received
4  it I -- I had a conversation with Isiah
5  and asked him did he give -- did he give
6  Anucha a hug, and he told me he had, and
7  that I said listen she -- she -- she sent
8  me an E mail.  She didn't think it
9  was -- she doesn't -- she doesn't want you
10  doing that to her.  She didn't feel like
11  it was appropriate.  So don't do that any
12  more.
13      Q.    Did you ever respond back to
14  Ms. Browne-Sanders about that?
15      A.    No, I did not.
16      Q.    Why not?
17      A.    I -- I -- when I received the E
18  mail I thought it was -- it was most
19  important that -- that I talk to Isiah and
20  get him to stop.  The next time I saw
21  Anucha was actually at the -- you know, I
22  was -- I was in Phoenix with -- a board of
23  governors meeting in Scottsdale with the
24  NHL, and I flew back, and the next time I
25  saw Anucha was at an event at The Garden.

393

MILLS

1

2  You may answer.

3      A.     Yeah, the -- Anucha had -- had

4  mentioned to me at some point earlier, I

5  don't remember the exact timing that Isiah

6  had asked Petra Pope to go into the -- the

7  referees' dressing -- locker room area

8  where they -- where they have their food

9  and -- and things like that and stick her

10 head in and check in to see if everything

11 was okay with the referees, if they needed

12 anything else.  Anucha said to me that,

13 you know, that is really not part of

14 Petra's job.  I said you know what, I

15 agree with you.  You know, the -- I don't

16 know if Isiah asked her do that.  I don't

17 know why and I don't think he should, so

18 I'm going to take care of it.  I will talk

19 to Isiah which I did.  I asked him did you

20 ask Petra to do this, and he said yes.  He

21 said you know she is someone that has been

22 around the league a long time.  All the

23 referees know her.  We have spent a lot of

24 money renting furniture, ordering

25 additional food, trying to make the

397

MILLS

1

2   you about Mr. Thomas' conduct at any other

3   time during her employment at MSG?

4       A.    Not that I can -- not at that I

5   can recall.

6       Q.    Did Ms. Browne-Sanders ever tell

7   that Mr. Thomas needed sexual harassment

8   training?

9       A.    No.

10      Q.    Did she ever tell you that he

11  had said that he loved her?

12      A.    No.

13      Q.    Did she ever tell you that

14  they -- that Mr. Thomas had suggested that

15  the two of them meet off site for any

16  reason?

17      A.    No.

18           (Mills Exhibit 16 marked for

19  identification.)

20           (Document handed to witness.)

21      Q.    I have given you a document that

22  -- that has been marked for identification

23  as Mills Exhibit 16, Bates stamp PL 00286.

24           Have you had a chance to look at

25  it, Mr. Mills?

398

MILLS

      1                  (Pause.)

2     A.    Yes.

3     Q.    Does this refresh your

4 recollection about the timing of when

5 Ms. Browne-Sanders sent you this E mail?

6     A.    Yes.

7     Q.    And you recall getting it on or

8 about December 15?

9     A.    Yes.

10    Q.    This is the E mail that you were

11 referring to before when you said you

12 received an E mail about -- of concerns

13 from Ms. Browne-Sanders about Mr. Thomas

14 hugging her?

15    A.    Yes.

16    Q.    And so the record is clear you

17 never responded to Ms. Browne-Sanders, to

18 this E mail?

19    A.    The -- what I did with

20 this -- in -- what I did when I received

21 this E mail was speak to Mr. -- Mr. -- Mr.

22 Thomas and tell him that he shouldn't do

23 this.

24    Q.    Right.  Okay.  That is quite