UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

06 Civ. 0589 (CGE)

----------------------------------------x

ANUCHA BROWNE-SANDERS,

Plaintiff,

- against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD
THOMAS, III, and JAMES DOLAN,

Defendants.

----------------------------------------x

December 11, 2006
10:00 a.m.

VIDEOTAPE DEPOSITION of JAMES
DOLAN, taken by the Plaintiff, pursuant to
Notice, held at the offices of Vladeck
Waldman Elias & Engelhard, P.C. 1501
Broadway, New York, New York, before
Debbie Zaromatidis, a Shorthand Reporter
and Notary Public of the State of New
York.

Page 1

48

```
 1                     DOLAN
 2    that I specifically remember was when Mr.
 3    Mills reported to us that Ms. -- Ms.
 4    Browne was leaving the company.
 5         Q.   What did he say and what did
 6    anyone else there say?
 7         A.   Mr. Mills reported that he had
 8    had a meeting with -- with Ms. Browne and
 9    that Ms. Browne had informed him that she
10    did not wish to continue on in her
11    position, and I believe that Mr. Ratner
12    was -- I don't know if I could use the
13    right word.  I don't know if I could say
14    he was pleased, but Mr. Ratner thought
15    that that was a good development for the
16    company.
17         Q.   Anybody else say anything else?
18         A.   Mr. Mills reported that he was
19    going to work on an arrangement where Ms.
20    Browne could -- could leave the company.
21    The -- on some sort of graduated basis,
22    continue to perform her duties, look for
23    another position.  I believe Ms. -- that
24    Steve reported that Ms. Browne asked
25    her -- asked him to help in locating
```

```
 1                    DOLAN
 2    another position not in the company.
 3         Q.    In this conversation, did Mr.
 4    Mills report that Ms. Browne-Sanders was
 5    concerned about her safety?
 6         A.    I don't recall that.
 7         Q.    Was there any discussion at this
 8    meeting about The Garden providing
 9    security for Ms. Browne-Sanders?
10         A.    I don't recall either.
11         Q.    Did Mr. Mills say why
12    Ms. Browne-Sanders said she was leaving
13    the company?
14         MR. GREEN:  Objection to form,
15    but you may answer.
16         A.    My recollection of it is -- is
17    that it was due to Ms. Sanders not feeling
18    that she could do the job.  Why that was I
19    could -- you know, I would only speculate.
20    she had had a very difficult time in the
21    position, so I don't think that that made
22    it a big surprise to us.
23         Q.    What do you mean by she had a
24    very difficult time in the position?
25         A.    Well, starting from July of that
```

50

1. DOLAN
2. year when the company decided to
3. recalendarize the budget process for the
4. sports teams, Ms. Sanders had what I would
5. characterize as great difficulty with that
6. entire process, and I believe the process
7. revealed significant weaknesses in her
8. skill levels that were necessary in order
9. for her to do the job.
10. Q. Now, understanding that you
11. can't give an exact date, can you give the
12. time frame when Mr. Mills reported to you
13. and others at a meeting that
14. Ms. Browne-Sanders was leaving the
15. company?
16. A. It was towards the end of the
17. year, November, December.
18. Q. Now, prior to July had you heard
19. anything positive or negative about
20. Ms. Browne-Sanders' performance from
21. anybody?
22. MR. GREEN: Objection to form.
23. You may answer.
24. A. I don't recall one way or
25. another other than that she was promoted.

```
 1                    DOLAN
 2    responsibilities for the Knicks.
 3        Q.   Do you recall approximately when
 4    that was?
 5        A.   Obviously prior to July.  I
 6    think significantly prior, meaning
 7    somewhere longer than six months prior.
 8        Q.   So would it have been in 2004?
 9        A.   It could have been, but it could
10    have been earlier.  It could have been
11    early 2005.
12        Q.   Now, prior to the November,
13    December time frame when you say that Mr.
14    Mills told you and others that
15    Ms. Browne-Sanders was leaving the Garden,
16    had you heard anyone be critical of
17    Ms. Browne-Sanders?
18        MR. GREEN:  Objection to form.
19    You may answer it.
20        A.   Yes.
21        Q.   Who did you hear who had a
22    criticism of Ms. Browne-Sanders?
23        A.   Well, I had criticism of
24    Ms. Browne-Sanders, and Mr. Ratner had
25    criticism of Ms. Browne-Sanders.
```

54

1                    DOLAN
2          Q.   Let's start with Mr. Ratner.
3     What criticism did Mr. Ratner express to
4     you of Ms. Browne-Sanders?
5          A.   I think Mr. Ratner's criticism
6     centered around the thing that I
7     was -- that I had mentioned before, the
8     inability to perform the duties,
9     responsibilities of the job, that the
10    skill levels were not there.
11         Q.   What skills did
12    Ms. Browne-Sanders not have in your view
13    or in Mr. Ratner's view as he expressed it
14    to you?
15         MR. GREEN:   Objection to form.
16    You may answer.
17         A.   Mr. Ratner specifically felt
18    that Ms. Sanders had problems getting
19    along with other executives in -- in the
20    company.   The -- but I also think that he
21    agreed with me that Ms. -- Ms. Sanders
22    particularly was missing the budgetary
23    skills, the financial skills as well as
24    the branding and marketing management
25    skills that were necessary in order to do

```
 1                      DOLAN                                55
 2      the job.
 3           Q.   And did Mr. Ratner tell you who
 4      he believed that she had problems getting
 5      along with?
 6           A.   I don't recall.
 7           Q.   Did anyone tell you that they
 8      had problems getting along with
 9      Ms. Browne-Sanders?
10           A.   I don't specifically recall.
11           Q.   Did Mr. Ratner tell you how he
12      came to form a belief that
13      Ms. Browne-Sanders had problems getting
14      along with others?
15           A.   I'm sure he did, but I don't
16      specifically remember -- recall the
17      specifics of it.  No.
18           Q.   Did he tell you that he had
19      understood that that was her reputation or
20      words to that effect?
21           MR. GREEN:  Objection to form.
22      You may answer.
23           A.   As I said, I don't specifically
24      recall, you know, how -- what he used as
25      his rationale or backup for forming that
```

```
                                                      56
 1.                      DOLAN
 2    opinion.
 3         Q.   And what were the budget and
 4    financial skills that you said both you
 5    and Mr. Ratner believed that
 6    Ms. Browne-Sanders was lacking?
 7         A.   Well, in -- budgeting is a -- it
 8    is part of a managerial science.  In
 9    essence the -- a budget is a numerical
10    expression of a -- of a plan of action for
11    an upcoming period of time, generally a
12    year in advance sometimes as much as five
13    years in advance.  The -- it requires
14    the -- the person in charge of that
15    operation to first be able to articulate
16    what their plans, their goals, their
17    objectives are for their area of
18    responsibility for that period of time.
19    It then requires from there the planning,
20    the -- the strategies, tactics, the
21    execution of those, the -- in advance
22    obviously for -- as long as the period of
23    time as the budget is for.  From that,
24    there -- there is then a financial portion
25    of that that is then translated into a
```

