Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

06 Civ. 0589 (GEL-XDR)

------------------------------------------x

ANUCHA BROWNE-SANDERS,

                   Plaintiff,

   - against -

MADISON SQUARE GARDEN, L.P., ISIAH LORD

THOMAS III, AND JAMES DOLAN,

                   Defendants.

------------------------------------------x

              October 30, 2006
              10:00 a.m.

    VIDEOTAPE DEPOSITION of DAN

GLADSTONE, taken by the Plaintiff,

pursuant to Notice, held at the offices of

Vladeck Waldman Elias & Engelhard, P.C,

1501 Broadway, New York, New York, before

Debbie Zaromatidis, a Shorthand Reporter

and Notary Public of the State of New

York.



83

GLADSTONE

1
2  A. I think it had to do with -- in
3  November with Vernon Manuel. And -- yeah.
4  Yes.
5  Q. All right. So let's just step
6  back if we can.
7       You recall having -- where was
8  the conversation -- where did it take
9  place the conversation you had with
10 Ms. Browne-Sanders in which she was
11 crying?
12 A. In her office.
13 Q. In her office?
14 A. That's correct.
15 Q. And why were you in her office?
16 A. I think she called me in.
17 Q. What did she say to initiate the
18 conversation?
19 A. I believe this was before
20 Thanksgiving, and she wanted me to
21 document information regarding -- to
22 Vernon Manuel's performance and his poor
23 job performance. He was struggling at the
24 time.
25 Q. Did she say anything else?

```
                                                            84
 1                    GLADSTONE
 2       A.    Not that I -- not that I can
 3   recall specifically.
 4       Q.    Did you say anything in response
 5   to that?
 6       A.    I -- I gave her what she wanted,
 7   and I actually had a problem because it
 8   was the Thanksgiving break, and I was
 9   getting ready to go home for Thanksgiving,
10   and most people were just leaving the
11   office on the earlier side, and I recall
12   it was kind of later in the day, and she
13   wanted everything documented, and it
14   wasn't, hey, enjoy the -- Thanksgiving
15   with your family.  It was, hey, you need
16   to get me everything about Vernon Manuel
17   over the weekend, and I need it buttoned
18   up and as factually together as possible
19   even if you must work on it this weekend.
20   I am need it, and I need it as soon as
21   possible.
22       Q.    And this was right before
23   Thanksgiving? You think it was --
24       A.    I believe so.
25       Q.    Was it -- was it the Wednesday
```

85

GLADSTONE

```
 1   
 2   before Thanksgiving?
 3        A.   I believe so.
 4        Q.   Was that the first request she
 5   had made to you of during -- of
 6   documenting Mr. Manuel's performance
 7   issues?
 8        A.   No, she had -- she had told me
 9   to keep accounts of all his job
10   performance.
11        Q.   When had she told you that?
12        A.   I can't recall.
13        Q.   Do you have any sense whether it
14   was 2004 or 2005?
15        A.   Probably a couple of months into
16   his employment when he first showed some
17   signs of problems.
18        Q.   And did you document his
19   performance problems?
20        A.   I started taking notes I
21   believe, but it wasn't -- they
22   weren't -- I can't recall exactly what was
23   sent or the amount of documentation that
24   was put down.  I felt uncomfortable
25   documenting and sending her this
```

214

GLADSTONE

happened, and that -- and that Stephon was not pleased with the salary. It seemed really like he wasn't pleased with the salary for Hassan, and he was not pleased with -- with just how it was, kind of the reality of the situation.

Q. Did you tell Ms. Browne-Sanders the details of what Mr. Marbury had said about her?

A. I expressed some of the things that he said. That's -- yes.

Q. And this was back in -- back in June?

A. I believe so. Yeah.

Q. When you say you expressed some of the things that he said, what did you tell Ms. Browne-Sanders?

A. I don't remember the specifics, but I told her that some of the hostile negative things he had said about her.

Q. Did you tell her that he had referred to her as a bitch?

A. I did.

Q. You told her that he had

215

GLADSTONE

1  
2 referred to her as a black bitch?  
3     A.    I believe so.  That was pretty  
4 clear in my head.  
5     Q.    Did Ms. Browne-Sanders have any  
6 reaction to that?  
7     A.    She was not pleased.  
8     Q.    Did she say anything or did she  
9 just say I am not pleased?  
10    A.    I don't recall the conversation.  
11 Just that it was not -- it was not a high  
12 point career discussion talking about  
13 this -- this kind of language.  
14    Q.    Did you have any further  
15 conversation with her about Mr. Marbury's  
16 call to you at that point in June?  
17    A.    No, not that I can recall.  
18    Q.    And how did it come to be that  
19 in November you were writing an E mail  
20 about the substance of the call?  
21    A.    That's actually a good question.  
22 I -- I was pretty surprised that all this  
23 information -- she needed this  
24 information.  It was -- seemed apparent to  
25 me that she was getting as much

