Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
06 Civ. 0589 (CGE)
- - - - - - - - - - - - - - - - - -x
ANUCHA BROWNE-SANDERS,

                         Plaintiff,

          -against-

MADISON SQUARE GARDEN, L.P., ISIAH
LORD THOMAS, III and JAMES DOLAN,

                         Defendants.

- - - - - - - - - - - - - - - - - -x
                         1501 Broadway
                         New York, New York

                         November 30, 2006
                         10:10 a.m.


          DEPOSITION of MADISON SQUARE
```

GARDEN by HANK RATNER, one of the

Defendants in the above-entitled

action, held at the above time and

place, taken before Barbara P.

Goldsmith, a Shorthand Reporter and

Notary Public of the State of New York,

pursuant to the Federal Rules of Civil

Procedure, and stipulations between

Counsel.

69

H. RATNER

1

2   Ms. Browne-Sanders' role at forecast

3   meetings, what was your understanding

4   of how long Ms. Browne-Sanders had been

5   the P&L manager?

6           MR. GREEN:  As of when?

7       Q.    As of when?  As of what date

8   she became --

9           MR. GREEN:  I don't mean to

10          confuse you.  I object to the form.

11          MS. VLADECK:  That's already

12          done.

13          MR. GREEN:  I don't know

14          whether the question was asking the

15          witness to answer as of a certain

16          date.

17          MS. VLADECK:  Okay.  I can

18          rephrase it.

19      Q.    Was it your understanding

20  that Ms. Browne-Sanders was P&L manager

21  from the date she was hired, or did she

22  become the P&L manager at some time

23  during her tenure?

24      A.    She was not the date she was

25  hired.  She became sometime during her

70

H. RATNER

1  tenure.

2      Q.    And do you know when during

3  her tenure she became P&L manager?

4      A.    No.

5      Q.    Did she attend the strategy,

6  budget or forecast meetings prior to

7  becoming a P&L manager?

8      A.    I don't know.  Her

9  involvement at the Garden preceded my

10  involvement with the Garden.

11      Q.    Was she present at the

12  meetings, strategy, forecast and

13  budget, from the day you became

14  involved at the Garden?

15      A.    Well, it wasn't necessarily

16  from the day I became involved.  I

17  think my first real involvement in the

18  Garden budget process was probably for

19  calendar year 2005, the 2005 budget

20  which was --

21      Q.    Was that in 2004?

22      A.    It would have been the end of

23  '04.  And that, I think, is my first

24  involvement in a budget cycle at the

71

H. RATNER

1

2  Garden and really my, you know, first

3  involvement with a lot of the stuff at

4  the Garden as opposed to where I had

5  been previously.

6      Q.    And from that time, was

7  Ms. Browne-Sanders, to your knowledge,

8  P&L manager?

9      A.    I think it might have been

10  right around there, but again, I

11  don't know.  I'm not a hundred percent

12  sure.

13      Q.    And what was

14  Ms. Browne-Sanders' role at forecast

15  meetings?

16      A.    Her role was to present the

17  forecast.

18      Q.    Now, at each of these

19  meetings where Ms. Browne-Sanders was

20  present, was Mr. Mills present?

21      A.    Again, no specific

22  recollection, but I think he would have

23  been.

24      Q.    And was Mr. Cudmore present?

25      A.    Again, no specific

80

H. RATNER

2      Q.      Somewhere between 10 and 20,
3  or 15?

4      A.      Ten and 15 maybe.  Again, I'm
5  being clear with you.  I am sort of
6  guessing on that number.

7      Q.      Did you form an impression as
8  to her performance?

9      A.      I did.

10     Q.      And what was your impression?

11     A.      Underwhelming.

12     Q.      What do you mean by that?

13     A.      I didn't think she had the
14  goods or temperament to do the job that
15  we needed done.

16     Q.      And when did you form that
17  impression?

18     A.      You know, I can't
19  particularly pinpoint exactly when it
20  occurred, when I first started having
21  concerns, but it was clear to me that
22  she didn't have a grasp of what it was
23  going to take to get her job done, that
24  she didn't have a grasp for the
25  financial aspects of her position, and

81

H. RATNER

that when you try to have

conversations, she was always very

defensive and not very open minded to

viewing things differently than she

would instinctively view them.

Q.    Anything else?

A.    I'm -- yes, I'm sure.

Q.    Well, what specific incidents

made you believe that she didn't have

the goods or temperament to get the job

done?

A.    You know, as we went through,

I mean, I had a limited number of

interactions with her. But I start

off, you know, sort of my view by

saying this is the P&L manager for the

