Ronald M. Green  (RG-7766)
Teresa M. Holland (TH-6973)
Barry A. Cozier (BC-7110)
Brian G. Cesaratto (BC-5464)
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York  10177
(212) 351-4500

Amber L. Kagan (AK- 7973)
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178
(212) 309-6000
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x
ANUCHA BROWNE SANDERS,                          :     06 CV 0589 (GEL) (DCF)
                                                :     ECF CASE
                        Plaintiff,              :
                                                :
        - against -                             :     **DEFENDANT'S LOCAL RULE
                                                :     56.1(b) COUNTER-
                                                :     STATEMENT IN
MADISON SQUARE GARDEN, L.P., ISIAH LORD         :     OPPOSITION TO
THOMAS III AND JAMES L. DOLAN,                  :     PLAINTIFF'S MOTION FOR
                                                :     PARTIAL SUMMARY
                        Defendants.             :     JUDGMENT**
------------------------------------------------x

Pursuant to Rule 56.1(b) of the Local Civil Rules, Defendants Madison Square

Garden, L.P. ("MSG") and James L. Dolan, by their attorneys, Epstein Becker & Green, P.C. and

Morgan Lewis & Bockius, L.P., submit the following counter-statement of material facts in

opposition to Plaintiff's statement pursuant to Local Rule 56.1 in support of Plaintiff's motion

for partial summary judgment ("Plaintiff's 56.1").   Defendants respectfully submit that

Plaintiff's motion for partial summary judgment sets forth many issues that raise genuine issues

of material fact that warrant denial.

NY:1849686v1

Dockets.Justia.com

### As to "Browne Sanders' Employment At MSG"

1.       Undisputed for purposes of this motion.

2.       Undisputed for purposes of this motion.

3.       Undisputed for purposes of this motion.

4.       Undisputed for purposes of this motion.

5.       Undisputed for purposes of this motion.

6.       Undisputed for purposes of this motion.

7.       Undisputed for purposes of this motion.

8.       Undisputed for purposes of this motion.

9.       Undisputed for purposes of this motion.

10.     Undisputed for purposes of this motion.

11.     Undisputed for purposes of this motion.

12.     Undisputed for purposes of this motion.

### As to "Facts Related to Plaintiff's Sexual Harassment Claim"

13.     Undisputed for purposes of this motion.

14.     Disputed in part.  Thomas testified that he "could have said I'll F'ing handle it or

I'll -- I could -- I could have sworn but never at [Plaintiff]." (Deposition Transcript of Isiah

Thomas dated December 8, 2006 ("Thomas Tr.") at 192-93).[1]

---

[1]       The relevant portions of deposition transcripts are attached to the Declaration of Brian Cesaratto in Opposition to Plaintiff's Motion for Partial Summary Judgment, dated May 25, 2007 ("Cesaratto Dec.") and are designated by "[deponent's last name] Tr. at [page number(s)]." Excerpts from the Deposition Transcript of Anucha Browne Sanders dated November 27, 2006 are attached as Exhibit A to the Cesaratto Dec. ("Plaintiff Tr. I") Excerpts from the Deposition Transcript of Anucha Browne Sanders dated November 28, 2006 are attached as Exhibit B to the Cesaratto Dec. ("Plaintiff Tr. II"). Excerpts from the Deposition Transcript of Isiah Thomas dated December 8, 2006are attached as Exhibit C to the Cesaratto Dec. Excerpts from the Deposition Transcript of Pete Olsen dated December 13, 2006 are attached as Exhibit D to the Cesaratto Dec. Excerpts from the Deposition Transcript of Faye Brown dated February 14, 2007 are attached as Exhibit E to the Cesaratto Dec. Excerpts and from the Deposition Transcript of Stephen Mills dated December 12, 2006 are attached as Exhibit F to the Cesaratto Dec. Excerpts from the Deposition Transcript of Stephon Marbury dated January 8, 2007 are attached as Exhibit G to the Cesaratto Dec. Excerpts from the Deposition Transcript of Karin Buchholz dated January 19, 2007 are

15.    Undisputed for purposes of this motion.

16.    Disputed and objected to as inadmissible hearsay. Thomas testified that he asked Petra Pope to check and see if the officials needed anything because he felt the way the Knicks were treating the officials was poor. (Thomas Tr. at 263-64). Thomas never testified that his intention was to have Pope "flirt with the referees." Thomas' testimony is consistent with what Plaintiff told Peter Olsen ("Olsen") during a lunch conversation on or about May 11, 2005. (Deposition Transcript of Peter Olsen dated December 13, 2006 ("Olsen Tr.") at 116). Plaintiff told Olsen, "Isiah knew Petra Pope . . . and that Isiah had asked Petra Pope to go into the referees' locker room before a game and alluded to like make them feel comfortable or see if there is anything they need or something like that." Id.

17.    Disputed and objected to as inadmissible hearsay. Thomas testified that Pope never told him that she did not want to check in on the referees. (Thomas Tr. at 267).

18.    Disputed. Thomas' testimony was that he hugged Browne Sanders often and that on only a single occasion in December 2005, when he went to greet her with his usual hug, she "pushed back." (Thomas Tr. at 257-58).

19.    Disputed and objected to as inadmissible hearsay. Thomas testified that he never said he was in love with Browne Sanders, nor did he ever compare his relationship with Browne

---

attached as Exhibit H to the Cesaratto Dec. Excerpts from the Deposition Transcript of John Moran dated November 10, 2006 are attached as Exhibit I to the Cesaratto Dec. Excerpts from the Deposition Transcript of Barry Watkins dated February 26, 2007 are attached as Exhibit J to the Cesaratto Dec. Excerpts from the Deposition Transcript of James Dolan dated December 11, 2006 are attached as Exhibit K to the Cesaratto Dec. Excerpts taken from the Deposition Transcript of Victoria Browne-Moore dated December 18, 2006 are attached as Exhibit L to the Cesaratto Dec. Excerpts from the Deposition Transcript of Ruth Browne dated January 16, 2007 are attached as Exhibit M to the Cesaratto Dec. Excerpts from the Deposition Transcript of Dan Gladstone dated October 30, 2006 are attached as Exhibit N to the Cesaratto Dec. Excerpts from the Deposition Transcript of Rusty McCormack dated November 7, 2006 are attached as Exhibit O to the Cesaratto Dec. Excerpts from the Deposition Transcript of Hank Ratner dated November 30, 2006 are attached as Exhibit P to the Cesaratto Dec. Excerpts from the Deposition Transcript of Jeffrey Nix dated January 26, 2007 are attached as Exhibit Q to the Cesaratto Dec. Deposition exhibits are included, where relevant, following the deponent's transcript and are designated by "[deponent's last name] Tr. Exh. [number]." Other documents are attached to the Cesaratto Dec. and are designated "Cesaratto Dec. Exh. [number]."

