# EXHIBIT A
## COMBINED RULE 56.1 STATEMENT

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| 1. Plaintiff was hired by MSG in November 2000 as its Vice President, Marketing. (Deposition Transcript of Anucha Browne Sanders dated November 27, 2006 ("Browne Sanders Tr. I") at 13 (attached as Exhibit ("Exh.") A to Declaration of Brian G. Cesaratto dated April 27, 2007 ("Cesaratto Dec.")) ; Affidavit of Stephen Mills dated April 27, 2007 ("Mills Aff."), 3). | Admit. | None |
| 2. The decision to recruit and hire Plaintiff was made by Stephen Mills ("Mills"), presently President and Chief Operating Officer, MSG Sports, for Madison Square Garden, L.P. ("MSG"), who knew Plaintiff when she worked for IBM on a potential project for MSG. (Browne Sanders Tr. I at 27-28 (Cesaratto Dec., Exh. A); Mills Aff. at 2-3). | Admit that Stephen Mills ("Mills") hired plaintiff. (Pl. Dep. I 27-28) Plaintiff had met Mills previously when Mills worked at the National Basketball Association League Offices. (Pl. Dep. I 28) | None |
| 3. Plaintiff's primary job responsibilities as Vice President of | Admit that plaintiff's responsibilities as Vice President of Marketing were to | The head of community relations reported to Plaintiff.[1] (Browne Sanders Tr. II at |

[1] The relevant portions of deposition transcripts are attached to the Declaration of Brian Cesaratto in Further Support of Defendant MSG & Dolan's Motion for Partial Summary Judgment, dated June 8, 2007 ("Cesaratto Reply Dec.") and are designated by "[deponent's last name] Tr. at [page number(s)]." Excerpts from the Deposition Transcript of Anucha Browne Sanders dated November 27, 2006 are attached as Exhibit A to the Cesaratto Reply Dec. ("Plaintiff Tr. I") Excerpts from the Deposition Transcript of Anucha Browne Sanders dated November 28, 2006 are attached as Exhibit B to the Cesaratto Reply Dec. ("Plaintiff Tr. II"). Excerpts from the Deposition Transcript of Isiah Thomas dated December 8, 2006 are attached as Exhibit C to the Cesaratto Reply Dec. Excerpts from the Deposition Transcript of Karin Buchholz dated January 19, 2007 are attached as Exhibit D to the Cesaratto Reply Dec. Excerpts from the Deposition

NY:1874796v2

Dockets.Justia.com

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| Marketing were to market the Knicks' team brand and oversee the Knicks' community relations activities, including those player appearances including by NBA requirements. (Deposition Transcript of Anucha Browne Sanders dated November 28, 2006 ("Browne Sanders Tr. II") at 246-48; (Cesaratto Dec., Exh. B)). Her duties included supervising the Knicks' promotion and charitable efforts in the local community, such as the promotion of literacy and poetry programs in the schools. (Affidavit of James Dolan ("Dolan Aff.") dated April 26, 2007 at 3; Mills Aff. 7). | market the Knicks' team brand. (Pl. Dep. II 246-247) In addition, plaintiff worked with the head of community relations on player programs and adhering to league community relations requirements. (Pl. Dep. II 246-247) | 219-220, 222; Buchholz Tr. at 19, 23, 34, 40-41). |
| 4. Plaintiff was the chief marketing officer for the Knicks responsible for all aspects of the Knicks' marketing and media efforts. (Mills Aff. 7). She was responsible for new media and communications on the Web, Knicks' game presentation and event management, | Admit. | None |

Transcript of James Dolan dated December 11, 2006 are attached as Exhibit E to the Cesaratto Reply Dec.  Excerpts from the Deposition Transcript of Jeffrey Nix dated January 26, 2007 are attached as Exhibit F to the Cesaratto Reply Dec.  Excerpts from the Deposition Transcript of [ ] dated January 23, 2007 are attached as Exhibit G to the Cesaratto Reply Dec.  Excerpts from the Deposition Transcript of Brock Weaver dated December 21, 2006 are attached as Exhibit H to the Cesaratto Reply Dec.  Excerpts from the Deposition Transcript of Leon Reimer dated January 22, 2007 are attached as Exhibit I to the Cesaratto Reply Dec.  Excerpts from the Deposition Transcript of Joseph Favorito dated February 12, 2007 are attached as Exhibit J to the Cesaratto Reply Dec.  Deposition exhibits are included, where relevant, following the deponent's transcript and are designated "[deponent's last name] Tr. Exh. [number]." Other documents are attached to the Cesaratto Reply Dec. and are designated "Cesaratto Reply Dec. Exh. [number]," "Deposition Transcript of Anucha Browne Sanders dated November 28, 2006 ("Browne Sanders Tr. II"); Deposition Transcript of Karin Buchholz dated January 19, 2007 ("Buchholz Tr.")

NY:1874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| and oversaw partnerships, sponsorship events and subscription, alumni relations, as well as Knicks' fan development. (Browne Sanders Tr. II at 246-247 (Cesaratto Dec, Exh. B)). | | |
| 5.   Plaintiff had access to highly confidential financial and business proprietary material and, as such, she was in a position of extreme trust. (Mills Aff. 7). | Admit that plaintiff had access to highly confidential financial and business proprietary material. However, a jury need not accept Mill's characterization in his affidavit of plaintiff being in a position of "extreme trust."[2]<br><br>FN 2  As this testimony was submitted in the form of an affidavit, plaintiff did not have the opportunity to cross-examine Mills on this issue. Moreover, under the Supreme Court's decision in Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 131, 151 (2000), a jury is entitled to disbelieve testimony of an interested witness. See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment at 19-21. | Plaintiff's admission that, upon promotion to Senior Vice President, Marketing and Business Operations, she was the P&L manager for the Knicks and she therefore owned the revenue streams totaling $120 million evidences her being in a position of extreme trust. Deposition Transcript of Anucha Browne Sanders dated November 27, 2006 ("Browne Sanders Tr. I") at 343-44; Rule 56.1 Statement in Support of MSG & Dolan's Motion for Partial Summary Judgment ("Def. 56.1") ¶¶ 6, 8. |
| 6.   On or about March 11, 2002, Plaintiff was promoted by Mills to the position of Senior Vice President, Marketing and Business Operations. (Browne Sanders Tr. II at 266 (Cesaratto Dec., Exh. B); Mills Aff. 8). James Dolan, the Chairman of MSG, approved | Admit that in the spring of 2002, plaintiff was promoted to the position of Senior Vice President, Marketing and Business Operations. (Pl. Dep. II. 266) Deny that Dolan approved plaintiff's promotion, Dolan testified that he did not have to approve plaintiff's promotion and that | Dolan also signed Plaintiff's salary increase in February 2005 after she was promoted. (Affidavit of Kevin T. Mintzer in Support of Plaintiff's Motion for Partial Summary Judgment, Exh. 2). |

3

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| Plaintiff's promotion thereby entrusting her with financial and operating responsibility for one of MSG's core businesses - the Knicks. (Dolan Aff. 2). | Mills informed him that Mills was promoting plaintiff. (Dolan Dep. 50-51) | |
| 7.    MSG issued a press release regarding Plaintiff's promotion. (Browne Sanders Dep. Tr. II at 269-270 (Cesaratto Dec. Exhs. B, C). The release stated, among other things, that "the promotion will also make her one of the highest ranking women at any professional team." (Cesaratto Dec., Exh. C). A news article on the promotion reported, "Ms. Sanders is now the third-highest ranking female executive in the National Basketball Association." (Browne Sanders Tr. II at 270 (Cesaratto Dec., Exhs. B, C). In addition, it stated that Plaintiff was "the highest ranking African-American female in major professional sports." (Id.) | Admit. | None |
| 8.    Plaintiff's promotion elevated her to one of the most important and visible senior executive level positions at MSG. (Dolan Aff. 3; Mills Aff. 8). Her new job included not only her responsibilities as Vice President, Marketing, but expanded to include, among other things, Profit & Loss responsibility for all of the Knicks' business operations. (Mills Aff. 8). The Knicks' marketing and business operations | Admit. | None |

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| budget, for which Browne-Sanders was now responsible, reached $120 million by the 2005-06 NBA season and was one of the largest components of the overall MSG operating budget. (Dolan Aff. at 3; Mills Aff. 8). | | |
| 9.  Plaintiff testified in her deposition that as Senior Vice President, Marketing and Business Operations "she owned the [Knicks'] revenue streams.   (Browne Sanders Tr. I at 344 (Cesaratto Dec., Exh. A)). | Admit. | None |
| 10.  In her position, Plaintiff negotiated and entered into contracts with major Knicks vendors and sponsors, such as McDonalds and Foxwoods Casino Hotels. (Mills Aff. 8). | Deny. Browne Sanders was not directly involved in negotiating contracts with major Knicks vendors and sponsors, such as McDonalds and Foxwoods Casino Hotels, and she did not sign any such contracts on behalf of MSG. (See Browne Sanders Decl. ¶8) | None |
| 11.  Plaintiff's responsibilities required her to interact with individuals and businesses vital to the Knicks' financial success, including its sponsors, vendors and fans. (Mills Aff. 8). Her increased responsibilities placed her in an even higher level of trust within the MSG organization. (Id.) | Admit that plaintiff's responsibilities required her to interact with individuals and businesses vital to the Knicks' financial success, including its sponsors, vendors and fans. However, a jury need not believe Mills' characterization in his affidavit that plaintiff's "increased responsibilities placed her in an even higher level of trust within the MSG organization." See FN 2. | Plaintiff's admission that, upon promotion to Senior Vice President, Marketing and Business Operations, she was the P&L manager for the Knicks and she therefore owned the revenue streams totaling $120 million evidences her being in a position of extreme trust. (Browne Sanders Tr. I at 343-44; Def. 56.1 ¶¶ 6, 8). |

