UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANUCHA BROWNE SANDERS,

               Plaintiff,

      - against -

MADISON SQUARE GARDEN, L.P., ISIAH
LORD THOMAS III and JAMES L. DOLAN,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      06 Civ. 0589 (GEL) (DF)


ECF CASE

REPLY DECLARATION OF KEVIN
T. MINTZER IN SUPPORT OF
PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

      KEVIN T. MINTZER, under penalty of perjury, affirms and states as follows:

      1.     I am a member of the firm Vladeck, Waldman, Elias & Engelhard, P.C., attorneys for plaintiff Anucha Browne Sanders ("plaintiff" or "Browne Sanders") in this action against Madison Square Garden, L.P. ("MSG"), Isiah Lord Thomas ("Thomas") and James L. Dolan ("Dolan"). I submit this declaration in support of plaintiff's Motion For Partial Summary Judgment and to reply to certain of defendants' factual assertions.

      2.     Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the deposition of James L. Dolan.

      3.     Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the deposition of Rusty McCormack.

      4.     Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the deposition of John Moran.

Dockets.Justia.com

5.      Attached hereto as Exhibit 4 is a true and correct copy of a document containing two e-mails from Dan Gladstone to Browne Sanders.  The document bears bates numbers MSG 6176-77 and was previously marked as Gladstone Deposition Exhibit 7.

6.      Attached hereto as Exhibit 5 is a true and correct copy of a document containing an e-mail from Karin Buchholz to Browne Sanders, which Browne Sanders forwarded to John Moran and Stephen Mills.  The document bears bates number MSG 3933 and was previously marked as Buchholz Deposition Exhibit 1.

7.      Attached hereto as Exhibit 6 is a true and correct copy of an e-mail from Gary Winkler to Browne Sanders.  The document bears bates stamp number MSG 00173.

8.      Attached hereto as Exhibit 7 is a true and correct copy of a portion of the transcript of the Court's in limine rulings in Tse v. UBS Financial Services, Inc., No. 03 CV 6234 (GEL) (S.D.N.Y. March 23, 2007).

9.      As discussed in my Affidavit In Support of Plaintiff's Motion For Partial Summary Judgment, I participated in the pre-litigation settlement discussions between counsel for MSG and counsel for Browne Sanders.  I have reviewed the Declaration of Christopher Reynolds, Esq., dated May 25, 2007.  While I have high regard for Mr. Reynolds, I do not share his recollection of certain matters reflected in his Declaration, particularly many of the comments that he attributes to "plaintiff's counsel."

10.     The Court should also be aware that after plaintiff's counsel conveyed a second settlement proposal to MSG's counsel on January 3, 2006, the parties did continue to discuss the possibility of settlement.  Indeed, on or about January 24, 2006, the day that this action was filed, my partner Anne C. Vladeck and I met with MSG counsel Ronald M. Green at

our offices.  At that meeting, counsel discussed the possibility of settlement.   To my knowledge, at no time prior to the filing of this action did anyone representing MSG state to plaintiff's counsel, in words or substance, that MSG considered plaintiff's settlement position to be "extortionate."

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 8, 2007 in New York, New York.

_____
KEVIN T. MINTZER

# Exhibit 1

1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   06 Civ. 0589 (CGE)

5   -------------------------------------------x

6   ANUCHA BROWNE-SANDERS,

7                           Plaintiff,

8          - against -

9   MADISON SQUARE GARDEN, L.P., ISIAH LORD

10  THOMAS, III, and JAMES DOLAN,

11                          Defendants.

12  -------------------------------------------x

13                          December 11, 2006

                            10:00  a.m.

14

15          VIDEOTAPE DEPOSITION of JAMES

16  DOLAN, taken by the Plaintiff, pursuant to

17  Notice, held at the offices of Vladeck

18  Waldman Elias & Engelhard, P.C, 1501

19  Broadway, New York, New York, before

20  Debbie Zaromatidis, a Shorthand Reporter

21  and Notary Public of the State of New

22  York.

23

24

25

58

DOLAN

1 person who was the author of such a
2 document would need and you would expect
3 would be able to answer. The --
4     Q.   Do you remember any questions
5 that she was unable to answer?
6     A.   Oh, yes. Specifically
7 the -- the way we review a budget we start
8 off not with any of the numbers per se,
9 but we start off asking the manager, the P
10 and L manager, to write down for us their
11 goals, strategies, tactics, the -- and in
12 the case of Ms. Browne-Sanders' area we
13 also required a branding statement. These
14 formed the basis for which you then form
15 the plan for -- for the operating year
16 ahead. It took us several meetings and a
17 great deal of coaching sometimes to the
18 point where I felt that I was authoring
19 the plan in order to get a sufficient
20 document that you could rely -- that you
21 could then use to formulate the -- a
22 budget off of.
23     Q.   And when was the first of these
24 several meetings that you said that there

59

DOLAN

1 was a great deal of coaching and when did
2 you have a sufficient document?
3     MR. GREEN:   Objection.
4 Multiple, compound question. You may
5 answer.
6     Q.   What is the time frame --
7     A.   What -- roughly July if -- that
8 is summer.
9     Q.   Now, when were all of the
10 meetings where there were several meetings
11 and a great deal of coaching?
12     A.   In that -- in the summertime,
13 June, July. I believe it went into
14 August.
15     Q.   Now, prior to the June, July,
16 August time frame, had you seen
17 Ms. Browne-Sanders at budget forecast or
18 strategy meetings?
19     A.   I don't recall.
20     Q.   Prior to the June, July, August
21 time frame, had you formed an opinion of
22 Ms. Browne-Sanders' skill set or skill
23 level?
24     MR. GREEN:   Objection to form.

60

DOLAN

1 In 2005, Anne?
2     MS. VLADECK:   Yes.
3     A.   No, I don't believe I had in
4 that position.
5     Q.   When you keep saying in that
6 position, what position are you referring
7 to?
8     A.   Well, I think that Ms. Saunders
9 had a job prior to this, the -- where she
10 was not in charge of the direct marketing
11 the -- of the Knicks, that she was in a
12 position where she was in charge of
13 portions of the execution of -- of that
14 marketing. The -- and the -- I believe
15 that she did a good job at that time,
16 the -- that was Mr. Mills -- I believe his
17 statements to me in -- his rationale in
18 promoting her into the position that he
19 did promote her into was that she had done
20 a good job in the job she had before.
21 The -- and it was a promotion, and
22 necessarily with a promotion you make a
23 move up the ladder of the company that you
24 are working for, and you take on

61

DOLAN

1 additional duties, responsibilities, et
2 cetera, and hopefully you've done a good
3 job and the -- you are ready to do that.
4 It became clear in July that Ms. Sanders
5 was not ready to do that, that it was in
6 my opinion a mistake to -- to promote her
7 to that position, but she was in the --
8 the position.
9     Q.   And to the best of your
10 recollection, when did she become
11 responsible for the areas that you thought
12 she was not ready for?
13     A.   Again, I -- you know, it is
14 prior to that July period. She had enough
15 experience that she was not considered new
16 at that July meeting and whether that was
17 six months or a year I have -- you know, I
18 can't tell you.
19     Q.   So you formed an impression in
20 the June, July, August 2005 time frame
21 that Ms. Browne-Sanders did not have the
22 skills for the job that she had at that
23 time?
24     A.   Yes.

16  (Pages 58 to 61)

62

DOLAN

1
2  Q.   Prior to that time at any point,
3  did anyone express criticism of her to
4  you?
5      MR. GREEN:  Objection. Asked
6  and answered.  You may answer again.
7  A.   Yes, I think we did.  I said
8  before no, not that I recall.
9  Q.   You said that Mr. Ratner had
10  expressed criticism to you of
11  Ms. Browne-Sanders?
12  A.   Yes.
13  Q.   On how many occasions did he
14  express criticism?
15  A.   More than once and not every
16  day.
17  Q.   Can you approximate how many
18  times?
19      MR. GREEN:  Do you have a time
20  frame, Anne? It may be helpful to the
21  witness.
22      MS. VLADECK:  I think he said
23  that it never happened before the
24  summertime frame.
25  A.   I don't recall it happening

63

DOLAN

1  before the summertime frame.
2  Q.   So after the summer of '05?
3  A.   So after the time frame through
4  November and they -- it would only have
5  been in conjunction with whenever we were
6  reviewing the -- some aspect of -- of the
7  area of the operations that Anucha was
8  responsible for.  I don't recall Mr.
9  Ratner coming out of the blue and
10  suggesting that, you know, this is
11  something we had to deal with.
12  Q.   Now, when Mr. Ratner expressed
13  to you his criticism of
14  Ms. Browne-Sanders, what, if anything, did
15  you say in response?
16  A.   I agreed with him that -- that
17  he -- that she was not capable of doing
18  the job that -- that she was assigned.
19  Q.   Did he suggest to you at any
20  time that she should be fired?
21  A.   He did.
22  Q.   When was the first time if there
23  was more than one time?
24  A.   I believe Mr. -- Mr. Ratner was

64

DOLAN

1
2  of the opinion that Ms. Sanders should be
3  fired essentially from the time that we
4  had those July budget meetings through to
5  when she ultimately was fired.
6  Q.   When he first raised with you
7  his belief that she should be fired, what
8  did you say?
9  A.   Well, I know that I did not
10  agree that she should be fired.
11  Q.   What did you say?
12  A.   That we gave her the position,
13  the -- I agree she is not skilled
14  for -- but let's give her an opportunity
15  to build those skills.  If she doesn't
16  take the opportunity to build the skills,
17  then that is another thing, and we will
18  have to have a replacement.
19  Q.   Did you at any point tell Mr.
20  Mills to tell Ms. Browne-Sanders that you
21  believed that she was not skilled and that
22  she had to build her skills?
23      MR. GREEN:  Objection to form.
24  Could you have the question read back to
25  us, please.

