UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                :
ANUCHA BROWNE SANDERS,          :
                                :
             Plaintiff,         :
                                :         06 Civ. 589 (GEL)
         -v-                :
                                :        **OPINION AND ORDER**
MADISON SQUARE GARDEN, L.P., et al.,  :
                                :
            Defendants.      :
                                :
------------------------------------------------------------x

Anne C. Vladeck, Kevin T. Mintzer, and
Karen Cacace, Vladeck, Waldman, Elias &
Engelhard, P.C., New York, NY, for plaintiff.

Ronald M. Green, Teresa M. Holland,
Barry A. Cozier, Brian G. Cesaratto, Epstein
Becker & Green, P.C., New York, NY, and
Amber L. Kagan, Morgan, Lewis & Bockius LLP,
New York, NY, for defendants MSG and Dolan.

Sue Ellen Eisenberg and Lucetta Franco,
Eisenberg & Bogas, P.C., Bloomfield Hills, MI,
Laurie Berke-Weiss and Louis Pechman,
Berke-Weiss & Pechman LLP, New York, NY,
for defendant Thomas.

GERARD E. LYNCH, District Judge:

       In this employment discrimination action, plaintiff Anucha Browne Sanders charges that

defendants Madison Square Garden, L.P., ("MSG"), Isiah Lord Thomas III, and James L. Dolan

subjected her to discrimination on the basis of sex, sexual harassment, and retaliation in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the New York State

Human Rights Law, N.Y. Exec. Law §§ 296 et seq. ("SHRL"), and the New York City Human

Rights Law, N.Y.C. Admin. Code §§ 8-107 et seq. ("CHRL").  Plaintiff moves for summary

judgment on her retaliation claim, arguing that defendants have failed to show a genuine issue of material fact as to that claim.  Defendant Thomas moves for summary judgment on that same claim insofar as it is asserted against him.  Defendants MSG and Dolan move for summary judgment on plaintiff's claims for pecuniary damage, arguing that her claims should be limited based on the discovery of after-acquired evidence.  Finally, all defendants move for summary judgment on plaintiff's claim for reputation damages.  The motions will be denied.

## BACKGROUND

Because the parties seek summary judgment on certain of plaintiff's claims – that is, because they ask the Court to find that certain of plaintiff's claims are so incontestable that judgment should be awarded to them without their having to present their case to a jury – for purposes of this motion the evidence on all disputed points must be viewed in the light most favorable to the party that opposes summary judgment.  On summary judgment, it is not the function of the Court to make factual findings or resolve disputed issues of fact.  Rather, the Court's responsibility is to decide whether there are triable issues of fact that require resolution by a jury at trial.  Consequently, nothing in this recitation should be taken as a factual finding, or as indicating any opinion on the part of the Court with respect to the merits of plaintiff's claims. In sketching the factual background for this motion, the Court merely indicates what the evidence would permit a jury to find, identifying significant disputes in the evidence.

## I.    Browne Sanders's Employment With The Knicks

Browne Sanders began her employment with MSG in November 2000 as a Vice-President of Marketing for the New York Knickerbockers ("Knicks"), a National Basketball Association ("NBA") franchise owned by MSG.  (Mintzer Aff. Ex. 15.)  As Vice-President of

Marketing, Browne Sanders's primary responsibility was to market the Knicks' team brand. (Pl. Dep. II 246-47.) Browne Sanders was also responsible for various facets of the Knicks' media and communications programs, game presentation, and event management. (Id.) Browne Sanders was hired by Stephen Mills, who was then MSG's Executive Vice-President for Franchise Operations. (Mills Dep. 47-49.) Mills was primarily responsible for evaluating Browne Sanders and recommending her for promotions and salary adjustments. (Mills Dep. 53-57, 99.)

As a Knicks executive, Browne Sanders had access to confidential financial and business proprietary material of MSG. (Mills Aff. ¶ 7.) When she was hired, Browne Sanders signed a copy of MSG's Confidentiality, Code of Business Conduct and Proprietary Property Agreement (the "Agreement") (Pl. Dep. II 44-46), which provided that "[d]uring [her] employment, [Browne Sanders] may not engage in activities or have personal or financial interests that may impair, or appear to impair, [her] independence or judgment or otherwise conflict with [her] responsibilities to [MSG]." (Cesaratto Aff. Ex. E.) Browne Sanders also signed MSG's "Employee Code of Conduct," which stated that "[p]ublic trust and confidence are the greatest assets held by [MSG]." (Pl. Dep. II 24; Cesaratto Aff. Ex. F.)

In March 2002, Browne Sanders was promoted to Senior Vice-President, Marketing & Business Operations. (Pl. Dep. II 83-85; Mills Dep. Ex. 4.) Her responsibilities expanded to include, among other things, oversight of the marketing and business operations budget. (Mills Aff. ¶ 8; Dolan Aff. ¶ 3.) Browne Sanders remained in that position until her termination in January 2006. Her total compensation for just over five years of employment with the Knicks exceeded $1,100,000. (Moran Aff. ¶ 11.) In her new role, plaintiff continued to report to Mills,

who had by then been promoted to President, MSG Sports Team Operations.  (Mills Dep. Exs. 1, 4.)

Thomas was hired as President of Basketball Operations for the Knicks in December 2003.  (Thomas Dep. 130.)  In that position, Thomas oversaw the coaches, players, and other Knicks personnel at the MSG Training Center located in Tarrytown, New York.  (Thomas Aff. ¶ 3.)  In addition, Thomas had an office at MSG's headquarters in Manhattan where Browne Sanders worked.  (Pl. Dep. I 213-14.)  Although Thomas did not supervise Browne Sanders, Browne Sanders was responsible for keeping Thomas informed about business developments related to the team.  (Pl. Dep. I 40 (stating that Browne Sanders had a "dotted line relationship" with Thomas).)

Until 2004, Browne Sanders received positive performance reviews and numerous bonuses.  (Dolan Dep. Ex. 16; Mills Dep. 56; Mills Dep. Exs. 3, 6-8, 11; Mintzer Aff. Ex. 22.)  Browne Sanders also had a good working relationship with Kevin Layden, the Knicks' President and General Manager until his termination in December 2003.  (Pl. Dep. I 33-34, 49.)  However, beginning in 2004, Browne Sanders began experiencing difficulties at work.  In March 2004, Browne Sanders met with Mills and Thomas to discuss a conflict between Thomas and Browne Sanders over their respective job responsibilities.  (See Pl. Dep. I 122-23; see generally Mills Dep. 189-201.  See also Olsen Dep. Ex. 7 (describing the "[r]ole conflict between Anucha and [Thomas]").)  Browne Sanders also began encountering conflict with other colleagues, including Frank Murphy, then-Senior Vice-President of Basketball Operations.  (Pl. Dep. I 240; see Thomas Dep. Ex. 1.)  In addition, in June 2005, Browne Sanders participated in a series of budget meetings with Mills, Dolan, and Hank Ratner, MSG's Vice-Chairman (Mills Dep. 124;

4

see Dolan Dep. 73; Ratner Dep. 80-87, 92), that Mills characterized as "disastrous." (Mills Dep. 124.) Browne Sanders acknowledges that a reasonable jury could find that her job performance generally declined in 2005. (Pl. Reply 9 n.8.)

## II.    The Sexual Harassment Allegations

Such a jury also could conclude that the relationship between Browne Sanders and Thomas became increasingly strained during 2005. Browne Sanders accuses Thomas of engaging in unwanted sexual advances; Thomas denies some of the alleged incidents and challenges Browne Sanders's interpretation of others. For purposes of this motion, the details of the disputed incidents need not be rehearsed. The flavor of the allegations is sufficiently conveyed by two alleged episodes. In May 2005, Browne Sanders told Peter Olsen, an MSG consultant and an advisor to Thomas, that Thomas had said that he loved her and requested that she "go off site" with him. (Olsen Dep. 117.) Thomas disputes this charge. (Thomas Dep. 213-14; 257-60.) Thomas acknowledges, however, that in December 2005, at a Knicks game, he attempted to kiss Browne Sanders on the cheek; when Browne Sanders pulled away, Thomas replied, "no love today?" (Thomas Dep. 258-59.)

During 2005 as well, Browne Sanders raised questions about alleged sexual harassment of other female employees by Knicks personnel. In June 2005, Browne Sanders informed her supervisee Dan Gladstone that one of Gladstone's subordinates, Hassan Gonsalves, had been accused of making harassing and derogatory comments towards female Knicks employees and about Browne Sanders. (Gladstone Dep. 207-12; Gladstone Dep. Ex. 7; Pl. Dep. Ex. 11.) When Gladstone questioned Stephon Marbury, a Knicks player and Gonsalves's cousin, about Browne Sanders's allegations, Marbury bluntly expressed his hostility to Browne Sanders. (Marbury

5

Dep. 28-32; Gladstone Dep. Ex. 7; Gladstone Dep. 216.)  When Browne Sanders informed John

Moran, MSG's Vice-President of Employee Relations, about Gonsalves's and Marbury's

behavior (Moran Dep. 70-75; Pl. Dep. II 352-53, 355-57), Gonsalves was terminated (Moran

Dep. 73-74), but Marbury was not questioned about Browne Sanders's allegations (id. 99, 115).

Towards the end of 2005, Browne Sanders began investigating and documenting the

allegedly inappropriate conduct of Thomas and Marbury.  In November 2005, Browne Sanders

spoke to Karen Buchholz, a Knicks Vice-President who reported to Browne Sanders, about

Buchholz's interactions with Thomas and Marbury, and requested that Buchholz send her an e-

mail documenting those interactions.  (Buchholz Dep. 124-33, 169-85; see Buchholz Dep. Ex.

1.)  Around the same time, Browne Sanders asked Gladstone to document his account of his

conversations with Marbury.  (Gladstone Dep. 215-19.)  In December 2005, Browne Sanders

asked another Knicks employee, Gary Winkler, to send her an e-mail documenting his

conversations with Petra Pope, the head of the Knicks' dance team, concerning allegations

(denied by Thomas) that Thomas had made inappropriate comments to Pope in 2004.  (Pl. Dep. I

176-78; Thomas Dep. 263-64; Olsen Dep. Ex. 7.)  Browne Sanders also asked other members of

her staff to document incidents of sexual harassment they witnessed at work.  (Pl. Dep. I 333-

34.)

Matters came to a head in December 2005 and January 2006.  On December 2 and 4,

Browne Sanders, accompanied by Buchholz, met with an attorney to discuss Browne Sanders's

sexual harassment complaint.  (See Buchholz Dep. 196-98.)  On December 22, counsel for

Browne Sanders met with counsel for MSG.  (Mintzer Aff. ¶ 25; Schoenfeld Aff. ¶ 4.)  At that

meeting, Browne Sanders's counsel informed MSG of Browne Sanders's sexual harassment

complaint.  (Mintzer Aff. ¶ 25.)  The attorneys agreed to "attempt to expedite a negotiated, good

faith resolution of Ms. Browne Sanders' claims."  (Id. ¶ 26; Mintzer Aff. Ex. 19.)

### III.    MSG's Internal Investigation and Browne Sanders's Termination

Shortly after the December 22 meeting, MSG assigned Moran and Rochelle Noel, an in-

house attorney for Cablevision, MSG's parent company, to conduct an internal investigation into

Browne Sanders's complaint.  (Schoenfeld Aff. ¶ 7.)  On January 6, 2006, Moran and Noel

interviewed Browne Sanders as part of that investigation.  (Mintzer Aff. Ex. 23.)

Thomas was interviewed by Moran and Noel on December 23, 2005, and January 11,

2006.  (Moran Dep. Exs. 10, 11; Noel Dep. Exs. 2, 13, 14.)  According to Moran and Noel,

Thomas claimed during the interview that Browne Sanders's allegations were false, and that

Browne Sanders had concocted the charges as a result of her conflict with Thomas over their

respective job responsibilities.  Specifically, Thomas claimed that he and Browne Sanders

"butted heads" because Thomas "wanted complete control of players['] time and

responsibilities," which Browne Sanders resisted, that Browne Sanders "wanted to be making

decisions" for Thomas, and that Browne Sanders acted like she was Thomas's boss.  (Moran

Dep. 299-300, 310-12; Moran Dep. Exs. 10, 11; Noel Dep. 64-67, 94-95. 232-233; Noel Dep.