1        DOLAN
2    budget, a plan, a financial plan
3    essentially saying we are going to -- we
4    are going to achieve this goal by using
5    these strategies and these tactics, and
6    these tactics will involve the spending of
7    this money, the using of these resources,
8    et cetera, the -- and then ultimately
9    having that result in an overall financial
10   plan for whatever the operation is that
11   you're running.  The -- Ms. Sanders did
12   not understand that basic concept.
13        Q.  Which basic concept?
14        A.  The basic concept is that the
15   budget was a plan -- the basic -- was a
16   reflection of the plan for the upcoming
17   year.
18        Q.  And how do you know that she did
19   not understand that basic concept?
20        A.  Because as I reviewed her
21   submission for a budget, it became clear
22   that she did not understand what she
23   needed to do in order to -- to complete
24   the -- a budget, a financial plan.  She
25   could not answer the questions that the

57

```
 1                    DOLAN
 2    person who was the author of such a
 3    document would need and you would expect
 4    would be able to answer.  The --
 5         Q.  Do you remember any questions
 6    that she was unable to answer?
 7         A.  Oh, yes.  Specifically
 8    the -- the way we review a budget we start
 9    off not with any of the numbers per se,
10    but we start off asking the manager, the P
11    and L manager, to write down for us that
12    goals, strategies, tactics, the -- and in
13    the case of Ms. Browne-Sanders' area we
14    also required a branding statement.  These
15    formed the basis for which you then form
16    the plan for -- for the operating year
17    ahead.  It took us several meetings and a
18    great deal of coaching sometimes to the
19    point where I felt that I was authoring
20    the plan in order to get a sufficient
21    document that you could rely -- that you
22    could then use to formulate the -- a
23    budget off of.
24         Q.  And when was the first of these
25    several meetings that you said that there
```

59

```
 1                      DOLAN
 2   was a great deal of coaching and when did
 3   you have a sufficient document?
 4              MR. GREEN:   Objection.
 5       Multiple, compound question.  You may
 6   answer.
 7       Q.   What is the time frame --
 8       A.   What -- roughly July if -- that
 9   is summer.
10       Q.   Now, when were all of the
11   meetings where there were several meetings
12   and a great deal of coaching?
13       A.   In that -- in the summertime,
14   June, July.  I believe it went into
15   August.
16       Q.   Now, prior to the June, July,
17   August time frame, had you seen
18   Ms. Browne-Sanders at budget forecast or
19   strategy meetings?
20       A.   I don't recall.
21       Q.   Prior to the June, July, August
22   time frame, had you formed an opinion of
23   Ms. Browne-Sanders' skill set or skill
24   level?
25              MR. GREEN:   Objection to form.
```

1.  DOLAN
2.  in 2005, Anne?
3.       MS. VLADECK:  Yes.
4.       A.  No, I don't believe I had in
5.  that position.
6.       Q.  When you keep saying in that
7.  position, what position are you referring
8.  to?
9.       A.  Well, I think that Ms. Saunders
10. had a job prior to this, the -- where she
11. was not in charge of the direct marketing
12. the -- of the Knicks, that she was in a
13. position where she was in charge of
14. portions of the execution of -- of that
15. marketing.  The -- and the -- I believe
16. that she did a good job at that time,
17. the -- that was Mr. Mills -- I believe his
18. statements to me in -- his rationale in
19. promoting her into the position that he
20. did promote her into was that she had done
21. a good job in the job she had before.
22.      The -- and it was a promotion, and
23. necessarily with a promotion you make a
24. move up the ladder of the company that you
25. are working for, and you take on

60

```
1                   DOLAN
2    additional duties, responsibilities, et
3    cetera, and hopefully you've done a good
4    job and the -- you are ready to do that.
5    It became clear in July that Ms. Sanders
6    was not ready to do that, that it was in
7    my opinion a mistake to -- to promote her
8    to that position, but she was in the --
9    the position.
10        Q.   And to the best of your
11   recollection, when did she become
12   responsible for the areas that you thought
13   she was not ready for?
14        A.   Again, I -- you know, it is
15   prior to that July period.  She had enough
16   experience that she was not considered new
17   at that July meeting and whether that was
18   six months or a year I have -- you know, I
19   can't tell you.
20        Q.   So you formed an impression in
21   the June, July, August 2005 time frame
22   that Ms. Browne-Sanders did not have the
23   skills for the job that she had at that
24   time?
25        A.   Yes.
```

```
 1              DOLAN
 2        Q.   Prior to that time at any point,
 3   did anyone express criticism of her to
 4   you?
 5             MR. GREEN:   Objection.  Asked
 6   and answered.  You may answer again.
 7        A.   Yes, I think we did.  I said
 8   before no, not that I recall.
 9        Q.   You said that Mr. Ratner had
10   expressed criticism to you of
11   Ms. Browne-Sanders?
12        A.   Yes.
13        Q.   On how many occasions did he
14   express criticism?
15        A.   More than once and not every
16   day.
17        Q.   Can you approximate how many
18   times?
19             MR. GREEN:   Do you have a time
20   frame, Anne?  It may be helpful to the
21   witness.
22             MS. VLADECK:   I think he said
23   that it never happened before the
24   summertime frame.
25        A.   I don't recall it happening
```