216

GLADSTONE

1
2  information together as she could about an
3  uncomfortable situation. She was not
4  happy with the Vernon Manuel situation.
5  She wanted me to document everything about
6  that, and she wanted me to document pretty
7  much everything that I had experienced or
8  witnessed that seemed out of the ordinary.
9      Q.    And as part of that, she had
10 asked you to document your -- your call
11 with Mr. -- Mr. Marbury in June?
12     A.    I believe so.
13     Q.    And as a result of that
14 direction, that's what you produced as the
15 top E mail in Gladstone 7?
16     A.    That's correct.
17     Q.    There are several items in
18 quotation marks in your E mail under the
19 heading "all referring to Anucha."
20         Do you have a recollection of
21 Mr. Marbury saying all those things that
22 are in quotations?
23     A.    I do.
24     Q.    The third bullet point refers to
25 a quote that Mr. Marbury said "We don't

218

1        GLADSTONE
2    A.    That's correct.
3    Q.    Is that fair to say?
4    A.    That's correct.
5    Q.    You -- you wrote in the last paragraph of that E mail "The conversation was more detailed, but to the best of my ability those are the only exact phrases that I can recall." And then you went on to say "I did call you that night to give you a heads up that Stephon was angry with the situation and that Stephon had some hostile things to say about members of Knicks management."
          Do you see that?
16   A.    I do.
17   Q.    You didn't refer to the conversation that you had had with Ms. Browne-Sanders a couple of days after your call with Mr. Marbury?
21   A.    I'm not sure what the question is.
23   Q.    In your E mail you didn't refer -- you testified just a little while ago that you had -- after that night you

```
                                                          219
 1                    GLADSTONE
 2   had had a couple of days later a
 3   conversation with Ms. Browne-Sanders about
 4   that subject?
 5        A.    That's correct.
 6        Q.    And that's not reflected in your
 7   E mail, correct?
 8        A.    It doesn't -- no.
 9        Q.    Any particular reason why that's
10   not reflected in your E mail?
11        A.    It didn't. I don't think it was
12   relevant. I think she asked me the
13   conversation that I had with Stephon.
14        Q.    The phrases in quotations --
15        A.    Yes.
16        Q.    -- is it your testimony that you
17   had previously told Ms. Browne-Sanders the
18   substance of these quotations back in
19   June?
20        A.    I don't remember the exact
21   words, but I remember we -- I told her
22   about the disparaging remarks.
23        Q.    Well, did you just refer to them
24   generally as disparaging remarks or were
25   you more detailed about it?
```

```
                          GLADSTONE                       220

   A.     I don't recall exactly what was
said.
   Q.     So you might have just told her
that he had very negative things to say
about her without going to -- into the
details about what specifically he said?
   A.     I definitely told her that he
used the -- the F word and that he called
her a bitch.
   Q.     You definitely told her that in
June?
   A.     I -- to the best of my ability,
I can remember that because that's the
only reason I even had the conversation
with her is that, wow, I was surprised,
and, hey, you should know that that I got
a phone call that I find uncomfortable and
unprofessional to get called at 9:30 at
night by anyone on staff that's going to
say anything negative about anyone else on
staff using race -- race and gender, which
I just found to be very disturbing.
   Q.     Did you bring Mr. Marbury's
comments to anyone's attention other than
```

Unknown

**From:** Gladstone, Dan
**Sent:** Monday, November 28, 2005 6:27 PM
**To:** Browne Sanders, Anucha
**Cc:** Buchholz, Karin
**Subject:** Staffing issues - MARBURY

**Importance:** High

**Attachments:** Staffing memo(June 16).doc

EXHIBIT
Gladstone 7
10/30/06

Anucha

As per your request, I am submitting some comments made by Stephon Marbury from a phone conversation that happened this summer in June (perhaps June 16th at 9 PM in the evening) when he called me on my cell phone to comment on events that transpired as mentioned below in the attached email as pertaining to his cousin, Knicks staffer Hassan Gonsalves:

- Stephon was upset that he felt his family member, Hassan, was being treated unfairly by Knicks management
- Stephon was not happy with the salary range for his cousin Hassan.
- I explained the timesheets and payroll process, and that Hassan would not be assigned to work more then 35 hours per work nor would he be assigned to work overtime and Hassan's salary was determined by Knicks management.
- I explained that Hassan was not granted a parking spot at 31st street garage and I did not approve him using my access code nor was I aware he was forging my signature to park his vehicle.