Knicks. It's a big job and a big

opportunity and a wonderful asset that

needs to be run well and also needs to

grow. So the person who's in the

position now of being the P&L manager,

really should be a person who's going

to be open minded, creative, figuring

out ways to not only operate the

82

1                    H. RATNER

2    business aspect of the franchise, but

3    also to grow the franchise.

4              You know, my interactions

5    really started, I would guess, sometime

6    throughout 2004 as I began -- started

7    getting involved with the Garden.  No

8    specific recollection of what was

9    occurring there other than in the

10   interactions which may have been in

11   some forecast meetings, just going

12   through and not getting the confidence

13   that I needed that the person, Anucha,

14   was really understanding the job and

15   all that could be done in that job.

16             Then we get to my real first

17   budget process, which is now for the

18   2005 fiscal year, and it was very

19   important to us that everything was

20   done on a zero based budget and

21   everything was relooked at and we just

22   didn't roll forward our previous

23   budgets and our previous business

24   assumptions.

25             So, you know, I have no

83

H. RATNER

1  specific recollection of the strategy
2  meetings other than I don't think they
3  went well in that when we tried to be
4  open minded and discuss thinking more
5  broadly about the opportunity of the
6  Knicks and the running of the Knicks,
7  you know, my recollection is it's sort
8  of was met with resistance.  It was met
9  with a lot of this is the way we do it.
10  And where I was coming from, it's
11  really about start over again and let's
12  figure out if we were starting, you
13  know, this franchise today, what do you
14  do today, what are the strategies
15  today, what are the business
16  opportunities today, and don't lock
17  yourself into the past.
18          And again, without specific
19  recollection, there wasn't a lot of
20  open minded behavior taking place.  It
21  was very, very defensive and sort of it
22  makes very difficult to run a business
23  and move forward if everybody is not
24  open minded to change, because that's

H. RATNER

the one constant we're always going to

have in the world, change.

You know, we then moved on

and we got to the budgets and, you

know, Anucha's command for the business

of the Knicks just wasn't acceptable to

me, you know, as the person sitting in

the center. You know, she needed to be

responsible for the business aspects of

what was taking place. So for

instance, you know, how many ushers

were going to be at the event. How

many security guards were going to be

at the event. How many food service

workers are going to be at the event.

Now, in our structure, those

groups reporting to a facilities group.

Because facilities is our in-house

expert on ushers and security and food

service. But the premise of our

organization is that that facilities

group works for the P&L manager. In

almost like a, if you went to a third

party vendor, you hired the third party

85

H. RATNER

1
2   vendor and the third party vendor works
3   for you and performs certain services
4   for you.  But that doesn't mean you
5   don't have responsibility for it.  You
6   do, because you have to work out with
7   them what's the prudent level of
8   ushers, security, food and beverage
9   workers, etcetera.  And those were the
10  type conversations that were very
11  frustrating because those were the kind
12  of conversations which were well,
13  that's sort of facilities, that's not
14  me.  And that was just dead wrong, as
15  we tried to explain, you know, over and
16  over again.
17          The same thing with
18  sponsorship sales and ad sales.  We
19  have a centralized group that sells
20  sponsorship sales and ad sales, and
21  that group works for, you know, the
22  individual entity.  It's like an ad
23  sales rep.  So they work for the
24  individual entity, whether it's the
25  Knicks, whether it's the Rangers.  It's

86

H. RATNER

1    the same thing, you know, for other

2    parts of the company as well. But they

3    have to please the business person

4    who's running the business unit as

5    opposed to the business person

6    abdicating those responsibilities and

7    basically well, that's ad sales or

8    that's facilities.

9           And we had a very difficult

10   time with Anucha in taking

11   responsibility for those numbers. And,

12   again, those numbers aren't numbers

13   that just are presented to you. The

14   job of the P&L manager is to go and

15   dive into those numbers and to

16   understand why we're doing what we're

17   doing and get behind the numbers and be

18   satisfied that those are the right