Sanders to "Love and Basketball." (Thomas Tr. at 65, 259). Thomas further testified that he has never even seen the movie "Love and Basketball." (Thomas Tr. at 260).

20.     Disputed in part and objected to as inadmissible hearsay. Thomas and Browne Sanders were playing HORSE at a Christmas party held at the Knicks' Tarrytown practice facility along with Jordan Schlachter, an MSG executive, and one other player. (Deposition Transcript of Faye Brown dated February 14, 2007 ("Brown Tr.") at 94, 99-100, 105, 108-109, 111). Faye Brown observed Thomas standing behind Plaintiff while she shot a basket, as he was next in line to shoot. (Brown Tr. at 113-120).

21.     Undisputed for purposes of this motion.

22.     Disputed. Stephen Mills ("Mills") testified that he never had a discussion with anyone about Thomas' use of "locker room language." (Deposition Transcript of Stephen Mills dated December 12, 2006 ("Mills Tr.") at 274)

23.     Disputed and objected to as inadmissible hearsay. See paragraph 19, *supra*, Thomas disputes that he ever told Plaintiff he was in love with her. Plaintiff insisted that Olsen keep their lunch confidential. (Olsen Tr. at 113).

24.     Undisputed for purposes of this motion.

25.     Undisputed for purposes of this motion.

26.     Undisputed for purposes of this motion.

27.     Disputed. Thomas never made comments concerning Plaintiff's physical appearance at the Open Practice in 2005. (Thomas Tr. at 213-214).

28.     Disputed. Thomas testified that he never said Browne Sanders was "attractive" or "easy on the eyes". (Thomas Tr. at 213-214). Thomas' reference to "not getting any love" from Browne Sanders was made in connection with his hugging her on one occasion in December

2005, discussed in Paragraph 18, *supra*, where she "pushed back." When Plaintiff "pushed back," according to his testimony, Thomas said to her "no love today[?]" (Thomas Tr. at 258). Footnote 3 is also disputed. Thomas did not deny making "some" of these statements; he denied making "all" of these statements.

29.    Disputed in part.    The contents of Gladstone's email are not disputed, but the contents of the conversation between Dan Gladstone ("Gladstone") and Stephon Marbury ("Marbury") are disputed. When asked about the email, Marbury testified that he never called Plaintiff a "black bitch" and that he would never use that phrase when referring to anyone because it is "not even in [his] lingo." (Deposition Transcript of Stephon Marbury dated January 8, 2007 ("Marbury Tr.") at 28-29). Marbury testified that the reason he referred to Plaintiff as a "bitch" during the conversation with Gladstone was because when he first arrived at the Knicks and he asked Plaintiff for game passes, she acted nasty toward him and said "this is not Phoenix or New Jersey and we don't run things like that in New York." (Marbury Tr. 10-13). Marbury further testified that he felt Browne Sanders "acts like she runs the Knicks. She don't run the Knicks. From the way how [sic] she walks around here telling people what to do and demanding people to do certain things as opposed to asking people to do things. She didn't do that. Like that's not her job." (Marbury Tr. at 29-30). Marbury testified that he never said "we don't like her, she thinks she tells us what to do, she don't tell us shit." Rather, Marbury's testimony was "I don't like her," and that "[s]he thinks she can tell people what to do." (Marbury Tr. at 31). Marbury testified that he never said "fuck that black bitch" and never said "we'll see what happens next year." (Marbury Tr. at 31-32). Mills testified that he didn't follow-up with anyone regarding Gladstone's email because the matter was being handled by human resources and a number of events happened subsequently, including the termination of Gonsalvez, Manuel and

ultimately the lawyers took over.  Thus, Mills did not have a chance to discuss the contents of

Gladstone's email with Marbury or Plaintiff.  (Mills Tr. at 317-318).

     30.     Objected to as inadmissible hearsay.

     31.     Undisputed as to the date of November 28, 2005 that Plaintiff told Mills.  MSG

objects to the exhibit as proof of the comments as inadmissible hearsay.

     32.     Objected to as inadmissible hearsay.

     33.     Objected to as inadmissible hearsay.

     34.     Disputed in part and objected to as inadmissible hearsay.  Buchholz testified that

she believed the sex with Marbury was consensual and not forced.  (Deposition Transcript of

Karin Buchholz dated January 19, 2007 ("Buchholz Tr.") at 86-87).  Moran testified that his

notes reflect that although it was Buchholz' opinion that ███████ was not very convincing,

Buchholz' opinion was inconsistent with what ███████ actually told Moran when he

interviewed her, which was that the sex was consensual and she was not forced to do anything.

(Deposition Transcript of John Moran dated November 10, 2006 ("Moran Tr.") at 81, 90).

     35.     Disputed in part and objected to as inadmissible hearsay.  Buchholz testimony

was "I *think* she said that he tried to text her, you know, 'I want some more of that,' but that ███

███ didn't respond to him."  (Buchholz Tr. at 59) (emphasis added).

     36.     Disputed in part.  Moran became aware of the alleged conduct as a result of a

conversation with Plaintiff on or after November 28, 2005.  (Moran Tr. at 69-73; Deposition

Transcript of Anucha Browne Sanders dated November 28, 2006 ("Plaintiff Tr. II") at 352-353,

355-357, Exh. GG).

     37.     Undisputed for purposes of this motion.

     38.     Undisputed for purposes of this motion.

39.    Undisputed for purposes of this motion.

40.    Undisputed for purposes of this motion.

**As To "Browne Sanders' Discussions With Members of Her Staff and Colleagues"**

41.    Objected to as inadmissible hearsay.

42.    Undisputed for purposes of this motion.

43.    Disputed in part as the citation to Buchholz's testimony is incomplete.  Buchholz

testified she was "uncomfortable" with Browne Sanders' request as follows:

> Q. Do you know which employees other than as stated in this e-mail Stephon Marbury made it clear to that he did not like Anucha Browne-Sanders?
>
> A.  I have to make it clear right now that Anucha asked me specifically and gave me wording and told me to document this e-mail.  And I was very uncomfortable that she said, you know, document the e-mail about how Stephon doesn't like me, what everyone said, who said it, why.  I even was trying to rack my brain to try to come up with -- she really wanted to prove that Stephon didn't like her and she asked me to write this e-mail.  And I did.  But I want it to go on record  that I was pressured to document these instances.