NY:1874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| 12. Plaintiff was a highly visible executive, immersed in MSG's civic and charitable community affairs who regularly attended Knicks home games and NBA meetings, and was named, at MSG's initiative to, the Sports Business Journal's "Forty Under Forty" list. (Deposition transcript of Joseph Favorito, dated February 12, 2007 at 127-130 (Cesaratto Dec., Exh. D); Mills Aff. 7-8). | Admit in part. Plaintiff was named to the Sports Business Journal's "Forty Under Forty" list. MSG supported plaintiff's inclusion in the list, but the Sports Business Journal made the ultimate decision, (Favorite Dep. 130) | Favorito, the Knicks' former Vice President of Public Relations testified as follows:<br><br>Q. Tell me, then, what was your involvement in the decision-making process of the Sports Business Journal?<br><br>A. I called Terry Lefton, who is the senior business writer, and I said "I really think this would be doing me a big favor if you got Anucha in there, and here is why." And he said "Okay, I will do it for you."<br><br>Q. He said that he would do it for you?<br><br>A. Yes.<br><br>(Favorito Tr. at 22-23, 129). |
| 13. Plaintiff's total compensation while employed at the Knicks exceeded $1,100,000. (Affidavit of John Moran, dated April 26, 2007 ("Moran Aff.") 11). Plaintiff earned $16,346 for the portion of the year she worked in 2000; $158,158 in 2001; $213,916 in 2002; $255,421 in 2003; $248,897 in 2004; and $307,230 in 2005. (Moran Aff. 11, Exh. K). | Admit. | None |

NY:1874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| 14.    At the time of her hire, on November 21, 2000, Plaintiff signed a copy of MSG's Confidentiality, Code of Business Conduct and Proprietary Property Agreement (the "Agreement"). (Browne Sanders Tr. II at 44-46 (Cesaratto Dec., Exhs. B and E)). | Admit. | None |
| 15.    Section 2 of the Agreement states as follows: During my employment I may not engage in activities or have personal or financial interests that impair, or appear to impair, my independence or judgment or otherwise conflict with my responsibilities to [MSG]. Such activities include, but are not limited to: . . . (g) serving as an officer, director, agent, employee, consultant or provider of or in any other capacity for any for-profit organization (the "Code"). | Admit that defendants have cited a portion of MSG's Confidentiality, Code of Business Conduct and Proprietary Property Agreement ("Code of Business Conduct") correctly. The Agreement also provides that its terms "shall not be waived or modified except by an instrument in writing signed by myself and an officer of the Company." (Cesaratto Decl., Ex. E at ¶ 5) | None |
| 16.    The Agreement also provides, under a section titled "Remedies" that: I understand that any breach of the Agreement may result in my immediate termination. I also understand that the company may, in addition, pursue its legal and equitable remedies in the event of a breach or threatened breach. | Admit. | None |
| 17.    Plaintiff also signed on November 21, 2000 MSG's "Employee Code Of Conduct," acknowledging that "Public | Admit. | None |

NY:1874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| trust and confidence are the greatest assets held by Madison Square Garden." (Browne Sanders Tr. II at 24 (Cesaratto Dec., Exhs. B and F). | | |
| 18. Cablevision's Code of Business Conduct and Ethics applicable to MSG (hereinafter "MSG Code of Ethics"), which Plaintiff received and acknowledged reading on October 11, 2004, provides at page 3: Legal Compliance It is the Company's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each employee, officer and director to adhere to the standards and restrictions imposed by those laws, rules and regulations. | Admit. | None |
| 19. Plaintiff attended MSG's ethics training on October 12, 2004. (Browne Sanders Tr. II at 196-197 (Cesaratto Dec., Exh. B); Moran Aff. 7, Exh. G). | Admit. | None |
| 20. MSG's Employee Handout to accompany the Company's October 12, 2004 business ethics training provides: Remember: Doing the right thing: protects personal and company integrity; builds and protects our reputation; ultimately protects jobs. It further provides that employees should ask themselves, "Will | Admit that defendants have cited selected portions of the documents correctly. | None |

8

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| my action violate any laws or policies of the company?" and "Could my action negatively impact me, others or the company?" (Moran Aff. 9, Exh. J). MSG's Statement of Company Values provides that "Cablevision is a business founded upon basic principles of honesty, integrity and a sincere commitment to our employees and our customers." (Moran Aff. 13, Ex. M). | | |
| 21. The MSG Employee Handbook dated April 2003 (the "Handbook") provides, under a section entitled "How We Conduct Ourselves: Employee Code of Conduct". An employee who fails to maintain these conduct standards by violating any of the company's work rules and/or the Employee Code of Conduct, is subject to disciplinary action up to and including termination. Listed below are examples of the rules and regulations you will be expected to follow. . . . Illegal activities are prohibited including being in the possession of or using controlled substances including alcohol. (Moran Aff. 10, Exh. J) (emphasis in original). | Admit that defendants have cited a portion of the MSG Employee Handbook correctly. The sections cited by defendants, however, must apply only to conduct at the workplace because they limit behavior that is legal and appropriate outside of the workplace, such as consuming alcohol and social gathering. (Moran Aff. ¶10, Ex. J, at 18) The MSG Employee Handbook also prohibits the use of vulgar, obscene or abusive language. (Moran Aff. ¶10, Ex, J, at 29) | The Employee Code of Conduct contained in the MSG Employee Handbook is not limited to workplace conduct. (Affidavit of John Moran dated April 27, 2007 in Support of Defendants MSG and Dolan's Motion for Partial Summary Judgment ("Moran Aff"), Exh. J) |
| 22. At her deposition, Plaintiff testified that she understood the import of the Agreement to mean that she was not permitted to engage in any business that | Admit that in the deposition testimony cited by defendants, MSG's counsel read to plaintiff a portion of the Code of Business Conduct and plaintiff testified | Plaintiff certified under penalty of perjury on her tax returns that she operated a direct marketing business. (See Def. 56.1 ¶29). The testimony of Plaintiff's sisters |

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| she might have owned or controlled while she was an executive of MSG. (Browne Sanders Tr. II at 45-46 (Cesaratto Dec, Exh. B)). | that she understood that portion of the Code of Business Conduct in 2000. (Pl. Dep. II 45-46) Plaintiff, however, did not operate a direct marketing business while she worked at MSG. (Pl. Dep. II 44; Sanders Dep. 291; Browne Dep. 216; Browne-Moore Dep. 229; Nix Dep. 252-53; Gerrard Dep. 73; Singer Dep. 80) | (Browne-Moore and Browne), as well as that of Rick Singer, Jeff Nix and Melinda Gerrard is inadmissible hearsay on whether Plaintiff operated a direct marketing business from her home. |
| 23.   Plaintiff admitted that she terminated one of the employees she supervised for attempting to engage in outside business activity while working at MSG. (Browne Sanders Tr. II at 240-241 (Cesaratto Dec., Exh. B)). | Admit that pursuant to Mills' direction, plaintiff fired an MSG employee who was ▓▓▓ in 2003. (Pl. Dep. II 240-41) The employee had offered to work for ▓▓▓ to coordinate a project involving the Knicks at the same time she was working full-time for MSG and coordinating the same project on behalf of MSG. (Pl. Dep. II 240-41) The employee also said that she had in the past been hired by other companies to coordinate projects with the Knicks while she was working full-time for MSG and her responsibilities included coordinating the projects for MSG. (Pl. Dep. II 240-41) | Plaintiff does not testify that she fired ▓▓▓ at Mills' direction. Plaintiff testified that she relayed ▓▓▓ misconduct to Mills and he directed her to someone in HR and she was fired for "ethics violations." (Browne Sanders Tr. II at 241). |
| 24.   Plaintiff testified that when she was hired, she received a copy of the Handbook and read parts of it at that time. (Browne Sanders Tr. II at 193 (Cesaratto Dec., Exh. B)). | Admit. | None |