65

DOLAN

1
2      MR. VLADECK:  Sure.
3      THE WITNESS:  No, I heard it.
4      MR. GREEN:  Okay.
5  A.   What I told Mr. Mills is
6  that -- not that I told him to tell her
7  that -- because -- that -- what I told Mr.
8  Mills was that I believed she didn't have
9  the skills, the -- and that rather than
10  letting her go because she couldn't do the
11  job, that we needed to provide her with
12  training and attempt to get her up to the
13  level that she needed to be in terms of
14  her skill level, so that she could do the
15  job. It was my feeling that the -- when
16  you do that for an employee that you get
17  back a very good employee assuming they
18  are willing to rely apply themselves and
19  learn the position.  The -- and it was my
20  hope that that was what was -- would
21  happen with Ms. Browne-Sanders.
22  Q.   What, if anything, did Mr. Mills
23  tell you when you discussed your belief
24  that Ms. Browne-Sanders wasn't performing?
25  A.   The -- I believe Mr. Mills

17  (Pages 62 to 65)

86

DOLAN

1    DOLAN
2    Mr. McCormack concerning
3    Ms. Browne-Sanders?
4         MR. GREEN:   Objection to form.
5    At any time ever?
6         MS. VLADECK:   Yes.
7    A.   I don't recall.
8    Q.   Prior to that helicopter ride,
9    had you had conversations with Mr.
10   McCormack or anyone else with respect to
11   the investigation into her charges?
12        MR. GREEN:   To the extent that
13   that would require you to reveal
14   conversations you had in the presence of
15   counsel, Mr. Dolan, or at the direction of
16   counsel, you may not answer this question.
17        MS. VLADECK:   This is a yes or
18   no.  Can I have the question read back,
19   please.
20        (Record read.)
21        MR. GREEN:   Because the
22   question contains the substance and
23   subject of the meeting, I instruct the
24   witness not to answer to the extent it
25   would be a meeting at which counsel was

87

DOLAN

1    DOLAN
2    present or held at counsel's direction.
3    So you may not answer this question if you
4    had any such meeting or discussion at
5    the -- in the presence of counsel or at
6    the direction of counsel.
7    A.   Okay.  I got the direction.  I
8    think that -- that the answer -- I know
9    that the answer is that the only
10   communication I had with Mr. McCormack
11   prior to this in regards to this -- this
12   matter would be to verify that he was in
13   fact investigating the matter.
14   Q.   Who made the decision to have
15   Ms. Browne-Sanders' employment be
16   terminated by The Garden?
17   A.   I did.
18   Q.   Did you make it on your own or
19   was it with others, consultation or
20   something else?
21   A.   Well, all decisions at The
22   Garden I make on my own.
23   Q.   And what were the reasons or
24   what was the reason you fired
25   Ms. Browne-Sanders?

88

DOLAN

1    DOLAN
2    A.   Because Ms. -- we could not keep
3    going with her in the position that she
4    was in in The Garden.  Remember, that what
5    we had agreed to was -- is that
6    Ms. Browne-Sanders was going to continue
7    on with her duties and responsibilities
8    while she looked for another position.
9    The -- that is what she had asked us to
10   do.  The -- and we had agreed.
11   Q.   The -- as part of that we -- the
12   operation of the -- of the marketing and
13   of the Knicks was part and parcel of that.
14   We needed somebody to make sure Game Day
15   happened.  Make sure that -- that the
16   slicks were reviewed, that the -- all of
17   the day-to-day responsibilities that were
18   part of Anucha's job.  That the -- after
19   that -- that conversation it was very
20   clear -- clear to me that she could no
21   longer do that job, that we could not have
22   her do that job.
23   Q.   I am sorry.  When you say after
24   that conversation, what conversation?
25   A.   The conversation on the

89

DOLAN

1    DOLAN
2    helicopter.
3    Q.   With Mr. McCormack?
4    A.   With Mr. McCormack.  I think Mr.
5    Ratner was there, too.
6    Q.   And the conversation related to
7    Mr. McCormack suggesting that
8    Ms. Browne-Sanders was undermining the
9    investigation?
10        MR. GREEN:  Objection to form.
11   You may answer.
12   A.   That she had had undermined the
13   investigation, yes.
14   Q.   Did Mr. Ratner say anything
15   during this conversation?
16   A.   I believe Mr. Ratner echoed what
17   he has been saying all along, that -- that
18   Ms. Sanders needed to be let go.
19   Q.   What, if anything, about what
20   Mr. McCormack told you was a factor in
21   your decision to fire Ms. Browne-Sanders?
22   A.   The -- really the single thing
23   was that -- is that -- whether she was
24   going to be able to continue to do -- to
25   exercise her duties and responsibilities

23  (Pages 86 to 89)

170

DOLAN

1  best -- I could just answer all of them
2  I'm not sure, and that is probably the
3  best answer I can give you.
4      Q.   Let's then just for safety's
5  sake say that this was written in or about
6  first quarter of '05.
7          What complaints, if any, did Mr.
8  Mills convey to you about
9  Ms. Browne-Sanders after this document?
10     A.   Mr. Mills really didn't complain
11 to me about Ms. Browne-Sanders, which, you
12 know, I would expect would be the -- you
13 know, that was his direct report. So kind
14 of -- it would be kind of unusual for Mr.
15 Mills to complain to me about his direct
16 report.
17     Q.   As you sit here today, do you
18 remember any complaints that Mr. Mills had
19 about Ms. Sanders -- Browne-Sanders that
20 he conveyed to you?
21     A.   No.
22     Q.   Did Mr. Mills at any time convey
23 a complaint about Ms. Browne-Sanders that
24 he had received from someone else to you?

171

DOLAN

1      A.   I don't recall.
2      Q.   Again, it would not be -- a
3  normal thing for Mr. Mills to talk to me
4  about the complaints for his -- his
5  employer. I mean he is responsible for
6  her. So why complain to me? The -- in
7  fact, I would probably ask him that
8  question. Why are you complaining to me?
9  She reports to you.
10     Q.   Before you made the decision to
11 fire Ms. Browne-Sanders, did you ask Mr.
12 Mills whether he agreed or disagreed with
13 that decision?
14     A.   No.
15     Q.   And do you recall why you made
16 the decision to fire her on the day that
17 you made the decision?
18     A.   Yes.
19     Q.   And what was that?
20     A.   We had come to the conclusion
21 that her working at the company was no
22 longer tenable due to the fact first
23 that -- that leading up until that point
24 and all the way from July up until that

172

DOLAN

1  point we had had problems. I think that
2  factored into it. The -- they -- and then
3  the issue of utilizing her position to
4  influence her direct reports and then
5  finally making a request for 6 million
6  dollars in severance.
7      Q.   On what do you base your
8  statement that she made a request for 6
9  million dollars in severance?
10     A.   It was reported to me that she
11 made a 6 million dollar -- request for 6
12 million dollars in severance.
13     Q.   Who reported it to you?
14         MR. GREEN:  I am going to ask
15 the witness not to respond further to the
16 extent it would reveal conversations with
17 counsel. If he acquired the information
18 from other means, he may respond fully.
19         MS. VLADECK:  Ron, I don't
20 believe you could open the door and then
21 close it. I think that to the extent that
22 he was relying on any information even if
23 it was through counsel the door has been
24 opened.