Exs. 2, 13, 14.)  Thomas also provided the investigators with specific examples of Browne

Sanders's allegedly deficient job performance.  (Moran Dep. 315-16; Moran Dep. Ex. 11.)

Simultaneously with the investigation, Browne Sanders and MSG engaged in settlement

negotiations.  On December 27, Browne Sanders's counsel conveyed a settlement proposal to

MSG's counsel; MSG's counsel presented a counter-offer on December 30.  (Mintzer Aff. ¶¶

27-28 & Ex. 20.)  Along with the offer, MSG wrote to Browne Sanders's counsel that her

proposal lacked a "rational basis," but nevertheless that "MSG [was] ready, willing and able to continue as rapidly as possible [the parties'] good-faith discussions in order to find a mutually acceptable resolution." (Mintzer Aff. Ex. 20.) On January 3, 2006, Browne Sanders's counsel orally conveyed another settlement proposal to MSG's counsel. (Mintzer Aff. ¶ 29.)

On January 13, 2006, Noel and Moran finalized the findings of their investigation in an investigation summary. (Noel Dep. Ex. 14.) On January 19, 2006, Marc Schoenfeld, then-Acting General Counsel for MSG, drafted a memorandum on behalf of Rusty McCormack, MSG's Senior Vice-President of Human Resources, making recommendations to MSG based on the findings in the investigation summary (the "McCormack Memo" or "Memo"). (Franco Aff. Ex. G.) The McCormack Memo recommended that Thomas receive "sensit[ivity]" training, in light of the finding that Thomas "occasion[ally] used profanity and . . . raised his voice in the workplace," and to address "one occasion" on which Thomas "greeted Browne Sanders with a hug and kiss." (Id.) The McCormack Memo also recommended that Mills meet with Cablevision's human resources officers to discuss what "lessons, if any, may be learned from the" investigation. (Id.)

However, the Memo found that "most of Browne Sanders' allegations were not confirmed," and stated that Browne Sanders had exhibited a "poor relationship and difficulty interacting with Mills and other members of MSG management," and that Browne Sanders and Thomas had a "number of business disagreements in philosophy and management style." (Id.) "[I]n light of . . . issues related to . . . Browne Sanders' communication skills and overall effectiveness," the Memo recommended that Browne Sanders's employment should be terminated. (Id.) On January 19, 2006, Browne Sanders was dismissed from her employment

with the Knicks.  (Mintzer Aff. ¶ 30.)  The decision to fire Browne Sanders was made by Dolan, MSG's Chairman.  (Dolan Dep. 85, 87 ("[A]ll decisions at the Garden I make on my own.").)

Defendants have asserted two seemingly inconsistent reasons for Browne Sanders's termination.  First, defendants represented to the Equal Employment Opportunity Commission ("EEOC") that Browne Sanders was terminated because she "lacked the interpersonal skills to perform her job effectively, and refused to follow [MSG's] directions."  (Mintzer-Thomas Aff. Ex. 7, at 2.)  Specifically, Dolan testified that he started to believe that Browne Sanders did not have the skills to perform her job as early as the summer of 2005, when she failed to perform adequately at budget meetings.  (Dolan Dep. 61, 64, 186.)  Dolan also testified that he had been advised of Browne Sanders's alleged deficiencies by other Knicks executives, including Mills and Ratner, prior to the time that she made her harassment complaint.  (Dolan Dep. 48, 188; see Ratner Dep. 80, 83-87, 93, 105, 110; Mills Dep. 369-70.)

However, aspects of Dolan's testimony could be found to contradict defendants' representation to the EEOC that Browne Sanders was terminated due to her deficient work performance.  Dolan repeatedly testified that, although Browne Sanders's work performance was deficient, he would not have terminated Browne Sanders but for a concern entirely separate from her general work performance: her conduct during MSG's internal investigation of her sexual harassment complaint.  (Dolan Dep. 190, 192, 200-02.)  Specifically, Dolan stated that Browne Sanders "could have continued on doing her job" if she had not gone "off through the company attempting to garner support for [her] complaint," and if she had not attempted to extort MSG with an unreasonable settlement demand.  (Id. 192.  See id. 179 (describing Browne Sanders's settlement demand as an extortionate "threat").)  Indeed, Dolan appeared directly to deny that his

9

decision to fire Browne Sanders was based on the performance issues cited in the McCormack Memo and presented to the EEOC as the reason for her firing.  (Id. 64 ("I did not agree that she should be fired [due to her deficient work performance].").)  According to Dolan, Browne Sanders's alleged "tamper[ing]" with the investigation and abuse of her authority during that investigation, as reflected by the findings of the investigation summary and McCormack Memo, was the "last straw" that led to her termination.  (Id. 77, 178, 190.  See id. 202 ("[W]e had no way of knowing whether [plaintiff] was going to continue to [violate company policy] or not continue to do that, and so how could I then have her continue to run that operation. . . . *[T]hat is why she was let go*.") (emphasis added).)[1]

## IV.    The Current Litigation

On January 24, 2006, Browne Sanders filed the complaint that initiated the present action, alleging that she was discriminated against on the basis of her sex and terminated in retaliation for her sexual harassment complaint in violation of federal, state, and city law.  (Am. Compl. ¶¶ 54-85.)  That same day, defense counsel issued press statements on behalf of their clients.  MSG's and Dolan's counsel stated that Browne Sanders's claim was "baseless" (Watkins Dep. 45), and that Browne Sanders was terminated due to her deficient work performance.  (Id. 143-45.)  Thomas's counsel stated that Browne Sanders's claims were "a blatant attempt . . . to get a large some of money from [MSG] by taking advantage of [Thomas's] celebrity status."  (Mintzer-Thomas Aff. Ex. 4.)

Browne Sanders responded in a statement denying defendants' accusations, which she

---

[1] Dolan claims that, although he did not personally read the McCormack Memo (Dolan Dep. 195-96), McCormack informed him about Browne Sanders's alleged tampering with the investigation before she was terminated.  (See id. 85-89.)

read at a press conference on January 25, 2006.  (Cesaratto Aff. Ex. G.)  That same day, Thomas held a press conference in which he again denied Browne Sanders's claims and asserted that Browne Sanders was trying to use him as a "pawn" for her "financial gain."  (Thomas Aff. ¶ 7.) Two days later, Thomas held another press conference in which he again denied Browne Sanders's claims.  (Id.)

During discovery, MSG sought and obtained (over Browne Sanders's objection) copies of Browne Sanders's federal, New York, and New Jersey tax returns for 2000-2005.  (Cesaratto Aff. Ex. N.)  The 2001-2004 returns originally produced to MSG included Schedule C deductions for the expenses of a "direct marketing" business, totaling approximately $73,000. (Cesaratto Aff. Exs. P(PL4302), Q(4321), R(PL4353), S(PL4388).)  However, Browne Sanders shortly thereafter produced amended federal and state tax returns for 2003 and 2004.  (Cesaratto Aff. Ex. O.)  The 2003 and 2004 tax returns had been amended the day after Browne Sanders's initial production to remove the Schedule C deductions.  (Cesaratto Aff. Exs. W-X.)  The amendment resulted in the elimination of approximately $20,000 of business deductions for 2003 and 2004.  (Reimer Dep. 36-37.)  Although the 2001 and 2002 tax returns included identical deductions (Cesaratto Aff. Exs. P(PL4302), Q(4321)), they were not similarly amended.

 Browne Sanders denies that she ever operated a "direct marketing" business, but claims that the Schedule C deductions were due to accountant error and not a deliberate attempt to commit tax fraud.  (Pl. Dep. II 43-44; Halstead Dep. 44-46, 48, 50-51, 64-65, 72.)  Browne Sanders asserts that she did not amend her 2001 and 2002 tax returns on the advice of her current accountant, who informed her that there is a "three year statute of limitations" for amending tax returns.  (Reimer Dep. 67; see Reimer Aff. ¶ 19.)

Since her termination, Browne Sanders claims that she has applied for jobs with "many potential employers" in a "wide variety of businesses." (Pl. Aff. ¶¶ 3-4.) At the time the motions were filed, Browne Sanders was working as an independent contractor for a non-profit organization. (Id.) Her annual compensation was less than half of what she earned at MSG. (Id.)[2] According to Browne Sanders, since her termination, she has been repeatedly questioned about the circumstances of her dismissal from MSG by prospective employers and recruiters, some of whom have referred to her dismissal from MSG as a reason for her rejection from employment. (Id.) As a result of her alleged injury, Browne Sanders seeks to recover approximately $600,000 in back pay, $9,762,000 in front pay and reputation damages through age 65, an unspecified amount for lost pension payments and stock options, and reinstatement.[3] (Cesaratto Aff. Ex. HH.)

## DISCUSSION

Plaintiff alleges that defendants engaged in unlawful conduct by discriminating against her on the basis of her sex, subjecting her to sexual harassment, and retaliating against her for her sexual harassment charge. None of the parties move for judgment as a matter of law on plaintiff's sex discrimination or sexual harassment claims. Thus, the merits of those claims will be determined by a jury at trial, and the Court will not discuss their merits except to the extent that a discussion of the underlying claims is necessary to determination of the pending motions.

---

[2] At oral argument, plaintiff's counsel represented to the Court that Browne Sanders is no longer working for the same non-profit organization, and has taken a new position in Buffalo, New York. (Tr. 5.) However, counsel also stated that Browne Sanders is still receiving half the salary she received from the Knicks. (Id.)

[3] Although the initial complaint also included a claim for emotional distress damages (Compl. ¶ 58), the amended complaint does not include that claim. (See Tr. 11.)

However, both plaintiff and defendants argue that they are entitled to judgment as a matter of law on certain of plaintiff's other claims. Specifically, plaintiff argues that she is entitled to judgment on her retaliation claim, while defendant Thomas argues that he is entitled to judgment on that same claim insofar as it is asserted against him. In addition, all three defendants allege that certain of plaintiff's claims for damages are barred as a matter of law.

Thus, the pending motions require the Court to consider the evidence bearing on plaintiff's retaliation and damages claims. However, as stated above, such consideration of the merits does not constitute fact-finding by the Court. Instead, the following discussion only identifies significant factual disputes which preclude the granting of judgment as a matter of law. The Court's responsibility at this juncture is only to identify the factual disputes contained in the record; it will be the jury's responsibility to resolve those disputes at trial.

## I.    Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court's responsibility is to determine if there is a genuine issue to be tried, and not to resolve disputed issues of fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences and resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most favorable to the nonmoving party. Id. at 254-55. However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists.  See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995).  Once the moving party has made a showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise triable issues of fact.  Anderson, 477 U.S. at 250.  A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the nonmoving party.  Id. at 248.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) ("[If] . . . there is *any evidence* in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.") (emphasis added) (citation and internal quotation marks omitted).

## II.    The Damages Claims

### A.    After-Acquired Evidence

Defendants MSG and Dolan argue that Browne Sanders's erroneous tax returns conclusively establish that she was either operating an outside business or engaging in tax fraud while employed at MSG, either of which would constitute a violation of MSG policy.  Therefore, defendants argue that Browne Sanders cannot recover damages for any period after which MSG would have terminated her for her alleged misconduct.  (Mem. of Law In Support of Madison Square Garden, L.P. and James L. Dolan's Mot. for Partial Summ. J. ("MSG Mem.") 12.)  Plaintiff argues that factual disputes exist as to both whether she violated MSG policy and whether she would have been terminated due to such misconduct, thereby precluding summary judgment.  The Court agrees.