62

63

```
 1                    DOLAN
 2    before the summertime frame.
 3         Q.   So after the summer of '05?
 4         A.   So after the time frame through
 5    November and they -- it would only have
 6    been in conjunction with whenever we were
 7    reviewing the -- some aspect of -- of the
 8    area of the operations that Anucha was
 9    responsible for.  I don't recall Mr.
10    Ratner coming out of the blue and
11    suggesting that, you know, this is
12    something we had to deal with.
13         Q.   Now, when Mr. Ratner expressed
14    to you his criticism of
15    Ms. Browne-Sanders, what, if anything, did
16    you say in response?
17         A.   I agreed with him that -- that
18    he -- that she was not capable of doing
19    the job that -- that she was assigned.
20         Q.   Did he suggest to you at any
21    time that she should be fixed?
22         A.   He did.
23         Q.   When was the first time if there
24    was more than one time?
25         A.   I believe Mr. -- Mr. Ratner was
```

64

```
 1                          DOLAN
 2       of the opinion that Ms. Sanders should be
 3       fixed essentially from the time that we
 4       had those July budget meetings through to
 5       when she ultimately was fired.
 6            Q.   When he first raised with you
 7       his belief that she should be fired, what
 8       did you say?
 9            A.   Well, I know that I did not
10       agree that she should be fixed.
11            Q.   What did you say?
12            A.   That we gave her the position,
13       the -- I agree she is not skilled
14       for -- but let's give her an opportunity
15       to build those skills.  If she doesn't
16       take the opportunity to build the skills,
17       then that is another thing, and we will
18       have to have a replacement.
19            Q.   Did you at any point tell Mr.
20       Mills to tell Ms. Browne-Sanders that you
21       believed that she was not skilled and that
22       she had to build her skills?
23            MR. GREEN:  Objection to form.
24       Could you have the question read back to
25       us, please.
```

65

```
 1                    DOLAN
 2           MR. VLADECK:  Sure.
 3           THE WITNESS:  No, I heard it.
 4           MR. GREEN:  Okay.
 5       A.    What I told Mr. Mills is
 6    that -- not that I told him to tell her
 7    that -- because -- that -- what I told Mr.
 8    Mills was that I believed she didn't have
 9    the skills, the -- and that rather than
10    letting her go because she couldn't do the
11    job, that we needed to provide her with
12    training and attempt to get her up to the
13    level that she needed to be in terms of
14    her skill level, so that she could do the
15    job.  It was my feeling that the -- when
16    you do that for an employee that you get
17    back a very good employee assuming they
18    are willing to rely apply themselves and
19    learn the position.  The -- and it was my
20    hope that that was what that was -- would
21    happen with Ms. Browne-Sanders.
22       Q.    What, if anything, did Mr. Mills
23    tell you when you discussed your belief
24    that Ms. Browne-Sanders wasn't performing?
25       A.    The -- I believe Mr. Mills
```

99

```
 1              DOLAN
 2    wanted to give Ms. Sanders an opportunity
 3    to be successful on the job.  He did
 4    agree -- I don't recall that I had to
 5    argue with him about it.  He did agree
 6    that he would go and work with our staff
 7    in putting together a training plan that
 8    would be designed to fill the gaps
 9    in -- in Ms. Sanders' skill set that she
10    needed in order to do the job.
11         Q.  And can you describe what those
12    gaps were?
13         A.  Essentially what I said before.
14    The -- budgeting, the -- the broader
15    managerial level of marketing particularly
16    having to do with branding.  The --
17         Q.  And --
18         A.  I believe there was some
19    discussion at least of -- of general
20    personnel management kind of skills, but I
21    don't know that that -- in my mind at
22    least, that wasn't the primary reason for
23    sending her for training.
24         Q.  And who --
25         MS. VLADECK:  Just one more.
```

67

```
 1              DOLAN
 2        Q.    You said that you asked Mr.
 3   Mills to work with somebody.  Who did you
 4   ask him to work with?
 5        A.    With Mr. Olsen.
 6              THE VIDEOGRAPHER:  We are now
 7   going off the record at approximately
 8   11:24 a.m.  End of tape one.
 9              MS. VLADECK:  Why don't we take
10   ten minutes.
11              (Recess taken.)
12              THE VIDEOGRAPHER:  We are now
13   going on the record at 11:40 a.m.
14        Q.    Just to go back for a moment to
15   the meeting at which Mr. Mills told you
16   and others that Ms. Browne-Sanders was
17   leaving The Garden, who else was at that
18   meeting?
19        A.    I remember Mr. Ratner was at the
20   meeting.  I don't remember who else.  I
21   would only be conjecturing to say.  It was
22   a board -- it was a chairman's meeting, so
23   the only normal people that would have
24   been there would have been the ones I gave
25   you before who attend the meeting, but
```