- Stephon was upset at these circumstances and expressed extreme displeasure at the Knicks front office staff, particularly mentioning Anucha
- Though time has passed, several comments I can recall Stephon making include:

all referring to Anucha
- "No one likes that black bitch"
- "Fuck that black bitch, she thinks she runs the Knicks, she don't run shit. I sell the tickets around here, not her, I put people in seats, this is my team."
- "We don't like her, she thinks she tells us what to do, she don't tell us shit"
- "Fuck that black bitch, she ain't shit and we'll see what happens this year"

the conversation was more detailed but to the best of my ability those are the only exact phrases I can recall. I did call you that night to give you a head's up that Stephon was angry with the situation and that Stephon had some hostile things to say about members of Knicks management.

sincerely

Dan Gladstone

-----Original Message-----
**From:** Gladstone, Dan
**Sent:** Thursday, June 16, 2005 1:13 PM
**To:** Browne Sanders, Anucha
**Cc:** Buchholz, Karin
**Subject:** Staffing issues
**Importance:** High

Anucha

As per your request - here are 2 issues that occurred this week that need to be bought to your attention regarding Knicks Field Marketing staffer Hassan Gonsalves:

- Time Sheets - over the period of Hassan's employment (hired October 2004) he has had trouble completing his bi-weekly administrative time sheets properly (submitting to me for approval, for me to sign, and then submitting to payroll to process on time so that Hassan would receive a paycheck). I have had to return at least 6 timesheets for

1

CONFIDENTIAL

MSG    6176

Hassan to re-do and properly submit to me for approval/signature in order to reflect the proper time/hours worked on Knicks events, and as a result often Hassan has not had his timesheet submitted to payroll in order in time to get his check the following week. Recently Hassan again submitted a timesheet reflecting overtime he was not approved to work - I made a change in his hours to reflect what he WAS approved to work and submitted to payroll for him so that he would be paid on time to expedite the process. On this occasion, I submitted the timesheet and send it back to Hassan to correct, because I wanted to get it to payroll in a timely manner so he would be paid the following week.

- Parking - it has come to my attention through the managers at Central parking system that Hassan has been using my parking account (#3-6-9) for the 31st street lot to park his own personal vehicle on a frequent basis under my name. I did not approve nor give out my account to Hassan to park his car on my account nor use my code. In fact, I have been extremely clear to Hassan that he is NOT to drive nor EVER be behind the wheel of a MSG vehicle as the result of a background check on his driver's license which resulted in him not being permitted or legal to drive company vehicles, thus it is extremely important that he does not park on the company account as we could be liable for an accident that occurs in the lot or associated with him parking and driving under the Knicks.

Moving forward, I have attached a DRAFT of a memo I wanted to present to both Tasheem Ward & Hassan Gonsalves to meet with them and re-enforce the nature of their employment status with the Knicks...please review and let me know how to proceed. I can also forward a copy of this memo to HR to approve or comment on...please advise....


Staffing memo(June 16).doc

Thank you.

Dan Gladstone
New York Knicks
Director, Community Relations & Field Marketing
2 Penn Plaza - 14th Floor - New York, NY 10121

w# (212) 465-6411
f# (212) 465-6047

get your Knicks tickets at ny.knicks.com

2

CONFIDENTIAL

# MEMO

**TO:** Tasheem Ward
Hassan Gonsalves

**FR:** Dan Gladstone

**CC:** Anucha Browne Sanders
Karin Buchholz

**RE:** Employment Guidelines

**DT:** 6/16/05

---

The following is a memo to outline and summarize the basic parameters of your employment:

You are employed in the New York Knicks Community Relations Department / Field Marketing with an annual salary of $30,300.

**Time Sheets:** In order to receive paychecks, you must complete and submit a bi-weekly administrative time sheet to Dan Gladstone to review and approve with signature, this timesheet should then be copied (with a copy going to Dan Gladstone) and submitted to the payroll department to be processed.

You will be responsible to work thirty five (35) hours per week, seven (7) hours per day (Monday – Friday) or any combination of hours that equal but does not go above thirty five (35) hours per week. If you are scheduled to work weekend events or 7 days per week, the total scheduling of your hours will never exceed thirty five (35) hours per week.

**Scheduling:** You will receive your work schedule – assignment of events that total thirty five (35) hours per week – in a weekly meeting with Dan Gladstone that will be scheduled based on the event calendar.

CONFIDENTIAL