19   numbers, whether they be expense or

20   revenue.

21          And you know, I really felt

22   that there was that disconnect that,

23   you know, she wasn't getting it, she

24   wasn't necessarily capable of getting

87

H. RATNER

it.  She didn't have, I think, the real

financial skills needed, and she was

very territorial.  She didn't cooperate

well with others, so these

interdependencies made it difficult.

So the concerns I started

having from limited contact in '04

became magnified by the budget process

for the '05 fiscal year.

Q.    And when was the budget

meeting at which you say that it became

magnified or the budget process, what

time period was that?

A.    You know, I'm not sure.  I

mean, I was guessing which I guess I

shouldn't be doing, it would be the

November, December.  You know,

sometimes budgets fall over and they

don't get done and you use something

for purposes of, you know, doing your

consolidated look for the year, but you

may continue the process beyond.  I

don't really remember in this instance

what happened or what the timing was.

92

H. RATNER

1  Mr. Pollichino for 20 years, given he

2  was at Rainbow back in the beginning

3  when I was at Rainbow. So I consider

4  him a value and trusted advisor in

5  addition to his role as head of

6  finance. And given my views, I wanted

7  to solicit what his views were.

8      Q.    Anyone else other than

9  Mr. Mills and Mr. Pollichino?

10      A.    Not that I can recall.

11      Q.    How many occasions did you

12  have to --

13      A.    Not at this point in time,

14  where we are.

15      Q.    Well, did you talk about

16  Ms. Browne-Sanders at a later point in

17  time?

18      A.    Subsequently, yeah.

19      Q.    When was that?

20      A.    That would have been at --

21  around some of the forecast meetings

22  that went on later in 2005.

23      Q.    And when was later?

24      A.    You know, I'm not sure.

100

H. RATNER

1
2  we should end her employment was more
3  around the forecast meetings that
4  happened later that year, that ended up
5  in getting her some training.
6      Q.     And those are the forecast
7  meetings that you don't recall when
8  they occurred?
9      A.     Right.
10     Q.     And what did he say to you,
11  what did Mr. Mills say to you?
12     A.     Well, at this point, it was
13  more a three-way conversation with
14  Steve and with Jim.  And Jim thought we
15  should offer her the opportunity of
16  some training to work on some of the
17  issues, where my feeling was that, you
18  know, this wasn't a matter of training,
19  but we got her training.
20     Q.     What percentage of her job
21  was the profit and loss manager part,
22  if you know?
23     A.     You know, I don't know how
24  you sort of segregate it out.  It's
25  sort of profit and loss and then

101

H. RATNER

2  everything kind of, you know, sits

3  below that.  It's managing that

4  business, op side of the business.

5      Q.    Now, did Mr. Mills agree or

6  disagree when you said to him words to

7  the effect that she should be fired?

8      A.    You know, I don't recall if

9  he did or if he didn't.  You know, Jim

10  really wanted to try the training

11  route, so it sort of ended the

12  dialogue.

13      Q.    Did you, either on your own

14  or ask Mr. Mills, to talk to either

15  Mr. McCormack or anyone else in human

16  resources about the procedures to

17  follow if someone at her level was to

18  be fired?

19      A.    Not that I can recollect, no.

20      Q.    And is there anything in

21  writing from you or between you and

22  Mr. Mills or you and Mr. Dolan that

23  reflects any of these conversations or

24  your view that Ms. Browne-Sanders was

25  not cutting it?

141

H. RATNER

an arrogant style to her.  She had a

very defensive style to her as well.

She was not open minded.

    Q.    Do you know whether -- strike

that.

        And is it your belief that

that arrogant style was present on all

occasions that you dealt with her?

    A.    I don't recall.

    Q.    And you said she had a lack

of concern about the return on the

investment.  On what do you base that?

    A.    You know, we were -- well,

she was proposing or actually she had

already entered into a deal which was a

money loser.  And again, in having the

conversation with the deal getting

revealed as entering into a deal which

was without a budget without getting

approval, you know, the conversation

was met with resistance as to -- the

P&L manager should be doing return on

investment.  It doesn't require me to

ask for it.  The P&L manager shouldn't

142

H. RATNER

necessarily be going forward and

entering into transactions that aren't

going to help grow the company. And my

question seemed to be questions that