(Buchholz Tr. at 181-82).

44.    Disputed in part.  Plaintiff's request to Gladstone to prepare the email regarding

Gladstone's June 2005 telephone conversation with Marbury occurred prior to Thanksgiving at

the same time as Plaintiff asked Gladstone to prepare a memo regarding Vernon Manuel's job

performance issues.   (Deposition Transcript of Dan Gladstone dated October 30, 2006

("Gladstone Tr.") at 83-85, 215-16, Exh. 7).  Gladstone did not testify that "all of the statements

in the e-mail that are attributed to Marbury are accurate."  Rather, Gladstone's testimony was

that to the best of his ability the statements attributed to Marbury in the email were the only exact

phrases that he could recall. (Gladstone Tr. at 218).

45.    Disputed in part.  Gary Winkler did not confirm to MSG that the substance of the email was accurate.  (Affidavit of Kevin T. Mintzer in Support of Plaintiff's Motion For Partial Summary Judgment dated April 27, 2007 ("Mintzer Aff.") Exh. 17).

46.    Disputed.  Plaintiff did not reasonably believe in good faith that she had a complaint of sexual harassment at the time she requested her staff prepare documents.  As evidence of her absence of a reasonable, good faith belief that she had a complaint, she made no prior complaint to Mills or MSG of sex discrimination or harassment.  (Mills Tr. at 389-90, 393, 397-98; Moran Tr. at 174-76; 194-196).

## As To "Plaintiff's Counsel's Contacts With MSG"

47.    Disputed in part.  Buchholz testified that Plaintiff forced her to meet with counsel, she was very uncomfortable with the situation and felt that the things Plaintiff was asking her to do were compromising her integrity.  (Buchholz Tr. at 197-99).

48.    Undisputed for purposes of this motion.

49.    Undisputed for purposes of this motion.

50.    Undisputed for purposes of this motion.

51.    Disputed in part.  It is undisputed that on January 6, 2006, Moran and Noel interviewed Plaintiff as part of MSG's investigation.  Defendants dispute that Plaintiff provided "substantial detail" about her sexual harassment complaint.  (Mintzer Aff. Exh. 23).

52.    Disputed in part.  Plaintiff's $6.5 million "settlement proposal" of December 27, 2007 was not made in good faith nor did it have a rational basis.  (Declaration of Christopher Reynolds, Esq. dated May 24, 2007, ("Reynolds Dec.") at ¶¶ 10-11).

53.    Undisputed for purposes of this motion.

54.    Undisputed for purposes of this motion.  The December 30, 2005 letter from MSG's counsel reads in relevant part:

> As best as I can determine from your demand and our discussions, your demand was based upon an assumption that your client would not be able to replicate or surpass, over a 20-year future career, the income and position she currently has with Madison Square Garden.  We do not share that assumption and see no rational basis to do so, especially in light of what would be her clear obligation to mitigate her alleged damages.
>
> Our counter-offer is premised instead on the commitment that MSG will actively support and facilitate Ms. Browne-Sanders finding new employment, be it in the sports and entertainment industry or elsewhere.  Given Ms. Browne-Sanders' background, experience and five-year affiliation with MSG, a well-known industry employer, and MSG's active support, we are confident that Ms. Browne-Sanders can obtain a rewarding and at least equally remunerative career elsewhere.
>
> MSG is ready, willing and able to continue as rapidly as possible our good-faith discussions in order to find a mutually acceptable resolution.  That resolution, however, must have a rational basis and our proposal accomplishes that."  (emphasis added).

(Reynolds Dec. at ¶ 11, Exh. B; Mintzer Aff. Exh. 28).

55.    Undisputed for purposes of this motion that on January 3, 2006 Plaintiff's counsel conveyed a second offer of $5.95 million that had no rational basis.  (Reynolds Dec. at ¶ 12).

56.    Undisputed for purposes of this motion.

57.    Disputed.  Plaintiff was advised by letter dated December 30, 2005, that given her allegations and alleged concerns about her own personal safety, she should remain on paid vacation until MSG's internal investigation was concluded.  (Moran Tr. at 202-04, Exh. 4). Moran also testified that he saw no connection between MSG's instruction to Plaintiff that she not come to work and her complaint of sexual harassment.  (Moran Tr. at 205).

58.    Disputed in part.  Plaintiff's counsel and MSG's counsel agreed on December 22, 2005 that "during the pendency of the parties' negotiations, Ms. Browne Sanders will be on paid

vacation from her employment and her absence from the office will be explained as such, with the negotiations and alleged claims remaining confidential." (Mintzer Aff. Exh. 19).

59.     Undisputed for purposes of this motion.

60.     Undisputed for purposes of this motion.

61.     Undisputed for purposes of this motion.

62.     Undisputed for purposes of this motion.

63.     Undisputed for purposes of this motion.  The Memo states in relevant part:

> As the report indicates, most of Browne Sanders' allegations were not confirmed.  However, based on comments Browne Sanders made to Steve Mills and members of her department before making her complaint, it is clear that Browne Sanders has a poor relationship and difficulty interacting with Mills and other members of MSG management.  Browne Sanders is unable to function effectively in her position.  Moreover, MSG cannot function if its senior management cannot communicate and work together effectively.  In light of this, and considering related issues with Browne Sanders' communication skills and overall effectiveness, Browne Sanders should be separated from MSG and offered severance and outplacement services, subject to her execution of an appropriate release.

(Moran Tr. Exh. 8, attached to Mintzer Aff., Exh. 5).

64.     Undisputed for purposes of this motion.

65.     Undisputed for purposes of this motion.  On January 19, 2007, MSG's counsel spoke with Plaintiff's counsel to inform him that Plaintiff was being terminated for her inability to function effectively in her position, her poor interactions with senior MSG management, and that the New York Knicks' organization could not function effectively if she remained employed. (Mintzer Aff. Exh. 21).

66.     Undisputed for purposes of this motion.

<u>As To "Dolan's Reasons For Terminating Plaintiff's Employment"</u>

67.    Disputed in part.  It is disputed that Dolan did not consult with anyone else, as Plaintiff acknowledges that one of the reasons Dolan terminated Plaintiff was based on conversations he had with Mills. (Plaintiff's R. 56.1 at ¶68).  Although Dolan made the ultimate decision to terminate Plaintiff, Mills had discussions with Dolan prior to Plaintiff's termination regarding her poor work performance and Mills expressed concerns regarding Plaintiff's inability to lead the Knicks strategically and grasp the concept of being the P&L manager. (Deposition Transcript of James Dolan, dated December 11, 2006 ("Dolan Tr.") at 64-66, 73; Mills Tr. at 123-127).  Mills also expressed his concerns to Dolan regarding Plaintiff's inability to work with her peers and manage her relationships across MSG from the advertising sales group to the facilities group to the basketball operations department.  (Mills Tr. at 123-127). Other than Mills, Dolan testified that he also received information on Plaintiff from Hank Ratner ("Ratner"), MSG's Vice Chairman, and Rusty McCormack ("McCormack"), MSG's Senior Vice President for Human Resources and Organization Development, who provided input on their views. (Dolan Tr. at 73, 85-87, 178-179).