10

NY:1874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| 25.   MSG sought copies of Plaintiff's tax returns by document request dated April 11, 2006. (Cesaratto Dec., Exh. H). On June 20, 2006, Plaintiff objected that Plaintiff's tax returns "were neither relevant nor reasonably calculated to lead to the discovery of admissible evidence." (Cesaratto Dec., Exh. I). | Admit that plaintiff objected to producing her tax returns on the grounds that the request was "overly broad, unduly invasive of plaintiff's privacy and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence." (Cesaratto Decl., Ex. I) | None |
| 26.   Following an exchange of letters between counsel on July 31, 2006 and August 11, 2006 that failed to result in Plaintiff voluntarily producing her tax returns, the parties submitted the issue to the Court. (Cesaratto Dec., Exhs. J, K and L). On November 6, 2006, the Court ordered Plaintiff to produce copies of her tax returns for tax years beginning in 2000. (Cesaratto Dec., Exh. M). | Admit that there was an exchange of letters between counsel on July 31, 2006 and August 11, 2006, that, among other things, addressed the production of plaintiff's tax returns. In their July 31, 2006 letter, defendants' counsel requested that plaintiff identify which documents had been withheld in response to MSG's Document Request No. 59, which included a request for plaintiff's tax returns. (Cesaratto Decl., Ex. J) In their August 11, 2006 letter, plaintiff's counsel explained which documents had been produced in response to MSG's Document Request No. 59 and requested that MSG explain why it believed it was entitled to any additional information. (Cesaratto Decl., Ex. K) On November 1, 2006, the parties wrote to the Court regarding several discovery issues. In that letter, defendants' counsel stated that defendants sought plaintiff's tax returns because | When Defendants sought the production of Plaintiff's tax returns, they were unaware at the time that the returns were fraudulent and, therefore, had no reason to assert it as a basis for production. In the November 1, 2006 letter to the Court, Plaintiff's counsel stated "Plaintiff does not believe there is any basis for defendants to obtain the documents at issue. Indeed, similar requests have been classified as fishing expeditions and have been denied in other cases. However, in an effort to avoid requiring the Court's intervention, plaintiff was willing to discuss these issues further." (Declaration of Brian G. Cesaratto dated April 27, 2017 in Support of Defendants MSG and Dolan's Motion for Partial Summary Judgment ("Cesaratto Dec."), Ex. L, at 6)(emphasis added)). |

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| | "plaintiff's financial situation and family income are relevant to the existence of financial stressors, may tend to explain her workplace interactions, or expose the potential motives for filing this action." (Cesaratto Decl., Ex. L, at 13) On November 6, 2006, the Court ordered plaintiff to produce her tax returns for the years beginning in 2000. (Cesaratto Decl., Ex. M) | |
| 27. On November 21, 2006, Plaintiff produced her federal and New York and New Jersey state tax returns for 2000-2005 and, on November 24, 2006 produced amended federal and state tax returns for 2003 and 2004. (Cesaratto Dec. Exhs. N and O). The amended returns were dated November 22, 2006. (Id.) | Admit. | None |
| 28. Plaintiff was deposed on November 27 and 28, 2006. (Cesaratto Dec. Exhs. A and B). | Admit. | None |
| 29. Plaintiff's 2001, 2002, 2003 and 2004 federal tax returns indicated on each year's Schedule C (which is titled, "Profit or Loss From Business (Sole Proprietorship)") that she was the proprietor of a direct marketing business which she operated from her home address. (Cesaratto Dec. Exhs. | Admit that plaintiff's 2001-2004 tax returns contain a Schedule C, which indicated that she was the proprietor of a direct marketing business which operated from her home address. Plaintiff, however, did not operate a direct marketing business at any point, including from 2001 through 2004. (Pl. Dep. II 44; Sanders Dep. 291; | Plaintiff testified that (a) the returns were "incorrect", and (b) that she did not look at them before signing. (Browne Sanders Tr. II at 41-43). Plaintiff has not submitted any sworn refutation of testimony that she provided him information for Schedule C to her tax returns. (See ¶ 46 |

12

NY:1874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
| --- | --- | --- |
| P(PL4302); Q(PL4321); R(PL4353); S(PL4388)). These deductions were carried over onto her New York and New Jersey tax returns as well on each of those years. (Cesaratto Dec., Exhs. T-V). | Browne Dep. 216; Browne-Moore Dep. 229; Nix Dep. 252-53; Gerrard Dep. 73; Singer Dep. 80) The Schedule C forms were prepared by ▮▮▮ plaintiff's accountant, but ▮▮▮ does not remember having any discussions with Browne Sanders regarding a direct marketing business. ▮▮▮ Dep. 44-46, 50-51, 64-65, 72) Nor does ▮▮▮ have any documents provided to him by plaintiff that reflect a direct marketing business ▮▮▮ Dep. 54) In a questionnaire that Browne Sanders completed for ▮▮▮ she confirmed that she did not have a business. ▮▮▮ Dep. 35; Mintzer-MSG Decl., Ex. 1). ▮▮▮ testified that he did not remember if he made up the information contained on the Schedule C forms that he prepared for plaintiff ▮▮▮ Dep. 48). Plaintiff did not know this information was included on her tax returns because she did not review her tax returns before she signed and filed them. (Pl. Dep. II 43; Reimer Dep. 92) | below). Her counsel's argument that Plaintiff did not know the information was included on Schedule C to her tax returns is not factually supported. The testimony of Plaintiff's sisters (Browne-Moore and Browne), as well as that of Rick Singer, Jeff Nix and Melinda Gerrard is inadmissible hearsay on whether Plaintiff operated a direct marketing business from her home. In addition, all of the testimony of Leon Reimer is inadmissible hearsay on the issue of Plaintiff's purported lack of knowledge as to the Schedule C to her 2001-2004 tax returns. <br><br> ▮▮▮ testified as to the 2001 return: <br><br> Q: Did you discuss expenses with Ms. Sanders? <br><br> A: Like I said, we had several conversations during probably the height of the season. Lot of this stuff is – I don't remember. All I could tell you, I know we finished the return. That's all I know. Forgive me. We do a lot of clients, and that's information I don't recall. I really don't. |

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| 30. The tax deductible expenses, totaling $73,000, associated with Plaintiff's "direct marketing business" are itemized on the Schedule C's attached to the original returns. (See Cesaratto Dec., Exh. P(PL4302); Q(PL4321); R(PL4353); S(PL4388)). They include car expenses, taxes and licenses, professional dues, | Admit in part, deny in part. Deny that plaintiff fixed in each years' return the date of February 13, 2001 as the date she first used her vehicle for business purposes. See ¶ 29. Plaintiff was not aware that any business deductions were taken on her 2001-2004 tax returns or that her returns declared that she was the sole | Q: And Part 5 with respect to Other Expenses, you also prepared this schedule; is that correct?<br><br>A: Yes.<br><br>Q: Did you discuss these items with Ms. Sanders?<br><br>A: Well, I don't recall. Like I said, we did the return at the height of the season. Information was spoken about. I don't recall specifically what you are asking for.<br><br>(Tr. at 45-46).<br><br>Plaintiff's denials are unsupported with admissible evidence and nothing more than her counsel's argument. All of the testimony of Leon Reimer is inadmissible hearsay on the issue of Plaintiff's purported lack of knowledge as to the Schedule C to her 2001-2004 tax returns. |

14

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| attending conferences, telephone, books and subscriptions, office supplies and office expenses. (Id.) Plaintiff fixed in each years' return the date of February 13, 2001 as the date she first used her vehicle for business purposes. (See Cesaratto Dec., Exhs. P, Q, R, S). | proprietor of a direct marketing business. (Pl. Dep. II 43; Reimer Dep. 24, 28, 99-100) | |
| 31. Plaintiff signed each of the tax returns in question, certifying that, as the taxpayer, each return was "true, correct and complete." (Browne Sanders Tr. at 38, 41, 43, 44 (Cesaratto Dec., Exhs. P(PL4300); Q(PL4319); R(PL4350); S(PL4385); T(PL4306, 4313); U(PL4329, 4340); V(PL4366, 4375). | Admit that plaintiff signed the tax returns. Plaintiff, however, did not know her tax returns contained erroneous information because she did not review her tax returns before she signed and filed them. (Pl. Dep. II 43; Reimer Dep. 92) | Plaintiff's denials are unsupported with admissible evidence and nothing more than her counsel's argument. All of the testimony of Leon Reimer is inadmissible hearsay on the issue of Plaintiff's purported lack of knowledge as to the Schedule C to her 2001-2004 tax returns. |
| 32. Plaintiff maintained at her November 28, 2006 deposition that the information reflected in Schedule C of her 2002, 2003 and 2004 federal tax returns was "incorrect." (Browne Sanders Tr. II at 40-43 (Cesaratto Dec., Exh. B)). She testified that she had learned that her tax returns for those years were "incorrect" in the three weeks prior to her deposition. (Id.) | Admit. | None |
| 33. Plaintiff testified that she never operated a direct marketing business of which she was the sole proprietor. (Browne Sanders Tr. II at 43-44 (Cesaratto | Admit. | None |

15

NY:1:874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| Dec., Exh. B). | | |
| 34. Plaintiff's husband testified that Plaintiff had never operated a direct marketing business of any kind from their home. (Deposition Transcript of Roy Sanders, dated December 14, 2006 at 291 (Cesaratto Dec., Exh. Y)). | Admit. | None |
| 35. Plaintiff acknowledged that if she was the proprietor of a direct marketing business in 2004 while she was employed as a senior vice president of MSG that such a proprietorship represented a violation of the Code for which termination could be appropriate. (Browne Sanders Tr. II at 45-46 (Cesaratto Dec., Exh. B)). | Admit that in the deposition testimony cited by defendants, plaintiff testified that she understood that if she violated MSG's Code of Business Conduct she could be terminated. (Pl. Dep. II 45-46) Plaintiff, however, did not operate a direct marketing business at any point, including from 2001 through 2004. (Pl. Dep. II 44; Sanders Dep. 291; Browne Dep. 216; Browne-Moore Dep. 229; Nix Dep. 252-53; Gerrard Dep. 73; Singer Dep. 80) | Plaintiff certified under penalty of perjury on her tax returns that she operated a direct marketing business. (See Def. 56.1 ¶29). The testimony of Plaintiff's sisters (Browne-Moore and Browne), as well as that of Rick Singer, Jeff Nix and Melinda Gerrard is inadmissible hearsay on whether Plaintiff operated a direct marketing business from her home. |
| 36. Following the Court's November 6, 2006 order, Plaintiff's counsel paid a $4,000 retainer to Leon Reimer, CPA ("Mr. Reimer") a New York City based accountant, to have prepared on Plaintiff's behalf amended federal and state tax returns for 2003 and 2004 and to provide Plaintiff advice regarding amending her returns (Deposition Transcript of Leon Reimer, dated January 22, 2007 ("Reimer Tr.") at 66-67, 82-84 (Cesaratto Dec., Exh. | Admit in part. As an accommodation to Leon Reimer ("Reimer"), plaintiff's counsel advanced Reimer the initial retainer that Reimer charged plaintiff to review her 2000-2005 tax returns. Plaintiff reimbursed counsel for the retainer amount and made all subsequent payments directly to Reimer. (Reimer Aff. ¶20; Mintzer-MSG Decl. ¶2) Based on his review of plaintiff's tax returns and his conversations with plaintiff, Reimer | Plaintiff's counsel's payment to Leon Reimer subsequent to this Court's November 6, 2006 order directing that Plaintiff produce her tax returns was an advance to Plaintiff as part of the "expenses of litigation." See DR 5-103(B)(1) ("A lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and |