173

DOLAN

1          MR. GREEN:  Well, I'll be happy
2  to stipulate to you by way of letting this
3  witness respond that we are not opening
4  the door beyond this communication with
5  counsel. If you agree not to pursue a
6  greater waiver of the privilege than this,
7  I will permit the witness to respond as to
8  what conversations he had with counsel in
9  connection with the 6 million dollar
10 issue.
11         MS. VLADECK:  I believe that
12 the waiver means that the whole
13 conversation is then one that he can
14 testify to. If you are not going to
15 permit --
16         MR. GREEN:  I won't permit a
17 broader waiver than the conversations
18 about the amount of money which may have
19 been requested during these discussions
20 pertaining to Ms. Anucha Browne-Sanders'
21 separation.
22         MS. VLADECK:  Why don't we
23 start with that. I will not argue that
24 your allowing him to testify to that is a

174

DOLAN

1  DOLAN
2  further waiver.
3      MR. GREEN:  Fair enough.
4      MS. VLADECK:  But I will argue
5  potentially that we are entitled just by
6  the initial comment to the entire
7  conversation.
8      MR. GREEN:  You are free to
9  make the argument, and I will allow the
10  witness to answer then with respect to the
11  question who was it who told him that
12  Anucha Browne-Sanders had demanded 6
13  million dollars.
14      MS. VLADECK:  Okay.
15      MR. GREEN:  He may respond.
16  **A.    That was a lot discussion for**
17  **the answer you are about to get.**
18  **Q.    And what is the answer I am**
19  **about to get?**
20  **A.    I don't recall.**
21      (Laughter.)
22  **Q.    Let -- let me ask you a question**
23  **that is more recent.**
24      **I asked you specifically about**
25  **the -- the amount of money this morning,**

176

DOLAN

1  DOLAN
2      THE WITNESS:  You know I give
3  you 30 seconds at which point if you don't
4  have this resolved, I am coming in and
5  answering the question.  Don't take that
6  as your advantage now.
7      (Witness leaves the room.)
8      THE VIDEOGRAPHER:  We are going
9  off the record at 3:12.
10      MS. VLADECK:  No, not off the
11  record.
12      MR. GREEN:  On the record.
13      THE VIDEOGRAPHER:  I am sorry.
14  We are not off the record at 3:12.
15      MR. MINTZER:  You are recording
16  a blue screen.
17      MS. VLADECK:  You were about to
18  say something that I said was a speaking
19  objection.
20      MR. GREEN:  You are
21  mischaracterizing his testimony.  I don't
22  believe he said he considered it.  I
23  believe you asked him if he told anyone
24  about that.  I don't think you asked him
25  if he considered it.  It is a fair

175

DOLAN

1      **DOLAN**
2  **and you rejected as a reason for deciding**
3  **to fire Ms. Browne-Sanders that a**
4  **settlement demand or a demand was**
5  **exorbitant.**
6      MR. GREEN:  I must -- I must
7  correct you.
8      MS. VLADECK: Wait.
9      MR. GREEN:  That wasn't his
10  testimony.
11      MS. VLADECK: Let me have Mr.
12  Dolan leave the room.
13      MR. GREEN:  Fair enough.
14      THE WITNESS:  I am going to
15  leave the room now.  Hey, guys this is not
16  boding well for a 4:30 departure.  I just
17  assume answer this question.
18      MS. VLADECK:  No.  No, not, Ron
19  -- not while he is here.
20      MR. GREEN:  Fine.  Step out
21  just for a moment.  Just outside the door.
22      THE WITNESS:  Sure.  Are you
23  coming with me?
24      MR. GREEN:  I want to argue
25  this point.

177

DOLAN

1      DOLAN
2  question, but I don't think it has been
3  asked.
4      MS. VLADECK:  Okay.  I'm not
5  sure that is correct, but I think it is
6  easily remedied.
7      MR. GREEN:  He can answer
8  fully.
9      (Witness returns to the room.)
10      MR. GREEN:  Thirty seconds.
11  Just made it.
12      MR. MINTZER:  Done.
13  **Q.    See, we take your deadline**
14  **seriously.**
15  **A.    What is the scoop Betty Boops?**
16  **Am I answering or not answering?**
17      MR. GREEN:  Well, I asked her
18  to rephrase the question.
19      THE WITNESS:  Fabulous.
20      MR. GREEN:  She may rephrase the
21  question or not.
22  **Q.    Let me go back a little.  Did**
23  **you hear about a 6 million dollar request**
24  **for severance from counsel?**
25  **A.    I don't recall --**

178

DOLAN

1    MR. GREEN:    You may answer.
2    A.    -- who I heard the 6 million
3 dollar request from.
4    Q.    In what context did you hear the
5 request?
6    A.    That is what I don't recall.
7    Q.    And did you hear the request on
8 the day you decided to fire her?
9    A.    I'm not sure.
10    Q.    Did you tell anyone that a
11 factor in your decision to fire
12 Ms. Browne-Sanders was that she had made a
13 request for 6 million in severance?
14    A.    I think I did.
15    Q.    Who did you tell?
16    A.    I think at that same discussion
17 at the helicopter I pointed out that she
18 is already had -- essentially -- I was
19 told she wasn't staying.  She -- she
20 resigned and asked for the extended stay
21 period.  The -- that she had tampered with
22 an investigation that -- that was begun on
23 her behalf, the -- and then had asked for
24 6 million dollars in severance.

179

DOLAN

1    Q.    Now, when you said you think you
2 said it in the same conversation, was that
3 with Mr. McCormack and Mr. Ratner?
4    A.    Right.
5    Q.    Is there a reason you didn't
6 tell me that this morning when you were
7 asked a direct question as to whether or
8 not you told Mr. Ratner or Mr. McCormack
9 that a request for severance was a factor
10 in your decision to fire her?
11    A.    No, I don't think you asked me
12 about a request for severance.  You asked
13 me about a settlement.  Settlement is a
14 bit different than a request for
15 severance.
16    Q.    Is that the way you've been
17 parsing my questions if there was --
18    A.    I don't mean to be cute with
19 you, but the --
20    Q.    Well --
21    A.    The -- it first came in a
22 request for severance.  That then came in
23 a threat, right, that if the -- that if
24 the -- if I didn't get the money, right,

180

DOLAN

1 I'm going to go, right, the -- and file
2 this case that we are talking about right
3 now and make a big stink about it.
4    Q.    Who told you that there was a
5 threat that if it wasn't paid we are going
6 to file this case and make a big stink
7 about it?
8    A.    I think it was Mr. Mills.  I'm
9 not sure whether it was him.  Whoever was
10 relating to Anucha at that time, I think
11 it was still Mr. Mills.
12    MS. VLADECK:  Do you have word
13 search?  Could you search for the word
14 exorbitant?
15    (The record was read back as
16 follows:
17    "Question:  Did you tell anyone
18 that you had to fire Ms. Browne-Sanders
19 because she made a settlement demand that
20 you believed was exorbitant?
21    "Mr. Green:  Objection to form.
22    "Answer:  No."
23    Q.    You never told anyone that --
24    A.    What --

181

DOLAN

1    MR. GREEN:  Objection to form.
2    Q.    -- about a settlement demand?
3    A.    Correct.  That they -- -- I
4 don't recall.  I'm not -- you know, at
5 this point I am a little confused because
6 at one point she is asking for -- she is
7 asking for 6 million dollars.  Later on I
8 believe she asked -- she let us know that
9 she got -- that if she doesn't get the 6
10 million dollars she is going to
11 then -- that she attempted to essentially
12 extort the 6 million dollars from the
13 company.
14    Q.    Did you have a discussion on
15 this subject at lunch with your counsel?
16    MR. GREEN:  I'm going to object
17 and instruct the witness not to answer to
18 conversations with counsel.
19    Q.    Well, did you have any
20 discussion during the lunch break with
21 your counsel to refresh your recollection
22 concerning this 6 million dollar demand?
23    MR. GREEN:  Same objection.  To
24 the extent counsel posed any questions or

186

DOLAN

2 my essentially taking the opinion of Mr.
3 Ratner that she had not improved, that he
4 believed that she was -- should be
5 terminated.
6    Q.    Are you done with all the events
7 leading from July to January?
8    A.    Yes, I think so.
9    Q.    What made you believe that from
10 July to January she had an inability to
11 budget or brand?
12    A.    Because of the July meeting, the
13 skills and the work product that she
14 produced was not -- low, not acceptable.
15 It showed a lack of understanding of
16 budgeting. It showed a lack of
17 understanding of branding. She was unable
18 to come up with a branding statement for
19 the New York Knicks. She had to be given
20 one. That the -- and her -- in her budget
21 she was unable to explain her budget and
22 when she -- and when she did explain her
23 budget, her explanations, the -- showed a
24 lack of understanding of how budgets
25 are -- are put together and differences

187

DOLAN

2 between things such as operating expenses
3 and capital expenses, and she actually in
4 the middle of the budgetary process
5 revealed that she had misclassified some
6 80,000 dollar or a hundred thousand
7 dollars worth of expenses from operating
8 into -- from capital into operating.
9    Q.    Was this all reflected during
10 the summer budget meetings or is this
11 something that happened between July and
12 January?
13    A.    This was all -- the budget
14 meetings went through July and August.
15    Q.    Okay. My question is after the
16 budget meetings over the summer --
17    A.    Yes.
18    Q.    What did you observe with
19 respect to Ms. Browne-Sanders' inability
20 to budget and/or brand from those budget
21 meetings until January of '06?
22    A.    Nothing other than that -- that
23 I did not receive a report that she had
24 gotten any better, and there was no reason
25 to think that she went through the -- the