Defendants' attempt to limit plaintiff's damages is predicated on the so-called after-acquired evidence doctrine.  After-acquired evidence is defined as "evidence of employee

misconduct, such as criminal behavior, employer rule infractions, malpractice and the like, of which the employer *became aware* only *after* the employee's termination." <u>Ahing v. Lehman Bros.</u>, No. 94 Civ. 9027, 2000 WL 460443, at *11 (S.D.N.Y. Apr. 18, 2000) (emphasis in original), citing <u>Gant v. Wallingford Bd. of Educ.</u>, 195 F.3d 134, 147 n.17 (2d Cir. 1999). Since after-acquired evidence of employee wrongdoing by definition cannot have been the reason for the employee's firing, it does not bar the employee's claims of employment discrimination. <u>McKennon v. Nashville Banner Pub'g Co.</u>, 513 U.S. 352, 360-61 (1995). However, evidence that the employee would have been terminated for lawful reasons if the employer had been aware of the employee's misconduct will make certain remedies, such as reinstatement and front pay, unavailable. <u>Id.</u> at 362.[4]

In order to rely on the after-acquired evidence doctrine, the employer must establish that the employee's wrongdoing was of such severity that the employee would have been terminated for that reason alone if the employer had known of it at the time of discharge. <u>Id.</u> at 362-63. The doctrine is not limited to workplace misconduct; instead, an employee's damages may be limited by misconduct that is "criminal in nature," or that "compromise[s] the integrity of the employer's business." EEOC Compliance Manual 604:0182. <u>See</u> <u>Washington v. Lake County, Ill.</u>, 969 F.2d 250, 256-57 (7th Cir. 1992) (granting summary judgment on after-acquired evidence claim where plaintiff concealed his criminal conviction). However, summary judgment is

---

[4] Although <u>McKennon</u> was an age discrimination case, because the substantive, anti-discrimination provisions of the ADEA are modeled upon Title VII, <u>see</u> <u>Trans World Airlines, Inc. v. Thurston</u>, 469 U.S. 111, 121 (1985), "the <u>McKennon</u> analysis is applicable to the instant Title VII case." <u>Flores v. Buy Buy Baby, Inc.</u>, 118 F. Supp. 2d 425,433 n.3 (S.D.N.Y. 2000), citing <u>Manard v. Fort Howard Corp.</u>, 47 F.3d 1067 (10th Cir. 1995). <u>See</u> <u>Vichare v. AMBAC, Inc.</u>, 106 F.3d 457, 468 (2d Cir. 1996) (applying the after-acquired evidence doctrine to a Title VII case); <u>Greene v. Coach, Inc.</u>, 218 F. Supp. 2d 404, 412 (S.D.N.Y. 2002) (same).

inappropriate on an after-acquired evidence defense unless the employer establishes that there

are no "material issues of relevant fact as to whether [the employer] would have fired [the

employee] solely on the basis of" the newly-discovered information. Flores v. Buy Buy Baby,

Inc., 118 F. Supp. 2d 425, 432-34 (S.D.N.Y. 2000); see Quinby v. WestLB AG, No. 04 Civ.

7406, 2007 WL 1153994, at *16 (S.D.N.Y. Apr. 19, 2007) (denying summary judgment where

there were issues of fact as to whether plaintiff falsified his job application).

      Defendants argue that plaintiff's erroneous tax returns conclusively establish that she

either operated an outside business or committed tax fraud while employed at MSG. Under

either scenario, defendants argue that plaintiff's potential damages are limited to damages

plaintiff incurred prior to November 21, 2006, the date on which defendants first learned of her

alleged misconduct.[5] Plaintiff argues that her erroneous tax returns do not establish as a matter

of law that she violated MSG policy, and that, even if she did engage in misconduct, defendants

have not established as a matter of law that plaintiff would have been terminated if they had

discovered the misconduct prior to her termination.

      As an initial matter, plaintiff argues that defendants' after-acquired evidence defense fails

because her alleged misconduct involves her tax returns, which are "confidential and statutorily

protected from disclosure." (Pl. Mem. In Opp'n to Madison Square Garden, L.P. and James L.

Dolan's Mot. for Summ. J. ("Pl. Opp'n Mem. I") 17-18, citing Russell v. Bd. of Plumbing

---

    [5] Alternatively, defendants argue that plaintiff's damages claim should be limited as of June 2006, "when Plaintiff should have first produced [the tax returns] without asserting baseless relevance objections that delayed their production . . . ." (MSG Mem. 13.) However, as summary judgment on defendants' after-acquired evidence defense will be denied, it is unnecessary to determine here the precise date from which plaintiff's damages should arguably be limited. Should it be necessary, such a determination is best left to the fact finder at trial.

Exam'rs of County of Westchester, 74 F. Supp. 2d 339, 348 (S.D.N.Y. 1999).)  Thus, plaintiff

argues that defendants could not make employment decisions based on her tax returns because

the defendants were not legally entitled to review them.  However, although an employer cannot

require an employee to produce her tax returns through unlawful "coercion," Russell, 74 F.

Supp. 2d at 348, defendants did not unlawfully coerce plaintiff to produce her tax returns, but

instead were legally entitled to obtain such evidence during the discovery process.  Indeed, the

Court specifically ordered plaintiff to produce her tax returns as part of discovery.  (Cesaratto

Aff. Ex. M).  Thus, defendants did not engage in unlawful tactics to secure the tax returns, but

instead used the legal process to obtain evidence relevant to plaintiff's suit; such evidence may

be used against her as part of an after-acquired evidence defense, "even if the information [that

gave rise to the defense] might have gone undiscovered absent the suit."  McKennon, 513 U.S. at

352.

        Defendants' sole evidence of plaintiff's alleged misconduct is her 2001-2004 tax returns;

defendants have produced no other evidence that plaintiff either engaged in tax fraud or operated

an outside business in violation of MSG policy.  Although plaintiff concedes that her tax returns

were erroneous and that she did not actually operate an outside business from 2001-2004, she

argues that she was unaware of the deductions until after she produced her tax returns to

defendants during discovery.  In support of her argument, plaintiff has submitted evidence (1)

that she did not operate an outside business (Sanders Dep. 291; Pl. Dep. II 44-45; Weaver Dep.

34; see Mintzer Aff. Ex. 1, at BH0013 (answering "No" under the question "Did you start a

business?" on Browne Sanders's 1040 questionnaire)); and (2) that the false deductions were the

result of accountant error, and not a deliberate attempt to commit tax fraud (Halstead Dep. 44-46,

50-51, 64-65, 72, 185-88, 191; Reimer Dep. 24, 63-64).

Thus, plaintiff argues that she has submitted evidence creating an issue of fact as to whether she violated MSG policy. Nevertheless, defendants argue that the simple existence of the deductions alone establishes that plaintiff must have known about them, regardless of her testimony and evidence to the contrary. (MSG Mem. 19 ("'[A] jury could conclude from nothing more than the presence of [an] uncontested signature' that the violation was willful."), quoting United States v. Romanow, 509 F.2d 26, 27 (1st Cir. 1975).)

Whether Browne Sanders actually engaged in activity that would have led to her termination presents issues of fact that are properly resolved by the fact finder at trial, and not by the Court on summary judgment. With respect to defendants' more serious accusations of tax fraud, the principal issue concerns Browne Sanders's knowledge and intent. Browne Sanders now acknowledges that her tax returns claimed tens of thousands of dollars in deductions inaccurately attributed to expenses of a business enterprise she now contends never even existed. A fact finder could reasonably infer that Browne Sanders was aware of the erroneous deductions, and only amended her returns after she was required to produce them, as a cover-up for her "willfull[y] . . . fraudulent" deductions. (MSG Mem. 18, citing United States v. Magnus, 365 F.2d 1007 (2d Cir. 1966).) As defendants assert, it is reasonable to infer that a person (particularly a sophisticated business executive such as Browne Sanders) is aware of the contents of her own tax returns, which she has signed and declared to be true under penalty of perjury. Nevertheless, Browne Sanders has testified that she did not review the returns before filing them, and was not aware of the erroneous deductions until she produced her tax returns during discovery. Whether that explanation is credible is a question for the fact finder at trial. "In light

18

of the contradictory allegations and claims on both sides, this issue cannot be resolved on a motion for summary judgment." <u>Sweet v. Blue Cross and Blue Shield of Utica-Watertown, Inc.,</u> No. 93 Civ. 811, 1998 WL 695610, at *6 (N.D.N.Y. Sept. 28, 1998).[6]

Moreover, even if it were indisputable that Browne Sanders had committed tax fraud, defendants would still be required to show that she would have been terminated as a result of that misconduct. Defendants argue that Browne Sanders's alleged misconduct was a "direct violation" of the Agreement, and that her failure to "do the right thing" would inevitably have led to her termination. (MSG Mem. 19.) Defendants have submitted evidence that at least some MSG employees have been terminated for violating various MSG policies. (Moran Aff. ¶¶ 2, 5, 6 & Exs. A-G.) For example, one MSG employee was terminated after she was arrested for conspiracy to commit bank fraud (Moran Aff. Ex. A), and another was suspended after being arrested for driving under the influence and criminal impersonation (Moran Aff. Ex. C), conduct that defendants characterize as "significantly less serious unlawful conduct than that Plaintiff engaged in." (MSG Mem. 20.) In addition, Browne Sanders herself testified that she terminated one of her subordinates for attempting to engage in outside business activity while working at MSG. (Pl. Dep. II 240-41.)

Browne Sanders does not dispute that MSG has terminated employees for violating

---

[6] Similarly, issues of fact exist with respect to defendants' alternative, less persuasive charge that Browne Sanders operated an outside business in violation of company policy. Browne Sanders denies that she operated any such business, and defendants have offered no tangible proof of any business activity. But plaintiff is wrong that there is no evidence supporting defendants' charge (Pl. Opp'n Mem. I 10-11): her own sworn representations on her tax returns constitute admissible evidence confessing to such conduct. While a fact finder may be more likely to believe that the tax returns were falsehoods, it is for the fact finder to decide what to make of Browne Sanders's conflicting accounts.

company policies in the past; however, she argues that the policies are not applied across the board, but in an inconsistent fashion which belies defendants' argument that her alleged misconduct inevitably and unquestionably would have led to her termination.  For example, Browne Sanders provides evidence that other employees – including Thomas and Dolan – have violated MSG policies in the past but were not terminated as a result of their violations. (Mintzer Aff. Ex. 5, at 5; Thomas Dep. 18-19; Favorito Dep. 46-47.)  Furthermore, Browne Sanders argues that defendants' alleged comparators are not similarly situated to her because they neither held the same position as she nor engaged in the same type of misconduct.  For example, Browne Sanders claims that several of defendants' comparators were fired after they were arrested, while she has "not been charged with any crime."  (Pl. Opp'n Mem. I 18.)

Defendants argue that plaintiff's evidence is merely an attempt "to divert attention from her own wrongdoing by referencing the entirely inapposite alleged misconduct" of Dolan and Thomas (Reply Mem. of Law In Further Support of Madison Square Garden, L.P. and James L. Dolan's Mot. for Partial Summ. J. ("MSG Reply") 8 n.8), and that their admitted failure to produce similarly situated comparators "does *not* exonerate plaintiff" for her own alleged misconduct (id. 8 (emphasis in original)), but is simply the result of the unique nature of plaintiff's misconduct.

Defendants misinterpret the summary judgment standard.  In order to survive a motion for summary judgment, plaintiff does not need to be "exonerate[d]" from wrongdoing.  (Id.) Instead, plaintiff only needs to show that a genuine issue of fact exists as to whether she would have been terminated for her alleged misconduct.  Even if Browne Sanders did violate MSG policy, it is MSG's burden to show that such wrongdoing would have inevitably led to her

termination.  MSG's failure to establish that it terminates each and every employee that violates

its policies – whether those policies prohibit operating an outside business, committing tax fraud,

or otherwise – creates such an issue of fact.  See Sweet, 1998 WL 695610, at *6 (denying

summary judgment where employer failed to show that it would have fired plaintiff "as a matter

of settled company policy had it known of his actions").

Furthermore, although Dolan and Mills testified that they unquestionably would have

terminated Browne Sanders if they had known about her alleged misconduct, a fact finder is not

required to accept an employer's testimony in determining whether the doctrine should apply.

See Lewis v. Sugar Creek Stores, Inc., No. 96 Civ. 0100, 1996 WL 685730, at *3-4 (W.D.N.Y.