70

```
 1.              DOLAN
 2       discussion of providing her with a
 3       separation package?
 4       A.    Not that I recall.
 5       Q.    Or severance?
 6       A.    Right.  I could have just said
 7       that to you, huh?
 8       Q.    And are notes or minutes
 9       normally taken at these chair meetings?
10       A.    No.
11       Q.    Approximately how long was there
12       a discussion at that meeting of
13       Ms. Browne-Sanders?
14       A.    I -- I couldn't say.  I
15       wouldn't, you know -- I didn't time it
16       or --
17       Q.    And do you recall approximately
18       how many times Mr. Ratner suggested to you
19       that Ms. Browne-Sanders should be fixed?
20       A.    I think --
21             MR. GREEN:  Objection.  Asked
22       and answered.  You may answer it again.
23       A.    I can't give you a specific.  I
24       know he was of that -- of that opinion and
25       I believe strongly of that opinion from
```

71

1.              DOLAN
2.   the July period on.
3.       Q.   Did Mr. Ratner tell you that he
4.   didn't personally like Ms. Browne-Sanders
5.   or her style?
6.       MR. GREEN:   Objection to form.
7.   You may answer it.
8.       A.   I don't recall that he
9.   specifically said he didn't like her.
10.      Q.   Did he ever describe her to you
11.  as arrogant?
12.      THE WITNESS:   Counsel --
13.      MR. GREEN:   You may answer the
14.  question fully except to the extent that
15.  those conversations might have been held
16.  in the presence of counsel; otherwise, you
17.  may answer the question.
18.      A.   Okay, I'm -- I don't
19.  think -- it is not my job to help you
20.  here.  The --
21.      (Laughter.)
22.      A.   But in the interest of -- the
23.  interest of getting through this
24.  the -- Mr. Ratner I believe did not think
25.  that Ms. Sanders had a strong and cordial

```
1                   DOLAN
2        from the -- the budget meeting, and really
3        my opinion of her changed pretty
4        dramatically from when you talk about pre
5        that July period to post that July period.
6            Q.   Other than Mr. Mills and Mr.
7        Ratner, did you get input from anyone else
8        on their view of Ms. Browne-Sanders?
9            MR. GREEN:  Objection to form.
10       You may answer.
11           A.   In what period?
12           Q.   Any period.
13           A.   Can you ask the question again?
14           MS. VLADECK:  Can you read it
15       back.
16           (Record read.)
17           A.   I am sure Mr. McCormack gave me
18       his view.
19           Q.   What was Mr. McCormack's view?
20           A.   Well, Mr. McCormack,
21       the -- would have given me his view.  I
22       believe he did give me his view right at
23       the time that Ms. Sanders was let go.
24           Q.   And what did he say to you and
25       what did you say to him?
```

```
 1                    DOLAN
 2        A.    Mr. McCormack said that
 3   Ms. Sanders had willfully violated the
 4   company's policies and had undermined his
 5   investigation of the charges of sexual
 6   harassment that he had -- was charged with
 7   investigating.
 8        Q.    What did he say she had done
 9   which was a willful violation of the
10   company policies?
11        A.    That she had attempted to
12   influence her direct reports using her
13   authority.
14        Q.    Anything else?
15        A.    I believe he told me that
16   he -- that she took one of her direct
17   reports here.
18        Q.    What did he say about that?
19        A.    Well, that clearly was against
20   company policy.
21        Q.    What company policy is it
22   against?
23        A.    When you are -- put in a
24   complaint regarding sexual harassment or
25   actually a complaint, any complaint that
```

74

75

```
 1                          DOLAN
 2    needs to be investigated at the company,
 3    we have a human resources and employee
 4    relations department that are charged
 5    with -- with -- what -- doing that, and that
 6    the -- as you would expect when someone
 7    makes a complaint there is always
 8    obviously two sides to it, and what the
 9    company deems necessary is to have
10    the -- its HR, ER person the group
11    investigate that from basically a third
12    party's point of view.  It requires both
13    parties to the -- to not discuss the
14    matter any further, not engage
15    in -- obviously in any further discussions
16    between themselves regarding the matter
17    and allow the HR department to conduct an
18    investigation and come to a conclusion.
19         Q.  Is it your belief that the HR
20    department came to a conclusion?
21              MR. GREEN:  Objection to form.
22    You may answer.
23         A.  No, I don't believe that
24    they -- that they had at that point.
25         Q.  No.  Do you believe they have at
```

1      DOLAN

2  any point?

3          MR. GREEN:  Same objection as

4  to form.  You may answer if you know, Mr.

5  Dolan.

6      A.   Yes, I have come -- that the HR

7  department believes that they came to a

8  conclusion regarding the complaint that

9  was made.

10     Q.   Did the HR department ever make

11  a recommendation based on the conclusion

12  that it came to?

13         MR. GREEN:  You mean to Mr.

14  Dolan himself?

15         MS. VLADECK:  To anyone.

16         MR. GREEN:  Objection to form.

17  If you know, Mr. Dolan, you may answer.

18     A.   Not that I am aware of.

19     Q.   Now, going back to the

20  conversation that you had with Mr.

21  McCormack, you stated that he told you

22  that Ms. Browne-Sanders attempted to

23  influence her direct reports using her

24  authority?

25     A.   Yes.

76

1. DOLAN
2. Q. What did Mr. McCormack say to
3. you about that?
4. A. That Ms. Sanders had brought in
5. her direct reports, that she attempted to
6. infuse a memory into them of -- of the
7. particular times that the complaint was
8. registered about essentially attempting to
9. coerce her -- her direct reports into
10. corroborating her complaint.
11. Q. Did he identify any of these
12. direct reports that she attempted to
13. coerce?
14. A. I don't specifically remember.
15. Q. Now, you said that he said to
16. you that she brought in her direct
17. reports. Was it your understanding that
18. during the time of the investigation that
19. Ms. Browne-Sanders was at work?
20. A. Yes.
21. MR. GREEN: Objection to form.
22. Which investigation are you referring to?
23. MS. VLADECK: The one that he
24. is referring to that Mr. McCormack said
25. that she was attempting to coerce people.