she was thinking about for the first

time when they were being asked.

Q.    Now, who else was at this

meeting?

A.    You know, again, no specific

recollection, but a meeting of this

type, forecast meeting, it would have

been Jim and Steve and John Cudmore,

Bob Pollichino, and I'm not sure who

else would have been there.

Q.    What, if anything, did Jim

Dolan say at the meeting with respect

to Last Man Standing?

A.    You know, I don't remember

specifically. He was not pleased with

the situation, but I don't remember how

that manifested itself with his

comments.

Q.    Well, did he say anything?

A.    Well, after the meeting was

143

H. RATNER

when we decided that or he decided that

she should go for training.

Q.    And did he suggest that she

go for training with respect to

financial issues?

A.    You know, I can't remember

what specifically was suggested, but it

was training for whatever areas that

they needed to help her fix.

Q.    And what areas did you

believe you needed to help her fix?

A.    You're asking me what I

believe or what Jim believed?

Q.    Either what you believed or

what Jim told you he believed.

A.    Well, my belief was she

should have been terminated, that she

wasn't going to be fixed.  If there was

going to be training, it would need to

be in financial and it would need to be

in management style and -- let me think

about the right way to say it -- peer

cooperation or, you know, getting along

with others.

144

H. RATNER

But to me, what was
important, not so much just the
particular deal or what happened with
the deal, but it was, you know, what
the conversation about it revealed, you
know, once again, at this meeting.

Q.    What, if anything, did
Mr. Mills say at the meeting?

A.    I don't remember.

Q.    Do you remember what anybody
said other than you and
Ms. Browne-Sanders?

A.    You know, not specifically,
no.

Q.    And do you remember any of
what she actually said or do you just
remember that she was arrogant and
didn't have concern for return on the
investment?

MR. GREEN:  Objection to
form, but you can answer that.

A.    I don't remember the
particular words.  It was more of, you
know, the general expression of, you

247

H. RATNER

1

2  conversations with concerning the

3  Garden providing or potentially

4  providing security for

5  Ms. Browne-Sanders?

6      A.    Steve Mills.

7      Q.    And to the extent you can,

8  tell us the whole conversation you had

9  with Mr. Mills about that.

10     A.    There really wasn't much more

11 to it than that.  It was if she had

12 security concerns, we should look to

13 address those concerns.  And then, you

14 know, it was left in Steve's hands.

15     Q.    And you said, I think,

16 earlier that this is the same

17 conversation you had with Mr. Mills

18 where he came to you to say that she

19 wanted to leave?

20     A.    Yes.

21     Q.    So Steve told you that

22 Ms. Browne-Sanders said she could no

23 longer do her job, she wanted to leave,

24 and you embraced that and said good and

25 then said let's figure out an

248

H. RATNER

appropriate severance package; is that
correct?

    A.    Along those lines, yes.

    Q.    And then he said, oh, and by
the way, there are threats against her
or she's concerned about her safety or
something else?

        MR. GREEN:  Objection to
    form.

    A.    I don't think he said oh, by
the way, but it was, you know, it was
part of the conversation that we had.

    Q.    Did you ask him from where
the threats were coming?

    A.    I didn't know of any threats.
I just know that she stated that she
had some concerns and my understanding,
whether expressed or implied, was that
it related to those two investigations
that had occurred.

    Q.    And was there anything else
in that conversation you had with
Mr. Mills that you recall that you said
or he said?

249

H. RATNER

1

2     A.     I can't recall if we

3     discussed it.  It was just the trying

4     to work with her to see what would best

5     work for her exiting to transition to

6     something else and whether that meant,

7     you know, staying with the company for

8     a period of time or whether it meant

9     figuring out a severance amount at that

10    point in time.  But that was part of

11    the discussion and that was for Steve

12    to go and work out and figure out.

13    Q.     And did you tell Mr. Mills to

14    contact a particular security company,

15    did you ask him to call security at the

16    Garden, or something else?

17    A.     No, neither.  I didn't make

18    suggestions along those lines.

19    Q.     Did Mr. Mills give you the

20    impression that he believed the threats

21    were serious?

22          MR. GREEN:  Objection to

23          form.

24    A.     Yeah, I don't recall, but,

25    you know, vaguely, no, I don't think