68.    Disputed in part.   Plaintiff omits Dolan's stated reason that Plaintiff was terminated, in part, because she lacked the necessary skills related to budgeting, branding and general personnel management. (Dolan Tr. at 56-62, 64-66, 185-186).  Dolan did not limit Plaintiff's poor job performance to the July and August 2005 budget meetings, but testified that from July 2005 leading up to her termination, "we had problems." (Dolan Tr. at 171, 185 ("and all the factors leading up to from July up until that point.  I mean that is a quite long list, you know")).  Dolan identified as a reason for termination the opinion of Ratner, (who had personally observed Plaintiff's performance) that over the time period since July Plaintiff had not improved and lacked the ability to perform her job as the P&L manager.  (Dolan Tr. at 53-56, 186, 191-92;

Deposition Transcript of Hank Ratner, dated November 30, 2006 ("Ratner Tr.") at 141-144). Plaintiff omits Dolan's testimony that he considered Plaintiff's stated intention to leave her job because she could no longer do her job at MSG having lost the respect of her employees and peers. (Dolan Tr. at 48, 190-91; Mills Tr. at 48-50; 123-127). Dolan also testified that another reason for his termination decision was based on the fact that Dolan was told by McCormack that Plaintiff "was essentially attempting to coerce her – her direct reports into corroborating her [own sexual harassment] complaint." (Dolan Tr. 74-77, 192). Dolan's belief that Plaintiff thereby violated MSG's policy was based on information provided to him by McCormack. (Dolan Tr. at 74, 84-87). When Dolan was asked what factor weighed more heavily out of the "combination" of factors he identified, he testified Plaintiff's poor job performance since July was "significant" and that the "tampering" particularly showed that she could no longer be trusted. (Dolan Tr. at 197-198). Dolan's testimony reads:

> Q.      Is one factor more heavily weighted than any of the others?
>
> MR. GREEN:  Objection to form.
>
> A.      I -- you -- it -- I would have to say that that the July -- the July through -- this period here was significant. The -- however the -- using her position to influence employees in the investigation was particularly -- showed a lack of -- of ability for us to trust her. I don't think we could trust her after she did that. The -- you know, the -- if she couldn't let the company operate and follow the rules of the company and she was going to establish her own rules, which is essentially what she did, that the -- it -- I mean at that point the – I think she really made her – her employment untenable because you just had no idea what she would do. The -- I mean the -- she clearly didn't respect the process and the lines of authority, so how could she stay?

Id.

69.    Undisputed for purposes of this motion.

70.     Disputed in part.  Karin Buchholz testified that she first informed MSG that she had accompanied Plaintiff to a meeting with counsel after Plaintiff commenced her lawsuit. (Buchholz Tr. at 65-66).

71.     Disputed in part.  Dolan also testified he told Ratner and McCormack that Plaintiff had "resigned" and "asked for an extended stay period." (Dolan Tr. at 178).

72.     Undisputed for purposes of this motion.

73.     Undisputed for purposes of this motion.

74.     Undisputed for purposes of this motion.  Dolan testified that such a conversation with McCormack occurred, as did Ratner.  (Dolan Tr. at 74, 84-87, 178).  Indeed, Plaintiff relies on this conversation that included McCormack.  (Plaintiff's 56.1 at ¶¶70, 71, 72).

75.     Undisputed for purposes of this motion.

76.     Undisputed for purposes of this motion.

77.     Disputed.  The quotation is incomplete.  The full text of Dolan's relevant testimony (with the portions omitted from Plaintiff's 56.1 Statement highlighted in bold), is as follows:

**Q.     And what is your understanding that she actually did in order to influence people or have them back her up?**

**A.     She –**

**Q.     What are – what are the events that you believe –**

A.     I believe she had discussions that -- that she brought -- that – that she had people in her office.  I mean it was reported to me that she had been tampering with the investigation that **-- that form.**  I mean the -- the -- you know, her responsibility at that point was to leave the investigation up to the people who she made the complaint to.  The -- actually I don't think she had made the complaint at that point.  That the -- I am a little fuzzy on whether -- whether it was right there before or after, but she clearly knew she was going to make a complaint that the -- and then she brought people in who reported to her.  That the – and proceeded to discuss

the merits of her complaint. The -- and attempt to persuade the people underneath her that her complaint had merit and that they -- and attempt to get them to back her up on her complaints. **That the -- the -- now even -- even if -- if those people had heard anything, right, that would back her up, at that point she rendered the company useless in its ability to investigate because at what point -- how do you know when we are asking those people whether they are responding to our specific questions or whether they are responding to the fact that their boss, right, told them that they need to answer this way, that they -- there was no -- she essentially rendered the company incapable of deciding the -- you know, deciding the merits of those people's testimony. The -- the -- I don't think that that is a difficult concept to understand, that the -- the -- you know, the -- you can't be the victim, the judge, and the jury and the prosecutor all at once. You're not allowed to do that. And the -- and that is what she was attempting to do. The -- she so wanted to -- apparently to have this complaint be verified by the people underneath her, that -- that she -- you know, she** violated the company policy, and she rendered herself at that point the -- the -- unemployable by the company. **The -- because the -- we had no way of knowing whether she was going to continue to do that or not continue to do that, and so how could I then have her continue to run that operation. We couldn't. The --** that is why she was let go.

(Dolan Tr. at 200-02).

78.     Disputed.   The quotation is incomplete.   The questions that were asked and

Dolan's complete relevant testimony are as follows:

Q.     Now, you said that you also relied on the opinion of Mr. Ratner that she should be terminated.   When did Mr. Ratner express his opinion that she should be terminated?