16

NY:1874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| Z)). | | advised plaintiff to amend her 2003 and 2004 returns. (Reimer Dep. 24-25, 48-54; Reimer Aff. ¶19) | presenting evidence, provided the client remains ultimately liable for such expenses.") |
| 37.    The amended returns for 2003 and 2004 completely eliminated all references to her direct marketing business for those two years.  (Cesaratto Dec, Exhs. Z, W and X, JJ).  As a result, approximately $20,000 of business deductions were removed from her tax return for each of these two years. (Reimer Tr. at 36-37, 49-50 (Cesaratto Dec, Exhs. W, X, Z)). | Admit. | None |
| 38.    Additional changes made by Plaintiff for the 2003 and 2004 years included a change of her filing status to Married Filing Separately; virtually eliminated her charitable contributions from $9,100 to $100 in 2003, and from $10,220 to $940 in 2004; and eliminated the claimed personal exemptions for three children and herself, and a tax credit for child care expenses paid to day care providers. (Compare Cesaratto Dec., Exh. R and S to Exh. W and X). | Admit.  Plaintiff amended her 2003 and 2004 tax returns based on Reimer's advice. (Reimer Dep. 25, 48-49) | None |
| 39.    As a result of all the amendments, Plaintiff incurred a back tax liability of approximately $38,000. (Cesaratto Dec., Exhs. W(PL4418) and X(PL4441)). | Admit. | None |
| 40.    Mr. Reimer advised Plaintiff at | Admit. | None |

NY:187479v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| their November 2006 meeting attended by Plaintiff's litigation counsel here, that the IRS has a three-year civil statute of limitations for amending or correcting tax returns and thus, recommended that she only amend her 2003 and 2004 returns. (Reimer Tr. at 67-68; and 56-57 (Cesaratto Dec., Exh. Z)). | | |
| 41.   Following Mr. Reimer's advice, Plaintiff amended only her 2003 and 2004 tax returns, but did not amend her 2001 and 2002 returns, claiming approximately $33,000 in losses.  (Reimer Tr. at 67 (Cesaratto Dec., Exhs. W, X, Z)). | Admit that based on Reimer's advice, plaintiff amended only her 2003 and 2004 tax returns. (Reimer Dep. 67-68) | None |
| 42.   Mr. Reimer furnished an invoice to Plaintiff for his services for preparation of the returns, but was in fact paid in full by Plaintiff's counsel. (Reimer Tr. at 82-83 (Cesaratto Dec., Exh. Z)). | Deny. See ¶ 36. | Reimer testified:<br><br>Q  And from whom was that retainer received?<br><br>A  The retainer was billed to Ms. Sanders and paid by the Vladeck firm.<br><br>(Reimer Tr. at 82-83). |
| 43.   Plaintiff filed all of the original and amended income tax returns referred to above, and produced by her in discovery, with the IRS and state taxing authorities. (Stipulation of Plaintiff dated April 4, | Admit. | None |

NY:1874796v2

18

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| 2007 (Cesaratto Dec., Exh. AA)). | | |
| 44. Brock Weaver, CPA ("Mr. Weaver"), Plaintiff's Indiana-based accountant, who prepared Plaintiff's 2005 tax return, asked Plaintiff in April 2006 about the business deductions on her 2004 income tax return. (Deposition Transcript of Brock Weaver dated December 21, 2006 ("Weaver Tr.:") at 32-34) (Cesaratto Dec., Exh. BB)). Plaintiff told Mr. Weaver that she had no direct marketing business at any time but had provided business expenses to her prior accountant, ███████ CPA, who prepared her returns for tax years 2001 through 2004. (Weaver Tr. at 107-109 (Cesaratto Dec., Exh. Z)). | Admit in part, deny in part. Admit that Brock Weaver ("Weaver"), asked plaintiff about the business deductions on her 2004 tax return and that plaintiff told Weaver that she had no direct marketing business at any time. Deny that plaintiff told Weaver that she provided business expenses to ███████ When Weaver asked Browne Sanders about the business expenses, she responded, "What business expenses, what do you mean by a business? ... I don't have a business." (Weaver Dep. 34) According to Weaver, Browne Sanders seemed not to know that the business expenses existed. Browne Sanders told Weaver, "I don't know where the preparer got those expenses from." (Weaver Dep. 35-36) Plaintiff told Weaver that she never had a direct marketing business. (Weaver Dep. 107) In addition, the evidence establishes that plaintiff did not provide any information to ███████ about business expenses. See ¶¶ 69-81, 95-96. | Plaintiff's assertion that the evidence establishes that Plaintiff did not provide any information to ███████ about business expenses is nothing more than her counsel's argument unsupported by admissible evidence. See Reply to ¶¶ 29, 69-81, 95-96. |
| 45. Mr. Weaver's notes reflect his April 2006 inquiry of Plaintiff concerning the business deductions he reviewed on her 2004 income tax return. (Weaver Tr. at 32-34 (Cesaratto Dec., Exhs. BB, II)). | Admit. | None |

NY:1874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| 46. ▮ CPA ("Mr. ▮ prepared Plaintiff's 2001, 2002, 2003 and 2004 tax returns. Deposition Transcript of ▮ dated January 23, 2007 at 59, 63, 69, and 76 (Cesaratto Dec., Exh. CC). Plaintiff was the only person Mr. ▮ spoke to regarding the preparation of her tax returns for tax years 2001 and 2003, and was the only person who supplied him with information to assist him in the preparation of her returns for those two years. ▮ Tr. at 43; 46-48; 70-73; and 176-177 (Cesaratto Dec., Exh. CC)). | Admit it part, deny in part. Admit that ▮ prepared plaintiff's tax returns for 2001-2004. Deny that plaintiff provided ▮ with the erroneous information contained on her 2001-2004 returns. ▮ does not remember having any discussions with Browne Sanders regarding a direct marketing business. ▮ Dep. 44-46, 50-51, 64-65, 72) Nor does ▮ have any documents provided to him by plaintiff that reflect a direct marketing business. ▮ Dep. 54) In a questionnaire which Browne Sanders completed for ▮ she confirmed that she did not have a business. ▮ Dep. 35) The questionnaire, entitled Individual Tax Organizer (1040), appears to be for the 2001 tax year and asks the taxpayer to check "yes" or "no" to several questions. (Mintzer-MSG Decl, Ex. 1) One of the questions is, "Did you start a business?" Plaintiff checked "NO" in response to that question. (Id. (BH0013)) The questionnaire also includes a worksheet for taxpayers to list all of their business expenses. (Id. (BH0018-19)) Browne Sanders did not list any business expenses on the worksheet. (Id.) The questionnaire ▮ in response to was produced by ▮ defendants' subpoena for his file | Plaintiff omits the following relevant testimony by ▮

Q   But your testimony is you did have a conversation with her regarding the schedule?

A   Yes, that's correct. ▮ (Tr. at 81).

Q   ...So again, with regard to the 2001 return that would have been prepared in 2002, you would not have included information on that return were it not information that you were led to believe was relevant to that return?

A   We prepare returns based on information that our clients give to us. And so we had conversations with Ms. Browne Sanders, which were undocumented, and we would not sign the return if we felt the return was fraudulent.