188

DOLAN

2 training, but I did not get a positive
3 report. I didn't get any report
4 essentially on it.
5    Q.    Did you ask for a report at any
6 time between the summer budget meetings
7 and the day you decided to fire her?
8    A.    I don't recall. I don't -- I
9 don't recall if I did or if I didn't.
10    Q.    Now, you said that you also
11 relied on the opinion of Mr. Ratner that
12 she should be terminated.
13       When did Mr. Ratner express his
14 opinion that she should be terminated?
15    A.    Consistently from July through
16 her termination date.
17    Q.    And you rejected his opinion
18 from July, August, September, October,
19 November and December; is that correct?
20       MR. GREEN:   Objection to form.
21 Misstates prior testimony.
22    Q.    Is that correct?
23       MR. GREEN:   You may answer.
24    A.    I think it -- rejected would be
25 strong, but essentially we didn't act upon

189

DOLAN

2 what his -- what his opinion -- we tried
3 to give Anucha a chance, but you have to
4 remember that the -- you are asking me
5 about the day she was fired. The -- we
6 went through this whole process with her.
7 Then she comes back to us, and she tells
8 us that she is not going to work here any
9 more. The -- that the -- it is unclear
10 what the reason is why she doesn't -- why
11 she can't work here any more, but I assume
12 that the -- that it had something to do
13 with her experience over the last six
14 months. The -- so now we are already
15 looking for -- we already have to rejigger
16 the -- the department, et cetera, but she
17 is -- she is going to stay as long as we
18 help her find another position, but she is
19 essentially out. She has no future at the
20 company by her own hand, and then
21 the -- comes in the report that she wants
22 $600,000 worth -- excuse me -- 6 million
23 dollars worth of severance that the -- and
24 that -- that the -- she's been tampering
25 with an investigation into a complaint

48 (Pages 186 to 189)

190

DOLAN

1  that she's made, and the last part is
2  the -- is the part that is most difficult
3  to deal with because as ridiculous as the
4  6 million dollar request was that
5  the -- she could have continued on doing
6  her job if she had not tampered
7  with -- with those people, the -- but the
8  combination of all of those things
9  together -- and finally the tampering as
10 being the last straw in that really led us
11 to -- led me to the conclusion that her
12 employment at the company was over with.
13     Q.   Now, you started by saying that
14 you believed she started this whole
15 process.  What whole process are you
16 referring to?
17     A.   I'm not sure --
18         MS. VLADECK:  Could you read it
19 back.
20         (Record read.)
21     Q.   What did you mean by the whole
22 process?
23     A.   What I meant by the whole
24 process is -- we went through the whole

191

DOLAN

1  budgeting process with her.  We discovered
2  these deficiencies that the -- that -- you
3  know, that -- in her skill set.  We went
4  through and paid for the -- and offered
5  her training the -- and paid for her
6  training to up those skills.  I mean that
7  was at our expense that the -- -- and, you
8  know, after we are done sending her
9  school, right -- that -- to get better at
10 this, right, the -- she walks into the
11 office and says essentially I'm quitting.
12 The -- I can't work here any more.
13 The -- the -- and you need to -- what
14 I -- what I need you to do is to keep me
15 on, and I'll do my job, which was fair,
16 and help me find another job.  That
17 the -- you know, at that point, you know,
18 I have to tell you that as -- as the CEO
19 of the company having then, you know,
20 offered her the -- the ability, right, to
21 essentially come out of what was a pretty
22 bad review but which is what came up out
23 of in terms of how her performance was in
24 that budgetary process, offering her the

192

DOLAN

1  ability for help, training to get her
2  skill levels up, the company was going to
3  stick with her, that the -- the -- and she
4  took the training, and then she came back
5  and basically said I quit.  The -- then
6  she asks for 6 million dollars, that
7  the -- and then we find out that
8  she -- that she is utilizing her position
9  that she is -- she is off through the
10 company attempting to garner support for a
11 complaint that the -- about sexual
12 harassment.  The -- at what point
13 does -- does an employee become no longer
14 effective at a company as -- in her
15 position.  She was no longer effective.
16 The -- the -- and the -- at that point,
17 you know, I decided that the company had
18 to -- had to just cut it off, and that was
19 when -- when she was fired.
20     Q.   Now, you say that you heard from
21 Mr. Mills that Mrs. Anucha Browne-Sanders
22 just walked into the office and said I'm
23 quitting?
24         MR. GREEN:   Objection.

193

DOLAN

1  Misstates prior testimony.  You may
2  answer.
3     A.   I think that is what I said,
4  but, you know -- look --
5     Q.   That is a yes or no.
6     A.   I'm taking -- you don't get to
7  do that with me.
8     Q.   Yes, I do.
9     A.   Well, I'm still going to answer
10 the way I want to answer.  I'm
11 characterizing what her conversation was
12 with Mr. Mills.
13     Q.   Did you hear from anyone that
14 what Ms. Browne-Sanders said as a result
15 of the sexual harassment was I can't take
16 this any more?
17         MR. GREEN:   Objection to form.
18 Can I have that question read back,
19 please.
20         (Record read.)
21     A.   No.
22     Q.   Now, who did you talk to about
23 Ms. Browne-Sanders from January 13 to
24 January 19, whether or not they were

49  (Pages 190 to 193)

202

DOLAN

1  is what she was attempting to do.
2  The -- she so wanted to -- apparently to
3  have this complaint be verified by the
4  people underneath her, that -- that
5  she -- you know, she violated the company
6  policy, and she rendered herself at that
7  point the -- the -- unemployable by the
8  company. The -- because the -- we had no
9  way of knowing whether she was going to
10 continue to do that or not continue to do
11 that, and so how could I then have her
12 continue to run that operation. We
13 couldn't. The -- that is why she was let
14 go.
15 Q.    And everything you learned about
16 her attempt to influence the investigation
17 in your words you learned from Mr.
18 McCormack; is that correct?
19 A.    From Mr. McCormack, that's
20 right.
21 Q.    Was there any other source of
22 information for that belief?
23 A.    Not for that decision, no.
24 Q.    And did Mr. McCormack tell

---

203

DOLAN

1  what investigation was occurring that he
2  he believed she was attempting to
3  influence?
4  MR. GREEN:    Objection to form.
5  If you can recall, Mr. Dolan.
6  A.    It was a harassment
7  investigation based on complaints from
8  Anucha. I knew that.
9  Q.    So it was your understanding
10 that it was an investigation into her own
11 complaints of sexual harassment?
12 A.    Right.
13 MR. GREEN:    Objection to form.
14 Q.    And that during that
15 investigation she brought people into her
16 office?
17 MR. GREEN:    Objection to form.
18 Q.    Is that correct?
19 MR. GREEN:    Objection to form.
20 It misstates a portion of the prior
21 testimony.
22 MR. VLADECK:    Please
23 Mr. -- objection to form is fine. I think
24 that there has been enough coaching.

---

204

DOLAN

1  MR. GREEN:    No, don't -- this
2  camera is rolling.
3  MS. VLADECK:    Mr. Dolan, do you
4  mind leaving the room?
5  MR. GREEN:    You stay right
6  here.
7  MS. VLADECK:    Excuse me.
8  MR. GREEN:    If you want to end
9  this deposition, you can end it. If you
10 want to end it right now. Do not attempt
11 to insult me in the presence of my client.
12 Do not falsely accuse me of coaching in
13 the presence of my client and do not
14 mislead my client. That is inconsistent
15 with his prior testimony, and you know it.
16 He is not here to be duped or tricked by
17 you asking questions to which he
18 responded.
19 MS. VLADECK:    Mr. Green, I
20 think any observer will see the difference
21 between prelunch and post lunch testimony.
22 MR. GREEN:    Are you referring
23 to Ms. Anucha Browne-Saunders?
24 MS. VLADECK:    No, I am

---

205

DOLAN

1  referring to Mr. Dolan, and I am referring
2  --
3  MR. GREEN:    Are you referring
4  to Anucha Browne-Sanders, of others giving
5  her information during her deposition?
6  MS. VLADECK:    I don't have any
7  clue what you are talking about, but you
8  are perfectly capable of saying whatever
9  you want which you did at her deposition.
10 Could I have the question read
11 back and could I have the answer without
12 speaking objections?
13 (Record read.)
14 A.    That is a question?
15 Q.    Did you believe that during the
16 investigation into her complaints of
17 sexual harassment she brought people,
18 subordinates into her office to discuss
19 the charges?
20 A.    I believe that she used her
21 position -- I'm sorry, but you know what,
22 whether it occurred in her office or not,
23 is just -- is just merely that the -- an
24 expression. I have no idea where it