Nov. 25, 1996).  Even if Browne Sanders's termination would have been consistent with

reasonable business judgment, it does not follow that she inevitably would have been terminated

due to her alleged misconduct.  For example, a reasonable fact finder could determine that

plaintiff's continued employment with the Knicks, which had been publicized and honored

within the industry (see Pl. Aff. ¶ 2 (stating that Browne Sanders "was named one of the top 40

professionals in the sports field under 40 years old by the Sports Business Journal")), was so

important to MSG that MSG would not have terminated her, even if it had discovered her

alleged misconduct: "The fact that [defendants] could have fired [plaintiff] . . . does not mean

that they necessarily would have terminated [her]."  Lewis, at *4.  The Court cannot say as a

matter of law that plaintiff's alleged misconduct unquestionably outweighed whatever benefit

her continued employment would have provided to MSG, and thus "limiting damages is . . .

inappropriate at this stage of the proceedings."  Sweet, 1998 WL 695610, at *6.  See McLean-

Nur v. Dep't of Transp., City of N.Y., No. 98 Civ. 819, 2000 WL 297176, at *6 (S.D.N.Y. Mar.

21, 2000) (finding that it is not the responsibility of the Court to "scrutinize the personnel decisions of an employer").

Finally, defendants argue that plaintiff violated MSG policy, not only during the years that she actually filed the erroneous tax returns, but also in November 2006 when she failed to amend her 2001 and 2002 tax returns along with her 2003 and 2004 tax returns, even though she was no longer employed by MSG at that time. Defendants argue that plaintiff's failure to amend her 2001 and 2002 tax returns constitutes a "continu[ation]" of her prior misconduct, and allowed her to "retain . . . false tax benefits." (MSG Mem. 21.) Plaintiff argues that post-termination misconduct cannot be grounds for an after-acquired evidence defense, and even if it could, her failure to amend her 2001 and 2002 tax returns did not constitute misconduct because she was advised not to amend those returns by her accountant. (Reimer Dep. 67-68; Reimer Aff. ¶ 19.) Defendants are not remotely entitled to summary judgment on this issue.

The legal basis for defendants' argument is disputable. The Second Circuit has never had occasion to decide whether post-employment misconduct can support an after-acquired evidence defense. While at least one circuit has held that it can, see Sellers v. Mineta, 358 F.3d 1058, 1063 (8th Cir. 2004), and another has at least held out the possibility that it might, Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 555 (10th Cir. 1999), the weight of authority in the district courts is to the contrary. See, e.g., Sigmon v. Parker Chapin Flattau & Klimpl, 901 F. Supp. 667, 682-83 (S.D.N.Y. 1995); Ryder v. Westingthouse Elec. Corp., 879 F. Supp. 534, 537-38 (W.D. Pa. 1995).

It is unnecessary to rule on this legal issue to decide defendants' motion, however, because even if the after-acquired evidence doctrine applies, on this record factual issues

preclude a determination as a matter of law that plaintiff's actions in 2006 would have led to her firing. In holding that post-termination conduct, under certain circumstances, might justify an after-acquired evidence defense, the Eighth Circuit emphasized that the employer must nevertheless prove that it would have terminated the employee because of the newly discovered evidence. Sellers, 358 F.3d at 1063-64. In determining whether the employer has met this burden, the court "must look to the employer's actual employment practices and not merely the standards articulated in its employment manuals." Id. at 1064.

Intentionally filing false tax returns is criminal conduct, see 26 U.S.C. § 7206; if the jury finds that Browne Sanders engaged in such conduct, a reasonable fact-finder might well find that an employer becoming aware of such conduct would dismiss her. But if the jury finds that Browne Sanders, as she claims, filed inaccurate returns by mistake, her failure to amend her 2001 and 2002 tax returns, which the jury could find was based on the advice of qualified tax professionals that such amendment was not required by law, is a much less serious matter, if indeed it constitutes misconduct at all. None of defendants' examples of employees dismissed for misconduct is remotely comparable to this, and defendants point to no express policy of MSG that clearly covers Browne Sanders's actions in 2006. Whether defendants' argument is sufficiently supported, in fact or law, to be permitted at trial at all can be decided at a later time, but under no circumstances can it support a summary ruling limiting plaintiff's damages as a matter of law.

Accordingly, defendants' summary judgment motion to limit plaintiff's potential damages based upon after-acquired evidence is denied.

**B.    Reputational Damages**

23

Next, all three defendants move for summary judgment on plaintiff's claim for "reputational damage." (Am. Compl., Prayer for Relief, at (d).) Defendants argue that damages for reputational injury are not recoverable under Title VII, but instead are only recoverable for defamation, a claim plaintiff has not pleaded and has expressly disavowed. (Tr. 9.) Alternatively, defendants argue that plaintiff has not provided any evidence that she suffered reputational injury due to defendants' allegedly unlawful conduct. Plaintiff argues that she may recover for reputational injury under Title VII if such injury causes harm to her future earning capacity, and that issues of fact exist as to whether defendants' conduct caused such damage. The Court agrees with plaintiff.

Title VII authorizes compensatory damages for a plaintiff's "future pecuniary losses." 42 U.S.C. § 1981a(b)(3).[7] The Second Circuit has not ruled on whether "reputational damage" is specifically recoverable under Title VII as a form of future pecuniary loss. However, at least one court in this district has recently held, without discussion, that reputational injury is compensable under Title VII. See Osorio v. Source Enters., Inc., No. 05 Civ. 10029, 2007 WL 683985, at *1-2, 5 (S.D.N.Y. Mar. 2, 2007) (upholding a jury award of four million dollars for emotional distress and "harm to reputation").

In addition, the Seventh Circuit has held that injury to an employee's reputation is compensable under Title VII where such injury negatively impacts the employee's "lost future earnings." Williams v. Pharmacia, Inc., 137 F.3d 944, 954 (7th Cir. 1998). According to

---

[7] The Title VII damages analysis also applies to plaintiff's SHRL and CHRL claims. See Cruz v. Coach Stores, 202 F.3d 560, 565 n.1 (2d Cir. 2000) ("[C]onsideration of claims brought under the state and city human rights law parallels the analysis used in Title VII claims.") (citations omitted).

<u>Williams</u>, an award for reputational damages "compensates [the plaintiff] for a lifetime of diminished earnings resulting from the reputational harm she suffered" as a result of the employer's unlawful conduct.  <u>Id.</u> at 953.  Thus, where an employee can expect to encounter increased difficulty in finding comparable employment due to "injury to [her] professional standing" caused by an employer's unlawful conduct, the employee may recover for the added difficulty in the form of compensatory damages.  <u>Id.</u> at 952, citing EEOC Policy Guidances on Damages Provisions of 1991 Civil Rights Act, 8 FEPM 405:7091, 7095.

Defendants argue that reputational damages are only recoverable in New York as part of a defamation claim.  (MSG Mem. 24-25; Mem. of Law of Def. Isiah Thomas In Support of His Mot. for Partial Summ. J. ("Thomas Mem.") 15-18.)  Specifically, defendants argue that "when dealing with loss of reputation alone, a state law defamation action for damages is the appropriate means of vindicating that loss."  (Thomas Mem. 15, citing <u>Patterson v. City of Utica</u>, 370 F.3d 322, 330 (2d Cir. 2004).)  Defendants assert that plaintiff's reputational injury claim is merely an attempt by plaintiff to "bootstrap" a defamation claim to her discrimination suit.  (Thomas Mem. 14.)  Thus, defendants argue that plaintiff cannot recover for her reputational injury because she has not stated a claim for defamation.

The parties' respective concessions at oral argument, however, have considerably narrowed, if not eliminated entirely, their disagreement.  Plaintiff acknowledged that she does not seek to recover for injury to reputation distinct from her Title VII claims for lost future earnings.  (Tr. 9.)  Rather, plaintiff seeks to offer evidence of injury to reputation only insofar as defendants' alleged retaliatory conduct has damaged her "career prospects" and caused her to "los[e] future earnings."  (Pl. Mem. of Law in Opp'n to Isiah Thomas' Mot. for Partial Summ. J.

("Pl. Opp'n Mem. II") 21.)  Plaintiff's claim is thus not, as defendants argue, "defamation in disguise."  (Thomas Mem. 16.)  A defamation claim seeks to compensate a plaintiff for the non-economic loss of "reputation alone."  Patterson, 370 F.3d at 330.  The jury is asked to place a value on the plaintiff's "good name," which, as Iago explained, when "filche[d]," renders the victim "poor indeed."  William Shakespeare, Othello, act 3, sc. 3.  But plaintiff here does not seek redress for any damage to her general  reputation in the community; instead, plaintiff argues that loss of business reputation is a factor to be considered in assessing purely economic losses resulting from her allegedly retaliatory dismissal.  (See Tr. 22 ("It is our position . . . [that] reputational damages . . . is part of [our] compensatory damage claim . . . under Title VII.").)  She has specifically disavowed the notion that her reputational damages claim should be interpreted either as a defamation claim or as a separate retaliation claim.  (Pl. Opp'n Mem. II 15-16; see Tr. 9.)

Defendants, in turn, although arguing in their motion papers that a plaintiff cannot receive damages for reputational injury outside of the defamation law framework, nevertheless conceded at oral argument that a Title VII plaintiff may recover for reputational injury to the extent that such an injury negatively impacts an employee's future earnings capacity, regardless of whether the plaintiff has stated a claim for defamation.  (Tr. 18 ("I think the case law recognizes that [reputational damages] may be recovered [under Title VII]"); id. 21 "([L]ost future earnings may . . . be recovered as front pay . . . .").)  Therefore, to the extent that defendants seek summary judgment on plaintiff's reputational damages claim based on the argument that she has not stated a claim for defamation, that argument was rendered moot by the

parties' concessions at oral argument.[8]

In any event, defendants' concession that harm to a plaintiff's reputation may be recoverable under Title VII as part of a front pay award was well-considered. The Seventh Circuit's reasoning in Williams, although not binding on this Court, is highly persuasive.[9] There is no conceptual barrier between allowing a Title VII plaintiff to recover for future losses and allowing a Title VII plaintiff to present evidence of reputational injury in order to accurately quantify that loss. Indeed, there is significant overlap between the two considerations. Although

---

[8] Thomas's argument in his motion papers that he cannot be held liable for reputational damages because his press statements were privileged under defamation law (see Thomas Mem. 16-18) was also rendered moot at oral argument. (Tr. 22.)

[9] Defendants argue that the Court should not adopt the Williams holding because that case framed reputational damages as a form of non-pecuniary loss under Title VII, thereby allowing plaintiffs to "double-dip" with respect to future economic losses by claiming both front pay, a form of pecuniary damage, and reputational damages. (Thomas Reply 7, 8.) Defendants' argument is unavailing. First, to the extent that Williams held that reputational damages are a form of non-pecuniary loss, 137 F.3d at 953, the Court rejects that finding, as has the Seventh Circuit in a subsequent case: "The standard legal remedy of an award of lost future earnings [is] indistinguishable as a practical matter from front pay . . . ." Mattenson v. Baxter Healthcare Corp., 438 F.3d 763, 771 (7th Cir. 2006). Thus, there is no potential for "double dipping" here because lost future earning capacity is properly considered a factor within a front pay award. See Gentile v. County of Suffolk, 926 F.2d 142, 153 (2d Cir. 1991) ("[W]hen a plaintiff seeks compensation for the same damages under different legal theories of wrongdoing, the plaintiff should receive compensation for an item of damages only once.").

However, rejecting the reasoning of Williams wholesale would be tantamount to throwing the baby out with the bathwater. Williams is persuasive insofar as it found that a plaintiff may be entitled to reputational damages when such damages are considered as a factor within an award for loss of future earning capacity; this reasoning is sound, regardless of whether the damage is labeled pecuniary or non-pecuniary, and has been applied by other district courts within this Circuit. See Mahony v. KeySpan Corp., No. 04 Civ. 554, 2007 WL 805813, at *7 (E.D.N.Y. Mar. 12, 2007) ("When reputational injury caused by an employer's unlawful discrimination diminishes a plaintiff's future earnings capacity, [she] cannot be made whole without compensation for the future earnings [she] would have received absent the employer's unlawful activity."), quoting Williams, 137 F.3d at 953; see id. (denying defendant's request to strike plaintiff's demand for reputational damages in a Sarbanes-Oxley suit).

not every violation of Title VII results in an injury to an employee's reputation, where an employer's allegedly unlawful conduct is publicized or highly visible, either in society at large or within a specific industry, such conduct may negatively affect the employee's ability to secure future employment. For example, the employee may be deemed too controversial, or prospective employers may base their hiring decisions on accusations that came out during the course of the litigation, regardless of the legitimacy of those accusations. It is undisputed that the circumstances surrounding plaintiff's termination in this case have been widely publicized. (See Tr. 24.) Thus, preventing plaintiff from presenting such evidence here would artificially limit her damages, as the damages award would not accurately reflect plaintiff's actual future earning capacity.