77

```
                                                              84
1                       DOLAN
2        A.   With that in mind, I think the
3    answer is no.
4        Q.   Were you aware that
5    Ms. Browne-Sanders had complained to Pete
6    Olsen concerning sexual harassment before
7    she went to a lawyer?
8             MR. GREEN:   Same objection.
9        A.   No.
10       Q.   Did you believe that
11   Ms. Browne-Sanders going to a lawyer was a
12   violation of any company policy?
13       A.   No.
14       Q.   Do you believe that two
15   employees together going to a lawyer is a
16   violation of company policy?
17            MR. GREEN:   Objection.  Asked
18   and answered.  The witness may answer if
19   he understands the question.
20       A.   I think it depends on the
21   situation.
22       Q.   In what circumstances would it
23   not be a violation of policy?
24            MR. GREEN:   Objection.  The
25   witness has answered that question now
```

85

```
 1              DOLAN
 2   several times.  I object to the form of
 3   the question.  If he wants to amend a
 4   prior answer, he may.  I am instructing
 5   him not to say what he said twice before.
 6           MS. VLADECK:  It is a different
 7   question.  Maybe if you hear it read back.
 8       A.  I think it -- I think I can
 9   answer the question.  I think it
10   is -- the -- when the employees are going
11   on their own behalf, I think that is fine.
12       Q.  When did Mr. McCormack tell you
13   that Ms. Browne-Sanders had willfully
14   violated company policies and undermined
15   his investigation of her charges?
16       A.  I don't have the specific date.
17   It was on a helicopter ride between our
18   corporate offices in Bethpage and West
19   30th Street here.
20       Q.  Can you time it as to proximity
21   to when she was actually fixed?
22       A.  Same day I think.  Within 24
23   hours.
24       Q.  Prior to that helicopter ride,
25   have you had any other conversations with
```

```
 1.          DOLAN

 2     Mr. McCormack concerning

 3     Ms. Browne-Sanders?

 4          MR. GREEN:  Objection to form.

 5     At any time ever?

 6          MS. VLADECK:  Yes.

 7          A.   I don't recall.

 8          Q.   Prior to that helicopter ride,

 9     had you had conversations with Mr.

10     McCormack or anyone else with respect to

11     the investigation into her charges?

12          MR. GREEN:  To the extent that

13     that would require you to reveal

14     conversations you had in the presence of

15     counsel, Mr. Dolan, or at the direction of

16     counsel, you may not answer this question.

17          MS. VLADECK:  This is a yes or

18     no.  Can I have the question read back,

19     please.

20          (Record read.)

21          MR. GREEN:  Because the

22     question contains the substance and

23     subject of the meeting, I instruct the

24     witness not to answer to the extent it

25     would be a meeting at which counsel was
```

98

87

```
 1                   DOLAN
 2      present or held at counsel's direction.
 3      So you may not answer this question if you
 4      had any such meeting or discussion at
 5      the -- in the presence of counsel or at
 6      the direction of counsel.
 7           A.   Okay.  I got the direction.  I
 8      think that -- that the answer -- I know
 9      that the answer is that the only
10      communication I had with Mr. McCormack
11      prior to this in regards to this -- this
12      matter would be to verify that he was in
13      fact investigating the matter.
14           Q.   Who made the decision to have
15      Ms. Browne-Sanders' employment be
16      terminated by The Garden?
17           A.   I did.
18           Q.   Did you make it on your own or
19      was it with others, consultation or
20      something else?
21           A.   Well, all decisions at The
22      Garden I make on my own.
23           Q.   And what were the reasons or
24      what was the reason you fired
25      Ms. Browne-Sanders?
```

88

```
1                      DOLAN
2         A.   Because Ms. -- we could not keep
3    going with her in the position that she
4    was in The Garden.  Remember, that what
5    we had agreed to was -- is that
6    Ms. Browne-Sanders was going to continue
7    on with her duties and responsibilities
8    while she looked for another position.
9    The -- that is what she had asked us to
10   do.  The -- and we had agreed.
11        Q.   The -- as part of that we -- the
12   operation of the -- of the marketing and
13   of the Knicks was part and parcel of that.
14   We needed somebody to make sure Game Day
15   happened.  Make sure that -- that the
16   slicks were reviewed, that the -- all of
17   the day-to-day responsibilities that were
18   part of Anucha's job.  That the -- after
19   that -- that conversation it was very
20   clear -- clear to me that she could no
21   longer do that job, that we could not have
22   her do that job.
23        Q.   I am sorry.  When you say after
24   that conversation, what conversation?
25        A.   The conversation on the
```

68

```
 1.            DOLAN
 2     helicopter.
 3         Q.   With Mr. McCormack?
 4         A.   With Mr. McCormack.  I think Mr.
 5     Ratner was there, too.
 6         Q.   And the conversation related to
 7     Mr. McCormack suggesting that
 8     Ms. Browne-Sanders was undermining the
 9     investigation?
10         MR. GREEN:  Objection to form.
11     You may answer.
12         A.   That she had had undermined the
13     investigation, yes.
14         Q.   Did Mr. Ratner say anything
15     during this conversation?
16         A.   I believe Mr. Ratner echoed what
17     he has been saying all along, that -- that
18     Ms. Sanders needed to be let go.
19         Q.   What, if anything, about what
20     Mr. McCormack told you was a factor in
21     your decision to fire Ms. Browne-Sanders?
22         A.   The -- really the single thing
23     was that -- is that -- whether she was
24     going to be able to continue to do -- to
25     exercise her duties and responsibilities
```