A.     Consistently from July through her termination date.

Q.     And you rejected his opinion from July, August, September, October, November and December; is that correct?

A.     I think it -- rejected would be strong, but essentially we didn't act upon what his -- what his opinion --we tried to give Anucha a chance, but you have to remember that the -- you are asking me about the day she was fired.   The -- we through this whole process with her.   Then she comes back to us, and she tells that she is not going to work here any more.   The -- that the -- it is

unclear what the reason is why she doesn't -- why she can't work here any more, but I assume that the -- that it had something to do with her experience over the last six months. The -- so now we are already looking for -- we already have to rejigger the -- the department, et cetera, but she is -- she is going to stay as long as we help her find another position, but she is essentially out. She has no future at the company by her own hand, and then the -- comes in the report that she wants $600,000 worth -- excuse me -- 6 million dollars worth of severance that the -- and that -- that the -- she's been tampering with an investigation into a complaint that she's made, and the last part is the -- is the part that is most difficult to deal with because as ridiculous as the 6 million dollar request was that the -- she could have continued on doing her job if she had not tampered with -- with those people, the -- but the combination of all of those things together -- and finally the tampering as being the last straw in that really led us to -- led me to the conclusion that her employment at the company was over with.

(Dolan Tr. at 188-190).

79.    Disputed.  The quotation is incomplete.  Dolan's complete relevant testimony is as follows:

Q.    What did you mean by the whole process?

A.    What I meant by the whole process is -- we went through the whole budgeting process with her.  We discovered these deficiencies that the -- that -- you know, that -- in her skill set.  We went through and paid for the -- and offered her training the -- and paid for her training to up those skills.  I mean that that was at our expense that the -- -- and, you know, after we are done sending her school, right -- that -- to get better at this, right, the -- she walks into the office and says essentially I'm quitting.  The -- I can't work here any more.  The -- the -- and you need to -- what I -- what I need you to do is to keep me on, and I'll do my job, which was fair, and help me find another job.  That the -- you know, at that point, you know, I have to tell you that as -- as the CEO of the Company having then, you know, offered her the -- the ability, right, to essentially come out of what was a pretty bad review but which is what came up out of in terms of how her performance was in that budgetary process, offering her the ability for help, training to get her skill levels up, the company was going to stick with her, that the -- the -- and she took the training, and then she came back and basically said I quit.  The -- then she asks for 6 million dollars, that the -- and then we find out that she -- that she is utilizing her position that she is -- she is off through the Company attempting to

garner support for a complaint that the -- about sexual harassment. The -- at what point does -- does an employee become no longer effective at a company as -- in her position. She was no longer effective. The -- the -- and the -- at that point, you know, I decided that the company had to -- had to just cut it off, and that was when -- when she was fired.

(Dolan Tr. 190-93). Dolan previously testified as to the "tampering" and Plaintiff's attempting

to "coerce" her direct reports that he had been informed by McCormack had occurred. (Dolan

Tr. at 77, 85-86, 189-190).

     80.    Undisputed for purposes of this motion.

## SEPARATE STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXISTS A GENUINE ISSUE OF FACT TO BE TRIED

The following material facts are relevant to the motion.

### Isiah Thomas Joins the Knicks and Plaintiff Becomes Concerned About Her Role and Her Job Security

     81.    Prior to Thomas' appointment as President, Basketball Operations by the Knicks,

Plaintiff had an excellent relationship with the Club's then-President and General Manager, Scott

Layden ("Layden") and Jeff Nix ("Nix"), Layden's Assistant General Manager. Plaintiff asked

Layden to witness her mother's will. (Deposition Transcript of Victoria Browne-Moore, dated

December 18, 2006 ("Browne-Moore Tr.") at 102-03; Deposition of Anucha Browne-Sanders

dated November 27, 2006 ("Plaintiff Tr. I") at 33-34, 49; 219-20; Deposition Transcript of Ruth

Browne, dated January 16, 2007 ("Browne Tr.") at 334-35; Deposition Transcript of Jeff Nix,

dated January 26, 2007 ("Nix Tr.") at 30-31).

     82.    As a result of Plaintiff's excellent relationship with Layden, Plaintiff enjoyed

perks, exercised influence and assumed responsibilities that were not part of her position.

(Deposition Transcript of Barry Watkins, dated February 26, 2007 ("Watkins Tr.") at 78-79).

For example, Plaintiff had lunch with Layden as often as three times per month, attended many

of the team's practice sessions; attended the NBA draft night and watched many of the team's home games from the broadcast booth with Layden, Nix and their basketball operations staff. (Plaintiff Tr. I at 50-51, 57, 59-60, 62-63; Plaintiff Tr. II at 122, 261; Faye Brown Tr. 58-59; Nix Tr. at 49, 51, 52-53).

83.     Plaintiff had direct access to the Knicks' players and would frequently be in the players' lounge immediately adjacent to the locker room. (Plaintiff Tr. I at 57-58, Plaintiff Tr. II at 122).

84.     In late December 2003, Layden was terminated by the Knicks and Thomas was appointed in his place. (Plaintiff Tr. I at 37; Nix Tr. at 33).

85.     Shortly after Thomas assumed his position, he began to make changes in the basketball operations staff and the way the team was managed. (Thomas Tr. at 33-35; Mills Tr. 168-170; Nix Tr. at 86-88, 90).

86.     One of those changes included relieving Nix of his responsibilities as Assistant General Manager, dispersing his duties to other staff members, and offering him a less influential position as Director of Scouting. (Thomas Tr. at 307; Nix Tr. at 131).

87.     Thomas restricted access to the team to those employees who, in Thomas' view, had an important reason to have such access. (Plaintiff Tr. II at 262; Thomas Tr. at 34-38).

88.     Plaintiff no longer had the access, perks, and perceived influence she had become used to. (Thomas Tr. at 47-48; Mills Tr. at 171, 174-178, 207-08; Watkins Tr. at 78-79).

89.     Over time, and as a result of these changes, Plaintiff's relationship with Thomas became strained. (Mills Tr. at 189-201; Watkins Tr. at 75-82).

90.     There was conflict over their respective roles and responsibilities and over Plaintiff's access to the team. (Mills Tr. at 174-178; 189-201; Watkins Tr. at 75-82).

91.    These conflicts came to a head in March 2004, when Plaintiff and Thomas attended a meeting with Steve Mills, President and COO of MSG Sports, to whom both reported. (Mills Tr. at 183, 191-96; Plaintiff Tr. at 122-23; Thomas Tr. at 242-45).

92.    Mills explained to Plaintiff and Thomas what their respective roles and responsibilities were and made it clear that while Plaintiff was responsible for the non-basketball business operations of the Knicks, Thomas was solely responsible for basketball operations. Id.

93.    Despite this outcome, Plaintiff regularly brought to Mills' attention perceived conflicts between her and Thomas and his staff, so much so that Mills began to feel like a referee, a role he did not want and for which he did not have time. (Mills Tr. at 246-48).