Q   All right. And just let me be clear about your testimony. And that is that in |

20

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
| --- | --- | --- |
| | concerning plaintiff. Browne Sanders had not maintained a copy of the questionnaire.<br><br>In addition, ▮ testified that he did not remember if he made up the information contained on the Schedule C forms that he prepared for plaintiff. (▮ Dep. 48) He also did not remember if in general he included information on tax returns that was not based on information that he received from his clients. (▮ Dep. 179) While ▮ testified that he did not speak to anyone other than plaintiff about her 2001 return (▮ Dep. 47-48), he then testified that he did not recall if he made up the information on plaintiff's Schedule C for 2001 (▮ Dep. 48). When questioned specifically on the tax returns he prepared for 2003, ▮ testified that he did not remember if the tax returns were prepared based on information provided to him by his clients. (▮ Dep. 194) He also testified that with regard to plaintiff's 2003 tax return, he did not remember if he completed it based on information provided by plaintiff. (▮ Dep. 198) | the calendar year 2002 when you prepared the return, that return would have been prepared based on information you received from Ms. Browne Sanders; is that correct?<br><br>A    Yes. (▮ Tr. at 175-77).<br><br>▮ made it clear that he did not fabricate the information on Plaintiff's returns:<br><br>Q    And have you ever made entries on Schedule C that were not either provided to you by the client orally or by documents?<br><br>MR. MINTZER:    Objection to form.<br><br>A    No. (▮ Tr. at 203). |

21

NY:1874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| 47. Mr. ████ would not have signed Plaintiff's tax returns if they were fraudulent, and all of the information contained on the returns was based on information that the Plaintiff provided to him. (Id. at 176-177). | Deny. See ¶ 46. ████ testified that he did not remember if he made up the information contained on the Schedule C forms that he prepared for plaintiff. ████ Dep. 48) In addition, when questioned about the specific entries on plaintiff's 2002 tax form, ████ testified that he did not know who provided the information included on the Schedule C ████ Dep. 64); he did not remember if he made any entries on the Schedule C form that were based on information that he did not receive from plaintiff ████ Dep. 185-88); and he did not remember if he added additional information to plaintiff's 2002 Schedule C that was not provided to him by plaintiff. ████ Dep. 191) | See Reply to ¶ 46 |
| 48. MSG would have terminated Plaintiff's employment upon learning of her tax fraud had she been employed. (Dolan Aff. 5; Mills Aff. 19). Plaintiff's tax fraud was in violation of MSG policy prohibiting illegal activity and her Agreement, as well as of the trust that had been placed in her as an MSG executive. (Dolan Aff. 5; Mills Aff. 17-21). | Deny. Plaintiff did not engage in tax fraud. See ¶¶ 69-81, 86, 95-96. Even if plaintiff had intentionally filed false taxes (which she did not), there is no credible evidence that defendants would have fired her. A jury need not believe the testimony of Mills or Dolan. See FN 2 (in response to Def. 56.1 ¶5). In addition, defendants have not offered evidence of any employee that they have fired because of the employee's personal taxes. None of the comparators proffered by defendants | See Reply to ¶¶ 98-103. |

22

NY:1874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| | engaged in conduct similar to the conduct allegedly engaged in by plaintiff. See ¶¶ 104-08. Moreover, there is substantial evidence that defendants do not fire employees who engage in illegal conduct or violate company policies. See ¶¶ 98-103. | |
| 49. Plaintiff's election in November 2006 to retain her admittedly false tax benefit for 2001 and 2002 demonstrates a lack of personal integrity and honesty that would prevent her from ever again being employed by MSG. (Dolan Aff. 7; Mills Aff. 31). Plaintiff's election to retain her false tax benefit would be in violation of MSG policy. (Id.) | Deny. There is no evidence that plaintiff did anything improper in following Reimer's advice to amend only her 2003 and 2004 tax returns. Even if plaintiff's amending only her 2003 and 2004 tax returns was improper, there is no credible evidence that such conduct would violate any MSG policy or that MSG would have fired her for such conduct. A jury need not believe the testimony of Mills or Dolan. See FN 2. In addition, defendants have not offered evidence of any employee that they have fired because of an employee's personal taxes. None of the comparators proffered by defendants engaged in conduct similar to the conduct allegedly engaged in by plaintiff. See ¶¶ 104-08. Moreover, there is substantial evidence that defendants do not fire employees who engage in illegal conduct or violate company policies. See ¶¶ 98-103. | Nothing in Plaintiff's responsive papers is sufficient to create a genuine dispute over whether Plaintiff would have been terminated for submitting false tax returns for four years claiming erroneous business deductions and by continuing to retain a tax benefit to which she is not entitled by failing to amend her returns for 2001 and 2002. |
| 50. MSG had no knowledge that | Admit. Plaintiff did not operate a direct | See Reply to ¶¶ 22 and 29. |

NY:1874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| Browne Sanders was the proprietor of a direct marketing business while she was employed at MSG as stated on her 2001-2004 tax returns. (Mills Aff. 24). Plaintiff never asked Mills for, or received his approval, to conduct her own outside personal business. (Id.) | marketing business at any point, including from 2001 through 2004. (Pl. Dep. II 44; Sanders Dep. 291; Browne Dep. 216; Browne-Moore Dep. 229; Nix Dep. 252-53; Gerrard Dep. 73; Singer Dep. 80) | |
| 51.    MSG would have terminated Plaintiff's employment upon learning that she owned a direct marketing business as her tax returns certified (and her 2001-2002 tax returns continue to certify) in violation of her Agreement. (Dolan Aff. 6; Mills Aff. 26). Her lack of integrity and personal honesty would prevent her from ever again being employed by MSG. (Mills Aff. 31). | Deny.  There is substantial evidence that defendants do not fire employees who violate MSG policies. See ¶¶ 98-103. In addition, a jury need not believe the testimony of Mills or Dolan. See FN 2 | See Reply to ¶¶ 98-103. |
| 52.    MSG has terminated or disciplined employees, at significantly lower level positions than that held by Plaintiff, for the following fraudulent, dishonest or unlawful conduct in breach of MSG policy and/or their signed agreements, identical to those signed by Plaintiff: falsification of employment applications; bank fraud; an arrest for felony assault... double booking work; working for a competing company; insurance fraud. (Affidavit of John Moran, dated April 26, 2007 ("Moran Aff.") ¶¶ 2 and 6; Exhs. A-G). | Admit that MSG has provided documents which purport to show it revoked a job offer to an employee after it determined that she had misrepresented her qualifications.  See ¶ 106.  Admit that MSG has provided documents which purport to show it fired an employee after she was arrested for conspiracy to commit bank fraud. (Moran Aff. ¶ 5, Ex. A) Admit that MSG has provided documents which purport to show it fired an employee who was arrested for felony assault and harassment and pled guilty to the violation | None |

24

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| | of harassment. (Moran Aff. ¶ 5, Ex. B) Admit that MSG has provided documents which purport to show it placed an employee on investigative layoff after she was arrested for driving under the influence and impersonating an officer, but reinstated the employee following a dismissal of the charges on speedy trial grounds. (Moran Aff. ¶ 5, Ex. C) Admit that MSG has provided documents which purport to show it fired an employee who was working for a competitor of MSG while being paid by MSG. Sec ¶ 104. Admit that MSG has provided documents which purport to show it fired an employee who submitted applications through MSG for medical insurance for a women that he falsely claimed was his wife, costing MSG over $70,000 in insurance premiums. See ¶ 105. | |
| 53.    On January 25, 2006, following the filing of this action, Stephen Mills made the following statement to the press: I am appalled by Anucha Browne Sanders' outrageous allegations.    At no time whatsoever did I tell her that any MSG employee was out to harm her or would harm her.  I was stunned to learn that while she was still employed at MSG, she demanded $6.5 million to leave quietly. | Admit. | None |

NY:1874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| Her was that [sic] only threat I was privy to. (Deposition Transcript of Barry Watkins dated February 26, 2007 ("Watkins Tr.") at 147-148 (Cesaratto Dec. Exh. DD)). | | |
| 54. MSG made the following statement through outside litigation counsel following the filing of the action: These fabricated and outrageous charges come from an individual whom MSG fired because of an inability to fulfill professional responsibilities, and who now is seeking a financial windfall. We have a zero tolerance policy for a hostile work environment and have always been proud of how our employees are treated, as evidenced by the fact that we have consistently taken appropriate action when employees have engaged in inappropriate behavior. We will fight these outrageous charges and defend our employees from baseless allegations intended to embarrass and harm them. (Watkins Tr. at 143-145 (Cesaratto Dec., Exh. DD)). | Admit. | None |
| 55. MSG also made the following overall statement following the filing of the action: Madison Square Garden has a comprehensive anti-harassment policy that includes provisions for employees to raise concerns and prohibits retaliation for | Admit. | None |

26

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| making complaints. We vigorously and immediately investigate any and all claims that are brought to our attention and take appropriate action against any employee found to have violated our strict policy, including termination, if warranted. We have a zero tolerance for a hostile work environment and have always been proud of how our employees are treated. (Watkins Tr. at 157-158 (Cesaratto Dec., Exh. DD)). | | |
| 56.    Following the EEOC determination of probable cause issued regarding Plaintiff's charge of discrimination, MSG made the following statement: When we present facts in court we will expose this charge for what it is - a false and financially-motivated fabrication brought by a disgruntled former employee. We obviously disagree with the EEOC's determination, though it is not an uncommon outcome for this type of preliminary administrative review. MSG's workforce, almost half of which is female, has and continues to enjoy a fair and professional work environment protected by stringent, comprehensive sexual harassment policies. (Watkins Tr. at 174-176 (Cesaratto Dec., Exh. DD)). | Admit. | None |
| 57.    Apart from official statements to | Deny. Aside from the official statements | None |