206

1          DOLAN
2   occurred. It wasn't expressed to me where
3   it occurred. What was very clear is --
4   was -- is that Ms. Sanders used her
5   position that the -- to influence these
6   people. The -- in conversations regarding
7   her sexual harassment claim. That
8   the -- specifically the -- it was reported
9   to me that she -- that she asked people to
10  back her up on -- on -- on the claims
11  of -- of harassment against Mr. Thomas,
12  the -- and the -- and, you know, I'm not
13  quite sure why you're all arguing about
14  this. The -- I mean are you suggesting
15  that she didn't do those things? That
16  the -- I mean because that is nuts. That
17  the -- you know, I mean I think that
18  you'll see in the rest of the depositions
19  that you get and the rest of this trial,
20  that -- that that is exactly what she did.
21  That the -- maybe you don't want to
22  believe it because you're representing
23  her, but the fact is that she did do
24  things and that -- excuse me. I'm not
25  done. The -- the -- and in addition to

207

1          DOLAN
2   that she did attempt to extort 6 million
3   dollars from the company that
4   the -- the -- using these false claims.
5   This is -- this is what this -- that is
6   what this is about. The -- this isn't,
7   you know, that the -- well, I've said what
8   I said.
9       Q.  Mr. Dolan, you have stated that
10  she attempted to use her influence. You
11  have not identified one person that she
12  attempted to influence.
13      A.  I don't have to identify
14  anybody.
15      Q.  Please. Excuse me. Please.
16          MR. GREEN:  Is there a
17  question?
18          MS. VLADECK: I am about to.
19          MR. GREEN:  Then why the
20  preamble?
21      Q.  Please give the name of one
22  person that you believe Ms. Browne-Sanders
23  attempted to influence as part of the
24  investigation?
25          MR. GREEN:  Objection. Mr.

208

1          DOLAN
2   Dolan, you may answer to the best of your
3   recollection.
4       A.  Okay. I don't need to know the
5   names -- excuse me. You're going to let
6   me answer the question. You asked the
7   question.
8       Q.  I think we are going to do this
9   at the courthouse. If you -- I don't
10  really need a long answer. If you know
11  the names you can tell me the names. If
12  you don't know the names, you can say you
13  don't know them.
14      A.  Okay. Fine. I don't know them.
15      Q.  And when did this occur?
16      A.  But I'm happy to do it at the
17  courthouse.
18      Q.  When did this occur?
19      A.  Excuse me?
20      Q.  What time frame did this attempt
21  to use her influence occur?
22      A.  I am not sure.
23      Q.  And when did Ms. Browne-Sanders
24  attempt to extort 6 million dollars?
25          MR. GREEN:  Objection to form.

209

1          DOLAN
2   You may answer, Mr. Dolan, to the best of
3   your recollection.
4       A.  Around the same time period.
5       Q.  And you, as you sit here today,
6   can't even say who it is who told you
7   that; is that correct?
8           MR. GREEN:  Objection. Why are
9   you putting argument into your question?
10          MS. VLADECK: Excuse me.
11          MR. GREEN:  Just rephrase the
12  question politely. He'll answer it.
13          MS. VLADECK: I think the
14  question is fine. Can you read it back.
15          MR. GREEN:  No, it isn't. It
16  is argumentative and unnecessarily so.
17  Just rephrase it, so it is a simple
18  question.
19          MS. VLADECK:  Ron, you have an
20  objection to form. I'd like an answer.
21          MR. GREEN:  Mr. Dolan, you are
22  permitted to answer the outstanding
23  question.
24          May we have the question read
25  back for, Mr. Dolan.

53  (Pages 206 to 209)

222

DOLAN

1  or conferred with counsel in connection
2  with the notification to Anucha
3  Browne-Sanders as to the circumstances of
4  her termination, he may not respond.  He
5  may respond otherwise if counsel was not
6  involved in any way.
7      Q.    And if you hear the question and
8  then you can see whether counsel was
9  involved or not.
10      A.    I think I can just give you an
11  answer now that will help you with that.
12  I was -- I am unaware of how Anucha
13  Browne-Sanders was informed of her
14  termination.
15      Q.    My question is somewhat
16  different.  You made the decision to fire
17  her; is that correct?
18      A.    That is it.
19      Q.    Why did you not accept her
20  resignation instead of decide to fire her?
21          MR. GREEN:  Same objection.
22      A.    I'm confused.  What resignation?
23  I mean the -- when she had a discussion
24  with Steve Mills?

223

DOLAN

1      Q.    Did you believe that that was a
2  resignation?
3      A.    Yes.
4      Q.    Then why didn't you accept her
5  resignation instead of decide to fire her?
6      A.    Well, resignation -- it was
7  actually a statement that said she was
8  going to resign, the -- or I guess you
9  consider -- you could consider it a
10  resignation, but she asked to stay on.  We
11  were accommodating her.
12      Q.    Then why didn't you say we no
13  longer want to accomodate you, and we
14  accept your resignation effective
15  immediately?
16      A.    I told I'm not -- you know, I'm
17  not familiar with how she was communicated
18  with when she was terminated.
19      Q.    In any of the training that you
20  may have received in sexual harassment or
21  discrimination, did you become familiar
22  with a term called "retaliation"?
23      A.    I think I understand the
24  concept.

224

DOLAN

1      Q.    And what is your understanding
2  of the concept?
3      A.    Essentially it is the -- an
4  action taken against a person in response
5  to their making an allegation, a formal
6  allegation.
7      Q.    Do you believe that
8  Ms. Browne-Sanders made a formal
9  allegation?
10      A.    Yes, I think she did.
11      Q.    Did you ever get involved in
12  ensuring that the players became involved
13  in community events?
14      A.    No.
15      Q.    Did any of the players ever ask
16  you whether they had to get involved in
17  either community events or commercials?
18      A.    No.
19      Q.    After Ms. Browne-Sanders filed
20  her complaint, did you get involved in the
21  press?
22      A.    I always view the company's
23  press strategy.  So yes.
24      Q.    And did you help formulate the

225

DOLAN

1  press strategy in response to
2  Ms. Browne-Sanders' complaints?
3          MR. GREEN:  Objection to form.
4  You may answer.
5      A.    Formulate, no.  Approve, yes.
6      Q.    And what was The Garden's press
7  strategy in response to
8  Ms. Browne-Sanders' complaint?
9          MR. GREEN:  Let me just
10  admonish the witness that to the extent
11  the garden's press strategy was discussed
12  with counsel or directed by counsel, you
13  could not answer that question; otherwise,
14  you may.
15      A.    I'm sorry.  I am not going to be
16  able to answer the question then.
17          (Dolan Exhibit 10 marked for
18  identification.)
19          (Document handed to witness.)
20          (Pause.)
21      A.    Okay.  How can we help you with
22  this?
23      Q.    If you look at -- it's cut off,
24  but I think it is 6100, which starts --

57  (Pages 222 to 225)

# Exhibit 2

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   06 CIV. 0589

5   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

6   ANUCHA BROWNE-SANDERS,

7                        Plaintiff,

8        - against -

9   MADISON SQUARE GARDEN, L.P., ISIAH LORD

10  THOMAS III, AND JAMES DOLAN,

11                       Defendants.

12  - - - - - - - - - - - - - - - - - - - - - - - - - - -x

13                       November 7, 2006

                         10:20  a.m.

14

15        VIDEOTAPE DEPOSITION of RUSTY

16  McCORMACK, taken by the Plaintiff,

17  pursuant to Notice, held at the offices of

18  Vladeck Waldman Elias & Engelhard, P.C.,

19  1501 Broadway, New York, New York, before

20  Debbie Zaromatidis, a Shorthand Reporter

21  and Notary Public of the State of New

22  York.

23

24

25

166

```
1            McCORMACK
2  Gonsalves' investigation?
3     A.   No.
4     Q.   Did you later learn that?
5     A.   No, he had made comments to Dan
6  Gladstone is my understanding.
7     Q.   Right.  Did you become
8  aware -- well let me -- let's try this
9  again.
10        In the context of the
11 investigation of Mr. Gonsalves, did you
12 become aware that Mr. Marbury had made
13 comments to Dan Gladstone about
14 Ms. Browne-Sanders?
15    A.   Yes.  Okay.
16    Q.   You did?
17    A.   Yes.
18    Q.   And so you learned of that in
19 the late November time frame when the
20 Gonsalves investigation was ongoing?
21    A.   Yes.
22    Q.   And what did you learn about
23 that?
24    A.   No, the Dan Gladstone remarks
25 I -- as I understand it, was like six
```