Defendants also argue that plaintiff's evidence is insufficient as a matter of law to establish that her reputation has been damaged. Specifically, defendants argue that "there is nothing" in the record "to indicate a causal nexus between" defendants' allegedly unlawful conduct and plaintiff's "failure to obtain employment." (Thomas Reply 10.)

Defendants' argument is unavailing. Plaintiff has submitted her own testimony, as well as the testimony of Jeffrey Nix, Director of Scouting for the Knicks, in support of her argument. (See Pl. Aff. ¶¶ 3-4; Pl. Dep. 465-67, 482-83; Nix Dep. 246-49.) Browne Sanders testified that, while interviewing for jobs after she was terminated from the Knicks, she has been "asked repeatedly about the circumstances of [her] separation from MSG," and specifically asked about her lawsuit. (Pl. Aff. ¶ 4.)[10] A reasonable fact finder could determine that prospective

---

[10] Defendants object to the recruiters' statements as inadmissible hearsay; however, plaintiff does not offer the statements for their truth, but as evidence that prospective employers are aware of and interested in plaintiff's termination from the Knicks. (See Tr. 24.)

employers who questioned Browne Sanders about her lawsuit and subsequently failed to offer her a job were motivated to deny her employment at least in part by their reaction to her termination and the surrounding public controversy. Indeed, defendants conceded at oral argument that plaintiff's evidence presents a "weak inference" between her termination from the Knicks and her inability to find comparable employment. (Tr. 26.) The strength or weakness of plaintiff's evidence should not be weighed on a motion for summary judgment; as long as plaintiff has provided sufficient evidence from which a reasonable trier of fact *could* determine that plaintiff has suffered reputational injury, whether or not plaintiff *should* recover damages for that injury is an issue for the fact finder at trial.[11]

Finally, defendants Thomas and Dolan argue that they cannot be liable to plaintiff for reputational damages because neither of them participated in any activity that could have caused injury to her reputation. Specifically, Thomas argues that plaintiff's sexual harassment claim involves "private encounters" between himself and plaintiff, and as such could not have injured her professional reputation (Thomas Mem. 18), and Dolan argues that he "made no statements whatsoever to the media regarding Plaintiff's lawsuit" (MSG Mem. 25). Both arguments are inapposite. Plaintiff claims that her reputation was injured by her termination itself as well as by the press statements made after her termination. (Pl. Opp'n Mem. II 16 ("While a jury could find that the public statements that Thomas . . . made about plaintiff after she filed this suit have compounded plaintiff's reputational injury, the underlying cause of [that injury] is the

---

[11] Defendants assert that plaintiff's failure to name experts or identify witnesses that can testify to her reputational injury dooms her claim. (Thomas Reply 10.) However, while such testimony could bolster plaintiff's claim, it is not required for plaintiff to survive summary judgment. Expert testimony is not required for a fact finder to infer a causal link between questions about plaintiff's dispute with MSG and the subsequent failure to offer plaintiff a job.

discriminatory and retaliatory conduct that resulted in plaintiff's dismissal.").)  A jury could reasonably find that Browne Sanders's lawsuit and the ensuing public controversy were, under the circumstances, reasonably foreseeable consequences of her termination.  Thus, to the extent a jury finds that both Dolan and Thomas participated in a retaliatory termination that has potentially damaged plaintiff's reputation and limited her ability to mitigate economic damages resulting from her firing, both may be liable for the ensuing damages.

Accordingly, defendants' motion for summary judgment on plaintiff's reputational damages claim is denied.

## III.    The Retaliation Claim

### A.    Plaintiff's Motion

Plaintiff contends that, based on the current record, "a jury would be compelled to find that [defendants] dismissed [her] because she engaged in protected activity."  (Pl. Mem. 11.) Defendants, however, argue that they have presented evidence creating issues of material fact with respect to several elements of plaintiff's claim.  Because the Court agrees that issues of fact preclude summary judgment on plaintiff's retaliation claim, plaintiff's motion will be denied.

Section 704(a) of Title VII states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To state a prima facie case of retaliation, plaintiff must show that: (1) she engaged in a protected activity; (2) defendant was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal

connection between the protected activity and the adverse action.  See Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996).

If plaintiff satisfies the prima facie test for retaliation, the burden shifts to the employer to show a legitimate, non-retaliatory reason for the adverse employment action.  Davis v. State Univ. of N.Y., 802 F.2d 638, 641 (2d Cir. 1986).  If the employer satisfies this burden, the presumption of retaliation drops from the case, and the burden shifts back to plaintiff to show that the employer's legitimate, non-retaliatory reason for the adverse employment action is actually a pretext for retaliation.  Id.

Browne Sanders argues that Dolan's testimony conclusively establishes that she was fired because of her complaints of sexual harassment.  The argument is not without force. Unlike the typical Title VII termination plaintiff, who argues that she was fired for retaliatory (or discriminatory) reasons, while the defendant employer contends that the plaintiff was fired for performance reasons entirely unrelated to her complaints of unequal treatment, Browne Sanders has the benefit of Dolan's testimony that (1) he personally and unilaterally decided to fire Browne Sanders (Dolan Dep. 85, 87); (2) although he was dissatisfied with her performance, he would *not* have fired her for performance-related reasons, but for her actions in connected to her complaints of discrimination, which were the "last straw" that led to her termination (id. 190, 192, 200-02).  Plaintiff thus argues that Dolan's testimony amounts to a conclusive admission of retaliatory firing.

Defendants argue that, despite this testimony, plaintiff has not established as a matter of law that her termination was the result of unlawful retaliation.  In general, they argue that Dolan's testimony (which is not entirely clear or consistent) should not be read as conceding that

31

Browne Sanders was fired for complaining about sexual harassment, but as asserting that she was fired for what he regarded as her bad faith efforts to obstruct the investigation of her complaints by pressuring her subordinates to support her case, and her bad faith efforts to "extort" money from MSG (Def. Resp. 20) by deliberately false accusations in which she herself did not believe. In specific legal terms, defendants thus argue that there are issues of fact about (1) whether Browne Sanders held a good faith belief that she was subjected to sexual harassment, and (2) whether she was fired because of her sexual harassment complaint or for legitimate, non-retaliatory reasons.

### 1.    Protected Activity

Defendants' first argument is that even if Browne Sanders was fired for her actions in connection with her allegations of sexual harassment, factual issues remain about whether those actions constituted protected activity. In the most common type of retaliation case, although plaintiff "need not establish that the conduct [s]he opposed was in fact a violation of Title VII" to show that she engaged in protected activity, Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988), plaintiff must show that she had a "good faith, reasonable belief" for making the complaint. Id. In other words, to establish her retaliation claim, Browne Sanders need not prove that Thomas's actions actually amounted to unlawful discriminatory conduct. She could not legally be fired for complaining about Thomas's alleged sexual harassment, even if his actions did not amount to illegal sexual harassment, provided that she had a good faith, reasonable belief that it did. A deliberately false allegation concocted in bad faith, or a complaint about conduct that no reasonable person would believe was actionable discrimination, however, confers no protection. Thus, the relevant inquiry is: (1) whether,

32

considering "the totality of the circumstances," there was an objective basis for the belief that defendants had engaged in unlawful conduct, De Los Santos v. City of New York, 482 F. Supp. 2d 346, 355 (S.D.N.Y. 2007), citing Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998), and (2) whether plaintiff herself subjectively believed that defendants had engaged in unlawful conduct. See De Los Santos, 482 F. Supp. 2d at 356. See, e.g., Moore v. Cal. Inst. of Tech. Jet Propulsion Lab., 275 F.3d 838, 846 n.1 (9th Cir. 2002) (describing the protected activity standard as having "both a subjective and an objective prong").

### a.    Participation Clause v. Opposition Clause

As an initial matter, plaintiff argues that she does not fall within this rule – that is, that she need not show that she held a "reasonable, good faith" belief – because her retaliation claim should be analyzed under the participation, and not opposition, clause of § 704(a).  (Pl. Mem. 12.)  Section 704(a) enumerates two ways in which a complainant can establish she was engaged in protected activity.  The rule set forth above applies to cases under the "opposition clause," which protects a complainant who *opposes* an employment practice made unlawful under the provisions of Title VII, either by way of formal or informal protests.  See Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).  Under the "participation clause," in contrast, a complainant engages in  protected activity if she *participates* in a proceeding brought under Title VII, for example, by responding to an EEOC investigation or testifying in a Title VII lawsuit. See Deravin v. Kerik, 335 F.3d 195, 203-04 (2d Cir. 2003).

The participation clause has indeed been interpreted more broadly than the opposition clause.  See Deravin, 335 F.3d at 203 n.6; see, e.g., id. at 203 (noting that § 704(a)'s language is "expansive and seemingly contains no limitations").  While an employee who opposes an

33

employer's conduct must show that she held a reasonable, good faith belief that the employer

violated Title VII, an employee who participates in an investigation into such conduct is not

required to show such a reasonable, good faith belief; instead, the "expansive" protection

provided by the participation clause protects "any" conduct of the participant, Deravin, 335 F.3d

at 203, even if such conduct is "false" or "malicious."  Proulx v. Citibank, N.A., 659 F. Supp.

972, 978 (S.D.N.Y. 1987).

        Plaintiff argues that she is not required to show that her complaints were made

reasonably and in good faith because the evidence gathering she did prior to the time that she

filed an internal complaint constitutes participation in an investigation under § 704(a).  Although

plaintiff recognizes that the vast majority of the cases in which the participation clause was

applied involved activity that occurred after the complainant filed an EEOC charge or initiated a

Title VII lawsuit (see Letter from Kevin T. Mintzer to the Court, July 5, 2007, at 1), she

nevertheless argues that the Second Circuit has held that "gathering evidence for a future

lawsuit," such as that done by plaintiff here, constitutes protected activity under the participation

clause, even if done in the context of an internal investigation or "[i]nformal settlement

discussions," and not in the context of an official Title VII proceeding.  (Pl. Reply 6, citing

Heller v. Champion Int'l Corp., 891 F.2d 432 (2d Cir. 1989) and Grant v. Hazelett Strip-Casting

Corp., 880 F.3d 1564 (2d Cir. 1989).)

        Plaintiff's argument is unavailing for three reasons.  First, according to both the actual

language of § 704(a) and its judicial interpretation, a complainant's activity is only protected

under the participation clause if such activity takes place in the context of a Title VII

"proceeding," such as an EEOC investigation or Title VII lawsuit.  See Jowers v. Lakeside

34

Family and Children's Servs., No. 03 Civ. 8730, 2005 WL 3134019, at *4 (S.D.N.Y. Nov. 22,

2005) (rejecting plaintiff's claims that he suffered retaliation "during a time period when he was

not participating in any Title VII proceeding").  Plaintiff undertook her own investigation *prior*

to filing a charge with the EEOC or initiating this lawsuit.  Thus, plaintiff's personal

investigation into her sexual harassment charge does not constitute "participation" under §

704(a).  Compare McMenemy v. City of Rochester, 241 F.3d 279, 283 (2d Cir. 2001) (analyzing

plaintiff's claim under the opposition clause where plaintiff personally investigated co-worker's

sexual harassment allegations), Jowers, 2005 WL 3134019, at *5 (analyzing plaintiff's claim

under the opposition clause where plaintiff alleged that his employer retaliated against him

because of a series of internal complaints), and Kotcher v. Rosa and Sullivan Appliance Ctr.,

Inc., 957 F.2d 59, 65 (2d Cir. 1992) (plaintiff's internal sexual harassment complaint was

considered "opposition to the unlawful practice of sexual harassment," and therefore protected

under the opposition, and not participation, clause), with Jute v. Hamilton Sundstrand Corp., 420

F.3d 166, 175 (2d Cir. 2005) (analyzing plaintiff's claim under the participation clause where

plaintiff was named as a witness in a co-worker's Title VII lawsuit).