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868    516-608-2400

171

```
 1                     DOLAN
 2          A.   I don't recall.
 3          Q.   Again, it would not be -- a
 4   normal thing for Mr. Mills to talk to me
 5   about the complaints for his -- his
 6   employer.  I mean he is responsible for
 7   her.  So why complain to me?  The -- in
 8   fact, I would probably ask him that
 9   question.  Why are you complaining to me?
10   She reports to you.
11          Q.   Before you made the decision to
12   fire Ms. Browne-Sanders, did you ask Mr.
13   Mills whether he agreed or disagreed with
14   that decision?
15          A.   No.
16          Q.   And do you recall why you made
17   the decision to fire her on the day that
18   you made the decision?
19          A.   Yes.
20          Q.   And what was that?
21          A.   We had come to the conclusion
22   that her working at the company was no
23   longer tenable due to the fact first
24   that -- that leading up until that point
25   and all the way from July up until that
```

172

```
 1                    DOLAN
 2    point we had had problems.  I think that
 3    factored into it.  The -- they -- and then
 4    the issue of utilizing her position to
 5    influence her direct reports and then
 6    finally making a request for 6 million
 7    dollars in severance.
 8         Q.  On what do you base your
 9    statement that she made a request for 6
10    million dollars in severance?
11         A.  It was reported to me that she
12    made a 6 million dollar -- request for 6
13    million dollars in severance.
14         Q.  Who reported it to you?
15              MR. GREEN:  I am going to ask
16    the witness not to respond further to the
17    extent it would reveal conversations with
18    counsel.  If he acquired the information
19    from other means, he may respond fully.
20              MS. VLADECK:  Ron, I don't
21    believe you could open the door and then
22    close it.  I think that to the extent that
23    he was relying on any information even if
24    it was through counsel the door has been
25    opened.
```

178

```
 1                        DOLAN
 2            MR. GREEN:  You may answer.
 3       A.   -- who I heard the 6 million
 4   dollar request from.
 5       Q.   In what context did you hear the
 6   request?
 7       A.   That is what I don't recall.
 8       Q.   And did you hear the request on
 9   the day you decided to fire her?
10       A.   I'm not sure.
11       Q.   Did you tell anyone that a
12   factor in your decision to fire
13   Ms. Browne-Sanders was that she had made a
14   request for 6 million in severance?
15       A.   I think I did.
16       Q.   Who did you tell?
17       A.   I think at that same discussion
18   at the helicopter I pointed out that she
19   is already had -- had essentially -- I was
20   told she wasn't staying.  She -- she
21   resigned and asked for the extended stay
22   period.  The -- that she had tampered with
23   an investigation that -- that was begun on
24   her behalf, the -- and then had asked for
25   6 million dollars in severance.
```

179

```
 1                     DOLAN
 2        Q.   Now, when you said you think you
 3   said it in the same conversation, was that
 4   with Mr. McCormack and Mr. Ratner?
 5        A.   Right.
 6        Q.   Is there a reason you didn't
 7   tell me that this morning when you were
 8   asked a direct question as to whether or
 9   not you told Mr. Ratner or Mr. McCormack
10   that a request for severance was a factor
11   in your decision to fire her?
12        A.   No, I don't think you asked me
13   about a request for severance.  You asked
14   me about a settlement.  Settlement is a
15   bit different than a request for
16   severance.
17        Q.   Is that the way you've been
18   parsing my questions if there was --
19        A.   I don't mean to be cute with
20   you, but the --
21        Q.   Well --
22        A.   The -- it first came in a
23   request for severance.  That then came in
24   a threat, right, that if the -- that if
25   the -- if I didn't get the money, right,
```

```
1                        DOLAN

2         Q.    This was the reason you fired

3    her; is that correct?

4         A.    Sure.

5         Q.    What is the best recollection

6    you have as to what you believed that she

7    did with respect to the investigation?

8         MR. GREEN:    Objection.    It is

9    asked and answered.    The witness

10   can -- answer the question if he wants to

11   supplement what he said.

12        A.    Again, used her influence with

13   direct reports to influence their answers,

14   their -- their responses to an inquiry to

15   an investigation that was being made on

16   her behalf.

17        Q.    And then the third thing was

18   you're understanding that she asked for 6

19   million in severance?

20        A.    She asked for 6 million dollars,

21   right?

22        MR. GREEN:    Just note my

23   objection that your question presupposed

24   that there were three.

25        Q.    Were there any other factors?
```

184

212-267-6868    VERITEXT/NEW YORK REPORTING COMPANY    516-608-2400

185

```
 1                      DOLAN
 2   am trying to get the universe of factors.
 3           MR. GREEN:    I thought the
 4   witness had testified more fully to a
 5   number of things.
 6           MS. VLADECK:    That is a
 7   speaking objection.
 8       Q.   To the extent that there are
 9   other factors, what are they?
10       A.   And all the factors leading up
11   to from July up until that point.  I mean
12   that is a quite a long list, you know.
13       Q.   That was your first factor.
14   What were all the events from July until
15   the date you fired her?
16       A.   The -- again, I stated earlier
17   the -- you know, the inability to do her
18   job.
19       Q.   And how was that reflected
20   between July and January?
21       A.   That's in -- that is
22   inability -- inability to budget,
23   inability to brand.  It is --
24       Q.   And --
25       A.   The -- and then the -- you know,
```

186

981

1      DOLAN
2      my essentially taking the opinion of Mr.
3      Rather that she had not improved, that he
4      believed that she was -- should be
5      terminated.
6      Q.    Are you done with all the events
7      leading from July to January?
8      A.    Yes, I think so.
9      Q.    What made you believe that from
10     July to January she had an inability to
11     budget or brand?
12     A.    Because of the July meeting, the
13     skills and the work product that she
14     produced was not -- low, not acceptable.
15     It showed a lack of understanding of
16     budgeting.    It showed a lack of
17     understanding of branding.    She was unable
18     to come up with a branding statement for
19     the New York Knicks.    She had to be given
20     one.    That the -- and her -- in her budget
21     she was unable to explain her budget and
22     when she -- and when she did explain her
23     budget, her explanations, the -- showed a
24     lack of understanding of how budgets
25     are -- are put together and differences

187

DOLAN

1.