94.    Mills repeatedly told Plaintiff that Thomas was President of the team and had full responsibility for basketball operations, so that Plaintiff needed to find a way to work with him and his staff in order to fulfill her responsibilities. (Mills Tr. at 246-48)..

### Plaintiff Begins to Demonstrate Serious Performance Deficiencies, Leading to Further Insecurity About Her Position

95.    In early 2004, MSG decentralized many of its business operations and gave several senior managers of its business groups – including Plaintiff – much more responsibility for the overall financial success performance of their business units. Within MSG, this expanded role was referred to as "P&L Manager." (Mills Tr. at 98-103; Ratner Tr. at 69-71, 81-87).

96.    In Plaintiff's case, the role of P&L Manager required her to understand and manage several important aspects of the Knicks' business (including food and merchandise sales and operations, and day of game facilities costs) for which she had not previously been directly responsible. (Id.; Plaintiff Tr. I at 344).

97.    While Plaintiff had previously been responsible only for the team's marketing and community relations operations, she was now accountable for virtually all of the team's revenues

and expenses. (Affidavit of Stephen Mills in support of Defendants' Motion for Partial Summary Judgment, dated April 27, 2007 ("Mills Aff.") ¶7; Mills Tr. 96-99).

98.     Plaintiff's revenue and expense budget was one of the largest components of MSG's annual budget and reached approximately $120 million a year by the 2005-06 season. (Mills Aff. ¶ 8).

99.     While Plaintiff performed satisfactorily in her marketing and community relations capacity – as reflected in her early performance reviews by Mills – she struggled with understanding and managing her expanded business role. (Mills Tr. at 97-98; 123-27).

100.    These problems become most visibly apparent in 2005, when Plaintiff was involved in a series of "disastrous" budget meetings with MSG's most senior management team, including Dolan, Ratner and Mills. (Mills Tr. at 124). These meetings highlighted Plaintiff's deficiencies in the minds of Messrs. Ratner, Dolan and Mills. (Dolan Tr. at 73; Mills Tr. at 123-27; Ratner Tr. at 80-87, 92).

101.    From their perception, Plaintiff could not capably answer questions concerning core aspects of the team's business activities and did not grasp what they believed were basic business and financial principles and important company approval procedures. Id.

102.    The problems were so severe from Dolan's perspective that he had a subsequent conversation with Mills and Ratner about her performance immediately after the meeting. (Dolan Tr. at 64-67, 196-97; Ratner Tr. at 100, 143).

103.    Ratner expressed the view that Plaintiff did not have the necessary ability to perform her job. (Ratner Tr. at 80-87, 92, 100-101; Dolan Tr. at 63).

104.    Mills discussed with Dolan the gaps in Plaintiff's skills in budgeting, financial management, branding the Knicks and general personnel management. (Dolan Tr. at 66).

105. Dolan gave Plaintiff another opportunity to prove herself and instructed Mills to identify some business courses Plaintiff could attend. (Dolan Tr. at 65-66; Mills Tr. at 366-68; Ratner at 143).. Despite this opportunity, Plaintiff's job performance did not improve. (Dolan Tr. at 185-188).

106. In October 2005, Plaintiff organized a free "open practice" for the Knicks that resulted in a dangerous situation, due to Plaintiff's decision to advertise the event and encouraging thousands of fans to arrive at the Garden without tickets. (Plaintiff Tr. II at 136-37, 342, Exhibit EE; McCormack Tr. at 123-24).

107. From the perspective of Timothy Hassett, MSG's Executive Vice President of Facilities, this situation resulted from Plaintiff's direct disregard of his staff's request – which they believed she agreed to – not to advertise the event to people without tickets. (Plaintiff Tr. II, Exhibit FF; Moran Tr. at 156-157).

108. Plaintiff not only went ahead and advertised the event against their advice, she made matters worse by never informing them she had done so. (McCormack Tr. at 123-24).

109. As a result, MSG's security staff was unexpectedly faced with a dangerously large crowd of patrons who had no tickets and were being told they could not enter. (Id.; Plaintiff Tr. II, Exhibit EE; Moran Tr. at 156-157).

110. In order to avoid the potential for injuries, the facilities staff had no choice but to admit these patrons without even the most basic security check and wanding for weapons and other contraband. (Plaintiff Tr. II, Exh. FF).

111. The incident was called to Mills' attention in an angry email from Hassett. (Plaintiff Tr. II, Exhibit FF).

112.    Mills was understandably quite concerned with Plaintiff's conduct. (Mills Tr. at 303-304).

113.    For one thing, he only learned of this serious issue from someone other than Plaintiff. (Plaintiff Tr. II, Exhibit FF).

114.    Moreover, there was now evident friction between Plaintiff and the executives responsible for MSG's facilities operations. (Mills Tr. at 303-304).

115.    Mills spoke to Plaintiff about this incident and was openly critical of the way she handled it. Id.

116.    Later in October 2005, Plaintiff decided to retain a number of untrained "customer service representatives" to work at MSG for the Knicks' opening game. (Brown Tr. at 244-49; Plaintiff Tr. I at 368-374; Moran Tr. at 164-166; McCormack Tr. at 93-100).

117.    She did this without consulting the facilities group, who had no idea who these individuals were or what they were supposed to be doing. Id.

118.    Moreover, MSG had unionized employees who were responsible for some of the duties Plaintiff assigned these "representatives" to perform. Id.

119.    Plaintiff's decision to retain and assign these representatives without coordinating with the facilities group, who could have advised her about it or at least been prepared for the potential fallout, could have caused MSG a serious problem with the unions representing its ushers, ticket takers and security officers. Id.

120.    This incident was brought to the attention of McCormack, who testified about how much it concerned him. (McCormack Tr. at 93-100).

121.    Mills repeatedly communicated his concerns to Plaintiff throughout 2005, both in emails and in conversations. (Mills Tr. 71-76). For example, in an April 30, 2005 email to

Plaintiff regarding her request to Thomas that he hand sign each of 4,500 letters requesting renewal of season ticket subscribers, Mills responded critically, "I think 4500 letters to sign is too much we have never sent originals like that and I question how valuable it really is." Plaintiff then admits, "I figured you wouldn't agree with Isiah signing the letters." (Plaintiff Tr. II Exh. BS-CC). Mills October 4, 2005 email to Plaintiff regarding her mounting a large mural in the arena containing players who were traded, states, "I think it is crazy to have a mural go up today with 2 players that are no longer on the team. We should take this down." and "I can not imagine what past direction or position would suggest that we should put something up that is clearly an out of date image . . . I am some what surprised that the team conclusion you come to is that we should leave it up. Given that this is part of every team you should give some thought as how you would like to deal with it. When the Knicks marketing function reported to me I budgeted a provision to make necessary changes when trades were made." (Plaintiff Tr. II, Ex. BS-II).