27

NY:1874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| the press regarding Plaintiff's allegations, no other statements were made to the press. (Watkins Tr. at 44-45 (Cesaratto Dec., Exh. DD)). | made by MSG and its counsel, other MSG employees spoke with reporters and their statements were reported in the press. (Watkins Dep. 44-47, 56-57, 148-52, 178-84; Favorite Dep. 59-67) | |
| 58.  Plaintiff filed her initial Complaint on January 24, 2006, (and publicly announcing the filing at that time) which sought relief "for mental anguish and humiliation as a result of defendant's discriminatory acts." (Complaint at 57, 63, 67, 71 (Cesaratto Dec., Exh. EE) and Browne Sanders Tr. at 463-464 (Cesaratto Dec., Exh. A)). Following her lawsuit, Plaintiff called a press conference and gave interviews regarding her lawsuit as reported in the press. (Cesaratto Dec., Exh. G). | Admit in part. The same day that plaintiff filed her lawsuit, lawyers for MSG made statements to the press on behalf of their client. MSG claimed that plaintiff's claim was "fabricated and outrageous" and that Browne Sanders was "fired because of an inability to fulfill her professional responsibilities." (Rule 56.1 Statement in Support of Defendants Madison Square Garden and James L. Dolan's Motion for Partial Summary Judgment "MSG 56.1," at ¶54)  Plaintiff responded to these smears in a statement that she read at a press conference on January 25, 2006. (Pl. Dep. I 463-64) | See Reply to ¶ 64. |
| 59.  Plaintiff later amended her Complaint, twice, first to add claims against Dolan under the State and City law, and then to add a Title VII claim as to MSG. (Amended Complaint dated July 25, 2006 at 69, 75 (Cesaratto Dec., Exh. FF); Second Amended Complaint dated November 10, 2006 at 69, 75 (Cesaratto Dec., Exh. GG)). Plaintiff also removed her claim for "mental anguish" and instead | Admit in part.  In her Amended Complaint, plaintiff removed her claim for mental anguish. (Cesaratto Decl., Ex. FF) Separately, in her Second Amended Complaint, plaintiff added a claim for reputational damages. (Cesaratto Decl., Ex. GG) | None |

28

NY:187479v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| added a claim as to Defendants "to make her whole for reputational damage." (Amended Complaint, Prayer for Relief at d (Cesaratto Dec., Exh. FF); Second Amended Complaint, Prayer for Relief at d (Cesaratto Dec., Exh. GG)). | | |
| 60.  Plaintiff's claim for reputational damage stems from MSG's press statements, following the lawsuit, regarding its reasons for Plaintiff's termination. (Browne Sanders Tr. I at 481-482 (Cesaratto Dec., Exh. A)). | Deny.  Plaintiff's claim for reputational damages stems from her allegation that her professional reputation has been negatively affected by the harassment she experienced at MSG, her resulting complaints of discrimination and her unlawful dismissal for complaining about defendants' discriminatory practices. (Pl. Dep. I 481-82.) As a result, plaintiff's ability to earn income now and in the future has been dramatically reduced. (Browne Sanders Decl, ¶ 3) While a jury could find that the public statements that defendants and their counsel have made about plaintiff after she filed this suit have compounded plaintiff's reputational injury, the underlying cause of plaintiff's reputational damage is the discriminatory and retaliatory conduct that resulted in plaintiff's dismissal. | Plaintiff's claim, as now asserted in her opposition is inconsistent with her prior deposition testimony and her responses to MSG's Second Set of Interrogatories. Fed. R. Civ. P. 56(e) (On motion for summary judgment, genuine issue of fact requiring trial cannot be raised by statements in affidavits not based on personal knowledge, statements and affidavits that conflict with prior deposition testimony, or arguments or statements by counsel unsupported by record). |
| 61.  Plaintiff seeks to recover, inter alia, $600,000 in back pay, $9,762,000 in front pay and reputation damages through age 65, an unknown amount on account of | Admit. | None |

29

NY:1874796v2

| Defendant's Rule 56.1 Statement | Plaintiff's Response to Defendant's Rule 56.1 Statement | Reply |
|---|---|---|
| pension payments and stock options, and reinstatement. (Plaintiff's Supplemental Disclosures Pursuant to Fed. R. Civ. P. 26, dated March 19, 2007 (Cesaratto Dec., Exh. HH)). | | |

30

NY:1874796v2

PLAINTIFF'S ADDITIONAL ALLEGATIONS

Besides admitting or purporting to controvert the statement in Defendant's Local Rule 56.1 Statement, Plaintiff's Statement Pursuant to Local Rule 56.1 in Response to Defendant's Local Rule 56.1 Statement contain additional allegations. For ease of the Court's reference, we have listed whether these additional allegations, numbered 62-108, are admitted or disputed, and set forth the paragraph in Defendant's Rule 56.1 Statement ("Def. 56.1), if applicable, that specifically addresses the assertions in detail.

| Plaintiff's Additional Allegations | Reply |
|---|---|
| 62.   Plaintiff was terminated from her employment at MSG on January 19, 2006. (Mintzer-MSG Decl., Ex. 2) | Undisputed for purposes of this motion. |
| 63.   On January 24, 2006, plaintiff filed this action. That same day, lawyers for MSG made statements to the press on behalf of their client, MSG claimed that plaintiff's claim was "fabricated and outrageous" and that Browne Sanders was "fired because of an inability to fulfill her professional responsibilities." (MSG 56.1 ¶ 54) Dolan acknowledged that he approved MSG's press strategy in response to Browne Sanders' lawsuit. (Dolan Dep. 224-25) | Undisputed for purposes of this motion. (See Def. 56.1 ¶ 54). |
| 64.   Plaintiff responded to the statements made by MSG's lawyers in a statement that she read at a press conference on January 25, 2006. (Pl. Dep. I 463-64) | Disputed. Plaintiff testified that she had a press conference at the time her lawsuit was filed and no evidence has been presented that her press conference occurred the day after her lawsuit or that it was in response to MSG's reaction to her lawsuit. (See Def. 56.1 ¶ 58, Cesaratto Dec., Exh. G)(New York Times article dated January 25, 2006 refers to telephone interview with Plaintiff the day before.) |
| 65.   Following Browne Sanders' unlawful dismissal and the negative public comments that have been made about her by defendants, her career prospects | Disputed and objected to as inadmissible hearsay. Plaintiff has put forth no evidence that her career |

NY:187479v2

| Plaintiff's Additional Allegations | Reply |
|---|---|
| and earning capacity have been damaged. (Pl. Dep. I 465-67; Browne Sanders Decl. ¶ 3) | prospects have been damaged other than her self-serving statements that she has been asked by recruiters about this action. (Browne Sanders Tr. I at 465-67; 482-83). |
| 66.    Although Browne Sanders applied for jobs with hundreds of potential employers in a wide variety of businesses, she is presently working as an independent contractor for a non-profit organization. Her annual compensation is less than half of what she had earned at MSG. (Browne Sanders Decl. ¶ 3) | Disputed in part.  Although Plaintiff has produced form letters sent to numerous potential employers, they were "blind" letters, not applications, all of which were sent after February 2007. At the time of her deposition in November 2006, Plaintiff testified that she applied for positions at less than ten organizations. (Browne Sanders Tr. I at 466-67). |
| 67.    Browne Sanders has repeatedly been asked  about the circumstances of her dismissal from MSG by prospective employers and executive recruiters, some of whom have specifically referenced the circumstances of her dismissal in the context of discussing potential jobs that she ultimately was not offered. (Pl. Dep. I 467; Browne Sanders Decl. ¶ 4) | Disputed and objected to as inadmissible hearsay. Plaintiff has put forth no evidence that she has been asked about the circumstances of her dismissal from MSG other than her self-serving statements that she has been asked by recruiters about this action. (Browne Sanders Tr. I at 465-67; 482-83). |
| 68.    Prior to 2000, plaintiff's tax returns were prepared by ARB Associates. (Mintzer- MSG Decl., Ex. 3) | Undisputed for purposes of this motion. |
| 69.    In 2001, plaintiff hired a new accountant, ▮▮▮▮▮▮▮▮▮▮ Dep. 25) ▮▮repared plaintiff's tax returns for the years 2001 through 2004. (Cesaratto Decl., Exs. P-S) | Undisputed for purposes of this motion. |
| 70.    Plaintiff did not operate a direct marketing business at any point, including from 2001 through 2004. (Pl. Dep. II 44; Sanders Dep. 291; Browne Dep. 216; Browne-Moore Dep. 229; Nix Dep. 252-53; Gerrard Dep. 73; Singer Dep. 80) | Disputed.  See ¶¶ 22, 29. |