168

```
1            McCORMACK
2  an E mail confirming that -- that those
3  comments had been made, which didn't make
4  Dan very happy, but then -- and that
5  was -- that was pretty much what -- that's
6  all I know as it came out, and we -- you
7  know, we -- we weren't aware of any of
8  this prior to -- to the Hassan thing even
9  coming up.
10    Q.   Okay.  My question is:  What
11 did -- I assume you learned of this
12 through Mr. Mar -- Mr. Moran?
13    A.   Yes.
14    Q.   What did Mr. Moran tell you?
15    A.   I don't remember specifically.
16    Q.   Well, do you remember generally
17 anything that Mr. Moran said about this
18 subject?
19    A.   No.
20    Q.   Did Mr. Moran tell you --
21    A.   I'm not sure but that
22 Mr. -- that Mr. Moran told me that to be
23 honest with you.  It could have come from
24 E mails that we read later.  I don't know
25 that --
```

167

```
1            McCORMACK
2  months earlier.
3     Q.   Right, but my question is when
4  did you learn of it?
5     A.   Oh, not until that time.
6     Q.   Right.  You learned of the
7  comments that Mr. Marbury was alleged to
8  have made to Mr. Gladstone in or around
9  late November when the Gonsalves
10 investigation was occurring.  That's
11 right, correct?
12    A.   I believe that the Stephon
13 Marbury comments to Dan Gladstone were
14 some six months earlier.
15    Q.   That's not my question.  My
16 question is:  When did you back aware of
17 that?
18    A.   I became aware in -- in
19 November, early December.
20    Q.   And what did you learn about
21 what Mr. Marbury was alleged to have said
22 about Ms. Browne-Sanders?
23    A.   Well, two things, number one, I
24 learned that Anucha had asked Dan to -- to
25 go back over that six months to send her
```

169

```
1            McCORMACK
2     Q.   Okay.
3     A.   -- to be honest.
4     Q.   So you acquired some knowledge
5  of these comments that Mr. Marbury was
6  alleged to have made to Mr. Gladstone,
7  correct?
8     A.   Yes.
9     Q.   Did you -- did you see an E
10 mail, are you --
11        MR. MINTZER:  Strike that.
12    Q.   You referred to an E mail in
13 your -- in your answer that Mr. Gladstone
14 had been asked to write?  Yes?
15    A.   Yes.
16    Q.   And you said that that Mr.
17 Gladstone was not happy about having had
18 to write that?
19    A.   Right.
20    Q.   What is the basis of that
21 testimony?
22    A.   It is just what I heard.
23    Q.   Who did you hear it from?
24    A.   I don't know.
25    Q.   When did you hear that?
```

43

212-267-6868

516-608-2400

# Exhibit 3

```
 1                                                    1

 2   UNITED STATES DISTRICT COURT

 3   SOUTHERN DISTRICT OF NEW YORK

 4   06 Civ. 0589 (CGE)

 5   ------------------------------------------x

 6   ANUCHA BROWNE-SANDERS,

 7                           Plaintiff,

 8         - against -

 9   MADISON SQUARE GARDEN, L.P., ISIAH LORD

10   THOMAS, III, and JAMES DOLAN,

11                           Defendants.

12   ------------------------------------------x

13                      November 10, 2006
                        10:10  a.m.
14

15            VIDEOTAPE DEPOSITION of JOHN D.

16   MORAN, taken by the Plaintiff, pursuant to

17   Notice, held at the offices of Vladeck

18   Waldman Elias & Engelhard, P.C, 1501

19   Broadway, New York, New York, before

20   Debbie Zaromatidis, a Shorthand Reporter

21   and Notary Public of the State of New

22   York.

23

24

25
```

98

1              MORAN
2    those text messages were not sent on the
3    premises of Madison Square Garden that it
4    was not a violation of the company's
5    anti-harassment policy?
6              MR. GREEN:   Objection to form.
7    You may answer, Mr. Moran.
8         A.   I'm not sure -- the definitive
9    point for me wouldn't be whether it
10   was -- if one of their -- one or both
11   might have been on or one was on or off.
12   It was employees -- employees have a right
13   to have relationships even though they
14   work for The Garden.  We don't prohibit
15   that as long as it is not a direct
16   reporting relationship, and if they are
17   text messaging each other, that is -- I
18   wouldn't consider that a violation.
19        Q.   Well, I mean a text message that
20   says in substance, you know, when can I
21   get more of that, do you consider that to
22   be appropriate under all circumstances
23   unless it is not from a supervisor to
24   their subordinate?
25            MR. GREEN:   Objection to form.

99

1              MORAN
2    Asked and answered.  You may answer again,
3    Mr. Moran.
4         A.   I -- I don't get into value
5    judgements as to what people are saying to
6    one another when they're not, you
7    know -- when they are conducting their own
8    private business.
9         Q.   So you considered what went on
10   between Mr. Marbury and ███████their
11   own private business?
12        A.   Yes, I did.
13        Q.   Did you make any inquiries of
14   Mr. Marbury about what had transpired?
15        A.   No, I didn't.
16        Q.   Did you make any effort to
17   communicate to Mr. Marbury that he -- he
18   needed to be cognizant of the company's
19   anti-harassment policy?
20            MR. GREEN:   Objection to form.
21   You may answer, Mr. Moran.
22        A.   No, I didn't.
23        Q.   Is there any reason why you
24   didn't explore any of these issues with
25   Mr. Marbury?

100

1              MORAN
2            MR. GREEN:   Objection to form.
3    Asked and answered.  You may answer again,
4    Mr. Moran.
5         A.   I felt it was outside -- outside
6    of the company's -- outside of the
7    company's viewing.  It was something that
8    he was doing on his own personal time.
9         Q.   In the course of your
10   investigation into Mr. Gonsalves' conduct,
11   did you learn of any other inappropriate
12   conduct by Mr. Marbury other than with
13   respect to ███████?
14            MR. GREEN:   Objection to form.
15   Misstates prior testimony as to Mr.
16   Marbury.  You may answer, Mr. Moran.
17        A.   I am sorry.  Would you -- would
18   you repeat --
19        Q.   Other than Mr. Marbury's conduct
20   with respect to Mr. -- ███████did you
21   learn of any inappropriate conduct by
22   Ms. Marbury -- Mr. Marbury in connection
23   with your investigation of Ms. -- Mr.
24   Gonsalves' alleged misconduct?
25            MR. GREEN:   Objection to form.

101

1              MORAN
2    You may answer.
3         A.   Nothing -- nothing comes to mind
4    at the moment.
5         Q.   Did you learn that in the course
6    of that investigation that Mr. Marbury had
7    made inappropriate comments about
8    Ms. Browne-Sanders?
9         A.   I -- I did learn that Mr.
10   Marbury called a gentleman named Dan
11   Gladstone and made comments -- according
12   to Mr. Gladstone he said that Stephon
13   called him, and they -- made comments
14   towards Anucha.
15        Q.   How did you learn that?
16        A.   From Mr. -- from Mr. Gladstone.
17        Q.   Were you speaking with Mr.
18   Gladstone in the context of your
19   investigation of Mr. Gonsalves?
20        A.   I believe so, yes.
21        Q.   Mr. Gladstone relayed to you
22   what the comments were that Mr. Marbury
23   made about Ms. Browne-Sanders?
24        A.   Yeah.  Just the -- back up.  I
25   think the context came not so much

26

102

MORAN

1        MORAN
2   in -- in the investigation of Mr.
3   Gonsalves, but -- and I'm not clear on the
4   context, but Anucha had asked him to put
5   in writing a conversation that took place
6   maybe a year earlier, and I'm not sure
7   that it -- I'm not sure that it had any
8   relationship at all to the investigation.
9   It was something that -- for whatever
10  reasons I'm not sure, but Anucha said to
11  him she -- we -- we had a conversation.
12  You told me about a year ago, what --
13  whatever the time frame was, that Stephon
14  had called you and made remarks about me.
15  Can you now put that in writing for me,
16  and he did I guess.  He -- I know he did,
17  and I don't -- I don't think it had
18  anything to do with the Gonsalves
19  investigation.  I mean it might have come
20  up during that time frame, but it wasn't
21  directly related to my investigation.
22      Q.   Does Mr. Gonsalves have any
23  relation to Mr. Marbury?
24      A.   He is referred to as his cousin,
25  but I don't know that to be accurate.

103

MORAN

1        MORAN
2       Q.   Who told you that they were
3   cousins?
4       A.   I -- it is sort of folklore
5   around.
6       Q.   Do you have a basis to doubt
7   that they are cousins?
8       A.   Someone had told me after
9   the -- after all of this that they weren't
10  in fact cousins, but to this day I don't
11  know.
12      Q.   In the context of interviewing
13  Mr. Gladstone concerning Mr. Gonsalves'
14  conduct, did Mr. Gladstone make you aware
15  of Mr. Marbury's comments towards
16  Ms. Browne-Sanders?
17      A.   He did.  He -- again I am not
18  sure in what context.  I'm not sure -- I'm
19  not sure why it came up because it didn't
20  seem to be relevant to investigating
21  Gonsalves' -- we are investigating what
22  Gonsalves did -- said, did or whatever to
23  these individuals.  That -- it did come
24  up, but I don't -- I don't recall why.  It
25  seemed extraneous to me.