Second, to the extent that Grant or Heller left any ambiguity concerning the distinction

between the participation clause and the opposition clause, such ambiguity was removed by the

Circuit in Deravin.  Deravin clarified that the participation clause applies to participation "*in*

*Title VII proceedings*."  335 F.3d at 203 (emphasis added).  See id. (finding that "defending

oneself against charges of discrimination" during trial is protected by the participation clause).

Moreover, according to Deravin, the purpose of the expansive protection of the participation

clause is "to ensure the overall integrity of the administrative process and encourage testimony,"

id. at 204; plaintiff's internal investigation of her sexual harassment charge does not implicate the "integrity of the administrative process," nor does it "encourage testimony" within that process, and thus does not fit within the boundaries of the participation clause. The Deravin court also emphasized that such an interpretation of the participation clause is consistent with the EEOC's position. See id., citing EEOC Compliance Manual § 8-II(C)(1) n.24 (May 20, 1998).[12]

Finally, adopting plaintiff's analysis here would engender significant inequities in the workplace for employers. The goal of Title VII is to eliminate unlawful bias from the workplace; however, adherence to Title VII should not prevent employers from making legitimate, business-related decisions by hindering them with the specter of potential, unwarranted litigation. The reasonable, good faith belief standard was formulated to provide employees the opportunity to oppose discriminatory practices without having to fear retaliation for their complaint should it prove to be unsubstantiated, as long as the employee actually believed in the legitimacy of the complaint and the complaint was reasonable. Such protection is necessary to encourage employees to come forward to challenge workplace practices they believe are discriminatory without fear of retaliation if a court or administrative agency ultimately disagrees with their position. Such good faith challenges have a value in policing illegal activity and furthering the development of discrimination law.

Deliberately false and malicious complaints of discrimination, however, have no such value. Such claims injure the reputation of those unjustly accused, without countervailing benefits. Prohibiting an employer from disciplining an employee who raises a discrimination

---

[12] "[I]nformal agency interpretations are entitled to deference so long as they are persuasive." Deravin, 335 F.3d at 204 n. 7, citing McMenemy, 241 F.3d at 284.

complaint in which she does not actually believe would permit employees to engage in disruptive or malicious conduct for their own personal gain, and not with the intent of eliminating workplace discrimination.  An employee so privileged could shield herself from legitimate, non-discriminatory adverse employment decisions simply by falsely claiming that she was investigating workplace discrimination, thereby preventing an employer from taking any adverse action against the employee for fear of potential litigation.  Protecting employees from legitimate, non-discriminatory business decisions not only fails to further Title VII's goal of eliminating unlawful bias from the workplace, but it undermines that goal by de-legitimatizing good faith, reasonable discrimination complaints, and potentially transforming Title VII from a sword against unlawful bias into a shield against non-discriminatory business decisions.

Seen in this light, the more absolute prohibition of retaliation for participation in Title VII proceedings might appear anomalous.  If properly limited to actual participation in proceedings, however, it makes sense.  Like the absolute privilege extended by many states, including New York, for defamatory statements made in the context of litigation, see Kelly v. Albarino, 485 F.3d 664, 665 (2d Cir. 2007), such a carefully limited absolute privilege is necessary to assure witnesses in judicial or administrative proceedings, whose participation is necessary to the proper functioning of the adjudicative system, that their participation will not subject them to adverse consequences such as defamation suits or adverse employment actions. Such expansive protection is not necessary for one who complains to her employer and seeks a financial reward for doing so; such conduct is adequately protected by the usual rule insulating the employee from retaliation when the complaint is made reasonably and in good faith.

**b.     Reasonable, Good Faith Belief**

Defendants do not dispute that a sexual harassment charge or participation in settlement negotiations can constitute "protected activity" under Title VII.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 217 (2d Cir. 2001) (hiring an attorney to pursue gender discrimination claim constitutes protected activity); Sprott v. Franco, No. 94 Civ. 3818, 1997 WL 79813, at *13 (S.D.N.Y. Feb. 25, 1997) (engaging in settlement negotiations constitutes protected activity). Nor do they argue, for purposes of this motion, that plaintiff's charge of sexual harassment was reasonable.[13]  Instead, defendants argue that plaintiff's belief was not held in good faith. Specifically, defendants argue that plaintiff's professed good faith belief that defendants engaged in unlawful behavior is belied by: (1) her failure to express concern about Thomas's alleged harassing behavior until after she sensed that her job was in jeopardy, and (2) her conduct during settlement negotiations.  Conversely, plaintiff argues that the evidence conclusively establishes that she subjectively believed that Thomas's conduct constituted sexual harassment prior to the time that she formally complained about that conduct, and that both parties agreed that the settlement negotiations proceeded in good faith.

Construing the facts in the light most favorable to defendants, as the Court must in the context of a summary judgment motion, plaintiff has not established that she held a good faith belief as a matter of law.  Defendants have produced evidence showing that plaintiff did not formally complain about the alleged sexual harassment until after she sensed her job was in

---

[13] Defendants vigorously contest at least some of the allegations against Thomas, and presumably will argue at trial that those actions he admits do not amount to illegal harassment. However, it is strongly arguable that an employee subjected to Thomas's admitted actions could reasonably consider them harassing, even if a jury could ultimately fairly conclude that those actions did not constitute prohibited discrimination.  Since defendants do not contest that such a complaint would be reasonable, the Court assumes without deciding that it would be.

jeopardy. Defendants' evidence shows that, prior to December 2005, plaintiff's job performance had declined, and that her superiors, including Mills and Dolan, had repeatedly expressed concerns over her job performance. (See Def. Resp. 4-7.) These concerns ranged from plaintiff's inability to manage the organization's budget (Mills Dep. 123-27; Dolan Dep. 73; Ratner Dep. 80-87; see Dolan Dep. 64-67, 196-97 (describing meeting between Dolan, Mills, and Ratner about plaintiff's allegedly deficient financial skills)), to her inability to communicate with members of her staff (see McCormack Dep. 123-24; Pl. Dep. Ex. FF), to her inability to efficiently and successfully plan Knicks media events (see Pl. Dep. Ex. FF; Brown Dep. 244-49; McCormack Dep. 93-100; Moran Dep. 164-66). Indeed, plaintiff's job performance allegedly became so deficient that Mills agreed to help her find another job prior to the time that she filed a sexual harassment charge. (Mills Dep. 124.)

For purposes of this motion, plaintiff does not dispute defendants' evidence of her deficient work performance, but merely calls it mostly "irrelevant" to her retaliation claim. (Pl. Mem. 9 n.8.) Plaintiff is incorrect. Evidence that plaintiff only made her sexual harassment complaint *after* she felt that her employment was in jeopardy is relevant to whether her complaint was made in good faith, or whether it was concocted in an attempt to secure what was basically an "extort[ionate]" severance package. (Def. Resp. 20.) While there is some evidence that plaintiff did express concerns about Thomas's alleged harassment prior to her formal complaint in December 2005 (see Olsen Dep. 117-19), she only expressed such concerns once and she did not follow up with a formal complaint until seven months later. In addition, defendants present the testimony of other Knicks employees who swear that plaintiff did not express concerns over Thomas's behavior until November 2005. (See Buchholz Dep. 200

(stating that Buchholz and plaintiff "never once" had a conversation about Thomas's behavior until November 2005)).  Thus, a reasonable trier of fact could find that the close timing between plaintiff's concerns over her job security and her sexual harassment complaint indicates that her complaint was not made in good faith, but instead was an attempt to avoid the consequences of her increasingly deficient work performance.

In addition, a reasonable trier of fact could find that plaintiff's conduct during settlement negotiations belies her supposed good faith belief in the sexual harassment charge.  For example, plaintiff offered to settle her claim for around $6 million, which amounted to over two decades of front-pay compensation, even though she had not yet been terminated, and MSG had only received official notice of her claim a few days prior to her demand and had not yet had the opportunity to fully investigate her claim.  (See Mintzer Aff. Ex. 20 (characterizing plaintiff's proposal as lacking a "rational basis").)  Furthermore, plaintiff threatened to go public with a lawsuit should MSG not agree to her demand in order to "teach [MSG] a lesson."  (Reynolds Aff. ¶ 8; see id. ("Plaintiff's counsel stated that Plaintiff 'wants money, lots of money.'").)  Plaintiff does not dispute the accuracy of this account of her settlement position (Pl. Reply 2 n.3), but only argues that her "settlement position was entirely appropriate" (id. 2), and that she had a "right" to threaten to go public with her complaint (id. 2 n.2, citing Nigro v. Pickett, 816 N.Y.S.2d 698 (Table), 2006 WL 940636, at *3 (N.Y. Sup. Ct. Westchester Cty. 2006).)  However, even if plaintiff had such a right, the question of whether plaintiff's settlement position was legitimate or whether it was a coercive attempt to extort money from defendants creates an issue of fact as to plaintiff's "motive[]" for filing her sexual harassment charge.  Spadola v. New York City Trans. Auth., 242 F. Supp. 2d 284, 292 (S.D.N.Y. 2003); see id. (finding that

40

Congress did not intend for Title VII "to arm employees with a tactical coercive weapon that may be turned against the employer as a means for the asserted victims to advance their own retaliatory motives . . . , and thereby extract employment concessions").

Plaintiff argues that a jury's consideration of the appropriateness of her settlement proposals would "inhibit settlement discussions and interfere with the effective administration of justice." (Pl. Reply 1-2, citing Pierce v. F.R. Tripler & Co., 955 F.2d 820, 827–28 (2d Cir. 1992).) But defendants claim that those proposals were a mere smokescreen for an extortionate demand, and that "the administration of justice" is not furthered by such demands. (Id.) It remains an issue of fact whether plaintiff's demands were appropriate or whether they were attempts to secure an extortionate settlement from defendants.

Defendants also argue that there is an issue of fact as to whether plaintiff's "disruptive" conduct in investigating her complaint constitutes protected activity under Title VII. (Def. Resp. 19-20.) Defendants claim that plaintiff's attempts to gather evidence for her sexual harassment charge by "requiring her employees to make written statements, in violation of MSG policy" amounted to "tampering" with their internal investigation and resulted in a disruption to the workplace. (Id. 20.) In addition, defendants present the testimony of Buchholz, who testified that plaintiff "force[d]" her into complying with her requests to substantiate her charge. (See Buchholz Dep. 198.) Conversely, plaintiff argues that she did not "tamper" with the investigation, but merely asked her staff to write short e-mails in support of her claim which required only a "de minimis expenditure of time" from her staff, and that she was entitled under Title VII to investigate her own claim, notwithstanding MSG's company policy. (Pl. Reply 4.)

Although "[a]n employee is privileged to report and protest workplace discrimination,

41

. . . not all forms of protest are protected by Title VII's prohibition on retaliation." <u>Matima v. Celli</u>, 228 F.3d 68, 78 (2d Cir. 2000). Instead, "the way in which an employee presses complaints of discrimination can be so disruptive or insubordinate that it strips away protections against retaliation." <u>Id</u>. at 79. The line between protected opposition and disruptive conduct is not sufficiently clear to allow the Court to determine as a matter of law that plaintiff's conduct was protected. <u>Compare</u> <u>Matima</u>, 228 F.3d at 80-81 (jury found employee's repeated confrontations with supervisors about his discrimination charge to be not protected), <u>with</u> <u>Grant</u>, 880 F.2d at 1570 (jury found employee's evidence gathering to be protected). Thus, whether plaintiff's conduct was so disruptive as to strip it of the protection afforded by Title VII is an issue that is best left for jury determination, as it was in <u>Matima</u> and <u>Grant</u>, and is improper for resolution on summary judgment.