2  between things such as operating expenses
3  and capital expenses, and she actually in
4  the middle of the budgetary process
5  revealed that she had misclassified some
6  80,000 dollar or a hundred thousand
7  dollars worth of expenses from operating
8  into -- from capital into operating.
9       Q.  Was this all reflected during
10  the summer budget meetings or is this
11  something that happened between July and
12  January?
13       A.  This was all -- the budget
14  meetings went through July and August.
15       Q.  Okay.  My question is after the
16  budget meetings over the summer --
17       A.  Yes.
18       Q.  What did you observe with
19  respect to Ms. Browne-Sanders' inability
20  to budget and/or brand from those budget
21  meetings until January of '06?
22       A.  Nothing other than that -- that
23  I did not receive a report that she had
24  gotten any better, and there was no reason
25  to think that she went through the -- the

188

1       DOLAN
2   training, but I did not get a positive
3   report.  I didn't get any report
4   essentially on it.
5       Q.   Did you ask for a report at any
6   time between the summer budget meetings
7   and the day you decided to fire her?
8       A.   I don't recall.  I don't -- I
9   don't recall if I did or if I didn't.
10      Q.   Now, you said that you also
11  relied on the opinion of Mr. Ratner that
12  she should be terminated.
13           When did Mr. Ratner express his
14  opinion that she should be terminated?
15      A.   Consistently from July through
16  her termination date.
17      Q.   And you rejected his opinion
18  from July, August, September, October,
19  November and December; is that correct?
20           MR. GREEN:  Objection to form.
21  Misstates prior testimony.
22      Q.   Is that correct?
23           MR. GREEN:  You may answer.
24      A.   I think it -- rejected would be
25  strong, but essentially we didn't act upon

DOLAN

what his -- what his opinion -- we tried to give Anucha a chance, but you have to remember that the -- you are asking me about the day she was fired. The -- we went through this whole process with her. Then she comes back to us, and she tells us that she is not going to work here any more. The -- that the -- it is unclear what the reason is why she doesn't -- why she can't work here any more, but I assume that the -- that it had something to do with her experience over the last six months. The -- so now we are already looking for -- we already have to rejigger the -- the department, et cetera, but she is -- she is going to stay as long as we help her find another position, but she is essentially out. She has no future at the company by her own hand, and then the -- comes in the report that she wants $600,000 worth -- excuse me -- 6 million dollars worth of severance that the -- and that -- that the -- she's been tampering with an investigation into a complaint

```
1                      DOLAN
2    that she's made, and the last part is
3    the -- is the part that is most difficult
4    to deal with because as ridiculous as the
5    6 million dollar request was that
6    the -- she could have continued on doing
7    her job if she had not tampered
8    with -- with those people, the -- but the
9    combination of all of those things
10   together -- and finally the tampering as
11   being the last straw in that really led us
12   to -- led me to the conclusion that her
13   employment at the company was over with.
14        Q.  Now, you started by saying that
15   you believed she started this whole
16   process.  What whole process are you
17   referring to?
18        A.  I'm not sure --
19        MS. VLADECK:  Could you read it
20   back.
21        (Record read.)
22        Q.  What did you mean by the whole
23   process?
24        A.  What I meant by the whole
25   process is -- we went through the whole
```

190

161

```
 1                    DOLAN
 2    budgeting process with her.  We discovered
 3    these deficiencies that the -- that -- you
 4    know, that -- in her skill set.  We went
 5    through and paid for the -- and offered
 6    her training the -- and paid for her
 7    training to up those skills.  I mean that
 8    was at our expense that the -- and, you
 9    know, after we are done sending her
10    school, right -- that -- to get better at
11    this, right, the -- she walks into the
12    office and says essentially I'm quitting.
13    The -- I can't work here any more.
14    The -- the -- and you need to -- what
15    I -- what I need you to do is to keep me
16    on, and I'll do my job, which was fair,
17    and help me find another job.  That
18    the -- you know, at that point, you know,
19    I have to tell you that as -- as the CEO
20    of the company having then, you know,
21    offered her the -- the ability, right, to
22    essentially come out of what was a pretty
23    bad review but which is what came up out
24    of in terms of how her performance was in
25    that budgetary process, offering her the
```

```
  1                    DOLAN
  2    ability for help, training to get her
  3    skill levels up, the company was going to
  4    stick with her, that the -- the -- and she
  5    took the training, and then she came back
  6    and basically said I quit.  The -- then
  7    she asks for 6 million dollars, that
  8    the -- and then we find out that
  9    she -- that she is utilizing her position
 10    that she is -- she is off through the
 11    company attempting to garner support for a
 12    complaint that the -- about sexual
 13    harassment.  The -- at what point
 14    does -- does an employee become no longer
 15    effective at a company as -- in her
 16    position.  She was no longer effective.
 17    The -- the -- and the -- at that point,
 18    you know, I decided that the company had
 19    to -- had to just cut it off, and that was
 20    when she was fired.
 21        Q.  Now, you say that you heard from
 22    Mr. Mills that Mrs. Anucha Browne-Sanders
 23    just walked into the office and said I'm
 24    quitting?
 25             MR. GREEN:  Objection.
```

VERITEXT/NEW YORK REPORTING COMPANY
212-267-6868                    516-608-2400

193

OLSEN

1
2    pretty specific to Frank, but there may
3    have been. I just don't know.
4        Q.    Did -- and Ms. Browne-Sanders
5    did not come up at that meeting?
6        A.    Correct.
7        Q.    Was there any follow-up after
8    that meeting with Mr. Thomas and Mr.
9    Mills?
10        A.    I had met -- well, I sent
11    the -- my synopsis, as I mentioned
12    earlier, to both. I had a meeting -- I
13    don't know -- I don't know that it was for
14    that purpose. I had a meeting with Steve
15    because probably we had a -- three or four
16    different things going on, but I asked him
17    about a follow up. He said he was
18    going -- I think he was going on vacation,
19    and he said why don't you send Isiah an E
20    mail, and I'll -- I think he said he would
21    mention it to him, but I can't say for
22    sure if he said that, but I think he said
23    that and ask him if he wants to follow-up
24    on, you know, other organizational issues
25    and so forth.