122.    The situation became so untenable that in one of the conversations, Plaintiff turned to Mills after he was critical with her and asked whether she was ever going to leave another meeting with Mills feeling good about herself. (Mills Tr. at 355-356).

123.    Finally, in November 2005, after all of these issues arose, Plaintiff had a meeting with Mills in which she told him that she had lost the respect and confidence of her peers and the employees that worked for her; that she felt she could no longer function in her job or perform her job for the Knicks; and that she needed Mills' help to find another job while she still had a job. (Mills Tr. at 123-25, 283-285, 300-301).

124.    Mills agreed to help her and reported the conversation to Ratner and McCormack, who eventually advised Dolan about it. (Mills Tr. at 127; Ratner Tr. at 247-49).

**Plaintiff Manufactures a Harassment Claim and a
"Sexually Hostile Environment" to Exact a Large Severance Before Leaving MSG**

**Plaintiff's Own Purported Harassment Claims**

125.    Immediately prior to the Thanksgiving holiday, Plaintiff instructed one of her subordinates, Dan Gladstone, Director of Fan Development, to prepare a memo concerning comments Knicks player Stephon Marbury had allegedly made about Plaintiff. (Gladstone Tr. at 83-85, 215-16, Exh. 7).

126.    Significantly, the comments were allegedly made over five months earlier and Gladstone had told Plaintiff of Marbury's comments, including the use of the word "bitch," but Plaintiff did not ever request that they be documented until November 2005, at the same time her performance issues were coming to a head. Id.

127.    Gladstone was surprised by Plaintiff's request and had a problem with it as her request came at the end of the day as he was leaving for Thanksgiving and requested that he provide the information over the weekend. (Gladstone Tr. at 84-85).

128.    At around the same time, Plaintiff directed another subordinate, Gary Winkler, Vice President of Event Presentation, to document a purported incident that occurred over a year earlier. (Plaintiff Tr. I at 178).

129.    That incident, the facts of which are disputed, pertained to alleged inappropriate behavior by Thomas toward Petra Pope, an MSG, in requesting that she check in on the referees. Id.

130.    Finally, after Plaintiff met with Moran on or after November 28, 2005, Plaintiff directed Karin Buchholz, Vice President of Community Relations and Fan Development, to prepare her own memo concerning Marbury's purported animosity toward Plaintiff. (Buchholz Tr. at 180-82; Exh. 1).

131.    Buchholz was "uncomfortable" and felt "pressured to document the instances" because Plaintiff was her supervisor.  Id.

132.    Moreover, according to Buchholz, Plaintiff actually told Buchholz what she should say in her memo.  Id.

133.    All of Plaintiffs' directions to prepare these memos were made just days before Plaintiff retained an attorney in early December 2005.  Id.

### Plaintiff's Involvement in the "Claims" of Other Employees

134.    At the same time Plaintiff was asking her subordinates to document old purported events, she was conducting an "investigation" into issues allegedly raised by lower-level staff employees. (Plaintiff Tr. I at 308, 312).

135.    Plaintiff launched what became a wide-ranging investigation into inappropriate comments made to female employees by Hassan Gonsalves, a Field Marketing Assistant and Stephon Marbury's cousin. (Plaintiff Tr. I at 313-14).

136.    Significantly, Plaintiff began and pursued her investigation into Gonsalves' conduct (and ultimately Marbury's conduct), without informing Mills or anyone in MSG's Employee Relations ("HR") department. (Moran Tr. at 69-73, 101-102; Plaintiff Tr. I, Exh. 11 (attached to Mintzer Aff. Exh. 1); Plaintiff Tr. II at 352-353, 355-357, Exh. GG; Plaintiff's 56.1 ¶ 31).

137.    Plaintiff's decision to conduct interviews by herself, without notifying or involving HR, was in direct contravention of clearly defined MSG policy. MSG's Harassment Prevention policy provides:

> Employees who have experienced conduct they believe is contrary to this policy have an obligation to take advantage of this complaint procedure.  If you believe you have been or are being discriminated against, harassed or otherwise treated improperly, or

believe some other employee is engaging in or receiving such treatment or conduct, you should contact your local Employee Relations Manager immediately. The local Employee Relations Manager has the primary responsibility for investigating and resolving any complaint of sexual or other harassment, discrimination or other improper or abusive conduct.

(Plaintiff Tr. I at 30, Plaintiff Tr. II at 25-27, Exh. 3).

138.    Plaintiff was familiar with the personnel policies pertaining to discrimination and she had a good relationship with John Moran, the person who investigated those types of allegations. at the time that she failed to file her own complaint. (Plaintiff Tr. I at 276-77; Exh. 3; Plaintiff Tr. II at 25-27, 149, 187-189; Exh. BS-K).

139.    At the same time Plaintiff was conducting these interviews, Plaintiff directed Buchholz and Gladstone to also prepare memos concerning various alleged performance deficiencies of Vernon Manuel, another employee on the Field Marketing Staff who was then dating Dolan's stepdaughter. (Gladstone Tr. at 83-85; Buchholz Tr. at 244-247).

140.    After Thanksgiving weekend, after she completed her "investigations" into Gonsalves and Manuel (and, in the process, obtained information that Marbury had engaged in consensual sex with ███████████ Plaintiff informed Mills for the first time of her investigations and the "results" thereof. (Plaintiff Tr. II at 352-353, 355-357, Exh. GG; Plaintiff's 56.1 ¶31)

141.    Mills was understandably concerned about Plaintiff's conduct and referred the entire matter to HR for a proper investigation. (Mills Tr. at 298-299; 305-306)

142.    At the conclusion of the HR investigation, MSG terminated the employment of both Gonsalves and Manuel. (Moran Tr. at 126-127).

**Plaintiff Retains Counsel and Seeks an Extortionate Severance Payment**

143.    On December 2, 2005, days after she completed her investigations into Messrs. Gonsalves, Manuel and Marbury, Plaintiff retained counsel and – for the first time – raised complaints of sex discrimination and harassment. (Plaintiff Tr. I at 298-99, 317-18; Buchholz at 69-70, 71; Mills Tr. at 342-343; Olsen 118-119).