NY:1874796v2

| Plaintiff's Additional Allegations | Reply |
|---|---|
| 71. In a questionnaire which Browne Sanders completed for ████ she confirmed that she did not have a business. (████ Dep. 35) The questionnaire, entitled Individual Tax Organizer (1████0), appears to be for the 2001 tax year and asks the taxpayer to check "yes" or "no" to several questions. (Mintzer-MSG Decl., Ex. 1) One of the questions is, "Did you start a business?" Plaintiff checked "NO" in response to that question. (Id. (BH0013)) The questionnaire also includes a worksheet for taxpayers to list all of their business expenses. (Id. (BH0018-19)) Browne Sanders did not list any business expenses on the worksheet. (Id.) The questionnaire was produced by ████n response to defendants' subpoena for his file concerning plaintiff. Browne Sanders had not maintained a copy of the questionnaire. | Undisputed that the document stated what is represented, however, disputed as Plaintiff's sworn-to tax returns state that she operated a direct marketing business. (See Def. 56.1 ¶ 29). |
| 72. ████ however, included a Schedule C on each tax return that he prepared for plaintiff. (Cesaratto Decl., Exs. P-S) The Schedule C claimed business expenses for a direct marketing business. (Cesaratto Decl., Exs. P-S) | Undisputed for purposes of this motion except that Plaintiff, not ████ filed her tax returns with the Federal and State taxing authorities. (See Def. 56.1 ¶ 43). |
| 73. ████ does not remember having any discussions with Browne Sanders regarding a direct marketing business. (████ Dep. 44-46, 50-51, 64-65, 72) Nor does ████ have any documents provided to him by plaintiff that reflect a direct marketing business. (████ Dep. 54) | Undisputed for purposes of this motion, except that ████ discussed the Schedule C with Plaintiff and all information on the 2001 and 2003 Schedule C was provided by Plaintiff. ████ Tr. 175-77). |
| 74. When questioned on the specific entries on plaintiff's 2002 tax form, ████ testified that he did not know who provided the information included on the Schedule C (████ Dep. 64); he did not remember if he made up any entries on the Schedule C form that were based on information that he did not receive from plaintiff (████ Dep. 185-88); and he did not remember if he added additional information to plaintiff's 2002 Schedule C that was not provided to him by plaintiff (████ Dep. 191). In response to questions by Thomas' lawyer, ████ testified as follows: Q: In the calendar year 2003 when you were preparing the tax return for 2002 for Anucha Browne Sanders, would you have made any entries on Schedule C of that return that were not | Undisputed for purposes of this motion except that ████ present lack of recollection does not mean that Plaintiff did not provide him the information necessary to prepare the tax return with regard to a direct marketing business as he testified occurred with respect to the 2001 and 2003 Schedule C information. (See Def. 56.1 ¶¶ 46, 47). |

NY:1874796v2

| Plaintiff's Additional Allegations | Reply |
|---|---|
| based on information given to you by Anucha Browne Sanders? A: I do not recall. ▇ Dep. 185-88) | |
| 75. When questioned specifically on the tax returns he prepared for 2003, ▇ testified that he did not remember if the tax returns were prepared based on information provided to him by his clients. ▇ Dep. 194) He also testified that with regard to plaintiff's 2003 tax return, he did not remember if he completed it based on information provided by plaintiff. ▇ Dep. 198) | Undisputed for purposes of this motion except that ▇ lack of recollection does not mean that Plaintiff did not provide him the information necessary to prepare the tax return with regard to a direct marketing business as he testified occurred with respect to the 2001 and 2003 Schedule C information. (See Def. 56.1 ¶¶ 46, 47). |
| 76. ▇ testified that he did not remember if he made up the information contained on the Schedule C forms that he prepared for plaintiff. ▇ Dep. 48) During questioning by MSG's and Dolan's counsel, ▇ testified as follows: Q: None of the information contained in Schedule C was made up by you? A; I don't recall. ▇ ep. 48) | Undisputed for purposes of this motion. |
| 77. ▇ also did not remember if in general he included information on tax returns that was not based on information that he received from his clients. ▇ Dep. 179) For example, ▇ gave the following testimony: Q: My question to you, sir, is that regardless of the tax year, you would not include information in the return that was not based on information that you received from the individual would you? A: I don't recall. ▇ Dep. 179) | Undisputed for purposes of this motion. |
| 78. ▇ is an alcoholic. ▇ Dep. 119) He began receiving treatment from High Focus, a rehabilitation company, in November 2006. ▇ Dep. 119-120) ▇ also receiving treatment from Alcoholics Anonymous ▇ Dep. 119) | Undisputed for purposes of this motion but disputed as to relevancy concerning the subject matter of this action. |
| 79. ▇ estified that he was in denial for many years about his alcoholism, and that he started receiving treatment for his alcoholism because his accounting partner ▇ old him that he needed to seek help in 2006. ▇ Dep. 122) | Undisputed for purposes of this motion but disputed as to relevancy concerning the subject matter of this action. |

34

NY:1874796v2

| Plaintiff's Additional Allegations | Reply |
|---|---|
| 80. ▇▇▇ did not know if his alcoholism affected the preparation of plaintiff's tax returns. ▇▇▇ testified that his memory was impaired due to his alcoholism, which had caused his brain to be "partially fried." ▇▇▇ Dep. 119) | Undisputed for purposes of this motion. |
| 81. Browne Sanders did not review the tax returns that ▇▇▇ prepared for her prior to signing them. (Pl. Dep. II 43) Accordingly, plaintiff did not know that the tax returns contained erroneous information when she filed them. (Pl. Dep. II 43) | Disputed. See Def. 56.1, ¶¶ 31, 43, 46. |
| 82. Plaintiff filed this lawsuit in January 2006. Plaintiff chose to have Weaver, an out-of-town accountant, prepare her 2005 tax returns. (Weaver Dep. 83-84) | Undisputed for purposes of this motion except that Jeff Nix testified that he chose Weaver to do Plaintiff's 2005 tax returns and made the recommendation to Plaintiff. (Nix Tr. at 253. |
| 83. Plaintiff spoke to Weaver in April 2006 concerning the preparation of her 2005 taxes. (Weaver Dep. 85) In order to complete plaintiff's 2005 tax returns, Weaver reviewed her 2004 tax returns. (Weaver Dep. 33-34) | Undisputed for purposes of this motion. |
| 84. Because it was so close to the filing deadline of April 15, Weaver was under a lot of pressure to go through all the issues he needed to discuss with Browne Sanders in order to complete her return. (Weaver Dep. 85) | Undisputed for purposes of this motion. |
| 85. Weaver asked Browne Sanders about taking a deduction related to her trip to aid the victims of the tsunami in Thailand. (Weaver Dep. 86-87) Browne Sanders told Weaver about the relief work she had done and the expenses she had incurred. (Weaver Dep. 86-87) | Undisputed for purposes of this motion. |
| 86. After reviewing her 2004 tax returns, Weaver also questioned Browne Sanders about the business expenses listed on the Schedule C. (Weaver Dep. 34) Browne Sanders responded to Weaver, "What business expenses, what do you mean by a business? … I don't have a business." (Weaver Dep. 34) According to Weaver, Browne Sanders seemed not to know that the business expenses existed. Browne Sanders told Weaver, "I don't know where the | Admit that according to Weaver, Browne Sanders professed not to know the business expenses existed. Plaintiff told Mr. Weaver that she had provided business expenses to her prior accountant: |

35

NY:187479v2

| Plaintiff's Additional Allegations | Reply |
|---|---|
| preparer got those expenses from." (Weaver Dep. 35-36) Plaintiff told Weaver that she never had a direct marketing business. (Weaver Dep. 107) Weaver also testified as follows: Q: So she told you that she had no idea how this schedule would have ever ended up on her return? A: Yes (Weaver Dep. 107-08) | Q  Did she tell you that she had never had a direct marketing business?

A  Yes.

Q  So she told you that she had no idea how this schedule would have ever ended up on her return?

A  Yes.

Q  Did she offer any explanation as to how such a thing could have occurred?

A  She said her taxpayer had -- Tax preparer. You said "taxpayer."

A  I'm sorry. Her tax preparer had gotten that information from her and she had thought he had just listed them as expenses and her comment was she was not aware that they were going on in this schedule on her tax return.

Q  So the information that went on the schedule had come from her to her tax preparer; is that what she |

NY:1874796v2

36

| Plaintiff's Additional Allegations | Reply |
|---|---|
| 87.    Weaver also told Browne Sanders that it appeared that she had not been using the correct filing status. (Weaver Dep. 39) He told her that if she was married and had lived with her husband for the last six months of the year, she could not file as head of household. (Weaver Dep. 39) He told her that she could either file as "married filing separately" or "married filing jointly." (Weaver Dep. 40) | indicated to you? A  Yeah, that's what she indicated. (Weaver Tr. at 107-109). |
| 88.    Weaver prepared two tax returns for plaintiff for 2005: one with the filing status of "married filing separately," and one with the filing status of "married filing jointly." (Weaver Dep. 54-57, 64-66, 103, 110) | Admit.  Weaver also told Browne Sanders she needed to "go back and amend her prior returns." (Weaver Tr. at 77).  This discussion took place in April 2006.  Id. |
| 89.    Plaintiff filed the tax return with the filing status of "married filing separately." (Mintzer-MSG Decl., Ex. 4; Cesaratto Decl., Ex. AA) | Undisputed for purposes of this motion. |
| 90.    Weaver incorrectly recorded that Browne Sanders filed the return with the status of "married filing jointly." (Weaver Dep. 49-51, 64-66) | Disputed in part. Plaintiff's stipulation attached as Exhibit AA to the Declaration of Brian Cesaratto does not reference Plaintiff's 2005 filing. |
| 91.    In November 2006, after this Court ordered plaintiff to produce her tax returns for the years 2000 through 2005, Browne Sanders reviewed her 2000 through 2005 tax returns and realized that her tax returns for 2001 through 2004 had listed a number of erroneous deductions concerning a direct marketing business. (Pl. Dep. II 43) | Undisputed for purposes of this motion. |
| 92.    After she realized that her tax returns had been filed incorrectly, plaintiff hired Reimer to review her tax returns. Reimer has specialized for the past thirty-three years in tax planning and forensic accounting. His expertise includes analyzing financial and tax records of individuals and entities to detect | Disputed.  Plaintiff was aware as early as April 2006, when Weaver told her that her tax returns for 2001 through 2004 contained erroneous deductions concerning  her  direct  marketing  business. (Weaver Tr. at 77, 107-09).