104

MORAN

1        MORAN
2       Q.   What did Mr. Gladstone tell you
3   that Mr. Marbury had said?
4           MR. GREEN:   Objection to form.
5   You may answer.
6       A.   I'm not going to be able to
7   quote it correctly, but he said that he
8   was -- called Anucha names, you know, that
9   she's not running this place, and he -- he
10  might have used the term bitch, ho.  I
11  don't know.  It was that type of language.
12  He was very upset.
13      Q.   Mr. Gladstone was upset?
14      A.   No, Mr. Marbury was upset
15  with -- when he was -- he was making these
16  comments towards Anucha.  I'm not sure
17  why.
18      Q.   Did you ever see an E mail in
19  which these comments were reflected?
20      A.   Yes, I did.
21      Q.   And did you see that E mail at
22  around the time you were investigating Mr.
23  Gonsalves' conduct?
24      A.   Yes, I did.
25      Q.   When you saw that E mail, were

105

MORAN

1        MORAN
2   you concerned that Mr. Marbury's comments
3   were contrary to the company's
4   anti-harassment policy?
5           MR. GREEN:   Objection to form.
6   You may answer.
7       A.   Well, the comments -- the
8   comments concerned me, and, you know, in
9   terms of the policy, you know, everything
10  is -- needs to be looked at in context,
11  and I wasn't sure what the context was,
12  but the -- but the words concerned me.
13      Q.   Well, did you make any effort to
14  find out what the context was?
15      A.   It is my -- my understanding of
16  what the context was -- well, the call was
17  like -- the call we are talking about
18  didn't take place in November when -- when
19  the E mail was asked for.  The call took
20  place -- I don't know -- six months or a
21  year earlier, and my understanding was
22  that Gon -- Hassan Gonsalves had been
23  forging the signature of a supervisor for
24  parking tickets, and it came to our
25  attention.  Not my attention, it came to

27

# Exhibit 4

## Unknown

| | |
|---|---|
| **From:** | Gladstone, Dan |
| **Sent:** | Monday, November 28, 2005 6:27 PM |
| **To:** | Browne Sanders, Anucha |
| **Cc:** | Buchholz, Karin |
| **Subject:** | Staffing issues - MARBURY |
| | |
| **Importance:** | High |
| | |
| **Attachments:** | Staffing memo(June 16).doc |

Anucha

As per your request, I am submitting some comments made by Stephon Marbury from a phone conversation that happened this summer in June (perhaps June 16th at 9 PM in the evening) when he called me on my cell phone to comment on events that transpired as mentioned below in the attached email as pertaining to his cousin, Knicks staffer Hassan Gonsalves:

- Stephon was upset that he felt his family member, Hassan, was being treated unfairly by Knicks management
- Stephon was not happy with the salary range for his cousin Hassan.
- I explained the timesheets and payroll process, and that Hassan would not be assigned to work more then 35 hours per work nor would he be assigned to work overtime and Hassan's salary was determined by Knicks management.
- I explained that Hassan was not granted a parking spot at 31st street garage and I did not approve him using my access code nor was I aware he was forging my signature to park his vehicle.

- Stephon was upset at these circumstances and expressed extreme displeasure at the Knicks front office staff, particularly mentioning Anucha
- Though time has passed, several comments I can recall Stephon making include:

**all referring to Anucha**
- "No one likes that black bitch"
- "Fuck that black bitch, she thinks she runs the Knicks, she don't run shit. I sell the tickets around here, not her, I put people in seats, this is my team."
- "We don't like her, she thinks she tells us what to do, she don't tell us shit"
- "Fuck that black bitch, she ain't shit and we'll see what happens this year"

the conversation was more detailed but to the best of my ability those are the only exact phrases I can recall. I did call you that night to give you a head's up that Stephon was angry with the situation and that Stephon had some hostile things to say about members of Knicks management.

sincerely

Dan Gladstone

-----Original Message-----

| | |
|---|---|
| **From:** | Gladstone, Dan |
| **Sent:** | Thursday, June 16, 2005 1:13 PM |
| **To:** | Browne Sanders, Anucha |
| **Cc:** | Buchholz, Karin |
| **Subject:** | Staffing Issues |
| **Importance:** | High |

Anucha

As per your request - here are 2 issues that occurred this week that need to be bought to your attention regarding Knicks Field Marketing staffer Hassan Gonsalves:

- **Time Sheets** - over the period of Hassan's employment (hired October 2004) he has had trouble completing his bi-weekly administrative time sheets properly (submitting to me for approval, for me to sign, and then submitting to payroll to process on time so that Hassan would receive a paycheck). I have had to return at least 6 timesheets for

1

Hassan to re-do and properly submit to me for approval/signature in order to reflect the proper time/hours worked on Knicks events, and as a result often Hassan has not had his timesheet submitted to payroll in order in time to get his check the following week. Recently Hassan again submitted a **timesheet reflecting overtime he was not approved to work** - I made a change in his hours to reflect what he WAS approved to work and submitted to payroll for him so that he would be paid on time to expedite the process. On this occasion, I submitted the timesheet and send it back to Hassan to correct, because I wanted to get it to payroll in a timely manner so he would be paid the following week.

- **Parking -** it has come to my attention through the managers at Central parking system that Hassan has been using my parking account (#3-6-9) for the 31st street lot to park his own personal vehicle on a frequent basis under my name. I did not approve nor give out my account to Hassan to park his car on my account nor use my code. In fact, I have been extremely clear to Hassan that he is NOT to drive nor EVER be behind the wheel of a MSG vehicle as the result of a background check on his driver's license which resulted in him not being permitted or legal to drive company vehicles, thus it is extremely important that he does not park on the company account as we could be liable for an accident that occurs in the lot or associated with him parking and driving under the Knicks.

Moving forward, I have attached a **DRAFT** of a memo I wanted to present to both Tasheem Ward & Hassan Gonsalves to meet with them and re-enforce the nature of their employment status with the Knicks...please review and let me know how to proceed. I can also forward a copy of this memo to HR to approve or comment on...please advise....



Staffing memo(June 16).doc

Thank you.

Dan Gladstone
New York Knicks
Director, Community Relations & Field Marketing
2 Penn Plaza - 14th Floor - New York, NY 10121

w# (212) 465-6411
f#  (212) 465-6047

get your Knicks tickets at ny.knicks.com

2

CONFIDENTIAL

MSG   6177

# Exhibit 5

REDACTED

| | |
|---|---|
| From: | Browne Sanders, Anucha |
| Sent: | Wednesday, December 07, 2005 8:47 PM |
| To: | Moran , John VP ER MSG |
| Cc: | Mills, Steve |
| Subject: | Fw: Issues |

As a follow up to last weeks meetings, steve said that you are reviewing all emails. I
want you to have this one as well.


-----Original Message-----
From: Buchholz, Karin <Karin.Buchholz@thegarden.com>
To: Browne Sanders, Anucha <Anucha.BrowneSanders@thegarden.com>
Sent: Mon Nov 28 21:04:21 2005
Subject: Issues

Anucha,

After our meeting with John Moran, I am documenting the instances where Stephon Marbury
made it clear to employees that he did not like you.  Last season, I asked Chris Bernard
to get several jerseys signed by Stephon and Stephon refused because he thought they were
requests from you.  Chris asked me not to say anything and said the reason Stephon wasn't
signing was because he didn't like you.  It took several days before we got the jerseys
signed after letting Stephon know that the jerseys were for Cablevision and a charitable
organization.  Stephon said he didn't want to do anything to help Anucha.    On several
occasions, Jamie Mathews said that Stephon did not want to cooperate with CR requests
because he did not like Anucha.  Dan Gladstone told me that Stephon called him on his cell
phone and said that wasn't going to do anything for "that bitch" and that he hated you.
It is common knowledge with the staff that Stephon doesn't like Anucha.

As you can imagine, this has made our job in Community Relations very difficult at times.


Karin

Karin J. Buchholz
Vice President,
Community Relations & Fan Development
New York Knicks
Two Pennsylvania Plaza
New York, NY 10121
(212) 465-6382
karin.buchholz@thegarden.com

1

CONFIDENTIAL

# Exhibit 6

| From: | Winkler, Gary |
|---|---|
| Sent: | Tuesday, December 13, 2005 12:31 PM |
| To: | Browne Sanders, Anucha |

ABS –

Per our conversation, I am aware that Petra was asked to check-in with the refs prior to games and make sure they were happy at some point last season.  I believe she did this once and the issue never resurfaced.  I recall the three of us speaking about this one day in your office last season.