Finally, although there is an issue of fact as to whether plaintiff's belief was held in good faith, it should be noted that if the complaint was made in good faith, it was fully protected. An employee may hold a good faith belief that she was harassed, even where the employee's belief was "baseless and perhaps motivated by animosity," <u>Lake v. Concord Family Servs.</u>, No. 96 Civ. 511, 2000 WL 307374, at *6 (E.D.N.Y. Feb. 16, 2000), as long as the belief was "honest and bona fide." <u>Reilly v. Beth Israel Med. Ctr.</u>, No. 97 Civ. 7712, 1999 WL 185261, at *4 (S.D.N.Y. Mar. 31, 1999), citing <u>Little v. United Techs., Carrier Transicold Div.</u>, 103 F.3d 956, 960 (11th Cir. 1997). Here, plaintiff has presented evidence that she subjectively believed that she had been subjected to sexual harassment, and defendants do not dispute that such a belief, if actually held, was reasonable. A reasonable juror would be entirely justified, on this record, in accepting that evidence; indeed, it may well appear that defendants' effort to discredit a complaint with an

adequate objective basis by challenging the plaintiff's subjective belief will be an uphill battle at best.

In ruling that defendants' evidence of plaintiff's increasingly deficient job performance, combined with evidence of plaintiff's conduct during settlement negotiations, creates an issue of fact for trial, the Court makes no fact-finding adverse to Browne Sanders. Instead, the Court simply cannot say as a matter of law that plaintiff's belief was "honest and bona fide." Reilly, 1999 WL 185261, at *4. Such a fact-specific inquiry is best left for jury determination, and is improper for resolution on summary judgment. See, e.g., Nugent v. St. Luke's/Roosevelt Hosp. Ctr., No. 05 Civ. 5109, 2007 WL 1149979, at *8 (S.D.N.Y. Apr. 18, 2007) (summary judgment is generally inappropriate where state of mind is at issue).

### 2.     Retaliation or Legitimate Firing

Defendants also argue that there is an issue of fact as to whether, assuming Browne Sanders engaged in legitimate protected activity, she was fired because of that activity or for other reasons. As noted above, defendants contend that plaintiff was terminated, not because she complained of sexual harassment, but because of their perception that her complaint was fraudulently concocted in an attempt to "extort" defendants, and supported by illegitimate efforts to influence potential witnesses. (Def. Resp. 20.)

Plaintiff's retaliation claim is indeed formidable. Plaintiff may show a causal connection between her protected activity and her firing either (1) "*indirectly*," by presenting evidence of temporal proximity between the protected activity and adverse action, or (2) "*directly*, through evidence of retaliatory animus directed against . . . plaintiff by the defendant." Commodari v. Long Island Univ., 89 F. Supp. 2d 353, 376 (E.D.N.Y. 2000) (emphasis in original), citing

43

DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987).  Browne Sanders

can present evidence of both types.

First, the temporal proximity between plaintiff's complaint and her termination – which

occurred less than one month after her complaint – would alone permit a jury to find a causal

connection between the complaint and her dismissal.  See Uddin v. City of New York, 427 F.

Supp. 2d 414, 426 (S.D.N.Y. 2006) ("For mere temporal proximity to establish causality, the

intervening period must be 'very close.'"), citing Clark Co. Sch. Dist. v. Breeden, 532 U.S. 268,

273 (2001).  Moreover, defendants' internal investigation of plaintiff's complaint – which

resulted in the recommendation of plaintiff's termination – ended *the same day* that plaintiff was

terminated.  No closer temporal proximity is practically possible.

Second, a reasonable fact finder could read Dolan's testimony, as plaintiff urges it

should, as essentially conceding that the firing was retaliatory.  Plaintiff argues that Dolan's

testimony concedes that her complaint was "the determinative factor" in her termination (Pl.

Mem. 24), insofar as he testified that plaintiff "could have continued on doing her job" if she had

not gone "off through the company attempting to garner support for [her] complaint," which was

the "last straw" that led to her termination.  (Dolan Dep. 190, 192, 200-02.)  Although, as further

discussed below, Dolan's somewhat opaque testimony could be read otherwise, his "last straw"

comment could be taken by a jury as referring to Browne Sanders's complaint, or alternatively as

a lame effort to cover up a retaliatory animus by making hair-splitting distinctions between her

complaint per se and the settlement discussions and investigatory efforts that were a necessary

and legitimate part of her complaint.  Moreover, a reasonable jury could infer that defendants

had a stronger motive to retaliate than most employers would.  In addition to the usual reasons an

employer might react negatively to accusations of discrimination, Dolan and MSG, operating an entertainment business very much in the public eye, had a strong motive to protect Thomas, who may have been perceived as a critical contributor to the team's success, against accusations that might discredit him in the eyes of ticket-buyers, or create pressure for his dismissal, to the detriment of the team's on-court prospects and MSG's bottom line.

Finally, Browne Sanders points out that defendants' credibility is undermined by evidence that they have offered two contradictory reasons for plaintiff's termination, thereby belying the validity of either account. During his deposition, as noted, Dolan maintained that plaintiff was legitimately terminated due to her allegedly improper conduct during MSG's internal investigation of her sexual harassment complaint. Dolan – who was the ultimate decisionmaker with respect to plaintiff's termination (see Dolan Dep. 87) – repeatedly testified during his deposition that, but for the events surrounding plaintiff's sexual harassment charge, plaintiff would not have been terminated, and that her allegedly deficient work performance was *not* the motivating factor for her termination. (Dolan Dep. 190, 192, 200-02; see id. 64-65 (describing Dolan's attempts to "give [plaintiff] an opportunity" to improve her job performance prior to her sexual harassment charge).)

However, defendants previously had represented to the EEOC that plaintiff *was* terminated due to her poor work performance. In their EEOC filings, defendants made no mention of plaintiff's alleged tampering with the investigation or allegedly extortionate settlement demand. (Mintzer-Thomas Aff. Ex. 7.) Thus, defendants have at different times put forth two distinct reasons for plaintiff's termination, both of which are facially legitimate and non-retaliatory, but which are seemingly contradictory. A reasonable fact finder could easily

conclude that such equivocation casts serious doubt on the credibility of either rationale.[14]

Despite the strength of these arguments, defendants' contention that they acted for reasons other than retaliation must be put to a jury. Contrary to plaintiff's argument, a reasonable fact finder could read Dolan's testimony more favorably to defendants. Defendants argue that in full context, Dolan's testimony was that the "last straw" in the decision to terminate Browne Sanders was not the sexual harassment charge itself, but her alleged tampering with MSG's investigation and her alleged attempts to extort defendants.[15] As discussed supra, Title VII does not protect employees from adverse employment actions taken as a result of "disruptive" behavior, Matima, 228 F.3d at 78, nor does Title VII protect employees who use allegations of unlawful conduct as smokescreens for extortionate demands. See Lapsley v. Columbia Univ.-Coll. of Physicians & Surgeons, 999 F. Supp. 506, 523 n.15 (S.D.N.Y. 1998) (Title VII does not protect an employee from adverse employment actions on account of "unbecoming, albeit legal, motivation[s], such as '. . . spite, or personal hostility'"), quoting

---

[14] Plaintiff argues that defendants' contradictory statements are so damning to their credibility that the Court should reject both proffered rationales as a matter of law. (See Tr. 60.) But that is transparently not the Court's role on summary judgment. That a party has at different times said different things does not conclusively establish that either, let alone both, are false. Furthermore, as discussed supra, defendants have produced evidence supporting both rationales. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule, 85 F.3d at 1011.

[15] See Dolan Dep. 74 (accusing plaintiff of "using her authority" to influence the investigation); id. 77 (describing plaintiff's investigation as "coerc[ive]"); id. 190 (characterizing plaintiff's settlement demand as "ridiculous"); id. 200 ("[I]t was reported to me that [plaintiff] had been tampering with the investigation . . . ."); id. 201 ("[Plaintiff] essentially rendered the company incapable of deciding . . . the merits of [the charge]."); id. 202 ("[W]e had no way of knowing whether [plaintiff] was going to continue to [violate company policy] or not continue to do that, and so how could I then have her continue to run that operation. . . . *[T]hat is why she was let go.*") (emphasis added).

46

Fisher v. Vassar Coll., 114 F.3d 1332, 1337 (2d Cir. 1997) (en banc).  Whether or not plaintiff's conduct was indeed disruptive, and whether or not her settlement demands were extortionate, are issues of fact best left for jury determination, and improper for resolution on summary judgment.

Alternatively, plaintiff argues that no reasonable jury could find that she had tampered with MSG's investigation, and by inference, that therefore no reasonable jury could believe Dolan's professed rationale for her termination.  However, as discussed above, issues of fact exist as to whether plaintiff's conduct was coercive, disruptive, and taken in bad faith. Moreover, the ultimate factual issue is not whether Browne Sanders did engage in obstructive or extortionate conduct, but whether defendants *believed* that plaintiff had tampered with the investigation, or made a bad faith extortionate demand.  See Davis, 802 F.2d at 641-42.  Title VII prohibits only intentional discrimination or retaliation.  Defendants violated the law if they acted for an unlawful *reason*.  If the actual reason for defendants' decisions was something other than retaliation, they did not violate the law, even if their reasons were mistaken or even spiteful. "It is not for the Court to scrutinize the personnel decisions of an employer, who need only prove that the motives for its choices were non-[retaliatory]," and not that they were wise or correct or fair.  McLean-Nur, 2000 WL 297176, at *6, citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 259 (1981).  Of course, if the jury finds that Browne Sanders did not engage in the alleged improprieties, and especially if it finds that the evidence to the contrary was insufficient to warrant a reasonable belief on Dolan's part that she had done so, the jury would be free to infer that the real reason for Dolan's decision was not what defendants contend.

Ultimately, the question is one of credibility, and such disputes are best left for jury determination.  See Jeffreys v. The City of New York, 426 F.3d 549, 554 (2d Cir. 2005) ("[I]t is

undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage . . . .").

In sum, plaintiff's retaliation claim contains several issues of fact that are improper for resolution on summary judgment. Contrary to plaintiff's argument, defendants do not concede the material facts at issue here. Instead, defendants have presented evidence that disputes those facts, on the basis of which a reasonable jury could find in favor of defendants. Whether or not that evidence should be accepted or rejected is an appropriate determination for a jury, and is improper for resolution on summary judgment. Id.

### B.    Thomas's Motion

Finally, Thomas argues that plaintiff's retaliation claim should be dismissed insofar as it is asserted against him. Thomas asserts that no evidence supports plaintiff's claim that Thomas aided and abetted MSG's allegedly retaliatory termination of plaintiff. Plaintiff responds that issues of fact preclude summary judgment on her claim. Although plaintiff's aiding and abetting claim requires the fact finder to draw some highly debatable inferences, the required inferences are not unreasonable as a matter of law. Summary judgment must therefore be denied.

Plaintiff does not allege that Thomas is directly liable for retaliation. He was not Browne Sanders's employer, or even her supervisor. However, the New York State and City anti-discrimination laws do not limit liability to the employer or agent who commits the act of retaliation itself. In addition, they specifically make it an unlawful employment practice for any person to "aid [or] abet . . . the doing of any of the acts forbidden under this article," N.Y. Exec. L. § 296(6); see N.Y.C. Admin. Code § 8-107(6), including retaliatory termination. See Heskin v. InSite Adver., Inc., No. 03 Civ. 2598, 2005 WL 407646, at *23 n.38 (S.D.N.Y. Feb. 25, 2005)

48

(finding that the aiding and abetting analysis is identical under both SHRL and CHRL).[16]  "Thus,

a person can be liable as an aider and abettor under the New York anti-discrimination provisions

if he 'actually participate[d] in the conduct giving rise to a discrimination claim,'" Long v.