1          DOLAN                                    196

2          A.    I --

3          MR. GREEN:   Objection to form.

4          A.    I don't know which date it was.

5          Q.    Is there anything that would

6     refresh your recollection?

7          A.    I don't know.   I -- you know, I

8     mean -- other than hearing somebody else's

9     testimony, I guess, and that is not really

10     very helpful.   I mean I --

11          Q.    Now, are you -- are you aware

12     that Mr. McCormack believed that the

13     document that you have before you, Dolan

14     Exhibit 1, was prepared after you made the

15     decision to fire Ms. Browne-Sanders?

16          MR. GREEN:   Objection to form.

17     If the witness knows what Mr. McCormack

18     knew or thought he knew.

19          A.    I -- you know, I am unaware of

20     this document essentially until today.   I

21     mean I am seeing it for the first time

22     today.   I didn't know Mr. McCormack wrote

23     a document such as this.

24          Q.    Well, he didn't write it.   Mr.

25     Schoenfeld did, but -- did you tell Mr.

1  DOLAN

2  McCormack the three reasons or the three

3  factors for Ms. Browne-Sanders'

4  termination that you just told us here

5  today?

6  MR. GREEN: I am going to

7  object to your characterizing the factors

8  as any specific number, but the witness

9  may answer.

10  A. I believe I did.

11  Q. And did you tell Mr. Ratner?

12  A. Yes.

13  Q. And you told both of them that

14  Ms. Browne-Sanders using her position to

15  influence the investigation was a factor

16  in the termination?

17  A. Yes.

18  Q. Is one factor more heavily

19  weighted than any of the others?

20  MR. GREEN: Objection to form.

21  A. I -- you -- it -- I would have

22  to say that the July -- the July the

23  through -- this period here was

24  significant. The -- however the -- using

25  her position to influence employees in the

197

198

```
 1                     DOLAN
 2   investigation was particularly -- showed a
 3   lack of -- of ability for us to trust her.
 4   I don't think we could trust her after she
 5   did that.  The -- you know, the -- if she
 6   couldn't let the company operate and
 7   follow the rules of the company and she
 8   was going to establish her own rules,
 9   which is essentially what she did, that
10   the -- it -- I mean at that point the -- I
11   think she really made her -- her
12   employment untenable because you just had
13   no idea what she would do.  The -- I mean
14   the -- she clearly didn't respect the
15   process and the lines of authority, so how
16   could she stay?
17        Q.  You have characterized what she
18   did as violation of policy as being wrong,
19   as all sorts of things.
20        A.  Yeah.
21        Q.  What did she do that in your
22   view was so bad that it deserved immediate
23   termination?
24            MR. GREEN:  Objection.
25   Misstates prior testimony.  It has been
```

200

```
 1                     DOLAN
 2      that she actually did in order to
 3      influence people or have them back her up?
 4           A.   She --
 5           Q.   What are -- what are the events
 6      that you believe --
 7           A.   I believe she had discussions
 8      that -- that she brought -- that -- that
 9      she had people in her office.  I mean it
10      was reported to me that she had been
11      tampering with the investigation that --
12      that form.  I mean the -- the -- you know,
13      her responsibility at that point was to
14      leave the investigation up to the people
15      who she made the complaint to.
16      The -- actually I don't think she had made
17      the complaint at that point.  That
18      the -- I am a little fuzzy on
19      whether -- whether it was right there
20      before or after, but she clearly knew she
21      was going to make a complaint that
22      the -- and then she brought people in who
23      reported to her.  That the -- and
24      proceeded to discuss the merits of her
25      complaint.  The -- and attempt to persuade
```

201

```
 1              DOLAN
 2   the people underneath her that her
 3   complaint had merit and that they -- and
 4   attempt to get them to back her up on her
 5   complaints.  That the -- the -- now
 6   even -- even if -- if those people had
 7   heard anything, right, that would back her
 8   up, at that point she rendered the company
 9   useless in its ability to investigate
10   because at what point -- how do you know
11   when we are asking those people whether
12   they are responding to our specific
13   questions or whether they are responding
14   to the fact that their boss, right, told
15   them that they need to answer this way,
16   that they -- there was no -- she
17   essentially rendered the company incapable
18   of deciding the -- you know, deciding the
19   merits of those people's testimony.
20   The -- the -- I don't think that is a
21   difficult concept to understand, that
22   the -- the -- you know, the -- you can't
23   be the victim, the judge, and the jury and
24   the prosecutor all at once.  You're not
25   allowed to do that.  And the -- and that
```

```
 1              DOLAN
 2    is what she was attempting to do.
 3    The -- she so wanted to -- apparently to
 4    have this complaint be verified by the
 5    people underneath her, that -- that
 6    she -- you know, she violated the company
 7    policy, and she rendered herself at that
 8    point the -- the -- unemployable by the
 9    company.  The -- because the -- we had no
10    way of knowing whether she was going to
11    continue to do that or not continue to do
12    that, and so how could I then have her
13    continue to run that operation.  We
14    couldn't.  The -- that is why she was let
15    go.
16         Q.  And everything you learned about
17    her attempt to influence the investigation
18    in your words you learned from Mr.
19    McCormack; is that correct?
20         A.  From Mr. McCormack, that's
21    right.
22         Q.  Was there any other source of
23    information for that belief?
24         A.  Not for that decision, no.
25         Q.  And did Mr. McCormack tell you
```