144.    On December 15, 2005, Plaintiff sent Mills an email in which she asserted that at the Knicks game the previous evening, Thomas had tried to hug her and the way he spoke to her made her uncomfortable. Mills never heard anything from Browne Sanders about Thomas acting inappropriate to her until December 15, 2005. (Mills Tr. at 397-98).

145.    This was the first time Plaintiff had ever complained to anyone at MSG about any allegedly inappropriate action or conduct by Thomas. (Moran Tr. 174-176, 194-196; Mills Tr. 397-98; Olsen Tr. at 118-119). Plaintiff did not make a complaint of sexual harassment to Olsen during their May 2005 lunch. (Olsen Tr. at 118-119).

146.    Nonetheless, on December 21, 2005, Plaintiff's counsel contacted MSG's legal department and asserted that Plaintiff had a "knock down" sexual harassment suit against MSG. (Declaration of Marc Schoenfeld dated March 2, 2007 ¶3, attached to Mintzer Aff. Exh. 18).

147.    In a meeting on December 22, 2005, between Plaintiff's counsel and MSG's counsel, before MSG had the opportunity to investigate Plaintiff's claims, Plaintiff's counsel indicated that unless a settlement could be reached, they were going to file a lawsuit likely to result in substantial publicity. (Reynolds Dec. ¶¶ 3, 7).

148.    Plaintiff's counsel specifically referred to the public embarrassment to the Knicks and Thomas that would result from the press coverage of the suit. (Reynolds Dec. ¶ 7).

149.    Plaintiff's counsel reminded MSG's counsel that Plaintiff's "investigation" had revealed that Marbury, the Knicks' star player, had been accused of having sexual relations with a young Knicks employee, even though this allegation had absolutely no bearing on Plaintiff's allegations about Thomas. (Reynolds Dec. ¶ 5).

150.    Plaintiff's counsel went on to say that MSG had to pay "a lot of money . . . in order to teach them [MSG] a lesson . . . that's the only way they [MSG] will learn." Plaintiff's counsel stated that Plaintiff "wants money, lots of money" if MSG was to avoid such a lawsuit. (Reynolds Dec. ¶ 8).

151.    Days later, while MSG's internal investigation into Plaintiff's claims was getting underway, Plaintiff's counsel made a "settlement demand" of $6.5 million, representing over 20 years' front pay. (Reynolds Dec. ¶10).. Among Plaintiff's counsel's rationales was that the settlement amount would "teach" MSG to impose "discipline" on its employees. (Reynolds Dec. ¶10).

152.    At the time, Plaintiff was still employed by MSG. and is not seeking emotional distress damages in this action. (Plaintiff's Second Amended Complaint dated November 10, 2006)

153.    As MSG's counsel pointed out in a letter dated December 30, 2005, Plaintiff's "settlement" demand had no rational basis. (Reynolds Dec. ¶11).

154.    Nevertheless, in response to a counter-offer from MSG of one year's salary as severance, Plaintiff's next "settlement" demand was reduced to $5,950,000, , representing over 22 years' front pay. (Reynolds Dec. ¶12).

## Dolan's Decision to Terminate Plaintiff

155.    When asked why he made the decision to terminate Plaintiff, Dolan testified that "[w]e had come to the conclusion that her working at the company was no longer tenable due to the fact first that – leading up until that point and all the way from July up until that point we had had problems." (Dolan Tr. at 171-72).

156.    Dolan identified as a factor in his decision to terminate "the inability to do her job" that included her "inability to budget" and "inability to brand" and lack of understanding as to both.   (Dolan Tr. at 185-86).   Dolan also identified as a factor his acceptance of the consistently expressed opinion of Ratner that she had not improved and should be terminated. Id.

157.    Dolan also identified Plaintiff's multi-million dollar demands and her utilizing her position to improperly influence her direct reports.  (Dolan Tr. at 188-190, 200-02).

158.    Dolan specifically testified that he believed, based on what he was told, that Plaintiff "used her influence with direct reports to influence their answers, their [sic] – their responses to an inquiry to an investigation that was made on her behalf." (Dolan Tr. at 184). He had been told she had "tampered with an investigation" and "essentially attempt[ed] to coerce her direct reports into corroborating her complaint," knowing that she was going to make a complaint, in violation of company policy. (Dolan Tr. at 77).

159.    Dolan also considered Plaintiff's telling Mills that she could no longer perform her job and asked MSG to keep her on while she looked for another position. (Dolan Tr. 87-88, 189-91).

160.    Dolan testified that the "combination of all those things together" with the "last straw" being the tampering he was advised of led him to terminate Plaintiff. (Dolan Tr. at 189-90).

161. When asked which factor was weighted more heavily in his decision, Dolan stated Plaintiff's performance issues since July were "significant" and Plaintiff's misuse of her position to influence her employees, stating that the Company could not trust her after that. (Dolan Tr. at 197-98).

**Other Relevant Facts**

162. In her Complaint, and subsequent deposition testimony, Plaintiff states that Thomas engaged in the following conduct:

> (1) called her a "bitch" and a "ho." (Plaintiff Tr. I at 131, 170, 218, 221; 2nd Am. Compl. ¶23);
>
> (2) made sexual advances, including suggesting that they go "offsite." (2nd Am. Compl. ¶2);
>
> (3) repeatedly told Plaintiff he was "in love" with her and compared his feelings to the movie "Love and Basketball." (Plaintiff Tr. II at 98; 2nd Am. Compl. ¶29); and
>
> (4) compared his scar above his eye with a scar above her eye and stated, "I know you think I'm inappropriate but I'm in love with you. (Plaintiff Tr. I at 399; 2nd Am. Compl. ¶31(b)).

Thomas, on the other hand, disputes that the vast majority of this conduct ever occurred. He:

> (1) denies that he ever called Plaintiff or any other MSG employee a "bitch." (Thomas Tr. at 177, 192);
>
> (2) denies that he ever swore at Plaintiff. (Thomas Tr. at 192);
>
> (3) denies ever telling Plaintiff that he was "in love" with her or that he compared his relationship with Plaintiff to the movie "Love and Basketball." (Thomas Tr. at 69);
>
> (4) denies ever saying that Plaintiff was "attractive" or "easy on the eyes." (Thomas Tr. at 213-214); and
>
> (5) denies ever proposing to Plaintiff that they go "offsite" for sex. (Thomas Tr. at 260).

New York, New York
May 25, 2007

EPSTEIN BECKER & GREEN, P.C.

By:    s/Ronald M. Green
       Ronald M. Green, Esq. (RG-4177)

250 Park Avenue
New York, New York  10177-1211
(212) 351-4500
Attorneys for Defendants