Disputed  in  part.  Plaintiff's  counsel  retained Reimer some 6 months after Plaintiff realized her returns had been filed incorrectly.  (Weaver Tr. at 77; Reimer Tr. at 16). |

37

| Plaintiff's Additional Allegations | Reply |
|---|---|
| irregularities in reporting, filing and payment matters. (Reimer Aff. ¶ 3) Reimer charged plaintiff a $4,000 retainer. (Reimer Dep. 82-83) This amount was advanced to Reimer by plaintiff's counsel as an accommodation to Reimer. Plaintiff reimbursed counsel for this payment and has paid Reimer directly for all subsequent charges not covered by the original retainer. (Reimer Aff. ¶ 20; Mintzer-MSG Decl. ¶ 2) | |
| 93.    Reimer met with Browne Sanders in November 2006 and reviewed her 2000- 2005 tax returns. (Reimer Dep. 20) | Undisputed for purposes of this motion. |
| 94.    Reimer told Browne Sanders that her 2000 and 2005 tax returns appeared to be prepared properly. (Reimer Dep. 21-22, 66) | Undisputed for purposes of this motion. |
| 95.    Reimer questioned Browne Sanders about the Schedule C forms that had been included in her 2001 through 2004 tax returns. (Reimer Dep. 24, 31-32) Reimer asked plaintiff if she had been in a trade or business. (Reimer Dep. 24) Browne Sanders replied that she had not been a trade or business and that she had been an employee. (Reimer Dep. 24, 63-64) Reimer asked plaintiff why a Schedule C had been filed. (Reimer Dep. 24) Browne Sanders informed Reimer that she did not know what a Schedule C was or why it was filed. (Reimer Dep. 24) Browne Sanders also told Reimer that she never discussed the Schedule C expenses with ▮▮▮▮ she had not supplied him with the amounts that were recorded, and she did not know how the amounts were determined. (Reimer Dep. 24, 28, 99-100) Browne Sanders told Reimer that she had not reviewed the tax returns after they were prepared. (Reimer Dep. 92) | Objected to as inadmissible hearsay concerning Plaintiff's purported lack of knowledge as to the Schedule C to her 2001-2004 tax returns. Plaintiff discussed her Schedule C with Weaver in April 2005. (Weaver Tr. at 107-09). |
| 96.    Reimer took notes during his initial meeting with plaintiff. (Reimer Dep. 60) One of his notes was a question, "made up expenses by new accountant?" (Reimer Dep. 64) Reimer wrote that note because Browne Sanders had not provided ▮▮▮ with information concerning the expenses listed on the Schedule C forms and Reimer questioned whether ▮▮▮ had made up the expenses. (Reimer Dep. 64-65) | Objected to as inadmissible hearsay concerning Plaintiff's purported lack of knowledge as to the Schedule C to her 2001-2004 tax returns. |

38

| Plaintiff's Additional Allegations | Reply |
|---|---|
| 97.    Reimer advised Browne Sanders that she should amend her 2003 and 2004 tax returns because they reflected a loss from a trade or business when she was not in a trade or business. (Reimer Dep. 24-25) Reimer advised Browne Sanders not to amend her 2001 or 2002 tax returns because the three-year civil statute of limitations that applied to amendments had already expired for those returns. (Reimer Dep. 67-68; Reimer Aff. 19) Plaintiffs amended 2003 and 2004 returns do not include a Schedule C or any deductions for business expenses. (Cesaratto Decl., Exs. W-X) | Undisputed for purposes of this motion. |
| 98.    Neither Cablevision, MSG's parent company, nor MSG fire all senior level employees that engage in illegal conduct.  For example, Dolan has an admitted history of illegal drug use during his employment with Cablevision, describing his mid-thirties as "a festival. It was not a festival of love, it was a festival of self-abuse.  Like any other alcoholic and chemically dependent person, every binge, every event, is a little more than the one before." (Mintzer-MSG Decl., Ex. 5, at 5) Such conduct is a violation of MSG policies, which apply to Dolan, yet he is currently the Chairman of MSG and Chief Executive Officer of Cablevision. (Dolan Dep. 257-58; Dolan Aff. ¶1) | Disputed.  Objected to as inadmissible hearsay. Allegations of recreational drug use with respect to any employees, past or present, is a transparent attempt to divert the Court's attention from the issues at hand. |
| 99.    In addition, there is substantial evidence that Thomas lied during his deposition in this case. For example, Thomas testified that he never referred to plaintiff as attractive or "easy on the eyes." (Thomas Dep. 214) Robert Levy ("Levy"), a third party with no connection to plaintiff or any interest in this case, has, however, testified that during a Knicks open practice he witnessed Thomas, plaintiff and a third person talking and that he heard Thomas say that Browne Sanders was attractive and easy on the eyes. (Levy Dep. 22)  In addition, Jonathan Schindel ("Schindel"), another third party with no connection to this case, has submitted a declaration stating that at the same time and open practice he also heard Thomas refer to Browne Sanders as beautiful, attractive, and easy on the eyes. (Schindel Decl. ¶9) Despite this evidence, Thomas remains the President, Basketball Operations for MSG and the Head Coach of the Knicks, and it has been widely reported that his contract has been | Disputed.    There  is  no  record  evidence  that Thomas lied during his deposition. |

NY:1874796v2

| Plaintiff's Additional Allegations | Reply |
|---|---|
| renewed. | |
| 100.    Thomas has also been involved in an outside business while employed by MSG. Thomas is one of the owners of Dale & Thomas Popcorn. (Thomas Dep. 18-19) In addition, Thomas has been involved in promotional activities related to Dale & Thomas Popcorn and has used the services of an MSG employee in connection with his Dale & Thomas work. (Favorito Dep. 46-47) | Undisputed for purposes of this motion. |
| 101.    Thomas has not received a written waiver from MSG to engage in any outside business, although he and Dolan claim that Thomas was given permission orally to be an investor in Dale & Thomas. (Thomas Dep. 162; Dolan Dep. 41) | Admit in part as to absence of a written waiver. Thomas obtained all requisite permission from the highest levels of MSG to allow a company in which he was an investor to offer its food product for sale at MSG. (Dolan Tr. at 40-41). The fact that MSG declined to enforce its own contractual right to require that approval to be in writing is irrelevant here. |
| 102.    Dale & Thomas Popcorn is also a vendor at MSG, and Thomas has not received a written waiver for this as required by MSG policy. (Thomas Dep. 162-63; Cesaratto Decl., Ex. E) | Disputed.    Thomas    obtained    all    requisite permission from the highest levels of MSG to allow a company in which he was an investor to offer its food product for sale at MSG. (Dolan Tr. at 40-41). The fact that MSG declined to enforce its own contractual right to require that approval to be in writing is irrelevant here. |
| 103.    In addition, Thomas hired a family member, his niece, as his assistant, without receiving a written waiver as required by MSG policy. (Thomas Dep. 301-03; Cesaratto Decl., Ex. E) | Thomas disclosed that his niece was his assistant and MSG approved her being hiring. (Thomas Tr. at 301-03). |
| 104.    Defendants have not identified any MSG employee who is similarly situated to plaintiff and was fired by MSG. Two of the comparators proposed by MSG    are ▓▓▓▓▓▓▓▓▓    and ▓▓▓▓▓▓▓▓▓ who MSG fired after they engaged in improper work-related conduct. (Moran Aff. ¶ 5) MSG fired ▓▓▓ after he double-worked as a | Disputed in part. MSG acknowledges that these other comparator employees have not engaged in the identical conduct of Plaintiff, and only offered evidence of these employees' offenses and discipline as proof that MSG policies are |

40

NY:1874796v2

| Plaintiff's Additional Allegations | Reply |
| --- | --- |
| cameraman for MSG and ABC-TV in July 2003. (Moran Aff. ¶ 5) worked for ABC-TV during the time he was scheduled to work for Madison Square Garden Network. (Moran Aff., Ex. D) As a result, he was not at his scheduled position for MSG and was paid by both companies. (Moran Aff., Ex. D) This was ▮▮▮▮ third act of misconduct. (Moran Aff, Ex. D) | consistently applied and enforced. |
| 105. MSG fired ▮▮▮ after it became aware that he had submitted applications through MSG for medical insurance for a woman that he claimed was his wife, when he was not married. (Moran Aff., Ex. F) misrepresentation had cost MSG over $70,000 in insurance premiums. (Moran Aff., Ex. F) | Undisputed for purposes of this motion. |
| 106. MSG also offers as a comparator ▮▮▮▮▮ MSG revoked an offer of employment ▮▮▮ after it determined that she had misrepresented her qualifications. (Moran Aff. ¶ 5) ▮▮▮ stated on her resume that she was a college graduate, but this was not true. (Moran Aff., Ex. E) | Undisputed for purposes of this motion. |
| 107. MSG proposes three other comparators ▮▮▮▮ and ▮▮▮▮▮▮ who MSG fired after they were arrested. (Moran Aff. ¶ 5) ▮▮▮ was reinstated after the case against her was dismissed on speedy trial grounds. (Moran Aff. ¶ 5) | Undisputed for purposes of this motion. |
| 108. Each of the comparators proposed by defendants are outside of the Knicks organization, and defendants have previously argued, and this Court has held, that plaintiff could not obtain discovery about allegations of discrimination and retaliation at MSG outside of the Knicks organization that do not involve Mills or Dolan. (Court's November 6, 2006 Order) | At the time of the Court's November 6, 2006 Order, MSG was unaware of Plaintiff's tax fraud and outside business activities. Your Honor's Order does not preclude proof going to Defendants' after acquired evidence defense. |

41

NY:1874796v2