Gary

Gary Winkler
Vice President, Event Presentation
New York Knicks
2 Penn Plaza,14th Floor
New York, NY 10121
PH: (212) 465-4437
FX: (212) 465-6062

Get your Knicks tickets today at www.nyknicks.com

REDACTED

1

MSG 00173
---------

CONFIDENTIAL

Exhibit 7

1

73NVTSEC            Conference
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    ROBERTA C. TSE,
3
4            Plaintiff,
4
5        v.                    03 CV 6234 (GEL)
5
6    UBS FINANCIAL SERVICES, INC.,
6
7            Defendant.
7
8    ------------------------------x
8                        New York, N.Y.
9                        March 23, 2007
9                        3:30 p.m.
10
10   Before:
11
11               HON. GERARD E. LYNCH,
12
12                    District Judge
13
13               APPEARANCES
14
14   BERANBAUM MENKEN BEN-ASHER & BIERMAN
15      Attorneys for Plaintiff
15   BY:  JOHN A. BERANBAUM
16      JASON J. ROZGER
16      KRISTEN FINLON
17
17   EPSTEIN BECKER & GREEN
18      Attorneys for Defendant
18   BY:  MARY A. GAMBARDELLA
19      ERIN CARNEY
19
20   ALSO PRESENT:  CLAUDIA COHEN, ESQ., UBS In-House Counsel
21
22
23
24
25

35

73NVTSEC              Conference

1   thing that ever happened to her because it freed her time to
2   develop a lucrative enterprise of self-employment or whether it
3   harmed her because she needed to put no more effort into her
4   trading after her firing, and was unable to find employment to
5   replace the income lost when she lost the UBS job.
6          Of course, the fact that the plaintiff is
7   independently wealthy, if she is, has nothing to do with the
8   matter; and if any limiting instruction is relevant on that
9   topic, I will give it.  Also, the defendant will not be allowed
10  to argue that plaintiff did not try to mitigate damages because
11  she has enough money from some other source to live on.
12         The issue is what she did or did not do to mitigate,
13  not why she did it.  If she sat at home and did nothing to look
14  for a job, it doesn't matter whether that was self-destructive
15  behavior or the result of laziness or the result of being rich
16  or whatever else.  What matters is what she did.  And the
17  possible prejudice that the jury could feel she isn't entitled
18  to damages because she's rich enough already is too hard to
19  separate from any purported probative argument as to her
20  motive.  But that form of prejudice does not outweigh highly
21  probative evidence, if there is any such, of what she did with
22  her time and how she did or did not replace the lost income,
23  which goes to the heart of any issue of damages.
24         Fifth.  The plaintiff moves to exclude evidence of a
25  purported after-acquired justification for her firing, that she

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

36

73NVTSEC                Conference

1   tape-recorded conversations with supervisors and colleagues, in
2   violation of company policy.
3        The defendants argue that the surreptitious taping
4   violated a clearly enforced company policy and, therefore, that
5   Ms. Tse would not have been fired -- I'm sorry, would have been
6   fired, in any event, when the taping was discovered.
7   Plaintiff's motion to exclude this evidence will be granted.
8        The law is clear that even if the defendant fired the
9   plaintiff for discriminatory reasons and knew nothing of some
10  legitimate reason that would have justified the firing, the
11  defendant can still cut off damages by proof of after-acquired
12  knowledge that would have led to her firing.  See McKennon v.
13  Nashville Banner, 513 U.S. 352 at 362 from 1995.
14       For example, if an employer unlawfully fires an
15  employee because of her age, but the employer can prove that it
16  would have fired the employee anyway at some later date due to
17  the discovery of some legitimate reason for firing her, such as
18  embezzlement, then the employee may only recover damages up to
19  the date on which the embezzlement was discovered; in other
20  words, up to the date in which the employer would have fired
21  her.
22       Plaintiff does not deny that her surreptitious taping
23  violated a company policy.  She claims, however, that the
24  taping was protected by the statutes that prohibit retaliation
25  against employees who participate in the investigation of civil

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

73NVTSEC              Conference

1  rights violations because the taping was intended to uncover
2  evidence to support her pending discrimination claims.
3  Therefore, she contends, she could not have legitimately been
4  fired for the taping.
5       Title 7 prohibits an employer from retaliating against
6  an employee who has "opposed any employment practice made
7  unlawful by the subchapter or because he has made a charge,
8  testified, assisted or participated in any manner in an
9  investigation, proceeding or hearing under this subchapter."
10  42 U.S.C., Section 2000e-3.
11      The Second Circuit has said that "The statute's use of
12  the phrase 'participate in any manner' evinces Congress's
13  intent to confer exceptionally broad protection, as the word
14  'any' has an expansive meaning; and thus, so long as Congress
15  did not add any language limiting the breadth of that word, the
16  term must be given literal effect."  Jute v. Hamilton
17  Sundstrand Corp., 420 F.3d 166 at 174 (2d Cir. 2005).
18      Although the phrase "protected activity" is to be
19  interpreted broadly, it has limits.  "Slapping one's harasser,
20  even in response to Title 7, Barred Harassment, is not a
21  protected activity."  Cruise v. Coach Stores, Incorporated, 202
22  F.3d 560 at 566 (2d Cir. 2000).
23      It appears that courts are to look at the employer's
24  legitimate need to forbid certain behavior that is simply too
25  disruptive or inimical in the employer's lawful interests;

38

73NVTSEC              Conference
1   thus, the Second Circuit agreed with another court that three
2   years of extremely disruptive behavior, including interrupting
3   meetings, misusing secretarial services, running up exorbitant
4   phone bills, inviting reporters to examine confidential salary
5   information and so on was so extreme as to be unprotected.  See
6   Grant v. Hazlet Strip Casting Corporation, 880 F.2d 1564 at
7   1570 (2d Cir. 1989) discussing Hochstadt v. Worcester
8   Foundation for Experimental Biology, 545 F.2d 222 (1st Cir.
9   1976).
10         Employers have an obvious interest in prohibiting
11   secret taping, but, of course, a great deal of
12   evidence-gathering activity by employees who suffer
13   discrimination is secret by necessity and may require an
14   employee to violate clear directives from the employer in a way
15   that would otherwise be inappropriate; thus, the Second Circuit
16   in Grant, just cited, found an employee's conduct protected
17   when he prepared a memo for his boss memorializing the boss's
18   discriminatory reasons for a hiring decision, and then refused
19   to destroy the memo after the boss signed it.
20         Coaxing one's boss into putting himself at legal
21   jeopardy, and then disobeying a direct order are certainly
22   legitimate causes for dismissal under normal circumstances, but
23   the Court found that these activities would be protected if the
24   employee believed himself to be gathering evidence of
25   discrimination.
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

39

73NVTSEC              Conference

1      The Second Circuit has not identified a clear test for
2   what activity is protected and what is not.  But in this case,
3   we need not struggle to find some precise formula because the
4   activity at issue, surreptitious taping in an effort to gather
5   evidence of discrimination, has already been identified as
6   protected activity.
7      In the case of Heller v. Champion International
8   Corporation, 891 F.2d 432 in 1989, the Second Circuit rejected
9   a district court's conclusion that an employee's dismissal for
10  secret taping was justified as a matter of law, at page 436.
11  It held that further factual inquiry was needed because "a
12  range of factors might have justified the employee's conduct."
13     The Court specifically identified the employee's
14  "belief that he was gathering evidence, in support of a
15  possible claim of age discrimination" as a factor that would
16  have justified the conduct, at page 437.
17     The dissent in that case warned that this holding
18  would likely mean that "every disgruntled employee in the
19  Second Circuit will feel free to report to work with a tape
20  recorder hidden on his person," at page 439.  And perhaps that
21  is the case we see before us.
22     Defendant cites at least one district court case from
23  outside the circuit, from the Middle District of North
24  Carolina, I believe, that takes a different view.  But the
25  Second Circuit has spoken clearly.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

40

73NVTSEC                Conference

1          Defendants argue that in Heller it was not clear that
2    the taping had violated a company policy.  That's a fair
3    distinction to make, but it can't be the basis of the decision,
4    because a company cannot define by contract what activity is
5    and is not protected by the civil rights laws.
6          In light of the Second Circuit's clear statement that
7    it constitutes protected activity, I cannot conclude that a
8    company policy could legitimately be applied to it in this
9    context.
10          In this case, the defendants have not made any claim
11    or cited any evidence that plaintiff was doing anything other
12    in her secret taping than gathering evidence to support her
13    pending discrimination complaints.  Therefore, I find that her
14    activity was protected and would not have constituted a
15    legitimate basis for termination when it was eventually
16    discovered.  And plaintiff's motion to exclude evidence of that
17    activity is granted.
18          Six.  The plaintiff seeks to exclude evidence that she
19    referred to certain contractors or workers as Mexican.  The
20    motion will be denied.
21          This is something of a tempest in a teapot.  If the
22    plaintiff testifies that UBS supervisors referred to her
23    clients as Asian or Oriental, it is entirely fair to ask her on
24    cross-examination whether she regards use of an ethnic
25    description of a customer in a business context as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300