Marubeni Am. Corp., No. 05 Civ. 0639, 2006 WL 547555, at *4 (S.D.N.Y. Mar. 6, 2006), citing

Feingold v. New York, 366 F.3d 138, 157-59 (2d Cir. 2004), even if the aider and abettor "[had]

no control or authority over plaintiff" that would allow him to engage in the unlawful conduct

himself.  Dunson v. Tri-Maint. & Contractors, Inc., 171 F. Supp. 2d 103, 114 (E.D.N.Y. 2001).[17]

    Under the New York Penal Law, which the drafters of the New York statutes presumably

had in mind, an aider and abettor can be liable for the criminal act of another if "acting with the

mental culpability required for the commission [of the offense], he . . . intentionally aids such

person to engage in such conduct."  N.Y. Penal Law § 20.00.  Thus, to be responsible for aiding

---

[16] Title VII contains no analogous language, see 42 U.S.C. § 2000e-3, and "it is unlikely that plaintiff could sustain a claim for aiding and abetting under that statute."  Long v. Marubeni Am. Corp., No. 05 Civ. 0639, 2006 WL 547555, at *4 n.4 (S.D.N.Y. Mar. 6, 2006).  See, e.g., EEOC v. Illinois, 69 F.3d 167, 169 (7th Cir. 1995) ("[W]e find it implausible to impute to Congress an intent to create [in the Age Discrimination In Employment Act], by language not at all suggestive of any such intention, aider and abettor liability . . . .").  Neither plaintiff's complaint nor her brief asks the Court to expand Title VII liability to include aiding and abetting claims; instead, the complaint makes clear that the aiding and abetting claim is based solely on state and local law.  (Am. Compl. ¶¶ 68, 74.)

[17] As an initial matter, Thomas argues that because he did not have the authority to terminate Browne Sanders, he cannot be held liable for aiding and abetting.  (Thomas Mem. 11.)  Thomas misinterprets the "actual participation" standard.  As in criminal law, "even where a[n] [offense] is so defined that it can only be committed by persons in a particular category, an aider and abettor who does not fall into that category may be guilty of the offense."  Long, 2006 WL 547555, at *4; see Dunson, 171 F. Supp. 2d at 114 ("[A]n individual may be liable under § 296(6) for directly participating in the unlawful conduct, regardless of his status in the corporation.") (citation and internal quotation marks omitted).  Thus, Thomas "can be liable for aiding and abetting the retaliatory commission of adverse employment actions even if he himself lacked the authority to take such an action against plaintiff[]."  Long, 2006 WL 547555, at *4.

and abetting an act of retaliation, a plaintiff must show that an act of retaliation occurred, and that the alleged accomplice (1) acting with the requisite intent to retaliate against the plaintiff, (2) provided assistance to the principal party committing the act of retaliation, (3) with the actual purpose of thus aiding the principal.

Accordingly, in order to sustain an aiding and abetting claim, plaintiff must show that defendant had the requisite intent to aid and abet the unlawful conduct. "Aiding and abetting liability requires that the aider and abettor 'share the intent or purpose of the principal actor,' and there can be no partnership in an act where there is no community of purpose." Brice v. Sec. Operations Sys., Inc., No. 00 Civ. 2438, 2001 WL 185136, at *4 (S.D.N.Y. Feb. 26, 2001) (citation omitted). Thus, in a claim for retaliatory termination, an individual can aid and abet the unlawful retaliatory practice "if, acting with the retaliatory animus required for liability, he intentionally aided another who [had] authority to engage in illegal conduct." Long, 2006 WL 547555, at *4. "[I]f the plaintiff fails to plead any facts suggesting that a defendant displayed any intent to discriminate or was in any way involved in the alleged discriminatory scheme, the defendant may not be held liable under the" state and local anti-discrimination laws. Lewis v. Triborough Bridge & Tunnel Auth., 77 F. Supp. 2d 376, 381 (S.D.N.Y. 1999).

Browne Sanders asserts that Thomas aided and abetted MSG's retaliatory firing, in that Thomas (1) knew that he was being accused of sexual harassment by Browne Sanders, and wanted her fired as a result, and (2) made knowingly false statements to MSG's internal investigators about Browne Sanders's job performance in order to provide MSG with a reason to terminate Browne Sanders's employment, (3) with the specific intention of helping MSG to retaliate against Browne Sanders for her sexual harassment complaints. Thomas argues that a

reasonable jury could not find on the basis of plaintiff's evidence that he either knew about Browne Sanders's sexual harassment claim or made the statements to MSG's investigators with the intent to aid and abet the alleged retaliation.  In addition, Thomas argues that a reasonable jury could not find that his statements were false.

Although Thomas's arguments have considerable weight, the Court is unable to say that no reasonable jury could find him liable for aiding and abetting a retaliatory termination.  First, although Thomas denies that he knew about plaintiff's sexual harassment charge when he was interviewed by MSG's internal investigators, a reasonable juror could infer that he did.  Thomas recognized the tension between himself and Browne Sanders at a December 2005 Knicks game, shortly before Browne Sanders filed her official complaint, when he attempted to kiss her on the cheek and she pulled away.  (Thomas Dep. 258 ("[I]t was kind of a little awkward moment . . . .").)  A reasonable juror could infer that such tension put Thomas on notice that Browne Sanders might file a complaint against him.  Moreover, as President of the Knicks' Basketball Operations, it would be reasonable to presume that Thomas would learn that a charge of sexual harassment had been leveled against him.  Furthermore, it would be reasonable to infer that, even if the internal investigators did not advise Thomas about the specific subject of their investigation, Thomas would have realized from the nature of the interview that the investigation must have been related to allegations Browne Sanders made against him.  Thus, whether or not Thomas actually knew about Browne Sanders's charge is a credibility issue that is properly determined by the fact finder at trial.  See Rule, 85 F.3d at 1011; Weyant v. Okst 101 F.3d 845, 855 (2d Cir. 1996) (in ruling on summary judgment motions, the district court must "eschew credibility assessments").  If Thomas did know that Browne Sanders had complained of his

advances, he would have a motive to retaliate.

However, even if plaintiff establishes at trial that Thomas knew about her sexual harassment charge when he spoke to MSG's internal investigators, to prove her aiding and abetting claim, plaintiff also must establish that Thomas made disparaging statements to the investigators *with the intention of aiding and abetting the retaliation*. Thus, plaintiff must show that Thomas's statements about Browne Sanders's poor work performance were not merely an attempt to protect himself against Browne Sanders's charge, but were made with the specific goal of providing MSG with a pretext to terminate her employment.

Plaintiff has provided no direct evidence that Dolan – who made the ultimate decision to terminate Browne Sanders – ever spoke to, or conferred with, Thomas about Browne Sanders's termination. Thus, Thomas argues, he could not have known that Dolan or MSG had any plan to retaliate against Browne Sanders, or that his statements about her would be of any use in facilitating her firing. Nevertheless, plaintiff contends that Thomas, although not in a position personally to take adverse employment actions against her, "by providing a false account of her [work performance]," intentionally assisted Dolan to terminate plaintiff's employment, "out of a desire to retaliate against her for her protected activity of complaining about [sexual harassment]." Long, 2006 WL 547555, at *4.

Construing the facts in the light most favorable to plaintiff, the Court cannot say that such an interpretation of the record is unreasonable. A defendant's intent is a matter often proved by circumstantial evidence, see Green v. City of New York, 465 F.3d 65, 78 (2d Cir. 2006), and is thus a question of fact even without direct evidence of retaliatory animus. For example, reasonable jurors could infer that Thomas knew that he was so valuable to the Knicks that MSG

would protect him from Browne Sanders's charge if they could, and anyone in his position

would know that if he provided the cover story, MSG would be better positioned to retaliate

against her.[18]

To establish her aiding and abetting claim, plaintiff must also show that Thomas's actions

did in fact encourage or assist the alleged principal violators in taking retaliatory action.  Thomas

points out that not only is there no evidence that Dolan spoke with Thomas before firing Browne

Sanders, or that Dolan was even aware of Thomas's statements to the internal investigators

before he terminated Browne Sanders, but that Dolan denies that he possessed such knowledge

when he decided to terminate her.  (Thomas Mem. 12 (stating that Dolan "made the decision to

terminate Browne Sanders on his own, completely undercutting any purported connection

between [Thomas's] statement[s] and Browne Sanders's termination"), citing Dolan Dep. 87,

171.)  Thus, Thomas argues, even if he wished to retaliate against Browne Sanders, his

statements to the investigators could have had no effect on the outcome.

Reasonable jurors, however, would not have to accept Dolan's testimony.  There is

evidence that Dolan was briefed on the contents of the McCormack Memo (Dolan Dep. 85-89),

---

[18] Moreover, plaintiff alleges that Thomas did not merely respond to the internal investigators' questions, but instead went out of his way to disparage her by providing unsolicited examples of her deficient work performance.  (Moran Dep. Exs. 10, 11; Noel Dep. Exs. 2, 13, 14; see also Mintzer-Thomas Aff. Ex. 7 ("According to Thomas, some of the players had previously complained to him about [Browne Sanders].").)  According to plaintiff, this additional, unsolicited criticism of plaintiff's work performance belies Thomas's argument that he did not believe or intend that his statements would lead to her termination.  Thomas's intent in making such statements is best determined by a jury at trial, and not by the Court on summary judgment.  See Rule, 85 F.3d at 1011; Gronowski v. Spencer, 424 F.3d 285, 293 (2d Cir. 2005) ("In a retaliation case, . . . state of mind is necessarily at issue.  In making its determination, the jury is permitted, of course, to rely on circumstantial evidence to support the required inference of retaliatory intent.").

which included an account of the Thomas interview.  (Franco Aff. Ex. G; see Noel Dep. Ex. 14.)

Moreover, MSG represented to the EEOC that Browne Sanders was fired for performance-

related reasons.  If that representation is untrue, Dolan's testimony in this case suggests, a

reasonable jury could find that Dolan (who could be inferred to be aware of MSG's response to a

government agency) actually did make use of Thomas's allegations regarding Browne Sanders

as a pretext for retaliation.  (See Mintzer-Thomas Aff. Ex. 6 (representing to the EEOC that

Browne Sanders "refused to accept and adapt to changes in procedure after Isiah Thomas joined

the Knicks" and that she was fired, in part, because she refused "to adapt to the changes

instituted by Thomas").)[19]

---

[19] Thomas also argues that, even if he did make statements about Browne Sanders's poor work performance to internal investigators with the intention of getting Browne Sanders fired, and even if Dolan relied on those statements in terminating Browne Sanders, "the weight of the evidence is that the statements [about Browne Sanders's poor work performance] were . . . truthful."  (Thomas Reply 5.)  Thomas argues that he could not have aided and abetted retaliation because his statements were true, as evidenced by MSG's representation to the EEOC that Browne Sanders was terminated due to her deficient work performance.  Essentially, Thomas argues that there was no underlying retaliation for him to aid and abet because Browne Sanders's termination was not retaliatory, but instead was motivated by legitimate, non-retaliatory considerations.

The legal premise of this argument is correct: "[L]iability under the [SHRL] and the []CHRL must first be established as to the employer/principal before an individual may be considered an aider and abettor."  Sowemimo v. D.A.O.R. Sec., Inc., 43 F. Supp. 2d 477, 490 (S.D.N.Y. 1999).  But as discussed in Part III.A supra, reasonable jurors could differ over whether plaintiff's deficient work performance was actually the motivating factor for her termination, or whether defendants' professed rationale was merely a pretext for retaliation.  Thus, whether Thomas's assertions about Browne Sanders were true or false, and why Browne Sanders was ultimately fired, are questions for resolution by the jury at trial.  Compare Sowemimo, 43 F. Supp. 2d 477, 491 (granting summary judgment on plaintiff's aiding and abetting claim against another employee where plaintiff "fail[ed] to establish the [employer's] liability" for retaliation), with Heskin, 2005 WL 407646, at *25 n.42 (denying summary judgment on plaintiff's aiding and abetting claim against another employee where plaintiff had "established a claim of primary liability against [the employer] sufficient to avoid summary judgment").

Plaintiff's aiding and abetting claim against Thomas is thus based on a chain of inferences both about his intentions and about the connection between his actions and MSG's (Dolan's) ultimate decision to fire her. A jury might well decide that the inferences are too many or too strained to justify a finding of liability. But the Court cannot say that every reasonable jury must so decide. Accordingly, Thomas's motion for summary judgment on plaintiff's retaliation claim is denied.

## CONCLUSION

For the foregoing reasons, plaintiff's and defendants' motions for partial summary judgment are denied. The parties are directed to submit a joint pre-trial order by August 17, 2007.

SO ORDERED.

Dated: New York, New York
       August 6, 2007

GERARD E. LYNCH
United States District Judge